WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein
Gary T. Holtzer
Adam P. Strochak
Stephen A. Youngman (*pro hac vice pending*)
Sylvia A. Mayer (*pro hac vice pending*)

KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200
James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*pro hac vice pending*)

Proposed Attorneys for Debtors and
Debtors in Possession

Proposed Co-Attorneys for Certain Subsidiary
Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                                        :
**In re**                                               :        **Chapter 11 Case No.**
                                                        :
**GENERAL GROWTH**                                      :        **09 - _____ ( )**
**PROPERTIES, INC., et al.,**                           :
                                                        :        **(Joint Administration Requested)**
                    **Debtors.**                        :
----------------------------------------------------------------x

**APPLICATION PURSUANT TO SECTIONS**
**327(a) AND 328(a) OF THE BANKRUPTCY CODE AND**
**BANKRUPTCY RULE 2014(a) AND 2016 FOR AUTHORIZATION TO**
**EMPLOY AND RETAIN MILLER BUCKFIRE & CO., LLC**
**AS FINANCIAL ADVISOR AND INVESTMENT BANKER FOR**
**THE DEBTORS *NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

South Street Seaport Limited Partnership, its ultimate parent, General Growth

Properties, Inc. ("**GGP**"), and their debtor affiliates, as debtors and debtors in possession

(collectively, "**General Growth**" or the "**Debtors**"),[1] submit this application (the

"**Application**") and respectfully represent as follows:

---
[1]    A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's
federal tax identification number, is attached hereto as **Exhibit "A"**.

## I.

## BACKGROUND

1.        Commencing on April 16, 2009 (the "**Commencement Date**") and continuing thereafter, the Debtors each commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## II.

## THE DEBTORS' BUSINESS

2.        GGP is a publicly-traded real estate investment trust ("**REIT**") headquartered in Chicago, Illinois.  GGP, along with its approximately 750 wholly owned Debtor and non-Debtor subsidiaries and affiliates (collectively, the "**GGP Group**"),[2] comprise one of the largest shopping center REITs in the United States, measured by the number of shopping centers it owns and manages.  GGP is the general partner of GGP Limited Partnership ("**GGP LP**"), which is the entity through which substantially all of the GGP Group's business is conducted.  GGP LP, in turn, owns or controls, directly or indirectly, GGPLP, L.L.C., The Rouse Company LP ("**TRCLP**"), and General Growth Management, Inc. ("**GGMI**").  GGMI is a non-Debtor affiliate that provides management and other services to the GGP Group, to certain joint

---

[2]        GGP owns 96% of GGP LP, and outside parties hold the remaining 4%.  Consequently, while the Debtors refer to subsidiaries owned directly or indirectly by GGP and GGP LP as "wholly owned," a small percentage of GGP LP actually is held by outside parties.

ventures of the GGP Group, and to third parties in which the GGP Group does not hold an ownership interest.

3.     The GGP Group operates its business on an integrated basis with centralized administration, leasing and management functions that enable the GGP Group to achieve operating efficiencies and revenue enhancement benefiting the overall enterprise. The Debtors include various wholly owned holding companies and project level operating companies. The non-Debtor subsidiaries and affiliates similarly include various holding companies, management companies, and project level operating companies, as well as all of the joint venture operations.

4.     For purposes of public financial reporting, GGP divides its operations into two business segments: (i) Retail and Other, which includes the operation, development and management of shopping centers, office buildings, and other commercial properties, and is the GGP Group's primary business; and (ii) Master Planned Communities, which includes the development and sale of land, primarily in large-scale, long-term community development projects. The net operating income ("**NOI**") for GGP's Retail and Other segment was $2.59 billion in 2008, a 4.5 percent increase over 2007. The NOI for the substantially smaller Master Planned Communities decreased from prior years and was approximately $29 million in 2008.

A.     **Retail and Other**

5.     The GGP Group owns a portfolio of more than 200 regional shopping centers located in major and middle markets throughout 44 states, including joint venture interests in approximately 48 shopping centers. The GGP Group also owns non-controlling interests in two international joint ventures that own shopping centers in Brazil and Turkey. The shopping centers in which the GGP Group has an ownership interest, or for which it has

management responsibility, have approximately 200 million square feet of space and contain over 24,000 retail stores, department stores, restaurants, and other amenities.

6.     The primary source of revenue for the Retail and Other segment is tenant rent.  The GGP Group's retail leases generally include both a base rent component and a charge for the tenant's share of expenses associated with the operation of the applicable shopping center, such as real estate taxes, utilities, insurance, maintenance costs, security costs, and other general operating expenses.  Many of the retail leases also contain scheduled increases during the term of the lease and an overage rent provision under which the tenant may be required to pay additional rent based upon its annual sales.  With respect to shopping center properties owned by, or in joint ventures with, third parties, the GGP Group generally conducts its property management activities through GGMI.  Consequently, in addition to its rental income, the GGP Group's Retail and Other segment also reports revenue earned from such property management services, as well as from strategic partnerships, advertising, sponsorship, vending machines, parking services, and the sale of gift cards.

### B.     Master Planned Communities

7.     In addition to its core shopping center business, the GGP Group also owns and develops large-scale, long-term master planned communities.  GGP Group has five master planned communities located in and around Columbia, Maryland; Summerlin, Nevada; and Houston, Texas.  These communities contain approximately 18,500 saleable acres of land.  They feature residential, retail, office and mixed-use components as well as schools, civic spaces and other amenities including parks, lakes, golf courses, and wilderness trails.  The master planned community segment's revenue is generated primarily from the sale of improved land to homebuilders and commercial developers.

C.    **Financials**

8.    As of December 31, 2008, the GGP Group as a whole reported

approximately $29.6 billion in total assets and approximately $27.3 billion in total liabilities

(including the GGP Group's proportionate share of joint venture indebtedness). Of the $27.3

billion in total liabilities, $24.85 billion represents the aggregate consolidated outstanding

indebtedness of consolidated entities, which includes $6.58 billion in unsecured, recourse

indebtedness and $18.27 billion in debt secured by properties. For 2008, the GGP Group

reported consolidated revenue of approximately $3.4 billion and net cash from operating

activities of $555.6 million. The GGP Group employs approximately 3,700 people. Additional

information regarding the Debtors' business, capital structure, and the circumstances leading to

these chapter 11 cases is contained in certain declarations filed concurrently herewith

(collectively, the "**Declarations**").

**III.**

**JURISDICTION**

9.    This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**IV.**

**BASIS FOR RELIEF REQUESTED**

10.    Pursuant to sections 327(a) and 328(a) of the Bankruptcy Code,

Bankruptcy Rule 2014(a) and 2016 and Rule 2014-1 of the Local Bankruptcy Rules for the

Southern District of New York, the Debtors seek the entry of an order authorizing the

employment and retention of Miller Buckfire & Co., LLC ("**Miller Buckfire**") as financial

advisor and investment banker to the Debtors in these chapter 11 cases, in accordance with the

terms of the engagement letter (the "**Engagement Letter**"), dated December 10, 2008, and the accompanying indemnification provisions (the "**Indemnification Provisions**"), as modified by the terms of the proposed interim order (the "**Interim Order**").[3] The Engagement Letter and accompanying Indemnification Provisions are attached hereto as **Exhibit "B"**. The Interim Order is attached hereto as **Exhibit "C"**.

## A.    Miller Buckfire Qualifications

11.    Miller Buckfire is an independent firm that provides strategic and financial advisory services in large-scale corporate restructuring transactions. Miller Buckfire is principally owned and controlled by Henry S. Miller and Kenneth A. Buckfire and by the employees of Miller Buckfire. Miller Buckfire currently has approximately 65 employees.

12.    Miller Buckfire's professionals have extensive experience in providing financial advisory and investment banking services to financially distressed companies and to creditors, equity holders and other constituencies in reorganization proceedings and complex financial restructurings, both in- and out-of-court. For instance, Miller Buckfire's professionals are providing or have provided financial advisory, investment banking, and other services in connection with the restructuring of: Acterna Corporation; Aerovías Nacionales de Colombia S.A.; Allied Holdings, Inc.; Amtrol Inc.; Anchor Danly Company; Applied Extrusion Technologies, Inc.; AT&T Latin America; Aurora Foods Inc.; Autocam Corporation; Avado Brands, Inc.; Birch Telecom, Inc.; Black Diamond Mining Company, LLC; Bruno's Inc.; Burlington Industries; Calpine Corporation; Cambridge Industries; Carmike Cinemas; Celotex Corporation; Centerpoint Energy; Citation Corporation; CMS Energy Corporation; Criimi Mae,

---

[3]    The Engagement Letter is incorporated herein by reference. Any description of any provision of the Engagement Letter contained in this Application is intended to be a summary of the applicable provisions of the Engagement Letter and is qualified in its entirety by the actual terms of the Engagement Letter.

Inc.; CTC Communications; Dana Corporation; Delta Air Lines, Inc.; Dow Corning Corporation; Drypers, Inc.; Dura Automotive Systems, Inc.; EaglePicher Holdings Inc.; Exide Technologies; Eurotunnel Group; Favorite Brands International Inc.; FLYi, Inc.; Foamex International; Focal Communications Corporation; FPA Medical Management; Gate Gourmet; Grand Union Co.; GWLS Holdings, Inc.; Grupo TMM; Hines Horticulture, Inc.; Horizon Natural Resources Company; Huntsman Corporation; ICG Communications; ICO Global Communication, Ltd.; IMPATH Inc.; Interstate Bakeries Corporation; J.L. French Automotive Castings; Kmart Corporation; Level (3) Communications; Laidlaw, Inc.; Lenox Group Inc.; Loewen Group; McLeodUSA; Meridian Technologies Inc.; Mervyn's LLC; Micro Warehouse; Mirant Corp.; Montgomery Ward & Co.; National Airlines; Oakwood Homes; Pacific Crossing Limited; Pathmark Stores, Inc.; Pegasus Satellite Communications; PennCorp Financial Group, Inc.; Pioneer Companies; PSINet; Polaroid Corporation; Polymer Group, Inc.; Progressive Molded Products Inc.; SI Corporation; The Spiegel Group; Sunbeam Corporation; Standard Pacific Corp.; Stolt-Nielsen S.A.; Stolt-Offshore S.A.; TECO Energy; Trans World Airlines; U.S. Office Products; Vonage Holdings Corp.; Vulcan, Inc.; and Women First Healthcare, Inc.  Miller Buckfire's professionals are also providing or have provided mergers and acquisitions advisory services in connection with whole or partial company sale transactions involving companies across a wide range of industries, including Atwood Mobile Products (Dura Corporation); Aurora Foods; Burlington Industries; Calpine Corporation; Cambridge Industries; Career Blazers; Conversent Communications; Country Road Communications; Dana Corporation; Focal Communications; Global Valley Networks; IMPATH; Pegasus Broadcast Corporation; Pegasus Communications; PSINet; and Polaroid Corporation.

13.     Since December 10, 2008, Miller Buckfire has provided the following services, among others, to the Debtors in connection with their restructuring efforts:

(a)     familiarized itself with the Debtors' operations;

(b)     analyzed the Debtors' current liquidity and projected cash flows and assisted the Debtors in identifying areas to improve and preserve liquidity;

(c)     assisted the Debtors in developing their strategic plan and financial projections;

(d)     developed materials for and presented analyses and recommendations to the Debtors' Board of Directors;

(e)     assisted the Debtors in evaluating restructuring alternatives;

(f)     engaged in negotiations with various stakeholders, including certain secured creditors, lenders under the 2006 Facility and the holders of the Rouse Bonds (the "**Rouse Bondholders**") (both as defined in the Mesterharm Declaration[4]) with respect to potential restructuring alternatives:

(i)     assisted the Debtors with negotiating the terms and conditions of the consent solicitation with the Rouse Bondholder committee;

(ii)    assisted in the development of materials used for meetings with the lenders under the 2006 Facility as well as participated in those meetings;

(iii)   assisted the Debtors with the negotiation of forbearances by the lenders under the 2006 Facility;

(iv)    assisted the Debtors in attempting to negotiate extensions and forbearances of certain commercial mortgage backed securities;

(v)     assisted the Debtors in negotiating extensions and forbearances of certain secured debt agreements.

(g)     assisted the Debtors in negotiating and obtaining debtor-in-possession financing ("**DIP Financing**").

---

[4]     On the Commencement Date the Debtors filed the [Declaration of James A. Mesterharm Pursuant to Local Bankruptcy Rule 1007-2 In Support of First Day Motions] (the "**Mesterharm Declaration**").

14.    In preparation for these Chapter 11 Cases, Miller Buckfire conducted a comprehensive process to secure DIP Financing on behalf of the Debtors.  Specifically, Miller Buckfire worked with the Debtors to identify and solicit numerous potential lenders, including certain of the Debtors' prepetition lenders, who might be willing to provide DIP financing in an amount sufficient to provide adequate liquidity for the Debtors.  In this process, Miller Buckfire solicited, received, and analyzed several proposals for DIP financing and participated in the negotiation of DIP financing terms with several parties.  This process resulted in an agreement to provide a DIP loan, as described in Cash Collateral/DIP Motion.[5]

15.    As a result of the prepetition work performed on behalf of the Debtors, Miller Buckfire acquired significant knowledge of the Debtors and their businesses and is now intimately familiar with the Debtors' financial affairs, debt structure, economic interests and positions of key constituents, operations and related matters.  Likewise, in providing prepetition services to the Debtors, Miller Buckfire's professionals have worked closely with the Debtors' senior management, financial staff, external stakeholders and other professionals.  Accordingly, Miller Buckfire has developed significant relevant experience and expertise regarding the Debtors that will assist it in providing effective and efficient services in these chapter 11 cases. The Debtors believe that Miller Buckfire is both well-qualified and uniquely able to represent them in these chapter 11 cases in an efficient and timely manner.

---

[5]    Contemporaneously herewith, the Debtors filed the Debtors' Motion Requesting (I) Entry of (A) Interim and Final Orders (1) Authorizing the Debtors' Use of Cash Collateral and Granting Adequate Protection Therefor Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001, and (2) Modifying the Automatic Stay, and (B) a Final Order Authorizing Borrowing with Priority Over Administrative Expenses and Secured by Liens on Property of the Estates Pursuant to Section 364(c) of the Bankruptcy Code, and (II) Scheduling of a Final Hearing on Each Requested Final Order (the "**Cash Collateral/DIP Motion**").

