| | |
|---|---|
| WEIL, GOTSHAL & MANGES LLP | KIRKLAND & ELLIS LLP |
| 767 Fifth Avenue | 300 North LaSalle |
| New York, New York 10153 | Chicago, Illinois 60654 |
| Telephone: (212) 310-8000 | Telephone:  (312) 862-2000 |
| Facsimile:  (212) 310-8007 | Facsimile:   (312) 862-2200 |
| Marcia L. Goldstein | James H.M. Sprayregen, P.C. |
| Gary T. Holtzer | Anup Sathy, P.C. (*pro hac vice*) |
| Adam P. Strochak | |
| Stephen A. Youngman (*pro hac vice*) | |
| Sylvia A. Mayer (*pro hac vice*) | |
| | |
| Proposed Attorneys for Debtors and | Proposed Co-Attorneys for Certain Subsidiary |
| Debtors in Possession | Debtors and Debtors in Possession |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| | : | |
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **GENERAL GROWTH** | : | **09-11977 (ALG)** |
| **PROPERTIES, INC., <u>et</u> <u>al.</u>,** | : | |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |

-------------------------------------------------------------------x

### DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO DEBTORS' MOTIONS FOR APPROVAL OF DEBTOR IN POSSESSION FINANCING, <u>USE OF CASH COLLATERAL AND CASH MANAGEMENT SYSTEM</u>

TO THE HONORABLE ALLAN L. GROPPER,
UNITED STATES BANKRUPTCY JUDGE:

      South Street Seaport Limited Partnership, its ultimate parent, General Growth

Properties, Inc. ("**GGP**"), and their debtor affiliates, as debtors and debtors in possession

(collectively, "**General Growth**" or the "**Debtors**"),[1] as and for their reply to the objections

(the "**Objections**") of the objecting parties listed on **Exhibit B** hereto (collectively, the

"**Objecting Parties**") to the *Debtors' Motion Requesting (I) Entry of (A) Interim and Final*

---

[1]     A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, is attached hereto as **Exhibit A**.

*Orders (1) Authorizing the Debtors' Use of Cash Collateral and Granting Adequate Protection Therefor Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001 and (2) Modifying the Automatic Stay, and (B) a Final Order Authorizing Borrowing with Priority Over Administrative Expenses and Secured by Liens on Property of the Estates Pursuant to Section 364(c) of the Bankruptcy Code, and (II) Scheduling a Final Hearing on Each Requested Final Order,* dated April 16, 2009 (the "**Motion**")[2] for, *inter alia*, approval of the Debtors' proposed postpetition debtor-in-possession financing and the Debtors' request for use of cash collateral and granting adequate protection and *Debtors' Motion for Interim and Final Orders Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 (A) or Authorization to (I) Continue Using Existing Centralized Cash Management System (II) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (III) Maintain Existing Bank Accounts and Business Forms; (B) for an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code; and (C) Scheduling a Final Hearing* (the "**Cash Management Motion**").  In support thereof, the Debtors respectfully state:

## I.

## PRELIMINARY STATEMENT

1.      In a market where many companies cannot obtain debtor-in-possession financing other than from their existing secured lenders, the Debtors engaged in a broad, active and aggressive marketing effort and commenced these chapter 11 cases with a new-money DIP financing commitment in hand.  Since the filing on April 16, the Debtors have

---

[2] Capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Motion.

engaged in a non-stop effort to improve on the terms of the DIP loan, negotiating with numerous additional parties as well as the original proposed DIP lender.  That process has resulted in a significantly improved DIP financing facility.

2.    The Debtors' obtained improved debtor-in-possession financing (the "**Revised DIP Loan**") is a group of lenders (the "**DIP Lenders**") which includes Canpartners Investments IV, LLC, Delaware Street Capital Master Fund, L.P., Farallon Capital Management, L.L.C., Luxor Capital Group, Perry Principals Investments LLC, and Whitebox Advisors (certain of which are holders of unsecured obligations of the Debtors, including 2006 Notes, Rouse Bonds, and Exchangeable Notes).  The Revised DIP Loan provides the Debtors with flexibility and optionality for their exit from chapter 11 by permitting conversion of the loan to post-emergence equity and has been filed concurrently herewith.  The Revised DIP Loan has significant improvements, including:

- **Eliminating the proposed warrant to acquire up to 4.9% of the equity in the Debtors pursuant to any plan of reorganization;**

- **$25 million in additional borrowing capacity;**

- **Increasing the term of the loan by six months, from 18 months to 24 months;**

- **Adding to Debtors' option to convert the Revised DIP Loan into equity at emergence another option to convert the Revised DIP Loan to post-emergence debt; and**

- **Lower interest rate and lower overall cost of borrowing.**

3.    The Revised DIP Loan also offers the Debtors the ability to eliminate most of the major objections by mortgage lenders and others concerning cash collateral and adequate protection issues as follows:

- **Granting secured mortgage lenders, as adequate protection, a first priority security interest in the account within the**

**centralized cash management system that holds the cash
transferred from the properties;**

- **Granting secured mortgage lenders as adequate protection a
  silent, second priority lien on the properties currently securing
  the Prepetition Goldman Facility;**

- **Additional financial reporting to secured mortgage lenders
  entitled to adequate protection in accordance with such lenders'
  original loan documents; and**

- **Compliance with certain leasing covenants in the secured
  mortgage loan agreements.**

4.      The Debtors are pleased to present the Revised DIP Loan to the Court

and parties in interest, and they urge the Court to approve it.  Approval of the Revised DIP

Loan, use of cash collateral, and continued use of the prepetition cash management system are

essential to the Debtors' ability to operate in chapter 11 and should be approved.  The relief

requested is modest in scope and scale and is designed to allow the Debtors to operate in

chapter 11 the same way they operated outside of chapter 11 – as an integrated enterprise –

with appropriate protections for all parties in interest.  The Revised DIP Loan will provide

additional liquidity for the benefit of *all* Debtors, and *all* secured lenders, cushioning the

Debtors against unforeseen circumstances and ensuring they will be able to continue funding

the operation and maintenance of each of their properties.

5.      Access to the Revised DIP Loan will ensure and enhance the Debtors'

ability to provide the centralized management services essential to the success of each

property, just as they did prepetition.  Likewise, use of cash collateral will provide the Debtors

with the liquidity necessary to pay the direct operation and maintenance expenses of each

property, as well as the costs of the corporate infrastructure and the employees who actually

perform the services necessary to operate each shopping center, just as was done prepetition.

Maintaining the prepetition cash management system will allow the Debtors to continue

sweeping cash into a centralized bank account held by Debtor GGP Limited Partnership

("**GGP LP**"), and enable payment of all expenses from centralized disbursement accounts and

retention of any excess cash – a system to which no mortgage lender objected prepetition.

6.       The Revised DIP Loan eliminates the warrant on the post-emergence

equity interests of the company, mooting the numerous objections to this feature of the

original proposed financing.  The Revised DIP Loan also resolves an issue that pervades many

of the Objections of secured lenders by permitting the Debtors to grant to secured lenders, as

adequate protection for the Debtors' use of their cash collateral, (x) first-priority replacement

liens in the Debtors' bank account containing the cash concentrated from the properties and

(y) a silent second lien on the properties currently securing the Prepetition Goldman Facility,

in each case to the extent the respective lender's project entity has a net intercompany

receivable for any diminution in the value of their collateral (after taking into account the

value of the prepetition collateral).  These replacement liens will be granted to the secured

lenders, in addition to a lien on the intercompany claims of their specific Debtor borrowers.  In

addition, the adequate protection offered by the Debtors to these secured lenders provides for

additional reporting requirements and compliance with certain leasing covenants, addressing

other concerns raised by some of the objecting parties.

7.       Various secured lenders objected to the original DIP financing as

unnecessary, asserting that their particular Debtors generate positive cash flow and therefore

do not need financing.  This myopic assertion ignores the way the Debtors operate.  To

continue their business uninterrupted and preserve value at each property, the Debtors need

sufficient liquidity to operate the entire national platform and provide centralized management

services for the duration of the chapter 11 cases.  The consequences of insufficient liquidity would be severe and felt at every one of the Debtors' properties:  If the Debtors run out of cash and cannot pay the employees who provide essential services to all properties, and the other centralized operating costs of the enterprise, the value of *every* property will suffer.

8.    The Revised DIP Loan provides an appropriate and prudent cushion on liquidity to ensure continued operations through the chapter 11 cases.  The same goes for use of cash collateral.  Allowing each secured lender to control the Debtors' cash, and mete it out only to pay those expenses that directly benefit the property from which it came, is inconsistent with the way the Debtors operated prepetition and unworkable because it would leave the Debtors with insufficient liquidity to run the nationwide enterprise that operates for the benefit of each and every one of the properties.

9.    Similarly unfounded are the Objecting Parties' contentions that the Debtors' requests for approval of the Revised DIP Loan, use of cash collateral, or continued use of their cash management system would effect any substantive consolidation of these estates.  The Objecting Parties cite no authority, and the Debtors are aware of none, holding that the relief the Debtors' request constitutes substantive consolidation.[3]  It is common for multiple debtors with DIP financing arrangements involving joint and several obligations to the DIP lender to continue to use of prepetition cash management systems that sweep cash from multiple subsidiaries and concentrate it at one entity.  This should be doubly true here, in chapter 11 cases involving nearly 400 affiliated debtors where it would be extraordinarily burdensome and costly to create new cash management systems at so many entities.

---

[3] Indeed, case law on exactly this issue holds that relief of the type requested does not constitute substantive consolidation. *Bergemann v. Babcock & Wilcox Co.*, 250 F.3d 955 (5th Cir. 2001).

10.     This Court should not be misled by the protestations of some of the Objectors that the Debtors are attempting to change the Debtors' preexisting cash management system or that individual Debtors already have separate cash management systems.  The Debtors, through their request to use cash collateral and maintain their existing cash management system ask to maintain the pre-bankruptcy, pre-default status quo, not change it. The existence of cash traps at certain entities, through which lenders exercised control over the Debtors' cash due to defaults, does not equate to having separate cash management systems, The plain fact is that the Debtors operated prepetition through a single, centralized cash management system.

11.     Objecting secured creditors suffer no harm from any of the relief requested because their interests in real property and cash collateral are adequately protected. The overall adequate protection package to be provided to secured mortgage lenders – current-pay, non-default-rate interest, payment of real estate taxes, payment of all property maintenance and operation expenses, compliance with certain pre-default covenants regarding leasing and other property transactions as described more fully below, compliance with reporting requirements in the original loan documents, and first-priority replacement liens on the cash swept from the subsidiaries – is consistent with existing bankruptcy jurisprudence and will more than adequately protect the secured parties' interests in the properties and in cash collateral.  The Debtors will demonstrate at the hearing that they accurately track and record intercompany claims and can determine, on an entity-by-entity basis, exactly how much cash collateral is swept up and how much is returned by GGP LP's payment of expenses.  The Debtors' financial projections will show that, for the anticipated duration of the chapter 11 cases, they will have sufficient cash and assets to protect the secured lenders against

diminution in the value, as of the petition date, of their allowed secured claims.

