GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Bruce R. Zirinsky
Nancy A. Mitchell
Howard J. Berman
Gary D. Ticoll

Attorneys for American General Life Insurance Company

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
: 
In re : Chapter 11
:
**GENERAL GROWTH PROPERTIES** : Case No. 09-11977 (ALG)
**INC.,** *et al.,* :
               Debtors. : (Jointly Administered)
:
-----------------------------------------------------------------x

**AMERICAN GENERAL LIFE INSURANCE COMPANY'S OBJECTION TO DEBTORS' (A) CASH MANAGEMENT MOTION AND (B) REQUEST FOR FINAL ORDER AUTHORIZING DEBTOR-IN-POSSESSION FINANCING AND USE OF CASH COLLATERAL, AND (II) REQUEST FOR ADEQUATE PROTECTION**

      American General Life Insurance Company ("**AG**" or the "**Lender**"), by and through its undersigned attorneys, files this objection (the "**Objection**") to (i) the Debtors' Motion Requesting (I) Entry of (A) Interim and Final Orders (1) Authorizing the Debtors' Use of Cash Collateral and Granting Adequate Protection Therefor Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001, and (2) Modifying the Automatic Stay, and (B) A Final Order Authorizing Borrowing With Priority Over Administrative Expenses and Secured by Liens on Property of the Estates Pursuant to Section 364(c) of the Bankruptcy Code, and (II) Scheduling of a Final Hearing on Each Requested Final Order [Docket #9] (the "**DIP**

**Financing Motion**")[1] and (ii) the Debtors' Motion for Interim and Final Orders Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 (A) for Authorization to (I) Continue Using Existing Centralized Cash Management System, (II) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (III) Maintain Existing Bank Accounts and Business Forms; (B) For an Extension of Time to Comply With Section 345(b) of the Bankruptcy Code; and (C) Scheduling a Final Hearing [Docket #10] (the "**Cash Management Motion**" and, together with the DIP Financing Motion, the "**Motions**"). In support of this Objection, AG respectfully states as follows:

### I. PRELIMINARY STATEMENT

1. AG is the holder of two promissory notes, each dated July 29, 1999, issued by The Rouse Company of Nevada, LLC, successor by merger with the Rouse Company of Nevada Inc. ("**Rouse Nevada**") and The Village of Cross Keys, LLC, successor by merger to The Village of Cross Keys, Incorporated, a Maryland corporation ("**VCKI**" and, together with Rouse Nevada, collectively, the "**Borrowers**"), evidencing a loan (the "**Loan**") in the amount of $15,000,000.00. The Loan is guaranteed by VCKI pursuant to an IDOT Guaranty Agreement dated July 29, 1999, executed by VCKI to and for the benefit of AG (the "**IDOT Guaranty**"). The obligations of VCKI under the IDOT Guaranty are secured by a first lien Indemnity Deed of Trust and Security Agreement dated July 29, 1999 ("**IDOT Deed of Trust**") and an Absolute Indemnity Assignment of Leases and Rents dated July 29, 1999 ("**IDOT ALR**"), each executed by VCKI for the benefit of AG and each encumbering properties located in Baltimore, Maryland, including the Village Square of Cross Keys and the Village of Cross Keys Quadrangle

---

[1] This Objection does not address the recent amendments to the DIP Loan made on May 6, 2009, and AG reserves its rights to assert further objections at the hearing.

(collectively, the "**Property**"). VCK Business Trust, a Maryland business trust (the "**Trust**" or "**Property Owner**"), a single purpose entity, acquired title to the Property from VCKI on or about April 18, 2002, subject to the existing liens securing the IDOT Guaranty. Pursuant to a Loan Assumption Agreement dated April 18, 2002, executed by AG, VCKI, the Trust, TRC and certain other parties, Rouse Nevada assumed the Loan and the Trust assumed all obligations owed to AG under the IDOT Guaranty, IDOT Deed of Trust and IDOT ALR.

2. AG submits that the Motions should be denied because the relief sought would deprive AG of its cash collateral without providing adequate protection. At the same time, AG's cash collateral would be used to finance the Debtors' enterprise as a whole, including other unprofitable properties. The applicable legal standards simply do not provide a basis for taking these steps.

