1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-11977

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


GENERAL GROWTH PROPERTIES, INC., et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                May 8, 2009

                11:45 AM


B E F O R E:

HON. ALLAN L. GROPPER

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Debtors' Motion for Entry of an Order Pursuant to

3   Section 105(a) of the Bankruptcy Code and Bankruptcy Rules

4   1015(c) and 9007 Implementing Certain Notice and Case

5   Management Procedures

6

7   HEARING re Debtors' Motion for Interim and Final Orders

8   Pursuant to Sections 105(a), 362(d), 363(b), and 503(b) of the

9   Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004 for

10  Authority to (i)Continue the Debtors' Workers' Compensation

11  Programs, General Insurance Programs, and Other Insurance

12  Programs; (ii)Pay All Pre-Petition Insurance Obligations in

13  Respect Thereof; and (iii) Direct Financial Institutions to

14  Honor and Process Checks and Transfers Related to Insurance

15  Obligations

16

17  HEARING re Debtors' Motion for Entry of an Order Pursuant to

18  Sections 105(a), 363(b), 507(a) and 541 of the Bankruptcy Code

19  (i)Authorizing Payment of Pre-Petition Taxes and Fees;

20  (ii)Authorizing and Directing Financial Institutions to Honor

21  and Process Related Electronic Transfers and Checks; and

22  (iii)Scheduling a Final Hearing

23

24

25

3

1

2   HEARING re Debtors' Motion for Interim and Final Orders

3   (i)Authorizing, But Not Directing, the Debtors to Pay Certain

4   Pre-Petition Claims of Critical Service Providers; and

5   (ii)Approving Procedures Related Thereto

6

7   HEARING re Debtors' Motion for Entry of Interim and Final

8   Orders Pursuant to Sections 105(a), 363(b), 507(a)(4) and

9   507(a)(5) of the Bankruptcy Code Authorizing, But Not

10  Directing, them to (i)Pay Pre-Petition Wages, Salaries,

11  Employee Benefits and Other Compensation; (ii)Maintain Employee

12  Benefits Programs and Pay Related Administrative Obligations;

13  and (iii) Authorize Applicable Banks and Other Financial

14  Institutions to Receive, Process, Honor and Pay All Checks

15  Presented for Payment and to Honor All Funds Transfer Requests

16

17  HEARING re Debtors' Motion, Pursuant to Sections 105(a) and 366

18  of the Bankruptcy Code, for Entry of An Order (i)Approving

19  Debtors' Proposed Form of Adequate Assurance; (ii)Resolving

20  Objections By Utility Companies; and (iii)Prohibiting Utilities

21  from Altering, Refusing or Discontinuing Service

22

23  HEARING re Debtors' Motion for Interim and Final Orders to

24  (i)Honor Tenant Obligations and (ii)Authorize Financial

25  Institutions to Honor Related Checks and Transfers

4

1

2   HEARING re Debtors' Motion for Interim and Final Orders

3   Pursuant to Sections 105(a), 345(b), 363(b) 363(C) and 364(a)

4   of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004

5   (A)for Authorization to (i)Continue Using Existing Centralized

6   Cash Management System; (ii)Honor Certain Pre-Petition

7   Obligations Related to the Use of the Cash Management System;

8   and (iii)Maintain Existing Bank Accounts and Business Forms;

9   and (B) for an Extension of Time to Comply with Section 345(b)

10  of the Bankruptcy Code; and (C)Scheduling a Final Hearing

11

12  HEARING re Debtors' Motion Requesting (I)Entry of (A)Interim

13  and Final Orders (i) Authorizing the Debtors' Use of Cash

14  Collateral and Granting Adequate Protection Therefor Pursuant

15  to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy

16  Rule 4001; and (ii)Modifying the Automatic Stay; and (B)a Final

17  Order Authorizing Borrowing with Priority Over Administrative

18  Expenses and Secured by Liens on Property of the Estates

19  Pursuant to Section 364(c) of the Bankruptcy Code; and

20  (II)Scheduling of a Final Hearing on Each Requested Final Order

21

22

23

24

25  Transcribed By:  Lisa Bar-Leib

5

1

2    A P P E a R a N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys to the Debtors and Debtors-in-Possession

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   MARCIA L. GOLDSTEIN, ESQ.

9          GARY T. HOLTZER, ESQ.

10         JOHN P. MASTANDO III, ESQ.

11         PENNY P. REID, ESQ.

12

13   WEIL, GOTSHAL & MANGES LLP

14        Attorneys to the Debtors and Debtors-in-Possession

15        1300 Eye Street, N.W.

16        Suite 900

17        Washington, DC 20005

18

19   BY:   ADAM P. STROCHAK, ESQ.

20

21

22

23

24

25

6

1

2    WEIL, GOTSHAL & MANGES LLP

3        Attorneys to the Debtors and Debtors-in-Possession

4        200 Crescent Court

5        Suite 300

6        Dallas, TX 75201

7

8    BY:   STEPHEN A. YOUNGMAN, ESQ.

9          MARY R. KORBY, ESQ. (TELEPHONICALLY)

10

11   WEIL, GOTSHAL & MANGES LLP

12       Attorneys to the Debtors and Debtors-in-Possession

13       700 Louisiana

14       Suite 1600

15       Houston, TX 77002

16

17   BY:   MELANIE GRAY, ESQ.

18

19

20

21

22

23

24

25

7

1

2    KIRKLAND & ELLIS LLP

3         Co-Counsel to Certain Subsidiary Debtors and

4          Debtors in Possession

5         300 North LaSalle Street

6         Chicago, IL 60654

7

8    BY:   ANUP SATHY, ESQ.

9          GABOR BALASSA, ESQ.

10         RICHARD C. GODFREY, ESQ.

11

12   AKIN GUMP STRAUSS HAUER & FELD LLP

13         Attorneys for the Official Committee of Unsecured

14          Creditors

15         One Bryant Park

16         New York, NY 10036

17

18   BY:   MICHAEL S. STAMER, ESQ.

19         ABID QURESHI, ESQ.

20

21

22

23

24

25

8

1

2  AKIN GUMP STRAUSS HAUER & FELD LLP

3       Attorneys for the Official Committee of Unsecured

4        Creditors

5       Robert S. Strauss Building

6       1333 New Hampshire Avenue, N.W.

7       Washington, DC 20036

8

9  BY:   JAMES SAVIN, ESQ.

10

11  UNITED STATES DEPARTMENT OF JUSTICE

12       Office of the United States Trustee

13       33 Whitehall Street

14       Suite 2100

15       New York, NY 10004

16

17  BY:   BRIAN MASUMOTO, ESQ.

18

19  ALSTON & BIRD LLP

20       Attorneys for Prudential Insurance Company of America

21       One Atlantic Center

22       1201 West Peachtree Street

23       Atlanta, GA 30309

24

25  BY:   GRANT T. STEIN, ESQ.

9

1

2    ALSTON & BIRD LLP

3          Attorneys for Amici Curiae, MBA/CMSA

4          90 Park Avenue

5          New York, NY 10016

6

7    BY:   JOSEPH P. FORTE, ESQ.

8

9    ARONAUER, RE & YUDELL, LLP

10         Attorneys for Centerline Servicing

11         444 Madison Avenue

12         New York, NY 10022

13

14   BY:   KENNETH S. YUDELL, ESQ.

15         JOSEPH ARONAUER, ESQ.

16

17   BINGHAM MCCUTCHEN LLP

18         Attorneys for Teachers Insurance

19         399 Park Avenue

20         New York, NY 10022

21

22   BY:   CAROL W. LEVY, ESQ.

23         MICHAEL J. REILLY, ESQ.

24

25

10

1

2   BROWN RUDNICK LLP

3        Attorneys for Wilmington Trust Company, as Trustee for

4         $1.55 Billion Exchangeable Notes

5        Seven Times Square

6        New York, NY 10036

7

8   BY:   EDWARD S. WEISFELNER, ESQ.

9

10   BROWN RUDNICK LLP

11        Attorneys for Wilmington Trust Company, as Trustee for

12         $1.55 Billion Exchangeable Notes

13        One Financial Center

14        Boston, MA 02111

15

16   BY:   WILLIAM R. BALDIGA, ESQ.

17

18   BRYAN CAVE LLP

19        Attorneys for Multiple Secured Property Level Lenders

20        1290 Avenue of the Americas

21        New York, NY 10104

22

23   BY:   LAWRENCE P. GOTTESMAN, ESQ.

24        MICHELLE MCMAHON, ESQ.

25

11

1

2    BRYAN CAVE LLP

3         Attorneys for Multiple Secured Property Level Lenders

4         2200 Ross Avenue

5         Suite 3300

6         Dallas, TX 75201

7

8    BY:   KEITH M. AURZADA, ESQ.

9

10   CLEARY GOTTLIEB STEEN & HAMILTON LLP

11        Attorneys for Goldman Sachs Mortgage Co.

12        One Liberty Plaza

13        New York, NY 10006

14

15   BY:   DEBORAH M. BUELL, ESQ.

16

17   DAY PITNEY LLP

18        Attorneys for A&K Endowment, Inc.

19        200 Campus Drive

20        Florham, NJ 07932

21

22   BY:   RICHARD M. METH, ESQ.

23

24

25

12

1

2     DECHERT LLP

3          Attorneys for Tysons Galleria, Ala Moana, and Maine Mall

4           Lenders

5          1095 Avenue of the Americas

6          New York, NY 10036

7

8     BY:   SHMUEL VASSER, ESQ.

9

10    DECHERT LLP

11         Attorneys for Tysons Galleria, Ala Moana, and Maine Mall

12          Lenders

13          90 State House Square

14          Hartford, CT 06103

15

16    BY:   KATHERINE A. BURROUGHS, ESQ.

17

18    DORSEY & WHITNEY LLP

19         Attorneys for U.S. Bank National Association

20         250 Park Avenue

21         New York, NY 10177

22

23    BY:  MICHAEL FOREMAN, ESQ.

24

25

13

1

2    DUANE MORRIS LLP

3         Attorneys for Principal Life Insurance Company

4         30 South 17th Street

5         Philadelphia, PA 19103

6

7    BY:   MARGERY N. REED, ESQ.

8

9    LAW OFFICES OF DAVID G. ELKINS

10        6023 Stewart Road

11        Suite 308

12        Galveston, TX 77551

13

14   BY:   DAVID G. ELKINS, ESQ.

15

16   GIBSON, DUNN & CRUTCHER LLP

17        Attorneys for Farallon Capital Management LLC

18        200 Park Avenue

19        New York, NY 10166

20

21   BY:   MATTHEW K. KELSEY, ESQ.

22        DAVID M. FELDMAN, ESQ.

23

24

25

14

1

2      GREENBERG TRAURIG, LLP

3            Attorneys for Metropolitan Life Insurance, American

4             General Insurance, KBC Bank

5            MetLife Building

6            200 Park Avenue

7            New York, NY 10166

8

9      BY:   GARY D. TICOLL, ESQ.

10            BRUCE R. ZIRINSKY, ESQ.

11

12     HERRICK, FEINSTEIN LLP

13            Attorneys for Citicorp North America, Inc. as

14             Administrative Agent on Oakwood

15            2 Park Avenue

16            New York, NY 10016

17

18     BY:   STEPHEN B. SELBST, ESQ.

19

20     JONES DAY

21            Attorneys for Pershing Square Capital Management

22            222 East 41st Street

23            New York, NY 10017

24

25     BY:   PAUL D. LEAKE, ESQ.

15

1

2    JONES DAY

3          Attorneys for Pershing Square

4          77 West Wacker

5          Chicago, IL 60601

6

7    BY:   BRAD B. ERENS, ESQ.

8

9    KILPATRICK STOCKTON LLP

10          Attorneys for ING Clarion Capital Loan Services LLC

11          Suite 2800

12          1100 Peachtree Street, NE

13          Atlanta, GA 30309

14

15   BY:   TODD C. MEYERS, ESQ.

16

17   LATHAM & WATKINS LLP

18          Attorneys for Deutsche Bank

19          53rd at Third

20          885 Third Avenue

21          New York, NY 10022

22

23   BY:   JAMES E. BRANDT, ESQ.

24          ROBERT J. ROSENBERG, ESQ.

25

16

1

2   LOWENSTEIN SANDLER PC

3        Attorneys for Constellation NewEnergy-Gas Division, LLC

4        1251 Avenue of the Americas

5        New York, NY 10020

6

7   BY:   MICHAEL S. ETKIN, ESQ.

8         S. JASON TEELE, ESQ.

9

10  MORRISON & FOERSTER LLP

11       Attorneys for 2006 Lending Group

12       1290 Avenue of the Americas

13       New York, NY 10104

14

15  BY:   BRETT H. MILLER, ESQ.

16

17  REED SMITH LLP

18       Attorneys for Northwestern Mutual Life Insurance Company

19       599 Lexington Avenue

20       New York, NY 10022

21

22  BY:   MARK D. SILVERSCHOTZ, ESQ.

23

24

25

17

```
 1

 2    REED SMITH LLP

 3         Attorneys for Northwestern Mutual Life Insurance Company

 4         2500 One Liberty Place

 5         1650 Market Street

 6         Philadelphia, PA 19103

 7

 8         CLAUDIA Z. SPRINGER, ESQ.

 9

10    RIEMER & BRAUNSTEIN LLP

11         Attorneys for 2008 Facility Lenders

12         Three Center Plaza

13         Boston, MA 02108

14

15    BY:   JEFFREY D. GANZ, ESQ.

16         PAUL S. SAMSON, ESQ.

17

18    SANFORD P. ROSEN & ASSOCIATES, P.C.

19         Attorneys for FRM Funding

20         747 Third Avenue

21         New York, NY 10017

22

23    BY:   SANFORD P. ROSEN, ESQ.

24

25
```

18

1

2   SAUL EWING LLP

3         245 Park Avenue

4         24th Floor

5         New York, NY 10167

6

7   BY:   JOHN J. JEROME, ESQ.

8

9   SQUIRE, SANDERS & DEMPSEY L.L.P.

10         Attorneys for Corporation Service Company

11         31st Floor

12         1095 Avenue of the Americas

13         New York, NY 10036

14

15   BY:   SANDRA E. MAYERSON, ESQ.

16

17   VENABLE LLP

18         Attorneys for CWCapital Management LLC; JE Robert

19          Company, Inc.

20         750 East Pratt Street

21         Suite 900

22         Baltimore, MD 21202

23

24   BY:   GREGORY A. CROSS, ESQ.

25

19

1

2   VENABLE LLP

3        Attorneys for CWCapital Management LLC; JE Robert

4         Company, Inc.

5        Rockefeller Center

6        1270 Avenue of the Americas

7        25th Floor

8        New York, NY 10020

9

10   BY:   CAROLLYNN H.G. CALLARI, ESQ.

11        EDWARD A. SMITH, ESQ.

12

13   VINSON & ELKINS LLP

14        Attorneys for Ivanhoe Capital LP

15        666 Fifth Avenue

16        26th Floor

17        New York, NY 10103

18

19   BY:   JANE L. VRIS, ESQ.

20

21

22

23

24

25

20

1

2    WHITE & CASE LLP

3         Attorneys for Elliott Associates, L.P.

4         1155 Avenue of the Americas

5         New York, NY 10036

6

7    BY:   DANIEL J. MORSE, ESQ.

8

9    ZEICHNER ELLMAN & KRAUSE LLP

10        Attorneys for Several Mall Lenders Specially Serviced by

11         Helios AMC

12        575 Lexington Avenue

13        New York, NY 10022

14

15   BY:   JANRA VAN ROY, ESQ.

16

17

18

19

20

21

22

23

24

25

21

1

2    GENOVESE JOBLOVE & BATTISTA P.A.

3        Attorneys for The Gap, Old Navy and Banana Republic

4        Bank of America Tower

5         at International Place

6        100 Southeast Second Street

7        44th Floor

8        Miami, FL 33131

9

10   BY:   PAUL J. BATTISTA, ESQ.

11        (TELEPHONICALLY)

12

13   GIBBONS P.C.

14        Attorneys for Trigen Entities

15        One Gateway Center

16        Newark, NJ 07102

17

18   BY:   MARK CONLAN, ESQ.

19        (TELEPHONICALLY)

20

21

22

23

24

25

22

1

2    GOULSTON & STORRS P.C.

3         Attorneys for New England Developers

4         400 Atlantic Avenue

5         Boston, MA 02110

6

7    BY:   DOUGLAS B. ROSNER, ESQ.

8         (TELEPHONICALLY)

9

10   HENNIGAN BENNETT & DORMAN LLP

11        Attorneys for Oaktree Capital Management, LP

12        865 South Figueroa Street

13        Suite 2900

14        Los Angeles, CA 90017

15

16   BY:   JOSHUA M. MESTER, ESQ.

17        BRUCE BENNETT, ESQ.

18        (TELEPHONICALLY)

19

20

21

22

23

24

25

23

1

2     SIDLEY AUSTIN LLP

3          555 West Fifth Avenue

4          Los Angeles, CA 90013

5

6     BY:   JEREMY E. ROSENTHAL, ESQ.

7          KEITH P. BANNER, ESQ.

8          (TELEPHONICALLY)

9

10    STEVENS & LEE, P.C.

11         Attorneys for M&I Equipment

12         485 Madison Avenue

13         20th Floor

14         New York, NY 10022

15

16    BY:   CONSTANTINE D. POURAKIS, ESQ.

17         (TELEPHONICALLY)

18

19    VORYS, SATER, SEYMOUR & PEASE LLP

20         Attorneys for The Limited

21         52 East Gay Street

22         Columbus, OH 43216

23

24    BY:   JESSE COOK-DUBIN, ESQ.

25         (TELEPHONICALLY)

24

1                    P R O C E E D I N G S

2           THE COURT:  Please be seated.  All right.  I gather

3    we have standing room only.  There is another courtroom where

4    parties can listen.  If you're not going to speak today or if

5    you're accompanying another lawyer who is going to speak but

6    you're not going to speak today, I'd ask you to please go into

7    the other courtroom.  Anyone in the other courtroom, if you can

8    hear me and you want to speak, you certainly can come back in

9    here.  We are going to take some of the first day orders first.

10   Many of them are not objected to.  And then we'll proceed to

11   the matters which appear to be more controversial, although for

12   today's purposes, we're going to try to simplify matters.  I

13   know this case has resulted in a great deal of interest.  There

14   are a lot of lawyers here.  But as far as I'm concerned, many,

15   if not all, of the issues that we're dealing today are not

16   particularly complicated.  Certainly, there is complexity in

17   the corporate structure and the numbers we have and the amount

18   of money involved.  But in terms of the issues that are before

19   me today, I do not view them as being particularly complex or

20   controversial at least as far as we can go today.  And I

21   realize that there have been many changes at the last minute.

22   Everyone wants to know exactly what the status of each matter

23   is and, certainly, that's one of the things we're going to be

24   able to accomplish today, I think.

25           All right.  I'll take appearances from the debtors

25

1    and the committee, the U.S. trustee.  I'm somewhat hesitant to

2    take other appearances.  I've never yet not taken appearances

3    from anyone in the courtroom.  I assume you've given your cards

4    to the reporter.  But we can't take all day in the appearance

5    issue.  Perhaps if parties would simply state their name, one

6    per client.  They don't have to identify all their clients.

7    I'm talking about the lawyers for the secured creditors.  I

8    would invite any secured creditor's lawyer, though, in giving

9    his or her appearance to tell me if they believe that they're

10   client is undersecured.  In the papers I have, there's one sole

11   creditor who takes that position.  I don't know if anybody

12   wishes to join them.  But don't tell me you're on the cusp.

13   I've heard that before.  But anybody who wishes to join the

14   unsecured group, we'll give them a seat at the front here, not

15   necessarily at the unsecured creditors' table, but I would like

16   to know if they want to take that position for today's

17   purposes.

18          All right.  Let's start with the debtors.  You can

19   give me your appearance where you are seated --

20          MS. GOLDSTEIN:  Your Honor, Marcia Goldstein, Weil

21   Gotshal & Manges on behalf of the debtors.  With me today are

22   my partners and who will appear at the hearing, Gary Holtzer,

23   Adam Strochak, Penny Reid, and Melanie Gray.  And also

24   representing the debtors today is Anup Sathy from Kirkland &

25   Ellis.

26

1          We also have present in the courtroom, Your Honor,

2     the CEO of General Growth, Adam Metz.  We have present the

3     general counsel, Ron Gern, as well as Mr. Mesterharm from

4     AlixPartners and Mr. Buckfire from Miller Buckfire who are the

5     witnesses we have scheduled for today.

6          THE COURT:  All right.

7          MR. STAMER:  Good morning, Your Honor.  For the

8     record, Michael Stamer from Akin Gump Strauss Hauer & Feld here

9     on behalf of the committee.  I am with my partners, James Savin

10    and Abid Qureshi.

11         MR. MASUMOTO:  Good morning, Your Honor.  Brian

12    Masumoto for the Office of the United States Trustee.

13         THE COURT:  All right.  Anyone else for unsecured

14    creditors?  All right.  For the secured creditors?

15         MR. CROSS:  Good morning, Your Honor.  Greg Cross

16    from Venable.  I'm here on behalf of CWCapital, JE Roberts --

17         THE COURT:  Why don't you just tell me -- unless

18    there's some need, just multiple lenders to multiple debtors.

19    Is that correct?

20         MR. CROSS:  Forty-one debtors, five to six billion

21    dollars of value.

22         THE COURT:  All right.

23         MR. CROSS:  And with me are my partners, Ed Smith and

24    Carollynn Callari.

25         THE COURT:  All right.

27

1          MR. GOTTESMAN:  Good morning, Your Honor.  Lawrence

2     Gottesman, Bryan Cave LLP, on behalf of multiple secured

3     property level lenders, approximately 3.8 billion dollars in

4     debt.  And with me here are my colleagues, Michelle McMahon and

5     Keith Aurzada.

6          MR. YUDELL:  Good morning, Your Honor.  Kenneth

7     Yudell of Aronauer, re & Yudell, again on behalf of multiple

8     property level lenders, Centerline Servicing, and with me is my

9     partner, Joseph Aronauer.

10         MR. VASSER:  Good morning, Your Honor.  Shmuel Vasser

11    of Dechert LLP on behalf of three properties, four debtors.

12    And I have with me Katherine Burroughs who will be speaking in

13    the hearing with me today.

14         THE COURT:  All right.

15         MR. SAMSON:  Good morning, Your Honor.  Paul Samson

16    with my partner, Jeffrey Ganz, on behalf of the group referred

17    to as the 2008 facility lenders which have twenty-four

18    properties and 1.51 billion of secured debt.

19         THE COURT:  Anyone else?

20         MS. BUELL:  Yes, Your Honor.  Deborah Buell, Cleary

21    Gottlieb Steen & Hamilton on behalf of Goldman Sachs Mortgage

22    Company.

23         MR. ZIRINSKY:  Good morning, Your Honor.  Bruce

24    Zirinsky, Greenberg Traurig LLP, on behalf of several first

25    lien property lenders and also on behalf of the mezzanine

28

1   lenders secured by equity in an entity that owns property.

2          THE COURT:  That's an intermediate holding company,

3   is that right?  So you're a lender to the intermediate holding

4   company and your lien is on the --

5          MR. ZIRINSKY:  Stock --

6          THE COURT:  -- stock of the property owning company.

7          MR. ZIRINSKY:  That's correct, Your Honor.

8          THE COURT:  And as I see in the paper, there are

9   about four mezzanine lenders, I think.  There's another one.

10  We'll get to you, sir.  There may be others.  All right.  If

11  you're a mezzanine lender, let me know.  Thank you, Mr.

12  Zirinsky.  Next?

13         MR. ROSEN:  Good morning, Your Honor.  Sanford Rosen

14  for FRM Funding Company.

15         THE COURT:  Are you a lender?

16         MR. ROSEN:  We are a lender.

17         THE COURT:  All right.

18         MS. VAN ROY:  Good morning, Judge.  Jantra Van Roy,

19  Zeichner Ellman & Krause LLP representing several mall lenders

20  specially serviced by Helios AMC.

