**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

In re                             :         **Chapter 11 Case No.**
                                     :

**GENERAL GROWTH**            :         **09-11977 (ALG)**
**PROPERTIES, INC., <u>et</u> <u>al</u>.**    :

                                       :         **(Jointly Administered)**
        **Debtors.**                 :
                                         :

-------------------------------------------------------- x

### FINAL ORDER AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 362, AND 364, (B) USE CASH COLLATERAL AND GRANT ADEQUATE PROTECTION PURSUANT TO BANKRUPTCY CODE SECTIONS 361 AND 363 AND (C) REPAY IN FULL AMOUNTS <u>OWED UNDER CERTAIN PREPETITION SECURED LOAN AGREEMENT</u>

Upon the motion (the "**DIP Motion**"), dated April 16, 2009, of South Street Seaport Limited Partnership, its parent, General Growth Properties, Inc. ("**GGP**"), and their debtor affiliates, as debtors and debtors in possession (the "**Debtors**")[1] for entry of an order authorizing the Debtors to, among other things:

(i)        enter into (a) a Senior Secured Debtor in Possession Credit, Security and Guaranty Agreement (the "**DIP Credit Agreement**"), attached hereto as **Exhibit 1** (as such agreement may be amended or modified from time to time),[2] by and among GGP and GGP Limited Partnership (collectively, the "**Borrowers**"), the guarantors party thereto (collectively, the "**Guarantors**"), and the other lenders from time to time party thereto (collectively, the "**Lenders**") and UBS, AG, as the Administrative Agent for the Lenders (the "**Agent**"); and

---

[1]     A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, is attached as **Exhibit "A"** to the Motion.

[2]     Capitalized terms used in this Order, but not defined herein, shall have the meanings ascribed to such terms in the DIP Credit Agreement.

(b) all other Loan Documents (together with the DIP Credit Agreement, the "**DIP Loan Documents**");

   (ii)  borrow, pursuant to the DIP Loan Documents, $400,000,000 and seek other financial accommodations from the Lenders pursuant to the DIP Credit Agreement, the other DIP Loan Documents, and this Order;

   (iii)  grant non-priming liens, security interests, and mortgages in substantially all of the Obligors' assets (subject to certain exceptions more fully set forth in the DIP Loan Documents and this Order) to secure repayment of the borrowings made under the DIP Loan Documents by, and financial accommodations made to, the Debtors;

   (iv)  use the proceeds arising from the DIP Loan Documents in a manner consistent with the terms and conditions of the DIP Loan Documents and this Order;

   (v)  use "Cash Collateral" as such term is defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**");

   (vi)  grant, as set forth more fully below, replacement liens and superpriority claims to the Adequate Protection Parties (defined below) to the extent of any diminution in value of such Adequate Protection Parties' respective interests in property of the Debtors or their estates, as adequate protection for the use of Cash Collateral;

   (vii)  vacate and modify the automatic stay imposed by section 362 of title 11 of the United States Code (the "**Bankruptcy Code**") to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Order;

   (viii)  pay all amounts contemplated to be paid under the DIP Documents (as defined below), including all fees and expenses set forth therein; and

(ix)     waive any applicable stay of the effectiveness of this Order and provide for the immediate effectiveness of this Order.

The Court having considered the DIP Motion, examined the exhibits attached thereto, and having completed a final hearing (the "**Final Hearing**") as provided for under section 364 of the Bankruptcy Code, Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") and finding the Debtors provided adequate notice to all necessary parties and that no further notice is required:

**BASED UPON THE RECORD ESTABLISHED AT THE FINAL HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.     **Petition Date.**  Commencing on April 16, 2009 (the "**Petition Date**") and continuing thereafter, the Debtors each filed voluntary petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York.  The Debtors have continued in the management and operation of their business and property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

B.     **Jurisdiction and Venue.**  This Court has jurisdiction over these proceedings pursuant to sections 157(b) and 1334 of title 28 of the United States Code and over the persons and property affected hereby.  This Court's consideration of the DIP Motion constitutes a core proceeding under section 157(b)(2) of title 28 of the United States Code.  Venue for these cases and the proceedings regarding the DIP Motion is proper in this district under sections 1408 and 1409 of title 28 of the United States Code.

C.     **Committee Formation.**  On April 24, 2009 the United States Trustee for the Southern District of New York (the "**United States Trustee**") appointed an official

committee of unsecured creditors in the Case (the "**Creditors' Committee**").

D. **Notice.** The Final Hearing was held in accordance with Bankruptcy Rule 4001 and Local Rule 4001-2. Notice of the Final Hearing and the relief requested in the DIP Motion was provided by the Debtors on April 16, 2009, whether by telecopy, email, overnight courier or hand delivery, to parties in interest, including: (i) the Office of the United States Trustee for the Southern District of New York (Attn: Greg M. Zipes); (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) EuroHypo AG, New York Branch, administrative agent for the lenders to certain of the Debtors under (a) the Second Amended and Restated Credit Agreement dated as of February 24, 2006 and (b) the Loan Agreement, dated as of July 11, 2008, as amended; (v) Deutsche Bank Trust Company Americas, as administrative agent for the lenders to certain of the Debtors under certain Loan Agreements, dated as of January 2, 2008 and February 29, 2008, respectively; (vi) Goldman Sachs Mortgage Company, as administrative agent for the lenders to certain of the Debtors under the Amended and Restated Credit Agreement, dated as of November 3, 2008; (vii) Wilmington Trust FSB, as indenture trustee under (a) that certain Indenture, dated as of May 5, 2006, and (b) that certain Indenture, dated as of April 16, 2007; (viii) LaSalle Bank National Association and Wilmington Trust FSB,[3] as indenture trustee under that certain Junior Subordinated Indenture, dated as of February 24, 2006; (ix) The Bank of New York Mellon Corporation, as indenture trustee under that certain Indenture, dated as of February 24, 1995; (x) those creditors holding the 100 largest unsecured claims against the Debtors' estates (on a consolidated basis); (xi) the Property Lenders (as defined in the DIP Motion); (xii) counsel to Pershing Square Capital Management, L.P.;

---

[3] Wilmington Trust, FSB recently entered into an agreement pursuant to which it will assume the indenture trustee assignments of LaSalle Bank National Association. As of the Commencement Date, the trustee assignment with respect to this indenture has not yet been transferred to Wilmington Trust, FSB; however, Wilmington Trust, FSB will succeed LaSalle Bank National Association as indenture trustee for this series of notes upon the transfer of the trustee assignment.

(xiii) counsel to the Agent; and (xiv) counsel to the Creditors' Committee. Such notice of the Final Hearing and the relief requested in the DIP Motion is due and sufficient notice and complies with sections 102(1) and 364(c) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c), 4001(d) and the Local Rules.

E. **Need for Postpetition Financing.** Entry of this Order is necessary to prevent substantial harm to the Debtors' estates that would otherwise result if the Debtors fail to obtain the financing contemplated herein to preserve the Debtors' assets and continue their operations, and, by the power vested in the Court pursuant to sections 105(a) and 364(c) of the Bankruptcy Code, and is hereby approved. The Debtors will suffer substantial harm unless this Court immediately authorizes the Debtors to obtain loans and other financial accommodations from the Lenders in accordance with the terms of this Order, the DIP Loan Documents, and any other documents, instruments, or agreements related thereto or delivered or executed in connection therewith (the DIP Loan Documents, together with such documents, instruments, and agreements, the "**DIP Documents**").

