# EXHIBIT 1

# DIP CREDIT AGREEMENT

**SENIOR SECURED DEBTOR IN POSSESSION CREDIT,
SECURITY AND GUARANTY AGREEMENT**

**dated as of _____, 2009**

**among**

**THE ENTITIES FROM TIME TO TIME PARTY HERETO AS LENDERS,
as the Lenders,**

**UBS SECURITIES LLC,
as the Lead Arranger,**

**UBS AG, STAMFORD BRANCH,
as the Agent,**

**GENERAL GROWTH PROPERTIES, INC.
and GGP LIMITED PARTNERSHIP,
as the Borrowers,**

**and**

**THE ENTITIES FROM TIME TO TIME PARTY HERETO AS GUARANTORS,
as the Guarantors**

# TABLE OF CONTENTS

Page

ARTICLE 1 INTERPRETATION OF THIS AGREEMENT ......................................................... 1

    Section 1.1    Definitions.................................................................................................. 1
    Section 1.2    Accounting Terms ................................................................................... 23
    Section 1.3    Interpretive Provisions .......................................................................... 23

ARTICLE 2 TERM LOAN; INTEREST AND FEES ............................................................. 24

    Section 2.1    Total Facility .......................................................................................... 24
    Section 2.2    Term Loan ............................................................................................... 24
    Section 2.3    Interest ..................................................................................................... 25
    Section 2.4    Exit Fees .................................................................................................. 26
    Section 2.5    Interest Limitation .................................................................................. 26
    Section 2.6    Agent's Fee. ............................................................................................ 26

ARTICLE 3 PAYMENTS AND PREPAYMENTS ................................................................. 27

    Section 3.1    Term Loan ............................................................................................... 27
    Section 3.2    Optional Prepayment of the Term Loan ................................................ 27
    Section 3.3    Mandatory Prepayments of the Term Loan ........................................... 27
    Section 3.4    Payments by the Borrowers ................................................................... 29
    Section 3.5    Apportionment, Application, and Reversal of Payments ...................... 29
    Section 3.6    Indemnity for Returned Payments ......................................................... 30
    Section 3.7    The Agent's Books and Records ............................................................ 30

ARTICLE 4 CASH COLLATERAL ACCOUNTS ................................................................. 30

    Section 4.1    Cash Collateral Accounts ...................................................................... 30

ARTICLE 5 TAXES, YIELD PROTECTION, AND ILLEGALITY ....................................... 32

    Section 5.1    Taxes ....................................................................................................... 32
    Section 5.2    Increased Costs and Reduction of Return .............................................. 33
    Section 5.3    Certificates of Lenders ........................................................................... 33
    Section 5.4    Replacement of Lenders ......................................................................... 34
    Section 5.5    Survival .................................................................................................. 34

ARTICLE 6 COLLATERAL ................................................................................................. 34

    Section 6.1    Grant of Security Interest ....................................................................... 34
    Section 6.2    Perfection and Protection of Security Interest ...................................... 36
    Section 6.3    Delivery of Mortgages ........................................................................... 37
    Section 6.4    Title to, Liens on, and Use of Collateral ............................................... 37

# TABLE OF CONTENTS
## (continued)

Section 6.5     Access and Examination; Confidentiality .......................................... 38
Section 6.6     Documents, Instruments, and Chattel Paper ................................... 39
Section 6.7     Right to Cure ....................................................................................... 39
Section 6.8     Power of Attorney ............................................................................... 39
Section 6.9     The Agent's and Lenders' Rights, Duties, and Liabilities ............... 39
Section 6.10    Site Visits, Observations, and Testing ............................................. 40
Section 6.11    Joinder of Subsidiaries ...................................................................... 40
Section 6.12    Voting Rights, etc. in Respect of Investment Property ................... 41
Section 6.13    Remedies .............................................................................................. 42

ARTICLE 7 BOOKS AND RECORDS; FINANCIAL INFORMATION; NOTICES ............. 42

Section 7.1     Books and Records ............................................................................. 42
Section 7.2     Financial Information .......................................................................... 42
Section 7.3     Notices to the Agent ........................................................................... 46

ARTICLE 8 GENERAL WARRANTIES AND REPRESENTATIONS ................................ 48

Section 8.1     Authorization, Validity, and Enforceability of this
                 Agreement and the Loan Documents; No Conflicts .......................... 48
Section 8.2     Validity and Priority of Security Interest; Administrative
                 Priority ................................................................................................. 48
Section 8.3     Corporate Name; Prior Transactions ............................................... 49
Section 8.4     Capitalization; Subsidiaries ............................................................. 49
Section 8.5     Material Agreements .......................................................................... 49
Section 8.6     Proprietary Rights .............................................................................. 50
Section 8.7     Litigation ............................................................................................. 50
Section 8.8     Labor Disputes ................................................................................... 50
Section 8.9     Environmental Laws .......................................................................... 50
Section 8.10    No Violation of Law ........................................................................... 51
Section 8.11    ERISA Compliance ............................................................................. 51
Section 8.12    Taxes ..................................................................................................... 52
Section 8.13    Regulated Entities .............................................................................. 52
Section 8.14    Use of Proceeds .................................................................................. 52
Section 8.15    Full Disclosure ................................................................................... 52
Section 8.16    Bank Accounts .................................................................................... 52
Section 8.17    Governmental Authorization .............................................................. 53
Section 8.18    First Lien Properties ........................................................................... 53
Section 8.19    Prior Lien Debt ................................................................................... 53
Section 8.20    Leases ................................................................................................... 54

# TABLE OF CONTENTS
## (continued)

Section 8.21    Title ........................................................................ 54
Section 8.22    Physical Condition ................................................. 54
Section 8.23    Management ........................................................... 54
Section 8.24    Condemnation ......................................................... 54
Section 8.25    Utilities and Public Access .................................... 54
Section 8.26    Separate Lots ......................................................... 55
Section 8.27    Permits; Certificate of Occupancy ....................... 55
Section 8.28    Ground Leased Property ........................................ 55
Section 8.29    Embargoed Person ................................................. 55
Section 8.30    Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws .............................. 56

ARTICLE 9 AFFIRMATIVE AND NEGATIVE COVENANTS ............................................. 56

Section 9.1    Existence and Good Standing ................................ 56
Section 9.2    Compliance with Law and Agreements; Maintenance of Licenses ............................................... 56
Section 9.3    Insurance ................................................................ 57
Section 9.4    Casualty and Condemnation ................................. 57
Section 9.5    Covenants with Respect to REA ............................ 58
Section 9.6    Environmental Laws .............................................. 59
Section 9.7    Compliance with ERISA ........................................ 60
Section 9.8    Mergers, Consolidations, Sales, Acquisitions ....... 60
Section 9.9    Transactions with Affiliates ................................... 62
Section 9.10    Business Conducted ............................................... 64
Section 9.11    Debt; Liens; No Negative Pledge .......................... 64
Section 9.12    New Subsidiaries ................................................... 67
Section 9.13    Use of Proceeds ..................................................... 67
Section 9.14    Investments ............................................................ 67
Section 9.15    Case Matters .......................................................... 68
Section 9.16    No Amendments or Advances of Prior Lien Debt ... 70
Section 9.17    Maintenance of Property; Compliance with Legal Requirements; Parking ........................................... 70
Section 9.18    Taxes and Other Claims ........................................ 70
Section 9.19    Leases .................................................................... 71
Section 9.20    Restricted Payments .............................................. 72

ARTICLE 10 CONDITIONS OF LENDING ................................................ 73

Section 10.1    Conditions Precedent to Making of Initial Term Loan ...................................................................... 73

100656687_1 (GGP_
DIP Credit
Agreement
051309).DOC

ARTICLE 11 DEFAULT; REMEDIES .................................................................. 75

Section 11.1    Events of Default ............................................................. 75
Section 11.2    Remedies ........................................................................ 78

ARTICLE 12 GUARANTY .............................................................................. 82

Section 12.1    Guaranty; Limitation of Liability ................................... 82
Section 12.2    Guaranty Absolute ......................................................... 83
Section 12.3    Waivers and Acknowledgments ..................................... 84
Section 12.4    Subrogation .................................................................... 85
Section 12.5    Guaranty Supplements ................................................... 86
Section 12.6    Continuing Guaranty; Assignments ................................ 86
Section 12.7    Limitation on Guaranty .................................................. 86

ARTICLE 13 AMENDMENTS; WAIVERS; PARTICIPATIONS; ASSIGNMENTS;
          SUCCESSORS ..................................................................... 87

Section 13.1    No Waivers; Cumulative Remedies .................................. 87
Section 13.2    Amendments and Waivers ............................................. 87
Section 13.3    Assignments; Participations .......................................... 87

ARTICLE 14 THE AGENT .............................................................................. 90

Section 14.1    Appointment and Authorization ..................................... 90
Section 14.2    Delegation of Duties ...................................................... 91
Section 14.3    Liability of the Agent ..................................................... 91
Section 14.4    Reliance by the Agent .................................................... 92
Section 14.5    Notice of Default ........................................................... 92
Section 14.6    Credit Decision .............................................................. 93
Section 14.7    Indemnification .............................................................. 93
Section 14.8    The Agent in Individual Capacity ................................... 94
Section 14.9    Successor Agent ............................................................ 94
Section 14.10   Withholding Tax ............................................................ 95
Section 14.11   Collateral Matters ......................................................... 96
Section 14.12   Restrictions on Actions by the Lenders; Sharing of
                Payments ....................................................................... 97
Section 14.13   Agency for Perfection .................................................... 98
Section 14.14   Payments by the Agent to the Lenders ........................... 98
Section 14.15   Concerning the Collateral and the Related Loan Documents ........... 98
Section 14.16   Relation Among the Lenders .......................................... 99

# TABLE OF CONTENTS
## (continued)

**ARTICLE 15 MISCELLANEOUS** ....................................................................................... 99

    Section 15.1      Cumulative Remedies ................................................................... 99

    Section 15.2      Severability ................................................................................... 99

    Section 15.3      Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver ................................................................................... 99

    Section 15.4      Waiver of Jury Trial .................................................................... 100

    Section 15.5      Survival ...................................................................................... 100

    Section 15.6      Fees and Expenses ...................................................................... 101

    Section 15.7      Notices ........................................................................................ 102

    Section 15.8      Waiver of Notices ....................................................................... 103

    Section 15.9      Binding Effect ............................................................................ 103

    Section 15.10     Indemnity of the Agent and the Lenders by the Obligors ............... 103

    Section 15.11     Limitation of Liability ................................................................ 104

    Section 15.12     Final Agreement .......................................................................... 104

    Section 15.13     Counterparts ................................................................................ 105

    Section 15.14     Captions ...................................................................................... 105

    Section 15.15     Agency of the General Partner for the Other Obligors ................... 105

    Section 15.16     Patriot Act .................................................................................. 105

    Section 15.17     Absence of Fiduciary Relationship; Affiliates; Etc. ....................... 105

    Section 15.18     Incorporation of Financing Order by Reference ............................. 106

    Section 15.19     Right to Publicize and Advertise ................................................. 106

    Section 15.20     Consent of the Agent and Lenders ............................................... 106

    Section 15.21     Lead Arranger. ............................................................................ 107

100656687_1 (GGP_
DIP Credit
Agreement
051309).DOC

<u>Schedules</u>:

| | | |
|---|---|---|
| Schedule 1.1A | — | Fee Properties |
| Schedule 1.1B | — | Guarantors |
| Schedule 1.1C | — | Leased Properties |
| Schedule 1.1D | — | Primary Properties |
| Schedule 3.1 | — | Debt to Equity Conversion Schedule |
| Schedule 6.1 | — | Commercial Tort Claims |
| Schedule 6.3 | — | Delivery of Mortgages |
| Schedule 8.3 | — | Prior Names |
| Schedule 8.4 | — | Capitalization |
| Schedule 8.5 | — | Material Agreements – Exceptions |
| Schedule 8.9 | — | Environmental Matters |
| Schedule 8.11 | — | ERISA Matters |
| Schedule 8.16 | — | Bank Accounts |
| Schedule 8.17 | — | Governmental Authorization – Exceptions |
| Schedule 8.18 | — | First Lien Properties |
| Schedule 8.19-1 | — | Prior Lien Debt |
| Schedule 8.19-2 | — | M&M Liens |
| Schedule 8.20 | — | Current Rent Roll |
| Schedule 8.20-1 | — | A/R Report |
| Schedule 8.21 | — | Title Exception Issues |
| Schedule 8.22 | — | Physical Condition – Exceptions |
| Schedule 8.23 | — | Management |
| Schedule 8.25 | — | Utilities and Public Access – Exceptions |
| Schedule 8.27 | — | Permits – Exceptions |
| Schedule 8.28 | — | Unrecorded Ground Leases |
| Schedule 9.3 | — | Insurance |
| Schedule 9.8 | — | Property Dispositions |
| Schedule 9.13 | — | Use of Proceeds – Debt |
| | == | |

<u>Exhibits</u>:

| | | |
|---|---|---|
| Exhibit A | — | Form of Continuation Notice |
| Exhibit B | — | Form of Financing Order |
| Exhibit C | — | Form of Funding Notice |
| Exhibit D | — | Form of Term Note |
| Exhibit E | — | Form of Compliance Certificate |
| Exhibit F | — | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit G | — | [Intentionally Omitted] |
| Exhibit H | — | Form of Guaranty Supplement |
| Exhibit I-1 | — | Form of Mortgage |
| Exhibit I-2 | — | Form of Deed of Trust |
| Exhibit J-1 | — | Form of Legal Opinion of Ronald L. Gern and Jeffrey Palkovitz |
| Exhibit J-2 | — | Form of Legal Opinion of Weil, Gotshal & Manges LLP |
| Exhibit K-1 | — | Form of Deed of Trust Subordination Agreement |
| Exhibit K-2 | — | Form of Mortgage Subordination Agreement |

# SENIOR SECURED DEBTOR IN POSSESSION
# CREDIT, SECURITY AND GUARANTY AGREEMENT

This Senior Secured Debtor in Possession Credit, Security and Guaranty Agreement, dated as of May [__], 2009, is made and entered into by and among the entities parties hereto as Lenders (as defined herein) from time to time, UBS AG, STAMFORD BRANCH, as administrative agent for the Lenders, GENERAL GROWTH PROPERTIES, INC., a Delaware corporation, as a co-Borrower, GGP LIMITED PARTNERSHIP, a Delaware limited partnership, as a co-Borrower, and the Subsidiaries of General Growth Properties, Inc. from time to time parties hereto as Guarantors (as defined herein).

## W I T N E S S E T H

A.        On April 16, 2009 (the "Petition Date"), the Borrowers and certain of the Guarantors filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, and have continued in the possession of their assets pursuant to Sections 1107 and 1108 thereof.  Each of the Guarantors is a Subsidiary of the Borrowers.

B.        The Borrowers have requested that the Lenders make a post-petition term loan (the "Term Loan") to the Borrowers consisting of a debtor-in-possession credit facility in an aggregate principal amount not to exceed $400,000,000, subject to this Agreement and, if and when entered, the Financing Order (as defined herein).

C.        The Lenders are severally, and not jointly, willing to extend such credit to the Borrowers under this Agreement upon the terms and subject to the conditions set forth in this Agreement and the Financing Order.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Lenders, the Agent (as defined herein), the Borrowers and the Guarantors hereby agree as follows:

## ARTICLE 1

## INTERPRETATION OF THIS AGREEMENT

Section 1.1        Definitions.  Capitalized terms wherever used in this Agreement shall have the following respective meanings.

"Account" means "accounts," as defined in the UCC, and any other rights to payment for the sale or lease of goods or rendition of services, whether or not they have been earned by performance, and "Accounts" means all of the foregoing.

"Additional Lender Amounts" has the meaning specified in Section 5.2.

"<u>Affiliate</u>" means, as to any Person (the "<u>subject Person</u>"), any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, the subject Person or which owns, directly or indirectly, 15.0% or more of the outstanding equity interests of the subject Person.  A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract, or otherwise.  Notwithstanding the foregoing, none of the Agent, the Lenders or any controlled Affiliate of the foregoing shall be Affiliates of any Obligor for any purpose of the Loan Documents.

"<u>Affiliate Investments</u>" has the meaning specified in <u>Section 9.9</u>.

"<u>Agent</u>" means UBS AG, Stamford Branch, solely in its capacity as administrative agent for the Lenders, and any successor agent.  References herein to "Agent" shall include each Person (if any) performing the duties of the Agent in accordance with <u>Section 14.2</u>.

"<u>Agent's Liens</u>" means the Liens in the Collateral granted to the Agent, for the benefit of the Lenders and the Agent, pursuant to this Agreement and the other Loan Documents.

"<u>Agent-Related Persons</u>" means the Agent, together with its Affiliates, and the officers, directors, employees, agents, sub-agents and attorneys-in-fact of the Agent and its Affiliates.

"<u>Agreement</u>" means this Senior Secured Debtor in Possession Credit, Security and Guaranty Agreement.

"<u>A/R Report</u>" has the meaning specified in <u>Section 8.20(b)</u>.

"<u>Assignee</u>" has the meaning specified in <u>Section 13.3(a)</u>.

"<u>Assignment and Acceptance</u>" has the meaning specified in <u>Section 13.3(a)</u>.

"<u>Automatic Stay</u>" means the automatic stay imposed under Section 362 of the Bankruptcy Code.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, and each successor statute thereto.

"<u>Bankruptcy Court</u>" has the meaning specified in Recital A of this Agreement.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, applicable to the Case.

"<u>Borrowers</u>" means the General Partner, as debtor and debtor in possession in the Case and GGPLP, as debtor and debtor in possession in the Case and the respective successors and assigns thereof, including, without limitation, any trustee in bankruptcy with respect thereto.

2

"Borrowing" means the borrowing hereunder consisting of the Term Loan made on the same date by the Lenders to the Borrowers.

"Breakage Costs" has the meaning specified in Section 3.4(c).

"Breakage Prepayment Account" has the meaning specified in Section 3.3(c).

"Business Day" means any day that is not a Saturday, Sunday, or a day on which banks in Chicago, Illinois or New York, New York are required or permitted to be closed; provided, however, that when used in connection with a LIBOR Rate determination in respect of the Term Loan, the term "Business Day" also shall exclude any day on which banks in London, England are not open for dealing in deposits of Dollars in the London interbank market.

"Capital Adequacy Regulation" means any guideline, request, or directive of any central bank or other Governmental Authority, or any other law, rule, or regulation, whether or not having the force of law, in each case, regarding capital adequacy of any bank or of any corporation controlling a bank.

"Capital Lease" means, with respect to any Person, any lease of property which, in accordance with GAAP, should be reflected as a capital lease on a balance sheet of such Person.

"Capital Stock" means any and all corporate stock, units, shares, partnership interests, membership interests, equity interests, rights, securities, or other equivalent evidences of ownership (however designated) issued by any Person.

"Carve-Out" has the meaning specified in the Financing Order.

"Case" means the jointly administered Chapter 11 case captioned *In Re: General Growth Properties, Inc., et al.*, Case No. 09-11977 (ALG) arising upon the filing by certain of the Debtors of voluntary petitions for relief with the Bankruptcy Court on the Petition Date.

"Cash Collateral Account" means, in respect of the Obligors (a) one or more deposit accounts maintained with U.S. Bank National Association or another Eligible Institution in accordance with this Agreement and (b) the Main Operating Account, which deposit accounts shall contain amounts transferred thereto in accordance with this Agreement and the other Loan Documents and, in the case of each of the foregoing clauses (a) and (b), with respect to which the Agent shall have a perfected Agent's Lien as security for the payment and performance of the Obligations by virtue of, and having the priority set forth in, the Financing Order.

"Cash Equivalents" means: (i) securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 12 months or less from the date of acquisition; (ii) certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any domestic or foreign commercial bank having capital and

3

surplus of not less than $500,000,000; (iii) repurchase obligations for underlying securities of the types described in clauses (i), (ii) and (iv) entered into with any financial institution meeting the qualifications specified in clause (ii) above; (iv) marketable short-term money market and similar securities having a rating of at least P-1 or A-1 from either Moody's Investors Service, Inc. ("Moody's") or Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency acceptable to the Majority Lenders) and in each case maturing within 12 months after the date of creation or acquisition thereof; (v) readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an investment grade rating from either Moody's or S&P with maturities of 12 months or less from the date of acquisition; (vi) Investments with average maturities of twelve months or less from the date of acquisition in money market funds rated within the top two ratings category by S&P or Moody's; and (vii) any other similar Investment permitted by the Bankruptcy Code or approved by the Bankruptcy Court.

"Cash Management Order" means the order of the Bankruptcy Court entered by the Court in respect of cash management of the Debtor.

"Casualty" means a fire, explosion, flood, hurricane, tsunami, collapse, earthquake or other casualty affecting all or any portion of any Property.

"Change in Control" means the occupation after the Closing Date of a majority of the seats (other than vacant seats) on the board of directors of the General Partner by Persons who were neither (a) nominated by the board of directors of the General Partner nor (b) appointed by directors so nominated.

"Charges" has the meaning specified in Section 2.5.

"Closing Date" means the date of this Agreement.

"Code" means the Internal Revenue Code of 1986 and the regulations promulgated thereunder.

"Collateral" has the meaning specified in Section 6.1(a).

"Commitment" means , at any time with respect to a Lender, the principal amount set forth beside such Lender's name under the heading "Commitment" on the signature page of this Agreement or on the signature page of the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder, or the most recent Assignment and Acceptance to which such Lender is a party, in accordance with the provisions of Section 13.3, as such Commitment may be adjusted from time to time in accordance with the provisions of Section 13.3, and "Commitments" means, collectively, the aggregate amount of the Commitments of all of the Lenders.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

"Commitment Letter" means the Commitment Letter dated as of May 12, 2009, among the Borrowers and the Initial Lenders.

"Compliance Certificate" has the meaning specified in Section 7.2(d).

"Condemnation" means a taking or voluntary conveyance of all or part of any of the Properties or any interest in or right accruing to or use of any of the Properties, as the result of, or in settlement of, any condemnation or other eminent domain proceeding by any Governmental Authority.

"Contaminant" means any substance, material or waste that is regulated, classified or otherwise characterized as a pollutant, hazardous substance, toxic substance, hazardous waste, including petroleum or petroleum derived substance or waste, asbestos, polychlorinated biphenyls, in each case to the extent regulated under any applicable Environmental Law.

"Continuation Date" means the effective date of a continuation as set forth in the applicable Continuation Notice.

"Continuation Notice" means a Continuation Notice substantially in the form of Exhibit A.

"Conversion Amount" has the meaning specified in Section 3.1.

"Debt" means, with respect to a Person without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property (other than trade payables and accrued expenses incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations in respect of Capital Leases of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit, surety bond or similar facilities, (g) Guaranties of such Person with respect to obligations of the type described clauses (a) through (f) above, (h) all obligations of other Persons of the kind referred to in clauses (a) through (g) above secured by any Lien on property owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, and (i) for the purposes of Section 11.1(d) only, the net obligations of such Person in respect of post-petition Hedge Agreements. The Debt of any Person shall include the Debt of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Debt expressly provide that such Person is not liable therefor.

"Debtor" means either Borrower, any Guarantor or any Negative Pledge Debtor that is a party to the Case.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

"<u>Debtors</u>" means the Borrowers, the Guarantors and the Negative Pledge Debtors that are party to the Case, collectively.

"<u>Default</u>" means any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured, waived pursuant to <u>Section 13.2</u>, or otherwise remedied during such time) constitute an Event of Default.

"<u>Default Rate</u>" means a per annum interest rate at all times equal to the sum of (a) the interest rate otherwise applicable to the Term Loan as set forth in this Agreement or, if no principal amount of the Term Loan is then outstanding, the one-month LIBOR Rate plus 12.0% per annum, plus (b) (i) on or before the Outside Date, 2.0% per annum, and (ii) after the Outside Date, 3.0% per annum.

"<u>Disqualified Lender</u>" means (i) any Person identified to the Agent in writing prior to the date hereof, (ii) any Person which is primarily engaged in the ownership of retail malls in the United States at the time of the relevant assignment or participation which directly or indirectly compete with the Obligors, (iii) any direct competitor of the General Partner, any of its Subsidiaries and their respective affiliates or any affiliate of such direct competitor that controls, is controlled by or is under common control therewith, in each case engaged in the ownership of retail malls in the United States, and (iv) any REIT which is, or any affiliate that controls, is controlled by or is under common control therewith which is, at the time of any applicable assignment or participation primarily engaged in the business of owning or operating commercial real estate in the United States with commercial real estate assets having a value in excess of $2 billion; provided that neither any Market Maker nor any Lender (or any of its Affiliates) shall be a Disqualified Lender.

"<u>DOL</u>" means the United States Department of Labor or any successor department or agency.

"<u>Dollar</u>" and "<u>$</u>" means dollars in the lawful currency of the United States.

"<u>Eligible Assignee</u>" means: (a) a commercial bank, commercial finance company or other lender in the business of making secured loans having total assets in excess of $250,000,000, (b) any Lender listed on the signature page of this Agreement; (c) any Affiliate of any Lender; and (d) any other Person reasonably acceptable to the Agent; <u>provided that</u>, at any time on or prior to the Maturity Date, no Disqualified Lender may, without the Borrowers' prior written consent, be an Eligible Assignee unless the maturity of the Term Loan has been accelerated.

"<u>Eligible Institution</u>" means any depository institution as approved under or contemplated by the cash management order entered in the Case.

"<u>Embargoed Person</u>" has the meaning specified in <u>Section 8.29(a)</u>.

"<u>Entry Date</u>" means the date on which the Financing Order was entered on the docket of the Bankruptcy Court (the "<u>original entry date</u>") and, with respect to any wholly-owned

6

Subsidiary of the Borrowers or its property becoming subject to the Case after the original entry date, the date on which such Subsidiary or its property becomes subject to the Case.

"Environmental Compliance Issues" has the meaning specified in Section 9.6(a).

"Environmental Laws" means all applicable federal, state, or local laws, statutes, common law duties, rules, regulations, ordinances, and codes, together with all applicable administrative orders, licenses, authorizations and permits of, and legally binding agreements with, any Governmental Authority, in each case relating to the protection of the environment and natural resources or human health and safety with respect to exposure to contaminants.

"Environmental Lien" means a Lien in favor of any Governmental Authority for any liability under Environmental Laws.

"ERISA" means the Employee Retirement Income Security Act of 1974, and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Obligor within the meaning of Section 414(b) or (c) of the Code and Sections 414(m) and (o) of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Pension Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Pension Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (d) the incurrence by the Borrowers or any of their ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or the withdrawal or partial withdrawal of the Borrowers or any of their ERISA Affiliates from any Pension Plan or Multi-employer Plan; (e) the receipt by the Borrowers or any of their ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan; (f) the adoption of any amendment to a Pension Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; (g) the receipt by the Borrowers or any of their ERISA Affiliates of any notice, or the receipt by any Multi-employer Plan from the Borrowers or any of their ERISA Affiliates of any notice, concerning the imposition of withdrawal liability (as defined in Part I of Subtitle E of Title IV of ERISA) or a determination that a Multi-employer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) the occurrence of a "prohibited transaction" with respect to which the Borrowers or any of the Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which the Borrowers or any such Subsidiary could reasonably be expected to have a material liability; or (i) any other event or condition with respect to a Pension Plan or Multi-employer Plan that could result in liability of the Borrowers or any Subsidiary.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

"Event of Default" has the meaning specified in <u>Section 11.1</u>.

"Exchange Act" means the Securities Exchange Act of 1934, and regulations promulgated thereunder.

"Exit Fee" has the meaning specified in <u>Section 2.4</u>.

"Federal Funds Rate" means, for any day, the rate set forth in the weekly statistical release designated as H.15(519), or any successor publication, published by the Federal Reserve Bank of New York (including any such successor, "<u>H.15(519)</u>") on the preceding Business Day opposite the caption "Federal Funds (Effective)," or, if for any relevant day such rate is not so published on any such preceding Business Day, the rate for such day will be the arithmetic mean as determined by the Agent of the rates for the last transaction in overnight Federal funds arranged prior to 9:00 a.m. (New York City time) on that day by each of three leading brokers of Federal funds transactions in New York City selected by the Agent.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System or any successor thereto.

"Fee Properties" means the Real Estate properties owned in fee by a Debtor, which properties owned as of the Petition Date are listed on <u>Schedule 1.1A</u>.

"Financing Order" means the order of the Bankruptcy Court in the form of <u>Exhibit B</u> (except as may otherwise be agreed in writing or on the record at the final hearing with respect to such order in the Case by the Majority Lenders) entered in the Case after notice and any hearing pursuant to the Bankruptcy Rules and applicable local rules which, among other matters, authorizes the Obligors to obtain credit, incur (or guaranty) the Obligations and grant Liens under the Loan Documents and provides for the priority of the Agent's and the Lenders' claims, as the same may be modified or supplemented from time to time after the Entry Date with the written consent of the Majority Lenders.

"First Lien Properties" means all Properties set forth in <u>Schedule 8.18</u>, together with any Property of a wholly-owned Subsidiary that becomes a Guarantor after the Closing Date.

"Fiscal Quarter" means a period of three calendar months beginning on the first day of each January, April, July, and October, constituting a Person's fiscal quarter for financial accounting purposes, with the first of such measurement periods beginning on the first day of each Fiscal Year and the last of such measurement periods ending on the last day of such Fiscal Year.

"Fiscal Year" means, with respect to any Person, such Person's fiscal year for financial accounting purposes.

"Foreign Subsidiary" means any Subsidiary of an Obligor (i) that is not incorporated or organized under the laws of the United States, any State thereof or the District of Columbia, or (ii) that is a disregarded entity for U.S. federal income tax purposes, (A) which is treated for U.S.

8

federal income tax purposes as a division of an entity described in clause (i) above or (B) substantially all of the assets of which consist of the Capital Stock of Subsidiaries described in clause (i) above.

"Fraudulent Conveyance" has the meaning specified in Section 12.7.

"Funding Date" means the date on which the Borrowing occurs.

"Funding Notice" means a notice substantially in the form of Exhibit C.

"GAAP" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the United States accounting profession), as in effect from time to time.

"General Intangibles" means "general intangibles," as defined in the UCC, chooses in action and causes of action, and any other intangible personal property of every kind and nature (other than Accounts), including, without limitation, all contract rights, payment intangibles, Proprietary Rights, corporate or other business records, inventions, designs, blueprints, plans, specifications, patents, patent applications, trademarks, service marks, trade names, trade secrets, goodwill, copyrights, computer software, customer lists, registrations, licenses, franchises, tax refund claims, any funds which may become due to a Person in connection with the termination of any employee benefit plan or any rights thereto and any other amounts payable to a Person from any employee benefit plan, rights and claims against carriers and shippers, rights to indemnification, business interruption insurance and proceeds thereof, property, casualty or any similar type of insurance and any proceeds thereof, proceeds of insurance covering the lives of key employees on which a Person is beneficiary, rights to receive dividends, distributions, cash, instruments, and other property in respect of or in exchange for pledged equity interests or Investment Property, and any letter of credit, guarantee, claim, security interest, or other security held by or granted to a Person.

"General Partner" means General Growth Properties, Inc., a Delaware corporation and the general partner of GGPLP.

"GGPLP" means GGP Limited Partnership, a Delaware limited partnership.

"GGMI" means General Growth Management, Inc., a Delaware corporation.

"Gift Card and Lotto Accounts" means one or more deposit accounts established by the General Partner or any Subsidiary that are used exclusively to hold the proceeds of gift cards or lotto sales, respectively, which accounts shall not be included in the Collateral.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to government.

"Ground Lease" means each ground lease pursuant to which a Debtor is leasing Real Estate from another Person.

"Guaranteed Obligations" has the meaning specified in Section 12.1(a).

"Guarantor" means each of the Persons identified on Schedule 1.1B and any other wholly-owned Subsidiary that (a) ceases to be a Negative Pledge Debtor and/or (b) becomes a party to the Case. Notwithstanding anything else in this Agreement, no Foreign Subsidiary and no Negative Pledge Debtor shall be a Guarantor.

"Guaranty" means, with respect to any Person, all obligations of such Person which in any manner directly or indirectly guarantee or assure, or in effect guarantee or assure, the payment or performance of any indebtedness, dividend, or other obligations of any other Person (the "guaranteed obligations"), or assure or in effect assure the holder of the guaranteed obligations against loss in respect thereof, including any such obligations incurred through an agreement, contingent, or otherwise: (a) to purchase the guaranteed obligations or any property constituting security therefor; (b) to advance or supply funds for the purchase or payment of the guaranteed obligations or to maintain a working capital or other balance sheet condition; or (c) to lease property or to purchase any debt or equity securities or other property or services.

"Guaranty Supplement" has the meaning specified in Section 12.5.

"Hedge Agreements" means interest rate swap, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other hedging agreements.

"Improvements" means all buildings, structures and other improvements located on any of the Properties and owned by any Debtor from time to time.

"Initial Lender" means each of the Persons listed on the signature pages to this Agreement as an "Initial Lender."

"Insurance Requirements" means, collectively, (a) all material terms of any insurance policy required pursuant to this Agreement and (b) all material regulations and then current standards applicable to or affecting any of the Properties or any portion thereof or any use or condition thereof, which may, at any time, be recommended by the board of fire underwriters, if any, having jurisdiction over any of the Properties, or any other body exercising similar functions.

"Intercompany Subordination Agreement" means, collectively, that certain (i) Deed of Trust Subordination Agreement by and among the General Partner, GGPLP, Century Plaza, L.L.C., Century Plaza, Inc. and the Agent in the form of Exhibit K-1, and (ii) Mortgage

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

Subordination Agreement by and among the General Partner, GGPLP, Howard Hughes Properties, Inc., TRC and the Agent in the form of <u>Exhibit K-2</u>.

"<u>Interest Determination Date</u>" means, in connection with the determination of the LIBOR Rate for any Interest Period, the second Business Day preceding the first day of such Interest Period; <u>provided</u> that the initial Interest Determination Date under this Agreement shall be the Funding Date.

"<u>Interest Period</u>" means, a period of (i) one month or such shorter time period as may be consented to by Agent (such consent not to be unreasonably withheld) and (ii) with the consent of the Agent, one, two, three, six or, if acceptable to all Lenders, nine months as selected by Borrowers in the applicable Funding Notice or Continuation Notice (A) initially, commencing on the Funding Date or Continuation Date thereof, as the case may be; and (B) thereafter, commencing on the day on which the immediately preceding Interest Period expires; <u>provided</u>, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day, (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to <u>clause (c)</u> of this definition, end on the last Business Day of a calendar month, and (c) no Interest Period shall extend beyond the Outside Date.

"<u>Investment Property</u>" means "investment property," as defined in the UCC, and any (a) securities whether certificated or uncertificated, (b) securities entitlements, (c) securities accounts, (d) commodity contracts and (e) commodity accounts, together with all other units, shares, partnership interests, membership interests, equity interests, rights or other equivalent evidences of ownership (howsoever designated) issued by any Person.

"<u>Investments</u>" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (i) the purchase or other acquisition of Capital Stock or debt or other securities of another Person, (ii) a loan, advance or capital contribution to, Guaranty or assumption of Debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (iii) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person (other than purchases of (1) real property and related rights that are adjacent to or ancillary to any Property or (2) other assets ancillary to a Property of the Debtors or (3) the Capital Stock of a Person whose assets consist primarily of any of the foregoing). For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"<u>IRS</u>" means the Internal Revenue Service and any Governmental Authority succeeding to any of its principal functions under the Code.

11

"<u>Issuer</u>" has the meaning specified in <u>Section 6.2(c)</u>.

"<u>Knowledge</u>" means, with respect to any Obligor, the actual knowledge of the president, chief executive officer, chief financial officer, general counsel, vice president and associate general counsel of development and finance or the equivalent officer performing similar functions of any of the foregoing, in each case of such Obligor.

"<u>Lead Arranger</u>" means UBS Securities LLC, solely in its capacity as lead arranger under this Agreement.

"<u>Lease</u>" means any lease, sublease, sub-sublease, license, letting, concession, occupancy agreement or other agreement (whether written or oral and whether now or hereafter in effect) under which any Debtor is a lessor, existing as of the Closing Date or hereafter entered into by any Debtor, pursuant to which any other Person (including Affiliates of any Debtor) is granted a possessory interest in, or right to use or occupy all or any portion of any space in any of the Properties, and every modification, amendment or other agreement relating to such lease, sublease, sub-sublease, or other agreement entered into, in accordance with the terms of the Loan Documents, in connection with such lease, sublease, sub-sublease, or other agreement and all agreements related thereto, and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"<u>Leased Properties</u>" means the Real Estate leased by a Debtor, as lessee, pursuant to a Ground Lease which Real Estate leased as of the Petition Date is listed on <u>Schedule 1.1C</u>.

"<u>Legal Requirements</u>" means:  (a) all applicable and legally binding governmental statutes, laws, rules, orders, regulations, ordinances (including, without limitation, zoning and other similar ordinances), judgments, decrees and injunctions of Governmental Authorities (including Environmental Laws) affecting either a Debtor or the Property or any portion thereof or the construction, ownership, use, alteration or operation thereof, or any portion thereof (whether now or hereafter enacted and in force), and (b) all permits, licenses and authorizations and regulations relating thereto.

"<u>Lender</u>" means any Person, in its capacity as a lender hereunder and its successors and permitted assigns in such capacity as a lender, and "<u>Lenders</u>" means two or more of such Persons, collectively.

"<u>LIBOR Rate</u>" means the greater of (a) 1.50% per annum and (b) the rate per annum determined by the Agent to be the arithmetic mean of the offered rates for deposits in Dollars with a term comparable to such Interest Period that appears on the Telerate British Bankers Assoc. Interest Settlement Rates Page (as defined below) at approximately 11:00 a.m., London, England time, on the second full London Business Day preceding the first day of such Interest Period; *provided*, *however*, that (i) if no comparable term for an Interest Period is available, the rate per annum shall be determined by using the weighted average of the offered rates for the two terms most nearly corresponding to such Interest Period and (ii) if there shall at any time no longer exist a Telerate British Bankers Assoc. Interest Settlement Rates Page, the rate per annum

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

shall equal the rate at which the Agent is offered deposits in Dollars at approximately 11:00 a.m., London, England time, two London Business Days prior to the first day of such Interest Period in the London interbank market for delivery on the first day of such Interest Period for the number of days comprised therein. "Telerate British Bankers Assoc. Interest Settlement Rates Page" shall mean the display designated as Reuters Screen LIBOR01 Page (or such other page as may replace such page on such service for the purpose of displaying the rates at which Dollar deposits are offered by leading banks in the London interbank deposit market).

All percentages resulting from any calculations or determinations referred to in this definition will be rounded upwards to the nearest multiple of 1/1,000 of 1% and all United States dollar amounts used in or resulting from such calculations will be rounded to the nearest cent (with one-half cent or more being rounded upwards).

"Lien" means: (a) any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on the common law, statute, or contract, and including a security interest, charge, claim, or lien arising from a mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment, deposit arrangement, agreement, security agreement, conditional sale or trust receipt or a lease, consignment, or bailment for security purposes and (b) to the extent not included under clause (a) preceding, any reservation, exception, encroachment, easement, right of way, covenant running with the land, condition, restriction, lease, or other title exception or encumbrance affecting any Property, in each case excluding any zoning or similar law or right reserved to or vested in any Governmental Authority to contest or regulate the use of any Property.

"Loan Documents" means, collectively (a) the Financing Order, (b) this Agreement, (c) the Term Note and (d) any other agreements, instruments, and documents heretofore, now or hereafter evidencing, securing, guaranteeing, or otherwise relating to the Obligations or the Collateral.

"London Business Day" shall mean any day on which banks are generally open for dealings in dollar deposits in the London interbank market.

"Loss Proceeds" means amounts, awards or payments payable to any Debtor or the Agent in respect of all or any portion of any of the Properties in connection with a Casualty or Condemnation thereof (after the deduction therefrom and payment to such Debtor and the Agent (or the holder of any Pre-Petition Lien with respect to such Property, any Tenant of such Property or holder of any Ground Lease or REA in respect of such Property to the extent required by the terms of the documents evidencing Pre-Petition Liens, the Lease, the Ground Lease or REA with such Person, as applicable), respectively, (a) of any and all reasonable out-of-pocket expenses incurred by such Debtor, the Agent or such other Person in the recovery thereof, including all reasonable out-of-pocket attorneys' fees and disbursements, the fees of insurance experts and adjusters and the reasonable out-of-pocket costs incurred in any litigation or arbitration with respect to such Casualty or Condemnation, (b) of any taxes payable with respect to such payments and (c) of any amounts required to be paid to or for the benefit of the holders of any Pre-Petition Lien).

13

"M&M Liens" means mechanics', materialmen's, repairmen's or similar Liens created under any contract or existing under any applicable law and affecting any Property.

"Main Operating Account" has the meaning specified in the first day motions and orders.

"Major Entities" means, on any date, the General Partner, GGPLP, TRC, any Obligor that owns any First Lien Property and any direct or indirect parent holding company of such Obligor.

"Major Lease" means any Lease which covers more than 75,000 square feet of rentable building area.

"Major REA" means any reciprocal easement agreement with respect to a regional shopping center entered into by the applicable Debtor and an anchor occupant.

"Majority Lenders" means one or more Lenders whose Pro Rata Shares aggregate more than 50.0% as such percentage is determined under the definition of Pro Rata Share set forth herein.

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U, or X of the Federal Reserve Board.

"Market Maker" means (a) any Person identified, in writing, to the Borrowers by or on behalf of the Initial Lenders prior to delivery by the Initial Lenders of the signed Commitment Letter and (b) any firm that regularly makes a trading market in, or quotes prices for purchase and sale of, debt instruments and which, in the case of this clause (b), is approved by the Borrowers, such approval not to be unreasonably withheld.

"Material Adverse Effect" means: (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties or condition (financial or otherwise) of the Debtors, taken as a whole, or of the Collateral, taken as a whole, (b) a material adverse change in, or a material adverse effect upon, the First Lien Properties, taken as a whole, (c) a material adverse change in, or a material adverse effect upon, the Negative Pledge Properties, taken as a whole, or (d) a material adverse effect upon the legality, validity, binding effect, or enforceability against any Obligor of the Loan Documents, taken as a whole; provided that, for purposes of determining the existence or occurrence of a Material Adverse Effect, (i) the effect of any Casualty or Condemnation shall be excluded, (ii) "Material Adverse Effect" excludes the foregoing if and to the extent the foregoing arise as a result of the filing of the Petitions and commencement of the Case and/or the events leading thereto and (iii) when used in this Agreement with respect to any action, event or circumstance that is subject to the Automatic Stay, such action, event or circumstance could not have, or be expected to have, a Material Adverse Effect for so long as such action, event or circumstance remains subject to the Automatic Stay.

"Material Agreements" means each contract and agreement (other than Leases and agreements in respect of Debt) relating to the ownership, management, development, use, operation, leasing, maintenance, repair or improvement of any Properties (a) under which a

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

Debtor has the obligation to pay more than $10,000,000 per annum or (b) as to which the breach, nonperformance or cancellation thereof, or the failure thereof to be renewed could reasonably be expected to have a Material Adverse Effect.

"Maturity Date" means the date that is the earliest to occur of (a) the Outside Date, (b) the Plan Date or (c) the date the Term Loan is accelerated pursuant to the terms hereof, whether at stated maturity, upon an Event of Default or otherwise.

"Maximum Rate" has the meaning specified in Section 2.5.

"Maximum Term Loan Amount" means the lesser of (a) $400,000,000 or (b) such amount as is approved by the Bankruptcy Court to be advanced pursuant to the Financing Order.

"Mortgage" has the meaning specified in Section 6.3.

"Multi-employer Plan" means a multi-employer plan as defined in Section 3(37) or Section 4001(a)(3) of ERISA which is or was at any time during the current year or the immediately preceding five years contributed to by any Borrower or any ERISA Affiliate.

"Municipal Financing" means any tax increment financings, sales or real estate tax rebates, payment in lieu of taxes (PILOTs), special improvement districts, financings funded by the issuance of bonds or other negotiable instruments sponsored or issued by a Governmental Authority or quasi-Governmental Authority, financings related to on-site or off-site infrastructure or public works or any other financing arrangements for which a Debtor is an obligor and a Governmental Authority or quasi-Governmental Authority is the obligee.

"Negative Pledge Debtor" means (i) any Subsidiary of the Borrower party to the Case on the Closing Date which holds one or more Negative Pledge Properties, (ii) any wholly-owned Subsidiary becoming a party to the Case after the Closing Date which holds one or more Negative Pledge Properties and (iii) any Subsidiary of a Person set forth in clause (i) or clause (ii) above.

"Negative Pledge Properties" means (a) all Properties other than First Lien Properties and (b) all Capital Stock of a Person owning Property (or the direct holding company of such Person) which Capital Stock has been pledged to secure Prior Lien Debt constituting so-called "mezzanine loans."

"Negative Pledge Property Retention Amount" means, with respect to any sale or other disposition of any Negative Pledge Property (or any Debtor owning any Negative Pledge Property or its direct or indirect parent holding company), an amount equal to (a) 50% of all Net Proceeds of all such sales or other dispositions aggregating up to $100 million of Net Proceeds, (b) 40% of all Net Proceeds of such sales or other dispositions aggregating more than $100 million and up to $200 million of Net Proceeds, (c) 30% of all Net Proceeds of such sales or dispositions aggregating more than $200 million and up to $300 million of Net Proceeds and (d) 20% of all Net Proceeds of such sales or dispositions aggregating more than $300 million of Net Proceeds.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

"Net Proceeds" means, with respect to any sale or disposition contemplated in Section 3.3(a), an amount equal to all proceeds of such sale or disposition net of the items specified in Section 3.3(a)(1), (2), (3) and (5).

"New Lending Office" has the meaning specified in Section 5.1(d).

"Non-Debtor Guarantor" means GGMI unless it becomes a party to the Case.

"Non-U.S. Lender" means each Lender (or Assignee) that is not a "United States person" as defined in Section 7701(a)(30) of the Code.

"Obligations" means all loans, advances, liabilities, obligations, covenants, duties, and debts owing by the Obligors (or any thereof) to the Agent and/or any Lender, arising under or pursuant to this Agreement or any of the other Loan Documents, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, acceptance, loan, guaranty, indemnification, or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including all principal, interest, charges, expenses, fees, attorneys' fees, filing fees, and any other sums chargeable to any Obligor hereunder or under any of the other Loan Documents. "Obligations" includes, without limitation, all debts, liabilities, and obligations of the Obligors now or hereafter arising from or in connection with the Term Loan and all Exit Fees.

"Obligor" means either Borrower or any Guarantor, and "Obligors" means the Borrowers and the Guarantors.

"Obligor Materials" has the meaning specified in Section 7.2.

"OFAC List" means the list of specially designated nationals and other prohibited parties maintained by the United States Treasury Department's Office of Foreign Assets Control.

"Other Taxes" means any present or future stamp or documentary taxes or any other excise or property taxes, charges, or similar levies (excluding, in the case of each Lender and the Agent, such taxes (including income taxes or franchise taxes) as are imposed on or measured by such Lender's or the Agent's, as the case may be, net income) which arise from any payment made hereunder or from the execution, delivery, or registration of, or otherwise with respect to, this Agreement or any other Loan Documents, excluding any and all taxes that are attributable to such Lender's or the Agent's failure to comply with the applicable requirements set forth in Section 14.10.

"Outside Date" means _____, 2011.[1]

---

[1] Insert date that is the Business Day on or immediately before 24 months after the Funding Date.

100656687_1
(GGP_ DIP Credit Agreement 051309).DOC

"Participant" has the meaning specified in Section 13.3(f).

"Participant Register" has the meaning specified in Section 13.3(g).

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001; Public Law 107-56).

"Payment Date" means the first Business Day of each month.

"PBGC" means the Pension Benefit Guaranty Corporation or any Governmental Authority succeeding to any of its principal functions thereof.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA which any Obligor or any ERISA Affiliate sponsors, maintains, or to which it makes, is making, or is obligated to make contributions at any time during the current year or the immediately preceding five plan years, but excluding any Multi-employer Plan.

"Permits" means all licenses, permits, variances and certificates used in connection with the ownership, operation, use or occupancy by each Obligor and each Debtor in respect of its Properties (including certificates of occupancy, business licenses, state health department licenses, licenses to conduct business and all such other permits, licenses and rights, obtained from any Governmental Authority or private Person concerning ownership, operation, use or occupancy of the Property).

"Permitted Liens" means:

(a)     the Agent's Liens;

(b)     Pre-Petition Liens and Liens resulting from the refinancing of the obligations secured thereby; provided that (i) such refinancing is on the same or substantially similar terms, (ii) the obligations secured thereby (A) shall not be increased, (B) shall have a final maturity no sooner than and a weighted average life no less than the obligations being refinanced and (C) shall not be the obligation of any Person other than the Person previously obligated thereon, and (iii) the Liens shall not cover any additional property;

(c)     Liens for taxes, fees, assessments, or other charges of a Governmental Authority not overdue by more than 30 days or, if more than 30 days overdue, which are (i) subject to the Automatic Stay or (ii) being contested in good faith and by appropriate proceedings diligently pursued and as to which adequate financial reserves have been established in accordance with GAAP on the applicable Debtor's books and records;

(d)     Liens (i) consisting of deposits made in the ordinary course of business exclusively in connection with, or to secure payment of, obligations under worker's compensation, unemployment insurance, social security, and other similar laws, or to secure the performance of bids, tenders, or contracts (other than for the repayment of borrowed

17

money) or to secure indemnity, performance, performance and completion bonds or guarantees, other similar obligations for the performance of bids, tenders, or contracts (other than for the repayment of borrowed money) or to secure statutory obligations (other than Liens arising under ERISA or Environmental Liens) or surety, stay, customs or appeal or other similar bonds, (ii) consisting of deposits made in the ordinary course of business exclusively to secure liability for insurance premiums or deductibles or self-retention amounts, (iii) securing Debt of the type set forth in <u>Section 9.11(a)(ix)</u> secured exclusively by the policies financed thereby (and the proceeds thereof), and (iv) consisting of deposits in respect of letters of credit or bank guaranties posted exclusively to support payment of the items in <u>clauses (i)</u> and <u>(ii)</u> or exclusively to secure letters of credit or bank guaranties otherwise permitted under <u>Section 9.11(a)(vi)</u> or <u>Section 9.11(a)(xvii)</u>;

(e)     Liens securing the claims or demands of carriers, warehousemen, landlords, and other like Persons;

(f)     Liens constituting encumbrances in the nature of reservations, exceptions, encroachments, easements, rights of way, covenants running with the land, and other similar title exceptions or encumbrances affecting any Real Estate of a Debtor including any REA; <u>provided</u> that such Liens do not in the aggregate materially detract from the value of such Real Estate for its intended purpose or materially interfere with its use in the ordinary conduct of such Debtor's business or the business of any material tenant occupying any of such Real Estate;

(g)     Liens securing the claims or demands of materialmen, mechanics, repairmen and similar Liens: (i) in respect of work done prior to the Petition Date, and (ii) M&M Liens arising after the Petition Date in respect of amounts not overdue by more than 60 days or, if more than 60 days overdue, the amount or validity of such Lien is being contested by the Debtor whose Property is affected thereby, by appropriate legal proceedings promptly initiated and conducted in good faith and with due diligence;

(h)     Liens arising from judgments and attachments in connection with court proceedings; <u>provided</u> the attachment or enforcement of such judgment Liens would not otherwise result in an Event of Default hereunder;

(i)     any "adequate protection liens" expressly contemplated by the Financing Order;

(j)     Liens created with the prior written consent of the Majority Lenders;

(k)     Liens not otherwise referred to in this definition incurred in the ordinary course of business that do not secure Debt; <u>provided</u> that the granting of such Lien could not be reasonably expected to have a Material Adverse Effect;

(l)     licenses of Proprietary Rights granted by Debtors in the ordinary course of business and not interfering in any material respect with the ordinary conduct of the business of the Debtors, taken as a whole, the granting of which could not reasonably be expected to result in a Material Adverse Effect;

18

(m)     rights of existing and future Tenants (as tenants only) pursuant to written Leases related to the Property in question to the extent such Leases are entered into in conformity with the provisions of this Agreement;

(n)     any interest or title of a lessor (or its mortgagor) under any Ground Lease (with respect to a Leased Property) (including a sub-lessor) under any operating lease or Ground Lease;

(o)     leases, subleases, licenses and sublicenses granted to other Persons not interfering in any material respect with the (i) ordinary course of the business of the Debtors, taken as a whole, and (ii) the rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by any Debtor or by a statutory provision, to terminate any such lease, license, franchise, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(p)     bankers' Liens, rights of setoff and other similar Liens on cash and cash equivalents on deposit in one or more accounts maintained by any Debtor, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements in respect of such deposit accounts, and not securing any obligations relating to any extension of credit;

(q)     the filing of UCC financing statements solely as a precautionary measure in connection with operating leases, consignment of goods or sales of Accounts;

(r)     Liens consisting of (i) an agreement to dispose of any property pursuant to a disposition permitted under Section 9.8 and (ii) earnest money deposits of cash or cash equivalents by any Debtor in connection with any letter of intent or purchase agreement permitted hereunder;

(s)     the granting of any purchase option, right of first refusal, right of first offer or similar right in respect of any portion of any of the Properties or the subjecting of any portion of any of the Properties to restrictions on transfer, in each case, in the ordinary course of business and (i) to the extent existing on the Petition Date, (ii) consisting of customary purchase options, rights of first refusal, rights of first offer or similar rights given in respect of anchor occupant parcels or outparcels, in the case of clause (ii), that do not contain a restraint on alienation to reasonably similar competitors of the Debtors, taken as a whole, or (iii) in respect of any Negative Pledge Property;

(t)     Liens securing Debt of the type permitted under Section 9.11(a)(iv) provided that individual financings of assets of the Debtors provided by one lender or its Affiliates may be cross-collateralized to other financings of assets provided by such lender or its Affiliates;

(u)     Liens set forth in any UCC search results delivered or made available to the Agent on or prior to the Petition Date with respect to the Non-Debtor Guarantor; and

19

(v)     Liens evidencing and/or securing any Municipal Financing and, to the extent constituting Debt, if such Debt is permitted under Section 9.11(a)(xxi).

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, Governmental Authority, or any other entity.

"Petition Date" has the meaning specified in Recital A of this Agreement (the "original petition date") and, with respect to any wholly-owned Subsidiary of the Borrowers that becomes a party to the Case after the original petition date, the date on which such Subsidiary becomes subject to the Case.

"Petitions" means the voluntary petitions filed by the Debtors with the Bankruptcy Court for relief under Chapter 11 of the Bankruptcy Code.

"Plan Date" means the effective date of a plan of reorganization in respect of the Debtors in the Case.

"Platform" has the meaning specified in Section 7.2.

"Pledged Collateral" has the meaning specified in Section 6.12(b).

"Prepayment Cash Collateral Account" has the meaning specified in Section 3.3(d).

"Pre-Petition Liens" means Liens which (a) were valid, enforceable, properly perfected (or are permitted to be perfected after the Petition Date pursuant to the Bankruptcy Code and are so perfected) and non-avoidable as of the Petition Date, if any, (b) as a matter of applicable nonbankruptcy law, would have priority over the Agent's Liens as of the Petition Date if the Agent's Liens were created as of such date (or with respect to Liens permitted to be perfected after the Petition Date pursuant to the Bankruptcy Code and which are so perfected, have priority over the Agent's Liens as of such date of perfection) and (c) are not avoided in the Case.

"Primary Properties" means the Properties described on Schedule 1.1D.

"Prior Lien Debt" means the Debt and other obligations existing as of the Petition Date which are secured by Pre-Petition Liens.

"Private Side Communications" has the meaning specified in Section 7.2.

"Pro Rata Share" means, with respect to a Lender, a fraction (expressed as a percentage), the numerator of which is the sum of the principal amount of the Term Loan owed to such Lender and the denominator of which is the aggregate principal amount of the Term Loan owed to all Lenders.

"Professional Person" means a Person who is an attorney, accountant, appraiser, auctioneer, financial advisor, or other professional Person and who is retained with approval of

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

the Bankruptcy Court, after notice and opportunity for hearing to the Agent and the Lenders, by (a) any Debtor pursuant to Section 327 of the Bankruptcy Code, (b) a committee pursuant to Section 1103(a) of the Bankruptcy Code or (c) the official committee of unsecured creditors.

"Properties" means the Fee Properties and the Leased Properties, including all Improvements thereon.

"Proprietary Rights" means, with respect to a Person, all of such Person's now owned and hereafter arising or acquired:  licenses, franchises, permits, patents, patent rights, copyrights, works which are the subject matter of copyrights, trademarks, service marks, trade names, trade styles, patent, trademark and service mark applications, and all licenses and rights related to any of the foregoing (including goodwill), and all other rights under any of the foregoing, all extensions, renewals, reissues, divisions, continuations, and continuations in part of any of the foregoing, and all rights to sue for past, present, and future infringement of any of the foregoing.

"Public Lender" has the meaning specified in Section 7.2.

"REA" means any reciprocal easement or similar agreement affecting any Property.

"Real Estate" means, with respect to any Person, all of such Person's now or hereafter owned or leased estates in real property, including, without limitation, all fees, leaseholds, and future interests, together with all of such Person's now or hereafter owned or leased interests in the improvements thereon, the fixtures attached thereto, and the easements appurtenant thereto. The Real Estate includes, without limitation, the Properties.

"Register" has the meaning specified in Section 13.3(d).

"REIT" means a real estate investment trust as defined in Section 856 of the Code or any successor provision.

"Release" means a release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching, or migration of a Contaminant into the environment including, without limitation, indoor air.

"Rent Roll" has the meaning specified in Section 8.20(a).

"Responsible Officer" means, with respect to any Obligor, the chief executive officer, the president, the chief financial officer, or any senior vice president, the treasurer, any assistant treasurer, the Secretary or any assistant secretary of such Obligor (or of the general partner or manager of such Obligor if it is not a corporation), or any other officer having substantially the same authority and responsibility.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of any Debtor, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any

21

such Capital Stock or any option, warrant or other right to acquire any such Capital Stock (other than convertible Debt).

"<u>Subsidiary</u>" as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled directly or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the General Partner.

"<u>Taxes</u>" means any and all present or future taxes, levies, imposts, deductions, charges, or withholdings, and all liabilities with respect thereto, excluding, in the case of each Lender and the Agent, taxes (including income taxes or franchise taxes and branch profits taxes) as are imposed on or measured by such Lender's or the Agent's, as the case may be, net income by the jurisdiction (or any political subdivision thereof) under the laws of which such Lender or the Agent, as the case may be, is organized or maintains a lending office or does business, or by a jurisdiction to which the Agent or such Lender is or previously was otherwise connected pursuant to the laws of such jurisdiction, other than by reason of activity arising solely from the Agent or such Lender having executed this Agreement and having enjoyed its rights and performed its obligations under this Agreement.

"<u>Tenant</u>" means any Person liable by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) pursuant to a Lease.

"<u>Tenant Allowances</u>" means tenant improvements paid or reimbursed through allowances to or credit against rent only by a Tenant pursuant to such Tenant's Lease.

"<u>Cash Management Order</u>" means the order of the Bankruptcy Court entered by the Court in respect of cash management of the Debtor.

"<u>Tenant Obligations Order</u>" means the order of the Bankruptcy Court entered by the Court in respect of tenant obligations of the Debtor.

"<u>Term Loan</u>" has the meaning specified in Recital B of this Agreement.

"<u>Term Note</u>" means a promissory note made by the Borrowers payable to the order of a Lender evidencing the obligation of the Borrowers to pay the aggregate unpaid principal amount of the Term Loan made to the Borrowers by such Lender and/or held by such Lender (and any promissory note or notes that may be issued from time to time in substitution, renewal, extension, replacement, or exchange thereof whether payable to such Lender or to a different Lender in connection with a Person becoming a Lender after the Closing Date or otherwise) substantially in the form of <u>Exhibit D</u>, with all of the blanks properly completed.

"<u>Threshold Amount</u>" means, with respect to any Property, $25,000,000.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

"TRC" means The Rouse Company LP.

"Unfunded Pension Liability" means the excess of a Pension Plan's actuarial value of benefit liabilities under Section 4001(a)(16) of ERISA, over the current actuarial value of that Pension Plan's assets allocable to such benefit liabilities, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 or Section 430 of the Code (or corresponding provisions of ERISA) for the applicable plan year.

"UCC" means the Uniform Commercial Code (or any successor statute) of the State of New York or of any other state the laws of which are required by Section 9-301 thereof to be applied in connection with the issue of perfection of security interests.

"United States" means the United States of America.

"U.S. Lender" means each Lender (or Assignee) that is a "United States person" as defined in Section 7701(a)(30) of the Code.

Section 1.2     Accounting Terms.  Any accounting term used in this Agreement without definition shall have, unless otherwise specifically provided herein, the meaning customarily given in accordance with GAAP, and all financial computations hereunder shall be computed, unless otherwise specifically provided herein, in accordance with GAAP.

Section 1.3     Interpretive Provisions.

(a)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)     The words "hereof," "herein," "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(i)     The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices, and other writings, however evidenced.

(ii)     The term "including" is not limiting and means "including without limitation."

(iii)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including."

(c)     Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, amendments and restatements, supplements and other modifications thereto, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document, and (ii) references to any statute or regulation

23

are to be construed as including all statutory and regulatory provisions consolidating, amending, replacing, supplementing, or interpreting the statute or regulation.

(d)     The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

(e)     This Agreement and the other Loan Documents are the result of negotiations among and have been reviewed by counsel to the Agent, the Lenders, and the Obligors and are the products of all parties.  Accordingly, the Loan Documents shall not be construed against the Agent, any Lender, or any Obligor merely because of any such Person's involvement in their preparation.

(f)     Terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the UCC.

(g)     Whenever the payment of any obligation or the performance of any covenant, agreement or obligation is stated to be due on a day which is not a Business Day, such payment or performance shall (except to the extent set forth in the definition of Interest Period) be made on the next succeeding Business Day, and such extension of time shall be included in the computation of interest or fees, as applicable.

(h)     All references in any Loan Document to all or any part of the Obligations being paid in full, payment in full, paid in full in cash, payment in full in cash, paid in cash, repayment in full, repaid in full, payment and satisfaction in full or indefeasibly paid or any similar phrase shall refer to such portion of the Obligations either being paid in full in cash or being converted to equity and/or debt to the extent permitted by, and in the manner set forth on, <u>Schedule 3.1-A</u>.

<div align="center">

**ARTICLE 2**

**TERM LOAN; INTEREST AND FEES**

</div>

<span style="color:blue">Section 2.1</span>     <u>Total Facility</u>.  Subject to all of the terms and conditions of this Agreement and the Financing Order, the Lenders severally agree to make available a term credit facility of up to the Maximum Term Loan Amount for use by the Debtors.  The term credit facility described in the preceding sentence is not a revolving line of credit, and the Borrowers may not reborrow sums previously advanced as part of the Term Loan and prepaid or repaid.

<span style="color:blue">Section 2.2</span>     <u>Term Loan</u>.

(a)     <u>The Term Loan</u>.  Subject to <u>Section 10.1</u>, the Lenders agree, on the terms and conditions hereinafter set forth, to make a single advance in the amount equal to its Commitment or such lesser amount as is authorized by the Financing Order to the Borrowers on or, at the Lenders' option, before the date which is two (2) Business Days following the Entry Date.

<div align="center">24</div>

(b)     No Liability.  The Agent shall not incur any liability to any Obligor as a result of acting reasonably under this Section 2.2, and the crediting of Term Loan to the Borrowers' deposit account, or wire transfer to such Person as the Borrowers shall direct, shall conclusively establish the obligation of the Borrowers to repay such Term Loan as provided herein.

(c)     Notation.  The Agent shall record on its books the principal amount of the Term Loan owing to each Lender from time to time.  In addition, each Lender is authorized, at such Lender's option, to note the date and amount of each payment or prepayment of principal of such Lender's Term Loan in its books and records, including computer records, such books and records constituting presumptive evidence, absent manifest error, of the accuracy of the information contained therein.

(d)     Term Notes.  The Borrowers shall execute and deliver to the Agent, on behalf of each Lender, effective as of the Closing Date and on the date of the assignment of any portion of any Lender's Term Loan, a Term Note, to evidence such Lender's Term Loan, in the principal amount equal to the greater of the amount of such Lender's Commitment with respect to the Term Loan or the aggregate principal amount of the Term Loan owed to such Lender.

(e)     Commitment Termination.  All Commitments shall automatically terminate at 5:00 P.M., New York City time, on June 1, 2009, if the conditions to the Funding Date set forth in Section 10.1 shall not have been satisfied by such time.

Section 2.3     Interest.

(a)     Interest Rates.  The Term Loan shall bear interest on the unpaid outstanding principal amount thereof (including, to the extent permitted by law, on accrued interest thereon not paid when due) from the date made until paid in full in cash at a per annum rate equal to the lesser of (i) the Maximum Rate or (ii) the LIBOR Rate for the relevant Interest Period applicable to such Term Loan, plus twelve percent (12.0%).  Subject to Section 2.5, all interest charges on the Obligations shall be computed on the basis of a year of 360 days and actual days elapsed (which results in more interest being paid than if computed on the basis of a 365-day year).

(b)     The basis for determining the LIBOR Rate and the Interest Period with respect to the Term Loan or any portion of the Term Loan (as the Borrowers may elect), shall be selected by the Borrowers and notified to Agent pursuant to the applicable Funding Notice or Continuation Notice, as the case may be.

(c)     The Borrowers shall deliver a Continuation Notice to Agent no later than 1:00 p.m. (New York City time) at least three Business Days in advance of the expiration of any Interest Period.

(d)     In the event the Borrowers fail to specify an Interest Period for determining the LIBOR Rate in the applicable Funding Notice or Continuation Notice, or if the Borrowers fail to deliver a Continuation Notice as required pursuant to clause (c) above, the LIBOR Rate for

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

the related Term Loan will be automatically determined using one-month LIBOR for purposes of clause (b) of the definition of "LIBOR Rate."

(e)    Default Rate.  Subject to Section 2.5, upon the occurrence and during the continuance of an Event of Default, the principal amount of the Term Loan outstanding and, to the extent permitted by applicable law, any interest payments on the Term Loan or any fees, in each case, which are overdue, shall thereafter bear interest payable on demand at a rate per annum equal to the lesser of (i) the Maximum Rate or (ii) the Default Rate.

Section 2.4    Exit Fees.  Subject to Section 2.5, the Borrowers agree to pay to the Agent, for the account of the Lenders, an exit fee (the "Exit Fee") in the following amounts and on the following dates:  (a) in the case of any prepayment in whole or in part in cash or otherwise of the Term Loan prior to the Maturity Date, whether by virtue of any voluntary or mandatory prepayment or otherwise (and including as a result of the application of any Collateral or proceeds thereof to the principal amount of the Term Loan as permitted by the Loan Documents but excluding any such application as a result of the occurrence of an Event of Default and the acceleration of the maturity of the Term Loan), an Exit Fee in the amount of three and three-quarters percent (3.75%) of the principal amount of the Term Loan prepaid, payable on the date of such prepayment and (b) on the earlier to occur of the Maturity Date or the date of the acceleration of the maturity of the Term Loan as a result of the occurrence of an Event of Default, an Exit Fee in the amount equal to the remainder of (i) three and three-quarters percent (3.75%) of the initial aggregate Commitments minus (ii) the aggregate amount of Exit Fees previously paid by the Borrowers to the Agent pursuant to clause (a) above.  The Exit Fees shall be fully earned when due and are non-refundable in all cases.  The payment of the Exit Fee on the Maturity Date may be paid by conversion of such amount as provided in Schedule 3.1-A.

Section 2.5    Interest Limitation  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Term Loan, together with all fees, charges and other amounts which are treated as interest on such Term Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lenders holding such Term Loan in accordance with applicable law, the rate of interest payable in respect of such Term Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Term Loan but were not payable as a result of the operation of this Section 2.5 shall be cumulated and the interest and Charges payable to such Lender in respect of such Term Loan or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount shall have been received by such Lender if such amount may be paid to such Lender without violating any Legal Requirement. Agent's Fee.  Subject to Section 2.5, the Borrowers agree to pay, to the Agent for the Agent's own account, collateral management, agency and administrative fees at the times and in the amounts separately agreed in writing among the Borrowers and the Agent; provided that the amount of such fees shall not exceed $30,000 per month but may be required to be paid annually in advance.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

## ARTICLE 3

## PAYMENTS AND PREPAYMENTS

Section 3.1      Term Loan.  The Borrowers jointly and severally agree to repay the outstanding principal balance of the Term Loan plus all accrued but unpaid interest thereon, together with all other non-contingent Obligations, on the Maturity Date; provided that the General Partner (on its own behalf and on behalf of GGPLP) shall have the right to elect to convert the outstanding principal amount of the Term Loan, the Exit Fee and accrued and unpaid interest due and owing upon the Plan Date (the "Conversion Amount") to equity and/or debt to the extent permitted by, and in the manner set forth on, Schedule 3.1-A.  Accrued and unpaid interest on the Term Loan shall be due and payable on each Payment Date (beginning on June 1, 2009) and on the Maturity Date, and the Borrowers agree to pay such accrued and unpaid interest on such dates (it being understood that the payment of interest on the Maturity Date may be paid by conversion of such amounts to the extent permitted by the preceding sentence).

Section 3.2      Optional Prepayment of the Term Loan.  The Borrowers may prepay the principal of the Term Loan, in whole or in part, at any time and from time to time by (a) providing to the Agent two (2) Business Days prior written notice of its intention to make such prepayment and (b) paying to the Agent (i) all accrued and unpaid interest on the principal amount being prepaid and (ii) the required Exit Fee, in each case concurrently with the making of such prepayment; provided, however, that each such optional prepayment  shall be in a minimum principal amount of $1,000,000 and integral multiples of $500,000 in excess thereof.

Section 3.3      Mandatory Prepayments of the Term Loan.  The Borrowers shall prepay the principal amount of the Term Loan at the following times and in the following amounts:

(a)      (i) in the case of a sale or disposition pursuant to Section 9.8(d) within two (2) Business Days (during which period no Obligor shall be entitled to make any Restricted Payments) and (ii) in the case of any sale or disposition of condominiums pursuant to Section 9.8(f)(i), on or before the last Business Day of the applicable Fiscal Quarter during which such sale or disposition was made of (A) any First Lien Property (or any Debtor owning such First Lien Property or its direct or indirect parent holding company) or (B) any Negative Pledge Property (or any Debtor owning such Negative Pledge Property or its direct or indirect parent holding company), all proceeds of such sale or other disposition net of (1) the reasonable and customary out-of-pocket costs and expenses of such sale or disposition paid to Persons that are not Obligors or their Subsidiaries, (2) the amount applied to all obligations secured by a Pre-Petition Lien on the asset being sold or the Capital Stock of the Person (or the direct holding company of such Person) owning such asset being sold which is secured by any Pre-Petition Lien, (3) the amount of sales and transfer taxes that are payable by a Debtor or any Affiliate in connection therewith, (4) in the case of a sale or disposition of (x) First Lien Property, to the extent the net proceeds of all such sales or dispositions since the Closing Date exceed $75,000,000 in the aggregate and (y) Negative Pledge Property, the Negative Pledge Property

27

Retention Amount, if applicable, and (5) an amount equal to the Exit Fee that will be payable in connection with such sale or disposition;

(b)     with respect to the Loss Proceeds of any Casualty or Condemnation with respect to any Property of any Debtor, at the time and in the amount of such prepayment as required by Section 9.4(e), net of an amount equal to the Exit Fee that will be payable in connection with the application of such Loss Proceeds;

(c)     notwithstanding any of the other provisions of this Section 3.3, so long as no Event of Default shall have occurred and be continuing, if any prepayment of the Term Loan is required to be made on a date other than on the last day of the Interest Period therefor and Breakage Costs would be payable as a result of prepayment on such other date, the Borrowers may, if Lenders have been requested in writing to, and have elected not to, waive such Breakage Costs, retain such amount of any such prepayment otherwise required to be made hereunder in a Breakage Prepayment Account (or pursuant to other arrangements satisfactory to the Agent) until the last day of such Interest Period, at which time such prepayment shall be made. For purposes of this clause (c), the term "Breakage Prepayment Account" means a deposit or securities account established by a Borrower with a bank or other financial institution designated by the Agent and over which the Agent shall have exclusive dominion and control, including the exclusive right of withdrawal for application in accordance with this clause (c), pursuant to an account control agreement in form and substance satisfactory to the Agent. If the maturity of the Term Loan has been accelerated pursuant to Section 11.2, or if the Term Loan has matured in accordance with its terms the Agent shall at the direction of the Majority Lenders, apply all amounts on deposit in the Breakage Prepayment Accounts (or otherwise held by the Agent) to satisfy any of the Obligations; and

(d)     notwithstanding any of the other provisions of this Section 3.3, so long as no Event of Default shall have occurred and be continuing, any prepayment of the Term Loan required to be made pursuant to this Section may, at the election of the Borrowers, be maintained in a Prepayment Cash Collateral Account (or pursuant to other arrangements reasonably satisfactory to the Agent) and, so long as no Event of Default has occurred and is continuing, such amount shall not be required to be applied to reduce the principal amount of the Term Loan at such time as would otherwise be required by this Section 3.3. For purposes of this clause (d), the term "Prepayment Cash Collateral Account" means a deposit or securities account established by a Borrower with a bank designated by the Agent and over which the Agent shall have exclusive dominion and control, including the exclusive right of withdrawal for application in accordance with this clause (d); provided that the Borrowers shall have the right to reasonably direct the investment of amounts on deposit in a Prepayment Cash Collateral Account in Cash Equivalents as the Borrowers shall elect. If the maturity of the Term Loan has been accelerated pursuant to Section 11.2 or if the Term Loan has matured in accordance with its terms, the Agent shall at the direction of the Majority Lenders apply all amounts on deposit in the Prepayment Cash Collateral Accounts (or otherwise held by the Agent) to satisfy any of the Obligations.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

**Section 3.4**      <u>Payments by the Borrowers</u>.

(a)       All payments to be made by the Borrowers shall be made without set-off, recoupment, or counterclaim except as otherwise expressly permitted hereunder.  Except as otherwise expressly provided herein, all payments by the Borrowers shall be made to the Agent, for the account of the Lenders (but in any event in one wire transfer), at the Agent's address set forth in <u>Section 15.7</u>, and shall be made in Dollars and in immediately available funds, no later than 3:00 p.m. (New York City time) on the date specified herein.  Any payment received by the Agent later than 3:00 p.m. (New York City time) may, at the option of the Agent, be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue.

(b)       Unless the Agent receives notice from the Borrowers prior to the date on which any payment is due to the Lenders that the Borrowers will not make such payment in full as and when required, the Agent may assume that the Borrowers have made such payment in full to the Agent on such date in immediately available funds and the Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent the Borrowers have not made such payment in full to the Agent, each Lender shall repay to the Agent on demand such amount distributed to such Lender, together with interest thereon at the Federal Funds Rate for each day from the date such amount is distributed to such Lender until the date repaid.

(c)       The Borrowers agree to compensate each Lender for any loss, cost or expense (collectively, "<u>Breakage Costs</u>") actually incurred by such Lender as a result of the making of a payment of the Term Loan for any reason (including, without limitation, the acceleration of the maturity of the Term Loan following an Event of Default) on a day that is not the last day of the applicable interest period.  To avoid doubt "Breakage Costs" shall not include the interest margins applicable to such prepaid Term Loan.  Each Lender will furnish to the Borrowers a certificate setting forth the basis and amount of each request by such Lender for compensation under this <u>Section 3.4(c)</u>, which certificate shall provide reasonable detail as to the calculation of such Breakage Costs.  Such certificate shall constitute prima facie evidence of the amount of such Breakage Costs, which shall be calculated by each Lender on a reasonable basis, consistent with the basis on which such calculations are then being made by similarly situated banks or financial institutions generally.

**Section 3.5**      <u>Apportionment, Application, and Reversal of Payments</u>.  Except as otherwise expressly provided herein, aggregate principal and interest payments shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Term Loan to which such payments relate held by each Lender) and payments of the fees (including, without limitation, the Exit Fees) shall, as applicable, be apportioned ratably among the Lenders as of the date such fees are received by the Agent.  Except as specifically provided otherwise herein or in the Financing Order, all payments shall be remitted to the Agent and all such payments not constituting payment of specific fees, and all proceeds of Accounts or other Collateral received by the Agent, shall be applied, ratably, subject to the provisions of this Agreement, <u>FIRST</u>, to pay any interest or fees then due with respect to, or which constitute,

<div align="center">29</div>

Obligations, SECOND, to pay or prepay principal of the Term Loan under this Agreement, and THIRD, to the payment of any other Obligation.  The Agent shall promptly distribute to each Lender, pursuant to the applicable wire transfer instructions received from each Lender in writing, such funds as it may be entitled to receive.

Section 3.6     Indemnity for Returned Payments.  If, after receipt of any payment which is applied to the payment of all or any part of the Obligations, the Agent or any Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible set-off, or a diversion of trust funds, or for any other reason, then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Agent or such Lender and the Borrowers shall be liable to pay to the Agent and the Lenders, and hereby do indemnify the Agent and the Lenders and hold the Agent and the Lenders harmless for, the amount of such payment or proceeds surrendered.  The provisions of this Section 3.6 shall be and remain effective notwithstanding any contrary action which may have been taken by the Agent or any Lender in reliance upon such payment or application of proceeds, and any such contrary action so taken shall be without prejudice to the Agent's and the Lenders' rights under this Agreement and shall be deemed to have been conditioned upon such payment or application of proceeds having become final and irrevocable.  The provisions of this Section 3.6 shall survive the termination of this Agreement.

Section 3.7     The Agent's Books and Records.  The Obligors agree that the Agent's books and records showing the Obligations and the transactions pursuant to this Agreement and the other Loan Documents shall be admissible in any action or proceeding arising therefrom, and shall constitute rebuttably presumptive proof thereof, irrespective of whether any Obligation is also evidenced by a promissory note or other instrument.  Such books and records shall be deemed correct, accurate, and binding on the Borrowers and an account stated (except for corrections of errors discovered by the Agent) in the absence of evidence to the contrary.  In the event a timely written notice of objections is given by the Borrowers, only the items to which exception is expressly made will be considered to be disputed by the Borrowers.

## ARTICLE 4

## CASH COLLATERAL ACCOUNTS

Section 4.1     Cash Collateral Accounts.

(a)     All cash of the Obligors shall be deposited by the Obligors in one or more accounts subject to the perfected Agent's Lien by virtue of, and having the priority set forth in, the Financing Order and, except for the Main Operating Account, if at any time required by the Agent upon the occurrence and during the continuance of an Event of Default, under its exclusive dominion and control upon written notice to the General Partner and the applicable financial institution.  Such funds shall be held in a Cash Collateral Account until such time as the amounts held therein are applied by the relevant Obligors to pay expenses or otherwise

30

used in accordance with this Agreement. So long as no Event of Default shall have occurred and be continuing, amounts held in a Cash Collateral Account shall be available to the Obligors for use in a manner or for a purpose not prohibited by this Agreement. During the existence of an Event of Default all amounts held in any Cash Collateral Account (other than amounts held in the Main Operating Account subject to the Liens in favor of the Adequate Protection Parties (as defined in the Financing Order)), at the election of the Agent, shall be applied as required by Section 11.2(e); provided that during the existence of an Event of Default (1) notwithstanding the existence of such Event of Default or an acceleration of the Obligations, funds in the Main Operating Account that are not subject to the first priority Agent's Lien shall not be transferred out of the Main Operating Account other than for ordinary course expenditures to protect and preserve the Collateral (including all documented payroll expenses (including benefits), operating expenses of the Properties, taxes, insurance premiums, ground rents with respect to the Properties, and cash management, in each case, in the ordinary course of business, and the adequate protection payments) and (2) funds in any Cash Collateral Account that are subject to the first priority Agent's Lien (x) may, until otherwise directed by Agent, be transferred out of the Cash Collateral Accounts only for ordinary course expenditures to protect and preserve the Collateral (including all documented payroll expenses (including benefits), operating expenses of the Properties, taxes, insurance premiums, ground rents with respect to the Properties, and cash management, in each case, in the ordinary course of business and (y) at the Agent's sole discretion and with the consent of the Majority Lenders, any funds in the Cash Collateral Accounts that are subject to the first priority Agent's Lien may instead be applied at the direction of the Agent.

(b)     If no Event of Default has occurred and is continuing, the Obligors may invest the funds in any Cash Collateral Account as permitted by the Bankruptcy Court.

(c)     The Non-Debtor Guarantor shall maintain one or more accounts for the collection of the revenues and income of the Non-Debtor Guarantor and its Subsidiaries. The Non-Debtor Guarantor shall pay its expenses and the expenses of its Subsidiaries from such account consistent with its past practices. From time to time, and not less than once per calendar month, the Non-Debtor Guarantor shall cause any funds in excess of those needed to pay the actual and reasonably forecasted expenses of the Non-Debtor Guarantor and its Subsidiaries for the remainder of such month and the following month to be transferred into a Cash Collateral Account either directly or indirectly through one or more Cash Collateral Accounts.

(d)     The Obligors shall cause the Negative Pledge Debtors to use all cash of the Negative Pledge Debtors only in accordance with the Cash Management Order, the Tenant Obligations Order and the Financing Order.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

# ARTICLE 5

## TAXES, YIELD PROTECTION, AND ILLEGALITY

Section 5.1    Taxes.

(a)    Any and all payments by any Obligor to a Lender or the Agent under this Agreement and any other Loan Document shall be made free and clear of, and without deduction or withholding for any Taxes, except as provided below.  In addition, the Borrowers shall pay all Other Taxes.

(b)    The Borrowers shall indemnify and hold harmless each Lender and the Agent for the full amount of Taxes or Other Taxes (including any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 5.1) paid by such Lender or the Agent and any liability (including penalties, interest, additions to tax, and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted.  Payment under this indemnification shall be made within 30 days after the date such Lender or the Agent makes written demand therefor accompanied by a certificate setting forth in reasonable detail the amount and calculation of any indemnification payment so requested by such Lender or the Agent.  However, no Lender shall be entitled to any amounts under this Section 5.1 to the extent that the event giving rise to such Taxes or Other Taxes occurred more than one hundred and twenty (120) days prior to the date notice and demand therefor was given to the Borrowers.

(c)    If any Obligor shall be required by law to deduct or withhold any Taxes or Other Taxes from or in respect of any sum payable hereunder to any Lender or the Agent, then:

(i)    the sum payable shall be increased as necessary so that after making all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section 5.1) such Lender or the Agent, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made;

(ii)    such Obligor shall make such deductions and withholdings; and

(iii)    such Obligor shall pay the full amount deducted or withheld to the relevant Governmental Authority or other authority in accordance with any Legal Requirements.

(d)    No Obligor shall be required to increase any amounts payable to a Lender (including an Assignee) or the Agent with respect to any Taxes under this Section 5.1 where (i) such Taxes are attributable to the failure of the Agent or such Lender to comply with the requirements of Section 14.10 or (ii) the obligation to withhold amounts with respect to Taxes existed on the date (A) the Agent or such Lender became a party to this Agreement or (B) with respect to payments to a Lender which changes its applicable lending office by designating a different lending office (a "New Lending Office"), the date such Lender designated such New Lending Office with respect to the Term Loan.

32

(e)     If the Agent or a Lender determines in its sole discretion that it has received a refund or credit that is attributable to any Taxes or Other Taxes as to which the Agent or such Lender has been indemnified by an Obligor, or with respect to which the Obligor has paid an additional amount hereunder, the Agent or such Lender shall within 30 days after the date of such receipt pay over the amount of such refund or credit (to the extent so attributable) to such Obligor.  If a Governmental Authority later determines that the Agent or such Lender is not entitled to such refund or credit, such Obligor shall return the amount of such refund or credit to the Agent or Lender upon written demand.

(f)     Within a reasonable period after the date of any payment by any Obligor of Taxes or Other Taxes pursuant to this Article 5, such Obligor shall furnish the Agent the original or a certified copy of a receipt evidencing payment thereof, or other evidence of payment reasonably satisfactory to the Agent.

(g)     Notwithstanding any other provision contained herein, if a Lender is classified for U.S. federal income tax purposes as a partnership and is composed of partners, which if such partners were themselves Non-U.S. Lenders would be required to provide the documentation described in Section 14.10, then Section 5.1 hereof shall be applied to payments to such Lender as if such payments were made directly to the partners of such Lender provided such Lender obtains from such partners the documents described in Section 14.10 and provides such documentation to the Agent and Borrowers.

Section 5.2     Increased Costs and Reduction of Return.  If any Lender shall have determined that (a) the introduction after the Closing Date of any Capital Adequacy Regulation, (b) any change after the Closing Date in any Capital Adequacy Regulation, (c) any change after the Closing Date in the interpretation or administration of any Capital Adequacy Regulation by any central bank or other Governmental Authority charged with the interpretation or administration thereof, or (d) compliance by such Lender or any corporation or other entity controlling such Lender with any Capital Adequacy Regulation issued after the Closing Date, affects or would affect the amount of capital required or expected to be maintained by such Lender or any corporation or other entity controlling such Lender and (taking into consideration such Lender's or such corporation's or other entity's policies with respect to capital adequacy and such Lender's desired return on capital) determines that the amount of such capital is increased as a consequence of its Commitment, Term Loan, credits, or obligations under this Agreement, then, within thirty (30) days following receipt by the Borrowers of written demand for such payment (accompanied by a certificate referred to in Section 5.3) by such Lender through the Agent, the Borrowers shall pay to such Lender, from time to time as specified by such Lender, additional amounts (the "Additional Lender Amounts") sufficient to compensate such Lender for such increase; provided that such Lender shall not be entitled to any such amounts to the extent that the event giving rise to such additional cost or reduced amount receivable occurred more than one hundred and twenty (120) days prior to the date such notice and demand was given to the Borrowers.

Section 5.3     Certificates of Lenders.  Any Lender claiming reimbursement or compensation under this Article 5 shall deliver to the Borrowers (with a copy to the Agent) a

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

certificate setting forth in reasonable detail the amount and calculation of the funds payable to such Lender hereunder and such certificate shall be presumed to be correct and binding on the Borrowers.  To the extent any Lender receives a refund of all or a portion of the Additional Lender Amounts, such Lender shall promptly remit the same to the Borrowers.

Section 5.4    Replacement of Lenders.  If (i) any Lender requests reimbursement or compensation under this Article 5, (ii) if any Lender refuses to consent to an amendment, modification, supplement or waiver required pursuant to Section 13.2 with respect to any Loan Document which has otherwise been approved by Majority Lenders or (iii) any Lender becomes insolvent or has its assets become subject to a receiver, liquidator, trustee, custodian or other officer having similar powers, then Borrowers may, at their sole expense and effort, upon notice to such Lender and Agent, require such Lender to assign and delegate at par (in accordance with Section 13.3), all of its interests, rights and obligations in connection with the Term Loan under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that if a Lender is being replaced as a result of a request for reimbursement or compensation under this Article 5 with respect to taxes, costs or other amounts being incurred generally by the other Lenders, such Lender may only be replaced by an Eligible Assignee that will alleviate the need for the reimbursement or payment of such taxes, costs or other amounts.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrowers to require such assignment and delegation cease to apply.

Each Lender hereby grants to the Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by, and in accordance with, this Section 5.4.

Section 5.5    Survival.  The agreements and obligations of the Obligors in this Article 5 shall survive the payment of all other Obligations.

## ARTICLE 6

## COLLATERAL

Section 6.1    Grant of Security Interest.

(a)    As security for all Obligations, each Obligor hereby collaterally assigns and grants to the Agent, for the benefit of the Agent and the Lenders, a continuing security interest in, Lien on, assignment of, all of the following property and assets of such Obligor, whether now owned or existing or hereafter acquired or arising, regardless of where located:

(i)    all Accounts, including all credit enhancements therefor;

34

(ii)     all contract rights, including, without limitation, all rights of such Obligor as either lessor or lessee under any lease or rental agreement of real or personal property, including, without limitation, each Lease;

(iii)    all chattel paper;

(iv)    all documents;

(v)     all instruments;

(vi)    all supporting obligations and letter-of-credit rights;

(vii)   all General Intangibles (including, without limitation, payment intangibles, intercompany accounts, and software);

(viii)  all inventory and other goods;

(ix)    all equipment and fixtures;

(x)     all Investment Property (except as provided in the last sentence of this Section 6.1(a) below);

(xi)    all money, cash, cash equivalents, securities, and other property of any kind;

(xii)   the Cash Collateral Accounts, the Breakage Prepayment Account, each Prepayment Cash Collateral Account and all other deposit accounts and all other credits and balances with and other claims against any financial institution;

(xiii)  all notes, and all documents of title;

(xiv)   all books, records, and other property related to or referring to any of the foregoing, including, without limitation, books, records, account ledgers, data processing records, computer software and other property, and General Intangibles at any time evidencing or relating to any of the foregoing;

(xv)    all commercial tort claims listed on Schedule 6.1 and disclosed from time to time to the Agent pursuant to the terms of this Agreement;

(xvi)   if such Obligor is a Debtor, all Real Estate owned or leased by such Obligor;

(xvii)  all other personal property of such Obligor, excluding any avoidance actions under Chapter 5 of the Bankruptcy Code and recoveries therefrom; and

(xviii) all accessions to, substitutions for, and replacements, products, and proceeds of any of the foregoing, including, but not limited to, proceeds of any insurance policies, claims against third parties, and condemnation or requisition payments with respect to all or any of the foregoing.

All of the foregoing and all other property of such Obligor in which the Agent or any Lender may at any time be granted a Lien, is herein collectively referred to as the "Collateral." Notwithstanding anything herein to the contrary, in no event shall the Collateral (or any component term thereof) include or be deemed to include (i) the Capital Stock of any Foreign

100656687_1
(GGP_ DIP Credit Agreement 051309).DOC

Subsidiary, other than 65% in total voting power of such Capital Stock and 100% of non-voting Capital Stock, in each case, of a first tier Foreign Subsidiary of any Obligor, (ii) any contracts, instruments, licenses, license agreements or other documents (or any rights thereunder), to the extent (and only to the extent) that the grant of a security interest would (A) constitute a violation of a restriction in favor of a third party on such grant, (B) give any other party to such contract, instrument, license, license agreement or other document the right to terminate its obligations thereunder, or (C) violate any law; provided that the limitation set forth in this clause (ii) above shall not affect, limit, restrict or impair the grant by an Obligor of a security interest pursuant to this Agreement in any such right, to the extent that an otherwise applicable prohibition or restriction on such grant is rendered ineffective by any applicable law, including the UCC or the Bankruptcy Code, (iii) any direct or indirect interest in any Capital Stock of any joint venture, partnership or other entity if and for so long as the grant of such security interest or Lien shall constitute a default under or termination pursuant to the terms of the joint venture agreement, partnership agreement or other organizational documents of, or contract or other agreement of (or covering or purporting to cover the assets of) such joint venture, partnership or entity or its direct or indirect parent, or require the payment of a fee, penalty or similar increased costs or result in the loss of economic benefit or the abandonment or invalidation of such Obligor's or any Subsidiary's interest in such Capital Stock or shall otherwise adversely impact such interest in such joint venture, partnership or other entity; provided that the limitation set forth in this clause (iii) above shall not affect, limit, restrict or impair the grant by an Obligor of a security interest pursuant to this Agreement in any such right, to the extent that an otherwise applicable prohibition or restriction on such grant is rendered ineffective by any applicable law, including the UCC or the Bankruptcy Code, (iv) any Ground Lease of a Debtor which has been assumed pursuant to Section 365 of the Bankruptcy Code if the granting of a Lien hereunder would cause a default under or allow the termination of such Ground Lease (it being agreed that, to the extent the Lien granted pursuant to this Section 6.1 attaches to any such Ground Lease prior to a Debtor's assumption thereof, and the granting of a Lien hereunder would cause a default under or allow the termination of such Ground Lease, such Lien shall automatically be released upon such assumption and any Mortgage evidencing such Lien shall automatically terminate with respect to such Ground Lease), (v) the Gift Card and Lotto Accounts and (vi) any Real Estate of the Non-Debtor Guarantor; provided, further, that any such security interest and Lien shall attach immediately and automatically after any such disqualifying condition specified in clause (ii) or (iii) of this paragraph shall cease to exist.

(b)     All of the Obligations shall be secured by all of the Collateral.

Section 6.2     Perfection and Protection of Security Interest.

(a)     Each Obligor shall, as applicable, at such Obligor's expense, perform all steps reasonably requested by the Agent at any time to perfect, maintain, protect, and enforce the Agent's Liens, including:  upon an Event of Default, delivering to the Agent (1) the originals of all instruments, documents, and chattel paper, and all other Collateral of which the Agent reasonably determines it should have physical possession in order to perfect and protect the Agent's security interest therein, duly pledged, endorsed, or assigned to the Agent without restriction, (2) warehouse receipts covering any portion of the Collateral located in warehouses

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

and for which warehouse receipts are issued, (3) certificates of title (excluding deeds for Real Estate) covering any portion of the Collateral for which certificates of title have been issued and (4) all letters of credit on which such Obligor is named beneficiary. Notwithstanding anything to the contrary contained herein, no Obligor shall be required to obtain, maintain or provide any (x) mortgage or deed of trust (except as set forth in Section 6.3 below), title insurance commitment or policy or survey, in each case, in respect of any Property or (y) lockbox agreement, deposit account control agreement (or similar agreement), or securities account control agreement (or similar agreement), in each case, in respect of any Collateral.

(b)     To the extent permitted by any Legal Requirement, the Agent may file, without any Obligor's signature, one or more financing statements disclosing the Agent's Liens on the Collateral; provided that the Agent will not file any financing statement against any Obligor if such filing would require the payment of any documentary, intangibles or similar fees or taxes (other than customary filing charges per page and nominal fees and taxes).

(c)     To the extent any Obligor is or becomes the issuer of any Investment Property that is Collateral (in such capacity, an "Issuer"), each Obligor agrees as follows with respect to such Investment Property, but subject to the terms of any documents or agreements entered into prior to the Closing Date creating or evidencing any Pre-Petition Lien with respect to such Investment Property:

(i)     All such Investment Property issued by such Issuer, all warrants, and all non-cash dividends and other non-cash distributions in respect thereof at any time registered in the name of, or otherwise deliverable to, any Obligor, shall be delivered directly to the Agent, for the account of such Obligor, at the Agent's address for notices set forth in Section 15.7.

(ii)     All cash dividends, cash distributions, and other cash or cash equivalents in respect of such Investment Property at any time payable or deliverable to any Obligor shall be deposited into the Cash Collateral Account.

(iii)     Such Issuer will not acknowledge any transfer or encumbrance in respect of such Investment Property to or in favor of any Person other than the Agent or a Person designated by the Agent in writing.

Section 6.3     Delivery of Mortgages.  Within sixty (60) days of the Funding Date, the applicable Obligor shall deliver mortgages with respect to each of the Primary Properties substantially in the relevant form attached hereto as Exhibit I-1 or I-2 appropriately completed, with such state specific changes as are necessary to create a Lien on the applicable Real Estate in such state and otherwise in a form described in Schedule 6.3 (each, a "Mortgage" and, collectively, the "Mortgages").

Section 6.4     Title to, Liens on, and Use of Collateral.  Each Obligor represents and warrants to the Agent and the Lenders and agrees with the Agent and the Lenders that:  (a) all of the Collateral owned by such Obligor is and will (subject to dispositions permitted hereunder) continue to be owned by such Obligor free and clear of all Liens whatsoever, except for Permitted Liens, (b) the Agent's Liens in the Collateral will not be junior in priority to any prior

37

Lien other than the Carve-Out, the Pre-Petition Liens and Liens described in <u>clauses (b)</u>, <u>(c)</u>, <u>(d)</u>, <u>(e)</u>, <u>(f)</u>, <u>(g)</u>, <u>(i)</u> (to the extent, and only to the extent, set forth in the Financing Order), <u>(j)</u> (to the extent, and only to the extent, so agreed by the Majority Lenders), <u>(m)</u>, <u>(n)</u>, <u>(o)</u>, <u>(p)</u>, <u>(s)</u>, <u>(t)</u>, <u>(u)</u> and <u>(v)</u> (to the extent existing on the Entry Date) of the definition of "<u>Permitted Liens</u>" and (c) such Obligor will use, store, and maintain the Collateral owned by such Obligor with all reasonable care.  The inclusion of proceeds in the Collateral shall not be deemed to constitute the Agent's or any Lender's consent to any sale or other disposition of the Collateral except as expressly permitted herein.

<span style="color:blue">Section 6.5</span>      <u>Access and Examination; Confidentiality</u>.

(a)      The Agent (or its representatives and/or advisors) may at reasonable times during regular business hours as may be requested by the Agent upon reasonable advance notice, and at any time when an Event of Default exists, upon reasonable notice to the Borrowers have access to, examine, audit, make extracts from or copies of, and inspect any or all of the Obligors' records, files, and books of account and the Collateral, and discuss the Obligors' affairs with executive officers of any Obligor.

(b)      The Agent and each Lender severally agree to take normal and reasonable precautions and exercise due care to maintain the confidentiality of all financial information and other information relating to the Borrowers and each Debtor, except to the extent that such information (i) was or becomes generally available to the public other than as a result of disclosure by the Agent or such Lender or (ii) was or becomes available on a nonconfidential basis from a source other than a Debtor (so long as such source is not known to Agent, such Lender or any of their respective Affiliates to be bound by confidentiality obligations to any Debtor).  Notwithstanding the foregoing, the Agent and any Lender may disclose any such information (1) pursuant to any requirement of any Governmental Authority to which the Agent or such Lender is subject or in connection with an examination of the Agent or such Lender by any such Governmental Authority, (2) pursuant to subpoena or other court process, (3) when appropriate to do so in accordance with the provisions of any applicable Legal Requirement, (4) to the extent reasonably necessary in connection with any litigation or proceeding between or among any Obligor and the Agent, any Lender, or their respective Affiliates or any other litigation or proceeding to which the Agent, any Lender, or their respective Affiliates may be party arising out of or related to this Agreement, any other Loan Document, or any transaction contemplated herein, (5) to the extent reasonably required in connection with the exercise of any right or remedy hereunder or under any other Loan Document, (6) to the Agent's or such Lender's directors, officers, employees, managers, independent auditors, accountants, attorneys, and other professional advisors on a "need to know" basis for use in connection with this Agreement and the other Loan Documents, (7) to any prospective Participant or Assignee, actual or potential and (8) to its Affiliates  on a "need to know" basis for use in connection with this Agreement and the other Loan Documents; provided that the receiving parties pursuant to subsections (6), (7) and (8) above, agree to keep such information confidential to the same extent required of the Agent and the Lenders hereunder.  The obligations of each party contained in this <u>Section 6.5(b)</u> shall continue for a period of three (3) years after such party ceases to be a party to this Agreement.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

Section 6.6    Documents, Instruments, and Chattel Paper.  Each Obligor represents and warrants to the Agent and the Lenders that (a) to its Knowledge all documents, instruments, and chattel paper describing, evidencing, or constituting Collateral owned by such Obligor, and all signatures and endorsements thereon of any Obligor, are and will be complete, valid, and genuine in all material respects, and (b) all goods evidenced by such documents, instruments, and chattel paper are and will be owned by such Obligor, free and clear of all Liens other than Permitted Liens.

Section 6.7    Right to Cure.  Upon the occurrence and during the continuance of an Event of Default, the Agent may, in its reasonable discretion, and shall, at the direction of the Majority Lenders and upon ten (10) days notice to the applicable Obligor, pay any amount or do any act required of any Obligor hereunder or under any other Loan Document in order to preserve, protect, maintain, or enforce the Obligations, the Collateral, or the Agent's Liens therein, and which any Obligor fails to pay or do, including payment of any judgment against any Obligor, any insurance premium, any warehouse charge, any finishing or processing charge, any landlord's or bailee's claim, and any other obligation secured by a Lien upon or with respect to the Collateral; provided, however, that the Agent's obligations to make any payments under this Section 6.7 shall only arise to the extent the Agent receives sufficient funds from the Lenders to make such payments; provided further that neither the Agent nor the Lenders shall pay any amount (i) being diligently contested by appropriate proceedings or (ii) in respect of any Pre-Petition Lien.  All payments that the Agent makes under this Section 6.7 and all out-of-pocket costs and reasonable expenses that the Agent pays or incurs in connection with any reasonable action taken by it hereunder shall be considered part of the Obligations and shall bear interest until repaid at the Default Rate.  Any payment made or other action taken by the Agent under this Section 6.7 shall be without prejudice to any right to assert an Event of Default hereunder and to proceed thereafter as herein provided.

Section 6.8    Power of Attorney.  Upon the occurrence of and during the continuance of an Event of Default, each Obligor hereby appoints the Agent and the Agent's designee(s) as such Obligor's attorney to sign such Obligor's name on any invoice, bill of lading, warehouse receipt, or other document of title relating to any Collateral, on drafts against customers, on assignments of Accounts, on notices of assignment, financing statements, and other public records and to file any such financing statements permitted under this Agreement by electronic means with or without a signature as authorized or required by applicable law or filing procedure.  Each Obligor ratifies and approves all acts of such attorney.  This power, being coupled with an interest, is irrevocable until this Agreement has been terminated and the non-contingent Obligations have been fully satisfied.

Section 6.9    The Agent's and Lenders' Rights, Duties, and Liabilities.  The Obligors assume all responsibility and liability arising from or relating to the use, sale, or other disposition of the Collateral.  The Obligations shall not be affected by any failure of the Agent or any Lender to take any steps to perfect the Agent's Liens or to collect or realize upon the Collateral, nor shall loss of or damage to the Collateral release any Obligor from any of the Obligations.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

Section 6.10    Site Visits, Observations, and Testing.  The Agent and its representatives will have the right at any commercially reasonable time, and upon reasonable advance notice to the applicable Obligor and subject to the terms and conditions of any applicable Ground Lease or other Lease, to enter and visit the Real Estate of any Obligor constituting Collateral for the purposes of observing such Real Estate and taking and removing soil or groundwater samples on any part of such Real Estate (a) upon prior consultation with such Obligor where the Agent reasonably believes there exists the presence of a Contaminant at concentrations exceeding those allowed by Environmental Laws that could reasonably be expected to materially and adversely affect the value of such Real Estate or (b) at any time during the existence of an Event of Default; provided that in the event such Real Estate is leased by a Obligor, such observing and testing shall be conducted in accordance with the terms of the Ground Lease with respect to such Real Estate and in observation of the rights of any Tenant.  The Agent is under no duty, however, to visit or observe such Real Estate or to conduct tests, and any such acts by the Agent will be solely for the purposes of protecting the Agent's Liens and preserving the Agent and the Lenders' rights and remedies under this Agreement.  No site visit, observation, or testing by the Agent and the Lenders will result in a waiver of any Default or Event of Default or impose any liability on the Agent or the Lenders other than for damages incurred as a result of the gross negligence, willful misconduct, bad faith or breach of the Loan Documents by the Agent or any Lender.  In each instance, the Agent will give such Obligor reasonable notice before entering such Real Estate or any other place the Agent is permitted to enter under this Section 6.10.  The Agent will make reasonable efforts to avoid interfering with any use of such Real Estate or any other property in exercising any rights provided hereunder.  The Agent agrees to indemnify, defend and hold harmless such Obligor from any loss or liability arising from damages caused to Real Estate or any personal property by Agent's representatives' actions taken under the authority granted by this Section 6.10.  The Agent agrees that any environmental professional retained to perform the taking and removing soil or groundwater samples under this Section 6.10 shall be reasonably qualified and possess reasonable levels of insurance naming Borrowers and any other relevant Obligor as an additional insured for the environmental sampling the environmental professional has been retained to conduct.

Section 6.11    Joinder of Subsidiaries.  Promptly upon any (a) wholly-owned Subsidiary (other than a Foreign Subsidiary or a Negative Pledge Debtor) of the Borrowers or its property becoming subject to the Case or (b) any wholly-owned Subsidiary (other than a Foreign Subsidiary) that is a Negative Pledge Debtor avoiding or having avoided or repaid or discharged the Pre-Petition Liens securing such Subsidiary's Prior Lien Debt (other than pursuant to a refinancing permitted by this Agreement), the Borrowers shall cause such Subsidiary to execute and deliver to the Agent a joinder agreement and a Guaranty Supplement pursuant to which such Subsidiary will become a party hereto for the purposes of guaranteeing the Obligations and granting the Agent Liens on the Collateral of such new Subsidiary of a type described in the definition of Collateral and such Subsidiary shall (a) obtain such orders from the Bankruptcy Court in the Case as the Agent may reasonably request to effect such joinder and such guarantee and (b) execute and deliver such other instruments, certificates, supplements to the Schedules and agreements in connection herewith and therewith as the Agent may reasonably request subject to the limitations set forth in Section 6.2.

40

Section 6.12    Voting Rights, etc. in Respect of Investment Property.

(a)    So long as no Event of Default shall be in existence and the relevant Obligor has not received a written notice pursuant to Section 6.12(b) (i) each Obligor shall be entitled to exercise any and all voting and other consensual rights (including, without limitation, the right to give consents, waivers, and notifications in respect of any securities) pertaining to its Investment Property or any part thereof; provided that without the prior written consent of the Majority Lenders, no vote shall be cast or consent, waiver, or ratification given or action taken which would (A) be inconsistent with or violate any provision of this Agreement or any other Loan Document in any material respect or (B) amend, modify, or waive any material term, provision, or condition of the certificate of incorporation, bylaws, certificate of formation, or other charter document or other agreement relating to, evidencing, providing for the issuance of, or securing any such Investment Property, in any manner that would materially impair such Investment Property or the Agent's Liens therein and (ii) each Obligor shall be entitled to receive, and each Obligor must, promptly following its receipt, deposit into the Cash Collateral Accounts, any and all dividends and interest paid in respect of any of such Investment Property (unless otherwise required, or permitted to be used, by this Agreement, including uses permitted under Section 9.13).

(b)    During the existence of an Event of Default, (i) the Agent may, upon written notice to the relevant Obligor, transfer or register in the name of the Agent or any of its nominees, for the benefit of the Agent and the Lenders, any or all of the Collateral consisting of Investment Property, the proceeds thereof (in cash or otherwise), and all liens, security, rights, remedies, and claims of any Obligor with respect thereto (as used in this Section 6.12 collectively, the "Pledged Collateral") held by the Agent hereunder, and the Agent or its nominee may thereafter, after written notice to the applicable Obligor, exercise all voting and corporate rights at any meeting of any corporation, partnership, or other business entity issuing any of the Pledged Collateral and any and all rights of conversion, exchange, subscription, or any other rights, privileges, or options pertaining to any of the Pledged Collateral as if it were the absolute owner thereof, including, without limitation, the right to exchange at its discretion any and all of the Pledged Collateral upon the merger, consolidation, reorganization, recapitalization, or other readjustment of any corporation, partnership, or other business entity issuing any of such Pledged Collateral or upon the exercise by any such issuer or the Agent of any right, privilege, or option pertaining to any of the Pledged Collateral, and in connection therewith, to deposit and deliver any and all of the Pledged Collateral with any committee, depositary, transfer agent, registrar, or other designated agency upon such terms and conditions as it may determine, all without liability except to account for property actually received by it, but the Agent shall have no duty to exercise any of the aforesaid rights, privileges, or options, and the Agent shall not be responsible for any failure to do so or delay in so doing, (ii) to the extent permitted under Legal Requirements, after the Agent's giving of the notice specified in clause (i) of this Section 6.12(b) all rights of any Obligor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 6.12(a)(i) and to receive the dividends, interest, and other distributions which it would otherwise be authorized to receive and retain thereunder shall be suspended until such Event of Default shall no longer exist, and all such rights shall, until such Event of Default shall no

41

longer exist, thereupon become vested in the Agent which shall thereupon have the sole right to exercise such voting and other consensual rights and to receive and hold as Pledged Collateral such dividends, interest, and other distributions, (iii) all dividends, interest, and other distributions which are received by any Obligor contrary to the provisions of this Section 6.12(b) shall be received in trust for the benefit of the Agent, shall be segregated from other funds of such Obligor and shall be forthwith deposited into the Cash Collateral Accounts as Collateral in the same form as so received (with any necessary endorsement), and (iv) each Obligor shall execute and deliver (or cause to be executed and delivered) to the Agent all such proxies and other instruments as the Agent may reasonably request for the purpose of enabling the Agent to exercise the voting and other rights which it is entitled to exercise pursuant to this Section 6.12(b) and to receive the dividends, interest, and other distributions which it is entitled to receive and retain pursuant to this Section 6.12(b).

Section 6.13    Remedies.  Neither the Agent nor any Lender shall take any action under this Article 6 (or similar provisions of any Loan Document) except after the five Business Day waiting period in accordance with the Financing Order.

# ARTICLE 7

# BOOKS AND RECORDS; FINANCIAL INFORMATION; NOTICES

Section 7.1    Books and Records.  The Borrowers shall maintain, at all times, correct and complete books, records, and accounts to enable the preparation of its financial statements, on a consolidated basis, in accordance with GAAP.

Section 7.2    Financial Information.  The Borrowers will furnish, or cause to be furnished, to the Agent, the following:

(a)    As soon as available, but in any event not later than 90 days after the close of each Fiscal Year, an audited consolidated balance sheet and consolidated statements of income and cash flow for the General Partner and its consolidated Subsidiaries for such Fiscal Year, and with respect to such audited financial statements, setting forth in comparative form figures for the previous Fiscal Year, all in reasonable detail, fairly presenting, in all material respects, the financial position and the results of operations of the General Partner and its consolidated Subsidiaries as at the date thereof and for the Fiscal Year then ended in accordance with GAAP.  Such financial statements shall be examined in accordance with generally accepted auditing standards by, and accompanied by a report thereon (without any qualification or exception as to the scope of such audit, other than any such qualification or exception arising as a result of the commencement of the Case or the events leading thereto) of Deloitte & Touche LLP, other independent certified public accountants of national standing selected by the General Partner or another firm reasonably satisfactory to the Agent.  The General Partner authorizes the Agent to communicate directly with the General Partner's certified public accountants, upon reasonable advance notice to the Borrowers, and by this provision, authorizes those accountants to disclose to the Agent any and all financial statements and other supporting financial documents and schedules relating to the General Partner and its

42

consolidated Subsidiaries and to discuss directly with the Agent the finances and affairs of the General Partner and its consolidated Subsidiaries; provided that the Borrowers shall have a reasonable opportunity to participate in such communications.

(b)     As soon as available but in any event not later than 45 days after the end of each of the first three Fiscal Quarters, the unaudited consolidated balance sheet of the General Partner and its consolidated Subsidiaries as at the end of such Fiscal Quarter, and unaudited consolidated statements of income for the General Partner and its consolidated Subsidiaries for such Fiscal Quarter and for the period from the beginning of the Fiscal Year to the end of such Fiscal Quarter, all in reasonable detail, fairly presenting, in all material respects, the financial position and results of operations of the General Partner and its consolidated Subsidiaries as at the date thereof and for such periods, in accordance with GAAP (other than presentation of footnotes and subject to normal year-end audit adjustments). The General Partner shall certify by a certificate signed by its chief financial officer that all such financial statements have been prepared in accordance with GAAP and present fairly, in all material respects, subject to normal year-end adjustments and the absence of footnotes, the General Partner's consolidated financial position as at the dates thereof and its results of operations for the periods then ended.

(c)     As soon as available but in any event not later than 90 days after the end of each Fiscal Year and 45 days after the end of each of the first three Fiscal Quarters, the unaudited consolidated balance sheet of the Obligor or Obligors owning each Primary Property and any Debtor owning any Negative Pledge Property to the extent prepared for the holder of the Prior Lien Debt as at the end of such Fiscal Year or Fiscal Quarter, as the case may be, and unaudited consolidated statements of income for the Obligor or Obligors owning each Primary Property and any Negative Pledge Property to the extent prepared for the holder of the Prior Lien Debt for such period and, with respect to each of the first three Fiscal Quarters of each Fiscal Year, for the period from the beginning of the Fiscal Year to the end of such Fiscal Quarter.

(d)     With each of the financial statements delivered pursuant to Section 7.2(a) and Section 7.2(b), the General Partner shall provide to the Agent a certificate of its chief financial officer or other principal financial officer in the form of Exhibit E (the "Compliance Certificate") stating that, except as explained in reasonable detail in such certificate, no Default or Event of Default then exists. If such certificate discloses that a Default or Event of Default then exists, such certificate shall set forth what action the Obligors have taken or propose to take with respect thereto.

(e)     Within ten (10) days after the filing thereof or the date the same are sent, as applicable, the Obligors shall provide to the Agent copies of all reports, if any, to or other documents filed by the General Partner with the Securities and Exchange Commission under the Exchange Act, and all reports, notices, or statements sent (other than routine non-material correspondence) by the General Partner to all holders of any equity interests of the General Partner or of any Debt of any Obligor registered under the Securities Act of 1933 or to the trustee under any indenture under which the same is issued, in each case, unless such statement, report or certificate is made publicly available by such Obligor.

43

(f)     Promptly and in any event no later than the last Business Day of each month, the Obligors shall provide to the Agent an updated 13-week cash flow forecast of receipts and disbursements on a consolidated basis.

(g)     Promptly, and in any event no later than 2:00 p.m. (New York City time), on the last Business Day of each week, the Obligors shall provide to the Agent the cash balance of the Main Operating Account as of the close of business on the immediately preceding Business Day (which notice may be provided by electronic mail).

(h)     Promptly after receipt thereof, the General Partner shall provide to the Agent a copy of the final management letter prepared for the General Partner by its independent certified public accountants in connection with its annual audit.

(i)     Promptly after any filing thereof, the Obligors shall deliver to the Agent copies of all written pleadings, motions, applications, financial information, petitions, schedules, reports, and other papers and documents filed with the Bankruptcy Court by or on behalf of any Debtor in the Case.

(j)     Promptly after any delivery thereof, the Obligors shall deliver to the Agent copies of all material written reports and presentations (other than information which is privileged or confidential in respect of the recipient) delivered by or on behalf of any Debtor to any official creditors' committee in the Case.

(k)     The Obligors shall provide to the Agent such additional information as the Agent (and/or any Lender, acting through the Agent) may from time to time reasonably request regarding the financial and business affairs of any Debtor.

Documents required to be delivered pursuant to this Section 7.2 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrowers post such documents, or provide a link thereto on the website of the Securities and Exchange Commission at http://www.sec.gov or on the website of the General Partner at www.ggp.com (or such other website address accessible to the Agent and the Lenders as notified to the Agent in accordance with the terms hereof); or (ii) on which such documents are posted on the Borrowers' behalf on IntraLinks/IntraAgency or another website to which each Lender and the Agent have access (whether a commercial, third-party website or whether sponsored by the Agent); provided that the Borrowers shall notify (which notice may be by facsimile or electronic mail) the Agent of the posting of any such documents.  Notwithstanding anything to the contrary contained in clauses (e) through (j) of this Section 7.2, the failure to deliver any notice or provide any information in accordance therewith shall not constitute a Default or Event of Default so long as such notice or information is delivered to the Agent concurrently with the delivery of the financial statements pursuant to clauses (a) or (b) above for the period in which such relevant notice or information were to have been given to the Agent. Notwithstanding anything contained herein, in every instance the Borrowers shall be required to provide paper copies of the Compliance Certificates required by Section 7.2(d) to the Agent; provided, however, that if such Compliance Certificate is first delivered by electronic means, the

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

date of such delivery by electronic means shall constitute the date of delivery for purposes of compliance with Section 7.2(d).

The Borrowers hereby acknowledge that (a) the Agent will make available to the Lenders materials and/or information provided by or on behalf of the Obligors hereunder (collectively, "Obligor Materials") by posting the Obligor Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Obligors or their securities) (each, a "Public Lender"). The Borrowers hereby agree that they will identify that portion of the Obligor Materials that may be distributed to the Public Lenders and that (w) all such Obligor Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Obligor Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Agent and the Lenders to treat such Obligor Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Obligors or their securities for purposes of United States federal and state securities laws; (y) all Obligor Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Agent shall be entitled to treat any Obligor Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

Each Lender acknowledges that circumstances may arise that require it to refer to Obligor Materials that may contain material non-public information ("Private Side Communications"). Accordingly, each Lender agrees that it will use commercially reasonable efforts to designate at least one individual to receive Private Side Communications on its behalf in compliance with its procedures and applicable law and identify such designee (including such designee's contact information) on such Lender's "Administrative Questionnaire." Each Lender agrees to notify the Agent in writing from time to time of such Lender's designee's e-mail address to which notice of the availability of Private Side Communications may be sent by electronic transmission.

Each Lender that elects not to be given access to Private Side Communications does so voluntarily and, by such election, (i) acknowledges and agrees that the Agent and other Lenders may have access to Private Side Communications that such electing Lender does not have and (ii) takes sole responsibility for the consequences of, and waives any and all claims based on or arising out of, not having access to Private Side Communications.

The Platform is provided "as is" and "as available." The Agent does not warrant the accuracy or completeness of the Obligor Materials, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by Agent in connection with the Obligor Materials or the Platform. In no event shall Agent or any Agent-Related Person have any liability to the Obligors, any Lender or any other person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in

45

tort, contract or otherwise) arising out of any Obligor's or Agent's transmission of communications through the Internet, except to the extent the liability of such person is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such person's gross negligence or willful misconduct.

Section 7.3    Notices to the Agent.  The Obligors shall notify the Agent in writing of the following matters at the following times (which notice shall set forth, in reasonable detail, the action that the Obligors or any ERISA Affiliate, as applicable, has taken or proposes to take with respect thereto):

(a)    promptly upon obtaining Knowledge of any Default or Event of Default;

(b)    promptly upon obtaining Knowledge of any event or development which could reasonably be expected to have, or has resulted in, a Material Adverse Effect;

(c)    promptly upon obtaining Knowledge of any pending (or written threat of any) action, suit, proceeding, or counterclaim by any Person, or any pending or threatened (in writing) investigation by a Governmental Authority, which could reasonably be expected to have, or has resulted in, a Material Adverse Effect;

(d)    promptly upon obtaining Knowledge of any pending (or written threat of any) strike, work stoppage, unfair labor practice claim, or other labor dispute affecting any Obligor, in each case in a manner which could reasonably be expected to have, or has resulted in, a Material Adverse Effect;

(e)    promptly upon obtaining Knowledge of any violation of any law, statute, regulation, or ordinance of a Governmental Authority affecting any Obligor which could reasonably be expected to have, or has resulted in, a Material Adverse Effect;

(f)    promptly after receipt of any notice of any violation by any Obligor of any Environmental Law which could reasonably be expected to have, or has resulted in, a Material Adverse Effect or that any Governmental Authority has asserted that any Obligor is not in compliance with any Environmental Law or is investigating any Obligor's compliance therewith, in each case, which could reasonably be expected to have, or has resulted in, a Material Adverse Effect;

(g)    promptly after receipt of any written notice that any Obligor is or may be liable to any Person as a result of the Release or threatened Release of any Contaminant or that any Obligor (or Obligor's Property) is subject to an Environmental Lien which has priority over the Agent's Liens or any investigation by any Governmental Authority evaluating whether any remedial action is needed to respond to the Release or threatened Release of any Contaminant which, in each case, could reasonably be expected to have, or has resulted in, a Material Adverse Effect;

(h)    at least 30 days prior to any change in any Obligor's legal name, state of organization, or form of organization;

46

(i)     upon request, each annual report (Form 5500 series), including Schedule B thereto, filed with the PBGC, the DOL, or the IRS with respect to each Pension Plan;

(j)     upon request, copies of each actuarial report for any Pension Plan and annual report for any Multi-employer Plan, and promptly after receipt thereof by any Obligor or any ERISA Affiliate, copies of the following:  (i) any notices of the PBGC's intention to terminate a Pension Plan or to have a trustee appointed to administer such Pension Plan, (ii) any unfavorable determination letter from the IRS regarding the qualification of a Pension Plan under Section 401(a) of the Code or (iii) any notice from a Multi-employer Plan regarding the imposition of withdrawal liability;

(k)     promptly after any Obligor or any ERISA Affiliate has Knowledge that any of the following events, which could reasonably be expected to have, or has resulted in, a Material Adverse Effect, has or will occur:  (i) a Multi-employer Plan has been or will be terminated, (ii) the administrator or plan sponsor of a Multi-employer Plan intends to terminate a Multi- employer Plan, or (iii) the PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multi-employer Plan;

(l)     promptly upon obtaining Knowledge of any (i) default, breach or failure to perform alleged in writing on the part of any Debtor under or in regard to any Major Lease, (ii) default, breach or failure to perform on the part of any Tenant under any Major Lease or any assertion, in writing, by any such Tenant or any guarantor of any such Tenant's obligations under such Major Lease that such Tenant or guarantor intends to seek to terminate such Major Lease or the guarantee of the Tenant's obligations thereunder or (iii) bankruptcy or similar action relating to any such Tenant or guarantor, in each case, which could reasonably be expected to have, or has resulted in, a Material Adverse Effect;

(m)     promptly upon obtaining Knowledge of any Casualty that is expected to result in damages in excess of the Threshold Amount or any Condemnation that could reasonably be expected to have a material adverse effect on the value of the relevant Property affected thereby, information regarding such Casualty or Condemnation (as applicable) in such detail as the Agent may reasonably request;

(n)     each Obligor shall deliver to the Agent copies of any written notices of material default or material event of default relating to any Major REA served to or by such Debtor which could reasonably be expected to have a Material Adverse Effect; and

(o)     promptly upon obtaining Knowledge that the aggregate amount of any Tenant Allowances made in respect of Primary Properties has exceeded $7,000,000 in any Fiscal Year (for purposes of the Fiscal Year ending December 31, 2009, for the period from the Closing Date through December 31, 2009).

Notwithstanding anything to the contrary contained in clauses (g), (h), (j), (k), (l), (m), (n) or (o) of this Section 7.3, the failure to deliver any  notice or provide any information in accordance therewith shall not constitute a Default or Event of Default so long as such notice or

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

information is delivered to the Agent concurrently with the delivery of the financial statements pursuant to <u>clauses (a)</u> or <u>(b)</u> of <u>Section 7.2</u> for the period in which such relevant notice or information were to have been given to the Agent. Notwithstanding the foregoing, notice shall be deemed to have been properly given in respect of the events, facts or circumstances set forth in this <u>Article 7</u> if such events, facts or circumstances are described in any pleading, motion, application, financial information, petition, schedule, report and other papers or documents delivered to the Agent pursuant to <u>Section 7.2(i)</u> or <u>Section 7.2(j)</u>.

<div align="center">

**ARTICLE 8**

**GENERAL WARRANTIES AND REPRESENTATIONS**

</div>

Each of the Obligors warrants and represents to the Agent and the Lenders as follows:

**Section 8.1** <u>Authorization, Validity, and Enforceability of this Agreement and the Loan Documents; No Conflicts</u>. Subject to entry of the Financing Order with respect to each Debtor, each Obligor has the power and authority to execute, deliver, and perform this Agreement and the other Loan Documents to which it is a party, to incur the Obligations, and to grant to the Agent the Liens upon the Collateral. Subject to entry of the Financing Order with respect to each Debtor, each Obligor has taken all necessary action (including, without limitation, obtaining approval of its stockholders, general partners, limited partners, members, or other applicable equity owners, if necessary) to authorize its execution, delivery, and performance of this Agreement and the other Loan Documents to which it is a party. This Agreement and the other Loan Documents have been duly executed and delivered by each Obligor and, subject to entry of the Financing Order with respect to each Debtor, constitute the legal, valid, and binding obligations of each Obligor, enforceable against it in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally, and the Cases in particular. Each Obligor's execution, delivery, and performance of this Agreement and the other Loan Documents to which it is a party do not conflict with, or constitute a violation or breach of, or constitute a default under, or result in the creation or imposition of any Lien upon the property of any Obligor by reason of the terms of (a) any post-petition contract, agreement, indenture, or instrument to which such Obligor is a party or which is binding upon it, in each case which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, (b) any Legal Requirement applicable to such Obligor which could reasonably be expected to have a Material Adverse Effect, or (c) the certificate of limited partnership, agreement of limited partnership, certificate of incorporation, bylaws, or other organizational or constituent documents, as the case may be, of the Borrowers.

**Section 8.2** <u>Validity and Priority of Security Interest; Administrative Priority</u>.

(a) The provisions of this Agreement and the other Loan Documents create Liens upon the Collateral in favor of the Agent, for the benefit of the Agent and the Lenders, which shall be deemed valid and perfected by entry of the Financing Order with respect to each Obligor and which shall constitute continuing Liens on the Collateral having priority over all

<div align="center">48</div>

other Liens on the Collateral (except the Carve-Out and as provided in Section 6.4), securing all the Obligations. The Agent shall not be required to file or record any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Liens and security interest granted by or pursuant to this Agreement, the Financing Order or any other Loan Document, except (i) the financing statement naming GGMI as debtor to be filed with the Secretary of State of the State of Delaware or (ii) to the extent not required by Section 6.2(a). As of the Closing Date, GGMI has not incurred any Debt for borrowed money that is secured by one or more Liens, except for the Liens created by this Agreement.

(b)     Pursuant to Section 364(c)(1) of the Bankruptcy Code, the Obligations of the Obligors shall at all times constitute allowed administrative expenses in the Case, having priority over all administrative expenses of and unsecured claims against the applicable Obligor now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code, subject, as to priority, only to the Carve-Out and any adequate protection Liens granted pursuant to the Financing Order, and shall at all times be senior to the rights of any Obligor, any Obligor's estate, and any successor trustee or estate representative in the Case or any subsequent proceeding or case under the Bankruptcy Code. Each of the Guarantors set forth on Schedule 1.1B (other than the Non-Debtor Guarantor), together with the Borrowers, and the Negative Pledge Debtors collectively constitute all of the Persons that are subject to the Case as of May 4, 2009.

Section 8.3     Corporate Name; Prior Transactions. Except as set forth on Schedule 8.3, during the past four months, no Obligor has been known by or used any other corporate name, or been a party to any merger or consolidation with any Person (other than Affiliates of the Borrower).

Section 8.4     Capitalization; Subsidiaries. Each Obligor is (a) duly incorporated, formed, or organized, as the case may be, and validly existing in good standing under the laws of its state of incorporation, formation, or organization, and (b) qualified to do business as a foreign business entity and in good standing in each jurisdiction in which the failure to be so qualified or be in good standing has had, or could reasonably be expected to have, a Material Adverse Effect, and (c) subject to the entry of the Financing Order with respect to each Debtor, has all requisite power and authority to conduct its business and own its property as presently conducted or owned. As of the Petition Date, the Capital Stock of each Obligor (other than the General Partner) and each Subsidiary of an Obligor directly owned by either Borrower or any Subsidiary is owned beneficially and of record in the amounts and by the Persons set forth on Schedule 8.4 (other than minor typographical errors and shortening of legal names). Each of the Guarantors (other than the Borrowers) and each of the Negative Pledge Debtors is a Subsidiary of GGPLP.

Section 8.5     Material Agreements. The Borrowers have granted the Agent access to true and complete copies of all Material Agreements. Except as indicated in Schedule 8.5 or as may occur as a result of the commencement of the Case, (a) each of the Material Agreements

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

is in full force and effect and, to the Knowledge of the Obligors, there are no material defaults thereunder on the part of any other party thereto which are not subject to the Automatic Stay or which would reasonably be expected to have a Material Adverse Effect, and (b) no Debtor is in default in any material respect in the performance, observance or fulfillment of any of its obligations, covenants or conditions contained in any agreement evidencing or creating any Permitted Lien which is not subject to the Automatic Stay or any other Material Agreement to which it is a party or by which it or its Property is bound which are not subject to the Automatic Stay or which would reasonably be expected to have a Material Adverse Effect.

Section 8.6    Proprietary Rights.  To the Obligors' Knowledge, as of the Closing Date, none of their Proprietary Rights infringe on or conflict with any other Person's property and no other Person's property infringes on or conflicts with such Proprietary Rights, in each case, in a manner which could reasonably be expected to have a Material Adverse Effect.

Section 8.7    Litigation.  As of the Closing Date, there is no pending or (to any Obligor's Knowledge) written threat of, any action, suit, proceeding, or counterclaim by any Person, or investigation by any Governmental Authority, which could reasonably be expected to have a Material Adverse Effect.

Section 8.8    Labor Disputes.  There is no pending or (to any Obligor's Knowledge) threatened, strike, work stoppage, material unfair labor practice claim, or other material labor dispute against or affecting any Obligor or its respective employees which could reasonably be expected to have a Material Adverse Effect.

Section 8.9    Environmental Laws.  Except as otherwise disclosed on Schedule 8.9, as of the Petition Date:

(a)    Each Debtor has complied in all material respects with all Environmental Laws except where failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)    Each Debtor has obtained all Permits necessary for its current operations under Environmental Laws if the failure to do so could reasonably be expected to have a Material Adverse Effect, and all such Permits are in good standing and each Debtor is in compliance with all terms and conditions of such Permits except for non-compliance that could not reasonably be expected to have a Material Adverse Effect.

(c)    No Debtor has received any summons, complaint, order, or similar written notice indicating that it is not currently in compliance with, or that any Governmental Authority is investigating its compliance with, any Environmental Laws or that it is or may be liable to any other Person as a result of a Release or threatened Release of a Contaminant which could reasonably be expected to have a Material Adverse Effect.

(d)    To each Obligor's Knowledge, none of the present operations of any Debtor is the subject of any current investigation by any Governmental Authority evaluating whether any

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

remedial action is needed to respond to a Release or threatened Release of a Contaminant which could reasonably be expected to have a Material Adverse Effect.

(e) To each Obligor's Knowledge, there has been no Release of a Contaminant at any Debtor's Property that requires, or would reasonably be expected to require, investigation, removal, remediation, or other response action under Environmental Laws which, in each case, could reasonably be expected to have a Material Adverse Effect.

The representations and warranties contained in this <u>Section 8.9</u> are the sole and exclusive representation being made by the Obligors with respect to any environmental matter related in any way to this Agreement or subject matter.

Section 8.10     No Violation of Law. No Debtor is in violation of any law, statute, regulation, ordinance, judgment, order, or decree applicable to it which violation could reasonably be expected to have a Material Adverse Effect.

Section 8.11     ERISA Compliance. Except as specifically disclosed in <u>Schedule 8.11</u>, as of the Closing Date:

(a) Except for those failures that could not, in the aggregate, reasonably be expected to result in a Material Adverse Effect, (i) each Pension Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code, and other Legal Requirements and (ii) each Obligor and each ERISA Affiliate has made all required contributions to any Pension Plan subject to Section 412 or Section 430 of the Code (or corresponding provisions of ERISA), and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 or Section 430 of the Code (or corresponding provisions of ERISA) has been made with respect to any Pension Plan.

(b) There are no pending or, to the Knowledge of any Obligor, threatened claims, actions, or lawsuits, or actions by any Governmental Authority, with respect to any Pension Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Pension Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c) Except for instances, if any, which together do not give rise to liability which has resulted or could reasonably be expected to result in a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur, (ii) neither any Obligor nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than contributions and premiums due and not delinquent under Section 4007 of ERISA) or a Multi-employer Plan (other than contributions in the normal course), (iii) neither any Obligor nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multi-employer Plan, and (iv) neither any Obligor nor any

51

ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

Section 8.12    Taxes.  Each Debtor has filed all federal and other material tax returns and reports required to be filed (or appropriate extensions have been timely filed), and has paid all post-petition federal and other material taxes, assessments, fees and other governmental charges levied or imposed upon it or its properties, income, or assets or which otherwise are due and payable (other than any such returns or reports or material taxes, assessments, fees and other governmental charges, as applicable (a) being contested in good faith by appropriate proceedings, (b) which consist of interest or penalties on pre-petition taxes or (c) which could not reasonably be expected to have a Material Adverse Effect).

Section 8.13    Regulated Entities.  No Obligor is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940.  No Obligor is a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of a "holding company" or a "public utility" within the meaning of the Public Utility Holding Company Act of 1935, or is subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code or law, or any other federal or state statute or regulation limiting its ability to incur indebtedness.

Section 8.14    Use of Proceeds.  The proceeds of the Term Loan are to be used solely for the purposes specified in Section 9.13.  No Obligor is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.

Section 8.15    Full Disclosure.  None of the representations or warranties made by any Obligor in the Loan Documents as of the date such representations and warranties are made or deemed made, and none of the statements or information contained in any exhibit, report (including the 2008 schedule of net operating income for the Properties delivered to the Agent immediately prior to the Closing Date), statement, or certificate furnished by or on behalf of any Obligor for use in connection with the Loan Documents (other than projections, forecasts or other forward-looking information or information of any industry-specific or general economic nature), contain any untrue statement of a material fact or omit any material fact required to be stated therein or necessary to make the statements made therein, when taken as a whole and in light of the circumstances under which they are made, not materially misleading as of the time when made or delivered.  The rolling 24-month forecast and the 13-week cash flow forecast delivered to the Agent immediately prior to the Closing Date are the most recent rolling 24-month forecast and the most recent 13-week cash flow forecast of receipts and disbursements on a consolidated basis, in each case prepared prior to the Petition Date (it being understood that the Obligors make no representation or warranty as to such forecasts other than that they have been delivered and were prepared in good faith based on assumptions believed by the Borrowers to be reasonable at the time of preparation thereof).

Section 8.16    Bank Accounts.  Schedule 8.16 contains a complete and accurate list, as of the Petition Date, of all material bank accounts, deposit accounts, commodity accounts,

52

investment accounts and security accounts maintained by each Debtor with any bank or other financial institution; <u>provided</u> that such schedule may, at the option of the Debtors, omit accounts which contain, on average, money with an average individual monthly balance less than $100,000 for any individual account.

Section 8.17    <u>Governmental Authorization</u>.  Except (i) as set forth on <u>Schedule 8.17</u>, (ii) for the entry of or pursuant to the terms of the Financing Order, (iii) for such approvals or similar actions which have been obtained prior to the Closing Date and remain in full force and effect, and (iv) for filings and recordings with respect to the Collateral required to be made under applicable law (if any), no approval, consent, exemption, authorization, or other action by, or notice to, or filing or registration with, any Governmental Authority, or other Person is necessary or required in connection with the execution, delivery, or performance by, or enforcement against, any Obligor of this Agreement or any other Loan Document.

Section 8.18    <u>First Lien Properties</u>.  As of the Funding Date, there has been no material diminution in the fair market value (taking into account any applicable insurance proceeds) of the First Lien Properties since the date of the Commitment Letter, other than arising out of or resulting from (a) the commencement of the Cases, (b) general market conditions beyond the control of the Obligors, (c) acts of war or sabotage or terrorism or (d) earthquakes, hurricanes or other natural disasters.  <u>Schedule 8.18</u> accurately sets forth all First Lien Properties as of the Petition Date (after giving effect to the use of proceeds of the Term Loan) and each owner or lessee under a Ground Lease of First Lien Properties.

Section 8.19    <u>Prior Lien Debt</u>.  <u>Schedule 8.19-1</u> accurately sets forth, in all material respects, the outstanding principal amount of all Debt for borrowed money due and outstanding in regard to the Prior Lien Debt as of the date set forth in <u>Schedule 8.19-1</u>.  <u>Schedule 8.19-2</u> sets forth, in all material respects, the M&M Liens affecting each Property, the name of each party asserting the claims, the amount claimed as being owed and the Property which is the subject of such claim by any Person who alleges it has supplied any labor and/or materials relating to any such Property and which remain unpaid as of the Closing Date, which information is segregated by each Property affected thereby, except to the extent any M&M Liens not listed in such <u>Schedule 8.19-2</u> secure valid claims in an amount less than or equal to (i) $25,000,000 in the aggregate with respect to the First Lien Properties and (ii) $50,000,000 in the aggregate with respect to all Properties; <u>provided</u> that it will not be a breach of this representation so long as an amount equal to any amounts in excess of such $25,000,000 and $50,000,000 amounts referred to above are applied either (A) to the payment of M&M Lien claims or (B) to prepay the Term Loan, in either case within 30 days after the date such M&M Liens exceed such amounts.  No Debtor has the right to request or receive any further advances of proceeds of any Prior Lien Debt and the only amounts that may hereafter be advanced as part of the Prior Lien Debt are amounts the holders of the Prior Lien Debt may advance as protective advances to pay taxes and insurance premiums relating to, and costs to protect or repair, collateral which secures such Prior Lien Debt.  The Debtors have provided or made available to the Agent, true, correct and complete copies of all material documents which evidence, secure and/or relate to the Prior Lien Debt set forth on <u>Schedule 8.19-1</u>.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

Section 8.20    Leases.

(a)    Schedule 8.20 sets forth in all material respects on a Property by Property basis (to the extent applicable) a rent roll, effective as of March 9, 2009, relating to all Leases (the "Rent Roll").  As of the date of the Rent Roll, to the Obligors' Knowledge, each of the Major Leases is valid and enforceable in accordance with its terms and is in full force and effect.

(b)    Except as set forth on Schedule 8.20-1 (the "A/R Report"), as of the date of such A/R Report, no rent (exclusive of any security deposits and *de minimis* payments constituting rent) under any Major Lease with respect to any of the First Lien Properties is more than 60 days past due.

Section 8.21    Title.  Except as set forth on Schedule 8.21, each Debtor owns good and indefeasible fee and/or leasehold title to its Property and good title to its personal property, in each case free and clear of all Liens whatsoever except the Permitted Liens; provided that after giving effect to the funding of the Term Loan and the use of the proceeds thereof on the Funding Date, none of the First Lien Properties are encumbered by any valid Liens securing outstanding Debt for borrowed money (except to the extent subordinated pursuant to an Intercompany Subordination Agreement and other than any such borrowed money incurred pursuant to a Municipal Financing if such Debt is permitted under Section 9.11(a)(xxi)).

Section 8.22    Physical Condition.

(a)    Except for matters set forth in Schedule 8.22, as of the Closing Date, no Obligor has Knowledge of any material structural or other material defect or damages in any Property or any Improvements thereon, whether latent or otherwise, which could reasonably be expected to have a Material Adverse Effect.

(b)    No Debtor has received, and no Obligor has Knowledge of any other party's receipt of, written notice from any insurance company or bonding company of any defects or inadequacies in any Property not covered by insurance policies which would, alone or in the aggregate, adversely affect in any material respect the insurability of the same or of any termination of any policy of insurance or bond which could reasonably be expected to have a Material Adverse Effect.

Section 8.23    Management.  Except as described on Schedule 8.23 or pursuant to contracts with Affiliates of the Debtor, no property management agreements are in effect with respect to any Property as of the Closing Date.

Section 8.24    Condemnation.  No Condemnation that could reasonably be expected to have a Material Adverse Effect has been commenced or, to each Obligor's Knowledge, is contemplated as of the Closing Date with respect to all or any material portion of any Property.

Section 8.25    Utilities and Public Access.  With respect to all Properties that are operating shopping centers, except as set forth in Schedule 8.25 or to the extent that the failure to have the same would not reasonably be expected to have a Material Adverse Effect, each

54

Property has adequate rights of access to dedicated public ways and is served by water, electric, sewer, sanitary sewer and storm drain facilities necessary to the continued use and enjoyment of each Property as presently used and enjoyed.

Section 8.26    Separate Lots.  To the Obligors' Knowledge, no portion of any Primary Property is part of a tax lot that also includes any real property that is not Collateral unless (i) there exists an equitable and enforceable mechanism for the allocation of taxes thereon or (ii) such failure to have a separate tax lot could not reasonably be expected to have a Material Adverse Effect.

Section 8.27    Permits; Certificate of Occupancy.  Except as disclosed in Schedule 8.27, each Debtor has to the Obligors' Knowledge obtained all Permits necessary for the present use and operation of its Property except to the extent the failure to do so would not reasonably be expected to have a Material Adverse Effect.  The uses being made of each Property are in conformity in all material respects with the Permits for such Property, all applicable Legal Requirements and any other restrictions, covenants or conditions affecting such Property except to the extent the failure to so conform would not reasonably be expected to have a Material Adverse Effect.

Section 8.28    Ground Leased Property.  A true and complete copy of all material Ground Leases has been made available to the Agent, and except as set forth on Schedule 8.28, each material Ground Lease in respect of a Primary Property or a memorandum thereof has been duly recorded (or the relevant Obligor will promptly use commercially reasonable efforts to cause the same to be duly recorded upon acquiring Knowledge that it has not been duly recorded).  Each Ground Lease is in full force and effect and no post-petition default has occurred thereunder and, to each Obligor's Knowledge, there is not any post-petition existing condition (other than the granting of the security interests hereunder) which, but for the passage of time or the giving of notice or both, would result in a default under the terms of such Ground Lease, in each case which would reasonably be expected to have a Material Adverse Effect.

Section 8.29    Embargoed Person.

(a)    None of the funds or other assets of any Obligor, or any direct or indirect equityholder in any Obligor, constitute property of, or are beneficially owned, directly or indirectly, by, any Person subject to trade restrictions under federal law, including, without limitation, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*, The Trading with the Enemy Act, 50 U.S.C. App. 1 *et seq.*, and any executive orders or regulations promulgated thereunder, with the result that (i) the investment in any Obligor or any direct or indirect equityholder in any Obligor, as applicable (whether directly or indirectly), is prohibited by law or (ii) the Term Loan is in violation of law (any such Person, an "Embargoed Person").

(b)    No Embargoed Person has any interest of any nature whatsoever in any Obligor or any direct or indirect equityholder in any Obligor, as applicable (whether directly or indirectly), with the result that (i) the investment in any Obligor or any direct or indirect

equityholder in any Obligor, as applicable (whether directly or indirectly) is prohibited by law or (ii) the Term Loan is in violation of law and (c) none of the funds of any Obligor or any direct or indirect equityholder in any Obligor, as applicable, have been derived from any unlawful activity with the result that (i) the investment in any Obligor or any direct or indirect equityholder in any Obligor, as applicable (whether directly or indirectly) is prohibited by law or (ii) the Term Loan is in violation of law. Notwithstanding the foregoing, no part of this Section 8.29 shall apply, or be construed as applying, to any Person that owns or purchases publicly traded shares in the General Partner.

Section 8.30    Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws.

(a)    Each Obligor, and to each Obligor's Knowledge, each Person owning an interest in any Obligor or any direct or indirect equityholder in any Obligor: (A) is not currently identified on the OFAC List and (B) is not a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of any Legal Requirement. Notwithstanding the foregoing, no part of this Section 8.30 shall apply, or be construed as applying, to any Person that owns or purchases publicly traded shares in the General Partner.

(b)    Each Lender and the Agent (for itself and not on behalf of any Lender) hereby notifies each Obligor that, pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Obligor, which information includes the name and address of each Obligor and other information that will allow each Lender or the Agent, as applicable, to identify such Obligor in accordance with the Patriot Act.

# ARTICLE 9

## AFFIRMATIVE AND NEGATIVE COVENANTS

Each Obligor covenants to the Agent and each Lender that so long as any of the non-contingent Obligations remain outstanding or any Commitment or this Agreement is in effect:

Section 9.1    Existence and Good Standing. Each Obligor shall, and shall cause each Debtor to, (a) maintain its existence in the jurisdiction of its incorporation, formation or organization, as the case may be (subject only to any mergers, consolidations, dissolutions or liquidations permitted by Section 9.8) and (b) maintain its qualification and good standing in all jurisdictions in which the failure to maintain such existence and qualification or good standing could reasonably be expected to have a Material Adverse Effect.

Section 9.2    Compliance with Law and Agreements; Maintenance of Licenses. Each Obligor shall, and shall cause each other Debtor to, comply with all Legal Requirements of any Governmental Authority having jurisdiction over it or its business (including the Federal Fair Labor Standards Act) unless failure to do so could not reasonably be expected to have a Material Adverse Effect. Each Obligor shall, and shall cause each other Debtor to, obtain and

maintain all Permits necessary to own its property and to conduct its business in substantially the same manner as conducted on the Closing Date unless failure to do so could not reasonably be expected to have a Material Adverse Effect.  No Obligor shall, and shall not cause each other Debtor to, modify, amend, or alter its certificate of limited partnership, certificate of incorporation, partnership agreement, bylaws, or other similar documents in a manner which materially and adversely affects the rights of the Lenders or the Agent.

Section 9.3    Insurance.  Each Obligor shall, and shall cause each other Debtor to, comply with all terms and provisions of Schedule 9.3, which are incorporated herein by reference.

Section 9.4    Casualty and Condemnation.

(a)    The Agent, on behalf of the Lenders, may, with respect to the First Lien Properties and subject to the rights of any other Person pursuant to any Lease, Ground Lease or REA, (i) jointly with the applicable Obligor settle and adjust any claims in respect of any Casualty or Condemnation, (ii) during the continuance of an Event of Default, settle and adjust any such claims without the consent or cooperation of any Obligor, or (iii) allow the applicable Obligor to settle and adjust any such claims; provided that if no Event of Default has occurred and is continuing, the Obligors may settle and adjust such claims without regard to clause (i) above aggregating not in excess of the Threshold Amount.  The reasonable out-of-pocket expenses incurred by the Agent in the adjustment and collection of Loss Proceeds shall become part of the Obligations, and shall be reimbursed by the Borrowers to the Agent within 30 days after receipt of written demand therefor itemizing such expenses.

(b)    Subject to the terms of any Lease, any Ground Lease, any REA or any agreement governing any Pre-Petition Lien, as applicable, all Loss Proceeds from any Casualty or Condemnation, shall be forthwith deposited into a Cash Collateral Account.

(c)    If any Condemnation or Casualty occurs and:

(i)    no monetary Event of Default exists at the time of the Condemnation or Casualty or the receipt of the Loss Proceeds; and

(ii)    either:

(A)    in the case of a Casualty, the Casualty will not render untenantable, or result in the cancellation of Leases (provided that a Lease shall not be deemed cancelled if the relevant Debtor shall enter into a new Lease with an existing or new Tenant on market terms) covering, more than 15% of the gross rentable area of such Property and the General Partner delivers to the Agent evidence reasonably satisfactory to the Agent that the insurer under each applicable insurance policy has not denied liability thereunder; or

(B)    in the case of a Condemnation, the Condemnation did not render untenantable, or result in the cancellation of Leases (provided that a Lease shall not be deemed cancelled if the relevant Debtor shall enter into a new Lease with

57

an existing or new Tenant on market terms) covering, more than 15% of the gross rentable area of the applicable Property, and the General Partner delivers to the Agent evidence reasonably satisfactory to the Agent that such Property can be restored to an economically and architecturally viable unit;

then the Loss Proceeds (after reimbursement of any reasonable out of pocket expenses incurred by the Agent in connection therewith) shall be applied to the cost of restoring, repairing, replacing or rebuilding such Property or part thereof subject to the Casualty or Condemnation, in the manner set forth below. The Obligors hereby covenant and agree to commence or cause to be commenced as promptly and diligently as practicable and to prosecute or cause to be prosecuted such restoring, repairing, replacing or rebuilding of such Property in a workmanlike fashion and in accordance with applicable law to a status at least equivalent to the quality and character of such Property immediately prior to the Condemnation or Casualty. If there shall remain excess Loss Proceeds after the proposed restoration has been substantially completed in accordance with the provisions of this Section 9.4, such excess shall be maintained in a Cash Collateral Account and disbursed in accordance with this Agreement. Notwithstanding anything to the contrary contained in this clause (c), if the terms of any Lease, any Ground Lease, any REA or any agreement governing any Prior Lien Debt require restoration, repair, replacement, rebuilding or other application then the Loss Proceeds shall be applied in accordance with the terms of such Lease, Ground Lease, REA or agreement governing such Prior Lien Debt, as the case may be.

(d)     Each Obligor shall cooperate with the Agent in obtaining for the Lenders the benefits of any Loss Proceeds lawfully or equitably payable to the Lenders. The Agent shall be reimbursed for any out-of-pocket expenses reasonably incurred in connection therewith (including all costs and expenses set forth in Section 15.6) out of such Loss Proceeds.

(e)     If a Debtor is not entitled to apply Loss Proceeds toward the restoration of its Property pursuant to Section 9.4(c), such Loss Proceeds shall either be applied within two (2) Business Days (during which period no Obligor shall be entitled to make any Restricted Payment) of receipt of such Loss Proceeds as a prepayment on the Term Loan or deposited into a Cash Collateral Account, as the Agent may so elect.

Section 9.5     Covenants with Respect to REA.

(a)     The Obligors covenant and agree (and shall cause the other Debtors to covenant and agree) as follows:

(i)     each Debtor shall comply with all material terms, conditions and covenants of any Major REA except for such non-compliance that could not reasonably be expected to have a Material Adverse Effect; and

(ii)     notwithstanding anything herein to the contrary, each Debtor shall have the right to waive or negotiate settlement of defaults (or threatened defaults) under any REA, so long as such waiver or settlement could not reasonably be expected to have a Material Adverse Effect.

58

(b)     Each Obligor shall (and shall cause each other Debtor to) pay all post-petition fees, assessments, charges or other amounts assessed to such Debtor pursuant to any Major REA when the same become due and payable (subject to good faith disputes) except to the extent the failure to pay such fees, assessments, charges or other amounts could reasonably be expected to have a Material Adverse Effect.

(c)     Subject to the terms of the applicable REA, in the event proceeds of a Casualty or Condemnation with respect to the Property owned or leased by a Debtor under a Ground Lease are required to be deposited into a segregated account pursuant to any REA, the Borrowers shall cause such amounts to be deposited into a segregated account of the type specified in the REA or established with an Eligible Institution.  Any amounts released from such segregated account to any Obligor shall be deposited into the Cash Collateral Accounts in accordance herewith.

(d)     At the Borrowers' written request, the Agent, for and on behalf of the Lenders, shall enter into a subordination agreement with respect to any (i) new REA or (ii) amendment, restatement, amendment and restatement, supplement or other modification of an existing REA, in each case, to the extent permitted by this Agreement and otherwise upon reasonable and customary terms.  For avoidance of doubt, the costs and expenses of the Agent in connection with the review of any such subordination agreement shall be paid or reimbursable by the Borrowers in accordance with <u>Section 15.6</u>; <u>provided</u> that such fees and expenses shall not exceed $3,000 per agreement.

Section 9.6     Environmental Laws.

(a)     Each Obligor shall, and shall cause each other Debtor to, conduct its business in compliance with all Environmental Laws applicable to it, including those relating to the generation, handling, use, storage, and disposal of any Contaminant except for such non-compliance that could not reasonably be expected to have a Material Adverse Effect.  Each Obligor shall, and shall cause each other Debtor to, take prompt and appropriate action to respond to any non-compliance with Environmental Laws that could reasonably be expected to result in a Material Adverse Effect of which any Obligor at any time has Knowledge ("Environmental Compliance Issues") and shall upon written request from the Agent report to the Agent from time to time on such response to any unresolved Environmental Compliance Issue.

(b)     The Agent may reasonably request, in which case the Obligors will promptly furnish or cause to be promptly furnished to the Agent, an update of the status of each unresolved Environmental Compliance Issue (whether past or present), if any, and copies of non-privileged technical reports prepared by any Debtor and its communications with any Governmental Authority to determine whether such Debtor is proceeding reasonably to correct, cure, or contest in good faith any Environmental Compliance Issue.  At any time any Environmental Compliance Issue that could reasonably be expected to have a Material Adverse Effect or Event of Default exists, the Obligors shall at the Agent's or the Majority Lenders' request and at the Obligors' expense, (i) retain an independent environmental professional

reasonably acceptable to the Agent to evaluate the site, including tests if appropriate, to which the Environmental Compliance Issue relates and prepare and deliver to the Agent (with a copy to the relevant Obligor), for distribution by the Agent to the Lenders, a report setting forth the results of such evaluation, a proposed plan for responding to any environmental problems described therein, and an estimate of the costs thereof and (ii) provide to the Agent for distribution by the Agent to the Lenders a supplemental report of such environmental professional whenever the scope of the environmental problems (if any), or the response thereto or the estimated costs thereof, shall change in any material respect.

Section 9.7    Compliance with ERISA.  Except to the extent the same could not reasonably be expected to result in a Material Adverse Effect, each Obligor shall and shall cause each ERISA Affiliate to:  (a) maintain each Pension Plan in compliance in all material respects with the applicable provisions of ERISA, the Code, and other federal or state law; (b) make all required contributions to any Pension Plan subject to Section 412 or Section 430 of the Code (or corresponding provisions of ERISA or any Multi-employer Plan); and (c) not engage in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, in each case unless enforcement action is stayed pursuant to Legal Requirements.

Section 9.8    Mergers, Consolidations, Sales, Acquisitions.  No Obligor shall, nor shall it permit any other Debtor to, consummate any transaction of merger, reorganization, or consolidation, or sell, assign, lease (or otherwise dispose of all or any part of its property (including any sale or other disposition of Capital Stock of any Debtor)) (for purposes of this Section 9.8, each such transaction, a "disposition"), or wind up, liquidate or dissolve, except for:

(a)    dispositions of obsolete, worn out or surplus personal property or personal property no longer useful in the business of the Debtors;

(b)    consolidations, mergers and dispositions of assets between or among Debtors (provided that any such consolidation or merger involving a Borrower shall result in a Borrower being the surviving entity in such consolidation or merger);

(c)    dissolutions and liquidations if all of the property of the dissolving Debtor is transferred to a Debtor;

(d)    dispositions of any Property (or any Debtor owning a Property or its direct or indirect parent holding company); provided that the net proceeds thereof are applied in accordance with, and to the extent required by, Section 3.3(a);

(e)    dispositions of real property constituting all or a portion of an anchor parcel to an anchor occupant in the ordinary course of business or otherwise consistent with past practice;

(f)    (i) dispositions of inventory (including gift cards, sales transfers and/or dedications from the Debtors' master planned communities and condominium sales) in the ordinary course of business; provided that, in the case of condominium sales, the net proceeds thereof are applied in accordance with Section 3.3(a); and (ii) sales of Property pursuant to any

60

purchase option, right of first refusal, right of first offer or similar right in respect of any of the Properties, in each case, in the ordinary course of business and (A) to the extent existing on the Petition Date, (B) consisting of customary purchase options, rights of first refusal, rights of first offer or similar rights given in respect of anchor occupant parcels or outparcels or (C) in respect of any Negative Pledge Property;

(g)     dispositions of personal property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such dispositions are promptly applied to the purchase price of such replacement property;

(h)     the disposition of cash and cash equivalents for a purpose that is otherwise permitted under this Agreement;

(i)     to the extent constituting a disposition, the entering into and performance of the Loan Documents;

(j)     dispositions of accounts in connection with the collection or compromise thereof;

(k)     Leases permitted under <u>Section 9.19</u> and licenses or sublicenses of property in the ordinary course of business and which do not materially interfere with the business of any Debtor;

(l)     transfers of property subject to any Casualty or Condemnation proceeding (including in lieu thereof) upon receipt of the net proceeds therefor;

(m)     dispositions in the ordinary course of business consisting of the abandonment of intellectual property rights which, in the reasonable good faith determination of the General Partner, are not material to the conduct of the business of any Debtor;

(n)     the expiration of any option agreement in respect of real or personal property;

(o)     Permitted Liens to the extent constituting a disposition of property;

(p)     dispositions of personal property (other than Capital Stock) among the Debtors and by a Debtor to any non-debtor Affiliate in the ordinary course of business;

(q)     in order to resolve disputes that occur in the ordinary course of business (in which event the Debtors may discount or otherwise compromise for less than the face value thereof) the disposition of notes or accounts receivable;

(r)     a disposition in order to qualify members of the board of directors (or similar governing body) if required by applicable law or contract;

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

(s)     Restricted Payments in accordance with <u>Section 9.20</u> and, to the extent constituting a disposition, Permitted Liens;

(t)     any involuntary or voluntary terminations of Hedge Agreements;

(u)     dispositions of investments in non-wholly owned Persons to the extent required by, or made pursuant to, buy/sale arrangements among the owners of the Capital Stock of such entity set forth in binding agreements pertaining to the ownership of such Capital Stock entered into before the Closing Date;

(v)     dispositions of Property secured by Pre-Petition Liens to the holders of such Pre-Petition Liens when the Borrowers reasonably believe that doing so is in the best interests of the Debtors and that the relevant Debtor's equity interest in such assets is negative;

(w)     the disposition of the Property described on <u>Schedule 9.8</u>; and

(x)     the disposition of assets (other than Property) in an amount not to exceed $50,000,000 in the aggregate.

Notwithstanding the foregoing, for the purposes of <u>clause (d)</u> and sales of condominiums pursuant to <u>clause (f)(i)</u>, (w) no Debtor shall consummate the disposition of any of the Properties collectively known to the parties as "Victoria Ward" without the prior written consent of the Majority Lenders, (x) no Property (or any Debtor owning a Property or its direct or indirect parent holding company) shall be disposed of for less than fair market value, as determined by the applicable Debtor in good faith, (y) no First Lien Property (or any Debtor owning a First Lien Property or its direct or indirect parent holding company) with a fair market value in excess of $30,000,000 shall be disposed of without the prior written consent of the Majority Lenders and (z) if any Real Estate of any Person is being disposed together with any First Lien Property (or any Debtor owning a First Lien Property or its direct or indirect parent holding company) in a single transaction or in a series of related transaction, none of such dispositions shall be consummated unless the Majority Lenders shall be satisfied with the allocation of consideration among such First Lien Property and other Real Estate.

<span style="color:blue">Section 9.9</span>     <u>Transactions with Affiliates</u>.  No Obligor shall, nor shall it permit any other Debtor to, (i) sell, transfer, distribute, or pay any money or property, including, but not limited to, any fees or expenses of any nature (including, but not limited to management or service fees), to any Affiliate (other than the other Debtors), (ii) lend or advance money or property to, invest in (by capital contribution or otherwise) or purchase or repurchase any stock, indebtedness or any property of, any Affiliate or (iii) become liable on any Guaranty of the indebtedness, dividends, or other obligations of any Affiliate (any of the foregoing, "<u>Affiliate Investments</u>"); <u>provided</u> that the foregoing shall not prohibit any of the following:

(a)     transactions upon fair and reasonable terms no less favorable to such Debtor than it would obtain in a comparable arm's-length transaction with a Person that is not an Affiliate;

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

(b)     Affiliate Investments among the Debtors;

(c)     Affiliate Investments existing as of the Closing Date;

(d)     Affiliate Investments (i) by any Affiliate of the Debtors that is not a Debtor in any Debtor, (ii) by any Debtor in any Affiliate of a Debtor that is not a Debtor consisting of required capital contributions pursuant to agreements or instruments existing as of the Closing Date, (iii) by the Non-Debtor Guarantor in its Subsidiaries or (iv) otherwise, in an aggregate amount under this clause (iv) not to exceed $50,000,000 after the Closing Date; provided that if an Event of Default has occurred and is continuing, no Affiliate Investments under clause (ii) or (iv) in an amount of $1,000,000 or more shall be made without the prior written consent of the Majority Lenders;

(e)     transactions in the ordinary course of business in accordance with the General Partner's and its Subsidiaries' cash management system;

(f)     loans and advances to directors, officers, employees and members of management of the Debtors in the ordinary course of business consisting of advances of payroll, travel expenses, petty cash and similar items;

(g)     Affiliate Investments reasonably necessary for any Debtor to remain qualified as a real estate investment trust, qualified REIT subsidiary or taxable REIT subsidiary under the provisions of the Code;

(h)     dispositions permitted pursuant to Section 9.8, Debt permitted by Section 9.11(a) and Liens permitted pursuant to Section 9.11(b);

(i)     Restricted Payments permitted in accordance with Section 9.20 and loans and advances made in lieu of such permitted Restricted Payments;

(j)     acquisitions of the property and assumptions of obligations of Affiliates resulting from mergers, consolidations, liquidations or dissolutions of any Affiliate permitted by Section 9.8;

(k)     reasonable and customary director, officer and employee compensation (including bonuses and severance) and other benefits (including retirement, health, stock option and other benefit plans) and indemnification arrangements in the ordinary course of business or to the extent approved in good faith by the board of directors (or other governing body) of such Debtor;

(l)     the payment of management fees by the Debtor which owns Willowbrook Mall to GGMI in accordance with the Amended and Restated Willowbrook Mall Property Management Agreement dated December 19, 1995;

(m)     equity issuances not prohibited by this Agreement; and

63

(n)     reasonable and customary fees paid to members of the board of directors (or other governing body) of any Debtor (or its direct or indirect parent) and reimbursement of reasonable out-of-pocket costs and expenses of such Persons.

Section 9.10     Business Conducted.  No Obligor shall, nor shall it permit any other Debtor to, engage directly or indirectly, in any line of business other than the businesses in which such Person is engaged on the Closing Date and businesses reasonably related or ancillary thereto.

Section 9.11     Debt; Liens; No Negative Pledge.

(a)     No Obligor shall, nor shall it permit any other Debtor to, create, incur, assume or suffer to exist any Debt except:

(i)     Debt under the Loan Documents;

(ii)     Debt in existence on the Petition Date (and refinancings thereof in accordance with clause (b) of the definition of "Permitted Liens");

(iii)     Capital Leases in existence on the Petition Date;

(iv)     purchase money Debt and Debt in respect of Capital Leases, in each case incurred after the Petition Date in the ordinary course of business of the Debtors as modified pursuant to the Case;

(v)     endorsement of items for deposit or collection in the ordinary course of business;

(vi)     indebtedness with respect to letters of credit or guaranties entered into in the ordinary course of business and any amendment, modification, extension, renewal or replacement thereof; provided that any letters of credit or guaranties under this clause (vi) shall be included in the limitation under clause (xiv);

(vii)     Debt among Debtors; provided that no such Debt shall be incurred by GGMI other than in the ordinary course of business;

(viii)     Debt which may be deemed to exist in connection with customary agreements providing for indemnification, purchase price adjustments, earnouts and similar obligations in connection with dispositions permitted pursuant to Section 9.8;

(ix)     Debt consisting of the financing of insurance premiums in the ordinary course of business, so long as the aggregate amount payable pursuant to such Debt does not materially exceed the amount of the premium for such insurance;

(x)     cash management obligations and Debt in respect of netting services, overdraft protection and similar arrangements in connection with cash management and deposit accounts;

(xi)     Debt representing deferred compensation to directors, officers, members of management, employees or consultants of the Debtors in the ordinary course of business;

64

(xii)     contingent obligations in respect of indemnities or similar agreements to hold others harmless arising in the ordinary course of business;

(xiii)     Debt in respect of indemnity, performance, surety, stay, customs, bid, appeal bonds, completion guarantees or other similar obligations provided in the ordinary course of business, including guarantees or obligations of the Debtors with respect to (and deposits of cash to secure) letters of credit supporting such indemnity, performance, surety, stay, customs, bid, appeal bonds, completion guarantees or other similar obligations, but excluding Debt incurred through the borrowing of money, Capital Leases and purchase money obligations;

(xiv)     other Debt of the Debtors in an aggregate principal amount at any time outstanding not to exceed, together with the aggregate amount of all letters of credit and guaranties under clause (vi) above, $75,000,000 (in all cases without double counting); provided that (x) before any Debtor incurs any Debt for borrowed money pursuant to this clause (xiv) in an aggregate principal amount exceeding $10,000,000, an Obligor shall provide to the Agent a reasonably detailed summary of the economic and other terms of such Debt and (y) no Debt for borrowed money incurred pursuant to this clause (xiv) in an aggregate principal amount in excess of $20,000,000 shall have a final maturity sooner than, or a weighted average life less than, that of the Term Loan;

(xv)     Guaranties of the Debtors with respect to Debt of the Debtors permitted hereunder;

(xvi)     Debt consisting of take or pay obligations contained in supply agreements, in each case incurred in the ordinary course of business;

(xvii)     Debt constituting reimbursement obligations with respect to (and deposits of cash to secure) letters of credit issued in the ordinary course in respect of workers' compensation, unemployment insurance, social security or other similar laws, to secure the performance of tenders, statutory obligations, bids, leases, government contracts, trade contracts and other similar obligations, securing insurance premiums or deductibles, coinsurance, reinsurance, self-retention or reimbursement obligations, indemnity, performance, surety, stay, customs and appeal bonds, performance bonds, performance and completion guarantees and other obligations of a similar nature; provided that upon the drawing of such letters of credit or the incurrence of such Debt, such obligations are reimbursed within 30 days following such drawing or incurrence;

(xviii)     Debt of the Debtors to any Affiliate of the Debtors in the ordinary course of business in connection with cash management and otherwise consistent with the cash management order in all material respects;

(xix)     additional Prior Lien Debt advanced as protective advances to pay taxes and insurance premiums relating to, and costs to protect or repair, collateral secured by Pre-Petition Liens, to the extent permitted under the definitive documents for such Prior Lien Debt as in effect on the Closing Date (as refinanced in accordance with clause (b) of the definition of Permitted Liens);

65

(xx)     to the extent constituting Debt by virtue of <u>clause (h)</u> of the definition thereof, Debt (other than in respect of borrowed money, purchase money and Capital Leases) secured by Permitted Liens;

(xxi)    Debt constituting a Municipal Financing incurred in the ordinary course of business in connection with a new development or redevelopment of the Property; <u>provided</u> that the prior written consent of the Majority Lenders shall be required with respect to any Municipal Financing that qualifies as Debt incurred after the Petition Date with respect to any First Lien Property; and

(xxii)   all premiums (if any), interest, fees, expenses, charges and additional or contingent interest on obligations described above in this <u>Section 9.11(a)</u>.

(b)      No Obligor shall, nor shall it permit any other Debtor to, create, incur, assume, or permit to exist any Lien on (A) any property now owned or hereafter acquired by any of them, except Permitted Liens or (B) any of the Negative Pledge Properties, except Permitted Liens.

(c)      Other than as set forth in this Agreement, no Obligor shall, nor shall it permit any other Debtor to, enter into or become subject after the Closing Date to any agreement, contract, or other arrangement whereby any Debtor is prohibited from, or would otherwise be in default as a result of, creating, assuming, incurring, or suffering to exist, directly or indirectly, any Agent's Lien, except for the following:

(i)      any agreement governing any post-petition Debt permitted by (A) <u>clauses (iv)</u>, <u>(ix)</u> and <u>(xvi)</u> of <u>Section 9.11(a)</u> as to the assets financed with the proceeds of such Debt or (B) <u>clauses (vi)</u>, <u>(xiii)</u> and <u>(xvii)</u> of <u>Section 9.11(a)</u> in respect of cash collateral;

(ii)     customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Debtor;

(iii)    customary provisions restricting assignment of any agreement entered into by a Debtor in the ordinary course of business;

(iv)     agreements of any holder of any Permitted Lien set forth in <u>clause (b)</u>, <u>(f)</u>, <u>(m)</u>, <u>(n)</u>, <u>(o)(ii)</u>, <u>(r)</u>, <u>(s)</u> or <u>(v)</u> of the definition thereof restricting the transfer of any property subject thereto;

(v)      customary restrictions and conditions contained in any agreement relating to the disposition of any Property permitted under <u>Section 9.8</u> pending the consummation of such disposition or in leases, subleases, licenses or sub-licenses relating to the assets covered thereby;

(vi)     customary provisions in partnership agreements, limited liability company organizational governance documents, asset sale and stock sale agreements and other similar agreements entered into in the ordinary course of business that restrict the transfer of ownership interests in such partnership, limited liability company or similar Person;

66

(vii)    restrictions on cash or other deposits or net worth imposed by suppliers or landlords under contracts entered into the ordinary course of business; or

(viii)   customary provisions in joint venture agreements and similar agreements applicable to joint venture relating solely to such joint venture.

Section 9.12    New Subsidiaries.  No Debtor shall, nor shall it permit any other Debtor to, directly or indirectly, organize, create or acquire any direct Subsidiary other than as follows:

(a)    in connection with a tax driven strategy in the ordinary course of business;

(b)    Subsidiaries (i) existing on the Closing Date, and/or (ii) acquired or formed by a Subsidiary that was not a Debtor at the time of such acquisition or formation;

(c)    new Subsidiaries of the Debtors approved in writing by the Majority Lenders; and

(d)    as approved by the Bankruptcy Court and reasonably acceptable to the Agent.

Section 9.13    Use of Proceeds.  The proceeds of the Term Loan shall be used (a) first, to repay the Debt set forth in Schedule 9.13 and (b) after such Debt has been repaid in full and the Pre-Petition Liens with respect thereto have been released, for general working capital purposes (not otherwise prohibited by this Agreement) in the ordinary course of business, (i) to fund expenses incident to the Debtors' efforts to operate, maintain, reorganize, or dispose of their business and assets, (ii) to fund payment of fees and expenses owing to Professional Persons incurred during the Case, (iii) to pay all fees and expenses provided under this Agreement (whether incurred before or after the Petition Date) and, in any event, only to the extent authorized by the Financing Order, and (iv) as otherwise authorized by the Financing Order, including, without limitation, permitted capital expenditures, priority employee wage claims, and expenses associated with the assumption of executory contracts and unexpired leases.  The Borrowers shall not use any portion of the proceeds of the Term Loan, directly or indirectly, (A) to purchase or carry any Margin Stock, (B) to repay or otherwise refinance indebtedness of the Borrowers or others incurred to purchase or carry any Margin Stock, (C) to extend credit for the purpose of purchasing or carrying any Margin Stock, (D) to acquire any security in any transaction that is subject to Section 13 or 14 of the Exchange Act, or (E) as prohibited pursuant to Section 9.15.

Section 9.14    Investments.  No Obligor shall, nor shall it permit any other Debtor to, directly or indirectly, make or hold any Investments, except the following:

(a)    Affiliate Investments not prohibited by Section 9.9;

(b)    Investments in cash and/or Cash Equivalents;

(c)    Investments existing on the Closing Date;

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

(d)　　Investments in the ordinary course of business consisting of UCC Article III endorsements for collection or deposit;

(e)　　Investments (including debt obligations and Capital Stock) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(f)　　Investments constituting (i) accounts or notes receivable arising, (ii) trade debt granted, (iii) deposits made in connection with the purchase price of goods or services or (iv) lease, utility and other similar deposits, in each case in the ordinary course of business;

(g)　　other Investments over the term of this Agreement not to exceed $100,000,000;

(h)　　Investments consisting of indebtedness or contingent liabilities, Liens, Restricted Payments and dispositions permitted by Section 9.11, Section 9.20 and Section 9.8, respectively; and

(i)　　Investments received in connection with the satisfaction or enforcement of indebtedness or claims due or owing to any Debtor or as security for any such Indebtedness claim;

provided that any Investment which when made complies with the requirements of the definition of the term "Cash Equivalent" may continue to be held notwithstanding that such Investment if made thereafter would not comply with such requirements.

Section 9.15　　Case Matters. All fees or expenses of Professional Persons at any time paid by the Debtors, or any of them, shall be paid by the Debtors pursuant to procedures established by an order of the Bankruptcy Court.

(b)　　No Obligor shall, nor shall it permit any other Debtor to, assert, file or seek, or consent to the filing or the assertion of or joinder in, or use any portion of the proceeds of the Term Loan to compensate services rendered or expenses incurred in connection with, any claim, counterclaim, action, proceeding, order, application, pleading, motion, objection, any other papers or documents, defense (including, without limitation, offsets and counterclaims of any nature or kind), or other contested matter (including, without limitation, any of the foregoing the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration, or similar relief):

(i)　　invalidating, setting aside, avoiding, subordinating, or otherwise challenging the validity, perfection, enforceability, or nonavoidability (under Sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or otherwise), in each case, in whole or in part, of the Obligations or the Agent's Liens;

(ii)     reversing, modifying, amending, staying or vacating the Financing Order, except for modifications and amendments consented to by the Majority Lenders in writing;

(iii)     granting priority for any administrative expense, secured claim or unsecured claim against the Borrowers or any of the Guarantors other than the Non-Debtor Guarantor (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Agent and the Lenders in respect of the Obligations, except as provided under the Carve-Out, Pre-Petition Liens and the Financing Order;

(iv)     granting or imposing under Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, any Lien equal or superior to the priority of the Agent's Liens (other than under clause (i) of the definition of Permitted Liens (to the extent, and only to the extent, set forth in the Financing Order) or as permitted to have priority under Section 6.4);

(v)     permitting the use of cash collateral as defined in Section 363 of the Bankruptcy Code, except as expressly permitted by the Financing Order or this Agreement; or

(vi)     modifying, altering, or impairing in any manner any of the Agent's Liens pursuant to the Financing Order, this Agreement, or any of the Loan Documents or any documents related thereto (including, without limitation, the right to demand payment of all Obligations and to enforce its liens and security interests in the Collateral), whether by plan of reorganization or liquidation, order of confirmation, or any financings of, extensions of credit to, or incurring of debt by any Debtor, whether pursuant to Section 364 of the Bankruptcy Code or otherwise.

(c)     No Obligor shall, nor shall it permit any other Debtor to, seek or consent to any order (i) dismissing any part of the Case under Sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; or (ii) converting any part of the Case under Sections 105 or 1112 of the Bankruptcy Code or otherwise, in each case in respect of any Major Entity, unless such Debtor would cease to be a Major Entity upon giving effect to transactions permitted under Section 9.8; provided that any mandatory prepayments required under Section 3.3 shall occur substantially contemporaneously with or prior to such dismissal or conversion.

(d)     The Obligors shall not, nor shall they permit any other Debtor to, make any payments or transfer any property on account of claims asserted by any vendors of any Debtor, for reclamation in accordance with Section 2-702 of any applicable UCC and Section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court upon prior notice to the Agent or unless otherwise consented to by the Majority Lenders.

(e)     The Obligors shall not, nor shall they permit any other Debtor to, return any inventory or other property to any vendor pursuant to Section 546(g) of the Bankruptcy Code,

100656687_1
(GGP_ DIP Credit Agreement
051309).DOC

unless otherwise ordered by the Bankruptcy Court in accordance with Section 546(g) of the Bankruptcy Code upon prior notice to the Agent or unless otherwise consented to by the Majority Lenders.

Section 9.16    No Amendments or Advances of Prior Lien Debt.  No amendment or modification of the terms of the Prior Lien Debt constituting debt for borrowed money or any document or instrument which evidences, secures or otherwise relates to any Prior Lien Debt constituting debt for borrowed money will be effected, other than in connection with any refinancing permitted hereby or which does not adversely affect the Term Loan or the Lenders, without the prior written consent of the Majority Lenders.  No Obligor shall,  nor shall it permit any other Debtor to, request or accept any advance of proceeds of any Prior Lien Debt after the Closing Date other than protective advances to pay taxes and insurance premiums relating to, and costs to protect or repair, collateral which secures such Prior Lien Debt and other similar matters.

Section 9.17    Maintenance of Property; Compliance with Legal Requirements; Parking.

(a)    Each Obligor shall, and shall cause each other Debtor to, keep its Property and Improvements that are operating as shopping malls or occupied buildings in good working order and repair (reasonable wear and tear and Casualty and Condemnation excepted).  Each Obligor shall, and shall cause each other Debtor to, from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto.  Each Obligor shall, and shall cause each other Debtor to, comply with, and shall cause its Property and Improvements to be operated, maintained, repaired and improved in compliance with, all Legal Requirements, Insurance Requirements and the requirements of any Major Lease or Ground Lease, in each case except to the extent that the failure to comply, operate, maintain, repair or improve the relevant Property or Improvements (i) could not reasonably be expected to have a Material Adverse Effect or (ii) is occasioned by Casualty or Condemnation and (A) the Agent or other insured party has not made available the proceeds thereof to the relevant Debtor to restore, repair, replace or rebuild the relevant Property or Improvements, or (B) the relevant Debtor is in the process of restoring, repairing, replacing or rebuilding the relevant Property or Improvements.

(b)    As applicable, each Obligor shall, and shall cause each other Debtor to, provide, maintain and light parking areas of its Properties that are operating as shopping malls, including any sidewalks, aisles, streets, driveways, sidewalk cuts and rights-of-way to and from the adjacent public streets, in a manner consistent with properties of a similar class as the relevant Property in the locale where such Property is located, in each case except to the extent such failure could not reasonably be expected to have a Material Adverse Effect.

Section 9.18    Taxes and Other Claims.  Each Obligor shall, and shall cause each other Debtor to, pay and discharge all material post-petition federal and other material post-petition taxes, assessments and governmental charges levied upon it, its income and its assets, subject to any orders of the Bankruptcy Court, and all lawful post-petition claims for labor,

70

materials and supplies or otherwise, in each case subject to any rights to contest contained in the definition of Permitted Liens. Each Obligor shall, and shall cause each other Debtor to, file all post-petition federal and all post-petition material state and local tax returns and other reports that it is required by law to file within the timeframes permitted (including any extensions thereof). All references in this Section to post-petition taxes, assessments and governmental charges shall, in the case of the Non-Debtor Guarantor only, include a reference to pre-petition taxes, assessments and governmental charges of the Non-Debtor Guarantor.

Section 9.19    Leases.

(a)    Upon the reasonable request of the Agent, the Borrowers shall furnish the Agent with executed copies of any Major Leases entered into after the Closing Date. The Obligors hereby covenant and agree that, with respect to First Lien Properties and subject to clause (b) below, all new Major Leases and renewals or amendments of Major Leases shall be entered into with Tenants whose identity and creditworthiness are appropriate for tenancy at the applicable Property, shall provide for rental rates and other economic terms which, taken as a whole, are not materially less favorable than then-existing market rates, based on the applicable market, except as otherwise agreed to by the Majority Lenders.

(b)    With respect to First Lien Properties, all new Major Leases that do not comply with Section 9.19(a) shall be subject to the prior written consent of the Majority Lenders (it being understood that all other Leases or terminations, renewals and amendments of Leases shall not require the Agent's prior written consent), which consent shall not be unreasonably withheld, conditioned or delayed. Each Debtor shall have the right to waive or negotiate settlement of defaults (or threatened defaults) under Leases, so long as such waiver or settlement could not reasonably be expected to have a Material Adverse Effect.

(c)    Each Obligor shall, and shall cause each other Debtor to (i) observe and perform all material post-petition obligations imposed upon the lessor under the Major Leases (other than Major Leases that are rejected pursuant to the Case), (ii) with respect to First Lien Properties, enforce all material terms, covenants and conditions contained in the Major Leases on the part of the lessee thereunder to be observed or performed, short of termination thereof (including enforcing the provisions, if any, requiring Tenants to perform all acts necessary to satisfy the requirements of Governmental Authorities and, if applicable, to do such acts as are necessary to maintain their respective certificates of occupancy in full force and effect); provided that a Debtor may terminate any Lease, subject to Section 9.19(b) above, following a default thereunder by the respective Tenant, (iii) not collect any of the rents under any Major Lease (exclusive of security deposits) more than one month in advance of the due date thereof, other than in connection with the satisfaction or compromise of Tenant improvements costs, (iv) not execute any assignment of lessor's interest in the Leases or associated rents other than the assignment of rents and leases contained in the Financing Order and, as applicable, in the documents that create or evidence the Pre-Petition Liens (or any refinancing or extension thereof permitted under this Agreement) and (v) not cancel or terminate any guarantee (except in accordance with the terms thereof) of any of the Major Leases without the prior written consent of the Majority Lenders (which consent shall not be unreasonably withheld or delayed)

71

unless such cancellation or termination could not reasonably be expected to have a Material Adverse Effect.

(d)     At the Borrowers' written request, the Agent, for and on behalf of the Lenders, shall enter into a subordination, non-disturbance and attornment agreement, in the form (i) in the case of Leases with respect to First Lien Properties, attached hereto as Exhibit F or (ii) in the case of Leases with respect to Negative Pledge Properties, in the form approved by the lender that holds the prior Lien on such Negative Pledge Property, and, in each case with respect to any national Tenant, as such Tenant and the Agent shall reasonably agree. The Agent shall not be required to provide any such subordination, non-disturbance and attornment agreement with respect to First Lien Properties unless it shall receive in exchange an estoppel certificate from the Tenant under the applicable Lease that the Tenant is not aware of any material default by the landlord under the Lease. For avoidance of doubt, the costs and expenses of the Agent in connection with the review of any such subordination, non-disturbance and attornment agreement shall be paid or reimbursable by the Borrowers in accordance with Section 15.6; provided that such fees and expenses shall not exceed $100 per such agreement in the case of agreements set forth in clause (i) which are not negotiated and otherwise $1,000 per agreement.

(e)     With respect to any approval by the Majority Lenders of a Major Lease pursuant to Section 9.19(a) or any consent of the Majority Lenders regarding any Major Lease referred to in Section 9.19(b), if no response thereto is received by the General Partner from the Agent within  ten (10) Business Days after a request for such approval or consent is delivered in writing to the Agent, then such approval or consent (as applicable) shall be deemed to have been given by the Majority Lenders.

Section 9.20     Restricted Payments.  No Obligor shall, nor shall it permit any other Debtor to, make any Restricted Payment except:

(a)     the Debtors may make Restricted Payments to any other Debtor (and, in the case of Debtors (other than the General Partner) that are not wholly-owned Subsidiaries, to other equity holders in accordance with and to the extent provided for in their governing organizational documents as in effect on the Closing Date or by applicable law);

(b)     Restricted Payments to any Debtor and to the General Partner and to its equityholders in order to maintain its REIT status under the Code; provided that, in the case of Restricted Payments to the equityholders of the General Partner, the cash portion of any such Restricted Payments shall not exceed the minimum cash portion necessary to maintain such REIT status, taking into account IRS Revenue Procedure 2009-15 and any comparable guidance;

(c)     Restricted Payments by a Debtor to a Subsidiary of the Borrowers that is not a Debtor to enable such Subsidiary or another Subsidiary to satisfy any tax liabilities (after taking into account any off-setting deductions) that are attributable to the business or activities

72

of any Debtor and are not payable directly by any Debtor, in each case to the extent used to pay such tax liabilities; and

(d)     Restricted Payments by any Debtor to enable the recipient or its direct or indirect parent to make preferred dividends in the amount not to exceed $500,000 in the aggregate; provided that any such preferred dividend is made by an entity that qualifies as a REIT.

# ARTICLE 10

## CONDITIONS OF LENDING

Section 10.1     Conditions Precedent to Making of Term Loan.  The obligation of each Lender to make the Term Loan on the Funding Date is subject to the following conditions precedent having been satisfied (except if and to the extent that any such condition has been expressly waived in writing by the Agent and the Lenders):

(a)     Financing Order.  At the time of the making of the Term Loan, the Agent shall have received a certified copy of the Financing Order, which Financing Order (i) shall have been entered on the docket of the Bankruptcy Court on or before the Funding Date and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Majority Lenders; and, if the Financing Order is the subject of a pending appeal in any respect, neither the making of the Term Loan, nor the performance by the Obligors of any of their respective obligations hereunder, under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(b)     [Intentionally Omitted].

(c)     Delivery of Documents.  The Agent shall have received each of the following documents, which shall be satisfactory in form and substance to the Agent and the Lenders:

(i)     executed counterparts of this Agreement, executed and delivered by a Responsible Officer of each Borrower and each other Obligor listed on Schedule 1.1B, the Agent, and the Lenders;

(ii)     a Term Note payable to the order of each Lender, duly executed and delivered by the Borrowers, complying with the requirements of Section 2.2(d);

(iii)     a copy of the resolutions of the board of directors (or similar governing body) of each Obligor authorizing and approving (as applicable) the commencement of the Case and the execution, delivery and performance of the Loan Documents;

(iv)     written opinions (addressed to the Agent and the Lenders and dated the Funding Date), issued by counsel to the Obligors in the forms set forth as Exhibits J-1 and J-2, respectively;

73

(v)     all other documents and instruments required by law or reasonably requested by the Agent in proper form to be filed, registered or recorded to create or perfect the Liens intended to be created under the Loan Documents; it being understood that no Mortgages, UCC financing statements or similar documents will be filed on the Funding Date except a UCC financing statement naming the Non-Debtor Guarantor as debtor to be filed with the Secretary of State of the State of Delaware;

(vi)     all governmental and regulatory approvals necessary in connection with the closing of this Agreement and the transactions contemplated hereby and such approvals shall have been received and be in full force and effect; and

(vii)     all certificates of insurance with proper loss payee and additional insured endorsements for the insurance policies required by Section 9.3.

(d)     The representations and warranties contained in this Agreement shall be true and correct in all material respects on and as of the Funding Date as if made on and as of such date (except to the extent that any such representation or warranty relates to another specified date, in which case the same shall be true and correct as of such other specified date), which shall be amended by the "Exception Report" (as defined in the Commitment Letter).

(e)     No material adverse change shall have occurred with respect to the assets, liabilities, business, financial condition, or results of operations of the Debtors , taken as a whole, in comparison to those that existed on the date of the Commitment Letter, in each case other than as a result of the filing of the Petitions and the commencement of the Case.

(f)     The Obligors shall have paid all costs and expenses of the Agent and the Lenders set forth in Section 15.6 invoiced at least two Business Days prior to the Funding Date, due and payable to the Agent for the benefit of the Agent or the Lenders.

(g)     [Intentionally Omitted.]

(h)     No event shall have occurred and be continuing, or would occur as a result of such extension of credit, which constitutes a Default or an Event of Default.

The acceptance by the Borrowers of any proceeds of the Term Loan shall be deemed to be a representation and warranty (other than with respect to conditions qualified as satisfactory to, to the satisfaction of or similar approval or consent of the Agent or any Lender, as to which the Borrowers make no representations or warranty) made by the Obligors to the effect that all of the conditions precedent to the making of the Term Loan have been satisfied or to the knowledge of the Borrower waived, with the same effect as delivery to the Agent and the Lenders of a certificate signed by a Responsible Officer of the Obligors as of the Funding Date to such effect.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

# ARTICLE 11

## DEFAULT; REMEDIES

Section 11.1    Events of Default.  It shall constitute an event of default ("Event of Default") if, on or after the Closing Date, any one or more of the following shall occur for any reason:

(a)    any failure by any Borrowers or any other Obligor obligated therefor to pay (i) any principal amount owing hereunder within two Business Days of the date when due (provided that no grace period shall be available for principal payments due on the Maturity Date) or (ii) any interest or premium on any of the Obligations or any fee or other amount owing hereunder within two Business Days of when due, whether upon demand or otherwise;

(b)    any representation or warranty made or deemed made by any Obligor in this Agreement or in any of the other Loan Documents or any certificate furnished by any Obligor at any time to the Agent or any Lender hereunder or thereunder shall prove to be untrue in any material respect as of the date on which made, deemed made, or furnished;

(c)    any default shall occur in

(i)    the observance or performance of any of the covenants and agreements contained in paragraphs (4) of Schedule 3.1-A, Section 4.1, Section 7.3(a), Section 9.1 (but only insofar as it requires the preservation of the existence of the Borrowers), Section 9.8, Section 9.9, Section 9.11, Section 9.12, Section 9.13, Section 9.14 and Section 9.15;

(ii)    the observance or performance of any of the covenants and agreements contained in this Agreement, other than as referenced in Section 11.1(a) or Section 11.1(c)(i), or any other Loan Documents, and such default shall continue for a period of thirty (30) days after receipt by the General Partner of written notice from the Agent; provided that if such breach is not capable of cure within such thirty (30) day period, such period shall be extended for a reasonable period of time to permit such cure so long as the relevant Person has promptly commenced and is diligently pursuing such cure; provided that, other than in the case of cures involving maintenance and repair of Real Estate and Improvements, such extended period shall not exceed an additional sixty (60) days; or

(iii)    the observance or performance of any of the covenants and agreements contained in paragraph (3) of Schedule 3.1-A and such default shall continue for a period of five (5) Business Days after the payment date (as such term is used in such paragraph (3));

(d)    any default shall occur with respect to any post-petition Debt of any Obligor or any Debt of the Non-Debtor Guarantor (in each case, other than the Obligations) in an outstanding principal amount which exceeds $50,000,000, or under any agreement or instrument under or pursuant to which any such Debt may have been issued, created, assumed,

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

or guaranteed by any Obligor, and such default shall continue for more than the period of any grace, waiver, cure or forbearance, if any, if the effect thereof (after taking into account the giving of notice or after the lapse of any required time period or both) is to accelerate, or to permit the holders of any such post-petition Debt to accelerate, the maturity of any such post-petition Debt, or any such post-petition Debt shall be declared due and payable or be required to be prepaid (other than by a regularly scheduled required prepayment) prior to the stated maturity thereof;

(e)     any Loan Document, including any guaranty of the Obligations, shall be (i) terminated other than in accordance with its terms, (ii) revoked by an Obligor, (iii) declared void, invalid, or unenforceable (it being understood that, to the extent the Financing Order contains provisions to allow the realization on the Collateral, no such declaration, invalidity or unenforceability shall constitute an Event of Default so long as the Liens on the Collateral granted pursuant to the Financing Order remain valid and enforceable), or (iv) challenged in writing by any Obligor;

(f)     one or more judgments, orders, decrees, or arbitration awards (other than any claim against any Property that is not stayed pending appeal granting relief from the Automatic Stay with respect to the Debtors' Properties) is entered against any Obligor involving liability in the aggregate (to the extent not covered by independent third party insurance) as to any single or related or unrelated series of transactions, incidents or conditions, of $37,500,000 or more, and the same shall remain unsatisfied, unvacated, and unstayed pending appeal or not subject to the Automatic Stay for a period of 60 days after the entry thereof;

(g)     (i) an ERISA Event shall occur with respect to a Pension Plan or Multi-employer Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect; (ii) the aggregate amount of Unfunded Pension Liability among all Pension Plans at any time which has resulted or could reasonably be expected to result in a Material Adverse Effect; or (iii) any Obligor or any ERISA Affiliate shall fail to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multi-employer Plan in an aggregate amount which has resulted or could reasonably be expected to result in a Material Adverse Effect;

(h)     any Loan Document ceases to be in full force and effect (other than in accordance with its terms) or any Lien with respect to any material portion of the Collateral intended to be secured thereby ceases to be, or is not, valid, perfected, and prior to all other Liens (other than Permitted Liens which are expressly permitted to have priority over the Agent's Lien) or is terminated, revoked, or declared void (other than in accordance with its terms) it being understood that to the extent the Financing Order contains provisions to allow the realization on any Collateral, no such termination, revocation, declaration, invalidity or unenforceability with respect to any Loan Document shall constitute an Event of Default;

(i)     an order shall be entered confirming any plan of reorganization in the Case in respect of any Major Entity (unless the applicable Debtor would cease to be a Major Entity

76

upon giving effect to a transaction permitted under <u>Section 9.8</u> and any mandatory prepayments required under <u>Section 3.3</u> occurring substantially contemporaneously with or prior to such plan of reorganization), which does not, upon entry thereof (i) contain a provision for the payment in full in cash of all non-contingent Obligations as of and no later than the effective date of such plan and (ii) provide for the continuation of the Liens and security interests granted to the Agent for the benefit of the Lenders and the required priorities of such Liens until the Obligations have been paid in full in cash;

(j)     an order with respect to the Case shall be entered appointing, or any Obligor shall file an application for an order with respect to the Case seeking the appointment of, in either case without the prior written consent of the Majority Lenders (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner or any other Person with enlarged powers relating to the operation of the business (*i.e.*, powers beyond those set forth in Sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(k)     an order shall be entered dismissing the Case or converting the Case to a case under Chapter 7 of the Bankruptcy Code, in each case in respect of a Major Entity, unless the applicable Debtor would cease to be a Major Entity upon giving effect to a transaction permitted under <u>Section 9.8</u> and any mandatory prepayments required under <u>Section 3.3</u> occurring substantially contemporaneously with or prior to such dismissal or conversion;

(l)     any Debtor or any Person with the support of any Debtor shall file any pleading, or any order is entered with respect to the Case, without the prior written consent of the Majority Lenders (i) to revoke, reverse, stay, modify, supplement, or amend the Financing Order, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the Agent and the Lenders in respect of the Obligations other than the Carve-Out, (iii) to grant or permit the grant of a Lien on any of the Collateral other than Permitted Liens (other than with respect to any pleading that (A) has been filed inadvertently, (B) has not resulted in the granting of or permission to grant such Lien and (C) has been withdrawn as soon as practicable but in no event later than the earlier to occur of (1) 15 days from the filing of such pleading or (2) 3 days prior to the hearing on the motion), (iv) to permit any Debtor to use proceeds of Collateral other than in accordance with the terms of the Loan Documents, (v) to invalidate or otherwise challenge any of the Agent's Liens, or otherwise object to, or raise defenses to, the extent, amount (other than bona fide disputes as to the amount of Obligations owed), validity, perfection, priority or enforceability of any of the Obligations or the Agent's Liens, (vi) to surcharge under Section 506(c) or 552 of the Bankruptcy Code any Collateral, or (vii) permit the use of cash collateral except as permitted by this Agreement and the Financing Order;

(m)     an order shall be entered that is not stayed pending appeal granting relief from the Automatic Stay to any creditor of a Debtor with respect to any claim against any Property that, when taken together with all other orders entered on the docket of the Bankruptcy Court that are not stayed pending appeal granting relief from the Automatic Stay with respect to the

77

Debtors' Properties, could reasonably be expected to have a Material Adverse Effect; provided that it shall not be an Event of Default if relief from the Automatic Stay is granted (i) solely for the purpose of allowing such creditor to determine the liquidated amount of its claim against a Debtor, (ii) to permit the commencement of or prosecution of a proceeding to collect proceeds in respect of a Condemnation or Casualty, (iii) to make protective advances in respect of taxes, insurance premiums or costs to protect or repair any Collateral secured by a Prior Lien Debt or (iv) in connection with a transaction permitted by Section 9.8(v);

(n)    the violation by any Debtor of any of the provisions of the Financing Order if such violation is adverse to the Agent or the Lenders;

(o)    absent the prior written consent of the Majority Lenders, any change or alteration that is adverse in any material respect to the Lenders to (i) the consolidated cash management system of the Obligors, as such system existed on the Petition Date (other than changes in the ordinary course of business consistent with past practices), or (ii) any order entered by the Bankruptcy Court in the Debtors' chapter 11 cases approving such cash management system; or

(p)    a Change in Control.

Section 11.2    Remedies.

(a)    If an Event of Default exists, the Agent may, in its discretion, and shall, at the direction of the Majority Lenders, at any time or times and in any order, without notice to or demand on any Obligor, restrict the amount of or refuse to permit any Lender to make the Term Loan.  If an Event of Default exists, the Agent shall, at the direction of the Majority Lenders, do one or more of the following, in addition to the action described in the preceding sentence, at any time or times and in any order, without notice to or demand on any Obligor except as required by Section 11.2(e):  (A) terminate the Commitments and the other obligations of the Agent and the Lenders under this Agreement; (B) declare any or all Obligations to be immediately due and payable; and (C) pursue its other rights and remedies under the Loan Documents, the Financing Order and/or applicable law.  Except as otherwise provided in the Financing Order, the Agent and the Lenders may exercise any of the foregoing remedies without demand and without further application to or order of the Bankruptcy Court.

(b)    Each Obligor recognizes that the Agent may be unable to effect a public sale of any or all of the Collateral that constitutes securities to be sold by reason of certain prohibitions contained in the laws of any jurisdiction outside the United States or in applicable federal or state securities laws but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such Collateral to be sold for their own account for investment and not with a view to the distribution or resale thereof.  Each Obligor acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall, to the extent permitted by law, be deemed to have been made in a commercially reasonable manner.

78

Unless required by a Legal Requirement, the Agent shall not be under any obligation to delay a sale of any of such Collateral to be sold for the period of time necessary to permit the issuer of such securities to register such securities under the laws of any jurisdiction outside the United States or under any applicable federal or state securities laws, even if such issuer would agree to do so. Each Obligor further agrees to do or cause to be done, to the extent that such Obligor may do so under Legal Requirements, all such other acts and things as may be necessary to make such sales or resales of any portion or all of such Collateral or other property to be sold valid and binding and in compliance with any and all Legal Requirements at the Obligors' expense. Each Obligor further agrees that a breach of any of the covenants contained in this Section 11.2(b) will cause irreparable injury to the Agent and the Lenders for which there is no adequate remedy at law and, as a consequence, agrees that each covenant contained in this Section 11.2(b) shall be specifically enforceable against such Obligor, and each Obligor hereby waives and agrees, to the fullest extent permitted by law, not to assert as a defense against an action for specific performance of such covenants that (i) such Obligor's failure to perform such covenants will not cause irreparable injury to the Agent and the Lenders or (ii) the Agent or the Lenders have an adequate remedy at law in respect of such breach. Each Obligor further acknowledges the impossibility of ascertaining the amount of damages which would be suffered by the Agent and the Lenders by reason of a breach of any of the covenants contained in this Section 11.2(b) and, consequently, agrees that, if such Obligor shall breach any of such covenants and the Agent or the Lenders shall sue for damages for such breach, such Obligor shall pay to the Agent, for the benefit of the Agent and the Lenders, as liquidated damages and not as a penalty, an aggregate amount equal to the value of the Collateral or other property to be sold on the date the Agent shall demand compliance with this Section 11.2(b).

(c) If an Event of Default has occurred and is continuing: (i) the Agent shall have for the benefit of the Lenders, in addition to all other rights of the Agent and the Lenders, the rights and remedies of a secured party under the UCC; (ii) the Agent may, at any time, take possession of, foreclose on and/or request a receiver of the Collateral and keep it on any Obligor's premises, at no cost to the Agent or any Lender, or remove any part of it to such other place or places as the Agent may desire, or the Obligors shall, upon the Agent's demand, at the Obligors' cost, assemble the Collateral and make it available to the Agent at a place reasonably convenient to the Agent; (iii) the Agent may sell and deliver any Collateral at public or private sales, for cash, upon credit, or otherwise, at such prices and upon such terms as the Agent deems advisable, in its sole discretion, and may, if the Agent deems it reasonable, postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale; (iv) the Agent may hold, lease, develop, manage, operate, control and otherwise use the First Lien Properties upon such terms and conditions as the Agent may deem reasonable under the circumstances (making such repairs, alterations, additions and improvements and taking other actions, from time to time, as the Agent deems reasonably necessary or desirable), exercise all such rights and powers of each Obligor with respect to the First Lien Properties, whether in the name of Obligor or otherwise, including without limitation the right to make, cancel, enforce or modify leases, obtain and evict tenants, and demand, sue for, collect and receive all rents, in each case, in accordance with the standards applicable to the Agent under the Loan Documents; (v) the Agent may employ consultants to inspect the First Lien Properties and to assure compliance by each Obligor of the

79

terms and conditions of the Loan Documents and to take any other reasonable actions, as the Agent deems reasonably necessary or desirable, in connection with the First Lien Properties (including preparing for the disposition thereof), and all actual, reasonable, out-of-pocket fees and expenses incurred in connection therewith shall be borne by the Obligors and (vi) upon demand from the Agent, the applicable Obligor shall direct the grantor or licensor of, or the contracting party to, any property agreement with respect to any First Lien Property to recognize and accept the Agent, for the benefit of and on behalf of the Lenders, as the party to such agreement for any and all purposes as fully as it would recognize and accept such Obligor and the performance of such Obligor thereunder and, in such events, without further notice or demand and at such Obligor's sole cost and expense, the Agent, for the benefit of and on behalf of the Lenders, may exercise all rights of such Obligor arising under such agreements. Without in any way requiring notice to be given in the following manner, each Obligor agrees that any notice by the Agent of sale, disposition, or other intended action hereunder or in connection herewith, whether required by the UCC or otherwise, shall constitute reasonable notice to such Obligor if such notice is mailed by registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt, at least ten (10) Business Days prior to such action to the Obligors' address specified in or pursuant to Section 15.7. If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the Obligations until the Agent or the Lenders receive payment, and if the buyer defaults in payment, the Agent may resell the Collateral. In the event the Agent seeks to take possession of all or any portion of the Collateral by judicial process, each Obligor irrevocably waives: (A) the posting of any bond, surety, or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Agent retain possession and not dispose of any Collateral until after trial or final judgment. Each Obligor agrees that the Agent has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any Person. The Agent is hereby granted a license or other right to use, without charge, each Obligor's labels, patents, copyrights, name, trade secrets, trade names, trademarks, and advertising matter, or any similar property, in completing production of, advertising, or selling any Collateral, and each such Obligor's rights under all licenses and all franchise agreements shall inure to the Agent's benefit for such purpose. The proceeds of sale shall be applied first to all expenses of sale, including reasonable attorneys' fees, and then to the Obligations. The Agent will return any excess to the applicable Obligor and the Obligors shall remain liable for any deficiency.

(d)     The Obligors acknowledge and agree that the Lenders would not provide the Term Loan if, among other things, they were not assured that if an Event of Default specifically occurs, the Agent, on behalf of the Lenders, may obtain all amounts in the Cash Collateral Accounts (other than amounts held in the Main Operating Account subject to the Liens in favor of the Adequate Protection Parties (as defined in the Financing Order)) and apply them immediately to the Obligations, and otherwise exercise the other rights and remedies available to the Agent.

(e)     Notwithstanding anything herein to the contrary, (i) neither the Agent nor any Lender shall take any action under this Section 11.2 (or similar provisions of any Loan

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

Document) except after compliance with any applicable notice requirements applicable thereto set forth in accordance with the Financing Order, and (ii) following the occurrence and during the continuance of an Event of Default, all amounts received by the Agent on account of the Obligations, from the Obligors and/or all amounts with respect to the proceeds of any Collateral (including, after the Agent has given the General Partner notice of the exercise of control, all amounts in the Cash Collateral Accounts, other than amounts held in the Main Operating Account subject to the Liens in favor of the Adequate Protection Parties (as defined in the Financing Order)) shall be (subject to the proviso below) promptly disbursed by the Agent as follows, unless otherwise agreed by the Agent and the Majority Lenders: (A) first, to the payment of expenses incurred by the Agent in the performance of its duties and the enforcement of the rights and remedies of the Agent and the Lenders under the Loan Documents, including, without limitation, all costs and expenses of collection, reasonable attorneys' fees, court costs and other amounts required to be paid or reimbursed by the Obligors to the Agent or the Lenders as provided by this Agreement or any of the other Loan Documents; (B) second, to the Lenders, pro rata in accordance with their respective Pro Rata Shares, until interest accrued on the Term Loan has been paid in full; (C) third, to the Lenders, pro rata in accordance with their respective Pro Rata Shares, until principal of the Term Loan then due and payable (if any) has been paid in full; (D) fourth, to the Agent, any remaining amount owed to the Agent pursuant to the terms of this Agreement or any other Loan Document; (E) fifth, to each Lender, any remaining amount owed to such Lender pursuant to the terms of this Agreement or any other Loan Document hereof multiplied by a fraction, the numerator of which is all remaining amounts owed to such Lender hereunder and thereunder and the denominator of which is the aggregate of all remaining amounts due all Lenders hereunder and thereunder, until all such remaining amounts have been paid in full and (F) lastly, to the extent the non-contingent Obligations have been paid in full, to the Borrowers; provided that during the existence of an Event of Default (1) notwithstanding the existence of such Event of Default or an acceleration of the Obligations, funds in the Main Operating Account that are not subject to the first priority Agent's Lien shall not be transferred out of the Main Operating Account other than for ordinary course expenditures to protect and preserve the Collateral (including all documented payroll expenses (including benefits), operating expenses of the Properties, taxes, insurance premiums, ground rents with respect to the Properties, and cash management, in each case, in the ordinary course of business, and the adequate protection payments), (2) funds in any Cash Collateral Account that are subject to the first priority Agent's Lien (x) may, until otherwise directed by Agent, be transferred out of the Cash Collateral Accounts only for ordinary course expenditures to protect and preserve the Adequate Protection Properties (as defined in the Financing Order) (including all documented payroll expenses (including benefits), operating expenses of such Properties, taxes, insurance premiums, ground rents with respect to such Properties, and cash management, in each case, in the ordinary course of business) and (y) at the Agent's sole discretion and with the consent of the Majority Lenders, any funds in the Cash Collateral Accounts that are subject to the first priority Agent's Lien may instead be applied at the direction of the Agent and (3) all proceeds received by the Agent and the Lenders in respect of sales of Collateral subject to a Pre-Petition Lien shall first be paid to the holder of such Pre-Petition Lien to the extent of its priority interest in such proceeds. The order of priority set forth in this Section 11.2(e) and the related provisions of this Agreement are set forth solely to determine the rights and priorities of the

81

Agent and the Lenders as among themselves. The order of priority set forth in this <u>Section 11.2(e)</u> may at any time and from time to time be changed by the Agent and the Lenders without necessity of notice to or consent of or approval by any Obligor or any other Person.

(f) An Event of Default shall occur as set forth in this Agreement even if an act or circumstance which gives rise, directly or indirectly, to such Event of Default has been authorized by the Bankruptcy Court or another court or tribunal with jurisdiction over the Case. Neither the Agent nor any Lender shall have any obligation whatsoever to object to any relief requested by any Debtor from the Bankruptcy Court or another court or tribunal with jurisdiction over the Case if and because such relief would or may constitute, or would or may lead to, an Event of Default, or the Agent's or any Lender's failure to object to such relief shall not limit the Events of Default under this Agreement, constitute a waiver or release of rights and remedies under this Agreement, estop or preclude the Agent or any Lender from fully enforcing the same, or have any res judicata effect on whether an Event of Default has occurred under this Agreement. Each Debtor shall be fully responsible for determining whether any relief it seeks from the Bankruptcy Court or another court or tribunal with jurisdiction over the Case would or may constitute, or would or may lead to, an Event of Default under this Agreement, and authorization for such relief shall not limit in any manner whatsoever such Debtor's obligation to fully comply with all of the terms and conditions of this Agreement.

(g) Without limiting the remedies of the Agent and the Lenders hereunder, each Obligor further agrees that a breach of any of the covenants and agreements of the Obligors contained in <u>paragraphs (4)</u> of <u>Schedule 3.1-A</u> will cause irreparable injury to the Agent and the Lenders for which there is no adequate remedy at law and, as a consequence, agrees that each such covenant and agreement contained in <u>paragraphs (4)</u> of <u>Schedule 3.1-A</u> shall be specifically enforceable against such Obligor, and the Agent and the Lenders shall be entitled to obtain injunctive relief with respect thereto without any bond or other security being required, and each Obligor hereby waives and agrees, to the fullest extent permitted by law, not to assert as a defense against an action for specific performance of such covenants that (i) such Obligor's failure to perform such covenants will not cause irreparable injury to the Agent and the Lenders or (ii) the Agent or the Lenders have an adequate remedy at law in respect of such breach.

## ARTICLE 12

## GUARANTY

<span style="color:blue">Section 12.1</span>    <u>Guaranty; Limitation of Liability</u>.

(a) Each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees the punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Obligor now or hereafter existing under or in respect of the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, interest,

<div align="center">82</div>

premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Obligations being the "Guaranteed Obligations"), and agrees to pay any and all reasonable out-of-pocket expenses (including, without limitation, reasonable out-of-pocket fees and expenses of counsel but excluding allocated costs of in-house counsel) incurred by the Agent or any Lender in enforcing any rights under this Guaranty or any other Loan Document.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Obligor to the Agent or any Lender under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Obligor.

(b)     Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to the Agent or any Lender under this Guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor so as to maximize the aggregate amount paid to the Agent and the Lenders under or in respect of the Loan Documents.

Section 12.2     Guaranty Absolute.  Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Agent or any Lender with respect thereto.  The Obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Obligor under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against any Borrower or any other Obligor or whether any Borrower or any other Obligor is joined in any such action or actions. The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)     any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Obligations of any other Obligor under or in respect of the Loan Documents, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Obligor or otherwise;

(c)     any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

(d)     any manner of application of Collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral for all or any of the Guaranteed Obligations or any other Obligations of any Obligor under the Loan Documents or any other assets of any Obligor;

(e)     any change, restructuring or termination of the corporate structure or existence of any Obligor;

(f)     any failure of the Agent or any Lender to disclose to any Obligor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Obligor now or hereafter known to such Agent or such Lender, as the case may be (each Guarantor waiving any duty on the part of the Agent and the Lenders to disclose such information);

(g)     the failure of any other Person to execute or deliver this Guaranty or the release or reduction of liability of any Guarantor or surety with respect to the Guaranteed Obligations; or

(h)     any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Agent or any Lender that might otherwise constitute a defense available to, or a discharge of, any Obligor or any other guarantor or surety, in its capacity as a guarantor or surety.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Agent or any Lender or any other Person upon the insolvency, bankruptcy or reorganization of any Borrower or any other Obligor or otherwise, all as though such payment had not been made.

Section 12.3     Waivers and Acknowledgments.

(a)     Each Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(b)     Each Guarantor hereby unconditionally and irrevocably waives (i) any defense arising by reason of any claim or defense based upon an election of remedies by the Agent or any Lender that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Obligors, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Obligations of such Guarantor hereunder.

(c)     Each Guarantor acknowledges that the Agent may, to the extent permitted by applicable law, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any Loan Document by

84

nonjudicial sale, and each Guarantor hereby waives any defense to the recovery by the Agent and the Lenders against such Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law.

(d)      Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of the Agent or any Lender to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Obligor or any of its Subsidiaries now or hereafter known by the Agent or such Lender, as the case may be.

(e)      Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in Section 12.2 and this Section 12.3 are knowingly made in contemplation of such benefits.

Section 12.4      Subrogation.  Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against any Borrower or any other Obligor that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Guaranty or any other Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Agent or any Lender against any Borrower or any other Obligor, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Borrower or any other Obligor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash and the Commitments shall have expired or been terminated.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the latest of (a) the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Guaranty and (b) the Maturity Date, such amount shall be received and held in trust for the benefit of the Agent and the Lenders, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising.  If (i) any Guarantor shall make payment to the Agent of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash and (iii) the Maturity Date shall have occurred, the Agent and the Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

**Section 12.5**     <u>Guaranty Supplements</u>.  Upon the execution and delivery by any Subsidiary of a guaranty supplement in substantially the form of <u>Exhibit H</u> hereto (each, a "<u>Guaranty Supplement</u>"), (a) such Subsidiary shall be referred to as an "<u>Additional Guarantor</u>," and shall become and be a Guarantor hereunder, and each reference in this Guaranty or any other provision of this Agreement to a "<u>Guarantor</u>" shall also mean and be a reference to such Additional Guarantor, and each reference in any other Loan Document to a "Guarantor" shall also mean and be a reference to such Additional Guarantor, and (b) each reference herein to "this Guaranty," "this Agreement," "hereunder," "hereof" or words of like import referring to this Guaranty and/or this Agreement, as the case may be, and each reference in any other Loan Document to the "Guaranty," "thereunder," "thereof" or words of like import referring to this Guaranty, shall mean and be a reference to this Guaranty and this Agreement as supplemented by such Guaranty Supplement; <u>provided</u> that in no event shall a Foreign Subsidiary be obligated to become a Guarantor.

**Section 12.6**     <u>Continuing Guaranty; Assignments</u>.  This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Guaranty and the termination or expiration of all Commitments, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Agent and the Lenders and their respective successors, transferees and assigns.  Without limiting the generality of <u>clause (c)</u> of the immediately preceding sentence, any Lender may assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments, any Term Loan held by it and its rights and remedies with respect to Collateral and the Obligations) to any Eligible Assignee, and such Eligible Assignee shall thereupon become vested with all the benefits in respect thereof granted to such Lender herein or otherwise, in each case as and to the extent provided in <u>Section 13.3</u>.  No Guarantor shall have the right to assign its rights hereunder or any interest herein or delegate any of its duties, liabilities or obligations hereunder or under any other Loan Document without the prior written consent of the Majority Lenders.

**Section 12.7**     <u>Limitation on Guaranty</u>.Notwithstanding any provision of this Guaranty to the contrary, it is intended that this Guaranty, and any Liens granted hereunder by each Guarantor to secure the obligations and liabilities arising pursuant to this Guaranty, not constitute a "Fraudulent Conveyance" (as defined below).  Consequently, each Guarantor agrees that if this Guaranty, or any Liens securing the obligations and liabilities arising pursuant to this Guaranty, would, but for the application of this sentence, constitute a Fraudulent Conveyance, this Guaranty and each such Lien shall be valid and enforceable only to the maximum extent that would not cause this Guaranty or such Lien to constitute a Fraudulent Conveyance, and this Guaranty shall automatically be deemed to have been amended accordingly at all relevant times. For purposes hereof, "Fraudulent Conveyance" means a fraudulent conveyance or fraudulent transfer applicable under Section 548 of the Bankruptcy Code or any fraudulent conveyance or fraudulent transfer under the provisions of any applicable fraudulent conveyance or fraudulent transfer law or similar law of any state, nation or other governmental unit, as in effect from time to time.

86

# ARTICLE 13

## AMENDMENTS; WAIVERS; PARTICIPATIONS; ASSIGNMENTS; SUCCESSORS

Section 13.1    No Waivers; Cumulative Remedies.  No failure by the Agent or any Lender to exercise any right, remedy, or option under this Agreement, or in any other agreement between or among any Obligor and the Agent and/or any Lender, or delay by the Agent or any Lender in exercising the same, will operate as a waiver thereof.  No waiver by the Agent or the Lenders on any occasion shall affect or diminish the Agent's and each Lender's rights thereafter to require strict performance by any Obligor of any provision of this Agreement.  The Agent's and each Lender's rights will be cumulative and not exclusive of any other right or remedy.

Section 13.2    Amendments and Waivers.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Obligor therefrom, shall be effective unless the same shall be in writing and signed by the Majority Lenders (or by the Agent at the written consent of the Majority Lenders) and the Obligors and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that no such waiver, amendment, or consent shall, unless in writing and signed by all the affected Lenders, do any of the following:

    (a)    increase or extend the Commitment of any Lender;

    (b)    postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest or fees;

    (c)    reduce the principal of, or the rate of interest specified herein on, the Term Loan or reduce any fees payable hereunder or under any other Loan Document;

    (d)    amend this Section;

    (e)    release all or substantially all of the Collateral or all or substantially all of the value of the Guarantees under Article 12;

    (f)    change the definition of Majority Lenders; or

    (g)    modify Schedule 3.1-A or Schedule 3.1-B.

provided that (i) no amendment, waiver, or consent shall, unless in writing and signed by the Agent, affect the rights or remedies or duties of the Agent under this Agreement or any other Loan Document and (ii) notwithstanding anything to the contrary set forth in this Section 13.2, the Financing Order may be amended in accordance with the definition thereof.

Section 13.3    Assignments; Participations.

    (a)    Any Lender may, with the written consent of the Agent (which consent shall not be unreasonably withheld), assign and delegate to one or more Eligible Assignees (each an

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

"Assignee") all, or any part of all, of the Term Loan, the Commitments, and the other rights and obligations of such Lender hereunder; provided that the Obligors and the Agent may continue to deal solely and directly with such Lender in connection with the interest so assigned to an Assignee until (x) written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, shall have been given to the General Partner and the Agent by such Lender and the Assignee; and (y) such Lender and its Assignee shall have delivered to the Agent an Assignment and Acceptance in a form reasonably acceptable to the Agent ("Assignment and Acceptance") together with any Term Note or Term Notes subject to such assignment and a recordation fee (payable by such Lender or such Assignee) of $3,500.

(b)      From and after the date that the Agent notifies the assignor Lender that it has received an executed Assignment and Acceptance, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations have been assigned to it pursuant to such Assignment and Acceptance, shall have the rights and obligations of a Lender under the Loan Documents (including the obligations pursuant to Schedule 3.1-A and Schedule 3.1-B), and (ii) the assignor Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(c)      By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties, or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency, or value of this Agreement or any other Loan Document furnished pursuant hereto or the attachment, perfection, or priority of any Lien granted by any Obligor to the Agent or any Lender in the Collateral; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Obligor or the performance or observance by any Obligor of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto; (iii) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such Assignee will, independently and without reliance upon the Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such Assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Agent by the terms hereof, together with such powers, including the discretionary rights and incidental power, as are reasonably incidental thereto; and (vi) such Assignee agrees that it will perform in accordance with their terms all of the

88

obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     The Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at its address referred to in Section 15.7 a copy of each Assignment and Acceptance delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitment of, and principal amount of the Term Loan and any stated interest owing to, each Lender from time to time.  The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrowers, the Agent and the Lenders shall treat each Person whose name is recorded in the Register as the owner of the Term Loan and any Term Notes evidencing such Term Loan recorded therein for all purposes of this Agreement.  Any assignment of any Term Loan, whether or not evidenced by a Term Note, shall be effective only upon appropriate entries with respect thereto being made in the Register.  Any assignment of all or part of a Term Loan evidenced by a Term Note shall be registered on the Register only upon surrender for registration of assignment of the Term Note evidencing such Term Loan, accompanied by a duly executed Assignment and Acceptance; thereupon one or more new Term Notes in the same aggregate principal amount shall be issued to the assigning Lender and/or the designated Eligible Assignee (as applicable), and the old Term Notes shall be returned by the Agent to the Borrowers marked "canceled."  The Register shall be available for inspection by the Borrowers or any Lender (with respect to any entry relating to such Lender's Term Loan) at any reasonable time and from time to time upon reasonable prior notice.  The Register shall be treated, solely for purposes of Treasury Regulation Section 5f.103-1(c) (which relates to whether an obligation is in registered form for purposes of claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest" received by a Non-U.S. Lender), as being maintained by the Agent as agent for the Borrowers; provided that the Agent shall have no duty or obligation whatsoever to or for the benefit of the Borrowers in connection with such matter.

(e)     Immediately upon satisfaction of the requirements of Section 13.3(a) and Section 13.3(d), this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Commitments arising therefrom.  The Commitment allocated to each Assignee shall reduce such Commitments of the assigning Lender pro tanto.

(f)     Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons (a "Participant") participating interests in any Term Loan, the Commitment of that Lender, and the other interests of that Lender (the "originating Lender") hereunder and under the other Loan Documents; provided that (i) the originating Lender's obligations under this Agreement shall remain unchanged (including the obligations pursuant to Schedule 3.1-A and Schedule 3.1-B), (ii) the originating Lender shall remain solely responsible for the performance of such obligations, (iii) the Obligors and the Agent shall continue to deal solely and directly with the originating Lender in connection with the originating Lender's rights and obligations under this Agreement and the other Loan Documents,  (iv) no Lender shall transfer or grant any participating interest under which the

89

Participant has rights to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, (v) all amounts payable by the Obligors hereunder shall be determined as if such Lender had not sold such participation, and (vi) at any time on or prior to the Maturity Date, no Disqualified Lender may, without the Borrowers' prior written consent, be a Participant unless the maturity of the Term Loan has been accelerated; except that, if amounts outstanding under this Agreement shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement to the same extent and subject to the same limitation as if the amount of its participating interest were owing directly to it as a Lender under this Agreement.

(g) In the event that any Lender sells participations in a Term Loan, such Lender shall, acting solely for this purpose as an agent of the Borrowers, maintain, or cause to be maintained, a register, on which it enters the name of all Participants in the Term Loan held by it and the principal amount (and stated interest thereon) of the portion of the Term Loan that is the subject of the participation (the "Participant Register"). A Term Loan (and the note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register. Any participation of such Term Loan (and the note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Borrowers and any Lender at any reasonable time and from time to time upon reasonable prior notice. The Participant Register shall be treated, solely for purposes of Treasury Regulation Section 5f.103-1(c) (which relates to whether an obligation is in registered form for purposes of claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest" received by a Non-U.S. Lender), as being maintained by the applicable Lender as agent for the Borrowers; provided that such Lender shall have no duty or obligation whatsoever to or for the benefit of the Borrowers in connection with such matter.

(h) Notwithstanding any other provision in this Agreement, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of any Federal Reserve Bank, in accordance with Regulation A of the Federal Reserve Board or U.S. Treasury Regulation 31 CFR §203.14, or any Federal Home Loan Bank, and such Federal Reserve Bank and/or Federal Home Loan Bank may enforce such pledge or security interest in any manner permitted under applicable law.

## ARTICLE 14

## THE AGENT

Section 14.1    Appointment and Authorization. Each Lender hereby designates and appoints the Agent as its agent under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes the Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. The Agent agrees to act as such on the express conditions contained in this Article 14. The provisions of this Article 14 are solely for the benefit of the Agent and the Lenders and no Obligor shall have rights as a third party beneficiary of any of the provisions contained herein other than with respect to Section 14.9, Section 14.10 and Section 14.11. Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document, the Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall the Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations, or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Agreement with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. Except as expressly otherwise provided in this Agreement, the Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions which the Agent is expressly entitled to take or assert under this Agreement and the other Loan Documents, including the exercise of rights and remedies pursuant to Section 11.2, and any action so taken or not taken shall be deemed consented to by the Lenders.

Section 14.2    Delegation of Duties.  The Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, sub-agents, employees, or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Agent shall not be responsible for the negligence or misconduct of any agent, sub-agent, employee, or attorney-in-fact that it selects as long as such selection was made without gross negligence or willful misconduct.

Section 14.3    Liability of the Agent.  None of the Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders for any recital, statement, representation, or warranty made by any Obligor or any Affiliate of any Obligor, or any officer thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement, or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability, or sufficiency of this Agreement or any other Loan Document, or for any failure of any Obligor to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books, or records of any Obligor or any Affiliate of any Obligor.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

Without limiting the generality of the foregoing, no Agent-Related Person: (i) shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Majority Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that such Agent-Related Person shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose such Person to liability or that is contrary to any Loan Document or applicable Requirements of Law; and (ii) shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Borrowers or any of their Affiliates that is communicated to or obtained by the person serving as Agent or any of its Affiliates in any capacity.

Section 14.4    Reliance by the Agent.

(a)    The Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex, or telephone message, statement, or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including, without limitation, counsel to the Obligors), independent accountants, and other experts selected by the Agent. The Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Majority Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Majority Lenders (or all Lenders if so required by the terms of this Agreement) and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders.

(b)    For purposes of determining compliance with the conditions specified in Section 10.1, each Lender that has executed this Agreement shall be deemed to have consented to, approved, or accepted or to be satisfied with, each document or other matter either sent by the Agent to such Lender for consent, approval, acceptance, or satisfaction, or required thereunder to be consented to or approved by or acceptable or satisfactory to such Lender.

Section 14.5    Notice of Default. The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless the Agent shall have received written notice from a Lender or an Obligor referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." The Agent will notify the Lenders of its receipt of any such notice. The Agent shall take such action with respect to such Default or Event of Default as may be requested by the Majority Lenders in accordance with Article 11; provided that unless and until the Agent has received any such

92

request, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

Section 14.6    Credit Decision.  Each Lender acknowledges that none of the Agent-Related Persons has made any representation or warranty to it, and that no act by the Agent hereinafter taken, including any review of the affairs of the Obligors and their Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender. Each Lender represents to the Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition, and creditworthiness of the Obligors and their Affiliates, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Obligors.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals, and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition, and creditworthiness of the Obligors.  Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by the Agent, the Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition, or creditworthiness of the Obligors which may come into the possession of any of the Agent-Related Persons.

Section 14.7    Indemnification.  WHETHER OR NOT THE TRANSACTIONS CONTEMPLATED HEREBY ARE CONSUMMATED, THE LENDERS SHALL INDEMNIFY UPON DEMAND THE AGENT-RELATED PERSONS (TO THE EXTENT NOT REIMBURSED BY OR ON BEHALF OF THE OBLIGORS AND WITHOUT LIMITING THE OBLIGATION OF THE OBLIGORS TO DO SO), PRO RATA, FROM AND AGAINST ANY AND ALL INDEMNIFIED LIABILITIES AS SUCH TERM IS DEFINED IN SECTION 15.10; PROVIDED THAT NO LENDER SHALL BE LIABLE FOR THE PAYMENT TO THE AGENT-RELATED PERSONS OF ANY PORTION OF SUCH INDEMNIFIED LIABILITIES RESULTING SOLELY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.  WITHOUT LIMITATION OF THE FOREGOING, EACH LENDER SHALL REIMBURSE THE AGENT UPON DEMAND FOR ITS RATABLE SHARE OF ANY COSTS OR OUT-OF-POCKET EXPENSES (INCLUDING COSTS AND EXPENSES SET FORTH IN SECTION 15.6) INCURRED BY THE AGENT IN CONNECTION WITH THE PREPARATION, EXECUTION, DELIVERY, ADMINISTRATION, MODIFICATION, AMENDMENT, OR ENFORCEMENT (WHETHER THROUGH NEGOTIATIONS, LEGAL PROCEEDINGS, OR OTHERWISE) OF, OR LEGAL ADVICE IN RESPECT OF RIGHTS OR RESPONSIBILITIES UNDER, THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, OR ANY DOCUMENT CONTEMPLATED BY OR REFERRED TO HEREIN, TO THE EXTENT THAT THE AGENT IS NOT REIMBURSED FOR SUCH EXPENSES BY OR ON BEHALF OF THE OBLIGORS.  THE UNDERTAKING IN THIS SECTION SHALL SURVIVE THE

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

PAYMENT OF ALL OBLIGATIONS HEREUNDER AND THE RESIGNATION OR REPLACEMENT OF THE AGENT.

Section 14.8     The Agent in Individual Capacity.  The Agent and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with the Obligors and their Affiliates as though it were not the Agent hereunder and without notice to or consent of the Lenders.  The Lenders acknowledge that, pursuant to such activities, the Agent or its Affiliates may receive information regarding the Obligors or their Affiliates (including information that may be subject to confidentiality obligations in favor of the Obligors or such Affiliates) and acknowledge that the Agent shall be under no obligation to provide such information to them.  With respect to its Term Loan, the Agent as a Lender shall have the same rights and powers under this Agreement as any other Lender and may exercise the same as though it were not the Agent, and the terms "Lender" and "Lenders" include the Agent in its individual capacity as a Lender hereunder.

Section 14.9     Successor Agent.  The Agent may resign as the Agent upon 30 days notice to the Lenders and the Borrowers, such resignation to be effective, subject to the next succeeding paragraph of this Section 14.9, upon the acceptance of a successor agent to its appointment as Agent.  If the Agent resigns under this Agreement, the Majority Lenders shall, with the consent of the General Partner if the Term Loan has not been accelerated (which consent may be withheld in it's sole and absolute discretion), appoint from among the Lenders a successor agent for the Lenders.  Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor agent and the retiring Agent's appointment, powers, and duties as the Agent shall be terminated.  After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 14.9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent under this Agreement.

If no such successor Agent shall have been so appointed by the Majority Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above provided that if the Agent shall notify Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such Collateral as nominee until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through an Agent shall instead be made by or to each Lender directly, until such time as the Majority Lenders appoint a successor Agent as provided for above in this Section 14.9.

After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article 14 and Section 15.10 shall continue in effect for the benefit of such

94

retiring Agent and its sub-agents in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

Section 14.10    Withholding Tax.

(a)    Each of the Lenders and the Agent shall provide in favor of the Obligors and the Agent the following forms:

(i)    Each Non-U.S. Lender shall deliver to the Borrowers and the Agent either (i) two copies of either U.S. Internal Revenue Service Form W-8BEN (claiming exemption from, or a reduction of, U.S. withholding tax under an income tax treaty), Form W-8ECI (claiming exemption from U.S. withholding tax because the income is effectively connected with a U.S. trade or business) or Form W-8IMY including any required statements and Forms W-8BEN and W-8ECI, or any subsequent versions thereof or successors thereto, as applicable, or (ii) in the case of a Non-U.S. Lender entitled to an exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," two copies of Form W-8BEN (certifying that such Non-U.S. Lender is a beneficial owner of the Term Loan), Form W-8IMY including any required statements and Forms W-8BEN and W-8ECI or any subsequent versions thereof or successors thereto, and a certificate satisfactory to the Agent and the General Partner that such Non-U.S. Lender Party is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of the General Partner within the meaning of Section 881(c)(3)(B) of the Code or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code.  Each Form W-8BEN, Form W-8IMY or Form W-8ECI delivered under this Section 14.10(a) shall be properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by the Borrowers under this Agreement and the other Loan Documents.  Such forms shall be delivered by each Non-U.S. Lender prior to the date of the first payment by the Borrower hereunder made to such Non-U.S. Lender and on or before the date, if any, that such Non-U.S. Lender designates a New Lending Office.  In addition, each Non-U.S. Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender or as reasonably requested from time to time by the General Partner or the Agent.  Each Non-U.S. Lender shall promptly notify the General Partner and the Agent at any time it determines that it is no longer in a position to provide any previously delivered form, statement, or certificate to the Borrowers or the Agent (or any other form, statement, or form of certification adopted by the IRS for such purpose).  Notwithstanding any other provision of this paragraph, a Non-U.S. Lender shall not be required to deliver any form pursuant to this paragraph that such Non-U.S. Lender is not legally able to deliver.

(ii)    Each U.S. Lender shall deliver to the Borrowers and the Agent two copies of U.S. Internal Revenue Service Form W-9, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such U.S. Lender certifying that such U.S. Lender is entitled to an exemption from United States backup withholding tax on all payments by the Borrowers under this Agreement and the other

95

Loan Documents. Such forms shall be delivered by each U.S. Lender on or before the date it becomes a party to this Agreement. In addition, each U.S. Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such U.S. Lender or as reasonably requested from time to time by the General Partner or the Agent. Each U.S. Lender shall promptly notify the General Partner and the Agent at any time it determines that it is no longer in a position to provide any previously delivered form, statement, or certificate to the General Partner or the Agent (or any other form, statement, or form of certification adopted by the U.S. taxing authorities for such purpose). Solely for purposes of this <u>Section 14.10(a)(ii)</u>, a U.S. Lender shall not include a Lender (or Assignee) that is treated as an exempt recipient based on the indicators described in Treasury Regulation Section 1.6049-4(c)(1)(ii).

(iii)     A Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which the Borrowers is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrowers (with a copy to the Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrowers, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, <u>provided</u> that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's reasonable judgment such completion, execution or submission would not materially prejudice the legal position of such Lender.

(b)     If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that the Agent or the Borrowers did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Agent or the Borrowers of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Lender shall indemnify the Agent and the Borrowers fully for all amounts paid, directly or indirectly, by the Agent or the Borrowers as Taxes or otherwise, including penalties and interest, and including any Taxes imposed by any jurisdiction on the amounts payable to the Agent under this <u>Section 14.10(b)</u>, together with all costs and expenses (including attorney and accountant costs related thereto). The obligation of the Lenders under this <u>Section 14.10(b)</u> shall survive the payment of the Obligations and the resignation or replacement of the Agent and termination of this Agreement.

<span style="color:blue">Section 14.11</span>     <u>Collateral Matters</u>.

(a)     The Lenders hereby irrevocably authorize the Agent, without the further consent of the Lenders, to release any Agent's Lien upon any Collateral (i) upon the termination of the Commitments and payment and satisfaction in full of all Term Loan and all other Obligations (other than indemnities to which a claim has not been made and obligations pursuant to <u>Schedule 3.1-A</u> and <u>Schedule 3.1-B</u> or pursuant to the provisions of the last sentence of <u>Section 15.5</u>); (ii) constituting property being sold or disposed of in accordance with this Agreement

<div align="center">96</div>

and with the approval of the Bankruptcy Court (to the extent required); (iii) constituting property leased to an Obligor under a lease which has expired or been terminated; or (iv) as required pursuant to any order of the Bankruptcy Court or as provided in Section 6.1(a). Except as provided above, the Agent will not release any of the Agent's Liens without the prior written authorization of the Majority Lenders.  Upon request by the Agent or the General Partner at any time, the Majority Lenders will confirm in writing the Agent's authority to release any Agent's Liens upon particular types or items of Collateral pursuant to this Section 14.11.  The Lenders hereby irrevocably authorize the Agent, at the request of the General Partner, to subordinate any Agent's Lien to the holder of any Lien described in clauses (b), (d), (f), (j) (if and to the extent applicable), (m), (o), (p), (s), (t), and (v) of the definition of Permitted Liens; in each case to the extent the underlying transaction is not prohibited hereby.

(b)     Upon receipt by the Agent of any authorization required pursuant to Section 14.11(a) to release any Agent's Liens upon particular types or items of Collateral, and upon at least two Business Days prior written request (or such shorter time period as the Agent may agree) by the General Partner, the Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Agent's Liens upon such Collateral; provided that (i) the Agent shall not be required to execute any such document on terms which, in the Agent's good-faith opinion, would expose the Agent to liability or create any material obligation or entail any material adverse consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of the Obligors in respect of) all interests retained by any Obligor, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

(c)     The Agent shall have no obligation whatsoever to any of the Lenders to assure that the Collateral exists or is owned by any Obligor or is cared for, protected, or insured or has been encumbered, or that the Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights, authorities, and powers granted or available to the Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion given the Agent's own interest in the Collateral in its capacity as one of the Lenders and that the Agent shall have no other duty or liability whatsoever to any Lender as to any of the foregoing.

Section 14.12     Restrictions on Actions by the Lenders; Sharing of Payments.

(a)     Each Lender hereby waives any and all rights to set-off against the Obligations, any amounts owing by such Lender to any Obligor or any accounts unrelated to the Term Loan of any Obligor now or hereafter maintained with such Lender.  Each of the Lenders further agrees that it shall not take or cause to be taken any action to enforce its rights under this Agreement or against any Obligor, including the commencement of any legal or equitable

97

proceedings, to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)     If at any time or times any Lender shall receive (i) by payment, foreclosure, set-off or otherwise, any proceeds of Collateral or any payments with respect to the Obligations owing to such Lender arising under, or relating to, this Agreement or the other Loan Documents, except for any such proceeds or payments received by such Lender from the Agent pursuant to the terms of this Agreement, or (ii) payments from the Agent in excess of such Lender's ratable portion of all such distributions by the Agent, such Lender shall promptly (A) turn the same over to the Agent, in kind, and with such endorsements as may be required to negotiate the same to the Agent, or in same day funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; provided that if all or part of such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

Section 14.13     Agency for Perfection.  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting the Lenders' security interest in assets which, in accordance with Article 9 of the UCC can be perfected by possession.  Should any Lender (other than the Agent) obtain possession of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

Section 14.14     Payments by the Agent to the Lenders.  All payments to be made by the Agent to the Lenders shall be made by bank wire transfer or internal transfer of immediately available funds to each Lender pursuant to wire transfer instructions delivered in writing to the Agent on or prior to the Closing Date (or if such Lender is an Assignee, on the applicable Assignment and Acceptance), or pursuant to such other wire transfer instructions as each party may designate for itself by written notice to the Agent.  Concurrently with each such payment, the Agent shall identify whether such payment (or any portion thereof) represents principal, premium, or interest on the Term Loan or otherwise.

Section 14.15     Concerning the Collateral and the Related Loan Documents.  Each Lender authorizes and directs the Agent to enter into this Agreement and the other Loan Documents relating to the Collateral, for the benefit of the Agent and the Lenders.  Each Lender agrees that any action taken by the Agent or the Majority Lenders, as applicable, in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral, and the exercise by the Agent or the Majority Lenders, as applicable, of their respective powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

**Section 14.16** <u>Relation Among the Lenders</u>.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

# ARTICLE 15

## MISCELLANEOUS

**Section 15.1** <u>Cumulative Remedies</u>.  The enumeration herein of the Agent's and each Lender's rights and remedies is not intended to be exclusive, and such rights and remedies are in addition to and not by way of limitation of any other rights or remedies that the Agent and the Lenders may have under the UCC or other applicable law.  The Agent (at the direction of the Majority Lenders when the same is required pursuant to the terms hereof) and the Majority Lenders shall have the right, in their sole discretion, to determine which rights and remedies within their authorities are to be exercised and in which order.  The exercise of one right or remedy shall not preclude the exercise of any others, all of which shall be cumulative.  The Agent may, and shall with the consent or at the direction of the Majority Lenders, without limitation, proceed directly against any Person liable therefor to collect the Obligations without any prior recourse to the Collateral.  No failure to exercise and no delay in exercising, on the part of the Agent or any Lender, any right, remedy, power, or privilege hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**Section 15.2** <u>Severability</u>.  The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

**Section 15.3** <u>Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver</u>.

(a)  EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS (AS OPPOSED TO THE CONFLICT OF LAWS PROVISIONS; <u>PROVIDED</u> THAT PERFECTION ISSUES WITH RESPECT TO ARTICLE 9 OF THE UCC MAY GIVE EFFECT TO APPLICABLE CHOICE OR CONFLICT OF LAW RULES SET FORTH IN ARTICLE 9 OF THE UCC) OF THE STATE OF NEW YORK; <u>PROVIDED</u>, <u>FURTHER</u>, THAT THE AGENT AND THE LENDERS SHALL RETAIN ALL RIGHTS ARISING UNDER FEDERAL LAW.

(b)  IN THE EVENT THE BANKRUPTCY COURT DOES NOT HAVE OR REFUSES TO EXERCISE JURISDICTION WITH RESPECT THERETO, ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE AGENT, EACH LENDER, AND EACH OBLIGOR, CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON EXCLUSIVE JURISDICTION OF THOSE COURTS.  EACH OF THE AGENT, EACH LENDER, AND EACH OBLIGOR IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT OR ANY DOCUMENT RELATED HERETO.

(c)    EACH PARTY HERETO HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO SUCH PARTY AT ITS ADDRESS SET FORTH IN <u>SECTION 15.7</u> AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED THREE (3) DAYS AFTER THE SAME SHALL HAVE BEEN SO DEPOSITED IN THE UNITED STATES MAILS.  NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE LEGAL PROCESS BY ANY OTHER MANNER PERMITTED BY LAW.

Section 15.4    <u>Waiver of Jury Trial</u>.  EACH OF THE AGENT, EACH LENDER, AND EACH OBLIGOR WAIVES ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING, OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AGENT-RELATED PERSON, PARTICIPANT, OR ASSIGNEE, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.  EACH OF THE AGENT, EACH LENDER, AND EACH OBLIGOR AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM, OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

Section 15.5    <u>Survival</u>.  All of the representations and warranties of the Obligors contained in this Agreement and the other Loan Documents shall survive the execution, delivery, and acceptance thereof by the parties, notwithstanding any investigation by the Agent or the

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

Lenders or their respective agents, and shall terminate upon the repayment in full of the Obligations (other than indemnities to which a claim has not been made and obligations pursuant to Schedule 3.1-A and Schedule 3.1-B). Solely to the extent related to the obligations of the parties under Schedule 3.1-A and Schedule 3.1-B, the only terms of this Agreement that will remain in full force and effect and will survive the termination of the Commitments and the payment and satisfaction in full of all Term Loans and all other Obligations (other than indemnities to which a claim has not been made) are as follows: Schedule 3.1-A and Schedule 3.1-B, Section 3.6, clauses (c)(i), (c)(iii) and (h) (solely as it relates to the provisions of this Agreement set forth in this sentence being in full force and effect in accordance with their terms) of Section 11.1, Section 13.1, the last sentence of Section 13.2 and Sections 15.2, 15.3, 15.4, 15.6, 15.7, 15.9, 15.10, 15.12, 15.13, 15.14, 15.17, and 15.18.

Section 15.6    Fees and Expenses.

(a)    Each Obligor agrees to pay to the Agent and each Lender, on demand, all reasonable and documented out-of-pocket costs and expenses that the Agent or any Lender pays or incurs in connection with the negotiation, preparation, consummation, administration, and termination of this Agreement or any of the other Loan Documents as follows: (i) all reasonable and documented fees, expenses, and disbursements of Gibson, Dunn & Crutcher LLP and of any law firm or other counsel, if any, (not to exceed one such firm or counsel) engaged by the Agent in connection with the negotiation, preparation and execution of the Loan Documents, including any such fees, expenses and disbursements of such law firm or other counsel in connection with the Case; (ii) costs and expenses (including attorneys' and paralegals' fees and disbursements for one counsel to the Agent and Lenders, taken as a whole, but excluding allocated costs of in-house counsel) for any amendment, supplement, waiver, consent, or subsequent closing in connection with the Loan Documents and the transactions contemplated thereby; (iii) taxes, fees and other charges for recording mortgages with respect to the Primary Properties, filing financing statements (to the extent permitted by this Agreement) and continuations, and other actions to perfect, protect, and continue the Agent's Liens (including costs and expenses paid or incurred by the Agent in connection with the consummation of this Agreement); (iv) actual, out-of-pocket sums paid or incurred during the existence of an Event of Default to pay any amount or take any action required of any Obligor under the Loan Documents that such Obligor fails to pay or take (but only to the extent that the Agent is otherwise permitted to take such action under any Loan Document or the Financing Order); (v) costs and expenses of any reasonably necessary actions taken during the existence of an Event of Default aimed at preserving and protecting the Collateral; and (vi) costs and expenses (including the cost of appraisals, inspections and verifications of the Collateral and disbursements for one counsel to the Agent and Lenders, taken as a whole, and, in the case of a conflict of interest, one additional counsel to the affected Lenders, taken as a whole, and, to the extent reasonably necessary, one counsel in each relevant material jurisdiction (not to exceed one per state), but in each case excluding allocated costs of in house counsel) of the Agent and the Lenders paid or incurred to (and/or in attempting to) obtain payment of the Obligations, enforce the Agent's Liens, sell or otherwise realize upon the Collateral, and otherwise enforce the provisions of the Loan Documents, or to defend any claims made or threatened against the Agent or any Lender arising out of the transactions contemplated hereby (including preparation

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

for and consultations concerning any such matters). All of the foregoing costs and expenses shall be part of the Obligations, shall bear interest until paid at the Default Rate and shall be payable on demand. No Obligor shall be responsible for the fees of any financial, restructuring or similar advisor pursuant to the Loan Documents unless agreed in writing by the Borrowers.

(b) [Intentionally Omitted.]

Section 15.7    Notices. Except as otherwise provided herein, all notices, demands, and requests that any party is required or elects to give to any other shall be in writing, or by a telecommunications device capable of creating a written record, and any such notice shall become effective (a) upon personal delivery thereof, including, but not limited to, delivery by overnight mail and courier service, (b) five (5) days after it shall have been mailed by United States mail, first class, certified or registered, with postage prepaid, or (c) in the case of notice by such a telecommunications device, when properly transmitted (with written confirmation of delivery), in each case addressed to the party to be notified as follows:

if to the Agent or to any Initial Lender:

> UBS AG, Stamford Branch
> 677 Washington Boulevard
> Stamford, CT 06901
> Telecopy: (203) 719-4176
> Attention: Omar Musule

with a copy to:

> Gibson, Dunn & Crutcher LLP
> New York Office:
> 200 Park Avenue
> New York, New York 10166-1093
> Telecopy: (212) 351-6366
> Attention:  David M. Feldman, Esq.
>                      J. Eric Wise, Esq.

if to any Obligor:

> General Growth Properties, Inc.
> 110 North Wacker Drive
> Chicago, Illinois  60068
> Telecopy No.:  312-960-5485
> Attn:  General Counsel

with a copy to (which shall not constitute notice):

> Weil, Gotshal & Manges LLP
> 200 Crescent Court, Suite 300

102

Dallas, Texas  75201-6950
Telecopy:  214-746-7777
Attention:  Angela L. Fontana, Esq.

or to such other address as each party may designate for itself by like notice, subject to the provisions of Section 15.15.

Section 15.8    Waiver of Notices.  Unless otherwise expressly provided herein, each Obligor waives presentment, protest and notice of demand or dishonor and protest as to any instrument, notice of intent to accelerate the Obligations, and notice of acceleration of the Obligations, as well as any and all other notices to which it might otherwise be entitled.  No notice to or demand on any Obligor which the Agent or any Lender may elect to give shall entitle any Obligor to any or further notice or demand in the same, similar, or other circumstances.

Section 15.9    Binding Effect.  The provisions of this Agreement shall be binding upon and inure to the benefit of the respective representatives, successors, and assigns of the parties hereto; provided that no interest herein may be assigned by any Obligor without prior written consent of the Agent and each Lender, except, if applicable, as contemplated by Section 3.1-A in connection with a debt conversion.

Section 15.10    Indemnity of the Agent and the Lenders by the Obligors.

(a)    THE OBLIGORS AGREE TO DEFEND, INDEMNIFY, AND HOLD THE AGENT-RELATED PERSONS, AND EACH LENDER AND EACH OF ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, COUNSEL, AGENTS, AND ATTORNEYS-IN-FACT (EACH, AN "INDEMNIFIED PERSON") HARMLESS FROM AND AGAINST ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, ACTIONS, JUDGMENTS, SUITS, COSTS, CHARGES, EXPENSES, AND DISBURSEMENTS (INCLUDING REASONABLE OUT-OF-POCKET ATTORNEY COSTS FOR ALL INDEMNIFIED PERSONS, TAKEN AS A WHOLE BUT EXCLUDING ALLOCATED COSTS OF IN-HOUSE COUNSEL) OF ANY KIND OR NATURE WHATSOEVER WHICH MAY AT ANY TIME (INCLUDING AT ANY TIME FOLLOWING REPAYMENT OF THE TERM LOAN AND THE TERMINATION, RESIGNATION OR REPLACEMENT OF THE AGENT OR REPLACEMENT OF ANY LENDER) BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST ANY SUCH PERSON IN ANY WAY RELATING TO OR ARISING OUT OF THIS AGREEMENT OR ANY LOAN DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY, OR ANY ACTION TAKEN OR OMITTED BY ANY SUCH PERSON UNDER OR IN CONNECTION WITH ANY OF THE FOREGOING, INCLUDING WITH RESPECT TO ANY INVESTIGATION, LITIGATION, OR PROCEEDING (INCLUDING ANY INSOLVENCY PROCEEDING OR APPELLATE PROCEEDING) RELATED TO OR ARISING OUT OF THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, OR THE TERM LOAN OR THE USE OF THE PROCEEDS THEREOF AND INCLUDING ANY OF THE FOREGOING ARISING FROM THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF THE INDEMNIFIED PERSON, WHETHER OR NOT ANY INDEMNIFIED PERSON IS A PARTY THERETO

103

(ALL THE FOREGOING, COLLECTIVELY, THE "INDEMNIFIED LIABILITIES");
PROVIDED THAT THE OBLIGORS SHALL HAVE NO OBLIGATION HEREUNDER TO
ANY INDEMNIFIED PERSON WITH RESPECT TO (I) INDEMNIFIED LIABILITIES
RESULTING SOLELY FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT
OF SUCH INDEMNIFIED PERSON OR (II) LIABILITIES, OBLIGATIONS, LOSSES,
DAMAGES, PENALTIES, ACTIONS, JUDGMENTS, SUITS, COSTS, CHARGES,
EXPENSES, AND DISBURSEMENTS OF ANY KIND OR NATURE WHATSOEVER
WHICH MAY AT ANY TIME BE IMPOSED ON, INCURRED BY, OR ASSERTED
AGAINST ANY SUCH PERSON AFTER THE DATE OF PAYMENT IN FULL OF THE
NON-CONTINGENT OBLIGATIONS. THE AGREEMENTS IN THIS SECTION SHALL
SURVIVE PAYMENT OF ALL OTHER OBLIGATIONS.

(b) THE OBLIGORS AGREE TO INDEMNIFY, DEFEND, AND HOLD
HARMLESS THE AGENT AND THE LENDERS FROM ANY LOSS OR LIABILITY
DIRECTLY OR INDIRECTLY ARISING OUT OF THE USE, GENERATION,
MANUFACTURE, PRODUCTION, STORAGE, RELEASE, THREATENED RELEASE,
DISCHARGE, DISPOSAL, OR PRESENCE OF A CONTAMINANT OR ARISING OUT OF
A VIOLATION OF OR LIABILITY UNDER ENVIRONMENTAL LAWS, IN EACH CASE
RELATING TO ANY OBLIGOR'S OPERATIONS, BUSINESS, OR PROPERTY. THIS
INDEMNITY WILL APPLY WHETHER THE CONTAMINANT IS ON, UNDER, OR
ABOUT ANY OBLIGOR'S PROPERTY OR OPERATIONS OR PROPERTY LEASED TO
ANY OBLIGOR. THIS INDEMNITY INCLUDES, BUT IS NOT LIMITED TO,
REASONABLE, OUT-OF-POCKET ATTORNEYS' FEES (EXCLUDING THE
ALLOCATED COST OF IN-HOUSE COUNSEL). THIS INDEMNITY EXTENDS TO THE
AGENT AND THE LENDERS, THEIR PARENTS, AFFILIATES, SUBSIDIARIES, AND
ALL OF THEIR DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, SUCCESSORS,
ATTORNEYS, AND ASSIGNS. THIS INDEMNITY WILL SURVIVE REPAYMENT OF
ALL OTHER OBLIGATIONS.

Section 15.11   Limitation of Liability.  No claim may be made by any Obligor, any
Lender, or other Person against the Agent, any Lender, or the Affiliates, directors, officers,
officers, employees, or agents of the Agent or any Lender for any special, indirect,
consequential, or punitive damages in respect of any claim for breach of contract or any other
theory of liability arising out of or related to the transactions contemplated by this Agreement or
any other Loan Document, or any act, omission, or event occurring in connection therewith, and
each of the Obligors and the Lenders hereby waives, releases, and agrees not to sue upon any
claim for such damages, whether or not accrued and whether or not known or suspected to exist
in its favor.

Section 15.12   Final Agreement.  This Agreement and the other Loan Documents are
intended by the Obligors, the Agent, and the Lenders to be the final, complete, and exclusive
expression of the agreement between them.  This Agreement supersedes any and all prior oral or
written agreements relating to the subject matter hereof.  Except as otherwise expressly provided
herein, no modification, rescission, waiver, release, or amendment of any provision of this
Agreement and any Schedules or Exhibits hereto that are amended or supplemented pursuant to

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

the terms hereof or any other Loan Document shall be made, except by a written agreement signed by the Obligors and a duly authorized officer of each of the Agent and the requisite Lenders. THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Section 15.13    Counterparts.  This Agreement and the other Loan Documents may be executed in any number of counterparts, and by the Agent, each Lender, and the Obligors in separate counterparts, each of which shall be an original, but all of which shall together constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

Section 15.14    Captions.  The captions contained in this Agreement are for convenience of reference only, are without substantive meaning and should not be construed to modify, enlarge, or restrict any provision.

Section 15.15    Agency of the General Partner for the Other Obligors.  Each of the Obligors (other than the General Partner) irrevocably appoints the General Partner as its representative for all purposes relevant to this Agreement, including the giving and receipt of notices and execution and delivery of all documents, instruments, and certificates contemplated herein and all modifications hereto.  Any acknowledgment, consent, direction, certification, or other action which might otherwise be valid or effective only if given or taken by all or any of the Obligors or acting singly, shall be valid and effective if given or taken only by the General Partner whether or not any of the other Obligors joins therein, and the Agent and the Lenders shall have no duty or obligation to make further inquiry with respect to the authority of the General Partner under this Section 15.15; provided that nothing in this Section 15.15 shall limit the effectiveness of, or the right of the Agent and the Lenders to rely upon, any notice, document, instrument, certificate, acknowledgment, consent, direction, certification or other action delivered by any Obligor pursuant to this Agreement.

Section 15.16    Patriot Act.  Each Lender and the Agent (for itself and not on behalf of any Lender) hereby notifies each Obligor that, pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies such Obligor, which information includes the name and address of such Obligor and other information that will allow such Lender or the Agent, as applicable, to identify such Obligor in accordance with the Patriot Act.

Section 15.17    Absence of Fiduciary Relationship; Affiliates; Etc.  The Obligors acknowledge that the Agent, the Lenders and their respective Affiliates may have economic interests that conflict with those of the Obligors and their Affiliates.  The obligors agree that each of the Agent, the Lenders and their respective Affiliates will act in their respective capacities under the Loan Documents as independent contractors and that nothing in the Loan Documents

will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Agent, the Lenders and their respective Affiliates, on the one hand, and any Obligor, its owners or its Affiliates, on the other hand. The Obligors acknowledge and agree that (a) the transactions contemplated by the Loan Documents are arm's-length commercial transactions between the Agent, the Lenders and their respective Affiliates, on the one hand, and the Obligors, on the other, (b) in connection with such transactions each of the Agent, the Lenders and their respective Affiliates is acting solely as a principal and not the agent or fiduciary of any Obligor, its management, stockholders, creditors, affiliates or any other Person, (c) none of the Agent, the Lenders or any of their respective Affiliates has assumed an advisory or a fiduciary responsibility in favor of any Obligor or any of its Affiliates with respect to the transactions contemplated hereby or any other obligation to any Obligor or any of Affiliates of any Obligor, except the obligations expressly set forth in this Agreement, and (d) each Obligor has consulted its own legal and financial advisors to the extent it deemed appropriate. Each Obligor further acknowledges and agrees that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Obligor agrees that it will not claim that any of the Agent, the Lenders or their respective Affiliates has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty, to any Obligor or any Affiliates of an Obligor in connection with such transactions. In addition, each of the Agent, the Lenders and their respective Affiliates may employ the services of its Affiliates in providing certain services hereunder and, subject to the agreement of such Affiliate to be bound by Section 6.5, may exchange with such Affiliates information concerning the Obligors, the Affiliates of the Obligors and other Persons that may be the subject of this arrangement, and such Affiliates shall be entitled to the benefits afforded to the Agent, the Lenders and their respective Affiliates hereunder. In addition, the Obligors acknowledge that none of the Agent, the Initial Lenders or their respective Affiliates provides accounting, tax or legal advice.

Section 15.18    Incorporation of Financing Order by Reference. Each of the Obligors, the Agent, and the Lenders agrees that any reference contained herein to the Financing Order shall include all terms, conditions, and provisions of such Financing Order and that the Financing Order is incorporated herein for all purposes. To the extent there is any inconsistency between the terms of this Agreement and the terms of the Financing Order, the terms of the Financing Order shall govern.

Section 15.19    Right to Publicize and Advertise. Subject to Section 6.5(b) hereof, the Agent and each Lender may, without consent of any Obligor, publicly disclose and/or advertise its lending relationship with the Obligors, the identity of the Obligors, the Commitments, and such other information as is publicly disclosed by any Obligor through any filing with the Bankruptcy Court or the Securities and Exchange Commission.

Section 15.20    Consent of the Agent and Lenders. Except as otherwise provided herein, whenever the consent of the Agent or any Lender is required by this Agreement, such consent may be granted or withheld in the sole discretion of the Agent or such Lender.

Section 15.21     Lead Arranger.  Notwithstanding anything herein to the contrary, the Lead Arranger listed on the cover page hereof shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents.

Section 15.22     Schedules.  Schedules 8.19-2, 8.20, 8.20-1, 8.21 and  9.8 are not attached hereto but have been delivered to the Agent who will retain copies thereof and make them available to any Lender that has elected to be given access to Private Side Communications (or the designee of any Lender that has agreed to be subject to the confidentiality provisions of Section 6.5(b)) upon request.

100656687_1
(GGP_ DIP Credit
Agreement
051309).DOC

IN WITNESS WHEREOF, the parties have entered into this Agreement on the date first above written.

AGENT:

**UBS AG, STAMFORD BRANCH**

By:_____
   Its:

By:_____
   Its:

INITIAL LENDERS:

Commitment: $210,000,000

**OPEN AIR INVESTORS, L.L.C.**

By: Farallon Capital Management, L.L.C.,
Its Manager

By: _____
     Name: _____
     Title: _____

Commitment:  $110,000,000          **LUXOR CAPITAL LLC**

By: _____
Name: _____
Title: _____

Commitment:  $25,000,000         **CANPARTNERS INVESTMENTS IV, LLC**

By: _____
Name: _____
Title: _____

Commitment: $25,000,000           **PERRY PRINCIPALS INVESTMENTS LLC**

By: _____
    Name: _____
    Title: _____

Commitment: $11,000,000     **WHITEBOX COMBINED PARTNERS LP**


By: _____
       Name:   Jonathan Wood
       Title:    Chief Operating Officer

Commitment: $6,000,000

**WHITEBOX HEDGED HIGH YIELD PARTNERS LP**

By: _____
     Name:   Jonathan Wood
     Title:    Chief Operating Officer

Commitment:  $5,000,000

**WHITEBOX CONVERTIBLE ARBITRAGE PARTNERS LP**

By: _____
      Name:   Jonathan Wood
      Title:    Chief Operating Officer

Commitment: $2,000,000          **PANDORA SELECT PARTNERS LP**

By: _____
        Name:   Jonathan Wood
        Title:    Chief Operating Officer

Commitment: $1,000,000

**WHITEBOX SPECIAL OPPORTUNITIES FUND SERIES B PARTNERS LP**

By: _____
      Name:   Jonathan Wood
      Title:    Chief Operating Officer

Commitment: $5,000,000

**DELAWARE STREET CAPITAL MASTER FUND, L.P.**

By:   DSC Advisors, L.P., its Investment Manager

_____
Name:   Prashant Gupta
Title:   Chief Financial Officer

BORROWERS:

**GENERAL GROWTH PROPERTIES, INC.**


By: _____
     Name:  Thomas H. Nolan, Jr.
     Title:    President

**GGP LIMITED PARTNERSHIP**

By:  General Growth Properties, Inc., its General Partner


By: _____
     Name:  Thomas H. Nolan, Jr.
     Title:    President

GUARANTORS:

[to be attached]

**Schedule 3.1-A**

**Loan Conversion Terms**

*Capitalized terms used herein and not otherwise defined shall have the meanings attributed to them in the Agreement.*

1.       The General Partner (on its own behalf and on behalf of the other Borrower) shall have the right by delivering written notice to the Lenders no later than the earlier of (x) the date that is 45 days prior to the Maturity Date, (y) the time of the approval by the Bankruptcy Court of a disclosure statement for the POR and (z) the date an order is entered approving a Qualified Backstop Party in connection with a potential Qualified Rights Offering, to elect (which election shall be irrevocable unless (i) otherwise consented to by all Lenders or (ii) the POR with respect to which such election applies is not approved by the Bankruptcy Court) to pay on the Plan Date (a) all or a portion of the sum of (i) the outstanding principal amount of the Term Loan, (ii) accrued and unpaid interest due and owing on the Plan Date and (iii) the Exit Fee then due and payable by issuing to the Lenders the Conversion Shares; provided, however, that in no event shall such conversion result in the Lenders' receipt in the aggregate of Common Stock in connection herewith equaling more than (A) 8.0% (on a Fully-Distributed Basis) of the aggregate amount of Common Stock distributed in connection with the POR or (B) 9.9% of the aggregate amount of Common Stock actually distributed in connection with the POR on the Plan Date (without giving effect to any Common Stock the distribution of which is subject to any contingency, holdback or other similar arrangement) (herein, the "Maximum Conversion Shares"); and/or (b) all or a portion of the outstanding principal amount of the Term Loan by issuing to the Lenders conversion debt.  Notwithstanding the prior language, the General Partner shall have the right to withdraw its conversion election made in accordance with (z) above,  or if (y) and (z) occur substantially concurrently, (y) and (z), and such election shall be of no further force and effect, if the General Partner determines that the rights offering contemplated by clause (z) in the first sentence is not, or is unlikely to be, a Qualified Rights Offering.

2.       The right of the General Partner to make the election and effect the conversion described in paragraph 1 above is subject to all of the following conditions precedent having been satisfied on the Plan Date (except if and to the extent that any such condition has been expressly waived in writing by the Majority Lenders):

a.       There is no continuing Event of Default;

b.       In the case of conversion of any portion of the Term Loan to Conversion Shares, and only in such case, the Common Stock is, or all necessary and appropriate actions have been taken, including receipt of approval for listing, such that the Common Stock will be, within five Business Days after the Plan Date, quoted on the New York Stock Exchange or The NASDAQ Global Market;

c.       The Plan Date occurs within 24 months of the date hereof;

d.     The General Partner and its direct and indirect consolidated subsidiaries ("Consolidated GGP") shall not have divested assets (after giving effect to transactions contemplated to be made in the POR, and including foreclosures after the commencement of the Case) that generated more than 20% of the net operating income of Consolidated GGP in its fiscal year 2008;

e.     The Exit Fee then due and payable shall have been paid in full at or prior to the time of such conversion; and

f.     In the case of conversion of all or any portion of the Term Loan to conversion debt, and only in such case, conversion debt shall have the following terms: (i) principal amount shall be less than or equal to six times the last twelve months net operating income of real property on which the Lenders have a first lien ("First Lien Properties"), provided that no tenant shall represent greater than 10% of the aggregate rent of the First Lien Properties in the last twelve months; (ii) collateral shall be comprised of the first mortgage liens on the First Lien Properties and related personal property, Borrowers' wholly-owned land and a lien on the Borrowers' cash collateral account; (iii) interest rate and other economic terms shall be the same as the Term Loan, provided that the Borrowers shall not be required to pay an origination, commitment, extension, exit or other comparable or substitute fee, or any prepayment premium, penalty or fee; (iv) non-economic terms of the conversion debt shall be substantially similar to the terms of the Term Loan provided that the bankruptcy concepts shall be generally removed and, in the case of the Subsidiaries owning the First Lien Properties, there shall be no or minimal baskets for indebtedness, liens and asset sales; (v) the General Partner and Lenders shall negotiate loan conversion documents in good faith; and (vi) Borrowers' direct parent and subsidiaries shall provide guarantees reasonably satisfactory to the Lenders that carve out all of the Negative Pledge Debtors, provided that such Persons grant no guarantees to other creditors.

3.     If and to the extent there is a Value Differential, the General Partner shall be obligated to pay an amount in cash and/or Common Stock ("Value Differential Shares"), at the General Partner's election, ratably to the Lenders, equal to such Value Differential.  The General Partner shall make its election as to the form of consideration in which it intends to pay the Value Differential, if any, and publicly announce the same by filing (or furnishing) a Form 8-K with the Securities and Exchange Commission, no later than the open of trading on the third Trading Day preceding the Value Differential Valuation Period (indicating its election and the percentages, if any, of the Value Differential to be paid in cash and through the issuance of Value Differential Shares). That portion of the Value Differential, if any, payable in cash shall be paid not later than 30 calendar days following the Trading Valuation Date.  The number of Value Differential Shares issuable in respect of that portion of the Value Differential, if any, payable in Value Differential Shares shall be determined on the seventh Trading Day following the Trading Valuation Date, subsequent to market close on such date, and such Value Differential Shares shall be issued no later than 10:00 AM Eastern Time on the tenth Trading Day following the Trading Valuation Date.  The number of Value Differential Shares issuable shall be determined by dividing (x) the dollar amount of the Value Differential payable in Value Differential Shares by (y) the product of (i) 97.0%

multiplied by (ii) the average of each Trading Day's volume-weighted average price with respect to trading of the Common Stock during normal trading hours (9:30 AM to 4:00 PM Eastern Time) for the period beginning on the first Trading Day following the Trading Valuation Date and ending on the seventh Trading Day following the Trading Valuation Date.  If payment of the Value Differential is not made in full when due, any amount not paid on such date shall be overdue and shall bear interest at the Default Rate from such payment date to the date payment is made (it being understood that the foregoing shall not in any way be construed as a limitation on any legal remedies to which the Lenders may be entitled as a result of any failure by the General Partner to pay the Value Differential when due).  No Value Differential Shares shall be issuable to any Lender, and no Lender shall have any right to receive Value Differential Shares, to the extent that the issuance or potential issuance thereof would result in such Lender beneficially owning (within the meaning of Section 13(d) under the Securities Exchange Act of 1934) more than 9.9% of the Common Stock; provided, however, that no Lender shall be deemed to beneficially own more than 9.9% of the Common Stock due to a group, trust, account, agreement, or other arrangement, implicit or explicit, with any other Lender solely as a result of any relationship created by this Schedule 3.1-A unless such Lenders reasonably conclude, based on advice of counsel, that such Lenders are or would be a group (within the meaning of Section 13(d) under the Securities Exchange Act of 1934) with respect to the Common Stock and that such Lenders could, depending on the number of Value Differential Shares issuable, be required to disclose on a Schedule 13D that each such Lender beneficially owns more than 9.9% of the Common Stock as a result of receiving Value Differential Shares.  To the extent any Lender is precluded from receiving Value Differential Shares to which it would be entitled but for the restriction set forth in the immediately preceding sentence, such Lender shall be entitled to receive cash in lieu of any Value Differential Shares that would otherwise have been issuable but for such restriction.  Notwithstanding anything herein to the contrary, no payment shall be made in respect of a Value Differential if a Qualified Rights Offering has been made.  If there is no Qualified Rights Offering, then no Lender shall, during the Value Differential Valuation Period, sell, assign or dispose of Common Stock or Common Stock derivatives in an amount greater than 10.0% of such Lender's Conversion Shares on any one Trading Day.

4.     The General Partner shall take all necessary and appropriate measures to cause the Conversion Shares and any Value Differential Shares to be freely tradable, upon issuance to the Lenders, without registration (e.g., pursuant to Section 1145 of the Bankruptcy Code).  If and to the extent the Majority Lenders determine in good faith that Conversion Shares and/or any Value Differential Shares will or may not be freely tradable, upon issuance to the Lenders, without registration, the General Partner covenants and agrees that following written notification by the  Majority Lenders to the General Partner of such determination no later than 30 Business Days after the Plan Date (such date, the "Request Date"), the General Partner shall, at its expense, prepare and file with the Securities and Exchange Commission a registration statement on Form S-3, if available (or, if not available, on Form S-1 or another appropriate form), covering the shares of Common Stock of the Lenders received by such Lenders as a result of the conversion described in paragraph 1(a) hereof and any Value Differential Shares that may be issuable in satisfaction of the Value Differential (collectively, the "Registrable

<u>Shares</u>"), and, to the extent the registration statement has not theretofore been declared effective or is not automatically effective upon such filing, the General Partner shall use commercially reasonable efforts to cause such registration statement to be declared or become effective as promptly as practicable, but in no event later than 180 days after the Request Date, and will use commercially reasonable efforts to keep such registration statement effective and usable for the resale of such Registrable Shares from the date of its initial effectiveness until such time as all Registrable Shares have been sold pursuant to the registration statement or all remaining Registrable Shares may otherwise be freely resold under the Securities Act without limitation or restriction. The registration contemplated by this <u>paragraph 4</u> shall be effected only once. The registration rights contemplated by this <u>paragraph 4</u> shall be effected pursuant to the terms of <u>Schedule 3.1-B</u>.

<u>Defined Terms</u>:

"<u>Common Stock</u>" means the common stock of the General Partner.

"<u>Common Stock Equivalent</u>" means any security or instrument that (i) directly or indirectly is convertible into or exercisable or exchangeable for Common Stock, (ii) by its terms is expressly linked to the price or performance of the Common Stock or (iii) by its terms expressly participates in dividends or distributions in respect of, or votes as a class with, the Common Stock; <u>provided</u>, <u>however</u>, that "Common Stock Equivalent" excludes (a) any security or instrument issued in the ordinary course of business pursuant to board approved employee benefits plans of the General Partner (an "<u>Employee Benefits Plan</u>") or any other option, warrant or other security or instrument issued or issuable in the ordinary course of business to employees, officers or directors of the General Partner pursuant to a General Partner board-approved incentive, retention, benefit or similar compensation plan and (b) any rights issued pursuant to the General Partner's shareholder rights plan (provided such rights have not separated from the Common Stock and no triggering event under the rights plan has occurred).

"<u>Conversion Amount</u>" means the sum of (i) the outstanding principal of the Term Loan, (ii) accrued and unpaid interest due and owing on the Plan Date and (iii) the Exit Fee then due and payable that is repaid by the issuance of shares of Common Stock on the Maturity Date in accordance with this <u>Schedule 3.1-A</u>.

"<u>Conversion Shares</u>" means that number of shares of Common Stock determined by dividing the Conversion Amount, stated in U.S. dollars, by the lowest of (i) the value of one share of Common Stock based on the value attributable to one such share in the POR, (ii) the lowest net price per share received from any other purchaser of Common Stock or Common Stock Equivalents in connection with the POR (other than as a result of settling Claims, and provided that any reinstatement or reaffirmation of any Common Stock or Common Stock equivalents of the General Partner in conjunction with the POR shall be treated as an issuance at the lesser of the POR or market value), whether by public offering, private placement, or pursuant to a rights offering to the pre-petition stakeholders of the General Partner in connection with the POR, and (iii) the lowest net price per share received by the General Partner from any issuance of Common Stock or

Common Stock Equivalents to any unaffiliated third party for cash or in exchange for assets in connection with the POR (other than Claims) (such lowest price, which may be the Qualified Rights Offering Price Per Share, the "Initial Conversion Price").  Any fractional share resulting from such calculation shall be paid in cash.  For purposes of this definition and for purposes of the second sentence of the definition of "Value Differential" below, "per share" when used with respect to the issuance of any Common Stock Equivalents shall mean the price per share of Common Stock implied by such Common Stock Equivalent determined using a customary methodology agreed between the Majority Lenders and the General Partner; provided that, in the event that the Majority Lenders and the General Partner are unable to agree on such a methodology, each of the Majority Lenders and the General Partner shall select an independent valuation expert, and such independent valuation experts shall in turn jointly select a third independent valuation expert, who shall determine an appropriate valuation methodology and apply such methodology to determine the price per share.

"Fully-Distributed Basis" means, with respect to any class of Common Stock of the kind or class having power generally to vote in the election of directors, the Common Stock that would be distributed after giving effect to the distribution of all Plan Distributable Securities.

"Plan Distributable Securities" means all Common Stock and all Common Stock Equivalents (including any Common Stock and Common Stock Equivalents of the General Partner that are reinstated or reaffirmed in conjunction with the POR) which will be exercised or exchanged or otherwise converted to Common Stock prior to or concurrently with distribution of such security under the POR with respect to which an entitlement to distribution exists under the POR (whether or not such entitlement is subject to contingency, holdback or other similar arrangement).

"POR" means the plan of reorganization with respect to the Debtors as confirmed by the Bankruptcy Court.

"Qualified Backstop Party" means an independent third party that (i) is not an Affiliate of the General Partner, and (ii) does not beneficially own more than 15% of the voting stock including voting stock derivatives (including any swap or short sale) of the General Partner.

"Qualified Rights Offering" means a rights offering to pre-petition stakeholders of the General Partner and/or its Affiliates in connection with the POR that meets the following qualifications: (i) subscribed to be sold to at least 50 ultimate purchasers who are not affiliated with each other (or 25 ultimate purchasers who are not affiliated with each other if such rights offering is made solely to creditors of the General Partner debtors in their capacity as such); (ii) the offered shares shall be listed on the New York Stock Exchange or The NASDAQ Global Market within five Trading Days of completion of the rights offering; (iii) the issue size is at least three times the Conversion Amount; (iv) the rights offering is conducted by a nationally known financial advisor at a price representing a discount to POR reorganization value designed to achieve a fully subscribed offering at such price as may be determined by such nationally known

financial advisor and a nationally known financial advisor selected by the Agent (acting at the direction of the Majority Lenders) (and, if such financial advisors are unable so to agree, such financial advisors shall select another nationally recognized financial advisor, which third financial advisor shall determine the amount of the discount); and (v) if and to the extent applicable, the offered shares are priced with reference to the trading market for the Common Stock prior to the commencement of the rights offering. Notwithstanding the foregoing, if a Qualified Backstop Party agrees to a contractual backstop of at least 40% of the rights being offered in such rights offering meeting the criteria of clauses (i), (ii) and (iii) of this definition, such rights offering shall be deemed to be a Qualified Rights Offering for all purposes except that the Qualified Rights Offering Price Per Share in such case shall be deemed to be equal to the lowest price per share (which shall be calculated net of any fees and other payments made to such third party in connection with the backstop arrangements) of Common Stock obtained by the General Partner and/or its Affiliates in such Qualified Rights Offering from any Qualified Backstop Party or any other purchaser in such rights offering.

"Qualified Rights Offering Price Per Share" means the lower of (i) the lowest price per share (which shall be calculated net of any fees and other payments made to such third party in connection with the backstop arrangements) of Common Stock obtained by the General Partner and/or its Affiliates in a Qualified Rights Offering from any Qualified Backstop Party or any other purchaser in such rights offering and (ii) the POR reorganization value per share.

"Trading Day" means a trading day consisting of a full trading session with respect to which the Common Stock is registered under the Exchange Act and traded on the New York Stock Exchange or The NASDAQ Stock Market.

"Trading Valuation Date" means the fortieth Trading Day following confirmation of the POR.

"Value Differential" means the amount derived (if a positive number) by subtracting (i) the product of (A) the number of shares of Common Stock issued as Conversion Shares multiplied by (B) the lesser of (x) the average of each Trading Day's volume-weighted average price with respect to trading of the Common Stock during normal trading hours (9:30 AM to 4:00 PM Eastern Time) for the period (the "Value Differential Valuation Period") beginning on the twentieth Trading Day following confirmation of the POR and ending on the fortieth Trading Day following confirmation of the POR and (y) the Subsequent Issuance Price (if any) (as defined below), from (ii) the product of (A) the number of shares of Common Stock issued as Conversion Shares multiplied by (B) the Initial Conversion Price. The term "Subsequent Issuance Price" shall mean the lowest net price per share received by the General Partner in respect of any issuance by the General Partner of Common Stock or Common Stock Equivalents subsequent to the issuance of the Conversion Shares and on or prior to the Trading Valuation Date; provided that such calculation shall exclude (i) the effect of any Common Stock or Common Stock Equivalents to the extent previously included in the calculation of the Conversion Price, (ii) any issuances of Common Stock or Common Stock Equivalents in the ordinary course of business in connection with an Employee

Benefits Plan and (iii) any issuances of rights in connection with General Partner's shareholder rights plan (provided such rights have not separated from the Common Stock and no triggering event under the rights plan has occurred).  In no event shall the General Partner issue or propose to issue Common Stock or Common Stock Equivalents during the period beginning on the tenth Trading Day prior to the Value Differential Valuation Period and ending on the tenth Trading Day following the Valuation Differential Valuation Period (other than (i) any issuance of Common Stock pursuant to a Common Stock Equivalent to the extent such Common Stock Equivalent was previously outstanding on the tenth Trading Day prior to the Valuation Differential Valuation Period, (ii) any issuance of Common Stock or Common Stock Equivalents in the ordinary course of business in connection with an Employee Benefits Plan and (iii) any issuance of rights in connection with General Partner's shareholder rights plan (provided such rights have not separated from the Common Stock and no triggering event under the rights plan has occurred)).

**Registration Rights**

*Capitalized terms used herein and not otherwise defined shall have the meanings attributed to them in the Agreement.*

## 1.  DEFINITIONS.

As used herein, the following terms shall have the following meanings:

Covered Securities: Any Conversion Shares that are issued to the Lenders as a result of the conversion pursuant to paragraph 1(a), and Value Differential Shares issued or issuable pursuant to paragraph 3, of Schedule 3.1-A.

Exchange Act: the Securities Exchange Act of 1934, as amended.

Holders: from time to time, the holders of the Covered Securities.

Prospectus: the prospectus included in any Registration Statement, as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any of the Registrable Securities covered by such Registration Statement and by all other amendments and supplements to the prospectus, including post-effective amendments and all material incorporated by reference in such prospectus.

Qualifying Employee Stock: means (i) rights and options issued in the ordinary course of business under employee benefits plans and any securities issued after the date hereof upon exercise of such rights and options and (ii) restricted stock and restricted stock units issued after the date hereof in the ordinary course of business under employee benefit plans and securities issued after the date hereof in settlement of any such restricted stock units.

Reg Rights Start Date: the meaning set forth in Section 2.1(a).

Registration Expenses: mean all expenses incurred by the General Partner in effecting any registration pursuant to this Agreement, including, without limitation, all registration and filing fees, printing expenses, fees and disbursements of counsel for the General Partner, Blue Sky fees and expenses, and expenses of the General Partner's independent accountants in connection with any regular or special reviews or audits incident to or required by any such registration, but shall not include Selling Expenses (but shall include other expenses reasonably incurred by Holders in connection with any Registration Statement, including without limitation, legal fees and expenses reasonably incurred by Holders in connection with any Registration Statement; provided, however, that the General Partner shall not be responsible for the fees and expenses of more than one counsel to advise all of the Holders in connection with such Registration Statement).

Registration Rights: the rights of Holders set forth in Article 2 to have shares of Registrable Securities registered under the Securities Act for sale under one or more effective Registration Statements.

Registration Statement: any registration statement filed by the General Partner under the Securities Act pursuant to the Registration Rights, including the Prospectus, any amendments and supplements to such Registration Statement, including post-effective amendments, and all exhibits and all material incorporated by reference in such registration statement.

Register, registered, and registration: shall refer to a registration effected by preparing and (a) filing a Registration Statement in compliance with the Securities Act and applicable rules and regulations thereunder, and the declaration or ordering of effectiveness of such Registration Statement or (b) filing a Prospectus and/or prospectus supplement in respect of an appropriate effective Registration Statement on Form S-3.

Registrable Securities: means all Covered Securities. Registrable Securities shall continue to be Registrable Securities (whether they continue to be held by the Majority Lenders or they are sold to other Persons) until (i) they are sold pursuant to an effective Registration Statement under the Securities Act, (ii) they may be sold by their holder pursuant to Rule 144 without limitation thereunder on volume or manner of sale and without any requirement as to availability of current public information or (iii) they shall have otherwise been transferred and new securities not subject to transfer restrictions under any federal securities laws and not bearing any legend restricting further transfer shall have been delivered by the General Partner, all applicable holding periods shall have expired, and no other applicable and legally binding restriction on transfer by the holder thereof shall exist.

Rule 144, Rule 405 and Rule 415: mean, in each case, such rule promulgated under the Securities Act.

SEC: the Securities and Exchange Commission.

Securities Act: the Securities Act of 1933, as amended.

Selling Expenses: mean all discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities.

Shelf Registration Statement: the meaning set forth in Section 2.1(c).

**2.    REGISTRATION RIGHTS AND PROCEDURES AND LISTING.**

2.1    Applicability; Registration.

(a)    This Article 2 shall be applicable commencing on the date on which the Agent (acting at the direction of the Majority Lenders) has determined in good faith in accordance with paragraph 4 of Schedule 3.1-A that Covered Securities will not or may not be freely tradable, upon issuance to the Agent, without registration, and has delivered written notification thereof to the General Partner (such date, the "Reg Rights Start Date"); provided, however, this Article 2

shall have no further effect if such written notice has not been duly delivered to the General Partner on or prior to 30 Business Days after the Plan Date.

(b)     Subject to the conditions of this Section 2.1, the General Partner shall prepare and file with the Securities and Exchange Commission, at the General Partner's expense, a Registration Statement on Form S-3 (or, if Form S-3 is unavailable, on Form S-1 or another appropriate form), covering the Registrable Securities (or, at General Partner's option, designate an existing Shelf Registration Statement, as defined below, filed with the SEC to cover such Registrable Securities).   To the extent the Registration Statement has not theretofore been declared effective or is not automatically effective upon such filing, the General Partner shall use commercially reasonable efforts to cause such Registration Statement to be declared or become effective as promptly as practicable, but in no event later than 180 days after the Reg Rights Start Date, and the General Partner shall use commercially reasonable efforts to keep such Registration Statement effective and usable for the resale of such Registrable Securities from the date of its initial effectiveness until such time as all Registrable Securities have been sold pursuant to the Registration Statement or all remaining Registrable Securities may otherwise be freely resold under the Securities Act without limitation or restriction.

(c)     Any registration pursuant to this Section 2.1 shall, to the extent possible, be effected by means of a shelf registration under the Securities Act (a "Shelf Registration Statement") in accordance with the methods and distribution set forth in the Shelf Registration Statement and Rule 415.   If, following the Reg Rights Start Date, any Holder or group of Holders of Registrable Securities intends to distribute Registrable Securities in an offering seeking at least $100 million in gross proceeds (or a lesser amount, provided that if less than $100 million in gross proceeds is sought, at least 33-1/3% of the number of Registrable Securities initially issued to Holders participate) by means of an underwritten offering giving rise to an obligation of the General Partner to enter into an underwriting agreement and take the other actions contemplated by Section 2.3(k), (1) such Holders shall so advise the General Partner and (2) the Holders holding a majority interest in the Registrable Securities electing to participate in such underwritten offering shall have the right to appoint book runners and all other applicable underwriting participants, subject to the approval of the General Partner not to be unreasonably withheld or delayed. The General Partner shall have the right to select a non-bookrunning co-manager, subject to the approval of the majority of participating Holders not to be unreasonably withheld or delayed.   Notwithstanding the prior sentence, the General Partner shall not be required to engage in more than one underwritten offering giving rise to an obligation of the General Partner to enter into an underwriting agreement and take the other actions contemplated by Section 2.3(k) in any 12-month period.

(d)     The General Partner shall not be required to effect a registration (including a resale of Registrable Securities from an effective Shelf Registration Statement) pursuant to this Section 2.1: (i) with respect to securities that are not Registrable Securities; or (ii) if the General Partner has notified the Holders that in the good faith judgment of the General Partner, it would be materially detrimental to the General Partner or its security holders for such registration to be effected at such time, in which event the General Partner shall have the right to defer such registration for a period of not more than ninety (90) days; provided that such right to delay a registration shall be exercised by the General Partner (A) only if the General Partner has generally exercised (or is concurrently exercising) similar black-out rights against holders of

similar securities that have registration rights, if any, and (B) not more than once in any twelve (12) month period.

2.2     Expenses of Registration.     Except as specifically provided herein, all Registration Expenses incurred in connection with any registration, qualification or compliance hereunder shall be borne by the General Partner. All Selling Expenses incurred in connection with any registrations hereunder, shall be borne by the holders of the securities so registered *pro rata* on the basis of the aggregate offering or sale price of the securities so registered.

2.3     Obligations of the General Partner.     Whenever required to effect the registration of any Registrable Securities, the General Partner shall, as expeditiously as reasonably practicable, subject to the provisions of this Article 2:

(a)     Prepare and file with the SEC a prospectus supplement with respect to a proposed offering of Registrable Securities pursuant to an effective Registration Statement and, upon the request of the Holders of a majority of the Registrable Securities registered thereunder, subject to Sections 2.1(d) and 2.4, use commercially reasonable efforts to keep such Registration Statement effective or such prospectus supplement current, until the termination of the period contemplated in Section 2.5.

(b)     Prepare and file with the SEC such amendments and supplements to the applicable Registration Statement and the Prospectus or prospectus supplement used in connection with such Registration Statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all Registrable Securities covered by such Registration Statement for the period set forth in paragraph (a) above.

(c)     Furnish to the Holders and any underwriters such number of copies of the applicable Registration Statement and each such amendment and supplement thereto (including in each case all exhibits) and of a Prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned or to be distributed by them.

(d)     Use its commercially reasonable efforts to register and qualify the securities covered by such Registration Statement under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably requested by the Holders or any managing underwriter(s), to keep such registration or qualification in effect for so long as such Registration Statement remains in effect, and to take any other action which may be reasonably necessary to enable such seller to consummate the disposition in such jurisdictions of the securities owned by such Holder; provided that the General Partner shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(e)     Notify each Holder of Registrable Securities at any time when a Prospectus relating thereto is required to be delivered under the Securities Act or the happening of any event as a result of which the applicable Prospectus, as then in effect, would include an untrue statement of a material fact or omits to state a material fact required to be stated therein or

4

necessary to make the statements therein not misleading in light of the circumstances then existing.

(f)      Give written notice to the Holders of Registrable Securities covered by a Registration Statement:

(i)      when any Registration Statement filed pursuant to Section 2.1 or any amendment thereto has been filed with the SEC and when such Registration Statement or any post-effective amendment thereto has become effective;

(ii)      of any request by the SEC for amendments or supplements to any Registration Statement or the Prospectus included therein or for additional information;

(iii)      of the issuance by the SEC of any stop order suspending the effectiveness of any Registration Statement or the initiation of any proceedings for that purpose;

(iv)      of the receipt by the General Partner or its legal counsel of any notification with respect to the suspension of the qualification of the Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose; and

(v)      of the happening of any event that requires the General Partner to make changes in any effective Registration Statement or the Prospectus in order to make the statements therein not misleading (which notice shall be accompanied by an instruction to suspend the use of the Prospectus until the requisite changes have been made).

(g)      Use its commercially reasonable efforts to prevent the issuance or obtain the withdrawal of any order suspending the effectiveness of any Registration Statement referred to in Section 2.3(f)(iii) at the earliest practicable time.

(h)      Upon the occurrence of any event contemplated by Section 2.3(f)(v), reasonably promptly prepare a post-effective amendment to such Registration Statement or a supplement to the related Prospectus or file any other required document so that, as thereafter delivered to the Holders and any underwriters, the Prospectus will not contain an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. If the General Partner notifies the Holders in accordance with Section 2.3(f)(v) to suspend the use of the Prospectus until the requisite changes to the Prospectus have been made, then the Holders and any underwriters shall suspend use of such Prospectus.

(i)      Use commercially reasonable efforts to procure the cooperation of the General Partner's transfer agent in settling any offering or sale of Registrable Securities, including with respect to the transfer of physical security instruments into book-entry form in accordance with any procedures reasonably requested by the Holders or any managing underwriter(s).

(j)      Use its commercially reasonable efforts to take such actions as are under its control to become or remain a well-known seasoned issuer (as defined in Rule 405 under the Securities Act) (and not become an ineligible issuer (as defined in Rule 405 under the Securities Act)) during the period when such Registration Statement remains in effect.

(k)     Enter into an underwriting agreement in form, scope and substance as is customarily entered into for similar underwritten offerings of equity securities by similar companies and take all such other actions reasonably requested by the Holders of a majority of the Registrable Securities being sold in connection therewith or by the managing underwriter(s), if any, to expedite or facilitate the underwritten disposition of such Registrable Securities, and in connection therewith as customary for any similar underwritten offering, (i) make such representations and warranties to the Holders that are selling stockholders and the managing underwriter(s), if any, with respect to the business of the General Partner and its subsidiaries, and the Registration Statement, Prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, in form, substance and scope as are customarily made by the issuer in similar underwritten offerings of equity securities by similar companies, and, if true, confirm the same if and when requested, (ii) use its commercially reasonable efforts to furnish underwriters opinions of counsel to the General Partner, addressed to the managing underwriter(s), if any, covering the matters customarily covered in the opinions requested in similar underwritten offerings of equity securities by similar companies, (iii) use its commercially reasonable efforts to obtain "cold comfort" letters from the independent certified public accountants of the General Partner (and, if necessary, any other independent certified public accountants of any business acquired by the General Partner for which financial statements and financial data are included in the Registration Statement) who have certified the financial statements included in such Registration Statement, addressed to each of the managing underwriter(s), if any, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters in connection with similar underwritten offerings of equity securities by similar companies, (iv) if an underwriting agreement is entered into, the same shall contain indemnification provisions and procedures customary in similar underwritten offerings of equity securities by similar companies, and (v) deliver such documents and certificates as may be reasonably requested by the Holders of a majority of the Registrable Securities being sold in connection therewith, their counsel and the managing underwriter(s), if any, to evidence the continued validity of the representations and warranties made pursuant to clause (i) above and to evidence compliance with any customary conditions contained in the underwriting agreement or other agreement entered into by the General Partner.

(l)     Make available for inspection by a representative of Holders, the managing underwriter(s), if any, and any attorneys or accountants retained by such Holders or managing underwriter(s), at the offices where normally kept, during reasonable business hours, financial and other records, pertinent corporate documents and properties of the General Partner, and cause the officers, directors and employees of the General Partner to supply all information in each case reasonably requested by any such representative, managing underwriter(s), attorney or accountant in connection with such Registration Statement; provided that this clause (l) shall only be applicable to a representative of such Holders that are selling stockholders and any attorneys or accountants retained by such Holders if such Holder is named in the applicable prospectus supplement as a Person who may be deemed to be an underwriter with respect to an offering and sale of Registrable Securities.

(m) The General Partner shall use commercially reasonable efforts to cause the Common Stock to be listed for quotation on the New York Stock Exchange or the Nasdaq Global Market at the effective time of any Registration Statement hereunder.

(n) The General Partner shall make generally available to its securityholders as soon as practicable after the effective date (as defined in Rule 158(c) under the Securities Act) of any Registration Statement hereunder, an earning statement of the General Partner within the meaning of Rule 158(a) and complying with Section 11(a) of the Securities Act and the rules and regulations of the SEC thereunder.

2.4     Suspension of Sales.    Upon receipt of written notice from the General Partner that a Registration Statement, Prospectus or prospectus supplement contains or may contain an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading or that circumstances exist that make inadvisable use of such Registration Statement, Prospectus or prospectus supplement, the Holder of Registrable Securities shall forthwith discontinue the marketing of or disposition of Registrable Securities until the Holder has received copies of a supplemented or amended Prospectus or prospectus supplement, or until such Holder is advised in writing by the General Partner that the use of the Prospectus and, if applicable, prospectus supplement may be resumed. The total number of days that any such suspension may be in effect in any 180 day period shall not exceed 60 days, or 120 days in any twelve month period.

2.5     Termination of Registration Rights.    A Holder's Registration Rights as to any securities held by such Holder (and its affiliates, partners, members and former members) shall not be available unless such securities are Registrable Securities.

2.6     Furnishing Information.    It shall be a condition precedent to the obligations of the General Partner to take any action pursuant to Section 2.3 that the selling Holders and the underwriters, if any, shall furnish to the General Partner such information regarding themselves, the Registrable Securities held by them and the intended method of disposition of such securities as shall be reasonably required to effect the registered offering of their Registrable Securities.

2.7     Indemnification. (a)    In connection with each registration pursuant to Article 2, the General Partner agrees to indemnify and hold harmless each selling Holder, each underwriter or agent participating in such offering, each of their respective employees, officers and directors, and each Person, if any, who controls any selling Holder or any such underwriter or agent within the meaning of Section 15 of the Securities Act as follows:

(i)     against any and all loss, liability, claim, damage and expense whatsoever, as incurred, arising out of an untrue statement or alleged untrue statement of a material fact contained in the Registration Statement (or any amendment thereto), or the omission or alleged omission therefrom of a material fact required to be stated therein or necessary to make the statements therein not misleading or arising out of an untrue statement of a material fact included in any preliminary prospectus or the Prospectus (or any amendment or supplement thereto) or the omission or alleged omission therefrom of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; and

(ii)     against any and all loss, liability, claim, damage and expense whatsoever, as incurred, to the extent of the aggregate amount paid in settlement of any litigation, or investigation or proceeding by any governmental agency or body, commenced or

7

threatened, or of any claim whatsoever based upon any such untrue statement or omission, or any such alleged untrue statement or omission, if such settlement is effected with the written consent of the General Partner, which shall not be unreasonably withheld:  provided, however, that, with respect to any selling Holder or any underwriter or agent, this indemnity does not apply to any loss, liability, claim, damage or expense to the extent arising out of an untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with written information relating to such Holder and furnished to the General Partner by such selling Holder or underwriter or agent, respectively, expressly for use in the Registration Statement (or any amendment thereto), or any preliminary prospectus or the Prospectus (or any amendment or supplement thereto).

(b)     Each selling Holder agrees severally, and not jointly, to indemnify and hold harmless the General Partner, its employees, officers and directors, each underwriter or agent participating in such offering and the other selling Holders, each of their respective employees, officers and directors, and each Person, if any, who controls the General Partner, any such underwriter or agent and any other selling Holder within the meaning of Section 15 of the Securities Act, against any and all loss, liability, claim, damage and expense described in the indemnity contained in Section 2.7(a), as incurred, but only with respect to untrue statements or omissions, or alleged untrue statements or omissions, made in the Registration Statement (or any amendment thereto), or any preliminary prospectus or the Prospectus (or any amendment or supplement thereto) in reliance upon and in conformity with written information relating to such Holder and furnished to the General Partner by such selling Holder expressly for use in the Registration Statement (or any amendment thereto), or any preliminary prospectus or the Prospectus (or any amendment or supplement thereto).

(c)     The obligations of the General Partner under Section 2.7(a) and of the selling Holders under Section 2.7(b) to indemnify any underwriter or agent who participates in an offering (or any Person, if any, controlling such underwriter or agent within the meaning of Section 15 of the Securities Act) shall be conditioned upon the underwriting or agency agreement with such underwriter or agent containing an agreement by such underwriter or agent to indemnify and hold harmless the General Partner, each of its employees, officers and directors, and each selling Holder and each of their respective employees, officers and directors, and each Person, if any, who controls the General Partner or any such selling Holder within the meaning of Section 15 of the Securities Act, against any and all loss, liability, claim, damage and expense described in the indemnity contained in Section 2.7(a), as incurred, but only with respect to untrue statements or omissions, or alleged untrue statements or omissions, made in the Registration Statement (or any amendment thereto), or any preliminary prospectus or the Prospectus (or any amendment or supplement thereto) in reliance upon and in conformity with written information relating to such underwriter or agent and furnished to the General Partner by such underwriter or agent expressly for use in the Registration Statement (or any amendment thereto), or any preliminary prospectus or the Prospectus (or any amendment or supplement thereto).

(d)     Each indemnified party shall give prompt notice to each indemnifying party of any action commenced against it in respect of which indemnity may be sought hereunder, but failure to so notify an indemnifying party shall not relieve the indemnifying party from any

liability it may have under this Agreement, except to the extent that the indemnifying party is materially prejudiced thereby. If it so elects, after receipt of such notice, an indemnifying party, jointly with any other indemnifying parties receiving such notice, may assume the defense of such action with counsel chosen by it (such counsel to be reasonably satisfactory to the indemnified parties), provided that the indemnified party shall be entitled to participate in (but not control) the defense of such action with counsel chosen by it, the fees and expenses of which shall be paid by the indemnifying party if the indemnifying party has reasonably concluded there would be a conflict if one counsel were to represent both the indemnified and the indemnifying party, and by the indemnified party in all other circumstances. In no event shall the indemnifying party or parties be liable for a settlement of an action with respect to which they have assumed the defense if such settlement is effected without the written consent of the indemnifying party (which consent shall not be unreasonably withheld), or for the fees and expenses of more than (i) one counsel for the General Partner, its officer, directors and controlling Persons as a group, (ii) one counsel for the selling Holders and their controlling Persons as a group and (iii) one counsel for the underwriters or agents and their controlling Persons as a group, in each case, in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances. No indemnifying party shall, without the written consent of the indemnified party, effect the settlement or compromise of, or consent to the entry of any judgment with respect to, any pending or threatened action or claim in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified party is an actual or potential party to such action or claim) unless such settlement, compromise or judgment (i) includes an unconditional release of the indemnified party from all liability arising out of such action or claim and (ii) does not include a statement as to, or an admission of, fault, culpability or a failure to act, by or on behalf of any indemnified party.

(e) Notwithstanding any other provision of this Section 2.7 and Section 2.8, in no event will any (i) Holder be required to undertake liability to any person under Section 2.7 or Section 2.8 for any amounts in excess of the dollar amount of the proceeds to be received by such Holder from the sale of such Holder's Registrable Securities (after deducting any fees, discounts and commissions applicable thereto) pursuant to any Registration Statement under which such Registrable Securities are to be registered under the Securities Act and (ii) underwriter, selling agent or other securities professional be required to undertake liability to any person hereunder for any amounts in excess of the discount, commission or other compensation payable to such underwriter, selling agent or other securities professional with respect to the Registrable Securities underwritten by it and distributed to the public.

(f) The obligations of the General Partner under this Section 2.7 and Section 2.8 shall be in addition to any liability which the General Partner may otherwise have to any indemnified person and the obligations of any indemnified person under this Section 2.7 and Section 2.8 shall be in addition to any liability which such indemnified person may otherwise have to the General Partner. The remedies provided in this Section 2.7 and Section 2.8 are not exclusive and shall not limit any rights or remedies which may otherwise be available to an indemnified party at law or in equity.

(g) The amount paid or payable by an indemnified party as a result of the losses, claims, damages or liabilities (or actions in respect thereof) referred to above shall be deemed to

include any legal or other fees or expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim.

       2.8    <u>Contribution</u>.  (a) If the indemnification provided for in <u>Section 2.7</u> is unavailable to or insufficient to hold harmless an indemnified party under <u>Section 2.7(a)</u> or <u>Section 2.7(b)</u> above in respect of any losses, claims, damages or liabilities (or actions in respect thereof) referred to therein, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (or actions in respect thereof) in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities (or actions in respect thereof), as well as any other relevant equitable considerations. The relative fault of such indemnifying party and indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by such indemnifying party or by such indemnified party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The parties hereto agree that it would not be just and equitable if contribution pursuant to this <u>Section 2.8</u> were determined by pro rata allocation (even if the Holders or any underwriters, selling agents or other securities professionals or all of them were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in this <u>Section 2.8(a)</u>.  The obligations of Holders and any underwriters, selling agents or other securities professionals in this <u>Section 2.8(a)</u> to contribute shall be several in proportion to the percentage of principal amount or number of shares, as applicable, of Registrable Securities registered or underwritten, as the case may be, by them and not joint.

       (b)    No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. For purposes of this <u>Section 2.8</u>, each Person, if any, who controls an underwriter or agent within the meaning of Section 15 of the Securities Act and each employee, officer and director of such underwriter or agent shall have the same rights to contribution as such underwriter or agent and each Person, if any, who controls the General Partner or a selling Holder within the meaning of Section 15 of the Securities Act and each employee, officer and director of the General Partner or a selling Holder shall have the same rights to contribution as the General Partner or such selling Holder, as the case may be.

       2.9    <u>Representations, Warranties and Indemnities to Survive</u>.  The indemnity and contribution agreements contained in this <u>Article 2</u> and the representations and warranties of the General Partner referred to in <u>Section 2.3(k)</u> shall remain operative and in full force and effect regardless of (i) any termination of any underwriting or agency agreement, (ii) any investigation made by or on behalf of the selling Holders, the General Partner or any underwriter or agent or controlling Person or (iii) the consummation of the sale or successive resales of the Registered Securities.

       2.10    <u>Lock-Up Agreements</u>.  (a) The General Partner agrees that, if requested by the managing underwriter, it will not, directly or indirectly, sell, offer to sell, grant any option for the sale of, or otherwise dispose of any Covered Securities or securities convertible into or

exchangeable or exercisable for Covered Securities (subject to customary exceptions) in the case of an underwritten offering for a period of 90 days from the effective date of the Registration Statement pertaining to such Covered Securities; provided, however, that any such lock-up agreement shall not prohibit the General Partner from directly or indirectly (i) selling, offering to sell, granting any option for the sale of, or otherwise disposing of any Qualifying Employee Stock (or otherwise maintaining its employee benefits plans in the ordinary course of business) or (ii) issuing Covered Securities or securities convertible into or exchangeable for Covered Securities upon exercise or conversion of any warrant, option, right or convertible or exchangeable security issued in connection with the plan of reorganization.

(b)     The lock-up agreements set forth in <u>Section 2.10(a)</u> shall be subject to customary exceptions that may be contained in an underwriting agreement if any such registration involves a similar underwritten offering.

2.11     <u>Rule 144 Reporting</u>.     With a view to making available to the Holders the benefits of certain rules and regulations of the SEC which may permit the sale of the Registrable Securities to the public without registration, the General Partner agrees, so long as it is subject to the periodic reporting requirements of the Securities Exchange Act, to use its commercially reasonable efforts to:

(a)     make and keep public information available, as those terms are understood and defined in Rule 144(c)(1) or any similar or analogous rule promulgated under the Securities Act, at all times after the effective date of this Agreement;

(b)     file with the SEC, in a timely manner, all reports and other documents required of the General Partner under the Exchange Act; and

(c)     so long as the Holders own any Registrable Securities, furnish to such Holders forthwith upon request: a written statement by the General Partner as to its compliance with the reporting requirements of Rule 144 under the Securities Act, and of the Exchange Act; and such other reports and documents as the Holders may reasonably request in availing itself of any rule or regulation of the SEC allowing it to sell any such securities without registration.

**Schedule 9.3**
**Insurance**

Section 9.3  Insurance.

(a)  Each Obligor shall obtain and maintain at all times with respect to each Property owned or Ground Leased by such Obligor, for the mutual benefit of such Obligor, the Agent and the Lenders, the following policies of insurance (for the purposes of this Section 9.3, the reference to (i) "Obligor" shall mean each Guarantor which owns or ground leases a First Lien Property and (ii) "Property" shall mean each individual First Lien Property owned or Ground Leased by the Obligor in question):

(i)  insurance against loss or damage by standard perils included within the classification so-called "Special Form Perils."  Such insurance shall be in an amount equal to the then full replacement cost of the Property and fixtures; shall have reasonable and customary deductibles; shall be paid for annually at the renewal period; shall be for "Replacement Cost" with no co-insurance penalty; and shall include ordinance or law coverage containing coverage for A: "Loss Due to Operation of Law" (with a minimum liability equal to $10,000,000.00), Coverage B: "Demolition Cost" and Coverage C: "Increased Cost of Construction" coverages;

(ii)  if any portion of the Improvements on a Property is at any time located in an area (a "**Flood Prone Area**") identified by the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, or any successor law (the "**Flood Insurance Acts**"), flood hazard insurance of the following types and in the following amounts (i) coverage under Policies issued pursuant to the Flood Insurance Acts (the "**Flood Insurance Policies**") in an amount equal to the maximum limit of coverage available for the applicable Property under the Flood Insurance Acts, subject only to customary deductibles under such Policies and (ii) to the extent commercially available, coverage under supplemental private Policies in an amount not to exceed Twenty-Five Million Dollars ($25,000,000);

(iii)  commercial general liability insurance, including contractual liability for so-called "insured contracts" and personal injuries (including death resulting therefrom) coverages and containing minimum limits per occurrence of not less than $1,000,000.00 with not less than a $2,000,000.00 general aggregate for any policy year.  In addition, at least $50,000,000.00 excess and/or umbrella liability insurance shall be obtained and maintained for any and all claims, including all legal liability

imposed upon any Obligor and all related court costs and attorneys' fees and disbursements;

(iv)     business income/rental-loss insurance in an annual amount equal to 100% of the projected annual gross rental income from the Property, covering the period from the date of Casualty to the date that the Property is repaired or replaced and operations are resumed (regardless of the length of such period), plus an extended period of indemnity for 180 days after the completion of restoration.  The amount of such insurance shall be increased or reduced from time to time as and when the gross revenues from such Property increase or decrease, as applicable;

(v)     insurance against loss or damage from (A) leakage of sprinkler systems and (B) explosion of steam boilers, air conditioning equipment, high pressure piping, machinery and equipment, pressure vessels or similar apparatus now or hereafter installed in any of the Improvements (without exclusion for explosions) and insurance against loss of occupancy or use arising from any breakdown, in such amounts as are generally available at reasonable premiums and are generally required by institutional lenders for properties comparable to the Property;

(vi)     worker's compensation insurance with respect to all employees of each Obligor as and to the extent required by any Governmental Authority or Legal Requirement and employer's liability coverage of at least $1,000,000.00 (if applicable);

(vii)     during any period of repair or restoration costing in excess of $1,000,000.00 in the aggregate, builder's "all risk" insurance in an amount equal to not less than the full insurable value of the Property on a "completed value" basis against such risks (including fire and extended coverage and collapse of the Improvements to agreed limits) as the Agent may reasonably request, in form and substance reasonably acceptable to the Agent;

(viii)     windstorm insurance in an amount equal to 100% of the insurable value of the Property, with a deductible reasonably approved by the Agent;

(ix)     if reasonably required by the Agent, earthquake insurance (A) with minimum coverage equivalent to the PML including business income exposure, (B) having a commercially reasonable deductible approved by the Agent, and (C) if the Property is legally nonconforming under applicable zoning ordinances and codes, containing ordinance of law coverage in amounts as required by the Agent; and

(x)     such other insurance as may from time to time be reasonably requested by the Agent for other insurable hazards which at the time are commonly insured against for properties similar to the Real Estate located in or around the region in which the applicable Property is located and are otherwise available at commercially reasonable rates.

(b)     All policies of insurance (the "Policies") required pursuant to this Section 9.3:

(i)     with respect to the Policies described in Sections 9.3(a)(i), (ii), (iii), (iv), (v), (vii), (viii) and (ix), such Policies shall be issued by (or fully supported by way of a cut-through endorsement, contingent property insurance coverage or a credit wrap in substantially the form in place on the Closing Date or as otherwise reasonably approved by the Agent) an insurer which has a claims paying ability rating of not less than "A-" by S&P or not less than "A:IX" by A.M. Best or by a syndicate of insurers through which at least 60% of the coverage (if there are 4 or fewer members of the syndicate) or at least 50% of the coverage (if there are 5 or more members of the syndicate) and one hundred percent (100%) of the first layer of such insurance coverage is with carriers having such claims-paying ability ratings of not less than "A-" or "A-PI (Public Information)" by S&P or not less than "A:IX" by A.M. Best (provided that the balance of such carriers shall have claims paying ability ratings of not less than "BBB" by S&P and not less than "A:VII" by A.M. Best) or such lower ratings as shall be approved by Agent and which syndicate may include Factory Mutual Insurance Company.  Notwithstanding the foregoing, but without reference to Factory Mutual Insurance Company, a maximum of 25% of the coverage provided for the Real Estate may be provided by insurers not rated with S&P, provided they have a claims paying ability rating of not less than A- IX with A.M Best, or such lower ratings as shall be approved by the Agent;

(ii)     shall be maintained throughout the term of the Term Loan without cost to any Lender or the Agent;

(iii)     with respect to the Policies described in Section 9.3(a)(i), (ii), (v), (vii) and (viii), shall contain a standard noncontributory mortgagee clause naming the Agent (on behalf of each Lender) and each Lender, and their respective successors and/or assigns of interests in the Term Loan, as first mortgagees and loss payees;

(iv)     with respect to the commercial general liability policy, shall name the Agent (on behalf of each Lender) and each Lender and their respective successors and assigns of interests in the Term Loans as additional insured;

3

(v)　　with respect to rental or business interruption insurance policies, shall name the Agent (on behalf of each Lender) and each Lender and their respective successors and/or assigns of interests in the Term Loans as loss payee;

(vi)　　shall contain terms and conditions or an endorsement providing that neither any Obligor nor the Agent nor any Lender nor any other party shall be a co-insurer under said Policies and that the Agent shall receive at least 30 days' prior written notice of any cancellation, decrease in coverage or other material adverse modification, except for nonpayment, which shall require 10 days' prior written notice;

(vii)　　shall contain terms and conditions or an endorsement providing that no act or negligence of any Obligor or of a Tenant or other occupant shall affect the validity or enforceability of the insurance insofar as a mortgagee is concerned;

(viii)　　shall contain a waiver of subrogation against each Lender and the Agent;

(ix)　　shall contain deductibles no larger than is customary for similar policies covering similar properties owned by sophisticated owners of similar properties, similar to the applicable Property, in the geographic market in which the Property is located; and

(x)　　shall, with respect to the Policies required under Section 9.3(a)(i) and (iv), contain coverage for terrorism satisfactory to the Agent (either through such Policies not containing a terrorism exclusion, or through separate Policies from insurers with ratings reasonably satisfactory to the Agent), as follows: each Obligor shall be unconditionally obligated to have such coverage in effect at all times unless and until all Obligations have been paid and performed in full and all Commitments have terminated or expired.  Each Obligor shall be unconditionally obligated to have such coverage in effect for the policy year in which the Closing Date occurs. Thereafter, each Obligor shall use commercially reasonable efforts, consistent with those of prudent owners of institutional quality commercial real estate, to maintain such coverage at all times while the Term Loans are outstanding, provided that such coverage is available at commercially reasonable rates.

Any policies of insurance maintained by any Obligor but not required hereunder shall comply with clauses (iii), (iv), (v), (vi) and (viii) above to the extent commercially available and appropriate.  If Obligors' insurers or reinsurance carriers fail to provide or maintain the ratings set forth in this Section, Borrowers may satisfy the applicable ratings requirement by providing a "cut-through or credit wrap" policy or  endorsement in form and substance reasonably approved

by Agent issued by an insurer reasonably satisfactory to Agent or by such other credit enhancement or guaranty by such other Person, in each event reasonably satisfactory to Agent.

(c)     The Obligors shall pay, or cause to be paid, the premiums for all Policies as the same become due and payable.  Certificates of insurance (on ACORD Form 27 or 28 where available or its equivalent from time to time) or, after the occurrence of an Event of Default, copies of the policy declaration pages and endorsements shall be delivered to the Agent, or, at the Agent's request, the Agent shall be given prompt access to the Policies for review.  Prior to the expiration date of each Policy, the Obligors shall deliver or cause to be delivered to the Agent evidence, reasonably satisfactory to the Agent, of its renewal.  If any Obligor obtains the insurance required by this <u>Section 9.3</u> pursuant to a blanket policy, promptly after request therefor from the Agent, to the extent then available, such Obligor shall deliver to the Agent evidence, reasonably satisfactory to the Agent, of payment of the premiums therefor.

Any blanket Policy remains subject to the Agent's reasonable review and approval of the schedule of locations and values thereunder and shall specifically allocate to the Property the amount of coverage used for Policy valuation purposes from time to time required hereunder.

(d)     If the Agent is not in receipt of written evidence that all insurance required hereunder is in full force and effect, the Agent shall have the right, upon reasonable notice to the Borrowers, to take such action as the Agent deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as the Agent in its sole discretion deems appropriate.

The Borrowers shall be liable for all premiums and out-of-pocket expenses incurred by the Agent in connection with obtaining such insurance coverage.

(e)     The Borrowers shall timely make or cause to be made any and all payments due to any premium finance company through which any Obligor finances the payment of its insurance premiums.  Each month the Borrowers shall forward, or cause to be forwarded, to the Agent evidence that such payment has been made.

**Schedule 1.1A**
**Fee Properties**

1.    10000 W. Charleston Blvd., 10000 W. Charleston Blvd, Las Vegas, NV

2.    1251 Center Crossing, 1251 Center Crossing Drive, Las Vegas, NV

3.    4848 Parcel, 4848 Oracle Road, Tucson, AZ

4.    Ala Moana Center, 1450 Ala Moana Blvd., Honolulu, HI - Any portion of Ala-Moana Center, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

5.    Alameda Plaza, 900 Yellowstone Highway, Pocatello, ID

6.    Animas Valley Mall, 4601 East Main Street, Farmington, NM

7.    Apache Mall, 333 Apache Mall, Rochester MN - Any portion of Apache Mall, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

8.    Arizona Center (Property includes One Arizona Center, Two Arizona Center, Arizona Center Parking, Retail Parcel and Theater Parcel), 400 E. Van Buren Street, Phoenix, AZ - Any portion of Arizona Center, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

9.    Association Building (a.k.a. C.A. Building), 10221 Wincopin Circle, Columbia, MD

10.   Augusta Mall, 3450 Wrightboro Road, Augusta, GA - Any portion of Augusta Mall, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

11.   Austin Bluffs Plaza, 4160 Austin Bluffs Pwky, Colorado Springs, CO

12.   Bailey Hills Village, 1055 Bailey Hill Road, Eugene, OR

13.   Baskin Robbins, 2553 17th Street, Idaho Falls, ID

14.   Bay City Mall, 4101 East Wilder Road, Bay City, MI

15. Bayshore Mall, 3300 Broadway, Eureka, CA - Any portion of Bay Shore Mall, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

16. Beachwood Place, 2300 Cedar Road, Beachwood, OH

17. Bellis Fair, 1 Bellis Fair Parkway, Bellingham, WA

18. Birchwood Mall, 4350 24th Avenue, Box 4350, Port Huron, MI

19. Boise Towne Plaza, 500 North Milwaukee, Boise, ID

20. Boise Towne Square, 350 North Milwaukee, Boise, ID - Any portion of Boise Town Square, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

21. Boise Towne Square Anchor Acquisition, 350 North Milwaukee, Boise, ID

22. Brass Mill & Commons, 495 Union Street, Waterbury, CT

23. Burlington Town Center 49 Church Street, Burlington, VT - Any portion of Burlington Town Center, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

24. Cache Valley Mall & Marketplace, 1300 Main Street, Logan UT

25. Canyon Point, I-215 and W. Charleston Blvd, Las Vegas, NV

26. Canyons Center (1160/1180 Town Center Drive and 1120/1140 Town Center Drive), Las Vegas, NV

27. Capital Mall, 3600 Country Club Dr., Jefferson City, MO

28. Century Plaza , 7580 Crestwood Blvd, Ste. 241, Birmingham, AL

29. Chapel Hills Mall, 1710 Briargate Boulevard, Colorado Springs, CO

30. Chico Mall, 1950 East 20th Street, Chico, CA

31. Chula Vista, 555 Broadway, Chula Vista, CA - Any portion of Chula Vista Center, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

32. Collin Creek Mall, 811 N. Central Expy, Plano, TX

33. Collin Creek Mall Dillards Parcel, 841 N. Central Expressway, Plano, TX

34. Colony Square Mall, 3575 Maple Avenue, Zanesville, OH

35. Columbia Corporate Center Offices (Fifty Columbia Corporate Center, including Columbia Bank Drive Thru), 10500 Little Patuxent Parkway, Columbia, MD

36. Columbia Corporate Center Offices (Forty Columbia Corporate Center), 10480 Little Patuxent Parkway, Columbia, MD

37. Columbia Corporate Center Offices (Sixty Columbia Corporate Center), 10490 Little Patuxent Parkway, Columbia, MD

38. Columbia Corporate Center Offices (Ten Columbia Corporate Center), 10400 Little Patuxent Parkway, Columbia, MD

39. Columbia Corporate Center Offices (Thirty Columbia Corporate Center), 10440 Little Patuxent Parkway, Columbia, MD

40. Columbia Corporate Center Offices (Twenty Columbia Corporate Center), 10420 Little Patuxent Parkway, Columbia, MD

41. Columbia Mall (MO), 2300 Bernadette Drive, Columbia, MO

42. Columbiana Centre, 100 Columbiana Circle, Columbia, SC

43. Coronado Center, 6600 Menual NE, Suite 1, Albuquerque, NM - Any portion of Coronado Center, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

44. Corporate Pointe #2, 10650 W. Charleston Blvd., Las Vegas, NV

45. Corporate Pointe #3, 10750 W. Charleston Blvd., Las Vegas, NV

46. Cottonwood Mall, 4835 South Highland Drive, Holladay, UT

47. Cottonwood Square, 1800 E. Murray-Holladay Rd., Salt Lake City, UT - Any portion of Cottonwood Square, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

48. Country Hills Plaza, 4305 S. Harrison Blvd., Ogden, UT

49. Crossroads Center, 4101 West Division Street, St. Cloud, MN

50. Deerbrook Mall, 20131 Highway 58 N, Humble, TX

51. Division Crossing, 16353 SE Division Street, Portland, OR

52.   Eagle Ridge Mall, 451 Eagle Ridge Drive, Lake Wales, FL

53.   Eastridge Mall, 601 SE Wyoming Boulevard, Casper, WY

54.   Eastridge Shopping Center, 1 Eastridge Mall, San Jose, CA

55.   Eden Prairie Anchor Acquisition, 8251 Eden Prairie Center, Suite 125, Eden Prairie, MN

56.   Eden Prairie Center, 8251 Eden Prairie Center, Suite 125, Eden Prairie, MN

57.   Elk Grove Promenade, Elk Grove Promenade, Elk Grove, CA

58.   Exhibit Building, 10215 Wincopin Circle, Columbia, MD

59.   Fallbrook Center, 6633 Fallbrook Avenue, West Hills, CA - Any portion of Fallbrook Center, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

60.   Faneuil Hall Marketplace, 4 South Market Building, Boston, MA - Any portion of Faneuil Hall, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

61.   Fashion Place, 6191 S. State Street, Murray, UT - Any portion of Fashion Place, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

62.   Fashion Show Mall, 3200 Las Vegas Boulevard South, Las Vegas, NV

63.   Foothills Mall, 215 East Foothills Parkway, Fort Collins, CO

64.   Fort Union, 800 East 7200 South, Midvale, UT - Any portion of Fort Union, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

65.   Four Seasons Town Centre, 400 Four Seasons Town Centre, Greensboro, NC

66.   Fox River Mall, 4301 West Wisconsin Avenue, Appleton, WI

67.   Fremont Plaza, 240 North Jones, Las Vegas, NV - Any portion of Fremont Plaza, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

68. Gallery at Harborplace, 200 East Pratt Street, Baltimore, MD - Any portion of Gallery at Harborplace, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

69. Gateway Crossing Shopping Center, 500 South 500 West, Bountiful, UT

70. Gateway Mall, 3000 Gateway Street, Springfield, OR

71. Gateway Overlook, Intersection of Routes 175 and 108, Columbia, MD - Any portion of Gateway Overlook, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

72. Glenbrook Square, 4201 Coldwater Boulevard, Fort Wayne, IN

73. Grand Teton Mall & Plaza, 2406 East 25th Street, Idaho Falls, ID

74. Grand Traverse Mall, 3200 South Airport Road West, Traverse City, MI

75. Greenwood Mall, 2625 Scottsville Rd., Bowling Green, KY

76. Halsey Crossing, 1500 North 181st Street, Portland, OR - Any portion of Halsey Crossing, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

77. Harborplace, 201 East Pratt Street, Baltimore, MD - Any portion of Harborplace, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

78. Hillshire Drive Property, 1551 Hillshire Drive, Las Vegas, NV

79. Hulen Mall, 4800 South Hulen Street, Ft. Worth, TX

80. Jordan Creek Town Center, 101 Jordan Creek Parkway, West Des Moines, IA

81. Kendall Town Center, address n/a raw land, Miami, FL

82. Knollwood Mall, 8332 Highway 7, St. Louis Park, MN

83. Lakeside Mall, 14000 Lakeside Circle, Sterling Heights, MI

84. Lakeview Square, 5775 Beckley Road, Battle Creek, MI

85. Landmark Mall, 5801 Duke Street, Alexandria, VA

86. Lansing Mall, 5330 West Saginaw, Lansing, MI - Any portion of Lansing Mall, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

87. Lincolnshire Commons, Milwaukee and Aptakisic, Lincolnshire, IL

88. Lynnhaven Mall, 701 Lynnhaven Parkway, Virginia Beach, VA

89. Mall of Louisiana, 6401 Bluebonnet Boulevard, Baton Rouge, LA

90. Mall of Louisiana Power Center, 6401 Bluebonnet Boulevard, Baton Rouge, LA

91. Mall of the Bluffs, 1751 Madison Avenue, Council Bluffs, IA

92. Mall St. Matthews, 5000 Shelbyville Road, Louisville, KY - Any portion of Mall St. Matthews, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

93. Mall St. Vincent, 1133 St. Vincent Avenue, Shreveport, LA - Any portion of Mall St. Vincent, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

94. Market Place, 2000 North Neil Street, Champaign, IL

95. Mayfair Mall and Offices, 2500 North Mayfair road, Wauwatosa, WI

96. Mondawmin Mall, 2410 Liberty Heights Avenue, Ste. 1200, Baltimore, MC

97. Moreno Valley Mall, 22500 Town Circle, Suite 1206, Moreno Valley, CA

98. Natick Nouvelle (condos, retail in condo building and offsite housing), 1245 Worcester Street, Suite #4030, Natick, MA 01760

99. Neighborhood Stores, 5740 Columbia Road, Columbia, MD

100. Newgate Mall, 3651 Wall Avenue, Ogden, UT

101. Newgate Mall Land, raw land adjacent to Newgate Mall, Ogden, UT

102. NewPark Mall, 2086 Newpark Mall, Newark, CA - Any portion of NewPark Mall which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

103. NewPark Mall Anchor Acquisition, 2086 Newpark Mall, Newark, CA

104. North Plains Mall, 2809 North Prince, Clovis, NM

105. North Point Mall, 1000 North Point Circle, Alpharetta, GA

106. North Star Mall, 2000 North Star Mall, San Antonio, TX

107. North Star Mall Anchor Acquisition, 2000 North Star Mall, San Antonio, TX

108. Northgate Mall, 271 Northgate Mall, Chattanooga, TX

109. Northridge Fashion Center, 9301 Tampa Avenue, Northridge, CA

110. NorthTown Mall, 4750 North Division, Spokane, WA - Any portion of NorthTown Mall, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

111. Oakwood Mall, 4800 Golf Road, Eau Claire, WI

112. Oakwood Shopping Center, 197 Westbank Expressway, Gretna, LA

113. Oglethorpe Mall, 7804 Abercorn Street, Savannah, GA

114. Oglethorpe Residential Properties, 42 Fairmont Avenue, 44 Fairmont Avenue, 48 Fairmont Avenue, 50 Fairmont Avenue, 52 Fairmont Avenue, 104 Fairmont Avenue, 106 Fairmont Avenue, 110 Fairmont Avenue, 112 Fairmont Avenue and 114 Fairmont Avenue, Savannah, GA

115. Orem Plaza Center and State Street, 50 West Center and 139 North State, Orem, UT

116. Oviedo Marketplace, 1700 Oviedo Marketplace Boulevard, Oviedo, FL

117. Oxmoor Center, 7900 Shelbyville Road, Louisville, KY - Any portion of Oxmoor Center, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

118. Owings Mills Mall, 10300 Mill Run Circle, Owings Mills, MD

119. Park City Center, 142 Park City Center, Lancaster, PA

120. Park Place, 5870 East Broadway Boulevard, Tucson, AZ

121. Parke West, 9744 West Northern Avenue, Peoria, AZ

122. Peachtree Mall, 3131 Manchester Expressway, Columbus, GA

123. Pecanland Mall, 4700 Millhaven Road, Monroe, LA

124. Pecanland Mall Anchor Acquisition, 4700 Millhaven Road, Monroe, LA

125. Piedmont Mall, 325 Piedmont Drive, Danville, VA – Any portion of Piedmont Mall which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

126. Pierre Bossier Mall, 2950 East Texas Street, Bossier City, LA

127. Pine Ridge Mall, 4155 Yellowstone Highway, Pocatello, ID - Any portion of Pine Ridge Mall, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

128. Pioneer Place (Includes Pioneer Office Tower), 700 SW Fifth Avenue, Portland, OR - Any portion of Pioneer Place Combined, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

129. Plaza 800, 2260 Oddie Blvd, Sparks, NV - Any portion of Plaza 800, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

130. Plaza 9400, 755 East 9400 South Street, Sandy, UT - Any portion of Plaza 9400, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

131. Potomac Place (f/k/a Rivertown Crossings undeveloped land), Potomac Circle, Grandville, MI

132. Prince Kuhio Plaza, 111 East Puainako Street, Hilo, HI - Any portion of Prince Kuhio Plaza, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

133. Providence Place, One Providence Place, Providence, RI - Any portion of Providence Place, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

134. Provo Plaza/PTC Motel Land, adjacent to Provo Towne Centre which is located at 1200 Towne Centre Boulevard, Provo, UT - Any portion of Provo Plaza/PTC Motel Land, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

135. Red Cliffs Mall, 1770 East Red Cliffs Drive, St. George, UT

136. Red Cliffs Plaza, 484 North Mall Road, St. George, UT

137. Redlands Promenade, Redlands, CA

138. Regency Square Mall, 9501Arlington Expressway, Jacksonville, FL

139. Ridgedale Center, 12401 Wauzata Boulevard, Minnetonka, MN

140. Ridgley Building, 5575 Sterrett Place, Columbia, MD

141. Rio West Mall, 1300 West I-40 Frontage, Gallup, NM - Any portion of Rio West Mall, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

142. River Hills Mall, 1850 Adams Street, Mankato, MN

143. River Pointe Plaza, 1700 West 9000 South, West Jordan, UT

144. Riverlands Shopping Center, 1324 W. Airline Highway, Laplace, LA

145. Riverside Plaza, 1300 North State, Provo, UT

146. Rivertown Crossings, 3700 RiverTown Parkway SW, Grandville, MI

147. Riverwalk Marketplace, 1 Poydras Street, New Orleans, LA - Any portion of Riverwalk Marketplace, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground  Lease.

148. Rogue Valley Mall, 1600 North Riverside Drive, Medford, OR

149. Saint Louis Galleria, 1155 Saint Louis Galleria, St. Louis, MO

150. Saint Louis Galleria Anchor, 1155 Saint Louis Galleria, St. Louis, MO

151. Salem Center, 401 Center Street NE, Salem, OR - Any portion of Salem Center, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

152. Sikes Senter, 3111 Midwestern Parkway, Wichita Falls, TX

153. Silver Lake Mall,200 W. Hanley Avenue, Coeur D' Alene, ID

154. Sooner Fashion Mall, 3301 West Main Street, Norman, OK

155. South Shore Mall, 1017 South Boone Street, Aberdeen, WA - Any portion of South Shore Mall, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

156. South Street Seaport and Seaport Marketplace Theater, 19 Fulton Street, New York, NY - Any portion of South Street Seaport and Seaport Marketplace Theater, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

157. Southlake Mall, 1000 Southlake Mall, Morrow, GA

158. Southland Center, 23000 Eureka Road, Taylor, MI

159. Southland Mall, One Southland Mall Drive, Hayward, CA

160. Southwest Plaza, 8501 West Bowles Avenue, Littleton, CO - Any portion of Southwest Plaza, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

161. Spring Hill Mall, 1072 Spring Hill Mall, West Dundee, IL

162. Staten Island Mall, Staten Island, NY

163. Staten Island off-site Wendy's, Staten Island, NY

164. Steeplegate Mall, 270 Loudon Road, Concord, NH

165. Stonestown Center, 3251 Twentieth Avenue, San Francisco, CA

166. Summerlin Centre, 10973 Summerlin Centre Drive, Las Vegas, NV

167. Summerlin MPC, address N/A raw land (approx 7,682 net acres), Las Vegas, NV

168. The Boulevard Mall, 3528 S. Maryland Parkway, Las Vegas, NV

169. The Bridges at Mint Hill, 13033 Bain School Road, Charlotte, NC

170. The Crossing Business Center #6, 1450 Center Crossing Drive, Las Vegas, NV

171. The Crossing Business Center #7, 1451 Center Crossing Drive, Las Vegas, NV

172. The Crossing Business Center (10000 Covington Cross), 10000 Covington Cross, Las Vegas, NV

173. The Crossing Business Center (10190 Covington Cross), 10190 Covington Cross, Las Vegas, NV

174. The Crossing Business Center (1201-1281 Town Center Drive), 1201-41   Town Center Drive and 1251-1281 Town Center Drive, Las Vegas, NV

175. The Crossing Business Center (1635 Village Center), 1635 Village Center Circle, Las Vegas, NV

176. The Crossing Business Center (1645 Village Center), 1645 Village Center Circle, Las Vegas, NV

177. The Crossing Business Center (9901-9921 Covington Cross), 9901-21 Covington Cross, Las Vegas, NV

178. The Crossing Business Center (9950-9980 Covington Cross), 9950-80 Covington Cross, Las Vegas, NV

179. The Crossroads Mall, 6650 South Westnedge Ave., Portage, MI

180. The Grand Canal Shoppes at the Venetian, 3377 Las Vegas Boulevard South, Las Vegas, NV - Any portion of The Grand Canal Shoppes at the Venetian, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

181. The Maine Mall, 364 Maine Mall Road, South Portland, ME

182. The Mall at Sierra Vista, 2200 El Mercado Loop, Sierra Vista, AZ

183. The Pines Mall, 2901 Pines Mall Drive, Pine Bluff, AR

184. The Shoppes at the Palazzo, 3377 Las Vegas Boulevard South, Las Vegas NV - Any portion of The Shoppes at the Palazzo, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

185. The Shops at Fallen Timbers, 6832 Russell Road, Maumee, OH

186. The Village at Redlands (a.k.a. Redlands Mall), 100 Redlands Mall, Redlands, CA; and adjacent parking lot at intersection of Citrus and 4th, Redlands, CA

187. The Woodlands Mall, 1201 Lake Woodlands Drive, The Woodlands, TX

188. Three Rivers Mall, 351 Three Rivers Drive, Kelso, WA

189. Town East Mall, 2063 Town East Mall, Mesquite, TX

190. Lockport Mall , 5737 South Transit Road, Lockport, NY

191. River Falls, 951 East Lewis and Clark Parkway (Highway 131), Clarksville, IN

192. Tuscon Entertainment Pavilion, 4646 N. Oracle Road, Tucson, AZ

193. Tuscon Mall, 4500 N. Oracle Road, Tucson, AZ - Any portion of Tucson Mall, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

194. Twin Falls Crossings, 870 Blue Lakes Blvd. North, Twin Falls, ID

195. Tysons Galleria, 2001 International Drive, Mclean, VA – Any portion of Tysons Galleria, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

196. University Crossing, 1300 South State Street, Orem, UT

197. Valley Hills Mall, 1960 Highway 70 SE, Hickory, NC – Any portion of Valley Hills Mall, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

198. Valley Plaza Mall, 2701 Ming Avenue, Bakersfield, CA

199. Victoria Ward Center, 1240 Ala Moana Blvd, Suite 601, Honolulu, HI

200. Victoria Ward – Unencumbered/IBM Building/Vacant Parcels/Ward Village Shops (at corner of Kamakee and Auahi Streets), 1240 Ala Moana Blvd, Honolulu, HI

201. Victoria Ward Village/Industrial/Gateway, Honolulu, HI

202. Victoria Ward Entertainment Center, Honolulu, HI

203. Village of Cross Keys, 5100 Falls Road, Baltimore, MD

204. Visalia Mall, 2031 South Mooney Boulevard, Visalia, CA

205. Vista Commons, 11700 West Charleston Blvd., Las Vegas, NV

206. Vista Ridge Mall, 2401 South Stemmons Freeway, Lewisville, TX

207. Volo Land, IL, Highway 12, Lakemoor, IL

208. VWL-Maui Ranch Property, off of Kamaole Road and adjacent to Uiupalakua Ranch, Maui, HI

209. Ward Plaza and Warehouse, Honolulu, HI

210. Washington Park Mall, 2350 SE Washington Boulevard, Bartlesville, OK

211. West Valley Mall, 3200 North Naglee Road, Tracy, CA

212.    Westwood Mall, 1850 West Michigan Avenue, Jackson, MI

213.    White Marsh Mall, 8200 Perry Hall Boulevard, Baltimore, MD

214.    White Mountain Mall, 2441 Foothill Boulevard, Rock Springs, WY

215.    Willowbrook Mall, 1400 Willowbrook Mall, Wayne, NJ - Any portion of Willowbrook Mall, if any, which is not ground leased by an Obligor, as ground lessee, pursuant to a Ground Lease.

216.    Woodbridge Center, 250 Woodbridge Center Drive, Woodbridge, NJ

217.    Woodlands Village, 2600 Woodlands Village Blvd, Flagstaff, AZ

218.    Yellowstone Square, 1750 Yellowstone Highway, Idaho Falls, ID

219.    All other fee-owned property owned by a Debtor.

**Schedule 1.1B**
**Guarantors**

1. 10 CCC Business Trust
2. 10000 Covington Cross, LLC
3. 10190 Covington Cross, LLC
4. 1201-1281 Town Center Drive, LLC
5. 1251 Center Crossing, LLC
6. 1450 Center Crossing Drive, LLC
7. 1451 Center Crossing Drive, LLC
8. 1551 Hillshire Drive, LLC
9. 1635 Village Centre Circle, LLC
10. 1645 Village Center Circle, LLC
11. 20 CCC Business Trust
12. 30 CCC Business Trust
13. 9950-9980 Covington Cross, LLC
14. Alameda Mall L.L.C.
15. Apache Mall, LLC
16. Arizona Center Parking, LLC
17. Augusta Mall Anchor Holding, LLC
18. Augusta Mall Holding, LLC
19. Bakersfield Mall, Inc.
20. Baltimore Center, LLC
21. Bay Shore Mall II L.L.C.
22. Bay Shore Mall, Inc.
23. Beachwood Place Holding, LLC
24. Benson Park Business Trust
25. Boise Town Square Anchor Acquisition, LLC
26. Boulevard Mall I LLC
27. Boulevard Mall II LLC
28. Boulevard Mall, Inc.
29. BTS Properties L.L.C.
30. Caledonian Holding Company, Inc.
31. Capital Mall, Inc.
32. Century Plaza L.L.C.
33. Century Plaza, Inc.
34. Chattanooga Mall, Inc.
35. Chico Mall L.L.C.
36. Chula Vista Center, LLC
37. Collin Creek Anchor Acquisition, LLC
38. Coronado Center Holding L.L.C.
39. Cottonwood Mall, LLC
40. DK Burlington Town Center LLC
41. Eagle Ridge Mall, Inc.
42. Eden Prairie Anchor Building L.L.C.
43. Eden Prairie Mall, Inc.

44. Elk Grove Town Center L.L.C.
45. Elk Grove Town Center, L.P.
46. ER Land Acquisition L.L.C.
47. Fallbrook Square Partners L.L.C.
48. Fallen Timbers Shops II, LLC
49. Fashion Place Anchor Acquisition, LLC
50. Fifty Columbia Corporate Center, LLC
51. Forty Columbia Corporate Center, LLC
52. Franklin Park Mall Company, LLC
53. Franklin Park Mall, LLC
54. General Growth Management, Inc.
55. General Growth Properties, Inc.
56. GGP Acquisition, L.L.C.
57. GGP Ala Moana Holdings L.L.C.
58. GGP American Holdings Inc.
59. GGP American Properties Inc.
60. GGP General II, Inc.
61. GGP Holding II, Inc.
62. GGP Holding Services, Inc.
63. GGP Holding, Inc.
64. GGP Ivanhoe II, Inc.
65. GGP Ivanhoe IV Services, Inc.
66. GGP Limited Partnership
67. GGP Natick Residence LLC
68. GGP Savannah L.L.C.
69. GGP/Homart Services, Inc.
70. GGP/Homart, Inc.
71. GGP-Bay City One, Inc.
72. GGP-Burlington L.L.C.
73. GGP-Canal Shoppes L.L.C.
74. GGP-Gateway Mall, Inc.
75. GGP-Glenbrook Holding L.L.C.
76. GGP-Grandville Land L.L.C.
77. GGP-La Place, Inc.
78. GGP-Lakeview Square, Inc.
79. GGP-Lansing Mall, Inc.
80. GGPLP L.L.C.
81. GGP-Maine Mall Holding L.L.C.
82. GGP-Maine Mall Land L.L.C.
83. GGP-Mint Hill L.L.C.
84. GGP-NewPark, Inc.
85. GGP-North Point Land L.L.C.
86. GGP-Pecanland II, L.P.
87. GGP-Pecanland, Inc.
88. GGP-Redlands Mall L.L.C.
89. GGP-Redlands Mall, L.P.

90. GGP-South Shore Partners, Inc.
91. GGP-Tucson Land L.L.C.
92. Grand Traverse Mall Holding, Inc.
93. Grandville Mall, Inc.
94. Greengate Mall, Inc.
95. Greenwood Mall, Inc.
96. Greenwood Mall Land, LLC
97. HHP Government Services, Limited Partnership
98. Hickory Ridge Village Center, Inc.
99. Hocker Oxmoor Partners, LLC
100. Howard Hughes Canyon Pointe Q4, LLC
101. Howard Hughes Properties, Inc.
102. Kalamazoo Mall, Inc.
103. Kapiolani Condominium Development, LLC
104. Kapiolani Retail, LLC
105. Knollwood Mall, Inc.
106. La Place Shopping, L.P.
107. Lakeside Mall Holding, LLC
108. Lockport L.L.C.
109. Lynnhaven Holding L.L.C.
110. Majestic Partners-Provo, LLC
111. Mall of Louisiana Land Holding, LLC
112. Mall of Louisiana Land, LP
113. Mall St. Matthews Company, LLC
114. Mall St. Vincent, Inc.
115. MSAB Holdings L.L.C.
116. MSAB Holdings, Inc.
117. Natick Retail, LLC
118. New Orleans Riverwalk Associates
119. New Orleans Riverwalk Limited Partnership
120. Newgate Mall Land Acquisition, LLC
121. NewPark Anchor Acquisition, LLC
122. NewPark Mall L.L.C.
123. North Star Anchor Acquisition, LLC
124. NSMJV, LLC
125. One Willow Company, LLC
126. Orem Plaza Center Street, LLC
127. PARCIT-IIP Lancaster Venture
128. Parcity L.L.C.
129. Parcity Trust
130. Park City Holding, Inc.
131. Park Mall, Inc.
132. Park Square Limited Partnership
133. Parke West, LLC
134. Parkside Limited Partnership
135. Parkview Office Building Limited Partnership

136. PC Lancaster L.L.C.
137. PC Lancaster Trust
138. Pecanland Anchor Acquisition, LLC
139. Pines Mall Partners
140. Price Development Company, Limited Partnership
141. Price Development TRS, Inc.
142. Price Financing Partnership, L.P.
143. Price GP L.L.C.
144. Prince Kuhio Plaza, Inc.
145. Redlands Land Acquisition Company L.L.C.
146. Redlands Land Acquisition Company LP
147. Redlands Land Holding L.L.C.
148. Rio West L.L.C.
149. River Falls Mall, LLC
150. River Hills Land, LLC
151. Rogue Valley Mall Holding L.L.C.
152. Rouse F.S., LLC
153. Rouse LLC
154. Rouse Office Management of Arizona, LLC
155. Rouse Ridgedale Holding, LLC
156. Rouse Ridgedale, LLC
157. Rouse Southland, LLC
158. Rouse-Arizona Center, LLC
159. Rouse-Arizona Retail Center Limited Partnership
160. Rouse-Fairwood Development Corporation
161. Rouse-New Orleans, LLC
162. Rouse-Oakwood Shopping Center, LLC
163. Rouse-Phoenix Cinema, LLC
164. Rouse-Phoenix Corporate Center Limited Partnership
165. Rouse-Phoenix Development Company, LLC
166. Rouse-Phoenix Master Limited Partnership
167. Rouse-Phoenix Theatre Limited Partnership
168. Rouse-Portland, LLC
169. Running Brook Business Trust
170. Saint Louis Galleria Anchor Acquisition, LLC
171. Saint Louis Galleria Holding L.L.C.
172. Saint Louis Land L.L.C.
173. Seaport Marketplace Theatre, LLC
174. Seaport Marketplace, LLC
175. Sixty Columbia Corporate Center, LLC
176. South Shore Partners, L.P.
177. South Street Seaport Limited Partnership
178. Southland Center Holding, LLC
179. Southland Mall, Inc.
180. St. Cloud Land L.L.C.
181. St. Cloud Mall Holding L.L.C.

182. Summerlin Centre, LLC
183. Summerlin Corporation
184. The Howard Hughes Corporation
185. The Hughes Corporation
186. The Rouse Company at Owings Mills, LLC
187. The Rouse Company BT, LLC
188. The Rouse Company LP
189. The Rouse Company of Florida, LLC
190. The Rouse Company of Louisiana, LLC
191. The Rouse Company of Michigan, LLC
192. The Rouse Company of Minnesota, LLC
193. The Rouse Company of Ohio, LLC
194. The Rouse Company Operating Partnership LP
195. The Village of Cross Keys, LLC
196. Three Willow Company, LLC
197. Town Center East Business Trust
198. Tracy Mall Partners I L.L.C.
199. Tracy Mall Partners II, L.P.
200. Tracy Mall, Inc.
201. TRC Co-Issuer, Inc.
202. TRC Willow, LLC
203. Tucson Anchor Acquisition, LLC
204. TV Investment, LLC
205. Two Arizona Center, LLC
206. Two Willow Company, LLC
207. Valley Hills Mall, Inc.
208. Victoria Ward Services, Inc.
209. Victoria Ward, Limited
210. Visalia Mall L.L.C.
211. Vista Commons, LLC
212. VW Condominium Development, LLC
213. Weeping Willow RNA, LLC
214. West Kendall Holdings, LLC
215. Willow SPE, LLC
216. Willowbrook II, LLC

**Schedule 1.1C**
**Leased Properties**

Those portions of the following properties which are leased by a Debtor, as lessee, pursuant to any Ground Lease:

Ala-Moana Center, 1450 Ala Moana Blvd., Honolulu, HI

Apache Mall, 333 Apache Mall, Rochester MN

Arizona Center, 400 E. Van Buren Street, Phoenix, AZ

Augusta Mall, 3450 Wrightboro Road, Augusta, GA

Bay Shore Mall , 3300 Broadway, Eureka, CA

Boise Town Square, 350 North Milwaukee, Boise, ID

Burlington Town Center , 49 Church Street, Burlington, VT

Chula Vista Center , 555 Broadway, Chula Vista, CA

Coronado Center , 6600 Menual NE, Suite 1, Albuquerque, NM

Cottonwood Square, 1800 E. Murray-Holladay Rd., Salt Lake City, UT

Fallbrook Center, 6633 Fallbrook Avenue, West Hills, CA

Faneuil Hall Marketplace , 4 South Market Building, Boston, MA

Fashion Place , 6191 S. State Street, Murray, UT

Fort Union, 800 East 7200 South, Midvale, UT

Fremont Plaza, 240 North Jones, Las Vegas, NV

Gallery at Harborplace , 200 East Pratt Street, Baltimore, MD

Gateway Overlook, Intersection of Routes 175 and 108, Columbia, MD

The Grand Canal Shoppes at the Venetian, 3377 Las Vegas Boulevard South, Las Vegas, NV

Halsey Crossing, 1500 North 181st Street, Portland, OR

Harborplace , 201 East Pratt Street, Baltimore, MD

Lansing Mall , 5330 West Saginaw, Lansing, MI

Mall St. Matthews , 5000 Shelbyville Road, Louisville, KY

Mall St. Vincent , 1133 St. Vincent Avenue, Shreveport, LA

NewPark Mall, 2086 Newpark Mall, Newark, CA

NorthTown Mall , 4750 North Division, Spokane, WA

Oxmoor Center, 7900 Shelbyville Road, Louisville, KY

Palazzo, The Shoppes at the, 3377 Las Vegas Boulevard South, Las Vegas NV

Piedmont Mall, 325 Piedmont Drive, Danville, VA

Pine Ridge Mall , 4155 Yellowstone Highway, Pocatello, ID

Pioneer Place Combined (includes Pioneer Office Tower), 700 SW Fifth Avenue, Portland, OR

Plaza 800, 2260 Oddie Blvd, Sparks, NV

Plaza 9400, 755 East 9400 South Street, Sandy, UT

Prince Kuhio Plaza, 111 East Puainako Street, Hilo, HI

Providence Place , One Providence Place, Providence, RI

Provo Plaza/PTC Motel Land, adjacent to Provo Towne Centre which is located at 1200 Towne Centre Boulevard, Provo, UT

Rio West Mall , 1300 West I-40 Frontage, Gallup, NM

Riverwalk Marketplace , 1 Poydras Street, New Orleans, LA

Salem Center , 401 Center Street NE, Salem, OR

South Street Seaport , 19 Fulton Street, New York, NY

South Shore Mall, 1017 South Boone Street, Aberdeen, WA

Southwest Plaza , 8501 West Bowles Avenue, Littleton, CO

Tucson Mall, 4500 N. Oracle Road, Tucson, AZ

Tysons Galleria , 2001 International Drive, McLean, VA

Valley Hills Mall, 1960 Highway 70 SE, Hickory, NC

Willowbrook Mall, 1400 Willowbrook Mall, Wayne, NJ

All other leased real property leased by a Debtor, subject however, to the terms of <u>clause (iv)</u> of the last paragraph of <u>Section 6.1(a)</u> in this Agreement.

<div align="center">

**Schedule 1.1D**
**Primary Properties**

</div>

| | Property Name | Property Location | Filing Location | Owner/Lessee Debtor |
|---|---|---|---|---|
| 1. | Apache Mall | Rochester, MN | Olmsted County, MN | Apache Mall, LLC (as to Fee Property) |
| | | | | Apache Mall, LLC (as to Leased Property) |
| 2. | Chula Vista Center | Chula Vista, CA | San Diego County, CA | Chula Vista Center, LLC (as to Fee Property) |
| | | | | Chula Vista Center, LLC (as to Leased Property) |
| 3. | Columbia Corporate Center Offices (Ten - Sixty) | Columbia, MD | Howard County, MD | 10 CCC Business Trust |
| | | | | 20 CCC Business Trust |
| | | | | 30 CCC Business Trust |
| | | | | Parkview Office Building Limited Partnership |
| | | | | Parkside Limited Partnership |
| | | | | Park Square Limited Partnership |
| 4. | Cottonwood Mall | Holladay, UT | Salt Lake County, UT | Cottonwood Mall, LLC |

| | | | |
|---|---|---|---|
| 5. | Natick Nouvelle (condos, retail in condo building and offsite housing) | Natick, MA | Middlesex County, MA | GGP Natick Residence LLC (as to Parcel 1 of Tract 1 (a.k.a. Nouvelle at Natick Residential Condo Units), Tract 2 (a.k.a. Deerfield Forest Offsite Affordable Housing Condo Units), Tract 3 (a.k.a. Natick Green Offsite Affordable Housing Condo Units) and Tract 4 (a.k.a. Natick Village Offsite Affordable Housing Condo Units)) |
| | | | | Natick Retail LLC (as to Parcel 2 of Tract 1 (a.k.a. the Satellite Commercial Unit)) |
| 6. | Parke West | Peoria, AZ | Maricopa County, AZ | Parke West, LLC |
| 7. | Summerlin MPC, address N/A raw land (approx 7,682 net acres) | Las Vegas, NV | Clark County, NV | Certain portions of Fee Property owned by The Howard Hughes Corporation |
| | | | | Certain portions of Fee Property owned by Howard Hughes Properties, Inc. |
| 8. | Summerlin Centre | Las Vegas, NV | Clark County, NV | Summerlin Centre, LLC |
| 9. | Victoria Ward – Unencumbered (includes vacant land parcels, Ward Village Shops and IBM Building) | Honolulu, HI | Honolulu County, HI | Victoria Ward, Limited |
| 10. | Vista Commons | Las Vegas, NV | Clark County, NV | Vista Commons, LLC |

11. And all other property, other than the property listed in 1 through 10 above, owned in fee or leased by only those Debtors listed in this <u>Schedule 1.1D</u> (the "Other Property"), provided, however, the Other Property is subject to the terms of <u>clause (iv)</u> of the last paragraph of <u>Section 6.1(a)</u> in this Agreement.

**Schedule 6.1**
**Commercial Tort Claims**

None.

**Schedule 6.3**
**Delivery of Mortgages**

1.      The mortgages shall be in a form designed to minimize mortgage recording and other similar taxes by (i) limiting the amount secured by an individual mortgage to the amount of the Term Loan allocated to such Property and/or (ii) the use of structures including, by way of example, an indemnity deed of trust structure or the assignment and restatement of an existing mortgage (as and where applicable); <u>provided</u> that the Agent agrees that it will cooperate with the Debtors to accept assignments or amendments of mortgages, deeds of trust, deeds to secure debt, assignments or other instruments to the extent such assignments or amendments would alleviate or reduce the need to pay mortgage or similar taxes, participation rights or similar payments or expenses.

2.      The Obligors, the Agent, and the Lenders hereby agree that, notwithstanding any provision of the Credit Agreement or any other Loan Document to the contrary, the maximum allocated face amount of any Mortgage filed on or with respect to the Property known as Apache Mall, 333 Apache Mall, Rochester, MN shall not exceed $100 million in the aggregate.

**Schedule 8.3**
**Prior Names**

| Name of Obligor | Prior Names |
|---|---|
| General Growth Properties, Inc. | Coastland Center, Inc.; GGP-Kentucky, Inc. |
| GGP Holding II, Inc. | General Growth Oak View Mall, Inc. |
| GGP Ivanhoe II, Inc. | Landmark Mall, Inc. |

# Schedule 8.4
# Capitalization

········· Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated

State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# *GENERAL GROWTH PROPERTIES, INC.*



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Rouse LLC

1% GP

99% LP

GGP Development, LLC
*Shell Company*

GGP 125, LLC
*Shell Company*

GGP 168th Street LLC (NY)
*Shell Company*

GGP Capital Trust I
*Issuer of Debt Securities*

The Rouse Company LP

GGP Echelon Place, LLC
*Shell Company*

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

Ivanhoe JV HoldCo, LLC
*Shell Company*

99.9953082% Common &.480 preferred shares

119 Preferred Stockholders

GGP Holding II, Inc. (REIT)

.0046918% Common

GGP Holding Services, Inc. (TRS)

GGP Ivanhoe IV Services, Inc. (TRS)

GGP American Holdings Inc. (QRS)

Caledonian Holding Company, Inc. (QRS)

~ 90.7% Common Managing Member

GGP American Properties, Inc. (QRS)

~ 3.1% Common

Outside preferred interests

~ 6.2% Common

GGPLP L.L.C.

Legend:
- ............ Disregarded Entity
- (dotted box) Owns interest in other entities
- (yellow box) Files Federal Tax Return
- (green box) Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# *GENERAL GROWTH MANAGEMENT, INC.*





**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

Rouse LLC

GGP Limited Partnership

99% LP

1% GP

The Rouse Company LP

**The Hughes Corporation (TRS 2)**

**The Howard Hughes Corporation**

THC HRE, LLC (MD)

43.2941%

56.7059%

Hex Holding, LLC

120 Preferred Stockholders

**Hexalon Real Estate, Inc** *REIT*

99.80%

.20%

**General Growth Management, Inc. (TRS)**

*Liquor License Loans to Entities:*
BC Mall Restaurant, Inc.
Paramus Park Restaurant, Inc.
PPK Restaurant, Inc.
Willowbrook Mall Restaurant, Inc.

JP Morgan
32.5%

NYSTERS
32.5%

35%

Perimeter Center Miscellaneous Income, LLC (JP Morgan)

50%

50%

**Perimeter Mall Facilities, LLC**

*Perimeter Mall Non-rental income Parking Structure at Perimeter Mall*

**Four State Facility Corporation (TRS)**

Bridgewater, Park Meadows, Towson Misc Income

1%

GGP Turkey Management, LLC

47.99%

0.01%

ECE/GGP Gayrimenkul Insaat Yonetim Ve Gelistirme Anonim Sirketi (Turkey)

ECE Turkiye Proje Yonetimi A.S. (Turkey)

*See Turkey International Chart for remaining ownership interests*

GGP Natick Residence, LLC

*Condo development at Natick Mall, (Natick, MA)*

*See Turkey International Chart for remaining ownership interests*

Valley Plaza Anchor Acquisition, LLC

*Federated Department Store Valley Plaza (Bakersfield, CA)*

Hoover Mall Services, LLC

*Shell Company*

Kapiolani Condominium Development, LLC

*Exploring feasibility of developing condo outside of Ala Moana .*

The Learning Mall, LLC

*Holder of Registered Federal Trademarks*

Faneuil Hall Beverage, LLC (MD)

*Liquor License was Transferred to tenant (King Fish Hall)*

**Rouse-West Dade, Inc. (MD) (TRS)**

Deferred related party loss with HRD Remainder (West Kendall)

**Harborplace, Inc. (MD) (TRS)**

*Shell Company Maintained for tax purposes*

2.38%

**MallFinder Network LLC (CO)**

*Investment*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# GGP International Division

## US Subsidiaries Only

100% ownership interest unless otherwise indicated

State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



| Name | Short Name |
| --- | --- |
| Acapurana Participacoes Ltda | ACAPURANA |
| Albarpa Participacoes Ltda. | ALBARPA |
| Aliansce Administracao de Empreendimentos Comerciais Ltda. | AAEC |
| Aliansce Administracao de Shopping Centers Ltda. | AASC |
| Aliansce Shopping Centers S.A. | ALIANSCE |
| Barpa Empreendimentos e  Participacoes S.A. | BARPA |
| BSC Shopping Center S.A. | BSC |
| Cencom S.A. | CENCOM |
| Colina Shopping Center Ltda. | COLINA |
| Frascatti Investimentos Imobiliarios Ltda. | FRASCATTI |
| Fundo de Investimento Imobiliario Via Parque Shopping | FIIVPS |
| GGP Brasil Participacoes S.A. | GGP BR |
| Haleiwa Participacoes S.A. | HALEIWA |
| Manati Empreendimentos e Participacoes S.A. | MANATI |
| Nacional Iguatemi Admininistracao Ltda. | NIAD |
| Nacional Iguatemi Bahia Administracao e Participacoes Ltda. | NIBAL |
| SCGR Empreenimentos E Participacoes SA | SCGR |
| SDT 3 Centro Comercial Ltda. | SDT3 |
| Yangon Participacoes Ltda. | YANGON |



**ORGANOGRAMA - GRUPO ALIANSCE**

**December 31, 2008**

# General Growth-Turkey Structure

**Updated: June 2008**



**Notes:**

A. GGP Lux is a disregarded entity for US tax purposes.

B. TRS and QEF Elections were made.

C. Automatic TRS Election and a QEF Election made.

D. 1% initial ownership percentage subject to dilution as additional capital is invested into ECE/GGP Gayrimonkul Insaat Yonetim
      Ve Gelistirme Anonim Sirketi by CURA/GGP Investment Corporation S.a.r.l.

E. Hexalon Real Estate, Inc. is an indirect subsidiary of General Growth Properties, Inc.



**Key:**

= Cura Subsidiary/Affiliate

= GGP Subsidiary

= Cura/GGP Jointly Owned Entities



# GGP PRIVATE REITs

**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

**GGP Holding, Inc. (REIT)**

99.9953082% Common & 480 shares Preferred

119 Preferred Stockholders

**GGP Holding II, Inc. (REIT)**

.0046918% Common

~ 90.7% Common

Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

GGPLP L.L.C.

~ 9.3% common

117 Preferred Stockholders

**Victoria Ward, Limited (REIT)**

The Hughes Corporation (TRS 2)

The Howard Hughes Corporation

THC-HRE, LLC (MD)

43.2941%

Hex Holding, LLC

56.7059%

120 Preferred Stockholders

**Hexalon Real Estate, Inc (REIT)**

50% Common

New York State Common Retirement Fund

50% Common

GGP/ Homart II L.L.C.

115 Preferred Stockholders

**GGP Natick Trust (MA) (REIT)**

116 Preferred Stockholders

**GGP/Homart, Inc. (REIT)**

51% Common

Ivanhoe Equities V LP

49% Common

117 Preferred Stockholders

**GGP Ivanhoe, Inc. (REIT)**

······· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

4

# *THE ROUSE COMPANY LP (TRS Entities)*



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

**The Rouse Company LP**

**The Hughes Corporation (TRS 2)**

**Howard Hughes Properties, Inc. (TRS 3) (NV)**

**TRC Co-Issuer Inc. (TRS)**

The Rouse Company BT, LLC (MD)

.99999% GP

99.00001% LP

The Howard Hughes Corporation (TRS)

The Rouse Company Operating Partnership LP

**Rouse-Fairwood Development Corporation (MD) (TRS 5)**

**The Rouse Company Protective Trust, Inc. (TRS 8)**

........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



5



# TRS 2
# THE HUGHES CORPORATION

**General Growth Properties, Inc.**

~96% GP

**GGP Limited Partnership**

~4% LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

100% Voting & Nonvoting Common Stock

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

**GGP Holding, Inc. (REIT)**

**HRD Remainder, Inc. (MD) (QRS)**

**The Hughes Corporation (TRS 2)**

**The Howard Hughes Corporation (TRS)**

*MPC @ Summerlin Summerlin West*

Princeton Land East, LLC

The Rouse Company Operating Partnership LP

5.577% GP

94.423% LP

THC-HRE, LLC (MD)

**Summa Corporation (Inactive) (TRS)**

**Summerlin Corporation (TRS)**

*TPC Golf @ Summerlin*

43.2941%

56.7059%

**Howard Hughes Properties Limited Partnership**

HHPLP JV HoldCo I, LLC

30.18%

Hex Holding, LLC

**H-Tex Incorporation (TX) (TRS)**
*Owns oil wells in TX*

TWC Land Development, LLC

1% GP

**Hughes Properties, Inc. (NV) (inactive) (TRS)**

1% GP

**HHP Government Services Limited Partnership (NV)**

99% LP

JMB

50%

69.75%

100% Preferred Stock (120 shares)
(Receives .01% of the economics of HRE)

100% Common Stock (1 share "Class C") (receives 99.99% of the economics of HRE)

99% LP

TWC Land Development, LP

*Owns interest in The Woodlands Land Development, LP*

*Ground lessee @ 1551 Hillshire Dr. (The DOE Bldg)*

53% LP &LP

53% GP &LP

HHPLP JV HoldCo II, LLC

Rouse F.S., LLC (MD)

.07%

Vista Commons, LLC
*Vista Commons retail center Las Vegas, NV*

47% LP

Maguire Partners-Playa Vista (CA)

**Hexalon Real Estate, Inc (HRE)** *REIT*

*HRE also owns the following:*
*Head Acquisition, LP (1.4205% preferred interest)*
*General Growth Management, Inc. 1 share common (2%)*

**Rouse-Fairwood Development Corporation (TRS5) (MD)**

Rouse SI Shopping Center, LLC (MD) *Staten Island Mall*

47% LP

Jim Christensen

Maguire Partners-Playa Vista Area C (CA)

Fashion Show Mall, LLC *Fashion Show Mall*

1450 Center Crossing Drive, LLC
*1450 Center Crossing Drive Las Vegas, NV*
*The Center Crossing Business Center Phase 6*

1451 Center Crossing Drive, LLC
*1451 Center Crossing Drive Las Vegas, NV*
*The Center Crossing Business Center Phase 7*

Red Rock Investment, LLC (NV)
*Holds Sec. 1031 land from BLM*

**Summerlin Center, LLC** *Summerlin Mall Site*

11 separate DE LLCs (see page 245) *Summerlin Center Las Vegas, NV*

50%

Trails Village Center Co (NV)
*Trails Village Center is located at the corner of Village Center Circle and Trailwood Dr. Tenant bldgs go from 1900 to 1990 Village Center Circle*
*As of Closing Date*

50%

Lake Meade & Buffalo Partnership (NV)
*Lake Mead and Buffalo Center aka Gateway Plaza to Summerlin is located at the NEC of Lake Mead Blvd and Buffalo Dr. Tenant bldgs go from 7450 to 7590 W. Lake Mead Blvd*

Clover Acquisition, LLC
*TRC Headquarters Building*

Qualifying REIT Assets

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated

State of Formation for the Entities is Delaware unless otherwise indicated.

6

# TRS 2 con't (Former TRS 6)



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

**The Hughes Corporation (TRS 2)**

The Howard Hughes Corporation (TRS)

Rouse Tri-Party TRS, Inc. (MD) (TRS)

27.285%

Westfield Growth LP

SPG Tri-Party Inc. (Simon)

43.294%

Tri-Party Non-856 Assets, LLC

29.4209%

50%GP

Stichting Pension Funds ABP

50%GP

Rolim Associates

RA Hotel, Inc.

RA West, Inc.

RA-CFH, LLC

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

7



# TRS 2 con't
# (Former TRS 9)

## The Woodlands Operating Company, LP
### d/b/a THE WOODLANDS DEVELOPMENT COMPANY



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4 % LPs

**GGP Limited Partnership**

Rouse LLC

99% LP

The Rouse Company LP

1% GP

**The Hughes Corporation (TRS 2)**

The Howard Hughes Corporation (TRS)

TWC Operating, LLC

1% GP

99% LP

TWC Operating, LP

42.5% GP*

MS/ TWC Joint Venture

56.5% LP

MS TWC, Inc.

1% GP

*GGP holds a 42.5% ownership interest in The Woodlands but a payout interest of 52.5% (see pg 13 of the Partnership Agreement)

*Employees Property Mgmt Grounds Maintenance Building Operations*

**The Woodlands Operating Company, LP (TX)**

99%LP

99%GP

The Woodlands Corporation (TX)

WECCR, Inc. (TX)

The Woodlands Brokerage, LLC (TX)

1%GP

1%GP

WECCR General Partnership (TX)

*WRCC Lease*

*Elected to be treated as a corporation for federal income tax purposes*

The Woodlands Operating Company, LP and its subsidiary entities are maintained by Morgan Stanley

The Woodlands Commercial Brokerage Company LP (TX)

*Commercial Leasing Land Sales Brokerage*

The Woodlands Beverage, Inc. (TX)

Beverage Operations, Inc. (TX)

*Liquor Licenses*

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



8



TRS 3
HOWARD HUGHES
PROPERTIES, INC.

General Growth Properties, Inc.

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LPs

99% LP

Rouse LLC

1% GP

The Rouse Company LP

100%

The Rouse Company BT, LLC (MD)

.99999% GP

Howard Hughes Properties, Inc. (TRS 3) (NV)

*MPC @ Summerlin*

*Summerlin North Vacant Land*
*Summerlin South Vacant land*

99.00001% LP

The Rouse Company Operating Partnership LP

100%

1%

Mall St Matthews Company, LLC

50%

49%

MSM Property L.L.C.

*Mall St. Matthews Ground Lease (Louisville, KY)*

Centerpoint Management, LLC

50%

Howard Hughes Centerpoint LLC (NV)

50%

Center Pointe Plaza, LLC (NV)

*10300 W. Charleston*

Howard Hughes Properties IV, LLC

*Corp Pt. #2*
*10650 W. Charleston*

Howard Hughes Properties V, LLC

*Corp. Pt. #3*
*10750 W. Charleston*

Howard Hughes Canyon Pointe Q4, LLC (NV)

*Canyon Pointe Village Center Restaurant Pad Quadrant*

10000 West Charleston Boulevard, LLC (NV).

*Las Vegas Headquarters Bldg.*

Qualifying REIT Assets
Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

9



# TRS 5

**ROUSE-FAIRWOOD DEVELOPMENT COPORATION**
**f/k/a HRD Properties, Inc.**



100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

10

# TRS 8
# THE ROUSE COMPANY
# PROTECTIVE TRUST, INC.



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

The Rouse Company Operating Partnership LP

100%

**The Rouse Company Protective Trust, Inc. (TRS 8)**



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated

State of Formation for the Entities is Delaware unless otherwise indicated.

*Beneficiary of:*
*-The Mizner Park Venture LLC Protective Trust*
*-The Woodlands Commercial Properties Company, LP Protective Trust*
*-Woodlands Office Equities-95 Limited Protective Trust*
*-The Rouse Company LP Protective Trust*

*As of Closing Date*



11

# TRC CO-ISSUER, INC. (TRS)

**General Growth Properties, Inc.**

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4 % LPs

Rouse
LLC

99% LP

1% GP

The
Rouse
Company LP

**TRC Co-Issuer, Inc.**

*Co-issuer of debt securities with
The Rouse Company LP*

.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# *THE ROUSE COMPANY LP*



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LPs

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

.99999% GP

99.00001% LP

The Rouse Company Operating Partnership LP



·········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# TRCLP/TRCOPLP Misc. Entities



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

UHS Holding Company, Inc.

93.2% GP

6.8% LP

99.00001% LP

Summerlin Hospital Medical Center, L.P.

*Summerlin Medical Center Las Vegas, NV*

The Rouse Company Operating Partnership LP

Columbia Crossing, LLC

*Assumed Landmark Mortgage*

Rouse Investing Company, LLC (MD)

*Vail, CO parcel*

Princeton Land, LLC

*West Windsor, NJ Property Other Land held in Princeton Land East, LLC which is owned by TRS 2)*

10450 West Charleston Boulevard, LLC (NV)

*10550 West Charleston Blvd. Corporate Point 1*

Harborplace Management Company, LLC (MD)

*Former Payroll Co.*

Terrapin Acquisition, LLC (MD)

*Shell Company*

Rouse Tri-Party Miscellaneous, LLC (MD)

Westfield

43.29%

Simon

29.42%

27.29%

Four State JV HoldCo, LLC

*Shell Company*

Tri-Party Miscellaneous, LLC (MD)

*Misc Rodamco Assets*

Legend:
- ............. Disregarded Entity
- Owns interest in other entities
- Files Federal Tax Return
- Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

14

# HRD Remainder, Inc.

## (Former TRS1)

## Miscellaneous Entities

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated

State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# *GGP/HOMART, INC.*



**General Growth Properties, Inc.**

~96% GP

**GGP Limited Partnership**

Outside Limited Partners

~4% LP

100% Common

**GGP/Homart, Inc. (REIT)**

116 Preferred Stockholders

*Undeveloped Land, Volo, IL*

**GGP/Homart Services, Inc. (TRS)**

**Jointly Held Malls**
Alderwood Mall (0.5%) -WA (Homart II)
Arrowhead Towne Center (33.34%) -AZ (Westcor & JCP)
The Shoppes at Buckland Hills (99.999%) -CT (Homart II)
Carolina Place (0.5%) -NC (Homart II)
Montclair Plaza (0.5%) -CA (Homart II)
Neshaminy Mall (50%) -PA (Ohio State Teachers)
Northbrook Court (0.5%) -IL (Homart II)
Superstition Springs Center (33.34%) -AZ (Westcor & JCP)

**WHOLLY OWNED MALLS**
Bay City Mall -MI
Brass Mill Center & Commons -CT
The Chula Vista Center -CA
Columbiana Centre -SC
Deerbrook Mall -TX
Lakeland Square Mall -FL
Moreno Valley Mall -CA
Newgate Mall -UT
NewPark Mall -CA
North Point Mall GA
Parks at Arlington -TX
Pembroke Lakes Mall -FL
Steeplegate Mall -NH
Tysons Galleria -VA
Vista Ridge Mall -TX
Washington Park Mall -OK
West Oaks Mall -FL
The Woodlands Mall -TX



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

16

# *GGP/HOMART II L.L.C.*



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

50% Common

**MALLS**
Alderwood Mall (99.5%) -WA (Homart I)
Altamonte Mall -FL
The Shoppes at Buckland Hills (.001%) -CT (Homart I)
Carolina Place (99.5%) -NC (Homart I)
First Colony Mall -TX
Glendale Galleria (99.5%) -CA (Natick)
Montclair Plaza (99.5%) -CA (Homart I)
Northbrook Court (99.5%) -IL (Homart I)
Otay Ranch -CA
Stonebriar Centre -TX
Willowbrook Mall -TX

**GGP/ Homart II L.L.C.**

New York State Common Retirement Fund

50% Common

**GGP Contractor, Inc. (TRS)**

*Operator/Tenant of Stonebriar Ice Rink*

115 Preferred Stockholders

**GGP-Natick Trust (MA) (REIT)**

**MALLS**
Glendale Galleria (.5%)
Natick Mall

**GGP-Natick Services, Inc. (TRS)**

.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

17

# *GGP IVANHOE, INC.*



MALLS
The Oaks Mall
Westroads Mall

General Growth Properties, Inc.

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Ivanhoe Equities V LP

117 Preferred Stockholders

49% Common

51% Common

GGP Ivanhoe, Inc. (REIT)

GGP Ivanhoe Services, Inc. (TRS)

Oaks Mall, LLC

*The Oaks Mall (Gainesville, FL)*

Westroads Mall L.L.C.

*Westroads Mall (Omaha, NE)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity
100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

18

# *GGP-TRS L.L.C.*

MALLS
Clackamas Town Center
Florence Mall
Galleria at Tyler
Kenwood Towne Centre
Silver City Galleria
Whalers Village



**General Growth Properties, Inc.**

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

TRS
JV
HoldCo, LLC

Teachers'
Retirement System
of the State of IL

50%

50%

**GGP-
TRS L.L.C.**

100%

GGP-TRS
Services, Inc.
(TRS)

········· Disregarded Entity

☐ Owns interest in other entities

▨ Files Federal Tax Return

▨ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Price Development Company, Limited Partnership
### f/k/a JP Realty

**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

Remaining interests held through GGP Holding II, Inc.

~90.7% Common Managing Member

~9.3% Common

GGPLP L.L.C.

Outside preferred interests

GGP Acquisition, L.L.C.

18.05774% LP

81.94226% GP

Price Development Company, Limited Partnership (MD)

Plaza 800 L.L.C.
*Shell Company*

**Price Development TRS, Inc. (TRS)**

500 West Capital, L.C. (UT)
*Shell Company*

Fremont Plaza L.L.C.
*Shell Company*

```
·········  Disregarded Entity
⬚         Owns interest in other entities
🟨         Files Federal Tax Return
🟩         Non-related  Entity
```
100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

**MALLS**
Alameda Plaza -ID
Anaheim Crossing (50%) -CA
Animas Valley Mall -NM
Boise Plaza (73.334%) -ID
Boise Town Plaza -ID
Boise Towne Square -ID
Cache Valley Mall -UT
Cottonwood Mall -UT
Cottonwood Square -UT
Country Hills Plaza -UT
Division Crossing -OR
Eastridge Mall -WY
Fort Union -UT
Fremont Plaza -NV
Gateway Crossing -UT
Grand Teton -ID
Halsey Crossing -OR
North Plains Mall (99%)-NM
NorthTown Mall (99%) -WA
Orem Plaza -UT
Pine Ridge Mall -ID
Plaza 800 -NV
Plaza 9400 -NV
Provo Towne Centre (75%) -UT
Red Cliffs Mall -UT
Red Cliffs Plaza -UT
River Pointe Plaza -UT
Riverside Plaza -UT
Salem Center -OR
The Mall at Sierra Vista -AZ
Silver Lake Mall -ID
Spokane Valley Mall (75%) -WA
Spokane Valley Plaza (75%) -WA
Three Rivers Mall -WA
Twin Falls Crossing -ID
University Crossing & Shops -UT
Visalia Mall -CA
White Mountain Mall -WY
Woodlands Village -AZ
Yellowstone Square -ID

*As of Closing Date*



20

# 110 NORTH WACKER Building



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

GGP 110, Inc. (QRS)

GGP 110 Holding L.L.C.

99.5%

.5%

GGP 110 L.L.C.

99%

Development Resources Wacker, LLC

GG DR, L.L.C. (IL)

1%

*Ground Lessee
110 N. Wacker Building
(Chicago, IL)*

---

........... Disregarded Entity

☐ Owns interest in other entities

🟨 Files Federal Tax Return

🟩 Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# ALA MOANA CENTER



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

99.80%

**General Growth Management, Inc. (TRS)**

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

GGPLP L.L.C.

~ 9.3% Common

Kapiolani Condominium Development, LLC

*Future owner of Kapiolani Condo Development @ Ala Moana Center*

GGP Ala Moana Holdings L.L.C.

Kapiolani Retail, LLC

*Future owner of Kapiolani Condo Retail & Parking @ Ala Moana Center*

GGP Ala Moana L.L.C.

GGP Kapiolani Development L.L.C.

*Ala Moana Center (Honolulu, HI)*

*Vacant land adjacent to Ala Moana Center to be deeded out*

Legend:
- ·········· Disregarded Entity
- ☐ Owns interest in other entities
- ☐ Files Federal Tax Return
- ☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

22



# ALAMEDA PLAZA



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

GGPLP L.L.C.

~ 9.3% Common

18.05774% LP

GGP Acquisition, L.L.C.

37000 sf land parcel adjacent to Alameda Plaza

81.94226% GP

Price Development Company, Limited Partnership (MD)

*Alameda Plaza (Pocatello, ID)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Alderwood Mall



**General Growth Properties, Inc.**

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

100%
Common

50%
Common

**GGP/
Homart, Inc.
(REIT)**

116 Preferred
Stockholders

New York
State Common
Retirement Fund

50%
Common

**GGP/
Homart II
L.L.C.**

99.5%

.5%

Alderwood
Mall
Holding L.L.C.

100%

Alderwood
Mall L.L.C.

*Alderwood mall
(Lynnwood, WA)*



............ Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

24

# ALLEN TOWNE Mall



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

AllenTowne Mall, LLC

*Future Mall Development Land*
*Allen Towne Mall*
*(Allen, TX)*

........... Disregarded Entity

☐ Owns interest in other entities

🟨 Files Federal Tax Return

🟩 Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Altamonte Mall



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

50% Common

GGP/ Homart II L.L.C.

New York State Common Retirement Fund

50% Common

100%

Altamonte Mall, LLC

*Altamonte Mall (Altamonte Springs, FL)*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# ANAHEIM CROSSING



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% Common

GGPLP L.L.C.

18.05774% LP

GGP Acquisition, L.L.C.

Price Development Company, Limited Partnership (MD)

81.94226% GP

Price-James JV HoldCo, LLC

Burnham Foundation

50%

Thomas James

25%

25%

Price-James Company (UT)

*Anaheim Crossing (Anaheim, CA)*



.......... Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# ANIMAS VALLEY MALL



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% Common

GGPLP L.L.C.

100%

GGP Acquisition, L.L.C.

18.05774% LP

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

Price-ASG L.L.C.

*Animas Valley Mall (Farmington, NM)*



........ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# APACHE MALL



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% Common

GGPLP L.L.C.

Apache Mall, LLC

*Apache Mall (Rochester, MN)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



29

# Arizona Center



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

**GGP Limited Partnership**

~4% LPs

99% LP

Rouse LLC

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

.99999% GP

99.00001% LP

120 Preferred Stockholders

**GGP Holding, Inc.** (REIT)

**The Rouse Company Operating Partnership LP**

**HRD Remainder, Inc.** (MD) (QRS)

Rouse-Arizona Center, LLC (MD)

99% LP

1% GP

Rouse-Arizona Retail Center Limited Partnership (MD)

*Ground Lessee @ Arizona Center
Retail/Garden Offices/Mixed Use
(AZ property)*

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Arizona Center
## Plaza & Parking



General Growth Properties, Inc.

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

99% LP

Rouse LLC

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

.99999% GP

99.00001% LP

The Rouse Company Operating Partnership LP

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

HRD Remainder, Inc. (MD) (QRS)

99% LP

Rouse-Phoenix Development Company, LLC (MD)

1% GP

Rouse-Phoenix Master Limited Partnership (MD)

*Ground Lessee @ Arizona Center Plaza & Parking surface lots & capital lease of 3 acres (AZ property)*

Legend:
- ·········· Disregarded Entity
- Owns interest in other entities
- Files Federal Tax Return
- Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

31



# Arizona Center

## Building and Parking Deck



**General Growth Properties, Inc.**

~96 % GP

GGP Limited Partnership

Outside Limited Partners

~4 % LPs

99% LP

Rouse LLC

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

**The Rouse Company Operating Partnership LP**

Rouse Office Management of Arizona LLC

95% LP

Two Arizona Center, LLC

*Ground Lessee @ 2 Arizona Center Office Building*

Arizona Center Parking, LLC

*Ground Lessee @ Arizona Center Office Building parking deck*

5% GP

Rouse-Phoenix Corporate Center Limited Partnership (MD)

*Ground Lessee @ 1 Arizona Center Office Building*



·········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

32

# Arizona Cinema



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

The Rouse Company Operating Partnership LP

Rouse-Phoenix Cinema LLC (MD)

99% LP

1% GP

Rouse-Phoenix Theatre Limited Partnership (MD)

*Ground Lessee @ Arizona Cinema (AZ property)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Arrowhead Towne Center



General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100% Common

GGP/ Homart, Inc. (REIT)

116 Preferred Stockholders

100%

GGP-Arrowhead, Inc. (QRS)

Westcor Realty Limited Partnership

JCP Realty, Inc.

33.34%

33.33%

33.33%

New River Associates (AZ)

*Arrowhead Towne Center (Glendale, AZ)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Augusta Mall



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

Augusta Mall Anchor Holding, LLC

Augusta Mall Holding, LLC

Augusta Mall Anchor Acquisition, LLC

Co-Borrowers

Augusta Mall, LLC

Owner of Macy's Dept. Store Parcel

Leasehold Interest in Mall Ground Lease with American General Insurance

*Augusta Mall (GA property)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# AUSTIN BLUFFS PLAZA



General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

GGP Acquisition, L.L.C.

18.05774% LP

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

PDC Community Centers L.L.C.
*Austin Bluffs Plaza (Colorado Springs, CO)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

36

# BAILEY HILLS VILLAGE



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

~ 9.3% common

GGPLP L.L.C.

Outside preferred interests

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

*Bailey Hills Village (Eugene, OR)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# BAYBROOK MALL



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Outside preferred interests

*Remaining interests held through GGP Holding II, Inc.*

GGPLP L.L.C.

~ 9.3% common

Baybrook Mall, LLC

*Baybrook Mall And Anchor Parcel (Friendswood, TX)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# Bay City Mall



General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100% Common

GGP/ Homart, Inc. (REIT)

116 Preferred Stockholders

GGP-Bay City One, Inc. (QRS)

17%

83%

Bay City Mall Associates L.L.C. (MI)

*Bay City Mall +3 parcels of peripheral land (Bay City, MI)*



.......... Disregarded Entity

▢ Owns interest in other entities

▨ Files Federal Tax Return

▨ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# BAYSHORE MALL



**General Growth Properties, Inc.**

100%

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Bay Shore Mall, Inc. (QRS)

Outside preferred interests

GGPLP L.L.C.

*Remaining interests held through GGP Holding II, Inc.*

~ 9.3% common

0.5%

.5025%

99.4975%

Bay Shore Mall II L.L.C.

99.5%

Bay Shore Mall Partners (CA)

*Bay Shore Mall (Eureka, CA)*

············ Disregarded Entity

▢ Owns interest in other entities

▢ Files Federal Tax Return

▢ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Bayside Marketplace



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

.99999% GP

99.00001% LP

The Rouse Company Operating Partnership LP

Bayside Marketplace, LLC

*Bayside Marketplace (Miami, FL)*

*GROUND LEASE*



- Disregarded Entity
- Owns interest in other entities
- Files Federal Tax Return
- Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# Beachwood Place



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

99% LP

Rouse LLC

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

**The Rouse Company Operating Partnership LP**

Beachwood Place Holding, LLC

Beachwood Place Mall, LLC

*Beachwood Place (Beachwood, OH)*



......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# BELLIS FAIR



**General Growth Properties, Inc.**

1%GP

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Outside preferred interests

*Remaining interests held through GGP Holding II, Inc.*

~ 9.3% common

GGPLP L.L.C.

99% GP

Bellis Fair Partners (WA)

*Bellis Fair Mall (Bellingham, WA)*



............ Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

43

# BIRCHWOOD MALL



⋯⋯ Disregarded Entity
☐ Owns interest in other entities
🟨 Files Federal Tax Return
🟩 Non-related Entity
100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



*As of Closing Date*

# BOISE PLAZA



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

73.334% GP

Outside Limited Partners

26.666% LP

Price-Boise Company, Ltd. (UT)

*Boise Plaza*
*Boise Parking Structure*
*(Boise, ID)*

........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# BOISE TOWNE PLAZA



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

GGP Acquisition, L.L.C.

18.05774% LP

81.94226% GP

.5%

Price Development Company, Limited Partnership (MD)

99.5%

BTS Properties L.L.C.

100%

Boise Towne Plaza L.L.C.

*Boise Towne Plaza (Boise, ID)*



- ......... Disregarded Entity
- Owns interest in other entities
- Files Federal Tax Return
- Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

46

# BOISE TOWNE SQUARE



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

Price GP L.L.C

1% GP

99% LP

TV Investment, LLC

100%

Boise Town Square Anchor Acquisition, LLC

*Mervin's Department Store at Boise Towne Square (Boise, ID)*

Price Financing Partnership, L.P.

*Parcel Adjacent to Boise Towne Square (Boise, ID)*

Boise Mall, LLC

*Boise Towne Square (Boise, ID)*



········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



*As of Closing Date*

47

# THE BOULEVARD



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners
~4% LP

Rouse LLC

1% GP

99% LP

~ 90.7% Common Managing Member

The Rouse Company LP

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

99.9953082% Common & .480 preferred shares

119 Preferred Stockholders

GGP Holding II, Inc. (REIT)

.0046918%

GGP American Holdings Inc. (QRS)

Caledonian Holding Company, Inc. (QRS)

~ 3.1% Common

Outside preferred interests

GGP American Properties, Inc. (QRS)

~ 6.2% Common

GGPLP L.L.C.

Boulevard Mall Inc. (QRS)

0.5%

99.5%

0.5%

99.5%

Boulevard Mall I LLC (NV)

Boulevard Mall II LLC (NV)

50%

50%

Boulevard Associates (NV)

*The Boulevard Mall (Las Vegas, NV)*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

48

# Brass Mill Center & Commons



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

100% Common

GGP/ Homart, Inc. (REIT)

116 Preferred Stockholders

100%

GGP-Brass Mill, Inc. (QRS)

*Brass Mill Center & Brass Mill Commons (Waterbury, CT)*



········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

49

# BRIDGES AT MINT HILL



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

~ 9.3% common

GGPLP L.L.C.

Outside preferred interests

GGP-Mint Hill L.L.C.

*The Bridges at Mint Hill Mall Development Land (NC)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# Bridgeland MP Community



General Growth Properties, Inc.

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

HRD Remainder, Inc. (MD) (QRS)

The Howard Research and Development Corporation (MD) (TRS)

Cypress LA, LLC

*To acquire land @ Bridgeland (West Houston, TX)*

LP Rouse Houston, LLC (MD)

99% LP

Bridgeland GP, LLC

1% GP

GGP-Bridgeland, LP (MD)

*Owner of 3,111 Acres @ Bridgeland (West Houston, TX)*

........... Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

51

# Bridgewater Commons





·········· Disregarded Entity

☐ Owns interest in other entities

■ Files Federal Tax Return

■ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

The Rouse Company Operating Partnership LP

99.00001% LP

Fourmall Acquisition, LLC (JPMorgan & NYSTERS)

35%

Four State Properties, LLC

65%

Rouse-Bridgewater Commons, LLC (MD)

Bridgewater Commons Mall, LLC (MD)

Bridgewater Commons Mall II, LLC

Bridgewater Commons Mall Development, LLC (MD)

*Bridgewater Commons Mall (Bridgewater, NJ)*

*Lifestyle Center Phase Lot 1.03*

*As of Closing Date*



# The Shoppes at Buckland Hills



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

50% Common

100% Common

New York State Common Retirement Fund

50% Common

GGP/ Homart II L.L.C.

**GGP/ Homart, Inc. (REIT)**

116 Preferred Stockholders

GGP-Buckland Hills One, Inc. (QRS)

.001%

99.999%

Pavilions at Buckland Hills L.L.C. (CT)

*Pavilions at Buckland Hills L.L.C. and certain parcel peripheral land (Manchester, CT)*

............ Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# BURLINGTON



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

119 Preferred Stockholders

99.9953082% Common & .480 preferred shares

GGP Holding II, Inc. (REIT)

.0046918% Common

1%

GGP-Burlington L.L.C.

99%

DK Burlington Town Center LLC

Burlington Town Center II LLC

The Burlington Town Center LLC
*Burlington Town Center (Burlington, VT)*

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



*As of Closing Date*

# CACHE VALLEY MALL & MARKETPLACE



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

Cache Valley, LLC

*Cache Valley Mall & Cache Valley Marketplace (Logan, UT)*



........... Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

55



# THE CANNERY



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Cannery Chicago, LLC

*Cannery Pre-Development*
*(does not own land)*
*(Chicago, IL)*

.......... Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# CAPITAL MALL



**General Growth Properties, Inc.**

100%

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

Capital Mall, Inc. (QRS)

.5%

99.5%LP

Capital Mall L.L.C.

*Capital Mall (Jefferson City, MO)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Canyon Pointe

**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LPs

Rouse LLC

99% LP

1% GP

**The Rouse Company LP**

**Howard Hughes Properties, Inc. (NV)**

Howard Hughes Canyon Pointe Q4, LLC (NV)

*Canyon Pointe Village Center Restaurant Pad Quadrant*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Carolina Place



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

50% Common

100% Common

New York State Common Retirement Fund

116 Preferred Stockholders

50% Common

**GGP/ Homart II L.L.C.**

**GGP/ Homart, Inc. (REIT)**

100%

GGP- Carolina Place, Inc. (QRS)

100%

.5%

99.5%

CPM Land L.L.C.

*Outparcel at Carolina Place (Pineville, NC)*

Carolina Place L.L.C.

*Carolina Place (Pineville, NC)*



............ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

59

# CENTURY PLAZA



**General Growth Properties, Inc.**

100%

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

Century Plaza, Inc. (QRS)

99.5%LP

.5%

Century Plaza L.L.C.

*Century Plaza (Birmingham, AL)*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

60

# CHAPEL HILLS MALL



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

Chapel Hills Mall L.L.C.

*Chapel Hills Mall
(Colorado Springs, CO)*



............ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# CHICO MALL



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

Chico Mall L.L.C.

95.5%

.5%GP

Chico Mall, L.P.

*Chico Mall (Chico, CA)*



............. Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

62

# Christiana Mall



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

99% LP

Rouse LLC

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

The Rouse Company Operating Partnership LP

99.00001% LP

Christiana Holdings I, LLC

50%

**Lend Lease**

Christiana Holdings II, LLC

Christiana Acquisition LLC

50%

Christiana Mall, LLC

*Christiana Mall (DE Property)*

CMA Access Company, LLC (MD)

*Ring Road*



......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Chula Vista Center



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100% Common

**GGP/ Homart, Inc. (REIT)**

116 Preferred Stockholders

100%

Chula Vista Center, LLC

*Chula Vista Center (Chula Vista, CA)*



.......... Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# CIRCLE T RANCH



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100%                     100%

General Growth-Westlake (GP), Inc. (QRS)

General Growth 170 (GP), LLC

.001%GP        99.999% LP        99% LP        1% GP

General Growth-Westlake, L.P.

General Growth 170, L.P.

50%GP                          50%GP

AIL Investment, L.P.

50%LP                    50%LP

Westlake Retail Associates, Ltd. (TX)

170 Retail Associates, Ltd. (TX)

*The Shops at Circle T Ranch Future Mall Development (Westlake, TX)*

*Power Center Land (Westlake, TX)*

········· Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# Clackamas Town Center



**General Growth Properties, Inc.**

~96% GP

~4% LP

Outside Limited Partners

GGP Limited Partnership

TRS JV HoldCo, LLC

50%

Teachers' Retirement System of the State of IL

GGP-TRS L.L.C.

50%

100%

Clackamas Mall L.L.C.

*Clackamas Town Center (Portland, OR)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# COASTLAND CENTER



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

Coastland Center, LLC

Coastland Center (Naples, FL)



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

67



# Collin Creek Mall



General Growth Properties, Inc.

~96 % GP

GGP Limited Partnership

Outside Limited Partners

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

The Rouse Company Operating Partnership LP

Collin Creek Anchor Acquisition, LLC

Collin Creek Mall, LLC

*Dillards Parcel (Plano, TX)*

*Collin Creek Mall (Plano, TX)*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# COLONY SQUARE



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Colony Square Mall L.L.C.

*Colony Square (Zanesville, OH)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Columbia Corporate Center
# (American City Building)



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

**GGP Holding, Inc. (REIT)**

**HRD Remainder, Inc.** (MD) (QRS)

**American City Building Corporation** (MD) (QRS)

*Ground Lessee American City Building, Columbia, MD*

............. Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Columbia Corporate Center (Ten)





Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Columbia Corporate Center
# (Twenty)



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

The Rouse Company LP

1% GP

120 Preferred Stockholders

**GGP Holding, Inc.** (REIT)

**HRD Remainder, Inc.** (MD) (QRS)

Columbia Mall, Inc. (MD) (QRS)

20 CCC Business Trust (MD)

*Twenty Columbia Corporate Center Columbia, MD*

20 CCC Borrower, LLC

*SPE Borrower*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# Columbia Corporate Center (Thirty)



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

The Rouse Company LP

1% GP

120 Preferred Stockholders

**GGP Holding, Inc. (REIT)**

**HRD Remainder, Inc.** (MD) (QRS)

Columbia Mall, Inc. (MD) (QRS)

30 CCC Business Trust (MD)

*Thirty Columbia Corporate Center Columbia, MD*

30 CCC Borrower, LLC

*SPE Borrower*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# Columbia Corporate Center
# (Forty)



General Growth Properties, Inc.

~96 % GP

GGP Limited Partnership

Outside Limited Partners

~4 % LPs

Rouse LLC

99% LP

The Rouse Company LP

1% GP

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

HRD Remainder, Inc. (MD) (QRS)

Columbia Mall, Inc. (MD) (QRS)

99% LP

Forty Columbia Corporate Center, LLC

1% GP

Parkview Office Building Limited Partnership (MD)

*Forty Columbia Corporate Center Columbia, MD*

*SPE Borrower*

40 CCC Borrower, LLC

............... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

74

# Columbia Corporate Center (Fifty)



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

**GGP Holding, Inc.** (REIT

**HRD Remainder, Inc.** (MD) (QRS)

Columbia Mall, Inc. (MD) (QRS)

99% LP

Fifty Columbia Corporate Center, LLC

1% GP

Parkside Limited Partnership (MD)

*Fifty Columbia Corporate Center Columbia, MD*

50 CCC Borrower, LLC

*SPE Borrower*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

75

# Columbia Corporate Center (Sixty)



**General Growth Properties, Inc.**

~96 % GP

**GGP Limited Partnership**

Outside Limited Partners

~4 % LPs

Rouse LLC

99% LP

The Rouse Company LP

1% GP

120 Preferred Stockholders

**GGP Holding, Inc. (REIT)**

**HRD Remainder, Inc.** (MD) (QRS)

Columbia Mall, Inc. (MD) (QRS)

99% LP

Sixty Columbia Corporate Center, LLC

1% GP

Park Square Limited Partnership (MD)

*Sixty Columbia Corporate Center Columbia, MD*

*SPE Borrower*

60 CCC Borrower, LLC



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# Columbia Corporate Center (Seventy)



**General Growth Properties, Inc.**

~96 % GP

**GGP Limited Partnership**

Outside Limited Partners

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

**GGP Holding, Inc.** (REIT)

**HRD Remainder, Inc.** (MD) (QRS)

Columbia Mall, Inc. (MD) (QRS)

99% LP

Seventy Columbia Corporate Center, LLC

1% GP

Seventy Columbia Corporate Center Limited Partnership (MD)

*Seventy Columbia Corporate Center Columbia, MD*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

77

# Columbia Corporate Center
# (Association Building)



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

The Rouse Company LP

1% GP

120 Preferred Stockholders

**GGP Holding, Inc.** (REIT)

**HRD Remainder, Inc.** (MD) (QRS)

Columbia Mall, Inc. (MD) (QRS)

Town Center East Business Trust (MD)

*Association Building @ Corporate Center Columbia, MD*

SPE IDOT Borrower Under 10/2008 Multi-Property Bridge Loan

CCC Association Borrower, LLC

······· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*   *Owns Fairwood Development Land*

# Columbia Corporate Center
# (Exhibit Building)



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

The Rouse Company LP

1% GP

120 Preferred Stockholders

**GGP Holding, Inc.** (REIT)

**HRD Remainder, Inc.** (MD) (QRS)

Columbia Mall, Inc. (MD) (QRS)

*Association Building @ Corporate Center Columbia, MD*

Town Center East Business Trust (MD)

SPE IDOT Borrower Under 10/2008 Multi-Property Bridge Loan

CCC Exhibit Borrower, LLC



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*  *Owns Fairwood Development Land*

# Columbia Corporate Center
# (Ridgely Building)



**General Growth Properties, Inc.**

~96 % GP

GGP Limited Partnership

Outside Limited Partners

~4 % LPs

Rouse LLC

99% LP

The Rouse Company LP

1% GP

120 Preferred Stockholders

**GGP Holding, Inc.** (REIT)

**HRD Remainder, Inc.** (MD) (QRS)

Columbia Mall, Inc. (MD) (QRS)

*Association Building @ Corporate Center Columbia, MD*

Town Center East Business Trust (MD)

SPE IDOT Borrower
Under 10/2008
Multi-Property Bridge Loan

CCC Ridgely Borrower, LLC



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Columbia Corporate Center (Running Brook Convenience Center)



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

~4 % LPs

**GGP Limited Partnership**

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

**GGP Holding, Inc. (REIT)**

**HRD Remainder, Inc.** (MD) (QRS)

Columbia Mall, Inc. (MD) (QRS)

Running Brook Business Trust (MD)

*Running Brook Convenience Center @ Corporate Center Columbia, MD*

SPE IDOT Borrower Under 10/2008 Multi-Property Bridge Loan

Running Brook Borrower, LLC



······· Disregarded Entity

☐ Owns interest in other entities

▇ Files Federal Tax Return

▨ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# COLUMBIA MALL (MO)



General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

Columbia Mall L.L.C.

*Columbia Mall
(Columbia, MO)*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*          82

# The Mall in Columbia



General Growth Properties, Inc.

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

**GGP Holding, Inc.** (REIT)

**HRD Remainder, Inc.** (MD) (QRS)

Columbia Mall, Inc. (MD) (QRS)

The Mall in Columbia Holding L.L.C — *SPE Mezz Borrower*

The Mall in Columbia Holding II L.L.C — *SPE Borrower*

| CM Theatre Business Trust (MD) | CM-N Business Trust (MD) | The Mall in Columbia Business Trust (MD) | CM-H Business Trust (MD) | Mall Entrances Business Trust (MD) | Lot 48 Business Trust (MD) | Lot 49 Business Trust (MD) |
|---|---|---|---|---|---|---|
| *Ground Lease to Theatre* | *Ground Lease to Anchor Land* | *Columbia Mall & Ring Road (MD property)* | *Ground Lease to Anchor Land* | *Columbia Mall Entrances Land* | *Columbia Mall Land* | |

Legend:
- Disregarded Entity
- Owns interest in other entities
- Files Federal Tax Return
- Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# COLUMBIANA CENTRE

**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100% Common

GGP/Homart, Inc.

116 Preferred Stockholders

100%

GGP- Columbiana Trust

*Columbiana Centre (Columbia, SC)*

.......... Disregarded Entity

☐ Owns interest in other entities

🟨 Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# CORAL RIDGE MALL



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

Coral Ridge Mall, LLC

*Coral Ridge Mall (Coralville, IA)*

·········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

85

# CORONADO CENTER



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

Coronado Center Holdings L.L.C.

Coronado Center L.L.C.

*Coronado Center (Albuquerque, NM)*



........ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# COTTONWOOD MALL



**General Growth Properties, Inc.**

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

~ 90.7% Common
Managing Member

Remaining interests held
through GGP Holding II, Inc.

Outside preferred
interests

~ 9.3% common

GGPLP
L.L.C.

100%

GGP
Acquisition,
L.L.C.

18.05774% LP

Price
Development
Company,
Limited Partnership (MD)

81.94226% GP

Price Development TRS, Inc.
(TRS)

*Future owner of
Cottonwood Mall Residential*

Cottonwood
Mall, LLC

*Cottonwood Mall Re-development
(Holladay, UT)*

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# COTTONWOOD SQUARE



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

*Cottonwood Square (Salt Lake City, UT)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

88

# COUNTRY HILLS PLAZA



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

Country Hills Plaza, LLC

*Country Hills Plaza (Ogden, UT)*



········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# CROSSROADS CENTER



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

~ 9.3% common

GGPLP L.L.C.

Outside preferred interests

117 Preferred Stockholders

Victoria Ward, Limited (REIT)

100%

The Crossroads Mall Land, Inc. (QRS)

.001%

99.999%

The Crossroads Mall Land L.L.C.

*Shell Company*

St. Cloud Mall Holding L.L.C.

St. Cloud Mall L.L.C.

*Crossroads Center & 4 adjacent outparcels (St. Cloud, MN)*

St. Cloud Land L.L.C.

*Residential properties adjacent to Crossroads Center (St. Cloud, MN)*

---

........... Disregarded Entity

☐ Owns interest in other entities

🟨 Files Federal Tax Return

🟩 Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# CROSSROADS MALL



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

Kalamazoo Mall, Inc. (QRS)

~ 9.3% common

GGPLP L.L.C.

.5%

99.5%

Kalamazoo Mall L.L.C.

*The Crossroads Mall (Portage, MI)*



............ Disregarded Entity

☐ Owns interest in other entities

🟨 Files Federal Tax Return

🟩 Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

91

# CUMBERLAND MALL



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

.0046918% Common

119 Preferred Stockholders

99.9953082% Common &.480 preferred shares

GGP Holding II, Inc. (REIT)

U.K.- LaSalle, LLC

*Entity used to bid on project with the city of Atlanta. Project is for Kiosks outside of the Mall.*

Cumberland Mall, LLC

*Cumberland Mall (Atlanta, GA)*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# Deerbrook Mall



**General Growth Properties, Inc.**

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

100%
Common

**GGP/
Homart, Inc.
(REIT)**

116 Preferred
Stockholders

Deerbrook
Mall, LLC

*Deerbrook Mall
(Humble, TX)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# DIVISION CROSSING



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

PDC Community Centers L.L.C.

*Division Crossing (Portland, OR)*



........ Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated

State of Formation for the Entities is Delaware unless otherwise indicated.

# EAGLE RIDGE MALL



**General Growth Properties, Inc.**

100%

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

Eagle Ridge Mall, Inc. (QRS)

~ 9.3% common

GGPLP L.L.C.

.5% GP

99.5%LP

Eagle Ridge Mall, L.P.

ER Land Acquisition L.L.C.

*Eagle Ridge Mall (Lake Whales, FL)*

*Shell Company*



········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

95

# EASTRIDGE SHOPPING



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

119 Preferred Stockholders

99.9953082% Common & 480 preferred shares

GGP Holding II, Inc. (REIT)

.0046918% Common

Eastridge Shopping Center L.L.C.

*Eastridge Shopping Center (San Jose, CA)*

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

96

# EASTRIDGE MALL (WY)



General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common
Managing Member

Remaining interests held through GGP Holding II, Inc.

~ 9.3% common

GGPLP L.L.C.

Outside preferred interests

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

PDC-Eastridge Mall L.L.C.

*Eastridge Mall (Casper, WY)*



........  Disregarded Entity

☐  Owns interest in other entities

🟨  Files Federal Tax Return

🟩  Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# EDEN PRAIRIE CENTER



**General Growth Properties, Inc.**

100%

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

Eden Prairie Mall, Inc. (QRS)

~ 9.3% common

GGPLP L.L.C.

.5%

99.5%

100%

Eden Prairie Anchor Building L.L.C.

Eden Prairie Mall L.L.C.

*Eden Prairie Center (Eden Prairie, MN)*

*Anchor pad and building at Eden Prairie Center (Eden Prairie, MN)*



............ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# ELK GROVE PROMENADE



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Outside preferred interests

Remaining interests held through GGP Holding II, Inc.

~ 9.3% common

GGPLP L.L.C.

100%

99.5%LP

Elk Grove Town Center L.L.C.

.5%GP

Elk Grove Town Center L.P.

*Future Mall development land (Elk Grove, CA)*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# FALLEN TIMBERS



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Fallen Timbers Shops II, LLC

*Vacant Land @
The Shops at Fallen Timbers*

Fallen Timbers Shops, LLC

*The Shops at Fallen Timbers
(Toledo, OH)*

........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



*As of Closing Date*

# FALLBROOK



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

Fallbrook Square Partners, L.L.C.

99.999%LP

.001%GP

Fallbrook Square Partners Limited Partnership

*Fallbrook Center (West Hills, CA)*



............ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

101

# Faneuil Hall Marketplace



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

99% LP

Rouse LLC

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

**The Rouse Company Operating Partnership LP**

Faneuil Hall Marketplace, LLC

*GROUND LESSEE*
*Faneuil Hall Marketplace*
*Includes all 6 bldgs on property (Boston, MA)*



............ Disgregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# Fashion Place



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

99% LP

Rouse LLC

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

**The Rouse Company Operating Partnership LP**

Fashion Place, LLC

*Fashion Place Mall (Salt Lake City, UT)*

Fashion Place Anchor Acquisition, LLC

*Ground Lessor for Nordstrom property subleased to the Cheesecake Factory*

......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Fashion Show



**General Growth Properties, Inc.**

~96 % GP

GGP Limited Partnership

Outside Limited Partners

~4 % LPs

100%

99% LP

Rouse LLC

1% GP

The Rouse Company LP

100%

100%

120 Preferred Stockholders

**GGP Holding, Inc.**
(REIT)

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

**The Hughes Corporation (TRS 2)**

100%

HRD Remainder, Inc. (MD) (QRS)

The Rouse Company Operating Partnership LP

**The Howard Hughes Corporation (TRS)**

94.423% LP

5.577% GP

30.18%

Howard Hughes Properties Limited Partnership

.07%

Rouse F.S., LLC (MD)

69.75%

100%

Fashion Show Mall, LLC

*Fashion Show Mall & Lord & Taylor Parcel (Las Vegas, NV)*

......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*    104

# First Colony Mall

**General Growth Properties, Inc.**

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

50%
Common

GGP/
Homart II
L.L.C.

New York
State Common
Retirement Fund

50%
Common

First Colony
Mall, LLC

*First Colony Mall
(Sugar Land, TX)*

·········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Florence Mall



**General Growth Properties, Inc.**

~96%
GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

TRS JV HoldCo, LLC

50%

Teachers' Retirement System of the State of IL

50%

GGP-TRS L.L.C.

Florence Mall L.L.C.

*Florence Mall (Florence, KY)*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# FOOTHILLS



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

GGP-Foothills L.L.C.

Foothills Mall (Fort Collins, CO)

········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# FORT UNION



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

GGPLP L.L.C.

Outside preferred interests

~ 9.3% common

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

*Fort Union II (Salt Lake City, UT)*

100%

PDC Community Centers L.L.C.

*Fort Union (Salt Lake City, UT)*



········· Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# FOUR SEASONS TOWN CENTRE



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

100%

GGP- Four Seasons L.L.C.

*Four Seasons Town Centre (Greensboro, NC)*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# FOX RIVER Mall & Plaza North

**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

Fox River Shopping Center, LLC

*Fox River Mall & Plaza North (Appleton, WI)*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# FREMONT PLAZA



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

~90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~9.3% common

GGPLP L.L.C.

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

*Fremont Plaza (Las Vegas, NV)*



- ......... Disregarded Entity
- Owns interest in other entities
- Files Federal Tax Return
- Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Galleria at Tyler



**General Growth Properties, Inc.**

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

TRS
JV
HoldCo, LLC

50%

GGP-
TRS L.L.C.

Teachers'
Retirement System
of the State of IL

50%

GGP-
Tyler Mall
L.L.C.

.5%GP

99.5%LP

Tyler
Mall Limited
Partnership

*Galleria at Tyler
(Riverside, CA)*



·········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# GATEWAY CROSSING



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

GGPLP L.L.C.

~ 9.3% common

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

Gateway Crossing L.L.C.

*Gateway Crossing (Bountiful, UT)*



........... Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

113

# GATEWAY MALL



**General Growth Properties, Inc.**

100%

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

GGP-Gateway Mall, Inc. (QRS)

~ 9.3% common

GGPLP L.L.C.

.5% GP

99.5%LP

GGP-Gateway Mall, L.L.C.

*Gateway Mall (Springfield, OR)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Gateway Overlook



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

99% LP

Rouse LLC

1% GP

The Rouse Company LP

120 Preferred Stockholders

**GGP Holding, Inc. (REIT)**

**HRD Remainder, Inc.** (MD) (QRS)

**The Howard Research and Development Corporation (MD) (TRS)**

Gateway Overlook Business Trust (MD) (Co-Guarantor)

*Ground Lessee for Gateway Overlook development in MD*

Gateway Overlook III Business Trust (MD)

*Vacant parcel adjacent to Gateway Overlook development in MD*

Gateway Overlook II Business Trust (MD) (Co-Guarantor)

*Ground Lessor for Gateway Overlook development in MD*

Gateway Overlook II Borrower, LLC (DE SPE Co-Borrower)

Gateway Overlook Borrower, LLC (DE SPE Co-Borrower)

**Legend:**
- ............ Disregarded Entity
- ☐ Owns interest in other entities
- ☐ Files Federal Tax Return
- ☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

115



# GLENBROOK SQUARE



General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

~ 9.3% common

GGPLP L.L.C.

Outside preferred interests

100%

GGP-Glenbrook Holding L.L.C.

Glenbrook Square Marshall Field parcel

100%

GGP-Glenbrook L.L.C.

Glenbrook Square (Fort Wayne, IN)



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

116

# Glendale Galleria



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

50% Common

**GGP/ Homart II L.L.C.**

New York State Common Retirement Fund

50% Common

115 Preferred Stockholders

**GGP-Natick Trust (MA) (REIT)**

100% Common

Glendale Holding, Inc. (QRS)

Glendale Holding L.L.C.

GGP-Glendale, Inc. (QRS)

99.5%

.5%

Glendale I Mall Associates, LLC

Glendale Anchor Acquisition, LLC

*Land Parcel at Glendale Galleria (Glendale, CA)*

100%

100%

*Portion of Glendale Galleria*

*Galleria Office Tower*

Glendale II Mall Associates, LLC

Glendale Ohrbach's Association, LLC

*Portion of Glendale Galleria (Glendale, CA)*

*Portion of Glendale Galleria (Glendale, CA)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

117



# Governors Square



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

99% LP

Rouse LLC

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

The Rouse Company Operating Partnership LP

Governor's Square Mall, LLC

*Governor's Square (Tallahassee, FL)*

*GROUND LEASE*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# The Grand Canal Shoppes at the Venetian

*The Grand Canal Shoppes at the Venetian*
*(Las Vegas, NV)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.





# GRAND TETON



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

GGPLP L.L.C.

~ 9.3% common

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

*Baskin Robbins (Idaho Falls, ID)*

Price- ASG L.L.C.

*Grand Teton Mall & Plaza (Idaho Falls, ID)*

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# GRAND TRAVERSE MALL



General Growth Properties, Inc.

100%

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

Grand Traverse Mall Holding, Inc. (QRS)

1% GP

99%LP

Grand Traverse Mall Partners, L.P.

*Grand Traverse Mall (Grand Traverse, MI)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

121

# GREENWOOD MALL



General Growth Properties, Inc.

~96% GP

100%

Outside Limited Partners

Greenwood Mall, Inc. (QRS)

GGP Limited Partnership

~4% LP

.5%

99.5%

Greenwood Mall L.L.C.

*Greenwood Mall (Bowling Green, KY)*

Greenwood Mall Land, LLC

*Self-storage facility adjacent to Greenwood Mall (Bowling Green, KY)*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

122

# HALSEY CROSSING



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

*Remaining interests held through GGP Holding II, Inc.*

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

PDC Community Centers  L.L.C.

*Halsey Crossing (Gresham, OR)*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related  Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Harborplace



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

99% LP

Rouse LLC

1% GP

The Rouse Company LP

The Hughes Corporation (TRS 2)

.99999% GP

The Rouse Company BT, LLC (MD)

The Howard Hughes Corporation (TRS)

Rouse Fairwood Development Corporation (TRS 5) (MD)

The Rouse Company Operating Partnership LP

99.00001% LP

99% GP

1% LP

Harbor Place Associates Limited Partnership (MD)

*Harborplace GROUND LESSEE (Baltimore, MD)*

Harborplace Borrower, LLC

*SPE Borrower*

- ......... Disregarded Entity
- :::::::: Owns interest in other entities
- ▮ Files Federal Tax Return
- ▮ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*    124



# Gallery at Harborplace
## Office & Retail



*Gallery @ Harborplace Office & Retail*
*(Baltimore, MD)*

- ········· Disregarded Entity
- ▢ Owns interest in other entities
- ▨ Files Federal Tax Return
- ▨ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Gallery At Harborplace Parking Garage

a/k/a Baltimore Center Garage

*Gallery @ Harborplace Parking Garage (Baltimore, MD)*

100% ownership interest unless otherwise indicated

State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*





# Highland Mall



General Growth Properties, Inc.

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

The Rouse Company Operating Partnership LP

The Rouse Company of Texas, LLC (TX)

99%LP

Rouse-Highland, LLC

Austin Mall, LLC (MD)

1%GP

Austin Mall Limited Partnership

1%GP

49%GP

CPI-Highland Assoc. LP

50%GP

The Highland Mall Joint Venture (NY)

.5% GP

.5% GP

99%LP

*Highland Mall (TX Property)*

Highland Mall Limited Partnership

........ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

127



# Hulen Mall

**and** United Artist Property



General Growth Properties, Inc.

~96 % GP

GGP Limited Partnership

Outside Limited Partners

~4 % LPs

99% LP

Rouse LLC

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

The Rouse Company Operating Partnership LP

Hulen Mall, LLC

*Hulen Mall (TX Property)*

HMF Properties, LLC

*United Artist Property Hulen Mall (TX Property)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

128

## JORDAN CREEK TOWN CENTER &
## VILLAGE AT JORDAN CREEK



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

100%                    100%

GGP Jordan Creek L.L.C.

GGP Village at Jordan Creek L.L.C.

*Jordan Creek Town Center (West Des Moines, IA)*

*Village at Jordan Creek (West Des Moines, IA)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Kenwood Towne Centre



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

TRS JV HoldCo, LLC

50%

Teachers' Retirement System of the State of IL

GGP-TRS L.L.C.

50%

100%

Kenwood Mall Holding, LLC

100%

Kenwood Mall L.L.C.

*Kenwood Towne Centre (Cincinnati, OH)*



········· Disregarded Entity

☐ Owns interest in other entities

🟨 Files Federal Tax Return

🟩 Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# KNOLLWOOD MALL



General Growth Properties, Inc.

100%

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

Knollwood Mall Inc. (QRS)

~ 9.3% common

GGPLP L.L.C.

99.5%LP

.5% GP

GGP-Knollwood Mall L.P.

*Knollwood Mall (St. Louis Park, MN)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

131

# Shops at La Cantera
## & Lifestyle Center



**General Growth Properties, Inc.**

~96 % GP

GGP Limited Partnership

Outside Limited Partners

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

**The Rouse Company Operating Partnership LP**

The Rouse Company of Texas, LLC (TX)

99% LP

**USAA Real Estate Company**

25% LP

75% GP

La Cantera Specialty Retail, LP (TX)

*Lifestyle Center at Shops at La Cantera (TX property)*

La Cantera Holding GP, LLC

1% GP

La Cantera Holding, LP

25% LP

75% GP

La Cantera Retail Limited Partnership (TX)

*Shops at La Cantera (TX property)*

........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Lakeland Square Mall



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

100%

Lakeland Square Mall, LLC

*Lakeland Square Mall (Lakeland, FL)*

············ Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Lakeside Mall



General Growth Properties, Inc.

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

The Rouse Company Operating Partnership LP

HRD Remainder, Inc. (MD) (QRS)

6.89%

Columbia Mall, Inc. (MD) (QRS)

Hickory Ridge Village Center, Inc. (MD) (QRS)

7.83%

3.24%

82.04%

Lakeside Mall Holding, LLC (MI)

Lakeside Mall Property LLC

Borrower/SPE

Lakeside Mall (MI Property)

........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

134



# LAKEVIEW SQUARE MALL



**General Growth Properties, Inc.**

100%

~96% GP

Outside Limited
Partners

~4% LP

GGP
Limited
Partnership

~ 90.7% Common
Managing Member

Remaining interests held
through GGP Holding II, Inc.

Outside preferred
interests

GGP-Lakeview
Square Inc. (QRS)

~ 9.3% common

GGPLP
L.L.C.

1% GP

99%LP

Lakeview
Square Limited
Partnership

*Lakeview Square Mall
(Battle Creek, MI)*



·········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*      135

# LANDMARK MALL



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

99.9953082% Common & 480 preferred shares

.0046918% Common

119 Preferred Stockholders

GGP Holding II, Inc. (REIT)

GGP Ivanhoe II, Inc. (QRS)

100%

Landmark Mall L.L.C.

*Landmark Mall (Alexander, VA)*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# LANSING MALL



**General Growth Properties, Inc.**

100%

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

GGP-Lansing Mall Inc. (QRS)

~ 9.3% common

GGPLP L.L.C.

1% GP

99%LP

Lansing Mall Limited Partnership

*Lansing Mall (Lansing, MI)*

............ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*    137



# LINCOLNSHIRE COMMONS



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

Lincolnshire Commons, LLC

*Lincolnshire Commons (Lincolnshire, IL)*

............ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# LOCKPORT MALL



**General Growth Properties, Inc.**

.001%

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

~ 9.3% common

GGPLP L.L.C.

Outside preferred interests

99.999%

Lockport L.L.C. (NY)

*Lockport Mall (Lockport, NY)*



............ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# LYNNHAVEN MALL



**General Growth Properties, Inc.**

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

~ 90.7% Common
Managing Member

*Remaining interests held
through GGP Holding II, Inc.*

Outside preferred
interests

~ 9.3% common

GGPLP
L.L.C.

100%

Lynnhaven
Holding L.L.C.

100%

Lynnhaven
Mall L.L.C.

*Lynnhaven Mall
(Virginia Beach, VA)*

.......... Disregarded Entity

     Owns interest in other entities

     Files Federal Tax Return

     Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# THE MAINE MALL



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

GGP-Maine Mall Holding L.L.C

100%

Victoria Ward, Limited

117 Preferred Stockholders

100%

100%

GGP-Maine Mall L.L.C.

*The Maine Mall (South Portland, ME)*

GGP-Maine Mall Land L.L.C.

*Theatre, IHOP and Pizza Hut parcels at The Maine Mall (South Portland, ME)*

........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



141

# MALL of the BLUFFS



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Outside preferred interests

Remaining interests held through GGP Holding II, Inc.

GGPLP L.L.C.

~ 9.3% common

Mall of the Bluffs, LLC

*Mall of the Bluffs (Council Bluffs, IA)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Mall of LOUISIANA



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners
~4% LP

**GGP Limited Partnership**

~ 90.7% Common Managing Member

Outside preferred interests

*Remaining interests held through GGP Holding II, Inc.*

~ 9.3% common

**GGPLP L.L.C.**

GGP-Mall of Louisiana, Inc. (QRS)

Mall of Louisiana Holding, Inc. (QRS)

Mall of Louisiana Land Holding, LLC

99.5%LP

99.5%LP

.5% GP

**GGP-Mall of Louisiana II, L.P.**

.5% GP

Mall of Louisiana Land, L.P.

*Mall of Louisiana Power Center Parcel*

.5% GP

99.5%LP

**GGP-Mall of Louisiana L.P.**

*Mall of Louisiana (Baton, Rouge, LA)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



143

# Mall St. Matthews



General Growth Properties, Inc.

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

100%

.99999% GP

The Rouse Company BT, LLC (MD)

Howard Hughes Properties, Inc. (NV)

The Rouse Company Operating Partnership LP

99.00001% LP

100%

Mall St Matthews Company, LLC

50%GP

1%GP

49%GP

GROUND LEASE

MSM Property L.L.C.

Mall St. Matthews (KY property)

........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

144



# MALL ST. VINCENT



General Growth Properties, Inc.

100%

~96% GP

Mall St. Vincent, Inc. (QRS)

Outside Limited Partners

~4% LP

GGP Limited Partnership

.001%GP

99.999%LP

Mall St. Vincent, L.P.

*Mall St. Vincent (Shreveport, LA)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# MARKET PLACE



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

Champaign Market Place L.L.C.

*Market Place Shopping Center (Champaign, IL)*

........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# MAYFAIR Mall & Offices



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

99% LP

Rouse LLC

The Rouse Company LP

1% GP

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

99.9953082% Common & 480 preferred shares

119 Preferred Stockholders

GGP Holding II, Inc. (REIT)

.0046918% Common

GGP Ivanhoe II, Inc. (QRS)

Mayfair Mall, LLC

*Mayfair Mall and Offices (Wauwatosa, WI)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# MEADOWS MALL



General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

99.9953082% Common &.480 preferred shares

119 Preferred Stockholders

GGP Holding II, Inc. (REIT)

.0046918% Common

GGP Ivanhoe II, Inc. (QRS)

GGP Meadows Mall L.L.C.

*Meadows Mall (Las Vegas, NV)*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Merrick Park



General Growth Properties, Inc.

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

The Rouse Company Operating Partnership LP

99.00001% LP

The Rouse Company of Florida, LLC (FL)

*Coarco, Hickox, MAPA & Rensen Properties*

*Thompson Parcel*

CG Merrick, LLC

Merrick Park Member, LLC

30%

30%

Merrick Park Holding, LLC

40%

Merrick Park, LLC (MD)

*The Village of Merrick Park (FL Property)*

*Taxable Subsidiary*

Merrick Park Miscellaneous Income, LLC

CG Merrick, LLC

30%

30%

40%

Merrick Park Parking, LLC

*IK is 3rd Party Operator*

*Parking Facility & Misc Income*



............ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

149

# Mizner Park



**General Growth Properties, Inc.**

~96 % GP

GGP Limited Partnership

Outside Limited Partners

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

.99999% GP

99.00001% LP

The Rouse Company Operating Partnership LP

100%

Mizner JV HoldCo, LLC

Rouse-Mizner Park, LLC

*Cayman Islands*

Henley Holding Company

Mizner Office Holdings, Inc.

Mizner Mall Holdings, Inc.

Mizner Park Holdings, Inc.

50%

50%

50%

17.5%

32.5%

**Mizner Park Holdings V, LLC**

*Cartoon Museum leasehold at Mizner Park*

**Mizner Park Venture, LLC**

99% LP

99%LP

Mizner Park Holdings I, LLC

Mizner Park Holdings II, LLC

Mizner Park Holdings III, LLC

Mizner Park Holdings IV, LLC

50% GP

50% GP

1% GP

1% GP

Crocker Downtown Development Associates (FL GP)

*Phase II Lease * Retail Lease*

Crocker Mizner Park III, Ltd., (FL LP)

*Office I Lease*

Crocker Mizner Park IV, Ltd. (FL LP)

*Office II Lease*  *As of Closing Date*

Legend:
- ······· Disregarded Entity
- Owns interest in other entities
- Files Federal Tax Return
- Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

150

# Mondawmin Mall/
## Metro Plaza

**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

**GGP Limited Partnership**

~4% LPs

Rouse LLC

99% LP

1% GP

**The Rouse Company LP**

.99999% GP

The Rouse Company BT, LLC (MD)

**The Rouse Company Operating Partnership LP**

99.00001% LP

Northwest JV HoldCo, LLC

99%

The Village of Cross Keys, LLC (MD)

Caselmar, LP

Northwest Associates (MD)

1%

82.34%

17.66%

**Mondawmin Business Trust (MD)**

*Mondawmin Mall (Baltimore, MD)*

Mondawmin Borrower, LLC

*Borrower under the 2008 multi-property Eurohypo senior secured facility*



- - - - - - - Disregarded Entity
☐ Owns interest in other entities
🟨 Files Federal Tax Return
🟩 Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

151



# Montclair Plaza



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

50% Common

100% Common

New York State Common Retirement Fund

50% Common

GGP/ Homart II L.L.C.

**GGP/ Homart, Inc. (REIT)**

116 Preferred Stockholders

99.5%

.5%

Montclair Plaza L.L.C.

*Montclair Plaza (Los Angeles, CA)*



·········· Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Moreno Valley Mall



**General Growth Properties, Inc.**

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

100%
Common

**GGP/
Homart, Inc.
(REIT)**

116 Preferred
Stockholders

100%

GGP-Moreno
Valley, Inc.
(QRS)

*Moreno Valley Mall
(Moreno Valley, CA)*

.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Natick Collection



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

50% Common

99.80%

**General Growth Management, Inc. (TRS)**

New York State Common Retirement Fund

GGP/ Homart II L.L.C.

50% Common

Natick Retail, LLC

*Commercial Retail for Nouvelle at Natick*
(6800 sq ft of commercial retail space located on condo ground floor)

GGP Natick Residence LLC

*Condo development Nouvelle at Natick*
(Does not include 6800 sq ft of commercial retail space located on ground floor)

115 Preferred Stockholders

**GGP-Natick Trust (MA) (REIT)**

Natick Mall, LLC

*Natick Mall (Natick, MA)*

GGP- Natick West L.L.C.

*Natick Collection (Natick, MA)*

---

- Disregarded Entity
- Owns interest in other entities
- Files Federal Tax Return
- Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

154



# Neshaminy Mall



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100% Common

**GGP/ Homart, Inc. (REIT)**

116 Preferred Stockholders

100%

GGP- Neshaminy Trust

50% GP

Neshaminy Mall Joint Venture Limited Partnership (IL)

GTR (affiliate of Ohio State Teachers Retirement System)

50% LP

*Neshaminy Mall (Bensalem, PA)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Newgate Mall



General Growth Properties, Inc.

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

100%

GGP-
Newgate
Mall, LLC

Newgate Mall (Ogden, UT)

Newgate
Mall Land
Acquisition, LLC

Parcel contiguous to Newgate Mall



............ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



**NewPark Mall**

General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100% Common

**GGP/ Homart, Inc. (REIT)**

116 Preferred Stockholders

100%

GGP-NewPark, Inc. (QRS)

99.5%

NewPark Anchor Acquisition, LLC

*Land parcel at NewPark Mall (Newark, CA)*

.5%

99.5%

.5%

.5%

GGP-NewPark L.L.C.

*50% undivided co-tenancy in NewPark Mall (Newark, CA)*

NewPark Mall L.L.C.

99.5%

Alameda Mall L.L.C.

50%GP

50%GP

Alameda Mall Associates (IL)

*50% undivided co-tenancy in NewPark Mall (Newark, CA)*

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

157



# Northbrook Court

**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100% Common

50% Common

GGP/Homart, Inc. (REIT)

116 Preferred Stockholders

New York State Common Retirement Fund

50% Common

GGP/ Homart II L.L.C.

100%

GGP Northbrook, Inc. (QRS)

.5%

99.5%

Northbrook Court L.L.C.

99.5%

99.5%

.5%

.5%

Northbrook Court I L.L.C.

Northbrook Court II L.L.C.

80%

20%

Westcoast Estates (CA)

*Northbrook Court (Northbrook, IL)*

········· Disregarded Entity

☐ Owns interest in other entities

▨ Files Federal Tax Return

▨ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

158

# NORTHGATE



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Rouse LLC

99% LP

1% GP

The Rouse Company LP

GGP Holding, Inc. (REIT)

120 Preferred Stockholders

Chattanooga Mall, Inc. (QRS)

99.50%

.5%

Northgate Mall L.L.C.

*Northgate Mall (Chattanooga, TN)*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# NORTH PLAINS MALL



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

North Plains Mall, LLC

*North Plains Mall (Clovis, NM)*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# North Point



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100% Common

**GGP/ Homart, Inc. (REIT)**

116 Preferred Stockholders

GGP-North Point, Inc. (QRS)

*North Point Mall (Alpharetta, GA)*

GGP- North Point Land L.L.C.

*Owner of the former Lord & Taylor anchor store at North Point Mall (Alpharetta, GA)*

········· Disregarded Entity

☐ Owns interest in other entities

🟨 Files Federal Tax Return

🟩 Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



*As of Closing Date*

161

# NORTHRIDGE FASHION Center



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

**GGP Holding, Inc. (REIT)**

99.9953082% Common & .480 preferred shares

119 Preferred Stockholders

**GGP Holding II, Inc. (REIT)**

.0046918% Common

U.K-American Properties, Inc. (QRS)

*Northridge Fashion Center (Northridge, CA)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# North Star Mall



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

HRD Remainder, Inc. (MD) (QRS)

The Rouse Company Operating Partnership LP

99.00001% LP

98.88%

1.12%

NSMJV, LLC

North Star Mall, LLC

*North Star Mall (TX Property)*

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# North Star Mall
# Anchor Properties



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

Rouse LLC

1% GP

99% LP

The Rouse Company LP

120 Preferred Stockholders

**GGP Holding, Inc. (REIT)**

99.9953082% Common &.480 preferred shares

.0046918% Common

119 Preferred Stockholders

**GGP Holding II, Inc. (REIT)**

GGP American Holdings Inc. (QRS)

Caledonian Holding Company, Inc. (QRS)

~ 90.7% Common Managing Member

GGP American Properties, Inc. (QRS)

~ 3.1% Common

~ 6.2% Common

GGPLP L.L.C.

Outside preferred interests

North Star Anchor Acquisition, LLC

Mervyns & Macy Dept. Store parcels at North Star Mall



.......... Disregarded Entity

☐ Owns interest in other entities

▨ Files Federal Tax Return

▨ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

164

# NORTHTOWN MALL



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common
Managing Member

*Remaining interests held through GGP Holding II, Inc.*

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

North Town Mall, LLC

*NorthTown Mall (Spokane, WA)*



............ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*     165

# Oakbrook Center



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

**GGP Limited Partnership**

~4 % LPs

Rouse LLC

99% LP

1% GP

**The Rouse Company LP**

Hexalon owned 100% by Hex Holding, LLC, an indirect subsidiary under TRS2

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

**Hexalon Real Estate, Inc. (REIT)**

120 Preferred Stockholders

The Rouse Company Operating Partnership LP

MCA Mall Investors LLC

1%

CalPERS

99%

Institutional Mall Investors, LLC

Rouse Oakbrook, LLC

Rouse-Urban, LLC (MD)

Rouse-Urban Acquisition, LLC (MD)

1.4205%

Westfield

.1676%

16.6267%

54.232%

Simon

27.5533%

50%

50%

48.99%

**UC Oakbrook Genpar, LLC**

Class A & C Limited Partners

**Head Acquisition, LP**

1% GP

5.6%

**Urban Shopping Centers, LP (IL)**

94.4%

**RoPro TRS, Inc. (TRS)**

50.01%

*Acquired in Rodamco Acquisition. Former owner in a Netherlands company. Holder of foreign bank account .*

**Oak Brook Urban Venture, LP (IL)**

*Oakbrook Center (IL Property)*

Oakbrook Shopping Center, LLC

**Oakbrook Facilities Corporation (TRS) (MD)**

*Non-rental Activities*

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

GGP

# The Oaks Mall



**General Growth Properties, Inc.**

~96% GP

~4% LP

Outside Limited Partners

GGP Limited Partnership

51% Common

Ivanhoe Equities V LP

117 Preferred Stockholders

GGP Ivanhoe, Inc. (REIT)

49% Common

Oaks Mall, LLC

*The Oaks Mall (Gainesville, FL)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

167



# OAK VIEW



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

99% LP

Rouse LLC

1% GP

The Rouse Company LP

120 Preferred Stockholders

GGP Holding, Inc.

99.9953082% Common &.480 preferred shares

119 Preferred Stockholders

GGP Holding II, Inc.

.0046918% Common

Oak View Mall L.L.C.

*Oak View Mall*
*(Omaha, NE)*



·········· Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# OAKWOOD MALL (WI)



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Outside preferred interests

Remaining interests held through GGP Holding II, Inc.

~ 9.3% common

GGPLP L.L.C.

Oakwood Hills Mall, LLC

Oakwood Mall (Eau Claire, WI)



········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

169

# Oakwood Shopping Center



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Rouse LLC

99% LP

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

.99999% GP

99.00001% LP

The Rouse Company Operating Partnership LP

100%

Rouse-Oakwood Shopping Center, LLC (MD)

95%LP

5%GP

Oakwood Shopping Center Limited Partnership (LA)

**Oakwood Shopping Center (Gretna, LA)**



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

170



# OGLETHORPE



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

99.9953082% Common &.480 preferred shares

119 Preferred Stockholders

GGP Holding II, Inc. (REIT)

.0046918% Common

GGP Ivanhoe II, Inc. (QRS)

*Residential Properties adjacent to Oglethorpe Mall (Savannah, GA)*

Oglethorpe Mall L.L.C.

*Oglethorpe Mall (Savannah, GA)*

GGP Savannah L.L.C.

*(Shell Company)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# OREM PLAZA



General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

~ 9.3% common

GGPLP L.L.C.

Outside preferred interests

GGP Acquisition, L.L.C.

18.05774% LP

81.94226% GP

Price Development Company, Limited Partnership (MD)

PDC Community Centers L.L.C.

*Orem Plaza Center Street*
*Orem Plaza State Street*

Orem Plaza Center Street, LLC

*Future owner of McDonalds parcel*
*@ Orem Plaza Center Street (Orem, UT)*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Otay Ranch



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

50% Common

New York State Common Retirement Fund

**GGP/ Homart II L.L.C.**

50% Common

100%

GGP- Otay Ranch L.L.C.

99.5%LP

.5%GP

GGP-Otay Ranch L.P.

*Otay Ranch Town Center (Chula Vista, CA)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

173

# Oviedo Market Place



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

**The Rouse Company Operating Partnership LP**

99.00001% LP

100%

The Rouse Company of Florida, LLC (FL)

100%

Rouse-Orlando, LLC

*Oviedo Marketplace (Orlando, FL)*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Owings Mills Mall



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

.99999% GP

99.00001% LP

The Rouse Company Operating Partnership LP

87.5%LP

The Rouse Company at Owings Mills, LLC (MD)

12.5% GP

Owings Mills Limited Partnership (MD)

*Owings Mills Mall (Owings Mills, MD)*

*Borrower under the 2008 multi-property Eurohypo senior secured facility*

OM Borrower, LLC



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# Owings Mills – One Corp Center



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

The Rouse Company Operating Partnership LP

One Owings Mills Corporate Center, LLC (MD)

O.M. Land Development, LLC (MD)

AON Risk Services Inc.

1% GP

64% LP

35% LP

One Owings Mills Corporate Center Associates Limited Partnership (MD)

*One Owings Mills Corporate Center (Owings, Mills, MD)*



- Disregarded Entity
- Owns interest in other entities
- Files Federal Tax Return
- Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

176



# Owings Mills – Two Corp Center



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

**The Rouse Company Operating Partnership LP**

99.00001% LP

Two Owings Mills Corporate Center, LLC (MD)

O.M. Land Development, LLC (MD)

AON Risk Services Inc.

1% GP

54% LP

45% LP

Two Owings Mills Corporate Center Associates Limited Partnership (MD)

*Two Owings Mills Corporate Center (Owings, Mills, MD)*



- Disregarded Entity
- Owns interest in other entities
- Files Federal Tax Return
- Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



Owings Mills –
Three & Four Corp Center
Properties sold 4/28/2008

**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

**The Rouse Company Operating Partnership LP**

100%

100%

Three OM, LLC

Four OM, LLC

1% GP

99% LP

99% LP

1% GP

Three Owings Mills Corporate Center Land Limited Partnership (MD)

Four Owings Mills Corporate Center Land Limited Partnership (MD)

*Former owner of Three Owings Mills Corporate Center (Owings, Mills, MD)*

*Former owner of Four Owings Mills Corporate Center (Owings, Mills, MD)*

Three OM SPE, LLC

Four OM SPE, LLC

··········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Oxmoor



General Growth Properties, Inc.

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

.99999% GP

99.00001% LP

The Rouse Company Operating Partnership LP

100%

Hocker Oxmoor Partners, LLC (KY)

100%

Hocker Oxmoor, LLC

*Oxmoor (KY property)*



......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated

State of Formation for the Entities is Delaware unless otherwise indicated.



# THE SHOPPES AT
# THE PALAZZO

**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP
Limited
Partnership

~4% LP

100%

Phase
II Mall
Subsidiary, LLC

*The Shoppes at the Palazzo
Las Vegas, NV*



·········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Paramus Park



General Growth Properties, Inc.

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

The Rouse Company Operating Partnership LP

99.00001% LP

Paramus Equities, LLC (TX)

Paramus Park, LLC (MD)

GGP-Paramus Park Mall, LLC

99.5%GP

Congen Properties, Inc. (Cigna)

*Capital interest only*

.50% LP

Paramus Park Shopping Center Limited Partnership (NJ)

*Paramus Park Mall (Paramus, NJ)*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated

State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

181



# PARK CITY



**General Growth Properties, Inc.**

~96% GP

**GGP Limited Partnership**

Outside Limited Partners

~4% LP

99% LP

Rouse LLC

1% GP

The Rouse Company LP

120 Preferred Stockholders

**GGP Holding, Inc. (REIT)**

99.9953082% Common & .480 preferred shares

119 Preferred Stockholders

**GGP Holding II, Inc. (REIT)**

.0046918% Common

GGP Ivanhoe II, Inc. (QRS)

99.99%

99.99%

Park City Holding, Inc. (QRS)

Parcity L.LC.

.01%    .01%

PC Lancaster L.LC.

Parcity Trust

PC Lancaster Trust

50% GP

PARCIT-IIP Lancaster Venture (IL)

50% GP

Lancaster Trust (IL)

*Trademark Holder & Park City Center (Lancaster, PA)*

········· Disregarded Entity

⬚ Owns interest in other entities

🟨 Files Federal Tax Return

🟩 Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

182



# Park Meadows



General Growth Properties, Inc.

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

The Rouse Company Operating Partnership LP

35%

Fourmall Acquisition, LLC (JPMorgan & NYSTERS)

Four State Properties, LLC

65%

Park Meadows Mall Holding, LLC

Park Meadows Mall, LLC

*Park Meadows Mall (Lone Tree, CO)*



......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# PARK PLACE



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

Park Mall, Inc. (QRS)

~ 9.3% common

GGPLP L.L.C.

99.5%

.5%

Park Mall L.L.C.

*Park Place (Tucson, AZ)*

············  Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related  Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# Parks at Arlington



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100% Common

**GGP/ Homart, Inc. (REIT)**

116 Preferred Stockholders

Parks at Arlington, LLC

*The Parks at Arlington + 1 parcel peripheral land (Arlington, TX)*

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



*As of Closing Date*

# PARKE WEST



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Parke West, LLC

*Parke West development land
(Peoria, AZ)*



········· Disregarded Entity

☐ Owns interest in other entities

▨ Files Federal Tax Return

▨ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# PEACHTREE MALL



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

Peachtree Mall L.L.C.

*Peachtree Mall (Columbus, GA)*



............ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# Pecanland Mall



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100%

Rouse LLC

1% GP

99% LP

~ 90.7% Common Managing Member

The Rouse Company LP

Remaining interests held through GGP Holding II, Inc.

~ 9.3% common

Outside preferred interests

GGPLP L.L.C.

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

99.9953082% Common &.480 preferred shares

119 Preferred Stockholders

GGP Holding II, Inc. (REIT)

.0046918% Common

99.5%LP

Pecanland Anchor Acquisition, LLC

*Mervyn's Department Store at Pecanland Mall (Monroe, LA)*

GGP-Pecanland, Inc. (QRS)

.5% GP

GGP-Pecanland II, L.P.

99.5%LP

.5% GP

GGP-Pecanland, L.P.

*Pecanland Mall (Monroe, LA)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*     188

# Pembroke Lakes Mall



General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100% Common

GGP/ Homart, Inc. (REIT)

116 Preferred Stockholders

100%          100%

GGP-Pembroke Lakes, Inc. (QRS)

GGP-Pembroke Lakes II, Inc. (QRS)

80%GP          20%LP

Pembroke Lakes Mall Ltd. (FL)

*Pembroke Lakes Mall (Pembroke Pines, FL)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Perimeter Mall



**General Growth Properties, Inc.**

~96 % GP

GGP Limited Partnership

Outside Limited Partners

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

**The Rouse Company Operating Partnership LP**

The Rouse Company of Georgia, LLC (GA)

Perimeter Mall Acquisition LLC (JP Morgan)

50%

50%

Perimeter Mall Venture, LLC

Perimeter Mall, LLC (MD)

*Perimeter Mall (Atlanta, GA)*

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# PIEDMONT MALL



**General Growth Properties, Inc.**

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

~ 90.7% Common
Managing Member

Remaining interests held
through GGP Holding II, Inc.

Outside preferred
interests

~ 9.3% common

GGPLP
L.L.C.

Piedmont
Mall, LLC

*Piedmont Mall
(Danville, VA)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# PIERRE BOSSIER



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

*Remaining interests held through GGP Holding II, Inc.*

~ 90.7% Common Managing Member

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

Pierre Bossier Mall, LLC

*Pierre Bossier Mall (Bossier City, LA)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# PINE RIDGE MALL



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

GGPLP L.L.C.

Outside preferred interests

~ 9.3% common

100%

GGP Acquisition, L.L.C.

18.05774% LP

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

Pine Ridge Mall L.L.C.

*Pine Ridge Mall (Pocatello, ID)*



........ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# THE PINES



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

~ 90.7% Common
Managing Member

Remaining interests held
through GGP Holding II, Inc.

Outside preferred
interests

~ 9.3% common

GGPLP L.L.C.

1.0%

99.0%

Pines Mall Partners (IA)

*The Pines Mall*
*(Pine Bluff, AR)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# PINNACLE HILLS



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100%

GGP-Rogers Retail L.L.C.

Graham Holdings, LLC

J.B. Hunt, LLC

Managing Member

Hunt Graham VI, LLC

50% Managing Member

50%

Rogers Retail, L.L.C.

*Holder of Options for additional land (Rogers, AK)*

Pinnacle South, LLC

Pinnacle Hills, LLC

*Pinnacle Hills Power Center (Rogers, AK)*

*Pinnacle Hills Promenade (Rogers, AK)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

195



# Pioneer Office



General Growth Properties, Inc.

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

The Hughes Corporation (TRS 2)

.99999% GP

The Rouse Company BT, LLC (MD)

The Rouse Company Operating Partnership LP

99.00001% LP

The Howard Hughes Corporation (TRS)

100%

Rouse-Fairwood Development Corporation (MD) (TRS 5)

98.999505% LP

Rouse-Portland, LLC (MD)

1% GP

.000495% LP

Pioneer Office Limited Partnership (MD)

*Pioneer Office (Portland, OR)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

196

# Pioneer Place



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

**GGP Limited Partnership**

~4 % LPs

Rouse LLC

99% LP

1% GP

**The Rouse Company LP**

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

**The Rouse Company Operating Partnership LP**

100%

The Hughes Corporation (TRS 2)

The Howard Hughes Corporation (TRS)

Rouse-Fairwood Development Corporation (MD) (TRS 5)

98.999505% LP

Rouse-Portland, LLC (MD)

1% GP

.000495% LP

**Pioneer Place Limited Partnership (MD)**

*Pioneer Place (Portland, OR)*

.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

197



# Plaza 800 & Plaza 800 Skippers



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

*Plaza 800 &
Plaza 800 Skippers
(Sparks, NV)*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Plaza 9400 & Plaza 9400 Shops



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common
Managing Member

*Remaining interests held through GGP Holding II, Inc.*

~ 9.3% common

GGPLP L.L.C.

Outside preferred interests

100%

GGP Acquisition, L.L.C.

18.05774% LP

81.94226% GP

Price Development Company, Limited Partnership (MD)

*Plaza 9400 & Plaza 9400 Shops (Sandy, UT)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# PRINCE KUHIO Plaza



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

99% LP

Rouse LLC

1% GP

The Rouse Company LP

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

99.9953082% Common &.480 preferred shares

119 Preferred Stockholders

GGP Holding II, Inc. (REIT)

.0046918% Common

Prince Kuhio Plaza, Inc. (QRS)

1% GP

Ho Retail Properties I Limited Partnership (IL)

99% LP

*Leasehold interest in Prince Kuhio Plaza (Hilo, HI)*



- - - - - - Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Providence Place



General Growth Properties, Inc.

~96 % GP

GGP Limited Partnership

Outside Limited Partners

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

.99999% GP

99.00001% LP

The Rouse Company Operating Partnership LP

100%

Providence Place Holdings, LLC

100%

Rouse Providence LLC

*Providence Place (Providence, RI)*



········ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Provo Plaza

**(In Development)**



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~9.3% common

GGPLP L.L.C.

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

Majestic Partners- Provo, LLC (UT)

*Provo Plaza Development (Provo, UT)*

········· Disregarded Entity

⬚ Owns interest in other entities

🟨 Files Federal Tax Return

🟩 Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# PROVO TOWNE CENTRE



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common
Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

JCP Realty, Inc.

75%GP

25%LP

Provo Mall Development Company, Ltd. (UT)

100%                    100%

500 West Associates, LLC (UT)

*PTC Trailer Court (Provo, UT)*

Provo Mall L.L.C.

*Provo Towne Centre (Provo, UT)*



............ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

203



# Quail Springs Mall



General Growth Properties, Inc.

~96% GP

100%

Outside Limited Partners

GGP Limited Partnership

~4% LP

Oklahoma Mall, Inc. (QRS)

99%

1%

Oklahoma Mall L.L.C.

50%

Riley, Inc. d/b/a Riley Omega, Inc (JCP)

JCP Realty, Inc.

1%

DayJay Associates (OK)

49%

Quail Springs Mall, LLC

*Quail Springs Mall (Oklahoma City, OK)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

204

# RED CLIFFS MALL



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

*Remaining interests held through GGP Holding II, Inc.*

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

PDC- Red Cliffs Mall  L.L.C.

*Red Cliffs Mall (St. George, UT)*

········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related  Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# RED CLIFFS PLAZA



General Growth Properties, Inc.

~96%
GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

~ 90.7% Common
Managing Member

Remaining interests held
through GGP Holding II, Inc.

Outside preferred
interests

~ 9.3% common

GGPLP
L.L.C.

GGP
Acquisition,
L.L.C.

18.05774%
LP

81.94226%
GP

Price
Development
Company,
Limited Partnership (MD)

*Red Cliffs Plaza*
*(St. George, UT)*

......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# REDLANDS MALL



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

100%

GGP-Redlands Mall L.L.C.

Redlands Land Acquisition Company L.L.C.

99.5%LP

99.5%LP

.5%GP

.5%GP

GGP-Redlands Mall L.P.

Redlands Land Acquisition Company L.P.

*Redlands Mall a/k/a Village at Redlands (Redlands, CA)*

Redlands Land Holding L.L.C

*Land adjacent to Redlands Mall a/k/a Redlands Promenade development (Redlands, CA)*



............... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# REGENCY SQUARE



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

99.9953082% Common &.480 preferred shares

GGP Holding, Inc. (REIT)

119 Preferred Stockholders

GGP Holding II, Inc. (REIT)

.0046918% Common

Caledonian Holding Company, Inc. (QRS)

RS Properties Inc. (QRS)

*Regency Square Mall (Jacksonville, FL)*

⋯⋯⋯ Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Ridgedale Mall



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

.99999% GP

99.00001% LP

**The Rouse Company Operating Partnership LP**

100%

The Rouse Company of Minnesota, LLC (MD)

100%

Rouse Ridgedale Holding LLC (MD)

100%

Rouse Ridgedale, LLC

100%

Ridgedale Center, LLC (MD)

Ridgedale Mall
*(Minnetonka, MN)*



- Disregarded Entity
- Owns interest in other entities
- Files Federal Tax Return
- Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# RIO WEST



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

Rio West L.L.C.

*Rio West Mall
(Gallup, NM)*



......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# The Shoppes at River Crossing



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

GGP-Macon, LLC

50%

Wilson Macon, LLC

50%

Shoppes at River Crossing, LLC

*The Shoppes at River Crossing (Macon, GA)*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# RIVERCHASE Galleria



General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

Hoover JV HoldCo, L.L.C.

Wilson Galleria, LLC

Hoover Mall Holding, L.L.C.

50%

50%

Hoover Mall Limited, L.L.C.

*Riverchase Galleria (Hoover, AL)*

Riverchase Anchor Acquisition, LLC

*Owner of Belk Department Store Site*

·········· Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

212

# RIVER FALLS MALL



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

River Falls Mall, LLC

*River Falls Mall (Clarksville, IN)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# RIVER HILLS Mall



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

River Hills Mall, LLC

*River Hills Mall (Mankato, MN)*

River Hills Land, LLC

*Future owner of vacant land @ River Hills Mall.*



··········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# RIVERLANDS



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

Rouse LLC

99% LP

1%GP

The Rouse Company LP

120 Preferred Stockholders

**GGP Holding, Inc.**

99.9953082% Common &.480 preferred shares

119 Preferred Stockholders

**GGP Holding II, Inc.**

.0046918% Common

Caledonian Holding Company, Inc. (QRS)

GGP-La Place, Inc. (QRS)

99.5% LP

.5%GP

La Place Shopping L.P.

*Riverlands Shopping Center (La Place, LA)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

215

# RIVER POINTE PLAZA



**General Growth Properties, Inc.**

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

~ 90.7% Common

Managing Member

Remaining interests held
through GGP Holding II, Inc.

Outside preferred
interests

GGPLP
L.L.C.

~ 9.3% common

GGP
Acquisition,
L.L.C.

18.05774%
LP

81.94226%
GP

Price
Development
Company,
Limited Partnership (MD)

100%

PDC
Community
Centers  L.L.C.

*River Pointe Plaza
(West Jordan, UT)*



········· Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related  Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

# RIVERSIDE PLAZA



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

GGPLP L.L.C.

Outside preferred interests

~ 9.3% common

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

PDC Community Centers L.L.C.

*Riverside Plaza (Provo, UT)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

217



# Riverspark



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

.99999% GP

99.00001% LP

The Rouse Company Operating Partnership LP

100%

Chesapeake Investors, LLC

100%

Rouse Commercial Properties, LLC (MD)

Hunt Valley Title Holding Company, LLC (MD)

1%GP
98%LP

1%GP

Riverspark Associates Limited Partnership (MD)

Property Sold

Rivers Park ABC, LLC

Shell Company



........ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

218

# RIVERTOWN Crossings



**General Growth Properties, Inc.**

~96% GP

100%

100%

MSAB
Holdings, Inc.
(QRS)

Outside Limited
Partners

GGP
Limited
Partnership

~4% LP

.001%

99.999%

~90.7% Common
Managing Member

MSAB
Holdings
L.L.C.

City of Grandville
Special Assessment Bonds
Series 2000 (taxable)

Outside preferred
interests

Remaining interests held
through GGP Holding II, Inc.

GGPLP
L.L.C.

~9.3% common

1%

Grandville
Mall II, Inc.
(QRS)

100%

99%

100%

GGP-
Grandville
Land L.L.C.

18acre undeveloped
land adjacent to
RiverTown Crossings
(Grandville, MI)

GGP-
Grandville II
L.L.C.

Grandville Mall, Inc.
(QRS)

.5%

99.5%

GGP-
Grandville
L.L.C.

Rivertown Crossings
(Grandville, MI)

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

219



# Riverwalk



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

.99999% GP

99.00001% LP

The Rouse Company Operating Partnership LP

The Hughes Corporation (TRS 2)

The Howard Hughes Corporation (TRS)

91% LP

The Rouse Company of Louisiana, LLC (MD)

Rouse-Fairwood Development Corporation (MD) (TRS 5)

Greengate Mall, Inc. (PA) (TRS)

Rouse-New Orleans, LLC (MD)

1% GP

8% LP

New Orleans Riverwalk Limited Partnership (MD)

50%

50%

New Orleans Riverwalk Associates (LA)

*Riverwalk Marketplace (New Orleans, LA)*

········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# ROGUE VALLEY MALL



General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

~ 9.3% common

GGPLP L.L.C.

Outside preferred interests

100%

Rogue Valley Mall Holding L.L.C.

100%

Rogue Valley Mall L.L.C.

*Rogue Valley Mall (Medford, OR)*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# SAINT LOUIS GALLERIA



**General Growth Properties, Inc.**

~96% GP

**GGP Limited Partnership**

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

**GGPLP L.L.C.**

100%          100%

117 Preferred Stockholders

**Victoria Ward, Limited (REIT)**

Saint Louis Galleria Holding L.L.C

Saint Louis Galleria Anchor Acquisition, L.L.C.

*Lord and Taylor Store
Saint Louis Galleria
(Richmond Heights, MO)*

100%

Saint Louis Land L.L.C.

100%

Saint Louis Galleria L.L.C.

*Southern Development
Parcels adjacent to
Saint Louis Galleria
(Richmond Heights, MO)*

*Saint Louis Galleria
(Richmond Heights, MO)*

........... Disregarded Entity

▢ Owns interest in other entities

▢ Files Federal Tax Return

▢ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

222



# SALEM CENTER



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

Price-ASG L.L.C

*Salem Center (Salem, OR)*

········· Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Senate Plaza



General Growth Properties, Inc.

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

.99999% GP

99.00001% LP

The Rouse Company Operating Partnership LP

100%

Chesapeake Investors, LLC

100%

Rouse Commercial Properties, LLC (MD)

Senate Plaza
*(Senate Plaza, PA)*



·········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# THE MALL AT SIERRA VISTA



**General Growth Properties, Inc.**

~96% GP

**GGP Limited Partnership**

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

**GGPLP L.L.C.**

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

Sierra Vista Mall, LLC

*The Mall at Sierra Vista (Sierra Vista, AZ)*

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# SIKES SENTER



**General Growth Properties, Inc.**

~96%
GP

Outside Limited
Partners

~4% LP

GGP
Limited
Partnership

~ 90.7% Common
Managing Member

Outside preferred
interests

*Remaining interests held
through GGP Holding II, Inc.*

~ 9.3% common

GGPLP
L.L.C.

Sikes
Senter, LLC

*Sikes Senter Mall
(Wichita Falls, TX)*



............ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Silver City Galleria



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

TRS JV HoldCo, LLC

50%

Teachers' Retirement System of the State of IL

GGP- TRS L.L.C.

50%

100%

Silver City Galleria L.L.C.

*Silver City Galleria (Taunton, MA)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# SILVER LAKE MALL



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

~ 9.3% common

GGPLP L.L.C.

Outside preferred interests

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

Silver Lake Mall, LLC

*Silver Lake Mall (Coeur d'Alene, ID)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

228



# SOONER Mall



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP
Limited
Partnership

Sooner
Fashion
Mall L.L.C.

*Sooner Mall
(Norman, OK)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related  Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# SOUTHLAKE Mall



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Southlake Mall L.L.C.

*Southlake Mall (Morrow, GA)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Southland Center



General Growth Properties, Inc.

~96 % GP

GGP Limited Partnership

Outside Limited Partners

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

The Rouse Company Operating Partnership LP

99.00001% LP

The Rouse Company of Michigan, LLC (MD)

Rouse Southland, LLC (MD)

Southland Center Holding, LLC (MD)

Southland Center, LLC

Southland Center (Taylor, Mi)

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

231



# SOUTHLAND Mall



**General Growth Properties, Inc.**

~96% GP

**GGP Limited Partnership**

Outside Limited Partners

~4% LP

Rouse LLC

~ 90.7% Common
Managing Member

1% GP

99% LP

The Rouse Company LP

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

GGPLP L.L.C.

120 Preferred Stockholders

**GGP Holding, Inc.**

119 Preferred Stockholders

99.9953082% Common &.480 preferred shares

**GGP Holding II, Inc.**

.0046918% Common

Southland Mall, Inc. (QRS)

.5% GP

99.5%LP

**Southland Mall, L.P.**

*Southland Mall (Hayward, CA)*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

232

# Southpoint Mall



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

99% LP

Rouse LLC

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

**The Rouse Company Operating Partnership LP**

Hexalon owned 100% by Hex Holding, LLC, an indirect subsidiary under TRS2

120 Preferred Stockholders

Hexalon Real Estate, Inc. (REIT)

Rouse-Urban, LLC (MD)

Rouse-Urban Acquisition, LLC (MD)

54.232%    Westfield

1.4205%

.1676%

16.6267%

27.5533%    Simon

Head Acquisition, LP

Class A & C Limited Partners

5.6%

94.4%

Urban Shopping Centers, LP (IL)

To acquire residential property

Southpoint Land, LLC

Southpoint Mall, LLC

*Southpoint Mall (Durham, NC)*

Legend:
- .......... Disregarded Entity
- Owns interest in other entities
- Files Federal Tax Return
- Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

233

# SOUTHSHORE MALL



**General Growth Properties, Inc.**

100%

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

GGPLP L.L.C.

~ 9.3% common

GGP-South Shore Partners, Inc. (QRS)

.5%GP

99.5%LP

South Shore Partners, L.P. (WA)

*South Shore Mall (Aberdeen, WA)*



.......... Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

234

# South Street Seaport



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

The Rouse Company Operating Partnership LP

Seaport Marketplace, LLC (MD)

95% LP

5% GP

Seaport Marketplace Theatre, LLC (MD)

*Leasehold interest in Seaport Marketplace Theatre (New York, NY)*

South Street Seaport Limited Partnership (MD)

*South Street Seaport (New York, NY)*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

235



# SOUTHWEST PLAZA



General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

Southwest Denver Land L.L.C

Ground Lessor of land on which Southwest Plaza is located. (Littleton, CO)

Southwest Plaza L.L.C

Southwest Plaza (Littleton, CO) GROUND LESSEE



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# SPOKANE VALLEY MALL & PLAZA



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% Common

GGPLP L.L.C.

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

75%GP

JCP Realty, Inc.

25%LP

Spokane Mall Development Company Limited Partnership (UT)

100%

Spokane Mall L.L.C.

*Spokane Valley Mall & Plaza (Spokane, WA)*



········· Disregarded Entity

☐ Owns interest in other entities

🟨 Files Federal Tax Return

🟩 Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*    237

# SPRING HILL MALL



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

*Remaining interests held through GGP Holding II, Inc.*

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

Spring Hill Mall L.L.C.

*Spring Hill Mall (West Dundee, IL)*



········· Disregarded Entity

☐ Owns interest in other entities

🟨 Files Federal Tax Return

▨ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Staten Island Mall



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

99% LP

Rouse LLC

1% GP

The Rouse Company LP

100%

.99999% GP

**The Hughes Corporation (TRS 2)**

The Rouse Company BT, LLC (MD)

99.00001% LP

100%

The Rouse Company Operating Partnership LP

The Howard Hughes Corporation

94.423% LP

5.577% GP

Howard Hughes Properties, Limited Partnership

Rouse SI Shopping Center, LLC (MD)

*Staten Island Mall (Staten Island, NY)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

239



# Steeplegate Mall



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

100% Common

GGP/ Homart, Inc. (REIT)

116 Preferred Stockholders

100%

GGP- Steeplegate, Inc. (QRS)

*Steeplegate Mall (Concord, NH)*



············ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Stonebriar Centre



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

50% Common

New York State Common Retirement Fund

50% Common

**GGP/ Homart II L.L.C.**

**GGP Contractor, Inc. (TRS)**

*Operator/Tenant of Stonebriar Ice Rink*

Stonebriar Mall, LLC

*Stonebriar Centre (Frisco, TX)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# STONESTOWN



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

Remaining interests held through GGP Holding II, Inc.

~ 90.7% Common Managing Member

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

Stonestown Shopping Center Holding L.L.C.

100%   99.5% LP

Stonestown Shopping Center L.L.C

.5% GP

Stonestown Shopping Center, L.P.

*Stonestown (San Francisco, CA)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

242



# Summerlin Properties



**General Growth Properties, Inc.**

~96% GP    ~4% LPs

**GGP Limited Partnership**

Rouse LLC

99% LP

1% GP

The Rouse Company LP

100% Voting & Nonvoting Common Stock

**The Hughes Corporation (TRS 2)**

The Howard Hughes Corporation (TRS)

Rouse-Fairwood Development Corporation (MD) (TRS 5)

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

The Rouse Company Operating Partnership LP

5.577% GP

94.423% LP

**Howard Hughes Properties Limited Partnership**

1451 Center Crossing Drive, LLC
*1451 Center Crossing Drive Las Vegas, NV*

1450 Center Crossing Drive, LLC
*1450 Center Crossing Drive Las Vegas, NV*

10000 Covington Cross, LLC
*10000 CC Dr. LV, NV*

10190 Covington Cross, LLC
*10190 CC Dr. LV, NV*

9901-9921 Covington Cross, LLC
*9901-21 CC Dr. LV, NV*

1251 Center Crossing, LLC
*1251 Center Cr. LV, NV*

1120/1140 Town Center Drive, LLC
*1120/40 Town Cntr LV, NV*

1635 Village Centre Circle, LLC
*1635 VC Circle LV, NV*

1645 Village Center Circle, LLC
*1645 VC Circle LV, NV*

1201-1281 Town Center Drive, LLC
*1201/41 & 1251/1281 Town Cntr Dr LV, NV*

9950-9980 Covington Cross, LLC
*9950-80 CC Dr. LV, NV*

1551 Hillshire Drive, LLC
*1551 Hillshire Dr LV, NV*

1160/1180 Town Center Drive, LLC
*1160/80 Town Cntr LV, NV*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

243

# Superstition Springs Center



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

100% Common

116 Preferred Stockholders

**GGP/ Homart, Inc. (REIT)**

100%

Superstition Springs, Inc. (QRS)

Westcor Realty Limited Partnership

JCP Realty, Inc.

50%

50%

Superstition Springs Holding, LLC

33.33%

East Mesa Land L.L.C.

*Fee simple Ownership interest in Superstition Springs Land (Mesa, AZ)*

33.34%

33.33%

East Mesa Mall L.L.C.

*Leasehold interest in Superstition Springs Center (Mesa, AZ)*

........... Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# THREE RIVERS MALL



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

*Remaining interests held through GGP Holding II, Inc.*

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

GGP Acquisition, L.L.C.

18.05774% LP

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

Three Rivers Mall L.L.C.

*Three Rivers Mall (Kelso, WA)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# TOWN EAST MALL



General Growth Properties, Inc.

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

Town East Mall, LLC

*Town East Mall*
*(Mesquite, TX)*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Towson Town Center



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

99% LP

Rouse LLC

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

The Rouse Company Operating Partnership LP

99.00001% LP

Fourmall Acquisition, LLC (JPMorgan & NYSTERS)

35%

65%

TTC Member, LLC (MD)

Four State Properties, LLC

1%

99%

TTC SPE, LLC (MD)

Rouse-Towson Town Center LLC (MD)

.5%

99.5%

Towson TC, LLC (MD)

*Towson Town Center (Towson, MD)*

Rouse-TTC Funding, LLC (MD)

*IDOT borrower on the mortgage*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

247

# Triangle Business Center



**General Growth Properties, Inc.**

~96 % GP

GGP Limited Partnership

Outside Limited Partners

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

**The Rouse Company Operating Partnership LP**

100%

Chesapeake Investors, LLC

100%

Rouse Commercial Properties, LLC (MD)

Hunt Valley Title Holding Company, LLC (MD)

1%GP

98%LP

1%GP

Triangle Business Center I Limited Partnership (MD)
Property sold



......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# TUCSON MALL





# TWIN FALLS CROSSING



General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

*Twin Falls Crossing (Twin Falls, ID)*



......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Tysons Galleria



**General Growth Properties, Inc.**

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

100%
Common

**GGP/
Homart, Inc.
(REIT)**

116 Preferred
Stockholders

100%

Tysons
Galleria
L.L.C.

*85% undivided interest as a tenant in common
in the fee and certain Improvements Comprising
Tysons Galleria
and leasehold interest as to the balance
(McLean, VA)*

········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# UNIVERSITY CROSSING



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common
Managing Member

*Remaining interests held through GGP Holding II, Inc.*

~ 9.3% common

GGPLP L.L.C.

Outside preferred interests

100%

GGP Acquisition, L.L.C.

18.05774% LP

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%  *University Crossing- Shops (Orem, UT)*

GGP- UC L.L.C.

*University Crossing (Orem, UT)*



········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# VALLEY HILLS MALL



**General Growth Properties, Inc.**

100%

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

Remaining interests held through GGP Holding II, Inc.

~ 90.7% Common Managing Member

Outside preferred interests

Valley Hills Mall, Inc. (QRS)

~ 9.3% common

GGPLP L.L.C.

.5%

99.5%

Valley Hills Mall L.L.C.

*Valley Hills Mall (Hickory, NC)*

........... Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



*As of Closing Date*    253

# VALLEY PLAZA



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

99.8%

**General Growth Management Inc.**

The Rouse Company LP

.0046918%

120 Preferred Stockholders

**GGP Holding, Inc.**

119 Preferred Stockholders

99.9953082% Common &.480 preferred shares

**GGP Holding II, Inc.**

~90.7% Common Managing Member

100%

Valley Plaza Anchor Acquisition, LLC

*Federated Department Store Valley Plaza (Bakersfield, CA)*

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

**GGPLP L.L.C.**

Caledonian Holding Company, Inc. (QRS)

~ 9.3% common

100%

Bakersfield Mall, Inc. (QRS)

RASCAP Realty, Ltd. (NY) (QRS)

*Valley Plaza Peripheral Land (Bakersfield, CA)*

0.5%

99.5%

**Bakersfield Mall LLC**

*Valley Plaza (Bakersfield, CA)*

Legend:
- Disregarded Entity
- Owns interest in other entities
- Files Federal Tax Return
- Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Village of Cross Keys



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

The Rouse Company Operating Partnership LP

The Village of Cross Keys, LLC (MD)

VCK Business Trust (MD)

*Village Square of Cross Keys &*
*Village of Cross Keys Quadrangle*
*(Baltimore, MD)*
*1687 & 1688*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# VISALIA MALL



**General Growth Properties, Inc.**

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

~ 90.7% Common
Managing Member

*Remaining interests held through GGP Holding II, Inc.*

Outside preferred
interests

~ 9.3% common

GGPLP
L.L.C.

100%

18.05774% LP

GGP
Acquisition,
L.L.C.

81.94226%
GP

Price
Development
Company,
Limited Partnership (MD)

100%

99.50%LP

Visalia Mall
L.L.C.

.50%GP

Visalia
Mall, L.P.

*Visalia Mall
(Visalia, CA)*



............ Disregarded Entity

☐ Owns interest in other entities

🟨 Files Federal Tax Return

🟩 Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

256

# Vista Commons



General Growth Properties, Inc.

~96% GP · ~4% LPs

GGP Limited Partnership

Rouse LLC

1% GP · 99% LP

The Rouse Company LP

100%

The Hughes Corporation (TRS 2)

100%

The Howard Hughes Corporation (TRS)

100%

Vista Commons, LLC

*Vista Commons Retail Strip Center
(Las Vegas, NV)*



Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

257



# Vista Ridge Mall



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

~4% LP

GGP Limited Partnership

Vista Ridge Mall, LLC

*Vista Ridge Mall (Lewisville, TX)*



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# WARD CENTERS

**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Remaining interests held through GGP Holding II, Inc.

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

117 Preferred Stockholders

Victoria Ward, Limited (REIT)

Various properties Adjacent to Ward Centers
(Honolulu, HI)

**Victoria Ward Services, Inc. (TRS)**

VW Condominium Development, LLC

*Future developer of condos @ Ward Centers (Honolulu, HI)*

Victoria Ward Center, L.L.C.

Land Trust No. 89433 (HI)

*Ward Centre (Honolulu, HI)*

Victoria Ward Entertainment Center, L.L.C.

Land Trust No. 89434 (HI)

*Ward Entertainment Center (Honolulu, HI)*

Ward Plaza-Warehouse, LLC

Land Trust No. FHB-TRES 200601 (HI)

*Property Adjacent to Ward Centers Plaza, Warehouse & Parking (Honolulu, HI)*

Ward Gateway-Industrial-Village, LLC

Land Trust No. FHB-TRES 200602 (HI)

*Various properties Adjacent to Ward Centers (Honolulu, HI)*

.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

259

# Washington Park Mall



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100% Common

**GGP/ Homart, Inc. (REIT)**

116 Preferred Stockholders

100%

GGP General II, Inc. (QRS)

99%LP

1%GP

Ho Retail Properties II Limited Partnership (IL)

*Washington Park Mall +3 parcels of peripheral land (Bartlesville, OK)*



Disgarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

260

# Water Tower Place



General Growth Properties, Inc.

~96 % GP

GGP Limited Partnership

Outside Limited Partners

~4 % LPs

99% LP

Rouse LLC

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

Hexalon owned 100% by Hex Holding, LLC, an indirect subsidiary under TRS2

The Rouse Company Operating Partnership LP

120 Preferred Stockholders

Hexalon Real Estate, Inc. (REIT)

Rouse-Urban, LLC (MD)

Rouse-Urban Acquisition, LLC (MD)

54.232%

Westfield

Simon

1.4205%   .1676%   16.6267%   27.5533%

Head Acquisition, LP

Class A & C Limited Partners

835 Michigan LP

5.6%

Urban Shopping Centers, LP (IL)

94.4%

45%GP

Water Tower Joint Venture (IL)

55%GP

Water Tower, LLC

*Water Tower Place (Chicago, IL)*

........ Disregarded Entity

☐ Owns interest in other entities

▨ Files Federal Tax Return

▨ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

261

# Westlake



General Growth Properties, Inc.

~96 % GP

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

99999% GP

99.00001% LP

120 Preferred Stockholders

GGP Holding, Inc. REIT

The Rouse Company Operating Partnership LP

The Rouse Company of Washington, LLC (MD)

The Rouse Company of Ohio, LLC (OH)

One Willow Company, LLC

1% LP

Two Willow Company, LLC

Rouse-Seattle, LLC

Beachwood Place, LLC (MD)

Salem Mall, LLC (MD)

65% LP

32% LP

1% GP

1% GP

49.5% LP

49.5% LP

HRD Remainder, Inc. (MD) (QRS)

1% LP

Rouse-Westlake Limited Partnership (MD)

Rouse Westlake Limited Partnership II

Non-related Entity

1% LP

74.25% GP & .75% LP

24% LP

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

Westlake Center Associates Limited Partnership (WA)

*Westlake Center (Seattle, WA)*

100% ownership interest unless otherwise indicated

State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

262

GGP

# West Oaks Mall



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

West Oaks Mall Trust

*West Oaks Mall (Ocoee, FL)*

West Oaks Anchor Acquisition, LLC

*Owner of Belk parcel*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Westroads Mall



**General Growth Properties, Inc.**

~96% GP

~4% LP

Outside Limited Partners

GGP Limited Partnership

51% Common

117 Preferred Stockholders

GGP Ivanhoe, Inc. (REIT)

Ivanhoe Equities V LP

49% Common

Westroads Mall L.L.C.

*Westroads Mall (Omaha, NE)*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

264

# WEST VALLEY



**General Growth Properties, Inc.**

100%

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

~ 90.7% Common
Managing Member

Outside preferred interests

Remaining interests held through GGP Holding II, Inc.

Tracy Mall, Inc. (QRS)

~ 9.3% common

GGPLP L.L.C.

99.5%LP

.5%GP

.5%

Tracy Mall Partners II, L.P.

99.5%

Tracy Mall Partners I, L.L.C

.5%GP

99.5%LP

Tracy Mall Partners, L.P.

*West Valley Mall*
*(Tracy, Ca)*

............ Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



*As of Closing Date*     265

# WESTWOOD Mall



General Growth Properties, Inc.

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

Westwood
Mall, LLC

*Westwood Mall
(Jacksonville, MI)*

........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Whalers Village



**General Growth Properties, Inc.**

~96% GP

GGP
Limited
Partnership

Outside Limited
Partners

~4% LP

TRS
JV
HoldCo, LLC

50%

Teachers'
Retirement System
of the State of HI

50%

GGP-
TRS L.L.C.

WV
Sub L.L.C.

*Whalers Village
(Lahaina, HI)*



........... Disregarded Entity

☐ Owns interest in other entities

🟨 Files Federal Tax Return

🟩 Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# White Marsh Mall



General Growth Properties, Inc.

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

120 Preferred Stockholders

GGP Holding, Inc. (REIT)

HRD Remainder, Inc. (QRS) (MD)

SPE Borrower

50%

50%

White Marsh Mall, LLC

50%

50%

*Split ownership of White Marsh Mall (Baltimore, MD)*

White Marsh Mall Associates (MD)

White Marsh Phase II Associates (MD)

50%

50%

White Marsh General Partnership (MD)



Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated

State of Formation for the Entities is Delaware unless otherwise indicated.

*Former Lord & Taylor Parcel Now Macy's Home and Sports Authority*



# WHITE MOUNTAIN MALL



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Other interest through GGP Holding II, Inc

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

100%

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

White Mountain Mall, LLC

*White Mountain Mall (Rock Spring, WY)*



........... Disregarded Entity

☐ Owns interest in other entities

☐ Files Federal Tax Return

☐ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# Willowbrook Mall



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

The Rouse Company BT, LLC (MD)

120 Preferred Stockholders

.99999% GP

**GGP Holding, Inc. REIT**

99.00001% LP

**The Rouse Company Operating Partnership LP**

**HRD Remainder, Inc.** (QRS) (MD)

One Willow Company, LLC

The Rouse Company of Ohio, LLC (OH)

Two Willow Company, LLC

Three Willow Company, LLC

Franklin Park Mall Company LLC (MD)

Willowbrook II, LLC (MD)

1.16%

13.97%

27.93%

56.94%

Franklin Park Mall, LLC

TRC Willow, LLC (MD)

Willow SPE LLC

Weeping Willow RNA, LLC

36.5%

1%

62.5%

*Willowbrook Mall (NJ Property)*

Willowbrook Mall, LLC

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



# Willowbrook Mall (TX)



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

50% Common

New York State Common Retirement Fund

50% Common

**GGP/ Homart II L.L.C.**

Willowbrook Mall (TX), LLC (DE)

*Willowbrook Mall (Houston, TX)*

Willowbrook Mall Anchor Acquisition (TX), LLC (DE)

*Lord & Taylor Parcel (Houston, TX)*

·········· Disregarded Entity

☐ Owns interest in other entities

🟨 Files Federal Tax Return

🟩 Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



*As of Closing Date*

# Woodbridge Center



General Growth Properties, Inc.

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

99% LP

Rouse LLC

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

The Rouse Company Operating Partnership LP

100%

Woodbridge Center Property, LLC

*Woodbridge Center (Woodbridge, NJ)*



·········· Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# The Woodlands Mall



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

100% Common

**GGP/ Homart, Inc. (REIT)**

116 Preferred Stockholders

The Woodlands Mall Associates, LLC

*The Woodlands Mall
+ 2 parcels of peripheral land
And Mervyns dept store parcel
(Woodlands, TX)*



.......... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.



# Woodlands- Commercial



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

**GGP Limited Partnership**

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

The Rouse Company Operating Partnership LP

MS TWC JV

TWC Commercial Properties, LLC

99% LP

100%

56.5% LP

1% GP

TWC Commercial Properties, LP

MS TWC, Inc.

42.5% GP*

1% GP

**TWCPC Holdings, L.P. (TX)**

99% LP

TWCPC Holdings GP, LLC (TX)

1% GP

The Woodlands Commercial Properties Company, LP (TX)

*GGP holds a 42.5% ownership interest in The Woodlands but a payout interest of 52.5% (see pg 13 of the Partnership Agreement)

TWCPC Holdings LP and its subsidiary entities are maintained by Morgan Stanley

*Also owns some of the land on South Shore of Lake Harrison planned for future home/condo development
(to be transferred to The Woodlands Land Development Company, LP prior to any development)*

*Conference Center
Woodlands Country Club
(TPC, Exxon, Palmer)
5 sale/leaseback bldgs.*

75% LP

25% GP

Various Interests with third parties ownership % not readily available:
Conference Center Condominium Association, Inc.
FV- 93 Limited
Timbermill - 94 Limited
Woodlands Sarofim #1, Ltd.

**Woodlands Office Equities-95 Ltd. (TX)**

........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

274

# Woodlands - Operating

**d/b/a THE WOODLANDS DEVELOPMENT COMPANY**

**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

**GGP Limited Partnership**

~4 % LPs

Rouse LLC

99% LP

The Rouse Company LP

1% GP

**The Hughes Corporation (TRS 2)**

**The Howard Hughes Corporation (TRS)**

TWC Operating, LLC

99% LP

1% GP

TWC Operating, LP

*\*GGP holds a 42.5% ownership interest in The Woodlands but a payout interest of 52.5% (see pg 13 of the Partnership Agreement)*

42.5% GP\*

MS/ TWC Joint Venture

56.5% LP

*Employees*
*Property Mgmt*
*Grounds Maintenance*
*Building Operations*

**The Woodlands Operating Company, LP (TX)**

MS TWC, Inc.

1% GP

The Woodlands Operating Company, LP and its subsidiary entities are maintained by Morgan Stanley

99%LP

The Woodlands Brokerage, LLC (TX)

The Woodlands Corporation (TX)

WECCR, Inc. (TX)

1%GP

1% GP

99%GP

WECCR General Partnership (TX)

*WRCC Lease*

*Elected to be treated as a corporation for federal income tax purposes*

The Woodlands Commercial Brokerage Company LP (TX)

*Commercial Leasing*
*Land Sales Brokerage*

The Woodlands Beverage, Inc. (TX)

Beverage Operations, Inc. (TX)

*Liquor Licenses*

---

Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*



275

# Woodlands- Land



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

GGP Limited Partnership

~4 % LPs

Rouse LLC

99% LP

1% GP

The Rouse Company LP

**The Hughes Corporation (TRS 2)**

The Howard Hughes Corporation (TRS)

99% LP

TWC Land Development, LLC

1%GP

TWC Land Development, LP

MS/ TWC Joint Venture

56.5% LP

100%

MS TWC, Inc.

42.5% GP*

1% GP

**TWLDC Holdings, LP (TX)**

*Developed Land & Lots*
*Underdeveloped Land*
*Player Golf Course*
*Carlton Woods Country Club*
*Woodlands Athletic Center*
*Southgate Building*

*GGP holds a 42.5% ownership interest in The Woodlands but a payout interest of 52.5% (see pg 13 of the Partnership Agreement)

TWLDC Holdings GP, LLC (TX)

99%LP

1%GP

**The Woodlands Land Development Company, LP (TX)**

TWLDC Holdings, L.P. and its subsidiary entities are maintained by Morgan Stanley

Other Interests w/ outside third parties. Ownership % not readily available: Stewart Title of Montgomery County, Inc.

Woodlands Acquisition, LLC (TX)

*Inactive*

The Woodlands Custom Residential Sales, LLC (TX)

99%LP

1%GP

The Woodlands Custom Sales, LP (TX)

*New Home Sales*

Town Center Development Company GP, LLC (TX)

99%LP

1%GP

Town Center Development Company, LP (TX)

*Venture Tech X & XI*

Other Interests w/ outside third parties. Ownership % not readily available: 10101 Woodloch Forest LLC Waterway Ave Partners LLC

········· Disregarded Entity

☐ Owns interest in other entities

▢ Files Federal Tax Return

▨ Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

276

# Woodlands- Office



**General Growth Properties, Inc.**

~96 % GP

Outside Limited Partners

~4 % LPs

GGP Limited Partnership

99% LP

Rouse LLC

1% GP

The Rouse Company LP

.99999% GP

The Rouse Company BT, LLC (MD)

99.00001% LP

**The Rouse Company Operating Partnership LP**

See page 275 for remaining ownership

The Woodlands Commercial Properties Company, LP (TX)

75% LP

25% GP

The Woodlands Commercial Properties Company, LP & Woodlands Office Equities-95 Ltd. are maintained by Morgan Stanley

Woodlands Office Equities-95 Ltd. (TX)

*Various Office Properties (The Woodlands, TX)*



........ Disregarded Entity

☐ Owns interest in other entities

🟨 Files Federal Tax Return

🟩 Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

# WOODLANDS VILLAGE



**General Growth Properties, Inc.**

~96% GP

Outside Limited Partners

GGP Limited Partnership

~4% LP

~ 90.7% Common Managing Member

Other interest through GGP Holding II, Inc

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

GGP Acquisition, L.L.C.

18.05774% LP

81.94226% GP

Price Development Company, Limited Partnership (MD)

100%

PDC Community Centers L.L.C.

*Woodlands Village (Flagstaff, AZ)*

Disregarded Entity
Owns interest in other entities
Files Federal Tax Return
Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

*As of Closing Date*

278

# YELLOWSTONE SQUARE



**General Growth Properties, Inc.**

~96% GP

GGP Limited Partnership

Outside Limited Partners

~4% LP

~ 90.7% Common Managing Member

Other interest through GGP Holding II, Inc

Outside preferred interests

~ 9.3% common

GGPLP L.L.C.

18.05774% LP

GGP Acquisition, L.L.C.

81.94226% GP

Price Development Company, Limited Partnership (MD)

*Yellowstone Square & Shop (Idaho Falls, ID)*



........... Disregarded Entity

Owns interest in other entities

Files Federal Tax Return

Non-related Entity

100% ownership interest unless otherwise indicated
State of Formation for the Entities is Delaware unless otherwise indicated.

**Schedule 8.5**
**Material Agreement Exceptions**

None.

**Schedule 8.9**
**Environmental Matters**

None.

**Schedule 8.11**
**ERISA Matters**

None.

Schedule 8.16 - Bank Accounts
As of April 13, 2009

| Account Title | Bank Name | Account Number |
|---|---|---|
| Piedmont Mall Gift Certificate Account | American National Bank | 0501 |
| GGP Limited Partnership Prince Kuhio Plaza | American Savings Bank | 9984 |
| Fox River Shopping Center Gift Certificate | Associated Bank | 7241 |
| Fox River Shopping Center Partners | Associated Bank | 0389 |
| Market Place Shopping Center General Growth Management, Inc Gift Certificate Account | Bank Champaign | 9639 |
| Market Place Shopping Center | Bank Champaign | 9647 |
| GGP/Homart, Inc., Deerbrook Mall | Bank of America | 5993 |
| GGP/Homart, Inc., Deerbrook Mall | Bank of America | 5955 |
| GGP Holding II, Inc. | Bank of America | 8163 |
| GGP Holding, Inc. | Bank of America | 8187 |
| GGP/Homart, Inc. | Bank of America | 8149 |
| Victoria Ward, Ltd. | Bank of America | 8168 |
| GGP/Homart, Inc., Deerbrook Mall | Bank of America | 6001 |
| GGP/Homart, Inc., Deerbrook Mall | Bank of America | 5998 |
| GGP/Homart, Inc., Deerbrook Mall | Bank of America | 5974 |
| GGP/Homart, Inc., Deerbrook Mall | Bank of America | 5979 |
| GGP Holding II, Inc. | Bank of America | 6308 |
| GGP/Homart, Inc. | Bank of America | 6266 |
| GGP Holding, Inc. | Bank of America | 6341 |
| GGP Limited Partnership | Bank of America | 6285 |
| The Hughes Corporation | Bank of America | 6280 |
| Howard Hughes Properties, Inc. | Bank of America | 6303 |
| Rouse-Fairwood Development Corporation | Bank of America | 6327 |
| The Howard Research and Development Corporation | Bank of America | 6322 |
| Baltimore Center Garage Limited Partnership | Bank of America | 6365 |
| Arizona Center (Garage) | Bank of America | 6396 |
| GGP Limited Partnership (NorthPoint Mall) | Bank of America | 8877 |
| General Growth Management, Inc. - Boise Towne Square | Bank of America | 2937 |
| Neighborhood Box Office | Bank of America | 6112 |
| Park Mall | Bank of America | 7036 |
| GGP Limited Partnership - Rogue Valley Gift Cert. | Bank of America | 6519 |
| GGP Limited Partnership Saint Louis Galleria GC | Bank of America | 8456 |
| GGP Limited Partnership - Lynnhaven Mall | Bank of America | 6924 |
| BOA MSTR SVCR For LaSalle BK TTEE for Reg Hldrs of BACM Comlmtg Pass thru Cert Ser 2003-1-Rogue Valley | Bank of America | 1810 |
| BOA MSTR SVCR For LaSalle BK TTEE for Reg Hldrs of BACM Comlmtg Pass thru Cert Ser 2003-1-Rogue Valley | Bank of America | 1811 |
| US Prime Property Inc. | Bank of America | 9902 |
| GGP Holding II LLC | Bank of America | 9435 |
| GGP Limited Partnership (Valley Plaza Mall) | Bank of America | 3867 |
| GGP Limited Partnership (Moreno Valley) | Bank of America | 5460 |
| GGP Homart Inc. (Newpark Mall) | Bank of America | 9638 |
| GGP Limited Partnership - Tucson Mall | Bank of America | 5216 |
| GGP Limited Partnership (Northtown Mall) | Bank of America | 4947 |
| GGP Limited Partnership Salem Center | Bank of America | 8470 |
| GGP Limited Partnership - Visalia Mall | Bank of America | 5230 |
| Price Development Co Limited SLM - Depository | Bank of America | 2401 |
| Pines Mall Limited Partnership | Bank of America | 9551 |
| GGP Limited Partnership - Rogue Valley Mall | Bank of America | 9743 |
| GGP Limited Partnership Saint Louis Galleria | Bank of America | 3550 |
| GGP Partnership for the benefit of Bank of America Merchant Services | Bank of America | 7523 |
| GGP Limited Partnership | Bank of America | 6333 |
| Victoria Ward, Limited | Bank of America | 6166 |
| Victoria Ward, Limited | Bank of Hawaii | 2100 |
| Victoria Ward Ltd. | Bank of Hawaii | 9950 |
| Victoria Ward Center LLC - Victoria Ward Entertainment Center | Bank of Hawaii | 1775 |
| Ward Plaza-Warehouse, LLC Lockbox Account FBO Goldman Sachs Commercial Mortgage Capital LP as Mortgagee | Bank of Hawaii | 3367 |
| Ward Gateway-Industrial-Village, Collection Account FBO Bank of America NA as Mortgagee | Bank of Hawaii | 3375 |
| Victoria Ward, Limited | Bank of Hawaii | 0021 |
| GGP Limited Partnership (Oakwood Center) | Bank of Louisiana | 1604 |
| HO Retail Properties II | Bank of Oklahoma | 2796 |
| HQ Retail Properties II, LP | Bank of Oklahoma | 5531 |
| Mayfair Property, Inc. | BankMutual | 0486 |
| GGP Limited Partnership (Mall St Matthews) | BB&T Bank | 8310 |
| Columbia Mall LLC | Boone County National Bank | 5706 |
| GGP Limited Partnership (RiverTown Crossings Gift Certificate) old | Byron Center State Bank | 7053 |
| GGP Limited Partnership RiverTown Crossings Mall | Byron Center State Bank | 5010 |
| General Growth Management Corp | Central Bank | 2035 |
| GGP/Homart, Inc | Chemical Bank & Trust Company | 5941 |
| GGP Limited Partnership - Burlington Town Center G.C. | Chittenden Bank | 1574 |
| GGP Limited Partnership - Burlington Town Center Local Depository | Chittenden Bank | 0566 |
| Rouse Providence LLC | Citizens Bank | 7103 |
| GGP/Homart, Inc | Citizens Bank | 5976 |

The Obligors' servicers may maintain certain escrow accounts (or ledger entries) on behalf of the Obligors for satisfaction of certain tax obligations. These accounts or ledger entries are not reflected on this Schedule.

| Account Title | Bank Name | Account Number |
|---|---|---|
| Rouse Providence LLC | Citizens Bank | ▮247 |
| Price Development Company LP | Citizens Bank of Clovis | ▮1201 |
| General Growth Management Inc as agent for Birchwood Mall | Citizens First Savings Bank | ▮0068 |
| Bayshore Mall | Coast Central Credit Union | ▮531 |
| Bayshore Mall Limited Partnership | Coast Central Credit Union | ▮8315 |
| General Growth Management, Inc. Peachtree Mall | Columbus Bank & Trust | ▮957 |
| GGP/Homart (Vista Ridge) | Compass Bank | ▮8863 |
| GGP Limited Partnership | Evergreen Investments | ▮2048 |
| GGP Limited Partnership (Spring Hill Mall) | First American Bank | ▮9703 |
| GGP Limited Partnership - Spring Hill Mall | First American Bank | ▮9701 |
| GGP Limited Partnership | First Hawaiian Bank | ▮4151 |
| GGP Ala Moana LLC | First Hawaiian Bank | ▮5057 |
| GGP Ala Moana LLC | First Hawaiian Bank | ▮3004 |
| GGP Ala Moana LLC | First Hawaiian Bank | ▮4071 |
| GGP Ala Moana LLC (3) | First Hawaiian Bank | ▮8876 |
| GGP Ala Moana LLC | First Hawaiian Bank | ▮5057 |
| GGP Ala Moana LLC for benefit of Secore Financial Corp as Mortgagee | First Hawaiian Bank | ▮5763 |
| GGP Ala Moana LLC | First Hawaiian Bank | ▮2748 |
| GGP Limited Partnership (Eastridge Mall) | First Interstate Bank | ▮222 |
| GGP Limited Partnership | First Tennessee Bank | ▮7471 |
| GGP/Homart, Inc. | Goldman Sachs | ▮6820 |
| GGP Limited Partnership | Goldman Sachs | ▮6837 |
| GGP Limited Partnership | Goldman Sachs | ▮6838 |
| GGP/Homart, Inc. | Goldman Sachs | ▮6819 |
| General Growth Management, Inc. | Huntington | ▮5540 |
| General Growth Management, Inc. | Huntington | ▮6073 |
| Colony Square Partners | Huntington Bank | ▮2444 |
| General Growth Properties (Colony Square Mall) | Huntington Bank | ▮3763 |
| GGP Limited Partnership (North Star Mall) | International Bank of Commerce | ▮6457 |
| GGP Inc. Bank Control acct for John V Howard | JP Morgan | ▮2275 |
| GGP Inc. Bank Control acct for Howard H Cremens | JP Morgan | ▮2267 |
| Landau & Heyman of Louisiana, Inc. managing agent for Pecanland Mall | JP Morgan Chase | ▮7989 |
| The Woodlands Mall Associates | JP Morgan Chase | ▮4324 |
| Colony Square Mall | JP Morgan Chase | ▮7638 |
| GGP Limited Partnership Glenbrook Square Mall | JP Morgan Chase | ▮4243 |
| Boise Mall LLC | JP Morgan Chase | ▮3207 |
| Visalia Mall LLC | JP Morgan Chase | ▮8590 |
| Boise Mall LLC or by Pacific Life Insurance Co as Servicer for Comm 2001 - J1 Acct | JP Morgan Chase | ▮8526 |
| University Crossing L.L.C. Gateway Crossing L.L.C. for the benefit of Morgan Stanley Mortgage Capital Inc. | JP Morgan Chase | ▮3256 |
| University Crossing L.L.C. Gateway Crossing L.L.C. for the benefit of Morgan Stanley Mortgage Capital Inc. | JP Morgan Chase | ▮3256 |
| PDC Community Center L.L..C. for the benefit of Morgan Stanley Mortgage Capital Inc. | JP Morgan Chase | ▮3272 |
| Pecanland Mall | JP Morgan Chase | ▮7220 |
| GGP Limited Partnership (Fashion Place) | JP Morgan Chase | ▮2419 |
| The Woodlands Mall Associates | JP Morgan Chase | ▮2488 |
| GGP Limited Partnership - Glenbrook Square Mall | JP Morgan Chase | ▮4060 |
| Atlantic Freeholds II (Town East Mall) | JP Morgan Chase | ▮9583 |
| GGP Limited Partnership | JP Morgan Chase | ▮7840 |
| JPMC as E A for Visalia Mall Lehman T&I | JP Morgan Chase | ▮9905 |
| General Growth Management, Inc. - Burlington Town Center | Key Bank | ▮6680 |
| GGP LTD Partnership | Key Bank | ▮5866 |
| Bellis Fair Mall | Key Bank of Washington | ▮5320 |
| GGP Limited Partnership | LaSalle Bank | ▮666 |
| The Hughes Corporation | LaSalle Bank | ▮5674 |
| Howard Hughes Properties, Inc | LaSalle Bank | ▮5682 |
| GGP/Homart, Inc. | LaSalle Bank | ▮6957 |
| GGP Limited Partnership-LC Debit Account | LaSalle Bank | ▮8384 |
| HO Retail Properties II, LP for the benefit of Eurohypo AG, as mortgagee | LaSalle Bank | ▮6973 |
| Bay City Mall Associates | LaSalle Bank | ▮6858 |
| GGP-Moreno Valley, Inc. | LaSalle Bank | ▮6817 |
| Vista Ridge Joint Venture | LaSalle Bank | ▮8181 |
| GGP-Deerbrook, L.P. | LaSalle Bank | ▮6833 |
| GGP-Brass Mill, Inc. | LaSalle Bank | ▮6841 |
| GGP-North Point, Inc | LaSalle Bank | ▮7074 |
| GGP-Steeplegate, Inc. | LaSalle Bank | ▮6791 |
| New Park Associates | LaSalle Bank | ▮6173 |
| The Woodlands Mall Associates | LaSalle Bank | ▮5049 |
| Tysons Galleria LLC | LaSalle Bank | ▮6783 |
| Newgate Mall LLC | LaSalle Bank | ▮6809 |
| Lakeside Mall | LaSalle Bank | ▮2123 |
| GGP Limited Partnership | LaSalle Bank | ▮13.1 |
| Rouse-Fairwood Development LP | M&T Bank | ▮6211 |
| Fashion Show Expansion LLC | M&T Bank | ▮1200 |

| Account Title | Bank Name | Account Number |
|---|---|---|
| GGP Limited Partnership | M&T Bank | ████0816 |
| Howard Hughes Properties Inc. - Land Accounting | M&T Bank | ████8253 |
| THE HUGHES CORPORATION - LAND ACCOUNTING | M&T Bank | ████7261 |
| GGP Limited Partnership (Owings Mills) | M&T Bank | ████6656 |
| GGP Limited Partnership | M&T Bank | ████0623 |
| Howard Hughes Properties, LP | M&T Bank | ████2602 |
| HHP Government Services, LP | M&T Bank | ████2768 |
| Howard Hughes Properties, Inc | M&T Bank | ████2661 |
| The Hughes Corporation | M&T Bank | ████2645 |
| Greenwood Mall | National City Bank | ████0714 |
| Lansing Mall | National City Bank | ████2584 |
| GGP Limited Partnership-Greenwood Mall Storage | National City Bank | ████8148 |
| Lansing Mall | National City Bank | ████8859 |
| Oxmoor Center | PNC Bank | ████3231 |
| GGP Ivanhoe II (Park City Center) | Sovereign Bank | ████5717 |
| GGP Limited Partnership (Staten Island Mall) | Sovereign Bank | ████3493 |
| GGP/Homart, Inc | Sterling Bank | ████3953 |
| GGP/Homart, Inc | Sterling Bank | ████7474 |
| GGP Limited Partnership (Eagle Ridge Mall) | SunTrust Bank | ████1803 |
| General Growth Management, Inc - Eagle Ridge Mall | SunTrust Bank | ████7936 |
| GGP/Homart, Inc | TD Banknorth | ████0608 |
| GGP Limited Partnership-The Maine Mall | TD Banknorth | ████7605 |
| GGP Limited Partnership-The Maine Mall | TD Banknorth | ████9730 |
| GGP Limited Partnership - Chico Mall Gift Certificate | Tri Counties Bank | ████0853 |
| GGP Limited Partnership - Chico Mall | Tri Counties Bank | ████3941 |
| GGP Limited Partnership-Gateway Mall | Umpqua Bank | ████0052 |
| GGP Limited Partnership-Gateway Mall | Umpqua Bank | ████0021 |
| GGP Limited Partnership | US Bank | ████0830 |
| Phase II Mall Subsidiary LLC for the benefit of Deutsche Bank Trust Company | US Bank | ████2069 |
| Oakwood Shopping Center LP, Citicorp North America as agent | US Bank | ████5888 |
| U.K. American Properties, Inc. Northridge Fashion Center | US Bank | ████3965 |
| Chico Mall LP | US Bank | ████7787 |
| Oakwood Shopping Center LP Citicorp North America as agent | US Bank | ████6870 |
| GGP Jordan Creek Town Center for the benefit of Eurohypo AG, New York as mortgagee | US Bank | ████8528 |
| U.K. American Properties, Inc. Northridge Fashion Center | US Bank | ████9181 |
| Phase II Mall Subsidiary LLC Deutsche Bank Trust Company Americas | US Bank | ████8952 |
| Chico Mall LP | US Bank | ████7795 |
| Phase II Mall Subsidiary LLC for the benefit of Deutsche Bank Trust Company | US Bank | ████2044 |
| U.K. American Properties, Inc. Northridge Fashion Center | US Bank | ████8499 |
| Chico Mall LP | US Bank | ████7803 |
| U.K. American Properties, Inc. Northridge Fashion Center | US Bank | ████3273 |
| Oakwood Shopping Center LP, Citicorp North America as agent | US Bank | ████6896 |
| Oakwood Shopping Center LP, Citicorp North America as agent | US Bank | ████6904 |
| U.K. American Properties, Inc. Northridge Fashion Center | US Bank | ████8457 |
| Connecticut General Life Ins Co, as mortgagee of GGP-Grandville LLC as mortgagor (Real Estate Tax Escrow) | US Bank | ████8416 |
| GGP Limited Partnership-Eden Prairie Gift Cert | US Bank | ████4740 |
| Mall of the Bluffs | US Bank | ████0952 |
| Chapel Hill | US Bank | ████0588 |
| GGP Limited Partnership | US Bank | ████6086 |
| U.K. American Properties, Inc. Northridge Fashion Center | US Bank | ████3460 |
| GGP Holding, Inc. - 10 CCC Business Trust | US Bank | ████8924 |
| GGP Holding, Inc. - 20 CCC Business Trust | US Bank | ████8932 |
| GGP Holding, Inc. - 30 CCC Business Trust | US Bank | ████8940 |
| GGP Holding, Inc. - Parkview Office Building Limited Partnership | US Bank | ████8957 |
| GGP Holding, Inc. - Parkside Limited Partnership | US Bank | ████8965 |
| GGP Holding, Inc. - Park Square Limited Partnership | US Bank | ████8973 |
| GGP Holding, Inc. - Columbia Convenience Center | US Bank | ████0709 |
| GGP Holding, Inc. - Columbia Association | US Bank | ████0691 |
| GGP Holding, Inc. - Columbia Exhibit Building | US Bank | ████0717 |
| GGP Holding, Inc. - Ridgely Building | US Bank | ████0725 |
| GGP Limited Partnership - Arizona Center Parking | US Bank | ████0675 |
| GGP Limited Partnership - Arizona Center 2 | US Bank | ████0865 |
| GGP Limited Partnership - Arizona Center 1 | US Bank | ████3857 |
| Oakwood Shopping Center LP, Citicorp North America as agent | US Bank | ████6912 |
| Howard Hughes Properties, Limited Partnership - 10190 Covington Cross | US Bank | ████0741 |
| Howard Hughes Properties, Limited Partnership - 1201/41 Town Center Drive | US Bank | ████0758 |
| Howard Hughes Properties, Limited Partnership - 1251/81 Town Center Drive | US Bank | ████0766 |
| Howard Hughes Properties, Limited Partnership - 9950/80 Covington Cross | US Bank | ████0808 |
| Howard Hughes Properties, Limited Partnership - 10000 Covington Cross | US Bank | ████0733 |

The Obligors' servicers may maintain certain escrow accounts (or ledger entries) on behalf of the Obligors for satisfaction of certain tax obligations. Those accounts or ledger entries are not reflected on this Schedule.

| Account Title | Bank Name | Account Number |
|---|---|---|
| Howard Hughes Properties, Limited Partnership - 1551 Hillshire Drive | US Bank | ███████0774 |
| Howard Hughes Properties, Limited Partnership - 1635 Village Center Circle | US Bank | ███████0782 |
| Howard Hughes Properties, Limited Partnership - 1645 Village Center Circle | US Bank | ███████0790 |
| Rouse-Fairwood Development Corporation - Crossing Business Center #6 | US Bank | ███████0816 |
| Rouse-Fairwood Development Corporation - Crossing Business Center #7 | US Bank | ███████0824 |
| Fashion Show Mall, LLC | US Bank | ███████7333 |
| GGP/Homart, Inc. - Chula Vista Center, LLC | US Bank | ███████8601 |
| GGP-Tucson Mall L.L.C. for the benefit of Wachovia Bank, National Association | US Bank | ███████6027 |
| GGPLP L.L.C. - Mall of Louisiana Power Center | US Bank | ███████0840 |
| GGPLP L.L.C. - Apache Mall, LLC | US Bank | ███████7777 |
| Northgate Mall, LLC for the benefit of Secore Financial Corporation as Mortgagee | US Bank | ███████4947 |
| Boulevard Associates | US Bank | ███████3964 |
| Mayfair Property, Inc. for the benefit of Secore Financial Corporation as Mortgagee | US Bank | ███████5985 |
| Landmark Mall, LLC for the benefit of Secore Financial Corporation as Mortgagee | US Bank | ███████9993 |
| Lancaster Trust for the bebefit of Eurohypo AG, New York Branch | US Bank | ███████5019 |
| HO Retail Properties I Limited Partnership, for the benefit of Bank of America NA, as mortgagee | US Bank | ███████9479 |
| Oglethorpe Mall, LLC for the benefit of Secore Financial Corporation as Mortgagee | US Bank | ███████9939 |
| Eastridge Shopping Center, LLC for the benefit of Secore Financial Corporation as Mortgagee | US Bank | ███████4954 |
| Southland Mall, Inc. for the benefit of Commerzbank AG | US Bank | ███████7339 |
| GGP - Pecanland L.P. for the benefit of Citigroup Global Markets Realty Corp., as agent | US Bank | ███████6646 |
| Grand Canal Shoppes II, LLC for the benefit of Archon Financial Group as mortgagee | US Bank | ███████7727 |
| Regency Square Mall | US Bank | ███████3972 |
| Bakersfield Mall LLC & RASCAP Realty Ltd. FBO Secor Financial Corp as mortgagee | US Bank | ███████8980 |
| Rouse-Phoenix Corporate Center LP together with R-P Theatre LP, R-P Master LP, and Rouse-AZ Retail Ctr LP jointly as Guarantor FBO US Bank as Agent fo | US Bank | ███████6563 |
| NSMJV, LLC | US Bank | ███████7309 |
| Lakeside Mall Property, LLC | US Bank | ███████7325 |
| Mondawmin Borrower, LLC | US Bank | ███████2379 |
| Willowbrook Mall, LLC | US Bank | ███████7259 |
| GGP Limited Partnership - Hulen Owner LP | US Bank | ███████5519 |
| OM Borrower, LLC | US Bank | ███████2403 |
| GGP Limited Partnership - Providence Place | US Bank | ███████6543 |
| GGP Limited Partnership - Beachwood Place Mall | US Bank | ███████5327 |
| Collin Creek Mall, LLC | US Bank | ███████6913 |
| GGP Limited Partnership - Faneuil Hall Marketplace | US Bank | ███████5535 |
| GGP Limited Partnership - Rouse Fashion Place | US Bank | ███████7432 |
| Woodbridge Center Property, LLC | US Bank | ███████7291 |
| GGP Limited Partnership - Southland Center | US Bank | ███████7424 |
| GGP Limited Partnership - Ridgedale Center | US Bank | ███████5501 |
| MSM Property, LLC | US Bank | ███████7317 |
| Pioneer Place Limited Partnership | US Bank | ███████1941 |
| The Howard Hughes Corporation - Vista Commons | US Bank | ███████0832 |
| Greenwood Mall | US Bank | ███████7556 |
| Mall St. Vincent, LP | US Bank | ███████8496 |
| GGP-Columbiana Trust | US Bank | ███████9107 |
| Champaign Market Place LLC FBO LaSalle Bank NA as Trustee of Holders of Bear Stearns Com. Mortgage Securities (Cert. Series 2007-PWR18) | US Bank | ███████8562 |
| Fox River Shopping Center L.L.P. | US Bank | ███████8570 |
| Fallbrook Square Partners Limited Partnership | US Bank | ███████6053 |
| Colony Square Mall, LLC | US Bank | ███████2478 |
| Columbia Mall LLC | US Bank | ███████8554 |
| River Hills Mall L.L.P | US Bank | ███████6061 |
| Sooner Fashion Mall LLC | US Bank | ███████6079 |
| Southlake Mall LLC | US Bank | ███████8588 |
| GGP-Four Seasons LLC for the benefit of Wachovia Bank National Association, Mortgagee | US Bank | ███████9313 |
| Westwood Mall, LLC | US Bank | ███████2486 |
| St. Cloud Mall, LLC (Crossroads Mall) for the benefit of UBS Waterbury Real Estate Investments, Inc. as mortgagee | US Bank | ███████3291 |
| GGP Foothills, LLC | US Bank | ███████8990 |
| Village of Jordan Creek for the benefit of Eurohypo AG, New York as mortgagee | US Bank | ███████6090 |
| GGP Jordan Creek Town Center for the benefit of Eurohypo AG, New York as mortgage | US Bank | ███████6082 |
| Gateway Overlook Business Trust | US Bank | ███████6111 |

The Obligors' servicers may maintain certain escrow accounts (or ledger entries) on behalf of the Obligors for satisfaction of certain tax obligations. These accounts or ledger entries are not reflected on this Schedule.

| Account Title | Bank Name | Account Number |
|---|---|---|
| Northwest Ohio Mall, LLC | US Bank | 2445 |
| Phase II Mall Subsidiary, LLC for the benefit of Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of certain other lenders | US Bank | 1157 |
| GGP-Lincolnshire LLC | US Bank | 6129 |
| North Town Mall, LLC | US Bank | 1974 |
| Price ASG L.L.C.-Aminas Valley Mall | US Bank | 3057 |
| Price ASG L.L.C. - Grand Teton Mall/Plaza | US Bank | 3040 |
| Price ASG L.L.C. -Salem Center | US Bank | 3065 |
| Pine Ridge Mall LLC for the benefit of Column Financial, Inc. as mortgagee | US Bank | 108 |
| PDC - Red Cliffs Mall LLC for the benefit of Column Financial, Inc. as mortgagee | US Bank | 6132 |
| PDC - Eastridge Mall LLC for the benefit of Column Financial, Inc. as mortgagee | US Bank | 6124 |
| Three Rivers Mall LLC for the benefit of Column Financial, Inc. as mortgagee | US Bank | 6116 |
| Pierre Bossier Mall, LLC | US Bank | 958 |
| Cache Valley, LLC | US Bank | 2361 |
| North Plains Mall, LLC | US Bank | 2395 |
| Sierra Vista Mall, LLC | US Bank | 2387 |
| Country Hills Plaza, LLC | US Bank | 9922 |
| Silver Lake Mall, LLC | US Bank | 2452 |
| White Mountain Mall, LLC | US Bank | 2460 |
| Gateway Mall | US Bank | 7564 |
| Grand Traverse Mall Partners, LP | US Bank | 5458 |
| GGP Eagle Ridge | US Bank | 0855 |
| Eden Prairie Mall LLC for the benefit of Bear Stearns Commercial Mortgage, Inc., as mortgagee | US Bank | 7321 |
| Tracy Mall Partners, LP for the benefit of Secore Financial Corporation as Mortgage | US Bank | 9998 |
| Lakeview Square Limited Partnership | US Bank | 6035 |
| Connecticut General Life Ins Co as Mtgee of GGP-Grandville LLC as Mtgor | US Bank | 8408 |
| Mall of Louisiana, LP for the benefit of Column Financial, Inc. as mortgage | US Bank | 7705 |
| GGP Limited Partnership - Capital Mall | US Bank | 7572 |
| Park Mall, LLC for the benefit of Wachovia Bank National Association as Mortgagee | US Bank | 4004 |
| Valley Hills Mall LLC for the benefit of Column Financial, Inc., as mortgagee | US Bank | 6810 |
| GGP-Glenbrook LLC for the benefit of Morgan Stanley Mortgage Capital as Lender | US Bank | 0519 |
| Peachtree Mall | US Bank | 8341 |
| Coronado Center LLC FBO Eurohypo Ag New York Branch as Mortgagee | US Bank | 7053 |
| GGP-Maine Mall LLC for the benefit of German American Capital Corporation, as Mortagagee | US Bank | 0436 |
| Chico Mall L.P. | US Bank | 7244 |
| Saint Louis Galleria LLC | US Bank | 7061 |
| Mall of the Bluffs, LLC | US Bank | 1982 |
| Spring Hill Mall, LLC | US Bank | 1925 |
| Piedmont Mall, LLC for the benefit of Secore Financial Corporation as Mortgagee | US Bank | 4012 |
| Southwest Plaza, LLC | US Bank | 1933 |
| Oakwood Hills Mall, LLC | US Bank | 1966 |
| Augusta Mall, LLC | US Bank | 8439 |
| Birchwood Mall, LLC | US Bank | 2022 |
| Sikes Senter LP | US Bank | 5654 |
| Lynnhaven Mall L.L.C. | US Bank | 5035 |
| Stonestown Shopping Center, L.P. and GGP-SL, L.L.C., for the benefit of Morgan Stanley Mortgage Capital, Inc., as mortgagee | US Bank | 0008 |
| Town East Mall L.P. for the benefit of UBS Real Estate Investment, Inc. | US Bank | 7354 |
| GGP Limited Partnership Collateral Account | US Bank | 6140 |
| GGP Acquisitions LLC & Price Holdings LLC | US Bank | 5045 |
| Homart Development Co | US Bank | 3106 |
| GGP Limited Partnership - Southwest Plaza | US Bank | 9579 |
| GGP Limited Partnership-Chapel Hills Storage | US Bank | 9005 |
| General Growth Mgmt Corp Agent for Equitable | US Bank | 5845 |
| GGP Holding II, Inc. | US Bank | 9501 |
| GGP Holding, Inc. | US Bank | 0589 |
| Victoria Ward, Ltd. | US Bank | 1855 |
| GGP Limited Partnership | US Bank | 4032 |
| GGP LP LLC | US Bank | 5014 |
| The Rouse Company | US Bank | 9767 |
| GGP Limited Partnership | US Bank | 4032 |
| GGP Limited Partnership (Pioneer Place Parking Facility) | US Bank | 8899 |
| Phase II Mall Subsidiary LLC for the benefit of Deutsche Bank Trust company | US Bank | 2051 |

The Obligors' servicers may maintain certain escrow accounts (or ledger entries) on behalf of the Obligors for satisfaction of certain tax obligations. These accounts or ledger entries are not reflected on this Schedule.

| Account Title | Bank Name | Account Number |
|---|---|---|
| Chico Mall LP | US Bank | 7811 |
| GGP Limited Partnership | US Bank/First American Money Market | 0172 |
| GGP Limited Partnership (Willowbrook Mall, NJ) | Valley National Bank | 4548 |
| GGP/Homart, Inc. | Wachovia Bank | 896 |
| Greenwich Cap Fin AM Hocker Oxmoor LLC | Wachovia Bank | 1838 |
| GGP Limited Partnership - Providence Depository | Wachovia Bank | 5361 |
| Regency Square Mall | Wachovia Bank | 0367 |
| GGP Limited Partnership (Woodbridge Center) | Wachovia Bank | 4722 |
| GGP-North Point, Inc | Wachovia Bank | 5968 |
| GGP/Homart, Inc | Wachovia Bank | 4166 |
| GGP Limited Partnership (Four Seasons Town Centre) | Wachovia Bank | 0016 |
| Century Plaza, LLC | Wachovia Bank | 1708 |
| GGP Limited Partnership (Augusta Mall) | Wachovia Bank | 4068 |
| GGP/Homart, Inc | Webster Bank | 5587 |
| GGP/Homart Inc. | Webster Bank | 553 |
| Price Development Company L.P Depository | Wells Fargo Bank | 6518 |
| GGP Limited Partnership-Foothills Mall | Wells Fargo Bank | 4277 |
| Rochester Mall LLC - Apache Mall Gift Certificate | Wells Fargo Bank | 8875 |
| General Growth Properties, Inc. (Ridgedale Center) | Wells Fargo Bank | 6118 |
| GGP Limited Partnership (Pioneer Place) | Wells Fargo Bank | 6257 |
| GGP Limited Partnership-Foothills Mall | Wells Fargo Bank | 5068 |
| Price Development Company Limited Partnership Animas Valley Mall Depository Account | Wells Fargo Bank | 049 |
| Price Development Co LP GTM - Deposit Account | Wells Fargo Bank | 1045 |
| Price Financing Partnership LP Red Cliffs Mall Depository | Wells Fargo Bank | 0951 |
| Oakwood Hills Mall Ltd | Wells Fargo Bank | 8007 |
| Rochester Mall LLC | Wells Fargo Bank | 5553 |
| GGP/Homart, Inc | Zions Bank | 5867 |
| GGP/Homart, Inc | Zions Bank | 3011 |
| GGP Limited Partnership Prince Kuhio Plaza | American Savings Bank | 9384 |

**Schedule 8.17**
**Governmental Authorization - Exceptions**

None.

**Schedule 8.18**
**First Lien Properties**

| No. | Owner/Lessee Debtor | Property |
|-----|---------------------|----------|
| 1. | GGP – Tucson Land, L.L.C. | 4848 Parcel – Tucson, 4848 Oracle Road, Tucson, AZ |
| 2. | GGP Acquisition, L.L.C.<br><br>Price Development Company, Limited Partnership | Alameda Plaza, 900 Yellowstone Highway, Pocatello, ID |
| 3. | Apache Mall, LLC | Apache Mall, 333 Apache Mall, Rochester MN |
| 4. | Rouse-Phoenix Master Limited Partnership (as to the Fee Property and a portion of the Master Leased Property)<br><br>Rouse-Phoenix Theatre Limited Partnership (as to a portion of the Leased Property)<br><br>Rouse-Arizona Retail Limited Partnership (as to a portion of the Leased Property)] | Arizona Center  (Retail, Theater, Fee and Master Leased Parcels), 400 E. Van Buren Street, Phoenix, AZ |
| 5. | Arizona Center Parking, LLC (as to a portion of the Leased Property) | Arizona Center Parking, 400 E. Van Buren Street, Phoenix, AZ |
| 6. | Town Center East Business Trust | Association Building (a.k.a. C.A. Building), 10221 Wincopin Circle, Columbia, MD |
| 7. | Price Development Company, Limited Partnership | Bailey Hills Village, 1055 Bailey Hill Road, Eugene, OR |
| 8. | Price Development Company, Limited Partnership | Baskin Robbins, 2553 17th Street, Idaho Falls, ID |
| 9. | Boise Town Square Anchor Acquisition, LLC | Boise Towne Square Anchor Acquisition, 350 North Milwaukee, Boise, ID |
| 10. | Howard Hughes Canyon Pointe Q4, LLC | Canyon Point, I-215 and W. Charleston Blvd, Las Vegas, NV |

| 11. | Century Plaza L.L.C. | Century Plaza, 7580 Crestwood Blvd, Ste. 241, Birmingham, AL |
|-----|----------------------|-------------------------------------------------------------|
| 12. | Chula Vista Center, LLC (as to the Fee and Leased Properties) | Chula Vista Center, 555 Broadway, Chula Vista, CA |
| 13. | Collin Creek Anchor Acquisition, LLC | Collin Creek Mall Dillards Parcel, 841 N. Central Expressway, Plano, TX |
| 14. | Parkside Limited Partnership | Columbia Corporate Center Offices (Fifty Columbia Corporate Center, which includes associated Columbia Bank Drive Thru), 10500 Little Patuxent Parkway, Columbia, MD |
| 15. | Parkview Office Building Limited Partnership | Columbia Corporate Center Offices (Forty Columbia Corporate Center), 10480 Little Patuxent Parkway, Columbia, MD |
| 16. | Park Square Limited Partnership | Columbia Corporate Center Offices (Sixty Columbia Corporate Center), 10490 Little Patuxent Parkway, Columbia, MD |
| 17. | 10 CCC Business Trust | Columbia Corporate Center Offices (Ten Columbia Corporate Center), 10400 Little Patuxent Parkway, Columbia, MD |
| 18. | 30 CCC Business Trust | Columbia Corporate Center Offices (Thirty Columbia Corporate Center), 10440 Little Patuxent Parkway, Columbia, MD |
| 19. | 20 CCC Business Trust | Columbia Corporate Center Offices (Twenty Columbia Corporate Center), 10420 Little Patuxent Parkway, Columbia, MD |
| 20. | Cottonwood Mall, LLC | Cottonwood Mall, 4835 South Highland Drive, Holladay, UT |
| 21. | Price Development Company, Limited Partnership | Cottonwood Square, 1800 E. Murray-Holladay Rd., Salt Lake City, UT |
| 22. | Eden Prairie Anchor Building L.L.C. | Eden Prairie Anchor Acquisition, 8251 Eden Prairie Center, Suite 125, Eden Prairie, MN |
| 23. | Elk Grove Town Center, L.P. | Elk Grove Promenade, Elk Grove Promenade, Elk Grove, CA |
| 24. | Town Center East Business Trust | Exhibit Building, 10215 Wincopin Circle, Columbia, MD |
| 25. | Price Development Company, Limited Partnership | Fremont Plaza, 240 North Jones, Las Vegas, NV |

| | | |
|---|---|---|
| 26. | 1551 Hillshire Drive, LLC | Hillshire Drive Property, 1551 Hillshire Drive, Las Vegas, NV |
| 27. | West Kendall Holdings, LLC | Kendall Town Center, address n/a raw land, Miami, FL |
| 28. | Lockport L.L.C. | Lockport Mall, 5737 South Transit Road, Lockport, NY |
| 29. | Mall of Louisiana Land, LP | Mall of Louisiana Power Center, 6401 Bluebonnet Boulevard, Baton Rouge, LA |
| 30. | GGP Natick Residence LLC (as to Parcel 1 of Tract 1, Tract 2, Tract 3 and Tract 4)<br><br>Natick Retail LLC (as to Parcel 2 of Tract 1) | Natick Nouvelle (condos, retail in condo building and offsite housing), 1245 Worcester Street, Suite #4030, Natick, MA 01760 |
| 31. | Running Brook Business Trust | Neighborhood Stores, 5740 Columbia Road, Columbia, MD |
| 32. | Newgate Mall Land Acquisition, LLC | Newgate Mall Land (adjacent parcel only), raw land adjacent to Newgate Mall, Ogden, UT |
| 33. | NewPark Anchor Acquisition, LLC | NewPark Mall Anchor Acquisition, 2086 Newpark Mall, Newark, CA |
| 34. | North Star Anchor Acquisition, LLC | North Star Mall Anchor Acquisition, 2000 North Star Mall, San Antonio, TX |
| 35. | GGP Ivanhoe II, Inc. | Oglethorpe Residential Properties (Ten houses near Oglethorpe Mall), 42 Fairmont Avenue, 44 Fairmont Avenue, 48 Fairmont Avenue, 50 Fairmont Avenue, 52 Fairmont Avenue, 104 Fairmont Avenue, 106 Fairmont Avenue, 110 Fairmont Avenue, 112 Fairmont Avenue and 114 Fairmont Avenue, Savannah, GA |
| 36. | Rouse-Phoenix Corporate Center Limited Partnership | One Arizona Center, 400 E. Van Buren Street, Phoenix, AZ |
| 37. | Parke West, LLC | Park West, 9744 West Northern Avenue, Peoria, AZ |
| 38. | Pecanland Anchor Acquisition, LLC | Pecanland Mall Anchor Acquisition, 4700 Millhaven Road, Monroe, LA |
| 39. | Price Development Company, Limited Partnership | Plaza 800, 2260 Oddie Blvd, Sparks, NV |
| 40. | Price Development Company, Limited Partnership | Plaza 9400, 755 East 9400 South Street, Sandy, UT |

| 41. | GGP-Grandville Land, L.L.C. | Potomac Place (f.k.a. Rivertown Crossings (undeveloped land only)), Potomac Circle, Grandville, MI |
|---|---|---|
| 42. | Majestic Partners-Provo, LLC | Provo Plaza/PTC Motel Land, adjacent to Provo Towne Centre which is located at 1200 Towne Centre Boulevard, Provo, UT |
| 43. | Price Development Company, Limited Partnership | Red Cliffs Plaza, 484 North Mall Road, St. George, UT |
| 44. | Redlands Land Holding L.L.C. | Redlands Promenade, Redlands, CA |
| 45. | Town Center East Business Trust | Ridgley Building, 5575 Sterrett Place, Columbia, MD |
| 46. | Rio West L.L.C | Rio West Mall, 1300 West I-40 Frontage, Gallup, NM |
| 47. | River Falls Mall, LLC | River Falls, 951 East Lewis and Clark Parkway (Highway 131), Clarksville, IN |
| 48. | La Place Shopping, L.P. | Riverlands Shopping Center, 1324 W. Airline Highway, Laplace, LA |
| 49. | New Orleans Riverwalk Associates | Riverwalk Marketplace, 1 Poydras Street, New Orleans, LA |
| 50. | Saint Louis Land L.L.C. (as to Adjusted Lots 6 and 7)

Saint Louis Galleria Anchor Acquisition, LLC (as to the Anchor Acquisition parcel) | Saint Louis Galleria Anchor (Anchor Acquisition and Adjusted Lots 6 and 7), 155 Saint Louis Galleria, St. Louis, MO |
| 51. | South Shore Partners, L.P. | South Shore Mall, 1017 South Boone Street, Aberdeen, WA |
| 52. | South Street Seaport Limited Partnership | South Street Seaport and Seaport Marketplace Theater, 19 Fulton Street, New York, NY |
| 53. | Summerlin Centre, LLC | Summerlin Centre, 10973 Summerlin Centre Drive, Las Vegas, NV |
| 54. | Certain portions of fee property owned by each of the Howard Hughes Corporation and Howard Hughes Properties, Inc. | Summerlin MPC, address N/A raw land (approx 7,682 net acres), Las Vegas, NV |
| 55. | GGP-Mint Hill L.L.C. | The Bridges at Mint Hill, 13033 Bain School Road, Charlotte, NC |
| 56. | 1450 Center Crossing Drive, LLC | The Crossing Business Center #6, 1450 Center Crossing Drive, Las Vegas, NV |

| 57. | 1451 Center Crossing Drive, LLC | The Crossing Business Center #7, 1451 Center Crossing Drive, Las Vegas, NV |
|---|---|---|
| 58. | 10000 Covington Cross, LLC | The Crossing Business Center (10000 Covington Cross), 10000 Covington Cross, Las Vegas, NV |
| 59. | 10190 Covington Cross, LLC | The Crossing Business Center (10190 Covington Cross), 10190 Covington Cross, Las Vegas, NV |
| 60. | 1201-1281 Town Center Drive, LLC | The Crossing Business Center (1201-1281 Town Center Drive), 1201-41 Town Center Drive and 1251-1281 Town Center Drive, Las Vegas, NV |
| 61. | 1635 Village Centre Circle, LLC | The Crossing Business Center (1635 Village Center), 1635 Village Center Circle, Las Vegas, NV |
| 62. | 1645 Village Center Circle, LLC | The Crossing Business Center (1645 Village Center), 1645 Village Center Circle, Las Vegas, NV |
| 63. | 9950-9980 Covington Cross, LLC (as to 9950-9980 Covington Cross)<br><br>1251 Center Crossing, LLC (as to 1251 Center Crossing) | The Crossing Business Center (includes 9950-9980 Covington Cross and 1251 Center Crossing), 9950-80 Covington Cross, Las Vegas, NV, 1251 Center Crossing Drive, Las Vegas, NV |
| 64. | Pines Mall Partners | The Pines Mall, 2901 Pines Mall Drive, Pine Bluff, AR |
| 65. | GGP-Redlands Mall, L.P. | The Village at Redlands (a.k.a. Redlands Mall), 100 Redlands Mall, Redlands, CA; and adjacent parking lot at intersection of Citrus and 4th, Redlands, CA |
| 66. | GGP-Tucson Land L.L.C. | Tucson Entertainment Pavilion (4646 Oracle), 4646 N. Oracle Road, Tucson, AZ |
| 67. | Price Development Company, Limited Partnership | Twin Falls Crossings, 870 Blue Lakes Blvd. North, Twin Falls, ID |
| 68. | Two Arizona Center, LLC (as to a portion of the Leased Property) | Two Arizona Center, 400 E. Van Buren Street, Phoenix, AZ |
| 69. | Victoria Ward, Limited | Victoria Ward – Unencumbered (includes vacant land parcels, Ward Village Shops at corner at Kamakee and Auahi Streets, IBM Building (1240 Ala Moana Blvd)), Honolulu, HI |
| 70. | Vista Commons, LLC | Vista Commons, 11700 West Charleston |

| | | Blvd., Las Vegas, NV |
|---|---|---|
| 71. | GGP/Homart, Inc. | Volo Land, IL, Highway 12, Lakemoor, IL |
| 72. | Victoria Ward, Limited | VWL-Maui Ranch Property, off of Kamaole Road and adjacent to Uiupalakua Ranch, Maui, HI |
| 73. | Price Development Company, Limited Partnership | Yellowstone Square, 1750 Yellowstone Highway, Idaho Falls, ID |

And all other property owned in fee or leased by only those Debtors listed in this Schedule 8.18, subject however, to the terms of clause (iv) of the last paragraph of Section 6.1(a) in this Agreement.

**1) Secured Debt**

| Property Name | Borrower(s) | Original Lender(s) | Principal Balance as of 03/15/09 |
| :--- | :--- | :--- | ---: |
| 10000 CHRLSTON / 9901/21 CVNGTON / 1120/40 TOWN CENTER DRIVE | 10000 West Charleston, LLC  & 9901-9921 Covington Cross, LLC | MetLife | $21,802,666 |
| 1160/80 TOWN CENTER DRIVE | 1160-1180 Town Center Drive, LLC | Prudential Mortgage | $8,887,707 |
| ALA-MOANA CENTER - TOTAL - 1 | GGP-Ala Moana L.L.C. & GGP KAPIOLANI DEVELOPMENT L.L.C. | LaSalle Bank National Association | $750,000,000 |
| ALA-MOANA CENTER- TOTAL - 2 | GGP-Ala Moana L.L.C. & GGP KAPIOLANI DEVELOPMENT L.L.C. | LaSalle Bank National Association | $750,000,000 |
| ANIMAS VALLEY | Price-ASG L.L.C. | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $35,053,571 |
| AUGUSTA MALL | Augusta Mall, LLC (mall); Augusta Mall Anchor Acquisition, LLC (Macy) | Eurohypo AG New York Branch | $175,000,000 |
| AUSTIN BLUFFS PLAZA | PDC Community Centers L.L.C. | Morgan Stanley | $2,294,126 |
| BAY CITY MALL | Bau City Mall Associates L.L.C | Eurohypo AG | $24,155,449 |
| BAYSHORE MALL | Bay Shore Mall Partners | Key Bank National Association | $31,051,773 |
| BEACHWOOD PLACE | Beachwood Place Mall, LLC | Morgan Stanley Mortgage Capital | $240,440,231 |
| BELLIS FAIR | Bellis Fair Partners | Principal Mutual Life Insurance Company | $61,893,712 |
| BIRCHWOOD MALL | Birchwood Mall, LLC | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $44,307,714 |
| BOISE TOWNE PLAZA | Boise Towne Plaza L.L.C. | Morgan Stanley | $10,939,807 |
| BOISE TOWNE SQUARE | Boise Mall, LLC | The Chase Manhattan Bank | $70,839,315 |
| BRASS MILL | GGP-Brass Mill, Inc. | Wachovia | $123,890,108 |
| BRASS MILL COMMONS | GGP-Brass Mill, Inc. | Wachovia | included in Brass Mill |
| BURLINGTON TOWN CENTER | The Burlington Town Center LLC | Merrill Lynch/Sandleman Partners | $26,000,000 |
| BURLINGTON TOWN CENTER  - MEZZ | The Burlington Town Center II LLC | Merrill Lynch/Sandleman Partners | $5,500,000 |
| CACHE VALLEY | Cache Valley, LLC | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $28,042,857 |
| CAPITAL MALL | Capital Mall LLC | GMAC Commercial Mortgage Corporation | $20,316,529 |
| CHAPEL HILLS MALL | Chapel Hills Mall L.L.C | Lehman | $115,808,905 |
| CHICO MALL  [5] | Chico Mall, L.P. | Citigroup | $57,203,000 |
| COLLIN CREEK | Collin Creek Mall, LLC | Morgan Guaranty Trust Company of New York | $67,086,807 |
| COLONY SQUARE | Colony Square Mall L.L.C. | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $25,238,571 |
| COLUMBIA MALL | Columbia Mall L.L.C. | U.S. Bank National Association | $90,000,000 |
| COLUMBIANA CENTRE | GGP-Columbiana Trust | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $105,441,143 |
| CORONADO CENTER | Coronado Center,L.L.C. | Morgan Stanley | $169,028,107 |
| CORPORATE POINTE #2 | Howard Hughes Properties IV, LLC | Column Financial | $4,531,027 |
| CORPORATE POINTE #3 | Howard Hughes Properties V, LLC | Column Financial | $4,531,027 |
| COUNTRY HILL PLAZA | Country Hills Plaza, LLC | U.S. Bank | $13,539,800 |
| CROSSROADS Center (MN) | St. Cloud Mall L.L.C. | USB Warburg Real Estate, Inc. | $84,436,879 |
| DEERBROOK MALL [6] | Deerbrook Mall, LLC | Commerz & Goldman Sachs | $73,964,091 |
| DIVISION CROSSING | PDC Community Centers L.L.C. | Morgan Stanley | $5,286,833 |
| EAGLE RIDGE MALL | Eagle Ridge Mall, L.P. | Wachovia Bank | $47,637,562 |
| EASTRIDGE MALL (WY) | PDC-Eastridge Mall L.L.C. | 2001 CMBS | $39,217,460 |
| EASTRIDGE SHOPPING CENTER | Eastridge Shopping Center L.L.C. | Bank of America | $170,000,000 |
| EDEN PRAIRIE CENTER | Eden Prarie Mall L.L.C. and Eden Prarie Anchor Building L.L.C | Lehman | $79,955,933 |
| FANEUIL HALL MARKETPLACE | Faneuil Hall Marketplace, LLC | Bank of America | $94,231,207 |
| FASHION PLACE | Fashion Place, LLC | Column Financial (Credit Suisse First Boston) | $144,666,547 |
| FASHION SHOW MALL | Fashion Show Mall LLC | Deutsche Bank Securities, Inc. | $648,219,165 |
| FOOTHILLS MALL | GGP-Foothills L.L.C. | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $50,757,571 |
| FORT UNION | PDC Community Centers L.L.C. | Morgan Stanley | $2,759,848 |
| FOUR SEASONS TOWN CENTRE | GGP-Four Seasons L.L.C. | Wachovia | $100,638,117 |
| FOX RIVER MALL | Fox River Shopping Center, LLC | U.S. Bank National Association | $195,000,000 |
| GATEWAY MALL | GGP-Gateway Mall L.L.C. | GMAC | $39,816,705 |
| GATEWAY CROSSING SHOPPING CENTER | Gateway Crossing L.L.C. | Morgan Stanley | $15,259,581 |
| GATEWAY OVERLOOK | Gateway Overlook II Business Trust (fee owner); Gateway Overlook Business Trust (lessee) | Principal Life Insurance Co. | $55,000,000 |
| GLENBROOK SQUARE | GGP-Glenbrook L.L.C. | Merrill Lynch | $177,483,218 |
| GRAND TETON MALL & PLAZA | Price-ASG L.L.C. | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $48,794,571 |
| GRAND TRAVERSE MALL | Grand Traverse Mall Partners, LF | Bank of America | $85,416,680 |
| GREENWOOD MALL | Greenwood Mall L.L.C. | GMAC | $44,702,747 |
| HALSEY CROSSING | PDC Community Centers L.L.C. | Morgan Stanley | $2,587,360 |
| HARBORPLACE | Harborplace Associates Limited Partnership | Prudential Mortgage Capital Company | $50,000,000 |
| HULEN MALL | Hulen Mall, LLC (mall); HMF Properties, LLC | Morgan Stanley | $113,182,044 |
| JORDAN CREEK TOWN CENTER | GGP-Jordan Creek L.L.C. (town center); GGP-Village at Jordan Creek (village) | Eurohypo AG | $185,950,185 |
| KNOLLWOOD MALL | GGP Knollwood Mall, LP | Wachovia Bank | $39,992,557 |
| LAKESIDE MALL | Lakeside Mall Property LLC | German American Capital | $180,599,047 |
| LAKEVIEW SQUARE | Lakeview Square Limited Partnership | Bank of America | $41,379,751 |
| LANDMARK MALL | Landmark Mall L.L.C. | n/a | n/a |
| LANSING MALL | Lansing Mall Limited Partnership | NM Life | $24,338,370 |
| LINCOLNSHIRE COMMONS | Lincolnshire Commons, LLC | Principal Life Insurance Company | $28,000,000 |
| LYNNHAVEN MALL | Lynnhaven Mall L.L.C. | Archon/Commerzbank | $237,310,818 |
| MALL AT SIERRA VISTA, THE | Sierra Vista Mall, LLC | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $23,556,000 |
| MALL OF LOUISIANA - MEZZ | GGP-Mall of Louisiana II, L.P. | Merrill Lynch | $62,392,592 |

**1) Secured Debt**

| Property Name | Borrower(s) | Original Lender(s) | Principal Balance as of 03/15/09 |
|---|---|---|---|
| MALL OF LOUISIANA - NOTE A | GGP-Mall of Louisiana, L.P. | Merrill Lynch | $118,589,401 |
| MALL OF LOUISIANA - NOTE B | GGP-Mall of Louisiana, L.P. | Merrill Lynch | $54,411,531 |
| MALL OF THE BLUFFS | Mall of the Bluffs, LLC | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Associaton & Bank of Ireland | $35,950,943 |
| MALL ST. MATTHEWS | MSM Property L.L.C. | Archon Financial, L.P. and Commerz Bank AG, NY Branch | $144,779,167 |
| MALL ST. VINCENT | Mall St. Vincent, L.P. | Citigroup Global Markets Realty Corp. | $49,000,000 |
| MARKET PLACE | Champaign Marketplace L.L.C. | U.S. Bank National Association | $106,000,000 |
| MAYFAIR MALL AND OFFICES | Mayfair Mall, LLC | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $274,932,172 |
| MONDAWMIN MALL | Mondawmin Business Trust | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $84,689,429 |
| MORENO VALLEY MALL | GGP-Moreno Valley, Inc. | Citigroup | $87,478,506 |
| NEWGATE MALL | GGP-Newgate Mall, LLC | Bank of America | $41,057,004 |
| NEWPARK MALL | GGP-NewPark L.L.C. and Alameda Mall Associates | Lehman Ali, Inc. | $68,285,267 |
| NORTH PLAINS MALL | North Plains Mall, LLC | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $10,656,286 |
| NORTH POINT MALL | GGP-North Point, Inc. | LaSalle Bank National Association | $215,946,342 |
| NORTH STAR MALL | North Star Mall, LLC | Goldman Sachs Mortgage Company | $232,942,738 |
| NORTHTOWN MALL | North Town Mall, LLC | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $114,975,715 |
| NORTHGATE MALL | Northgate Mall L.L.C. | Merrill Lynch | $45,071,589 |
| NORTHRIDGE FASHION CENTER | U.K.-American Properties, Inc. | Goldman | $126,593,450 |
| OAKWOOD CENTER | Oakwood Shopping Center Limited Partnership | Citigroup North America | $95,000,000 |
| OAKWOOD MALL | Oakwood Hills Mall, LLC | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $75,771,800 |
| OGLETHORPE MALL | Oglethorpe Mall L.L.C. (mall); GGP Savannah L.L.C. (Belk parcel); GGP Ivanhoe II, LLC (residential property adjacent to mall) | German American Capital (Deutsche Bank) | $141,573,710 |
| OREM PLAZA CENTER STREET | PDC Community Centers L.L.C. | Morgan Stanley | $2,466,616 |
| OREM PLAZA STATE STREET | PDC Community Centers L.L.C. | Morgan Stanley | $1,526,542 |
| OVIEDO MARKETPLACE | Rouse-Orlando LLC | Prudential Mortgage Capital Company | $51,889,489 |
| OXMOOR CENTER | Hocker Oxmoor, LLC | Greenwich Capital | $56,984,686 |
| OWINGS MILLS MALL | Owings Mills Limited Partnership | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $53,281,429 |
| PARK CITY CENTER - NOTE A | Lancaster Trust | Eurohypo AG/Wells Fargo as Trustee | $120,225,816 |
| PARK CITY CENTER - NOTE B | Lancaster Trust | Eurohypo AG/Wells Fargo as Trustee | $29,235,355 |
| PARK PLACE | Park Mall L.L.C. | Wachovia Bank | $176,696,825 |
| PEACHTREE MALL | Peachtree Mall L.L.C. | Bank of America | $89,712,099 |
| PECANLAND MALL | GGP-Pecanland, L.P. | Salomon | $57,982,872 |
| PIEDMONT MALL | Piedmont Mall, LLC | Prudential Mortgage Capital Company | $33,945,341 |
| PIERRE BOSSIER MALL | Pierre Bossier Mall, LLC | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $40,381,714 |
| PINE RIDGE MALL | Pine Ridge Mall L.L.C. | Column Financial | $26,441,366 |
| PIONEER OFFICE TOWER | Pioneer Place Limited Partnership | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Associaton & Bank of Ireland | Included in Pioneer Place |
| PIONEER PLACE | Pioneer Place Limited Partners Land | City of Portland | $682,061 |
| PIONEER PLACE | Pioneer Place Limited Partnership | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $156,763,886 |
| PRINCE KUHIO PLAZA | HO Retail Properties I Limited Partnership | Bank of America | $37,825,629 |
| PROVIDENCE PLACE - 1 | Rouse Providence LLC | Lehman Bros | $258,880,078 |
| PROVIDENCE PLACE - 2 | Providence Place Holdings LLC | Lehman Bros | $59,610,544 |
| PROVIDENCE PLACE - 3 | Providence Place Holdings LLC | Lehman Bros | $39,097,144 |
| PROVIDENCE PLACE PILOT A1 | Rouse Providence LLC | La Salle | $25,120,765 |
| PROVIDENCE PLACE PILOT A2 | Rouse Providence LLC | La Salle | $21,423,194 |
| PROVO PLAZA LAND LOAN | Provo Mall LLC | Strong Enterprises | $2,249,717 |
| RED CLIFFS MALL | PDC-Red Cliffs Mall L.L.C. | Column Financial | $25,130,998 |
| REGENCY SQUARE MALL | RS Properties Inc. | Eurohypo AG | $93,981,144 |
| RIDGEDALE CENTER | Ridgedale Center, LLC | Bear Stearns Commercial Mortgage, Inc | $178,451,400 |
| RIVER HILLS MALL | River Hills Mall, LLC | U.S. Bank National Association | $80,000,000 |
| RIVER POINTE PLAZA | PDC Community Centers L.L.C. | Morgan Stanley | $3,820,668 |
| RIVERSIDE PLAZA | PDC Community Centers L.L.C. | Morgan Stanley | $5,467,954 |
| RIVERTOWN CROSSINGS - NOTE 1 | GGP-Grandville L.L.C | CIGNA | $15,806,088 |
| RIVERTOWN CROSSINGS - NOTE 2 | GGP-Grandville II L.L.C | CIGNA | $102,263,966 |
| ROGUE VALLEY MALL | Rogue Valley Mall L.L.C | Bank of America | $26,376,276 |
| SAINT LOUIS GALLERIA | Saint Louis Galleria L.L.C. | Credit Suisse First Boston | $237,748,414 |
| SALEM CENTER | Price-ASG L.L.C. (ground leases) | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $41,727,771 |
| SIKES SENTER | Sikes Senter, LLC | LaSalle Bank N.A. | $61,462,462 |
| SILVER LAKE MALL | Silver Lake Mall, LLC | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $18,227,857 |
| SOONER FASHION MALL | Sooner Fashion Mall L.L.C. | U.S. Bank National Association | $60,000,000 |

**1) Secured Debt**

| Property Name | Borrower(s) | Original Lender(s) | Principal Balance as of 03/15/09 |
|---|---|---|---|
| SOUTHLAKE MALL | Southlake Mall L.L.C. | Prudential Mortgage Capital Company | $100,000,000 |
| SOUTHLAND CENTER | Southland Center, LLC | Column Financial | $108,941,927 |
| SOUTHLAND MALL [6] | Scotland Mall, L.P. | Commerz & Goldman Sachs | $81,476,603 |
| SOUTHWEST PLAZA | Southwest Denver Land L.L.C. (fee owner); Southwest Plaza L.L.C. (ground lessee) | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $96,187,000 |
| SPRING HILL MALL | Spring Hill Mall L.L.C. | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Associaton & Bank of Ireland | $68,088,057 |
| ST SECURED - 10 COLUMBIA CORPORATE CENTER (3) | 10 CCC Borrower LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $5,664,808 |
| ST SECURED - THE CROSSING BUSINESS CENTER (10000 COVINGTON CROSS) (3) | 10000 Covington Cross LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $926,261 |
| ST SECURED - THE CROSSING BUSINESS CENTER (10190 COVINGTON CROSS) (3) | 10190 Covington Cross LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $3,824,102 |
| ST SECURED - 1201/41 TOWN CENTER DRIVE (3) | 1201-1281 Town Center Drive LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $1,935,949 |
| ST SECURED - 1251/81 TOWN CENTER DRIVE (3) | 1201-1281 Town Center Drive LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $1,620,607 |
| ST SECURED - 1551 HILLSHIRE DRIVE (3) | 1551 Hillshire Drive LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $2,988,890 |
| ST SECURED - THE CROSSING BUSINESS CENTER (1635 VILLAGE CENTER) (3) | 1635 Village Centre Circle LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $2,061,329 |
| ST SECURED - THE CROSSING BUSINESS CENTER (1645 VILLAGE CENTER) (3) | 1635 Village Center Circle LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $1,765,957 |
| ST SECURED - 20 COLUMBIA CORPORATE CENTER (3) | 20 CCC Borrower LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $5,094,250 |
| ST SECURED - 30 COLUMBIA CORPORATE CENTER (3) | 30 CCC Borrower LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $2,083,027 |
| ST SECURED - 40 COLUMBIA CORPORATE CENTER (3) | 40CCC Borrower LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $2,793,604 |
| ST SECURED - 50 COLUMBIA CORPORATE CENTER (3) | 50 CCC Borrower LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $7,093,329 |
| ST SECURED - 60 COLUMBIA CORPORATE CENTER (3) | 60 CCC Borrower LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $5,716,619 |
| ST SECURED - THE CROSSING BUSINESS CENTER (9950/80 COVINGTON CROSS) (3) | 9950-9980 Covington Cross, LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $2,576,475 |
| ST SECURED - APACHE MALL (3) | Apache Mall LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $61,163,333 |
| ST SECURED - ARIZONA CENTER ONE (3) | Rouse-Phoenix Corporate Center Limited Partnership | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $21,535,000 |
| ST SECURED - ARIZONA CENTER PARKING (3) | Two Arizona Center, LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $2,360,000 |
| ST SECURED - ARIZONA CENTER TWO (3) | Arizona Center Parking, LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $21,338,333 |
| ST SECURED - ASSOCIATION BUILDING (A/K/A C.A. BUILDING) (3) | CCC Association Borrower LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $2,977,295 |
| ST SECURED - CHULA VISTA (3) | Chula Vista Center LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $40,120,000 |
| ST SECURED - COLUMBIA CONVENIENCE CENTER (3) | Running Brook Borrower LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $499,634 |
| ST SECURED - CROSSING BUSINESS CENTER #6 (3) | 1450 Center Crossing Drive LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $1,723,663 |
| ST SECURED - CROSSING BUSINESS CENTER #7 (3) | 1451 Center Crossing Drive, LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $3,586,767 |
| ST SECURED - EXHIBIT BUILDING (3) | CCC Exhibit Borrower LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $379,933 |
| ST SECURED - MALL OF LOUISIANA POWER CENTER (3) | Mall of Louisiana Land, L.P. | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $10,226,667 |
| ST SECURED - RIDGLEY BUILDING (3) | CCC Ridgely Building LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $245,833 |
| ST SECURED - VISTA COMMONS (3) | Vista Commons LLC | Goldman Sachs Mortgage Company and GGP Lenders, L.L.C. | $8,948,333 |
| STATEN ISLAND MALL - NOTE 1 | Rouse SI Shopping Center, LLC | Northwestern Mutual Life Insurance Company | $85,000,000 |
| STATEN ISLAND MALL - NOTE 2 | Rouse SI Shopping Center, LLC | Northwestern Mutual Life Insurance Company | $70,776,220 |
| STATEN ISLAND MALL - NOTE 3 | Rouse SI Shopping Center, LLC | Northwestern Mutual Life Insurance Company | $125,000,000 |
| STEEPLEGATE MALL | GGP-Steeplegate, Inc. | Bank of America | $78,005,310 |
| STONESTOWN CENTER - NOTE B | Stonestown Shopping Center, L.P. | Merrill Lynch Mortgage Capital, Inc. | $60,000,000 |
| STONESTOWN  CENTER- MEZZ | Stonestown Shopping Center Holding L.L.C. | Merrill Lynch Mortgage Capital, Inc. | $57,400,000 |
| STONESTOWN  CENTER- NOTE A | Stonestown Shopping Center, L.P. | Merrill Lynch Mortgage Capital, Inc. | $155,600,000 |
| THE BOULEVARD MALL | Boulevard Associates | Deutsche Bank | $107,824,837 |
| THE CROSSROADS (MI) | Kalamazoo Mall, L.L.C. | Lehman Capital (a division of Lehman Brothers Holdings, Inc. | $39,848,818 |
| GALLERY AT HARBORPLACE | Baltimore Center Garage Limited Partnership | Mayor and City Council of Baltimore | $16,200,975 |
| GALLERY AT HARBORPLACE  - 1 | Baltimore Center Inc. | Lehman | $49,459,653 |
| GALLERY AT HARBORPLACE  - 2 | Baltimore Center Inc. | Lehman | $3,200,000 |
| GALLERY AT HARBORPLACE  - 3 | Baltimore Center Inc. | Lehman | $5,100,000 |
| GALLERY AT HARBORPLACE  - 4 | Baltimore Center Inc. | Lehman | $2,200,000 |
| GALLERY AT HARBORPLACE  - 5 | Baltimore Center Inc. | Lehman | $4,704,500 |
| THE MAINE MALL | GGP-Maine Mall L.L.C. | Citigroup | $216,604,793 |
| THE SHOPPES AT THE PALAZZO | Phase II Mall Subsidiary, LLC | Deutsch Bank Securities, Inc. | $249,622,888 |
| THE SHOPS AT FALLEN TIMBERS | Fallen Timbers Shops, LLC (mall); Fallen Timbers Shops II, LLC (adjacent land) | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $42,400,800 |
| THE WOODLANDS MALL - NOTE 1 | The Woodlands Mall Associates, LLC | Wachovia Bank, N.A. | $185,000,000 |
| THE WOODLANDS MALL - NOTE 2 | The Woodlands Mall Associates, LLC | Wachovia Bank, N.A. | $55,000,000 |
| THREE RIVERS MALL | Three Rivers Mall L.L.C. | Column Financial | $21,527,484 |
| TOWN EAST MALL | Town East Mall, LLC | UBS Warburg | $105,391,123 |
| FALLBROOK  CENTER | Fallbrook Square Partners Limited Partnership | U.S. Bank National Association | $85,000,000 |
| THE GRAND CANAL SHOPPES AT THE VENETIAN | Grand Canal Shops II LLC | Wells Fargo | $394,366,370 |
| TUCSON MALL | GGP-Tucson Mall L.L.C. | Wachovia | $119,233,401 |
| TYSONS GALLERIA | Tysons Galleria L.L.C | Eurohypo AG, New York Branch | $255,000,000 |
| UNIVERSITY CROSSING | GGP-UC L.L.C. | Morgan Stanley | $11,392,613 |
| VALLEY HILLS MALL | Valley Hills Mall L.L.C | CSFB | $56,941,750 |
| VALLEY PLAZA MALL | Bakersfield Mall LLC and RASCAP Realty, Ltd | Lehman | $95,452,329 |
| VICTORIA WARD ENTERTAINMENT CENTER & VICTORIA WARD CENTER | Victoria Ward Center, L.L.C. | Bank of America | $58,389,316 |
| VICTORIA WARD VILLAGE/INDUSTRIAL/GATEWAY | Ward Gateway-Industrial-Village, LLC | Bank of America | $88,500,000 |
| WARD PLAZA AND WAREHOUSE | WARD PLAZA-WAREHOUSE, LLC | GOLDMAN SACHS COMMERCIAL MORTGAGE CAPITAL, L.P., | $68,500,000 |

| Prior Lien Debt | | | |
|---|---|---|---|
| **Schedule 8.19-1** | | | |
| **As of March 15, 2009** | | | |

**1) Secured Debt**

| Property Name | Borrower(s) | Original Lender(s) | Principal Balance as of 03/15/09 |
|---|---|---|---|
| VILLAGE OF CROSS KEYS | VCK Business Trust | Columbia National Real Estate Finance LLC | $10,313,384 |
| VISALIA MALL | Visalia Mall, L.P | Lehman | $41,712,466 |
| VISTA RIDGE MALL | Vista Ridge Mall, LLC | Lehman Brothers Bank FSB | $80,481,542 |
| WASHINGTON PARK MALL | HO Retail Properties II Limited Partnership | Lehman Brothers Bank FSB | $12,115,914 |
| WEST VALLEY MALL | Tracy Mall Partners, L.P | Bear Stearns Commercial Mortgage, Inc. | $56,601,774 |
| WESTWOOD MALL | Westwood Mall, LLC | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $24,116,857 |
| WHITE MARSH MALL | White Marsh Mall Associates & White Marsh Phase II Associates (mall, as TIC); White Marsh General Partnership (former L&T) | Metropolitan Life Insurance Company | $187,000,000 |
| WHITE MOUNTAIN MALL | White Mountain Mall, LLC | Eurohypo AG, ING Real Estate Fin., Wachovia, Hypo, Aareal, National Association & Bank of Ireland | $10,656,286 |
| WILLOWBROOK MALL | Willowbrook Mall, LLC | Bank of America | $158,797,770 |
| WOODBRIDGE CENTER | Woodbridge Center Property, LLC | Eurohypo AG, New York Branch | $208,279,344 |
| WOODLANDS VILLAGE | PDC Community Centers L.L.C. | Morgan Stanley | $6,985,872 |
| **SUB TOTAL** | | | **$15,133,598,584** |

**2) Debt Secured by Non-Real Estate**

| Property Name | Borrower(s) | Original Lender(s) | Principal Balance 3/15/2009 |
|---|---|---|---|
| BANK OF AMERCIA SWAP (4) | GGP Limited Partnership | Bank of America | $6,855,852 |
| GGPLP/GGPLPLLC REVOLVER [7] | GGP Limited Partnership and GGPLP LLC | Various Lenders | $650,000,000 |
| GGPLP/GGPLPLLC SENIOR TERM | GGP Limited Partnership and GGPLP LLC | Various Lenders | $1,987,500,000 |
| HOMART I | GGP Limited Partnership | State of NY Comptroller | $245,115,000 |
| IVANHOE CAPITAL | Ivanhoe Capital L.P. | Ivanhoe | $93,712,500 |
| **SUB TOTAL** | | | **$2,983,183,352** |

**3) Insurance Debt**

| Property Name | Borrower(s) | Original Lender(s) | Principal Balance 3/31/2009 |
|---|---|---|---|
| INSURANCE FINANCING | General Growth Properties Inc. | Aon Premium Finance, LLC | $439,800 |
| **SUB TOTAL** | | | **$439,800** |

**4) Capital Leases**

| Property Name | Lessor(s) | Lessee | Principal Balance as of 03/15/09 |
|---|---|---|---|
| COLLIN CREEK [1] | Collin Creek Mall, L.P. | US Bancorp Equipment Finance, Inc | $10,125 |
| SOUTH STREET SEAPORT [1] | TRC South Street Seaport | Madison Capital LLC | $10,820 |
| FASHION SHOW [1] | Pitney Bowes Global Financial Services (Postage Equipment), Constellation Energy Source Inc (Central Plant), and PHH Leasing (Vehicle) | Fashion Show Mall LLC (Vehicle), Rouse FS LLC (Central Plant and Postage Equipment), and Fashion Show Expansion LLC (Central Plant). | $8,235,463 |
| **SUB TOTAL** | | | **$8,256,407** |

**5) Property Secured Letter's of Credit**

| Property Name | Borrower(s) | Original Lender(s) | Principal Balance as of 03/15/09 |
|---|---|---|---|
| LANDMARK MALL [2] | LANDMARK MALL LLC | Bank of America | $21,989,210 |
| **SUB TOTAL** | | | **$21,989,210** |
| **GRAND TOTAL** | | | **$15,164,284,001** |

[1] The Capital Lease at Collin Creek is for Food Court fixtures. The Capital Lease at South Street Seaport is for a vehicle. There are three (3) Capital Leases at Fashion Show - (a) Postage Equipment, (b) Vehicle, and (c) a Central Plant. The Capital Lease schedule is not intended to be exhaustive and other Capital Leases entered into in the ordinary course of Obligor's business shall also be deemed Prior Lien Debt.

[2] Total capacity on the letter of credit is $25,000,000. The mortgage granted by Landmark Mall LLC, which mortgage encumbers Landmark Mall, secures various letters of credit issued by Bank of America for the benefit of various GGP affiliates.

[3] It is assumed that this loan will be paid off simultaneously with the closing of the contemplated loan herein.

[4] Represents GGP's total exposure to the swap as of 03/31/09. This number fluctuates daily. Our collateralization is of only of amounts exceeding $5,000,000.

[5] Represents balance at the Maturity Date of the loan - February 2nd, 2009

[6] Represents balance at the Maturity Date of the loan - March 2nd, 2009

[7] Total Capacity is $650,000,000 which has been modified over time. However, the current balance is $590,000,000. Additionally, there are letters of credit outstanding that are not drawn which would increase the current balance of $590,000,000.

*This Prior Lien Debt Schedule 8.20-1 does not separately list (A) references to Special Improvement District charges, which are treated as debt for purposes of GAAP but are treated as part of the tax bills for purposes of this Credit Agreement, (B) any payment plans in connection with M&M liens, or (C) Debt incurred in connection with Municipal Financing, which shall each be deemed to be Prior Lien Debt.

**Schedule 8.22**
**Physical Condition - Exceptions**

**None, except as noted below:**

- Cottonwood Mall – Holladay, UT
  Redevelopment of Cottonwood was stopped in the fourth quarter of 2008. The conditions of the mall site include an existing Macy's Department Store (operating), a freestanding TGIF restaurant and a 50-acre site (dirt pad) where the original mall stood.
- Elk Grove Promenade – Elk Grove, CA
  This is a new development project that has been temporarily suspended. The buildings are approximately 65% complete.
- River Falls Mall – Clarksville, IN
  We demolished a portion of the former mall to construct a power center with big box use. A large portion of the power center is leased. However, the raw spaces in the power center have rear and side walls, but are open to the front (unfinished).
- Summerlin Centre – Las Vegas, NV
  This is a new development project that has been temporarily suspended. Steel erection had commenced to about 40% complete when the project was halted.
- Saint Louis Galleria Anchor – St. Louis, MO
  The former Lord & Taylor building was torn down to make way for Nordstrom. The project has been placed on hold and there is a temporary barricade between the common area and the construction site. The construction site is fenced in and the Nordstrom shell is incomplete.
- Tucson Mall – Tucson, AZ
  We purchased the former Macy's building and tore it down to make way for a lifestyle component. The project is currently on hold. There is a temporary barricade covering the former Macy's entrance and a fence surrounding the construction site.
- Ward Village Shops (Victoria Ward Industrial - Unencumbered) – Honolulu, HI
  Construction activities have been suspended on a 65,000 square-foot two-level anchor store building and a seven story 800-stall parking structure. The buildings are approximately 60% complete.

**Schedule 8.23**
**Management**

| Obligor | Property | Management Agreement |
|---|---|---|
| Willowbrook Mall, LLC | Willowbrook Mall (NJ) | Dated January 1, 1995 |

**Schedule 8.25**
**Utilities and Public Access**

None.

**Schedule 8.27**
**Permits – Exceptions**

None.

**Schedule 8.28**
**Unrecorded Ground Leases**

None.

## SCHEDULE 9.13 USE OF PROCEEDS - DEBT

**GGP Consolidation - Sources & Uses of Cash - CONSOLIDATED
Draft DIP Funds Flow - Target Funding the week ended 5/15/09
($000's)**

---

**Sources of Cash**

| | | |
|---|---|---|
| Estimated Cash on Hand - Week Ended 5/15/09 (Prior to DIP Transaction) | $ | 186,613 |
| Loan Draw | | 400,000 |
| Goldman Incentive Refund and Escrow | | 15,962 |
| | | |
| Total Sources of Cash | | 602,575 |

**Uses of Cash** [1, 3]

| | | |
|---|---|---|
| Payment of Goldman loan | | (215,000) |
| DIP Transaction Fees & Expenses | | (4,000) |
| Goldman Interest [2] | | (3,176) |
| | | |
| Total Uses of Cash | | (222,176) |
| | | |
| Total Available Cash After Transactions | $ | 380,400 |

**Notes:**
1: Also includes any other use of proceeds permitted by Section 9.13 of the Credit Agreement.
2: Interest accrued through 05/14/2009.
3: Uses of cash does not include potential Goldman legal fees reimbursement.