1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-11977

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


GENERAL GROWTH PROPERTIES, INC., et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                May 13, 2009

                11:26 AM


B E F O R E:

HON. ALLAN L. GROPPER

U.S. BANKRUPTCY JUDGE

2

1

2  HEARING re Debtors' Motion for Interim and Final Orders to

3  (i)Honor Tenant Obligations; and (ii)Authorize Financial

4  Institutions to Honor Related Checks and Transfers

5

6  HEARING re Debtors' Motion for Interim and Final Orders

7  Pursuant to Sections 105(a), 345(b), 363(b) 363(c) and 364(a)

8  of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004

9  (A)for Authorization to (i)Continue Using Existing Centralized

10  Cash Management System; (ii)Honor Certain Pre-Petition

11  Obligations Related to the Use of the Cash Management System;

12  and (iii)Maintain Existing Bank Accounts and Business Forms;

13  (B)for an Extension of Time to Comply with Section 345(b) of

14  the Bankruptcy Code; and (C)Scheduling a Final Hearing

15

16  HEARING re Debtors' Motion Requesting (I)Entry of (A)Interim

17  and Final Orders (i)Authorizing the Debtors' Use of Cash

18  Collateral and Granting Adequate Protection Therefor Pursuant

19  to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy

20  Rule 4001; and (ii)Modifying the Automatic Stay; and (B)a Final

21  Order Authorizing Borrowing with Priority Over Administrative

22  Expenses and Secured by Liens on Property of the Estates

23  Pursuant to Section 364(c) of the Bankruptcy Code; and

24  (II)Scheduling of a Final Hearing on Each Requested Final Order

25

3

1

2    HEARING re Debtors' Motion for Entry of a Protective Order

3    Pursuant to Sections 105(a) and 107(b) of the Bankruptcy Code

4    and Bankruptcy Rule 9018 Establishing Procedures for the

5    Protection of Confidential Information in connection with

6    First-Day Motions

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed By:  Lisa Bar-Leib

4

1

2      A P P E a R a N C E S :

3      WEIL, GOTSHAL & MANGES LLP

4            Attorneys to the Debtors and Debtors-in-Possession

5            767 Fifth Avenue

6            New York, NY 10153

7

8      BY:   MARCIA L. GOLDSTEIN, ESQ.

9            GARY T. HOLTZER, ESQ.

10

11     WEIL, GOTSHAL & MANGES LLP

12           Attorneys to the Debtors and Debtors-in-Possession

13           1300 Eye Street, N.W.

14           Suite 900

15           Washington, DC 20005

16

17     BY:   ADAM P. STROCHAK, ESQ.

18

19     WEIL, GOTSHAL & MANGES LLP

20           Attorneys to the Debtors and Debtors-in-Possession

21           200 Crescent Court

22           Suite 300

23           Dallas, TX 75201

24

25     BY:   STEPHEN A. YOUNGMAN, ESQ.

5

1

2    WEIL, GOTSHAL & MANGES LLP

3          Attorneys to the Debtors and Debtors-in-Possession

4          700 Louisiana

5          Suite 1600

6          Houston, TX 77002

7

8    BY:   MELANIE GRAY, ESQ.

9          CHRISTOPHER M. LOPEZ, ESQ. (TELEPHONICALLY)

10

11   KIRKLAND & ELLIS LLP

12          Co-Counsel to Certain Subsidiary Debtors and

13           Debtors in Possession

14          300 North LaSalle Street

15          Chicago, IL 60654

16

17   BY:   GABOR BALASSA, ESQ.

18          RICHARD C. GODFREY, ESQ.

19

20

21

22

23

24

25

6

1

2    AKIN GUMP STRAUSS HAUER & FELD LLP

3         Attorneys for the Official Committee of Unsecured

4          Creditors

5         One Bryant Park

6         New York, NY 10036

7

8    BY:   MICHAEL S. STAMER, ESQ.

9

10   AKIN GUMP STRAUSS HAUER & FELD LLP

11        Attorneys for the Official Committee of Unsecured

12         Creditors

13        Robert S. Strauss Building

14        1333 New Hampshire Avenue, N.W.

15        Washington, DC 20036

16

17   BY:   JAMES SAVIN, ESQ.

18

19

20

21

22

23

24

25

7

1

2   AKIN GUMP STRAUSS HAUER & FELD LLP

3        Attorneys for the Official Committee of Unsecured

4         Creditors

5        1700 Pacific Avenue

6        Suite 4100

7        Dallas, TX 75201

8

9   BY:   CHARLES R. GIBBS, ESQ.

10

11   UNITED STATES DEPARTMENT OF JUSTICE

12        Office of the United States Trustee

13        33 Whitehall Street

14        Suite 2100

15        New York, NY 10004

16

17   BY:   BRIAN MASUMOTO, ESQ.

18

19   ALSTON & BIRD LLP

20        Attorneys for Prudential Insurance Company of America

21        One Atlantic Center

22        1201 West Peachtree Street

23        Atlanta, GA 30309

24

25   BY:   GRANT T. STEIN, ESQ.

8

1

2      ALSTON & BIRD LLP

3            Attorneys for Amici Curiae, MBA/CMSA

4            90 Park Avenue

5            New York, NY 10016

6

7      BY:   JOSEPH P. FORTE, ESQ.

8

9      ARONAUER, RE & YUDELL, LLP

10           Attorneys for Centerline Servicing

11           444 Madison Avenue

12           New York, NY 10022

13

14     BY:   KENNETH S. YUDELL, ESQ.

15

16     BINGHAM MCCUTCHEN LLP

17           Attorneys for Teachers Insurance

18           399 Park Avenue

19           New York, NY 10022

20

21     BY:   MICHAEL J. REILLY, ESQ.

22

23

24

25

9

1

2    BROWN RUDNICK LLP

3         Attorneys for Wilmington Trust Company, as Indenture

4              Trustee for the 3.98% Exchangeable Notes Due 2027, and

5              Ad Hoc Consortium of Holders of Such Notes

6              One Financial Center

7              Boston, MA 02111

8

9    BY:   WILLIAM R. BALDIGA, ESQ.

10

11   BRYAN CAVE LLP

12        Attorneys for Multiple Secured Property Level Lenders

13        1290 Avenue of the Americas

14        New York, NY 10104

15

16   BY:   LAWRENCE P. GOTTESMAN, ESQ.

17        MICHELLE MCMAHON, ESQ.

18

19

20

21

22

23

24

25

10

1

2    BRYAN CAVE LLP

3         Attorneys for Multiple Secured Property Level Lenders

4          Whose Loans are Serviced by Centerline Servicing

5         2200 Ross Avenue

6         Suite 3300

7         Dallas, TX 75201

8

9    BY:   KEITH M. AURZADA, ESQ.

10

11   BRYAN CAVE LLP

12        Attorneys for Multiple Secured Property Level Lenders

13         Whose Loans are Serviced by Centerline Servicing

14        One Metropolitan Square

15        211 North Broadway

16        Suite 3600

17        St. Louis, MO 63102

18

19   BY:   LLOYD A. PALANS, ESQ.

20

21

22

23

24

25

11

1

2    CLEARY GOTTLIEB STEEN & HAMILTON LLP

3         Attorneys for Goldman Sachs Mortgage Co.

4         One Liberty Plaza

5         New York, NY 10006

6

7    BY:   DEBORAH M. BUELL, ESQ.

8

9    COHEN TAUBER SPIEVACK & WAGNER LLP

10        Attorneys for Howard S. Wright Constructors, LP

11        420 Lexington Avenue

12        Suite 2400

13        New York, NY 10170

14

15   BY:   IRA R. ABEL, ESQ.

16

17   DAY PITNEY LLP

18        Attorneys for A&K Endowment, Inc.

19        200 Campus Drive

20        Florham, NJ 07932

21

22   BY:   RICHARD M. METH, ESQ.

23

24

25

12

1

2    DEBEVOISE & PLIMPTON LLP

3         Attorneys for New York Life Insurance Co.

4         919 Third Avenue

5         New York, NY 10022

6

7    BY:   RICHARD F. HAHN, ESQ.

8

9    DECHERT LLP

10        Attorneys for Tysons Galleria, Ala Moana, and Maine Mall

11         Lenders

12        1095 Avenue of the Americas

13        New York, NY 10036

14

15   BY:   SHMUEL VASSER, ESQ.

16

17   DORSEY & WHITNEY LLP

18        Attorneys for U.S. Bank National Association

19        250 Park Avenue

20        New York, NY 10177

21

22   BY:  MICHAEL E. FOREMAN, ESQ.

23

24

25

13

1

2    DUANE MORRIS LLP

3          Attorneys for Principal Life Insurance Company

4          30 South 17th Street

5          Philadelphia, PA 19103

6

7    BY:   MARGERY N. REED, ESQ.

8

9    LAW OFFICES OF DAVID G. ELKINS

10         6023 Stewart Road

11         Suite 308

12         Galveston, TX 77551

13

14   BY:   DAVID G. ELKINS, ESQ.

15         (TELEPHONICALLY)

16

17   GIBSON, DUNN & CRUTCHER LLP

18         Attorneys for Farallon Capital Management LLC

19         200 Park Avenue

20         New York, NY 10166

21

22   BY:   DAVID M. FELDMAN, ESQ.

23         MATTHEW J. WILLIAMS, ESQ.

24

25

14

1

2    GREENBERG TRAURIG, LLP

3         Attorneys for Metropolitan Life Insurance, American

4          General Insurance, KBC Bank

5         MetLife Building

6         200 Park Avenue

7         New York, NY 10166

8

9    BY:   GARY D. TICOLL, ESQ.

10

11   HERRICK, FEINSTEIN LLP

12        Attorneys for Citicorp North America, Inc. as

13         Administrative Agent on Oakwood

14        2 Park Avenue

15        New York, NY 10016

16

17   BY:   STEPHEN B. SELBST, ESQ.

18

19   KILPATRICK STOCKTON LLP

20        Attorneys for ING Clarion Capital Loan Services LLC

21        Suite 2800

22        1100 Peachtree Street, NE

23        Atlanta, GA 30309

24

25   BY:   TODD C. MEYERS, ESQ.

15

1

2    LATHAM & WATKINS LLP

3         Attorneys for Deutschebank

4         53rd at Third

5         885 Third Avenue

6         New York, NY 10022

7

8    BY:   ROBERT J. ROSENBERG, ESQ.

9          NOREEN A. KELLY-NAJAH, ESQ.

10

11   MORRISON & FOERSTER LLP

12         Attorneys for 2006 Lending Group

13         1290 Avenue of the Americas

14         New York, NY 10104

15

16   BY:   BRETT H. MILLER, ESQ.

17

18   REED SMITH LLP

19         Attorneys for Northwestern Mutual Life Insurance Company

20         599 Lexington Avenue

21         New York, NY 10022

22

23   BY:   MARK D. SILVERSCHOTZ, ESQ.

24

25

16

1

2    RIEMER & BRAUNSTEIN LLP

3         Attorneys for 2008 Facility Lenders

4         Three Center Plaza

5         Boston, MA 02108

6

7    BY:   PAUL S. SAMSON, ESQ.

8

9    SANFOR P. ROSEN & ASSOCIATES, P.C.

10        Attorneys for FMR Funding Company

11        747 Third Avenue

12        New York, NY 10017

13

14   BY:   SANFORD P. ROSEN, ESQ.

15

16   SAUL EWING LLP

17        245 Park Avenue

18        24th Floor

19        New York, NY 10167

20

21   BY:   JOHN J. JEROME, ESQ.

22

23

24

25

17

1

2    SQUIRE, SANDERS & DEMPSEY L.L.P.

3          Attorneys for Corporation Service Company

4          31st Floor

5          1095 Avenue of the Americas

6          New York, NY 10036

7

8    BY:   SANDRA E. MAYERSON, ESQ.

9

10   TEITELBAUM & BASKIN, LLP

11         Attorneys for H&M Hennes & Mauritz, L.P.

12         3 Barker Avenue

13         Third Floor

14         White Plains, NY 10601

15

16   BY:   KENNETH M. LEWIS, ESQ.

17

18   TOGUT, SEGAL & SEGAL, LLP

19         Attorneys for Macys

20         One Penn Plaza

21         New York, NY 10119

22

23   BY:   NEIL BERGER, ESQ.

24

25

18

1

2    VENABLE LLP

3          Attorneys for CWCapital Asset Management, LLC; Midland

4           Loan Services, Inc.; Oryx Capital Markets, LLC; and JE

5           Robert Company, Inc.

6          750 East Pratt Street

7          Suite 900

8          Baltimore, MD 21202

9

10   BY:   GREGORY A. CROSS, ESQ.

11

12   VENABLE LLP

13         Attorneys for CWCapital Asset Management, LLC; Midland

14          Loan Services, Inc.; ORIX Capital Markets, LLC; and JE

15          Robert Company, Inc.

16         Rockefeller Center

17         1270 Avenue of the Americas

18         25th Floor

19         New York, NY 10020

20

21   BY:   EDWARD A. SMITH, ESQ.

22

23

24

25

19

1

2    VINSON & ELKINS LLP

3          Attorneys for Ivanhoe Capital LP

4          666 Fifth Avenue

5          26th Floor

6          New York, NY 10103

7

8    BY:   JANE L. VRIS, ESQ.

9

10   WILLKIE FARR & GALLAGHER LLP

11         Attorneys for Brookfield Asset Management

12         787 Seventh Avenue

13         New York, NY 10019

14

15   BY:   SHELLEY C. CHAPMAN, ESQ.

16

17   ZEICHNER ELLMAN & KRAUSE LLP

18         Attorneys for Several Mall Lenders Specially Serviced by

19          Helios AMC

20         575 Lexington Avenue

21         New York, NY 10022

22

23   BY:   JANRA VAN ROY, ESQ.

24

25

20

1

2      GENOVESE JOBLOVE & BATTISTA P.A.

3            Attorneys for The Gap, Old Navy and Banana Republic

4            Bank of America Tower

5             at International Place

6            100 Southeast Second Street

7            44th Floor

8            Miami, FL 33131

9

10     BY:   PAUL J. BATTISTA, ESQ.

11           (TELEPHONICALLY)

12

13     GOULSTON & STORRS P.C.

14           Attorneys for New England Development

15           400 Atlantic Avenue

16           Boston, MA 02110

17

18     BY:   PHILIP SEGALOFF, ESQ.

19           (TELEPHONICALLY)

20

21

22

23

24

25

21

1

2    HENNIGAN BENNETT & DORMAN LLP

3         Attorneys for Oaktree Capital Management, LP

4         865 South Figueroa Street

5         Suite 2900

6         Los Angeles, CA 90017

7

8    BY:   JOSHUA M. MESTER, ESQ.

9         BRUCE BENNETT, ESQ.

10        (TELEPHONICALLY)

11

12   K & L GATES

13        Attorneys for Vratsinas Construction Co.

14        1717 Main Street

15        Suite 2800

16        Dallas, TX 75201

17

18   BY:   JEFFREY R. FINE, ESQ.

19        (TELEPHONICALLY)

20

21

22

23

24

25

22

1

2    SIDLEY AUSTIN LLP

3        555 West Fifth Avenue

4        Los Angeles, CA 90013

5

6    BY:   JEREMY E. ROSENTHAL, ESQ.

7        (TELEPHONICALLY)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

23

1              P R O C E E D I N G S

2              THE COURT:  This is General Growth Properties.  Are

3    we ready?

4              MS. GOLDSTEIN:  I believe, Your Honor, that we are

5    ready.

6              THE COURT:  All right.  I'll take appearances.  And

7    I'll take appearances first from those in the courtroom and

8    then from anyone on the telephone who wishes to appear and to

9    speak.

10             MS. GOLDSTEIN:  Okay.  Your Honor, Marcia Goldstein,

11   Weil Gotshal & Manges on behalf of the debtors.  And also

12   appearing today, my partners, Gary Holtzer, Adam Strochak and

13   Melanie Gray.

14             MR. STAMER:  Good morning, Your Honor.  Michael

15   Stamer, James Savin and Chuck Gibbs from Akin Gump here on

16   behalf of the official committee.

17             MR. CROSS:  Good morning, Your Honor.  Greg Cross and

18   Ed Smith from Venable on behalf of CWCapital Asset Management,

19   Midland Loan Services, ORIX Capital Markets and JE Robert.

20             THE COURT:  And are you still an informal spokesman

21   for an --

22             MR. CROSS:  I am --

23             THE COURT:  -- informal group of lenders?

24             MR. CROSS:  I am, Your Honor.

25             THE COURT:  Very good.

24

1          MR. GOTTESMAN:  Good morning, Your Honor.  Lawrence

2    Gottesman along with my colleagues, Michelle McMahon, Lloyd

3    Palans, Keith Aurzada, of Bryan Cave on behalf of multiple

4    property level secured lenders.

5          MR. YUDELL:  Good morning, Your Honor.  Kenneth

6    Yudell of Aronauer, Re & Yudell on behalf of a number of

7    lenders whose loans are being serviced by Centerline Servicing.

8          MR. FELDMAN:  Good morning, Your Honor.  David

9    Feldman and Matthew Williams from Gibson, Dunn & Crutcher on

10   behalf of the proposed DIP lenders.

11         MR. REILLY:  Good morning, Your Honor.  Michael

12   Reilly from Bingham McCutchen on behalf of Teachers Insurance.

13   We're part of the informal secured group speaking today in our

14   capacity as mez lender and lenders of certain nondebtor

15   entities.

16         MS. REED:  Good morning, Your Honor.  Margery Reed

17   from Duane Morris on behalf of Principal Life Insurance

18   Company.

19         MR. SAMSON:  Good morning, Your Honor.  Paul Samson

20   of Reimer & Braunstein on behalf of the 2008 facility lenders.

21         MS. VAN ROY:  Good morning, Your Honor.  Jantra Van

22   Roy, Zeichner Ellman & Krause LLP on behalf of several mall

23   lenders serviced by Helios.

24         MR. MASUMOTO:  Good morning, Your Honor.  Brian

25   Masumoto for the Office of the United States Trustee.

                                                                    25

1           THE COURT:  I'll continue on the left side of the

2    courtroom.

3           MR. BALDIGA:  Good morning, Your Honor.  William

4    Baldiga of Brown Rudnick for the Wilmington Trust Company as

5    indenture trustee for the 3.98 percent convertible bonds and

6    for an ad hoc consortium of holders of those bonds and for

7    Capital Ventures and Fashion stakeholders.  Thank you.

8           MR. FOREMAN:  Good morning, Your Honor.  Michael

9    Foreman of Dorsey & Whitney for U.S. National Bank, National

10   Association, cash management bank of the debtors and lender

11   under three facilities.

12          MS. VRIS:  Good morning, Your Honor.  Jane Vris,

13   Vinson & Elkins for Ivanhoe Capital, a secured lender in this

14   case.

15          MR. ROSEN:  Good morning, Your Honor.  Sanford Rosen,

16   Sanford Rosen & Associates for FMR Funding Company, a property

17   lender.

18          THE COURT:  Good morning.

19          MR. LEWIS:  Good morning, Your Honor.  Kenneth Lewis,

20   Teitelbaum & Baskin, attorneys for H&M Hennes & Mauritz, L.P.

21          THE COURT:  Lenders?

22          MR.LEWIS:  No.  We are a tenant in about twenty-five

23   locations, Your Honor.

24          THE COURT:  You are --

25          MR. LEWIS:  A tenant.

26

1          THE COURT:  A tenant?

2          MR. LEWIS:  All right.

3          THE COURT:  I think you're the first tenant who has

4  appeared that I can recall.  Yes, sir?

5          MR. VASSER:  Good morning, Your Honor.  Shmuel

6  Vasser, Dechert LLP for mortgage lenders to three malls, Maine

7  Mall, Ala Moana and Tysons Galleria.

8          MR. ABEL:  Good morning, Your Honor.  Ira Abel, Cohen

9  Tauber Spievack Wagner for Howard S. Wright Constructors.

10  We're a mechanics of properly perfected mechanic's lien of a

11  shell property in Elk Grove, California.

12          MR. MEYERS:  Good morning, Your Honor.  Todd Meyers

13  with Kilpatrick Stockton.  We're counsel to a number of lenders

14  whose loans are being serviced by ING Clarion.

15          MR. SELBST:  Good afternoon, Your Honor.  Stephen

16  Selbst, Herrick Feinstein for Citicorp Foundation for the

17  Oakwood Shopping Center lenders.

18          MR. TICOLL:  Good morning, Your Honor.  Gary Ticoll

19  of Greenberg Traurig of behalf of MetLife, who is a first lien

20  property lender, and also -- in addition, we represent two

21  lenders -- property lenders.

22          MR. SILVERSCHOTZ:  Your Honor, good morning.  Mark

23  Silverschotz, Reed Smith LLP, on behalf of Northwestern Mutual

24  Life Insurance which is a property lender on two facilities.

25          MR. ROSENBERG:  Good morning, Your Honor.  Robert

27

1    Rosenberg and Noreen Kelly-Najah of Latham & Watkins on behalf

2    of Deutschebank as agents and secured lenders to Fashion Show

3    and Palazzo.

4         MR. HAHN:  Good morning, Your Honor.  Richard Hahn of

5    Debevoise & Plimpton on behalf of New York Life, a property

6    level lender.

7         MR. METH:  Good morning, Your Honor.  Richard M.

8    Meth, Day Pitney LLP, appearing on behalf of A&K Endowment,

9    Inc., a holder with regard to the Summerlin Business Entity and

10   Summerlin Development.

11        MR. BERGER:  Judge, Neil Berger, Togut, Segal &

12   Segal, for Macys, a tenant.

13        MR. STEIN:  Grant Stein, Your Honor, Alston & Bird,

14   on behalf of Prudential Insurance Company of America, property

15   lender, also a mezzanine.

16        THE COURT:  Anyone else in the courtroom?

17        MR. ROWE:  Good morning, Your Honor.  George Rowe for

18   General Trust Company.

19        THE COURT:  A property lender?

20        MR. ROWE:  No.  Equity, Your Honor.

21        THE COURT:  All right.

22        MR. FORTE:  Joseph Forte of Alston & Bird

23   representing the CMSA and the MBA Amici.

24        THE COURT:  Anyone else?  All right.  On the

25   telephone, please.  Anyone on the phone wish to appear today?

28

1    Is the phone line open?

2              THE OPERATOR:  Yes, Your Honor.

3              THE COURT:  It is?

4              MR. ELKINS:  Good morning, Your Honor.  This is David

5    Elkins and I'm here on behalf of myself as a beneficiary under

6    a deferred payment contract involving some undeveloped land in

7    Nevada.  Thank you.

8              THE COURT:  Anyone else on the phone?  All right.

9    Ms. Goldstein, where shall we start today?

10             MS. GOLDSTEIN:  Thank you, Your Honor.  We're here on

11   the continued hearing with respect to the debtors' motions to

12   use cash collateral, to approve DIP financing and to approve

13   the continuation of the debtors' cash management system.

14             Your Honor, this morning, we are presenting a revised

15   debtor-in-possession loan with a different lender than we had

16   filed prior to the prior hearing.  The new lenders are a group

17   of institutional lenders to the corporate debtors and they are

18   led, generally, by Farallon.  Your Honor, we filed this new

19   loan agreement along with a new proposed order with the

20   permission of the Court, at approximately 1 p.m. yesterday.

