UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-11977-alg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


GENERAL GROWTH PROPERTIES INC.,


     Debtor.


- - - - - - - - - - - - - - - - - - - -x

        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        July 28, 2009

        11:04 AM


B E F O R E:

HON. ALLAN L. GROPPER

U.S. BANKRUPTCY JUDGE

1

2   HEARING re The Completion Fee, Initial DIP Financing Fee, and

3   Other Financing Fee Portions of the Application for

4   Authorization to Employ and Retain Miller Buckfire & Co., LLC

5

6   HEARING re Motion filed by Goldman Sachs Mortgage Company and

7   Brookfield Financial, LLC and Certain Affiliates for Allowance

8   and Payment of a Chapter 11 Administrative Expense Claim

9   Against the Estates.

10

11   HEARING re Motion filed by Mott, Inc. for an Order Granting

12   Relief from the Automatic Stay.

13

14   HEARING re Motion by Debtor Requesting Extension of Exclusive

15   Periods for Filing a Chapter 11 Plan and Solicitation of

16   Acceptances thereto.

17

18   HEARING re Second Motion Filed by Debtor for an Order Further

19   Extending Time to File Schedules of Assets and Liabilities,

20   Schedules of Executory Contracts and Unexpired Leases, and

21   Statement of Financial Affairs

22

23

24

25

1

2 HEARING re Application Filed by the Official Committee of

3 Unsecured Creditors for an Order Authorizing Employment and

4 Retention of Houlihan Lokey Howard & Zukin Capital, Inc. as

5 Financial Advisor and Investment Banker Nunc Pro Tunc to April

6 27, 2009

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25 Transcribed by: Laurie Ann Sherby

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4        Attorneys for Debtor

5        767 Fifth Avenue

6        New York, NY 10153

7

8    BY:   GARY T. HOLTZER, ESQ.

9        MARCIA L. GOLDSTEIN, ESQ.

10       PENNY P. REID, ESQ.

11       DIANA M. ENG, ESQ.

12

13

14   WEIL, GOTSHAL & MANGES LLP

15       Attorneys for Debtor

16       1300 Eye Street, NW

17       Washington, DC 20005

18

19   BY:   ADAM P. STROCHAK, ESQ.

20

21

22

23

24

25

1

2    WEIL, GOTSHAL & MANGES LLP

3         Attorneys for Debtor

4         200 Crescent Court

5         Dallas, TX 75201

6

7    BY:   STEPHEN A. YOUNGMAN, ESQ.

8

9

10   KIRKLAND & ELLIS LLP

11        Attorneys for the Debtor

12        300 North LaSalle Street

13        Chicago, IL 60654

14

15   BY:   ANUP SATHY, P.C., ESQ.

16

17

18   AKIN GUMP STRAUSS HAUER & FELD LLP

19        Attorneys for Official Committee of Unsecured Creditors

20        One Bryant Park

21        New York, NY 10036

22

23   BY:   MICHAEL S. STAMER, ESQ.

24        ABID QURESHI, ESQ.

25

UNITED STATES DEPARTMENT OF JUSTICE

      Office of the U.S. Trustee

      33 Whitehall Street

      21st Floor

      New York, NY 10004


BY:   GREG ZIPES, ESQ.



VENABLE LLP

      Attorney for CW Capital Asset Management, et al.

      Rockefeller Center

      1270 Avenue of the Americas

      New York, NY 10020


BY:   EDWARD A. SMITH, ESQ.

1

2    BRYAN CAVE LLP

3         Attorneys for Property Loan Secured Lenders

4         1290 Avenue of the Americas

5         New York, NY 10104

6

7    BY:   LAWRENCE P. GOTTESMAN, ESQ.

8         KEITH AURZADA, ESQ.

9

10

11   WILKIE FARR & GALLAGHER LLP

12        Attorneys for Brookfield Financial, LLC

13        787 Seventh Avenue

14        New York, NY 10019-6099

15

16   BY:   PAUL V. SHALHOUB, ESQ.

17

18

19   DECHERT LLP

20        Attorneys for Pacific Life Insurance Co.

21        1095 Avenue of the Americas

22        New York, NY 10036-6797

23

24   BY:   JAMES O. MOORE, ESQ.

25

1

2    GIBSON, DUNN & CRUTCHER LLP

3          Attorneys for UBS and DIP lenders

4          200 Park Avenue

5          New York, NY 10166-0193

6

7    BY:   MATTHEW K. KELSEY, ESQ.

8

9

10   BINGHAM MCCUTCHEN LLP

11         Attorney for Teachers Insurance

12         399 Park Avenue

13         New York, NY 10022-4689

14

15   BY:   MICHAEL J. REILLY, ESQ.

16         CAROL WEINER LEVY, ESQ.

17

18

19   ARONAUER, RE & YUDELL, LLP

20         Attorneys for Centerline Mortgages

21         444 Madison Avenue

22         New York, NY 10022

23

24   BY:   JOSEPH ARONAUER, ESQ.

25

MCGUIREWOODS LLP

     Attorneys for Mott, Inc.

     1750 Tysons Boulevard

     McLean, VA  22102-4215

BY:   KENNETH M. MISKEN, ESQ.

REEDSMITH LLP

     Attorneys for Northwest Mutual Life Insurance Company

     599 Lexington Avenue

     New York, NY 10022

BY:   MARK D. SILVERSCHOTZ, ESQ.

GREENBERG TRAURIG, LLP

     Attorneys for Metropolitan Life Insurance Company and

     KPC Bank, N.V.

     200 Park Avenue

     New York, NY 10166

BY:   HOWARD J. BERMAN, ESQ.

1

2    GREENBERG TRAURIG, LLP

3         Attorneys for Metropolitan Life Insurance Company and

4         KPC Bank, N.V.

5         One International Place

6         Boston, MA 02110

7

8    BY:   JOSEPH P. DAVIS III, ESQ.

9

10

11   RIEMER & BRAUNSTEIN LLP

12        Attorneys for 2008 Facility Lenders

13        Times Square Tower

14        Seven Times Square

15        New York, NY 10036

16

17   BY:   STEVEN D. ISSER, ESQ.

18

19

20   RIEMER & BRAUNSTEIN LLP

21        Attorneys for 2008 Facility Lenders

22        Three Center Plaza

23        Boston, MA 02108

24

25   BY:   PAUL S. SAMSON, ESQ.

1

2    ALSTON & BIRD, LLP

3           Attorneys for Prudential

4           One Atlantic Center

5           1201 West Peachtree Street

6           Atlanta, GA  30309-3424

7

8    BY:   GRANT T. STEIN, ESQ.

9

10

11   COHEN TAUBER SPIEVACK & WAGNER LLP

12          Attorneys for Howard S. Brighton Constructors

13          420 Lexington Avenue

14          New York, NY 10170

15

16   BY:   IRA R. ABEL, ESQ.

17

18

19   CLEARY GOTTLEIB STEEN & HAMILTON LLP

20          Attorneys for Goldman Sachs Mortgage Co.

21          One Liberty Plaza

22          New York, NY 10006-1470

23

24   BY:   DEBORAH M. BUELL, ESQ.

25

1

2    DEBEVOISE & PLIMPTON LLP

3         Attorneys for Miller Buckfire

4         919 Third Avenue

5         New York, NY 10022

6

7    BY:   MICHAEL E. WILES, ESQ.

8

9

10   SAUL EWING

11        Attorneys for General Trust Co.

12        245 Park Avenue

13        New York, NY 10167

14

15   BY:  JOHN J. JEROME, ESQ.

16

17

18   KILPATRICK STOCKTON LLP

19        Attorneys for ING Clarion Lenders

20        1100 Peachtree Street

21        Atlanta, GA 30309-4530

22

23   BY:   TODD C. MEYERS, ESQ.

24        (TELEPHONICALLY)

25

1          P R O C E E D I N G S

2          THE COURT:  Please be seated.  Is the phone open?

3          THE CLERK:  Yes.

4          THE COURT:  May I have appearances please in General

5     Growth Properties.  .

6          MR. HOLTZER:  Good morning, Your Honor.  Gary Holtzer,

7     Weil Gotshal & Manges.  With me today at counsel table from our

8     firm, Marcia Goldstein and Penny Reid.  Also here today, Steven

9     Youngman and Adam Strochak, Your Honor, as well as Diana Eng.

10    And with me at counsel table as well, Anup Sathy from the

11    Kirkland law firm.

12         MR. STAMER:  Good morning, Your Honor, Michael Stamer

13    and Abid Qureshi from Akin Gump Strauss Hauer & Feld here on

14    behalf of the official committee, Your Honor.

15         MR. GOTTESMAN:  Good morning, Your Honor.  I'm

16    Lawrence Gottesman, Bryan Cave, my partner Keith Aurzada, on

17    behalf of property level secured lenders, holding the aggregate

18    of approximately $3.8 billion in debt.

19         MR. SMITH:  Good morning, Your Honor.  Edward Smith of

20    the Venable firm, on behalf of CW Capital Asset Management, JE

21    Robert Company, Midland Loan Services and Orus (phonetic).

22         MR. ARONAUER:  Joseph Aronauer, Aronauer, Re & Yudell,

23    attorneys for the mortgagees serviced by Centerline Service,

24    Inc.

25         MR. SILVERSCHOTZ:  Good morning, Your Honor, Mark

1   Silverschotz, Reed Smith for Northwest Mutual Life Insurance

2   Company, property lender.

3           MR. KELSEY:  Good morning, Your Honor, Matt Kelsey

4   with Gibson, Dunn & Crutcher representing UBS as agent and DIP

5   lenders.

6           MR. DAVIS:  Good morning.  Joseph Davis, and with me

7   is Howard Berman for Met Life and KBC.

8           MR. SAMSON:  Good morning, Your Honor, Paul Samson of

9   Riemer & Braunstein and with me, Steve Isser, for the 2008

10  facility secured lenders.

11          MR. REILLY:  Good morning, Your Honor, Michael Reilly

12  from Bingham McCutchen with Carol Weiner Levy for Teachers

13  Insurance, specifically with respect to Besinine (phonetic)

14  debtors.

15          MR. MISKEN:  Good morning, Your Honor, Ken Misken from

16  McGuire Woods for Mott, Inc.

17          MR. WILES:  Good morning, Your Honor, Michael Wiles

18  from Debevoise & Plimpton, for Miller Buckfire and their

19  application.

20          MR. ZIPES:  Greg Zipes, Your Honor, from the US

21  Trustee's Office.

22          MS. BUELL:  Debbie Buell, Cleary Gottlieb Steen &

23  Hamilton, LLP on behalf of Goldman Sachs Mortgage Co.

24          MR. STEIN:  Grant Stein, Alston & Bird, LLP, on behalf

25  of Prudential Insurance Company of America.

1          MR. ABEL:  Good morning, Your Honor, Ira Abel, Cohen

2  Tauber Spievack & Wagner for Howard S. Brighton Constructors.

3          MR. SHALHOUB:  Paul Shalhoub of Wilkie Farr &

4  Gallagher for Brookfield Financial.  Good morning.

5          MR. MOORE:  James Moore from Dechert, LLP for Pacific

6  Life Insurance Co.

7          THE COURT:  Anyone else in the courtroom appearing

8  today?  All right, on the telephone?

9          MR. MYERS:  Good morning, Your Honor, Todd Myers,

10  Kilpatrick Stockton from the ING Clarion lenders.

11          THE COURT:  All right.  Anyone else on the telephone

12  who wishes to note his or her appearance this morning?  All

13  right.  Then Mr. Zipes, did we get your appearance?

14          MR. ZIPES:  Yes.

15          THE COURT:  We did.  All right.  Anyone else?  Okay.

16          Mr. Holtzer, where should we start today?

17          MR. HOLTZER:  Thank you, Your Honor.  For the record,

18  Gary Holtzer, Weil, Gotshal & Manges for General Growth.  Your

19  Honor, working through the agenda at the top of the order,

20  we've identified certain matters that have been adjourned.  I

21  will read them off so that the record is clear.  The first one

22  is a matter on the debtor's application to retain Deloitte &

23  Touche, LLP and that one has been adjourned to August 13.  Your

24  Honor, you will note that that hearing on the agenda appears at

25  10 a.m.  We have conformed to Your Honor's request to start

1    those hearings at 10 a.m., if they haven't been scheduled yet.

2    So we will be putting those on unless we hear otherwise.

3            THE COURT:  All right.  I will try to save the date.

4    The purpose of 10:00 was to make sure we didn't interrupt

5    lunch.

6            MR. HOLTZER:  We will see if that strategy works.

7            THE COURT:  Or we didn't delay it.  Perhaps it is a

8    mistake.  I suppose if we started hearings at noon maybe they

9    would be shorter.  We'll try 10:00.

10           MR. HOLTZER:  Yes, Your Honor.  Item 2, similarly, the

11   authorization application to retain Deloitte Hecht, LLP, also

12   over to August 13 at 10 a.m.  Similarly, item 3, to retain

13   Ernst & Young over to August 13 at 10 a.m.  Item 4 was a motion

14   by the City of Maumee.  That one has been adjourned to August

15   19 at 11:00.  Your Honor, that one is at 11:00 because that

16   hearing had been previously noticed for that time.

17           THE COURT:  All right.

18           MR. HOLTZER:  Item 5, Your Honor, we would like to

19   take along with item 1 under the resolved heading, that we had

20   filed request before Your Honor in order to extend the

21   automatic stay in respect of certain litigations that are

22   ongoing outside of this court.  In connection with those

23   motions, we engaged in discussions with parties to those

24   motions about the relief that we were seeking.

25           As a result of those discussions, we have obtained

1   stipulations that we have signed and would present to Your

2   Honor.  We can submit them to chambers, as well, Your Honor,

3   for your review.  I believe that they have been submitted to

4   chambers.  But essentially the essence of those stipulations

5   affords the debtors the stay of discovery or the stay of those

6   litigations and so we do not need to seek that relief now

7   before Your Honor.  Those stipulations would function to

8   provide the relief that the debtors need.