**B.**    **Services to be Provided by Miller Buckfire**

16.    Pursuant to the terms of the Engagement Letter, Miller Buckfire will provide a broad range of necessary financial advisory and investment banking services (the "**Services**") to the Debtors as Miller Buckfire and the Debtors shall deem appropriate and feasible in order to advise the Debtors in the course of these chapter 11 cases, including, but not limited, to the following:

(a)    familiarize itself with the business, operations, properties, financial condition and prospects of the Company;[6]

(b)    if the Company determines to undertake a Transaction and/or Financing advise and assist the Company in structuring and effecting the financial aspects of such a transaction or transactions, subject to the terms and conditions of the Engagement Letter;

(c)    review and analyze the Company's business plans and financial projections prepared by the Company, including, but not limited to, testing assumptions and comparing those assumptions to historical Company and industry trends;

(d)    review and analyze the Company's liquidity position and assist management in identifying areas and means to improve and preserve the Company's liquidity;

(e)    assist in the determination of a capital structure for the Company;

(f)    assist in the determination of a range of values for the Company on a going concern basis;

(g)    attend meetings of the Company's Board of Directors and its committees;

(h)    provide financial advice and assistance to the Company in connection with a Sale and/or in developing and seeking approval of a restructuring plan (the "**Plan**");

(i)    provide financial advice and assistance to the Company in structuring any new securities to be issued under the Plan;

---

[6]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Engagement Letter.

(j)     assist the Company and/or participate in negotiations with entities or groups affected by the Plan;

(k)     in connection with a Sale, identify potential acquirors and, at the Company's request, contact such potential acquirors;

(l)     assist the Company and/or participate in negotiations with potential acquirors; and

(m)     participate in hearings before the bankruptcy court with respect to the matters upon which Miller Buckfire has provided advice, including, as relevant, coordinating with the Company's counsel with respect to testimony in connection therewith.

17.    The Services that Miller Buckfire will provide to the Debtors are necessary to enable the Debtors to maximize the value of their estates.  The Debtors believe that the Services will not duplicate the efforts of other professionals retained by the Debtors in these chapter 11 cases.  Specifically Miller Buckfire (i) will provide unique services to the Debtors and (ii) the Debtors will use reasonable efforts to coordinate Miller Buckfire's services with the Debtors' other retained professionals to avoid unnecessary duplication of services.

18.    The Debtors have chosen AlixPartners, LLP ("**AlixPartners**") to act as restructuring advisor for the Debtors.  The Debtors have filed or plan to file, a separate application for the retention of AlixPartners.  Both Miller Buckfire and AlixPartners have advised the Debtors that they will make every effort to avoid duplication of their work.

**C.**    **Professional Fees**[7]

19.    Subject to Court approval, the Debtors will compensate Miller Buckfire in accordance with the terms and conditions and at the times set forth in the Engagement Letter,

---

[7]    The Fee and Expense Structure shown is for convenience. To the extent that this summary is inconsistent with the terms of the Engagement Letter, the fee and expense structure as set forth in the Engagement Letter shall control.

which provides in relevant part for the following compensation structure (the "**Fee and Expense Structure**"):

(a)  Retainer:  A retainer of $1,250,000, which shall be applied against the Monthly Fee (as defined below) and any other fees or expenses hereunder due and payable after such filing until exhausted.

(b)  Financial Advisory Fee:  A financial advisory fee of $200,000, which shall be due and paid by the Company upon the execution of the Engagement Letter.

(c)  Monthly Fee:  A monthly financial advisory fee of $300,000, which shall be due and paid by the Company beginning on January 1, 2009 and thereafter on the 1st day of each month during the term of this engagement.  Fifty percent of the aggregate monthly advisory fees paid to Miller Buckfire following January 1, 2010 shall be credited against any Completion Fee (as defined below).

(d)  Completion Fee:  A completion fee, contingent upon the consummation of a Transaction and payable at the closing thereof, equal to $22,500,000.

(e)  Initial DIP Financing Fee:  A Financing fee of 1.0% of the aggregate amount of a commitment for a debtor-in-possession Financing at the commencement of a bankruptcy case, which fee shall be due and payable upon closing of such DIP Financing.

(f)  Financing Fee:  Financing Fees in respect of any Financing (other than the Initial DIP Financing) payable upon closing equal to:

  (i)  1.0% of the gross proceeds of any indebtedness issued that is secured by a first lien;

  (ii)  3.0% of the gross proceeds of any indebtedness issued that (x) is secured by a second or more junior lien, (y) is unsecured and/or (z) is subordinated;

  (iii)  5.0% of the gross proceeds of any equity or equity-linked securities or obligations issued.

  Notwithstanding anything to the contrary contained in the Engagement Letter, no fee shall be payable for a Financing that involves an individual or portfolio based rollover, extension, modification or refinancing of indebtedness at any of the Company's project level direct or indirect subsidiaries.

(g)  Fifty percent (50%) of all Financing fees paid pursuant to subparagraphs (e) and (f) shall be credited against the Completion Fee.

20.    Under the terms of the Engagement Letter, Debtors will reimburse Miller Buckfire on a monthly basis for its travel and other reasonable out-of-pocket expenses.

21.    Further, prior to the Commencement Date, the Debtors provided Miller Buckfire with a retainer of $1,250,000 (the "**Retainer**") to be applied against the Monthly Fee and any other unpaid fees and expenses at such time.  The Retainer was paid on December 30, 2008.  As of the Commencement Date, the Retainer was unapplied to the extent of $1,250,000.

22.    The Debtors believe that the Fee and Expense Structure described above is comparable to compensation generally charged by investment banking firms of similar stature to Miller Buckfire for comparable engagements, both in and out of bankruptcy.  Further, the Debtors believe that the Fee and Expense Structure described above is consistent with Miller Buckfire's normal and customary billing practices for cases of this size and complexity that require the level and scope of services outlined.

23.    Miller Buckfire and the Debtors believe that the foregoing Fee and Expense Structure is both reasonable and market-based.  In determining the level of compensation to be paid to Miller Buckfire and its reasonableness, the Debtors compared Miller Buckfire's fee proposal to the other proposals received by the Debtors in the investment banking selection process.  The Debtors also compared Miller Buckfire's proposed fees with the range of investment banking fees in other large and complex chapter 11 cases.  In both instances, the Debtors found Miller Buckfire's proposed fees to be reasonable and within the range of other comparable transactions.

24.    To induce Miller Buckfire to do business with the Debtors in bankruptcy, the compensation structure described above was established to reflect the difficulty of the extensive assignments Miller Buckfire expects to undertake and the potential for failure.

25.    Miller Buckfire's restructuring expertise, as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by the Debtors during the term of Miller Buckfire's engagement, were important factors in determining the amount of the Monthly Fees, the Initial DIP Financing Fee, the Completion Fee and the Retainer.  In addition, the Debtors believe that the ultimate benefit to the Debtors of Miller Buckfire's services cannot be measured merely by reference to the number of hours to be expended by Miller Buckfire's professionals in the performance of such services.

26.    The Completion Fee has been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of Miller Buckfire and its professionals, and in light of the fact that such commitment may foreclose other opportunities for Miller Buckfire and that the actual time and commitment required of Miller Buckfire and its professionals to perform services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm.

27.    In addition, given the numerous issues which Miller Buckfire may be required to address in the performance of its services hereunder, Miller Buckfire's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Miller Buckfire's services for engagements of this nature in both out-of-court and chapter 11 contexts, the Debtors believe that the fee arrangements in the Engagement Letter (including the Completion Fee) are reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

28.    As set forth in the affidavit of Kenneth A. Buckfire, a managing director of Miller Buckfire (the "**Buckfire Affidavit**"), annexed hereto as **Exhibit "D,"** Miller Buckfire has not shared or agreed to share any of its compensation from the Debtors with any other

person, other than other principals and employees of Miller Buckfire, as permitted by section 504 of the Bankruptcy Code.

29.    The Debtors also request, and Miller Buckfire has agreed, that in the event that Miller Buckfire seeks reimbursement for attorneys' fees from the Debtors during the term of these cases pursuant to the Engagement Letter, the invoices and supporting time records from such attorneys shall be included in Miller Buckfire's own application and such invoices and time records shall be subject to the United States Trustee's guidelines for compensation and reimbursement of expenses and the approval of this Court under the standard of sections 330 and 331 of the Bankruptcy Code, without regard to whether such attorney has been retained under section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code.

30.    Consistent with its ordinary practice and the practice of investment bankers in other chapter 11 cases, whose fee arrangements are typically not hours-based, Miller Buckfire does not ordinarily maintain contemporaneous time records in one-tenth hour increments, or provide or conform to a schedule of hourly rates for its professionals.  The Debtors therefore request that Miller Buckfire be excused from compliance with such requirements, and that Miller Buckfire be required only to maintain such records in half-hour increments.

### D.    Miller Buckfire's Disinterestedness

31.    To the best of the Debtors' knowledge, information and belief, Miller Buckfire has no connection with, and holds no interest adverse to, the Debtors or parties in interest in the matters for which Miller Buckfire is proposed to be retained, except as disclosed in the Buckfire Affidavit.

32.    Prior to the Commencement Date, Miller Buckfire received total monthly fees of $1,200,000 for January 2009 through April 2009, pursuant to section 2(c) of the Engagement Letter, and a one-time Financial Advisory Fee of $200,000 in December 2008, pursuant to section 2(b) of the Engagement Letter.  Miller Buckfire also received a retainer of $1,250,000, paid in December 2008, and $44,203 for expenses incurred from December 2008 through March 2009.  In total, Miller Buckfire received $2,694,203 prior to the Commencement Date.  The payments received in the 90 days before the Commencement Date are described in more detail below:

| Date Received | Starting Retainer Balance | Invoiced Amount | | | | Amount Received | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Fee | Expenses | Retainer | Total | Fee | Expenses | Retainer | Total |
| 3/5/2009 | $1,250,000.00 | $300,000.00 | $6,385.63 | $0.00 | $306,385.63 | $300,000.00 | $6,385.63 | $0.00 | $306,385.63 |
| 3/16/2009 | $1,250,000.00 | $300,000.00 | $22,622.01 | $0.00 | $322,622.01 | $300,000.00 | $22,622.01 | $0.00 | $322,622.01 |
| 3/30/2009 | $1,250,000.00 | $300,000.00 | $15,195.55 | $0.00 | $315,195.55 | $300,000.00 | $15,195.55 | $0.00 | $315,195.55 |

33.    Miller Buckfire is a "disinterested person," as such term is defined in section 101(14) of the Bankruptcy Code and as required under section 327(a) of the Bankruptcy Code.  The Buckfire Affidavit, executed on behalf of Miller Buckfire in accordance with section 327 of the Bankruptcy Code and Bankruptcy Rule 2014, is filed contemporaneously herewith and incorporated herein by reference.  The Debtors' knowledge, information, and belief regarding the matters set forth in this Application, are based, and made in reliance, upon the Buckfire Affidavit.

**E.    <u>Indemnification of Miller Buckfire</u>**

34.    As more fully described in the Engagement Letter, if the Application is granted, the Debtors have agreed to indemnify Miller Buckfire from and against certain losses

arising out of their engagement by the Debtors in connection with these chapter 11 cases, other than claims resulting from the willful misconduct or gross negligence of Miller Buckfire. The Debtors submit that such indemnification is standard in the specialized financial advisory industry and that the provision of such indemnification by the Debtors is fair and reasonable considering Miller Buckfire's qualifications and the expectations of other special financial advisors in connection with engagements of this scope and size. See United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.), 315 F.3d 217, 234 (3d Cir. 2003) (finding indemnification agreement between debtor and financial advisor reasonable under section 328); In re Comdisco, Inc., 2002 U.S. Dist. WL 31109431 (N.D. Ill. 2002) (mem.) (affirming order authorizing indemnification of Rothschild, Inc. and Lazard Frères & Co. LLC by the debtors); In re Joan & David Halpern, Inc., 248 B.R. 43 (Bankr. S.D.N.Y. 2000), aff'd, 2000 WL 1800690 (S.D.N.Y. 2000).

35.    The terms of the Indemnification Provisions of the Engagement Letter are similar to indemnification terms that have previously been approved by bankruptcy courts in this District and elsewhere. See, e.g., In re Acterna, Case No. 03-12837 (BRL) (Bankr. S.D.N.Y. June 24, 2003) [Docket No. 134]; In re Spiegel, Case No. 03-11540 (CB) (Bankr. S.D.N.Y. August 6, 2003) [Docket No. 675]. Accordingly, the Debtors request that the Court approve the Debtors' indemnification of Miller Buckfire under the terms set forth in the Engagement Letter as modified by the Interim Order.

**F.    Approval of Engagement Pursuant to 328(a) of the Bankruptcy Code**

36.    The Debtors seek approval of Miller Buckfire's compensation structure pursuant to sections 327(a) and 328(a) of the Bankruptcy Code. Section 328(a) of the Bankruptcy Code provides, in pertinent part, that a debtor "with the court's approval, may

employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including a retainer, on an hourly basis, on a fixed or percentage basis, or on a contingent fee basis." 11 U.S.C. § 328(a). The Debtors submit that reasonable terms and conditions are those employed by Miller Buckfire and other leading investment bankers inside and outside of the bankruptcy context.

37.    Similar fee arrangements have been approved and implemented in other large chapter 11 cases in this District and elsewhere. See, e.g., In re NextWave Personal Commc'ns, Inc., Case No. 98-21529 (ASH) (Bankr. S.D.N.Y. October 1, 2001) [Docket No. 1042] (approving the employment of UBS Warburg LLC as financial advisor for the debtors, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code); In re Casual Male Corp., Case No. 01-41404 (REG) (Bankr. S.D.N.Y. July 19, 2001) [Docket No. 197] (authorizing retention of Robertson Stephens, Inc. as investment banker for debtors under section 328); In re PSINET, Inc., Case No. 01-13213 (REG) (Bankr. S.D.N.Y. July 11, 2001) [Docket No. 199] (approving the retention of Dresdner Kleinwort Wasserstein as investment banker and financial advisor to the debtors, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code); In re WCI Steel, Inc., Case No. 03-44662 (WTB) (Bankr. N.D. Ohio December 8, 2003) [Docket No. 205] (approving the retention of Jefferies & Company, Inc., as financial advisor to the debtors, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code); In re Calpine Corp., et al., Case No. 05-60200 (BRL) (Bankr. S.D.N.Y April 26, 2006) [Docket No. 1370] (granting authority for the Debtors to employ and retain Miller Buckfire as their financial advisor and investment banker pursuant to sections 327(a) and 328(a) of the Bankruptcy Code); In re Dana Corp., et al., Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. March 29, 2006) [Docket No. 741] (approving the

Debtors' application to employ and retain Miller Buckfire as their financial advisor and

investment banker pursuant to sections 327(a) and 328(a) of the Bankruptcy Code).

38.    Notwithstanding approval of its retention under section 328 of the

Bankruptcy Code, Miller Buckfire intends to apply to the Court for allowances of compensation

and reimbursement of expenses in accordance with applicable provisions of the Bankruptcy

Code, the Bankruptcy Rules, the Local Rules of the Bankruptcy Court for the Southern District

of New York, applicable orders of this Court and the Guidelines of the Office of the United

States Trustee for the Southern District of New York (the "**U.S. Trustee**").