12.     Several secured lenders allege that the commencement of chapter 11 cases by certain of the Debtors, and the relief requested on financing issues, is unnecessary and violates provisions of loan agreements and organizational documents designed to ensure isolation of assets and make these entities "bankruptcy remote."  These assertions are incorrect on every level.  The relief requested in the Motion or the Cash Management Motion is not inconsistent with the requirements of organizational documents or loan documents, and even if it were, the provisions of the Bankruptcy Code that specifically authorize the Court to approve DIP financing and authorize use of cash collateral prevail over any contractual arrangements to the contrary.  Moreover, every Debtor that is before this Court has adhered to the requirements of its organizational documents and the Bankruptcy Code and Bankruptcy Rules in filing for relief under chapter 11, and did so only after careful consideration of the status of its indebtedness and many other factors.  Equally untenable is the contention that Debtors owing billions of dollars in secured debt that is overdue or maturing over the next few years, in a marketplace where commercial real estate financing is nonexistent, are not "distressed" and should not be in chapter 11 at all.

13.     The objections of servicers for loans that have been sold into the commercial mortgage backed securities ("**CMBS**") markets are permeated with indignation that their borrowers have filed for relief under chapter 11 and appear grounded in the misperception that "bankruptcy remote" means "bankruptcy proof."  These sentiments are echoed in the amicus brief of the Commercial Mortgage Securities Association and the Mortgage Bankers Association, which opines, apparently without irony, that the chapter 11 filings by Debtors who are CMBS borrowers will be detrimental to "the functioning of the

CMBS market." Amicus Br. at 20. The Objecting Parties and their amici colleagues have

confused cause and effect. It was the collapse of the real estate finance market generally in the

second half of 2008, and the CMBS market in particular, that precipitated the Debtors' cases,

not vice versa.[4]

        14.     Certain Objecting Parties have indicated that motions to dismiss the

cases of some Debtors will be forthcoming, and one already has been filed. The Debtors are

confident that, when properly before the Court, those motions will be denied. In the

meantime, the Court should grant the motions that are properly before it and authorize the

Debtors to enter into the DIP Loan, use cash collateral on a permanent basis, and continue to

use their prepetition cash management system.

## II.

## BACKGROUND

### A.    Procedural Background

        15.     Commencing on April 16, 2009 (the "**Commencement Date**") and

continuing thereafter, the Debtors each commenced a voluntary case under chapter 11 of title

11 of the United States Code (the "**Bankruptcy Code**"). The Debtors' chapter 11 cases have

been consolidated for procedural purposes only and are being jointly administered pursuant to

Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). The

---

[4] The Debtors object to the "amicus curiae" brief submitted by two trade associations -- the
Commercial Mortgage Securities Association and Mortgage Bankers Association. It is not relevant to
the issues in dispute on the Debtors first-day motions. Indeed, the amici admit the brief is not
submitted in opposition to any particular motion. The *amici* do not appear to have obtained leave of
Court to file the brief, and did not even seek the Debtors' consent to file this free-floating brief. The
creditors and interested parties here are all represented by competent counsel (including the same
counsel that is acting as counsel for the trade associations); the trade associations have not identified
any tangible interest in any other specific case that would be affected by a decision here; and they do
not have any particularly unique perspective that cannot be provided by the more than twenty-five law
firms already involved in this litigation. Should the Court be inclined to consider the brief, the
Debtors request the opportunity to respond to its speculative and inaccurate contents.

Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

16.     On April 16, 2009, this Court authorized the Debtors, pursuant to sections 361, 362, 363, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), to use the Cash Collateral of Adequate Protection Parties (as defined below) on an interim basis, as described in more detail in the Interim Cash Collateral Order [Docket No. 43].  The Court also scheduled a final hearing to consider the Debtors' use of the Adequate Protection Parties' Cash Collateral as well as the Debtors' motion for a final order on their proposed DIP Financing (the "**Final Hearing**") for May 8, 2009.  On April 23, 2009, this Court entered an *Order Pursuant to Section 105 of the Bankruptcy Code Directing that Certain Orders in the Chapter 11 Cases of General Growth Properties, Inc. et al. be Made Applicable to a New Debtor*, extending the relief granted to the Debtors whose chapter 11 cases were filed on April 16, 2009 to those whose chapter 11 cases were filed on April 22, 2009.

17.     The Objecting Parties have asserted various objections to the proposed DIP Financing, the requested use of Cash Collateral, and the requested maintenance of the Debtors' existing cash management system.  The Debtors are responding to the various objections through this Omnibus Reply Brief to avoid duplicative filings as most of the specific objections are common in nature.  The Debtors expressly reserve all rights to specifically respond to any particular Objection and reserve all rights to present evidence and argument at the Final Hearing or any subsequent hearing concerning any particular Objection.

B.    **The Objections**

18.    As of the Objection Deadline,[1] objections to either the DIP financing or the Debtors' use of Cash Collateral in accordance with the terms proposed by the Debtors in the Final DIP Order have been filed by the Objecting Parties.  The Debtors will file a summary chart identifying the primary objections and the responses thereto asserted by the Objecting Parties in support of their objections to the Debtors' proposed DIP Financing, use of cash collateral and request to maintain their existing cash management system.

19.    As set forth in more detail below, the objections are not supported and should be overruled, to the extent not otherwise withdrawn or resolved.  The Debtors' use of Cash Collateral is warranted pursuant to section 363(c)(2) of the Bankruptcy Code.  The proposed adequate protection to the property lenders whose Cash Collateral the Debtors seek to use (the "**Adequate Protection Parties**") is sufficient and consistent with the terms of the Bankruptcy Code (particularly given the additional adequate protection provisions to be provided).

20.    Similarly, this Court should authorize and approve the Debtors' proposed DIP Financing.  As will be shown at the Final Hearing**,** the Debtors negotiated the Revised DIP Loan with the DIP Lenders extensively, in good faith, and at arm's length.  The terms of the DIP Financing represent the best DIP terms the Debtors were able to obtain after extensive postpetition negotiations, and represent a significant improvement over the terms initially proposed.

21.    Finally, this Court should approve the Debtors' request to maintain their existing cash management system whereby the Debtors ask this Court to maintain the status

---

[1] The Debtors gave extensions of the Objection Deadline to certain Objecting Parties.

quo of the cash management system.  Nothing about this request should be objectionable to the Objecting Parties.  Consequently, the Debtors submit that entry of the final orders authorizing the Debtors' use of Cash Collateral,  approving the Debtors' proposed DIP Financing, and approving the Debtors' cash management system is warranted and justified. **C.**

**C.  The Revised DIP Loan and Additional Adequate Protection**

      **1.**      **The Revised DIP Loan**

      22.      Since the Commencement Date, the Debtors have engaged in a continuous effort to improve the terms of the initial DIP loan and have succeeded in doing so. The Debtors have obtained a commitment from the DIP Lenders to provide the financing pursuant to the revised DIP credit agreement with the DIP Lenders (the "**Revised DIP Agreement**").  The Debtors have filed their Notice of Filing of Revised Credit Agreement with the Court substantially contemporaneously herewith, which includes clean and redlined copies of the Revised DIP Agreement.  The redline is marked against the initial DIP Credit Agreement (the "**Pershing DIP Agreement**") between the Debtors and Pershing Square Capital Management, L.P. (as Administrative Agent) ("**Pershing Square**").  A revised proposed final order approving the Revised DIP Agreement (as well as final approval on the Debtors' use of Cash Collateral, as described below) is annexed hereto as **Exhibit C** (the "**Revised Final DIP Order**"), and a revised exhibit to the Motion reflecting the Adequate Protection Parties is annexed hereto as **Exhibit D**.

      23.      The material differences between the Pershing DIP Agreement and the Revised DIP Agreement are set forth in the comparison chart below.[2]

---

[2] The chart noted herein is annexed for summary comparison purposes only.  To the extent of any inconsistencies or discrepancies between the chart contained herein and the governing DIP loan documents, such documents shall control.

| Term | Pershing DIP Agreement | Revised DIP Agreement |
|---|---|---|
| **Amount** | $375,000,000 | $400,000,000 |
| **Warrant** | Ability to acquire up to 4.9% of equity securities | None |
| **Conversion to Equity Feature** | Ability to convert all or a portion of outstanding DIP loan into up to 5% of reorganized equity | Ability to convert all or a portion of outstanding DIP loan into up to 6% of reorganized equity or to post-emergence debt |
| **Loan Draw Requirements** | Fully funded at closing | Fully funded at closing |
| **Collateral Package** | Includes senior lien on unencumbered collateral, junior lien on encumbered collateral and senior lien on cash collateral | Includes senior lien on unencumbered collateral, junior lien on encumbered collateral and junior lien on cash collateral |
| **Pricing** | LIBOR plus 12% (with a LIBOR Floor of 3%) | LIBOR plus 12% (with a LIBOR Floor of 2.25%) |

  **2.**  **Use of Cash Collateral and Revised Adequate Protection**

   24.  The Debtors seek final approval for the use of Cash Collateral, including all cash currently trapped by various Adequate Protection Parties in blocked accounts, maintained in escrow accounts for payment of taxes or other operational expenses, or otherwise controlled by an Adequate Protection Party.

   25.  <u>First Lien on Upstreamed Cash and Second Lien on Properties Currently Securing Prepetition Goldman Facility</u>.  The Debtors, with the agreement of the DIP Lenders, have supplemented the adequate protection package to be provided to the Adequate Protection Parties.  To address the concerns and arguments raised by certain of the Objecting Parties, the Debtors and the DIP Lenders have agreed, among other things, to modify the replacement liens to be provided to the Adequate Protection Parties in exchange for the

3

Debtors' use of Cash Collateral. Specifically, the Adequate Protection Liens to be provided to the Adequate Protection Parties now include, in addition to the adequate protection described in the Motion: a continuing, valid, binding, enforceable, and automatically perfected postpetition security interest in, and lien on (i) the cash in the Main Operating Account and (ii) a silent second lien on the properties currently securing the Prepetition Goldman Facility in an amount equal to the lesser of (x) the aggregate diminution in the value of the Adequate Protection Parties' interest in the Prepetition Collateral (after taking into account the value of the Prepetition Collateral) and (y) the net positive balance of the Intercompany Claim of the Debtor whose property constitutes Prepetition Collateral of the Adequate Protection Party (the liens granted to each Adequate Protection Party pursuant to this paragraph, collectively, the "**Adequate Protection Liens**"); provided, however, that the Adequate Protection Liens shall be subject and subordinate only to any liens on the Collateral that are senior to, or pari passu with, the Prepetition Liens and the Carve-Out (as defined in the Revised Final DIP Order).