3. Specifically, the Debtors are asking the Court to approve a sweep of rents generated by the Property into the Debtors' Concentration Account (as defined below). Any rent swept from the Borrowers in excess of the amount used to pay principal and interest to AG net of any management and maintenance services provided to the Borrowers (the "**Excess Rent**") is a postpetition extension of credit. AG objects to the extension of such risky, non-interest-bearing, unsecured, postpetition financing. In addition, the DIP provides no benefit to the Borrowers and Property Owner.

4. These cases are not substantively consolidated,[2] and as such, it is improper to ignore the separateness of each entity and to use the property of one Debtor, to the

---

[2] *See In re Owens Corning,* 419 F.3d 195, 211 (3d Cir. 2005) (Substantive consolidation requires a showing that "(i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."); *see also In re Augie/Restivo Banking Co., Ltd.*, 860 F.2d 515, 519 (2d Cir. 1988) ("'[r]esort to consolidation ... should be used only after it has been determined that all creditors will benefit because untangling is either impossible or so costly as to consume the assets.'").

detriment of its creditors, to fund the operations and recovery of the constituencies of other Debtors. AG has relied on the separateness and the credit-worthiness of their respective Borrowers and guarantors when making their credit decision and should receive the full benefit of its bargain.

5. If the Court approves the Motions without modification, AG will be stripped of its cash collateral. This lien stripping is a two-step process. First, if final approval of the Cash Management Motion is granted, the Excess Rent will be transferred from the Borrowers to the Concentration Account, owned by GGP Limited Partnership ("**GGP LP**"). The Debtors acknowledge that, pursuant to section 363(e) of the Bankruptcy Code, their right to use cash collateral is conditioned on providing the secured lender with adequate protection. Nonetheless, the Debtors fail to provide adequate protection; rather they offer the so-called Replacement Lien, which is nothing but a lien on the intercompany administrative claim of the applicable Debtor borrower. The so-called Replacement Lien does not qualify as adequate protection, as it is patently obvious that a lien on an Intercompany Claim of speculative value cannot possibly replace the cash collateral, a first lien on cash, which is the best collateral a secured lender could have. However, the lien stripping is not complete. In the second step, under the DIP Financing Motion, the value of the purported Replacement Lien will be further diminished as the DIP Financing Motion provides that the DIP Lenders would be granted a first priority security interest in, among other things, the Concentration Account as well as a superpriority administrative claim senior to the Intercompany Claims. This renders the purported Replacement Lien virtually worthless. In fact, absent the Replacement Lien, simply by operation of law, the Borrowers would be entitled to administrative claims on account of

postpetition advances to GGP LP and any payment of such administrative claims would inure to the benefit of AG, as secured lender.

6. As proposed in the Debtors' Motions, AG's cash collateral would be used to fund the Debtors generally (and their non-Debtor affiliates), but AG's right to payment would be subordinated to the DIP Lenders. As a result, the cash collateral belonging to AG would be used, among other things, to pay shortfalls on the Debtors' other non-performing properties to the detriment of AG. Moreover, because the DIP Loan is being used to pay down the $225,000,000 Goldman Loan (the **"Goldman Paydown"**), the cash collateral would be dissipated if the Goldman collateral ultimately proves to be insufficient to pay the principal and interest obligations incurred under the DIP Loan. AG believes the relief requested in these Motions only address the concerns and interests of the over-all enterprise and the DIP Lenders, but does not address the legitimate interests and concerns of AG, the Borrowers and the Property Owner.

7. Finally, in addition to subordinating the purported Replacement Liens to the DIP Lender claims, the proposed Carve-Out also would subordinate the purported Replacement Liens to, among other things, the fees due the United States Trustee, fees and expenses incurred by a trustee up to $500,000, professional fees and expenses up to $25,000,000 incurred after acceleration of the DIP Loan, plus *unlimited* unpaid professional fees and expenses through the date of acceleration. In a case of this size, professional fees and expenses will be substantial. The deep subordination of the purported Replacement Lien therefore makes any recovery in connection therewith entirely speculative.

8. The Property is cash flow positive after payment of interest, principal, and operating expenses, including management costs, maintenance, security, and property taxes.

The current outstanding principal amount of the Loan is $10,257,234.81.

9. Because the terms of the proposed DIP Loan provide no benefit to the Borrowers and the Property Owner and do not adequately protect AG's collateral, AG respectfully requests that the Court deny the Motions.