21         THE COURT:  Thank you.

22         MR. SELBST:  Good morning, Your Honor.  Stephen

23  Selbst, Herrick, Feinstein LLP.  I represent Citicorp North

24  America.  We are the lenders for Oakwood Center and we are the

25  lender who believes that we are undersecured.

1          THE COURT:  Thank you.  You are the one that's

2     identified in the papers --

3          MR. SELBST:  Yes.  And we so allege.

4          MR. MILLER:  Good morning, Your Honor.  Brett Miller,

5     Morrison & Foerster on behalf of the 2006 lending group.

6          MS. REED:  Good morning, Your Honor.  My name is

7     Margery Reed.  I'm with Duane Morris.  I represent Principal

8     Life Insurance Company which is a --

9          THE COURT:  Are you a lender?

10          MS. REED:  A lender to multiple debtors.

11          THE COURT:  Thank you.

12          MR. ERENS:  Good morning, Your Honor.  Brad Erens of

13     Jones Day.  I'm here with my partner, Paul Leake.  We represent

14     Pershing Square Capital Management, proposed DIP lenders.

15          THE COURT:  The first proposed -- as of this morning.

16          MR. ERENS:  That's correct, Your Honor.

17          THE COURT:  And as of last night.  All right.  Thank

18     you.

19          MR. ROSENBERG:  Good morning, Your Honor.  Bob

20     Rosenberg, Latham & Watkins with my partner, James Brandt, on

21     behalf of Deutsche Bank as the lender for a total of 900

22     million dollars for two different properties.

23          MR. WEISFELNER:  Good morning, Judge.  Ed Weisfelner,

24     together with my partner, Bill Baldiga, from Brown Rudnick

25     representing the parties as set forth in my 2019 statement

30

1    which includes Wilmington Trust as indenture trustee for

2    approximately 1.55 billion dollars worth of GGPLP bonds as well

3    as an ad hoc consortium of those same bondholders.

4            THE COURT:  And the bonds are unsecured?

5            MR. WEISFELNER:  They are indeed, Your Honor.

6            THE COURT:  All right.

7            MR. SILVERSCHOTZ:  Your Honor, Mark Silverschotz,

8    Reed Smith LLP, on behalf of Northwestern Mutual Life Insurance

9    Company which is a team secured lender on two of the

10   properties, the Lansing Mall and the Staten Island Mall.

11           MR. KELSEY:  Good morning, Your Honor.  Matt Kelsey

12   with Gibson, Dunn & Crutcher representing Farallon Capital who

13   was until this morning the DIP lender.

14           MS. VRIS:  Your Honor, Jane Vris of Vinson & Elkins

15   for Ivanhoe Capital, one debtor, one creditor, it's secured.

16   It's not quite in the managed category.  It is a loan secured

17   by equity by of a nondebtor entity.

18           MR. REILLY:  Good morning, Your Honor.  Michael

19   Reilly, Bingham McCutchen, with Carol Levy.  We represent

20   Teachers Insurance.  They are a mezzanine lender.  They also

21   hold multiple positions with various debtors and nondebtors.

22           THE COURT:  I read something about teachers having

23   debt outside the bankruptcy.  Is that other debt?

24           MR. REILLY:  That's correct, Your Honor.  We have two

25   entities that are nondebtors.

1          THE COURT:  That are nondebtors.  All right.

2          MR. REILLY:  Thank you.

3          MR. FOREMAN:  Good morning, Your Honor.  Michael

4    Foreman, Dorsey & Whitney for U.S. Bank, a lender under

5    multiple facilities and the debtors' cash management bank.

6          THE COURT:  Right.  And you've got a setoff that's

7    been worked into the papers.

8          MR. FOREMAN:  Yes.

9          THE COURT:  Or a possible setoff.  All right.

10         MR. MEYERS:  Good morning, Your Honor.  Todd Meyers,

11   Kilpatrick Stockton, representing multiple property level

12   lenders whose loans are all being serviced by ING Clarion.

13         THE COURT:  All right.

14         MR. ELKINS:  Good morning, Your Honor.  David Elkins.

15   I'm here by myself not as a lender but as a -- having an

16   interest in certain real property that I think may be impacted

17   by the proposed DIP loan.

18         THE COURT:  Are you a lawyer, Mr. Elkins?

19         MR. ELKINS:  Once was but not for at least ten years.

20         THE COURT:  All right.

21         MR. STEIN:  Your Honor, Grant Stein on behalf of

22   Prudential Insurance Company of America.  We have two loans to

23   the debtors that are direct loans for debtors, one being

24   Harvard Place for fifty-eight million, another loan to an

25   entity known as GGP Grand Ville 2 which is a mezzanine loan and

32

1    then another billion dollars of loans that are involved in

2    various tranches and securitizations that others will be

3    speaking to, some of which are loans where debtors are in

4    bankruptcy, some where they're not.

5           THE COURT:  All right.  Anyone else in the room?

6           MR. ACME:  Bill Acme from Pershing Square Capital

7    Management, DIP lender as of this morning, the DIP lender as of

8    a previous proposal.

9           THE COURT:  All right.  And on the telephone, is

10   anybody going to speak today?  All right.  Ms. Goldstein, I

11   guess we're ready to begin.

12          MS. GOLDSTEIN:  Thank you, Your Honor.

13          MR. JEROME:  Your Honor?

14          THE COURT:  Mr. Jerome?

15          MR. JEROME:  Jerome for General Trust.  We represent

16   twenty-one percent of the equity.  We're not going to speak to

17   the secured lenders.  But there is a clarification that we

18   spoke to Weil Gotshal about which hopefully will be put on the

19   record.

20          THE COURT:  All right.

21          MR. METH:  Good morning, Your Honor.  Richard M.

22   Meth, Day Pitney LLP.  We represent A&K Endowment, Inc. which

23   is older with regard to certain CSA agreements between Rouse

24   Company and has certain property interests known as the

25   Summerlin properties.

33

1          THE COURT:  All right.

2          MS. GOLDSTEIN:  Your Honor --

3          THE COURT:  Where would you like to begin?

4          MS. GOLDSTEIN:  Well, Your Honor, before we begin

5     with the hearing, I would like to report on the chambers

6     conference that we had this morning, committee counsel and

7     debtors' counsel, with Your Honor, which went primarily to the

8     scheduling and process or procedure for this hearing.  As I

9     think those in the courtroom might figure out given that we

10    have this morning's DIP lender and Wednesday's DIP lender, we

11    had filed this morning a revised DIP loan with Pershing Square.

12    And it's the culmination, frankly, of a very interesting three

13    weeks since we filed our petitions and made our initial filing

14    with respect to the first DIP loan with Pershing Square.  One

15    thing I can say, Your Honor, that the debtor is pleased that

16    the DIP loan initially filed attracted sufficient attention

17    that we were able to engage in an auction process that led to

18    the filing of -- I'll call it for purposes of today, even

19    though there are other lenders in it, the Farallon DIP, which

20    we filed on Wednesday which we believed to have been a material

21    improvement over the initial Pershing DIP.  After that was

22    filed, and until late last night, the prospect of yet further

23    interest and improvements was there and late in the date

24    yesterday, we received what the debtor believed to be an even

25    improved DIP loan from Pershing.  We have been in communication

34

1   with the committee and others and we also understand that there

2   is continuing interest by at least Farallon and maybe others in

3   seeing if they could even further improve the DIP loan.

4          And, Your Honor, how we have agreed, with the

5   committee and, based upon the chambers conference, to proceed

6   is to move forward with our first day motions, move forward

7   with our motion to use cash collateral.  And one point I'd make

8   on that, Your Honor, is that both the Farallon DIP loan and the

9   Pershing Square DIP loan negotiations enabled us to achieve

10  what we perceive to be a significantly improved adequate

11  protection package for the mortgage lenders.  And I won't get

12  into detail on that now.  I'll save that for when we get to

13  that in the schedule of the hearing today.  But I would like to

14  make clear, particularly for the mortgage lenders, that in any

15  further discussion of the DIP loans that we would not accept

16  any provisions that were less favorable to the mortgage lenders

17  than that which we have already achieved.

18         What we propose then is to move forward, as I said,

19  with our first day motions, move forward with our cash

20  management and cash collateral motions and move as far as we

21  can through the objections but defer the final DIP hearing to a

22  time subject to your calendar, Your Honor, early next week so

23  that we can come back and say this is really the final and best

24  DIP proposal and be ready to address any and all concerns at

25  that point in time with respect to the DIP loan.  We believe

35

1    the committee agrees with that approach.  And given that, I

2    would like to introduce my partner, Gary Holtzer, who would

3    proceed with the first day motions that are up for final

4    hearing.  And then I will continue with the cash collateral and

5    cash management motion.

6           THE COURT:  All right.  I can -- yes?

7           MR. STAMER:  If I might approach the podium just for

8    a moment, Your Honor.  Again, for the record, Michael Stamer

9    from Akin Gump on behalf of the official committee.  So the

10   record is complete, Your Honor, we filed earlier this morning,

11   and I believe we have extra copies in the courtroom, a

12   preliminary objection to the Pershing Square number two

13   proposed DIP loan.  Although I do agree with much of what

14   debtors' counsel says, we, the committee, do not agree that the

15   second round with Pershing Square is, in fact, the highest and

16   best.  In connection with our preliminary objection, Your

17   Honor, as Your Honor knows, we requested an adjournment to

18   allow this ongoing auction to continue to play itself out and

19   to try to get people on the same page or, if not, get people

20   ready to establish for the Court which is, in fact, the highest

21   and best DIP loan.  But the committee is, of course, supportive

22   of adjourning the DIP motion to early next week.  I think we

23   talked Tuesday or Wednesday.  We just need to check calendars.

24   And that's all I wanted to add, Your Honor.

25          THE COURT:  All right.  I don't think there's any

36

1   need to hear from secured lenders about scheduling of the first

2   day motions that nobody has objected to.  I can assure all of

3   the secured lenders that their interests will be taken into

4   consideration.  There's no way that we could proceed with a DIP

5   hearing, full DIP hearing, today based upon the state of the

6   notice given to parties and based upon the state of the record.

7   But we do have a lot of people who've come a long way today.

8   And I think we should accomplish as much as we can.

9           I've read a lot of papers.  I've seen in the papers a

10  great deal of hysteria.  Maybe that's a little bit overstated

11  because I am reading pleadings that are written by fine

12  lawyers.  But I think we can clear away some of the cobwebs

13  that have enveloped this case today and get us to the real

14  issues.  And I presume that you have a real issue to raise with

15  me, sir.

16          MR. LEAKE:  I do, Your Honor.  My name is Paul Leake

17  from Jones Day on behalf of the proposed DIP lender.  And I

18  will take just a couple minutes but I figured it was important

19  for you --

20          THE COURT:  Well, yes.  You certainly have a

21  particular interest in the DIP.

22          MR. LEAKE:  I appreciate that, Your Honor.  Thank

23  you -- and the proposed DIP lenders, Pershing Square Capital

24  Management and affiliated funds.  Your Honor, the debtor ran a

25  process to identify the DIP on the best terms available in the

37

1    market.  Pershing Square participated in that process in

2    absolute good faith.  The debtor made it clear time and time

3    and time again in this process that today was going to be the

4    last day.  They were not going to adjourn it.  They were going

5    to go forward.  No one should have any expectations otherwise

6    because the debtor needed to get this done.  And we thought

7    that was a good idea, first of all, not complaining about that

8    all, but we relied absolutely on that process as the debtor was

9    outlining it.

10           As you know, process is extremely important in these

11   types of circumstances.

12           THE COURT:  I agree completely with you.  And are you

13   telling me that with twenty, thirty, forty lenders in the room

14   who are affected by the DIP, interested in the DIP, perhaps not

15   as affected by the DIP as they purport to be.  But are you

16   telling me that they should have ten or fifteen minutes to read

17   the papers, to understand what's being done at this point and

18   that I can approve the DIP today?

19           MR. LEAKE:  I think that's a very legitimate

20   question, Your Honor.  Absolutely.  And let me address that.

21   Most of the objections that are out there in these multitudes

22   of pleadings and pieces of paper have nothing to do with the

23   changes that have occurred with respect to the new proposed DIP

24   this morning.  A lot of -- a lot of the underbrush is going to

25   be cleared.  Was already in the original.  Was addressed in

1    some of the changes for what I'll call the bondholder proposed

2    DIP loan on Tuesday -- or Wednesday, whenever it was filed.

3    And so the changes that allowed the debtor to absolutely make

4    the decision that we are the highest and best bid available on

5    terms most favorable to this estate have nothing to do with the

6    multitude of objections out there.  So I do think this is not a

7    question of there's a lot of people who need to look at changed

8    words because those were changed and many of them addressed

9    with respect to the pleadings that were filed earlier.

10           But what I do want to come back and emphasize, Your

11    Honor, is that, as I was saying, process is extremely important

12    to maximizing value for the debtor.  Failure of a process this

13    important will hurt the estate.  It always does.  We played by

14    the rules.  And I'll tell you, we made dramatic concessions

15    because we wanted to be the DIP lender in this case.  We

16    decided what it would take to do that.  We lived by the rules

17    and the deadlines set by the debtor and made a lot of

18    concessions to get to where we are today.

19           One important thing I just want to make perfectly

20    clear.  Our commitment expires today, Your Honor.  At this

21    point, we are not prepared to extend it to accommodate just a

22    process and a discussion that we were not a part of.  We, as I

23    said, expected the debtor to live by the rules and they could

24    not have been more clear about if we were going to show up and

25    we were going to show our best hand and we wanted to get this,

1    we had to do it on the expectation that today we're going

2    forward and they're not putting it off.

3         I don't know what's going to happen as it is if the

4    hearing on the DIP is put off.  But I would -- I have to say to

5    you so everybody's aware of it that our commitment expires

6    today and that we are not at this point prepared to extend that

7    commitment.

8         The last thing I'd like to say is the committee just

9    argued for a couple minutes just about.  This is something that

10   they think they might want to object to and they need more time

11   with respect to that.  And they would like to open the process

12   up a little bit more and see if we can do it even better.

13   Again, that just goes to exactly the main problem here is that

14   we had a process and the debtors should live by it.  It was the

15   debtors' decision to put this process in place and to accept

16   us.

17        THE COURT:  Mr. Leake, you have now said four or five

18   times that the debtors set certain rules.  They established the

19   process.  As I assume you know, and knew all along, they then

20   come to the Court for approval of the DIP.  And it should come

21   to no surprise that the Court had some difficulty in requiring

22   a DIP to be approved with this number of changes on -- today.

23   If you want me to approve a DIP today, let's go back to the DIP

24   that everybody had on the table before this morning.  And if

25   the debtors wish right now for me to put that DIP back on the

40

1    table then perhaps the parties have adequate notice although

2    they only had a few days.  So when you say the debtors set the

3    rules, I endorse wholeheartedly the debtors' efforts to set

4    certain rules and to administer these cases effectively and in

5    the best interest of all parties.  And I understand your

6    client's desire to be done with it but I set the rules.

7            MR. LEAKE:  That you do, Your Honor.

8            THE COURT:  I just did.

9            MR. LEAKE:  Okay.

10           THE COURT:  So even if the debtors got up and said

11   we're going forward today, my answer is the same.  It's too

12   soon.  The committee has to have an opportunity to digest what

13   you're doing.  They threw together a response which, I assume,

14   is already on their machine.  I would think you'd want them to

15   look at that response again and say, does this really make

16   sense in light of the terms that your client put on the table.

17   But if your client decides that it's had enough, we'll do the

18   best we can.  I appreciate the fact that everyone's been

19   working very hard around the clock.  I think it would benefit

20   everybody to get a good night's sleep.  I hope Tuesday is a

21   convenient date for parties.  I'll make myself available.  And

22   I agree this should be done and you should come to a conclusion

23   here.  But we simply cannot with this number of parties and

24   this many changes, as far as I'm concerned, without anybody's

25   input.  We can't determine the DIP today.  We can't decide the

41

1    DIP today --

2              MR. LEAKE:  Thank you, Your Honor.

3              THE COURT:  -- with whatever results.

4              MR. ZIRINSKY:  Your Honor, may I be heard, too?

5              THE COURT:  If it is really necessary on this issue,

6    yes.

7              MR. ZIRINSKY:  It is on this issue, Your Honor.  I

8    don't oppose an adjournment.  I think that's a good idea.  I

9    just want to say that there's one thing for a process.  There's

10   another thing for due process.  And I think Your Honor is

11   alluding to due process here.

12             What I would like to suggest is that I have -- to the

13   best of my knowledge, the mortgagees secured creditors who are

14   here, many of whom are objecting to the DIP that's on the table

15   or the one that was on the table before this one came on the

16   table, there are a number of structural issues that Your Honor

17   is being asked to consider in considering objections to the

18   DIP.  And I don't know what the revised proposal is that was

19   teed up for this morning.  But I have information, which is

20   pure hearsay, that there may be other DIP financiers available

21   which would be structurally different which might obviate the

22   necessity for the Court having to rule on objections.  It might

23   obviate a lot of the objections of the secured creditors if

24   structural -- if a different DIP is structured differently so

25   as not to so egregiously attach to the collateral of the

42

1    secured creditors that the debtors be asked or maybe suggested

2    by Your Honor that the debtors involve those secured creditors

3    who might be interested in having discussions with the debtors

4    about what the various alternative DIPs might be in an effort

5    to see if it could be a DIP evolved out of this process which

6    would obviate a lot of the objections that Your Honor is

7    otherwise going to have to consider.

8         THE COURT:  Well, I think you are correct in several

9    respects.  One, I do think that those aspects that affect the

10   secured creditors should be isolated and should be looked at

11   and that those aspects of the matter should be clarified.  I

12   think those are a finite number of issues.

13        MR. ZIRINSKY:  I agree.

14        THE COURT:  Secondly, I think there should be some

15   way to organize the secured creditors so that there is some --

16   there are common issues.  I'm not trying to prevent anyone from

17   getting due process or being heard.  But I think that when we

18   take a break, and we will take a break, I'd like the secured

19   creditors perhaps to get in one room or an auditorium -- Yankee

20   stadium may be available.  And see if there's some way to get

21   common ground so that the debtors can deal with thirty or forty

22   or fifty parties in an effective way.  And I think that we can

23   perhaps start on today.

24        Ms. Goldstein, do you wish to comment on any of this?

25        MS. GOLDSTEIN:  Yes, Your Honor.  Your Honor, I agree

43

1    that the secured lenders have a number of issues in common.

2    Some go directly to the use of cash collateral and those

3    certainly should move forward today.  However, those that are

4    impacted by the DIP for all, if not -- almost all of those

5    issues are really common in terms of the DIP loans that either

6    have been before the Court, the Wednesday loan, I'll call it

7    that, or this morning's loan are structurally identical insofar

8    as they affect the secured lenders.  And I think that, Your

9    Honor, we can move forward and put that behind us.  And if, as

10   a result of any further negotiation, there is a structural

11   change that is viewed as better for the secured lenders, that's

12   just an improvement for everybody.  But, Your Honor, at this

13   point, everything we have put on the table in terms of the DIP

14   loan, whether it be Pershing or whether it be Farallon, are

15   structurally identical insofar as how they impact the secured

16   lenders and also insofar as they permit adequate protection for

17   the secured lenders.

18          THE COURT:  Why don't we do this?  I think we should

19   go through those orders that we can handle briefly.  We can

20   then get into the issue of cash collateral or at least begin

21   that.  And, Mr. Zirinsky, if you or a group of lenders wish to

22   identify those issues that affect the secured lenders and that

23   are directly impacted by the DIP in either structure because I

24   think the structures as far as the secured lenders are

25   concerned are very similar.  If you can identify those issues

1   and then anyone who wishes to can add to them, at least we'll

2   know what we can at least start work on today.  I don't think

3   there will be any final determination as to the DIP, but I

4   think if people are heard, we'll be in a position to get a much

5   better product by Tuesday -- or whenever.  Whenever.

6         All right.  Mr. Holtzer?  Anyone else have

7   something --

8         MR. JEROME:  Your Honor, just a minor process

9   question.  Can we arrange somehow or other if the debtor could

10  give us and the proposed DIP lender the papers twenty-four

11  hours in advance so that we have a chance to digest them and

12  read them and so I can get some sleep?

13        THE COURT:  I'm sure if they can, they will.  All

14  right?

15        MR. JEROME:  Thank you.

16        MR. HOLTZER:  Thank you, Your Honor.  Gary Holtzer,

17  Weil Gotshal & Manges for the debtors.  Your Honor, we filed an

18  agenda and if Your Honor has a copy of that, per Your Honor's

19  request, we thought we would try to move through some of the

20  matters as quickly as possible.

21        THE COURT:  All right.  Go right ahead.

22        MR. HOLTZER:  The first items on the matter, Your

23  Honor, are adjourned matters.  They relate to the retention of

24  professionals in the matter.  We've had extensive discussions

25  with the U.S. trustee and the creditors' committee about topics

45

1    involving the engagements.  And we've agreed for purposes of

2    today that we would adjourn those until next week and we will

3    work with your chambers to get an appropriate date, Your Honor,

4    as we wanted to handle the other matters, time allowing, that

5    are on for the calendar.

6            THE COURT:  All right.

7            MR. HOLTZER:  We've marked those as adjourned, Your

8    Honor.

9            The second group of items on the calendar are the

10   items marked as uncontested.  We filed certain motions and did

11   not get objections and we wanted to move to those next, Your

12   Honor.

13           The first one is the case management motion.  We've

14   had discussions with the U.S. trustee and with counsel for the

15   creditors' committee.  Neither have an objection to that

16   motion.  We have added language to that motion which we

17   provided in our order to chambers.  And that language includes

18   language to involve counsel to the committee in certain aspects

19   of the case management procedures.

20           THE COURT:  Does anyone wish to be heard?  All right.

21   We'll approve the motion.

22           MR. HOLTZER:  Thank you, Your Honor.  Your Honor, the

23   next motion on the calendar is a motion requesting authority to

24   pay certain insurance amounts and workers' compensation amounts

25   during the pre-petition period.  We filed that motion.  We had

46

1    an interim hearing on April 23rd.  There have been no

2    objections to that motion and, again, we've had extensive

3    discussions with the U.S. trustee and counsel for the

4    creditors' committee.  And there is no objection to that

5    motion.

6         THE COURT:  Does anyone wish to be heard?  All right.

7    We'll approve that motion.

8         MR. HOLTZER:  Thank you, Your Honor.  Item number 3,

9    Your Honor, is a motion requesting permission to pay certain

10   pre-petition taxes.  The various categories have been laid out

11   in the motion.  And again, we've had discussions with the U.S.

12   trustee and the counsel for the creditors' committee.  And

13   there are no objections to that motion.

14        THE COURT:  All right.  At an earlier hearing, I

15   invited any secured lender to let me know if they wish to

16   object to the debtors' proposal to pay taxes on the secured

17   properties and no one stood up.  Anyone wish to be heard with

18   regard to this motion?  All right.  We'll approve the motion.

19        MR. HOLTZER:  Thank you, Your Honor.

20        THE COURT:  Whoever is on a speaker on the telephone

21   must pick up.  I'm going to ring off on all the phones if

22   someone doesn't pick up.  You'll have to hang up, sir, or

23   ma'am.  Please go ahead, Mr. Holtzer.

24        MR. HOLTZER:  Thank you, Your Honor.  The next item

25   on the calendar, item 4 under this heading, is our motion for

47

1    authorization to pay certain critical service providers.

2    Again, Your Honor, we've had very extensive discussions with

3    the U.S. trustee and with the creditors' committee and there

4    had not been an objection to this motion.  We had interim

5    relief from Your Honor for certain important ones prior to this

6    hearing date.  And we're ready for the next phase.