F. **No Comparable Credit Available on More Favorable Terms.** The Debtors have made reasonable efforts, under the circumstances, to locate financing of the type contemplated by this Order, and the Court expressly finds that the Debtors are unable to obtain, in the ordinary course of business or otherwise, financing of the type contemplated herein on an unsecured basis. Specifically, the Debtors have been unable to obtain unsecured credit allowable under sections 364(a), 364(b), 364(c)(1) and 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit, allowable only under Bankruptcy Code sections 364(c)(2) and 364(c)(3), on more favorable terms and conditions than those provided in the DIP Documents and this Order.

G.      **Lenders' Requirements.**  The Lenders are willing to lend money and provide other financial accommodations to the Debtors only on the terms and conditions and with the protections provided herein and in the DIP Documents and are relying on such terms, conditions, and protections in agreeing to lend money and provide financial accommodations to the Debtors hereunder.

H.      **Good Faith.**  The terms and conditions of the DIP Documents have been negotiated in good faith and at arms' length by all parties involved, the payment of the Goldman Indebtedness (as defined in Paragraph I below) reflects the Debtors' exercise of prudent business judgment, and the Lenders and the Debtors have offered sufficient proof thereof.  Accordingly, the Court expressly finds that the terms of the DIP Documents have been extended in good faith and that any credit extended, loans to be made, or other financial accommodations granted to the Debtors pursuant to the DIP Documents shall, in each case, be deemed to be extended in good faith, as that term is used in section 364(e) of the Bankruptcy Code.

I.      **Debtors' Acknowledgements and Agreements Regarding the Prepetition Goldman Facility.**  Prior to the Petition Date, certain of the Debtors, as borrowers or guarantors (the "**Goldman Facility Debtors**"),[4] were party to that certain Amended and Restated Credit Agreement, dated as of November 3, 2008 (as in effect on the date hereof, the "**Goldman Credit Agreement**"), with Goldman Sachs Mortgage Company, as administrative agent (together, with its successors and assigns, the "**Goldman Facility Agent**") and the lenders party thereto (the "**Goldman Lenders**") with all related documents and agreements, as amended

---

[4]      The following Debtors constitute the Goldman Facility Debtors: 10 CCC Business Trust; 10000 Covington Cross, LLC; 10190 Covington Cross, LLC; 1201-1281 Town Center Drive, LLC; 1450 Center Crossing Drive, LLC; 1451 Center Crossing Drive, LLC; 1551 Hillshire Drive, LLC; 1635 Village Centre Circle, LLC; 1645 Village Center Circle, LLC; 20 CCC Business Trust; 30 CCC Business Trust; 9950-9980 Covington Cross, LLC; Apache Mall, LLC; Arizona Center Parking, LLC; Chula Vista Center, LLC; Mall of Louisiana Land, LP; Park Square Limited Partnership; Parkside Limited Partnership; Parkview Office Building Limited Partnership; Rouse-Phoenix Corporate Center Limited Partnership; Running Brook Business Trust; Town Center East Business Trust; Two Arizona Center, LLC; Vista Commons, LLC.

or modified, the "**Prepetition Goldman Facility**"). The Debtors acknowledge and agree that: (i) the aggregate unpaid principal amount of the loans advanced under the Prepetition Goldman Facility is $215,000,000, which, together with accrued and unpaid prepetition contract and default rate interest of $86,597.22, accrued and unpaid postpetition contract and default rate interest of $2,511,319.44, and accrued and unpaid prepetition and postpetition fees, costs and expenses, accrued solely as permitted under Section 9.16 of the Goldman Credit Agreement, and reasonable estimates thereof as set forth in the Payoff Letter (as defined below), amounts to a total indebtedness of $214,950,822.66 (including the credit referenced in (a) below and the postpetition fees and expenses referenced herein) as of May 15, 2009 and, together with any per diem postpetition interest accruing thereafter until payment in full of unpaid principal amount of the loans advanced under the Prepetition Goldman Facility in accordance with this Order (collectively, the "**Goldman Indebtedness**"); (ii) as of the Petition Date and as of the date of this Order, the Goldman Indebtedness is secured by valid, binding, enforceable, and properly perfected liens on and security interests in certain real property and personal property of the Goldman Facility Debtors as described in the Prepetition Goldman Facility (the "**Prepetition Goldman Liens**") with a salable value the Debtors believe is in excess of the Goldman Indebtedness; (iii) as of the Petition Date and as of the date of this Order, the Goldman Indebtedness constitutes the legal, valid and binding obligations of the respective Goldman Facility Debtors, enforceable in accordance with the terms of the Prepetition Goldman Facility (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (iv) the Goldman Lenders and the Goldman Facility Debtors entered into an agreement, dated as of April 15, 2009 (the "**Incentive Agreement**"), pursuant to which if the Goldman Facility Debtors repay the Goldman Indebtedness in full in cash on or before June 1,

2009, (a) the Goldman Facility Debtors shall be entitled to be paid $3,225,000 which is an amount equal to 1.5% of the unpaid principal amount of the loans outstanding under the Prepetition Goldman Facility and (b) an affiliate of the Goldman Facility Debtors as of the repayment date shall be entitled to a rebate of a fee of $1,075,000 paid in connection with the Incentive Agreement which is an amount equal to 0.5% of the unpaid principal amount of the loans that were outstanding as of April 15, 2009 under the Prepetition Goldman Facility as of the date of the Incentive Agreement.

J.     **Section 506(c) and Section 552(b) Waiver.**  In light of the Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, the Lenders are entitled to a waiver of (i) the provisions of section 506(c) of the Bankruptcy Code and (ii) any "equities of the case" claims under section 552(b) of the Bankruptcy Code, in each case, in respect of the DIP Documents.

K.     **Immediate Entry of the Order.**  The Debtors have requested that this Order become immediately effective and enforceable upon entry, notwithstanding any provisions that may apply in Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure.  The Debtors have demonstrated good cause for the entry of this Order and for this Order to become immediately effective and enforceable upon entry.  Among other things, entry of this Order and the immediate effectiveness and enforceability of this Order upon entry will minimize the disruption of the Debtors' business operations and permit the Debtors to satisfy their operating expenses, will increase the possibilities for confirmation of a successful chapter 11 plan for the Debtors, and is in the best interests of the Debtors, their creditors, and the Debtors' bankruptcy estates.  The terms of the borrowings and other financial accommodations authorized hereby are fair and reasonable under

the circumstances and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

## ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1.      **Motion Granted.**  The DIP Motion is granted in accordance with the terms and conditions set forth in this Order and the DIP Documents.  Any objections and reservations of rights included therein, to the extent not withdrawn with prejudice, settled, or resolved are hereby overruled on the merits.

2.      **Approval of Entry into DIP Documents.**  The Debtors shall be and hereby are authorized to borrow money and seek other financial accommodations from the Lenders on the terms and conditions contained in this Order and the DIP Documents, and the DIP Documents, including, without limitation, the DIP Credit Agreement, are expressly approved by this Court.  To effectuate and evidence the terms and conditions of the borrowings and extensions of credit and other financial accommodations to be made to the Debtors by the Lenders pursuant to the terms of this Order, the Debtors are hereby authorized and directed to enter into the DIP Credit Agreement substantially in the form appended as **Exhibit 1** hereto and any other DIP Documents that may be entered into in connection with the DIP Credit Agreement, which agreements are hereby expressly approved by this Court.

3.      **Enforceable Obligations.**  Upon execution and delivery of the DIP Credit Agreement and the other DIP Documents, such agreements and documents shall constitute valid and binding obligations of the Obligors, enforceable against the Obligors, their estates and any successors thereto and their creditors in accordance with their terms.