21   There has since been, based upon discussions over the last

22   twenty-four hours primarily with the representatives of the

23   informal secured creditor group, additional change to the order

24   and corresponding changes in the credit agreement.  And we have

25   blacklines available or we'll shortly have blacklines available

29

1   for everyone in the courtroom.  And later in the hearing, my

2   partner, Gary Holtzer, who stayed up later than I did last

3   night, will review the blackline with the Court.

4           THE COURT:  Does that make him better able to --

5   perhaps he's more familiar with it but --

6           MS. GOLDSTEIN:  Well, that makes him more familiar

7   with the intricacies of that blackline.

8           THE COURT:  -- it may be more blurry.  That was my

9   thought.  But all right.

10          MS. GOLDSTEIN:  Okay.  So --

11          THE COURT:  Everyone then will -- you'll give a

12  complete analysis of any differences between the blackline as

13  filed and the document that you're presenting today.

14          MS. GOLDSTEIN:  Yes, Your Honor.

15          THE COURT:  All right.

16          MS. GOLDSTEIN:  And we will do that later.  I think

17  the two most significant changes from the loan that we had

18  previously brought to this Court last week are the elimination

19  of any warrant and the elimination of second liens and

20  guarantied claims against property level and mez level

21  borrowers.  As Your Honor is aware, the first was a big issue

22  for the unsecured creditors and the second a big issue for the

23  secured creditors.

24          The DIP loan that we are seeking approval of today

25  was selected by the debtor following a process that was

30

1    developed and engaged in on a fully collaborative basis with

2    the creditors' committee and which was participated in by

3    representatives of the unofficial secured lender group.

4         With a court reporter present at our offices Monday

5    afternoon, there was a full description of the process that

6    would be undertaken with respect to evaluation of bids by the

7    prospective DIP lenders.  That process was explained to all of

8    the bidders at the same time.  None had any questions or

9    comments and proceeded with the process.

10        Late in the evening, the winner, the Farallon group

11   was selected.  And this was with the concurrence of the

12   creditors' committee and the secured lenders.  We want to thank

13   all the parties who participated in that process and spent a

14   lot of hours to help us get here this morning and, frankly, who

15   spent many hours since then trying to resolve all possible

16   issues that could come up with respect to the DIP financing.  I

17   can't tell you that we've resolved every single issue, Your

18   Honor, but we are pleased that certainly all objections of the

19   unsecured creditors' committee have been resolved.  And after

20   the efforts of the unofficial group of secured lenders over the

21   last twenty-four hours and even during the process, we think

22   we've resolved almost all of the objections that had been

23   asserted by the secured lenders.  As an aside, Your Honor, we

24   also have resolved the objections of the secured lenders to the

25   tenant obligations form of order.  We had dealt with the tenant

31

1    obligations motion at the last hearing and we will be ready to

2    present a consensual order on that today.

3         Your Honor, now so what is left in terms of

4    objections, we believe that at the appropriate time in the

5    hearing, Deutschebank will speak as to its continuing objection

6    with respect to certain aspects of the debtors' cash management

7    motion.  We're also not sure if there are other secured lenders

8    or mez lenders who may not have participated in the

9    coordinating group who may still have objections.  So,

10   obviously, we may hear from representatives of those lenders

11   later in the hearing.

12        I thought it would be appropriate at this time to

13   review highlights of the DIP loan that we are seeking approval

14   of.  And then we would proceed with making -- or continuing our

15   case through testimony.

16        Your Honor, we are seeking approval of a 400 million

17   dollar DIP financing which has a twenty-four month term.  And

18   the borrowers -- we don't have our organizational poster up

19   here -- are GGPI and GGPLP.  And the guarantors are debtors

20   other than the owners of property level and other than

21   mezzanine financing borrowers.  And so, therefore, the

22   obligors, when we talk about obligors on the DIP loan, are the

23   two borrowers that I identified as well as a much more narrow

24   list of guarantors.

25        The collateral is a grant by the obligors only.  So

32

1    we have no second lien collateral in connection with this DIP

2    financing.  There will be -- the nonobligors will be the

3    subject to a negative pledge that is also required by the DIP

4    lender.

5            The interest rate will be LIBOR plus twelve percent

6    with a LIBOR floor of 1.5 percent.  There's only one additional

7    fee, a 3.75 percent exit fee.

8            There will be an administrative agent fee of 30,000

9    dollars per month which, unless it's changed, will be paid for

10   the year in advance.  The loan may be assigned by the lenders

11   to eligible assignees and the debtors and the lending group

12   have agreed on the requirements for an eligible assignee and

13   have agreed on the list of assignees that would not be

14   acceptable to either.

15           Voting in connection with the DIP loan would be by

16   majority lender vote, more than fifty percent of the aggregate

17   loans or commitments.  There will continue to be a feature

18   important to the debtors, the debtors' option to convert any

19   outstanding amounts under the DIP loan to equity.  This is

20   purely an option by the debtor.  There's no forced conversion

21   of the DIP loan and that can be converted up to a maximum of

22   eight percent of the fully diluted equity.

23           Your Honor, I think that from the standpoint of the

24   at least high level provisions of this DIP loan -- obviously,

25   it's a very long document.  I believe those are the provisions

33

1    that most questions would be asked about.  Obviously, we can go

2    over and will go over the blackline later in the hearing after

3    we have gone through the testimony.

4          At this point, we'd like to move forward with the

5    testimony.  At the last hearing on Friday, we offered the

6    testimony of Mr. Mesterharm in support of the three motions

7    before the Court.  And what I would like to suggest is that we

8    reserve Mr. Mesterharm until later in the hearing after Mr.

9    Holtzer goes through the blackline because we do believe that

10   covers a number of points that were of concern to the secured

11   lenders.  And if there's still a need for cross-examination of

12   Mr. Mesterharm, or further testimony, we would like to be able

13   to return him to the witness stand, if necessary at that time.

14         We would like to go forward today with the testimony

15   of Mr. Buckfire.  He's here and we would like to offer him as a

16   witness as to the debtors' efforts to obtain DIP financing and

17   the process that resulted in the DIP loan before the Court

18   today.

19         We have available, Your Honor, Mr. Latella from

20   Cushman who is here if there is a need for testimony on the

21   appraisal of the so-called Goldman assets.  At this point, Your

22   Honor, we do not -- or are not aware of anyone who is raising

23   an objection to the admission of that appraised amount through

24   the testimony of Mr. Mesterharm at the last hearing.  But, as I

25   said, Mr. Latella is here today if such testimony would be

34

1    required.

2          Given that we are not quite certain what objections

3    will still be asserted today, we reserve the opportunity to

4    come back and respond to those.  But I would like to have my

5    partner, Melanie Gray, proceed with the testimony of Mr.

6    Buckfire.

7          THE COURT:  Well, shouldn't we have -- oh, I see your

8    colleague is not in his chair.  Shouldn't we first go through

9    the changes to the DIP, if we can?  Well, presumably he'll be

10   back.

11         MS. GOLDSTEIN:  Maybe he went out to see what the

12   status of the blackline was, Your Honor.

13         THE COURT:  Do you want to take care of the tenant

14   improvement order and --

15         MS. GOLDSTEIN:  That's my same colleague, Your Honor.

16         THE COURT:  He's going to do that as well.  All

17   right.

18         MS. GOLDSTEIN:  Give me a moment.

19         THE COURT:  Okay.

20      (Pause)

21         MS. GOLDSTEIN:  I see him at the door, Your Honor.

22         THE COURT:  Mr. Holtzer, are you ready to go through

23   the material changes to the DIP at this time?  I gather you're

24   waiting for copies to get down to the court, is that correct?

25         MR. HOLTZER:  Yes, Your Honor, we are.

35

1        THE COURT:  And do you want to wait before going

2    through the changes?

3        MR. HOLTZER:  I think it may make sense to do that,

4    Your Honor.  I'm happy to go through it at a high level now

5    with Your Honor if you want.  I think many of the parties will

6    understand it but it may make more sense to wait for --

7        THE COURT:  Well, I think we probably should do it

8    once.  Everyone is concerned -- unless there were issues that

9    you can identify that we can take up separately.  We can do

10   that.  If you call Mr. Buckfire, it's merely to put him on for

11   certain purposes.  I assure all parties who want to question

12   Mr. Mesterharm they'll have an opportunity to do so insofar as

13   it is relevant to the matters before us today.  Obviously, if

14   there are other issues that parties have as we go forward in

15   these cases, there will be other opportunities both for

16   examination in court and for examination out of court or,

17   perhaps even better, for analysis and for meetings out of court

18   so that parties can understand.  If you want to put Mr.

19   Buckfire, if that's the most efficient way of proceeding, you

20   may.  I'll hear anybody who wishes to proceed in another

21   fashion and feels that their interests are being adversely

22   affected.

23       MS. GOLDSTEIN:  Your Honor, Mr. Holtzer informs me

24   that our documents have arrived.

25       THE COURT:  All right.

36

1      MS. GOLDSTEIN:  So rather than debate whether Mr.

2  Buckfire's testimony should go forward first, I think we should

3  just go through the documents.

4      THE COURT:  All right.  And since you mention Mr.

5  Buckfire, I want to disclose that Mr. Buckfire and I are and

6  will be for the next couple of weeks members of a board of

7  trustees of a small private school that my sons attended many

8  years ago.  And I think he's rotating off of the board in a few

9  weeks so I don't know that we'll even attend another meeting

10  together.  But I make that disclosure so that parties can

11  consider whether they feel there is an appearance of bias or

12  impropriety.  I don't believe there is one but if anybody feels

13  differently they can certainly let the Court know by letter but

14  should do so very promptly.

15      MS. GRAY:  Your Honor, Melanie Gray with Weil

16  Gotshal.  I just wanted to inform the Court that Mr. Buckfire

17  resigned from that board on April 16th which was the date that

18  these Chapter 11 cases were fired -- I'm sorry -- were filed.

19      THE COURT:  Were fired?

20      MS. GRAY:  So he's no longer a trustee on that board.

21      THE COURT:  All right.

22      MR. HOLTZER:  Okay, Your Honor.  Gary Holtzer, Weil

23  Gotshal & Manges for General Growth.  Your Honor, if I may

24  approach, I want to make sure you're looking at the same thing

25  that everyone else is.

37

1          THE COURT:  All right.  Does everyone have a copy of

2     the document --

3          (Pause)

4          MR. HOLTZER:  Your Honor, I apologize.  We may have

5     passed out the prior blackline.  So we may have to take a

6     moment and fix that.

7          THE COURT:  Take your time.  Do you want me to take a

8     brief recess?

9          MR. HOLTZER:  I think that probably makes sense, Your

10    Honor.

11         THE COURT:  All right.  I'll take a brief recess.

12    Now -- so the final order that you've given me, Mr. Holtzer, is

13    that the right document or not?

14         MR. HOLTZER:  Yes, Your Honor.  The final order is

15    the correct document.  The --

16         THE COURT:  And it's blacklined against which

17    document?

18         MR. HOLTZER:  It's blacklined against the filed

19    version.

20         THE COURT:  The version that was filed yesterday?

21         MR. HOLTZER:  Yes, Your Honor.

22         THE COURT:  All right.

23         MR. HOLTZER:  Your Honor?

24         THE COURT:  Yes?

25         MR. HOLTZER:  We'll have to make sure that's the

38

1    correct order also.  Give us a few moments.

2         THE COURT:  Take your time.  I'll be next door.

3       (Recess from 11:50 a.m. until 12:29 p.m.)

4         THE COURT:  Please be seated.  Be seated.

5         MR. HOLTZER:  Thank you, Your Honor.  We're very

6    sorry for the delay.  We have --

7         THE COURT:  No.  That's fine.

8         MR. HOLTZER:  -- passed out changed pages from the

9    credit agreement that we filed with the Court on Tuesday which

10   show the changes from the DIP credit agreement for the Farallon

11   Group as compared to what we're presenting today.

12        In addition, Your Honor, as you might expect, there

13   have been some continuing discussions and additional changes

14   that aren't in the blackline which we'll describe for Your

15   Honor on the record.  I'm sure we have plenty of eyes on the

16   document and there may be additional comments or thoughts that

17   we will have to continue to work through the document as we go

18   forward now.  But I'm going to start now to go through the

19   changes pages in the credit agreement.

20        Your Honor, the first one is simply including in

21   Section 1.1, the definition of "cash management order".  And,

22   in fact, many of these changes are changes that developed

23   through discussions that the company had yesterday with

24   coordinating counsel for the property lenders as well as the

25   DIP lender.  And that is what is resulting in some of these

1    changes to satisfy concerns that coordinating counsel for the

2    property lenders had taken in if they had discussions with many

3    of the property lenders on calls that they were working

4    through.  And so, the first one again, Your Honor, is just

5    inclusion of the definition of "cash management order".

6         Secondly, Your Honor, in Section 4.1(a), the secured

7    pre-petition wage lenders expressed some concern that the

8    adequate protection payments would cease upon an acceleration

9    of the DIP.  We have added language so that it is clear that we

10   specify that the funds in the main operating account that are

11   not the subject of the agent's first liens may only be used

12   during an even of default for adequate protection obligations.

13   And I think that was the concern that was raised.  So we have

14   added language to satisfy that point.

15        And, again, at each of these points, I'm confident

16   that coordinating counsel will step up to clarify anything that

17   we don't get right.

18        The next one, Your Honor, is Section 4.1(d).  That

19   one, Your Honor, we were asked to include specific definitions

20   for the tenant obligations order which we'll also be presenting

21   to Your Honor later today after having had similar discussions

22   with coordinating counsel for the secured property lenders to

23   resolve as many of the issues as we can with that order.  They

24   asked that we use the defined term for the tenant obligations

25   order as well as a definition for a cash management order.

40

1          The next one, Your Honor, is in Section 6.11(b).  The

2     secured pre-petition lenders expressed concern that 6.11(b) did

3     not allow for refinancing of prior lien debt because it

4     requires the negative pledged debtor to become a guarantor upon

5     discharge or repayment of the prior lien debt.  And I think we

6     have added words so that refinancings are able to occur, which

7     was the principal comment made, as long as they're not adverse

8     to the lender.  And that's our view about what we would be

9     doing in the future to address that point.

10          The next one, Your Honor, is 8.2(a).  The secured

11     pre-petition lenders expressed a concern that the DIP loan may

12     create superpriority claims that purport to be superior to

13     their liens.  We wanted to clarify, Your Honor, on the record

14     that there's no intention to make superpriority claims senior

15     to any liens.  We would confirm that, as a matter of law, that

16     that really can't happen.  So we didn't do anything in the

17     document.  We promised we would clarify that on the record.

18          The next one, Your Honor, is 9.16.  The secured pre-

19     petition lenders expressed a concern of the ability of the DIP

20     lenders to veto modifications to their mortgage loan

21     agreements.  And we have placed a provision in or adjusted the

22     language, Your Honor, so that we permit modifications to those

23     documents that are not adverse to the term loan or the lenders.

24     And the DIP lender has agreed to that, of course.

25          The next one, Your Honor, is Section 11.2(d).  The

41

1    pre-petition lenders expressed a concern that the DIP lender

2    might be able to apply all of the main operating account funds

3    to repayment of the DIP upon the occurrence of an event of

4    default and that that would vitiate the adequate protection

5    liens that they were getting in that account.  We have added a

6    cross-reference to that section to clarify that their rights

7    with respect to the amounts in the main operating account are

8    subject to the adequate protections liens that we're giving to

9    the secured pre-petition lenders to satisfy that concern.

10           The next one, Your Honor, is at Section 11.2(e).  The

11   secured pre-petition lenders expressed concern that the

12   adequate protection payments would cease upon an acceleration

13   of the DIP.  We've added language to specify that the funds in

14   the main operating account that are not subject to the agent's

15   first liens, all right, may only be used during an event of

16   default for adequate protection obligations.  So that that's

17   clear now.

18           The next one, Your Honor, is at Section 11.2(e).  The

19   pre-petition lenders expressed concern that the DIP lender

20   might be able to disburse funds from the cash collateral

21   account to repay the DIP upon the occurrence of the event of

22   default.  And that would, again, eliminate their entitlement to

23   have that first lien position on the cash.  And so, we have

24   added the cross-reference there as well to make sure that the

25   adequate protection liens are in front of the DIP lenders'

42

1    entitlement to that cash out of the account.

2         Your Honor, what's not in the blackline are two

3    changes that we made this morning in response to other secured

4    lender comments that we had.  And they are to the definition of

5    "negative pledge debtor" and "negative pledge properties".  We

6    have clarified that it is not the intention of this loan

7    agreement to pick up properties securing or entities which are

8    part of the credit structure of the mez debt.  Your Honor may

9    recall that there are both project level lenders and then above

10   them there are mez lenders that are structurally subordinated

11   from those project level lenders.  And we added some language

12   to clarify that point.

13        The next one --

14        THE COURT:  Those debtors are not either subject --

15   or they're not lenders or they're not subject to the DIP order?

16        MR. HOLTZER:  They're not, Your Honor.  Borrowers or

17   guarantors.

18        THE COURT:  Borrowers or guarantors is the right

19   terminology.

20        MR. HOLTZER:  That's correct, Your Honor.

21        THE COURT:  All right.

22        MR. HOLTZER:  The last point on the credit agreement,

23   Your Honor, is that we added language to confirm that mandatory

24   prepayment provisions don't pick up sales proceeds that would

25   go to the mez lender so that that's clear.  It's consistent

1    with the prior comment we just made.

2           With that, Your Honor, I think we would have moved

3    through the credit agreement changes that we wanted to place on

4    the record.  I'll just take a moment to make sure I haven't

5    missed any.  Your Honor, with those changes on the record, and,

6    again, we have passed out those changed pages to the folks in

7    attendance here today, and we would not offer up any more in

8    respect of changes to the actual credit document itself.

9           THE COURT:  All right.  You want to go through the

10   changes to the DIP order?

11          MR. HOLTZER:  Yes, Your Honor.

12          THE COURT:  All right.  Those, Your Honor, are a

13   little more extensive and the blackline that we have here in

14   court reflects blackline changes that we had made to the order

15   that we had filed on Tuesday.  However, there continue to be

16   discussions in your caucus room this morning and those changes

17   we'll have to describe on the record for you as well.  Those

18   changes were made to satisfy concerns that were raised by both

19   secured project level lenders as well as additional concerns

20   and adjustments from the DIP lender in response to some of

21   those changes.

22          Your Honor, the first change -- and it's a change

23   that occurs in a number of places and it's really a cleanup

24   change.  We had used the term "obligor" as opposed to

25   "debtor" -- we used the term "debtor" as opposed to "obligor"

44

1    and we're having to change that.  Part of that change, Your

2    Honor, is as a result of the improvement in the DIP loan

3    wherein we have removed the second lien and guaranties from the

4    project level lenders.  And as a result, the uniformity of the

5    use of the word "debtor" no longer makes sense.  We needed to

6    create another term to distinguish for purposes in the order.

7    And those changes are shown in the blackline.  I believe that

8    the blackline that you have, Your Honor, is one in which the

9    DIP lender was still confirming that that change throughout was

10   acceptable to them.  And we'll make sure before we finish that

11   they can confirm that, Your Honor, because it's on more than

12   one page.  But it was all as a result of a benefit to the

13   secured property lenders as a result of taking the second lien

14   and the guaranty off of those project level entities.

15          MR. CROSS:  We can confirm that we've gone through

16   the order and the changes from "debtor" to "obligor" is fine.

17          THE COURT:  All right.

18          MR. HOLTZER:  Your Honor, the first substantive

19   change that we'd like to note for the Court is on page 17.

20   It's actually on page 16 of the blackline, I apologize.  It's

21   in the heading titled "Lien on Main Operating Account".  We

22   have made an adjustment to the placement of the defined term

23   "main operating account" so that it includes any successor or

24   replacement account.  A comment that was made by counsel for

25   the property level lenders was that they wanted to make sure

45

1    that monies could not be moved out of the main operating

2    account and thereby eliminate the benefit of their lien.

3         Your Honor, just so that we're clear, some of the

4    changes that are reflective of removing the second lien and

5    guaranty from the project level lenders are made at points.

6    And while they're what I would call cleanup, they are one of

7    the most substantive changes in the order because it

8    effectuates one of the main benefits that the property level

9    lenders were seeking to achieve in the negotiation.

10        The next change, Your Honor, is on page -- paragraph

11   6(c).  It may be easier to do that in the blackline.  Various

12   parties asked for clarification that the liens of the adequate

13   protection parties will attach to funds in the main operating

14   account that are moved out of the main operating account.  And

15   we have added words that say "in such funds wherever

16   deposited".

17        Further down, in paragraph 16, Your Honor, another

18   concern raised by the secured pre-petition lenders was that the

19   adequate protection payments would cease upon an acceleration

20   of the DIP.  We referred to that a few moments ago in our

21   changes in the credit agreement.  There are parallel changes

22   here in the order.

23        Your Honor, the next change is in paragraph 8(a) of

24   the order.  Your Honor, and this is one of the changes that is

25   shown in the order but there's been a subsequent adjustment

46

1    which we'll reference now.  The issue that was raised which

2    caused the removal of the language shown in the blackline

3    toward the bottom of 8(a) was a concern that the secured pre-

4    petition lenders expressed whereby they were concerned that

5    this language would preclude them from access to their remedies

6    -- or, I'm sorry.  This was -- they were concerned that the

7    adequate protection payments would cease upon acceleration of

8    the DIP.  And they were also concerned that this language would

9    preclude them from accessing certain remedies while the

10   payments -- I need one moment, Your Honor.

11        (Pause)

12           MR. HOLTZER:  Your Honor, this is -- the concern that

13   the DIP lenders had on this point is that they wanted the

14   property level lenders to have a silent second on what we call

15   the Goldman assets.  And we had removed language which had

16   defeated that concern.  And then further discussions with the

17   property lenders, we've reinserted that language.  And so, the

18   first sentence which begins "So long as payment" will remain

19   out of the order.  But the second sentence which begins

20   "Whether or not payments on account of the adequate protection

21   obligations are made", that sentence will remain in the order.

22   And the property level lenders have understood and agreed that

23   that is not their concern.  But I'm happy to have them clarify

24   that one on the record.

25           MR. CROSS:  Yeah.  I was just going to confirm.  No

47

1    objections.

2         THE COURT:  All right.  They are getting then a

3    silent second on the Goldman property?

4         MR. HOLTZER:  Yes.  And this language confirms that.

5         THE COURT:  Jointly and severally, more or less?

6         MR. CROSS:  More or less.

7         THE COURT:  All right.

8         MR. HOLTZER:  Yes, Your Honor.  Your Honor, the next

9    change that we have is --

10        THE COURT:  I suppose anybody who doesn't want it can

11   stand up and say they don't want it.

12        MR. CROSS:  Your Honor, one of the clarifications --

13   and I also understood that in replace of the first sentence

14   here, we're working on language that provides for a mechanic

15   with regard to the adequate protection.  And some language is

16   going into that to replace that first sentence.  And we just

17   haven't come up with the language yet.

18        MR. HOLTZER:  My partner, Mr. Youngman, may be

19   working on that.  Give me a moment.

20   (Pause)

21        MR. HOLTZER:  Your Honor, we'll have to come back to

22   that one and see where that one lands.

23        THE COURT:  We can come back to that.  All right.

24   One issue to come back to.

25        MR. HOLTZER:  Yeah.  The next one, Your Honor, is in

48

1    paragraph 13(a).  This is a simple one, Your Honor.  The

2    secured pre-petition lenders requested notice of an event of

3    default.  So we have made that revision.