9          We can present now, Your Honor, if Your Honor would

10  like for the record a more fulsome presentation of each

11  stipulation.  The committee has reviewed those stipulations and

12  has no objection.  And as we have reached agreement with the

13  counterparties in respect of those motions to extend the stay

14  on the relief and the stipulations, we would offer to Your

15  Honor that we can submit them to Your Honor and have those

16  resolved on today's calendar.

17         THE COURT:  Does anyone wish to be heard with regard

18  to extending the automatic stay?  All right.  Then it seems to

19  me that the only parties who could possibly be affected would

20  be the litigants who have agreed to the relief.  And I will

21  grant the requested relief.  And we'll take this matter off

22  then the calendar for -- it was on the calendar for what day?

23  It was on the calendar for today?

24         MR. HOLTZER:  Yes, Your Honor.

25         THE COURT:  All right.  Fine.  Very good.

1          MR. HOLTZER:  Your Honor, moving along to the heading

2     listed uncontested matters.  General Growth had filed a motion

3     for an extension of time -- a further extension of time, Your

4     Honor, to file schedules and statements.  The extension of time

5     would be for an additional thirty days.  It would move the

6     deadline from July 31 to August 31.  We've had the discussions

7     regarding this relief with the US Trustee and with the

8     Creditors Committee.  There are no objections to this relief

9     either, Your Honor.

10          THE COURT:  Does anyone wish to be heard?  All right.

11    We'll grant that request to August 31.

12          MR. HOLTZER:  Thank you, Your Honor.  Next on the

13    agenda is the first contested matter, Your Honor, which is our

14    motion to extend exclusivity and I will let Ms. Goldstein

15    address that one.

16          MS. GOLDSTEIN:  Good morning, Your Honor, Marsha

17    Goldstein from Weil, Gotshal & Manges on behalf of General

18    Growth.

19          Your Honor at this point in the hearing we would like

20    to address the debtor's motion for extension of their exclusive

21    periods to propose and solicit their plan of reorganization.

22    The debtor's exclusive periods to propose and solicit a plan

23    are currently set to expire on August 14, 2009 and October 13,

24    2009 respectively.  The debtors have requested a six-month

25    extension of those exclusive periods to February 26, 2010 and

1  April 23, 2010 respectively.

2       Given that General Growth is the largest real estate

3  Chapter 11 ever filed with 388 debtors and 166 operating retail

4  centers, and as previously described to this Court, a highly

5  complex organizational and capital structure, the debtors

6  submit that their request is reasonable.  The request is

7  supported by the unsecured creditors committee, as well as

8  comparable precedence cited in our reply.

9       The debtors believe that the factual predicate for

10  this motion is largely a matter of public record of which the

11  Court can take judicial notice based upon testimony given, and

12  filings made in these cases to date.  However, we are also

13  prepared if needed to offer the proffer of Mr. Tom Nolan

14  (phonetic), President and Chief Operating Officer of the

15  debtors who is here today.  And we would reserve the

16  opportunity, Your Honor, if you think it is necessary to put on

17  that proffer --

18       THE COURT:  Well I will see if anyone today wishes

19  further testimony.  I have the parties' positions.  As I

20  understand them, no party objects to some extension of

21  exclusivity under the circumstances of these cases, although

22  maybe there's one party who just has a blanketed -- the

23  question seems to be from a number of the secured lenders

24  whether it should be 90 days or 120 days, whether six months is

25  simply too long and I certainly take into account the objection

1   of the lenders that there hasn't been enough progress to date

2   with regard to their specific loans.  And however, I read your

3   reply as a representation as to what your intention is for the

4   next, I gather, six months.

5       So it seems to me that the real questions are whether

6   it should be six months or five months or four months, under

7   all of the circumstances and what the debtors are going to do

8   during those six, five or four months or three months.  I think

9   perhaps that was the shortest time that any of the lenders

10  suggested.

11      MS. GOLDSTEIN:  I think that's right, Your Honor.

12  Your Honor, I would like to address those questions initially

13  through oral argument and then take your guidance on whether to

14  go forward with the proffer.

15      THE COURT:  All right.

16      MS. GOLDSTEIN:  Your Honor, I agree.  I think -- I

17  counted two that didn't concede that some extension of

18  exclusivity would be warranted in these cases.  And, you know,

19  the only objectors are the mortgage lenders or a group of

20  mortgage lenders who are generally over secured.  And from the

21  arguments made in their objections, the themes presented are

22  basically the same in terms of what they have generally

23  presented in these cases, that each project debtor is a simple

24  single asset real estate case which bears no relation to the

25  enterprise or to the restructuring of any other debt in this

1  enterprise.  And that plans extending maturities at so-called

2  market rates can easily be proposed in the three, four month

3  periods suggested.  But they're focused on their own individual

4  debtors.

5        So, Your Honor, just imagine the chaos if we had a

6  termination of exclusivity or a short period of exclusivity

7  that would expire and the debtors and the unsecured creditors'

8  committee, as well would be faced with potentially over a

9  hundred secured creditor plans that more likely than not, they

10  would be contesting.  And we would spend the next six months

11  scheduling those hearing, responding to multiple fronts of

12  discovery, not to mention if we don't have adequate time and we

13  are confronted with multiple plans from the secured creditors,

14  what kind of burden that would be on the Court and the debtors.

15        And frankly, all to what end, the debtors' response to

16  that kind of onslaught would be to develop a comprehensive plan

17  of reorganization that would try to resolve the multiple plan

18  issues.  And that, Your Honor, is exactly what we hoped to do

19  in the next six months.  We think it makes a lot more sense to

20  take the time needed to do the work that would enable the

21  debtor to propose a comprehensive plan.  It doesn't mean that

22  that plan will not have terms for each of the secured lenders.

23  But the plan will be developed in a context of developing a

24  capital structure where the debt restructuring at each of the

25  secured level debt -- secured -- or for each of the secured

debtors, secured lenders would make sense in the context of the

whole.  The debtor needs to think through the laddering of

maturities, how one restructuring would affect another

restructuring and certainly how the restructurings below would

affect the prospects of restructuring and what the capital

structure would look like at the corporate levels.

So, Your Honor, in terms of time, there are a number

of work streams that the debtor has been undertaking and will

be continuing to undertake so that it can develop proposals to

surface to the secured creditors and to work with the

creditors' committee to make sure that we are united with them,

as well in making those proposals.

And when we say we're seeking six months in terms of

an extension of exclusivity, Your Honor, we're not asking for

six months to come out with a proposal.  The six-month period

is a period during which we would be engaged in discussions,

making proposals, hopefully having some consensual resolution

with at least a significant group of the secured creditors.

Six months is to get us to be able to file a comprehensive plan

of reorganization which requires a lot more work, a lot more

exchange than simply coming up with a proposal.  Those

proposals would obviously occur earlier within the six-month

period.

So Your Honor, I think it goes without say that

contrary to certain objector assertions, the debtors have been

1   dealing with the complexities of operating in Chapter 11,

2   stabilizing their business and also undertaking substantial

3   steps towards reorganization in the earl stages of this case.

4        The debtors have also been working on preparing

5   themselves for the prospect that they don't have a consensual

6   plan.  Meeting the confirmation standards that would be applied

7   in the event that we cannot achieve across the board consensual

8   transactions.

9        But if you look at what's happened in the case so far,

10  Your Honor, in the first eight weeks of the Chapter 11 cases,

11  the debtor have already participated in a four week competitive

12  DIP auction process, achieved the approval of the use of cash

13  collateral involving over a hundred secured loans, litigated

14  various motions to dismiss who were -- which were primarily

15  brought by the parties who filed the objections to this motion.

16  And in addition, the debtors sought and obtained and relief

17  such as orders relating to mechanics liens, asset sales, tenant

18  obligations, just to name a few, that have allowed them to

19  streamline their Chapter 11 cases and frankly, also to operate

20  their business in the ordinary course.

21       The debtors management and employees have spent

22  countless hours implementing the relief sought in those orders,

23  in addition to providing careful attention to the day-to-day

24  aspects of their business operations, addressing heightened

25  inquiries raised by tenants, employees, contractors, vendors,

1    utility companies, to name only a few.

2        Now the debtors have also engaged in what I would

3    describe as behind the scenes steps to further their

4    restructuring process and to be able to begin presenting

5    restructuring proposals to their secured and unsecured

6    creditors.  These efforts have included conducting preliminary

7    discussions with secured lenders or their counsel regarding the

8    debt obligations and possible debt restructuring approaches,

9    providing extensive information to the unsecured creditors'

10   committee and dealing with and responding to information

11   requests from the various secured lenders, performing a variety

12   of financial and legal analyses that will be necessary to

13   formulate, propose and confirm a comprehensive plan that

14   considers the integrated nature of the debtor's business,

15   provides for laddered maturities of mortgage debt and otherwise

16   addresses the various debt pieces at both the corporate and

17   project level debtors and making sure that all the proposals

18   result in achieving feasibility on a comprehensive basis.

19   That's a fact important just from the business standpoint of

20   the debtor and it also will be a confirmation test that we will

21   have to meet.

22        As this court will recall during the debtors first day

23   hearings, the debtors did put forth testimony as to the

24   integrated nature of the debtors business, specifically the

25   debtors' use of a centralized cash management system,

1   centralized payment of expenses at the property level entities

2   and the debtors centralized leasing operations, human

3   resources, employees and accounting systems.

4          It is the fact that the debtors historically have

5   operated and continue to operate as an integrated business unit

6   and also, Your Honor, in the face of the need for efficiency in

7   these Chapter 11 cases, it is those two factors that have

8   driven the desire of the debtor and the need to develop a

9   comprehensive plan of reorganization that addresses all of the

10  debtors' debt, debt at both the project level and also at the

11  corporate level.

12         One-off plans, as have been suggested by a number of

13  the secured lenders are simply not an option for these debtors

14  given the nature of their business and the inter-relation of

15  the various debt structures to their ongoing feasibility but

16  would also frankly be wasteful of the debtors and Court's

17  resources potentially requiring the consideration of and

18  discovery relating to and ultimately multiple trials of many

19  common issues that would effect confirmation of any plan or

20  plans affecting these debtors.

21         Given all that, Your Honor, it is hard to imagine that

22  six months would not be reasonable.  The work required to

23  develop the proposals and to be prepared to handle a

24  confirmation, a plan filing and a confirmation taking into

25  account the complexity of these debtors through integrated

1    nature of their business and capital structure doesn't happen

2    overnight, doesn't happen in ninety days.  And certainly, Your

3    Honor, six months makes a lot of sense if you think about the

4    fact that we need to develop multiple proposals within the

5    comprehensive plan.  We recognize that secured creditors even

6    in a single plan are separate classes and needed to be treated

7    separately.  And so we will need to be talking to all the

8    secured creditors.  We will need to consider how to be prepared

9    if they are not responsive to the proposals that we put forth.

10        And we can't anticipate how long those negotiations

11   would go because we do hope that we can get to a consensual

12   result here.  We then also -- and in a parallel track, need to

13   deal with the various types of debt, bank debt, bond debt, in

14   different entitles at the parent companies.

15        And so, Your Honor, six months is actually very

16   ambitious.  We hope to be filing the plan in this period.  We

17   expect to be very actively engaged with creditors at all levels

18   but that's going to require a lot of work on multiple fronts.

19   And I think it would be a great accomplishment to get a plan

20   filed here within this proposed exclusivity period.

21        We believe, Your Honor, that the circumstances here

22   satisfy the Adelphia factors.  These debtors' cases are

23   obviously large and complex.  The debtors have liquidity.

24        THE COURT:  When did they become the Adelphia factor?

25        MS. GOLDSTEIN:  Well, that's what we've -- the cases,

1   Your Honor --

2           THE COURT:  All right.  That's fine.

3           MS. GOLDSTEIN:  Well they are laid out quite nicely in

4   the Adelphia --

5           THE COURT:  Let's call them the Adelphia factors.

6           MS. GOLDSTEIN:  We call them the Adelphia factors.

7   Apparently it's become a term of art.

8           UNIDENTIFIED SPEAKER:  Maybe to General Growth

9   factors.

10          MS. GOLDSTEIN:  But, you know we would like it to be

11  the General Growth factors

12          THE COURT:  All right.  No, they're not going to

13  become the General Growth factors.

14          MS. GOLDSTEIN:  Anyway, I don't think there's any

15  doubt.  I don't think anyone, even the secured lenders --

16          THE COURT:  I think the factors are pretty well known.

17          MS. GOLDSTEIN:  Okay.

18          THE COURT:  And they've been around a lot longer than

19  Adelphia.

20          MS. GOLDSTEIN:  They've been around.

21          THE COURT:  Almost as long as some of us in this

22  courtroom have been around and --

23          MS. GOLDSTEIN:  Well I have been arguing these and,

24  you're right, Your Honor, for a very long time they haven't

25  changed.  Perhaps they were, you know -- it was a big case,

1    Your Honor, and it had a number of factors.  But in any

2    event --

3          THE COURT:  And a number of complexities.  I hope we

4    don't have as many.

5          MS. GOLDSTEIN:  Your Honor, I think if we take the six

6    months to really work through the issues, we could avoid a lot

7    of those complexities.

8          THE COURT:  All right.

9          MS. GOLDSTEIN:  And Your Honor, so in any event,

10   whether we call them Adelphia factors or not, I don't think

11   there's any doubt this is a large and complex case.  We have

12   liquidity.  We're paying our bills.  The debtors have made good

13   faith efforts to be developing and presenting plan proposals

14   that will lead towards an effective reorganization.  Obviously

15   there are unresolved contingencies here that will need to get

16   dealt with and frankly, I think it's also evident that the

17   debtors are not seeking to extend exclusivity to pressure their

18   creditors.  In fact, we think the motions to keep it short are

19   intended for the opposite result.

20         So, Your Honor, just looking at the objections, I

21   think frankly that I have addressed some of their themes but

22   let me just be a little more specific.  We received seven

23   objections and two joinders.  We believe that based on the

24   facts of this case and each case is different, that all of

25   those objections should be overruled.  We also received a late

1    objection; the Howard S. Wright Constructors filed what

2    appeared to be a joinder to the objections of Northwest Mutual

3    Life and CW Capital and a limited objection of its own.   In

4    fact, the Howard S. Wright objection did not seem to bear any

5    relationship to those filed by Northwest Mutual or CW Capital.