39.    Accordingly, the Debtors believe that the Court should approve Miller

Buckfire's retention subject to the standard of review set forth in section 328(a) of the

Bankruptcy Code, and it should not be subject to review pursuant to section 330 or any other

standard of review.

## V.

## NOTICE

40.    No trustee, examiner, or statutory creditors' committee has been appointed

in these chapter 11 cases.  The Debtors have served notice of this Motion on: (i) the Office of the

United States Trustee for the Southern District of New York (Attn: Greg M. Zipes); (ii) the

Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) EuroHypo AG,

New York Branch, administrative agent for the lenders to certain of the Debtors under (a) the

Second Amended and Restated Credit Agreement dated as of February 24, 2006 and (b) the Loan

Agreement, dated as of July 11, 2008, as amended; (v) Deutsche Bank Trust Company Americas,

as administrative agent for the lenders to certain of the Debtors under certain Loan Agreements,

dated as of January 2, 2008 and February 29, 2009, respectively; (vi) Goldman Sachs Mortgage

Company, as administrative agent for the lenders to certain of the Debtors under the Amended

and Restated Credit Agreement, dated as of November 3, 2008; (vii) Wilmington Trust, FSB, as

indenture trustee under (a) that certain Indenture, dated as of May 5, 2006, and (b) that certain

Indenture, dated as of April 16, 2007; (viii) LaSalle Bank National Association and Wilmington

Trust, FSB,[8] as indenture trustee under that certain Junior Subordinated Indenture, dated as of

February 24, 2006; (ix) The Bank of New York Mellon Corporation, as indenture trustee under

that certain Indenture, dated as of February 24, 1995; and (x) those creditors holding the 100

largest unsecured claims against the Debtors' estates (on a consolidated basis).  The Debtors

submit that no other or further notice need be provided.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:  April 16, 2009
      New York, New York

General Growth Properties, Inc., et al.
Debtors and Debtors in Possession

/s/ Adam Metz
Name: Adam Metz
Title: Chief Executive Officer

---

[8]     Wilmington Trust, FSB recently entered into an agreement pursuant to which it will assume the indenture trustee assignments of LaSalle Bank National Association.  As of the Commencement Date, the trustee assignment with respect to this indenture has not yet been transferred to Wilmington Trust, FSB; however, Wilmington Trust, FSB will succeed LaSalle Bank National Association as indenture trustee for this series of notes upon the transfer of the trustee assignment.

# Exhibit A

## Debtors

| Debtor | Last Four Digits of Federal Tax I.D. No.* | Debtor | Last Four Digits of Federal Tax I.D. No.* |
|---|---|---|---|
| 10000 Covington Cross, LLC | N/A | Augusta Mall Holding, LLC | N/A |
| 10000 West Charleston Boulevard LLC | N/A | Austin Mall Limited Partnership | N/A |
| 10190 Covington Cross, LLC | N/A | Austin Mall, LLC | N/A |
| 1120/1140 Town Center Drive, LLC | N/A | Bakersfield Mall, Inc. | N/A |
| 1160/1180 Town Center Drive, LLC | N/A | Bakersfield Mall LLC | 3084 |
| 1201-1281 Town Center Drive, LLC | N/A | Baltimore Center Associates Limited Partnership | 5598 |
| 1251 Center Crossing, LLC | N/A | Baltimore Center Garage Limited Partnership | N/A |
| 1450 Center Crossing Drive, LLC | N/A | Baltimore Center, LLC | N/A |
| 1451 Center Crossing Drive, LLC | N/A | Bay City Mall Associates L.L.C. | N/A |
| 1551 Hillshire Drive, LLC | N/A | Bay Shore Mall II L.L.C. | 9502 |
| 1635 Village Centre Circle, LLC | N/A | Bay Shore Mall, Inc. | N/A |
| 1645 Village Center Circle, LLC | N/A | Bay Shore Mall Partners | 5255 |
| 9901-9921 Covington Cross, LLC | N/A | Beachwood Place Holding, LLC | N/A |
| 9950-9980 Covington Cross, LLC | N/A | Beachwood Place Mall, LLC | N/A |
| Alameda Mall Associates | N/A | Bellis Fair Partners | 5992 |
| Alameda Mall L.L.C. | N/A | Benson Park Business Trust | N/A |
| Apache Mall, LLC | N/A | Birchwood Mall, LLC | N/A |
| Arizona Center Parking, LLC | N/A | Boise Mall, LLC | N/A |
| Augusta Mall, LLC | N/A | Boise Town Square Anchor Acquisition, LLC | N/A |
| Augusta Mall Anchor Acquisition, LLC | N/A | Boise Towne Plaza L.L.C. | N/A |
| Augusta Mall Anchor Holding, LLC | N/A | Boulevard Associates | 7916 |
| | | Boulevard Mall, Inc. | N/A |
| | | Boulevard Mall I LLC | 3079 |
| | | Boulevard Mall II LLC | 3080 |
| | | BTS Properties L.L.C. | N/A |

---

* Pursuant to Treasury Regulation section 301.7701-3(b), certain Debtors are disregarded for tax purposes. "N/A" indicates that a separate tax identification number is not required for these Debtors.

| Debtor | Last Four Digits of Federal Tax I.D. No.* | Debtor | Last Four Digits of Federal Tax I.D. No.* |
|---|---|---|---|
| The Burlington Town Center LLC | N/A | Elk Grove Town Center, L.P. | N/A |
| Cache Valley, LLC | N/A | ER Land Acquisition L.L.C. | N/A |
| Caledonian Holding Company, Inc. | N/A | Fallbrook Square Partners Limited Partnership | N/A |
| Century Plaza, Inc. | N/A | Fallbrook Square Partners L.L.C. | N/A |
| Century Plaza L.L.C. | 9142 | Fallen Timbers Shops, LLC | N/A |
| Champaign Market Place L.L.C. | N/A | Fallen Timbers Shops II, LLC | N/A |
| Chapel Hills Mall L.L.C. | N/A | Faneuil Hall Marketplace, LLC | N/A |
| Chattanooga Mall, Inc. | N/A | Fashion Place, LLC | N/A |
| Chico Mall L.L.C. | N/A | Fashion Place Anchor Acquisition, LLC | N/A |
| Chico Mall, L.P. | N/A | Fashion Show Mall LLC | N/A |
| Chula Vista Center, LLC | N/A | Fifty Columbia Corporate Center, LLC | N/A |
| Collin Creek Anchor Acquisition, LLC | N/A | Forty Columbia Corporate Center, LLC | N/A |
| Collin Creek Mall, LLC | N/A | Fox River Shopping Center, LLC | N/A |
| Colony Square Mall L.L.C. | N/A | Franklin Park Mall, LLC | 1736 |
| Columbia Mall L.L.C. | N/A | Franklin Park Mall Company, LLC | N/A |
| Coronado Center L.L.C. | N/A | Gateway Crossing L.L.C. | N/A |
| Coronado Center Holding L.L.C. | N/A | Gateway Overlook Business Trust | N/A |
| Cottonwood Mall, LLC | N/A | Gateway Overlook II Business Trust | N/A |
| Country Hills Plaza, LLC | N/A | General Growth Properties, Inc. | 3895 |
| Deerbrook Mall, LLC | N/A | GGP Acquisition, L.L.C. | N/A |
| DK Burlington Town Center LLC | N/A | GGP Ala Moana L.L.C. | N/A |
| Eagle Ridge Mall, Inc. | N/A | GGP Ala Moana Holdings L.L.C. | N/A |
| Eagle Ridge Mall, L.P. | 1211 | GGP American Holdings Inc. | N/A |
| Eastridge Shopping Center L.L.C. | N/A | GGP American Properties Inc. | N/A |
| Eden Prairie Anchor Building L.L.C. | N/A | GGP General II, Inc. | N/A |
| Eden Prairie Mall, Inc. | N/A | GGP Holding, Inc. | 0211 |
| Eden Prairie Mall L.L.C. | 1182 | GGP Holding II, Inc. | 7493 |
| Elk Grove Town Center L.L.C. | N/A | | |

| Debtor | Last Four Digits of Federal Tax I.D. No.* | Debtor | Last Four Digits of Federal Tax I.D. No.* |
|---|---|---|---|
| GGP Holding Services, Inc. | 0219 | GGP-Maine Mall Land L.L.C. | N/A |
| GGP Ivanhoe II, Inc. | N/A | GGP-Mall of Louisiana, L.P. | 7204 |
| GGP Ivanhoe IV Services, Inc. | 6959 | GGP-Mint Hill L.L.C. | N/A |
| GGP Jordan Creek L.L.C. | N/A | GGP-Moreno Valley, Inc. | N/A |
| GGP Kapiolani Development L.L.C. | N/A | GGP-Newgate Mall, LLC | N/A |
| GGP Knollwood Mall, LP | 1685 | GGP-NewPark, Inc. | N/A |
| GGP Limited Partnership | 6121 | GGP-NewPark L.L.C. | N/A |
| GGP Natick Residence LLC | N/A | GGP-North Point, Inc. | N/A |
| GGP Savannah L.L.C. | N/A | GGP-North Point Land L.L.C. | N/A |
| GGP Village at Jordan Creek L.L.C. | N/A | GGP-Pecanland, Inc. | N/A |
| GGP/Homart, Inc. | 2784 | GGP-Pecanland, L.P. | 0863 |
| GGP/Homart Services, Inc. | 2467 | GGP-Pecanland II, L.P. | 0891 |
| GGP-Bay City One, Inc. | N/A | GGP-Redlands Mall L.L.C. | N/A |
| GGP-Brass Mill, Inc. | N/A | GGP-Redlands Mall, L.P. | N/A |
| GGP-Burlington L.L.C. | 2109 | GGP-South Shore Partners, Inc. | N/A |
| GGP-Canal Shoppes L.L.C. | N/A | GGP-Steeplegate, Inc. | N/A |
| GGP-Foothills L.L.C. | N/A | GGP-Tucson Land L.L.C. | N/A |
| GGP-Four Seasons L.L.C. | N/A | GGP-Tucson Mall L.L.C. | N/A |
| GGP-Glenbrook L.L.C. | N/A | GGP-UC L.L.C. | N/A |
| GGP-Glenbrook Holding L.L.C. | N/A | Grand Canal Shops II, LLC | N/A |
| GGP-Grandville L.L.C. | 6334 | Grandville Mall, Inc. | N/A |
| GGP-Grandville II L.L.C. | N/A | Grandville Mall II, Inc. | N/A |
| GGP-Grandville Land L.L.C. | 1990 | Greengate Mall, Inc. | 8940 |
| GGP-La Place, Inc. | N/A | Greenwood Mall Land, LLC | N/A |
| GGP-Lakeview Square, Inc. | N/A | Harbor Place Associates Limited Partnership | 8763 |
| GGP-Lansing Mall, Inc. | N/A | Harborplace Borrower, LLC | N/A |
| GGPLP, L.L.C. | 9491 | HHP Government Services, Limited Partnership | 5387 |
| GGP-Maine Mall L.L.C. | N/A | Hickory Ridge Village Center, Inc. | N/A |
| GGP-Maine Mall Holding L.L.C. | N/A | | |

| Debtor | Last Four Digits of Federal Tax I.D. No.* | Debtor | Last Four Digits of Federal Tax I.D. No.* |
|---|---|---|---|
| HMF Properties, LLC | N/A | Lansing Mall Limited Partnership | 8373 |
| Ho Retail Properties I Limited Partnership | 6769 | Lincolnshire Commons, LLC | N/A |
| Ho Retail Properties II Limited Partnership | N/A | Lockport L.L.C. | 5991 |
| Hocker Oxmoor, LLC | N/A | Lynnhaven Holding L.L.C. | N/A |
| Hocker Oxmoor Partners, LLC | N/A | Lynnhaven Mall L.L.C. | N/A |
| Howard Hughes Canyon Pointe Q4, LLC | N/A | Majestic Partners-Provo, LLC | N/A |
| The Howard Hughes Corporation | 8800 | Mall of Louisiana Holding, Inc. | N/A |
| Howard Hughes Properties, Inc. | 8603 | Mall of Louisiana Land, LP | N/A |
| Howard Hughes Properties, Limited Partnership | 3933 | Mall of Louisiana Land Holding, LLC | N/A |
| Howard Hughes Properties IV, LLC | N/A | Mall of the Bluffs, LLC | N/A |
| Howard Hughes Properties V, LLC | N/A | Mall St. Matthews Company, LLC | N/A |
| HRD Parking, Inc. | N/A | Mall St. Vincent, Inc. | N/A |
| HRD Remainder, Inc. | N/A | Mall St. Vincent, L.P. | 6370 |
| Hulen Mall, LLC | N/A | Mayfair Mall, LLC | N/A |
| The Hughes Corporation | 4858 | MSAB Holdings, Inc. | N/A |
| Kapiolani Condominium Development, LLC | N/A | MSAB Holdings L.L.C. | 7198 |
| Kapiolani Retail, LLC | N/A | MSM Property L.L.C. | 2929 |
| Knollwood Mall, Inc. | N/A | Natick Retail, LLC | N/A |
| La Place Shopping, L.P. | N/A | New Orleans Riverwalk Associates | 0856 |
| Lakeside Mall Holding, LLC | 7441 | New Orleans Riverwalk Limited Partnership | 1645 |
| Lakeside Mall Property, LLC | N/A | Newgate Mall Land Acquisition, LLC | N/A |
| Lakeview Square Limited Partnership | 8376 | Newpark Anchor Acquisition, LLC | N/A |
| Land Trust No. 89433 | N/A | NewPark Mall L.L.C. | N/A |
| Land Trust No. 89434 | N/A | North Plains Mall, LLC | N/A |
| Land Trust No. FHB-TRES 200601 | N/A | North Star Anchor Acquisition, LLC | N/A |
| Land Trust No. FHB-TRES 200602 | N/A | North Star Mall, LLC | N/A |
| Landmark Mall L.L.C. | N/A | North Town Mall, LLC | N/A |
| | | Northgate Mall L.L.C. | N/A |

| Debtor | Last Four Digits of Federal Tax I.D. No.* | Debtor | Last Four Digits of Federal Tax I.D. No.* |
|---|---|---|---|
| NSMJV, LLC | 9431 | Price Development TRS, Inc. | 8038 |
| Oakwood Hills Mall, LLC | N/A | Price Financing Partnership, L.P. | N/A |
| Oakwood Shopping Center Limited Partnership | 9385 | Price GP L.L.C. | N/A |
| Oglethorpe Mall L.L.C. | N/A | Price-ASG L.L.C. | N/A |
| Oklahoma Mall L.L.C. | 8382 | Prince Kuhio Plaza, Inc. | N/A |
| OM Borrower, LLC | N/A | Providence Place Holdings, LLC | N/A |
| One Willow Company, LLC | N/A | RASCAP Realty, Ltd. | N/A |
| Orem Plaza Center Street, LLC | N/A | Redlands Land Acquisition Company L.L.C. | N/A |
| Owings Mills Limited Partnership | N/A | Redlands Land Acquisition Company LP | N/A |
| Park Mall, Inc. | N/A | Redlands Land Holding L.L.C. | N/A |
| Park Mall L.L.C. | 8169 | Ridgedale Center, LLC | N/A |
| Park Square Limited Partnership | N/A | Rio West L.L.C. | N/A |
| Parke West, LLC | N/A | River Falls Mall, LLC | N/A |
| Parkside Limited Partnership | N/A | River Hills Land, LLC | N/A |
| Parkview Office Building Limited Partnership | N/A | River Hills Mall, LLC | N/A |
| PDC Community Centers L.L.C. | N/A | Rogue Valley Mall L.L.C. | N/A |
| PDC-Eastridge Mall L.L.C. | N/A | Rogue Valley Mall Holding L.L.C. | N/A |
| PDC-Red Cliffs Mall L.L.C. | N/A | Rouse LLC | N/A |
| Peachtree Mall L.L.C. | N/A | The Rouse Company LP | N/A |
| Pecanland Anchor Acquisition, LLC | N/A | The Rouse Company at Owings Mills, LLC | N/A |
| Phase II Mall Subsidiary, LLC | N/A | The Rouse Company BT, LLC | N/A |
| Piedmont Mall, L.L.C. | N/A | The Rouse Company of Florida, LLC | N/A |
| Pierre Bossier Mall, LLC | N/A | The Rouse Company of Louisiana, LLC | N/A |
| Pine Ridge Mall L.L.C. | N/A | The Rouse Company of Michigan, LLC | N/A |
| Pines Mall Partners | 2185 | The Rouse Company of Minnesota, LLC | N/A |
| Pioneer Office Limited Partnership | 4181 | The Rouse Company of Ohio, LLC | N/A |
| Pioneer Place Limited Partnership | 4180 | The Rouse Company Operating Partnership LP | N/A |
| Price Development Company, Limited Partnership | N/A | | |