26. In addition, certain secured lenders also have raised adequate protection concerns in their objections to the Debtors' *Motion to (I) Honor Tenant Obligations and (II) Authorize Financial Institutions to Honor Related Checks and Transfers* (the "**Tenant Motion**")[3] These objectors contend that the Tenant Motion should not alter the Debtors' obligations under the applicable loan documents with respect to any restrictions on tenant allowances or other agreements with respect to Tenant Obligations (as defined in the Tenant Motion).[4]

---

[3]    Tenant Obligations Motion (Docket No. 11). On April 29, 2009, the Debtors filed a supplement to the Tenant Obligations Motion (the "**Supplement**") (Docket No. 193).

[4]    See Objections to the Tenant Obligations Motion at Docket Nos. 107 and 239.

27.     To address these objections, the Debtors propose to supplement the
Adequate Protection Package by agreeing to comply with certain covenants in the loan
agreements relating to leasing and other property transactions.  Specifically, the Debtors will
comply with covenants in first mortgage documents imposing notification or consent
requirements, or other limitations, on the Debtors' ability to enter into, terminate, restate or
amend leases or reciprocal easement agreements ("**REAs**").  The Debtors will comply with
these covenants in the same manner they would comply in a prepetition, non-default situation,
with respect to both new leases and REAs entered postpetition and the modification or
termination of any prepetition lease or REA.  Where the applicable loan document requires the
consent of the lender, the Debtors will not execute and deliver documents effecting such a
transaction without first obtaining the required consent of the lender.

28.     To further facilitate the Debtors' ability to enter into property
transactions and preserve and enhance the value of the secured lenders' collateral, the Debtors
propose that any lender who receives the benefit of the Debtors' compliance with restrictions
on property transactions shall be required to execute a subordination, non-disturbance and
attornment agreement ("**SNDA**") in favor of a qualified tenant, or a consent and subordination
agreement ("**CSA**") for anchor occupants and adjoining landowners.[5]  The execution and
delivery of SNDAs or CSAs, as applicable, is ordinary course in the Debtors' business and the
commercial real estate industry, and secured lenders regularly executed them prepetition. The

---

[5]      SNDAs and CSAs are common agreements ancillary to commercial real estate transactions
whereby the tenant (or owner of a reciprocal easement) and the lender agree in advance on certain
protections for each other in the event of a foreclosure.  In an SNDA, the lender/mortgagee agrees that,
notwithstanding a foreclosure, it will honor the lease and not disturb the occupancy of the tenant.  In
exchange, the tenant agrees to recognize the lender/mortgagee as the new landlord.  For purposes of
adequate protection, a qualified SNDA tenant is any tenant (a) with a national or regional presence, or
(b) occupying 5,000 square feet or more or office or retail property (whether in one or more lease
instruments).

chapter 11 filings have prompted many tenants to require them as a condition to the execution and delivery of property transaction documents such as new or amended leases.  As set out in greater detail in the Final DIP Order submitted herewith, to reduce the time required to negotiate and execute SNDAs and CSAs, the Debtors propose to use the form attached to the applicable loan document, or if the loan document does not specify a form, the one attached to the Final DIP Order.

29.    Finally, the Debtors have agreed to provide to the Adequate Protection Parties the financial reporting to which such parties were entitled in accordance with their original first mortgage loan documents.[6]

30.    As noted in more detail below, the Debtors believe the Adequate Protection Package, as supplemented (the "**Revised Adequate Protection Package**") addresses the concerns raised by the Objecting Parties and adequately protects them for the Debtors' use of their Cash Collateral.

### III.
### THE OBJECTIONS SHOULD BE OVERRULED

**A.    The Debtors' Request to Use Cash Collateral Should Be Granted**

31.    Although the Debtors are seeking approval of DIP Financing, the Debtors continue to require the use of Cash Collateral, wherever located, to continue operations and preserve the value of the Debtors' assets.  It is universally acknowledged that a debtor's cash "is the life's blood of the business," and the bankruptcy court must ensure that such life's blood "is available for use, even if to a limited extent."  In re Mickler, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981).

---

[6] With respect to a small number of properties where loan documents require the Debtors to provide audited financial statements for the property-owning entity, the Debtors will provide unaudited information.

32.    Courts typically authorize a debtor to use cash collateral to continue its operations so long as the interests asserted by affected creditors in such cash are adequately protected.  Thus, courts balance the protection a debtor seeks to provide with the debtor's need to use cash in its reorganization effort.  Stein v. U.S. Farmers Home Admin. (In re Stein), 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).  In ruling whether a debtor is adequately protected early in a case, courts "will generally permit the business operation to continue, at least to the point of plan formulation, if the debtors make a solid evidentiary showing to support their projections[.]"  In re Dynaco Corp., 162 B.R. 389, 395 (Bankr. D.N.H. 1993).

33.    Consistent with these requirements, courts repeatedly have recognized that use of cash collateral is appropriate where necessary to preserve a debtor's ability to reorganize and thus maximize the value of an estate for all interested parties.  See, e.g., Chrysler Credit Corp. v. George Ruggiere Chrysler-Plymouth, Inc. (George Ruggiere Chrysler-Plymouth, Inc.), 727 F.2d 1017, 1020 (11th Cir. 1984) (allowing debtor to use cash collateral over secured creditor's consent after noting that "[w]ithout the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated."); MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1399 (10th Cir. 1987) (permitting debtor to use cash collateral to expand operations after finding there was only a low risk that secured creditor's interest would diminish); In re Stein, 19 B.R. at 459 (granting cash collateral motion and declaring that access to cash is imperative for a debtor to operate its business); Dynaco, 162 B.R. at 394 (granting a motion for the use of cash collateral and stating that "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary in order to operate a business"); see also In re Megan-Racine Assocs. Inc., 202 B.R. 660, 663

7

(Bankr. N.D.N.Y. 1996) (noting, in connection with motion to approve use of cash collateral, that "[w]hat is important at this juncture in the case in any determination of additional adequate protection is the future stability of the value of the Collateral, rather than any particular level of value at any one time since the case was commenced").

34.    As adequate protection for the Debtors' continued use of Cash Collateral, the Debtors have proposed to provide the revised form of adequate protection provided in the Revised Final DIP Order.

**1.    The Proposed Adequate Protection**
**Package Is Appropriate and Justified Under the Circumstances**

35.    The Objecting Parties argue that the Adequate Protection Package is insufficient because, according to the Objecting Parties: (i) the Debtors have not articulated with sufficient specificity how they propose to maintain the Adequate Protection Properties (as defined in the proposed Revised Final DIP Order), and have not provided for reserves for payment of taxes, insurance and capital expenditures, (ii) the Debtors do not intend to make payment of outstanding principal payments, attorneys' fees of Adequate Protection Parties' counsel, or provide default (as opposed to non-default) interest, and (iii) the proposed Adequate Protection Liens rank junior in priority to the liens provided to the DIP Lenders, and the value of such liens are not guaranteed.  For the reasons set forth below, the Debtors submit that the foregoing objections lack merit and, accordingly, should be overruled.

36.    The Adequate Protection Liens to be provided to the Adequate Protection Parties will adequately protect their interests in the Cash Collateral.  Since the filing of the Motion, the Debtors have received additional proposals for debtor in possession financing and have selected the DIP Lenders as their proposed DIP lender.  In addition to

better economic terms, the DIP Lenders have agreed to the Revised Adequate Protection Package.

37.    Specifically, pursuant to the Revised Final DIP Order, the Adequate Protection Parties will receive, in addition to a lien on the Intercompany Claims that its respective Debtor receives on account of the net cash that flows into the Debtors' centralized Cash Management System, a lien on the Main Operating Account in an amount equal to the lesser of (x) the Aggregate Value Diminution (after taking into account the value of the Prepetition Collateral) and (y) the net positive balance of the Intercompany Claim of the Debtor whose property constitutes Prepetition Collateral of the Adequate Protection Party (such liens, the "**<u>Adequate Protection Liens</u>**"); provided, however, that such liens are subordinate only to any liens on the Collateral that are senior to, or pari passu with, the Prepetition Liens and the Carve-Out.  Indeed, the liens granted to the DIP Lenders on then cash contained in the Debtors' main operating account and the property currently securing the Prepetition Goldman Facility will be subject to the Adequate Protection Liens.

38.    In light of this change, the Debtors submit that to the extent certain Objecting Parties contended that the Adequate Protection Liens provided under the previously proposed Final DIP Order were inadequate or illusory, such objections are now moot and should be overruled.

39.    <u>Payment of principal, default-rate interest, and attorneys' fees are not mandated under the Bankruptcy Code</u>.  Although section 361 of the Bankruptcy Code sets forth general parameters as to what constitutes adequate protection, the Bankruptcy Code does not require that the periodic cash payments made to a party receiving adequate protection be in

the form of continued payment of principal, attorneys' fees, or interest at the default

contractual rate.[7]

40.     Secured creditors are only entitled to receive interest payments to the

extent that they are oversecured.  See Indian Palms Assocs., Ltd., 61 F.3d 197 (3d Cir. 1995)

(adequate protection payments could be allocated to interest only to the extent of the excess

collateral).  It is appropriate for a debtor to make adequate protection interest payments at the

non-default contract rates.  In re Calpine Corp., 365 B.R. 392, 396 (Bankr. S.D.N.Y. 2007).

Nothing in the proposed Revised Final DIP Order is intended to foreclose an Adequate

Protection Party from seeking the contractual default rate as part of its claim against the

Debtors.  See, e.g., In re Liberty Warehouse Assocs. Ltd. P'ship, 220 B.R. 546, 551 (Bankr.

S.D.N.Y. 1998) (noting that secured party received adequate protection payments at non-

default rate, it had not waived its right to assert default rate interest as part of its claim).