## II. BACKGROUND

10. On April 16, 2009 (the "**Petition Date**"), the Debtors commenced these bankruptcy cases by filing voluntary petitions for relief under 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"). The Debtors are authorized to operate as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

11. On the Petition Date, the Debtors filed a Cash Management Motion to continue using their existing cash management system. The Cash Management Motion seeks authority for the Debtors to collect all the cash rent generated from the income producing properties in a main operating account held in the name of GGP LP (the "**Concentration Account**"). On April 16, 2009, the Court granted the Cash Management Motion on an interim basis.

12. Pursuant to the DIP Financing Motion, the Debtors are seeking authority to enter into a secured debtor-in-possession financing agreement (the "**DIP Agreement**") with certain lenders (the "**DIP Lenders**") providing a term credit facility in the amount of $375,000,000 (the "**DIP Loan**")[3]. Under the DIP Agreement, General Growth Properties, Inc. and GGP LP are borrowers and all the other Debtors, are guarantors of the DIP Loan.

---

[3] A transfer made or obligation incurred for less than "a reasonably equivalent value" or "fair consideration" when the debtor was insolvent or which renders the debtor insolvent is a fraudulent conveyance. The Debtors' recent bankruptcy filings suggests that they believe that the Borrower may be insolvent. Assuming, that the Borrower is currently solvent and liquid, the upstreaming of all cash receipts of the Borrower and its incurrence of $375 million of secured, superpriority indebtedness will likely render the Borrower insolvent. Therefore, the relief sought under the Motions, to use the Borrower's cash collateral to support borrowings under the DIP Agreement and to fund the operations of affiliated Debtors may constitute a fraudulent conveyance.

13.     Under the DIP Financing Motion, the Debtors are also seeking authority, among other things, to (i) repay in full a $225,000,000 prepetition loan with Goldman Sachs and other lenders (the **<u>Goldman Loan</u>**") secured by 27 properties (the **<u>Goldman Collateral</u>**") owned by certain Debtors (the **<u>Goldman Debtors</u>**"); (ii) grant the DIP Lenders a first priority security interest in all of the Debtors' unencumbered property, including the Concentration Account (the **<u>DIP Lien</u>**"); (iii) grant the DIP Lenders a junior lien in any encumbered assets of each of the Debtors; and (iv) use the cash collateral of each Debtor's property lenders, including AG's cash collateral.

14.     As adequate protection for use of the cash collateral, the Debtors propose to (i) pay to each of the secured property lenders, including AG, interest when due postpetition at the applicable non-default contract rate, (ii) maintain the properties and pay the property taxes thereon, and (iii) grant to the property lenders (including AG) a second priority lien, junior to the DIP Lien, in the applicable intercompany administrative claim (the **<u>Intercompany Claim</u>**") on account of rents that accrue postpetition into the centralized cash management system, after payment of expenses of operating the properties (**<u>Replacement Lien</u>**").

15.     Under the DIP Financing Motion, the Debtors are also requesting that the Court approve a carve-out (the **<u>Carve-Out</u>**") for, among other things, an unlimited amount of unpaid professional fees and expenses through the date of acceleration of the DIP Loan plus $25,000,000 of professional fees and expenses incurred after the date of acceleration.

### III.  <u>ARGUMENT</u>

*AG is Entitled to Adequate Protection for*
*<u>Use of Its Property Collateral and Cash Collateral</u>*

16.     Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used, sold, or leased or proposed to be used, sold, or leased,

by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest . . . ." 11 U.S.C. § 363(e). Accordingly, AG is entitled to adequate protection for the use of its cash collateral. *See In re Mosello*, 195 B.R. 277, 293 (Bankr. S.D.N.Y. 1996) (stating that a creditor holding a security interest in both real property and cash collateral is entitled to protection of its interest in each).

17. A debtor may not use a secured party's cash collateral unless the secured party consents to its use or the court authorizes such use after the debtor demonstrates that the creditor's interest in the cash collateral is adequately protected. 11 U.S.C. § 363(c)(2); *see In re Blackwood Assocs., L.P.*, 153 F.3d 61, 67-68 (2d Cir. 1998); *In re Vienna Park Properties*, 976 F.2d 106, 114 (2d Cir. 1992) (stating that section 362(c)(2) of the Bankruptcy Code "prohibits the debtor's use of . . . assets without the secured creditors' consent or court authorization.") (citation omitted). The burden of proving adequate protection of a non-debtor party's property rests with the debtor. *See* 11 U.S.C. §§ 361(g), 363(p); *see also In re Constable Plaza Assocs.*, L.P., 125 B.R. 98, 104 (Bankr. S.D.N.Y. 1991) (stating that "[t]he debtor has the burden of demonstrating that the creditor will be adequately protected if it is authorized to use . . . cash collateral").