7         THE COURT:  Does anyone wish to be heard?

8         MR. STAMER:  Your Honor, just very briefly.

9    Michael -- you can stay there, Gary.

10        MR. HOLTZER:  Yep.

11        MR. STAMER:  Michael Stamer for the committee, Your

12   Honor.  We did, as Mr. Holtzer represented, have significant

13   discussions about the critical vendor motion -- critical

14   provider motion.  The economics are such that, I believe, on

15   the interim hearing, it was a million seven that was going to

16   be paid.  And through the final hearing, it was fifteen million

17   dollars that would be paid.  Based on the information provided

18   to us and the fact that this is somewhere in the neighborhood

19   of a thirty billion dollar capital structure, we thought that

20   was not unreasonable.  And we were persuaded that it made

21   sense.  To the extent the debtors need to deviate from their

22   plans with respect to critical vendors, they promised to keep

23   the committee in the loop and we'll have back and forth as is

24   necessary.

25        THE COURT:  I gather you know what payments they

48

1    propose to make?

2         MR. STAMER:  Your Honor, we do.

3         THE COURT:  And you also know the procedures that

4    they propose to put in place to get creditor other concessions

5    or benefits from the vendees, the so-called critical vendees.

6         MR. STAMER:  Your Honor, we do.

7         THE COURT:  All right.  Does anyone wish to be heard?

8    All right.  I am, as those who were here at the earlier hearing

9    know I'm very hesitant to approve critical vendor orders of any

10   type.  But since the committee has had a chance to review the

11   proposal, it is a de minimis almost in the context of these

12   cases and the twenty-day period in Rule 6003 has gone by.  I'll

13   approve the motion.  Thank you.

14        MR. HOLTZER:  Thank you, Your Honor.  The next item

15   up on the calendar is the motion for approval of employee wages

16   and benefits.  Your Honor, with respect to this motion, we've

17   again had extensive discussions with the committee and the U.S.

18   trustee.  We filed a supplement to our original motion asking

19   for some incremental relief in addition to what was included in

20   the first day motion.  That relief we've also discussed

21   extensively with the U.S. trustee and the creditors' committee.

22   I believe that the U.S. trustee has an objection to a portion

23   of that relief insofar as we are asking for relief to go beyond

24   the statutory cap with a few employees as we've laid out in the

25   supplement to the motion.  We are prepared, if need be, to put

49

1    on a proffer of Mr. Mesterharm from AlixPartners with respect

2    to the small and very modest amounts that we are going beyond

3    the statutory cap in the supplement to those employees if Your

4    Honor so requests.  The U.S. trustee may like to be heard on

5    this.  The creditors' committee has agreed and does not object

6    to the entry of the order.

7         Counsel for the creditors' committee asked that we

8    note on the record that the motion calls out as a notice to

9    parties one of our benefit plans known as the CVA plan.  It is

10   one of the companies benefit plans that provides for incentive

11   compensation.  That incentive compensation is not due to be

12   paid until next year so we are not seeking authority today and

13   may not seek authority to make those payments.  However, the

14   counsel for the creditors' committee asked that we at least

15   place on the record that we are not seeking authority today.

16   We will have discussions with the creditors' committee about

17   that plan.  And if we need to come back to the Court for that

18   plan, we will.

19        THE COURT:  Well, maybe the case will be over before

20   next year.

21        MR. HOLTZER:  Maybe.

22        THE COURT:  All right.

23        MR. STAMER:  Your Honor, if I could be heard just

24   very briefly.  The committee has been in active dialogue with

25   the company on this motion.  Again, the economics in summary

50

1    are approximately six million dollars to be paid to employees

2    for pre-petition unpaid obligations.  An additional

3    approximately 180,000 dollars in the aggregate to, I think, who

4    the company has described as key producers.  The committee

5    realizes that the employees of this enterprise are valuable

6    assets and we believe that it is necessary and appropriate to

7    make these payments.  We're satisfied that it is important to

8    allow the company to continue its reorganization efforts.

9         In addition, Your Honor, as part of this motion,

10   there was an agreement by the two most senior executives --

11        UNIDENTIFIED SPEAKER (TELEPHONICALLY):  Hello?

12        THE COURT:  You'll have to pick up if you're on the

13   telephone, please.  Go ahead.

14        MR. STAMER:  There was -- the two senior most

15   executives of the company whose compensation I won't go into in

16   detail but they're paid a bi-weekly compensation and a

17   quarterly additional form of compensation.  For purposes of the

18   payments that were due the quarter ending, I think, May 2nd,

19   the two senior executives have agreed to defer those payments.

20   Your Honor, like in any bankruptcy case, large or small, there

21   will be a discussion between the company and the committee

22   about appropriate compensation and incentivizing rank and file

23   employees and senior executive employees.  And we are

24   scheduling a meeting with the company in the next week or so

25   and that will be on the agenda.

1           The only issue that we disagree on with respect to

2      this motion, and what we've effectively done is we've kicked

3      that can down the road, is the CVA plan.  Your Honor, that is a

4      discretionary bonus plan that the company has indicated they

5      think is part of their ordinary course of business.  We're not

6      so sure, Judge.  But, again, it doesn't kick in until sometime

7      early next year.  The company has agreed they will give us

8      advanced notice of no less than fifteen business days before

9      any payment is made under that plan.  And with that

10     accommodation, Your Honor, the committee has no objection to

11     the relief that's being sought in this motion.

12           THE COURT:  All right.  Mr. Masumoto?

13           MR. MASUMOTO:  Your Honor, if I may?

14           THE COURT:  Just come to the microphone, please, so

15     that we're certain to pick up the passage.

16           MR. MASUMOTO:  Good morning, Your Honor.  Brian

17     Masumoto for the Office of the United States Trustee.  As

18     indicated by counsel, unfortunately, our office does take a

19     position with respect to the amount of the payments that exceed

20     the statutory cap under 507(a)(4).  In this instance, we were

21     provided with some additional information regarding these

22     employees which indicate, essentially, ten employees will

23     receive amounts over the 10,950 dollar cap, amounts that go up

24     as high as 14,500 dollars.  Based upon the information

25     provided, we've been advised that none of these employees are

52

1   insiders.  However, six of the ten employees receive annual

2   salaries of in excess -- of 125,000 or more.  And accordingly,

3   these aren't the typical rank and file employees who are being

4   allowed to receive payments in excess of statutory cap.

5        As Your Honor knows, in the recent bankruptcy format,

6   the amount of priority -- the priority claim under 507(a)(4)

7   was fairly significantly increased.  And in this context, we

8   believe that that cap should serve as a limitation on the

9   amounts that are paid to the employees, particularly, those who

10   are highly compensated.

11        Accordingly, we do oppose the amounts in excess of

12   the amount notwithstanding the aggregate total as fairly

13   modest.  Again, with respect to the individuals, there is also

14   an issue regarding the nature of the amounts that go over the

15   cap.  My understanding is that the amounts are attributable to

16   commission payments.  And I believe the debtor has taken the

17   position that these commissions were technically in compliance

18   with 507(a)(4) by virtue of essentially being credited with

19   being -- within the 180 days, although, arguably, the issue is

20   as to whether or not these compensations were earned over that

21   period may be somewhat in question.

22        Based on these factors, again, Your Honor, we

23   still -- our office attempts to maintain a fairly consistent

24   and uniform policy that the statutory cap should be observed.

25   All right.  Thank you.

53

1          THE COURT:  Thank you.  Anyone else?  Well, I have

2    consistently and uniformly overruled the objection of the U.S.

3    trustee on the point.  I appreciate the position but I don't

4    believe that the statutory cap amount is the only -- the fact

5    that these payments are within the statutory priority is the

6    only reason why we approve to employees at the beginning of the

7    case.  There are many reasons to do that especially in a case

8    where we're making some, albeit modest in the context of this

9    case, payments to critical vendors.

10          It also seems to me that we shouldn't encourage

11   parties to file on a particular day or during a wage period or

12   at the beginning or at the end of a wage period by having an

13   absolute limit on the statutory cap amount especially where

14   they're in the nature of commissions and, in effect, the

15   agreement, even if there's no formal agreement with the

16   employee is being observed.  Nothing in the motion implicates

17   Section 503(c) of the Bankruptcy Code which does apply in these

18   cases and, therefore, I'll approve the motion.  Thank you.

19          MR. HOLTZER:  Thank you, Your Honor.  We now turn,

20   Your Honor, to the utility motion.  And I will turn the podium

21   over to my partner, Melanie Gray.

22          MS. GRAY:  Good afternoon, Your Honor.  Melanie Gray

23   with Weil Gotshal & Manges.  I'm happy to report that despite

24   the number of objections to the utilities motion, we have been

25   able to work diligently to resolve all but two.  And I will

54

1   announce the status of the two that have not been resolved.

2   We've also made two revisions to the order based upon

3   negotiations with the committee which I hope will mean that the

4   proposed order is now satisfactory to the Court as well.

5          Your Honor, we've resolved all of the objections

6   except for one with the Trigen entities.  And with regard to

7   those, Your Honor, first, Trigen provides certain utilities to

8   the Grand Canal Shoppes in Las Vegas.  And we have worked with

9   them to reach agreement with regard to the accounts and the

10  pre-petition amounts due.  We believe that we will have

11  agreement with regard to the amount of adequate assurance once

12  both parties are able to reconcile those accounts.  And so, we

13  ask, with regard to Trigen, that the motion -- that they will

14  be excluded from this order.  And we reserve our rights to come

15  back if there is a dispute with regard to Trigen and the

16  adequate assurance that they request and that we oppose.  And

17  so, we would set that for a subsequent date.

18         THE COURT:  You don't want a date today, though?

19         MS. GRAY:  No, Your Honor.  I believe that it would

20  be appropriate to allow the parties to work through these

21  issues.

22         THE COURT:  All right.

23         MS. GRAY:  And Mr. Conlan of Gibbons for Trigen may

24  be on the phone.  He may want to be heard with regard to the

25  setting of a subsequent hearing.

55

1          THE COURT:  All right.

2          MR. CONLAN (TELEPHONICALLY):  Good morning, Your

3     Honor.  Mark Conlan of Gibbons and endorse for counsel as

4     reported to the Court.

5          THE COURT:  All right.  Then we'll deal with it in a

6     subsequent order if necessary.

7          MS. GRAY:  Thank you.  And, Your Honor, I will just

8     say that the parties had agreed that during this period of time

9     where we work out the adequate assurance that Trigen has agreed

10     to continue to provide the utility services to the debtors.

11          The second objection, Your Honor -- the resolution of

12     that is really a withdrawal of the motion as to two parties who

13     are listed as utilities.  And those are Constellation

14     NewEnergy, Inc. and Constellation NewEnergy-Gas Division.

15          THE COURT:  That's in your papers.

16          MS. GRAY:  Yes, Your Honor.

17          THE COURT:  All right.

18          MS. GRAY:  They were listed and, as you can imagine,

19     based upon the number of utilities and accounts, we went back

20     and looked at those agreements when we received the objection

21     from these two Constellation entities.  And those, Your Honor,

22     are indeed forward contracts as opposed to your normal utility

23     contracts.  And we agree with Constellation's position that

24     they should not be considered and are not utilities for

25     purposes of 366 in this case.  So the debtors have withdrawn or

56

1    are seeking to withdraw the motion with prejudice as to those

2    two entities.

3            THE COURT:  All right.

4            MS. GRAY:  However, even though we are withdrawing

5    the objection, we agree that nothing prejudices the parties'

6    rights with regard to these contracts in any subsequent dispute

7    or issue that may come before the Court.

8            THE COURT:  All right.  Thank you.  Does anyone wish

9    to be heard.  Well, then, we'll enter an appropriate --

10            MR. ETKIN:  Your Honor?

11            THE COURT:  Yes?

12            MR. ETKIN:  Just briefly.  Michael Etkin, Lowenstein

13    Sandler on behalf of the various Constellation entities.  We

14    have not seen the latest --

15            THE COURT:  You'll see it.  You'll see it.

16            MR. ETKIN:  Just want to make sure we see it.

17            THE COURT:  You'll see it.

18            MR. ETKIN:  Thank you.

19            MS. GRAY:  We'll be --

20            THE COURT:  I think everyone should have a chance to

21    see the final order before it's submitted.

22            MS. GRAY:  Yes.

23            THE COURT:  If there's any issue, you can be heard by

24    telephone but I'm sure there won't be.

25            MS. GRAY:  And, Your Honor, if I may just note two

1    other revisions to the order, for purposes of the record,

2    working with the committee, we have reached an agreement with

3    regard to notice provisions to the committee in connection with

4    any settlements as to adequate protection that are reached --

5    or adequate assurance that are reached with utility providers.

6    And that is set forth in the revised order.  And, likewise,

7    Your Honor, we took guidance from the utility order that was

8    entered in the Tronocs (ph.) case.  And we have provided in the

9    order that nothing in the order bars a utility from seeking

10   additional adequate assurance in these cases if circumstances

11   change.  And, of course, the debtors reserve their right to

12   object if such additional adequate assurance is sought.

13        THE COURT:  Well, hopefully, that provision will

14   lower the decibel level in the next case.  If that were

15   possible, I think utilities could save a few dollars in filing

16   their objections and debtors' counsel could get a little more

17   sleep.

18        But, thank you.  I thank all parties for having

19   gotten as far as they have on this issue.  Does anyone wish to

20   be heard?  Well then, we'll enter an appropriate order.

21        MS. GRAY:  Thank you, Your Honor.  We'll turn it back

22   to Mr. Holtzer.

23        MR. HOLTZER:  Actually, Your Honor, looking at the

24   rest of the calendar for today, we'd like to begin our motions

25   on adequate protection, cash collateral, cash management and

1    the tenant obligations motion which we're going to present

2    together.  And Ms. Goldstein now will begin that presentation.

3              THE COURT:  All right.

4              MS. GOLDSTEIN:  Thank you, Your Honor.  Your Honor,

5    as our papers indicate, we are seeking to use cash collateral

6    pursuant to Section 363(c)(2) and 363(e) of the Bankruptcy

7    Code.  Under Section 363(c)(2), the Bankruptcy Code allows the

8    debtor to use cash collateral absent consent after notice and a

9    hearing and approval by the Court.  Section 363(e) allows the

10   Court to condition the use of cash collateral by the debtor as

11   may be necessary to provide adequate protection.  And although

12   the Bankruptcy Code identifies certain forms of adequate

13   protection, in Section 361, it is by no means intended to

14   provide an exhaustive list of what constitutes adequate

15   protection.

16             Your Honor, you know, since the initial hearing on

17   the use of cash collateral on the first day of this case, we

18   have spoken to a number of the counsel for the mortgage

19   lenders.  We have seen their objections which were filed before

20   we amended our DIP loan.  And we believe, particularly, through

21   the DIP loan negotiation process that we have made very

22   significant strides in addressing the chief adequate protection

23   objections of the secured lenders.  So I would like to

24   summarize the adequate protection package that we now propose.

25             Replacement liens.  The first adequate protection

59

1    proposal provided for a replacement lien on intercompany claims

2    that a specific debtor would receive on account of the

3    difference between the cash that was swept up to the parent's

4    central cash management system and the amounts that came back

5    down to the projects to pay the expenses of the project.  And

6    that net cash would become an intercompany claim.  And the

7    proposal was to provide a lien on that intercompany claim.

8    We're not taking away that proposal, Your Honor, but we heard

9    from the lenders and, as I'm sure you read in their objections,

10   that they felt that that was inadequate.  And their primary

11   objection was well, we don't think that is as strong as you

12   suggest because the DIP lender would have a lien on all the

13   cash in the main operating account.

14         Your Honor, we felt that this was a point that we

15   could take up with the DIP lenders and achieve the improvement,

16   particularly on that point, in terms of adequate protection.

17   And we were able to do so.  So that we are now proposing that

18   the mortgage lenders would get a lien on the main operating

19   account which is senior to the lien of the DIP lender.  And

20   that lien would be to the extent of the lesser of the aggregate

21   diminution in value which is designed to protect the secured

22   lender from a decrease in value of their interest in the

23   collateral and the post-petition net positive balance of the

24   intercompany claim.

25         Your Honor, it's quite possible that the intercompany

60

1   claim is greater in amount than what the diminution is.  I

2   could also posit a scenario, particularly for an undersecured

3   creditor, where the diminution might be the entirety of the net

4   intercompany claim.  So, Your Honor, I'm not suggesting that

5   that is the case.  But by proposing this lien to be the lesser

6   of those two, we believe that we have appropriately covered the

7   requirement for adequate protection of taking the cash out of

8   the projects, sweeping it, as the debtor always had done, to

9   the centralized cash management system and using the cash back

10  at the project level.

11          This, Your Honor, we believe satisfies and moots the

12  objection of the mortgage lenders that the DIP lenders were, in

13  effect, priming the holders of the adequate protection

14  replacement liens because the DIP lender in the first iteration

15  of the DIP loan had a first lien on that main operating

16  account.

17          We also will be giving a -- Your Honor, may I have

18  one second?  We also, Your Honor, will be granting to the

19  mortgage lenders a second lien on what we call the Goldman

20  properties.  As I'm sure everyone here is aware, the proposed

21  DIP loan would pay off what we call the Goldman loan -- it is

22  secured by twenty-seven properties -- in order to provide a

23  first lien to the DIP lender.  Your Honor, when we proceed with

24  our testimony, we will show that the value of the Goldman

25  properties is such that it, one, provided a great deal more

61

1    liquidity by having a new lender on it.  But also, it's of such

2    value that it is a valuable second lien to the mortgage

3    lenders.  Frankly, Your Honor, between the first lien on the

4    main operating account and a second lien on the Goldman

5    properties, we think this is a loan without anything else.  I

6    would consider uber-adequate protection.

7         Now, Your Honor, of course, we will also give

8    superpriority claims under Section 503(b) and 507(b) of the

9    Bankruptcy Code to the mortgage lenders which are senior to the

10   superpriority claims of the DIP lenders but to the same extent

11   as they would have a lien on the main operating account.

12   Again, Your Honor, we're trying to protect the diminution in

13   value of the secured creditors' interest in the collateral as

14   is required from an adequate protection standpoint.

15        In addition, as we had originally proposed, we still

16   propose to pay pre- and post-petition interest at the

17   non-default contract rate set forth in the lenders'

18   documentation as further adequate protection.  Your Honor, of

19   course, we would reserve the application of those payments.  We

20   have one lender who has conceded that it is undersecured.  We

21   are still proposing to make payments equal to the non-default

22   contract rate interest.  But in the case of an undersecured

23   creditor, that would not be interest or applied as interest,

24   rather it would be applied against principal.  So we believe

25   that that satisfies adequate protection under that formula both

62

1    for oversecured creditors and undersecured creditors.

2          Your Honor, in addition, the debtors will continue to

3    operate the properties in the ordinary course of business and

4    pay in the ordinary course of business the post-petition

5    operation expenses, the maintenance expenses to properties,

6    taxes on the properties, as they have done in the past.

7          One additional item of new adequate protection that

8    we are proposing, Your Honor, is related to our motion with

9    respect to tenant practices.  A number of the secured lenders

10   have objected to that motion not because they do not want the

11   debtors to continue to engage in normal lease amendments,

12   normal practices with their tenants because, obviously,

13   maintaining relationship with the tenants and accommodating the

14   tenants is in the best interest not only of General Growth but

15   also in the best interest of the mortgage lenders at the mall

16   level.  So they don't object to the order that we're requesting

17   per se.  However, they did not want to find that they did not

18   have the kinds of consent rights with respect to leasing that

19   they had pre-petition.

20         And so, we believe that actually satisfying that

21   objection is really another form of adequate protection.  And

22   so, we are proposing, as a form of adequate protection, that

23   the debtors will comply with pre-default restrictions contained

24   in the mortgage documents on the ability of the debtors to

25   enter, amend and terminate tenant leases or reciprocal easement

63

1    agreements.  If the debtors' credit documentation with the

2    lenders requires the lenders' consent to enter into a post-

3    petition lease or reciprocal easement agreement or to amend

4    pre-petition leases of reciprocal easements, the debtors will

5    not enter into these agreements without the lenders' consent

6    provided, Your Honor -- we expect this to be a cooperative two-

7    way street -- that the lenders give the debtors the

8    subordination and nondisturbance agreements or consent and

9    subordination agreements that would otherwise be required in

10   these transactions in the ordinary course.

11         Last but not least, Your Honor, the debtors will

12   provide the lenders with financial reporting that was required

13   under their documentation pre-petition and pre-default.  And

14   so, we will adhere to what was originally in the loan

15   documentation with respect to reporting as we had always done

16   in the pre-default scenario.

17         Your Honor, we believe the adequate protection

18   package is very comprehensive.  I called it uber-adequate

19   protection.  I believe that.  And it really covers a rainbow of

20   forms of adequate protection.  And so, we're comfortable that

21   we can provide this adequate protection consistent with the

22   best interest of both the debtors and the mortgage lenders.

23   And we were pleased, frankly, Your Honor, that the competitive

24   DIP negotiations enabled us to achieve both the first lien on

25   the main operating account and the grant of a second lien on

64

1    the Goldman properties that we believe are true enhancements to

2    the adequate protection package.

3          Your Honor, I would like to make some additional

4    remarks about the nature of the -- what I would consider the

5    remaining, maybe, nonadequate protection objections.  And then,

6    my proposal would be that my partner, Adam Strochak, put on our

7    evidence.  And then I would further propose that at the

8    conclusion of our case that the secured lenders have their

9    opportunity to assert their responses and make their main case

10   on their objections.

11         So if I can continue to address the objections and

12   move forward in that manner, I would like to do so.

13         THE COURT:  All right.  If you -- address the

14   objections rather briefly --

15         MS. GOLDSTEIN:  I will, Your Honor.

16         THE COURT:  How much evidence do you have?  How long

17   do you think your witness --

18         MS. GOLDSTEIN:  Well, Your Honor, since --

19         THE COURT:  Who do you propose to call and how long

20   do you think it will be?  Or shall I ask Mr. Strochak?

21         MS. GOLDSTEIN:  Well, Your Honor, I think you could

22   ask Mr. Strochak the length of the testimony --

23         THE COURT:  Yes.

24         MS. GOLDSTEIN:  -- that we would propose on Mr.

25   Mesterharm.  But I think I will be brief and really just give

65

1    an overview of our position --

2           THE COURT:  All right.

3           MS. GOLDSTEIN:  -- on the objections.  We had

4    intended to call Mr. Buckfire in connection with the proposed

5    DIP loan.  So we will not put him forth today but will do so

6    when we proceed with the DIP loan.

7           THE COURT:  All right.

8           MS. GOLDSTEIN:  How long?

9           MR. STROCHAK:  To the left of the testimony, Your

10    Honor, Mr. Mesterharm and I anticipate thirty to forty-five

11    minutes on direct.  We do have a second witness who I think is

12    tentative.  We have an appraisal issue that Mr. Mesterharm is

13    going to rely on for purposes of his financial analysis.  I

14    suppose if somebody objects, we do have the appraiser here to

15    testify if necessary.  But we're hopeful that it'll be

16    unnecessary.

17           THE COURT:  All right.

18           MR. STROCHAK:  In any event, it would be quick.

19           THE COURT:  I'm not trying to -- this is not a

20    contest on endurance.  So at some point, we're going to take a

21    break.  I hope the lenders, the secured lenders, can use that

22    time to get a little bit organized and to discuss the issues

23    that, for example, Mr. Zirinsky raised as to the common

24    matters.  But we can take that break now or we can -- or after

25    Ms. Goldstein has completed her remarks.  Or we can take the

66

1   testimony -- maybe we should have the testimony first 'cause

2   then maybe your thirty minute projection will be more accurate.

3            MR. STROCHAK:  That'll really be up to Mr.

4   Mesterharm.  I was going to suggest we break now --

5            THE COURT:  All right.

6            MR. STROCHAK:  -- just because thirty minutes always

7   stretches to forty-five and we're pushing close to 2:00.

8            MS. GOLDSTEIN:  And, Your Honor --

9            MR. STROCHAK:  But it's really at your discretion,

10  Your Honor.

11           MS. GOLDSTEIN:  And, Your Honor --

12           THE COURT:  Well, maybe you can take the time to

13  shorten the -- I'll hear from the -- if the parties have

14  particular issues that can be taken up at this point, they may.

15  I'll take -- but, Ms. Goldstein, you want to finish your

16  remarks first?