4.      **Protection of Lenders and Other Rights.**  From and after the Petition Date, the Obligors shall use the proceeds of the extensions of credit under the DIP Loan

Documents only for the purposes specifically set forth in the DIP Loan Documents and this Order, including to satisfy and discharge in full the Goldman Indebtedness and for general working capital purposes not otherwise restricted by the DIP Credit Agreement. In connection therewith, upon the Closing Date, the Obligors shall direct the Lenders to transfer immediately available funds to the Goldman Facility Agent or any proper assignee or designee thereof an amount necessary to pay in full the unpaid amount of the Goldman Indebtedness, as set forth in the pay-off letter from the Goldman Facility Agent to the Goldman Facility Debtors and GGP, dated May 15, 2009 (the "**Payoff Letter**"). Upon the receipt of the transferred funds by the Goldman Facility Agent: (i) all of the Debtors' obligations under the Prepetition Goldman Facility and any other unpaid amounts under the Goldman Indebtedness shall be considered finally satisfied in full; provided, however, that the indemnities provided in Section 5.18 of the Goldman Credit Agreement that by their express terms survive repayment of the Goldman Indebtedness shall remain in full force and effect for all purposes (the "**Goldman Facility Indemnity**"); (ii) all liens, encumbrances, and any other interests in the Debtors' (or any affiliate's) property held by the Goldman Facility Agent or otherwise arising under the Goldman Prepetition Facility shall be deemed fully released, and the Goldman Lenders and/or the Goldman Facility Agent are hereby directed upon request of the Goldman Facility Debtors or the Lenders to promptly deliver to the Goldman Facility Debtors or the Lenders documents in recordable form as are necessary to evidence the release of such liens, encumbrances, and interests; and (iii) all parties shall be forever barred from attempting to enforce any such lien, encumbrance or other interest in the Debtors' or any affiliate's property that arose under the terms of the Prepetition Goldman Facility; provided, however to the extent the Goldman Lenders and/or the Goldman Facility Agent incur fees and expenses in connection with (A) any inquiry or

request by the Debtors, the Creditors' Committee, or any other party in interest, relating to the Prepetition Goldman Facility, the Goldman Indebtedness, the Prepetition Goldman Liens, and/or the prepetition activities of any of the Goldman Lenders and/or Goldman Facility Agent (and/or its and/or their successors or assigns) in connection with the Prepetition Goldman Facility, the Goldman Indebtedness, or the Prepetition Goldman Liens; or (B) defending an Avoidance Action as described in paragraph 5(a) below ((A) and (B) collectively, the "**Avoidance Action Defense**"), the Goldman Lenders and/or the Goldman Facility Agent shall have a first priority lien on the prepetition collateral previously securing the Goldman Indebtedness in an amount not to exceed the lesser of (a) $1,000,000 and (b) the reasonable unpaid fees and expenses incurred by the Goldman Facility Agent in connection with the Avoidance Action Defense (the "**Goldman Facility Indemnity Lien**"). The claims under the Goldman Facility Indemnity in excess of the amount of the Goldman Facility Indemnity Lien shall constitute an administrative expense claim under section 503(b) of the Bankruptcy Code, which administrative expense shall not exceed $1,000,000; provided, however, that such administrative expense shall be subject to the DIP Liens in all respects; provided, further, that nothing herein limits the rights of the Goldman Facility Agent and/or the Goldman Lenders to file unsecured claims with respect to the Goldman Facility Indemnity.

5.      **Goldman Refinancing Examination Period.**

(a)      **Avoidance Actions.**  Notwithstanding the terms of paragraph 4, any party-in-interest with standing (including the Creditors' Committee) shall have 210 days from the date of the entry of this Order (the "**Avoidance Action Deadline**") to file an adversary complaint with this Court (i) challenging the validity, enforceability, extent or priority of the Prepetition Goldman Liens or (ii) otherwise asserting any claims or causes of action  against the

Goldman Facility Agent or any of the Goldman Lenders (and/or its successors and/or assigns, if applicable) (an "**Avoidance Action**") arising out of the Prepetition Goldman Facility, the Goldman Indebtedness, and/or the prepetition activities of the Goldman Facility Agent or any of the Goldman Lenders (and/or its and or their successors and assigns, if applicable). Any Avoidance Action may be filed by the Creditors' Committee or such other party in the name of the Debtors without leave of the Bankruptcy Court.

**(b)** **Failure to File or Successfully Prosecute an Avoidance Action**.

To the extent that (i) an Avoidance Action is not filed by the Avoidance Action Deadline by the Creditors' Committee or such other party or (ii) if an Avoidance Action is so filed and the Goldman Facility Agent or any of the Goldman Lenders (and/or its and/or their successors and assigns, if applicable) ultimately prevails in its defense thereof pursuant to a final non-appealable order: (A) the Goldman Indebtedness shall constitute allowed claims in an amount equal to the payment made to the Goldman Facility Agent or an assignee or designee thereof (and/or its and/or their successors and assigns, if applicable) pursuant to Paragraph 4 of this Order for all purposes in the Debtors' bankruptcy proceedings and any subsequent proceedings under the Bankruptcy Code and shall not be subject to avoidance, reduction, recovery, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any other applicable federal, state, or local law or regulation by any person or entity (including, without limitation, any trustee, successor trustee, examiner, or responsible person in these or any subsequent proceedings under the Bankruptcy Code); (B) the Prepetition Goldman Lien shall be deemed legal, valid, binding, enforceable, perfected, and otherwise unavoidable first priority liens and security interests, as of the Petition Date, and shall not be subject to any claim (as such term is

defined in the Bankruptcy Code), counterclaim, cross-claim, defense, avoidance, reduction, recovery, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), or any other challenge under the Bankruptcy Code or any other applicable federal, state, or local law or regulation, by any person or entity (including, without limitation, any trustee, successor trustee, examiner, or responsible person in these or any subsequent proceedings under the Bankruptcy Code); (C) the payment of the Goldman Indebtedness authorized and directed by this Order shall be final and irreversible; and (D) each Debtor shall be deemed to have irrevocably waived and released any and all "claims" (as such term is defined in the Bankruptcy Code), counterclaim, cross-claims, causes of action, defenses, offsets, and setoff rights against the Goldman Facility Agent and each of the Goldman Lenders, in their respective capacities as Goldman Facility Agent and/or Goldman Lender, and not in any other capacity or in respect of any other relationship it or they may have, or have had, with the Debtors, whether arising at law or in equity, including, without limitation, those asserting avoidance, reduction, recovery, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), or any other challenge arising under or pursuant to the Bankruptcy Code or any other applicable federal, state, or local law or regulation.

        **(c)**       **<u>Lenders' Senior Priority to the Prepetition Goldman Lien</u>.** The release of liens, encumbrances, and interests effectuated by this Order with respect to the Prepetition Goldman Facility shall be final upon the entry of this Order and the payment of the Goldman Indebtedness as provided in Paragraph 4, and no remedy or relief with respect to any Avoidance Action shall involve the re-establishment of any such liens, encumbrances, or interests, or any other interests, in the Collateral; <u>provided, however</u>, that (i) this Paragraph 5(c) shall not apply with respect to the Goldman Facility Indemnity Lien and (ii) nothing in this

paragraph or in this Order is intended to or shall prevent or prejudice the right of the Goldman Lenders and/or the Goldman Facility Agent, if any, to seek to obtain, establish, or reinstate any lien, encumbrance, or interest in collateral in the event that in connection with any Avoidance Action or otherwise, the Goldman Lenders and/or the Goldman Facility Agent are required to repay or return funds received, or pay any money into the estate, on account of or in repayment of all or any portion of the Goldman Indebtedness, provided such lien is subject to the Prepetition Liens, the DIP Liens and the Adequate Protection Liens, as defined below; provided, however, that the rights of any parties in interest with respect to any such relief sought are hereby expressly preserved..