4          Similarly, in paragraph 17(h), the secured pre-

5    petition lenders have requested notice of amendments of the DIP

6    documents.  We've made that change.  At page 35, or paragraph

7    17(o) probably is a better cross-reference, the secured pre-

8    petition lenders have requested notice of an amendment of this

9    order since their adequate protection rights are contained in

10   this order.  We've made that revision.

11         THE COURT:  So we're now in --

12         MR. HOLTZER:  17 --

13         THE COURT:  Right.  I think in order to -- is it --

14   one second.  In 17(h), where we were a moment ago, you give, in

15   the proviso at the end, the creditors' committee an objection

16   to an amendment to the order.  I think you'd have to give that

17   right to any party.  Where it says creditors' committee, just

18   consider whether it shouldn't be "or any party in interest

19   would have the right to object to an amendment becoming

20   effective without a court order".

21         MR. HOLTZER:  Give me one moment, Your Honor.  I

22   think there's a reason we distinguish --

23      (Pause)

24         MR. HOLTZER:  I think, Your Honor, and we'll confirm

25   this with the committee as well, I believe the reason for

49

1    distinguishing is that the top group gets five business days to

2    object to material amendments.  But I think the creditors'

3    committee wanted to see them all.  But let us review the words

4    and we'll see if that makes sense.

5            THE COURT:  All right.

6            MR. HOLTZER:  We were trying not to give notice of

7    non-material ones to a huge population.

8            THE COURT:  Well, I think that's certainly fair if

9    you just put them on the docket.

10           MR. HOLTZER:  Yeah.  We'll be filing them, Your

11   Honor, of course.

12           THE COURT:  You can just file them.  And I think we

13   need the words "or filed" in them.  I'm just giving you these

14   small matters because we're in (o).  And I think unless it's a

15   tremendous burden where under "Amendment of Order" in the last

16   line, it says "Notice of any amendment of the order shall be

17   provided to all parties entitled to receive notice."  I think

18   you certainly can provide that notice.  I gather it goes out by

19   email so it's not a burden.  But I think it should be filed.

20   So I would add the words "filed on the docket and" at that

21   point.

22           MR. HOLTZER:  Yes, Your Honor.

23           THE COURT:  And I only mention it 'cause we're here

24   in (o) and these are not material changes.  Anything else?

25           MR. HOLTZER:  Yes.  Two more.  At paragraph 18 --

50

1          THE COURT:  All right.

2          MR. HOLTZER:  We have a language requested that we

3   clarify the language in 18.  And that one was happening as we

4   were breaking.  So let me just confirm where that is.  Yes,

5   Your Honor.  I think that objection to the language in the

6   blackline, I understood, has been withdrawn.  And so the

7   blackline, as Ms. Vris has reviewed it for her client, is

8   acceptable now.

9          THE COURT:  All right.

10         MR. HOLTZER:  So we're past that one, Your Honor.

11  Finally, I think we've been asked to add provisions that

12  provide for reporting to mez lenders.  And we'll be putting

13  that in the order as well.

14         THE COURT:  All right.  And I would just ask you to

15  add to the end of paragraph 19, which has to do with the

16  effectiveness order, if entered on subsequent filed cases,

17  words to the effect that "subject" -- and I would add something

18  like this:  "subject to the right of any party in interest in

19  any such subsequent case to move within twenty days" -- or you

20  can propose another period -- "for an order restricting or

21  amending the effect of this order in such case and subject

22  further to the revision by such subsequent debtor with

23  appropriate notice in such subsequent case".

24         MR. HOLTZER:  Okay.

25         THE COURT:  Something to that effect.  These are not

51

1    material.  Now I can proceed in any -- we can proceed in any

2    number of different ways.  We can -- yes?

3              MR. HOLTZER:  Your Honor, there was one other point

4    we should mention.  And I'll ask for Ms. Buell's indulgence for

5    a moment as counsel for Goldman, and Ms. Goldstein.  We had,

6    immediately prior to this hearing commencing, a few open issues

7    with respect to the Goldman situation.  And I think that we've

8    resolved --

9              THE COURT:  Such as the payoff letter, I gather.

10             MR. HOLTZER:  Such as the payoff letter, Your Honor.

11   And I think that we have resolved them.  Ms. Goldstein, do you

12   want to put that one on the record since that one's yours?

13             MS. GOLDSTEIN:  Thank you, Your Honor. We apologize

14   for this back and forth but a lot of things were going on this

15   morning.

16             THE COURT:  No, no.  Nothing to apologize for.

17             MS. GOLDSTEIN:  The one issue that needed to be

18   resolved under the payoff letter was a continuing indemnity for

19   Goldman Sachs.  The order provides that the creditors'

20   committee has a period in which to investigate the liens of

21   Goldman Sachs.  Their documents provided for indemnification

22   which Goldman asserted covered such costs.  What we have agreed

23   so that the payoff could go forward is that there would be a

24   carve-out from the DIP loan for fees incurred by Goldman in

25   connection with such investigation for up to one million

52

1    dollars.  Your Honor, we hope that the investigation goes

2    quickly so that that is not the case.  But there will be a

3    carve-out for that indemnity.  The debtors agree that to the

4    extent the costs of Goldman defending any claim -- and, by the

5    way, it would have to a successful claim -- I mean, a

6    successful defense --

7            THE COURT:  I understand that and --

8            MS. GOLDSTEIN:  -- because if the committee under any

9    circumstance --

10           THE COURT:  I'm going to assume that the million

11   dollar figure is the result of grave concern and not a serious

12   anticipation that it would cost that much to respond to the

13   committee's --

14           MS. GOLDSTEIN:  No.  Your Honor, in fact --

15           THE COURT:  -- inquiries.  However, I'll leave it at

16   that.

17           MS. GOLDSTEIN:  Yeah.  I mean, Your Honor, again, if

18   the liens were proved to be not perfected and they were

19   unsecured, obviously, then the indemnity would not be secured.

20   So -- and that would go away.  But on the assumption, Your

21   Honor, that this is a potential secured claim, there is a

22   carve-out of up to a million dollars.  The debtors agreed that

23   there would also be an administrative claim for amounts beyond

24   that up to another million dollars subordinate to the DIP lien

25   and DIP administrative expense claim.  And anything else is

53

1   just unsecured.

2        Now, the facts are, Your Honor, that the debtor will

3   provide the documents that the committee needs to review.

4   We're hoping that this is a de minimis issue but the debtor,

5   the committee and Goldman Sachs were satisfied with that

6   approach as well as the DIP lender.

7        MS. BUELL:  Sorry, Your Honor.  Ms. Goldstein --

8        THE COURT:  Why don't you come to the microphone so

9   that those in the -- on the telephone and others can hear you.

10       MS. BUELL:  Yes, Your Honor.  Deborah Buell of

11  Clearly Gottlieb on behalf of Goldman Sachs Mortgage Company.

12  Ms. Goldstein has accurately described the resolution that we

13  have come to.  And obviously, the carve-out and the admin claim

14  is a very protective type of provision in the event that we go

15  beyond an inquiry, we actually have litigation.  We obviously

16  expect this to be hypothetical rather than actual and to do

17  whatever we can to respond to the inquiry and to wrap it up.

18       THE COURT:  All right.  Thank you.

19       MR. HOLTZER:  Your Honor, two other items that

20  counsel for the pre-petition lenders reminds me about.  One is

21  they would like some language added that in the event that the

22  debtors are not going to be in compliance, or aren't in

23  compliance, I should say, with this order, they would like

24  notice of that.

25       MR. CROSS:  That's right.  And we'd like the

54

1    opportunity to come in on an expedited basis to enforce the

2    cash collateral order.

3            THE COURT:  You always have that.  I think you have

4    that right throughout the case if there's cause.

5            MR. CROSS:  That's better than the order.  Thank you.

6            THE COURT:  And we can certainly -- it's certainly

7    appropriate to put language in the order but I expect to be

8    open for business for longer than this case will be pending.

9            MR. HOLTZER:  Secondly and finally, Your Honor, in

10   paragraph number 6, there's some blackline language that we

11   added and that I referred to a few minutes ago wherein we

12   confirmed that during an event of default or an acceleration of

13   the obligations that we would continue to use cash collateral

14   and make the adequate protection payments in accordance with

15   this order.  Counsel wanted us to confirm that that includes

16   paying the expenses of the property.  That's your comment?

17           MR. CROSS:  Your Honor, there's a concern that's been

18   expressed by some of the lenders that the words "that is

19   subject to the liens of the adequate protection parties" in

20   some way limits the ability of the upstreamed rent to come back

21   down and pay operating expenses because adequate protection is

22   the diminution concept.  I believe the intent of this language

23   is that if rents are upstreamed that rents could come back down

24   to pay operating expenses even if the DIP's been accelerated.

25   And that's what we're seeking to clarify in that discussion.

55

1          MR. HOLTZER:  And the answer is, Your Honor, that's

2    absolutely correct.

3          THE COURT:  All right.  Thank you.

4          MR. HOLTZER:  With that, Your Honor, that

5    incorporates the changes to both the credit agreement and the

6    order.

7          THE COURT:  All right.  How do you suggest we proceed

8    from this point?

9          MR. HOLTZER:  Your Honor, we would call Mr. Buckfire

10   to the stand to complete his testimony.

11         THE COURT:  All right.  You want to complete the

12   record then we can take a brief break and then I can hear from

13   any party with continuing objections or concerns.  And anyone

14   who wishes to examine either Mr. Mesterharm or Mr. Buckfire

15   will have an opportunity if they wish.  Or, they should,

16   perhaps during the break, discuss with the debtors procedures

17   whereby the individual concerns can be brought in due course

18   before the Court and be heard without necessarily precluding

19   the entry of a corporate cash collateral order which, as I've

20   said many times, can be amended for cause shown on notice at

21   any time during a case.  And the DIP order -- now the DIP order

22   may well impinge on various issues and may impinge on the cash

23   collateral order.  But I'm not so sure it does any longer in a

24   material way.

25         So I think those are matters.  I don't want to keep

56

1    fifty or seventy-five lawyers tied up today for concerns that

2    are unique to individual property holders.  On the other hand,

3    everyone has their right to cross-examine on this record if

4    they want to.  I would be grateful -- and I think it's to

5    everybody's advantage that we try to create some procedures in

6    this case that makes sense.  So individual property lenders'

7    interests can be considered separately.  Those who wish to

8    proceed with certain motions or certain concerns will certainly

9    have an opportunity to do so.  The more people we keep here

10    today, the more cost it's going to be for the debtor as a whole

11    because I assume at least everybody who claims to be

12    oversecured, and that's almost everyone, is going to want to

13    add their legal fees to the value of the collateral.  So I

14    think it's in everybody's interest that we keep legal fees

15    down.  You just heard -- we certainly don't want to keep

16    Goldman's lawyers in the room any more than we possibly can.

17                MS. BUELL:  Thank you, Your Honor.

18                THE COURT:  But I can't tell Ms. Buell to go home and

19    not to stay for the end of this.  Yes, sir?  Did you have a

20    comment?

21                MR. CROSS:  I was trying to be helpful.  I think,

22    frankly, from a secured lenders' perspective, we've resolved

23    ninety-eight percent of it.  And if we were allowed, without

24    Mr. Buckfire's testimony to proceed with the ability to put

25    just a couple of things on the record, we could rapidly allow

57

1    many people in the courtroom to go.

2            THE COURT:  That's certainly fine with me.  Indeed,

3    if there's no objection -- and these are important matters.  So

4    anyone can object.  But if the parties want to proceed by way

5    of proffer with regard to Mr. Buckfire's testimony, I bet Mr.

6    Buckfire wouldn't object.  And if there's no objection -- and

7    again, anyone who wishes, may object.  However, the right to

8    cross-examine can be and will be reserved for another time and

9    another hearing, if necessary.

10           MR. HOLTZER:  Your Honor, we can go forward and

11   proffer Mr. Buckfire's testimony and probably do that very

12   efficiently and quickly.

13           THE COURT:  All right.

14           MR. HOLTZER:  We can take counsel up on his offer

15   then thereafter to see whether or not in a short period of time

16   before the break we can give finality to many of the issues

17   that are filling up rows of seats here.  I would also note,

18   Your Honor, in order to make that part efficient, we should

19   also go forward and explain to Your Honor the changes that

20   we've agreed to with the secured property coordination

21   committee and the unsecured creditors' committee on the tenant

22   obligations order that we have following the Court's grant of

23   that motion last time and the direction to circulate that order

24   and have discussions with all the parties.

25           So, Your Honor, Ms. Goldstein reminds me.  It may be

58

1      even more efficient as well to see whether there is anyone who

2      is objecting to the relief we're seeking as compared to arguing

3      some legal points in the order which is what I think counsel

4      was referring to when he said that we could move through about

5      ninety-eight percent of this pretty quickly.  So it may be

6      helpful to the process to find out --

7                THE COURT:  All right.

8                MR. HOLTZER:  -- whether or not there is anybody who,

9      in fact, is objecting to the relief.

10               THE COURT:  Are there any objections -- what I would

11     call objections in principle?  Yes, sir?  Come forward.

12               MR. SELBST:  Good afternoon, Your Honor.  Stephen

13     Selbst, Herrick Feinstein, for Citicorp as the administrative

14     agent on the Oakwood property.  Your Honor, my objection is

15     very simple.  Citicorp has alleged that it is undersecured.

16     The debtors did not challenge that contention.  And, Your

17     Honor, respectfully, we believe that we are differently

18     situated than all the other property lenders here.  As Your

19     Honor is well aware, it's the debtor's burden to establish that

20     we're adequately protected.  And at least in the testimony that

21     was adduced before Your Honor last week, there was no evidence

22     whatsoever that there is any kind of an equity cushion with

23     respect to that property.

24               Therefore, Your Honor, even though we recognize that

25     the debtors have made significant concessions on other issues,

59

1    we believe that we are uniquely harmed by the use of our cash

2    collateral and we're simply asking to be carved out of this

3    order on that basis, Your Honor.

4          THE COURT:  By being carved out of this order, what

5    do you mean by that?  Do I understand correctly that your

6    property is not being subjected to a second lien?

7          MR. SELBST:  That's correct, Your Honor.

8          THE COURT:  So what do you mean by being carved out

9    of this order?  Do you want me to order the debtors not to pay

10   your client anything by way of adequate protection?

11         MR. SELBST:  Of course not, Your Honor.

12         THE COURT:  All right.

13         MR. SELBST:  What I don't want is the --

14         THE COURT:  But what is the diminution in the value

15   of your property that is result of the entry of the DIP order.

16   Put the cash collateral order aside.

17         MR. SELBST:  The DIP order is not the issue, Your

18   Honor.  Your Honor, I want to be very clear.  I am not

19   objecting --

20         THE COURT:  No, no.  Thank you.  I --

21         MR. SELBST:  No, no.  I'm not objecting to the DIP

22   order.  I'm objecting to the usage of the cash collateral.

23         THE COURT:  Use of cash collateral.

24         MR. SELBST:  That's correct, Your Honor.

25         THE COURT:  All right.  And what would you propose?

60

1          MR. SELBST:  As I suggested in my papers, the

2    traditional remedy is a sequestration of the rent and that all

3    of the rents in excess of the property operating expenses be

4    applied to my client's obligations.

5          THE COURT:  All right.  Would you like me to set down

6    for a separate hearing the question of the use of your cash

7    collateral and whether or not you are receiving adequate

8    protection as it's defined -- or as it's not defined in the

9    Bankruptcy Code but as it's understood --

10         MR. SELBST:  As it is taught by the cases.

11         THE COURT:  -- in the Bankruptcy Code and have a

12   separate hearing --

13         MR. SELBST:  I'd be very happy with that, Your Honor.

14         THE COURT:  -- on that issue?

15         MR. SELBST:  I'd be very happy with that, Your Honor.

16         THE COURT:  And, in the meantime, the debtors should

17   not, I assume, escrow any funds for the benefit of your client.

18         MR. SELBST:  What do you mean by not escrow, Your

19   Honor?

20         THE COURT:  Well, I gather that the funds will not be

21   upstream -- you don't want the funds to be upstreamed --

22         MR. SELBST:  That's correct, Your Honor.

23         THE COURT:  -- out of your --

24         MR. SELBST:  That's correct.

25         THE COURT:  -- out of your properties.

61

1          MR. SELBST:  That's correct, Your Honor.

2          THE COURT:  Right.  Now before we proceed along

3     the --I'm not -- I'll hear from the debtors.

4          MR. SELBST:  Of course, Your Honor.

5          THE COURT:  But before we proceed along those lines,

6     let me ask you what, in Mr. Mesterharm's testimony, relied on

7     an equity cushion to justify the use of your client's cash

8     collateral?

9          MR. SELBST:  Your Honor, the debtors generally

10    alleged that there were equity cushions in these properties.

11    We responded in our papers and we attached an affidavit from

12    our appraiser stating that we were undersecured.

13          In the debtors' omnibus reply, and I don't have the

14    citation of the paragraph, they said that Citicorp concedes

15    that they are undersecured.  That, to me, suggests an admission

16    on their part that they're not challenging that assertion, Your

17    Honor.  I was going to ask Mr. Mesterharm on cross-examination

18    whether, in fact, they had conducted any appraisal of the

19    property, whether they had any basis to challenge that.  And as

20    I said at the outset, Your Honor, it's their burden to

21    establish that equity cushion owed and that adequate

22    protection.  And that's the only basis on which I wanted to --

23    excuse me, Your Honor.

24          THE COURT:  I was just trying to clarify that, as I

25    understand the record to date, it is their burden to establish

62

1    adequate protection.

2         MR. SELBST:  Correct.

3         THE COURT:  But I did not understand that as part of

4    that adequate protection package that they were relying on

5    their proof that there was an equity cushion in your case or in

6    anybody else's case, for that matter.

7         MR. SELBST:  I think they did, Your Honor, allege in

8    their original papers that there was generally an equity

9    cushion.  And for the reasons that I've suggested to you, I was

10   trying to distinguish the case of my client's loan because we

11   do believe we're differently situated, Your Honor.

12        THE COURT:  All right.

13        MS. GOLDSTEIN:  Your Honor, may I respond?

14        THE COURT:  Yes.  Well, why don't I hear anybody else

15   who has a general objection to either the DIP or the cash

16   collateral order or the tenant improvements order?

17        MR. ELKINS (TELEPHONICALLY):  Your Honor, may I speak

18   to the Court?

19        THE COURT:  I'll take parties on the telephone when

20   everyone in the room has finished.

21        MR. ELKINS:  Thank you.

22        MR. HOLTZER:  We might alleviate some of this as well

23   if the Court would make a finding that the findings it makes

24   today do not prejudice any of the parties with respect to a

25   dismissal motion that they may bring subsequently.  I think

63

1    some people are concerned that findings in these orders may

2    prejudice their ability to be subsequent motions and that may

3    allow -- of any kind -- and that may allow many people not to

4    take the podium.  If you can confine the findings for purposes

5    of this DIP loan and the cash collateral order.

6          THE COURT:  All right.

7          MR. ROSENBERG:  Good morning, Your Honor.  Forgive me

8    if I simply didn't quite understand.  But I wasn't clear on the

9    scope of what you were asking for right now.  Deutschebank

10   continues to object to the use of cash collateral out of the

11   protection order --

12         THE COURT:  Right.

13         MR. ROSENBERG:  -- because of the unique

14   circumstances of Deutschebank.  I don't believe that any

15   further cross-examination will be necessary if the parties --

16   if the debtor will stipulate to one point.  But we do want to

17   make oral argument and I'd refer Your Honor to documents that

18   are being put into evidence.

19         THE COURT:  All right.  Tell me what the point is.

20   And I have a stipulation from you with respect to documents.

21         MR. ROSENBERG:  Yes, you do, Your Honor.  The point

22   is that the budget that was provided to us late last week

23   provides for the first time for -- I believe it was 3.9 million

24   dollars of overhead, headquarters, admin expenses that were not

25   part of the approved budgets until that moment.  So my hope is

64

1   that the debtor will stipulate that arguments as to whether or

2   not those charges are appropriate can be made another day if

3   necessary at all.

4        THE COURT:  In what context would that be made in?

5   That the case is being now administered generally?

6        MR. ROSENBERG:  No, Your Honor.  It would be made in

7   the context of this -- the estates in which I am interested

8   being overcharged for expenses that it (a) should not have been

9   hit with at all; or (b) are being double-hit with which,

10  frankly, is our present belief.  Again, it's not an issue we

11  have to deal with today if the debtor is willing to reserve it

12  for some other time.

13       THE COURT:  All right.

14       MR. CROSS:  Your Honor, I was asked by a number of

15  people to put one general thing on.  Maybe it helps you, maybe

16  it doesn't.

17       THE COURT:  Go ahead.  The other is that there are a

18  number of parties who do not feel compelled to address the

19  Court.  They do not intend to withdraw their objections.  They

20  understand that their objections will be overruled but they've

21  just as soon -- they do not, by not appearing at the podium,

22  want to say that they've waived their objections.

23       THE COURT:  Well, I think we should hear from at

24  least one party what the continuing objection is.  And if all

25  other parties have that objection, those parties don't have to

65

1    stand up to do anything more than say me, too.  And we can do

2    this also after the break.  But I want to know what the

3    parties' continuing objections are, first, to the DIP order

4    and, second, to cash collateral.

5            MR. CROSS:  I think the parties are prepared to

6    address any specific language provisions or legal provisions in

7    those orders that I think was interpreted by some in the room

8    that you were inviting sort of broad-based objections to the

9    concept that went beyond just the language of these orders.

10   People who have specific objections intend to come up and

11   address those to the extent they still exist.  There are not

12   very many of them as based upon my understanding.

13           But there are some people who are concerned that by

14   not approaching the podium to say --

15           THE COURT:  By not approaching now, parties are

16   certainly not waiving their right to come up --

17           MR. CROSS:  That's all I was asking --

18           THE COURT:  -- after we take a break, particularly,

19   if the language that I hope the parties will be able to fine

20   tune during the break is deemed satisfactory.  And as I've said

21   on any number of occasions in terms of use of cash collateral,

22   parties can seek further relief for cause shown at a later

23   stage in the case.  But on the other hand, the DIP is fairly --

24   it's not necessarily forever but it's a order that affects the

25   lender and affects other parties and we have to deal with it.

66

1    You have a material on this, right?

2              MR. ABEL:  A material --

3              THE COURT:  You have a mechanic's lien holder?

4              MR. ABEL:  Mechanic's lien, yes, Your Honor, properly

5    perfected on Elk Grove, California.  It is a non-producing

6    property.  I have a couple of probably very general and

7    hopefully very easily answered questions, basically on two

8    schedules.  I believe these are to the DIP loan.  One is

9    Schedule 8.18 and the other is to 8.19-1 and 8.19-2.  And the

10   general questions are:  for 8.18, it's defined on first lien

11   properties.  It is not clear to me whether those are properties

12   in which a first lien exists -- at least a first lien exists on

13   a property or those of which the DIP lender is getting a first

14   lien.  I'd like that simply clarified.  I assume that will be

15   fairly easy.  And then on the 8.19-1, this appears to be -- it

16   says "prior lien debt".  I would consider a mechanic's lien to

17   be a prior lien debt.  And I don't know why my particular

18   client is not listed on that lien, number one.  And, number

19   two, in the DIP loan agreement, under that paragraph -- excuse

20   me -- again, it says the first lien --

21             THE COURT:  What paragraph number?

22             MR. ABEL:  This is of the -- I believe it's of the

23   DIP loan, Section 8.19.  And this is of the one as of, I guess,

24   last night.  I don't know.  I haven't seen anything since then.