6    And so if we have to address that objection separately, we

7    will.

8         The first theme I think I've already mentioned which

9    is that these are simply single asset real estate cases that

10   can easily be resolved by one off plans and that wouldn't take

11   six months.   I think it's counterintuitive to say that when

12   drafting 166 or 388 plans would probably take a lot longer than

13   what we're thinking about.

14        And, of course, that approach ignores the integrated

15   nature of the debtors' business, the complexity of

16   restructuring the $24 billion in combined debt at the

17   project --

18        THE COURT:  Well we now have your representation --

19        MS. GOLDSTEIN:  Okay.

20        THE COURT:  -- and you just -- you stated it again and

21   I'll -- but I will read it from your reply, "The debtors have

22   worked with their financial and legal advisors to assess

23   maturity dates, interest rates, the economics of each property

24   and countless other factors across all properties in the

25   portfolio and to develop comprehensive proposals to restructure

1    each loan to take into account both the individual property and

2    the entire portfolio.  In short order, after consultation with

3    the unsecured creditors' committee and the coordinating

4    committee of secured lenders, the debtors will develop these

5    proposals to secured lenders."

6          MS. GOLDSTEIN:  Yes, Your Honor.

7          THE COURT:  So let's hear -- I think on this issue, I

8    would like to hear from the secured lenders.  I think that's

9    what they were looking for.  That's what they have been looking

10   for since -- they say before the case was even filed.  I

11   haven't heard from any secured lender who has developed a

12   proposal to you and presented it but there may be one however.

13   We have this.  This is I think part of the record.  I don't

14   think we need testimony to back this up.  What we need is a

15   period of time for you to do that and -- but please, go ahead.

16         MS. GOLDSTEIN:  Okay.

17         THE COURT:  But I think I --

18         MS. GOLDSTEIN:  I think, Your Honor --

19         THE COURT:  I think we should hear fairly soon from

20   the lenders.

21         MS. GOLDSTEIN:  Well, Your Honor, I am --

22         THE COURT:  Because I think that that's what they were

23   looking for because they want to get out of this case and I

24   know you want to get out of this case as soon as possible, as

25   much as you all like coming to court at either 10:00 or 11:00

1    in the morning or 9:00 for that matter.

2        MS. GOLDSTEIN:  Whether it's 10:00 or 11:00, Your

3    Honor.  Well, Your Honor, I think we all agree there's no fact

4    dispute between the debtors and the secured lenders that we

5    would all like to get out of this case as soon as possible.  I

6    think the difference of view is that we think if we have six

7    months, we can actually make enough progress on the multiple

8    fronts in terms of preparing the comprehensive plan that takes

9    into account the needs of the various secured lenders and the

10    needs of the debtor.  And that that's the best way to get this

11    case out more quickly rather than if we had a ninety-day

12    extension, having the debtor be worried about seeking the next

13    extension.  It certainly would be a lot more productive in our

14    view for the debtors to have the opportunity to do all the

15    work, finish the work -- I mean it's not -- the work is well

16    underway, finish the work and come out with the proposals to

17    the secured lenders that it is comfortable will work from the

18    integrated point of view and from a business point of view for

19    the debtor.

20        And so that is the difference between where we are and

21    what the secured lenders are saying and, you know, frankly as

22    we cite in our papers, there are a number of cases either this

23    size, larger or smaller, were extensions of six months or more

24    have been granted because they were complex.

25        The other point I wanted to make before concluding is

1    that we don't think -- some of the lenders have suggested

2    financial benchmarks or a benchmark based on "concrete

3    progress."  We think that financial benchmarks are just another

4    bite at the apple, if you would, Your Honor, in terms of

5    adequate protection relating to the debtors use of cash

6    collateral.  We think we've finished that.  We have been

7    providing the requested information to the secured creditors.

8         We also think that any kind of benchmark or condition

9    related to concrete progress puts us in an untenable position

10   because it leaves the debtors secured creditors in a position

11   to say no to everything we put forward and simply then come

12   forward and say we should no longer have exclusivity.

13        Two other minor points; the Teachers' objection seems

14   to be very concerned with a dispute we're having with them over

15   their request to perform a seismic study.  That's a

16   disagreement we're having. I don't think has anything to do

17   with the requested exclusivity extension.  And the Elk Grove

18   objection and this is the late filed Howard S. Wright

19   Constructors objection, suggests that the relief be denied on

20   the basis that we need to make an independent case for each

21   extension of exclusivity for each of the 388 debtors.

22        Your Honor, we could take the next six months doing

23   that but we don't think that's the most productive use of this

24   court's or our time and quite frankly is just about as chaotic

25   as having the 388 plans filed.

1          So, Your Honor, at this point, either we can proceed

2     with the proffer or otherwise --

3          THE COURT:  Well let's hear from the lenders or the

4     objectors.  Are you coordinating for the group?

5          UNIDENTIFIED SPEAKER:  I'm not sure I want to have

6     that --

7          THE COURT:  Well, you're going first.

8          UNIDENTIFIED SPEAKER:   I'm going first, Your Honor.

9          THE COURT:  So you get the opportunity to argue first

10    and I will certainly ask others not to duplicate.  That's my

11    only request.

12         UNIDENTIFIED SPEAKER:  Your Honor, certainly in an

13    effort to minimize the burden upon the Court, the secured

14    lenders have discussed the issues and I think most of us are in

15    agreement on sort of the core issues, Your Honor.  I can't

16    speak for everyone but as the debtors pointed out, the vast

17    majority of the secured lenders don't have a problem with some

18    extension.  There's a little bit of variations in terms of the

19    time periods.  We've suggested three months as a reasonable

20    period under the circumstance, obviously subject to the Court's

21    power under the code for further extensions if, in fact, cause

22    is demonstrated.

23         You know, as Your Honor is fond of remarking, the

24    courts are always opened.  If in fact progress is being made,

25    then an extension of further time may very well be appropriate.

1     We're not standing here today and saying that whatever it is it

2     is and should be a final extension.  The secured lenders are --

3     certainly my clients are ready, willing and able to respond to

4     proposals if and when received and to engage in negotiations

5     with the debtors.  We understand the issues.  We've spent

6     considerable time getting our arms around them as well,

7     Your Honor.

8            It's probably worth addressing very briefly the notion

9     that if were over secured that that equates to an unlimited

10    extension, I don't think the code contemplates that, Your

11    Honor.  As Your Honor is aware, this is an extraordinarily

12    expensive case.  The first fee statements for the first six

13    weeks or so came up to approximately $15.8 million which, you

14    know, per the earlier cash collateral order is essentially

15    being paid with the cash flow from the secured lenders

16    properties.

17           In the meantime, no amortization payments are being

18    paid per the same order, Your Honor, and that we're not asking

19    Your Honor to revisit that at this time but just in terms of

20    the time period and while we want to all move this forward as

21    quickly as possible, for my clients alone, that's in excess of

22    $5 million a month, Your Honor.  It's a considerable number

23    where we obviously want to make progress.

24           The only other point that I would want to briefly

25    address and I don't want to belabor this, Your Honor, because

we've set forth our position in our limited objection, is the
notion that somehow a benchmark that there's progress towards a
consensual plan gives the lenders an absolute veto over an
extension of exclusivity.

I have spent far too much time appearing before this
Court to think that that would be a successful gambit. I think
it presumes a level of bad faith from the secured lenders
that's not warranted. We have been asking from more or less
day one to see if we could try and start the process. We've
been awaiting proposals and we have repeatedly advised the
debtors' counsel that we're ready, willing and able to react to
a proposal and engage in discussions.

You know, so under those circumstances, we think that
a limited extension for this time would be appropriate and
subject obviously to the debtors' rights to seek a further
extension, our right to oppose or even seek a termination if in
fact the facts warrant it, Your Honor.

THE COURT: Thank you.

UNIDENTIFIED SPEAKER:    Thank you.

MR. SMITH:  Good morning, Your Honor.  It's Edward
Smith of the Venable firm.

Your Honor, we don't object to an extension of
exclusivity but think that any extension should be limited to
three months.  GGP's counsel says they need six months to file
a plan.  We say, we're actually not that far apart, Your Honor,

1    we say let's have three months for the debtors to make

2    proposals and for negotiations.  And at that point, we think

3    the debtors should come back and make a showing under 1121 that

4    an additional extension is warranted and would foster the

5    possibility of a consensual plan.

6        Your Honor, we are looking for proposals.  I think

7    that's a fair statement.  And one of the benefits, it seems to

8    us to a more limited extension is that it would provide the

9    debtors with an additional incentive to come to the secured

10   lenders with proposals as quickly as possible and to press

11   those negotiations.

12       So, Your Honor, we ask the Court to defer

13   consideration of the additional three month extension until we

14   get through the first three months.  Thank you.

15       MR. DAVIS:  Good morning, Your Honor.  Joseph Davis

16   for MetLife and KBC.

17       Your Honor in the parlance of the debtors, we would be

18   the proponents of chaos theory.  We actually are not advocating

19   for a short term or long term extension.  We actually think

20   that no extension should be granted.

21       THE COURT:  Right.  And you think the case, at least

22   of your client, should be dismissed.

23       MR. DAVIS:  Yes.

24       THE COURT:  And I had hoped that I would get a

25   decision out, a written decision on your motion and the other

1    two motions I have pending before today.  And I do expect to

2    get it out shortly, I hope at the end of next week.

3          And obviously the issues are related but I have

4    considered your motions very carefully.  The evidence and the

5    arguments and the cases and I will come out with a written

6    decision shortly.  But why don't you go ahead with your

7    argument today.

8          MR. DAVIS:  Thank you, Your Honor.  I suspect that

9    that was taking place and you are actually right, they are

10   integrated.  They are integrated in a way that these debtors

11   are not.  The fundamental flaws in the filing of entities as

12   separate debtors that never belonged in bankruptcy in the first

13   place become the backwash, if you will, of this request for a

14   six-month extension of the period of exclusivity.

15         There are no complexities with regard to working out

16   the issues related to hundreds, in all likelihood, but

17   certainly for my purposes the small number of borrowers that

18   are related to MetLife.

19         To the extent the complexities that now exist, they

20   were manufactured by putting into bankruptcy entities that

21   never belonged there in the first place.

22         THE COURT:  Okay.  I will deal --

23         MR. DAVIS:  I --

24         THE COURT:  I will deal with that issue, I hope,

25   comprehensively or at least as comprehensively as I can, in my

1    decision.  They're in.  They're in bankruptcy.  Congress wrote

2    a statute in 1978 that set certain requirements for a company

3    getting in and then gave that company -- I'm using the word

4    company -- but they gave that debtor certain period of

5    exclusivity.

6         We're dealing now with -- we're assuming arguendo that

7    they're in and that your goal other than perhaps to appeal an

8    adverse ruling on my behalf, is to get them out.  There are two

9    ways to get out.  One way is to continue to argue and to fight

10   and to refuse, in effect to negotiate.  The other is to do what

11   you say they should have done before filing which is to

12   negotiate.  And I did ask Ms. Goldstein whether there was any

13   evidence that anyone had come to them.  I didn't -- I wasn't

14   that specific but I did certainly indicate that it would be an

15   interesting aspect of the record to hear that a lender had

16   actually made a proposal to the debtors and had been either

17   refused or said -- told well we can't deal with that yet or

18   we're not interested in talking to you.  And I haven't heard

19   that on anybody's behalf.

20        So I am certainly not suggesting that you should go

21   first or not.  The debtors have said they're going to make

22   proposals, I assume shortly, because if they're going to file a

23   plan in six months, I think they'll have to start simply

24   because of the large number of parties.

25        But if they do, hopefully there will be negotiation on

1 both sides if indeed they are in bankruptcy in accordance with

2 the statutory scheme that I didn't write but Congress did in

3 1978.

4     MR. DAVIS: Certainly, Your Honor. And MetLife has

5 been, remains, and will continue to be ready, willing and able

6 to engage in any such negotiations. Also so far the debtors

7 have not initiated any.

8     The concern that we have and certainly the papers were

9 filed by the debtors, particularly the reply brief, points

10 towards an argument that either assumes or insinuates that some

11 form of consolidation was taking place here resulting --

12     THE COURT: Well I don't -- if that's in there, you

13 could perhaps point it out. It assumes that there is a need to

14 coordinate. The debtors certainly say that they will have to

15 consider how to deal with intransigent lenders but I am not

16 going to assume that a lender of your client's stature and

17 experience is going to be in that category and I don't think

18 you want me to make that assumption because you said from day

19 one that your client is ready and willing to negotiate and the

20 debtors should have done so before they ever filed.

21     MR. DAVIS: Correct.

22     THE COURT: Okay. So I don't read anything in these

23 papers about consolidating debtors. I do see in these papers a

24 need, and I would put it this way, although this isn't

25 necessarily the right way to put it, there's a top down

1   restructuring, because they've got a lot of debt at the top and

2   there's a bottom up restructuring.  And the debtors have, as I

3   understand it, stated in their papers that they recognize

4   they're going to have to do a bottom up restructuring, i.e.,

5   talk to your clients and a lot of parties similarly situated.

6   And they're going to have to do a top down restructuring

7   dealing with the enormous amount of debt on the top.  That's

8   what I understand the future to bring.

9          MR. DAVIS:  To the extent, Your Honor, your summary

10  turns out to be an accurate one, in essence sort of like an

11  hour glass approach, certainly from the bottom up approach,

12  that's consistent with not only what we would expect but what

13  we think the law would require.  It also is pretty

14  straightforward, not that difficult to get complete whether

15  you're talking about a single acts identity with one borrower,

16  if you will, one lender, a small number of unsecured creditors,

17  it just don't take that long to restructure them and I'm not

18  waiving any arguments we had that didn't belong in the

19  bankruptcy in the first place obviously but complexity as you

20  put forth ought to be at the corporate level.

21         But at the moment, we have absolutely no indication

22  from the debtors and they have made no attempt to show it

23  today, as to how it is they plan on integrating these two

24  diametrically opposed problems, potentially unresolvable

25  problems.