5

| Debtor | Last Four Digits of Federal Tax I.D. No.* | Debtor | Last Four Digits of Federal Tax I.D. No.* |
|---|---|---|---|
| Rouse F.S., LLC | 9886 | Sikes Senter, LLC | N/A |
| Rouse Office Management of Arizona, LLC | N/A | Silver Lake Mall, LLC | N/A |
| Rouse Providence LLC | N/A | Sixty Columbia Corporate Center, LLC | N/A |
| Rouse Ridgedale, LLC | N/A | Sooner Fashion Mall L.L.C. | N/A |
| Rouse Ridgedale Holding, LLC | N/A | South Shore Partners, L.P. | 6053 |
| Rouse SI Shopping Center, LLC | N/A | South Street Seaport Limited Partnership | N/A |
| Rouse Southland, LLC | N/A | Southlake Mall L.L.C. | N/A |
| Rouse-Arizona Center, LLC | N/A | Southland Center, LLC | N/A |
| Rouse-Arizona Retail Center Limited Partnership | 4885 | Southland Center Holding, LLC | N/A |
| Rouse-Fairwood Development Corporation | 9217 | Southland Mall, Inc. | N/A |
| Rouse-New Orleans, LLC | N/A | Southland Mall, L.P. | 1889 |
| Rouse-Oakwood Shopping Center, LLC | N/A | Southwest Denver Land L.L.C. | N/A |
| Rouse-Orlando, LLC | N/A | Southwest Plaza L.L.C. | N/A |
| Rouse-Phoenix Cinema, LLC | N/A | Spring Hill Mall L.L.C. | N/A |
| Rouse-Phoenix Corporate Center Limited Partnership | N/A | St. Cloud Land L.L.C. | N/A |
| Rouse-Phoenix Development Company, LLC | N/A | St. Cloud Mall L.L.C. | N/A |
| Rouse-Phoenix Master Limited Partnership | 5092 | St. Cloud Mall Holding L.L.C. | N/A |
| Rouse-Phoenix Theatre Limited Partnership | N/A | Stonestown Shopping Center L.L.C. | N/A |
| Rouse-Portland, LLC | N/A | Stonestown Shopping Center, L.P. | N/A |
| RS Properties Inc. | N/A | Summerlin Centre, LLC | N/A |
| Saint Louis Galleria L.L.C. | N/A | Summerlin Corporation | 5927 |
| Saint Louis Galleria Anchor Acquisition, LLC | N/A | Three Rivers Mall L.L.C. | N/A |
| Saint Louis Galleria Holding L.L.C. | N/A | Three Willow Company, LLC | N/A |
| Saint Louis Land L.L.C. | N/A | Town East Mall, LLC | N/A |
| Seaport Marketplace, LLC | N/A | Tracy Mall, Inc. | N/A |
| Seaport Marketplace Theatre, LLC | N/A | Tracy Mall Partners, L.P. | 7674 |
| Sierra Vista Mall, LLC | N/A | Tracy Mall Partners I L.L.C. | 9500 |
|  |  | Tracy Mall Partners II, L.P. | 9495 |

| Debtor | Last Four Digits of Federal Tax I.D. No.* | Debtor | Last Four Digits of Federal Tax I.D. No.* |
|---|---|---|---|
| TRC Co-Issuer, Inc. | 0460 | White Marsh Mall Associates | N/A |
| TRC Willow, LLC | N/A | White Marsh Mall LLC | N/A |
| Tucson Anchor Acquisition, LLC | N/A | White Marsh Phase II Associates | N/A |
| TV Investment, LLC | N/A | White Mountain Mall, LLC | N/A |
| Two Arizona Center, LLC | N/A | Willow SPE, LLC | N/A |
| Two Willow Company, LLC | N/A | Willowbrook II, LLC | N/A |
| Tysons Galleria L.L.C. | N/A | Willowbrook Mall, LLC | N/A |
| U.K.-American Properties, Inc. | N/A | Woodbridge Center Property, LLC | N/A |
| Valley Hills Mall, Inc. | N/A | The Woodlands Mall Associates, LLC | N/A |
| Valley Hills Mall L.L.C. | 6809 | | |
| Valley Plaza Anchor Acquisition, LLC | N/A | | |
| VCK Business Trust | N/A | | |
| Victoria Ward Center L.L.C. | N/A | | |
| Victoria Ward Entertainment Center, L.L.C. | N/A | | |
| Victoria Ward, Limited | 7590 | | |
| Victoria Ward Services, Inc. | 8057 | | |
| The Village of Cross Keys, LLC | N/A | | |
| Visalia Mall L.L.C. | N/A | | |
| Visalia Mall, L.P. | N/A | | |
| Vista Commons, LLC | N/A | | |
| Vista Ridge Mall, LLC | N/A | | |
| VW Condominium Development, LLC | N/A | | |
| Ward Gateway-Industrial-Village, LLC | N/A | | |
| Ward Plaza-Warehouse, LLC | N/A | | |
| Weeping Willow RNA, LLC | N/A | | |
| West Kendall Holdings, LLC | N/A | | |
| Westwood Mall, LLC | N/A | | |
| White Marsh General Partnership | N/A | | |

## Exhibit B

**Engagement Letter and Indemnification Provisions**

 MILLER BUCKFIRE

Miller Buckfire & Co., LLC
153 East 53rd Street, 22nd Floor
New York, New York 10022
www.millerbuckfire.com

December 10, 2008

General Growth Properties, Inc.
110 N Wacker Drive
Chicago, IL 60606
Attention: Adam Metz
Interim Chief Executive Officer

Dear Mr. Metz:

This letter agreement confirms the terms under which General Growth Properties, Inc. (the "Company") has engaged Miller Buckfire & Co., LLC ("Miller Buckfire") as its financial advisor and investment banker with respect to a possible Transaction and/or Financing (each as defined below) and with respect to such other financial matters as to which the Company and Miller Buckfire may agree in writing during the term of this engagement. For purposes hereof, the term "Company" includes affiliates of the Company and any entity that the Company or its affiliates may form or invest in to consummate a Transaction and/or Financing, and shall also include any successor to or assignee of all or a portion of the assets and/or businesses of the Company whether pursuant to a Plan (as defined below) or otherwise. If appropriate in connection with performing its services for the Company hereunder, and upon consent of the Company, which consent shall not be unreasonably withheld, Miller Buckfire may utilize the services of one or more of its affiliates, in which case references herein to Miller Buckfire shall include such affiliates.

1.    Kenneth Buckfire, whom will co-lead the assignment with Ronen Bojmel, will personally lead and manage this engagement on behalf of Miller Buckfire. In case Ken Buckfire becomes incapacitated for any reason, Ronen Bojmel or another Miller Buckfire partner will assume his role. Miller Buckfire, as financial advisor and investment banker to the Company, will perform the following financial advisory and investment banking services, in each case as requested by and at the direction of the Company:

   a.    <u>General Financial Advisory and Investment Banking Services</u>. Miller Buckfire will:

      i.    to the extent it deems necessary, appropriate and feasible, familiarize itself with the business, operations, properties, financial condition and prospects of the Company; and

      ii.   if the Company determines to undertake a Transaction and/or Financing advise and assist the Company in structuring and effecting the financial aspects of such a transaction or transactions, subject to the terms and conditions of this agreement.

b.　　Restructuring and Sale Services.　If the Company pursues a Transaction, Miller Buckfire will, to the extent requested by the Company:

　　i.　　review and analyze the Company's business plans and financial projections prepared by the Company, including, but not limited to, testing assumptions and comparing those assumptions to historical Company and industry trends;

　　ii.　　assist in the determination of a capital structure for the Company;

　　iii.　　assist in the determination of a range of values for the Company on a going concern basis;

　　iv.　　attending meetings of the Company's Board of Directors and its committees;

　　v.　　provide financial advice and assistance to the Company in connection with a Sale and/or in developing and seeking approval of a Restructuring plan (as the same may be modified from time to time, a "Plan"), which may be a plan under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code");

　　vi.　　provide financial advice and assistance to the Company in structuring any new securities to be issued under the Plan;

　　vii.　　assist the Company and/or participate in negotiations with entities or groups affected by the Plan;

　　viii.　　in connection with a Sale, identify potential acquirors and, at the Company's request, contact such potential acquirors;

　　ix.　　assist the Company and/or participate in negotiations with potential acquirors; and

　　x.　　participate in hearings before the bankruptcy court with respect to the matters upon which Miller Buckfire has provided advice, including, as relevant, coordinating with the Company's counsel with respect to testimony in connection therewith.

For purposes of this agreement, (i) the term "Transaction" shall mean a Restructuring, a Sale or any combination thereof; (ii) the term "Restructuring" shall mean any material recapitalization or restructuring (based in both instances on the Company in the aggregate and including, without limitation, through any exchange, conversion, cancellation, forgiveness, retirement and/or a material modification or amendment to the terms, conditions or covenants thereof) of the Company's preferred equity and/or debt securities and/or other indebtedness, obligations or liabilities (including preferred stock, partnership

interests, lease obligations, trade credit facilities and/or contract or tort obligations), including pursuant to a repurchase or an exchange transaction, a Plan or a solicitation of consents, waivers, acceptances or authorizations; and (iii) the term "Sale" shall mean the disposition to one or more third parties in one or a series of transactions of (x) all or substantially all of the equity securities of the Company by the security holders of the Company or (y) all or substantially all of the assets (including the assignment of any executory contracts) or businesses of the Company or its subsidiaries, in either case, including through a sale or exchange of capital stock, options or assets, a lease of assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, a recapitalization, the formation of a joint venture, partnership or similar entity, or any similar transaction..

    c.    <u>Financing Services</u>.  If the Company pursues a Financing, Miller Buckfire will:

        i.    provide financial advice and assistance to the Company in structuring and effecting a Financing, identify potential Investors (as defined below) and, at the Company's request, contact such Investors;

        ii.    if Miller Buckfire and the Company deem it advisable, assist the Company in developing and preparing a memorandum (with any amendments or supplements thereto, the "<u>Financing Offering Memorandum</u>") to be used in soliciting potential Investors, it being agreed that (A) the Financing Offering Memorandum shall be based entirely upon information supplied by the Company, (B) the Company shall be solely responsible for the accuracy and completeness of the Financing Offering Memorandum, and (C) other than as contemplated by this subparagraph (c)(ii), the Financing Offering Memorandum shall not be used, reproduced, disseminated, quoted or referred to at any time in any way, except with Miller Buckfire's prior written consent; and

        iii.    if requested by the Company, assist the Company and/or participate in negotiations with potential Investors.

For purposes of this agreement, the term "<u>Financing</u>" shall mean (i) a private issuance, sale or placement of the equity, equity-linked or debt securities (including any 144A offering), instruments or obligations of the Company with one or more lenders and/or investors except to the extent issued to existing security holders of the Company in exchange for their existing securities, or (ii) any loan or other financing, including any "debtor in possession financing" or "exit financing" in connection with a case under the Bankruptcy Code or (iii) a rights offering (each such lender or investor, an "<u>Investor</u>"), provided, however, that a rollover, extension, modification or refinancing of indebtedness at any of the Company's project level direct or indirect subsidiaries shall not constitute a Financing for purposes of this agreement.

It is understood and agreed that nothing contained herein shall constitute an expressed or implied commitment by Miller Buckfire to act in any capacity or to underwrite, place or

purchase any financing or securities, which commitment shall only be set forth in a separate underwriting, placement agency or other appropriate agreement relating to the Financing.

In rendering its services to the Company hereunder, Miller Buckfire is not assuming any responsibility for the Company's underlying business decision to pursue or not to pursue any business strategy or to effect or not to effect any Restructuring, Financing, and/or Sale or other transaction, although the Company will be entitled to rely upon Miller Buckfire's advice. The Company agrees that Miller Buckfire shall not have any obligation or responsibility to provide accounting, audit, "crisis management," or business consultant services for the Company and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements, or to provide any fairness or valuation opinions or any advice or opinions with respect to solvency in connection with any transaction. The Company confirms that it will rely on its own counsel, accountants and similar expert advisors for legal, accounting, tax and other similar advice.

In order to coordinate effectively the Company's and Miller Buckfire's activities to effect a Restructuring, Financing or Sale, the Company will promptly inform Miller Buckfire of any discussions, negotiations or inquiries regarding a possible Restructuring, Financing or Sale (including any such discussions, negotiations or inquiries that have occurred in the six month period prior to the date of this agreement).