---

[7] What constitutes adequate protection must be decided on a case-by-case basis.  See, e.g., In re
Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1992); In re Realty Southwest Assocs., 140 B.R. 360,
366 (Bankr. S.D.N.Y. 1992) (citing Martin v. United States, 761 F.2d 472, 274 (8th Cir. 1985)).
Moreover, courts should take equitable considerations into account in determining what constitutes
adequate protection.  See In re Dynaco Corp., 162 B.R. 389, 394 (Bankr. D.N.H. 1993) ("Adequate
protection will take many forms, only some of which are set forth in section 361 of the Bankruptcy
Code. . .and must be determined based upon equitable considerations arising from the particular facts
of each proceeding."); Stein v. U.S. Farmers Home Admin., 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982)
("The equities in each case must be weighed in striking a balance.").  The determination of adequate
protection is a "fact-specific inquiry."  In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its
application is left to the vagaries of each case….") (citation omitted).  The focus of the adequate
protection requirement is to preserve the secured creditor's position at the time of the bankruptcy filing
and protect the secured creditor from diminution in the value of its collateral during the reorganization
process.  Id.  at 288 (citation omitted); Beker, 58 B.R. at 736; see In re WorldCom, Inc., 304 B.R. 611,
618-619 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code,
which sets forth how adequate protection may be provided under section 363, makes clear that the
purpose is to insure that the secured creditor receives the value for which the creditor bargained for
prior to the debtor's bankruptcy.").  "However, neither the legislative history nor the Bankruptcy Code
require the Court to protect a creditor beyond what was bargained for by the parties." WorldCom, 304
B.R. at 619; see Beker, 58 B.R. at 741  ("*Adequate* protection, not *absolute* protection is the statutory
standard.") (emphasis added).

41.    Requiring that the Debtors make principal payments on their outstanding debt would be antithetical to established Bankruptcy Code principles.  The protections afforded debtors in chapter 11 proceedings are intended to provide debtors with breathing room by, among other things, allowing a debtor the opportunity to temporarily suspend regular payment obligations to effectively negotiate and restructure its debt obligations in an eventual plan of reorganization.  Requiring the Debtors to make principal payments during this time would greatly decrease the flexibility needed to reorganize effectively.  It also is unnecessary because the Adequate Protection Package, as a whole, provides ample protection against any diminution in the allowed secured claims of the Adequate Protection Parties, as measured on the petition date.  With the sole exception of Citicorp, which contends it is undersecured on the Oakwood Mall in Louisiana, no objecting lender has alleged that the value of its collateral is worth less than the value of its claim.[8]

42.    Payment of attorneys fees, likewise, is unnecessary to adequately protect secured lenders, and paying attorneys fees during the course of the chapter 11 case for numerous secured lenders would only put unnecessary pressure on the Debtors' liquidity, cause legal costs to increase unnecessarily, and create an administrative and judicial morass as the Debtors monitor the legal and other professional fees of dozens of lenders and inevitably have to involve the Court in resolving disputes.  Accruing any reimbursable attorneys' fees and satisfying them under a plan of reorganization does not lead to a conclusion that any secured lender is not adequately protected.

43.    There is no requirement that the Debtors provide adequate protection for any equity cushion that might erode due to accrual of default-rate interest, attorneys fees,

---

[8] The Debtors' Response to Citicorp's Objection is at paragraph 57 below.

or other charges that might cause a secured lender's claim to increase during the chapter 11 cases.  "[T]here is no lack of adequate protection when the equity cushion above that amount is eroding through either a decline in collateral value or an increase in the claim due to the accrual of interest or expenses."  In re Lane, 108 B.R. 6, 8 (Bankr. D. Mass. 1989); see also In re Delta Resources, Inc., 54 F.3d 722, 730 (11th Cir. 1995)  ("An oversecured creditor's interest in property which must be adequately protected encompasses the decline in the value of the collateral only, rather than perpetuating the ratio of the collateral to the debt.").  The Debtors are only required to provide adequate protection for the value of the allowed secured claim *as of the petition date*.  See In re Nice, 355 B.R. 554, 563 (Bankr. N.D. W. Va. 2006) ("Adequate protection is solely a function of preserving the value of the creditor's secured claim as of the petition date due to a debtor's continued use of collateral."); In re Addison Properties Ltd. P'ship, 185 B.R. 766, 784 (Bankr. N.D. Ill. 1995) ("For purposes of adequate protection, the claim of the secured creditor is fixed as of the date of filing."); In re Dahlquist, 34 B.R. 476, 480 (Bankr. D.S.D. 1983) ("The value of an allowed secured claim for purposes of adequate protection is determined as of the time the bankruptcy petition is filed." (citing In re Auto-Train Corp., 9 B.R. 159, 166 (Bankr. D.D.C. 1981)).

44.    The Debtors' maintenance of the Adequate Protection Properties constitutes adequate protection.  Certain Objecting Parties argue that the Debtors have made no showing of how they intend to continue to maintain their properties, or alternatively, argue that the Debtors should be required to maintain reserves or escrows for insurance, taxes and other expenses.  The Debtors currently pay all operating and maintenance expenses of the properties securing the Property Loans and will continue to do so during their chapter 11 cases, thereby preserving and enhancing the value of the Adequate Protection Properties.

These expenses include both the costs specific to each Adequate Protection Property, such as local personnel, utility payments, security and janitorial services, and all other direct expenses of operating and maintaining a shopping center or office building, and the corporate-level costs associated with the GGP Group's centralized, integrated management. These corporate level costs include the wages and benefits and other costs for of *all* employees of the entire enterprise. As will be demonstrated at the Final Hearing, the Debtors intend to continue to pay operating and maintenance expenses as they have done in the past. Presentation of detailed expense budgets for each of the numerous Adequate Protection Properties involved in these chapter 11 cases is impractical and unnecessary. The evidence at the hearing will show that, on an aggregate basis, the Debtors' rolling 13-Week Forecast (annexed as an exhibit to the DIP Motion) and 2009/2010 Projections attached as **Exhibit E** (the "**2009/2010 Projections**") contemplate payment of all necessary expenses. In addition, the Debtors have sought, and obtained, this Court's permission to pay certain pre- and postpetition taxes as well as to make insurance payments.

45.    Courts have noted that using cash collateral to maintain the property from which rents are being used is a sufficient form of adequate protection. See Federal Nat. Mortg. Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship, 153 B.R. 204 (N.D. Ill. 1993) ("[T]he required adequate protection of Rents is satisfied to the extent the Debtor reinvests the rents in the operation and maintenance of the property because the value of the secured creditor's interest in its collateral will thereby be increased."); In re 499 W. Warren Street Assocs., Ltd. P'ship., 142 B.R. 53, 58 (Bankr. N.D.N.Y. 1992) (allowing the use of cash collateral to maintain property); In re McCombs Properties VI, Ltd., 88 B.R. 261, 267 (Bankr. C. D. Cal. 1988) (holding that rents could be spent to make repairs or renovations that would

Pg 24 of 53

increase rent flow even without equity cushion); <u>In re Western Real Estate Fund, Inc.</u>, 83 B.R. 52, 54 (Bankr. W. D. Okla. 1988) (allowing expenditures of postpetition rent revenues for upkeep).

46.    There is no requirement in the Bankruptcy Code that the Debtors establish escrows to pay the taxes, insurance or any other expenditures relating to their properties and the Court should reject the suggestion of certain Objecting Parties that doing is necessary to establish adequate protection.  The Debtors fully intend to pay these costs directly.  If for any reason they should fail to do so, nothing precludes an Adequate Protection Party from requesting that this Court revisit adequate protection and order additional protections.  At this time, however, escrowing operational expenses for scores of properties is inefficient and unnecessary.

47.    <u>The Debtors will provide additional reporting and will comply with certain pre-default leasing covenants in the Adequate Protection Parties' secured mortgage documents</u>.  Certain Objecting Parties contend the Adequate Protection Package is insufficient because it does not provide for continued reporting.  Pursuant to the Amended Adequate Protection Package, the Debtors have agreed to provide financial reporting consistent with the pre-default, pre-bankruptcy financial reporting requirements contained in the Adequate Protection Parties' original first mortgage security documents, as more fully set forth in the Revised Final DIP Order.  Accordingly, any objections on this basis should be overruled as moot.

48.    <u>The Adequate Protection Liens on the cash in the Main Operating Account are senior to the DIP Liens</u>.  Certain Objecting Parties argue that the Debtors' proposed form of adequate protection is insufficient because the replacement liens proposed

by the Debtors ostensibly rank junior to those provided to the DIP Lenders.  Pursuant to the

proposed Revised Final DIP Order, the liens granted to the DIP Lenders on the cash contained

in the Main Operating Account and the on the property currently securing the Prepetition

Goldman Facility will rank junior to the Adequate Protection Liens.  Accordingly, the Debtors

submit that objections of this nature are now moot.

### 2.    Mezzanine Lenders Are Not Entitled to Adequate Protection

49.    Certain Objecting Parties that are mezzanine lenders (the "**Mezzanine**

**Lenders**") to the Debtors contend that they are entitled to adequate protection because they

claim liens on the equity interests of the Debtor entities that own the Adequate Protection

Properties.  To the extent those Mezzanine Lenders have a lien on assets of the Debtors, their

collateral is not the "Cash Collateral" that the Debtors are currently seeking to use.  Section

363(a) defines cash collateral as "cash, negotiable instruments, documents of title, securities,

deposit accounts, or other cash equivalents whenever acquired in which the estate and an

entity other than the estate have an interest and includes the proceeds, products, offspring,

rents or profits of property and the fees, charges, accounts or other payments…"  The cash that

the Debtors seek to use is not the collateral of the Mezzanine Lenders.  The Mezzanine

Lenders have no security interest in the rents received at the property level and therefore have

no interest in cash collateral that requires adequate protection.  The Mezzanine Lenders

likewise have no basis to complain about the imposition of second liens in favor of the DIP

Lender because they have no direct interest in this collateral.  Accordingly, the Mezzanine

Lenders' objections should be overruled.

**3.    The Debtors Will Use Cash Collateral In Accordance
with their Rolling 13-Week and 2009/2010 Projections**

50.    Certain Objecting Parties suggest that the Debtors should use Cash

Collateral in accordance with a pre-determined budget governing each Adequate Protection

Property.  Alternatively, certain Objecting Parties contend that the Debtors cannot use the

Cash Collateral of particular Adequate Protection Parties for general use throughout their

business, but instead must segregate such amount for use in connection with the specific

Adequate Protection Property to which the Cash Collateral relates.  Citing section 363(c)(4) of

the Bankruptcy Code, these Objecting Parties argue that the Bankruptcy Code requires the

Debtors to segregate cash collateral.  This argument, however, ignores the prefatory language

of section 363(c)(4), which makes clear that segregation of cash collateral is required *only* in

circumstances where the Court has not otherwise authorized the debtor in possession to use

cash collateral.