*Operation and Maintenance of the Property Collateral Provides Adequate Protection Only to the Extent the Cash Collateral is Used For the Applicable Property*

18. The Debtors state that where a debtor seeks to use rents constituting a secured party's cash collateral, adequate protection is available if the debtor will use the rents for maintaining the property. *DIP Financing Motion* at 53. However, the Debtors misstate the law by asserting that the secured property lenders, including AG, will be adequately protected because the Debtors' use of the cash collateral will preserve the value of the Debtors' income

producing properties *generally* by facilitating the Debtors' financial rehabilitation. *Id.* at 54. This is *not* the law.

19. As the cases cited by the Debtors themselves make clear, the required adequate protection is satisfied *only to the extent* that all of the cash collateral is reinvested in the underlying property, *not* in the debtor's business generally, much less in the business of the debtor's affiliates. *See Federal Nat'l. Mortg. Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship*, 153 B.R. 204, 209 (N.D. Ill. 1993) ("[T]he required adequate protection of [r]ents is satisfied ***to the extent*** the Debtor reinvests the rents in the operation and maintenance of the property because the value of the secured creditor's interest in its collateral will thereby be increased.") (emphasis added); *In re Constable Plaza Assocs.*, 125 B.R. at 105 ("debtor's plowing back the rents ***solely*** for the purpose of maintaining and operating its office building will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage") (emphasis added); *In re Prichard Plaza Assocs. Ltd. P'Ship*, 84 B.R. 289, 302 (Bankr. D. Mass. 1998) (stating that adequate protection would be satisfied if the debtor applied rents ***entirely*** to the operation and maintenance of the property). *See also In re Gaslight Village, Inc.*, 6 B.R. 871, 875 (Bankr. D. Conn. 1980) (debtor not entitled to use cash collateral to fund operating costs of properties not responsible for generating such cash collateral).

20. Here, the Debtors propose to sweep ***all*** the cash collateral into the Concentration Account, but only use ***a portion*** of the cash collateral to pay the services for the underlying properties. Therefore, with respect to each property, each Debtor has the burden of demonstrating the amount that will be reinvested in that property. None of the Debtors, including the Borrowers or guarantors, have provided any such information. With respect to

the portion of the swept cash collateral that is not reinvested in the underlying property (the Excess Rent), the Debtors are required to provide adequate protection. It is not sufficient for the Debtors to merely assert that the Excess Rent will benefit the overall enterprise generally.

*Adequate Protection Must Be Completely Compensatory and Not Speculative*

21. The Debtors' obligation to provide adequate protection for the use of cash collateral is not satisfied by anything less than the equivalence of the cash collateral used, in this case the Excess Rent to be transferred to the Concentration Account. *See In re Waste Conversion Technologies, Inc.*, 205 B.R. 1004, 1007 (D. Conn. 1997) (quoting *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935) ("Thus, there is no reason to divest the [Lenders] of [their] interest, unless the adequate protection provided 'is a substitute of the most indubitable equivalence.'")).

22. AG is entitled to the benefit of its bargain with the Borrowers and its guarantors. "[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained pre-bankruptcy." *See, e.g., Resolution Trust Corp. v. Swedeland Dev't Corp. (In re Swedeland Dev't Corp.)*, 16 F.3d 552, 567 (3d Cir. 1994), quoting *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *see also In re Republic Tech. Intern., L.L.C.*, 267 B.R. 548, 554-55 (Bankr. N.D. Ohio 2001) (holding that a creditor is entitled to that amount of adequate protection which would enable it to receive the benefit of its bargain); *In re Hart Ski Mfg. Co., Inc.*, 9 B.R. 397, 400 (Bankr. D. Minn. 1981) ("The secured creditor is entitled to the indubitable equivalent or full benefit of its bargain."). Here, the bargain negotiated between AG, the Borrowers and the guarantors provided security interests in the respective Property collateral and cash collateral, and the transactions were all structured to ensure that the collateral would be used first to satisfy the claims of the respective secured

lenders and not be comingled with the assets of affiliates, or used for the benefit of the overall enterprise.