17           MS. GOLDSTEIN:  Yes, Your Honor.

18           THE COURT:  THE COURT:  All right.  Why don't you do

19  that and then --

20           MS. GOLDSTEIN:  I will do that and I will try to

21  shorten them.

22           THE COURT:  -- parties who need to be heard can

23  collect their thoughts.

24           MS. GOLDSTEIN:  Your Honor, I would like to present a

25  brief summary of the objections and our overview of what we

1    will show in response.

2         On the adequate protection point, I do believe we've

3    addressed the chief objections of the mortgage lenders,

4    although some of them continue to seek, as adequate protection,

5    the default rate of interest, the payment of attorneys' fees,

6    or the payment of principal.  Some of them have also raised

7    issues about the inter-company claims being difficult to value,

8    but I do think that our proposal of the lien on the main

9    operating account may have eliminated that objection.

10        A number of the secured lenders have argued that the

11   cash collateral should only be used for the particular property

12   that generated the cash.  And essentially, Your Honor, they're

13   suggesting that cash cannot be upstreamed through the central

14   cash management system and utilized by the parent companies to

15   operate the business.

16        There has been a suggestion that permitting the use

17   of cash collateral and presumably adopting and continuing the

18   centralized cash management system results in a de facto

19   substantive consolidation of the debtors.  There's a suggestion

20   that notwithstanding that we are seeking the Court's approval

21   to use cash collateral, that nonetheless, the debtors should be

22   required to segregate the cash collateral as adequate

23   protection.  It seems inconsistent with the use.  And there's

24   also been a suggestion that the debtors' mezzanine lenders

25   should receive adequate protection for the use of cash

1   collateral.  Your Honor, we're not addressing any of the DIP

2   issues with respect to these, just the cash collateral.

3          So Your Honor, we will establish through the

4   testimony of Mr. Mesterharm that the adequate protection

5   package to be provided to the property lenders is more than

6   sufficient to provide adequate protection to the lenders for

7   any diminution in their collateral.  And again, I don't want to

8   repeat myself too much, but this is a significant increase in

9   the adequate protection previously proposed.

10         We will also show, Your Honor, that the debtors are

11  able to track inter-company claims, such that at any point the

12  debtors will be able to assess the value of any particular

13  inter-company claims.  And therefore, the mortgage lenders will

14  be able to make those assessments as well.

15         I'd like to address some of the legal issues,

16  particularly -- well, Your Honor, I may not limit myself, so I

17  won't limit to a few, but I'll try to keep them brief.

18         THE COURT:  Do you want to save that for a reply so

19  that we find out, as best we can, what issues are still on the

20  table?

21         MS. GOLDSTEIN:  Your Honor, I'd be happy to do that.

22  Maybe that would shorten the hearing.  But we would like an

23  opportunity to respond --

24         THE COURT:  I certainly would like --

25         MS. GOLDSTEIN:  -- to those issues that I view as

69

1      legal issues.

2              THE COURT:  I'd like to see the lenders get in one

3      room and -- would you sit down, please?  I'd like to see the

4      lenders get in one room and at least try to organize, if they

5      can, a response which is not repetitive and where each party

6      has an opportunity to be heard.  And we'll go till midnight if

7      we have to, but I do think that the issues, for the most part,

8      are fairly uniform.  And the issues are really not that

9      complicated.  I mean, this is not rocket science; this is cash

10     collateral and adequate protection.  It's a big case.  There

11     are a lot of debtors.  But if we look on it debtor by debtor,

12     and I realize that there is an issue in not, but if we look on

13     it debtor by debtor, the issues, at least in my mind, are not

14     all that complicated.

15             Now, you, sir, had a question that you wanted to

16     raise before lunch.  Yes, come to the microphone if you want to

17     be sure to get on the written record.

18             MR. VASSER:  Shmuel Vasser for Tysons Galleria, Ala

19     Moana, and Maine Mall lenders.  Two very quick comments.  One

20     is with respect to the testimony, we should go ahead with the

21     testimony.  I just want to tell Your Honor that about ten days

22     ago I asked the debtors to provide the testimony and the

23     evidence that they intend to rely on at this hearing.  I got it

24     this morning at 1 a.m. in the morning.  So to the extent we

25     will need some follow-up --

1          THE COURT:  Well, I'm sure you got it long before

2     some other parties.  Thank you.  Next comment?

3          MR. CROSS:  Your Honor, Greg Cross, Venable.  I just

4     wanted to respond to the fact that the secured lenders have

5     coordinated.  There's approximately twelve billion dollars of

6     secured debt sitting at the table.  We've been in active

7     communication.  We do have fairly centralized lists.  And

8     that's the fashion that we intend to proceed.

9          THE COURT:  Very good.

10         MR. CROSS:  We didn't want the Court to be misled

11    that we were not prepared and focused with centralized

12    objections.

13         THE COURT:  I know that many of you represent a great

14    number of lenders.  The organization has not been apparent to

15    me, and I'm delighted to hear it.  And I'll invite you after

16    lunch to tell me exactly where we are in terms of trying to

17    coordinate responses.  I have thirty separate responses down --

18    at least, downstairs.  And no one has to feel that they're not

19    going to be heard even though there are many responses.

20    Everyone has an opportunity.  Everyone has a right to be heard.

21    So don't take my comments in the wrong fashion.  My comments,

22    though, are:  I think everyone would benefit from more rather

23    than less coordination where there are uniform issues.  Then I

24    can deal with the issues.  There are issues that are going to

25    come up.  We're going to have to schedule some of them today so

71

1    I can deal with them.  And I'll deal with them on a party by

2    party basis.  But I don't want the complexity of these cases

3    also to obscure what I suggest are some pretty simple issues

4    and pretty simple and direct application of well-known

5    bankruptcy principles to a complicated inter-related situation.

6           MR. CROSS:  All right.  I think you will find we

7    agree with that.

8           THE COURT:  Very good.  I'll look forward to hearing

9    that.  Now, you're going to tell me different.

10          MS. GOLDSTEIN:  I'm actually going to just second

11   what Your Honor --

12          THE COURT:  Well, you don't need to.  The whole idea

13   of coordination is that you don't have to.

14          MR. GOTTESMAN:  Well, amplify Your Honor.  You're

15   right, this is a large case.  There are many more zeros than

16   certainly may of us are used to.

17          THE COURT:  Well, reading the paper these days we're

18   getting used to more and more zeros.

19          MR. GOTTESMAN:  I guess a billion is the old million

20   or vice versa, I'm not sure how it should go, Your Honor.  But

21   in that respect, you know, whether the case is about a million

22   dollars or a billion or thirty billion, the normal process that

23   we would have expected, and I just want to clarify the record

24   for this, Your Honor, is that between the interim, the first

25   day hearings and today, that the debtors' counsel would have

72

 1    sat in a room, at least with the primary group -- and as Mr.

 2    Cross pointed out, there's approximately twelve, maybe even a

 3    little bit more, billion dollars literally in the four corners

 4    of this table, excluding committee counsel -- and at least made

 5    an attempt to reach common ground on some of these issues.  In

 6    fact, the debtors represented the very first day, that

 7    afternoon, Your Honor, they would do so.  At the continued

 8    second day, we've been ready, willing, and able, we've

 9    obviously been in communication on other issues in terms of

10    some of the logistical matters with regard to these cases, Your

11    Honor.

12            And so I don't want to have the impression that

13    there's a lack of coordination or a lack of desire to do what

14    we would do in any other case, which is in fact show up with a

15    consensual resolution at the final hearing.  It hasn't happened

16    because there hasn't been the dialogue that you would normally

17    expect in a case, perhaps, with less zeros attached to it.  And

18    the fact that there are more zeros -- and that's the only thing

19    I want to amplify or second in terms of Your Honor's remarks --

20    doesn't change that fundamental process that we would expect in

21    the bankruptcy process.

22            THE COURT:  I think that those are very constructive

23    comments and I think we're all going to have to deal with not

24    only the zeros but the number of separate matters.  I

25    certainly, sitting up here, am going to have to deal with those

73

1    issues and they'll be dealt with.  And that should be an issue

2    for this afternoon.  But why don't we get as many parties to

3    get their lunch in if they can without too much interference by

4    the marshals downstairs, which I have absolutely no control

5    over, and see if there can't be some dialogue.  But what we're

6    doing today, I think, is not rocket science.

7              MR. GOTTESMAN:  I think that's fundamentally correct,

8    Your Honor, but the concern I have is since there's been

9    essentially zero dialogue, that literally by the time we all

10   manage to pile out of the building and allow time to get

11   through security downstairs, there's still not time for that.

12   We've heard that there is not going to be a hearing, at least a

13   final hearing on the DIP.  It's a little bit unclear to me to

14   what extent we'll touch on the DIP today or not.  I guess I'm a

15   little bit confused by that, Your Honor.  I don't think you

16   would hear objections to simply continuing use of cash

17   collateral on an interim basis till next Tuesday to permit

18   those discussions to go forward.  We're certainly willing,

19   ready and able to work tonight, tomorrow, Sunday to see if we

20   can reach common ground.  In fact, if there are structural

21   changes, that can alleviate at least some of our objections.  I

22   will say that we disagree with debtors' counsel.  We think some

23   of the changes have been a step backwards.  I could point to

24   the notion that this may survive as an exit facility with

25   second liens on our properties.  We don't view that as an

74

1    improvement, Your Honor.  But that said, the debtor may not

2    think --

3              THE COURT:  You're talking about the DIP now.

4              MR. GOTTESMAN:  But they're all -- in some respects,

5    Your Honor, they're all inextricably linked, because what in

6    fact constitutes adequate protection, what may satisfy the

7    property level lenders on a consensual basis, to a certain

8    extent is that balancing act, Your Honor, as to what everything

9    looks like when the sun comes down on Tuesday.

10             THE COURT:  Well, that's certainly something to think

11   about during lunch break.  Yes, sir?

12             MR. SAMSON:  Your Honor, thank you.  Paul Samson for

13   the 2008 facility lenders.  I just want to echo what the Court

14   suggested earlier, that all of the lenders try to coordinate,

15   because we haven't been part of the group at the table.  My

16   clients are out 1.5 billion.  There's a lot of other lenders'

17   counsel in the room that aren't part of the group at the table.

18   I just want to second the Court's suggestion that if all of the

19   lenders could get together during the break, we might be able

20   to better coordinate than has been already.

21             THE COURT:  I suggest the lenders perhaps use the

22   courtroom and my conference room next door during the lunch

23   break and see if that process can begin.

24             Yes, ma'am?

25             MS. GOLDSTEIN:  Your Honor, I would just like to make

75

1   one more comment before the break.  Your Honor, we have been in

2   dialogue with various counsel for the secured lenders.  We've

3   been in dialogue with the Venable firm.  We've been in dialogue

4   with Alston & Bird.  We've been in dialogue with counsel for

5   the 2008 lenders.  I can't say we've been in dialogue with

6   every single -- as you know, thirty objections were filed.  And

7   we listened, we heard proposals, we said we could or couldn't

8   do certain things.

9        But Your Honor, we couldn't strike a deal, for

10   example, with one lawyer for one set of secured creditors and

11   then say gee, that may or may not be acceptable to another set.

12   I would say that we were never approached on behalf of a large

13   group of secured lenders to see if we could cut a universal

14   deal.  I think that the achievement that we made in terms of

15   adequate protection were based upon the fact that we listened

16   to the mortgage lenders in a number of conversations and we

17   think that by doing so we were able to address their biggest

18   point.

19        So I just want the record clear that we have not

20   rejected any conversations.  We've spoken to a number of these

21   lawyers who have called us.  But Your Honor, your point on

22   coordination really has not existed in terms of the approach to

23   the debtors.  The debtors couldn't make one-off settlements

24   here.  We view these as all common issues.

25            THE COURT:  It's nobody's fault.  It's nobody's

76

1    responsibility.  That is a function of the complexity of these

2    cases.  But I also think, in terms of what we're trying to do

3    today, it's important to keep in mind what we're doing, which

4    in the first place is an attempt to at least make one firm step

5    forward on cash collateral.  Cash collateral is not forever.  I

6    mean --

7            MS. GOLDSTEIN:  We agree with that, Your Honor.

8            THE COURT:  -- there's nothing in the cash collateral

9    order that says this will -- there may be an end date, and the

10   last one had an end date of today for the lenders' protection.

11   But there's nothing that prevents somebody from coming in, that

12   I know of, for good grounds --

13           MS. GOLDSTEIN:  Your Honor, we understand that and --

14           THE COURT:  -- and saying it doesn't work any more.

15   The cash collateral order, whatever it is today, has to be

16   coordinated with the DIP.  I understand that there may be DIP

17   issues.  And I understand -- I think, in my own view, and you

18   can tell me I'm wrong, because I just read papers sitting up

19   here, I'm not in the middle of things.  But it looks to me like

20   the really more difficult issues for the secured lenders are

21   the DIP issues.  You raised one yourself, sir.  And how do you

22   coordinate the aspects of the DIP, which is a forever matter --

23   not forever, but at least is designed to be fairly permanent --

24   with the lenders' interests.  So I think those are things that

25   can be thought about.

77

1          What we're trying to deal with this afternoon, I

2     think, are the fairly limited issues of default rate,

3     attorneys' fees, payment of principal, nature of the

4     replacement lien, and the like.  And as I suggested a few

5     minutes ago, I don't think that's rocket science.  But parties

6     can certainly argue to the contrary.  Maybe we've gone as far

7     as we can and we should take a break for an hour until 2:15.

8     Will that be enough time?

9          MS. GOLDSTEIN:  Yes, thank you, Your Honor.

10         THE COURT:  Thank you.

11         IN UNISON:  Thank you, Your Honor.

12      (Recess from 1:09 p.m. to 2:40 p.m.)

13         THE CLERK:  All rise.

14         THE COURT:  Please be seated.  All right, Ms.

15    Goldstein, are we ready to proceed?

16         MS. GOLDSTEIN:  Your Honor, one thing, before we

17    proceed to the testimony, on the cash collateral hearing.  We

18    thought that it would be helpful, in connection with the

19    process for finalizing the DIP terms, to ask for the Court's

20    assistance in setting a deadline for the submission of revised

21    DIP bids, setting a deadline for us to file the last and final

22    DIP loan agreement, frankly, so that no one can complain they

23    were left out of the process.  And our suggestion would be that

24    final bids be submitted to the debtors' counsel, copy to the

25    committee counsel, by noon tomorrow, and that we would file

78

1  with the Court a final DIP loan agreement by noon on Monday.

2  We would seek the Court's assistance in setting that kind of a

3  schedule.

4          THE COURT:  All right.

5          MR. STAMER:  May I be heard, sir?

6          THE COURT:  Let's hear from the committee first and

7  then I'll hear from anyone else.

8          MR. STAMER:  Thank you, Your Honor.  Your Honor, the

9  first I heard of this was when I walked back into the courtroom

10  from lunch.  As Your Honor will recall from the objection that

11  we filed, our concern with respect to the current situation is

12  the company was inclined to cut off the auction too early.

13  Look, there needs to be -- we understand there needs to be

14  finality.  But as this has been an iterative process, every

15  iteration has been valuable.  I think this -- and the

16  suggestion I made to counsel was not have the lawyers seek to

17  set arbitrary deadlines, but when we have a break, either after

18  the hearing, or if we have a break, is seek input from the

19  bidders as to what the process should look like.  And if the

20  bidders say yeah, okay, best and final by noon tomorrow, it all

21  works for us.  But I'd like not to do it arbitrarily, and I'd

22  like to have the benefit of people's views.

23          Your Honor, just one other thing, the only

24  information the Court has, I think, with respect to the bids

25  right now -- there are two pieces with respect to timing.  One,

79

1    you heard Pershing Square say their commitment expires today.

2    And second, which I'm not sure the Court is aware of, the

3    commitment that was signed by the Farallon group doesn't expire

4    until the end of June.

5              MR. SPEAKER:  End of -- June 1.

6              MR. STAMER:  I'm sorry, June 1.  So Your Honor, we're

7    not in a hurry to do the wrong DIP.  We're not looking to spin

8    this out longer than is necessary, but I think we need to think

9    about any process that's set to finalize the DIP negotiations.

10   Thank you, Judge.

11             THE COURT:  All right, Mr. Zirinsky?  Come forward to

12   the microphone.  You can't be heard in the other room if you

13   don't come to the microphone, and it may not be picked up by

14   the machine.  Go ahead.

15             MR. ZIRINSKY:  Thank you, Your Honor.  Your Honor,

16   the secured lenders took Your Honor's suggestion over the

17   course of the recess and we did meet.  And we have established

18   some common ground.  And there may be others who are also going

19   to want to speak to this --

20             THE COURT:  I'm sure there are, and I'll hear from

21   them all.

22             MR. ZIRINSKY:  But basically, Your Honor, we

23   concluded the following.  One, is that we do believe that it

24   would be better to defer the hearing on cash collateral until

25   Tuesday, assuming that's still going to be the hearing on the

80

1    final DIP, for the following reasons.

2             One, we believe that the issues of adequate

3    protection will only be partially -- or can only be partially

4    dealt with in the context of the cash collateral hearing

5    because the overlay of a DIP may well impact on whatever Your

6    Honor may decide today.  If we were to go forward on cash

7    collateral, Your Honor might decide that after hearing about

8    the DIP on Tuesday, that what you thought was adequate today

9    might not be adequate on Tuesday because of other provisions

10   that will come into play.

11            THE COURT:  I'm not sure I understand what you're

12   saying.

13            MR. ZIRINSKY:  Well --

14            THE COURT:  Are you saying that without availability

15   of a DIP, cash collateral can't be used because adequate

16   protection will not be sufficient?

17            MR. ZIRINSKY:  No, I'm not saying that Your Honor

18   couldn't find adequate protection.  I don't believe the

19   debtors' proposal affords adequate protection, but I don't

20   believe that Your Honor -- it's not that Your Honor couldn't

21   find some way to fashion adequate protection for use of cash

22   collateral.  However, we think that because of issues raised,

23   by at least the DIP that has been most recently presented by

24   the debtors, including junior liens and other provisions, that

25   that will impact on adequate protection issues beyond what

81

1   would be dealt with today.

2          For example -- and I'm not trying to get into the

3   merits, Your Honor, I'm just really trying to make a point --

4   part of the adequate protection package that the debtors

5   propose to give is a lien on inter-company claims, post-

6   petition inter-company claims.  Those inter-company claims are

7   going to be coming from the entities who are going to be using

8   cash collateral because they don't have sufficient cash on

9   their own to generate cash.  So those will be the people that

10   will owe money into the cash collateral system: the users of

11   cash.  If there were to be a shortfall, the other property

12   owners whose cash was used, whose properties are cash-flow

13   positive whose cash was used, would be looking to recover those

14   receivables from entities that were users of cash: deficit

15   properties.  And by putting junior liens on the assets of those

16   deficit properties in favor of a DIP loan, you would basically

17   have a significant impact on the ability of the positive

18   property lenders to be able to ever recover on those inter-

19   company loans.  And I'm not trying to get into the merits, as I

20   said, but that's just one example of the type of issue that we

21   see that's all inter-related.

22          What we've also done is we have agreed to start

23   meeting this afternoon to develop a common approach towards

24   what DIP loan would be satisfactory to us that would also

25   accommodate the needs of the debtor.  We have heard, from at

82

1    least one very credible party, their willingness to put a

2    proposal in.  And I believe they've given the debtors past

3    proposals where they would not be taking any junior liens on

4    collateral.  They would not insist upon a concentrated bank

5    account, and other provisions that we would find objectionable,

6    as far as we understand them, under the current DIP that's

7    being proposed, that many if not all of those objectionable

8    provisions might not be part of that DIP.  That party is in

9    court and I believe their counsel is prepared to make a brief

10   statement.

11        What we thing would be best, and I'm going to take a

12   line from Your Honor -- we spent a lot of times together in the

13   Northwest Airlines case, and one of Your Honor's messages in

14   that case was "Let's do it right the first time.  Let's do it

15   once and let's do it right."  We think there's an opportunity

16   here over the next several days, if we can bring

17   representatives of the secured parties together -- and we've

18   agreed to work together -- if we can bring them together with

19   the debtors and with the creditors' committee and get a process

20   going, we think we might be in a position where everybody could

21   present to Your Honor next week, hopefully on Tuesday.  We

22   could present to Your Honor next week a DIP and a cash

23   collateral order that would be far less objectionable than what

24   we are dealing with if we go forward today, and certainly what

25   we're going to be dealing with if we go forward on Tuesday,

83

1    based on what we've heard of the debtors' current thinking on a

2    DIP proposal.

3         We think it's in the interests of everybody to see if

4    we can't get a consensual set of orders done here.  And I think

5    that, in fairness, we didn't see this most recent DIP until

6    last night.  Your Honor's already heard about that.

7         THE COURT:  We're not dealing with the DIP today.

8    And the DIP intersects with cash collateral or with the rights

9    of the secured lenders in a few ways that I think you started

10   this morning to at least say that you thought we should clarify

11   and specify.  And I think that might be useful to do, so that

12   we get on the table those intersections such as junior liens

13   and how a debtor, if at all, gets out of bankruptcy, or if

14   everybody gets out of bankruptcy together.  We'll see.  My

15   comment as to doing it right the first time is probably related

16   to the fact that airlines have been known to go into bankruptcy

17   more than once.

18        MR. ZIRINSKY:  So have real estate developers.

19        THE COURT:  Well, again, I will say exactly what I

20   said.  I hope that we'll do it right the first time, but we're

21   not doing everything today.  Let me hear from the other

22   members.  I hear your point.  We are not dealing with the DIP

23   today.  And if I don't let your colleague speak, he is going to

24   have a real problem.

25        MR. ZIRINSKY:  My only point, Your Honor, is that we

84

1    ought to have -- the issues are inter-related.  Use of cash

2    collateral is going to be impacted on what type of adequate

3    protection liens can be afforded.  And to the extent that a DIP

4    lender takes collateral away that otherwise might be used for

5    adequate protection liens, there's going to be a conflict.

6            And our point is we're prepared to let the debtor

7    continue to use cash collateral on an interim basis until we

8    get to the DIP.  Thank you, Your Honor.

9            MR. CROSS:  Your Honor, I'm not trying to be

10   obnoxious by standing up.  I was supposed to be the appointed

11   spokesperson.  We had about thirty lenders that met.  We do

12   have unanimity and agreement on a number of things.

13           THE COURT:  All right.

14           MR. CROSS:  One of those things is the process, and

15   it was a fair statement of the process.  We are committed to

16   meeting later this afternoon and forming a working group so

17   that we can give the debtors what they requested earlier, which

18   is a singular voice to at least discuss those provisions of a

19   DIP and a cash collateral agreement which would be acceptable

20   to the lender community.  We recognize there are certain

21   differences among the lenders, but we would like to try and

22   sort those out so that we could narrow them, and we believe

23   that we could substantially narrow them if we were given a

24   small window of time to do so.

25           We also believe, based upon what we've heard, that if

85

1    we were given additional time, many of the concerns we have may

2    go away with a DIP that is selected, so that a lot of the

3    issues, that are briefed ad nauseam in the papers in front of

4    you, will melt away because the DIP will no longer concerning

5    things like second liens on real estate.  That's a possibility.

6    So what we would like the Court to do is please allow us to

7    adjourn any further issues and debate on cash collateral or the

8    DIP to a subsequent date.  Tuesday is fine.  I would suggest

9    it's fine with the lender community if we went a week to allow

10   this to be fully fleshed out.

11          I agree with Mr. Stamer that we should meet with the

12   lenders and ask the lenders what they want, rather than having

13   DIP on top of DIP being presented to the Court and presented to

14   the lenders to react to.  We would like to see it as a more

15   organized process.  And as is typical in most cases where the

16   lenders have cash collateral, we ask just for a seat at the

17   table so that we can participate in those conversations, and we

18   have our act together and are willing to do that.

19          So we collectively, all thirty-three or thirty-four

20   of us, are asking you to give us that opportunity so that we

21   don't have to all come up and compete for the podium and you

22   won't see me rising and sitting down, up and down, like one of

23   those bobbing ducks that used to be in the back of the cars.