6. **Post-Petition Liens.** Upon entry of this Order, the Agent, for the benefit of itself and the Lenders, is hereby granted valid, perfected, enforceable, and non-avoidable security interests, liens, and mortgages (the "**DIP Liens**") in the Collateral; provided, however, in no event shall the Collateral (or any component thereof) include or be deemed to include: (i) the Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law and the proceeds thereof, whether received by judgment, settlement or otherwise; (ii) the Capital Stock of any Foreign Subsidiary, other than 65% in total voting power of such Capital Stock and 100% of non-voting Capital Stock, in each case, of a first tier Foreign Subsidiary of any Obligor; (iii) any contracts, instruments, licenses, license agreements or other documents (or any rights thereunder), to the extent (and only to the extent) that the grant of a security interest would (A) constitute a violation of a restriction in favor of a third party on such grant, (B) give any other party to such contract, instrument, license, license agreement or other document the right to terminate its obligations thereunder, or (C) violate any law; provided, that the limitation set forth

in this clause (iii) shall not affect, limit, restrict or impair the grant by an Obligor of a security interest pursuant to the DIP Loan Documents in any such right, to the extent that an otherwise applicable prohibition or restriction on such grant is rendered ineffective by any applicable law, including the Uniform Commercial Code (the "**UCC**") or the Bankruptcy Code; (iv) any direct or indirect interest in any Capital Stock of any joint venture, partnership or other entity if and for so long as the grant of such security interest or Lien shall constitute a default under or termination pursuant to the terms in effect as of the Petition Date of the joint venture agreement, partnership agreement or other organizational documents of, or contract or other agreement of (or purporting to cover the assets of) such joint venture, partnership or entity or its direct or indirect parent, or require the payment of a fee, penalty or similar increased costs or result in the loss of economic benefit or the abandonment or invalidation of such Obligor's or any Subsidiary's interest in such Capital Stock or shall otherwise adversely impact such interest in such joint venture, partnership or other entity; provided that the limitation set forth in this clause (iv) shall not affect, limit, restrict or impair the grant by an Obligor of a security interest pursuant to the DIP Loan Documents in any such right, to the extent that an otherwise applicable prohibition or restriction on such grant (whether applicable to such Obligor or to any parent company or Person owned by such Obligor) is rendered ineffective by any applicable law, including the UCC or the Bankruptcy Code; (v) any Ground Lease of a Debtor that has been assumed pursuant to section 365 of the Bankruptcy Code if the granting of a Lien hereunder would cause a default under or allow the termination of such Ground Lease (it being agreed that, to the extent the Lien granted pursuant to this paragraph attaches to any such Ground Lease prior to a Debtor's assumption thereof, such Lien shall automatically be released upon such assumption and any Mortgage evidencing such Lien shall automatically terminate); (vi) the Gift

Card and Lotto Accounts; (vii) any Real Estate of the Non-Debtor Guarantor; and (viii) any Shopping Center Properties (defined in Paragraph 8 below) that are subject to a valid, unavoidable, prepetition lien, provided, however, that, notwithstanding anything set forth in the Order or the DIP Documents to the contrary, as security for the obligations under the DIP Loan Documents, the Agent, on behalf of the Lenders, shall have a pledge of the unencumbered equity of any subsidiary holding a Shopping Center Property; provided, further, that any such security interest and Lien shall attach immediately and automatically after any such disqualifying condition specified in clause (iii), (iv) or (v) of this Paragraph shall cease to exist. The DIP Liens shall be granted on the following basis:

(a)    **Senior Lien Priority.** Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, perfected, enforceable, and non-avoidable first priority security interests, liens, and mortgages on all of the Obligors' now existing or hereafter acquired Collateral not subject to a valid, perfected, enforceable, and non-avoidable security interest, lien, or mortgage (i) as of the Petition Date or subject to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, in each case, only to the extent that such valid, perfected, enforceable, and non-avoidable security interests, liens, or mortgages are senior in priority to the DIP Liens or are Permitted Liens that, pursuant to the DIP Credit Agreement, are permitted to be senior in priority to the DIP Liens, except as otherwise provided in Paragraph 4 above or 6(c) below or (ii) as a result of the refinancing of the Prepetition Goldman Facility and the release of security interests, liens, and mortgages resulting therefrom.

(b)    **Junior Lien Priority.** Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, perfected, enforceable, and non-avoidable junior security interests, liens

and mortgages on all of the Obligors' now existing or hereafter acquired Collateral that was subject to valid, perfected, enforceable, and non-avoidable security interests, liens, or mortgages in existence on the Petition Date or that is subject to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and that have priority to the Lenders under applicable law, in each case, subject only to such valid, perfected, enforceable, and non-avoidable senior security interests, liens, or mortgages and any other Permitted Liens that, pursuant to the DIP Credit Agreement, are permitted to be senior in priority to the DIP Liens.

(c) **Lien on Main Operating Account.** Notwithstanding anything to the contrary above or otherwise, the DIP Liens shall include valid, binding, perfected, enforceable, and non-avoidable liens and fully-perfected security interests in the Debtors' "Main Operating Account" as defined in the cash management motion filed on April 16, 2009 in these cases and any successor or replacement account (the "**Main Operating Account**"), as well as the funds in such account, subject and junior only to the liens securing the Adequate Protection Obligations as set forth in paragraph 8(a) below; provided that, until this Court orders otherwise, to preserve the asserted setoff rights of U.S. Bank N.A. ("**U.S. Bank**") in the Main Operating Account, any lien granted to a Lender or any other party shall be subordinated to U.S. Bank's asserted claim to $1,717,336.18 in the Main Operating Account; provided, further, that (i) the rights of any parties in interest to object to U.S. Bank's asserted setoff rights, its claims, and the forms of relief noted herein are expressly preserved and (ii) the Debtors' rights, generally, with respect to the Bank Accounts maintained at U.S. Bank are expressly preserved; provided, further, that other than holders of the Adequate Protection Obligations, the Agent, and the Lenders, no other Person shall have any lien or security interest in the Main Operating Account or in any

funds in the Main Operating Account.  Notwithstanding the foregoing, the financial institution (the "**Bank**") at which the Main Operating Account is maintained is authorized to charge back, offset, expense or deduct from the Main Operating Account the service charges incurred by the Bank on account of the Debtors' cash management expenses, returned checks or other returned items, including, but not limited to, dishonored checks, wire transfers, drafts, ACH Transfers or other debits, regardless of whether such amounts were deposited prepetition and regardless of whether the returned items relate to prepetition or postpetition items, and that solely the normal service charges and fees (the "**Service Charges**") may be assessed and deducted in the ordinary course of business from funds held in the Main Operating Account, and the automatic stay provisions of section 362 of the Bankruptcy Code are modified to allow the Bank to assess and collect such charges, but the automatic stay shall remain in full force and effect for all other purposes as to the Bank, including, but not limited to, any setoff rights (other than with respect to the Service Charges) that the Bank may possess.  Should the Debtors transfer or otherwise utilize funds from the Main Operating Account outside of the Debtors' ordinary course of business, except as otherwise permitted under the DIP Credit Agreement or this Order, the Agent's valid, binding, perfected, enforceable, and non-avoidable liens and fully-perfected security interests in the Main Operating Account (subject and junior only to the liens securing the Adequate Protection Obligations as set forth in Paragraph 8(a) below), and all funds contained therein shall transfer and attach, on the same senior priority basis, to the Debtors' interest in such funds wherever deposited, in the proceeds and other assets created from any such use of the funds held in the Main Operating Account outside the ordinary course of the Debtors' business.  During the existence of an Event of Default, all amounts held in the Main Operating Account or any Cash Collateral Account (other than amounts held in the Main Operating Account subject to the Liens

in favor of the Adequate Protection Parties), at the election of the Agent, shall be applied as required by section 11.2(e) of the DIP Credit Agreement; provided, however, that notwithstanding the existence of an Event of Default or an acceleration of the Obligations, funds that are not subject to the first lien of the Agent shall not be transferred out of the Main Operating Account other than for ordinary course expenditures to protect and preserve the Collateral (including all documented payroll expenses (including benefits), operating expenses of the Properties, taxes, insurance premiums, ground rents with respect to the Properties, and cash management, in each case, in the ordinary course of business) and the Adequate Protection Payments); provided further, that notwithstanding the existence of an Event of Default or an acceleration of the Obligations, the Debtors may continue to use Cash Collateral so long as such Cash Collateral that is subject to the liens of the Adequate Protection Parties is applied to the Adequate Protection Obligations.