25             THE COURT:  Why don't you discuss it with the

67

1    debtors?

2         MR. ABEL:  Fine.

3         THE COURT:  You now have two ques -- do you have a

4    third question?

5         MR. ABEL:  My third question is can I see 8.19-2?

6    That's it.

7         THE COURT:  You can't ask that of me.

8         MR. ABEL:  No.  I can't ask that of you.

9         THE COURT:  Thank you.

10        MR. ABEL:  I just wanted to find out if it said what

11   I thought it said.  Thank you.

12        THE COURT:  Anyone else?

13        MR. METH:  May it please the Court, Your Honor.

14   Richard M. Meth, Day Pitney LLP, appearing on behalf of A&K

15   Endowment.  I believe the position that we've said has been set

16   forth in the objection that we filed as well as that filed by

17   Mr. Elkins who I know wants to address the Court on the phone.

18        THE COURT:  Well, you're here.  Why don't you address

19   the Court?  And --

20        MR. METH:  No.  His interests are separate and apart

21   and not my client.

22        THE COURT:  All right.

23        MR. METH:  He's not my client.  But he has similar

24   interests.

25        THE COURT:  Then explain to me your continuing

68

1    objection and what words in the proposed order adversely affect

2    your client's interest?

3         MR. METH:   There are not specific words and that's

4    why -- much as Mr. Rosenberg addressed certain concerns, we do

5    not have any issues that we wish to address with Mr. Westerman

6    [sic] who is the debtor's expert from Alix.

7         Our concerns are really three-fold.  Under the terms

8    of the CSA agreement, to which our client is a party, it was

9    initially a party to that agreement with Rouse which then was

10   acquired by General Growth.  There are restrictions based upon

11   the fiduciary relationship that existed pursuant to the terms

12   of that agreement which preclude a number of things.  One is

13   that no liens can be put on what is called the Summerlin --

14   either Business Entity or the Summerlin Development unless

15   those funds are to be used expressly for the improvement of

16   that property.  That is one of a number of negative pledges set

17   forth in Section 4.05 of the CSA agreement.  Another deals with

18   a reservation of rights with regard to any sale in excess of

19   500 acres of that Summerlin Development much less the sale of

20   any particular major component of that property.  We believe,

21   Your Honor, that those would be reserved and could be reserved

22   in conjunction with any proposed sale, either of a 500 plus

23   acre parcel or in connection with a proposed sale of the

24   entirety of the Summerlin Development and would simply request

25   a reservation of rights in that regard.  But we do have major

69

1    concerns based both on the fiduciary obligations that are set

2    forth in that CSA agreement as well as the restrictions that

3    are set forth with regard to the expenditure of funds and the

4    lien-ing of the property in that regard.

5           And hopefully, I'll be able to work out some kind of

6    reservation of rights language with counsel for the debtor

7    during the break.

8           THE COURT:  You referred to three issues.  You've

9    named two.

10          MR. METH:  I believe those -- I meant two.

11          THE COURT:  All right.

12          MR. METH:  I think those are all for Your Honor.

13          THE COURT:  All right.  Anyone else?  All right.  On

14   the telephone?  Anyone on the telephone?

15          MR. ELKINS (TELEPHONICALLY):  This is David Elkins.

16          THE COURT:  You just heard counsel mention several

17   concerns?

18          MR. ELKINS:  I actually share some of those

19   concerns --

20          THE COURT:  All right.  Any --

21          MR. ELKINS:  -- but I have others that I would like

22   to take two minutes to explain them to you.

23          THE COURT:  No.  You don't have to explain the same

24   concerns.  Explain to me what other additional concerns you

25   have.  Obviously, if you have something you must add to what

70

1    counsel has stated -- but I understand the two points.

2          MR. ELKINS:  Our concerns, Your Honor, are that given

3    the fiduciary obligations that were agreed to by the company in

4    1996 and given the protections that were intended to be

5    forwarded by the overall structure and covenant of the role of

6    an agreement that we have an interest in the properties that

7    are covered by the agreement which clearly do -- and the

8    company, as I understand it, currently proposes through the DIP

9    to grant a first lien on those properties to secure the DIP

10   lenders.  Our view is that that granting of a lien severely

11   impairs the interest we have in the properties.  It's a direct

12   and obvious violation of fiduciary duties owed to us by the

13   company for its own benefit.  They agree to subordinate their

14   interest in the property to ours and yet they're violating that

15   term.  We would simply ask that the company either give us some

16   form of adequate protection or reject our contract.

17         THE COURT:  All right.  Thank you.

18         MR. ELKINS:  Thank you.

19         THE COURT:  Anyone else on the telephone?  All right.

20   Ms. Goldstein or counsel do you wish to respond to any of these

21   concerns or shall we take a break and then see what can be

22   finalized?

23         MS. GOLDSTEIN:  Your Honor, I would like to briefly

24   respond to Citibank's objection because we vigorously object to

25   any separate hearing regarding the Oakwood property.

71

1          I also would like to take a minute and point out that

2    the CSA agreement, which Mr. Elkins and counsel spoke about, is

3    an executory contract.  They are not lenders on the property,

4    let alone secured lenders.  Those properties are entirely

5    unencumbered.  Whatever rights they have as parties to the

6    executory contract, they have.  If we reject the contract

7    they'll have the rights, whatever they are, as a result of that

8    and that is not a matter for today's hearing.

9          On Citibank, we were very clear in our response that

10   we were not relying on an equity cushion for undersecured

11   creditors.  In fact, we didn't rely on an equity cushion for

12   anybody, Your Honor.  While we may believe that many of the

13   lenders are oversecured, we have not taken any position on the

14   value of any property, including the Citibank property.  They

15   maintain they're undersecured and therefore we responded

16   accordingly.  But we have not taken a position on the value of

17   their property or anyone else's property.

18         The adequate protection that we're offering to

19   Citibank is appropriate for an undersecured creditor.  You can

20   use the cash collateral of an undersecured creditor as long as

21   they're adequately protected.

22         The properties, Your Honor, are cash flow positive.

23   The debtor sweeps or traditionally swept the cash, paid the

24   expenses of the property and prior to the petition paid

25   interest on the property.  What we're proposing now is to make

1    an adequate protection payment on the property equal to the

2    amount of interest.  Citibank asserts it's undersecured and so

3    we believe -- and obviously that could change if it turns out

4    their not but it should be applied to principal.  And for every

5    dollar of rent, excess rent, the difference between the rents

6    swept and the amount that goes back to the property for the

7    adequate protection payment and to pay the expenses of the

8    property, that differential, is a claim held by that property

9    against the parent company.  It's an administrative claim.

10   Citibank has a lien on that claim but also, more importantly,

11   Citibank has, just as the other secured lenders do, a first

12   lien on the cash that is held in the debtors' main account to

13   the extent of the diminution in value of the collateral.

14          And if that diminution is equal to the rent

15   differential, then that may be the case Your Honor.  I don't

16   think that we know for sure that that is the full diminution.

17   But essentially, Your Honor, they have a lien for up to the

18   amount of the excess rents.  And so sequestering the excess

19   rents is just another way to achieve what we've already

20   proposed.  Not only that, Your Honor, but we've also proposed a

21   lien, a second lien, on the Goldman assets.

22          So, essentially, our proposed adequate protection is

23   of greater value to Citi Corp. then what their counsel is

24   asking for.  Because if you carve them out they get no second

25   lien, no lien on the cash and the lien on the cash can be in an

73

1    amount up to the excess rent that they're looking to sequester.

2    So Your Honor, they are being treated no differently then any

3    other creditor with respect to the use of cash collateral.

4         Your Honor, let me just go back.  They're being

5    treated the same other than the application of the adequate

6    protection payments, Your Honor.  And let me note for the

7    record that since the interim order was entered we have made an

8    adequate protection payment and they have, nonetheless, in

9    violation of the order, continued to trap the cash.  So they

10   have taken more than they're entitled to and in violation of

11   the court order and in our view in violation of the stay since

12   the beginning of the case.

13        So we do not believe there should be a separate

14   hearing.  We think we have proposed a package that more than

15   adequately protects their interest in their collateral.

16        Your Honor, as to the other -- I think Mr. Rosenberg

17   said that Deutsche Bank would pursue it's objection.  I don't

18   know if you want us to respond to that now.  I know my partner,

19   Adam Strochak, was planning to deal with that later in the

20   hearing but I assumed that they will just go forward with their

21   arguments and will respond later.

22        THE COURT:  All right.  Unless they wish any further

23   response right now.

24        MR. ROSENBERG:  We do not, Your Honor.

25        THE COURT:  All right.

74

1          MR. ROSENBERG:  We'll discuss with the debtor whether

2     they're willing to stipulate to reserve rights on the issue I

3     described.  Other than that, we're fine going forward.

4          THE COURT:  All right.

5          MR. STAMER:  Your Honor, just very briefly.  We

6     support the debtors' responses to the objections.  And in

7     particular, we do not believe that a separate hearing for

8     Citibank is justified or appropriate under these circumstances,

9     again for the reasons identified by the debtors' counsel.

10    Thank you.

11         THE COURT:  Thank you.  All right.  Do you want to,

12    before we take a break, proffer Mr. Buckfire's testimony or

13    shall we save that for later?

14         MS. GRAY:  Your Honor, Melanie Gray of Weil Gotshal &

15    Manges.  I'm happy to go ahead with the proffer.

16         THE COURT:  All right.

17         MS. GRAY:  It's relatively short and that way we can

18    move forward with regard to Mr. Buckfire's testimony and

19    further build the record for the hearing.

20         Your Honor, I offer, pursuant to Federal Rules of

21    Evidence 103(a)(2) and 611(a) as a proffer the following

22    testimony of Kenneth A. Buckfire, a managing director and

23    cofounder of Miller Buckfire LLC.  Mr. Buckfire is present in

24    the courtroom, is thoroughly familiar with the debtors'

25    extensive process to secure DIP financing and the terms of the

75

1    new DIP loan that is before the Court today.

2         If Mr. Buckfire were called to testify in support of

3    the motion to approve the debtor-in-possession financing his

4    direct testimony would be as follows:

5         He is a managing director and cofounder of Miller

6    Buckfire, a private investment banking firm specializing in

7    strategic and financial advisory services and large scale

8    corporate restructurings and M&A transactions.

9         In addition to advising clients in a broad range of

10   industries and managing principal investments in distressed

11   companies.  Mr. Buckfire has played a leading role in the

12   restructurings of several major companies, including real

13   estate, financing and restructuring transactions for Standard

14   Pacific Homes, Oakwood Homes, CRIIMI MAE and Walter Industries.

15        Mr. Buckfire has extensive debtor-in-possession

16   financing experience as well, having arranged, what until

17   recently was the largest DIP financing for Calpine help line in

18   the amount of 7.4 billion dollars.

19        Mr. Buckfire is knowledgeable regarding the current

20   market for DIP financing, which he would describe as extremely

21   difficult having essentially broken down in July of 2007.

22        Mr. Buckfire holds an MBA from Columbia University

23   and a bachelor's degree in economics and philosophy from the

24   University of Michigan.

25        Along with other members of Miller Buckfire's team,

76

1    Mr. Buckfire has been serving as the financial advisor to the

2    debtor since December 10, 2008.  In this capacity he is

3    familiar with the debtors' business operations, financial

4    affairs, debt structure, projected cash flows, financial

5    projections and the comprehensive efforts to obtain the DIP

6    financing.

7         Mr. Buckfire would testify that as part of Miller

8    Buckfire's engagement it was assisting the company in arranging

9    forbearances with its creditors and attempting to arrange an

10   out-of-court restructuring process while also preparing for the

11   continuancy of a Chapter 11 filing as the company, in January,

12   believed that it was at risk of potentially running out of

13   liquidity in February.

14        Mr. Buckfire would testify that over the course of

15   the last several months the debtors have engaged in a broad,

16   active and aggressive marketing effort to secure DIP financing

17   on the most favorable terms available in the current market.

18   Beginning in January of 2009 Mr. Buckfire and Miller Buckfire

19   commenced a thorough process to solicit proposals for DIP

20   financings, seeking financings from a wide spectrum of

21   candidates including commercial banks, real estate investors,

22   hedge funds, certain of the debtors' existing lenders and other

23   parties with existing stakes in the company's capital

24   structure.

25        Mr. Buckfire would testify that of the more than

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

77

1    thirty institutions initially contacted, twelve expressed

2    interest and signed confidentiality agreements to gain access

3    to General Growth's information for due diligence purposes.

4    Parties subject to the confidentiality agreements received

5    access to the confidential information through a data room

6    including the company's consolidated budget and cash flows and

7    information about the assets that comprise the DIP collateral.

8            At the end of January, Miller Buckfire distributed a

9    request for a proposal to the parties subject to the

10   confidentiality agreement.  And in response received proposals

11   from several potential lenders.  Miller Buckfire, along with

12   the debtors and their professionals, engaged in lengthy and

13   difficult negotiations with one potential lender that merited

14   the most attention.  However, after nearly two months of

15   intense negotiations they were unable to reach agreement on the

16   key terms potentially leaving these debtors without any source

17   of DIP financing.

18           Mr. Buckfire would testify that faced with the

19   possibility of a Chapter 11 filing without the necessary

20   liquidity cushion that the DIP financing provides; the debtors

21   received an unsolicited proposal from Pershing Square, one of

22   the initial parties who had previously indicated an interest in

23   providing DIP financing.

24           Discussions with Pershing Square led to a new

25   proposal for a DIP financing that provided several key

78

1   advantages as the debtors detailed in their cash management and

2   DIP financing motion that was filed on the first day of this

3   case.

4          Mr. Buckfire would testify that as of the

5   commencement date, the original Pershing DIP commitment was the

6   most favorable DIP available to the debtors at that time.

7   Since that time, however, the debtors have continued to engage

8   in nonstop efforts to improve upon the terms of the original

9   Pershing Square DIP loan, negotiating with numerous additional

10  parties as well as a continued dialogue with Pershing Square.

11         The debtors and Miller Buckfire remained engaged in

12  vigorous negotiations up through the May 8th hearing with

13  potential DIP lenders.  Mr. Buckfire would testify that on May

14  5th the debtors selected the exchangeable noteholders' DIP loan

15  and filed the appropriate notice and documentation with this

16  Court the following day.  Parallel negotiations with both the

17  noteholders and Pershing Square continued after this time and

18  resulted in yet a revised, more attractive DIP loan offered by

19  Pershing Square.  On May 8th the debtors filed this revised

20  Pershing Square DIP loan with the Court.

21         Mr. Buckfire would testify that at the May 8th

22  hearing Your Honor instructed the debtors to collaborate with

23  all parties in interest to continue accepting proposals for a

24  final DIP loan.  On Monday, May 11th, at the Court's

25  instruction, the debtors conducted a negotiation session at the

79

1    offices of Weil Gotshal & Manges to obtain the best terms

2    available from interested potential lenders.  All interested

3    lenders were invited to attend and present their best and final

4    DIP proposals to the debtor, their advisors, the official

5    committee of unsecured creditors and its advisors as well as to

6    the secured property lenders in this case.

7        During the day, four DIP proposals were presented by

8    three interested DIP lenders.  Participants in the bidding

9    process had ample opportunity to collaborate with the debtors,

10   the committee and the secured lenders participating who all

11   vocalized their issues regarding each of the proposals directly

12   to the DIP lenders.  At the conclusion of this session and with

13   the support of the committee, the debtors ultimately selected

14   the revised noteholders DIP loan which is before the Court

15   today.

16       Mr. Buckfire would testify that the debtors sustained

17   efforts post-petition to obtain the most favorable DIP facility

18   available, has resulted in the noteholders DIP loan which does

19   offer the more attractive -- the most attractive terms

20   available then provided under the prior proposals and present

21   the best overall package that the debtors have received to

22   date.

23       Mr. Buckfire would testify that the key highlights

24   that distinguish the revised noteholder loan include 400

25   million dollars facility, interest rate at twelve percent plus

80

1    LIBOR with a LIBOR floor of 1.5 percent; a twenty-four month

2    term, a conversion feature of up to 400 million of equity or

3    debt at the company's or debtors' sole option capped at the

4    lender's -- and capped at the lender's receipt of eight percent

5    of the common stock distributed in connection with a plan of

6    reorganization.

7         This DIP does not contain any warrant and no

8    commitment fee.  There is a 3.7 five percent exit fee as

9    opposed to the earlier four percent fee that was included in

10   the earlier DIP proposals, which is also convertible into

11   equity or debt at the debtors' option.

12        This DIP loan is secured by a first lien on the

13   properties currently securing the pre-petition Goldman bridge

14   loan in addition to other collateral as provided for in section

15   6.1 of the loan agreement.

16        The second liens on the encumbered property of the

17   debtors or capital stock of the debtors owning property, to the

18   extent that the capital stock secures the prior lien -- there

19   are no second liens -- I knew that didn't sound right coming

20   out the first time.  There are no second liens on the

21   encumbered properties of the debtors or capital stock of

22   debtors owning properties to the extent that the capital stock

23   secures the prior lien debt.  And it does provide a first lien

24   on cash collateral and the debtors' main consecration account

25   in favor of those pre-petition secured lenders that are

1    entitled to receive adequate protection as set forth in the

2    proposed order.

3         Mr. Buckfire would testify that the ability of the

4    debtors to continue to operate their business and reorganize

5    under Chapter 11 will be significantly enhanced by the

6    financing memorialized in the revised noteholders DIP credit

7    agreement.

8         Mr. Buckfire would testify that the debtors' option

9    to convert the DIP loan into equity or debt removes a

10   significant condition to a successful plan of reorganization.

11   Further, the debtors operations and chances of a successful

12   reorganization will be improved by the enhanced liquidity

13   provided by this DIP loan.  The liquidity provided by the loan

14   will further give the debtors an enhanced ability to main and

15   selectively improve its properties through increased capital

16   spending and maintenance during the course as well as to

17   operate in the ordinary course of business.

18        Mr. Buckfire would further testify that throughout

19   this process the terms of the revised noteholders DIP loan, as

20   were the others, were vigorously negotiated at arm's length and

21   in good faith.  And based upon his experience and understanding

22   of the current financing markets, the debtors could not have

23   obtained more favorable overall terms and certainly not on an

24   unsecured basis, secured only with junior liens or with a

25   superpriority claim.

82

1          THE COURT:  All right.

2          MS. GRAY:  And that, Your Honor, I offer as Mr.

3    Buckfire's testimony.

4          THE COURT:  Very good.  And I assume I have a proffer

5    as to good faith that there are no undisclosed side deals that

6    the lenders, as well as the debtors, have been acting at arm's

7    length and in good faith in all respects.

8          MS. GRAY:  Absolutely, Your Honor.  And -- but I will

9    point out, just with regard to the Goldman facility, the

10   debtors were able to negotiate a reduction in the exit fee for

11   that and that is reflected in the side letter but it results in

12   a several million dollar benefit to the estate.

13         THE COURT:  Very good.  Thank you.  All right.  I

14   think we should take a break now.  So any further concerns with

15   regard to the documentation can be clarified; any further

16   issues can be isolated and then we'll come back.  I'll hear

17   from the parties with regard to any remaining issues and to the

18   extent there are issues, I hope that I'll be in a position to

19   rule.

20         Anyone who needs -- strike that.  Anybody who wishes

21   to examine Mr. Mesterharm or Mr. Buckfire certainly can do so.

22   I do think that it would be in everyone's interest to find a

23   way to reserve individual concerns for a later date but I

24   realize that with regard to the Citibank objection, as to

25   today, that may be timely to decide.  The Citibank objection

83

1    and the objection with regard to the Summerland Properties.

2          As to the issues relating to mechanic's liens, my

3    understanding in this DIP and cash collateral order is that

4    pre-existing valid and enforceable liens of a non-consensual

5    nature, i.e. mechanic's liens and the like, were not being

6    affected.

7          UNIDENTIFIED SPEAKER:  That's correct, Your Honor.

8          THE COURT:  And that there is language in the order

9    to that effect.

10         MS. GOLDSTEIN:  Your Honor?

11         THE COURT:  Yes.

12         MS. GOLDSTEIN:  I would point out that we will be

13   having to proceed, I believe, with Deutsche Bank objection as

14   well.

15         THE COURT:  Oh, I didn't mean to exclude the Deutsche

16   Bank objection but I'd like to find out, after the break,

17   exactly what the objection is.  It's to the cash management

18   order as it stands today, particularly?

19         MS. GOLDSTEIN:  Your Honor, Mr. Rosenberg said the

20   cash collateral order, I had believed it was to the cash

21   management order but I guess we'll find out --

22         THE COURT:  Or perhaps both.

23         MS. GOLDSTEIN:  -- when they make oral argument.

24         THE COURT:  Both.  All right.  Thank you.

25         UNIDENTIFIED ATTORNEY:  Your Honor, what time do you

84

1    want us to get back?

2         THE COURT:  Does 2:30 appear reasonable?  Give

3    parties an opportunity to get back.

4         (Recess from 1:40 p.m. until 2:55 p.m.)

5         THE COURT:  All right.  We're back on the record in

6    General Growth Properties.

7         (Pause)

8         MR. HOLTZER:  Good afternoon, Your Honor. Gary

9    Holtzer, Weil Gotshal & Manges for General Growth.

10        Your Honor, we've completed the testimony of Ken

11   Buckfire and we would propose that we go forward now, describe

12   on the record, the changes to the tenant obligation order that

13   has been circulated amongst the parties.  And then, Your Honor,

14   we can turn to any objections that any of the parties have and

15   resolve them in whichever order Your Honor would like to

16   approach.

17        THE COURT:  We can start in any order.  If the tenant

18   obligations order has the fewest obligations let's do that one

19   first.

20        MR. HOLTZER:  Your Honor, may I approach with a black

21   line?

22        THE COURT:  Surely.

23        (Pause)

24        THE COURT:  Pardon me; this is black lined against

25   which version?

09-11977-alg   Doc 574   Filed 05/15/09   Entered 05/20/09 10:16:54   Main Document
Pg 85 of 165

1        MR. HOLTZER:  This is black lined against the version

2   that was filed, Your Honor.

3        THE COURT:  All right.

4        MR. HOLTZER:  Your Honor, the tenant obligations

5   motion had, as a part of it now, language that we took from the

6   cash collateral adequate protection order that related to the

7   debtors' agreement as a part of the adequate protection package

8   to go ahead and honor certain provisions of the pre-petition

9   loan agreements governing the leasing of the debtors' space in

10  its malls.  And we have included that now in the tenant

11  obligation order.

12       THE COURT:  You're on page 5?

13       MR. HOLTZER:  And that language is at page 5.  And

14  the language, Your Honor, is language which makes clear that

15  what the debtors are doing is that they're going to comply with

16  a nondefault leasing covenant specified in the first mortgage

17  document as part of the adequate protection package.

18       In exchange for that, Your Honor, the debtors are

19  requesting that the lenders comply with their provisions

20  concerning necessary consents, including with respect to SNDAs.

21       During the course of discussions with the

22  coordinating counsel for the pre-petition secured lenders, we

23  included language as a result of one of their comments, which

24  is in paragraph -- which is on page 6 in the bottom paragraph.

25  The way that this document works and the way that we disclosed

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

86

1    last time is that certain of our loan agreements have SNDAs

2    attached.  Others do not have SNDAs attached; SNDA is a

3    subordination nondisturbance agreement.  And what we have done

4    is we've attached to this document the form of SNDA that we

5    would like to use in the event that the underlying loan

6    agreement does not have a form of SNDA attached.  And all of

7    this is in connection with our commitment to comply with the

8    leasing covenants and the loan agreements.  Which, as Your

9    Honor noted at the last hearing, we're not obligated to do but

10   we're going to do as part of the adequate protection package

11   that we're offering.