1    It would help if the debtors were starting with

2  negotiating those simpler issues which is to say where they had

3  a single lender with a single borrower secured by a single

4  piece of property which ought to be resolvable very fast.

5    To the extent that there are problems that go beyond

6  that, that's the extension they ought be seeking and that's the

7  issue that ought to be before the Court, not driving into this

8  process of indefinite, if you will, hold which is from our

9  client's perspective it appears dealing with pretty

10  straightforward problems.  These are not that complex.  When he

11  talks about the property level -- debtors and the property

12  level issues, it becomes complex.

13    If the lines are blurred between the separate

14  borrowers at the bottom as you put it, and I think aptly, I

15  think that's exactly what we're talking about here.

16    THE COURT:  Thank you.

17    MR. STEIN:  Your Honor, Grant Stein, Alston & Bird for

18  Prudential.

19    You had asked if there was a lender that had reached

20  out and provided a proposal to the debtors and we did not put

21  this in our objection but I can represent to the Court that

22  after discussions with the debtors back on July 16, we provided

23  at the request of Miller Buckfire, business person to business

24  person, a written term sheet.  We have not finished discussing

25  that.  That's going to take some time.  I am not saying the

1    debtor is not --

2        THE COURT:  How much time?

3        MR. STEIN:  Well -- and that's a good point because

4    our view and what we put in our pleading was that we thought

5    that that could get done in forty-five to sixty days.  And we

6    thought about that some more.  And we -- and our view has

7    modified to basically say we still think it could get done in

8    sixty days but that is not the only extension of exclusivity

9    that's reasonable because we would then be filing if we

10   couldn't reach agreement something or the debtor would have to

11   really within thirty days.

12       So our view is that a ninety-day extension to let us

13   get through that first sixty days where we have something

14   substantive there, that's reasonable.  So you get to a ninety-

15   day extension and you kind of know where you are at the end of

16   the first sixty and that is Prudential's view.

17       And let me explain one other point and then I will

18   step aside and that is that you made the comment about that we

19   want to get out; absolutely.  But getting out in this context

20   is either that you reach a confirmed plan that deals with the

21   primary issues we'll be dealing with as a secured creditor;

22   issue one, an additional term, issue two, the interest rate

23   issue.  What's it going to be if the contracts aren't being

24   cured and reinstated?  Those are issues we may be able to

25   make -- reach agreement on.  We are hopeful and to be honest,

1    we have an expectation we can.

2         But what happens if we, Prudential, or other creditors

3    can't?  I'm not saying that someone is not acting in good

4    faith.  Sometimes agreements can't be reached.  It's at that

5    point in time where the case still goes forward and there may

6    be creditor plans, those creditor plans being realistic are not

7    going to take the cases properties out of this estate.  There's

8    equity in them.  They're going to leave the debtor in place but

9    they're going to address those issues and from our perspective

10   if we reach agreement, good.  If we don't reach agreement, then

11   have a multi-plan process go forward only on those properties

12   where agreement can't be reached because ultimately it is going

13   to boil down -- again, I'm over simplifying, there's a lot more

14   potentially that will happen --  it's going to boil down to

15   what the interest rates are.

16        So we support an extension.  Prudential modifies its

17   position and asks for it to be ninety days but I wanted to put

18   a little bit of flesh on it and respond to Your Honor's

19   comment.  Thank you.

20        THE COURT:  Thank you.

21        MR. REILLY:  Michael Reilly, Bingham McCutchen on

22   behalf of Teachers Insurance.

23        I want to speak today, Your Honor, from the due point

24   of a mezzanine lender like my colleagues at MetLife and

25   reminding the Court that the mezzanine lenders are in a unique

position. We are secured. We are at the property level. We
are one entity up from the mall itself and under the adequate
protection order, we are not receiving current interest at this
time, even though we feel we are well-secured and entitled to
the accrual and payment of that interest.

So the mezzanine lenders, more than anyone, if I
might-- may, are sort of paying for the expenses of this
reorganization in that they are not getting any interest in
return on a current basis. And I raise that because we do find
ourselves in the middle. The mezzanine is in the middle by
definition. That's where the word comes from. I am in the
middle of a, as you just mentioned, a bottoms up versus a top
down dispute and we believe there are two parallel
reorganizations going along. And I would like to offer a
solution to that approach as opposed to just say what we don't
like.

And our solution is a two step process and to
recognize that there are two parallel reorganizations at work
here. One at the bottom level, as you'd mentioned. It's
relatively straightforward. It's relatively typical of single
asset real estate. There happened to be 166 of them, so I
recognize it's not going to be done in an afternoon but it
doesn't have to take six months neither.

And I expect that the debtors would expect to be
formulating plans on those properties, first in a way I would

1   like to hold them to it and have a tighter deadline on that.

2   And then if we look at the parent level, that's going to be all

3   about the net equity value of the property level. It's going to

4   be about solvency and insolvency.  It's going to be about

5   whether debt should convert to equity.  It's going to be about

6   corporate control and board seats and all of the things that go

7   with it that don't really have to involve things at the

8   property level.  In fact, I would submit that unless and until

9   you have a firm base at the property level of a stabilized

10  value, a stabilized cash flow, its debt capacity and defining

11  the estate for the parent level, until that reorganization is

12  done or at least deals are cut, you can't reorganize at the

13  top.  You could talk about it and you can approach it but you

14  cannot reorganize the top unless you have a reorganized bottom

15  including deals at the bottom, not just talking about deals at

16  the bottom.  I do believe --

17          THE COURT:  Is your client also a property level

18  lender on the properties as to which you have mezzanine debt?

19          MR. REILLY:  We are -- on those properties and more,

20  Your Honor.

21          THE COURT:  Yes.

22          MR. REILLY:  Yes, we are A and B lenders on a variety

23  of the properties.

24          THE COURT:  Like MetLife, MetLife, I think has two

25  property level loans, mortgages and then is a mezzanine lender

1    at the next level up for one those.

2            MR. REILLY:  Yes, Your Honor.

3            THE COURT:  All right.

4            MR. REILLY:  Yes, a similar situation as well as A and

5    B debt at other properties for which we do not speak today

6    because special servicers speak for those properties.  The

7    debtor --

8            THE COURT:  Sometimes.

9            MR. REILLY:  Pardon?

10           THE COURT:  Sometimes.

11           MR. REILLY:  We're trying to coordinate as best we

12   can, Your Honor.  I think the debtor is going to have a unified

13   approach and we would accept that but I do want to remind the

14   parties that while you could have a unified approach to

15   maturity, as the debtor said, they're going to need to ladder

16   those maturities because nobody is going to have 166 properties

17   all come due, their new debt on the same day.  And once you

18   ladder maturities -- so you're not going to have the same

19   maturities.  Once you ladder maturities, you are not going to

20   have the same interest rates because you have different periods

21   of time and different periods of risk.  You're not going to

22   have the same amortization because each property has different

23   cash flow and different debt capacity.  You are not going to

24   have the same tenant improvement terms because we have regional

25   differences in all of the malls.  You may have the same

1  valuation approach but you're going to get 166 different

2  results.

3      THE COURT:  Are you arguing for more than six months?

4      MR. REILLY:  No, Your Honor.  I'm -- it may sound that

5  way but I am arguing to remind everyone that we will need 166

6  deals based on the same framework and each one is unique and

7  there will be separate plans or arrangements for each of those

8  companies.  But if you have a unified approach and force the

9  debtor to approach that first, we think it makes a lot more

10  sense for the case.

11      And if I could -- and so why are these so unique?  If

12  I can borrow the cliché from classic real estate, it's all

13  about location, location, location.  Each property is different

14  yet the debtor views them in an integrated way in terms of

15  their cash flow and their value to the enterprise.

16      If I may use the Teachers property for an example

17  where we have tried to put a proposal on the table, we want to

18  put a proposal on the table, but my client has said I need

19  information about my property, we need this seismic and

20  engineering report which the debtor dismissed as something

21  that's not typical in real estate restructuring.  Well my

22  property is three miles from the San Andreas fault in San

23  Francisco.  It's very typical for properties in San Francisco

24  to have this type of report because if that location shakes, we

25  need to know the answer because that affects capital

1    expenditures and risk going forward.  It greater affects the

2    value, the integrity of the structures.  It's an integral part

3    of plan negotiations.

4         So I didn't want our request to be thought of as just

5    some information request and I was concerned that the delay and

6    difficulty in getting that at the business level, we did not go

7    through all the law firms and not create motions over all of

8    this yet, I was concerned the difficulty at the business level

9    was an indicator that the debtor really wasn't all that serious

10   about getting plan negotiations going very quickly.  And that

11   is why we highlighted it and that's why we would hope that we

12   would have some redress on that.

13        And finally, Your Honor, I think as we know this is a

14   very, very closed watched case in the industry.  It was

15   considered a controversial filing by many observers but I would

16   agree with the Court that now that we are here, we have to

17   decide how to best sensibly use the reorganization process.

18   And I would urge the parties and the Court to seize the

19   opportunity to turn this into an exemplary Chapter 11 where we

20   can very efficiently move on very numerous, yet fairly

21   straightforward problems for 166 properties and show the

22   Chapter 11 to be the forum that it was designed to be to help

23   parties of a complex company reorganize and reorganize

24   efficiently.

25        And if I could borrow one more cliché, if you wouldn't

1    mind from the news, as our President recently said, "Nothing

2    gets done in this town without deadlines."  And the same goes

3    in Chapter 11.  We need deadlines, Your Honor, and I would

4    strongly urge a two-step process to best serve the interest of

5    the property lenders, as well as the debtor in general and the

6    parent lenders that come with it.  And I think that would best

7    serve the reorganization and get us the quickest result.  Thank

8    you.

9          THE COURT:  Thank you.

10         MR. SILVERSCHOTZ:  Good morning, Your Honor, Mark

11   Silverschotz, Reed Smith for Northwestern Mutual Life Insurance

12   Company.

13         Your Honor admonished objectors not to repeat one

14   another and I will not do so.  First, I would like to join my

15   colleagues and fellow objectors on observing that ninety days

16   is the appropriate extension here simply because the debtor has

17   taken the invitation that Northwestern put in its objection to

18   commence negotiations with respect to a restructuring of our

19   debts.  And we are gratified that in the reply as Your Honor

20   noted, the debtor has observed and agreed that it is now time

21   to do so.

22         The question for Your Honor as you observed at the

23   outset is how much rope to give this debtor, how much time is

24   going to optimize the reorganization process.  I am not certain

25   that I agree with Ms. Goldstein that a single plan for 388

1    debtors is necessarily less complicated than a series of more

2    simplified plans for individual property debtors.  But that's

3    something that after ninety days and after a negotiation with

4    the bulk of the lenders in these solvent debtor cases, the

5    Court will make -- will be in a much better position to

6    evaluate.  We do not believe that terminating exclusivity is

7    appropriate.  We do not believe that a six-month extension will

8    advance the process towards reorganization.

9         And lastly, Your Honor, there are a number of straw

10   men that were thrown up during the initial presentation by

11   Ms. Goldstein.  Northwestern did not move to dismiss. I believe

12   she said that all of the objectors had moved to dismiss.

13        THE COURT:  No, I don't -- I didn't hear that.

14        MR. SILVERSCHOTZ:  I'm sorry, then I apologize to

15   Ms. Goldstein.

16        THE COURT:  Maybe it was --

17        MR. SILVERSCHOTZ:  I misheard.  We did not.  We

18   believe that this case, at least on our debtors at our debt

19   level is simple, can be reorganized quickly and that clearing

20   out the simple cases at the property level will, in fact,

21   advance the more complicated top down reorganization from the

22   holding companies.  Thank you, Your Honor.

23        MR. SAMSON:  Your Honor, Paul Samson for the 2008

24   facility lenders.  We're a syndicate of secured lenders that

25   lent $1.51 billion on twenty-four properties in July of 2008,

1    just nine months prior to the bankruptcy petition.

2          We noted in our limited opposition -- because we don't

3    have a problem with ninety days either as many of the other

4    secured lenders have stated -- we noted in our opposition that

5    Mr. Metz who was the CEO of General Growth Partners in his

6    first day affidavit represented that they would present a

7    business plan and restructuring proposals within few months.

8    Now within a few months usually means three months, give or

9    take.  We have received nothing.

10          And I would add that we did initiate discussions

11    shortly after the petition was filed with the debtors.  Those

12    discussions broke off.  I don't think it was anyone's fault.

13    The debtors had a lot to do with the first day motions but

14    we're always happy to discuss it with them.  And we, as I said,

15    did initiate discussions at one point in time.

16          So we have Mr. Metz's promising within a few months;

17    we've seen nothing.  We have for that reason said give them the

18    ninety days.  How does it hurt them to come back ninety days

19    from now?  And yes, we did suggest benchmarks but we didn't

20    suggest that they needed to actually have filed a proposed

21    plan.  We just suggested as one of them that they start

22    negotiations and show they have made concrete proposals and

23    started negotiations.

24          We also take issue with some of the debtors comments

25    that all of the objecting secured lenders relied entirely on

1    the fact that we've lent to SPE, special purpose entities, that

2    are single asset, we should deal with those.  We reserve our

3    rights on that argument but we're also trying to be practical

4    and reasonable, Your Honor, and have pointed out as have the

5    other lenders that where the company -- the aggregate company

6    totally relies on the cash flow from the operating properties,

7    however they do it, they have to do it from the bottom up to

8    identify how much surplus cash they're going to have available

9    for the rest of the so-called top down creditors.

10        So either way you cut it, they've got to start these

11   discussions.  I don't want to repeat what some of my other

12   brethren have suggested.  And we felt -- one concern we always

13   have in these cases, Your Honor, is market timing and there's a

14   great incentive for the debtor and even for constituencies such

15   as the equity holders and the committee to benefit from market

16   timing and in so many words, to play with the secured lenders

17   surplus in a time where the markets are very uncertain and

18   we're not sure how values are going to go six months from now.

19   And even though we believe we're over secured now, and are glad

20   the debtor agrees with us, we think there's risk going forward

21   that that may not always be the case, although going forward

22   always is the case.