The Company shall make available to Miller Buckfire all reasonable and relevant information concerning the business, assets, operations, financial condition and prospects of the Company that Miller Buckfire reasonably requests in connection with the services to be performed for the Company hereunder and shall provide Miller Buckfire with reasonable access to the Company's officers, directors, employees, independent accountants and other advisors and agents as Miller Buckfire shall deem appropriate. The Company represents that all information regarding the Company furnished by it or on its behalf to Miller Buckfire (including information contained in any Financing Offering Memorandum and/or Sale Memorandum) will be accurate and complete in all material respects. The Company recognizes and confirms that in advising the Company and completing its engagement hereunder, Miller Buckfire will be using and relying on publicly available information and on data, material and other information furnished to Miller Buckfire by the Company and other parties. It is understood that in performing under this engagement Miller Buckfire may assume and rely upon the accuracy and completeness of, and is not assuming any responsibility for independent verification of, such publicly available information and the other information so furnished.

Miller Buckfire acknowledges and agrees that this engagement does not obligate the Company to consummate any Transaction.

2.    Miller Buckfire's compensation for services rendered under this agreement will consist of the following cash fees:

a.    A retainer of $1,250,000, which shall be due and paid upon execution of this agreement (the "Retainer"). The Retainer shall be credited upon

consummation of a Transaction against the Completion Fee or Financing fee(s) payable to Miller Buckfire pursuant to subparagraphs 2(e) or 2(f) below, provided that if the Company files a Chapter 11 case, then the Retainer will be applied by Miller Buckfire against the financial advisory fees payable pursuant to subparagraphs 2(b) and 2(c) and any other fees or expenses hereunder due and payable after such filing until exhausted.

b.      A financial advisory fee of $200,000, which shall be due and paid by the Company upon the execution of this agreement.

c.      A monthly financial advisory fee of $300,000, which shall be due and paid by the Company beginning on January 1, 2009 and thereafter on the 1st day of each month during the term of this engagement. Fifty percent of the aggregate monthly advisory fees paid to Miller Buckfire following January 1, 2010 shall be credited against any Completion Fee.

d.      If at any time during the term of this engagement or within the twelve full months following the termination of this engagement (including the term of this engagement, the "Fee Period"), (x) any Transaction is consummated or (y)(1) a definitive agreement or Plan to effect a Transaction is entered into and (2) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period), any Transaction is consummated, Miller Buckfire shall be entitled to receive a completion fee (a "Completion Fee"), contingent upon the consummation of a Transaction and payable at the closing thereof, equal to $22,500,000.

e.      If at any time during the Fee Period, the Company obtains a commitment for a debtor-in-possession Financing at the commencement of a bankruptcy case (such Financing, the "Initial DIP Financing"), Miller Buckfire shall be entitled to receive a Financing fee of 1% of the aggregate amount of such commitment, which fee shall be due and payable upon closing of the Initial DIP Financing.

f.      If at any time during the Fee Period, the Company (x) consummates any Financing (other than the Initial DIP Financing) or (y)(1) the Company receives and accepts written commitments for one or more Financings (other than the Initial DIP Financing) (the execution by a potential financing source and the Company of a commitment letter or securities purchase agreement or other definitive documentation shall be deemed to be the receipt and acceptance of such written commitment) and (2) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period) any Financing (other than the Initial DIP Financing) is consummated, the Company will pay to Miller Buckfire the following (either as underwriting discounts, placement fees or other compensation):

i.      1% of the gross proceeds of any indebtedness issued that is secured by a first lien;

ii.    3.0% of the gross proceeds of any indebtedness issued that (x) is secured by a second or more junior lien, (y) is unsecured and/or (z) is subordinated;

iii.    5.0% of the gross proceeds of any equity or equity-linked securities or obligations issued.

Notwithstanding anything to the contrary contained herein, no fee shall be payable pursuant to this subparagraph 2(f) for an individual or portfolio based rollover, extension, modification or refinancing of indebtedness at any of the Company's project level direct or indirect subsidiaries.

Fifty percent (50%) of all Financing fees paid pursuant to this subparagraphs 2(e) and 2(f) shall be credited against the Completion Fee.

For purposes of this subparagraph 2(f), it is understood and agreed that if the proceeds of any such Financing are to be funded in more than one stage, the aggregate proceeds to be raised in all stages of such Financing shall be deemed to have been received, and Miller Buckfire shall be entitled to the applicable compensation hereunder calculated based on such aggregate proceeds, upon the closing date of the first stage thereof.

Each party hereto acknowledges and agrees that Miller Buckfire's restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required during the term of Miller Buckfire's engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit of Miller Buckfire's services hereunder could not be measured merely by reference to the number of hours to be expended by Miller Buckfire's professionals in the performance of such services. Each party hereto also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of Miller Buckfire and that the actual time and commitment required of Miller Buckfire and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, given the numerous issues with Miller Buckfire's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Miller Buckfire's services for engagements of this nature in an out-of-court context, each party hereto agrees that the fee and expense arrangements hereunder are reasonable under all applicable legal standards. In addition, the Company and Miller Buckfire acknowledge and agree that more than one fee may be payable to Miller Buckfire under subparagraphs 2(d), 2(e) and/or 2(f) hereof in connection with any single transaction or a series of transactions, and in each case, each such fee shall be paid to Miller Buckfire.

3.    In addition to any fees payable by the Company to Miller Buckfire hereunder, the Company shall, whether or not any transaction contemplated by this agreement shall be proposed or consummated, reimburse Miller Buckfire on a monthly basis for its

travel and other reasonable out-of-pocket expenses incurred in connection with, or arising out of Miller Buckfire's activities under or contemplated by this engagement or in the enforcement of Miller Buckfire's rights hereunder (including all fees, disbursements and other charges of counsel to be retained by Miller Buckfire, and of other consultants and advisors retained by Miller Buckfire with the Company's consent). The Company shall also reimburse Miller Buckfire, at such times as Miller Buckfire shall request, for any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to or contemplated by, this engagement. Such reimbursements shall be made promptly upon submission by Miller Buckfire of statements for such expenses.

4.    The Company agrees to indemnify Miller Buckfire and certain related persons in accordance with the indemnification provisions ("Indemnification Provisions") attached to this agreement. Such Indemnification Provisions are an integral part of this agreement, and the terms thereof are incorporated by reference herein. Such Indemnification Provisions shall survive any termination or completion of Miller Buckfire's engagement hereunder.

5.    The Company agrees that none of Miller Buckfire, its affiliates or their respective directors, officers, members, managers, agents, employees and controlling persons, or any of their respective successors or assigns ("Covered Persons") shall have any liability to the Company or any person asserting claims on behalf of the Company or in the Company's right for or in connection with this engagement or any transactions or conduct in connection therewith except for losses, claims, damages, liabilities or expenses incurred by the Company which are finally judicially determined to have resulted primarily from the gross negligence or willful misconduct of such Covered Person; provided, however, that in no event shall the Covered Persons' aggregate liability to the Company or any person asserting claims on behalf of the Company or in the Company's right exceed the fees Miller Buckfire actually receives from the Company pursuant to its engagement hereunder, unless there is a final judicial determination of gross negligence or willful misconduct specified in this sentence.

6.    This agreement and Miller Buckfire's engagement hereunder may be terminated by either the Company or Miller Buckfire at any time, upon prior written notice thereof to the other party; provided, however, that (a) termination of Miller Buckfire's engagement hereunder shall not affect the Company's continuing obligation to indemnify Miller Buckfire and certain related persons as provided for in this agreement, and its continuing obligations and agreements under paragraphs 5 and 7 hereof, (b) so long as (i) Miller Buckfire has not terminated without cause, and (ii) the Company has not terminated Miller Buckfire for gross negligence or willful misconduct, Miller Buckfire shall be entitled to the full fees in the amounts and at the times provided for in paragraph 2 hereof and (c) any termination of Miller Buckfire's engagement hereunder shall not affect the Company's obligation to reimburse expenses accruing prior to such termination to the extent provided in paragraph 3 hereof.

8

7.  Miller Buckfire has been retained under this agreement as an independent contractor with no fiduciary or agency relationship to the Company or to any other party. The advice (oral or written) rendered by Miller Buckfire pursuant to this agreement is intended solely for the benefit and use of the Board of Directors of the Company in considering the matters to which this agreement relates, and the Company agrees that such advice may not be relied upon by any other person or entity, used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner for any purpose, nor shall any public references to Miller Buckfire be made by the Company, without the prior written consent of Miller Buckfire.

8.  The Company agrees that following consummation of a Transaction or Financing Miller Buckfire shall have the right to place advertisements in financial and other newspapers and journals at its own expense describing its services to the Company hereunder; provided that Miller Buckfire will submit a copy of any such advertisement to the Company for its approval, which approval shall not be unreasonably withheld or delayed.

9.  This agreement shall be deemed to be made in New York. This agreement and all controversies arising from or relating to performance of this agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to such state's rules concerning conflicts of laws that might provide for any other choice of law. The Company hereby irrevocably consents to personal jurisdiction in the Supreme Court of the State of New York in New York County, Commercial Part, or any Federal court sitting in the Southern District of New York for the purposes of any suit, action or other proceeding arising out of this agreement or any of the agreements or transactions contemplated hereby, which is brought by or against the Company, hereby waives any objection to venue with respect thereto, and hereby agrees that all claims in respect of any such suit, action or proceeding shall be heard and determined in any such court, and that such courts shall have exclusive jurisdiction over any claims arising out of or relating to such agreements or transactions; provided that in the event that the Company becomes a debtor under chapter 11 of the Bankruptcy Code, during any such case, any such claims may also be heard and determined in the Bankruptcy Court (as defined below). The Company hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the Company at its address set forth above, such service to become effective ten (10) days after such mailing. ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION ARISING OUT OF THIS AGREEMENT OR CONDUCT IN CONNECTION WITH MILLER BUCKFIRE'S ENGAGEMENT IS HEREBY WAIVED.

10. This agreement may be executed in counterparts, each of which together shall be considered a single document. This agreement shall be binding upon Miller Buckfire and the Company and their respective successors and assigns (including, in the case of the Company, any successor to all or a portion of the assets and/or the businesses of the Company under a Plan). This agreement is not intended to confer any rights

9

upon any shareholder, creditor, owner or partner of the Company, or any other person or entity not a party hereto other than the indemnified persons referenced in the Indemnification Provisions contained herein and the Covered Persons referenced above. This agreement (including the Indemnification Provisions) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this agreement is determined to be invalid or unenforceable in any respect, such determination will not affect the agreement in any other respect, which will remain in full force and effect. No waiver, amendment or other modification of this agreement shall be effective unless in writing and signed by each party to be bound thereby.

11.    The Company does not appear on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury, nor is it a prohibited party according to other U.S. government regulatory or enforcement agencies.

12.    The Company hereby acknowledges that affiliates of Miller Buckfire engage in the hedge fund and/or principal investment business, which affiliates are separated by ethical walls to prevent the improper sharing of client information. The Company hereby acknowledges and agrees that such affiliates may from time to time have a long or short position in, buy and sell or otherwise effect transactions for their own accounts or for the accounts of investment pools managed by them in the securities, loans or other obligations or instruments of the Company or those of other companies or entities so long as the personnel involved in performing such activities have not received access to the Company's confidential information from Miller Buckfire.

13.    In the event that the Company becomes a debtor under chapter 11 of the Bankruptcy Code, the Company shall apply promptly to the bankruptcy court having jurisdiction over the chapter 11 case or cases (the "Bankruptcy Court") for the approval pursuant to sections 327(a) and 328(a) of the Bankruptcy Code of this agreement and Miller Buckfire's retention by the Company under the terms of this agreement, subject only to the standard of review provided for in Section 328(a) of the Bankruptcy Code, and not subject to the standard of review under section 330 of the Bankruptcy Code or any other standard of review, and shall use its best efforts to obtain Bankruptcy Court authorization thereof. The Company shall supply Miller Buckfire and its counsel with a draft of such application and the proposed order authorizing Miller Buckfire's retention that is proposed to be submitted to the Bankruptcy Court sufficiently in advance of the filing of such application or the submission of such order, as the case may be, to enable Miller Buckfire and its counsel to review and comment thereon. Miller Buckfire shall have no obligation to provide any services under this agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless Miller Buckfire's retention under the terms of this agreement is approved under Section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is acceptable to Miller Buckfire in all respects. Miller Buckfire

acknowledges that in the event that the Bankruptcy Court approves its retention by the Company pursuant to the application process described in this paragraph 12, payment of Miller Buckfire's fees and expenses shall be subject to (i) the jurisdiction and approval of the Bankruptcy Court under Section 328(a) of the Bankruptcy Code and any order approving Miller Buckfire's retention, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications. In the event that the Company becomes a debtor under the Bankruptcy Code and Miller Buckfire's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of Miller Buckfire hereunder as promptly as practicable in accordance with the terms hereof.   In so agreeing to seek Miller Buckfire's retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Miller Buckfire's experience and expertise, its knowledge of the industry in which the Company operates and the capital markets and its other capabilities will inure to the benefit of the Company, that the value to the Company of Miller Buckfire's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the fees payable to Miller Buckfire hereunder are reasonable regardless of the number of hours to be expended by Miller Buckfire's professionals in performance of the services to be provided hereunder.   Prior to commencing a chapter 11 case, the Company shall pay all undisputed amounts theretofore due and payable to Miller Buckfire in cash.

We are pleased to accept this engagement and look forward to working with the Company. Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed duplicate of this letter, which shall thereupon constitute a binding agreement between Miller Buckfire and the Company.

Very truly yours,

MILLER BUCKFIRE & CO., LLC

By: *KEN BUCKFIRE*
_____
Name: Kenneth A. Buckfire
Title: Managing Director

By: _____
_____
Name: Ronen Bojmel
Title: Managing Director

Accepted and Agreed to:

GENERAL GROWTH PROPERTIES, INC.

By: *Adam Metz*
_____
Name:  Adam Metz
Title:  Interim Chief Executive Officer

12

# INDEMNIFICATION PROVISIONS

In connection with the engagement of Miller Buckfire & Co., LLC ("Miller Buckfire") as financial advisor to General Growth Properties, Inc., the Company hereby agrees to indemnify and hold harmless Miller Buckfire and its affiliates, their respective directors, officers, members, managers, agents, employees and controlling persons, and each of their respective successors and assigns (collectively, the "indemnified persons"), to the full extent lawful, from and against all losses, claims, damages, liabilities and expenses incurred by them which (A) are related to or arise out of (i) actions or alleged actions taken or omitted to be taken (including any untrue statements made or any statements omitted to be made) by the Company or (ii) actions or alleged actions taken or omitted to be taken by an indemnified person with the Company's direction or express consent or (B) are otherwise related to or arise out of Miller Buckfire's activities under Miller Buckfire's engagement. The Company will not be responsible, however, for any losses, claims, damages, liabilities or expenses pursuant to clause (B) of the preceding sentence which are finally judicially determined to have resulted primarily from the gross negligence or willful misconduct of the person seeking indemnification hereunder or settled without the consent of the Company (such consent not to be unreasonably withheld or delayed) prior to a determination as to the indemnified party's gross negligence or willful misconduct. For purposes of these indemnification provisions, the term the "Company" has the meaning set forth in the engagement letter, dated as of December 10, 2008, between Miller Buckfire and General Growth Properties, Inc., of which these indemnification provisions are an integral part.