51.    Section 363(c)(4) provides, "*Except as provided in paragraph (2) of*

*this subsection*, the trustee shall segregate and account for any cash collateral in the trustee's

possession, custody or control."  Section 363(c)(2) prohibits a debtor from using cash

collateral unless the entity that has an interest in such cash collateral consents or the court

allows such use.  Numerous courts have noted that the segregation requirement applies only

when the Court has not otherwise permitted use of cash collateral.  See In re White Plains

Dev. Corp, 137 B.R. 139, 142 (Bankr. S.D.N.Y. 1992) (noting that, "[u]nder the Bankruptcy

Code, as applied after the Butner case, a debtor must 'segregate and account for any cash

collateral that it does not have the consent of the creditor or authority from the court to use,

sell or lease. . .'"); In re Northport Marina Assocs., 136 B.R. 911, 919 (Bankr. E.D.N.Y.

1992); Freightliner Market Dev. Corp. v. Silver Wheel Freightlines, Inc., 823 F.2d 362, 367

(9th Cir. 1987) ("Unless the Trustee gets a court order or consent, he is obligated to segregate and account for any cash collateral in his possession, custody, or control. 11 U.S.C. § 363(c)(4).... On the other hand, if a debtor gets a creditor's consent or a court order, the creditor loses his right to trace proceeds."); In re Four Seasons Marine & Cycle, Inc., 263 B.R. 764, 768 (Bankr. E.D. Tex. 2001) ("11 U.S.C. § 363(c)(4) explicitly provides that, *in the absence of consent or court authorization,* '... the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control.'") (emphasis added). Consequently, the Bankruptcy Code "requirement" that a debtor segregate cash collateral is only a requirement insofar as the Court does not order otherwise.

52.    Here, valid reasons exist for not requiring a debtor to segregate Cash Collateral of a particular Adequate Protection Party or to condition use of the Cash Collateral on compliance with a property-specific budget.  As is set forth in the Cash Management Motion, the GGP Group manages its cash through a centralized cash management system and does not have the infrastructure in place for each Adequate Protection Property to independently perform that function.  Individual subsidiaries and Adequate Protection Properties do not have check writing capabilities and lack treasury personnel trained to manage cash.  The Debtors do forecast expenses on a property-by-property level, but requiring the Debtors to test expenditures against scores of property-level budgets as a condition to continued use of cash collateral is impractical and unnecessary.

53.    Indeed, what the Objecting Parties who have raised this issue seek would, in effect, require the Debtors to create a new cash management system at each of the property-level Debtors.  This would, in turn, result in (i) added and unnecessary expense of putting in place contracts, employees and infrastructure, including disbursement and other

2

bank accounts, required to handle, among other things, collection, accounting, and disbursements – all of which are now, and have always been, handled through the Debtors centralized cash management system, (ii) disruption due to the difficulty associated with coordination of a new cash management system, (iii) additional bank fees due to few consolidated accounts, and (iv) loss of pricing concessions from national vendors whose contracts relate to groups of the Debtors' properties.

54.    The Debtors will provide appropriate reporting, on an aggregate basis through monthly operating reports filed with the Court, and on a property level basis through reporting consistent with prepetition practices under the applicable loan documents.  In addition, the Debtors have projected their  use of Cash Collateral in accordance with their rolling 13-Week and 2009/2010 Projections annexed hereto as **Exhibit E**.  This is more than sufficient to monitor expenditures and adequately protect the Adequate Protection Parties.

55.    Some Objecting Parties argue that the ability to use Cash Collateral for purposes other than property maintenance and operation is tantamount to an improper surcharge under section 506(c) of the Bankruptcy Code.  It is no such thing.  Nowhere in section 363(c)(2), which governs the use of cash collateral, does the Bankruptcy Code limit the purposes for which cash collateral may be used.  Equating the ability to surcharge collateral for expenses that improve or benefit it with requesting to use collateral and providing adequate protection would, in essence, rewrite section 363(c)(2) of the Bankruptcy Code.  The Debtors do not seek to surcharge any Adequate Protection Party's collateral by the relief requested in these motions.  Section 506(c) is inapplicable.

56.    Nor will permitting the Debtors to upstream Cash Collateral in the manner that is consistent with their existing Cash Management System amount to de-facto

substantive consolidation. The Cash Management System currently in place is the same system that the Debtors have asked this Court to maintain. Thus, the Debtors seek only to maintain the status quo, not effect any substantive consolidation. The assertion that continued use of Cash Collateral, in the same way the Debtors used their cash prior to chapter 11, constitutes a substantive consolidation, is a sweeping mischaracterization of the law. Substantive consolidation is an equitable remedy that pools the assets of multiple debtors and channels the claims of all creditors to this common pool of assets. *Babcock & Wilcox*, 250 F.3d at 958-59 (rejecting contention that DIP financing order effected substantive consolidation). The motions before the Court do no such thing. To the extent they were previously secured, each of the Adequate Protection Parties here remains a secured creditor of a particular Debtor, and assets are not being pooled as a matter of law or fact. The Debtors will maintain appropriate intercompany accounting records to track all movements of cash and payment of expenses, preserving the ability to separately identify the assets and liabilities of each Debtor. Use of a centralized cash management system, by itself, does not suggest that substantive consolidation is appropriate. See, e.g., In re Charter Behavioral Health Sys. LLC, 292 B.R. 36, 41 (Bankr. D. Del. 2003) (noting that entry of an order on motion to maintain centralized cash management system does not indicate substantive consolidation).

### 4. Undersecured Creditors' Interests Will be Adequately Protected

57. Citicorp objects to use of cash collateral on the basis that it is undersecured and use of rents generated by the Oakwood Mall would thus further diminish the value of its collateral. This Court and others, however, have noted that the Bankruptcy Code does not limit debtors to use of only the cash collateral of oversecured creditors. Rather, as long as a debtor is able to provide adequate protection it may use an undersecured creditor's

cash collateral.  See In re 680 Fifth Avenue Assocs., 154 B.R. 38, 42 (Bankr. S.D.N.Y. 1993) ("But where a lender is undersecured, the debtor's use of that lender's cash collateral, *absent adequate protection*, would clearly cause a decrease in the value of that creditor's property in which the debtor had an interest…"); see also In re Carbone,  395 B.R. 631 (Bankr. N.D. Ohio 2008) (allowing the debtor to use the cash collateral of an undersecured creditor so long as the debtor was able to provide the creditor with adequate protection).  The Debtors will provide Citicorp with the same adequate protection package they are providing to all other secured Adequate Protection Parties.  Because Citicorp concedes it is undersecured, it is not entitled to post-petition interest payments.

58.    Accordingly, if use of cash collateral is approved by the Court, the Debtors will pay an amount equal to periodic interest payments but those payments shall be applied to reduce principal rather than be paid as interest.  Because the total indebtedness to Citicorp will be reduced each month, it is adequately protected against any decline in the value of the Oakwood Mall property.  The replacement lien and other components of the Adequate Protection Package likewise will protect Citicorp against any diminution in value on account of use of its cash collateral.  To the extent any other Adequate Protection Party is determined to be undersecured, the order reserves all rights to recharacterize adequate protection payments as principal.

### 5.    Certain Adequate Protection Properties Cannot Be "Carved-Out" From Proposed Use of Cash Collateral

59.    Certain Objecting Parties argue that the Adequate Protection Properties securing their loan are adequately capitalized and thus will not benefit from the use of Cash Collateral or the proceeds of the proposed DIP Loan and accordingly should not be required to have to "lend cash" to the Debtors' enterprise.  To the extent these arguments can be read to

imply that the Debtors should enable these parties to "opt out" of the proposed financing and cash collateral use, such result is untenable.

60.    As noted, the Debtors maintain an integrated cash management system. Were individual Adequate Protection Properties to be excluded from such order, the Debtors could find themselves in a position where they were paying the operating expenses of such properties without having access to the rents collected on account of such properties. Alternatively, if the Debtors were required to segregate an Adequate Protection Property's rents and use those rents to pay only such Adequate Protection Property's expenses, the Debtors would be forced to create a separate cash management system for such property. Given the size and complexity of the Debtors' enterprise, this result could wreak havoc on the Debtors' Cash Management System and the smooth operation of these properties during the Debtors' chapter 11 cases. As noted above, implementing separate cash management systems for hundreds of subsidiary Debtors will result in a time-consuming administrative hurdle that will cause the Debtors to divert valuable estate resources.

**B.    The DIP Financing Should be Authorized**

61.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

62.    Notwithstanding that the Debtors were able to file their chapter 11 cases with proposed debtor in possession financing in hand, the Debtors have worked steadfastly since the filing of their chapter 11 cases to obtain a commitment for debtor in possession financing on better economic and other terms.  These negotiations culminated in the proposal of debtor in possession financing by the DIP Lenders (the "**Revised DIP Financing**").  The Debtors negotiated the Revised DIP Financing extensively in good faith and at arms' length. The Debtors submit that their decision to enter into the Revised DIP Financing is an exercise of their sound business judgment.  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990); see also In re Funding Sys. Asset Mgmt. Corp., 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985).

1.    **The Debtors Require DIP Financing to Successfully Administer Their Chapter 11 Cases**

63.    Certain Objecting Parties contend that the Debtors do not require DIP financing, either on an enterprise-wide basis or on a property-specific basis.  This is incorrect on both levels.  The Revised DIP Loans provides an appropriate minimum level of liquidity to ensure the Debtors will be able to maintain and operate all of their properties through the chapter 11 cases.  The Debtors' consolidated 2009-10 forecasts show that, in the absence of DIP financing, their cash availability will fall to approximately $100 million at the low point. Although it is theoretically possible to operate with only $100 million in cash, given the size

7

of the Debtors' business, the Debtors have concluded in the exercise of their business

judgment that obtaining the additional liquidity provided by Revised DIP Loan is prudent for a

number of reasons.

64.    While the Debtors' projections are conservative, in the current

economic climate the Debtors determined that having added liquidity as a backstop against

unforeseen deterioration in their financial performance was a sound step to take in order to

ensure the ability to operate and maintain their properties for the benefit of all constituencies,

including their secured mortgage lenders.  The Debtors also have concluded that having DIP

financing would help stabilize their business and facilitate the reorganization process by

reassuring tenants, vendors, and employees that the Debtors have ample liquidity to meet

postpetition expenses and continue uninterrupted operation of their properties.