23. The mere assertion by the Debtors that there will be sufficient funds to repay the Intercompany Claims after satisfying the claims of the DIP Lender and the Carve-Out is insufficient. *See In re 680 Fifth Avenue Associates*, 154 B.R. 38, 43 (Bankr. S.D.N.Y. 1993) (debtors failed to **prove** that secured creditors' interest in rents would be adequately protected and therefore, rents could not be used to pay professional fees) (emphasis added). The Debtors have provided only the barest summary thirteen week enterprise projections; they have not provided detailed projections, longer term projections, or property-by-property projections for any of the individual Debtors, including the Borrowers. Accordingly, the Debtors fail to satisfy their burden.

24. As adequate protection for use of the Cash Collateral, the Debtors propose to provide to the secured property lenders the so-called Replacement Liens in the Intercompany Claims. However, as these Intercompany Claims are subject to subordination to the DIP Loan and the Carve-Out, and dependent on the success of the Debtors' enterprise as a whole and the cash flow and solvency of a myriad of other Debtors and future Debtors, the value of the so-called Replacement Lien is speculative at best. Thus, the Replacement Liens do not qualify as adequate protection. *See In re Swedeland Dev. Corp.*, 16 F.3d 567 at 567 ("Congress did not contemplate that a creditor could find its priority position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects."); *In re Windsor Hotel, LLC*, 295 B.R. 307, 315-16 (Bankr. C.D. Ill. 2003) (when future cash flow projections were based on speculation the

court denied use of secured creditors' collateral as collateral for debtor-in-possession financing on a priming basis).

25. Accordingly, because cash collateral is the highest and best form of collateral, without the consent of AG, the Borrowers and the related guarantors cannot satisfy the adequate protection requirement unless they provide equivalent replacement collateral. The purported Replacement Lien on a speculative Intercompany Claim is not equivalent replacement collateral.

*AG is Entitled to Default Interest and Principal as Adequate Protection*

26. In proposing to pay contract interest as adequate protection for the use of the Property Owners' collateral, the Debtors recognize that an oversecured creditor is entitled to contract interest. Absent payment of contract interest as it becomes due, the collateral cushion would be eroded and the rights of the oversecured creditor diminished. However, the Debtors improperly limit the interest payment to the *non-default* contract rate. The Bankruptcy Code is unambiguous[4] and the overwhelming weight of recent case law is clear: an oversecured creditor is entitled to interest provided for under the contract, including default interest if so provided. *See In re Lapiana*, 909 F.2d 221, 224 (7th Cir. 1990) (stating that creditors have a right to bargained-for post-petition interest and "bankruptcy judges are not empowered to dissolve rights in the name of equity."). Here, where the Loans provide for default interest, to adequately protect AG, the Debtors are required to pay the applicable default rate interest, as it comes due. Otherwise, the collateral cushion will be eroded and the rights of AG will be diminished.

---

[4] Section 506(b) provides in relevant part:

> To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there *shall* be allowed to the holder of such claim, *interest on such claim*, and any reasonable fees, costs, or charges *provided for under the agreement* under which such claim arose.

11 U.S.C. § 506(b) (emphasis added).

27. While payment of contract rate default interest will address the otherwise certain erosion of AG's collateral cushion, absent payment of principal, the Debtors fail to satisfy the requirement to provide adequate protection for the diminution in value of the Property collateral or for the Debtors' use of the Excess Rent. As the Debtors recognize in the motions and declarations they have filed in these cases, we are in the midst of an unprecedented financial and economic crisis. In this environment, rapid declines in the value of commercial property are not only foreseeable, but likely. If the value of the Property collateral declines and the Debtors are permitted to use the Excess Rent without providing adequate protection as required by the Bankruptcy Code, even with the payment of default interest, AG's collateral cushion will erode, and its rights as a secured lender will be diminished over the course of these chapter 11 cases, and its rightful recoveries could be impaired. That is why the Bankruptcy Code requires that debtors provide adequate protection for the use of cash collateral that is the indubitable equivalent of the cash collateral used -- the proposed Replacement Lien does not meet this requirement.