24          THE COURT:  Fair enough.

25          MR. CROSS:  So that's what we're asking.  And I don't

86

1    think, unless I misspoke, that we have anyone else who's going

2    to seize the podium.  I think that we are speaking with one

3    voice.

4           We have one issue with respect to the confidentiality

5    agreement that we'd like to be heard this afternoon.  But other

6    than that, we're requesting an adjournment if you would grant

7    us that.

8           THE COURT:  All right.  Anyone else?

9           MR. ROSENBERG:  Your Honor?

10          THE COURT:  Yes, come forward.  You have to come

11   around this way, Mr. Rosenberg.

12          MR. ROSENBERG:  Thank you, Your Honor.

13          THE COURT:  For all present who wonder why we're

14   meeting on a Friday, you can thank Mr. Rosenberg for that.  The

15   debtors proposed to meet yesterday but there was a lunch that

16   many people here attended, and well, so be it.  But go on, you

17   have a statement to make.

18          MR. ROSENBERG:  Your Honor, that leaves me

19   speechless.  I was going to say that I'll be far briefer than I

20   was yesterday.

21          THE COURT:  All right.

22          MS. GOLDSTEIN:  I'd simply make --

23          THE COURT:  I hope so.

24          MR. ROSENBERG:  Very brief, Your Honor, even briefer

25   than I was going to be ten seconds ago.  Deutsche Bank, we

87

1   firmly believe, is somewhat differently situated from all of

2   the other lenders in this case, for reasons that were set forth

3   in our papers and that I won't argue the merits of at this

4   time.

5           So on the one hand, I simply wanted to distinguish

6   Deutsche Bank from the other lenders who are all speaking with

7   one voice.  But having said that, want to say that, you know,

8   ninety percent of it will be the same.  And we're very happy to

9   see that I think some rationality and sense is prevailing here

10  of people getting together and trying to work this through.

11  And we would very much support the notion of an adjournment in

12  order to see if we can't make progress, rather than shooting at

13  a continually moving target that may moot the issues when it

14  shakes out at the end of the day.  We would very much support

15  that adjournment.

16          THE COURT:  All right.

17          MR. FELDMAN:  Good afternoon, Your Honor, David

18  Feldman from Gibson, Dunn & Crutcher.  My colleague, Mr.

19  Kelsey, spoke earlier.  I represent Farallon, Canyon, Luxor and

20  Whitebox, who until about 2 a.m. last night had been the

21  proposed DIP lenders in this case.

22          THE COURT:  You want an adjournment so you can get

23  some sleep.

24          MR. FELDMAN:  No -- well, that would be nice.  Sleep

25  would be nice at this point.  That would be very nice.  I

88

1    just -- a couple of observations.  I guess after the comment of

2    doing it right the first time, I think unfortunately with

3    regard to the DIP process, we have lost that opportunity,

4    because I feel some sense of deja vu here as the debtors seek

5    to set a deadline.  Frankly, there was a deadline that had been

6    set and we had submitted all of our papers, full set of

7    commitment papers and a credit agreement and the like, and then

8    frankly, it wasn't until literally 2 a.m. last night that we

9    were told there was a different deal that the company was going

10   to go forward with.  We still haven't seen, while we've heard

11   some discussions of the terms and seen snippets of various

12   documents and some interim drafts, we still haven't seen final

13   documents on this new proposal.

14          So if there is to be a date set for us to put in a

15   response, effectively, to that proposal, which was a response

16   to ours, it would be nice to know really what it is.  I now

17   hear that that commitment, you know, if it doesn't get approved

18   today, goes away.  So I'm not sure whether that is something

19   we're shooting at or not.

20          But I think that we're -- one thing I should tell you

21   about the folks that I represent, and maybe you've heard this

22   already, is it's not just folks who are interested in the DIP

23   investment.  That's a nice component of it.  But the folks that

24   I represent are all major unsecured creditors in this case.

25   And their, frankly, initial motivation here was to provide a

89

1    DIP that was a reasonable investment but also in the best

2    interests of unsecured creditors in this case.  And I think

3    they need and deserve and what's appropriate under the

4    circumstance is that they have an appropriate understanding of

5    what we're competing against and a process which is fair and

6    balanced.  And to date, you know, it's been a little uneven,

7    Your Honor.

8         And we understand that the debtor's juggling lots of

9    different things, but we want an opportunity to have a fair

10   shot at getting this financing.  We think it would be a good

11   thing for the estate generally for our group to provide the

12   financing.  And what we don't want to do is be shooting against

13   a proposal in a vacuum.

14        THE COURT:  Thank you.

15        MR. FELDMAN:  Thank you.

16        THE COURT:  Anyone else, briefly?

17        MS. BUELL:  Yes, Your Honor.  Your Honor, Deborah

18   Buell, Cleary Gottlieb, on behalf of Goldman Sachs Mortgage

19   Company.  I'm speaking briefly at the request of the secured

20   lenders simply to confirm to the Court that Goldman Sachs

21   Mortgage Company is proposing a DIP.  The debtors have done

22   some talking to us.  We have sent over a revised proposal just

23   this morning which they have not, obviously, had an opportunity

24   to fully evaluate.  It does dispense with the second lien,

25   which is obviously of interest to the secureds and was the

90

1    subject of some lunchtime conversation.  So we just want to say

2    that certainly on behalf of this proposed DIP lender, we very

3    much appreciate the adjournment and expect to work very

4    diligently with the debtors and the constituencies and whatever

5    deadline the Court sets.

6        MS. GOLDSTEIN:  Your Honor, I would like to speak on

7    behalf of the debtor in opposition to adjourning the cash

8    collateral hearing.  All we have heard, I believe, from the

9    secured lenders are issues relating to the DIP.  And in fact,

10   there are a couple of things I can clarify to make this very,

11   very simple.

12       One, the proposed lien on the central operating

13   account, we can propose under any circumstance.  We have the

14   Farallon DIP on file.  If it's the case that Pershing has gone

15   away, we have the Farallon DIP on file.  That permits it.  And

16   we believe we can agree to grant that lien under any

17   circumstance.  We also believe we can agree to grant the second

18   lien on the Goldman properties under any circumstance.

19       So Your Honor, I think, from what I heard in all the

20   speeches that just occurred, the big issue --

21       THE COURT:  Well, they weren't speeches.  They are

22   statements of position.

23       MS. GOLDSTEIN:  Whatever.

24       THE COURT:  And parties are --

25       MS. GOLDSTEIN:  They're entitled to be heard.

1        THE COURT:  -- reacting very quickly, and for all of

2    you on very little sleep, to a changing situation, but one that

3    may be in the best interests of the estates generally.

4        MS. GOLDSTEIN:  And Your Honor, we're trying to do

5    what's in the best interests of the estate.

6        THE COURT:  I'm certain of that.

7        MS. GOLDSTEIN:  Every time we've talked to secured

8    lenders they haven't relented on principal, legal fees, default

9    interest as adequate protection --

10        THE COURT:  Well, only some of them will raise those

11    issues.

12        MS. GOLDSTEIN:  Okay.

13        THE COURT:  We can certainly deal --

14        MS. GOLDSTEIN:  Notwithstanding what we've

15    proposed --

16        THE COURT:  -- with those and I think it would be --

17    the only reason not to deal with those issues this afternoon

18    would be to give parties time to deal with things that are more

19    important.

20        MS. GOLDSTEIN:  And --

21        THE COURT:  But I think we can deal with those issues

22    very quickly.  As I said earlier, this is not rocket science.

23        MS. GOLDSTEIN:  No, we totally agree, Your Honor.

24        THE COURT:  Nor is it forever.

25        MS. GOLDSTEIN:  And that's why --

1      THE COURT:  Everyone can reserve their rights to come

2  back.  I hope they don't, but you have the right to come back

3  and propose to the debtors first and then to come to the Court

4  for additional adequate protection.  And that's if anybody

5  changes from being over-secured to under-secured or to being

6  just on the cusp, which seems to be a frequent occurrence.

7      MS. GOLDSTEIN:  And Your Honor, we would like very

8  much to go ahead and put on our case on cash collateral,

9  because there are legal issues there that need to be discussed.

10  And we think it's important -- they have nothing to do with the

11  DIP loan -- to get this done so that we, the debtor, can move

12  on with this case.  We're prepared to put on our case and we'd

13  like to do that this afternoon.  Your Honor, you know, we have

14  seen the prior Goldman proposals.  We know it does not include

15  a second lien.  There were other economic reasons, et cetera,

16  for our choice.  We certainly welcome the competitor DIP

17  lenders to not require a second lien.  We would give a negative

18  pledge.  There are ways around that.  But so far we have looked

19  at the DIP loan from the point of view of what is best for the

20  estate.

21      So Your Honor, I think that is for another day, but I

22  believe that nothing has been put forth this afternoon by the

23  secured lenders that impacts our ability, or that should

24  detract from our ability to put on our case on cash collateral

25  under any DIP lending scenario.

93

1          MR. STAMER:  Your Honor, may I be heard for just a

2     minute?  I promise it will be less than sixty seconds.  I just

3     want to clarify where the committee is.  I stood up, Your

4     Honor, in opposition to setting forth in stone a procedure as

5     it related to the DIP auction process.  That is not my position

6     as it relates to cash collateral.  I think the DIP and cash

7     collateral are severable.  I agree with the company, you can go

8     forward with cash collateral, you can approve cash collateral

9     without going forward with the DIP.  And if something happens

10    with respect to the DIP, we can talk about it when that's

11    before the Court.  But I wanted to make sure the Court

12    understood there's a distinction between my point on the DIP

13    and cash collateral.

14          THE COURT:  I understand that, and I think there is a

15    distinction between the two.  Let's go forward with testimony

16    on the cash collateral.  The lenders or all parties will then

17    have a better record on which to make whatever determinations

18    they seek.  If they need to cross-examine, it should be solely

19    related to the issues of cash collateral.  We are not dealing

20    with the DIP, and I realize without any question, that there

21    may be overlap, but that has to do with the DIP.  And if the

22    DIP impinges on whatever cash collateral principles are

23    established today, then we'll have to revise the cash

24    collateral order accordingly, or we won't be able to enter a

25    DIP order.  All right, call your witness.

94

1          MR. STROCHAK:  Thank you, Your Honor.  Adam Strochak,

2    Weil, Gotshal, for the debtors.  We call James Mesterharm from

3    AlixPartners.  Your Honor, I have an exhibit binder.  With

4    permission, I'll approach and hand a copy to the Court and one

5    for the witness?

6          THE COURT:  All right.

7          MR. STROCHAK:  I don't have binders for everybody in

8    the room.  I just have copies of all of the exhibits.  Anybody

9    who asked for a copy, we provided copies late last night, and

10   I'm happy to provide copies.  My colleague, Mr. Lopez, has

11   copies of exhibits.

12         MR. SPEAKER:  I'd like a copy.

13         MR. STROCHAK:  You certainly may.  Mr. Lopez has

14   copies right here and he's happy to distribute them.

15         THE COURT:  Just carry them.  Stay where you are.

16   Just carry them over.  All right, go ahead.  We have a half an

17   hour.

18         MR. STROCHAK:  Thank you.

19   DIRECT EXAMINATION

20   BY MR. STROCHAK:

21   Q.   Mr. Mesterharm, how long have you been working with

22   General Growth?

23   A.   I started with General Growth the first week of December.

24   Q.   And what are your responsibilities there?

25   A.   Myself and my firm have been engaged to be restructuring

1    advisors.  We assist the company in its preparation of cash

2    forecasts.  We're assisting the company in the preparation of a

3    budget.  We've also assisted the company in preparing for

4    filing of these Chapter 11 cases and have participated in

5    discussions with creditors and creditors' advisors.

6    Q.    Thank you.  Let me ask you a few questions about General

7    Growth's operations.  How does the company manage its

8    properties?

9    A.    The company manages its properties in a centralized

10   fashion.  They provide, through their corporate organization,

11   management of the malls from both an asset and property basis.

12   They also provide all of the main administrative functions of

13   the company on a centralized basis, such as accounting, legal,

14   human resources.  But more importantly, operationally, they

15   provide centralized leasing services to the properties and also

16   centralized procurement and cost-related management services

17   around development and construction.

18   Q.    Does the company's centralized management structure

19   provide any benefits for the individual property level

20   entities?

21   A.          Certainly.  The company, in the way it operates

22   today, it operates as a portfolio of properties which benefit

23   from the centralized system by virtue of the relationships that

24   the debtor has with tenants.  Tenants appreciate working with

25   General Growth on a centralized fashion when they would like to

96

1    approach the company and discuss their portfolio of leases with

2    the company and work out deals across the network of the mall

3    operations, and also in terms of how the company manages its

4    cash.  And a centralized fashion provides a central framework

5    for collection and consolidation and management of cash and

6    disbursements, which enables the company to do it on the most

7    cost-effective basis with the highest level of internal

8    controls.  And then lastly, on a cost-basis, obviously not

9    having to replicate all of the centralized functions of the

10    corporate structure and provide them at each individual mall,

11    the company gets leverage of staff.  And then lastly, they get

12    synergies from being able to buy services and products in bulk.

13    So for example, the negotiation of security agreements for

14    security vendors who will provide those services across

15    multiple malls, and the company believes that they achieve the

16    best pricing by negotiating in this fashion.

17    Q.   Do the individual property-level entities have their own

18    employees?

19    A.   The individual property-level -- the operations do not

20    have their own employees.  In fact, they're all employees of

21    GGPLP.  And they're provided to the company.  They're

22    actually -- their W-2, their payroll, is through GGPLP.

23    Q.   Let me direct you to the exhibit binder, and turn, if you

24    would, to Exhibit 1.

25        MR. ROSEN:  Your Honor, we still haven't received any

1   copies.

2           THE COURT:  I'm sorry about that.  We're still going

3   forward.  No one has to cross-examine today.  Go ahead.

4           MR. STROCHAK:  Thank you, sir.

5   Q.   Mr. Mesterharm, what is Exhibit 1?

6   A.   Exhibit 1 is a thirteen-week cash flow forecast of the

7   consolidated operations of General Growth Properties.

8   Q.   Did you participate in the preparation of the forecast?

9   A.   Yes, I did, with myself and my team.

10  Q.   Would you just describe generally how it was prepared?

11  A.   Sure.  The company itself has a very detailed forecast

12  process.  They develop a property-by-property forecast which

13  they refer to as the Rolling-24.  It is a monthly forecast by

14  mall built from a bottoms-up basis by rent rolls and

15  combination of information around the leases that exist; also,

16  assumptions on new deals that could potentially be entered

17  into, along with cost-level detail by property.  In addition,

18  it has corporate-related expenses budgeted out by corporate

19  departments.

20      We then work with the company in terms of taking that

21  information and converting it into more of a cash forecast as

22  opposed to a more accounting-oriented forecast.  And that

23  entailed basically taking certain things that were flatlined on

24  more of an accrual basis and recharacterizing them in a -- to

25  reflect more timing of cash payments.

98

1        And then in converting it to a thirteen-week, we looked at

2   historical payment and receipt patterns and took monthly

3   information and translated it and converted it into weekly

4   information.

5   Q.   Let me just turn your attention to Exhibit 2.  Is that the

6   thirteen-week that you mentioned?

7   A.   Well, Exhibit 1 is the thirteen-week.

8   Q.   I'm sorry.  I got it backwards.  And Exhibit 2, what is

9   Exhibit 2, sir?

10  A.   Exhibit 2 is a two-year forecast, again, based off of the

11  similar company Rolling-24 forecast, again, converting certain

12  aspects into a more cash-oriented forecast.  We utilized the

13  May through Dece -- May '09 through December 2010 numbers for

14  this forecast.

15  Q.   What's your degree of comfort with the two-year forecast?

16  A.   Yeah, it's a very thorough process in putting this

17  forecast together.  As I said, it is built from the bottom up

18  by property.  It is updated monthly.  So if a tenant files for

19  bankruptcy or a tenant lease is terminated for one reason or

20  another, that's updated through the remaining period of the

21  forecast.  Also, as the company experiences certain changes in

22  its cost structure, that's built into the forecast each month.

23  So it is the company's most current information.

24  Q.   All right.  Let me turn you, if I could, to Exhibit 4.

25  And if you would explain for me what is Exhibit 4, sir?

99

1   A.   Exhibit 4 is a chart of the company's expected liquidity

2   position on a consolidated basis and looking at the liquidity

3   that the company would expect to have both with the DIP loan.

4   This DIP loan, I believe, we utilized here was the last-night

5   DIP loan versus proceeding without a DIP loan.

6   Q.   When you say "last night", do you mean the exchangeable --

7   the Farallon DIP or the one from Pershing?

8   A.   Oh, actually, I apologize.  This was the -- this was based

9   on the exchangeable.

10   Q.   Was that true for all the forecasting and projection

11   information that you developed?

12   A.   Yes.

13   Q.   It was based on the --

14   A.   Yes.

15   Q.   -- the DIP proposal that was filed earlier this week with

16   our reply papers?

17   A.   Yes.  All of the projections, the thirteen-week, the

18   monthly forecasts through the balance of '09 and '10, and these

19   charts, were prepared utilizing the Farallon DIP.

20         MR. STROCHAK:  Your Honor, we offer Exhibits 1, 2 and

21   3.

22         UNIDENTIFIED SPEAKER:  We said 1, 2 and 4.

23         MR. STROCHAK:  Oh, excuse me, 1, 2 and 4.  I'm sorry,

24   Your Honor.

25         THE COURT:  I think I'll let parties reserve their

1   objections till they've had a chance to review them.  They are

2   what they are.  And there can be cross-examination at a later

3   date if the parties want to do so.  So we'll provisionally

4   admit them.

5   (Debtors' Exhibit 1, 13-week cash flow forecast of the

6   consolidated operations of GGP, was hereby received into

7   evidence as of this date.)

8   (Debtors' Exhibit 2, two-year cash flow forecast, was hereby

9   received into evidence as of this date.)

10  (Debtors' Exhibit 4, chart of the GGP's expected liquidity

11  position on a consolidated basis, was hereby received into

12  evidence as of this date.)

13       MR. STROCHAK:  Thank you, Your Honor.

14       THE COURT:  But if any -- I can hear any argument.

15  Anybody who wants to argue at this time can argue.

16       MR. ZIRINSKY:  I just want to make a point, Your

17  Honor, if I may speak from back here just to save time.

18       THE COURT:  Well, it saves time but it may not be

19  picked up.  I can repeat it if you want me to, without adopting

20  it.  Why don't you --

21       MR. ZIRINSKY:  If you can receive it without adopting

22  it, provisionally would -- subject to objection, that's fine.

23       THE COURT:  They are the debtors' forecasts.  They

24  can certainly be -- you can certainly cross-examine.

25       MR. ZIRINSKY:  My only point, Your Honor, is that

1   they make certain assumptions about a DIP loan, and this is a

2   cash collateral hearing.

3          THE COURT:  You are -- so you're objecting to Exhibit

4   4 principally?

5          MR. ZIRINSKY:  Well, the cash forecasts --

6          THE COURT:  Cash forecasts also.  Fine.  We don't

7   have a DIP loan yet, so all of those forecasts are provisional.

8          MR. ZIRINSKY:  Thank you, Your Honor.

9          THE COURT:  You have another point?

10          MR. STEIN:  Yes, Your Honor.  Thank you.  Grant Stein

11   on behalf of Prudential.  The problem with Exhibit 1, Your

12   Honor, is that under Federal Rule of Evidence 1006, Exhibit 1

13   is a summary.  And the testimony, as I heard it, is that there

14   is a property-by-property specific forecast that underlies that

15   summary.  That needs to be provided to us; it has not been,

16   certainly for the properties I'm dealing with.  And on that

17   basis, we object to its admission until we have the underlying

18   information and the opportunity to review it.

19          THE COURT:  I gave you the opportunity to reserve

20   your cross-examination.  Therefore, your objection is

21   overruled.  But you may, if you wish -- I hear a request for

22   your property's information, and I'm sure the debtors will take

23   it under advisement.  Thank you.

24          MR. STEIN:  Thank you, Your Honor.

25          THE COURT:  Anyone else?  All right.

102

1          MR. STROCHAK:  Just for the record, Your Honor --

2          THE COURT:  Yes?

3          MR. GOTTESMAN:  Your Honor, just in terms of

4   procedure, because there are many objections that are being

5   raised, I don't want -- obviously don't want thirty of us

6   popping up and down.

7          THE COURT:  Good idea.

8          MR. GOTTESMAN:  But --

9          THE COURT:  Very, very sound.

10         MR. GOTTESMAN:  But one last pop-up, Your Honor.  But

11  I do want to make a standing statement that we are -- unless we

12  pop down, if you will, we are joining in these objections and

13  that --

14         THE COURT:  I already reserved everyone's right to

15  cross-examine, to further examine with regard to these numbers.

16  They're all taken in provisionally.  And I'm not sure I need

17  any of this to rule on cash collateral, but we have it.  You

18  know have more information, which I think should be useful to

19  everyone.

20         MR. GOTTESMAN:  Thank you, Your Honor.

21         MR. STROCHAK:  Just for the record, Your Honor, for

22  any of the lenders who requested it, we did provide the backup

23  on a property-by-property basis for those lenders over the past

24  week or so.

25         THE COURT:  All right.  Well, Prudential apparently

103

1    wants it.  They've been very busy filing motions, and they

2    probably haven't had time to ask for the underlying

3    information.  I'll get to the scheduling of motions later

4    today.

5            MS. GOLDSTEIN:  For the record, Judge the mall

6    lenders --

7            THE COURT:  Move over the --

8            MS. GOLDSTEIN:  For the record, Judge, the mall

9    lenders specially serviced by Helios asked for that information

10   in -- weeks ago through Mr. Youngman of debtors' counsel's

11   firm --

12           THE COURT:  And I assume you wish to add --

13           MS. GOLDSTEIN:  -- and have not --

14           THE COURT:  -- did not receive it.

15           MS. GOLDSTEIN:  -- and have not received it.

16           THE COURT:  All right, well --

17           MS. GOLDSTEIN:  Yes, and not smiling, Judge.

18           THE COURT:  Thank you for letting me know.

19           MR. STROCHAK:  May I proceed?

20           THE COURT:  Yes.

21           MR. STROCHAK:  Thank you.

22   BY MR. STROCHAK:

23   Q.  Mr. Mesterharm, turning to cash management issues, would

24   you just describe briefly the debtors' cash management system?

25   A.  Sure.  The company manages its cash, and always has, on a

1    centralized basis.  What that implies -- or what that entails

2    is that checks are received at lockboxes and then matriculate

3    or pass their way through up to the parent.  That generally

4    happens through one of two majority paths:  Either the lockbox

5    itself points directly up to GGPLP's concentration account, or

6    it passes through a lender depository account.  And absent an

7    event of default, it continues to pass up, the debtor is given

8    the ability to continue to have access to the funds, and they

9    pass it back up to GGPLP's concentration account.

10        The cash, when it arrived at GGPLP, was, you know, in

11   effect, invested in a series of overnight investments and

12   deposited in investment accounts and then was utilized to pay

13   the costs of the corporate enterprise plus the property-level

14   enterprise.  All the payments were made at the top level.

15   Q.   Do the individual property-level debtors have their own

16   cash management systems?

17   A.   No.  There are some lenders who believe cash traps are

18   cash management systems.  But the only systems that are set up

19   on the wholly-owned properties to make payments and invest cash

20   are those maintained by GGPLP.

21   Q.   Under what circumstances were cash traps imposed?

22   A.   Cash traps were generally imposed if an event of default

23   occurred, which predominantly, prior to the bankruptcy filing,

24   was driven by loan maturities.  And lenders then -- once the

25   loan matured and the company was unable to negotiate

1    extensions, they enacted cash traps, with the exception of the

2    Fashion Show and Palazzo facilities where there the company

3    attempted to negotiate a nine-month extension of the loan.