(d)      **General Priority of DIP Liens.**  Subject to the provisions above (including the liens securing the Goldman Facility Indemnity set forth in Paragraph 4 and the Adequate Protection Obligations set forth more particularly in section 8(a) below), the DIP Liens shall, subject to the provisions of the Carve-Out, be at all times senior to the rights of the Debtors, their estates, and all of their creditors, and shall at all times be senior to the rights of any successor trustee, examiner, or responsible person in these or any subsequent proceedings under the Bankruptcy Code.

(e)      **Perfection of Post-Petition Liens.**  The Agent shall not be required to file financing statements, mortgages, notices of liens, or other documents in any jurisdiction or take any other action in order to validate, perfect, or establish the priority of the DIP Liens granted to them by this Order or the DIP Loan Documents.  The DIP Liens granted in

this Order and in the DIP Loan Documents to secure repayment of any of the Obligations are deemed perfected hereby and no further notice, filing or other act shall be required to effect such perfection. If the Lenders shall, in their sole discretion, choose to file (in accordance with the terms and conditions set forth in the DIP Loan Documents) financing statements, mortgages, or other documents or otherwise confirm perfection of such security interests, liens, and mortgages, the Lenders are authorized (to the extent not prohibited by the DIP Loan Documents) to effect such filings and recordings and all such financing statements, mortgages, or similar documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Order. A photocopy of this Order may, in the discretion of the Lenders, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, notices of lien or similar instruments, and all filing offices are directed hereby to accept such copy of this Order for filing and recording.

7.     **Superpriority Administrative Claim Status.** The Obligations and the Debtors' use (if any) of Cash Collateral pursuant to the Carve-Out or otherwise pursuant to this Order shall constitute an administrative expense under section 364(c)(1) of the Bankruptcy Code, with priority, subject to the section 507(b) claims of the Adequate Protection Parties as set forth in paragraph 8(b) below and the provisions of the Carve-Out, over all other claims or costs or expenses of administration of the kinds specified in, or ordered pursuant to, any provision of the Bankruptcy Code (the "**Superpriority Administrative Claim**"), and shall at all times be senior to the rights of the Debtors or any successor trustee, examiner, or responsible person in these or any subsequent proceedings under the Bankruptcy Code. With the exception of the fees and expenses permitted by the Carve-Out, no costs or expenses of administration that have been or may be incurred in these cases, any conversion of any of these cases pursuant to sections 105 or

1112 of the Bankruptcy Code or otherwise, or in any other future proceedings related hereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lenders against the Debtors arising out of loans and extensions of credit or other financial accommodations made by the Lenders to the Debtors.

8. **Use of Cash Collateral and Adequate Protection Parties.** Holders of claims against any of the Debtors, which claims are secured by the "Shopping Center Properties," as such term is defined in the DIP Motion, or in any other real property of a Debtor whose cash constitutes Cash Collateral and whose cash the Debtors use (such properties collectively, the "**Adequate Protection Properties**" and such claimholders collectively, the "**Adequate Protection Parties**"), are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in their respective prepetition collateral including the Cash Collateral (collectively, the "**Prepetition Collateral**"), for and equal in amount to the aggregate diminution in the value of the Adequate Protection Parties' interest in the Prepetition Collateral as may be determined by the Court (the "**Aggregate Value Diminution**"). Pursuant to the terms and conditions of this Order and the DIP Loan Documents, each Debtor is authorized to use all Cash Collateral, wherever it may be located and regardless of whether it is in an account controlled by any Adequate Protection Party. All Adequate Protection Parties are ordered to relinquish control over all Cash Collateral to the Debtors and shall not interfere with any effort by the Debtors or their banks to redirect Cash Collateral to the Main Operating Account. As adequate protection, the applicable Adequate Protection Parties are hereby granted the following (collectively, the "**Adequate Protection Obligations**"):

(a) **Adequate Protection Liens.** Each applicable Adequate Protection Party is hereby granted (effective and perfected upon the date of this Order and without the necessity

of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements) (i) a continuing, valid, binding, enforceable, and automatically perfected postpetition first-priority security interest in, and lien on (A) the Intercompany Claims (as defined in the DIP Motion) that its respective Debtor receives on account of the net cash that flows into the Debtors' centralized Cash Management System and (B) the Main Operating Account (the "**Adequate Protection First Liens**") and (ii) upon the repayment in full of the Goldman Indebtedness pursuant to Paragraph 4 of this Order, a second-priority lien on the properties currently securing the Prepetition Goldman Facility (the "**Adequate Protection Second Liens**"), which liens shall be junior to (a) the DIP Liens and (b) the Goldman Facility Indemnity Lien, in each case of (A) and (B) above, in an amount equal to the lesser of (x) the Aggregate Value Diminution (after taking into account the value of the Prepetition Collateral) and (y) the postpetition net positive balance of the Intercompany Claim of the Debtor whose property constitutes Prepetition Collateral of the Adequate Protection Party (the Adequate Protection First Liens and the Adequate Protection Second Liens granted to each Adequate Protection Party pursuant to this paragraph, collectively, the "**Adequate Protection Liens**"); provided, however, that the Adequate Protection Liens shall be subject and subordinate only to any liens on the Collateral that are senior to, or pari passu with, the Prepetition Liens and the Carve-Out, and provided further, however, that notwithstanding the above, the Adequate Protection Second Liens shall be subject and subordinate to the DIP Liens and the Goldman Facility Indemnity Lien.  Whether or not payments on account of the Adequate Protection Obligations are made, the holders of the Adequate Protection Second Liens shall not be entitled to exercise any rights or remedies with respect to the Adequate Protection Second Liens until the Obligations have been paid in full in cash or converted to equity and/or post reorganization debt

in the manner contemplated by the DIP Credit Agreement.  Notwithstanding anything set forth herein, until the DIP Obligations are paid in full, the Debtors shall not use the Collateral or the sale proceeds thereof to pay the Adequate Protection Obligations.  The Adequate Protection Liens of holders of M&M Liens shall secure only interest that may accrue under applicable law on account of the claims secured by such M&M Liens.

(b)     **Section 507(b) Claims of Adequate Protection Parties.**  The applicable Adequate Protection Parties are hereby granted, subject to the payment of the Carve-Out, allowed superpriority claims as and to the extent provided for in sections 503(b) and 507(b) of the Bankruptcy Code, senior to the claims under section 364(c)(1) of the Bankruptcy Code held by the Lenders.

(c)     **Interest; Operation of Properties.**  As adequate protection, and prior to acceleration of the Term Loan, except as provided in Paragraph 6(c) hereof:  (i) each applicable Adequate Protection Party shall continue to receive from the Debtors current payment of interest (whether attributable to interest owed prepetition or postpetition) at the non-default contract rate set forth in such Adequate Protection Party's respective credit documentation (the "**Adequate Protection Payments**"); provided, however, that:  (i) the Debtors expressly reserve all rights in respect of the application of such payments to a respective Adequate Protection Party's claim pursuant to section 506 of the Bankruptcy Code or otherwise; (ii) the Debtors will continue to operate the respective Adequate Protection Properties in the ordinary course of business and pay in the ordinary course of business the necessary postpetition costs and expenses of operating and maintaining the Adequate Protection Properties; and (iii) the Debtors shall pay the prepetition and postpetition property taxes relating to the Adequate Protection Properties.