12            During the course of discussions with counsel for the

13   senior -- the pre-petition secured property lenders, they asked

14   if we would insert language, which we have, along the following

15   lines.  It begins on page 6 and it's the second sentence.  And

16   it says, "With respect to the form of SNDA attached as Exhibit

17   1, the debtors will discuss in good faith requests by any

18   adequate protection party to develop standardized modifications

19   for such adequate protection party provided that any such

20   standardized modifications shall not unreasonably delay or

21   impair the debtors' leasing activities."  And we've included

22   that in response to a request by coordination counsel that we

23   at least consider and engage with any parties that don't have a

24   form attached to their loan agreements in an effort to try to

25   resolve that consensually.  But if we can't we would like the

87

1    form that we have attached here to be the one we use in

2    connection with the offer to comply with the leasing provisions

3    as a part of the adequate protection package.  And that's the

4    substance of this order.

5          I would note for the record, we have been asked by

6    several tenants whether or not the information that we note in

7    this order that will be going to the creditors committee will

8    ultimately be going to parties other than the advisors or

9    professionals for the committee.  And we have said that we

10   would work with the committee to develop a subcommittee so that

11   there are actual members of the committee who are making

12   decisions concerning them.

13         MR. STAMER:  That's correct, Your Honor.

14         THE COURT:  All right.

15         MR. HOLTZER:  And so with that, Your Honor, if there

16   are any other questions on this order, that's where we stand on

17   tenant obligations.

18         THE COURT:  All right.  Does anyone wish to be heard

19   on the tenant order?

20         MR. LEWIS:  Good afternoon, Your Honor.  Kenneth

21   Lewis, attorney for H&M Hennes & Mauritz LP.

22         While I've had some discussion with Mr. Holtzer with

23   respect to the language addressing the notice provisions.  As

24   Your Honor is aware, looking at the black line, while the prior

25   form of final order that was annexed to the supplement provided

88

1    for notice of the satisfaction of certain pre-petition tenant

2    obligations as well as certain lease amendments would be

3    provided to committee counsel only.  And it was to be done on a

4    confidential basis and also on a no-name basis.

5           I assume, through discussions with the committee,

6    that language has been changed to now provide that the notice

7    would be provided to committee counsel.  The confidentiality

8    provisions were removed as was the no-name basis.  I had asked

9    if it could then be more of a for professional eyes only

10   language.  I am told that the committee has some issues as to

11   why that's in there.  So certainly it's my preference, and we

12   can hear from the committee as to why we can't have

13   professional eyes only.  If we can't have professional eyes

14   only, certainly my concern as to whatever this subcommittee

15   would be that in essence it would not be another tenant or a

16   competitor of H&M because certainly we don't want our

17   competitors to see what our lease provisions provide and I

18   certainly don't believe that the debtors would want to see or

19   permit other tenants to start comparing notes with respect to

20   what their leases may or may not provide.

21          I've also asked Mr. Holtzer to confirm and I believe

22   he's prepared to do so.  And so the record is clear that the

23   individual proposed tenant obligation or amendments means an

24   obligation or amendment on an individual lease or location

25   basis as opposed to just an individual tenant basis.

89

1            THE COURT:  All right.

2            MR. STAMER:  Your Honor, just very briefly.  Again,

3    for the record, Michael Stamer from Akin Gump Strauss Hauer &

4    Feld on behalf of the official committee.

5            Your Honor, the arrangement that we negotiated with

6    the debtors was never on a no names basis.  It is a start off

7    as professional eyes only but my assumption is there will need

8    to be decisions that will have to be made and it is the

9    professional's view that that should involve members of the

10   committee.

11           Mr. Holtzer wanted me to specify, and of course we're

12   amenable to this, that that subcommittee that we create will

13   not have any tenants on it.  And if there is another committee

14   member that for some reason should not be provided access to

15   this information, we'll talk to the company about it and work

16   through that issue.  And if not -- if we have a disagreement,

17   as always, we are free to come to consult with Your Honor.

18           But we feel that the confidential nature of the

19   information that we're going to be discussing will be protected

20   fully through that procedure.

21           MR. HOLTZER:  Your Honor, one other follow up.

22   Counsel asked that we confirm on the record that the thresholds

23   set in the document for notice are per tenant per location and

24   that's correct.

25           THE COURT:  All right.  Well, it seems to me that --

90

1    well, please, go ahead.  Is it on the same issue?

2            MR. CROSS:  It is on the same issue, Your Honor.

3            THE COURT:  All right.

4            MR. CROSS:  I think this might actually be more

5    controversial now than the DIP order.  We been addressing

6    things ad hoc, I want to thank the Court for the extension that

7    it granted and gave us the opportunity to organize, as well as

8    thank the debtor and --

9            THE COURT:  You don't have to thank me.  I thank you

10   for the organization that has obviously moved things forward.

11           MR. CROSS:  It made a big difference.  And this order

12   is substantially improved because these things -- these

13   provisions were not in this order.  There are two provisions of

14   the order I just want to address briefly.

15           First, the SDNA language is an accommodation and we

16   will work in good faith.  I just want to underscore from a

17   client perspective rather than coordinating counsel, I think is

18   now my official title, that if we bring that request to the

19   Court it will be because it's very important to our clients.

20   In the rush of these papers they have not had a chance to

21   review the form SNDA and most of our mortgages do not have a

22   copy of them attached.

23           THE COURT:  I know how much all parties enjoy coming

24   down here.  I assume that if they do it's for an important

25   reason.

91

1        MR. CROSS:  The significant that I raise in my hat as

2    coordinating counsel, is that there is significant concern

3    about the alteration rights being granted without seeking

4    lender consents, particularly if lender consent is required

5    under the loan agreements.  It is correct that typically loan

6    covenants do not have to be complied with in bankruptcy.  The

7    difference here would be it is a use of cash collateral.  It

8    has been put into the cash collateral motion and typically that

9    kind of expenditure, at least with respect to major

10   alterations, would be something that would be subject to

11   approval.

12       We negotiated with, and there was give and take in

13   this order and some things you get and some things you do not.

14   The debtors' taken a firm position that they do not want to

15   change this.  Many of the secured creditors would like to see

16   alterations equally be subject to lender approval and I would

17   suggest at least major alterations be subject to lender

18   approval.  That would resolve many of the objections that you

19   might otherwise hear.

20       THE COURT:  All right.

21       MR. LEWIS:  Your Honor, Kenneth Lewis.  Again, I

22   appreciate committee counsel's comments.  And again, I would

23   just want the record to be clear that my rights are reserved

24   with respect to --

25       THE COURT:  Your clients and the rights of lessee's

92

1    are reserved.  Obviously they are very important to the

2    debtors' success in the future and I'm sure that all parties

3    will be sensitive to their concerns.  I don't know that we can

4    go any further today.

5            MR. LEWIS:  Great.  Thank you very much, Your Honor.

6            THE COURT:  Thank you.

7            MR. BERGER:  Judge, Neil Berger, Togut Segal & Segal

8    for Macy's.  My client has not had an opportunity to review the

9    SDNA.  I'm certain I can turn it around and have comments, if

10   any, to debtors' counsel and committee within twenty-four hours

11   and I'd ask for that opportunity.

12           THE COURT:  You had your opportunity, sir.  As I said

13   to your predecessor, your interests are very important because

14   you're a customer, if you will.  And I'm sure that parties will

15   be sensitive.  And if you have interests and you have concerns,

16   I'm open for business.

17           MR. BERGER:  Thank you, Judge.

18           MR. HOLTZER:  Your Honor, one clarification on the

19   last point.  Macy's is, of course, a tenant.  The SNDA goes to

20   the lender side of the house, not the tenant side of the house

21   so -- just to make that clear.  It really doesn't have anything

22   to do, really, with the Macy's side.  It's really a lender

23   issue.

24           THE COURT:  I assumed so.  I didn't think that the

25   concern was limited just to SNDAs but I may have misunderstood.

93

1    In any event, we're here today and if there are any documents

2    that are not in your possession we should get those to you

3    immediately.

4        MR. HOLTZER:  Your Honor, just a brief response in

5    connection to counsel's comments.  First of all, it has been a

6    huge assistance coordinating amongst the various lenders and

7    that is truly what has moved this along efficiently.  But with

8    respect to this particular order, counsel is correct, there has

9    been much give and take on what has gone into this order with

10   respect to the SNDA language and including the commitment work

11   in good faith.  And the issue counsel is raising in one which

12   we discussed and we have decided that we would abide by and

13   comply with the specific leasing provisions but not the other

14   provisions, including the ones that counsel has mentioned.

15       So I just wanted to make that clear and that's where

16   we are on that.  So thank you.

17       THE COURT:  All right.  Well, I continue to believe

18   that we don't necessarily solve every issue today and some

19   issues that may be of concern are simply reserved.  We've

20   certainly made a lot of progress.

21       All right.  Any other objections to the tenant

22   improvements order?  Anyone wish to be heard?  Yes?

23       MR. YUDELL:  Kenneth Yudell of Aronauer Re & Yudell

24   on behalf of a group of lenders, property lenders that are

25   serviced by Center Line Servicing.

94

1            Just one brief point to supplement what Mr. Cross

2      said on the alterations provision, Your Honor.  The relief that

3      was requested in the motion by the debtors was very, very

4      specific to continue their pre-petition practices with respect

5      to leasing.  It wasn't until this order that this carve out

6      provision of alterations appeared.

7            And as Your Honor has stated, there are certain

8      issues that we may be able to handle on another day.  And it

9      seems to me that since this relief with respect to alteration

10     rights wasn't included in their motion, perhaps it is something

11     that we can handle on another day.

12            MR. HOLTZER:  Your Honor, again just so the record is

13     clear, we don't view the leasing provisions to include the

14     alteration ones.  And if that's what counsel is attempting to

15     argue, we want the record to be clear that the alteration

16     provisions are not, of course, provisions that we're going to

17     comply with.  We don't intend that and that's not, in our view,

18     what the leasing provisions are.

19            THE COURT:  All right.  Anyone else?  All right.  I

20     understood this order, initially, to have two goals.  One was

21     to obtain court permission to continue the pre-petition

22     practices in the sense that some of those obligations might be

23     considered pre-petition obligations that would not be

24     necessarily appropriate to continue post-petition.  No one has

25     argued that those obligations that were of possibly a pre-

95

1    petition nature should not be fulfilled despite the bankruptcy

2    filing.

3          The other part of this order now contains various

4    efforts to provide the interested lenders with a part of their

5    total adequate protection package.  We'll come back in a few

6    moments to the question of what adequate protection means in

7    the bankruptcy context, but I believe it is a carefully

8    tailored provision that balances the needs of debtors against

9    the rights of secured creditors.  And that in this context this

10   order, at this point in time in the cases, appropriately

11   balances the parties' interests.  It does not preclude lenders

12   from attempting to protect what they believe to be their

13   interests vis-a-vis the debtors.  But it does not hamstring the

14   debtors in attempting to administer these cases in a reasonable

15   fashion.

16         The most important provisions of the order, it would

17   seem to me on the basis of the record that I have, are the

18   provisions that the debtor -- in connection with which the

19   debtors have agreed to comply with the underlying loan

20   documents.

21         As for any additional concerns, there has been so

22   much progress made in this area that I certainly will not

23   assume that any issues can't be worked out.  These are

24   principally business issues.  If parties believe that the

25   debtors are proceeding outside the ordinary course of business,

96

1     which is a term that sometimes is admittedly difficult to

2     define, but if the parties believe that I will remain open for

3     business and I can certainly hear the parties.  I don't think

4     anyone's rights are being unfairly dealt with today and I'll

5     approve the order.

6          All right.  Where shall we go next?  The DIP order?

7          MR. HOLTZER:  Yes, Your Honor.

8          THE COURT:  I don't know if I have any remaining

9     objections to the DIP order but perhaps I do.

10         (Pause)

11         THE COURT:  If you want me to -- since DIP and cash

12    collateral orders are actually in the same, I can take them

13    together if you wish.  But I do think -- I would appreciate

14    your distinguishing between the two because there is a cash

15    collateral component and then there is a DIP component.  And

16    there's a panoply of protections given to the DIP.

17         MR. CROSS:  Right.  And I think what you're going to

18    find is I've got two corrections to put on the record that are

19    agreed to and some reservation of rights.

20         THE COURT:  All right.

21         MR. CROSS:  And I've tried to catalogue them but

22    everyone can speak for themselves, obviously.

23         First, the proposed DIP loan agreement contains an

24    error in paragraph 4.1(a), it's on page 30 of the black line

25    and counsel has agreed to fix this but collateral was referred

97

1    to in both the A and the B provisions of that paragraph.  And

2    the first provision should refer to adequate protection

3    properties so that it clarifies the language.  But I just

4    wanted to get that on the record.

5            The second is in the order, paragraph 8(c).  The

6    parties have agreed to insert after the words of adequate

7    protection subject to paragraph 6(c) of this order --

8            THE COURT:  Just hold on.  We're in paragraph 8(c)?

9            MR. CROSS:  It's page 22 of the black line.

10           THE COURT:  Of the black line?  All right.  One

11   second.  Is that entitled Interest Operation of --

12           MR. CROSS:  Yes, it is.

13           THE COURT:  All right.  Actually on my copy I'm on

14   page 23.

15           MR. CROSS:  I think you found it; you're doing better

16   than I was doing.

17           THE COURT:  All right.

18           MR. CROSS:  It begins "As adequate protection"?

19           THE COURT:  Yes.

20           MR. CROSS:  And then the next word is "and" and then

21   insert the words "Subject to paragraph 6(c) of this order."

22           THE COURT:  Any objection?  Is that agreed?

23           MR. HOLTZER:  Yes, Your Honor.

24           MR. CROSS:  The next three points and the only three

25   points I have are reservations of rights.  Well, there's four

98

1     actually.  The first is that the mezzanine holders want to

2     reserve their right to make a subsequent showing that they

3     should be entitled to adequate protection payments.  And I

4     recognize that Your Honor has made that clear from the bench

5     but they asked me to raise it for a reaffirmation if they could

6     come back at a later date and make such a showing.

7          THE COURT:  Well, my earlier comments were in the

8     nature of comments, I wasn't making any final determinations so

9     they certainly can come back and argue that they're entitled to

10    more than they're getting at the moment.

11         MR. CROSS:  Correct.  That was my understanding.  The

12    second --

13         THE COURT:  My only request would be, obviously,

14    especially when adequate protection is concerned, that's a

15    subject to be discussed with the debtors before going to Court.

16    And also, I would appreciate very much coordination of efforts.

17    I think there were four mezzanine lenders in the case or in the

18    cases.  I do not ordinarily think it's fair to decide issues

19    that affect multiple parties without having all the parties, at

20    least, on notice.  So I think that whatever is done should be

21    done in a coordinated fashion if at all possible.

22         MR. CROSS:  This does not signal a rush to the court

23    by the mezzanine holders.

24         THE COURT:  No, I don't assume that at all nor am I

25    inviting parties to do so.

99

1      MR. CROSS:  Second point is that the parties -- the

2  lenders would like to reserve their rights to object to the use

3  of nondebtor cash.

4      THE COURT:  What do you mean by that?  That is they

5  want to continue the argument that their individual property

6  should be ring fenced?

7      MR. CROSS:  No.  They're nonbankrupt entities whose

8  cash is being swept into the operating account.

9      THE COURT:  Being swept in rather than going out to?

10      MR. CROSS:  Right.  It's coming in.

11      THE COURT:  And --

12      MR. CROSS:  And so many of the lenders in the room

13  represent those nondebtor parties as well as the debtor

14  parties.  And so they want the ability to come in and

15  subsequently object to that portion of cash management.  It's

16  just reserving rights.

17      THE COURT:  All right.  The objection usually goes in

18  the other direction.

19      MR. CROSS:  I understand that.  But I think we've

20  dealt with many of those issues in the context -- we're not

21  relitigating things that we've already discussed with the

22  debtor.

23      THE COURT:  All right.

24      MR. CROSS:  And I'm --

25      THE COURT:  No, I hear you.  I'll wait for their

100

1   comment.

2        MR. CROSS:  And I'm again wearing my hat as

3   coordinating counsel.  The third point is that, and this is a

4   significant issue for many, that the findings of fact be

5   limited to determinations with respect to debtor in possession

6   financing and cash collateral.  And I believe that's consistent

7   with the statements that were made throughout the hearing on

8   Friday.  That this was the testimony for purposes of this

9   hearing and the issues that were in front of the Court.  There

10  are parties who have independent motions in front of the Court

11  and they don't want to be prejudiced by a finding in this

12  proceeding with respect to their other action, a motion to

13  dismiss for example.

14        And then my colleague, Mr. Gottesman, is going to put

15  on a reservation of rights which in my individual capacity

16  support with respect to continuation of 552 liens because we do

17  not believe that's really in front of the Court.  I will put on

18  the record, having stated these objections, that subject to the

19  552 reservation issue, the clients that I represent with

20  respect to forty-one debtor properties, believe that all of the

21  objections that we raised have been resolved.

22        THE COURT:  Thank you.  And thank you for your

23  coordination efforts.

24        MR. GOTTESMAN:  Good afternoon, Your Honor.  Lawrence

25  Gottesman of Bryan Cave on behalf of certain proctored level

1    secured lenders.  I want to echo Mr. Cross' remarks, in terms

2    of resolution of our issues.  The process that the debtor ran

3    resulted in material improvement to both the DIP and the cash

4    collateral, from our perspective.  And but for this very

5    limited discrete issue, Your Honor, we're satisfied with both

6    the substance and the form of the order.

7         The only area in which we perhaps didn't reach

8    complete agreement was the extent of the reservation of rights.

9    It's our view that the issue of the application, the effect of

10   552(b) on any remaining cash is an issue, quite frankly, for

11   another day that need not and does not get resolved by the

12   order that Your Honor will enter presumably this afternoon or

13   tomorrow with respect to cash collateral and the DIP.

14        The debtor in discussions and good faith has

15   expressed a view to the contrary.  That in fact use effectively

16   cuts off whatever rights might be there under 552(b).

17        THE COURT:  What rights might be there in your view,

18   under 552(b)?

19        MR. GOTTESMAN:  Under 552(b), Your Honor, to the

20   extent that our security documents provide, and we believe that

21   they all do, Your Honor, our pre-petition liens attach to any

22   post-petition cash.  It's best illustrated in the following

23   way:  The adequate protection lien that's been agreed to and

24   negotiated between the debtors and the secured lender group,

25   coordinated group, whatever term we're going to use for that,

1    Your Honor, is essentially limited to a net diminution amount.

2    And that diminution amount, to paraphrase the formula,

3    ultimately is a function of not only the net intercompany

4    claim, but the ultimate up or down movement of the value of the

5    real estate that secures the secured lender's claims.

6         552(b) on the other hand, at least in our view, isn't

7    tied to a diminution concept.  It simply says to the extent

8    that there are products, proceeds and all the various other

9    items that are mentioned in 552(b)(1) of the code.  And to the

10   extent the lenders' lien attach to such proceeds under its

11   terms, the Code provides that it attaches to those post-

12   petition products, proceeds and the like.

13        Now, whether or not that winds up being an amount

14   different then the adequate protection lien, I think will

15   depend upon all sorts of events that none of us can certainly

16   foresee today in terms of where the value of the underlying

17   collateral is when these cases are concluded.

18        I want get to the issue that Your Honor needs to

19   resolve today, one way or the other, we simply wanted to make

20   clear that to the extent there is a right under 552(b), to the

21   extent that that right, in fact, results in different rights

22   with respect to that cash at the end of the case, it's reserved

23   for us to talk about at that point in time.  It may turn out

24   that in fact there's not an economic issue, depending upon

25   where these cases go, Your Honor, which is one of the many

103

1    reasons why we don't' think that the Court needs to address it

2    today.

3         On the other hand, we don't think it's appropriate in

4    the context of this cash collateral order to waive those rights

5    any more then we would waive our rights to seek additional

6    adequate protection if circumstances change or any of the other

7    items that Your Honor has indicated that the Court is open to

8    business to consider, at some point in the future should be

9    appropriate.

10        THE COURT:  So you're argument is that 552(b) means

11   more than just that the security interest extends to rents and

12   didn't just get rid of the old argument that you needed a

13   receiver or all of that.  But that somehow it makes the

14   security interest inviolate.

15        MR. GOTTESMAN:  Not so much inviolate but to the

16   extent there's unused cash -- here's the way we would

17   conceptualize the difference.  The failure of adequate

18   protection claim under 507(b), Your Honor, is tied to

19   diminution.

20        THE COURT:  Yes, it is.

21        MR. GOTTESMAN:  I don't think 552(b) is tied to

22   diminution.  It's applied to, essentially, whatever remains.

23   Now at the end of the day that might be the same or it might be

24   more.

25        THE COURT:  Okay.  I understand what you're saying.

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

1    Of course if you're going to make that argument the debtors may

2    bring out their big guns and ask you what the words "Except to

3    the extent that the Court after noticing a hearing and based on

4    the equities of the case orders otherwise," what that clause

5    might mean.

6          Fortunately, I haven't been asked to use -- they

7    haven't purported to use that clause.  They are proceeding on

8    what I have observed seems to be fairly standard, well

9    recognized adequate protection provisions.  And I'm very

10   please, actually, that I haven't had to get into the

11   intricacies of 552(b).  But I understand that I might be lucky

12   enough later in the case to be asked to do so.  And I think all

13   I'll say today, and I certainly can hear from the debtors, is

14   that the -- none of the provisions of 552(b) have really been

15   put before me today for resolution.

16         MR. GOTTESMAN:  That's satisfactory.  Thank you very

17   much, Your Honor.

18         THE COURT:  Except that at least we haven't had to go

19   into lengthy analysis of the rights of a perfected receiver

20   versus what I assume would have been every state of the union

21   or at least forty-five of the fifty states.

22         MR. GOTTESMAN:  I know we have --

23         THE COURT:  So we can thank Congress for at least

24   having clarified things to that extent.

25         MR. GOTTESMAN:  And we're all greatly relieved, Your

105

1    Honor.

2            THE COURT:  All right.  Then we're all on the same

3    page on 552(b).

4            MR. GOTTESMAN:  Thank you very much, Your Honor.

5            THE COURT:  Thank you.

6            MR. FELDMAN:  Your Honor, David Feldman of Gibson

7    Dunn & Crutcher on behalf of the proposed DIP lenders.

8            The one thing I want to clarify, and I'm just not

9    sure what I'm hearing on the reservation of rights is, with

10   regard to cash collateral, which I understand to be cash that's

11   being generated in the estate and once it comes into the estate

12   from these nondebtor entities we have a specific agreement as

13   to the priority of our security interest in that cash

14   collateral.  And in fact they had a very unusual granting of

15   adequate protection; we've given the secured lenders a first

16   priority lien limited to their adequate protection claim in

17   that cash.

18           And what I want to make sure I'm understanding is,

19   this reservation of rights and 552(b), I think what's

20   fundamental to our deal is that the only thing coming in front

21   of our perfected security interest in the cash is the adequate

22   protection lien and nothing else.  I guess we can't find

23   ourselves at the end of the case saying no, you know what it's

24   not just the adequate protection lien, in addition it's an

25   additional claim that comes in front of our cash.  If they're

106

1    going to reserve rights subject to the DIP, that's fine but I

2    don't think we can be in a position where we're waiting till

3    the end of the case to find out which cash is our cash

4    collateral.