23        So what we're suggesting is benchmarks aren't

24   necessarily such a bad thing.  They don't have to be cast in

25   stone.  Giving some financial information isn't necessarily an

1    adequate protection issue.  There's lots of creditors that are

2    entitled to adequate protection that are still entitled to the

3    financial information.  And we would add that one thing that

4    concerns us is in the presentation on May 8 in Mr. Harmes'

5    (phonetic) testimony and in particular on Exhibit 7 which we

6    attach as Exhibit 2 to Mr. Gansa's (phonetic) affidavit, they

7    suggested that the DIP loan proceeds would be part of the

8    cushion.  In the reply, they are now suggesting otherwise.

9         So there is some risk for the secured creditors and

10   there's some to a large extent an adequate protection issue but

11   I think it's also relevant to the discussion of how long are we

12   going to give them before they have to show some progress?  We

13   don't want to needlessly burden the Court but we don't think

14   that asking them to come back in ninety days and show some

15   progress or give another ninety days is unreasonable.  Thank

16   you, Your Honor.

17        THE COURT:  Thank you.

18        MR. STAMER:  Your Honor, might I be heard briefly for

19   the committee?

20        THE COURT:  Yes, sure.

21        MR. STAMER:  Again for the record, Michael Stamer from

22   Akin Gump on behalf of the official committee.

23        Your Honor as is indicated in the debtors' motion, and

24   as said on the record, the committee supports the debtors'

25   request for a six month extension of exclusivity.  We think the

1    extension is justified based upon the size and complexity of

2    these cases together with the progress that has been made since

3    the petition date.

4         Your Honor what is clear from the remarks thus far on

5    the record is that the parties are grasping for the best way to

6    move forward.  The difference, Your Honor, from our perspective

7    is we believe that the secured creditors, I believe each of

8    which has acknowledged that they are over secured and

9    adequately protected; no one has moved to modify the cash

10   collateral orders, they are advocating  a process they

11   perceive to be best for them.  Your Honor, the debtors and the

12   committee are advocating a process that we believe is best for

13   the enterprise.

14        The committee is very focused on maximizing value for

15   all the estates and creditors.  Your Honor we believe a six

16   month extension is the appropriate extension to achieve that

17   goal.

18        Your Honor, I don't need to spend a lot of time to

19   talk about the size or the complexity of the cases, just an

20   observation.  If Your Honor will recall, the structure chart

21   attached to the first day affidavit was in and of itself in

22   excess of twenty pages long.  Your Honor, we strongly believe

23   with the debtors that the appropriate way to look at these

24   debtors is to analyze them as integrated, inter-related

25   entities and not merely a collection of single asset real

1    estate cases.

2         We also agree with the debtors, Your Honor, that the

3    way to maximize value for all parties is to negotiate and

4    prosecute a plan of reorganization for all or substantially all

5    of the debtors, not Your Honor to pursue what we perceive to be

6    a nightmare associated with the filing and prosecution of

7    hundreds of individual plans of reorganizations.

8         Your Honor, there was an argument made by I believe

9    counsel for teachers about the need to do this in a two-step

10   process, that you should work on the property companies first

11   and then work on what we've called "Top Co." Your Honor, and I

12   believe the debtors agree with the committee that the

13   appropriate way to address these issues it to address them at

14   the same time. That the Top Co. creditors should not and are

15   not sitting idly by while there's litigation or negotiation

16   with the property companies.

17        There are a variety of creditor constituencies at Top

18   Co. that have been working with their own respective

19   professionals. They're being given access to information to

20   allow those Top Co. negotiations to begin and become

21   constructive. So Your Honor, I think it's unfair to talk in

22   terms of the need to make this a two-step process and an

23   abbreviated two-step process at that.

24        Your Honor, on the progress issue and I will just

25   spend a minute on this, as the Court will recall from the

1    committee's perspective, this case had a little bit of a bumpy

2    start.  We had very strong disagreements with the debtors with

3    respect to the original DIP that was proposed and the process

4    through which they originally were pursuing a DIP loan.

5         Your Honor, we filed an objection and with the

6    assistance of this Court, the parties were able to work through

7    their issues and the outcome was an extraordinarily favorable

8    DIP loan that provided the company and its constituency's

9    liquidity and flexibility necessary to move this process

10   through Chapter 11.

11        Your Honor, since the petition date, the committee

12   will fully acknowledge that the company has made significant

13   tangible progress towards what will hopefully be a successful

14   and consensual exit from Chapter 11.  But Your Honor just so

15   everyone's clear, we fully appreciate that the real heavy

16   lifting starts now.  That the debtors have a lot to do in the

17   next six months and the committee is anxious to be working with

18   them, again to drive this process to a successful and hopefully

19   consensual conclusion.

20        The committee strongly believes, Your Honor, that a

21   shorter exclusivity extension or the use of benchmarks or

22   bifurcating the exclusivity, Your Honor, will be distracting

23   and counterproductive.  Your Honor, further support of the

24   committee's view, and the debtors will fully acknowledge this,

25   is that the extension to exclusivity that the debtors are

1    requesting and that the committee is supporting is without

2    prejudice to anyone's right to object to a further extension or

3    for that matter, to come in during the next six months if the

4    parties feel that insufficient progress is not being made.

5         Your Honor, it is for those reasons that the committee

6    does, in fact, support the six month extension to exclusivity.

7    Thank you.

8         MR. ABEL:  Good morning, Your Honor.  Ira Abel, Cohen

9    Tauber for Howard S. Wright Constructors.  I will be brief.

10        First, I don't know if Your Honor has received the

11   pleadings that we filed.

12        THE COURT:  Yes, I received the pleadings.

13        MR. ABEL:  That's fine.

14        THE COURT:  I understand you have a particular

15   problem.  Your property is half built.

16        MR. ABEL:  It's kind of an unusual situation, Your

17   Honor, but --

18        THE COURT:  I understand that.

19        MR. ABEL:  Very briefly.  We believe that the ninety

20   days is an appropriate time, pretty much for the reasons that

21   have already been stated.  All of the other points have pretty

22   much been made by all of the other parties, so I won't belabor

23   the record with that.

24        And I won't even address the debtors' comments

25   regarding lateness or inappropriate joinder to inappropriate

1     motions.  Thank you.

2          THE COURT:  All right.

3          MS. GOLDSTEIN:  Very brief, Your Honor.  I believe

4     that the comments by counsel for a number of the secured

5     lenders made a number of points.  One, that we have not

6     declined to engage in discussions with secured lenders, that we

7     have invited a proposal from Prudential, as an example, that we

8     have engaged in discussions and went forward and had

9     discussions on that proposal.  Similarly engaged in discussions

10    with Northwest.  And this will be something that we need to

11    continue to do.

12         And I have known Mr. Reilly for many years and I

13    always am happy when he supports me in a case.  And I think he

14    laid out many of the tasks that we have to do but I do disagree

15    with two things that he raised.  The implication that by

16    necessity we will be doing separate plans for every -- either

17    every center or every debtor, that's one of the work streams,

18    Your Honor, if you will that we're engaging in is to figure out

19    the best way to propose a plan.  Is it one consolidated plan

20    with separate subplans?  Is it the filing of multiple plans

21    under one umbrella?

22         We are working on all of that and assessing the inter-

23    relationships of all of the debtors and I think it was counsel

24    for MetLife who got up here and seemed very obsessed over

25    substantive consolidation.  You're right, Your Honor, it was

1   not it was not in our papers.  We did, however, say that we

2   need to assess the inter-relationships of the debtors.

3   Substantive consolidation is not a black and white thing.  It

4   doesn't mean everybody gets substantially consolidated or not.

5         And one of things we're looking at is whether there

6   are some subgroups that should be appropriate substantively

7   consolidated.  We have not reached any conclusions on that at

8   this point.

9         So engaging in negotiations with secured lenders is

10   something that we have started and we are continuing to do the

11   work, so that we can engage with a broader group of the secured

12   lenders.  And under an scenario, no matter how we proceed, the

13   secured lender on a particular property has to be dealt with.

14   It may be in a separate plan as part of an overall plan

15   proposal.  It maybe part of a consolidated plan.  But we still

16   need to do all the things that Mr. Reilly said; talk to each

17   secured lender, deal with interest rates, deal with maturities.

18   Make sure the maturities all work together.  And that's why

19   this is an integrated process.

20         And I think to do all that work, I believe it would be

21   an amazing achievement to get it done within six months.  And

22   you're right, Your Honor, we have started it and we have to

23   start it now and we have to come out with proposals, so that

24   we -- sooner rather than later, so that we can engage in the

25   back and forth with not just the secured lenders, but also the

1 unsecured lenders.

2   And you can be sure, Your Honor, the other area where

3 I disagree with Mr. Reilly is that I don't think we can

4 bifurcate this. I echo Mr. Stamer's point. The unsecured

5 creditors need to be very involved in the reorganization

6 process. They will have views on how we treat the secured

7 creditors. And certainly if I were them, I would want to know

8 how I fair under a plan before agreeing to or not objecting to

9 or finding some basis to contest plans for the secured

10 creditors.

11   So I think that in terms of trying to best use the

12 time to get out of Chapter 11 as efficiently and as quickly as

13 possible, we need to take the six months and try to work with

14 all parties and try to get something as consensual as possible.

15 I can't represent to you, Your Honor, that it will be

16 consensual as to every creditor, that's a goal, but we think

17 that we will get this to a point if we have the time and are

18 not fighting about benchmarks and interim periods of

19 exclusivity, to get this to the best possible point that we can

20 in a six month period and a plan on file with a fully done

21 disclosure statement and be able to start setting some

22 hearings, a disclosure hearing and a confirmation hearing, that

23 will get us out of Chapter 11, rather than forcing the debtor

24 just to file a plan. And then the process starts and continues

25 for at least as long a period with more contest along the way.

1          Your Honor, I think that those are basically what I

2     wanted to get to if, you know -- on the more minutia, on the

3     seismic report, it's not as though there's never been a seismic

4     report on that property.  In prior loan diligence, there has

5     been seismic reports.  That's something we ought to take out of

6     the exclusivity process and, you know, we should continue to

7     deal with that separately.

8          THE COURT:  Let's put that in the business-to-

9     business --

10         MS. GOLDSTEIN:  That's a business issue between the

11    debtors and Teachers.

12         THE COURT:  -- process and recognize that the fewer

13    issues there are between parties, the quicker one gets to the

14    real issues.

15         MS. GOLDSTEIN:  But, Your Honor, bottom line, I think

16    we stand by our request for six months.  We think that it's

17    eminently reasonable.  We think that there has been nothing

18    said by the objectors that indicates we need less time.  I mean

19    if we only had to deal with Prudential, maybe ninety days is

20    enough.  If we only had to deal with Northwest Mutual, maybe

21    the same but we have to deal with multiple facets of this case

22    and over a hundred secured lenders, as well as the various

23    constituencies represented by Mr. Stamer.

24         THE COURT:  Anyone else?  All right.  I have

25    considered the Adelphia factors, the size and complexity of the

case, the necessity for sufficient time to negotiate good faith

progress, the debtor being turned on its bills, whether there

are reasonable prospects for filing a viable plan, whether the

debtor has made progress in negotiating time which has elapsed,

whether the debtor is seeking an extension to pressure

creditors or whether there is an unresolved contingency.

Most of these factors in Adelphia at 352 B.R. 578, 587

are met and justify an extension of exclusivity.  And, in fact,

the only real issue before me today is how long that should be.

The debtors have convinced me that they do need a period that

is more substantial than would ordinarily be granted in a

request for extension of exclusivity.  This is the first such

request.  We have a commitment on the part of the debtors to

make proposals to the secured lenders in the very short run.

Obviously, I don't have a date but I have a commitment.  And it

seems to me that that is one place to start but that in order

for there to be a proposal for the individual property lenders

that makes sense, the case as a whole cannot be ignored.

That's not to say that the cases are to be

consolidated in any way.  That issue certainly hasn't been

raised and the fact that the debtor is a debtor with 388

entities and multiple loans, is a fact that cannot be ignored.

And indeed, the cases do not ignore it.  It's interesting to

have Prudential here before me because they were present in two

cases in which I was involved that the parties cite; In re:

1    Manville Forest Products, Corp., 31 B.R. 991.  There the

2    district court granted a fourth or a fifth extension of

3    exclusivity by the bankruptcy court in the Manville case with

4    respect to a separate company that argued passionately that it

5    was not involved in asbestos litigation. The court, the

6    district court did make certain statements which are reflected

7    in the decision that at some point a separate debtor cannot be

8    kept in a case that has complexities at other points in the

9    group.  But we're not anywhere near that situation in this

10   case.

11        The other case is McClean Industries where Prudential

12   moved for relief from the stay, 87 B.R. 830 of one of four

13   debtors stating that they were a separate property company,

14   owning some property in North Carolina and they didn't have

15   problems in the shipping industry.  And in a comprehensive

16   decision, the bankruptcy court denied the motion for relief

17   from that stay, not on the ground that there should be

18   consolidation but o the ground that the interests of that

19   separate company couldn't be pulled out of the whole at that

20   point in time.

21        I find the debtors' commitment to attempt to propose a

22   plan that would take into account the interests of the separate

23   property owning companies and their creditors within six months

24   is to be a -- it may be a somewhat heroic endeavor but it

25   shouldn't be deterred.

1          And, therefore, I think this case would be in a better

2     position if we attempt to hold the debtors to their goal rather

3     than go through another exclusivity extension motion in three

4     months or in four months.  And that the goal should be to have

5     a plan or plans obviously, proposed within the six-month

6     period.  I don't believe that it would be appropriate for the

7     Court to micromanage the process or to set up certain

8     benchmarks.  On the other hand, I think it would be useful to

9     have perhaps a status conference in three or four months,

10    sometime before the end of the year to give the parties an

11    opportunity to be heard if they believe the process is not

12    going in the manner that the debtors have committed.

13         Obviously, I am not looking for a hearing at which the

14    secured lenders or those who are in the case, complain about

15    the specifics of the negotiations.  On the other hand, it would

16    certainly seem that at that point the lenders should have the

17    proposals the debtors have committed to make or there should be

18    a very good reason why that has not proceeded in the fashion

19    that the debtors appear to have committed to, at least as I

20    understand the arguments today.