After receipt by an indemnified person of notice of any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought hereunder, such person will notify the Company in writing of such complaint or of the commencement of such action or proceeding, but failure so to notify the Company will relieve the Company from any liability which the Company may have hereunder only if, and to the extent that such failure results in the forfeiture by the Company of substantial rights and defenses, and will not in any event relieve the Company from any other obligation or liability that the Company may have to any indemnified person otherwise than under these indemnification provisions. If the Company so elects or is requested by such indemnified person, the Company will assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to Miller Buckfire and the payment of the fees and disbursements of such counsel. In the event, however, such indemnified person reasonably determines in its judgment that having common counsel would present such counsel with a conflict of interest or if the defendants in, or targets of, any such action or proceeding include both an indemnified person and the Company, and such indemnified person reasonably concludes that there may be legal defenses available to it or other indemnified persons that are different from or in addition to those available to the Company, or if the Company fails to assume the defense of the action or proceeding or to employ counsel reasonably satisfactory to such indemnified person, in either case in a timely manner, then such indemnified person may employ separate counsel to represent or defend it in any such action or proceeding and the Company will pay the fees and disbursements of such counsel; provided, however, that the Company will not be required to pay the fees and disbursements of more than one separate counsel (in addition to local counsel) for all indemnified persons in any jurisdiction in any single action or proceeding. In any action or proceeding the defense of which the Company assumes, the indemnified person will have the right to participate in such litigation and to retain its own counsel at such indemnified person's own expense. The Company further agrees that it will not, without the prior written consent of Miller Buckfire, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not Miller Buckfire or any other indemnified person is an actual or potential party to such claim, action, suit or proceeding) unless such settlement, compromise or consent includes an unconditional release of Miller Buckfire and each other indemnified person hereunder from all liability arising out of such claim, action, suit or proceeding.

The Company agrees that if any indemnification sought by an indemnified person pursuant to these indemnification provisions is held by a court to be unavailable for any reason other than as specified in the second sentence of the first paragraph of these indemnification provisions, then (whether or not Miller Buckfire is the indemnified person), the Company and Miller Buckfire will contribute to the losses, claims, damages, liabilities and expenses for which such indemnification is held unavailable (i) in such proportion as is appropriate to reflect the relative benefits to the Company, on the one hand, and Miller Buckfire, on the other hand, in connection with Miller Buckfire's engagement referred to above, or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i), but also the relative fault of the Company, on the one hand, and Miller Buckfire, on the other hand, as well as any other relevant equitable

13

considerations; provided however, that in any event the aggregate contribution of all indemnified persons, including Miller Buckfire, to all losses, claims, damages, liabilities and expenses with respect to which contribution is available hereunder will not exceed the amount of fees actually received by Miller Buckfire from the Company pursuant to Miller Buckfire's engagement referred to above. It is hereby agreed that for purposes of this paragraph, the relative benefits to the Company, on the one hand, and Miller Buckfire, on the other hand, with respect to Miller Buckfire's engagement shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid or received by the Company or the Company's stockholders, claims holders or contract parties, as the case may be, pursuant to the transaction, whether or not consummated, for which Miller Buckfire is engaged to render financial advisory services, bears to (ii) the fee paid or proposed to be paid to Miller Buckfire in connection with such engagement. It is agreed that it would not be just and equitable if contribution pursuant to this paragraph were determined by pro rata allocation or by any other method which does not take into account the considerations referred to in this paragraph.

The Company further agrees that it will promptly reimburse Miller Buckfire and any other indemnified person hereunder for all reasonable expenses (including fees and disbursements of counsel) as they are incurred by Miller Buckfire or such other indemnified person in connection with investigating, preparing for or defending, or providing evidence in, any pending or threatened action, claim, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not Miller Buckfire or any other indemnified person is a party) and in enforcing these indemnification provisions.

The Company's indemnity, contribution, reimbursement and other obligations under these indemnification provisions shall be in addition to any liability that the Company may otherwise have, at common law or otherwise, and shall be binding on the Company's successors and assigns.

Solely for purposes of enforcing these indemnification provisions, the Company hereby consents to personal jurisdiction, service and venue in any court in which any claim or proceeding which is subject to, or which may give rise to a claim for indemnification or contribution under, these indemnification provisions is brought against Miller Buckfire or any other indemnified person.

These indemnification provisions shall apply to the above-mentioned engagement, activities relating to the engagement occurring prior to the date hereof, and any subsequent modification of or amendment to such engagement, and shall remain in full force and effect following the completion or termination of Miller Buckfire's engagement.

# Exhibit C

## Buckfire Affidavit

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein
Gary T. Holtzer
Adam P. Strochak
Stephen A. Youngman (*pro hac vice pending*)
Sylvia A. Mayer (*pro hac vice pending*)

Proposed Attorneys for Debtors and
Debtors in Possession

KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200
James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*pro hac vice pending*)

Proposed Co-Attorneys for Certain Subsidiary
Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
**In re**                                                    :       **Chapter 11 Case No.**
                                                             :
**GENERAL GROWTH**                                           :       **09 - _____ (   )**
**PROPERTIES, INC., et al.,**                                :
                                                             :       **(Joint Administration**
**Requested)**                                               :
             **Debtors.**                                    :
-------------------------------------------------------------x

**AFFIDAVIT OF KENNETH A. BUCKFIRE IN SUPPORT**
**OF THE DEBTORS' APPLICATION PURSUANT TO SECTIONS**
**327(a) AND 328(a) OF THE BANKRUPTCY CODE AND**
**BANKRUPTCY RULE 2014(a) FOR AUTHORIZATION**
**TO EMPLOY AND RETAIN MILLER BUCKFIRE & CO., LLC**
**AS FINANCIAL ADVISOR AND INVESTMENT BANKER**
***NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

I, Kenneth A. Buckfire, being duly sworn, hereby deposes and says:

1.       I am a co-founder and Managing Director of Miller Buckfire &

Co., LLC ("**Miller Buckfire**"), a financial advisory services and investment banking firm

that maintains offices located at 153 East 53rd Street, 22nd Floor, New York, New York

10022, and I make this Affidavit (the "**Buckfire Affidavit**") on behalf of Miller Buckfire.

I submit this Buckfire Affidavit in support of the Debtors' Application Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a) and 2016 for Authorization to Employ and Retain Miller Buckfire & Co., LLC as Financial Advisor and Investment Banker for the Debtors *Nunc Pro Tunc* to the Commencement Date (the "**Application**"), filed by the Debtors[1] in the above-captioned chapter 11 cases. The Application seeks interim and final orders authorizing the Debtors' employment and retention of Miller Buckfire as financial advisor and investment banker in these chapter 11 cases on the terms and conditions set forth in the engagement letter between the Debtors and Miller Buckfire, dated December 10, 2008 (the "**Engagement Letter**"), as modified by the proposed interim order attached to the Application.[2] I submit this Buckfire Affidavit in accordance with Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2014-1 of the Local Rules of the Bankruptcy Court for the Southern District of New York. Except as otherwise noted, I have personal knowledge of the matters set forth herein.

2.    Miller Buckfire is an independent firm that provides strategic and financial advisory services in large-scale corporate restructuring transactions. Miller Buckfire is principally owned and controlled by Henry S. Miller and Kenneth A. Buckfire and by the employees of Miller Buckfire. Miller Buckfire currently has approximately 65 employees.

---

[1]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Application.

[2]    Any description of any provision of the Engagement Letter contained in this Affidavit is intended to be a summary of the applicable provisions of the Engagement Letter and is qualified in its entirety by the actual terms of the Engagement Letter.

3.    Miller Buckfire's professionals have extensive experience in providing financial advisory and investment banking services to financially distressed companies and to creditors, equity holders and other constituencies in reorganization proceedings and complex financial restructurings, both in- and out-of-court.  For instance, Miller Buckfire's professionals are providing or have provided financial advisory, investment banking, and other services in connection with the restructuring of: Acterna Corporation; Aerovías Nacionales de Colombia S.A.; Allied Holdings, Inc.; Amtrol Inc.; Anchor Danly Company; Applied Extrusion Technologies, Inc.; AT&T Latin America; Aurora Foods Inc.; Autocam Corporation; Avado Brands, Inc.; Birch Telecom, Inc.; Black Diamond Mining Company, LLC; Bruno's Inc.; Burlington Industries; Calpine Corporation; Cambridge Industries; Carmike Cinemas; Celotex Corporation; Centerpoint Energy; Citation Corporation; CMS Energy Corporation; Criimi Mae, Inc.; CTC Communications; Dana Corporation; Delta Air Lines, Inc.; Dow Corning Corporation; Drypers, Inc.; Dura Automotive Systems, Inc.; EaglePicher Holdings Inc.; Exide Technologies; Eurotunnel Group; Favorite Brands International Inc.; FLYi, Inc.; Foamex International; Focal Communications Corporation; FPA Medical Management; Gate Gourmet; Grand Union Co.; GWLS Holdings, Inc.; Grupo TMM; Hines Horticulture, Inc.; Horizon Natural Resources Company; Huntsman Corporation; ICG Communications; ICO Global Communication, Ltd.; IMPATH Inc.; Interstate Bakeries Corporation; J.L. French Automotive Castings; Kmart Corporation; Level (3) Communications; Laidlaw, Inc.; Lenox Group Inc.; Loewen Group; McLeodUSA; Meridian Technologies Inc.; Mervyn's LLC; Micro Warehouse; Mirant Corp.; Montgomery Ward & Co.; National Airlines; Oakwood Homes; Pacific Crossing

3

Limited; Pathmark Stores, Inc.; Pegasus Satellite Communications; PennCorp Financial

Group, Inc.; Pioneer Companies; PSINet; Polaroid Corporation; Polymer Group, Inc.;

Progressive Molded Products Inc.; SI Corporation; The Spiegel Group; Sunbeam

Corporation; Standard Pacific Corp.; Stolt-Nielsen S.A.; Stolt-Offshore S.A.; TECO

Energy; Trans World Airlines; U.S. Office Products; Vonage Holdings Corp.; Vulcan,

Inc.; and Women First Healthcare, Inc.  Miller Buckfire's professionals are also

providing or have provided mergers and acquisitions advisory services in connection with

whole or partial company sale transactions involving companies across a wide range of

industries, including Atwood Mobile Products (Dura Corporation); Aurora Foods;

Burlington Industries; Calpine Corporation; Cambridge Industries; Career Blazers;

Conversent Communications; Country Road Communications; Dana Corporation; Focal

Communications; Global Valley Networks; IMPATH; Pegasus Broadcast Corporation;

Pegasus Communications; PSINet; and Polaroid Corporation.

        4.     Since December 10, 2008, Miller Buckfire has provided the

following services, among others, to the Debtors in connection with their restructuring

efforts:

      (a)    familiarized itself with the Debtors' operations;

      (b)    analyzed the Debtors' current liquidity and projected cash flows and assisted the Debtors in identifying areas to improve and preserve liquidity;

      (c)    assisted the Debtors in developing their strategic plan and financial projections;

      (d)    developed materials for and presented analyses and recommendations to the Debtors' Board of Directors;

      (e)    assisted the Debtors in evaluating restructuring alternatives;

(f)    engaged in negotiations with various stakeholders, including lenders under the 2006 Facility and the holders of the Rouse Bonds (the "**Rouse Bondholders**") (both as defined in the Mesterharm Declaration) with respect to potential restructuring alternatives:

(i)    assisted the Debtors with negotiating the terms and conditions of the Rouse consent solicitation with the Rouse Bondholder committee;

(ii)    assisted in the development of materials used for meetings with the lenders under the 2006 Facility as well as participated in those meetings;

(iii)    assisted the Debtors with the negotiation of forbearances by the lenders under the 2006 Facility;

(iv)    assisted the Debtors in attempting to negotiate extensions and forbearances of certain commercial mortgage backed securities;

(v)    assisted the Debtors in negotiating extensions and forbearances of certain secured debt agreements.

(g)    assisted the Debtors in negotiating and obtaining debtor-in-possession financing ("**DIP Financing**").

5.    In preparation for these Chapter 11 Cases, Miller Buckfire conducted a comprehensive process to secure DIP Financing on behalf of the Debtors. Specifically, Miller Buckfire worked with the Debtors to identify and solicit numerous potential lenders, including certain of the Debtors' prepetition lenders, who might be willing to provide DIP financing in an amount sufficient to provide adequate liquidity for the Debtors. In this process, Miller Buckfire solicited, received, and analyzed several proposals for DIP financing and participated in the negotiation of DIP financing terms with several parties. This process resulted in an agreement to provide a DIP loan, as described in Cash Collateral/DIP Motion.

6.    As a result of the prepetition work performed on behalf of the Debtors, Miller Buckfire acquired significant knowledge of the Debtors and their businesses and is now intimately familiar with the Debtors' financial affairs, debt structure, economic interests and positions of key constituents, operations and related matters.  Likewise, in providing prepetition services to the Debtors, Miller Buckfire's professionals have worked closely with the Debtors' senior management, financial staff, external stakeholders and other professionals.  Accordingly, Miller Buckfire has developed significant relevant experience and expertise regarding the Debtors that will assist it in providing effective and efficient services in these chapter 11 cases.  The Debtors believe that Miller Buckfire is both well-qualified and uniquely able to represent them in these chapter 11 cases in an efficient and timely manner.

7.    The parties have entered into the Engagement Letter, which governs the relationship between Miller Buckfire and the Debtors.  The terms and the conditions of the Engagement Letter were negotiated between the Debtors and Miller Buckfire, and they reflect the parties' mutual agreement as to the substantial efforts that will be required in this engagement.

8.    It is anticipated that the following Miller Buckfire professionals will be primarily responsible for providing professional services to the Debtors:  me, Ronen Bojmel, Elizabeth Abrams, Matthew Rodrigue and Jenna Jost.  To date, Miller Buckfire has provided, or will provide on a prospective basis upon the Court's approval of the Application, the following services:

(a)    familiarize itself with the business, operations, properties, financial condition and prospects of the Company;

(b)     if the Company determines to undertake a Transaction and/or Financing advise and assist the Company in structuring and effecting the financial aspects of such a transaction or transactions, subject to the terms and conditions of the Engagement Letter;

(c)     review and analyze the Company's business plans and financial projections prepared by the Company, including, but not limited to, testing assumptions and comparing those assumptions to historical Company and industry trends;

(d)     review and analyze the Company's liquidity position and assist management in identifying areas and means to improve and preserve the Company's liquidity;

(e)     assist in the determination of a capital structure for the Company;

(f)     assist in the determination of a range of values for the Company on a going concern basis;

(g)     attend meetings of the Company's Board of Directors and its committees;

(h)     provide financial advice and assistance to the Company in connection with a Sale and/or in developing and seeking approval of a restructuring plan (the "**Plan**");

(i)     provide financial advice and assistance to the Company in structuring any new securities to be issued under the Plan;

(j)     assist the Company and/or participate in negotiations with entities or groups affected by the Plan;

(k)     in connection with a Sale, identify potential acquirors and, at the Company's request, contact such potential acquirors;

(l)     assist the Company and/or participate in negotiations with potential acquirors; and

(m)     participate in hearings before the bankruptcy court with respect to the matters upon which Miller Buckfire has provided advice, including, as relevant, coordinating with the Company's counsel with respect to testimony in connection therewith.