65.    The suggestion that each property-owning Debtor's finances must be

scrutinized individually to determine the need for DIP financing has no support in the law and

once again ignores the way these Debtors actually operate.  Each shopping center owned by

the Debtors, for example, is dependent on the operation of the nationwide enterprise for vital

services.  Indeed, these shopping centers do not maintain their own personnel.  Thus, even if

the projected cash flow of an individual property-owning Debtor might be sufficient to cover

its expenses and interest payments through the course of the chapter 11 case, it remains a

sound exercise of business judgment to participate in the Revised DIP Loan to ensure that the

enterprise has sufficient funds to provide the services that sustain, for example, each shopping

center owned by the Debtors.  Furthermore, there is no guarantee that a property that is cash-

flow positive today will remain so through the entire chapter 11 process or that an unplanned

capital expenditure may be required for such property.  Ensuring adequate liquidity now – at a

time when it is available to all of the Debtors – is a prudent step for each Debtor. There is

nothing inappropriate about obligating each Debtor for all the borrowings under the Revised

DIP Loan. See Babcock & Wilcox, 250 F.3d at 959 (approving DIP financing where all

debtors were jointly and severally obligated).

     **2.**      **The Terms of the DIP Loan are the Best Available in the Current Market**

     66.     The Debtors believe that the improved terms of the Revised DIP

Financing as compared to that of Pershing resolves the objections raised by the Objecting

Parties in connection with the financing's economic terms.  Significantly, the Revised DIP

Financing lacks the "warrant" component to which many of the Objecting Parties have

objected.  Moreover, putting aside the fact that the Revised DIP Financing eliminates the

warrant requirement, the Revised DIP Financing contains other more favorable economic

terms.  For example, the Revised DIP Loan provides an additional $25 million of borrowing

capacity to the Debtors and gives the Debtors the option to convert the outstanding debt to

equity upon emergence from chapter 11 protection or, alternatively, to post-emergence debt.

This feature alleviates the pressure that the Debtors might otherwise face upon emergence in

trying to obtain exit financing.

     67.     Moreover, those features of the original DIP Credit Agreement with

Pershing that continue in the Revised Final DIP Order, including, for example, the waiver of

the Debtors' rights under section 506(c) of the Bankruptcy Code, attacked as "extraordinary"

by certain of the Objecting Parties have become common requirements to obtaining a lender's

willingness to extend credit to chapter 11 debtors.  See, e.g., In re Linens Holding Co. Ch. 11

Case No. 08-10832 (CSS) (Bankr. D. Del. May 28, 2009); In re Dura Automotive Sys., Inc.

Ch. 11 Case No. 06-11202 (KJC) (Bankr. D. Del. Nov. 21, 2006) (same).  Without question,

the DIP Credit Agreement contains features that the Debtors were unable to improve or modify. Nonetheless, given the various proposals received by the Debtors to date, the Debtors believe and will demonstrate that the proposed financing to be provided by the DIP Lenders is the best available to the Debtors in the current economic climate.

> **3.      Repayment of the Goldman Loans Was a Key Component to Obtaining the DIP Financing**

68.     Certain of the Objecting Parties question why repayment of the Goldman Facility is necessary. As the Debtors will demonstrate at the Final DIP Hearing, both the Debtors and the Lenders believe that the value of the collateral securing the Goldman Facility (the "**Goldman Collateral**") significantly exceeds the amount of such facility. In short, substantially all of the Debtors' prospective DIP lenders required a first lien on the Goldman Collateral. Absent granting such a lien, the Debtors would have received DIP financing on substantially less favorable terms or been unable to receive DIP financing at all. Satisfying the outstanding amounts under the Goldman Facility was the only way to provide the Lenders with a first lien on the Goldman Collateral, absent the possibility of protracted and expensive "priming" litigation.

69.     Second, the Goldman Facility was one of the more recent debt facilities into which the Debtors entered. As such, the interest rate on the Goldman Facility was higher than that of the other outstanding credits of the Debtors, and it therefore is a sound exercise of the Debtors' business judgment to use proceeds of the Revised DIP Loan to repay the Goldman Facility, as opposed to other secured debt, to provide the Lenders a first lien. In addition, the replacement of the Goldman Facility with the Revised DIP Loan provides the Debtors with an option to convert this loan amount to either post-emergence debt or equity, which would not be possible had the Goldman Facility remained outstanding. Finally, the

Debtors were offered a discount on the exit fees associated with the Goldman Facility to satisfy such indebtedness at this juncture. For the foregoing reasons, and particularly given that obtaining a first lien on the Goldman Collateral was a prerequisite to obtaining the proposed DIP Financing, the Debtors submit that repayment of such facility is necessary and an exercise of sound business judgment.

**C.    Restrictions in Loan Documents and/or Organizational
        Documents Do Not Preclude the Debtors from Obtaining
        Debtor in Possession Financing or Using Cash Collateral as Proposed**

70.    Certain Objecting Parties assert that the Motion and the Cash Management Motion should be denied because the relief sought in those motions purportedly would violate the terms of the project subsidiaries' loan agreements and organizational documents. In particular, such Objecting Parties assert that "upstreaming" cash to a centralized bank account, "commingling" cash in a bank account with funds from other debtor entities, and providing security interests in the property-level assets violate their respective loan covenants and organizational documents. These arguments are meritless. To put it simply, loan covenants and organizational documents cannot rewrite the Bankruptcy Code; were the rule otherwise, the Bankruptcy Code could be circumvented and its purpose frustrated by prepetition documents. A debtor's loan covenants and organizational documents, in short, do not override the Bankruptcy Code sections that specifically contemplate the commonplace relief that the Debtors seek in their Cash Collateral and Cash Management Motions.

71.    The loan-covenant and organizational-document objections are also misleading in suggesting that cash transfers from the project subsidiaries to GGP LP, and the availability of that cash for use by other entities in the GGP Group would constitute a sea change in how the GGP Group manages cash. For years leading up to the loan defaults that

precipitated this bankruptcy, the project subsidiaries uniformly participated in – and benefited from – GGP Group's cash management system that involved upstreaming their cash to GGP LP typically on a daily basis.  Although certain property-level Lenders now feign surprise at the existence of this cash management system, the system and upstreaming of cash to the parent level have been transparent and apparent to Lenders, whether from quarterly financial reporting or otherwise.

72.     Finally, the Objecting Parties misstate the terms of the loan agreements and operating documents as they existed before the property-level defaults.  Nothing in those documents barred the project subsidiaries from transferring their cash to the parent level or prevented parent-level entities from maintaining their cash in a centralized bank account.  The Objecting Parties' assertions to the contrary are unsupported, and, indeed, contradicted by the pre-default terms of those documents.  The Debtors here simply seek to continue operating the cash management system as it has operated transparently for years.

**1.      Loan-Covenants and Corporate-Governance
Terms Do Not Trump the Bankruptcy Code**

73.     The argument of certain Objecting Parties, in essence, is that loan agreements and operating documents should be interpreted to override mainstay provisions of the Bankruptcy Code.  The law makes plain, however, that lenders cannot, by contract or otherwise, limit the Court's authority or a debtor's rights under the Bankruptcy Code.  Contractual and corporate-governance limitations have no effect on the Debtors' express rights under the Bankruptcy Code to use cash collateral or to impose junior liens on the Debtors' assets.

**a.      Prepetition Contracts Do Not Limit Relief
Available Under the Bankruptcy Code**

12

74.     Certain Objecting Parties assert that the Debtors should not be permitted to continue their long-standing cash management system or impose liens on Lenders' collateral because doing so would violate the terms of certain loan agreements between Lenders and Debtors.  Their arguments ignore that prepetition contracts do not and cannot constrain the Bankruptcy Court's authority to effectuate rights that the Bankruptcy Code specifically grants the Debtors.  Given the Bankruptcy Code's precedence and preemptive effect, courts will not enforce "prepetition agreements purporting to interfere with a debtor's rights under [the Bankruptcy Code]."  In re Trans World Airlines, Inc., 275 B.R. 712, 723 (Bankr. D. Del. 2002) (hereinafter "In re Trans World II"); In re Trans World Airlines, Inc., 261 B.R. 103, 114 (Bankr. D. Del. 2001) (prepetition contractual provisions that would limit an entity's right to file or debtor's post-filing rights under the Bankruptcy Code are not enforceable); In re Detrano, 222 B.R. 685, 689 (Bankr. E.D.N.Y. 1998), rev'd on other grounds, 266 B.R. 282 (E.D.N.Y. 2001) ("It has long been settled law in this Circuit that waivers of bankruptcy remedies are generally against public policy and not enforceable"); In re Morris, 1998 WL 355510, at *7 (Bankr. N.D. Ill. June 30, 1998) (invalidating prepetition agreements to waive the benefits of a bankruptcy discharge); In re R.H. Macy & Co. 170 B.R. 69, 77 (Bankr. S.D.N.Y 1994) (invalidating a provision in a prepetition contract that would have restricted a debtor's rights under the Bankruptcy Code); In re Weitzen, 3 F. Supp. 698, 698 (S.D.N.Y. 1933) (contractual impairment of bankruptcy rights is unenforceable).

75.     Thus, "[t]he Bankruptcy Code explicitly invalidates provisions of private agreements which deprive the debtor of the use and benefit of property upon the filing of a bankruptcy case."  In re Pease, 195 B.R. 431, 433 (Bankr. D. Neb. 1996).  For example, in In re Trans World II, the debtor sought approval of an asset purchase agreement that would

include the sale of property, even though the terms of a prepetition contract purported to bar the debtor from selling that property. 275 B.R. at 716. The counterparty to the contract objected to the sale, but the court dismissed the objection, holding that the prepetition contract could not be enforced "in derogation of the Debtor's rights under section 363 and 365" of the Bankruptcy Code. Id. at 723.

76.     The same rule bars Objecting Parties from using loan covenants to override the Debtors' rights under the Bankruptcy Code to use their cash and lien their property. In particular, nothing in the loan agreements or any other contract could bar the Debtors from exercising their rights under section 363(c)(2) of the Bankruptcy Code to use cash collateral in which other entities have a legal right, so long as those entities' interests in the cash collateral are adequately protected. 11 U.S.C. § 363(c)(2). Nor could the loan covenants restrict the Court's power under section 364(c) of the Bankruptcy Code to "authorize the obtaining of credit or the incurring of debt …secured by lien on property of the estate that is not otherwise subject to a lien…or secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c)(2), (3). The Debtors' motions, in the end, turn on the question of adequate protection, not on the Debtors' compliance (or alleged noncompliance) with prepetition loan covenants.

### b.    Debtors' Organizational Documents Do Not Limit the Relief Available Under the Bankruptcy Code

77.     Certain Objecting Parties further object on the grounds that the relief the Debtors seek in their first-day motions would violate provisions of the project subsidiaries' operating documents, including prohibitions against "commingling" funds and the imposition of liens on the Debtors' property without Lender consent. Like contractual terms, however, organizational documents cannot trump the purpose of and rights afforded by the Bankruptcy

Code.  Indeed, the Bankruptcy Code itself expressly recognizes this fundamental principle.