*The Goldman Paydown Should not be Permitted*

28. Under the DIP Agreement, the DIP Loan will be used to pay down the $225,000,000 Goldman Loan, to the benefit of the handful of Goldman Debtors who are obligors under that facility and who provided the Goldman Collateral. But the Borrowers and its guarantors, including the Property Owner, are not Goldman Debtors. Accordingly, there is no benefit to the Borrowers, its guarantors and the Property Owner from the satisfaction of the Goldman Loan and issuance of approximately $275 million of post-petition financing obligations. Moreover, because the Debtors propose to upstream the Cash Collateral to the Concentration Account and grant to the DIP Lenders a first priority lien on that account, the Cash Collateral will be dissipated, and the rights of AG diminished, if the Goldman Collateral ultimately proves

insufficient to pay the principal and interest obligations incurred under the DIP Loan as a result of the Goldman Paydown. The Debtors have not demonstrated that this will not occur due to declines in market value of the Goldman Collateral or other reasons. AG respectfully submits that the Court should not permit the Debtors to involuntarily subordinate payment of AG to the repayment of the DIP Lenders on account of the Goldman Paydown (or, indeed, for any other purpose).

*The Carve-Out for Professional Fees Should be Capped*

29. The DIP Agreement provides for a Carve-Out that includes **unlimited** unpaid professional fees and expenses through the date of acceleration of the DIP Loan, plus up to $25,000,000 incurred after acceleration. As a result, if the proposed Cash Management Motion and Financing Motion are approved in their current form, professional fees and expenses (and all the other fees and expenses included in the Carve-Out) will be paid out of the Cash Collateral (as it would be upstreamed to the Concentration Account). The payment of professional fees out of Cash Collateral is improper in the first place. *See In re 680 Fifth Avenue Associates*, 154 B.R. at 43 (debtors failed to *prove* that secured creditors' interest in rents would be adequately protected and therefore, rents could not be used to pay professional fees) (emphasis added).

30. Here, the problem is compounded by the unusual failure to cap the professional fee carve-out. (*See e.g. In re Lyondell Chemical Co.*, No. 09-10023 (REG) [Docket No. 1002] (Bankr. S.D.N.Y. March 1, 2009) (allowing a maximum professional fee carve-out of $25 million); *In re Solstice, LLC*, 09-11010 (REG) [Docket No. 52] (Bankr. S.D.N.Y. April 12, 2009) (allowing $50,000 profession fee carve-out for debtor's professionals); *In re Lenox Sales, Inc.*, No. 08-14679 (ALG) [Docket No. 129] (Bankr. S.D.N.Y. December 16, 2008) (permitting a maximum professional fee carve-out of $2 million).

31. Further, the unlimited use of AG's cash collateral without its consent results in an improper surcharge in violation of Bankruptcy Code section 506(c). "Pursuant to section 506(c), recovery can be had if three criteria are met: (i) the expenditure is reasonable; (ii) the expenditure is necessary in preserving or disposing of the secured creditor's collateral; and (iii) the secured creditor benefits directly from the expenditure." *See Shaw, Licitra, Parente, Esernio & Schwartz, P.C. v. Travelers Indemnity Co. (In re Grant Assoc.)*, 154 B.R. 836, 842 (S.D.N.Y. 1993) (citations omitted). However, the Debtors have not met any of the foregoing criteria as a secured creditor's collateral is generally not subject to surcharge by attorneys' fees and expenses. *See, e.g,. General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Food-Services Corp.)*, 739 F.2d 73, 76 (2d Cir. 1984) (holding that fees payable from creditor's collateral were not for the benefit of such creditor and were therefore in error). AG respectfully submits that the professional fees and expenses entitled to the Carve-Out should be capped.

### III. CONCLUSION

32. WHEREFORE, for the reasons set forth above, AG respectfully requests that the Court deny the DIP Financing Motion and the Cash Management Motion.

Dated: May 6, 2009
      New York, New York

**GREENBERG TAURIG, LLP**

By: /s/ Bruce R. Zirinsky
    Bruce R. Zirinsky
    Nancy A. Mitchell
    Howard J. Berman
    Gary D. Ticoll
    200 Park Avenue
    New York, New York 10166
    Telephone: (212) 801-9200
    Facsimile: (212) 801-6400
    Zirinskyb@gtlaw.com
    Mitchelln@gtlaw.com
    Bermanh@gtlaw.com
    Ticollg@gtlaw.com

Attorneys for American General Life Insurance Company