4    They were unsuccessful at getting a nine-month extension.  In

5    negotiating the nine-month extension, the company did agree to

6    certain cash traps to be put in place.  They were unsuccessful

7    at getting a nine-month extension and instead entered into a

8    shorter-term extension where the lenders on those two

9    properties began cash traps.

10   Q.    And those agreements for Fashion Show and Palazzo, are

11   they still in place or have they expired?

12   A.    The forbearance agreements on Fashion Show and Palazzo

13   have expired.

14   Q.    With respect to both the Fashion Show and the Palazzo

15   malls, do tenants still send their rent payments into the same

16   lockbox as they did prior to the imposition of the trap?

17   A.    Yes, and they send them into the same lockbox.  From

18   there, the Fashion Show and Palazzo lenders had a waterfall

19   system where monies were, in effect, reserved in certain

20   accounts for certain -- for certain expenses, and included in

21   that was a budget of operating expenses.  And once a month they

22   provided funds to the debtor based on the budget for the

23   debtor -- or for the parent -- it wasn't the debtor at the

24   time -- but for the parent, GGPLP, to take those funds and then

25   invest them and then utilize those funds to make the payments

1   on behalf of those properties.

2        So, in effect, while those lenders claimed that they had a

3   cash management system, in effect they just inserted themselves

4   into the debtors' cash management system and they continued to

5   use the debtors' cash management system even after entering

6   into the forbearance agreement.

7   Q.   Before the imposition of the trap for Fashion Show and

8   Palazzo, how would the debtors pay interest to the lender for

9   those properties?

10  A.   The debtors would have paid interest directly.  After the

11  trap, I believe a specific subaccount was set up by the Fashion

12  Show and Palazzo lenders to reserve cash for that interest.

13  And I believe they took that -- they would clear that account

14  and pay the interest directly themselves.

15  Q.   And before the trap was put in place?

16  A.   Before the trap was put in place, all monies from the

17  Fashion Show and Palazzo -- or the system operated as I

18  described.  The general system receipts went into -- rent

19  receipts went into a lockbox, it swept up to the parent, and

20  the parent paid all costs of the facility.

21  Q.   All right.  Let me turn, if I could, to intercompany

22  accounting.  Do the debtors track the movement of cash between

23  entities?

24  A.   Yes, they do.  The debtors utilize an accounting system, a

25  general ledger ERP software package known as JD Edwards.  And

1   each of the individual property operations and certain

2   suboperations maintain separate general ledger -- you know,

3   business unit-level general ledgers at each of the -- at each

4   of the malls, which then, in effect, are consolidated to report

5   the company's consolidated results.

6        When -- so when -- the way that then works in turn with

7   the company's cash system is when receipts -- or our rent

8   receipts are received at the mall level and deposited into the

9   lockbox, that creates a journal entry at the property level,

10  which is effectively a debit of cash and a credit of rent

11  receivable or accounts receivable.  And then when the money is

12  swept up to the parent, it's a credit to cash and debit to the

13  intercompany account.  And the -- each of these individual

14  subledgers or ledgers at the mall level and at the corporate

15  level up top maintain an intercompany account where all of this

16  sort of activity, whether it's receipts coming in or payments

17  being made, are captured in that system.

18  Q.   The charges for expenses that are paid, are those -- do

19  those cover both direct and indirect costs?

20  A.   That is correct.  When the company at -- when GGPLP pays

21  the costs related to the individual properties, they are -- and

22  including things like the payroll, as I mentioned earlier, the

23  employees are actually employees of GGPLP, but they may work

24  directly at the mall -- they are then charged to the

25  intercompany account and in an accounting method that's nearly

1    reverse of the money coming up.  The cash goes down through the

2    intercompany account and then gets charged against the

3    intercompany receivable at the property level.  That would --

4    that would be for direct costs.

5        There are also indirect costs that are also charged to the

6    malls, and those would be for allocations.  They could be

7    allocations on things like -- the company, as I mentioned, does

8    certain things on a centralized basis, like procuring property

9    insurance.  And the property insurance is paid as a single

10   bill; it's not 200 separate property insurance policies.  And

11   then those are -- the cost of that is then allocated to the

12   individual properties.

13       Also, there are certain of the corporate services that I

14   described:  leasing, accounting, legal, HR, property

15   management, et cetera.  A portion of those are also allocated

16   to the properties as well, through the intercompany account.

17   Q.   Are there protections in place to ensure the accuracy of

18   intercompany accounting at the company?

19   A.   The intercompany accounts are reviewed like any other

20   account of the company in its ERP system.  The company

21   employs -- or, like all companies, they close their books on a

22   monthly basis and review the accounts to make sure that they

23   properly reflect the company's results.  And on an annual basis

24   the company is subject to audit on a consolidated level and on

25   numerous levels below the consolidated level as well.

1    Q.    Turn with me, if you would, Mr. Mesterharm, to Exhibit 7

2    in your binder.  And would you describe for us what Exhibit 7

3    is?

4    A.    Sure.  Exhibit 7 is a cash forecast analysis to calculate

5    how the debtors believe adequate protection is provided to the

6    property-level lenders vis-a-vis their intercompany -- the

7    intercompany account and the cash transferred up.

8    Q.    Okay.  Could you walk us through the analysis that you've

9    done?  Let's start with the April through December 2009 column.

10   A.    Sure.  In the April through December 2009 column, starting

11   at the top, what we have done is we've grouped those properties

12   which the company's forecasts show are positive contributors to

13   the overall enterprise.  And so what it would say is from April

14   through December, after some income taxes, that those

15   properties would, on a net basis -- that means cash flow up

16   less costs paid on their behalf, less allocated costs -- would

17   put up to GGPLP 421 million dollars.

18   Q.    Would it be correct to say that that represents cash

19   collateral of the secured lenders?

20   A.    Yes.  I believe so.

21   Q.    Okay.  Please go on.

22   A.    The next sections are a series of entities which are

23   either utilizing cash as opposed to providing it up, or

24   properties which are first-lien properties of the DIP lender or

25   proposed DIP lender.  And so there is no pre-petition first

1    lien lender that adequate protection would be being provided

2    to.  And then there are also certain costs:  unallocated costs

3    or costs of the restructuring or costs of the DIP loan.  And

4    what they would say for the months of April through December:

5    that the aggregate cost would be 219 million.

6    Q.    Okay.  And then the Sources of Cash section of the chart,

7    Exhibit 7, what does that represent?

8    A.    What this shows is the company's beginning cash position

9    as of March 31 plus the excess proceeds of the DIP loan over

10   the colla -- or over the refinancing of the pre-petition

11   Goldman collateral.  And it would say that the -- at the onset,

12   the company would have roughly 325.7 million dollars.

13        What we then attempted to show is that that 325.7 million

14   can clearly cover the 219 million of costs and properties that

15   require funding, and then leaving, in effect, the 421 million

16   provided up by the other property-level lenders, you know,

17   available for adequate protection.

18   Q.    And the 106.6 million dollars --

19   A.    That would represent the cushion.

20   Q.    Okay.  And then explain for me, if you could, the next

21   section of the table moving down, "Appraised Value of the

22   Goldman Properties".

23   A.    What we have also provided to the property-level lenders

24   for adequate protection is a second lien on the Goldman -- the

25   pre-petition Goldman loan properties, which would have been

1   refinanced out by the DIP.  So it's a specific pool of

2   properties that the pre-petition first lien lenders would get a

3   second lien on that in regards to their adequate protection.

4        And so the company recently received an appraisal of those

5   properties performed by Cushman & Wakefield, and they appraised

6   that -- those properties at 609 million.

7        MR. ZIRINSKY:  Objection.

8   (Pause)

9        MR. STROCHAK:  Would you like a response, Your Honor?

10  I'm sorry.

11       THE COURT:  It certainly is -- it is hearsay.  But in

12  terms of the company's -- the numbers and the company's putting

13  together their numbers, he can certainly testify as to what

14  they received.  As to whether or not there's any basis for it,

15  we'll have that in due course.

16       MR. ZIRINSKY:  Thank you.

17  Q.   Just to move forward a second, if you would turn back one

18  exhibit in your binder, Mr. Mesterharm, to Exhibit 6.

19  A.   Yes.

20  Q.   I'm sorry.  What's Exhibit 6?

21  A.   Exhibit 6 is an appraisal performed by Cushman & Wakefield

22  on the Goldman properties.

23  Q.   That's the appraisal you mentioned?

24  A.   That's correct.

25  Q.   And is an appraisal of this type something that you would

112

1    typically rely upon in preparing a financial analysis for use

2    in a bankruptcy proceeding such as this?

3    A.    Yes.

4    Q.    Let me roll you forward to Exhibit 7 again, your analysis.

5    A.    Yep.

6    Q.    And let's just -- bring me, if you could, to the

7    conclusion in the April - December 2009 column, the 315.7

8    number.

9    A.    Sure.  If you take the value of the appraised assets --

10          THE COURT:  Whoever online will have to either hang

11   up or pick up or just have to -- I think we'll have to -- we'll

12   have to just close the line.  All right.  All right, go ahead.

13   A.    Okay.  The appraised value is indicated by the Cushman &

14   Wakefield appraisers on the Goldman properties, or 609 point --

15   609 million.  The DIP loan that we have been working with, the

16   proposed DIP loan, is 400 million.  So it would indicate that

17   there is excess value above the Goldman -- or what would be

18   above the DIP loan of 209.1 million, which would be available

19   for the -- to honor the second lien.

20         And so the 315 represents the excess of the cash above

21   funding those properties.  And the corporate costs that are

22   unallocated that need funding and the cost of the case, the

23   professionals and the DIP, plus the excess value of the Goldman

24   property, equals 315.7 million dollars.

25   Q.    Thank you.  Push that ahead for me, if you would, to 2010.

1    And could you explain, are there any differences in the

2    analysis for 2010?

3    A.   Well, 2010 is for a full year and obviously is relying on

4    the 2010 projections.  But what it shows is that if you roll

5    forward the beginning excess cash of 106, you know, that was

6    left after covering the 219 million of costs for April through

7    December, that the -- there would actually be a shortfall in

8    2010 of 65.5 million in covering it just from cash.  And at

9    that point you would start to utilize some of the Gold --

10    excess value of the Goldman collateral, and you'd still be left

11    with a 143.6 million dollar cushion.

12    Q.   And that represents December 31, 2010?

13    A.   That is correct.

14    Q.   Okay.

15         MR. STROCHAK:  Your Honor, we would offer,

16    provisionally, Exhibits 6 and 7.  The foundation for Exhibit 6,

17    Your Honor, the Cushman appraisal, is Rule 703 -- it's relied

18    upon; it's reasonable reliance under these circumstances -- or

19    Rule 807, the catch-all exception.  And as I indicated

20    previously, Mr. Latella from Cushman & Wakefield is here and he

21    is available.  We didn't think it was necessary under the

22    circumstances for an adequate protection analysis.  But if

23    there is going to be an objection, he is here and can lay a

24    foundation for the admission of that appraisal.

25         THE COURT:  All right, let's take Exhibit 7 first.

114

1    Exhibit 7 is the company's cash forecast analysis with whatever

2    information they've deemed appropriate to make in their own

3    analysis.  Any objections?

4         MR. ZIRINSKY:  Just the same objections, Your Honor,

5    as to hearsay and as to the fact that it includes assumptions

6    regarding the DIP loan.

7         THE COURT:  Does -- have you ever heard of a cash

8    flow analysis that doesn't assume certain assumptions?

9         MR. ZIRINSKY:  Well, since there isn't --

10        THE COURT:  Have you -- answer my question.  Yes or

11   no?

12        MR. ZIRINSKY:  No.

13        THE COURT:  All right.  Fine.

14        MR. ZIRINSKY:  As long as my rights are reserved with

15   regard to those numbers, that's fine.

16        THE COURT:  Your rights are reserved to cross-

17   examine.  As to admitting Exhibit 6, I'd only admit it as --

18   for the limited purpose of showing what they relied on.  And if

19   we want to take the time to have the witness testify today, we

20   can.  But it seems to me parties might spend their time better

21   -- but maybe while everyone's here we should have him come

22   forward.  I'll leave it to the parties.  He can perhaps testify

23   generally as to how he provided the appraisals.  But I do think

24   parties should have a little more time to look at their own

25   information.  I take very seriously counsel's statement that

1    they had been looking for information for some time.  We are

2    dealing with a huge number of properties and we're trying to be

3    both as fair as we can to individual lenders without letting an

4    important process get off -- not off track but get subverted

5    for reasons that will be deleterious to the estates as a whole.

6         So, for limited purposes, I would admit, very limited

7    purposes, Exhibit 6.  Exhibit 7 is the debtors' cash flow

8    analysis.

9    (Debtors' Exhibit 6, Cushman & Wakefield appraisal, was hereby

10   received into evidence as of this date.)

11   (Debtors' Exhibit 7, GGPLP cash flow analysis, was hereby

12   received into evidence as of this date.)

13        MR. STROCHAK:  Thank you, Your Honor.

14   BY MR. STROCHAK:

15   Q.   Mr. Mesterharm, turn with me to Exhibit 5, if you would.

16   And could you explain, sir, what Exhibit 5 is?

17   A.   Exhibit 5 is another line chart which is showing what the

18   company expects its liquidity position to be over time with the

19   revised DIP -- again, that would be the Farallon Group DIP --

20   versus what it would be -- what the company's liquidity would

21   position -- position would be with the revised DIP if, in fact,

22   the company, for adequate protection, was required to pay two

23   percent default interest on all of its defaulted pre-petition

24   loans where adequate protection was required, and also if --

25   and, further, if we also had to pay the amortization that

1   exists on those loans as well.  And what that would show is

2   that the company would run out of funds, you know, and, if they

3   had to make both those payments, would run out of funds in June

4   of 2010.  And if they only had to pay the default interest,

5   they would skate precariously close -- you know, after the same

6   period and, you know, through the balance of 2010, would get

7   down below fifty million in liquidity.

8   Q.   Let me turn to a different topic.

9        MR. STROCHAK:  Actually, Your Honor, provisionally we

10  offer Exhibit 5.

11       THE COURT:  Anyone wish to be heard?  We'll enter it

12  on the same basis as the other exhibits.

13  (Debtors' Exhibit 5, line chart re liquidity provision, was

14  hereby received into evidence as of this date.)

15  Q.   Turning to a different topic, Mr. Mesterharm, do the

16  debtors, from time to time, modify leases, easement agreements

17  and other property documents that they enter into with their

18  tenants and other customers?

19  A.   Yes, they do.

20  Q.   Under what circumstances?

21  A.   The debtors, from time to time, enter into

22  discussions/negotiations with a various number of tenants who

23  are seeking to modify leases either to extend those leases,

24  seeking rent relief, seeking mutual termination rights, and

25  things along those lines that are very customary in this

117

1    business when you're managing a portfolio of properties and a

2    portfolio of leasing relationships.

3    Q.    What's the significance of those transactions to the

4    debtors' ability to conduct business in the ordinary course?

5    A.    Those -- the ability to continue to conduct business in

6    the way that the company conducts business regarding these

7    leasing negotiations is critical to the maximization of value

8    of the debtors.

9    Q.    And what particular benefits does it provide for the

10   company to be able to enter into these agreements in terms of

11   populating its malls with tenants?

12   A.    Well, as I said, in the pa -- in earlier discussion, the

13   lenders manage the business on a centralized business.  They

14   conduct negotiations with the tenants, you know, on a portfolio

15   basis.  The tenants prefer to work with the company that way

16   where they can come in and discuss all of their individual

17   locations that exist across GGP's platform.  And as such, from

18   time to time, the company needs to enter into agreements with

19   the mall -- with these tenants to modify the agreements.

20        An example would be an example where a tenant may have

21   certain rights under the leases, such as a termination right

22   due to a kick-out, meaning that certain performance metrics

23   weren't made, and so they had the ability to terminate the

24   lease.  In other instances, there may be some leases that are

25   maturing.

1          And through this portfolio review process, they oftentimes

2     are required to modify a number of leases where, in order to

3     avoid, you know, a lender triggering a kick-out, we may need to

4     agree to a rent reduction where the alternative would be that

5     the company give up a hundred percent of the subsequent

6     leases -- lease revenues under that lease.  This way the debtor

7     is able to renegotiate and effect the lease and maybe for a

8     lesser payment.  But in return for that, they generally seek an

9     extension of the lease and so they can recoup some of what they

10    gave up, or they make kick more of the lease over to a

11    percentage-based lease where, if the underlying tenant actually

12    performs at a higher level, they're able to, again, recoup some

13    of the relief that they granted.

14    Q.    Has the company experienced any reaction from tenants and

15    other -- you know, other of its customers regarding these types

16    of arrangements since the Chapter 11 filing?

17    A.    Absolutely.  As -- you know, the company meets with its

18    tenants regularly and conducts negotiations on a variety of

19    time frames on its overall leasing portfolio.  You know, there

20    have been a number of amendments that the company would like to

21    enter into that are currently pending approval of this order

22    from the Court so that the company can continue to operate its

23    business as it has in the past.  The tenant relationships are,

24    you know, the lifeblood of the company.  The rent's generated

25    by the company.  And the tenants really -- this is a way of

119

1    doing business in this industry.  And it's critical for us to

2    get this level of relief from the automatic stay to be able to

3    continue to operate in a fashion that's consistent with

4    industry practices.

5              UNIDENTIFIED SPEAKER (TELEPHONICALLY):  Excuse me,

6    some of us on the phone can't hear what's being said.

7              MR. STROCHAK:  Maybe if you just --

8              THE COURT:  All right, we'll --

9              MR. STROCHAK:  -- speak a little closer to the

10   microphone.

11   Q.   Let me turn you back, if I could, to just go back one

12   second over a different topic and back to Exhibit 7, if you

13   would.  Exhibit 7, your cash forecast analysis on the adequate

14   protection, is it correct that that was based on what we've

15   called the Farallon debtor-in-possession financing proposal?

16   A.   That is correct.

17   Q.   If a new debtor-in-possession financing results in a lower

18   interest rate than the Farallon proposal, what does that do to

19   your analysis in Exhibit 7?

20   A.   It would improve it as -- the line referred to as "DIP

21   Interest" would be a reduction.

22             THE COURT:  Can you hear that on the phone?

23             UNIDENTIFIED SPEAKER:  Yes, Your Honor.

24             THE COURT:  All right.  Please follow up.

25   A.   And if the DIP interest was reduced, obviously the cost

120

1    that'd need to be funded by the DIP and by the company's excess

2    cash at the beginning of the case would have more surplus if

3    they didn't have to pay as much DIP interest.

4    Q.    Thank you.

5                MR. STROCHAK:  Your Honor, just for clarification, I

6    had Mr. Mesterharm go over some of the tenant issues, and

7    that's because the testimony here supports the tenant piece of

8    the adequate protection package.

9                Your Honor, with that, we would pass the witness for

10   cross-examination.

11               THE COURT:  All right.  I think the only cross-

12   examination that would be helpful today is that that's aimed

13   precisely at the cash collateral issues, keeping in mind that

14   whatever cash collateral determination is made today is a

15   tentative and -- not tentative, but is subject to revision for

16   cause shown as we go through the case.  Does anyone wish to

17   examine?

18               UNIDENTIFIED SPEAKER:  No, Your Honor.

19               MR. CROSS:  Your Honor, I have a --

20               THE COURT:  All right, do you want --

21               MR. CROSS:  I have a question, just a question.

22               THE COURT:  All right.  You'll come to the witness

23   stand, please.

24               MR. CROSS:  I mean, in deciding a course of action,

25   you probably saw lots of whispers.  We -- because everything's

1    been merged, we don't even have a proposed form of cash

2    collateral order because the order we have includes DIP and

3    cash collateral.

4              THE COURT:  That is correct.

5              MR. CROSS:  And we're not trying to be difficult.  It

6    just becomes very -- it becomes very difficult for us to

7    assess -- we would prefer to just reserve all of our questions

8    and come back and deal with it later.

9              THE COURT:  All right.

10             MR. CROSS:  But by doing that, we don't want to

11   consent to cash collateral.  We're happy with interim cash

12   collateral for the next hearing and decide what we need to do.

13   But we don't even know what to question on because we don't

14   know what order this is supposed to be supporting.  And it's

15   very difficult where we currently sit.

16             THE COURT:  Well, I think the testimony can obviously

17   be used for both DIP and cash collateral purposes.  But the

18   only thing I'm considering today is cash collateral.  And I

19   understand the difficulty, and I agree with it only to the

20   extent that, as I've said on several occasions, cash collateral

21   is a -- by definition, not forever.  It can be amended.  And --

22             MR. CROSS:  And we don't want to impede the debtors'

23   business operations.  We want them to continue to have cash

24   collateral in the near term --

25             THE COURT:  All right.

1          MR. CROSS:  -- just in --

2          THE COURT:  What about -- now, you're speaking for

3     the lenders generally, but obviously any lender may speak up.

4     What are we going to do with the tenant improvements order

5     today?  The debtors have made a number of revisions to it; I

6     believe they would say in an effort to be responsive to some of

7     the objections and the comments.

8          MR. CROSS:  I had -- actually had one of the

9     objections to the tenant improvements order, so I can speak to

10    that.

11         THE COURT:  All right.

12         MR. CROSS:  The debtor accommodated our objections.

13    Those accommodations are inserted in the cash collateral order;

14    they're not in the tenant order.  I actually made a call and

15    said can we put them in the tenant order so -- we can have them

16    in both, but let's have it in the tenant order.  The debtor was

17    not -- rejected that idea.

18         I had one issue with respect to some additional

19    provisions that were added to the cash collateral order dealing

20    with that, but they were not dealing with just getting lender

21    consent to tenant changes in leases.

22         This business needs to continue to operate; we

23    recognize that.  The tenant -- the debtor needs to continue to

24    deal with lessees; we recognize that.  The debtor has said that

25    it will continue to comply with loan documents in the tenant

1    obligations order; we are fine with that.  We'd ask for the

2    same consent rights for each lender as -- or given to the

3    committee to the extent they're additional.  But that's it.

4    That's where it stops.

5              THE COURT:  All right.

6              MR. CROSS:  So -- and with that order, I think we

7    have an order with -- you know, with just putting --

8              THE COURT:  Well, we don't have necessarily the form

9    of an order, but let me see whether anyone has any other -- any

10   remaining objections to the tenant improvements order, not to

11   the form of the order, because I think that has -- parties have

12   a right to see the final order, but to the principles in the

13   order.

14             MR. CROSS:  And to -- just before I leave the podium,

15   and I won't monopolize, there are two provisions in there

16   dealing with SNDAs and capping fees for approval.  Those --

17   it's unclear whether the debtor means to leave those just in

18   cash collateral or make them part of the tenant order.  They

19   were never part of the tenant order, nor were they part of

20   objections.  So I'm unclear where they go.  The SNDA form of

21   agreement that is attached I think many of the lenders would

22   have objection to because it obligates the lender to undertake

23   obligations that it would normally not do.

24             But that narrow piece was added in by the debtor, and

25   we're not sure where it falls.  To the extent the debtor said,

1    I'm going to comply with loan documents just as I did pre-

2    petition, please allow me the discretion to get on with it,

3    we're fine with it.  My clients are fine with it.  We can see

4    if anyone else has an objection.

5         THE COURT:  All right.

6         MR. HOLTZER:  Your Honor, would it be helpful if I

7    just clarify for the rest --

8         THE COURT:  Sure.

9         MR. HOLTZER:  Gary Holtzer for Weil, Gotshal &

10   Manges.  The comment was made that the form of SNDA attached

11   may be objectionable.  I believe, and my colleagues will

12   correct me if I'm wrong, that the document that's attached is

13   the document that was attached to the form of DIP and that it

14   says that it will either be the form that's in a loan document,

15   if it happens to have one of those, or that form, right?  So if

16   there was a pre-negotiated form, as counsel refers to, so that

17   the record is clear, what the debtors are saying is that they

18   will comply with the loan agreements, including any attached

19   form, okay?