(d)    **Lease and REA Related Obligations.**  As additional adequate protection, each Debtor and Adequate Protection Party shall comply with the terms of the *Final Order Approving Debtors' Motion to (I) Honor Tenant Obligations and (II) Authorize Financial Institutions to Honor Related Checks and Transfers* entered substantially contemporaneously herewith.

(e)    **Financial Reporting.**  As additional adequate protection, the Debtors shall provide to each Adequate Protection Party and the holder of each Prepetition Lien secured by any Negative Pledge Property (the "**Mezzanine Lenders**") (provided that the Mezzanine Lenders shall not be construed as Adequate Protection Parties for the purposes of this Order) (i) such financial reporting as was required prepetition under each Adequate Protection Party's first mortgage document(s) as the same were in place at origination of the related loans (without giving effect to any reporting obligations required following an event of default under such documents) and (ii) a monthly summary of the cash balance in the Main Operating Account and a monthly summary of the Intercompany Claims then outstanding; provided, that in instances where such documents require the Debtors to provide audited financial statements for the property owning entity, the Debtors will provide unaudited information. Any financial reports provided by the Debtors pursuant to this paragraph 8(e) shall be simultaneously provided to counsel to the Lenders and counsel to the Creditors' Committee.

9.    **Carve-Out**.  The DIP Liens, the Adequate Protection Liens, and the Superpriority Administrative Claim shall be subject to:  (i) any unpaid fees due to the United States Trustee pursuant to section 1930 of title 28 of the United States Code or otherwise and any fees due to the Clerk of the Court of the United States Bankruptcy Court for the Southern District of New York; (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of

the Bankruptcy Code in an amount not exceeding $500,000 (the "**Chapter 7 Carve-Out**"); (iii) the reasonable expenses of members of any statutory committee (excluding fees and expenses of professional persons employed by such committee members individually); (iv) to the extent allowed at any time, all unpaid fees and expenses allowed by the Bankruptcy Court of professionals or professional firms retained pursuant to section 327 or 1103 of the Bankruptcy Code (the "**Professional Persons**") through the date of the acceleration of the maturity of the Term Loan; and (v) after the date of acceleration of the maturity of the Term Loan, to the extent allowed at any time, the payment of the fees and expenses of Professional Persons in an aggregate amount not to exceed $25 million minus the Chapter 7 Carve-Out (plus the amounts specified in items (i) through (iv) hereof) (the amount of all such permitted uses being defined herein as the **"Carve-Out"**).  The Carve-Out shall exclude any fees and expenses incurred in connection with (a) any action or inaction that is in violation of or a default under any of the DIP Documents or this Order or (b) the assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (x) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the Obligations, (ii) the DIP Liens, or (iii) any of the Agent's or Lenders' rights under the DIP Documents or (y) preventing, hindering, or delaying, whether directly or indirectly, the Agent's or Lenders' assertion or enforcement of the DIP Liens or realization upon any Collateral.

    10.  **Authorization to Use Proceeds of DIP Loan Documents.**  To the extent that the Lenders make advances or extend credit under this Order and the DIP Credit Agreement, the Debtors shall use such loans, and shall otherwise use their Cash Collateral and other assets, solely in a manner that is consistent with the terms of this Order and the DIP Loan Documents.

So long as the Term Loan has not been accelerated, the Debtors are hereby authorized to use any cash proceeds of the Collateral as provided in this Order and the DIP Loan Documents.

11.     **Limitations on the Use of Proceeds.**  No proceeds of loans or other financial accommodations made by the Lenders hereunder, and no Cash Collateral (including the Carve-Out), may be used to compensate services rendered or expenses incurred in connection with, directly or indirectly, (i) the modification, stay, or amendment of this Order without the consent of the Lenders or (ii) a violation, breach, or default of this Order or any of the DIP Documents, including, without limitation, any claim or action the purpose of which is to seek or the result of which would be to obtain any relief (a) invalidating, setting aside, avoiding, or subordinating, in whole or in part, any of the Obligations or the DIP Liens in the Collateral or (b) preventing, hindering, or otherwise delaying, whether directly or indirectly, the Lenders' or the Agent's assertion, enforcement, or realization upon any Collateral as permitted by this Order or such documents.

12.     **Sale of the Collateral and Resulting Proceeds.**  Any proceeds of the sale, lease, or other disposition of the Collateral shall be applied in the manner consistent with this Order and the terms of the DIP Loan Documents, and the Debtors hereby irrevocably waive any right to direct the manner or application of any payments to the Lenders or any other receipts by the Lenders of proceeds of the Collateral contrary to the provisions of the DIP Loan Documents.  The Debtors may not sell any Collateral unless the proceeds of the sale of the Collateral are applied in accordance with the terms of the DIP Credit Agreement.

13.     **Enforcement of Remedies.**

(a)     Upon an Event of Default or the occurrence of the Maturity Date, the Lenders shall have the right to demand immediate payment in full in cash of all of the non-

contingent Obligations.  In the absence of immediate and full payment in cash of all of the Obligations at 9:00 a.m. (New York time) on the fifth (5th) Business Day after the date on which the Agent shall have given written notice (by facsimile or otherwise) to the Debtors and their counsel, counsel of record for the Creditors' Committee, the parties listed on the Adequate Protection Exhibit (as may be amended or supplemented in accordance with Paragraph 17(j) herein) (the "**Order Amendment Notice Parties**") and the United States Trustee of the Agent's intention to exercise and enforce the rights granted to the Lenders under the DIP Documents, this Order, and applicable law, the automatic stay is hereby deemed vacated, and the Agent shall be permitted to exercise such rights and remedies under such agreements, documents, and applicable law as to all or such part of the Collateral as the Agent shall, in its sole discretion, elect, including, but not limited to, the Agent's right to foreclose on the mortgages placed on the Primary Properties under this Order and the DIP Loan Documents.  Upon such enforcement by the Agent, the Debtors shall cooperate with the Agent in the disposition of the Collateral and shall not otherwise interfere or actively encourage others to interfere with the Agent's enforcement of its rights.

(b)  Upon receipt of written notice by counsel to the Debtors and counsel to the Creditors' Committee of an Event of Default of any of the Debtors' Obligations, the Lenders and/or the Agent, as applicable, may immediately charge interest at the Default Rate set forth in the DIP Credit Agreement.

14.  **Enforcement of Remedies in the Bankruptcy Court.**  In addition to the remedies set forth in the DIP Loan Documents and to provide for an orderly disposition of the Collateral, upon an occurrence and during the continuation of an Event of Default and written request by the Agent to counsel to the Debtors (with a copy delivered simultaneously to counsel

to the Creditors' Committee), the Debtors shall, at the sole expense of the Debtors' bankruptcy estates and on such terms as set forth by the Agent, file: (i) a motion or motions seeking to sell, assume and assign, or otherwise dispose of any or all of the Collateral as the Agent may direct pursuant to sections 363 and 365 of the Bankruptcy Code; and (ii) any further motions necessary to maximize the value received from the sale or disposition of the Collateral, including, but not limited to, motions to retain any additional professionals to assist the Debtors in the sale of the Collateral. The Debtors shall file any such motions within five (5) Business Days after the Agent's request and shall diligently prosecute all such motions. If the Debtors fail to so file or diligently pursue such motions, the Agent may file and prosecute such motions in the name of and at the expense of the Debtors, and the Agent is hereby specifically given such authority and standing. In the event of any sale or disposition of the Collateral in accordance with this paragraph or otherwise, the Agent shall have the right to credit bid any or all of the Obligations under section 363(k) of the Bankruptcy Code.