5         MR. GOTTESMAN:  Your Honor, I think I can alleviate

6    the DIP lender's concern.  The reservation of rights does not

7    and is not intended to find whatever liens are granted to the

8    DIP lender pursuant to this order.

9         THE COURT: That's certainly my understanding.

10        MR. FELDMAN:  That's fine.

11        THE COURT:  Your lien is what it is.

12        MR. GOTTESMAN:  Right.  And the only thing that comes

13   ahead is the adequate protection lien that's granted pursuant

14   to this order in accordance with the terms of the order.

15        THE COURT:  I think that's -- if that's not perfectly

16   clear in the documentation it should be made clear.

17        MR. GOTTESMAN:  I can certainly represent on behalf

18   of my clients, Your Honor.

19        THE COURT:  That certainly is my understanding.

20        MR. FELDMAN:  I think it is clear but what I wanted

21   to make clear is that this additional reservation of rights on

22   the record didn't undermine what to us clear under the

23   documents.

24        MR. GOTTESMAN:  It's not intended to.

25        THE COURT:  It was not intended to and maybe we've

107

1    heard the last of 552, I'm not sure.

2           MS. GOLDSTEIN:  No, you have not heard the last, Your

3    Honor, of this because we have a response to that.  But I'd

4    like to respond to the reservation of rights and let you know

5    where we agree it's a reservation and where we think it's an

6    objection that we have to respond to, if that makes sense, Your

7    Honor.

8           THE COURT:  Yes.

9           MS. GOLDSTEIN:  There was not a discussion around,

10   and we all agree these are reservation of rights.  Those are

11   the secured lenders' reservations of rights but we do have

12   issue with several of them.

13          THE COURT:  Please go ahead.

14          MS. GOLDSTEIN:  The first one, with respect to the

15   mezzanine lenders, we have no issue with.  We understand that

16   they may come back to this court if they believe that

17   circumstances have changed.  And we certainly agree that they

18   should come to discuss those with the debtors first.  And that

19   is not an admission on our part that they're entitled to

20   adequate protection.  But they do have every -- we're not

21   trying to impair their reservation of rights.

22          We have an issue with the reservation or objection, I

23   couldn't tell what it was, regarding the use of nondebtor cash.

24   There are nondebtors who generate cash flow and in the ordinary

25   course that cash is through the cash management system that has

108

1    always been applicable, swept to the parent and the parent uses

2    the cash as testified by Mr. Mesterharm.

3         That cash is not the subject of this cash collateral

4    order.  With respect to the nondebtors, I think I can say there

5    are no defaults which would give the secured creditors any

6    rights to track cash because if there were they would be in

7    this court.

8         So these nondebtors generate cash.  There may be

9    liens on the properties but there is no right to object to the

10   use of that cash, it's not cash collateral that is subject to

11   the jurisdiction of this Court.  So, I didn't understand the

12   reservation of rights --

13        THE COURT:  I'm not sure I understood it but perhaps

14   it was basically that by appearing here today on behalf of

15   certain lenders, we don't want there to be an implication that

16   nondebtors who are not here today are prohibited from asserting

17   their legal rights vis-à-vis the debtors if they wish.  Now, I

18   don't know that this is the place to assert those, whether they

19   are or they aren't.  But I don't think -- are any of those

20   issues before me today?

21        MS. GOLDSTEIN:  Your Honor --

22        THE COURT:  Other than --

23        MS. GOLDSTEIN:  -- not a nondebtor.

24        THE COURT:  Other than if the parties have their

25   contractual rights.

109

1          MS. GOLDSTEIN:  Whatever rights they have, Your

2     Honor.  But we're not -- we cannot agree that rights are

3     reserved as to that cash as cash collateral because they're not

4     subject to a proceeding.

5          THE COURT:  There is -- all right.

6          MR. CROSS:  Your Honor accurately stated it.

7          THE COURT:  That cash isn't cash collateral.

8          MR. CROSS:  Your Honor, I agree with you.

9          THE COURT:  It's cash.

10         MR. CROSS:  We have people here who represent -- I

11    mean, I have almost as many nondebtor clients as I have debtor

12    clients and there are concerns among a lot of the lender group

13    that their presence here would be misconstrued and their

14    interpretations with respect to this order.  You stated it

15    exactly correctly.  That was what was intended.

16         MS. GOLDSTEIN:  Okay.

17         THE COURT:  All right.

18         MS. GOLDSTEIN:  The third reservation, that none of

19    the findings of fact in connection with this hearing could

20    apply to anything outside of DIP financing and cash collateral.

21    Your Honor, that's a very, very broad statement.  For example,

22    if this Court determines that the proposed DIP financing is in

23    the best interests of the debtors, I do think that that's a

24    binding fact and I don't think that a lender for one of those

25    debtors can use that finding in connection, for example, with

VERITEXT REPORTING COMPANY

212-267-6868                                      516-608-2400

110

1    respect to a motion to dismiss and say well it wasn't in the

2    best interest of my debtor.

3            I think there are things that are occurring in this

4    hearing that may or may not be applicable.  And I don't think

5    the debtor could agree that every finding of fact in this

6    hearing is limited only to this hearing.

7            THE COURT:  As I heard the reservation, it wasn't

8    that the Court wasn't necessarily making certain findings and

9    conclusions with regard to the use of cash collateral and the

10   DIP order but that these findings would not preclude any party

11   who had a particular motion, for example, from attempting to

12   expand the record with regard to their particular facts.

13           Mr. Mesterharm testified, we had a proffer from Mr.

14   Buckfire.  And I think Mr. Mesterharm's testimony may have been

15   more broadly pertinent to, for example, motions to dismiss.  I

16   have, I think, one already.  I my have others.  Although I

17   certainly don't invite them I don't, today, preclude them.  I

18   will certainly hear them.

19           And I think in connection with such a motion a party

20   ought to have the right to supplement the record.  If you wish

21   them to examine Mr. Mesterharm today to further expand the

22   record with regard to their particular facts, we can do that.

23   It would seem to me it would make more sense for those matters

24   to be reserved.  And certainly the debtors can rely on a

25   general finding as a result of today's proceedings and the

1    proceedings last Friday.  But it would seem to me parties

2    either have a right to cross examine today or reserve that with

3    regard to their particular positions.  Because there have been,

4    obviously, a few parties who have asserted that their position

5    is unique or they have unique legal issues that they want the

6    Court to resolve.  And I think we'd be extending these hearings

7    much more than we need to if we require that examination today.

8           Now, I was quite abrupt with some of the lender's

9    last week, in part because their right to cross examine was

10   being reserved.

11          MS. GOLDSTEIN:  Your Honor, just to be clear, we

12   would agree that we're not trying to cut off any party's right

13   to make a record or to cross examine.  But also, we do not want

14   to be precluded from relying on findings of this hearing, which

15   we would find helpful to us.  So I think we would agree that

16   any other party's rights are reserved to expand the record, to

17   cross examine, to make a record but our rights are similarly

18   reserved or otherwise not precluded.

19          THE COURT:  I would think that the most rational way

20   to proceed, if we need to proceed with individual motions, is

21   to -- for you to incorporate the record and start from there.

22   Incorporate the testimony of Mr. Mesterharm and then we start

23   from there.

24          MS. GOLDSTEIN:  But Your Honor, we don't --

25          THE COURT:  If we need to go down that route.

112

1          MS. GOLDSTEIN:  We don't have a problem with that.

2          THE COURT:  All right.

3          MS. GOLDSTEIN:  But we do have a problem, Your Honor,

4    in reserving rights under Section 552(b).  I think we all

5    understand that 552(b) clarifies, if properly perfected, the

6    lien on rents, on post-petition rents.  And it's really no

7    different from the lien on post-petition proceeds.  And, you

8    know, use of cash collateral occurs in many cases.  I think

9    you've said it on the record, these are not difficult concepts.

10   It comes up all the time.  And it's one thing to say that a

11   section gives you a lien on post-petition assets, the question

12   for the Court is what is the adequate protection that we are

13   providing for the use of that cash collateral?  We are, indeed,

14   using the cash collateral.  It is being taken by the debtors.

15   It's being used not only to pay the expenses of a specific

16   property but being used to pay corporate expenses that keeps

17   all the properties going.

18          So at that point, Your Honor, they no longer have a

19   lien on the rents they have the replacement lien.  And the

20   replacement lien is designed to protect these secured

21   creditors.  And a concept of adequate protection is about

22   protecting the decrease in value of the secured creditor's

23   interest in the collateral.  And we have a formula, which we

24   believe in our order, does that and many of the secured lenders

25   do not object to it.  And it is the lesser of the net rent

113

1    differential or the diminution in value.  And I can give you

2    two extremes, Your Honor, it's very clear how that works.

3           If a secured creditor is oversecured today and we've

4    used the cash collateral of that secured creditor and at

5    confirmation the secured creditor is still oversecured today

6    because in that case there was a very adequate equity cushion,

7    then we will deal with the secured creditors' oversecured

8    position at that time.  And if we don't have a consensual plan

9    and we have to confirm a plan under 1129(b), we will be looking

10   at protecting the security interests in the secured creditors'

11   collateral to the extent of its allowed secured claim.

12          If we have an undersecured creditor, use the example

13   because Citibank says it's undersecured, if that's true it

14   could very well be that they suffer more diminution because

15   we've used their rents.  So they may, indeed, have more of lien

16   on the cash then perhaps Mr. Cross' clients, and I'm talking

17   about at the end of the case when we're looking at

18   confirmation, who might still be very oversecured if they are

19   indeed oversecured.

20          So we think we have the proper measurement, in terms

21   of the definition of adequate protection.  And the adequate

22   protection we have to provide under Section 362, rents are no

23   different from proceeds and it's clear that rents are right in

24   the section that defines cash collateral.  So we think we have

25   provided the appropriate adequate protection.  The appropriate

114

1    measurement is to protect against the diminution in value of

2    the secured creditors' interests in the collateral.  We can

3    fight about what that diminution is later.  I'm not trying to

4    limit anybody's rights in that regard.  But we don't think

5    there's an inviolate lien that you can't use and adequately

6    protect.

7              And Your Honor, my concern is that the DIP lender, I

8    think, is relying on our formula in terms of what is the lien

9    ahead of them.  I think the unsecured creditors are relying on

10   that formula in terms of what encumbrances they come behind.  I

11   think this is very important.

12             MR. STAMER:  Your Honor, I've got a few comments with

13   respect to the DIP order.  If you'd like I can do them all or I

14   can just do the 552 issue, I'd leave it to you.

15             THE COURT:  Why don't you do them all?

16             MR. STAMER:  Why don't we start with the 552 issue?

17   It should come as no surprise to the Court that we agree with

18   the debtors' position yet again.  Critical to the committee's

19   support is an understanding regarding the accumulation of cash

20   at the holding company and the provision of adequate protection

21   as defined.

22             What the secured lenders are attempting to do, Your

23   Honor, is preserve their ability at the end of the case to not

24   only demand payment in full but payment in full in cash or in a

25   big slug of cash.  Your Honor, we believe what the --

115

1          THE COURT:  I don't hear an end of the case argument.

2     I'm delighted, in one sense, to hear the parties talking about

3     the end of the case.  I think that's very positive and

4     hopefully there will be an end to the cases, much sooner than

5     might be expected.  But I didn't hear an end of the case

6     argument.  I did from Ms. Goldstein but that's not what I heard

7     from the lenders.

8          MR. STAMER:  Your Honor, I believe that's a part of

9     where they're going with the reservation.  The ability not to

10    be cut off from that argument and somehow claw back cash that

11    has left their estate, notwithstanding that the Court has found

12    they're adequately protected and in fact that they're

13    oversecured and will be paid in full.

14         So Your Honor, our position is that the debtor is

15    right on this point, that in fact it would be inappropriate to

16    allow the 552 rights to outlive the entry of this order.

17         Your Honor, if I could, my overall comments on the

18    DIP.  The committee supports the DIP loan.  I don't find

19    myself, this early in the case, often supporting the entry of

20    the order approving a DIP and a cash collateral order when

21    representing the committee.  But Your Honor, I think what we

22    have here is a somewhat remarkable result, as you've heard on

23    the record.  We have had an extremely successful auction that

24    has preserved very significant value for the benefit of the

25    debtors, the estates and all the stakeholders.

1          I just have, Your Honor, one reservation to put on

2     the record and then a comment with respect to 503(b), which I

3     think is important for the Court to understand as we move

4     forward.

5          Your Honor, as you'll recall in the committee's

6     objection, we raised an issue with the concept of the debtors'

7     exclusive ability to exercise the conversion right in the DIP.

8     Their ability to, if they choose, to convert the DIP loan into

9     either equity or debt.  Our concern was that that should not be

10    a unilateral right.  And Your Honor, as people have said, some

11    points you get in an agreed order and some you don't, this is

12    one we didn't get.  But I wanted to make sure the Court

13    understood that by virtue of us supporting the loan, we are not

14    deferring throughout the case, or even more important at the

15    end of the case, to the debtors' discretion with respect to the

16    exercise of this conversion right.

17         THE COURT:  Do I hear you saying you're reserving

18    your rights?

19         MR. STAMER:  I'm sorry, Your Honor.  But yet again

20    and I know all rights are reserved.  It is our sincere hope,

21    Your Honor, that the conversion issue will be one part of fully

22    consensual plan of reorganization.  If it's not or if there are

23    other issues, Your Honor, as you've said you're open for

24    business and we'll be here to talk to you about it.

25         One other point and then I'll sit down, Your Honor.

1    And that is with respect to 503(b).  You'll recall, at the end

2    of our last hearing we had a discussion about the importance of

3    503(b), that we anticipated the committee would be supporting a

4    503(b) application for bidders that participated and added

5    value.  Our position hasn't changed.  In fact, I wanted to

6    supplement some of the things that went on.

7         Your Honor, in connection with the last go round of

8    the auction, the committee was in contact with two of the

9    bidders, one the successful bidder and the other the Goldman

10   Sachs Group and Brookfield, in connection with our support for

11   a substantial contribution application.  And the substantial

12   contribution was two part, it was reasonable fees and expenses

13   and an additional amount on top of that.

14        Your Honor, it was our view and it was the committee

15   that was involved in the discussions, that it was necessary and

16   appropriate to bring the DIP lenders back to the -- the

17   competitive DIP lenders back to the process, that in fact we

18   provide them with some assurances that if they lost that in

19   fact they would be compensated for their out-of-pocket expenses

20   and the commitment they made for purposes of this process.

21        As it all turns out, Your Honor, the successful DIP

22   lender, subject to Your Honor's approval, will be Fairlawn.

23   There will be no 503(b) application for Fairlawn and no payment

24   will be made.  There will, Your Honor, for the other bidder,

25   the Goldman and Brookfield group, the committee has given them

118

1    our support for a 503(b) application in the amount of five

2    million dollars, staged over, if approved, payable upon the

3    entry of the order approving the application.  And then another

4    portion payable at the end of the case.

5            Again Your Honor we think that the value provided by

6    each of the two bidders, the competing bidders, inure to the

7    great benefit of the estates.  And when that application is

8    filed, Your Honor, you can anticipate the committee will be

9    supporting the application.

10           And again, I just wanted to bring that to the Court's

11   attention --

12           THE COURT:  All right.

13           MR. STAMER:  -- in connection with this process.

14           THE COURT:  Now, you've referred to Goldman and

15   Brookfield.  Is that distinct from the Pershing Square Group?

16           MR. STAMER:  It is, Your Honor, and I'm glad you

17   asked.  There were three bidders at Monday night's auction.

18   Pershing, you'll recall, was the original proposed DIP lender.

19           THE COURT:  Yes.

20           MR. STAMER:  They received, pre-petition, a fifteen

21   million dollar payment, a commitment fee, whatever it's called.

22   As you might anticipate, Your Honor, the committee will look

23   into that payment to see whether or not it would be appropriate

24   for a portion or all of that payment to come back into the

25   estates.  But we're not here to spend a lot of time on that

1    issue.  We believe, again, to set forth an even playing field

2    and to maximize the likelihood of a competitive auction, which,

3    Your Honor, we clearly had, it was important to make the

4    representations and agreements to the other two bidders in

5    connection with Monday night's auction.

6         So again, Your Honor, we are, as I said, supportive

7    of the entry of the order approving the DIP loan, and I just

8    wanted to bring all the information as it relates to the 503(b)

9    issues before the Court in connection with the DIP.  Thank you,

10   Judge.

11        THE COURT:  Thank you.

12        MR. FELDMAN:  David Feldman again on behalf of the

13   DIP lenders.  I just want to respond to one of the points that

14   Mr. Stamer raised on reservation of rights with respect to our

15   debt equity conversion.  I'm not exactly sure what he means,

16   but I just want to make clear, we have an agreement with the

17   company --

18        THE COURT:  If you're --

19        MR. FELDMAN:  -- which says that we have the right --

20   the company has an option to convert under circumstances.  What

21   I want to make clear is we're giving that right to no one other

22   than the company.  If Mr. Stamer wants the right to stand up

23   and argue whether the company should or shouldn't exercise the

24   right or seek to compel the company to do something or another

25   in the bankruptcy case, that's one thing.  But we've not given

1   the right to anybody else or any other -- frankly, a creditor

2   plan --

3            THE COURT:  I think the papers are perfectly clear on

4   that point.

5            MR. FELDMAN:  Okay.  Thank you.

6            THE COURT:  And it was my term "reservation of

7   rights", not his.

8            MR. FELDMAN:  Okay.  Thank you, Your Honor.

9            MS. GOLDSTEIN:  Your Honor, I don't want to belabor

10  the point on the conversion, but Mr. Stamer said it was a

11  unilateral right of the debtor.  I agree with what counsel for

12  Farallon has said.  We understand the right to be the debtors'

13  option.  But, you know, it really is a plan issue, Your Honor,

14  and I only wish that a plan was a unilateral process for the

15  debtor, but we all know that it's a multilateral process and

16  the committee will clearly be a significant party in those

17  discussions.  And, you know, if they don't like the plan that

18  we seek a creditor vote on, they can certainly object to it.

19  So I just wanted to make sure that that was --

20           THE COURT:  All right.

21           MS. GOLDSTEIN:  -- the understanding on the

22  reservation of rights.  The debtor has not made any promises in

23  connection with Section 503(b).  We will review the application

24  when it is filed.

25           THE COURT:  All right, anyone else?

121

1          MR. MEYERS:  Yes, Your Honor, Todd Meyers for various

2     lenders that are having their loans serviced by ING Clarion.

3     We had a couple of remaining points in the DIP order, and at

4     the break I was able to talk to Mr. Holtzer and work these out.

5     And I'll just make a statement on the record which hopefully he

6     will confirm.  Section 7 or paragraph 7 of the DIP order, which

7     deals with super-priority administrative claims of the DIP

8     lenders, we just sought clarification that the super-priority

9     administrative claims of the DIP lenders were only against the

10    obligors and not the property level debtors.  As you know,

11    we've achieved success in getting rid of the guarantees that

12    would be a hallowed right if they had administrative claims in

13    our estates.  The language in section 7 was not clear as to who

14    the administrative claim was against, and so we discussed that

15    with Mr. Holtzer and my understanding is he's agreed to confirm

16    that those would only be in the estates of the obligors and not

17    the property level debtors.

18          The other point that we sought clarification with is

19    paragraph 8 of the DIP order which deals with use of cash

20    collateral.  There is a provision in there that says that "all

21    adequate protection parties are ordered to relinquish control

22    over cash collateral to the debtors and shall not interfere

23    with any effort by the debtors or their banks to redirect cash

24    collateral".  And all we wanted to make clear there, Your

25    Honor, is that if a debtor ceases to be a debtor in this case,

122

1   and we do have a pending motion to dismiss -- if a debtor

2   ceases to be a debtor in the case, our understanding is that

3   based on the way the debtor defined cash collateral in this

4   order, that nondebtors' cash will no longer be cash collateral

5   and therefore, this restriction would not apply.  And again,

6   Mr. Holtzer's agreed to confirm that as well.

7            THE COURT:  All right.

8            MR. HOLTZER:  Yes, Your Honor, we confirm both

9   reports.

10           THE COURT:  Thank you.

11           MR. MEYERS:  Thank you, Your Honor.

12           MR. SELBST:  In the interest of cleaning up the

13   record, Your Honor, I wanted to clarify one thing.  Just before

14   the --

15           THE COURT:  You need to state your name --

16           MR. SELBST:  I'm sorry.

17           THE COURT:  -- for the record and your client.

18           MR. SELBST:  I'm sorry.  Yes.  Stephen Selbst,

19   Herrick, Feinstein for Citicorp NA.  Your Honor, just before

20   the break the debtors made an allegation that my clients had

21   interfered with cash collateral on a post-petition basis.  I

22   was surprised by the charge, first, because I hadn't heard

23   about it until this court and I had no knowledge of it.  But I

24   want to represent to the Court that if any cash collateral has

25   been taken, it certainly will be resent to the debtor.  But I

1   also wanted to say that I checked with my client during the

2   break and they have no knowledge about this.  Now, if there's

3   any confusion I do intend to pursue this, but it's certainly

4   not Citicorp's intention to interfere either with the automatic

5   stay or an order of this Court and we will get this resolved.

6            THE COURT:  Thank you.  Now, while you're here, I

7   gather you have a pending objection to the use of cash

8   collateral portions of the DIP order but not to the DIP loan

9   per se, is that correct?

10           MR. SELBST:  Just as I told you before, that's

11  correct.

12           THE COURT:  And in terms of your objection, do you

13  wish to make any further record?  Do you need to, at this point

14  in time in the case, take any further facts into account other

15  than your statement that in your view or in your client's view

16  it's under-secured?

17           MR. SELBST:  Your Honor, nothing beyond what I said

18  to the Court previously.

19           THE COURT:  No further examination?

20           MR. SELBST:  That's correct, Your Honor.

21           THE COURT:  All right, thank you.  Anyone else?

22  There were some other existing objectors before the break.  One

23  was Mr. Abel.  Are you here?  Have you gotten answers to your

24  questions?

25           MR. ABEL:  I've gotten answers to my questions, Your

124

1    Honor.  We're fine.

2              THE COURT:  All right.  So that's resolved.  Mr.

3    Rosenberg?

4              MR. ROSENBERG:  I've got an answer to the reservation

5    of rights point that I had put on the record, an objection

6    to --

7              THE COURT:  Well, come forward, if you would, please,

8    so that the machine can pick you up and that you can be heard

9    in the overflow room.

10             MR. ROSENBERG:  I apologize, Your Honor.

11             THE COURT:  No, no problem.

12             MR. ROSENBERG:  The debtor has agreed to the issue

13   respecting the reservation of rights and the budget that I had

14   alluded to earlier, so that will be put on the record that

15   those rights are reserved with respect to the charges against

16   the debtor and therefore the adequacy of the use of cash

17   collateral to that extent.  So that is no longer an issue for

18   today.  That was the only issue that I might have needed to

19   cross-examine on.

20             THE COURT:  Right.

21             MR. ROSENBERG:  What remains, Your Honor, is

22   Deutschebank's objection, to the extent it applies to

23   Deutschebank, vis-a-vis the adequate protection proposal and

24   the cash management proposal.  And indeed, with respect to the

25   order, I would refer Your Honor to exactly the same provision

125

1    in paragraph 8 that was just referred to.  Obviously, we object

2    to that provision to the extent we will be seeking different

3    relief.