21         So I will grant the request for extension but suggest

22    that we do have a -- some type of a status conference within

23    four months to see where we are.  I do think there is something

24    to be said for the proposition that as one of the lenders said

25    sometimes deadlines focus parties' attention.  And it's

1   important that the process be viewed as a constructive one.

2   All right.

3          What's our next motion?

4          MR. HOLTZER:  Again, Gary Holtzer, Weil, Gotshal &

5   Manges for the debtors.

6          Your Honor, there are four matters still left on the

7   calendar.  I don't know if we had started at 10:00, whether we

8   would have finished before lunch anyway, but those matters are

9   an application under 503(b) by Goldman Sachs and Brookfield.

10  There are the applications to retain the financial advisors for

11  General Growth and for the creditors committee and then there's

12  a motion also on the calendar for relief from the automatic

13  stay.

14         We can attempt to go forward, for example, on Goldman

15  Sachs before lunch or we can take a break now and come back

16  after lunch.

17         THE COURT:  Well why don't we -- let's deal with as

18  many of them as we can and see where we are.

19         MR. HOLTZER:  Okay.

20         THE COURT:  The motion for relief from the stay

21  shouldn't take very long.

22         MR. HOLTZER:  Fine, Your Honor.

23         THE COURT:  I read the papers.  I gather that the

24  movants still wishes to go forward with the motion and counsel

25  was here.

1          MR. MISKEN:  Yes, Your Honor.

2          THE COURT:  Do you want to com forward?  Have you read

3     the responsive papers?

4          MR. MISKEN:  Good afternoon, Your Honor, Ken Misken on

5     behalf of Mott, Inc.  We're here today on Mott, Inc.'s  relief

6     from the stay to terminate a lease between Tyson's Galleria as

7     landlord and Mott, Inc. as tenant.  Mott, Inc. asserts two

8     grounds for terminating the lease.  The first one is based upon

9     the debtor's own interpretation of the lease.  The lease lacks

10    mutuality.  And this -- the lease that I am talking about is

11    governed by Virginia law.  And Virginia law defines that

12    mutuality as mutuality of engagement.  So there's no mutuality

13    of engagement in this lease.

14         THE COURT:  Where is that in your papers?

15         MR. MISKEN:  It's not in our initial pleading, Your

16    Honor.

17         THE COURT:  Well if you want to bring another motion

18    on mutuality of engagement to declare this lease void under

19    Virginia law, I think your recourse is to bring an adversary

20    proceeding for a declaration that the lease is void.

21         MR. MISKEN:  Okay, Your Honor.

22         THE COURT:  I don't know what that has to do with the

23    automatic stay.  If you need to quote me Virginia law, you're

24    not going to quote it from the podium there.

25         MR. MISKEN:  That's fair.  One thing that I did ask

1    the debtors to do is to set up a briefing schedule and to

2    conduct some limited discovery on those issues and --

3         THE COURT:  Well, it seems to me you should start with

4    a declaratory judgment action.  If you really want to continue

5    to litigate this in this forum, it's that -- and you're going

6    to say the lease you've been operating under for how long?

7         MR. MISKEN:  The lease that we're operating on has

8    been for two years but there were some -- we were moving into

9    new space.

10        THE COURT:  Yes.

11        MR. MISKEN:  And the debtor was required to provide

12   that new space by June 1, 2009.  And the debtor didn't provide

13   that new space, so that Mott can conduct its work on that new

14   space so it can move in by September 1.

15        The reason why the debtor hasn't provided that new

16   space is that there is a current tenant in that place.  So if

17   you look at the terms of the lease, one thing that the debtor

18   relies upon is Article 2(c) of the lease.

19        THE COURT:  Yes, that's what I recall.

20        MR. MISKEN:  And that article provides that if the

21   tenant is prevented from beginning construction on the lease

22   premises by the beginning work date because of the failure of

23   the landlord to substantially complete the landlord's work,

24   it's our position that the debtor had an obligation under the

25   lease to retake the premises, to begin the work.  This

1    provision, Article 2(c) does not relieve the debtor from its

2    obligations to start.  Article 2(c) is, so to speak, a shield

3    for the tenant in case the tenant isn't able to complete its

4    work or to start its work, so that it wouldn't be a breach of

5    the lease by the tenant if the landlord was unable to complete

6    it.

7         THE COURT:  Well if you say this creates a void in

8    this, it seems to me that you've got to go forward with some

9    showing.  I have nothing on the papers before me to indicate

10   that.

11        MR. MISKEN:  And --

12        THE COURT:  What's your other argument?

13        MR. MISKEN:  Well the other argument is a breach of

14   lease under Section 365(d)(3), I believe.  You know, if the

15   debtor does have an obligation under the lease to prepare the

16   premises and to turn those premises over to Mott, Inc.,

17   365(d)(3) requires the debtor to timely perform all of its

18   obligations under the lease within sixty days from the petition

19   date.  We are now beyond that sixty days.

20        The debtor still hasn't retaken the premises.  The

21   debtor hasn't even begun its work and the tenant is -- the

22   current tenant is still in its place.  So by the terms of the

23   bankruptcy code, 365(d)(3), since the debtor hasn't complied or

24   even begun its obligations under the lease, it would be a post

25   petition default and the lease should be terminated.

1        THE COURT:  All right.

2        MR. MISKEN:  So that's our other argument, Your Honor.

3        THE COURT:  I don't recall anything in your motion on

4    (d)(3).  I am looking at your motion now.  I see a reference to

5    (d)(1), lack of adequate protection of an interested property.

6    Do I see anything on (d)(3)? I nothing whatsoever on (d)(3),

7    not a word.  You have a four or five page motion and I see

8    nothing in here, no reference to (d)(3).  But let me hear from

9    the debtors.

10        MS. REID:  Good afternoon, Your Honor, it's Penny Reid

11   on behalf of the debtor.

12        I'm going to stick the background because I think

13   you're already fairly familiar with it.  Your Honor is correct,

14   we have been operating under this lease since August of 2008

15   when it was extended by the old lease which had been there for

16   about eleven years, has been extended by the new lease.

17        Contrary to what counsel says, the debtors have in no

18   way been in breach of the lease and indeed, this particular

19   action that they're complaining of is something that the

20   parties contemplated and Article 2(c) provides that where the

21   tenant is prevented from beginning their work on the opening

22   day, the opening day as well as the beginning work day are both

23   extended one day for each day.

24        And there's nothing in the lease that says contrary to

25   what counsel says, that the landlord has to start work on that

1    beginning day or this section 2(c) is invalid.

2         I think Your Honor's aware that in order for them to

3    be able to lift the stay, they have to show that there is cause

4    to do that and the way to show cause is to show that they would

5    be entitled to some relief if the stay was lifted.  And in this

6    case, Your Honor, we do not believe they are entitled to

7    terminate.  I mean, I think the lease is very clear that it

8    will extend day by day until we begin work.

9         What -- importantly, Your Honor, the delay in opening

10   this lease is really not Tyson Galleria's fault.  What happened

11   was at the time we entered into the new lease with Hugo Boss

12   there was a negotiation with the current tenant and the current

13   tenant had indicated to Tyson's Galleria that they were going

14   to get out on June 1.  And they were actually looking to move

15   into some other property also.

16        What happened at that point unfortunately, given the

17   current economic environment, the current tenant is not able to

18   move out and so they're going to stay until the end of their

19   lease which is December and then they're going to vacate and at

20   that point we will move in and have the property ready by the

21   beginning of 2010 which this six-month delay really doesn't

22   support any type of reason to lift the stay but most

23   importantly, it's not a breach of the agreement because the

24   agreement provided for this remedy, specifically in 2(c).

25        THE COURT:  All right.  Thank you.

1          MS. REID:  Thank you, Your Honor.

2          MR. MISKEN:  Your Honor, and as I said before, I

3    thought that we had needed to conduct some discovery and to

4    brief these issues because there are versions or --

5          THE COURT:  I think you need either to start over

6    again or to restate your motion.  You're seeking relief that

7    you don't refer to in your motion and as to lifting the stay

8    for cause and simply looking at the papers that have been

9    presented to me on their face, without deciding any of the

10   further issues you've raised, it seems to me the motion should

11   be denied.  However, it's without prejudice to your starting

12   over again if you wish.  It seems to me it may be that what

13   you're seeking is a declaration in which case you would need to

14   bring an adversary proceeding to get a declaration as to what

15   the lease means or to get a declaration that the lease is void.

16   So that's my ruling.

17         MR. MISKEN:  Okay, Your Honor.

18         THE COURT:  And I think that's consistent with what

19   you just said.  You want some opportunity for discovery and

20   further litigation.  That you certainly would have in an

21   adversary proceeding context.

22         MR. MISKEN:  Thank you, Your Honor.  And I did look at

23   the adversary proceeding issue and I didn't think that that

24   issue fit under the 7000 rules and thought it could be brought

25   by --

1          THE COURT:  Well, 7001 says a request for a

2     declaration is an adversary proceeding.

3          MR. MISKEN:  Okay, Your Honor.

4          THE COURT:  Thank you.

5          MR. MISKEN:  Thank you.

6          THE COURT:  All right.  Do you want to take the

7     request by Goldman Sachs and co-movant?

8          MR. HOLTZER:  Yes, Your Honor, I do.

9          THE COURT:  All right.

10         MR. HOLTZER:  I think that's the best to take next.

11         THE COURT:  Next?

12         MR. HOLTZER:  Ms. Buell from Cleary, I believe will be

13    presenting that application, Your Honor.

14         THE COURT:  All right.

15         MS. BUELL:  Good afternoon, Your Honor, Debbie Buell,

16    Clearly Gottlieb Steen & Hamilton, LLP on behalf of Goldman

17    Sachs Mortgage Company, one of the joint bidders making this

18    application for administrative claim allowance under 503(b).

19    This is, in fact, a revised application, Your Honor, for

20    administrative claim for benefits provided to the estates in

21    the DIP bidding process.  You may recall that we were here on

22    May 8 and the Court set up the auction processes for that

23    continued DIP bidding but the debtors foreshadowed the prospect

24    of an application of this type saying that at the time they

25    would be willing to at least consider the prospect of

1    supporting such an application, depending on how the DIP

2    process continued and how the auction proceeded.

3         And, in fact, here we are.  The initial application,

4    as you may recall, was for a request for a $5 million fee and

5    reimbursement of professional expenses of approximately

6    $770,000.  There have been substantial discussions with the

7    debtor, both before the application was filed and thereafter.

8    We now have a revised application for a total amount of

9    $2,750,000 which is supported both by the debtors and by the

10   unsecured creditors committee.

11        There is no objection that has been filed by any

12   creditor or any shareholder but we do have an objection that's

13   been filed by the US Trustee's Office and my understanding of

14   that objection, having talked to the office is that we don't

15   have a disagreement as to the facts, as to what we have

16   presented in terms of what happened during the bidding process

17   and the bids that were presented in the ultimate bid that the

18   debtors selected as the winning bid but what we do have is a

19   disagreement as to how 503(b) should be applied to those facts.

20   And as a result, what I would like to do, Your Honor, is we

21   have three affidavits that have been submitted as part of the

22   motion.  I would like to offer those affidavits into evidence,

23   the three affiants --

24        THE COURT:  Well they're part of the record but is

25   there any objection to my taking in the affidavits as a factual

1       matter?

2               MR. ZIPES:  No, Your Honor.  The agreement -- Greg

3       Zipes from the US Trustee's Office.  My understanding of the

4       facts are that they are uncontested at this point.  What the

5       facts are as presented in the motion and in the United States

6       Trustee's objection, we also cite to the record that's not

7       necessarily a part of the movant's presentation of the facts.

8               MS. BUELL:  Your Honor, I would also make an

9       additional proffer of testimony by Mr. Border (phonetic) who is

10      here today if the US Trustee --

11              THE COURT:  I don't want any other proffers unless the

12      US Trustee has an objection.  Now you're asking for an

13      allowance under 503(b)(3)?

14              MS. BUELL:  That's correct, Your Honor.  The motion

15      was initially --

16              THE COURT:  (3)--

17              MS. BUELL:  503(b)(3)(D).

18              THE COURT:  (b)(3)(D).

19              MS. BUELL:  And also --

20              THE COURT:  And (b)(4).

21              MS. BUELL:  (b)(4).

22              THE COURT:  All right.

23              MS. BUELL:  And in our --

24              THE COURT:  And why aren't you proceeding under the

25      general provision of 503(b)(1)(A)?

1          MS. BUELL:  Your Honor?

2          THE COURT:  The actual necessary cost and expenses of

3   preserving the estate including --

4          MS. BUELL:  That is an alternative ground that we

5   cited in our reply brief, Your Honor.  We think that the

6   test --

7          THE COURT:  You didn't happen to read my decision,

8   although it's not officially reported in the Tyson case?

9          MS. BUELL:  We did read that, Your Honor.

10         THE COURT:  And --

11         MS. BUELL:  And we cited that, as well.

12         THE COURT:  If you don't like my decision, maybe you

13  will like the decision of the Third Circuit in In re: O'Brien

14  Environmental Energy, 181 F.3d 527.

15         MS. BUELL:  Absolutely, Your Honor.  And in that

16  O'Brien case it sets out the nine factors that the Third

17  Circuit thought appropriate to review in terms of determining

18  whether an admin claim application akin to a break-up fee,

19  which is what we have here for the part of the request that is

20  above the request for reimbursement of professional fees

21  incurred is appropriate under 503(b).

22         And we believe, Your Honor, that the record that we

23  have presented absolutely establishes the satisfaction of those

24  elements.  Certainly I think there is no factual dispute and

25  the debtors support, as well as the committee's support helps

confirm that the collateral package which was part of the joint

debtors' bid application from their very first bid on May 1 and

which was finally adopted as part of the successful Fairlawn

(phonetic) bid, which was selected by the debtors at the

auction on May 12, was an absolutely unique and highly valuable

aspect to the debtors in getting a DIP financing of great

benefit to the estate both for its substantive collateral

protection for the DIP lenders and its ability to create

consensus among a group of creditors, the subsidiary secured

creditors, as well as the unsecured creditors to get behind the

DIP financing which the debtors needed.