9.      The Debtors have chosen AlixPartners, LLP ("**AlixPartners**") to act as restructuring advisor for the Debtors.  The Debtors have filed or plan to file, a

7

separate application for the retention of AlixPartners. Both Miller Buckfire and

AlixPartners have advised the Debtors that they will make every effort to avoid

duplication of their work.[3]

        10.     Subject to the Court's approval of the Application, the Debtors will

compensate Miller Buckfire in accordance with the terms and conditions and at the times

set forth in the Engagement Letter, which generally provides for the following

compensation structure (the "**Fee and Expense Structure**"):

    (a)    Retainer: A retainer of $1,250,000, which shall be applied against the Monthly Fee and any other fees or expenses hereunder due and payable after such filing until exhausted.

    (b)    Financial Advisory Fee: A financial advisory fee of $200,000, which shall be due and paid by the Company upon the execution of the Engagement Letter.

    (c)    Monthly Fee: A monthly financial advisory fee of $300,000, which shall be due and paid by the Company beginning on January 1, 2009 and thereafter on the 1st day of each month during the term of this engagement. Fifty percent of the aggregate monthly advisory fees paid to Miller Buckfire following January 1, 2010 shall be credited against any Completion Fee.

    (d)    Completion Fee: A completion fee, contingent upon the consummation of a Transaction and payable at the closing thereof, equal to $22,500,000.

---

[3]     In particular, Miller Buckfire and AlixPartners will play distinct roles in these chapter 11 cases. As described in further detail below, Miller Buckfire is providing and will continue to provide financial advisory and investment banking services to the Debtors, including working with parties in interest to negotiate and implement a Plan, Financing or Sale, as appropriate, and providing the Debtors with advice and analysis as to their capital structure. By contrast, AlixPartners will provide the Debtors with operational services, assisting the Debtors with on-the-ground business restructuring assistance and operational advice. Consequently, although it is anticipated that Miller Buckfire and AlixPartners frequently will work together on restructuring-related issues, they will perform discrete and non-overlapping roles. Moreover, Miller Buckfire and AlixPartners have worked alongside one another in numerous other chapter 11 proceedings and have successfully managed to carve out defined roles and avoid duplication of effort.

8

(e)    <u>Initial DIP Financing Fee</u>: A financing fee of 1.0% of the aggregate amount of a commitment for a debtor-in-possession Financing at the commencement of a bankruptcy case, which fee shall be due and payable upon closing of the such Financing.

(f)    <u>Financing Fee</u>: Financing Fees in respect of any Financing (other than the Initial DIP Financing) payable upon closing equal to:

(i)    1.0% of the gross proceeds of any indebtedness issued that is secured by a first lien;

(ii)   3.0% of the gross proceeds of any indebtedness issued that (x) is secured by a second or more junior lien, (y) is unsecured and/or (z) is subordinated;

(iii)  5.0% of the gross proceeds of any equity or equity-linked securities or obligations issued.

Notwithstanding anything to the contrary contained in the Engagement Letter, no fee shall be payable for a Financing that involves an individual or portfolio based rollover, extension, modification or refinancing of indebtedness at any of the Company's project level direct or indirect subsidiaries.

(g)    Fifty percent (50%) of all Financing fees paid pursuant to subparagraphs (e) and (f) shall be credited against the Completion Fee.

11.    Under the terms of the Engagement Letter, Debtors will reimburse Miller Buckfire on a monthly basis for its travel and other reasonable out-of-pocket expenses.

12.    Further, prior to the Commencement Date, the Debtors provided Miller Buckfire with a retainer of $1,250,000 (the "**Retainer**") to be applied against the Monthly Fee and any other unpaid fees and expenses at such time. The Retainer was paid on December 30, 2008. As of the Commencement Date, the Retainer was unapplied to the extent of $1,250,000.

9

13.     The Debtors believe the Fee and Expense Structure described above is comparable to compensation generally charged by investment banking firms of similar stature to Miller Buckfire for comparable engagements, both in and out of bankruptcy.  Further, the Debtors believe that the Fee and Expense Structure described above is consistent with Miller Buckfire's normal and customary billing practices for cases of this size and complexity that require the level and scope of services outlined.

14.     Miller Buckfire and the Debtors believe that the foregoing Fee and Expense Structure is both reasonable and market-based.  In determining the level of compensation to be paid to Miller Buckfire and its reasonableness, the Debtors compared Miller Buckfire's fee proposal to the other proposals received by the Debtors in the investment banking selection process.  The Debtors also compared Miller Buckfire's proposed fees with the range of investment banking fees in other large and complex chapter 11 cases.  In both instances, the Debtors found Miller Buckfire's proposed fees to be reasonable and within the range of other comparable transactions.

15.     To induce Miller Buckfire to do business with the Debtors in bankruptcy, the compensation structure described above was established to reflect the difficulty of the extensive assignments Miller Buckfire expects to undertake and the potential for failure.

16.     Miller Buckfire's restructuring expertise, as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by the Debtors during the term of Miller Buckfire's engagement, were important factors in determining the amount of the Monthly Fees, the Initial DIP Financing Fee, the Completion Fee and the Retainer.  In addition, the Debtors

10

believe that the ultimate benefit to the Debtors of Miller Buckfire's services cannot be measured merely by reference to the number of hours to be expended by Miller Buckfire's professionals in the performance of such services.

17.    The Completion Fee has been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of Miller Buckfire and its professionals, and in light of the fact that such commitment may foreclose other opportunities for Miller Buckfire and that the actual time and commitment required of Miller Buckfire and its professionals to perform services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm.

18.    In addition, given the numerous issues which Miller Buckfire may be required to address in the performance of its services hereunder, Miller Buckfire's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Miller Buckfire's services for engagements of this nature in both out-of-court and chapter 11 contexts, the Debtors believe that the fee arrangements in the Engagement Letter (including the Completion Fee) are reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

19.    Miller Buckfire has not shared or agreed to share any of its compensation from the Debtors with any other person, other than other principals and employees of Miller Buckfire, as permitted by section 504 of the Bankruptcy Code.

20.    The Debtors also request, and Miller Buckfire has agreed, that in the event that Miller Buckfire seeks reimbursement for attorneys' fees from the Debtors during the term of these cases pursuant to the Engagement Letter, the invoices and

supporting time records from such attorneys shall be included in Miller Buckfire's own

application and such invoices and time records shall be subject to the United States

Trustee's guidelines for compensation and reimbursement of expenses and the approval

of this Court under the standard of sections 330 and 331 of the Bankruptcy Code, without

regard to whether such attorney has been retained under section 327 of the Bankruptcy

Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C)

of the Bankruptcy Code.

21.     Consistent with its ordinary practice and the practice of investment

bankers in other chapter 11 cases, whose fee arrangements are typically not hours-based,

Miller Buckfire does not ordinarily maintain contemporaneous time records in one-tenth

hour increments, or provide or conform to a schedule of hourly rates for its professionals.

The Debtors therefore request that Miller Buckfire be excused from compliance with

such requirements, and that Miller Buckfire be required only to maintain such records in

half-hour increments.

22.     In connection with its proposed retention by the Debtors in these

cases, Miller Buckfire undertook to determine (i) whether it had any conflicts or other

relationships that might cause it not to be "disinterested" or to hold or represent an

interest adverse to the Debtors, (ii) all "connections" (as such term is used in Bankruptcy

Rule 2014) to the Debtors, their creditors, other parties in interest, their respective

attorneys and accountants, the U.S. Trustee or any person employed in the office of the

U.S. Trustee and (iii) whether the revenues received by Miller Buckfire from any of its

clients in unrelated matters who are also Interested Parties (as defined below) are equal to

or greater than 1% of Miller Buckfire's annual revenues.  In connection with this inquiry,

12

the Debtors or their representatives provided Miller Buckfire with a list of names of

individuals and entities that may be parties in interest in these chapter 11 cases

(collectively, the "**Interested Parties**"), which included the following:

(a)    the Debtors;

(b)    the Debtors' domestic nondebtor affiliates;

(c)    the Debtors' foreign nondebtor affiliates;

(d)    the Debtors' current and former officers and directors;

(e)    major business affiliations of the Debtors' officers and directors;

(f)    the Debtors' property names and trade names;

(g)    the attorneys and other professionals that the Debtors have identified for employment in these chapter 11 cases;

(h)    joint venturers with (a) the Debtors or (b) their nondebtor affiliates;

(i)    the Debtors' secured lenders;

(j)    the Debtors' one hundred largest unsecured creditors on a consolidated basis, as identified in the Debtors' chapter 11 petitions;

(k)    certain issuers of letters of credit to the Debtors;

(l)    certain noteholders of the Debtors and the indenture trustees for such noteholders;

(m)    certain underwriting investment bankers for Debtor's bonds;

(n)    certain stockholders of the Debtors;

(o)    certain major lessors of the Debtors;

(p)    certain major customers and tenants of the Debtors;

(q)    certain major competitors of the Debtors;

(r)    certain parties to significant litigation with the Debtors;

13

23.     Miller Buckfire is an independent and privately-owned investment bank and financial advisory firm.  Miller Buckfire is wholly owned by MB Advisory Group, LLC ("**MB Advisory**"), a limited liability company organized under the laws of the State of Delaware.  The principal owner of MB Advisory is MB Capital Co., LLC ("**MB Capital**"), which is also a Delaware limited liability company.  MB Capital owns 90% of the membership interests in MB Advisory, and Sal. Oppenheim North America Corporate Finance Holding LLC ("**Investor**") owns the remaining 10%.  Investor is a Delaware limited liability company formed in 2007 by Sal. Oppenheim Jr. & Cie.KGaA ("**Oppenheim**"), a leading European private bank that provides investment banking and asset management services in various countries in Europe.  In March 2007, at the time Investor acquired its interest in MB Advisory, Miller Buckfire also entered into a Strategic Collaboration Agreement with Oppenheim.  Pursuant to that agreement, Miller Buckfire will work with Oppenheim to provide financial restructuring services to clients located in Germany, Austria and Switzerland.  Miller Buckfire and Oppenheim also will work together on potential cross-border M&A transactions and may from time to time act as joint advisors in such M&A transactions.  However, the Strategic Collaboration Agreement does not apply to the provision of investment banking and financial advisory services for restructuring purposes to clients in the United States.

24.     Investor and Oppenheim will have no involvement in Miller Buckfire's provision of services in these chapter 11 cases, and they will have no access to any of Miller Buckfire's records or other non-public information relating to this case.  Given their limited relationships, Miller Buckfire does not have access to Oppenheim's conflicts databases for purposes of the disclosures being made herein.  Miller Buckfire

14

has, however, reviewed the lists of parties-in-interest provided by the Debtors to

determine if Oppenheim or any affiliates of Oppenheim known to Miller Buckfire (based

on a limited review of publicly available information) are parties-in-interest in these

cases.  To the best of my knowledge, information and belief, none of the parties-in-

interest identified to Miller Buckfire are affiliated with Oppenheim or its affiliates.

          25.     Miller Buckfire does not believe that Investor's minority stake in

MB Advisory, the strategic relationship between Miller Buckfire and Oppenheim, or

Oppenheim's limited connections with potential parties-in-interest, are material to Miller

Buckfire's work in this case.

          26.     An affiliate of Miller Buckfire serves as manager for an investment

fund (the "**Managed Fund**").  The Managed Fund is intended principally for investments

by third parties unrelated to Miller Buckfire.  However, such investors also may include

financial institutions (some of which may be parties in interest in this case), or affiliates

of Miller Buckfire and various of its officers and employees (some of which may include

Miller Buckfire employees providing services in connection with the Debtors' chapter 11

cases).  The Managed Fund may invest from time to time in claims or securities of or

relating to the Debtors or parties in interest in the case.  However, Miller Buckfire

employees working in connection with the Debtors' chapter 11 cases have no control

over or involvement in investment decisions or business decisions made for the Managed

Fund.  The fund managers of the Managed Fund maintain investment control over

investment decisions.  In addition, no confidential information concerning the Debtors is

permitted to be communicated to any persons working for the manager of the Managed

Fund. Miller Buckfire does not believe that the relationships outlined above constitute adverse interests or render Miller Buckfire not disinterested in these chapter 11 cases.

27.    A number of business executives are members of an informal strategic advisory committee (the "**Strategic Committee**") of MB Advisory, which is the parent company of Miller Buckfire. The Strategic Committee is an informal group of business executives who have agreed to consult with and advise Miller Buckfire's parent generally on the strategic direction of the Miller Buckfire company group and future business trends. The members of the Strategic Committee have no direct financial stake in Miller Buckfire engagements and no role in the management of Miller Buckfire. They have not been consulted concerning any matter relating to the Debtors' chapter 11 cases, nor will they be so consulted in the future. Members of the Strategic Committee, and entities for whom they work, may have relationships with creditors or other parties in interest in these cases. However, in light of the limited role of the Strategic Committee (and the fact that its members play no role in these cases), Miller Buckfire is not collecting and providing detailed information regarding such possible relationships.

28.    As part of its diverse practice, Miller Buckfire appears in numerous cases, proceedings and transactions involving many different attorneys, accountants, investment bankers and financial consultants, some of whom may represent claimants and parties in interest in these chapter 11 cases. Further, Miller Buckfire has in the past, and may in the future, be represented by several attorneys and law firms, some of whom may be involved in these proceedings. In addition, Miller Buckfire has been in the past, and likely will be in the future, engaged in matters unrelated to the Debtors or these chapter 11 cases in which it works with or against other professionals involved in

16

these cases.  Based on our current knowledge of the professionals involved in these
chapter 11 cases, and to the best of my knowledge, none of these business relations
constitute interests adverse to the Debtors.

29.    To the best of my knowledge and belief, insofar as I have been
able to ascertain after reasonable inquiry, neither I nor Miller Buckfire nor any of its
professional employees has any connection with the Debtors, their creditors, the U.S.
Trustee or any other Potential Parties in Interest in these chapter 11 cases or their
respective attorneys or accounts, except as follows:

(a)    Prior to the commencement of these cases, Miller Buckfire's
professionals performed professional services for the Debtors.