For example, in defining "property of the estate," section 541 provides that property of a

debtor becomes property of the estate "notwithstanding any provisions in an agreement,

transfer instrument *or applicable nonbankruptcy law* that restricts or conditions such transfer

of such interest by the debtor."  11 U.S.C. § 541(c)(1)(A) (emphasis added).  Similarly, the

Bankruptcy Code contemplates that a chapter 11 plan of reorganization may include

amendments or additions to a debtor's charter in order to implement a plan of reorganization.

See, e.g., 11 U.S.C. § 1123(a)(5)(I) (noting that a chapter 11 "plan shall—provide adequate

means for the plan's implementation, such as—amendment of the debtor's charter"); 11

U.S.C. § 1123(a)(6) (noting that a chapter 11 plan shall "provide for the inclusion in the

charter of the debtor . . . a provision prohibiting the issuance of nonvoting equity securities").

Moreover, although not dispositive of the Bankruptcy Court's authority under the Bankruptcy

Code, even Delaware law recognizes this essential tenet of the bankruptcy process.  See 8 Del.

Code § 303 (permitting a bankruptcy court, *inter alia*, to alter, amend, or repeal a debtor's

bylaws, and to amend its certificate of incorporation).

        78.     It is, therefore, commonplace for plans of reorganization to provide for

new or amended organizational documents.  See, e.g., In re WorldCom, Inc., 2003 WL

23861928, at *48 (Bankr. S.D.N.Y. Oct. 31, 2003) (discussing provisions of the reorganization

plan, including a new certificate of incorporation and by-laws); In re Federated Dep't Stores,

Inc., 1990 WL 120751, at *6 (S.D. Ohio July 26, 1990) (authorizing debtor to amend its

certificate of incorporation in the context of obtaining credit under section 364(c)(3)); see also

Solutia's Fifth Amended Joint Plan of Reorganization, In re Solutia Inc., Case No. 03-17949

(S.D.N.Y. Oct. 19, 2007) (confirmed plan modifying organizational documents); Debtors'

First Amended Prepackaged Joint Plan of Reorganization, In re DJK Residential LLC, Case No. 08-10375 (S.D.N.Y. May 2, 2008) (same); Debtors' Sixth Amended Joint Plan of Reorganization, In re Calpine Corp., Case No. 05-60200 (S.D.N.Y. Dec. 19, 2007) (same). Nothing about the relief that Debtors seek here warrants a departure from this established approach.

79.    Tellingly, the Objecting Parties do not (and cannot) cite a single case for the proposition that organizational documents or contracts can limit the tools available to debtors under the Bankruptcy Code.  The sole case cited in purported support of their position on this issue in *any* of the objections is In re The 1031 Tax Group, LLC, Case No. 07-11448 (S.D.N.Y July 17, 2007) (cited at Docket No. 255 at ¶ 27).  But that case has nothing to do with the effect of organizational documents on the Bankruptcy Code.  Rather, that case concerned a debtor's postpetition motion to approve the appointment of its sole manager and/or director.  Id.  There, the court articulated the commonsense proposition that an appointment to the position of manager or director is a function of state law, noting that "[t]he Bankruptcy Code does not authorize the bankruptcy court to fill these positions, or to bypass the procedures that the state statutes mandate."  Id.  Of course, filling the manager/director position did not implicate, much less conflict with, rights afforded debtors under the Bankruptcy Code.

80.    TIAA's argument that the DIP Facility and cash management system give rise to claims for breach of fiduciary duty and ultra vires acts are also without merit. (Docket No. 319)  As to the first, TIAA cites no authority for the proposition that a breach of loan documents or organizational documents by a debtor-in-possession necessarily involves a breach of fiduciary duty to its estate or creditors.  To the contrary, courts have recognized that

it can be in a party's best interest to breach a contract, *see International Ass'n of Heat and Frost Insulators and Asbestos Workers Local Union 42 v. Absolute Environmental Servs.*, Inc., 814 F. Supp. 392, 401 (D. Del. 1993). Moreover, TIAA provides no basis for concluding that the DIP financing and cash management system will not "maximize the value of the estate, treat all parties to the cases fairly, and protect and conserve the debtor's property." *In re Northwest Airlines Corp.*, 349 B.R. 338, 369 (Bankr. S.D.N.Y. 2006). Indeed, Debtors maintain that the DIP facility and cash management system are not only permissible but *necessary* to "protect and conserve" the value of all Debtors' estates (and, by extension, the value available to creditors) because of the nature of their integrated operations. Similarly, to the extent any organizational documents might be violated, TIAA provides no basis for concluding that the bankruptcy court cannot override those documents to the extent necessary to facilitate the Debtors' restructuring under Chapter 11. The court's ability to override or amend organizational documents is fundamental to the bankruptcy process, *see, e.g.*, 11 U.S.C. § 1123(a)(5)-(6), and it may exercise that authority as it deems appropriate.

81.    At bottom, the Debtors are entitled to pursue their rights under the Bankruptcy Code to use their cash and to encumber their property, regardless of any purported limitations contained in the project subsidiaries' loan covenants and organizational documents, so long as the Debtors provide adequate protection of the secured Lenders' interests as applicable.

**2.    GGP Seeks to Continue Its Prepetition Consolidated Cash Management System That Was Transparent and Fully Disclosed to the Lenders**

82.    The property-level Debtors have no cash management system of their own, but instead rely on the GGP Group's centralized Cash Management System. Under this

system, the revenues from the property entities flow to a Main Operating Account held in the name of GGP LP.  Funds are upstreamed into the Main Operating Account directly from a project subsidiary's lockbox receipts or indirectly through intermediary accounts.  GGP LP in turn generally makes disbursements from the Main Operating Account in payment of the project subsidiaries' debt service, accounts payable, taxes, and all other expenses associated with operating, managing, and maintaining the subsidiary's property.

83.     Each of the project subsidiaries has benefited from the centralized Cash Management System.  The centralized system, for example, has reduced the costs of implementing an independent system of cash management, bank accounts, bookkeeping, treasury, and related expenses.  J. Mesterharm Decl. ¶ 22.  Additionally, the Cash Management System provides cash liquidity to the properties whenever bills come due, without regard to when rents – a property's principal income – are received.  Id.  This benefit is especially significant when capital expenditures are required, for which project subsidiaries would otherwise need to secure construction loans or other financing.  These liquidity benefits eliminate borrowing costs and avoid the challenges of securing financing in a credit market that is largely frozen.[1]

84.     The centralized Cash Management System has been transparent to, and in no way concealed from, the Lenders.  GGP has made numerous disclosures over the years showing that project subsidiaries were part of a consolidated enterprise providing centralized management for substantially all aspects of business operations, including cash management services.

---

[1]     Moreover, many lenders counted on the project subsidiaries' connection to the parent-level entities, requiring that GGP, Inc. and/or GGP LLP guarantee the loans.

85.     For example, GGP supplied the Objecting Parties with quarterly financial reports for the project subsidiaries that generally showed the project subsidiaries had received significant rent payments and had positive net income for the quarter.  By contrast, the quarterly balance sheets disclosed that the project subsidiaries themselves typically retained only a few thousand dollars of cash or none at all.  The difference, of course, was largely attributable to the upstreaming of cash.  The quarterly financial statements for Fashion Show LLC, a project subsidiary that borrowed from lenders who have filed an objection through their administrative agent (Docket No. 217), are illustrative:  Fashion Show LLC's income statement for the quarter ended March 31, 2008 showed rental income of approximately $13 million and net income of $9.3 million.  Yet, the balance sheet reflected cash of only **$1,400**.  See **Exhibit F**  Likewise, the March 31, 2008 financial statements for Gateway Crossing Shopping Center – another property covered by an Objection here (Docket No. 243) – showed $472,578 of rental income and $268,940 of net income, but **$0 cash**.  See **Exhibit G**.  Plainly, Lenders have had information all along showing that the project subsidiaries were retaining relatively little, or no, cash themselves.  After all, the entire premise of the REIT structure is that cash will be upstreamed to the parent for distribution as dividends to investors.

86.     Other information concerning the centralized Cash Management System was likewise made available to the Objecting Parties, including:

- In loan negotiations, the Lenders' representatives often asked about the GGP Group's Cash Management System, and GGP explained how it worked.

- Lenders conducting pre-loan due diligence saw that GGP LP wrote checks to pay the bills of project subsidiaries.  For example, Lenders seeking proof that a property's real estate taxes had been paid received copies of payment checks which disclose GGP LP on their face as the payor.  (See, e.g., **Exhibit H**,

19

showing payment of the tax bill for Southlake Mall, the retail mall securing a loan by Objector U.S. Bank to Southlake Mall, LLC)

- When loans were disbursed, the proceeds were wire transferred to GGP LP, *not* to the project subsidiary whose property secured the loan. Lenders saw where the funds were being transferred on the face of the closing statements. (See e.g., **Exhibit I**, Closing Statements)

- GGP's publicly available financial statements disclose the financial and management relationship between GGP and the properties. GGP's 10-K for 2007 and 2008 discloses GGP's business as "the operation, development and management of retail and other rental properties, primarily shopping centers." (2007 10-K at 1; 2008 10-K at 1, 36)  The 10-K plainly discloses that GGP, Inc. is "the asset manager for most of the Company Portfolio, executing the strategic decisions and overseeing the day-to-day property management functions, including operations, leasing, construction management, maintenance, accounting, marketing and promotional services." (2007 10-K at 1; 2008 10-K at 1)  "Preservation of capital is paramount and, operationally, we are striving to increase net operating income ("**NOI**") at our existing retail operations through proactive property management and leasing and through operating cost reductions." (2008 10-K at 2)

87.    These examples provide ample support for what the Court already has observed:  "It is an obvious fact that the Lenders to the individual properties here did not do business with a single borrower; they did business with one of the largest similarly situated companies in the country and they get protections from that." (4/16/09 Hr'g. Tr. at 88)  Lenders' objections to the continuation of the centralized Cash Management System that has benefited the operations of the properties that secure the Lenders' loans, and to which Lenders acquiesced prepetition, should be overruled.

   **3.    The Governance Documents and Loan Agreements Do
            Not Prohibit Transfers of Cash to GGP LP**

88.    Certain Objecting Parties contend that transfers of cash to GGP LP would violate the terms of the operating agreements and the loan agreements.  Not only are these arguments irrelevant in the bankruptcy context, as discussed above, but they simply are not true.

20

### a.    Cash "Upstreaming" is Not Prohibited

89.    ***None*** of the organizational documents that are the subject of a "covenant violation" objection bars the project subsidiaries from transferring cash to a parent entity.  (See, e.g., **Exhibit J**, Tysons Galleria, LLC Operating Agreement)  Indeed, none of the operating agreements even addresses the issue.  That is why the Objecting Parties cannot cite to any provision from those documents in support of their argument.

90.    Similarly, the applicable loan agreements do nothing to prevent the Debtors from transferring cash to a parent entity, absent a default or other "Trigger Event." Nearly all of the loan documents that Objecting Parties assert should prohibit the upstreaming of cash to GGP LP include Cash Management Agreements and Account Control Agreements. Neither of those agreements support the Objecting Parties' assertion.  The Cash Management Agreements generally required the project subsidiary to cause all rents to be deposited in a lock box.  (See, e.g., **Exhibit K**, Tysons Galleria L.L.C. Cash Mgmt. Agmt. § 3.1(a))  Absent a default or other Trigger Event, the cash was transferred daily out of the lock box as directed by the property-level borrower:

> Prior to the occurrence of a Trigger Event and after the cure or cessation of a Trigger Event, ***Borrower shall have the right*** (the "**Borrower's Direction Right**") to give instructions, notices, and directions to Lockbox Bank with respect to the transfer of funds in the Lockbox Account and ***on each Business Day to receive funds in the Lockbox Account free and clear of Lender's interest therein***; *provided, however*, upon the occurrence and during the continuance of a Trigger Event, Borrower's Direction Right shall be suspended.

(See, e.g., **Exhibit K**, Tysons Galleria L.L.C. Cash Mgmt. Amt. § 4.1(a) (emphasis added))

91.    In addition, the Account Control Agreements generally provide that the property-level borrowers may transfer cash from the lock box, without limitation as to the recipient of those monies.  Specifically, those agreements provide that, absent Lender's written notice of a Triggering Event to the Depository Bank where the lockbox is established,

"Depository Bank *shall* honor Borrower's instructions, notices and directions with respect to the transfer or withdrawal of funds from the Lockbox Account, *including paying or transferring the funds to Borrower or any other person or entity*."   (See, e.g., **Exhibit L**, Tysons Galleria L.L.C. Account Control Agmt. ¶ 4 (emphasis added))

92.    As noted above, none of the operating agreements that is the subject of a "covenant violation" objection prohibited project subsidiaries from transferring cash to GGP LP.  And of the 54 loan agreements that are the subject of the "covenant violation" objections, 52 do not restrict upstreaming, either (unless a Trigger Event has occurred).  The remaining two loan agreements subject to this objection contain limitations on upstreaming, but those limitations were the product of December 2008 amendments that occurred only after the loans had matured and the project subsidiaries were already in default.  (**Exhibit M** Fashion Show Mall LLC Am. and Restated Cash Mgmt. Agmt., dated Dec. 16, 2008, at § 4.1(c); **Exhibit N**, Phase II Mall Subsidiary, LLC ("**Palazzo**") Am. and Restated Cash Mgmt. Agmt., dated Dec. 16, 2008, at § 4.1(c)).  Before those post-default amendments, the two project subsidiaries' loan documents included the same Cash Management Agreements and Account Control Agreement terms that are quoted above, allowing the project subsidiaries to upstream their cash to GGP LP.  **Exhibit O**, Fashion Show Mall LLC Cash Mgmt. Agmt. dated Jan. 2, 2008, at § 4.1(c); **Exhibit P**, Palazzo Cash Mgmt. Agmt., dated Feb. 29, 2008, at § 4.1(c)), as Debtors propose to do in the course of these chapter 11 proceedings.

93.    In other words, the operating agreements have never prevented cash transfers from the project subsidiaries.  And, until the defaults occurred that led to these chapter 11 filings, the loan documents at issue here allowed the project subsidiaries to transfer their cash to GGP LP.

22

b.    **The Cash Management System Does Not Violate
Governance Documents and Loan Agreements**

94.    Certain Objecting Parties also argue that, if granted, the Cash

Management Motion would violate prohibitions against "commingling" cash that appear in the

project subsidiaries' governance documents and loan agreements.  Again, Objectors have

misinterpreted and misapplied the governance and loan documents.

95.    Here, the Debtors will track and account for the cash that each project

subsidiary upstreams to GGP LP, where the funds are collected in the Main Operating

Account.  In particular, the Debtors will maintain records of all transfers within the cash

management system utilized postpetition, so that all transfers and transactions will be properly

documented and accurate intercompany balances will be maintained.  (Mesterharm Aff. ¶ 86)

The upstreaming of cash to GGP LP would be recorded as an intercompany receivable to the

contributing project subsidiary, giving the subsidiary an administrative claim that would be

reduced as GGP LP makes payments on the entity's behalf.  Thus, the intercompany

receivable would be an asset of the project subsidiary, and the upstreamed cash would be an

asset of the parent.  The deposit of the parent's upstreamed cash into a centralized bank

account would, therefore, not involve the project subsidiary's assets and could not constitute

commingling of the subsidiary's assets.

96.    Moreover, even if the funds in the main operating account were deemed

to belong to the property-level subsidiary, the upstreaming to GGP LP would still not

constitute commingling.  Courts considering the issue have held that commingling or

intermingling of funds entails the mixing or combining of funds without the ability to track the

relative ownership of those who contributed to the combined fund.  Jackowski v. Seoco, Inc.,

2001 WL 709485, at *2 (N.D. Ill. 2001) ("[A] centralized cash management system where

23

accounting records track the indebtedness of each entity is not the equivalent of intermingling funds."); In re Acushnet River & New Bedford Harbor Proceedings, 675 F. Supp. 22, 34 (D. Mass. 1987) (holding that without "considerably more," "a centralized cash management system . . . where the accounting records always reflect the indebtedness of one entity to another, is not the equivalent of intermingling funds").  Thus, no commingling occurs where each contributor's funds are tracked and accounted for, even if mixed in one account.

97.      The governance materials and loan agreements cited by the Objecting Parties draw the same distinction between tracking ownership and commingling.  Those documents state that the property-level debtor "will not commingle its assets with those of any other Person," but then go on in the next sentence to state that the project subsidiary "will maintain and account for its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person."  If, as certain Objecting Parties suggest, the bar against "commingling" prevents a project subsidiary from depositing funds into a common bank account, this second sentence would serve no purpose.

98.      In sum, even if the governance documents and loan agreements were relevant postpetition – which they are not – the Debtors' proposed Cash Management Order would not violate the terms of those documents.

## D.      Prudential's Additional Requests For Relief Are Improper and Meritless

99.      In their objection, the Prudential Insurance Company of America and Prudential Retirement Insurance and Annuity Company (collectively, "**Prudential**") request certain affirmative relief with respect to two of the Debtors, Harborplace Borrower, LLC and 1160/1180 Town Center Drive LLC.  (Docket No. 222)  In particular, Prudential seeks (i) a

determination that those Debtors are single asset real estate debtors under section 101(51B) of the Bankruptcy Code, (ii) relief from the automatic stay to pursue foreclosure remedies against those Debtors, and (iii) dismissal of those Debtors' chapter 11 cases.  Prudential's requests for relief are both procedurally improper and substantively without merit.

100.    As an initial matter, Prudential's requested relief is not properly before this Court.  To obtain the types of relief that Prudential is seeking, a party must either file a motion or, in some cases, institute an adversary proceeding.  See Fed. R. Bankr. P. 1017 ("Conversion or dismissal under . . . [§] 1112(a) shall be on motion filed and served as required by Rule 9013."); Fed. R. Bankr. P. 4001 ("A motion for relief from an automatic stay provided by the Code . . . shall be made in accordance with Rule 9014 . . . "); Fed. R. Bankr. P. 7001 (delineating certain proceedings that must be filed as adversary proceedings); Fed. R. Bankr. P. 9014 ("In a contested matter not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought.").  Thus, Sections B and C of Prudential's objection should be disregarded and Prudential's improper requests for relief should be denied.

101.    But even if Prudential's requests for relief were properly before this Court, Prudential has failed to carry its burden for any of the three forms of relief it has requested and, therefore, those requests must be denied.  The Debtors will provide the Court with evidentiary support in opposition to each of Prudential's requests for relief when those issues are properly presented to the Court.

## E.    Revisions to the Final DIP Order

102.    To address some of the concerns made by the Objecting Parties, the Debtors have made certain modifications to the previously proposed Final DIP Order and such

modifications are reflected in the proposed Revised Final DIP Order.  A redlined copy of the proposed Revised Final DIP Order is annexed hereto.

## IV.

## CONCLUSION

103.    The funds provided by the Revised DIP Loan, the use of Cash Collateral, and continuation of the Debtors' prepetition cash management system, as noted above, will enable the Debtors to continue to, among other things, satisfy their business needs, pay their employees, and operate their business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all parties in interest.  For the reasons set forth in the Motion, this Reply and as will be demonstrated at the Final DIP Hearing, the Objections lack merit.  As such, they should be overruled.

## V.

## NOTICE

104.    No trustee or examiner has been appointed in these chapter 11 cases. The Debtors have served notice of this Motion on: (i) the Office of the United States Trustee for the Southern District of New York (Attn: Greg M. Zipes); (ii) proposed counsel to the Creditors' Committee; (iii) parties entitled to receive notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002; (iv) counsel to the proposed DIP Lenders; and (v) counsel to Pershing.  The Debtors submit that no other or further notice need be provided.

105.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court overrule the

Objections to the extent not otherwise settled, resolved or withdrawn, grant the relief

requested in the Motion, and such other and further relief as is just and proper.

Dated:  May 6, 2009
       New York, New York

       /s/ Gary T. Holtzer

       _____

       Marcia L. Goldstein
       Gary T. Holtzer
       Adam P. Strochak
       WEIL, GOTSHAL & MANGES LLP
       767 Fifth Avenue
       New York, New York 10153
       Telephone:  (212) 310-8000
       Facsimile:   (212) 310-8007

          and

       Stephen A. Youngman (*Pro Hac Vice*)
       WEIL, GOTSHAL & MANGES LLP
       200 Crescent Court, Suite 300
       Dallas, Texas  75201
       Telephone:  (214) 746-7700
       Facsimile:   (214) 746-7777

          and

       Sylvia A. Mayer (*Pro Hac Vice*)
       WEIL, GOTSHAL & MANGES LLP
       700 Louisiana Street, Suite 1600f
       Houston, Texas  77002
       Telephone:  (713) 546-5000
       Facsimile:   (713) 224-9511

       Proposed Attorneys for Debtors
       and Debtors in Possession

          and

James H.M. Sprayregen, P.C
Anup Sathy, P.C. (*Pro Hac Vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

Proposed Co-Attorneys for Certain Subsidiary
Debtors and Debtors in Possession