20        MR. CROSS:  And that's why -- it's just that --

21        MR. HOLTZER:  Let me just finish for a moment,

22   please, all right?  And that we added this to answer counsel's

23   second question, right, about where it should go in the

24   documents as a response to the dialogue that we had with people

25   about things that were important to them.  We added this as a

125

1    part of the adequate protection package and believe it should

2    go in the adequate protection order, Your Honor.

3              THE COURT:  All right.

4              MR. CROSS:  And I want to be clear; it's just those

5    instances where it's not attached to the loan agreement, that

6    we have a concern because the form was just --

7              THE COURT:  I think --

8              MR. CROSS:  I wasn't trying to --

9              THE COURT:  I think both parties understand that.

10             All right, otherwise, does anyone wish to be heard on

11   the tenant improvements order?  Maybe we can put that behind

12   us.

13             MR. GOTTESMAN:  Once again, this is just a point of

14   clarification, Your Honor.  It's a little bit unclear whether

15   the notion of a qualified tenant would seem to have come in

16   as -- into the process.  And, you know, I'm a little but

17   unclear as to where it goes.  It would seem to undercut the

18   notion of the consent rights that were being given, on the one

19   hand, with respect to honor in the loan document provisions.

20   There is, I think, a difference of opinion on the lender side

21   of the table as to whether or not what the debtor would call

22   qualified tenants comports with what the loan agreements would.

23             And as long as that issue's reserved for another day,

24   we're fine with the tenant improvement order, Your Honor.  If

25   some -- if that's now going in there, and it's still unclear to

1   me which -- I'm not sure that it's of form or substance, as

2   Your Honor has bifurcated that issue.  But clearly we don't

3   want to be in a position where simply anyone who has a regional

4   or national presence, as the debtor describes it, is now deemed

5   to be a qualified tenant irrespective of what the loan

6   documents say.

7          THE COURT:  All right.

8          MR. HOLTZER:  Your Honor, again, Gary Holtzer.

9   Nothing is irrespective of what the loan documents say if the

10  loan documents speak to this.

11         THE COURT:  If the loan documents speak to it, I

12  gather it's the debtors' position that they're part of the loan

13  documents.

14         MR. GOTTESMAN:  And even if it's just up to our

15  discretion, as I take it?

16         THE COURT:  If -- I suppose so, but I am open for

17  business.  I certainly don't look forward to the question of

18  approving tenants for -- how many properties?

19         MR. STROCHAK:  Two hundred malls, Your Honor.

20         THE COURT:  Two hundred malls.  But I think perhaps

21  those tenants who I come in contact with professionally from

22  this bench are probably not the tenants who we're looking for.

23         MR. GOTTESMAN:  That's precisely our concern, Your

24  Honor.  That's precisely our concern.

25         THE COURT:  I'm sure that's your concern, and forgive

1   me if some of my comments today reflect the fact that I would

2   like everyone in this room to recall that we're talking

3   about -- no matter how hard-fought this is, and there is

4   concern on the lenders' side, I realize, about getting caught

5   up in a complex case, but we are dealing with positive numbers,

6   positive cash flow.  The debtors said in their early papers

7   that the problem wasn't with tenants who weren't paying, for

8   the most part.  They probably have some, but the numbers here

9   are numbers that most of the other parties who come to this

10  room would be delighted to see.

11          And, therefore, I think the overall perspective

12  should be taken -- I'm sure they'll be taken into account by

13  the parties as they protect their respective party -- their

14  respective clients' interests overall.  But we have in this

15  room many secured lenders represented.  We also have an

16  enormous amount of unsecured debt.  And we have an equity as

17  well.  And I'm sure that the Bankruptcy Code provides the

18  mechanism for adjusting all of those interests and protecting

19  the rights of those whose rights are properly protected while

20  not impinging on others'.

21          In any case, on the tenant improvements order,

22  perhaps we have an order in principle and the debtors can

23  circulate to all interested parties a final form of order.  If

24  there's an issue on the form of order, I'm sure I'll hear about

25  it on Tuesday.  But I certainly hope by Tuesday we can enter

128

1    that order, and the debtor can at least put this small piece of

2    this puzzle behind it.

3            MR. STROCHAK:  Thank you, Your Honor.

4            MR. MEYERS:  Your Honor, may I be heard on the tenant

5    motion?

6            THE COURT:  Oh --

7            MR. MEYERS:  Very quickly.

8            THE COURT:  Of course.

9            MR. MEYERS:  And hopefully this order -- the order

10   will resolve this clarification too.  Todd Meyers for ING

11   Clarion.  We did file an objection to the tenant motion.  We

12   are satisfied with the debtors' proposed resolution by giving

13   us the consent rights, but there was one --

14           THE COURT:  Consent rights that you have?

15           MR. MEYERS:  The consent rights that we have,

16   correct.

17           THE COURT:  Pre-petition?

18           MR. MEYERS:  Correct.  But there's one point that we

19   raised, and we weren't sure that this was addressed, and that

20   is that the debtors are asking for the Court, under the

21   doctrine of necessity, to approve the satisfaction, however

22   they satisfy it, by writing a check or lease modifications, to

23   satisfy the debts they owe to their tenants.  And we are okay

24   with that, but some -- the incur --

25           THE COURT:  I assume so, and the unsecured creditors'

1    committee, which is certainly entitled to be heard on that

2    issue, believes this to be an important enough matter for the

3    debtors to spend the money.

4          MR. MEYERS:  Right.  Very much so, Your Honor.  All

5    we want to make clear, though, and we don't know that this

6    resolution made clear, is that if the incurrence of the

7    obligation required our consent, as often a tenant improvement

8    would, that we were given that consent right pre-petition, and

9    if not, that the debtor won't be authorized to do that without

10   our consent now.  In other words, if two days before the

11   bankruptcy the debtor entered into a lease that would have

12   required our consent and they didn't get it and they agreed to

13   build ten stories onto a mall, we don't want this order to

14   bless them to satisfy that debt.

15         THE COURT:  All right.  Mr. Holtzer?

16         MR. HOLTZER:  Your Honor, counsel is confusing tenant

17   improvements with our provisions regarding our leasing

18   practices.  On tenant improvements, we asked in our original

19   motion, we stand here today asking, for approval to pay the

20   pre-petition tenant improvements that we cited in there.  We

21   discussed it with the creditors' committee.  It has nothing to

22   do with the consents by the landlords.  Those are the tenant

23   improvements, right?  And those are all the pre-petition tenant

24   improvements.

25         Secondarily -- separately, not secondarily, on the

130

1    leasing side, that's where we've agreed to abide by the

2    documents and obtain consents, but not on tenant improvements.

3    We've asked for a universe of them; we've discussed it with the

4    committee.  It involves the payment of certain funds or

5    satisfaction with respect to pre-petition tenant improvement

6    obligations under the leases.  If we enter into a new lease

7    going forward, it's a post-petition lease.

8         THE COURT:  And the lender will be informed of your

9    intention to enter into the post-petition lease?

10         MR. HOLTZER:  The lender will be --

11         THE COURT:  If they're entitled to it under the

12    documents.

13         MR. HOLTZER:  Yes.  If we're going to enter into a

14    post-petition lease --

15         THE COURT:  All right.

16         MR. HOLTZER:  -- we'll be within the leasing

17    provisions.

18         THE COURT:  All right.

19         MR. MEYERS:  Again, Your Honor, I don't think I'm

20    confusing them.  The -- my debtors, my eight debtors -- or nine

21    debtors, but for eight properties, had certain obligations to

22    get consent of the servicers before they could incur these

23    debts.  And the motion sought for you to approve so that they

24    could satisfy these debts.  And if they didn't get our consent,

25    then we object to your approving them satisfying those debts

131

1    without our consent.

2        THE COURT:  I thought the debtors were going to

3    follow the provisions of the agreements with regard to such

4    expenditures.  Is that correct or incorrect?

5        MR. HOLTZER:  No, we're going to follow the leases,

6    Your Honor, with res -- we're going to follow the loan

7    agreements, Your Honor, with respect to the entry into of

8    leases.

9        THE COURT:  But not --

10        MR. HOLTZER:  Amendments --

11        THE COURT:  Yes?

12        MR. HOLTZER:  -- as well.

13        THE COURT:  But not tenant improvements?

14        MR. HOLTZER:  No.  Give me a moment, Your Honor.

15    (Pause)

16        MR. HOLTZER:  Your Honor, on tenant improvements, I

17    don't think our pleadings address that, and so we hadn't put

18    that forward.  We're happy in the dialogue, on a go-forward

19    basis, with the secured lenders to talk about that facet.

20        THE COURT:  Well, maybe we'll have to adjourn the

21    matter till Tuesday.  I had thought that you were going to

22    follow the provisions of the loan agreements with regard to

23    tenant improvements.

24        MR. HOLTZER:  Give me just a moment, Your Honor.

25        THE COURT:  But I may be wrong.  Is that -- was that

1    your --

2             UNIDENTIFIED SPEAKER:  That was my understanding.

3             MR. HOLTZER:  There was a --

4             UNIDENTIFIED SPEAKER:  May I be heard?

5             THE COURT:  Sure.

6             UNIDENTIFIED SPEAKER:  There was an earlier motion

7    with respect to a million dollars, but it only dealt with two

8    problems.

9        (Pause)

10            MR. HOLTZER:  Your Honor, so that we're clear, and

11   counsel will correct me if they don't misunderstand, our

12   approach is that on tenant allowances we are going to comply

13   with the loan documents, if that's what the question is.  Is

14   that your question?

15            UNIDENTIFIED SPEAKER:  Yes.

16            MR. HOLTZER:  That's the answer.

17            THE COURT:  That's what I --

18            UNIDENTIFIED SPEAKER:  That's what we thought.

19            THE COURT:  That's what I thought too.

20            MR. HOLTZER:  Yeah.

21            THE COURT:  If there's a dispute, I'm sure that I'll

22   hear --

23            UNIDENTIFIED SPEAKER:  I'm sure you will.

24            THE COURT:  I hope not.  All right.  But, well, I

25   think we can circulate a form of order on tenant improvements.

133

1    Or am I wrong?

2            UNIDENTIFIED SPEAKER:  No, Your Honor.  Maybe I stood

3    up prematurely.  I had some questions for Mr. Mesterharm on the

4    cash collateral.

5            THE COURT:  All right.  Well, you have somebody ahead

6    of you.

7            MR. BRANDT:  Your Honor, I wasn't clear.  Are we

8    going to reserve cross for --

9            THE COURT:  You can certainly reserve cross for

10   another day.

11           MR. BRANDT:  Would that be for Tuesday or --

12           THE COURT:  For Tuesday.  You represent Prudential?

13           MR. BRANDT:  I represent Deutsche Bank, Your Honor --

14           THE COURT:  Deutsche Bank.

15           MR. BRANDT:  -- which is the administrative agent for

16   the loans on the Palazzo and Fashion Show.

17           THE COURT:  With Mr. Rosenberg?

18           MR. BRANDT:  With Mr. Rosenberg.

19           MR. ROSENBERG:  James Brandt, Your Honor.  But I

20   still --

21           THE COURT:  All right.

22           MR. BRANDT:  I spoke more quickly yesterday.

23           THE COURT:  I think that all cross can be reserved

24   until Tuesday, as necessary.  And perhaps parties will be

25   better prepared by then.

1        Yes?

2        MR. GOTTESMAN:  I'm just following up on that

3    suggestion.  There -- obviously there's not -- there will not

4    be cross, and a number of exhibits were admitted today

5    provisionally.  Your Honor's remarked on a number of times this

6    afternoon that cash collateral could be revisited.  You alluded

7    to changes in circumstances.  I just want to put on the record

8    that those changes in circumstances might include additional

9    evidence brought out on that eventual cross-examination and

10   Your Honor's reconsideration of some of that provisional

11   admittance into evidence of some of those exhibits if and when

12   that's appropriate, Your Honor.

13       THE COURT:  All right.

14       MR. BRANDT:  Your Honor, as long as I'm here, I'll go

15   ahead.  I mean, I'll just be two minutes.

16       THE COURT:  If you have a couple of questions that

17   you think will clarify the issues for today, you certainly can

18   ask them.  You lose no rights by reserving.

19       MR. ZIRINSKY:  Your Honor, and that's -- if I may,

20   Your Honor.  Bruce Zirinsky.  I just want to clarify.  Your

21   Honor does not intend to rule on cash collateral use today?

22       THE COURT:  I intend to give you some of my

23   preliminary remarks on cash collateral use today; the parties

24   can use them as they wish.  We will not enter an order, because

25   we don't have an order, and as long as there's no objection to

135

1   continuation of the interim order until we enter or we refuse

2   to enter a DIP.  That's what the debtors originally requested,

3   and we'll put that in place today, assuming they won't object.

4          MR. ZIRINSKY:  And parties reserve the right to

5   cross-examine on another day?

6          THE COURT:  Absolutely.

7          MR. ZIRINSKY:  Thank you, Your Honor.

8          THE COURT:  If anybody has two minutes of

9   examination, they may.  But if it relates to a particular loan,

10  like the Fashion Mall loan, it seems to me that it is better

11  reserved.  But two minutes is two minutes.

12         Go ahead.  You're already at the podium.  I

13  understand that you have a particular provision, and indeed the

14  debtors had in their exhibit book, but did not introduce, your

15  letter staking out your position.

16  CROSS-EXAMINATION

17  BY MR. BRANDT:

18  **Q.   Mr. Mesterharm, do you -- I've handed you two documents;**

19  **I've identified them as DB-1 and DB-2.  Do you recognize them?**

20         MR. STROCHAK:  Might I ask for a copy, Your Honor?

21     (Pause)

22  **A.   They appear to be cash management agreements regarding the**

23  **Fashion Show and Palazzo properties.**

24  **Q.   Have you ever seen them before?**

25  **A.   I have not seen these.**

136

1    Q.   You never read the agreements -- you testified a little

2    bit about Fashion Show and Palazzo on direct.  You've never

3    read the agreements that govern cash management with respect to

4    either of the properties?

5    A.   I testified about how the cash moves.  I didn't testify as

6    to these documents.

7    Q.   Okay.  So just to be clear, you've never seen either DB-1

8    or DB-2?

9    A.   No, I have not.

10                MR. STROCHAK:  Asked and answered, Your Honor.

11   Q.   Okay.  I noticed that the agreement -- you mentioned --

12   you used the word "cash traps" a lot on direct with respect to

13   Fashion Show and Palazzo.  The agreement is called Cash

14   Management Agreement.  Did you know that it was called Cash

15   Management Agreement?

16   A.   Well, as I said, this is the first time I'm seeing them.

17   So -- and that is what they are entitled.

18   Q.   Okay.  You testified a little bit on direct about the fact

19   that the forbearance agreements with respect to Palazzo and

20   Fashion Show expired.  Do you know whether the cash management

21   agreement with respect to Palazzo or Fashion Show expired?

22   A.   I believe they did --

23   Q.   Well --

24   A.   -- with the forbearance.

25   Q.   Well, you've got it in front of you.  Do you want to take

137

1    a quick look?  Would it surprise you to know that they didn't

2    expire, either cash management agreement?

3              THE COURT:  Are you now arguing with the witness or

4    are you asking him questions?

5              MR. BRANDT:  I'm asking.

6              THE COURT:  The question, does he know as he sits

7    here today --

8              MR. BRANDT:  Do you know.

9              THE COURT:  Mr. Mesterharm, do you know as you sit

10   here today?

11   Q.   Do you know as you sit here today whether the cash

12   management agreements for Palazzo or Fashion Show expired?

13   A.   I do not know.

14   Q.   Okay, let's look at pages 12 and 13 of the agreement.

15   A.   Which one?

16   Q.   Why don't we take Fashion Show?

17             THE COURT:  If you're going to argue with him as to

18   the import of a document of this nature, for purposes of this

19   hearing I don't think you need to -- you can make your point.

20   I gather your point is that if I read a section of this

21   agreement it will show me that the cash management did or

22   didn't expire.  Is that the point of this two minutes of

23   testimony --

24             MR. BRANDT:  Well --

25             THE COURT:  -- that you referred to?

1          MR. BRANDT:  Well, and the fact, Your Honor, that the

2     agreement provides directly how cash is supposed to be handled

3     and not swept up to the parent.  And I was going to ask the

4     witness whether he had information that anybody on the debtors'

5     side, during the course of the cash management agreement, had

6     told Deutsche Bank that the agreement wasn't being honored.

7          THE COURT:  Let's get a question.

8     Q.   Okay, the question is did anybody on the debtors' side

9     tell Deutsche Bank during the pre-petition time when the cash

10    management agreement governed that the debtor was not honoring

11    the agreement in the way of how cash was being handled?

12    A.   No, I believe, from the point in time that this new cash

13    management system was -- or this new system was put in place,

14    that the company did honor it.  But I believe that Deutsche

15    Bank did not, 'cause if they were supposed to honor it they

16    would have funded the company's disbursements on May 1, and

17    they did not.  So I believe not only did they violate the

18    interim -- or the order on cash collateral on an interim basis;

19    they also violated this agreement if -- because they didn't

20    provide the company the funds to pay the costs on May 1.

21    Q.   The agreement you haven't read?

22    A.   (No audible response.)

23    Q.   All right.

24         MR. BRANDT:  I have no further questions, Your Honor.

25         MR. SAMSON:  Your Honor, just for the record --

139

1          THE COURT:  Come to the podium, please.

2          MR. SAMSON:  Paul Samson for the 2008 facility

3    lenders.  Since, in discussion after I indicated that I would

4    have some questions, the Court and other parties indicated

5    reservation till Tuesday would be fine, I will reserve my

6    questions until Tuesday.

7          THE COURT:  All right.  Thank you.

8    CROSS-EXAMINATION

9    BY MR. ROSEN:

10   Q.   Good afternoon, Mr. Mesterharm.

11         MR. ROSEN:  Your Honor, Sanford Rosen for FRM Funding

12   Company.  We are a mortgage lender to Fox River Shopping

13   Center.

14   Q.   Mr. Mesterharm?

15   A.   That's correct.

16   Q.   I just have a couple of questions for you.  Are you

17   familiar with the reply that the debtors' counsel interposed to

18   the various objections that were raised with respect to the

19   debtors' motion to approve financing and use cash collateral?

20   A.   I am.

21   Q.   You are?

22   A.   I am.

23   Q.   Did you read it?

24   A.   Yes, I did.

25   Q.   Okay.  One of the proposed forms of adequate protection

1    that is being proposed, which I assume is going to be obtained

2    assuming the Court is going to authorize the use of cash

3    collateral from today until some adjourn date, is that -- and

4    I'm referring to paragraph 25.  It says specifically, "The

5    adequate protection liens to be provided to the adequate

6    protection parties now include, in addition to the adequate

7    protection described in the motion," and this is what I want

8    you to focus on, "a continuing, valid, binding, enforceable and

9    automatically perfected post-petition security interest in and

10   lien on (i) the cash in the main operating account and (ii) a

11   silent second lien on the properties currently securing the

12   pre-petition Goldman facility in an amount equal to the lesser

13   of X the aggregate diminution in the value of the adequate

14   protection parties' interest in the pre-petition collateral."

15   And my question to you, sir, is could you tell me what FRM

16   Funding Co.'s interest is in its pre-petition collateral, as

17   you sit here today?

18   A.   Are you asking me do I know who FRM --

19   Q.   No --

20   A.   -- is a lender to?

21   Q.   No.  I think you know that I'm not asking you FRM is.  I'm

22   asking you, with respect to our borrower, which is Fox River

23   Shopping Center -- I assume you know who that is, do you not?

24   A.   Yes.

25   Q.   That's one of the debtors, right?

1    A.    Um-hmm.

2    Q.    Okay.  So what I'm asking you is if you can tell me, as

3    you sit here today, what is the value of FRM Funding Co.'s

4    interest in the pre-petition collateral?

5    A.    Are you asking me what's the value of the mall?

6    Q.    Well, how do you define -- how do you define the interest

7    in pre-petition cash collateral?

8    A.    I'm not -- again, I'm not following your question.

9    Q.    Well, do you have the reply in front of you?  I'm not

10   trying to --

11   A.    No, I do not.

12   Q.    -- give you a hard time.  May I show it to you?

13   A.    Sure.

14            THE COURT:  I think we're wasting a lot of time here.

15            MR. ROSEN:  We are?

16            THE COURT:  That's a legal reply.  You're quoting

17   from the statute.  If you want to ask him if he knows, as he

18   sits here today, what he believes the value of the mall is, you

19   can ask him that.  And if he doesn't recall it, then that's

20   that for today.

21            MR. ROSEN:  I'll go along with that.  I'll adopt

22   that, Your Honor.

23   Q.    Do you --

24            THE COURT:  Do you know the value of the mall as you

25   sit here at this moment?

142

1              THE WITNESS:  No, I do not.

2    Q.   Do you --

3              THE COURT:  Thank you.  That's all.

4    Q.   Is that information available to you today?

5    A.   The value of the mall?

6    Q.   Yeah.

7    A.   No, it is not.

8    Q.   Well, then how would the -- how would the debtors ever be

9    able to measure the diminution if you don't know the starting

10   point?

11             MR. STROCHAK:  Objection, Your Honor.

12             THE COURT:  Sustained.

13             MR. STROCHAK:  Thank you.

14             THE COURT:  Next question.  Next questioner, come

15   forward, please.

16             MR. ROSEN:  I'm getting there, Your Honor.  Give me a

17   second.

18   Q.   You testified regarding Exhibit 7?

19   A.   Yes.

20   Q.   Now, Exhibit 7 assumes, does it not, the proceeds of the

21   DIP loan is proceeds of cash --

22   A.   Yes, it --

23   Q.   -- as a source of cash, correct?

24   A.   It does assume that the company is able to enter into a

25   DIP that provides 400 million of gross financing.

143

1    Q.   Okay, but right now we don't have a DIP, and between now

2    and the time that a DIP is provided --

3              THE COURT:  Is there a question --

4              MR. ROSEN:  Yeah.

5    Q.   What does the --

6              THE COURT:  -- or are you --

7    Q.   What does the abs -- how does the absence of the DIP

8    affect your numbers?

9    A.   Over what time period?

10   Q.   Over the next week.

11   A.   Well, over the next week we would not receive the 196

12   million of net proceeds -- or 192.6; we would not receive that.

13   You know, this is -- this is not the right exhibit to show what

14   a weekly result is.  This is a April-through-December.

15             THE COURT:  If your point is can the debtors do

16   without the DIP for the next week, I think the record so

17   indicates.

18             MR. ROSEN:  No, I'm not concerned about doing without

19   the DIP.  I'm concerned about being adequately protected

20   without the DIP.  And I'd like, really, someone to explain to

21   me what the adequate protection is if we can't measure a

22   benchmark.

23             THE COURT:  All right.  We'll let counsel do that.

24   Next question.

25             MR. ROSEN:  No, let's have counsel do that.

1          THE COURT:  All right, in due course.

2          MR. ROSEN:  I just want to ask --

3          THE COURT:  Sit down, sir.

4          MR. ROSEN:  -- wait, one other question.

5          THE COURT:  Sit down.

6          MR. ROSEN:  I can't ask another question?

7          THE COURT:  No.  You're done.

8          MR. ROSEN:  Why am I done?

9          THE COURT:  You're finished because I said so.

10         MR. ROSEN:  Oh, okay.  Well, then I reserve my

11    rights, Your Honor.

12         THE COURT:  You have your rights.  Next questioner.

13         MR. ROSEN:  Your Honor, we're reserving till Tuesday.

14         THE COURT:  Well, everybody's reserving till Tuesday.

15         MR. MEYERS:  As am I, Your Honor.  My only comment

16    was my understanding is that the documents underlying the

17    summary, which was Exhibit 1, is something that I'll get over

18    the weekend, which I appreciate.  And that's it.  Thank you.

19         THE COURT:  I think there are several parties who are

20    looking for that information, and they absolutely should get

21    it.

22         MR. MEYERS:  Mr. Holtzer asked me to clarify.  As to

23    my properties, the three that I have identified --

24         THE COURT:  Yes.

25         MR. MEYERS:  -- to him, and the answer is yes.  Thank

1    you, Judge.

2         THE COURT:  Anyone else?  All right.  Do you want to

3    ask that one more question, Counsel?  Come forward and ask one

4    more question.  I thought you were finished.  You several times

5    stopped.  Come forward and ask your other question.

6         (Pause)

7    FURTHER CROSS-EXAMINATION

8    BY MR. ROSEN:

9    Q.   Could you tell me how much cash my particular debtor is

10   going to be sending into the consolidated account over the next

11   week?

12   A.   I cannot, sitting here right now.

13   Q.   Is that information available to you today?  I'm not

14   asking you if you recall the number, but have you developed

15   that information?

16   A.   We do have information on a property-by-property basis.

17   The -- we may not have it on a weekly basis.

18   Q.   Do you have it on a monthly basis?

19   A.   Yes.

20   Q.   One other question.  Pre-petition, you've testified that

21   it was the case, correct me if I'm wrong, that the debtor

22   maintained separate ledgers with respect to money coming in and

23   out of each of the debtors on a property-by-property level, is

24   that correct?

25   A.   I don't think that is a correct characterization of what I

146

1   said.

2   Q.   Or would you like to correct me?

3   A.   What I said is that individual debtors have ledgers.  On

4   those ledgers, there's an intercompany account which records

5   the activity between various legal entities.

6   Q.   So Fox River, for example, would have an account

7   reflecting whether it is a net giver or a net taker, if you

8   will, to the upstream, correct?

9   A.   Yes, they would.

10   Q.   And would that be reflected as an account receivable from

11   the parent if it's a net giver?

12   A.   If it is a net giver, it would have a -- it would be, in

13   effect, a receivable from the parent.

14   Q.   And, in fact, the debtor in that instance would have been

15   making loans upstream, is that not correct?

16          MR. STROCHAK:  Objection, Your Honor.

17          THE COURT:  Sustained.

18          MR. STROCHAK:  Calls for a legal conclusion.

19          MR. ROSEN:  He can't testify to whether that's a

20   loan?

21          THE COURT:  I sustained the objection.  Next

22   question.  You don't have to argue with me or with him.

23          MR. ROSEN:  I'm not ar -- I don't want to argue with

24   anyone, Judge.

25          THE COURT:  Objection sustained.

147

1          MR. ROSEN:  I'm just trying to do a job here.

2          THE COURT:  Next question.

3     Q.    **Do the books record it as a loan receivable?**

4     A.    **I'm not sure.**

5     Q.    **You're not sure?**

6     A.    **It's shown as an intercompany.  That's not a loan.  It's**

7     **not a -- it's an intercompany balance on a ledger statement.**

8     Q.    **Okay.**

9          MR. ROSEN:  Thank you.

10         THE COURT:  Anyone else?  All right.

11         MR. STROCHAK:  No redirect, Your Honor.

12         THE COURT:  All right.

13         Thank you.  You may step down --

14         THE WITNESS:  Thank you.

15         THE COURT:  -- subject to -- I'm sure you'll come

16    back on Tuesday for further examination to the extent

17    necessary.

18         THE WITNESS:  Looking forward to it.

19         THE COURT:  All right.  I have a request by the

20    debtors that I rule on cash collateral today and a request by a

21    number of parties that I postpone that ruling.  And I have a

22    request by the debtors that I set a deadline with regard to the

23    submission of competing DIP proposals.  I think those are the

24    two outstanding issues before me today.

25         MR. STAMER:  Your Honor, I don't mean to interrupt

148

1    you.

2         THE COURT:  No, you can interrupt, but --

3         MR. STAMER:  What we're trying to do, Your Honor, and

4    I hope the Court appreciates this, is to make sure that

5    whatever the deadline is, that the principal parties-in-

6    interest are going to participate and they're not going to be

7    locked out of the process by virtue of the deadline.

8         What may make sense, Your Honor, is to take a five-

9    minute adjournment.  And I don't want to extend this any longer

10   than needed.  We can talk to the debtor; we can talk to the

11   bidders.  I believe their representatives are actually in the

12   courtroom.  And then maybe we can come up with an agreement as

13   to the way in which we all think it should proceed.

14        THE COURT:  All right.  I think that's probably a

15   good idea.  Take a ten-minute adjournment on procedural issues

16   of any type.  And then I'll hear from any party who wishes with

17   regard to outstanding issues.

18        MR. STAMER:  Thank you very much, Judge.

19        THE COURT:  Yes.

20        MR. HOLTZER:  Your Honor, just one moment.  Before we

21   close the record, there is one correction to the record that

22   counsel for Pershing Capital would like to make.

23        THE COURT:  All right.

24        MR. LEAKE:  Good afternoon, Your Honor.  Paul Leake,

25   Jones Day, on behalf of the proposed DIP lender this morning,

149

1    Pershing Square Capital Management.  Earlier, Your Honor, I had

2    told you that our commitment letter had -- would terminate

3    today at 5 o'clock.  Sometime in the earlier hours of the

4    morning this morning, a revision was asked for by the debtors

5    to amend that provision, and then it was made.  And the

6    commitment signed based on that amendment had not reached me

7    before I left the office to come straight -- to come here.  And

8    the termination provision reads that the commitment terminates

9    on the earlier of 5 p.m. on the day immediately following the

10   entry date, defined as "Entry of an Order" -- so as of right

11   now, not relevant as to the earlier date -- or June 1 if the

12   funding date shall not have occurred by that date.  So I wanted

13   to clarify the record, Your Honor, a request by the debtor made

14   last night to which we agreed to.  And I wanted to make sure I

15   corrected that on the record.

16            THE COURT:  So the date for both proposals, if I may

17   use that term, is June 1.  And when does the Goldman Sachs

18   concession go away?  Is that in June as well?  I gather that if

19   Goldman Sachs is paid off by a certain date, there's a

20   concession?

21            UNIDENTIFIED SPEAKER:  June 1, Your Honor.

22            THE COURT:  June 1 also.  All right.  At least we

23   have a consistent date.

24            MR. LEAKE:  Your Honor --

25            THE COURT:  You have a further correction?

1          MR. LEAKE:  The debtor would like -- the debtor would

2     like me to read it into the record, Your Honor, which I am

3     perfectly happy to do.  "Our commitment hereunder will

4     terminate upon the earlier of (a) 5 p.m., New York Time, on the

5     day immediately following the entry date, unless accepted by

6     you at or prior to such time," that was a clarification they

7     wanted, "and (b) June 1, 2009 if the initial funding date shall

8     not have occurred on or prior to such date."  The document

9     speaks for itself.  Thank you, Your Honor.

10          THE COURT:  Yes, sir?

11          MR. KELSEY:  Can I just make a quick comment?

12          THE COURT:  Yes.  Just so the parties on the phone

13     can hear you, come to the microphone.

14          MR. KELSEY:  Thank you.  Good afternoon, Your Honor.

15     Matt Kelsey, Gibson Dunn --

16          THE COURT:  Speak a louder, please.

17          MR. KELSEY:  Good afternoon.  Matt Kelsey, Gibson,

18     Dunn & Crutcher, on behalf of Farallon Capital, which was the

19     DIP lender but currently maybe isn't the DIP lender.  I agree

20     with Mr. Stamer's recommendation.  I just wanted to make one

21     point for the Court just to give us some context here, and that

22     is at least fifty percent of entities that are going to fu --

23     were going to fund into this DIP from the West Coast had flew

24     out here for this hearing today fully expecting to have that

25     DIP approved.  We've heard deadlines mentioned by the debtor

151

1    like 10 a.m. tomorrow morning while these people are flying

2    back home.  We think that's a little tight.  Given the

3    circumstances and the amount of travel, we think, at a minimum,

4    we would get into sometime next week.

5           THE COURT:  Well, why don't we -- I'll take that

6    break.  I think the parties should discuss it.  I think they

7    need to get some sleep very badly.  And we do have a little bit

8    of time.  And this may be one of those occasions where a little

9    more time is beneficial rather than less.

10           UNIDENTIFIED SPEAKER:  Thank you, Judge.

11      (Recess from 4:25 p.m. until 4:58 p.m.)

12           THE COURT:  Be seated.  All right, we'll go back on

13   the record in General Growth Properties.

14           Ms. Goldstein?

15           MS. GOLDSTEIN:  Thank you, Your Honor.  Thank you for

16   allowing us a somewhat more than ten-minute recess, but it was

17   worthwhile because hopefully it's precedent in this case that

18   we actually have a consensus among the debtor, the secureds and

19   the unsecureds and the prospective DIP lenders.  I can't

20   guarantee that for everything that goes forward here, but we

21   have it today.

22           THE COURT:  I hope it's more than on your joint

23   desire to get out of this room this afternoon.

24           MS. GOLDSTEIN:  However, we --

25           THE COURT:  You're united on the basis upon which

152

1    we're going to close the record today.

2            MS. GOLDSTEIN:  We're united on this basis, but --

3            THE COURT:  All right.

4            MS. GOLDSTEIN:  -- we're also united on, you know,

5    having a collaborative process to get to the end of DIP

6    negotiations.  And so -- I will work backwards, Your Honor,

7    because this, in part, depends on your calendar.  We would

8    like, if possible, to have a hearing on Wednesday.  I

9    personally would like it Wednesday morning.

10           THE COURT:  Wednesday?

11           MS. GOLDSTEIN:  And we have no objection to Wednesday

12   morning, Your Honor --

13           THE COURT:  All right, Wednesday it is.

14           MS. GOLDSTEIN:  -- if it's --

15           THE COURT:  I will --

16           MS. GOLDSTEIN:  -- compatible with your calendar.

17           THE COURT:  I have a confirmation hearing which has

18   been noticed for 10, but why don't we be -- we'll be optimistic

19   and say 10:30.

20           MS. GOLDSTEIN:  That's very good, Your Honor.  It

21   must be an uncontested confirmation, we hope.

22           THE COURT:  Well, it's uncontested as many matters

23   today have been uncontested, but there are some loose ends.

24           MS. GOLDSTEIN:  Okay --

25           THE COURT:  Uncontested but with loose ends.

153

1          MS. GOLDSTEIN:  Okay.  Well, good.  We'll -- 10:30.

2     Thank you very much, Your Honor.

3          THE COURT:  All right.

4          MS. GOLDSTEIN:  So given that --

5          THE COURT:  So if you have to wait, I hope it won't

6     be for very long.

7          MS. GOLDSTEIN:  Okay.  And given that, Your Honor, we

8     would like your guidance as to by when on Tuesday we should

9     file the filed -- the completed DIP agreement.

10         THE COURT:  Well, I think parties have to have an

11    opportunity to read the form of the agreement, and it may be a

12    matter of some complexity.  I haven't -- we're not setting

13    bidding guidelines --

14         MS. GOLDSTEIN:  No, we're not, Your Honor.

15         THE COURT:  -- or anything of that nature.  So I

16    think it's really up to the debtor to establish a procedure

17    that is as fair as possible considering the number of

18    interested parties.  But it would seem to me that if we're

19    going to have a hearing at 10:30 -- or shall I say 11?  Maybe

20    11?  Or maybe I should make it 11 --

21         MS. GOLDSTEIN:  Yeah.

22         THE COURT:  -- on Wednesday.  The parties should be

23    able to know where we are by noon on Tuesday.  Is that -- I see

24    some heads nodding yes.

25         MS. GOLDSTEIN:  Yes, Your Honor.  I think that is

154

1    exactly what we were hoping you would say.

2             THE COURT:  Well, you can always suggest it.  That's

3    what you were hoping.  Noon on Tuesday.

4             MS. GOLDSTEIN:  Okay.  And --

5             THE COURT:  Now, how we get there, number one, I do

6    think I'm going to order all parties to get some sleep tonight.

7    Can I do that?

8             MS. GOLDSTEIN:  You can, Your Honor, and we would

9    like --

10            THE COURT:  And without any effect, I'm sure.  But I

11   assume there'll be some work done over the weekend to clarify a

12   few -- the intersection of the DIP loan and the secured

13   lenders' rights can be easy or it can be difficult, as you

14   know, and --

15            MS. GOLDSTEIN:  We understand.

16            THE COURT:  Okay.

17            MS. GOLDSTEIN:  And, Your Honor, on that note, what

18   we would like to propose -- and all of the prospective DIP

19   lenders are in the courtroom, at least the ones that have

20   participated to date; we do believe they will probably be doing

21   some thinking and working, and I assume calls will occur over

22   the weekend.  But we would like to set a time on Monday,

23   probably noon or 1 o'clock -- I'll say 1:00 -- at the offices

24   of Weil, Gotshal & Manges where these prospective DIP lenders

25   would have submitted their bids.  They've heard a lot of

1   information today about what they can do that could help the

2   situation.  And then we would expect to have the committee at

3   our office, secured lenders' representatives at our office, and

4   the prospective bidders, and we'll have an iterative discussion

5   with the parties during the course of the afternoon.  And

6   hopefully -- we expect we would select a DIP lender by early

7   evening so that we can have something on file Tuesday morning.

8   And I think that is the procedure the debtor and the committee

9   and the secureds and the prospective lenders have all agreed

10   to.

11        (Pause)

12        MS. GOLDSTEIN:  Your Honor, some of the lenders have

13   raised the question, and this will be part of the discussions,

14   I'm sure, either over the weekend or in connection with their

15   bids, of making 503(b) claims for their expenses.  We do

16   appreciate that some of these lenders have put a lot of time

17   into this, including legal time.

18        THE COURT:  503(b) or 506 --

19        MS. GOLDSTEIN:  5 -- no --

20        THE COURT:  -- (b)?

21        MS. GOLDSTEIN:  -- substantial contribution, legal

22   fees.

23        THE COURT:  Oh, the DIP lenders --

24        MS. GOLDSTEIN:  The DIP lenders.

25        THE COURT:  -- not the --

156

1          MS. GOLDSTEIN:  Yes.  No, we're not talking about --

2          THE COURT:  -- secured lenders.

3          MS. GOLDSTEIN:  No.  No.  I apologize, Your Honor.

4          THE COURT:  They seem to be on 506 grounds.

5          MS. GOLDSTEIN:  They're caught up in 506(c), but

6     the --

7          THE COURT:  Eventually.

8          MS. GOLDSTEIN:  The prospective DIP lenders are

9     interested in that, and I think that's something we're willing

10    to discuss with them.  But I can't make any -- obviously,

11    that's something for the Court to decide ultimately, but we'll

12    be discussing whether the debtors will be supporting something

13    along those lines.

14         MR. STAMER:  If I could supplement that, Judge,

15    without contradicting what counsel said.  We think the bidders,

16    to date, have provided value.  And we are encouraging people to

17    show up on Monday.  And we in the company -- we need to talk to

18    the committee -- are considering being supportive of 503(b)

19    applications for bidders that show up, that make bids and that

20    do not prevail in the process.  So, just so the record's clear,

21    so the bidders understand where we're coming from --

22         THE COURT:  My --

23         MR. STAMER:  -- ultimately it's up to the Court, we

24    all understand that, but it's designed to be a welcoming and

25    collaborative process.

157

1        THE COURT:  Well, Mr. Zirinsky cited Northwest once

2   today.  I'm not going to cite it, but since he may have some

3   knowledge that others don't, you can certainly consult with him

4   and with Mr. Masumoto on my 503(b) attitude in another case.

5   And each case is different, and I recognize that.  Each of the

6   400 cases we have here is different too, and that will be taken

7   into account.

8        MR. STAMER:  Your Honor, just an administrative

9   announcement.  We're going to meet, with your permission, with

10  secured lenders in your conf --

11       THE COURT:  You don't -- oh, you don't need my

12  permission to meet, but you certainly may use the conference --

13       MR. CROSS:  We said that we can --

14       THE COURT:  I'll get you a bigger room if you need

15  it.

16       MR. CROSS:  That's fine.  It's plenty big.  So that

17  we can decide who would be the representatives who are at Weil,

18  because the invitation has it that fifty people show up.  It's

19  just going to be a small group.

20       THE COURT:  That -- I think that's a -- that would be

21  a major step forward.  Anyone else?  All right, well, perhaps I

22  should reserve any further comments on cash collateral until

23  next week.  I don't know exactly what issues are remaining.

24  There are issues relating to the Fashion Mall, I gather.

25       MS. GOLDSTEIN:  Well, yes, they believe they are

158

1    different, Your Honor.

2         THE COURT:  And -- I mean, I have this -- I should

3    make the following comments on use of cash collateral.  All

4    parties are receiving non-default interest.  Only one party is

5    being asked to, at this time, to credit that interest against

6    principal rather than against the actual accrued interest.

7    Along with that adequate protection, there is a lien on the

8    cash that is -- or the net cash that's going up into the cash

9    concentration account.

10        The parties had various expectations pre-petition

11   with regard to the treatment of their debt and the treatment of

12   their debtor by itself.  However, this case does involve many

13   other entities, and it involves the interests of unsecured

14   creditors, of enormous amounts and of equity holders as well.

15        I'm going to leave the specifics until next week.

16   The parties have a right to make their case.  But I would

17   simply ask the parties to consider some of the basic principles

18   of bankruptcy law that are Bankruptcy 101.  I say that because,

19   as difficult as this weekend may be for you, I have to read

20   exams.  And I didn't give my students this problem but I do

21   think some of the issues we're dealing with are Bankruptcy 101.

22   I mean, lenders are entitled to adequate protection.  Pre-

23   petition provisions of loan agreements in the nature of

24   covenants and conditions are breached in Chapter 11.  The most

25   important of such conditions that are breached in Chapter 11 is

1    the condition that payment be made in accordance with the terms

2    of the loan agreement.  And that's breached in most cases; in

3    many cases far more substantially than in this case where the

4    debtor is proposing to pay interest at the non-default rate.

5            Parties reserve their right to seek interest of the

6    default rate at the end of the case; the debtors make that

7    clear in their papers.  I can hear argument on Wednesday or at

8    a later time if it only involves a few parties as to payment of

9    interest at the default rate currently.  But I would just note

10   that a couple of parties want me to find that each of the

11   individual debtors are single-asset real estate cases.  And one

12   party has moved for that relief.  I don't quite understand

13   where that gets us in this case.  Even if they were, it's an

14   interesting question.  362(d)(3) provides that one of the

15   debtors' recourses in the event that we have a single-asset

16   real estate case is to pay interest currently at what rate?  At

17   the non-default rate.  Congress has adjusted, in this way, the

18   rights of lenders, if we really have a single-asset real estate

19   case, and the rights of debtors and those interested in the

20   debtors' success:  unsecured creditors, equity holders and

21   others.

22           So if parties want to go forward on the single-asset

23   real estate side of things and get a decision, I will consider

24   it in due course.  But it seems to me that it's not going to

25   really advance anybody when the debtor has agreed to pay

1    interest at the non-default rate currently or an amount

2    equivalent to interest at the non-default rate currently.  And

3    you reserved the right if they should later change their

4    position because of exigencies.

5           Similarly, with regard to the breach of rights as

6    to -- rights of lenders to separateness and the covenants, I

7    have at least one motion for relief from the stay; I have a

8    motion to dismiss.  If I have to schedule them on Wednesday,

9    I'll schedule them for a very near date because they can

10   impinge on other parties' rights.  But I would simply ask the

11   parties to consider whether they really seek, at this point in

12   time, a relief of this nature.  There's some hyperbole, at

13   least I view it as hyperbole, in a brief I have from a group

14   called the Commercial Mortgage Securities Association and the

15   Mortgage Bankers Association speaking of systemic violation of

16   parties' risks and systemic problems in the real estate

17   industry.  And we do have some systemic problems in the real

18   estate industry, or so I read in the papers perhaps coming from

19   the other direction.  This debtor is trying to deal with them

20   in the market that we have.  And so far it appears that the

21   numbers would indicate it can deal with those problems far more

22   successfully than many of the other parties who find their way

23   into this court.

24          So I think it's very important that each lender have

25   its right to seek specific relief.  I don't know if there were

161

1    situations, as this brief seems to indicate but very vaguely,

2    of separate corporate directors and others.  And if there are

3    motions to be brought, they can be brought.  But I think that

4    if we look at some fairly standard provisions of Bankruptcy

5    101, we would find that there is a way in these cases to

6    reconcile the interests of the secured lenders with the

7    interests of the debtors in protecting their assets for the

8    benefit of all creditors.

9            So I think I've gone as far as I should today.  I

10   think we made a lot of progress, and I really appreciate those

11   who have made that effort.  And I hope that it will continue

12   tomorrow after the parties have gotten some sleep tonight.

13   Thanks very much.

14           ALL:  Thank you, Your Honor.

15           THE COURT:  And we're adjourned until Wednesday at

16   10:00.

17           ALL:  11.

18           THE COURT:  At -- I beg your pardon, 11:00.

19           MS. GOLDSTEIN:  Your Honor --

20       (Gap in audio)

21           MS. GOLDSTEIN:  -- motions that you approved.

22           THE COURT:  Please.

23           MS. GOLDSTEIN:  And we will circulate a tenant

24   leasing -- the leasing practices motion --

25           THE COURT:  Circulate a tenant's --

162

1          MS. GOLDSTEIN:  -- order, excuse me.

2          THE COURT:  Yeah, one for the tenant improvements,

3     and then --

4          MS. GOLDSTEIN:  A bridge order or --

5          THE COURT:  Yes.

6          MS. GOLDSTEIN:  -- on the cash collateral.

7          THE COURT:  Oh, I should also -- before we stop, I

8     will so order the record as to a continuation of use of cash

9     collateral on the same basis as the prior order from today, at

10    least until Wednesday of next week.

11         MS. GOLDSTEIN:  Thank you.

12         MR. STROCHAK:  Your Honor, and cash management as

13    well?

14         MS. GOLDSTEIN:  And cash management?

15         THE COURT:  And cash management.  Does anyone wish to

16    be heard on that?  All right.  Thank you.  Good night.

17         MR. STROCHAK:  Thank you.

18     (Whereupon these proceedings were concluded at 5:16 p.m.)

19

20

21

22

23

24

25

163

I N D E X

T E S T I M O N Y

| WITNESS | EXAM BY | PAGE | LINE |
|---------|---------|------|------|
| James Mesterharm | Mr. Strochak | 94 | 20 |
| James Mesterharm | Mr. Brandt | 135 | 18 |
| James Mesterharm | Mr. Rosen | 139 | 10 |
| James Mesterharm | Mr. Rosen | 145 | 9 |

E X H I B I T S

| PARTY | NO. | DESCRIPTION | ID | EVID. |
|-------|-----|-------------|-----|-------|
| Debtors | 1 | 13-week cash flow forecast of the consolidated operations of GGP | | 100, 5 |
| Debtors | 2 | 2-year cash flow forecast | | 100, 8 |
| Debtors | 4 | Chart of the GGP's expected liquidity position on a consolidated basis | | 100,10 |
| Debtors | 6 | Cushman & Wakefield appraisal | | 115, 9 |
| Debtors | 7 | GGPLP cash forecast analysis | | 115,11 |
| Debtors | 5 | Line chart re: liquidity position | | 116,13 |

164

1

2                          R U L I N G S

3    DESCRIPTION                                    PAGE      LINE

4    Debtor's motion for order seeking to implement    45        21

5    certain notice and case management procedures

6    approved

7    Debtors' motion requesting authority to pay       46         7

8    certain insurance amounts and workers'

9    compensation amounts during the pre-petition

10   period approved

11   Debtors' motion for authorization to pay          48        13

12   certain critical service providers approved

13   Debtors' motion for approval of employee          53        18

14   wages and benefits approved

15   Debtors' motion for entry of an order approving   57        20

16   proposed form of adequate assurance, resolving

17   objections by utility companies and prohibiting

18   utilities from altering, refusing, or

19   discontinuing service granted

20   Record so ordered as to debtors' continued use   162         8

21   of cash collateral until hearing on 5/13/09

22   Record so ordered as to debtors' continued use   162        15

23   of existing cash management system until hearing

24   on 5/13/09

25

165

1

2                        C E R T I F I C a T I O N

3

4      I, Lisa Bar-Leib, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      _____

8      LISA BAR-LEIB

9

10     Veritext LLC

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date:  May 12, 2009

16

17

18

19

20

21

22

23

24

25