15. **Reliance by Lender.** The Debtors shall not seek to modify, vacate, or amend this Order without the written consent of the Agent. If any or all of the provisions of this Order are hereafter modified, vacated, or stayed by subsequent order of this or any other Court, such stay, modification, or vacation shall not affect the validity of any debt to the Lenders incurred pursuant to this Order or the DIP Documents prior to the later of (i) the effective date of such stay, modification, or vacation and (ii) receipt of written notice thereof by counsel to the Agent at the addresses set forth in section 15.7 of the DIP Credit Agreement (the "**Effective Time**"), or otherwise affect the validity and enforceability of any DIP Lien or priority authorized hereby. Notwithstanding any such stay, modification, or vacation, any advances of funds made

pursuant to this Order by the Lenders to or for the benefit of the Debtors prior to the Effective Time shall be governed in all respects by the original provisions of this Order.

16.    **Good Faith**.  The Court has considered and determined the matters addressed in this Order pursuant to its power under section 364(c) of the Bankruptcy Code to authorize the Debtors to obtain credit and other financial accommodations on the terms agreed to by and between the Debtors and the Lenders and as set forth in this Order, the DIP Credit Agreement, and the other DIP Documents, and thus, each of the terms and conditions of the DIP Documents, as part of an authorization under such section, is subject to the protections contained in section 364(e) of the Bankruptcy Code.

17.    **Miscellaneous**.

(a)    **Section 364 Waiver.**  In consideration of the financing and other accommodations made available pursuant hereto, the Debtors irrevocably waive any right to: (i) grant or impose, or request that the Court grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens, security interests, or mortgages on any property, equal or superior to the priority of the DIP Liens, except as provided under the Carve-Out and the DIP Loan Documents (including the Adequate Protection Obligations); and (ii) seek authority to use Cash Collateral as defined in section 363 of the Bankruptcy Code other than as permitted by this Order, the DIP Credit Agreement, and the other DIP Loan Documents.  Upon the acceleration of the Term Loans, the Debtors' right to use Cash Collateral shall permanently cease and all such Cash Collateral shall be applied solely to the Obligations.  Such waiver shall be binding upon any successor trustee, examiner, or responsible person in these or any subsequent proceedings under the Bankruptcy Code.

**(b)** **Modification of the Automatic Stay.** The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified as to the Agent to the extent necessary to permit the Agent to implement the provisions of this Order and the DIP Documents, thereby permitting the Agent, inter alia, (i) to receive and apply collections, payments, or proceeds of Collateral, (ii) to file any financing statements or other instruments and documents, if any, evidencing its security interests in and liens and mortgages on the Collateral, in each case, to the extent permitted by, and in accordance with, the DIP Loan Documents; (iii) to charge any fees and interest accruing under the DIP Loan Documents, and (iv) to take any or all of the actions permitted by the DIP Documents and this Order upon an Event of a Default or following acceleration of the Term Loan (<u>provided</u>, <u>however</u>, the Agent shall comply with the notice requirements of Rule 4001-2 of the Local Rules of Bankruptcy Procedure for the Southern District of New York).

**(c)** **Prohibition of Alterations to Lenders Rights Under the DIP Documents.** The DIP Liens and rights, remedies, and benefits granted to the Agent pursuant to this Order and the DIP Documents shall not be modified, altered, or impaired in any manner by any plan of reorganization or order of confirmation for any of the Debtors, or by any other financings of, extensions of credit to, or incurring of debt by any of the Debtors, whether pursuant to sections 363 or 364 of the Bankruptcy Code, or otherwise, or by any other order of this Court. In connection therewith, no order (i) converting the chapter 11 case of any of the Major Entities under sections 105 or 1112 of the Bankruptcy Code or otherwise shall be entered unless such order expressly provides, prior to any other relief set forth therein, for the final payment in full in cash of all of the non-contingent Obligations and treatment of the contingent Obligations in accordance with the provisions the DIP Credit Agreement, unless such Debtor

would cease to be a Major Entity upon giving effect to transactions permitted under Section 9.8 of the DIP Credit Agreement, provided that any mandatory prepayments required under Section 3.3 of the DIP Credit Agreement shall occur substantially contemporaneously with or prior to such dismissal; or (ii) confirming any plan in any of the Major Entities' chapter 11 cases shall be entered unless such order and such plan provides for the final payment in full in cash of all the non-contingent Obligations and treatment of contingent Obligations in accordance with the provisions of the DIP Loan Documents on or before the effective date of such plan or, as of such time, the conversion of certain Obligations to equity and/or post reorganization indebtedness in the manner contemplated by the DIP Credit Agreement. The DIP Credit Agreement and the other DIP Documents are, to the extent applicable, hereby assumed, and none of such agreements may be rejected, abrogated, or disaffirmed in these or any subsequent proceedings under the Bankruptcy Code, including the conversion of any of these cases.

**(d)** **Prohibitions In the Event of Dismissal of Any of the Cases.**

Except to the extent provided in the DIP Loan Documents, the Debtors shall not seek dismissal of any of the chapter 11 cases of the Major Entities unless and until all of the non-contingent Obligations shall have been finally paid in full in cash or, as of such time, converted to equity and/or post reorganization indebtedness in accordance with the provisions of, and in the manner contemplated by, the DIP Credit Agreement, unless such Debtor would cease to be a Major Entity upon giving effect to transactions permitted under Section 9.8 of the DIP Credit Agreement; provided that any mandatory prepayments required under Section 3.3 of the DIP Credit Agreement shall occur substantially contemporaneously with or prior to such dismissal. If an order dismissing any of the cases of the Debtors under section 1112 of the Bankruptcy Code or otherwise is at any time entered: (i) the priority claims and DIP Liens granted to the Agent

pursuant to this Order and the DIP Loan Documents in the Collateral of such Debtor shall continue in full force and effect and shall maintain their priorities as provided in this Order until the Obligations shall have been finally paid in full in cash, or converted to equity in the manner contemplated by the DIP Credit Agreement; (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of interpreting this Order; and (iii) such order shall not modify the rights granted to the Lenders pursuant to this paragraph.

(e) **Section 506(c) Waiver.** No costs or expenses of administration shall be imposed against the Agent or the Lenders, the Obligations, or the Collateral in respect of the DIP Loan Documents under section 506(c) of the Bankruptcy Code or otherwise, and no action or inaction on the part of the Agent or the Lenders shall be deemed to constitute a consent to such surcharge.

(f) **Section 552(b) Waiver.** The Agent and Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Agent and the Lenders with respect to proceeds, product, offspring or profits of any of the Collateral.

(g) **No Marshaling.** The Agent and the Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.

(h) **Amendment.** The Debtors and the Agent may amend or waive any provision of the DIP Documents without the need for further approval from this Court provided that: (i) the DIP Documents, as so modified, are not materially different from the DIP Documents approved in this Order; (ii) notice of all amendments to the DIP Documents are filed with the Court; and (iii) notice of all amendments to the DIP Documents (other than those that

are ministerial or technical and do not adversely affect the Debtors) is provided five (5) Business Days' in advance to counsel to the Creditors' Committee (the "**Amendment Notice Period**"), all parties requesting notice in these cases, the Order Amendment Notice Parties, and the United States Trustee; <u>provided</u>, <u>however</u>, that if the Creditors' Committee notifies the Debtors and the Agent that it objects to such an amendment within the Amendment Notice Period, such amendment shall not become effective absent entry of an Order of the Court authorizing such amendment unless such objection is resolved or withdrawn.

(i)     **Amendment of Organic Documents.**  Each Debtor shall, and shall cause each applicable entity that it controls to, implement any necessary amendment to its certificate of incorporation, bylaws or comparable governing documents such that ownership of (1) any equity securities issued in connection with the provisions of the DIP Documents (including the conversion of all or a portion of the Term Loan, any accrued and unpaid interest, and the Exit Fee into equity and/or post reorganization indebtedness into equity under the terms therein) and (2) any other equity securities received in respect of pre-petition securities of the Debtors owned by the Lenders will not, in any case, (A) violate any applicable limitations on ownership, and (B) have any adverse consequences under any provisions in such governing documents or any shareholder rights plan or similar arrangements.

(j)     **Amendment of Adequate Protection Party Exhibit.**  The Adequate Protection Party Exhibit filed as an exhibit to the Debtors' Reply, dated May 6, 2009, may be amended, <u>provided that</u> such exhibit, as so amended, shall be served within two (2) business days therefrom on (a) the U.S. Trustee, (b) the Adequate Protection Parties, (c) the Creditors' Committee, and (d) the Lenders.  To the extent the Debtors are required to make any Adequate Protection Payments to any Adequate Protection Party, the Debtors shall rely on the

contact and/or payment information contained in the Adequate Protection Party Exhibit. Any

Adequate Protection Party who wishes to revise the contact information contained in the

Adequate Protection Party Exhibit shall notify the Debtors in writing of such change and, to the

extent one Adequate Protection Party seeks to replace another, such Adequate Protection Party

shall also provide notice to the Adequate Protection Party to be replaced (the "**Replacement**

**Notice**") which Replacement Notice shall be countersigned by the Adequate Protection Party to

be replaced or such other arrangement as the Debtors may determine in their sole discretion shall

be acceptable to evidence the replacement of the applicable Adequate Protection Party.

      **(k)**     **Reimbursement of Costs and Expenses.** The Agent and Lenders

shall be promptly reimbursed by the Debtors without further motion to, hearing by, or order of

this Court for all reasonable out-of-pocket costs and expenses (including, without limitation, all

filing and recording fees, attorneys' and paralegals' fees and expenses, and out-of-pocket

expenses) (the "**Expense Reimbursement**"), in each case, as provided for in the DIP

Documents; <u>provided</u>, <u>however</u>, that the Agent shall serve, by facsimile or electronic mail, each

Expense Reimbursement on the United States Trustee, counsel to the Debtors, and counsel to the

Creditors' Committee (the "**Expense Reimbursement Notice Parties**"). If, after ten (10)

Business Days after receipt by the Expense Reimbursement Notice Parties of any Expense

Reimbursement, the Expense Reimbursement Notice Parties do not deliver to the Agent an

objection to the reasonableness of such Expense Reimbursement, then the Debtors shall

promptly pay the Agent and the Lenders such Expense Reimbursement.

      **(l)**     **Releases.** The Debtors hereby each release and discharge the

Agent, the Lenders, and their attorneys, officers, directors, affiliates, agents, and employees (the

"**Lender Parties**") from any and all claims and causes of action arising out of the Lender

Parties' relationship with any of the Debtors in connection with, in any manner directly or indirectly, the Loan Documents, this Order, the negotiation of any of the foregoing, or any action or inaction in connection therewith or the facilities, consideration, agreements, documents, or reimbursements related to the foregoing.

(m) **No Third Party Beneficiary.** No party not referenced in this Order is intended to be or shall be deemed to be a third party beneficiary of the provisions of this Order or any of the DIP Documents.

(n) **Action by Lenders.** Any action authorized to be taken on behalf of the Lenders as a whole by the Majority Lenders or by the Agent pursuant the terms of any of the DIP Documents shall be deemed to be the action of the Lenders under this Order.

(o) **Amendment of Order.** The Debtors shall, with the consent of the DIP Lenders, be entitled to amend this Order so as to make any non-substantive, non-material changes, underline provided that the Debtors provide counsel to the Creditors' Committee and the Order Amendment Notice Parties five (5) Business Days' notice in advance of any such amendment (the "**Order Amendment Notice Period**") and the Debtors shall file such amended order with the Court; provided, further, that if the Order Amendment Notice Parties or the Creditors' Committee notify the Debtors and the Agent that it objects to such an amendment to the Order within the Order Amendment Notice Period, such amended Order shall not become effective absent entry of an Order of the Court authorizing such amendment unless such objection is resolved or withdrawn. Notice of any amendment of the Order shall be provided to all parties entitled to receive notice of such amended Order.

(p) **Order Controlling.** To the extent any terms of this Order are inconsistent with the terms set forth in the DIP Documents, the terms of this Order shall control.

18. **Limitations on Liens.** Notwithstanding anything in this Order, (including clause (viii) in the first paragraph of Paragraph 6 above), any order authorizing use of cash collateral entered prior to the date hereof, any Order entered approving the operation of the Debtors' cash management system (including docket #43), the DIP Credit Agreement and related documents to the contrary, the Debtors are not authorized to use distributions on account of the direct or indirect equity interests in GGP Ivanhoe, Inc., or its subsidiaries, including cash dividends, the equity interests, or any proceeds of the foregoing, to the extent subject to the lien of Ivanhoe Capital LP and nothing herein or in the other Orders and documents referred to above shall be deemed to authorize or grant a lien or security interest to, or encumbrance in favor of, any party in or on any of such property or any of the proceeds thereof or to eliminate, modify, subordinate or cut off any lien or security interest Ivanhoe Capital LP would otherwise have, if any, in such property or proceeds. The foregoing shall not prejudice the right of the Debtors and Ivanhoe Capital LP to seek further relief from the Court after notice to each other nor prevent GGP Limited Partnership or the any of the Debtors from using Ivanhoe Capital LP's cash collateral upon consent by Ivanhoe Capital LP.

19. **Immediate Effectiveness.** Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be valid and fully effective immediately upon its entry, and, upon such entry, shall be binding upon and inure to the benefit of the Agent, the Lenders, the Debtors, their estates, and their respective successors and assigns (including, without limitation, any trustee, examiner, or responsible person hereinafter appointed as a representative of any of the estates in these or any subsequent proceedings under the Bankruptcy Code), and the terms and provisions of this Order as well as the liens, security interests, and mortgages and other terms of

the DIP Credit Agreement and the other DIP Documents shall continue in these proceedings and any superseding proceedings under the Bankruptcy Code, and such liens, security interests, and mortgages shall maintain their priority as provided by this Order, until satisfied and discharged. This Order likewise shall be immediately binding and effective on the terms set forth above with respect to any other debtor that shall become part of the Case upon the filing of a bankruptcy petition or entry of the order for relief for such debtor, and, at such time, such debtor shall be deemed party to all of the DIP Documents; provided, however, that with respect to such subsequent debtor, subject to (x) the right of any party in interest to move, within 20 days after the date on which such subsequent debtor files its bankruptcy petition, to restrict the application of this Order to the subsequent debtor's case and (y) the Debtors' rights to object to such relief.

20. **Notice.** The Debtors shall, within three (3) Business Days, serve by mail a copy of this Order on the Notice Parties and any other persons which the Debtors know are entitled to notice under Bankruptcy Rule 4001(c). Any notice herein that is required to be provided to the Lenders or the Agent shall be provided to the following address:

> David M. Feldman
> Matthew J. Williams
> GIBSON, DUNN & CRUTCHER LLP
> New York Office:
> 200 Park Avenue
> New York, New York 10166-1093
> Telephone: (212) 351-4000
> dfeldman@gibsondunn.com
> mjwilliams@gibsondunn.com

Dated: New York, New York
     May 14, 2009

          */s/ Allan L. Gropper*
          UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1**

**TO BE FILED SEPARATELY**