4            THE COURT:  You have to explain what you mean by "the

5    provision" --

6            MR. ROSENBERG:  Okay.  That --

7            THE COURT:  -- in paragraph 8 --

8            MR. ROSENBERG:  Yes, Your Honor.

9            THE COURT:  -- and exactly -- I think you said you

10   wanted to argue.

11           MR. ROSENBERG:  I do, Your Honor.  We want to, per

12   the stipulation that Your Honor referred to before lunch, put

13   in additional evidence which are the documents that pertain to

14   this relationship pre-petition.

15           THE COURT:  All right.  And then you'll describe them

16   to me?

17           MR. ROSENBERG:  I will, indeed, Your Honor.

18           THE COURT:  All right.

19           MR. ROSENBERG:  Shall I proceed and do that now?  I'm

20   not clear on the process.

21           THE COURT:  Sure.  As far as I'm concerned, why don't

22   you go ahead and then we'll deal with your objection, at least

23   in terms of argument on both sides, and then any other

24   objections that are still outstanding.

25           MR. ROSENBERG:  Okay.  That's great, Your Honor.  The

1    language that I was referring to in the cash collateral order

2    is paragraph 8 that says, "Pursuant to the terms and conditions

3    of this order and the DIP loan agreements, each debtor is

4    authorized to use all cash collateral wherever it may be

5    located and regardless of whether it is in an account

6    controlled by any adequate protection party."

7          No problem with that sentence.  It's the next one:

8    "All adequate protection parties are ordered to relinquish

9    control over all cash collateral to the debtors and shall not

10   interfere with any effort by the debtors or their banks to

11   redirect cash collateral to the main operating account."  And

12   that, Your Honor, goes to the essence of what we believe is

13   different about Deutschebank and what I would like to address

14   to the Court.

15          THE COURT:  All right.

16          MR. ROSENBERG:  I would begin, of course, Your Honor,

17   by moving into evidence the documents which the debtor has

18   stipulated may go into evidence with respect to authenticity

19   and admissibility.

20          MR. HOLTZER:  No objection, Your Honor.

21          MR. ROSENBERG:  Okay.  I would refer, in particular,

22   Your Honor, to --

23          THE COURT:  Do you have a book of --

24          MR. ROSENBERG:  We do, Your Honor.  I thought you had

25   it, but if you don't --

127

1          THE COURT:  Well, I don't, but I've read your

2    objections and, as I understand it, you're referring in every

3    case to specific covenants in your various loan documents

4    establishing certain requirements with regard to the loan, is

5    that correct?

6          MR. ROSENBERG:  Your Honor, I'm actually referring

7    to --

8          THE COURT:  Provisions and covenants.

9          MR. ROSENBERG:  -- the specific documents called cash

10   management agreements --

11         THE COURT:  Right.

12         MR. ROSENBERG:  -- which are not the same, contrary

13   to the debtors' allegations --

14         THE COURT:  Right.

15         MR. ROSENBERG:  -- as all the other cash management

16   agreements.

17         THE COURT:  Right.  Now, if I assume and find that

18   your cash management provisions were different from all of the

19   others and more restrictive --

20         MR. ROSENBERG:  Yes.

21         THE COURT:  -- then, in connection with a cash

22   management order, I could find, could I not, that despite the

23   fact that your provisions were different, that nevertheless

24   their cash management order is appropriate and the cash

25   collateral, the adequate protection provisions necessarily were

128

1    adequate under the circumstances.

2         MR. ROSENBERG:  You certainly could so find, Your

3    Honor.  I would hope to convince you otherwise.

4         THE COURT:  All right.  But I just wanted to

5    indicate --

6         MR. ROSENBERG:  Oh, no, you --

7         THE COURT:  -- that you may convince me, and I'll

8    hear from the debtors, that your provisions were different, but

9    you also have to convince me that that difference must carry

10   over or should carry over into these bankruptcy cases.

11        MR. ROSENBERG:  I would amend that only slightly,

12   Your Honor, in your favor.  I have to convince you that they

13   are sufficiently different, that the Deutschebank is entitled

14   to more and better adequate protection than is being generally

15   offered even if not a complete carry-over of the provisions.

16        THE COURT:  All right.

17        MR. ROSENBERG:  And I'm prepared, I hope, to so

18   convince you.

19        THE COURT:  All right.

20        MR. ROSENBERG:  There are two major reasons why we

21   are different, Your Honor.  One involves the cash management

22   agreements.  Now, the debtor, I believe, frankly, has done us a

23   favor by adding to the exhibit list the general cash management

24   agreement that I think they're going to tell you all the

25   parties other than Deutschebank have and which probably is

129

1    consistent with the one that Deutschebank used to have.

2    Interestingly, it's dated 2005.  And they're going to tell you

3    that it's the same.

4          Well, let me tell you why it's different in essence.

5    That agreement, the one that applies to all parties, provides

6    that the debtor controls the cash.  Yes, it goes into various

7    accounts in the name of the secured creditor.  But number one,

8    either before or even after it goes into those accounts, the

9    debtors can remove it from those accounts and take control of

10   that cash.  That is subject only to what is defined in that

11   agreement as a cash management event, essentially a breach of a

12   covenant, then the debtor loses that right.  And if the debtor

13   cures the covenant, the debtor has the right again.  So when

14   the debtor refers to those as cash traps, that's a very

15   accurate description.  Those are cash traps under which if

16   there's a breach the cash is trapped.  If there's no breach it

17   belongs to the debtor.  Furthermore, to the extent of any

18   excess cash after it goes into the accounts, you know, labeled

19   for taxes, insurance, etcetera, that cash automatically goes

20   back to the debtor under those agreements.  No question about

21   it.

22         Our agreement, Your Honor, is different.  Our

23   agreement never permits that cash to go back to the debtor.

24   The control of the cash is exclusively within the realm of the

25   secured creditor under all circumstances, and there is no

130

1    provision for any excess cash to go back to the debtor.  To the

2    contrary, the waterfall provides for the use of every dollar of

3    cash within the estate.  And that, Your Honor, is the second

4    reason why our case is different from all the others.  The

5    Fashion Show property has a second lien on it in favor of the

6    Palazzo property -- or in favor of the secured creditors of the

7    Palazzo property.  So that every dollar that comes out of the

8    mechanism that I just described is to the immediate detriment

9    of the second lien holder.  The second lien holder bargained

10   for every single dollar to pay down the first lien, to the

11   extent there were available dollars.

12        THE COURT:  That second lien holder is, under the

13   debtors' proposal, to receive adequate protection in the form

14   of interest at the nondefault rate, maintenance of the

15   properties and the like.  Is that correct?

16        MR. ROSENBERG:  That's absolutely true, Your Honor,

17   and I will hope to convince you that because of the closed

18   system which the debtors propose to be replaced, the adequate

19   protection being offered is not adequate on these facts.

20        THE COURT:  Now, the closed system, if I understand

21   it, results in a faster repayment of the loan to your clients,

22   is that right?

23        MR. ROSENBERG:  Well, I'm not sure it's faster, Your

24   Honor.  But remember, the reason this was put in place, the

25   reason why we have a different system is because the loan

131

1   matured -- not defaulted and accelerated, matured.

2          THE COURT:  Right.

3          MR. ROSENBERG:  Okay.  So we're entitled to it being

4   paid.  This isn't a prepayment in any way, shape or form.

5          THE COURT:  And are you telling me that every other

6   lender whose debtor is in bankruptcy is not facing a default

7   that at least on the documents that their lawyers produced

8   entitle them to payment?

9          MR. ROSENBERG:  I wouldn't dream of saying that, Your

10  Honor.

11         THE COURT:  So everybody is facing a payment default.

12         MR. ROSENBERG:  Not everybody had a payment

13  default --

14         THE COURT:  It may hurt you more.  I mean --

15         MR. ROSENBERG:  Eight months prior to -- not a

16  payment default, a matured obligation, the result of which was

17  to put this system into place.  And yes, it hurts us more and

18  that's why we're entitled to better adequate protection for

19  exactly that reason.

20         THE COURT:  It hurts you more because why?  Because

21  the loan --

22         MR. ROSENBERG:  It hurts us --

23         THE COURT:  -- matured some months ago --

24         MR. ROSENBERG:  It hurt --

25         THE COURT:  -- and the debtors couldn't pay it and

132

1    they didn't file sooner so that this agreement wasn't put in

2    place.  Is that why it hurts you more?  How much have your

3    clients accumulated in interest over this past period of time

4    since maturity?

5            MR. ROSENBERG:  I don't know the answer to that.  I

6    can certainly find out if you consider it relevant.

7            THE COURT:  Well, no, I don't think it's material.  I

8    just --

9            MR. ROSENBERG:  But I understand the input of your

10   rhetoric certainly.

11           THE COURT:  Well, I assumed that you would.

12           MR. ROSENBERG:  And I did.

13           THE COURT:  Do you have any authority -- I did read

14   your papers, I looked for authority that would support your

15   position, and I recognize that this is not an ordinary single

16   asset real estate case.  Indeed, you have several projects that

17   are themselves intertwined here.  But I looked for some

18   authority that would apply the standard provisions of the

19   Bankruptcy Code, that go back now some thirty years, to a

20   situation like this.  I could not find very much authority that

21   was particularly applicable, although the debtors do cite, for

22   example, the TWA cases on the effectiveness of pre-petition

23   agreements during the post-petition period.

24           MR. ROSENBERG:  Your Honor, the authority we cited to

25   you certainly is not directly on point, but it does go to the

1    care with which adequate protection needs to be looked at when

2    it is proposed that the cash collateral will be used for

3    purposes other than the debtor in question.

4         THE COURT:  Are you suggesting that these parties

5    here are not taking care with regard to these orders?

6         MR. ROSENBERG:  Your Honor, here's what worries me

7    about the orders, okay?  In exchange for this closed cash

8    system, we are being offered an undifferentiated pro rata share

9    of a cash collateral pool and --

10        THE COURT:  A lien on that pool.

11        MR. ROSENBERG:  Yes, but a pro rate undifferentiated

12   lien, right?  It's not our own money in a pile and, by

13   definition, Your Honor -- by definition, the good companies, if

14   you will, are contributing to the bad companies, by definition.

15   Otherwise it wouldn't be necessary, right?  So at the end of

16   the day it is not at all clear that there will be sufficient

17   cash to repay the good companies for the use of cash collateral

18   in favor of the bad companies.

19        Now, the debtor will say that's why a second lien on

20   the former Goldman collateral is being given.  Well, the answer

21   to that, Your Honor, again, is this is an undifferentiated,

22   silent, second, payable only, or foreclosable only under very

23   limited circumstances, if and when the DIP lender is already

24   paid out.  It's a very limited value.  You know, in the old

25   days, Your Honor, we used to say the only adequate protection

134

1    for cash is cash.  Now, I know we've moved away from that

2    position.

3            THE COURT:  You said that on behalf of your secured

4    creditor clients.

5            MR. ROSENBERG:  No, that's --

6            THE COURT:  And --

7            MR. ROSENBERG:  Fair enough.

8            THE COURT:  And the judges, I assume, went back to

9    the words of the statute and looked at the fact that number

10   one, we don't have a definition, per se, but we have several

11   examples, all of which are preceded with the word "or".

12           MR. ROSENBERG:  Your Honor, there is no question --

13           THE COURT:  In Section 361.

14           MR. ROSENBERG:  There is no question that this

15   statute gives you an enormous amount of discretion to determine

16   what is appropriate here, and I wouldn't dream of suggesting

17   otherwise.  What I am trying to convince Your Honor of,

18   apparently not terribly successfully, is that you have to look

19   at what is being given up in making the determination as to

20   what is adequate.  There is some kind of a relationship between

21   the two.  And while this package may be perfectly adequate for

22   those who had a system where they already did not have control

23   of the cash in the sole discretion of the debtor every time the

24   debtor decided to remove the cash, because that's what the

25   agreements provided, that is not this agreement.

1          And I ask Your Honor to take that into account in

2    deciding whether it is an appropriate exercise of discretion to

3    say that this complete control over excess cash, which was

4    indeed available to pay down the debt, is adequately protected

5    by a pro rata lien on cash collateral which by definition is

6    going to benefit others at the expense of the cash flow

7    positive entities and an undifferentiated second lien -- silent

8    second lien on real estate.  I suggest, Your Honor, that that's

9    not a fair tradeoff.  Thank you.

10          THE COURT:  Thank you.

11          MR. STROCHAK:  Good afternoon, Your Honor.  Adam

12   Strochak, Weil, Gotshal & Manges for the debtors.

13   Deutschebank's comments are that its cash management

14   arrangement was somehow substantively different than the ones

15   in place for every other debtor in these cases.  And that's

16   just categorically incorrect.  Deutschebank had a flavor of

17   cash trap, in our view, that is slightly different than some

18   others and identically similar to many others in this case.

19          It's not correct that the Fashion Show and Palazzo

20   loans were the only ones that had matured upon the filing of

21   these cases.  There are others.  They are laid out in the

22   declaration that we submitted from Mr. Mesterharm.  The Chico

23   property, the Prince Kuhio property, the Jordan Creek property,

24   they were all matured loans and all had cash traps in place

25   that were operating substantially the same way as the ones for

1    the Fashion Show and Palazzo properties.

2        Let me take a look and just bring the Court up to

3    speed on where things are.  Deutschebank is holding

4    approximately fifteen million dollars of the debtors' money at

5    this point.  Since the commencement of the cases, the debtors

6    have not received reimbursement of the expenses that they have

7    paid on behalf of the Fashion Show and Palazzo properties.  So

8    the cash management agreement that Mr. Rosenberg refers to

9    isn't working the way he said it was supposed to work.  They're

10   holding that money right now, to the detriment of the estates.

11       The suggestion that the agreements that were in place

12   pre-petition for Fashion Show and Palazzo are somehow a totally

13   different variant are simply unfounded, and that's found in the

14   documents that Your Honor has before you.  In the stipulation

15   we have given Your Honor the cash management agreements that

16   were in place prior to the ones that were instituted in

17   December when the loan matured and went into a forbearance.

18   And if you run through those provisions, for example in

19   Exhibit H to the stipulation, there is the original agreement

20   for the Palazzo property.  If you run through section 4 of that

21   you'll see what happens is they run through a waterfall.  That

22   is, the rents are collected, they are put into a series of

23   reserve accounts.  They're used to pay taxes and insurance.

24   They're used to pay the lenders' fees on the account.  They're

25   used to pay interest, operation and maintenance of the

1   properties, other reserves principal.  And they go through this

2   waterfall that is substantially identical to what would happen

3   under the agreement that Mr. Rosenberg wants to enforce right

4   now.

5            If you look at the old agreement, which is very

6   similar to what's in place for many of the debtors' properties.

7   If you look at the old agreement, it says that in the event of

8   default, if there's a payment default on the loan, the money

9   does not go back to the debtor.  The expenses get paid, the

10  reserves get established, but the excess cash does not go to

11  the debtor, which is exactly the situation which exists -- or

12  existed pre-petition that Mr. Rosenberg is arguing is

13  completely different than anything else.

14           The difference between the Deutschebank agreements

15  that were in place pre-petition and the older agreements that

16  were done in these same loan documents is simply where that

17  account resides.  The current agreements are what I would call

18  pre-triggered agreements because the loan was in default at the

19  time those agreements were entered into.  The restrictions on

20  use of cash were in effect immediately under those documents.

21  So the agreements were revised to be in this pre-triggered

22  state, so you didn't have the language in the agreement that

23  says as long as there's no default this is how it works: the

24  cash comes in, the debtors get the cash, the debtors pay the

25  expenses.  You didn't have that paradigm under the agreements

138

1    that were in place pre-petition because those loans were

2    already in default when that was done.  So all it did was it

3    essentially pre-triggered those agreements.

4            THE COURT:  Was there a pre-petition cash account

5    with any money in it at the time of the filing?

6            MR. STROCHAK:  I believe there was, Your Honor.  That

7    was what Deutschebank was holding.

8            THE COURT:  The fifteen million dollars is what's

9    accumulated as well since the date of the filing?

10           MR. STROCHAK:  The fifteen million is both pre and

11   post, Your Honor.

12           THE COURT:  Pre and post.

13           MR. STROCHAK:  Yes, there was a pre-petition balance,

14   I believe, and then it's been added to because rents have come

15   in since then, and it's continued to grow because Deutschebank

16   has not been reimbursing the debtors for any expenses.

17           THE COURT:  So having made this point separately, are

18   they entitled to adequate protection of that pre-petition cash

19   that they had in their account?

20           MR. STROCHAK:  I think they have it, Your Honor.

21           THE COURT:  They have it.

22           MR. STROCHAK:  I think they have it, Your Honor.  And

23   anything that's been up-streamed -- anything that is going to

24   be up-streamed in the course of this case --

25           THE COURT:  Will be protected.

1          MR. STROCHAK:  -- that is protected, Your Honor, yes.

2          THE COURT:  All right.  Now, they say that fifty-two

3     of the fifty-four debtors or something like that, you state in

4     your papers, have the same cash management program, and they're

5     the other two?  Is that your understanding?

6          MR. STROCHAK:  No, Your Honor, that's not my

7     understanding of what we were saying in the papers.  We were

8     just talking about the state of the agreements because you did

9     have these different agreements that had been done pre-

10    petition.  It was just a reference to the fact that we had

11    these different agreements out there.

12         THE COURT:  All right.

13         MR. STROCHAK:  The suggestion that they are somehow

14    not adequately protected because the cash is undifferentiated,

15    because the lien is undifferentiated, is incorrect, Your Honor.

16    We demonstrated through Mr. Mesterharm's testimony and

17    Exhibit 7 that the debtors have adequate cash and assets to

18    cover the anticipated balance of the entire amount of cash that

19    will be subject to the aggregate adequate protection lien on

20    behalf of all secured creditors, secured mortgage lenders.

21         Mr. Mesterharm's analysis, the Court will recall,

22    broke it into two pieces, essentially, the cash flow positive

23    piece and the cash flow negative piece, and demonstrated that

24    over the course of the cases the debtors will have ample

25    assets -- cash and other assets to satisfy the cash flow

1    positive piece.  So the suggestion that Deutschebank is somehow

2    funding bad properties with its cash flow on a good property is

3    incorrect.  There is enough assets and cash to satisfy all of

4    the adequate protection claim, and we've demonstrated that.

5         What Mr. Rosenberg seems to be suggesting is that he

6    wants to revert to a pre-petition world where he was able to

7    take the excess cash and use it to pay down the debt.  And that

8    world doesn't exist any more.  We're in Chapter 11 now and

9    secured lenders can't just take the excess cash and use it to

10   apply to their principal and pay down their debt.

11        We think we've come up with an adequate protection

12   package that is fair, that protects all the secured lenders'

13   interests.  And the suggestion that one lender should be able

14   to use excess cash generated from its property to pay down

15   principal, while none of the others in the case can do that, is

16   simply inappropriate and unnecessary in order to protect their

17   interests, Your Honor, as we have demonstrated.

18        The suggestion, Your Honor, that Fashion Show and

19   Palazzo are special because they are inter-related and there is

20   a second lien, is also not a justification for treating the

21   lender for those two properties differently in these cases than

22   everybody else.  There are other loans and other properties

23   that are cross-collateralized, Your Honor.  And I think as the

24   Court has already indicated, the second lien interest is

25   protected as well because the interests in the cash are

141

1    adequately protected through the package that we have offered.

2          I think that is all I have at this point, Your Honor,

3    unless you have any questions.

4          THE COURT:  Thank you.

5          MR. STROCHAK:  Thank you very much.

6          THE COURT:  All right.  Mr. Rosenberg, anything

7    further?  Or anyone else after him?

8          MR. ROSENBERG:  Just very briefly, Your Honor.

9    Number one, I did not suggest -- I think I was quite clear in

10   not suggesting that this Court could not have a use of cash

11   collateral in exchange for adequate protection.  I suggested

12   that under the circumstances this adequate protection was not

13   adequate.

14         Number two, I am completely puzzled by the debtors'

15   continuing allegation that Deutschebank somehow, well, either

16   violated the automatic stay, according to Mr. Strochak, or

17   didn't violate the automatic stay but should have paid expenses

18   and failed to do so, according to Mr. Mesterharm, kind of

19   inconsistent, but either way I don't get it.

20         Your Honor, what actually happened is when Your Honor

21   entered the interim order, the one that I thought very clearly

22   said "maintain existing situation in place pending the final

23   order", the debtor had U.S. Trust revoke Deutschebank's

24   signature cards.  So Deutschebank lost control over these

25   accounts at this point.  So frankly, I don't know what they're

142

1    talking about.  They're trying to paint us with a brush as a

2    bad guy, but if we didn't have control over the accounts

3    because they revoked the signature cards, I'm kind of puzzled

4    as to how we either violated the automatic stay by not giving

5    them the money or violated our fiduciary duties by not paying

6    the debt.  I'm not clear which.  It depends who you ask.  But

7    you know, Your Honor, they really don't have their story

8    straight.  Thank you.

9              THE COURT:  All right.  Mr. Meth?

10             MR. METH:  Thank you, Your Honor.  Very briefly.

11   It's more in the context of a clarification than anything else.

12   It's clear that we do not have any current cash collateral

13   issues.  To the extent that there might be cash collateral

14   issues, I think the Court has made clear, as well have counsel

15   for the debtor, that those issues can be addressed in the

16   future, either upon the proposed sale of a major Summerlin

17   business unit or hopefully in the context of a component part

18   of a Summerlin business unit.  And our only request in that

19   regard would be that we would get notice with respect to that

20   so that we could come before Your Honor and argue our case at

21   that time.

22             The only real issue that exists at this point is that

23   unlike many of the other parties before Your Honor, we have a

24   situation where we have unencumbered property that is going to

25   be subject to a first lien of the DIP lender where no adequate

143

1   protection has been offered to the holders and my client with

2   respect to the liens that are being provided pursuant to the

3   DIP order.  And that is our concern and that is our issue.

4           THE COURT:  But you don't have a security interest in

5   the property.

6           MR. METH:  No, that is correct, Your Honor.  We do

7   not at this point.

8           THE COURT:  So on what basis are you entitled to

9   adequate protection of your interests?

10          MR. METH:  As previously cited in our papers and as

11  raised this morning, not to burden the record, pursuant to

12  Section 4.05 of the CSA agreement, pursuant to the fiduciary

13  duties and pursuant to the restructur --

14          THE COURT:  You have contractual rights.

15          MR. METH:  Correct, and we also recognize --

16          THE COURT:  And what rights under the Bankruptcy Code

17  do you have?

18          MR. METH:  Only the concept of adequate protection,

19  Your Honor, in the broadest sense.  We recognize, as Ms.

20  Goldstein said earlier today, that to the extent that it's an

21  executory contract, that will be addressed at a later time

22  also.  Today is not the date for that either.  But I just

23  wanted to make clear for the record that our situation was

24  based on the taking of unencumbered property, encumbering it

25  with no apparent indication of any benefit whatsoever being

144

1    received and no adequate protection being received in that

2    context.  And I think Your Honor otherwise understands my

3    position well, and unless Your Honor has any further questions,

4    I thank the Court for its indulgence.

5              THE COURT:  Thank you.

6              MS. GOLDSTEIN:  Your Honor, just one point in

7    response regarding the Summerlin properties.  We will be making

8    a motion that deals with sales of lots in master planned

9    community.  The debtor does sell lots in the ordinary course

10   and we will have a motion that requires notice for certain

11   sizes that we might have to notice to the committee.  But we

12   haven't come to the Court with that yet.  We want to be sure

13   that nothing we say here today requires any special notice with

14   respect to the Summerlin properties beyond what is covered in

15   any further court order.

16             MR. STAMER:  Your Honor, I apologize for getting up.

17   I'm not responding to that.  And I do not believe this is in

18   the nature of a reservation of rights, and if it is I

19   apologize.  It has to do with cash management, and I believe

20   Your Honor's going to rule on cash management in connection

21   with the DIP loan.  And this will take me sixty seconds.

22             Your Honor, we had requested -- let me take a step

23   back.  The Court knows that pursuant to the cash management

24   system, cash will flow between and among the various debtors

25   and to and from certain nondebtors.  The committee's concern

145

1   was that we believed we needed a certain amount of transparency

2   and collaboration with the company in connection with those

3   flows of money.

4        We had asked the company for a protocol, a formal

5   protocol for dealing with projects that we would refer to as

6   being on the bubble that maybe shouldn't continue to be funded

7   to the extent they exist.  And the company was unwilling to

8   agree with protocol.  But what the parties did agree to, the

9   company and the committee, was that we would work

10  collaboratively and transparently.  The company would give us

11  the benefit of everything that was going on.  And hopefully,

12  once again, we would agree to the appropriate treatment of

13  projects, if there were any, that really should not be funded.

14  And if, in fact, there were projects that should not be funded

15  and we couldn't agree upon it, then we would come back to the

16  Court for your assistance.  That's really the nature of the

17  agreement, Your Honor, and we're satisfied with the cash

18  management order as revised and with that caveat on the record.

19  Thank you, Judge.

20       THE COURT:  All right.

21       MR. HOLTZER:  Your Honor, just a brief response.

22  Again, Gary Holtzer, Weil, Gotshal & Manges for General Growth.

23  What we have discussed with Mr. Stamer and the committee is

24  that we will be coordinating and consulting with the committee.

25  We will continue, as we have during this DIP process and cash

146

1    collateral and adequate protection process, to flow information

2    to them and have a good and healthy dialogue about what's going

3    on.

4           I don't know that I would go so far as Mr. Stamer

5    said to let him know everything that's going on.  There are

6    certain things, of course, that we won't be able or in a

7    position to share with the committee as they will be privileged

8    or otherwise part of deliberations that we'll have on the

9    debtors' side.  Ultimately, the decisions will be the debtors,

10   but we've been working --

11          THE COURT:  I think the parties here have enough

12   experience in administering large Chapter 11 cases that they'll

13   be able to coordinate what needs to be coordinated in the case.

14          MR. HOLTZER:  We appreciate that, Your Honor.

15          THE COURT:  I'm confident in that.  I don't think we

16   can predict or micromanage everything that comes up in the

17   future.  And I'm sure the parties will be able to find a modus

18   operandi.

19          MR. HOLTZER:  Thank you, Your Honor.

20          THE COURT:  Anything else from any other party who

21   wishes any issue dealt with today?

22          MR. STROCHAK:  I just have one brief response to Mr.

23   Rosenberg, Your Honor.  That's it.

24          THE COURT:  All right.

25          MR. STROCHAK:  I'm not quite sure about the signature

147

1    card, and obviously we can find out the answer to that.

2          THE COURT:  I'm not making any findings today as to

3    what was done or what wasn't done.  We're looking forward not

4    backwards.

5          MR. STROCHAK:  The only point I would make, Your

6    Honor, is that the point illustrates why this cash trap is

7    really no substantively different than anybody else's.  It was

8    still under the control, such that the debtors' bank had

9    control over the signature card, as Mr. Rosenberg is

10   suggesting.  So it really demonstrates that this is really no

11   different than anything else that was going on with respect to

12   other traps.  That was my only point, Your Honor.

13         THE COURT:  All right.  Anyone else?  All right.

14   I'll take a brief recess and give you a decision in just a few

15   minutes.

16       (Recess from 4:32 p.m. to 4:51 p.m.)

17         THE COURT:  The following constitutes the Court's

18   finding of fact and conclusions of law with regard to all

19   issues that have not been previously dealt with on the record.

20         These cases obviously involve many debtors and a

21   corporate organization of extraordinary complexity.  Because of

22   the sheer size of the cases, the Court was faced with several

23   dozen objections to a motion for use of cash collateral and for

24   approval of a DIP order.

25         Almost all of the objections filed by the mortgage

148

1    lenders have been resolved.  A few have been specifically

2    reserved.  The reservations or objections of the unsecured

3    creditors' committee have been fully resolved.  And it

4    shouldn't be forgotten, as we spend most of the day today

5    properly on the protection of the secured creditors, recalling

6    that there are hundreds of millions of dollars, if not billions

7    of dollars of unsecured debt in these cases as well as

8    interests of equity holders, although obviously I'm not making

9    any suggestion or determination with regard to the position of

10   the equity in these cases.

11          I appreciate very much that the debtors and the

12   lenders have made heroic efforts to resolve objections.  A

13   process was undertaken where the debtors obtained not only the

14   benefits of a better DIP loan from a business perspective, and

15   I understand how difficult that is, particularly in these times

16   where DIP loans are not easy to obtain.  Also the terms of the

17   DIP loan were designed not to impinge on the rights of the

18   secured creditors or to preclude the secured creditors from

19   preserving their positions in these cases and their fundamental

20   interests.  Indeed, the parties in negotiating the DIP loan,

21   were so successful that the real objections that are

22   outstanding are objections as to the provisions for adequate

23   protection rather than the provisions of the DIP loan per se.

24   And let me turn to adequate protection.

25          As to the question of adequate protection, there is

149

1    no dispute that the rents from the various properties

2    constitute the lenders' cash collateral pursuant to 552 of the

3    Bankruptcy Code.  The lenders, or some of them, assert that

4    their rights to this cash collateral are inviolate.  That, of

5    course, is not the law.  The Bankruptcy Code does not provide

6    that a debtor has to escrow its cash from rents on real

7    properties when it is most likely to need that cash most, after

8    a bankruptcy filing.

9          I have no intention of dwelling on Section 552 except

10   to note, as I did earlier, that although it confirms to

11   mortgagees an interest in rents without regard to state law, it

12   provides that the Court can, after notice and a hearing, and

13   based on the equities of the case, order otherwise with regard

14   to a continuation of a security interest in rents post-

15   petition.  The debtors do not propose to rely on Section 552

16   and no parties have argued that to me.  Reliance on the

17   exception in 552 would have been extraordinary, at least in my

18   experience.

19         But the debtors propose to use provisions relating to

20   cash collateral that have been used in hundreds if not

21   thousands of cases and to provide adequate protection in its

22   most garden variety standard form.  They propose to provide the

23   lenders with a replacement lien on the cash that has been

24   up-streamed, equal to the lower of the cash transferred or the

25   diminution in value of the lenders' interest in their pre-

150

1     petition collateral, drawing in as a consequence of the

2     existence of these cases.

3             There is no indication in the record that the

4     replacement lien will not be sufficient, but the debtors

5     further propose to pay each of the lenders, including the one

6     lender that has declared itself under-secured, Citicorp, an

7     amount equivalent to interest at the nondefault rate and to

8     maintain the properties in accordance with the pre-petition

9     agreements.  The rents and the properties will indirectly pay

10    the costs of maintaining and preserving the properties.  I do

11    not see, on this record, any serious issue regarding the less

12    successful properties funding the more successful properties.

13    The debtors' projections do not indicate that even without the

14    DIP that they would run out of cash in the foreseeable future.

15            In any event, the issue is whether the properties are

16    adequately protected against a diminution in the value of their

17    collateral.  The debtors have demonstrated that for purposes of

18    the hearings and for purposes of entry of this order on cash

19    collateral and on the DIP loan.  As I have said several times

20    during these hearings, no lender is precluded from requesting

21    from the debtors and then coming to court for additional

22    adequate protection if necessary.

23            Let me turn now to the remaining specific objections

24    of certain lenders, and particularly the objection that

25    covenants and conditions in the loan documents -- the pre-

151

1    petition loan documents -- should not be overridden by virtue

2    of the bankruptcy filing of their borrower or borrowers.

3         It is absolutely standard black letter law that

4    covenants and conditions are inevitably breached in bankruptcy.

5    Even agreements designed to govern actions in bankruptcy are

6    generally unenforceable.  See In re Trans World Airlines, Inc.

7    261 B.R. 103, 114 (Bankr. D. Del. 2001) and a later case 275

8    B.R. 712, 723, in 2002 in Trans World Airlines as well.  The

9    most basic covenant is to pay on time.  The breach of this

10   covenant in some bankruptcy cases is total.  The debtors'

11   ability and agreement to pay current interest means that the

12   breach, from a fundamental perspective, is only partial in

13   these cases.  And those lenders who have been relying on a

14   consistent flow of funds equivalent to interest will not have

15   their expectations diminished, at least at this stage of the

16   cases.

17        The Deutschebank group of lenders, the so-called

18   Fashion Show and Palazzo lenders, nevertheless argue that cash

19   traps should not be lightly overridden.  But the law is that

20   they are entitled to adequate protection.  They say in their

21   surreply, quote, "As for the first lien on cash concentrated in

22   a centralized account maintained under the debtors' centralized

23   cash management system, it is obvious that such a lien does not

24   constitute the 'indubitable equivalent' of the Fashion Show and

25   Palazzo lenders' interests in the cash collateral at the

1   Fashion Show property level."

2           The Bankruptcy Code does not, however, require that

3   the lenders receive the indubitable equivalent of the

4   protection provided by their pre-petition security agreements.

5   Section 361 of the Bankruptcy Code uses the word "indubitable

6   equivalent" as one of several examples of the adequate

7   protection, but it provides all the examples in the

8   disjunctive using the word 'or'.

9           The debtors are providing the secured creditors with

10  adequate protection as that term has been used in innumerable

11  bankruptcy cases since the adoption of the 1978 Code.  A

12  replacement lien to replace the lien on the cash being used,

13  interest at the nondefault rate, to establish that a particular

14  debtor will not likely fall behind in a commitment to maintain

15  and preserve the properties in accordance with the pre-petition

16  documents.

17          It is recognized that secured creditors who enter

18  into pre-petition agreements with the debtor are sometimes

19  disappointed by a subsequent bankruptcy filing.  It is

20  important to observe, however, that when Congress wanted to

21  give secured lenders more of an adequate protection, it knew

22  how to do so.  Section 1110 of the Bankruptcy Code provides the

23  debtors have to perform under aircraft pre-petition documents

24  after sixty days unless agreed otherwise under certain such

25  documents.  There is no such provision for real estate lenders.

153

1    Nor is it reasonable at this stage of the case to demand

2    further protection in an order forbidding the debtors' use of

3    cash when the debtors do need the cash in order to administer

4    these cases in the interests of all parties.

5            Nothing in this decision is intended to decide any

6    issues other than cash management and cash collateral and

7    approval of the DIP order.  I take serious exception to some of

8    the arguments made in Amici speech by the Commercial Mortgage

9    Securities Association and Mortgage Bankers Association who

10   speak of systemic risk from a case like this.  Obviously, a

11   case like this raises difficult issues because there are so

12   many debtors.  However, all debtors' interests and all secured

13   lenders' interests will be respected in accordance with fairly

14   standard provisions and understandings.  Contrary to the

15   assertions of the Commercial Mortgage Securities Association,

16   we are not substantively consolidating any estates.  We are

17   only deciding the matters before the Court today.  Even the

18   Association recognizes, in discussing the separateness of these

19   entities, the fact that the parties did receive, I assume, in

20   all of these matters, reasoned judicial opinions that recognize

21   that the Bankruptcy Code does exist.

22           There is no implication in the record before me that

23   the debtors' proposed use of cash collateral should be

24   restricted to situations where the lender is over-secured.

25   Citibank will receive the same protection as other lenders:

154

1     cash equivalent to interest with a determination at a later

2     date as to the application, maintenance of the properties, and

3     a replacement lien.  On this record there is no need and no

4     desire on the part of the debtors to deal with the question

5     whether some of the lenders or all of them, other than

6     Citibank, are over-secured.

7              As to the position of those creditors who are

8     interested in the Summerlin properties, obviously they do not

9     have a security interest.  They are not entitled to adequate

10    protection per se, and their interests are not being adversely

11    affected in the bankruptcy sense by the lien being granted to

12    the DIP lender.  On the other hand, I am certain that they will

13    get adequate notice of any issues relating to their properties

14    and I'm not hearing any of those issues today.

15             I will therefore sign the DIP order and the cash

16    collateral order.

17             As to the cash management order, there hasn't been

18    much discussion of the terms of it today.  I signed an interim

19    order.  I do not recall whether the order stated that the

20    debtors were merely rolling over their pre-petition cash

21    management program.  I do not view that as a required finding

22    for purposes of finding a final cash management order.  I do

23    think that I need not find today the precise issues relating to

24    the Palazzo and other Fashion Show lenders and the pre-petition

25    situation in terms of cash management because the debtors'

155

1      proposed use of cash is appropriate and there appear to be

2      sufficient protections provided for the secured lenders.

3              So I will sign appropriate orders.  If there's any

4      fine tuning needed for the orders, you certainly might spend a

5      few minutes tending to that.  I very much appreciate the fact

6      that the secured lenders have organized themselves.  And I

7      assure every lender that they will receive a hearing as to

8      their specific issues.

9              Now, there's an issue -- not an issue, but I gather

10     the next omnibus hearing date is the 27th of May?  Is that

11     correct?

12             MR. HOLTZER:  Correct, Your Honor.

13             THE COURT:  I have at least one motion to dismiss

14     already filed, is that right?  I do think -- and I'll leave it

15     to the parties to discuss -- that if more than one party is

16     interested in a legal issue, it is certainly preferable to hear

17     all such motions on the same day.  And if they're motions to

18     dismiss, I think they should be heard very, very shortly.  But

19     as far as I'm concerned, there is no reason not to enter the

20     DIP order in the form that it's been provided.

21             Now, I also had on the calendar today an order to

22     show cause by the debtors to enter a confidentiality order.

23     And there were some objections to that.

24             MR. HOLTZER:  Your Honor, if I might, before we get

25     to that.  Again, Gary Holtzer, Weil, Gotshal & Manges for

1    General Growth.

2          THE COURT:  Why don't you come to the microphone so

3    everyone can hear you?

4          MR. HOLTZER:  Thank you, Your Honor.  I only

5    interrupt for a moment because I wanted to confirm that in

6    addition to the cash management order and the DIP order, the

7    Court would be entering the tenant obligation order.

8          THE COURT:  The tenant -- yes, of course.

9          MR. HOLTZER:  And finally, Your Honor, we'll need to

10   have a brief sidebar with the committee.  I understand that the

11   DIP lender wants to place something on the record about

12   notification in connection with the conversion option in the

13   DIP loan, and we need to show that, as it's just been handed to

14   me.  I believe it is only a noticing time period issue, but we

15   promised we would fork that through.  Is that correct, Mr.

16   Feldman?

17         MR. FELDMAN:  Not entirely true or correct.  It was

18   part of the deal that was struck in one of our 2 in the morning

19   nights.  It was an item that wasn't, for whatever reason, was

20   not included that people wanted to make sure was included.

21         THE COURT:  What is the language?  Do you have the

22   language in your hand?

23         MR. HOLTZER:  Sure.

24         THE COURT:  Why don't you read it into the record,

25   and where would it go?

157

1          MR. HOLTZER:  There is a schedule, Your Honor, to the

2   loan agreement, schedule 3.1A.

3          THE COURT:  3.1A?

4          MR. HOLTZER:  Correct.  That is the schedule that is

5   entitled "Loan conversion terms", and it's where the terms and

6   conditions that apply to the conversion are contained.  And the

7   language would be inserted into that schedule following the

8   definition of "maximum conversion shares".  And the language

9   is, "Notwithstanding the prior language, the general partner

10  shall have the right to withdraw its conversion election and

11  such election shall be of no further force and effect if the

12  general partner determines that the rights offering

13  contemplated by clause Q in the first sentence is not unlikely

14  to be a qualified rights offering."

15         Excuse me for one moment, Your Honor.

16      (Pause)

17         THE COURT:  Did you want that double negative in

18  there?

19         MR. FELDMAN:  Just to give it context, Your Honor,

20  and then the debtor can speak as well.  It has to do -- the

21  language -- Mr. Holtzer just read an exception to the language

22  that was added.  It has to do with the timing of when they give

23  the DIP lender notice of their intent to convert the DIP to

24  equity at the end of the case.  And there were supposed to be

25  three -- the earlier of three dates, and only two made it into

158

1    the ultimate draft, and there was a third.  But then what Mr.

2    Holtzer read is the exception to the third.  It's a pretty

3    technical point and it just has to do with the timing of when

4    we're going to get notice that we're going to be converted to

5    equity.  And I think --

6         THE COURT:  When you're going to get notice?

7         MR. FELDMAN:  When we're going to get notice that

8    we're going to be converted into equity.

9         THE COURT:  All right.

10        MR. HOLTZER:  Your Honor, why don't we just proceed

11   for a moment to do the order to show cause so I can make sure

12   that the language is absolutely accurate with the DIP lender?

13        THE COURT:  Very good.

14        MR. STROCHAK:  Thank you, Your Honor.  Adam Strochak,

15   Weil, Gotshal for the debtors.  The purpose for the order to

16   show cause was to get a confidentiality order entered on an

17   expedited basis so that we could push documents out to the many

18   secured lenders and others who requested documents in

19   connection with the debtors' first day motions.

20        The intention was for that order only to cover

21   documents that got produced in connection with the first day

22   motions, not to be an order of general applicability for the

23   entire case.  Now that we have -- a coordinating counsel has

24   stepped up for the secured lenders, I think it will be possible

25   for us to go and perhaps negotiate a more comprehensive

159

1  protective order that would govern exchange of documents during

2  the entire Chapter 11 case.  And we'll certainly work on that

3  as the case moves forward.

4      There were a couple of objections to what I would

5  characterize as our interim order.  The objections seem to fall

6  in two general camps.  One was that one group wanted the burden

7  on the debtors to have to come in and establish that a

8  protective order was appropriate for particular documents on a

9  document by document basis.  We didn't think that was workable,

10  and in fact, it has proven unnecessary in this case because

11  we've been able to work out confidentiality issues with anyone

12  who wanted to offer documents into evidence or use them in any

13  other way in this case.  So it seems unnecessary, and frankly

14  moot, at this point to have that burden.

15      The second one was the idea of sharing information.

16  Each of the secured lenders received information, wanted to be

17  able to share it with other secured lenders.  We weren't

18  comfortable with that, Your Honor.  We had property-specific

19  information that went out to secured lenders, information about

20  tenants, information about rents, stuff that we consider highly

21  confidential, and we didn't think it was appropriate for that,

22  certainly not at this stage of the case, to be shared broadly

23  among the entire secured creditor constituency.

24      I think that more or less summarizes the objections.

25  Your Honor, we think the order is simple and straightforward.

160

1    It was designed simply to expedite the production of documents

2    for the hearing and ensure that confidential information that

3    was being provided would be subject to reasonable protections,

4    giving everybody an opportunity to challenge the debtors'

5    designation of documents as confidential if it was necessary,

6    although it's proven unnecessary in connection with these

7    hearings.

8            So with that, Your Honor, we have made changes to the

9    exhibit to address as many of the objections as we could.  I

10   have a redlined version of the order that I can present to Your

11   Honor.  I don't think it resolves all of the objections.  I

12   don't know who else wants to pursue objections at this point,

13   but we're obviously happy to respond to anyone who does.  So

14   with that --

15           THE COURT:  Well, we could simply roll it over and

16   put this on the calendar for May 27th so to give a chance for

17   everybody to be heard before then and perhaps resolve any

18   issues.  I don't know what production you're going to be making

19   between now and then.  I hope everybody will take a little bit

20   of a break from these cases.  But let me hear from anyone else.

21           MR. STROCHAK:  We'd appreciate that opportunity we

22   have for the 27th.

23           THE COURT:  Sir?

24           MR. CROSS:  We had an objection on file, Your Honor,

25   and we agree with that suggestion.

1          MR. SAMSON:  Let's just roll it over.  As for first

2     days it's probably moot now anyway.  And let's see if we can

3     all work together to come up with something that everyone can

4     live with.  And just for the record, I'm Paul Samson or Riemer

5     & Braunstein for the 2008 facility lenders.

6          MR. STROCHAK:  That's certainly acceptable to us,

7     Your Honor, so long as the record is so ordered that the

8     existing confidentiality protections will be maintained with

9     respect to anything that we have shared already.

10         THE COURT:  I think that goes without saying, but

11    I'll also order that.

12         MR. STROCHAK:  Thank you, Your Honor.

13         THE COURT:  All right.  And we'll put this on for May

14    27th at 11.

15         MR. STROCHAK:  Very good.

16         THE COURT:  And let's see if we can get the last

17    clause.

18       (Pause)

19         MR. HOLTZER:  Okay, Your Honor, let me try to put the

20    last point on the record.  Again for the record, Gary Holtzer,

21    Weil, Gotshal & Manges for the company.  This is a change

22    Schedule 3.1A to the loan conversion terms.

23         In paragraph 1 there is a clause that ends with --

24    clause Y that ends with the term "for the POR".  We would

25    insert in that clause a new clause that would say in clause Z,

162

1    "The date a motion is filed seeking an order approving a

2    backstop purchaser in connection with a potential qualified

3    rights offering, and subject to the entry of such order."  We

4    would insert that in the first part.

5         And then we would add language at the end of that

6    sentence, after the defined term "maximum conversion shares",

7    and that language would say, "Notwithstanding the prior

8    language, the general partner shall have the right to withdraw

9    its conversion election, and such election shall be of no

10   further force and effect if the general partner determines that

11   the rights offering contemplated by clause Z in the first

12   sentence is not or is unlikely to be a qualified rights

13   offering."

14        THE COURT:  All right.

15        MR. FELDMAN:  We're agreed on the language, just I

16   think it befitting that I end the hearing with -- just to be

17   clear, we reserve our rights in connection with what is or

18   isn't a qualified rights offering.  And I think we have that,

19   but I just want to make it clear that we had that right.  Thank

20   you, Your Honor.

21        THE COURT:  As I understand it, rights offerings were

22   a thing of the past, but they may come back again in the

23   future, is that correct?

24        MR. FELDMAN:  Maybe, we'll see.

25        THE COURT:  We'll see.

163

1          MR. FELDMAN:  A lot of time and effort is spent on

2    qualified rights offerings and in this DIP.

3          THE COURT:  All right.  Anything else?  Thank you

4    very much.

5          ALL:  Thank you, Your Honor.

6     (Whereupon these proceedings were concluded at 5:20 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

164

1

2                              I N D E X

3

4                            R U L I N G S

5    DESCRIPTION                                    PAGE    LINE

6    Debtor's motion for order seeking approval     155      3

7    of DIP, cash collateral and cash management

8    orders entered

9    Tenant obligation order entered                156      8

10   Record so ordered as to maintaining existing   161     11

11   confidentiality protections with respect to

12   anything debtors have already shared

13

14

15

16

17

18

19

20

21

22

23

24

25

165

1

2                    C E R T I F I C a T I O N

3

4      I, Lisa Bar-Leib, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      _____

8      LISA BAR-LEIB

9

10     Veritext LLC

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date:  May 15, 2009

16

17

18

19

20

21

22

23

24

25