There is really no question in the record, Your Honor,

that the joint bidders were the first to offer that.  They

consistently offered that and finally at the end of the auction

process where the debtors had gone through a process, going

through with each bidder saying this is the best deal that we

have gotten on a variety of terms, see if you can match it or

best it, that the collateral package was, in fact, the

collateral package that the joint bidders had supported

throughout.

Another aspect of the joint bidders' substantial

contribution, their preservation of value to the estate through

this process, Your Honor, was on the warrant issue.  As you

will recall, the Pershing One (phonetic) DIP proposal had

warrants that were basically priced at nominal value for the

1    DIP financing party.  That would have been a highly, highly,

2    expensive aspect of that proposal for the debtors.  The debtors

3    obviously solicited bidding on that issue, encouraged bidding

4    on that issue and got bidding on that issue.  The joint bidders

5    consistently throughout the bidding process never had a request

6    for warrants in any of their bids and I think that also

7    contributed to the debtors negotiating leverage to insure that

8    they would be able to resist any request for warrants as part

9    of a DIP financing package.

10           And that, of course, Your Honor, was you know, a

11   highly important and cost effective aspect of the DIP financing

12   auction process which the debtors and the committee ran.  There

13   are other aspects which I think are less important, less unique

14   than the two that I have just mentioned, Your Honor.

15           THE COURT:  And do I understand the record correctly

16   that at the time of the -- that these proposals and

17   negotiations were going on, the debtors stated that they would

18   or might support an application for a, what is in effect, a

19   breakup fee for your clients?

20           MS. BUELL:  That's correct, Your Honor, and it

21   certainly might, not would, we have to be, you know, absolutely

22   clear about what was said and what was not said, but certainly

23   the debtors as was their fiduciary duty were very outgoing and

24   encouraging continued bidding in the process and obviously

25   there was some encouragement needed for the joint bidders

1    because we have been bidding since May 1.  We thought

2    absolutely had the most attractive collateral package for the

3    estate on a number of levels and we didn't get selected on May

4    6 and we didn't get selected on May 8 and we, at the end of the

5    day, still didn't get selected on May 12.

6            So the first time that I think it's fair to say that

7    the debtors encouraged the joint bidders to stay in the process

8    and continue to contribute value was on May 8 when the Court

9    announced that we would have an auction process and the debtors

10   encouraged the joint bidders to stay in and said that they

11   would consider the prospect of support for a substantial

12   contribution application if the joint bidders continued in that

13   process to put on bids that were of value to the estate.

14   Obviously if we had taken a left turn and started demanding

15   large warrants, et cetera, et cetera, we wouldn't be here

16   today, Your Honor.

17           But as I have said, we stuck with a collateral package

18   which ultimately was the collateral package that permitted the

19   debtors to get that plus a financial package that they

20   ultimately found somewhat more attractive from Fairlawn than

21   the joint bidders.

22           THE COURT:  Thank you.  Anyone for your co-movant?  If

23   you have nothing to add, I am not insisting that you --

24           MR. SHALHOUB:  Yes, I really don't have anything to

25   add, Your Honor.  For the record, Paul Shalhoub of Wilkie Farr

1    & Gallagher.  I will defer until I hear the US Trustee's

2    comments and objections.

3         THE COURT:  All right.  Now your client is not a

4    creditor as the US Trustee has pointed out, as I understand it,

5    except you're a post-petition creditor but that doesn't come

6    within the definition of creditor in the code.

7         MR. SHALHOUB:  That's correct, Your Honor, although

8    you do not need to a creditor to qualify under 503(b)(1) of the

9    bankruptcy code.

10        THE COURT:  I noticed that.

11        MR. SHALHOUB:  As well as we were participating under

12   503(b)(3)(D) and 503(b)(4) with Goldman who was a substantial

13   creditor and the bids that were made were made on a joint

14   basis, a combined basis and the discussions that were taking

15   place with the debtors and the creditors committee was on a

16   joint basis and on a combined basis, not what fee or

17   reimbursement would be appropriate for Goldman and what fee or

18   reimbursement would be appropriate for Brookfield.  That's not

19   at discussion status.

20        THE COURT:  All right.  Thank you.

21        MR. STAMER:  Your Honor, very briefly again for the

22   record, Michael Stamer from Akin Gump on behalf of the official

23   committee.

24        Your Honor, on June 19, the committee filed a

25   pleading, a statement in support of the application.  And I

won't go into detail.  It's a brief statement.  Your Honor from

our perspective, the joint bidders, and we had a ringside seat,

were very active, very constructive participants both before

and during the auction process.

Your Honor, the resources that they allocated and the

favorable structure and economic provisions that they

articulated were extremely beneficial to the process.  And

truly contributed to what I think we all know was a remarkable

result in light of the credit markets at that time and

currently.

Your Honor, there has been some concern expressed

about opening the flood gates of Section 503(b) and it's a

valid concern.  My only response to that, Your Honor, is in my

almost twenty-year career, I have never seen an auction break

out for a DIP financing.  And I would be surprised if we saw

any in the near future.

This is a unique circumstance which was fraught with

all kinds of risk and challenges and Goldman Sachs and

Brookfield, the joint bidders, stepped up and provided real

value to this estate.  And, Your Honor, it's for that reason

that the committee is supportive of the application.

THE COURT:  Thank you.

MR. ZIPES:  Good afternoon, Your Honor, Greg Zipes

from the US Trustee's Office.

This motion presents two part questions, at least one

1   of which has been not addressed by the movants, at least today.

2   The first is whether there was a substantial contribution.

3   And --

4           THE COURT:  Do you want an evidentiary hearing?  We'll

5   have one right away, if you want one.

6           MR. ZIPES:  Right, Your Honor.

7           THE COURT:  If you dispute the facts that they have

8   stated, then let's have an evidentiary hearing.  We'll put on

9   some testimony and we'll get an appropriate record.

10          MR. ZIPES:  Your Honor, I don't know that we have any

11  disputes about the facts but the facts are also as brought

12  forth in our objection.  We think that you have to look to the

13  relevant time period here, which is that when the debtors filed

14  in April, they didn't have any DIP financing at all at the

15  time.  And the debtor in testimony on May 13, through Mr.

16  Buckfire, in fact flagged the dire need of the debtor for DIP

17  financing that was before the Court and in fact was an

18  unsolicited offer before the Court at that time.

19          And Goldman and the joint bidders, I will call them,

20  had every opportunity to come in and offer DIP financing before

21  the case filed, then also during the initial period; they

22  didn't for their own economic reasons.  But, Your Honor, that's

23  an example of while we're talking about how they benefited the

24  estate, that's potentially an example on the record where they

25  haven't benefited the estate.

1    Goldman, in fact, filed an objection to the cash

2    collateral motion at the beginning of the case and presumably

3    if that objection had been carried through to its logical

4    conclusion and hadn't been worked out in the meantime, that

5    might have had in fact dire consequences for the debtor.  So

6    these are the same parties that are now arguing for substantial

7    contribution.  It is fact driven, Your Honor.  It is a fact

8    driven inquiry but it's not --

9         THE COURT:  All I want to know is if you want me to

10    have an evidentiary hearing on the subject, I will have one.  I

11    don't think any of the facts you've stated a facts are

12    disputed.  I think they're all in the record.

13         MR. ZIPES:  Right.

14         THE COURT:  The implications are something else but I

15    also think that and I know you may be getting some of this at

16    the last minute and haven't -- and should have an opportunity

17    to think about it, but if we put substantial contribution aside

18    for the moment, because I know you have a -- want to, as a

19    matter of principle, limit that subsection in 503(b), and look

20    at the issues in the same way that the Third Circuit did in

21    O'Brien Environmental Energy.  Then the question it seems to me

22    is whether or not this is an administrative expense once the

23    debtors committed to consider it, which they did at the time of

24    the auction and now that the debtors have indeed agreed to it.

25         So the question of substantial contribution doesn't

1   come up.  The question of whether there's a creditor doesn't

2   come up because entities can apply for administrative expenses,

3   not just creditors.  And we're left with the question as to

4   whether or not this was an actual necessary expense of the

5   administration.

6         MR. ZIPES:  And, Your Honor, I am -- my point is not

7   to make them file another motion.  That clearly was not their

8   motion, your point that you're raising is not their motion.

9   But on its merits, yes, once there is an analysis of

10   substantial contribution under whatever subsection, there's

11   also the question of actual costs and expenses and what's

12   legitimate.  And 503(d) uses the word actual costs.

13         So what we're left here with and again looking at the

14   facts, we have a demarcation point; May 8 seems to be a

15   demarcation point of when the joint bidders were asked to come

16   back in by the debtors and committee nomenclature whether it's

17   appropriate for them to make that on their own but that was at

18   least the point where everybody's talking about they came back

19   into the process.

20         And there's a time before that when presumably they

21   were willing to walk away and they would have walked away and

22   they had no expectations of fees and expenses being paid and

23   they had no expectation of participating in the process.

24         And then you have the $5 million fee, as well.  I'm

25   talking about attorney fees, I guess for the $700,000 some odd

1  dollars and that May 8 being a breakup -- a line of

2  demarcation.  And then there's the $5 million fee which

3  actually is --

4        THE COURT:  Do you wish them to renew their motion for

5  $5 million rather than $2. --

6        MR. ZIPES:  Well, Your Honor, if the settlement was

7  under $700,000, we might have gotten somewhere but the $2.75

8  million is clearly in excess of attorney fees and actual

9  attorney fees.

10        THE COURT:  It clearly is because it's net of

11  attorneys' fees.  And attorneys' fees could add to that, if

12  I --

13        MS. BUELL:  No, Your Honor, they're inclusive.

14        THE COURT:  It's inclusive.

15        MR. ZIPES:  Regardless, it's above that --

16        THE COURT:  It's inclusive.

17        MR. ZIPES:  -- amount, Your Honor, so I do think we

18  have to adjust that.

19        THE COURT:  All right.  There is -- okay.  I

20  understood that there was a breakup fee and that that's in

21  addition to the legal fees involved which were about $700 to

22  $800,000, at least according to the papers before me.  So about

23  a $2 million breakup fee and a $750,000 legal fee.

24        MR. ZIPES:  Again, we're adopting that nomenclature

25  that I don't necessarily accept because it's not -- we're

1     discussing a breakup fee and that's -- we're talking

2     substantial contribution.

3           THE COURT:  You are but I am not.  I'm asking you to

4     talk actual and necessary expense.

5           MR. ZIPES:  Yes.  So --

6           THE COURT:  And maybe I should give you an opportunity

7     to think about that side of it to read the O'Brien case; I

8     don't want to suggest people read my own case, but --

9           MR. ZIPES:  Your Honor, your case was extremely well-

10     written and actually your case --

11           THE COURT:  You might read it.

12           MR. ZIPES:  -- in Tyson -- and actually your case

13     proves the point, Your Honor, that in that case, Your Honor,

14     you only -- it was (b)(1) but you looked at what was absolutely

15     necessary in terms of expenses.  And in that case, there was a

16     lien search or something, a title search on the property.  You

17     didn't allow full fees in that situation.  You only allowed it

18     for a specified --

19           THE COURT:  Because I had the debtor objecting and the

20     debtor said don't give them anything.  Now what do I do in the

21     current situation where the debtor said -- and I don't think

22     they're in the business of giving away money, although -- I'm

23     only saying that for purpose of this motion not of the next

24     motion -- I don't think -- they are run by experienced

25     businessmen, and we are talking about big numbers in this case

1    but we're also talking about a negotiation.  The creditors'

2    committee has looked at this.  No creditor has objected, even

3    to the $5 million number.  So we do have a different situation

4    from the situation in Tyson where the debtor said give this guy

5    nothing.  He was a volunteer.

6             MR. ZIPES:  And, Your Honor, if a breakup fee was what

7    the movants wanted, they could have come in at the time of the

8    hearing and asked for that as well, and people could have

9    addressed it on the --

10            THE COURT:  That is a very good point because the

11   principle -- that's what has to be done, that in a situation

12   like this you've got to stop everything, go to court, set a

13   hearing date on the breakup fee, give notice to the thousands

14   of creditors perhaps or at least to the service list and then

15   come back and stop everything.  Is that a good principle?

16   Should we be setting that in stone?

17            MR. ZIPES:  Well it could have been set up at the

18   beginning of the case, Your Honor, frankly, in fee bidding

19   procedures for -- bidding procedures or --

20            THE COURT:  That almost invites -- it says anybody who

21   comes in and we don't know if anybody will come in because as

22   Mr. Stamer said, DIP auctions are almost unheard of.  It's not

23   something that people anticipate.  It's different for a 363

24   sale or something like that.

25            MR. ZIPES:  Well --

1          THE COURT:  This was unusual.

2          MR. ZIPES:  Well, Your Honor, let's address that for a

3     moment because by limiting it to DIP financing, obviously

4     there's probably -- well I should say there's probably not

5     going to be any further DIP financing type motions but it is

6     very conceivable in this case that there will be a 363 sale of

7     assets and there will be a plethora of bidders involved with

8     those.  And any one of them looking at this particular

9     situation could draw the conclusion as a non-successful bidder

10    that they added to the process and that they should come in.

11         Your Honor, the floodgate issue is a real one.  It's

12    not clear why this has to be decided at this time because the

13    money is going to be there at the end of the case, as well as -

14    - or maybe even three months from now when we can test that

15    assumption that no one else is coming in.

16         Your Honor, I don't know how this court would react

17    when people -- non-successful bidders start coming in and

18    saying that they are entitled to substantial contribution but

19    the question s why now?  And that was a part of our papers.

20         The statute is the statute.  It does require actual

21    costs and there was absolutely no showing in the papers of this

22    $5 million which it may be $2 million now but there was no

23    showing of that being an actual cost.  And further, the May 8

24    date does seem to be a significant date here.  That's what

25    everybody is saying.

1      And so, Your Honor, we would in the first instance say

2  you don't need to decide this today.  We weren't -- we had

3  actually asked the parties to put this off a little bit to see

4  what would happen and they wanted to go forward.  That's

5  obviously their right.

6      But in the second instance, we would say that

7  substantial contribution under (b)(3) and (4), the statute is

8  important, Your Honor, having been that in the sense that

9  (b)(1) may or may not be an appropriate provision to move on.

10 The bigger Tyson case was under (b)(1).

11     And in the third instance that if you are inclined to

12 grant this in some way today, that you look at what was actual

13 and what's actually a cost that the parties incurred.

14     THE COURT:  Thank you.

15     MR. HOLTZER:  Your Honor, Gary Holtzer, Weil Gotshal &

16 Manges for the debtor.

17     We have listened to all the parties here and obviously

18 we agree to a stipulation resolving the matter.  We did that

19 for a variety of reasons including in particular because we

20 believe during the process Goldman and Brookfield did add

21 substantial value and are deserving after our discussions with

22 the committee during the process and after it, of the amount

23 that we agreed to in the stipulation to resolve the matter.

24     The structure in particular that Ms. Buell has pointed

25 out was a very key ingredient to the process for achieving the

1  DIP financing that we did in this case.

2       MS. BUELL:  Your Honor, just a few clean up remarks.

3  I don't think that it is, in fact, a relevant factual or

4  dispositive factual issue but the situation is that Goldman had

5  had discussions with the debtors prior to the filing about the

6  prospect of DIP financing and if that is at all important, we

7  would certainly be willing to make a proffer or present

8  evidence on that point.

9       I don't think it is.  I think that as we have heard,

10  you know, the question is the -- either substantial benefit or

11  the actual and necessary costs of preserving the estate.  I

12  believe that 503(b) addresses the expense to the debtor, not to

13  the entity making the application.  And so the question is is

14  the cost that is represented by this proposed administrative

15  claim, something that is an actual cost to preserving the

16  estate.  And we believe that the record before the Court

17  certainly with respect to the value of the DIP financing

18  ultimately obtained and the joint bidders' role in contributing

19  to that establishes that, in fact, the $2.75, we think is a

20  relatively modest number in terms of how that cost could be

21  assessed.

22       The other thing I just want to say because I think

23  it's an interesting issue to those of us who practice in this

24  area is the one about the need for advanced ruling on a breakup

25  fee as opposed to the scenario that we are now experiencing

1    where the debtor definitely had an incentive to continue to

2    encourage bidders to participate, made a judgment at the time

3    that it was willing to at least consider the prospect of

4    substantial contribution, not make a commitment, not ask the

5    Court to approve a commitment to them at that time but felt

6    that the situation was such that they could imagine themselves

7    in good faith supporting that as appropriate under the code as

8    part of their fiduciary duties.

9         As the facts turned out, the debtors had the

10   opportunity after the fact to assess the work that had been

11   done by the joint bidders and after some good faith exercise of

12   their fiduciary duties in negotiating the number, have come to

13   a number that they are willing to support.

14        And so I think that n some ways, Your Honor, the way

15   that this has played out certainly does stand, I think to the

16   benefit of the estate as a whole.

17        THE COURT:  Thank you.  Mr. Zipes?

18        MR. ZIPES:  I'm sorry, Your Honor, just very briefly.

19   Judge, very, very briefly.  I think it's clear that (b)(3) does

20   refer to creditor expenses rather than what the benefit might

21   be to the debtor.  And that's consistent with the -- although

22   Tyson was under (b)(1), that might be the easiest one to look

23   at.  This court reimbursed the creditor or the alleged party

24   that improved the value to the estate its actual expenses.

25   That's what this court looked at.

1          MR. KELSEY:  Good afternoon, Your Honor, Matt Kelsey

2     of Gibson Dunn & Crutcher on behalf of the DIP lenders.  We

3     actually represented the Fairlawn Group.

4          I just wanted to note for the record, we have no

5     objection to the Goldman/Brookfield application.  We were there

6     at the auction.  It was a robust process that did leave to a

7     DIP proposal. I think everyone's in agreement that was much

8     better than the original Ackman proposal.  And just in terms of

9     context, you know, there was-- the original Ackman proposal and

10    then, you know, parties negotiated and it appeared that they

11    had rested on an agreement on the first Fairlawn proposal.  And

12    then actually the day of the DIP hearing, parties were notified

13    that another Ackman proposal or Ackman II I think it's been

14    referred to in the papers was chosen or supported by the

15    debtors.  There was some disagreement as to whether or not that

16    was the best DIP proposal.

17         Given that what had happened in that week, where the -

18    - you know, there's been a back and forth, I think parties were

19    kind of fatigued and you know as a -- it seemed reasonable for

20    the debtors to consider and for the committee to commit to

21    support expense reimbursement or breakup fee for participants

22    in the auction to entice them to continue and to finish the

23    process up.  That's all I have.

24         THE COURT:  Thank you.  All right.  Based on the

25    record before me, I find that the fee, the stipulation which

1    the debtors had agreed to and the committee supports in effect,

2    carries out a position the debtors took at the time of the

3    active and highly beneficial negotiation and auction relating

4    to the DIP loan to consider seriously a breakup fee.

5         I understand that the amounts were not set at the time

6    and the debtors did not fully commit themselves but I think

7    it's very important that a debtor be able, where appropriate,

8    to follow through on a commitment that is made during the

9    course of the bankruptcy case for an important and ultimately

10   beneficial purpose.

11        The key factor here is not only the debtors'

12   commitment to consider an appropriate fee but the debtors'

13   ultimate decision to support one in a specific amount with the

14   consent of the creditors' committee and no objection of any

15   actual creditor.

16        In In re: O'Brien Environmental Energy, Inc. 181 F.3d

17   527 (3rd Cir. 1999) the circuit court considered at length a

18   request for payment as an administrative expense of a breakup

19   fee that the debtors had not agreed to.  And that the

20   bankruptcy court had not approved at the outset of the bidding

21   process and that the bankruptcy court ultimately refused to

22   approve.

23        But the analysis of the Court indicates that such a

24   fee certainly could be an appropriate administrative expense

25   under 503(b)(1)(A) and the Court cited and quoted In re:

1   Mammoth Mart, Inc. 536 F.2d 950, 954 (1st Cir. 1976) as setting

2   forth the characteristics of a administrative expense.

3            "The debt must arrive from a transaction with the

4   debtor-in-possession and consideration supporting the

5   claimant's right to payment (must be) beneficial to the debtor-

6   in-possession in the operation of the business."  The Second

7   Circuit also follows the Mammoth Mart definition.

8            The record on this application which includes the

9   debtor's consent indicates that this was a transaction with the

10  debtor-in-possession.  There's no dispute about that.  The

11  initial agreement to consider a fee and then to carry forth and

12  enter into an agreement based thereon resulted in a benefit to

13  the debtor in the operation of the business.

14           So I do not believe by approving this as an

15  administrative expense, I am opening the floodgates.  I've

16  looked in the first instance to the debtor to make the decision

17  on what's an appropriate administrative expense and what isn't.

18  And I certainly don't look on the debtor as being in the

19  business of giving away funds unnecessarily.  But under all of

20  the circumstances, it seems to me that this is an appropriate

21  payment as an administrative expense.  There's no question of

22  the debtors cash position and it might as well be handled now,

23  rather than at a later stage.  I think we need to handle what

24  we can and then move on.

25           I do not have to get into the question of whether or

1    not the claimants are both creditors whether they have shown a

2    substantial contribution.  But as Mr. Zipes knows, my views of

3    substantial contribution are a little broader than the US

4    Trustee's generally.  And I don't mean to indicate that I don't

5    think that the movant would be unable to show that their

6    participation in the process constituted a substantial

7    contribution.  But I don't think we need to reach that issue.

8              I don't know if I have an appropriate order but --

9              MR. ZIPES:  Your Honor, can I just --

10             THE COURT:  Yes.

11             MR. ZIPES:  Greg Zipes again.  Can I just get

12   clarification?  Are you approving the stipulation of the

13   parties?

14             THE COURT:  Yes, I am approving the stipulation.

15             MR. ZIPES:  And not necessarily the motion, the 503(b)

16   motion.  How is this -- what is the decision?

17             THE COURT:  The decision is to approve the stipulation

18   as an actual and necessary expense of administration under

19   503(b)(1).  Now do you want an opportunity to put in additional

20   papers on that issue?  I don't think we need any more argument

21   but if you want, I will hold off entering and I will reconsider

22   if you want to brief that issue but you will have to deal with

23   O'Brien and you'll have to deal with my decision -- well if

24   you -- which you have discussed in In re: Michael Tyson 2005

25   Bankruptcy Lexis 3230.

1      MR. ZIPES:  Can we ask for that additional time but we

2  will contact chambers and if the parties verify --

3      THE COURT:  If you need it -- all right, you can

4  certainly consider it.

5      MS. BUELL:  We can just --

6      THE COURT:  But I --

7      MS. BUELL:  We'll find out in the next couple of days.

8      THE COURT:  All right.

9      MR. ZIPES:  I think that's right.

10     MS. BUELL:  Thank you, Your Honor.

11     THE COURT:  I certainly don't want to blindside you,

12  which I obviously haven't done because you read the Tyson and

13  you read the O'Brien cases.

14     MR. ZIPES:  Your Honor, we -- okay.  Thank you, Your

15  Honor.

16     THE COURT:  Mr. Holtzer?

17     MR. HOLTZER:  Your Honor, we have two items left on

18  the agenda.  I think that we might benefit from a chambers

19  conference on those last two items.

20     THE COURT:  All right.

21     MR. HOLTZER:  We can do that at the lunch break or

22  immediately before it.

23     THE COURT:  Why don't we -- we can do that right now.

24     MR. HOLTZER:  Okay, Your Honor.  Should we schedule a

25  time to come back after lunch to finish the --

1          THE COURT:  Do you want to break before the conference

2     or shall we take the conference right now?

3          MR. HOLTZER:  No, we can do it now, Your Honor.

4          THE COURT:  All right.  Let's take it now.  Thank you.

5          (Recess from 1:16 p.m. to 2:06 p.m.)

6          THE CLERK:  All rise.

7          THE COURT:  Please be seated.  We're back on the

8     record.  Mr. Holtzer?

9          MR. HOLTZER:  We are, Your Honor.  Just for the

10    record, I believe the phone has been turned off due to some

11    interference.

12         THE COURT:  I don't know whether anybody was still on

13    it but if anybody has an inquiry, they certainly can contact a

14    number of people here.

15         MR. HOLTZER:  Yes, Your Honor.  After further

16    discussions, Your Honor, and I believe well need to go on the

17    record briefly with respect to the Houlihan application which I

18    will cede the podium to Mr. Stamer on in just a moment in

19    regards to their monthly fees, we've decided that the best

20    approach with respect to the application for both Miller

21    Buckfire and for Houlihan is to put those applications over

22    until the hearing on August 13, which is currently a date we

23    have.  It's a 10 a.m. hearing, I will note.

24         And we will submit to the Court, modified letters in

25    both instances which include all the changes to date so that

1  they're reflected in one letter and we will come to court on

2  that date prepared to make a detailed record.

3         In the interim, we will have discussions with Mr.

4  Jerome who has an objection to both applications still pending

5  in an effort to resolve that objection.  I understand from Mr.

6  Jerome that he is not objecting to the finance portion of the

7  Miller Buckfire only, if you will, the completion fee.  And so

8  we'll focus on that.

9         THE COURT:  All right.  I think it would be very

10  helpful to have the agreements or the revised agreements.

11  Obviously you'll provide them to Mr. Jerome, Mr. Zipes, and

12  anybody else here or anybody else in the creditor body who or

13  shareholder body who wants them.  And we'll take the matter up

14  on the 13th.  If that's not a convenient date for an

15  evidentiary hearing if we need one, I can give you a date next

16  week or -- I'm sure we could determine an appropriate date.

17         And we need to then go back on the record -- well,

18  we're on the record but we need to deal with, as I understand

19  it, the fact that we never did retain Houlihan at all, putting

20  aside completion fee or the success fee, we have the Houlihan

21  application to be retained on a monthly fee that certainly

22  should be determined.

23         MR. STAMER:  That is correct, Your Honor.  Again, for

24  the record, Michael Stamer from Akin Gump on behalf of the

25  official committee.

1    As discussed with the parties in chambers and I

2  believe there are no objections, we would seek to have Houlihan

3  retained on an interim basis and have their monthly, the

4  originally proposed monthly which is $250,000 a month, during

5  the interim period be payable in accordance with the ordinary

6  procedures, the case management procedures.  It is a similar

7  arrangement to the one that has been reached with respect to

8  Miler Buckfire.  And, Your Honor, we would propose to circulate

9  a proposed form of order to the parties and then have one

10  submitted to chambers upon review by the parties.

11    THE COURT:  Does anyone wish to be heard?  All right.

12  Then I will enter an appropriate order.

13    MR. STAMER:  Anything else today?

14    MR. HOLTZER:  No, thank you, Your Honor.  Thank you

15  for all of your time today.

16    THE COURT:  All right.  I need some orders but I don't

17  need them now.  If you have any, you can certainly hand them up

18  but I think probably most of them will require some revisions.

19    MR. HOLTZER:  Yes, Your Honor.

20    THE COURT:  Okay.

21    MR. HOLTZER:  Before I'll meet with your law clerk.

22    (Proceedings concluded at 2:06 PM)

23

24

25

1

2                    I N D E X

3

4                         RULINGS

5                              Page      Line

6  Motion of plaintiffs        17        21

7  for an order extending

8  the automatic stay granted

9  Motion by debtors           64        21

10  requesting extension

11  of exclusive period for

12  filing a Chapter 11

13  plan and solicitation

14  of acceptances thereto granted

15  Motion of Mott Inc. for     71        10

16  an order granting relief

17  from automatic stay denied

18  Motion by Goldman Sachs     94        14

19  Mortgage Company and

20  Brookfield Financial for

21  allowance and payment of

22  a Chapter 11 administrative

23  expense claim against the estate,

24  stipulation granted

25

C E R T I F I C A T I O N

I, Laurie Ann Sherby, certify that the foregoing transcript is

a true and accurate record of the proceedings.

_____

Laurie Ann Sherby

Veritext LLC

200 Old Country Road

Suite 580

Mineola, NY 11501

Date:  July 30, 2009