(b)    The Debtors have many creditors.  From time to time, Miller
Buckfire may perform or may have performed services for, or
maintained other commercial or professional relationships with,
certain creditors of the Debtors and various other parties and their
affiliates that are adverse to the Debtors, in each case in matters
unrelated to these cases.  Such parties include Avenue Capital
Group, Bank of America Corporation, The Bank of New York
Mellon, Barclays Capital, Citigroup, Inc., Credit Suisse Securities
LLC, Deutsche Bank Securities, Inc., Eurohypo AG, Fortress
Investment Group LLC, Fidelity Management & Research
Company, General Electric Co., Goldman Sachs Group, Inc.,
JPMorgan Chase & Co., Morgan Stanley, Sun Capital Partners,
Inc., UBS AG, Wells Fargo & Company.

(c)    Goldman Sachs Urban Investment Group is a significant
shareholder in one of Miller Buckfire's current clients and is
unrelated to the parties in interest in these cases.

(d)    Miller Buckfire acted as financial advisor to Mervyn's, LLC
during its restructuring process.  Miller Buckfire's engagement
with the company ended in October 2008.

(e)    From time to time, Miller Buckfire also may have had dealings
(either as co-advisers or in another capacity) on other unrelated
matters with certain of the other professionals who are providing,
or are expected to provide services in these cases, including,
without limitation:

17

    (i)       AlixPartners;

    (ii)      Kirkland & Ellis, LLP

    (iii)     Weil, Gotshal & Manges LLP;

    (iv)    Kurtzman Carson Consultants, LLC

30.     To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, Miller Buckfire has not been retained to assist any entity or person other than the Debtors on matters relating to, or in direct connection with, these chapter 11 cases.  If Miller Buckfire's proposed retention by the Debtors is approved by the Court, Miller Buckfire will not accept any engagement or perform any service for any entity or person other than the Debtors in these cases.  Miller Buckfire will, however, continue to provide professional service to entities or persons that may be creditors of the Debtors or parties-in-interest in these cases, provided that such services do not relate to, or have any direct connection with, these cases or the Debtors.

31.     Insofar as I have been able to determine after reasonable inquiry, Miller Buckfire and the employees of Miller Buckfire that will work on this engagement do not hold or represent any interest adverse to the Debtors or their estates, and Miller Buckfire is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that Miller Buckfire, its professionals and employees:

    (a)     are not creditors, equity security holders or insiders of the Debtors;

    (b)     were not, within two years before the date of filing of the Debtors' chapter 11 petitions, a director, officer, or employee of the Debtors; and

(c)    do not have an interest materially adverse to the Debtors, their respective estates, or any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in the Debtors, or for any other reason.

32.    I am not related or connected to and, to the best of my knowledge after reasonable inquiry, no other professional of Miller Buckfire who will work on this engagement is related or connected to, any United States Bankruptcy Judge for the Southern District of New York, any of the District Judges for the Southern District of New York, the United States Trustee for this Region, or any employee in the Office of the United States Trustee for this Region.

33.    To the best of my knowledge and belief, insofar as I have been able to ascertain after reasonable inquiry, none of the employees of Miller Buckfire working on this engagement on the Debtors' behalf has had, or will have in the future, direct contact concerning these cases with the Debtors' creditors, other parties in interest, the U.S. Trustee, or anyone employed in the Office of the United States Trustee other than in connection with performing financial advisory and investment banking services on behalf of the Debtors.

34.    If Miller Buckfire discovers any additional information that requires disclosure, Miller Buckfire will promptly file a supplemental declaration with the Court.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 16, 2009

/s/ Kenneth A. Buckfire
Kenneth A. Buckfire
Managing Director
Miller Buckfire & Co., LLC

19

## Exhibit D

## Interim Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                   :

In re                          :        Chapter 11 Case No.
                                   :

**GENERAL GROWTH**
    **PROPERTIES, INC., et al.,**  :
                                   :        09-[_____ (   )]

        **Debtors.**          :

                                   :        **(Jointly Administered)**
                                   :
------------------------------------------------------------x

**INTERIM ORDER PURSUANT TO SECTIONS 327(a) AND 328(a)
OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS
TO EMPLOY AND RETAIN MILLER BUCKFIRE& CO., LLC
AS FINANCIAL ADVISOR AND INVESTMENT BANKER**

Upon the application, dated April 16, 2009 (the "**Application**")[1] of South Street

Seaport Limited Partnership, its ultimate parent, General Growth Properties, Inc. ("**GGP**"), and

their debtor affiliates, as debtors and debtors in possession (collectively, "**General Growth**" or

the "**Debtors**"), pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the

"**Bankruptcy Code**"), and Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy

Procedure, requesting authorization to employ and retain Miller Buckfire & Co., LLC ("**Miller**

**Buckfire**"), all as more fully described in the Application; and the Court having jurisdiction to

consider the Application and grant the requested relief in accordance with 28 U.S.C. §§ 157 and

1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of

New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.);

and consideration of the Application being a core proceeding pursuant to 28 U.S.C. § 157(b); and

venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Debtors

---

[1]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them
in the Application.

having provided notice of the Application and Hearing (as defined below) to: (i) the Office of the United States Trustee for the Southern District of New York (Attn: Greg M. Zipes); (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) EuroHypo AG, New York Branch, administrative agent for the lenders to certain of the Debtors under (a) the Second Amended and Restated Credit Agreement dated as of February 24, 2006 and (b) the Loan Agreement, dated as of July 11, 2008, as amended; (v) Deutsche Bank Trust Company Americas, as administrative agent for the lenders to certain of the Debtors under certain Loan Agreements, dated as of January 2, 2008 and February 29, 2009, respectively; (vi) Goldman Sachs Mortgage Company, as administrative agent for the lenders to certain of the Debtors under the Amended and Restated Credit Agreement, dated as of November 3, 2008; (vii) Wilmington Trust, FSB, as indenture trustee under (a) that certain Indenture, dated as of May 5, 2006, and (b) that certain Indenture, dated as of April 16, 2007; (viii) LaSalle Bank National Association and Wilmington Trust, FSB,[2] as indenture trustee under that certain Junior Subordinated Indenture, dated as of February 24, 2006; (ix) The Bank of New York Mellon Corporation, as indenture trustee under that certain Indenture, dated as of February 24, 1995; and (x) those creditors holding the 100 largest unsecured claims against the Debtors' estates (on a consolidated basis); and the Court having held a hearing to consider the requested relief (the "**Hearing**"); and upon the Declarations, the record of the Hearing, and all of the proceedings before the Court, the Court finds and determines that the requested relief is in the best interests of the Debtors, their estates, creditors, and all parties in interest; the Debtors have provided due and proper notice of the

---

[2]    Wilmington Trust, FSB recently entered into an agreement pursuant to which it will assume the indenture trustee assignments of LaSalle Bank National Association. As of the Commencement Date, the trustee assignment with respect to this indenture has not yet been transferred to Wilmington Trust, FSB; however, Wilmington Trust, FSB will succeed LaSalle Bank National Association as indenture trustee for this series of notes upon the transfer of the trustee assignment.

Application and Hearing and no further notice is necessary; the legal and factual bases set forth

in the Application establish just and sufficient cause to grant the requested relief herein; and

therefor, it is

ORDERED that the Application is granted, on an interim basis; and it is further

ORDERED that the Debtors are authorized to retain and employ Miller Buckfire

as their financial advisor and investment banker, *nunc pro tunc* to the Commencement Date,

pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, and on the terms and conditions

set forth in the Engagement Letter as modified by this Interim Order, and to pay fees to Miller

Buckfire on the terms and at the times specified in the Engagement Letter; and it is further

ORDERED that Miller Buckfire will file fee applications for interim and final

allowance of compensation and reimbursement of expenses pursuant to the procedures set forth

in Sections 330 and 331 of the Bankruptcy Code, any applicable Bankruptcy Rules, Local Rules

of the Bankruptcy Court for the Southern District of New York (the "**Local Rules**"), any orders

of this Court and any procedures as may be fixed by order of this Court; and it is further

ORDERED, notwithstanding the prior paragraph, that the fees payable to Miller

Buckfire pursuant to the Engagement Letter shall be subject to review only pursuant to the

standards set forth in section 328(a) of the Bankruptcy Code and shall not be subject to the

standard of review set forth in Section 330 of the Bankruptcy Code, and it is further

ORDERED, notwithstanding anything to the contrary in the Bankruptcy Code, the

Bankruptcy Rules, the Local Rules, any orders of this Court or any guidelines regarding

submission and approvals of fee applications, Miller Buckfire and its professionals (i) shall only

be required to maintain time records for services rendered post-petition, in half-hour increments

and (ii) shall not be required to provide or conform to any schedule of hourly rates; and it is further

ORDERED that the United States Trustee retains all rights to object to Miller Buckfire's interim and final fee applications (including expenses reimbursement) on all grounds including but not limited to the reasonableness standard provided for in section 330 of the Bankruptcy Code; and it is further

ORDERED that the Debtors shall indemnify and hold harmless Miller Buckfire and other Indemnified Persons, as that term is defined in the Engagement Letter, pursuant to the indemnification provisions of the Engagement Letter and, during the pendency of these chapter 11 proceedings, subject to the following conditions:

(a)    all requests of Indemnified Persons for payment of indemnity, contribution, or otherwise pursuant to the indemnification provisions of the Engagement Letter shall be made by means of a final fee application and shall be subject to the approval of, and review by, the Court to ensure that such payment conforms to the terms of the Engagement Letter, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and other orders of this Court and is reasonable based on the circumstances of the litigation or settlement in respect of which indemnity is sought; provided, however, that in no event shall an Indemnified Persons be indemnified or receive contribution to the extent that any claim arose or expense has resulted for any such losses finally judicially determined by a court of competent jurisdiction to have primarily resulted from the bad faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct of Indemnified Persons;

(b)    in no event shall Indemnified Persons be indemnified or receive contribution or other payment under the indemnification provisions of the Engagement Letter if

the Debtors or a representative of the Debtors' estate asserts a claim for, and a court determines by a final order that such claims primarily arose out of, such person's bad faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct of Indemnified Person; and

(c)    in the event an Indemnified Person seeks reimbursement of attorneys' fees from the Debtors pursuant to the Engagement Letter, the invoices and supporting time records from such attorneys shall be attached to Miller Buckfire's own interim and final fee applications, and such invoices and time records shall be subject to the United States Trustee guidelines for compensation and reimbursement of expenses and the approval of the Bankruptcy Court under the standards of section 330 of the Bankruptcy Code without regard to whether such attorneys have been retained under section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code; and it is further

ORDERED that to the extent that there may be any inconsistency between the terms of the Application, the Engagement Letter and this Interim Order, the terms of this Interim Order shall govern; and it is further

ORDERED that within three (3) business days of the date of this Interim Order, the Debtors shall serve a copy of the Interim Order and this Application on: (i) the Office of the United States Trustee for the Southern District of New York (Attn: Greg M. Zipes); (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) EuroHypo AG, New York Branch, administrative agent for the lenders to certain of the Debtors under (a) the Second Amended and Restated Credit Agreement dated as of February 24, 2006 and (b) the Loan Agreement, dated as of July 11, 2008, as amended; (v) Deutsche Bank Trust Company Americas, as administrative agent for the lenders to certain of the Debtors under certain Loan Agreements,

dated as of January 2, 2008 and February 29, 2009, respectively; (vi) Goldman Sachs Mortgage Company, as administrative agent for the lenders to certain of the Debtors under the Amended and Restated Credit Agreement, dated as of November 3, 2008; (vii) Wilmington Trust, FSB, as indenture trustee under (a) that certain Indenture, dated as of May 5, 2006, and (b) that certain Indenture, dated as of April 16, 2007; (viii) LaSalle Bank National Association and Wilmington Trust, FSB, as indenture trustee under that certain Junior Subordinated Indenture, dated as of February 24, 2006; (ix) The Bank of New York Mellon Corporation, as indenture trustee under that certain Indenture, dated as of February 24, 1995; and (x) those creditors holding the 100 largest unsecured claims against the Debtors' estates (on a consolidated basis); and it is further

ORDERED that objections, if any, to the relief requested in the Application on a permanent basis shall be set forth in a writing describing the basis therefor which shall be filed with the Court electronically in accordance with General Order M-242 (N.B. General Order M-242 and the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the United States Bankruptcy Court for the Southern District of New York) by registered users of the Court's electronic case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers) and served in accordance with General Order M-242 or otherwise so as to be actually received no later than [_], 2009 at [_] [_].m. [(EST)] by (i) the Office of the United States Trustee for the Southern District of New York (Attn: Greg M. Zipes); (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) EuroHypo AG, New York Branch, administrative agent for the lenders to certain of the Debtors under (a) the Second Amended and Restated Credit Agreement dated as of February 24, 2006 and (b) the

6

Loan Agreement, dated as of July 11, 2008, as amended; (v) Deutsche Bank Trust Company

Americas, as administrative agent for the lenders to certain of the Debtors under certain Loan

Agreements, dated as of January 2, 2008 and February 29, 2009, respectively; (vi) Goldman

Sachs Mortgage Company, as administrative agent for the lenders to certain of the Debtors under

the Amended and Restated Credit Agreement, dated as of November 3, 2008; (vii) Wilmington

Trust, FSB, as indenture trustee under (a) that certain Indenture, dated as of May 5, 2006, and (b)

that certain Indenture, dated as of April 16, 2007; (viii) LaSalle Bank National Association and

Wilmington Trust, FSB, as indenture trustee under that certain Junior Subordinated Indenture,

dated as of February 24, 2006; (ix) The Bank of New York Mellon Corporation, as indenture

trustee under that certain Indenture, dated as of February 24, 1995; (x) those creditors holding

the 100 largest unsecured claims against the Debtors' estates (on a consolidated basis); (xi) Weil,

Gotshal & Manges LLP, Attorneys for the Debtors, 767 5th Avenue, New York, New York

10023 (Attn: Gary Holtzer); (xii) Weil, Gotshal & Manges LLP, Attorneys for the Debtors, 700

Louisiana Suite, 1600 Houston, Texas  77002 (Attn: Sylvia Mayer); (xiii) Weil, Gotshal &

Manges LLP, Attorneys for the Debtors, 767 5th Avenue, New York, New York 10023 (Attn:

Blaire Cahn); and (xiv) Kirkland & Ellis LLP, Co-Attorneys for Certain Subsidiary Debtors, 200

East Randolph Drive, Chicago, Illinois 60601[3] (Attn: Anup Sathy); and it is further

ORDERED that the final hearing will be held on [_], 2009 at [_] [_].m. [(EST)]

to consider the relief requested herein on a final basis and, pending entry of an order following

the conclusion of the final hearing, the relief granted herein shall remain in effect on an interim

basis; and it is further

---

[3]      Effective April 20, 2009, the new address for Kirkland & Ellis LLP is:  300 North LaSalle,
Chicago, Illinois 60654.

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation, interpretation and/or enforcement of this

Order.


Dated: [_____], 2009
      New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE