**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
In re:

GENERAL GROWTH PROPERTIES, INC., *et al.*,

                                Debtors.

------------------------------------------------------------------------x

Chapter 11

Case No. 09-11977 (ALG)

(Jointly Administered)

## MEMORANDUM OF OPINION

A P P E A R A N C E S :

KIRKLAND & ELLIS LLP
Co-Counsel for the Jointly Represented Debtors
  By:  Richard C. Godfrey, Esq.
        James H.M. Sprayregen, Esq.
        Anup Sathy, Esq.
        Sallie G. Smylie, Esq.
        Gabor Balassa, Esq.
300 North LaSalle Street
Chicago, Illinois 60654

WEIL, GOTSHAL & MANGES LLP
Co-Counsel for the Jointly Represented Debtors
  By:  Marcia L. Goldstein, Esq.
        Gary T. Holtzer, Esq.
        Adam P. Strochak, Esq.
767 Fifth Avenue
New York, New York 10153

AKIN GUMP STRAUSS HAUER & FELD LLP
Counsel for the Official Committee of Unsecured Creditors
  By:  Michael S. Stamer, Esq.
        Abid Qureshi, Esq.
        Sean E. O'Donnell, Esq.
One Bryant Park
New York, New York 10036

  By:  James R. Savin, Esq.
1333 New Hampshire, N.W.
Washington, D.C. 20036

KILPATRICK STOCKTON LLP
Counsel for Certain Lenders by ING Clarion
 Capital Loan Services LLC as Special Servicer
 By:  Todd C. Meyers, Esq.
      Susan A. Cahoon, Esq.
      Alfred S. Lurey, Esq.
      Rex R. Veal, Esq.
      Mark A. Fink, Esq.
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530

 By:  Jonathan E. Polonsky, Esq.
31 West 52nd Street, 14th Floor
New York, New York 10019

ZEICHNER ELLMAN & KRAUSE LLP
Counsel for Wells Fargo Bank, N.A., as Trustee for the
 Registered Holders of Banc of America Commercial
 Mortgage, Inc., Commercial Mortgage Pass-Through
 Certificates, Series 2006 2; Wells Fargo Bank, N.A., as
 Trustee for the Registered Holders of Credit Suisse First
 Boston Mortgage Securities Corp., Commercial Mortgage
 Pass-Through Certificates, Series 2006 C1 and certain
 noteholders, all acting by and through Helios AMC, LLC
 in its capacity as Special Servicer
 By:  Stephen F. Ellman, Esq.
      Nathan Schwed, Esq.
      Jantra Van Roy, Esq.
      Robert Guttman, Esq.
575 Lexington Avenue
New York, New York 10022

GREENBERG TRAURIG, LLP
Counsel for Metropolitan Life Insurance Company and
 KBC Bank N.V.
 By:  Joseph Davis, Esq.
      Bruce R. Zirinsky, Esq.
      Nancy A. Mitchell, Esq.
      Howard J. Berman, Esq.
      Gary D. Ticoll, Esq.
200 Park Avenue
New York, New York 10166

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are five motions (the "Motions") to dismiss certain of the Chapter

11 cases filed by one or more debtors (the "Subject Debtors") that are owned directly or

indirectly by General Growth Properties, Inc. ("GGP").  One of the Motions was filed by

ING Clarion Capital Loan Services LLC ("ING Clarion"),[1] as special servicer to certain

secured lenders;[2] one of the Motions was filed by Helios AMC, LLC ("Helios"),[3] as special

servicer to other secured lenders;[4] and three of the Motions were filed by Metropolitan Life

Insurance Company and KBC Bank N.V. (together, "Metlife", and together with ING

[1] ING Clarion seeks dismissal of the cases of the following Subject Debtors: Bakersfield Mall LLC
(Case No. 09-12062); RASCAP Realty, Ltd. (Case No. 09-11967); Visalia Mall, L.L.C. (Case No. 09-
12307); GGP-Tucson Mall L.L.C. (Case No. 09-12155); Lancaster Trust (Case No. 09-12473); HO
Retail Properties II Limited Partnership (Case No. 09-11997); RS Properties Inc. (09-12265);
Stonestown Shopping Center L.P. (Case No. 09-12283); and Fashion Place, LLC (Case No. 09-12109)
(collectively, the "ING Clarion Debtors").

[2] ING Clarion is special servicer to Wells Fargo Bank, N.A., as Trustee for the Certificate holders of
Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass- Through
Certificates, Series 2005-C6; Bank of America, N.A., successor trustee to Wells Fargo Bank, N.A.,
successor-by-merger to Wells Fargo Bank Minnesota, N.A., as Trustee for the Certificate holders of
Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series
2003-C8; U.S. Bank National Association, successor trustee to Wells Fargo Bank, N.A., successor-by-
merger to Wells Fargo Bank Minnesota, N.A., as Trustee for the Certificate holders of Wachovia Bank
Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2003-C9; EHY
Sub Asset LLC; Metlife Bank, N.A.; Bank of America, N.A., successor trustee to Wells Fargo Bank,
N.A., successor-by-merger to Wells Fargo Bank Minnesota, N.A., as Trustee for the Certificate holders
of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates,
Series 2003-C7; Bank of America, National Association, as successor-by-merger to LaSalle Bank
National Association, as Trustee for the Certificate holders of ML-CFC Commercial Mortgage Trust
2006-3, Commercial Mortgage Pass-Through Certificates, Series 2006-3; Teachers Insurance and
Annuity Association of America; Bank of America, National Association, as successor-by-merger to
LaSalle Bank National Association, as Trustee for the Certificate holders of LB-UBS Commercial
Mortgage Trust 2003-C7, Commercial Mortgage Pass-Through Certificates, Series 2003-C7; and Bank
of America, N.A., successor-by-merger to LaSalle Bank National Association, as Trustee for the
Certificate holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-
Through Certificates, Series 2004-C1.

[3] Helios seeks dismissal of the cases of the following Subject Debtors: Faneuil Hall Marketplace, LLC
(Case No. 09-12109) and Saint Louis Galleria L.L.C. (Case No. 09-12266) (together, the "Helios
Debtors").

[4] Helios is special servicer to Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Banc
of America Commercial Mortgage, Inc., Commercial Mortgage Pass-Through Certificates, Series 2006
2; Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2006 C1 and
certain noteholders.

Clarion and Helios, the "Movants").[5] Each of the Movants is a secured lender with a loan to one of the Subject Debtors. The primary ground on which dismissal is sought is that the Subject Debtors' cases were filed in bad faith. It is also contended that one of the Subject Debtors was ineligible to file. The above-captioned debtors (the "Debtors") and the Official Committee of Unsecured Creditors appointed in these cases (the "Committee") object to the Motions. Based on the following findings of fact and conclusions of law, the Motions are denied.

## BACKGROUND

GGP, one of the Debtors, is a publicly-traded real estate investment trust ("REIT") and the ultimate parent of approximately 750 wholly-owned Debtor and non-Debtor subsidiaries, joint venture subsidiaries and affiliates (collectively, the "GGP Group" or the "Company").[6] The GGP Group's primary business is shopping center ownership and management; the Company owns or manages over 200 shopping centers in 44 states across the country. These include joint venture interests in approximately 50 properties, along with non-controlling interests in several international joint ventures. The GGP Group also owns several commercial office buildings and five master-planned communities,[7] although these

---

[5] Metropolitan Life Insurance Company seeks dismissal of the cases of the following Subject Debtors: Providence Place Holdings LLC (Case No. 09-12233); Rouse Providence LLC (09-12252); Howard Hughes Properties, Limited Partnership (Case No. 09-12171); 10000 West Charleston Boulevard LLC (Case No. 09-12040); 9901-9921 Covington Cross, LLC (Case No. 09-12051); and 1120/1140 Town Center Drive, LLC (Case No. 09-12042).

   Both Metropolitan Life Insurance Company and KBC Bank N.V. seek dismissal of the cases of the following Subject Debtors: White Marsh Mall LLC (Case No. 09-12317); White Marsh Mall Associates (Case No. 09-12001); White Marsh Phase II Associates (Case No. 09-12002); and White Marsh General Partnership (Case No. 09-12000) (collectively, the "Metropolitan Debtors").

[6] As further discussed below, 388 of the entities in the GGP Group have filed for Chapter 11 protection: 360 filed on April 16, 2009 and an additional 28 filed on April 22, 2009. For purposes of convenience, April 16th is used as the "Petition Date" herein.

[7] The GGP Group's principal master planned communities, which are large-scale, long-term community development projects, are located in Columbia, Maryland; Summerlin, Nevada; and Houston, Texas. Revenue is generated from these properties through the sale of improved land to homebuilders and commercial developers. (See Declaration of James A. Mesterharm Pursuant to

4

businesses account for a smaller share of its operations.  The Company reported consolidated

revenue of $3.4 billion in 2008.[8]  The GGP Group's properties are managed from its

Chicago, Illinois headquarters, and the Company directly employs approximately 3,700

people, exclusive of those employed at the various property sites.

## I.  Corporate Structure

The corporate structure of the GGP Group is extraordinarily complex, and it is

necessary to provide only a broad outline for purposes of this opinion.  GGP is the general

partner of GGP Limited Partnership ("GGP LP"), the company through which the Group's

business is primarily conducted.[9]  GGP LP in turn controls, directly or indirectly, GGPLP,

L.L.C., The Rouse Company LP ("TRCLP"), and General Growth Management, Inc.

("GGMI").[10]  GGPLP L.L.C., TRCLP and GGMI in turn directly or indirectly control

hundreds of individual project-level subsidiary entities, which directly or indirectly own the

individual properties.  The Company takes a nationwide, integrated approach to the

development, operation and management of its properties, offering centralized leasing,

marketing, management, cash management, property maintenance and construction

management.[11]

---

Local Bankruptcy Rule 1007-2 In Support of First Day Motions, dated April 16, 2009, ¶ 24 (ECF Docket  No. 13) (the "Mesterharm Declaration").  All parts of the Mesterharm Declaration that are used in this opinion were incorporated by reference into the Supplemental Declaration of James A. Mesterharm in Support of Debtors' Opposition to the Motions to Dismiss, dated June 16, 2009 (the "Supplemental Mesterharm Declaration").  The Supplemental Mesterharm Declaration was admitted into evidence, subject to cross-examination, as his direct testimony.

[8] Revenues from the GGP Group's shopping center operations are generated through rents, property management services performed by GGMI (defined below), strategic partnerships, advertising, sponsorship, vending machines, parking services and the sale of gift cards.  (See Mesterharm Decl., April 16, 2009, ¶ 23.)

[9] GGP owns 96% of GGP LP, with outside parties holding the remaining 4%.

[10] GGP LP, GGPLP, L.L.C. and TRCLP are each Debtors, while GGMI is a non-Debtor affiliate that provides management services to the GGP Group, the joint ventures and other unrelated third parties.

[11] "Through this centralized management process, GGP LP provides national support with respect to substantially all aspects of business operations.  Accounting, business development, construction, contracting, design, finance, forecasting, human resources and employee benefits, insurance and risk

## II. Capital Structure

As of December 31, 2008, the GGP Group reported $29.6 billion in assets and $27.3 billion in liabilities.[12]  At that time, approximately $24.85 billion of its liabilities accounted for the aggregate consolidated outstanding indebtedness of the GGP Group.  Of this, approximately $18.27 billion constituted debt of the project-level Debtors secured by the respective properties, $1.83 billion of which was secured by the properties of the Subject Debtors.[13]  The remaining $6.58 billion of unsecured debt is discussed below.

### A. Secured Debt

The GGP Group's secured debt consists primarily of mortgage and so-called mezzanine debt.  The mortgage debt is secured by mortgages on over 100 properties, each of which is typically owned by a separate corporate entity.  The mortgage debt can in turn be categorized as conventional or as debt further securitized in the commercial mortgage-backed securities market.

### (i) Conventional Mortgage Debt

The conventional mortgage debt is illustrated, on this record, by three of the mortgages held by Metlife.  Each of the three mortgages was an obligation of a separate GGP subsidiary.  There is no dispute that some of the Subject Debtors that issued the Metlife

---

management, property services, marketing, leasing, legal, tax, treasury, cash management and other services are provided or administered centrally for all properties under the GGP Group's ownership and management.  Only the most basic building operational needs are addressed at the individual property level." (Mesterharm Decl., April 16, 2009, ¶ 17.)

[12] Liabilities include the GGP Group's share of indebtedness of its joint ventures.

[13] The total debt of the ING Clarion and Helios Debtors was $1,264,938,617.  (See Declaration of Thomas H. Nolan, Jr., dated June 16, 2009, ¶ 48.) (the "Nolan Declaration").  The total debt of the Metlife Debtors was $568,090,030.  (Nolan. Decl., June 23, 2009, ¶ 17.)  The Nolan Declaration and the Supplemental Declaration of Thomas H. Nolan, Jr., dated June 23, 2009 (the "Supplemental Nolan Declaration") were admitted into evidence, subject to cross-examination, as his direct testimony.

mortgages were intended to function as special purpose entities ("SPE").[14]  SPE's typically

contain restrictions in their loan documentation and operating agreements that require them

to maintain their separate existence and to limit their debt to the mortgages and any

incidental debts, such as trade payables or the costs of operation.  (See, e.g., Metlife MTD

White Marsh Debtors ¶ 12, ECF Doc. No. 631.)[15]  Metlife asserts, without substantial

contradiction from the Debtors, that SPE's are structured in this manner to protect the

interests of their secured creditors by ensuring that "the operations of the borrower [are]

isolated from business affairs of the borrower's affiliates and parent so that the financing of

each loan stands alone on its own merits, creditworthiness and value . . . ."  (Metlife MTD

Providence Debtors, ¶ 14., ECF Docket No. 629.)  In addition to limitations on indebtedness,

the SPE's organizational documents usually contain prohibitions on consolidation and

liquidation, restrictions on mergers and asset sales, prohibitions on amendments to the

organizational and transaction documents, and separateness covenants.  Standard and Poor's,

Legal Criteria for Structured Finance Transactions (April 2002).[16]

 The typical SPE documentation also often contains an obligation to retain one or

more independent directors (for a corporation) or managers (for an LLC).  The Metlife loans

did not contain any such requirement, but for example, the Amended and Restated Operating

Agreements of both Faneuil Hall Marketplace, LLC ("FHM") and Saint Louis Galleria

---

[14] Howard Hughes Properties, Limited Partnership, 10000 West Charleston Boulevard LLC, 9901-9921 Covington Cross, LLC and 1120/1140 Town Center Drive, LLC are not identified in the relevant Metlife Motion as being SPE's.  The terminology is not entirely clear, and Metlife does not suggest that the Court dismiss only the motions of the SPE's.

[15] Sometimes referred to as a "single-purpose entity" or "bankruptcy remote entity," an SPE has been described by one commentator as "an entity, formed concurrently with, or immediately prior to, the closing of a financing transaction, one purpose of which is to isolate the financial assets from the potential bankruptcy estate of the original entity, the borrower or originator."  David B. Stratton, *Special-Purpose Entities and Authority to File Bankruptcy*, 23-2 Am. Bankr. Inst. J. 36 (March 2004).  "Bankruptcy-remote structures are devices that reduce the risk that a borrower will file bankruptcy or, if bankruptcy is filed, ensure the creditor procedural advantages in the proceedings."  Michael T. Madison, *et. al.*, The Law of Real Estate Financing, § 13:38 (2008).

[16] *See, e.g.,* Article XIII of the Operating Agreements of the Helios Debtors.  (Joint Trial Ex. 34, 35.)

L.L.C. ("SLG"), in a section entitled "Provisions Relating to Financing," mandate the appointment of "at least two (2) duly appointed Managers (each an 'Independent Manager') of the Company..."  (Joint Trial Ex. 34, 35, Art. XIII(o)).  The Company's view of the independent directors and managers is that they were meant to be unaffiliated with the Group and its management.  (See Hr'g Tr. 227: 8-14, June 17, 2009.)  It appears that some of the secured lenders believed they were meant to be devoted to the interests of the secured creditors, as asserted by a representative of Helios.  (See Altman Test. 159:7-13, June 5, 2009.)  In any event, this aspect of the loan documentation is discussed further below.

Although each of the mortgage loans was typically secured by a separate property owned by an individual debtor, many of the loans were guaranteed by other GGP entities. One of the Metlife loans, for example, was guaranteed.  Moreover, many loans were advanced by one lender to multiple Debtors.  For example, in July 2008, the GGP Group received a loan from several lenders led by Eurohypo AG, New York Branch, as administrative agent, the outstanding principal of which totaled $1.51 billion as of the Petition Date (the "2008 Facility").  GGP, GGP LP and GGPLP, L.L.C. are guarantors, and 24 Debtor subsidiaries are borrowers under the 2008 Facility, which is secured by mortgages and deeds of trust on 24 properties.  The loan was set to mature on July 11, 2011, but was in default as of the Petition Date due to a cross-default provision triggered by the default of another multi-Debtor loan called the 2006 Facility.  One of the last financings the Debtors were able to obtain before bankruptcy, in December 2008, was a group of eight non-recourse

mortgage loans with Teachers Insurance and Annuity Association of America, in the total amount of $896 million, and collateralized by eight properties (the "Teachers Loans").[17]

The typical mortgage loan for the GGP Group members had a three to seven-year term, with low amortization and a large balloon payment at the end. Some of the mortgage loans had a much longer nominal maturity date, but these also had an anticipated repayment date ("ARD"), at which point the loan became "hyper-amortized," even if the maturity date itself was as much as thirty years in the future. Consequences of failure to repay or refinance the loan at the ARD typically include a steep increase in interest rate, a requirement that cash be kept at the project-level, with excess cash flow being applied to principal, and a requirement that certain expenditures be submitted to the lender for its approval.[18] The Debtors viewed the ARD as equivalent to maturity and the consequences of a loan becoming hyper-amortized as equivalent to default, and historically sought to refinance such loans so as to avoid hyper-amortization.

### (ii) Commercial Mortgage-Backed Securities

Many of the GGP Group's mortgage loans were financed in the commercial mortgage-backed securities ("CMBS") market, represented on these Motions by each of the loans serviced by ING Clarion and Helios, as special servicers. In a typical CMBS

---

[17] The borrowers under the Teachers Loans are all non-Debtor entities, and the maturity dates range from five to seven years, with an option for the lender to extend maturity for an additional three years. The Teachers Loans were not in default as of the Petition Date.

[18] Examples of the consequences of an ARD can be seen with respect to three of the ING Clarion loans. The ING Clarion loan on the GGP-Tucson Mall L.L.C. reached its ARD on October 13, 2008. The Debtors were unable to refinance or repay the loan and as a result a cash trap was triggered and the interest rate increased from 5% to 9.26%. While the lender agreed to defer collecting additional interest in cash and to add the obligation to the current principal balance of $118,000,000, the cash trap required application of any excess cash to the outstanding principal and interest until the loan was paid in full. (Supp. Mesterharm Decl., June 16, 2009, ¶ 7.) For the Valley Plaza Mall, if the loan goes into hyper-amortization, the regular interest rate of 3.9% is increased to the greater of the regular interest rate plus 5% or the Treasury Rate plus 5%. The outstanding principal balance of the loan is currently $96,000,000. The same increase is true of the Visalia Mall, with an ARD of January 11, 2010 and a regular interest rate of 3.77%. The outstanding principal balance of the loan is currently $42,000,000. (Id. at ¶¶ 4-5.)

transaction, multiple mortgages are sold to a trust qualified as a real estate mortgage conduit ("REMIC") for tax purposes. The REMIC in turn sells certificates entitling the holders to payments from principal and interest on this large pool of mortgages. (Mesterharm Decl., April 16, 2009, ¶ 43.) The holders of the CMBS securities typically have different rights to the income stream and bear different interest rates; they may or may not have different control rights. *See generally* Talcott J. Franklin and Thomas F. Nealon III, Mortgage and Asset Backed Securities Litigation Handbook § 1.6 (April 2008).

The REMIC is managed by a master servicer that handles day-to-day loan administration functions and services the loans when they are not in default. A special servicer takes over management of the REMIC upon a transfer of authority. Such transfers take place under certain limited circumstances, including: (i) a borrower's failure to make a scheduled principal and interest payment, unless cured within 60 days, (ii) a borrower's bankruptcy or insolvency, (iii) a borrower's failure to make a balloon payment upon maturity, or (iv) a determination by the master servicer that a material and adverse default under the loan is imminent and unlikely to be cured within 60 days.[19] While a master servicer is able to grant routine waivers and consents, it cannot agree to an alteration of the material terms of a loan or mortgage. A special servicer has the ability to agree to modify the loan once authority has been transferred, but often only with the consent of the holders of the CMBS securities, or in some cases the holders of certain levels of the debt.

### (iii)  Mezzanine Debt

The Debtors are also obligors on so-called mezzanine loans from at least four lenders, of which one, Metlife, is a Movant on these motions to dismiss. In these transactions

---

[19] *See, e.g.,* the definition of "Servicing Transfer Event" contained in Banc of America Commercial Mortgage, Inc., Series 2006-2 Pooling and Servicing Agreement, which relates to the Faneuil Hall Marketplace (Joint Trial Ex. 22 at 065.)

generally, and in the Metlife mezzanine loan in particular, the lender is the holder of a

mortgage on the property held by one of the Subject Debtors.  The lender makes a further

loan, ordinarily at a higher interest rate, to a single-purpose entity formed to hold the equity

interest in the mortgage-level borrower.  The loan to the single-purpose entity is secured only

by the stock or other equity interest of the mortgage level borrower.  The single-purpose

entity typically has no other debt and its business is limited to its equity interest in the

property-owning subsidiary.

### B. Unsecured Debt

In addition to secured debt, members of the GGP Group were obligated on

approximately $6.58 billion of unsecured debt as of the Petition Date.  Other than trade debt

incurred by some of the project-level Debtors, most of this debt was an obligation of one or

more of the holding companies, generally at the top levels of the corporate chart.  The

principal components of this debt were as follows:

Under an indenture dated April 16, 2007, GGP LP issued $1.55 billion of 3.98%

Exchangeable Senior Notes (the "GGP LP Notes").  The notes are senior, unsecured

obligations of GGP LP and are not guaranteed by any entity within the GGP Group.  The

outstanding principal was $1.55 billion as of the Petition Date, with interest payable semi-

annually in arrears.[20]

Under an indenture dated February 24, 1995, TRCLP issued five series of public

bonds (collectively, the "1995 Rouse Bonds"), which were unsecured obligations of TRCLP,

not guaranteed by any other entity in the GGP Group.  Four of the five series remain

outstanding.  Additionally, under an indenture dated May 5, 2006, TRCLP and TRC Co-

---

[20] Upon the satisfaction of certain conditions, noteholders had the right to exchange the GGP LP Notes
for GGP common stock or a combination of cash and common stock, at GGP LP's option.

Issuer, Inc., issued one series of private placement bonds, in the face amount of $800 million (the "2006 Rouse Bonds"). The 2006 Rouse Bonds are unsecured obligations of TRCLP and TRC Co-Issuer, Inc. and are not guaranteed by any other entity in the GGP Group. The total aggregate outstanding amount due on the Rouse Bonds as of the Petition Date was $2.245 billion. TRCLP was unable to pay the outstanding balance of one series of the Rouse Bonds upon maturity in March 2009 and received a notice of default. This default in turn triggered defaults for each of the other series of Rouse Bonds.

In February 2006, GGP, GGP LP and GGPLP, L.L.C. became borrowers under a term and revolving credit facility with Eurpohypo AG, New York Branch serving as administrative agent (the "2006 Facility"). The 2006 Facility is guaranteed by Rouse L.L.C., with GGP LP pledging its equity interest in GGPLP, L.L.C., TRCLP and Rouse LLC and Rouse LLC pledging its general partnership interest in TRCLP to secure the obligations under the 2006 Facility. Each of the borrower, guarantor and pledgor entities is a Debtor, the current outstanding balance on the term loan is approximately $1.99 billion, and the outstanding balance on the revolving loan is $590 million. The facility was not scheduled to mature until February 24, 2010, but fell into default in late 2008 through a cross-default provision triggered by the default of one of the GGP Group's property-level mortgage loans.

On February 24, 2006, GGP LP issued $206.2 million of junior subordinated notes to GGP Capital Trust I ("the Junior Subordinated Notes"). GGP Capital Trust I, a non-Debtor entity, subsequently issued $200 million of trust preferred securities ("TRUPS") to outside investors and $6.2 million of common equity to GGP LP. The Junior Subordinated Notes are unsecured obligations of GGP LP, one of the Debtors, and are not guaranteed by any entities within the GGP Group. The current outstanding principal amount on the notes is $206.2

12

million and the notes mature on April 30, 2036.  The Junior Subordinated Notes are subordinate in payment to all indebtedness of GGP LP, other than trade debt.

### C.  **Other Debt**

The GGP Group had entered into five interest-rate swap agreements as of December 31, 2008.  The total notional amount of the agreements was $1.08 billion, with an average fixed pay rate of 3.38% and an average variable receive rate of LIBOR.  The Company made April 2009 payments to only one of the counterparties, and two of the swaps have been terminated.  Additionally, as of December 31, 2008, the Company also had outstanding letters of credit and surety bonds in the amount of $286.2 million.

With respect to the Company's joint venture interests, GGP LP is the promissor on a note in the principal amount of $245 million, payable to the Comptroller of the State of New York, as trustee for the New York State Common Retirement Fund, and due on February 28, 2013.  It is secured by a pledge of GGP LP's member interest in the GGP/Homart II L.L.C. joint venture.  Additionally GGP LP is the promissor on a note in the amount of $93,712,500, due on December 1, 2012, payable to Ivanhoe Capital, LP, and secured by a pledge of GGP LP's shares in the GGP Ivanhoe, Inc. joint venture.

### D.  **Equity**

GGP had 312,352,392 shares of common stock outstanding as of March 17, 2009.[21] GGP is required, as a REIT, to distribute at least 90% of its taxable income and to distribute, or pay tax on, certain of its capital gains.  During the first three quarters of 2008, GGP distributed $476.6 million, or $1.50 per share, to its stockholders and GGP LP unitholders, but it suspended its quarterly dividends as of the last quarter of 2008.

---

[21] This includes 42,350,000 common partnership units of GGP LP, which were converted into an equal number of shares of GGP common stock on January 2, 2009.

### III.  **The Events of 2008-2009**

Historically, the capital needs of the GGP Group were satisfied through mortgage loans obtained from banks, insurance companies and, increasingly, the CMBS market.  As noted above, these loans were generally secured by the shopping center properties and structured with three to seven-year maturities, low amortization rates and balloon payments due at maturity.  (Nolan Decl., June 16, 2009, ¶ 9.)  There is no dispute that the Company's business plan was based on the premise that it would be able to refinance the debt.  The testimony of Thomas Nolan, the President and Chief Operating Officer of GGP, is that "[t]his approach was standard in the industry, so for many years, it has been rare to see commercial real estate financed with longer-term mortgages that would fully amortize."  (Nolan Decl., June 16, 2009, ¶ 9.)

However, in the latter half of 2008, the crisis in the credit markets spread to commercial real estate finance, most notably the CMBS market.  This in turn affected the ability of the GGP Group to refinance its maturing debt on commercially acceptable terms. (Mesterharm Decl., April 16, 2009, ¶ 10.)  The GGP Group attempted to refinance its maturing project-level debt or obtain new financing, contacting dozens of banks, insurance companies and pension funds.  It also contacted national and regional brokers and retained the investment banking firms of Goldman Sachs and Morgan Stanley to attempt to securitize and syndicate the loans.  Despite these efforts, the only refinancing the GGP Group was able to obtain during this period was with Teachers Insurance, which is described above.

The GGP parent entities also attempted to find refinancing for their own mostly unsecured debt, but efforts to raise debt or equity capital were similarly unsuccessful. (Nolan. Decl., June 16, 2009, ¶ 20.)  GGP hired an investment banking firm that specializes

in the restructuring of debt, Miller Buckfire & Co., LLC ("Miller Buckfire"), to attempt to renegotiate the debt, but the lenders were unwilling to consent to additional forbearance, which in turn led to defaults and cross-defaults. Furthermore, the GGP Group was generally unable to sell any of its assets to generate the cash necessary to pay down its debts, as potential purchasers were themselves unable to acquire financing.

The Debtors claim that the CMBS structure caused additional roadblocks to the Company's attempts to refinance its debt or even talk to its lenders. In January 2009, the GGP Group contacted the master servicers of those loans that were set to mature by January 2010, seeking to communicate with the special servicers regarding renegotiation of the loan terms. The response from the master servicers was that the Company could not communicate with the special servicers until the loans were transferred, and that the loans had to be much closer to maturity to be transferred. The GGP Group subsequently attempted to communicate with the master servicers regarding only those loans set to mature through May 2009, but received the same response. The Debtors then attempted to contact the special servicers directly, only to be referred back to the master servicers. Finally, in February 2009, the GGP Group attempted to call a "summit" of special servicers to discuss those loans due to mature through January 2010, but only one servicer was willing to attend and the meeting was cancelled. (Nolan. Decl., June 16, 2009, ¶¶ 18-19.)

Unable to refinance, the Company began to tap more heavily into its operating cash flow to pay both its regular expenses and financial obligations. This in turn left the Company short of cash to meet prior commitments towards development and redevelopment costs. As additional mortgage loans began to mature, the Company's liquidity problems grew worse. For example, two large loans from Deutsche Bank matured on November 28, 2008. In return

for brief extensions of the maturity date, Deutsche Bank required the Debtors to increase the rate of interest 3.75%, from LIBOR plus 225 basis points to LIBOR plus 600 basis points, 75 basis points over the prior default interest rate. Additionally, Deutsche Bank required excess cash flow from the properties to be escrowed in a lockbox account and applied entirely to the relevant properties, with surplus used to amortize the principal on the relevant loan.

Based on the state of the markets, the GGP Group began to contemplate the necessity of a Chapter 11 restructuring. Several of the loans went into default and one of the lenders, Citibank, commenced foreclosure proceedings on a defaulted loan on March 19, 2009.[22] On April 16, 2009, 360 of the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code. An additional 28 of the Debtors filed for protection on April 22, 2009, for a total of 388 Debtors in the above-captioned Chapter 11 cases.

Upon filing, the Debtors did not dispute that the GGP Group's shopping center business had a stable and generally positive cash flow and that it had continued to perform well, despite the current financial crisis. Specifically, they stated "[t]he Company's net operating income ("NOI"), a standard metric of financial performance in the real estate and shopping center industries, has been increasing over time, and in fact increased in 2008 over

---

[22] The Citibank loan in the amount of $95 million, secured by the Oakwood Center shopping center, and guaranteed by GGP LP, GGP and TRCLP, was the only loan that actually reached the foreclosure stage, and it is the only loan in which the lender has asserted it is undersecured, i.e., that the value of the property is lower than the loan amount. As of the Petition Date, the other loans that had matured or defaulted included (a) a loan of approximately $57.2 million secured by the Chico Mall shopping center, (b) a loan of approximately $186.6 million secured by the Jordan Creek Town Center shopping center, a portion of which is guaranteed by GGPLP, L.L.C., (c) a loan of approximately $74.2 million secured by the Deerbrook Mall shopping center, (d) a loan of approximately $81.6 million secured by the Southland Mall shopping center, (e) a loan of $37.8 million secured by the Prince Kuhio Plaza, a portion of which is guaranteed by GGP LP, (f) a loan of approximately $33.1 million secured by nine strip centers, and (g) a loan of approximately $105.1 million secured by the Town East Mall, a portion of which is guaranteed by GGP LP. Of these property-level loans in default, seven of the ten are CMBS loans. Each of the borrowers and guarantors on the Las Vegas Loans, Oakwood Loan, Chico Mall Loan, Jordan Creek Loan, Deerbrook Loan, and Southland Loan, Prince Kuhio Loan, Multi-Property Loan, and Town East Loan is a Debtor in these chapter 11 cases. (Mesterharm Decl., April 16, 2009, ¶ 33.)

the prior year despite the challenges of the general economy." (Mesterharm Decl., April 16, 2009, ¶ 8.)[23] Despite this, faced with approximately $18.4 billion in outstanding debt that matured or would be maturing by the end of 2012, the Company believed its capital structure had become unmanageable due to the collapse of the credit markets.

The Debtors filed several conventional motions on the Petition Date. The only motion that was highly contested was the Debtors' request for the use of cash collateral and approval of debtor-in-possession ("DIP") financing. By the time of the final hearing on May 8, 2009, numerous project-level lenders had objected, based on concerns that the security of their loans would be adversely affected. Many of these parties argued that it would be a violation of the separateness of the individual companies for the Debtors to upstream cash from the individual properties for use at the parent-level entity. After hearing extensive argument, the Court ruled that the SPE structure did not require that the project-level Debtors be precluded from upstreaming their cash surplus at a time it was needed most by the Group. The final cash collateral order, entered on May 14, 2009 (ECF Docket No. 527), however, had various forms of adequate protection for the project-level lenders, such as the payment of interest at the non-default rate, continued maintenance of the properties, a replacement lien on the cash being upstreamed from the project-level Debtors and a second priority lien on certain other properties. DIP financing was arranged, but the DIP lender did not obtain liens on the properties of the project-level Debtors that could arguably adversely affect the lien interests of the existing mortgage lenders, such as the Movants.

---

[23] The Company's NOI for its operations involving the operating, development and management of its shopping centers, office buildings and commercial properties totaled $2.59 billion in 2008, which was a 4.5% increase over the year before. (Mesterharm Decl., April 16, 2009, ¶ 15.) Its NOI accounting for the development and sale of land in its master planned communities was $29 million, a decrease from prior years. (Mesterharm Decl., April 16, 2009, ¶ 15.)

At an early stage in the cases it became clear that several lenders intended to move to dismiss, and the Court urged all parties who intended to move to dismiss any of the cases to coordinate their motions. Six motions were filed (three by Metlife), with one party subsequently withdrawing its motion. ING Clarion and Helios, which hold CMBS debt, argued that their cases should be dismissed because they were filed in bad faith in that there was no imminent threat to the financial viability of the Subject Debtors. ING Clarion also contended that Lancaster Trust, one of the Subject Debtors, was ineligible to be a debtor under the Bankruptcy Code. Metlife, which holds conventional mortgage debt, similarly argued that the Subject Debtors were not in financial distress, that the cases were filed prematurely and that there was no chance of reorganization as there was no possibility of confirming a plan over its objection.

## **DISCUSSION**

### I. **Bad Faith Dismissal**

The principle that a Chapter 11 reorganization case can be dismissed as a bad faith filing is a judge-made doctrine. In the Second Circuit, the leading case on dismissal for the filing of a petition in bad faith is *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304 (2d Cir. 1997), which in turn relied on *Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222 (2d Cir. 1991). Under these decisions, grounds for dismissal exist if it is clear on the filing date that "there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings." *In re C-TC 9th Ave. P'ship*, 113 F.3d at 1309-10, quoting *In re Cohoes*, 931 F.2d at 227 (internal citations omitted). One frequently-cited decision by Chief Judge Brozman of this Court has restated the principle as

18

follows: "[T]he standard in this Circuit is that a bankruptcy petition will be dismissed if *both* objective futility of the reorganization process *and* subjective bad faith in filing the petition are found."  *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) (emphasis in original); *see also In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996).

No one factor is determinative of good faith, and the Court "must examine the facts and circumstances of each case in light of several established guidelines or indicia, essentially conducting an 'on-the-spot evaluation of the Debtor's financial condition [and] motives.'"  *In re Kingston Square*, 214 B.R. at 151, quoting *In re Little Creek Development Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986).  "It is the totality of circumstances, rather than any single factor, that will determine whether good faith exists."  *In re Kingston Square*, 214 B.R. at 725, citing *Cohoes*, 931 F.2d at 227.  Case law recognizes that a bankruptcy petition should be dismissed for lack of good faith only sparingly and with great caution.  *See Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989); *see also In re G.S. Distrib., Inc.*, 331 B.R. 552, 566 (Bankr. S.D.N.Y. 2005).

*C-TC 9th Ave. P'ship*, like many of the other bad faith cases, involved a single-asset real estate debtor, where the equity investors in a hopelessly insolvent project were engaged in a last-minute effort to fend off foreclosure and the accompanying tax losses.  *See also Little Creek Development Co.*, 779 F.2d 1068.  Thus, many of the following factors listed by the *C-TC* Court as evidencing bad faith were characteristics of this type of case:

> (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure

action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees.

*In re C-TC 9th Ave. P'shp.*, 113 F.3d at 1311.  Relatively few of these factors are relevant to the cases at bar, and two of the Movants, ING Clarion and Helios, expressly disavowed reliance on the *C-TC* bad faith formulation at the hearing on the Motions, conceding in effect that there was a reasonable likelihood that the Debtors intended to reorganize and could successfully emerge from bankruptcy.  (See Hr'g Tr. 18:2-3; 18:14-19:22; 44:1-2.)  These Movants instead argue that the filings, when examined from the perspective of the individual Debtors, were premature.  The third Movant, Metlife, did not expressly disavow reliance on the *C-TC* formulation.  However, its contentions were not based on the argument that the debtors did not intend to reorganize.  Metlife argued that the Debtors could never confirm a plan over its objection, implying that Metlife would never agree to a plan proposed by the Debtors.  Then, having staked out a position that the Debtors might characterize as evidence of bad faith, Metlife contended that the Subject Debtors' subjective bad faith was evidenced by the prematurity of the filing and various actions taken by the Debtors that are further analyzed below.

### A.  Objective Bad Faith: Prematurity

All three Movants support their contention that the Chapter 11 filings of these Debtors were, in effect, premature by reliance on the few cases that have dismissed Chapter 11 petitions where the debtor was not in financial distress at the time of filing, where the prospect of liability was speculative, and where there was evidence that the filing was designed to obtain a litigation advantage.  The leading decision is *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999), in which the debtors filed

Chapter 11 petitions for the express purpose of protecting themselves from antitrust
litigation.  At the same time they published a press release touting their financial
health, as well as their denial of any antitrust liability.  The Third Circuit held that
"the mere possibility of a future need to file, without more, does not establish that a
petition was filed in 'good faith.'"  *Id.* at 164.  The principle of *SGL Carbon* was
followed by this Court in *In re Schur Mgmt. Co.*, 323 B.R. 123 (Bankr. S.D.N.Y.
2005), where two debtors filed for bankruptcy to avoid a possible judgment from a
personal injury suit in which they denied all liability and which had yet to go to trial.
In *Schur Mgmt.*, this Court noted that "[i]t would be sheer speculation to guess as to
the amount of a judgment, whether it would be imposed on one or both debtors and
whether it would impair healthy companies with only $14,075 in aggregate liabilities
and a net positive cash flow."  323 B.R. at 127.

In *SGL Carbon* and *Schur Mgmt.*, the prospect of any liability from pending litigation
was wholly speculative.  By contrast, the Subject Debtors here carry an enormous amount of
fixed debt that is not contingent.  Movants argue nevertheless that none of the Subject
Debtors had a mortgage with a maturity date earlier than March 2010, and that the Subject
Debtors should have waited until much closer to the respective maturity dates on their loans
to file for bankruptcy.  Movants contend in effect that the prospect of liability was too remote
on the Petition Date for the Subject Debtors, and that the issue of financial distress and
prematurity of filing cannot be examined from the perspective of the group but only on an
individual-entity basis.  Accepting for the moment this latter proposition, the question is
whether the Subject Debtors were in actual financial distress on the Petition Date and
whether the prospect of liability was too remote to justify a Chapter 11 filing.

21

### (i)  The Financial Distress of the Individual Project Debtors

The record on these Motions demonstrates that the individual debtors that are the

subject of these Motions were in varying degrees of financial distress in April 2009.  Loans

to four of the Subject Debtors had cross-defaulted to the defaults of affiliates or would have

been in default as a result of other bankruptcy petitions.[24]  Of the loans to the remaining

sixteen Subject Debtors, one had gone into hyper-amortization in 2008.  Interest had

increased by 4.26%.  Five of the Subject Debtors had mortgage debt maturing or hyper-

amortizing in 2010, two in 2011, and one in 2012.  The remaining seven Subject Debtors

were either guarantors on maturing loans of other entities or their property was collateral for

a loan that was maturing, or there existed other considerations that in the Debtors' view

placed the loan in distress, such as a high loan-to-value ratio.

The Debtors' determination that the Subject Debtors were in financial distress was

made in a series of Board meetings following substantial financial analysis.  The Debtors

established that in late 2008 they hired a team of advisors to assist in the evaluation of either

an in-court or an out-of-court restructuring.  The team included Miller Buckfire as

restructuring advisor, AlixPartners LLP as financial advisor, and both Weil Gotshal &

Manges and Kirkland & Ellis as legal advisors.  The process of evaluating the Company's

restructuring options took approximately six weeks and encompassed a total of seven Board

meetings and three informational sessions.  During these meetings, the Boards discussed

general considerations applicable to the project-level companies, as well as specific facts

relating to the individual properties, with both GGP personnel and the financial, restructuring

---

[24] There was some dispute at the time of trial as to whether certain of the loans were actually in default.
(See Hr'g. Tr. 203:17-205:17, June 17, 2009.)  The fact that the parties still could not, as of June 2009,
agree whether there was a default establishes that on the Petition Date the Debtors could not have been
confident that the loans would not be accelerated and foreclosure proceedings commenced.

and legal advisors available.  The Boards specifically focused on: "the collapse of the

commercial real estate financing market; the challenges facing the CMBS market and the

practical difficulties of negotiating with CMBS servicers to meaningfully modify loan terms;

integration of the project entities with GGP Group and requirements for securing DIP

financing; and the consequences of filing an entity for bankruptcy individually, outside a

coordinated restructuring with other GGP entities."  (Nolan Decl., June 16, 2009, ¶¶ 29-35;

Board Minutes - Joint Trial Ex. 1-7.)  The Boards also concentrated on three of the above-

referenced filing factors: "(i) defaults or cross-defaults with other loans; (ii) loans that were

maturing in the next three to four years; and (iii) other financial considerations indicating that

restructuring would be necessary, including a loan-to-value ratio above 70 percent."  (Id. at ¶

38.)[25]

        In addition to these general considerations, the Boards discussed each project-level

entity individually.  For each entity, Robert Michaels, the Vice Chairman of GGP, "provided

an overview of its financial and operational considerations, including the property's

performance, outlook, and projected capital needs.  In addition, for each entity, the Boards

received written materials consisting of a fact sheet on the property, an income statement,

and a draft board resolution."  (Nolan Decl., June 16, 2009, ¶ 45.)  In these meetings, the

Debtors divided the various property-level entities into separate groups to evaluate whether

to file each individual entity.  (See Helios Trial Ex. 16; Nolan Decl., June 16, 2009, ¶ 38.)[26]

--------

[25] The Debtors introduced an exhibit with respect to the loan-to-value ratios of certain of the properties.
Subsequent to the hearing on these Motions, Metlife filed a *Motion in Limine to Exclude Debtors'
Trial Exhibit No. 2* (ECF Docket No. 940) (the "Motion in Limine").  Metlife contended that the
exhibit's loan-to-value ratios are not reliable or supported by the record.  The Court grants the Motion
in Limine and has not relied on Debtors' Exhibit 2 for purposes of this Opinion.

[26] The entities were separated into Groups A through G.  Ten factors were used to consider whether to
file an entity for bankruptcy, although other considerations were applied depending on the facts and
circumstances related to the entity.  The ten factors included:

On April 15, 2009 the Boards separately voted to put most of the project-level Debtors into

bankruptcy.  Certain Subject Debtors acted by written consent of the directors or managers.[27]

Fourteen entities were left out of the filing, as none of the ten filing factors was applicable.

(Nolan Decl., June 16, 2009, ¶ 49; Helios Trial Ex. 16; Hr'g Tr. 196: 9-21, June 17, 2009.)

Movants contend that, in the name of the "doctrine" of "prematurity," the Debtors

had a good faith obligation to delay a Chapter 11 filing until they were temporally closer to

an actual default.  For the following reasons, these Debtors were justified in filing Chapter 11

petitions when they did.

We start with the statute.  Chapter X of the former Bankruptcy Act expressly required

that a petition be filed in good faith, providing that "[u]pon the filing of a petition by a

---

(1) The Company is a borrower or guarantor under a credit facility that is currently in default and
    for which no forbearance has been obtained.
(2) The Company is a borrower or guarantor under a credit facility that is currently in a
    forbearance period that can be terminated at the Lender's discretion.
(3) The default of General Growth Properties, Inc. or another entity within the General Growth
    Properties structure and/or a bankruptcy filing by an entity guaranteeing the Company's debt
    triggers an Event of Default under the Company's existing loan.
(4) The Company owns a property which is subject to an existing cash trap that has been
    implemented.
(5) The Company is a borrower or guarantor under a loan that matures within the next three to
    four years.
(6) The Company is part of a project in which one or more subsidiaries or affiliates are under
    consideration for filing to facilitate a restructuring.
(7) The Company is the general partner of a partnership that is under consideration for filing.
(8) The Company is subject to multiple other filing considerations, including a loan which has a
    loan-to-value ratio in excess of 70%.
(9) The Company holds unencumbered assets and is filing to facilitate the inclusion of such assets
    as part of an overall corporate restructuring.
(10) The Company may be part of a non-core asset disposition process that could be facilitated by
    a section 363 sale in bankruptcy.

(Helios Trial Ex. 16.)
[27] In their capacity as managers of Providence Place Holdings, LLC, White Marsh, LLC and 10000
West Charleston Boulevard, LLC, Thomas Nolan and Robert Michaels signed consents on April 15,
2009 for those entities to file bankruptcy.  (Sup. Nolan Decl., June 23, 2009, ¶ 4.)  On that same date,
Nolan, as president of the general partners of Howard Hughes Properties, L.P., White Marsh Mall
Associates, and White Marsh Phase II Associates, president of the general partner of the managing
partner of White Marsh General Partnership, and sole member of 9901-921 Covington Cross, LLC,
signed consents for those entities to file bankruptcy.  (Sup. Nolan Decl., June 23, 2009, ¶¶ 5-6.)  The
resolutions attached to the Town Center Drive petition indicate that the officers of the sole member,
Howard Hughes Properties, L.P., authorized the bankruptcy.

debtor, the judge shall enter an order approving the petition, if satisfied that it complies with the requirements of this chapter and has been filed in good faith, or dismissing it if not so satisfied."  Bankruptcy Act of 1898 § 141, 11 U.S.C. § 541 (1976) (repealed 1978).  Neither Chapter XI nor XII contained a similar good faith requirement, and the good faith provisions were one of the many parts of Chapter X that debtors avoided by filing under Chapter XI and that Congress rejected when it structured Chapter 11 of the Bankruptcy Reform Act of 1978.

Indeed, when Congress adopted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"),[28] it significantly strengthened the provisions of § 1112, requiring the Court to dismiss or convert an abusive Chapter 11 case.[29]  BAPCPA added several factors to the prior list of grounds for dismissal.  Significantly, it did not provide expressly that a Chapter 11 case should be dismissed for bad faith in filing, and all of the listed grounds for dismissal relate to a debtor's conduct *after* the filing, not before.  Similarly, in 2005 Congress added several provisions designed to shorten Chapter 11 cases,[30] but it omitted any requirement that the Court hold an initial hearing on a Chapter 11 debtor's *bona fides* or good faith.

The Code's omission of any such hearing, which would doubtless invite significant litigation at the start of every Chapter 11 case, is nevertheless consistent with another of the Code's innovations, ordinarily leaving the debtor in possession and not appointing a trustee.

---

[28] Pub. L. No. 109-8, April 20, 2005, 119 Stat 23 (2005).

[29] For example, § 1112 now provides that if there is "cause" for dismissal or conversion, the Court *must* act, within a brief period and after a hearing, "absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interest of creditors and the estate . . . ."  11 U.S.C. § 1112(b)(1).

[30] *See, e.g.,* the amendment to § 1121(d) putting a limit on extensions of exclusivity.

These provisions carry out the goal of the 1978 Bankruptcy Code to incentivize a debtor to file earlier rather than later, so as to preserve the value of the estate.[31]

In light of the statute, this Court declines the invitation to establish an arbitrary rule, of the type desired by Movants, that a debtor is not in financial distress and cannot file a Chapter 11 petition if its principal debt is not due within one, two or three years.  The Movants did not establish that the Debtors' procedures for determining whether to file the individual Subject Debtors were unreasonable or that the Debtors were unreasonable in concluding that the disarray in the financial market made it uncertain whether they would be able to refinance debt years in the future.  There was no evidence to counter the Debtors' demonstration that the CMBS market, in which they historically had financed and refinanced most of their properties, was "dead" as of the Petition Date,[32] and that no one knows when or if that market will revive.  Indeed, at the time of the hearings on these Motions, it was anticipated that the market would worsen, and there is no evident means of refinancing billions of dollars of real estate debt coming due in the next several years.  The following testimony of Allen Hanson, an officer of Helios, is telling:  "Q. Helios is aware that there are debt maturities that will occur in 2009, 2010, 2011 and 2012 that the CMBS market will not be able to handle through new CMBS issuances, correct?  A. Based on the circumstances we see today, yes."  (See Hanson Dep. Tr. 155: 25-156:6, June 5, 2009; Hanson Dep. Tr. 144:14-145:10.)

---

[31] "Proposed chapter 11 recognizes the need for the debtor to remain in control to some degree, or else debtors will avoid the reorganization provisions in the bill until it would be too late for them to be an effective remedy."  H.R. Rep. No. 595, at 233, 95th Cong., 1st Sess. (1977); *see also In re SGL Carbon*, 200 F.3d at 163-64; *In re Johns-Manville Corp.*, 36 B.R. at 736.

[32] For example, CMBS issuances dropped by 97% when the first nine months of 2008 are compared with the same period for 2007.  Furthermore, CMBS issuances for the fourth quarter of 2008 were 98% lower than in the fourth quarter of 2007.  (Mesterharm Decl., April 16, 2009, ¶ 41.)

It is well established that the Bankruptcy Code does not require that a debtor be insolvent prior to filing. *See In re The Bible Speaks*, 65 B.R. 415, 424 (Bankr. D. Mass. 1986). In *U.S. v. Huebner,* 48 F.3d 376, 379 (9th Cir. 1994), the Court noted a corollary that is equally applicable here: "The Bankruptcy Act does not require any particular degree of financial distress as a condition precedent to a petition seeking relief." Many other cases have denied motions to dismiss, despite the fact that the subject debtors were able to meet current expenses. In *In re Century/ML Cable Venture*, 294 B.R. 9 (Bankr. S.D.N.Y. 2003), for example, the Court denied a motion to dismiss because, despite being able to meet current expenses, the debtor had "a huge financial liability which it does not have the ability to pay out of current cash flow, and without a substantial liquidation of its assets." 294 B.R. at 35-36, *citing, inter alia, In re Johns-Manville Corp.*, 36 B.R. 727, 736-37 (Bankr. S.D.N.Y. 1984); s*ee also In re Central Jersey Airport Services*, 282 B.R. 176, 181 (Bankr. D.N.J. 2002); *In re Chris-Marine U.S.A., Inc.*, 262 B.R. 118, 125 (Bankr. M.D. Fla. 2001).

The foregoing is not to assert that every stand-alone company with ample cash flow would necessarily act in good faith by filing a Chapter 11 petition three years before its only debt came due. However, contrary to Movants' contentions, the Court is not required in these cases to examine the issue of good faith as if each Debtor were wholly independent. We turn to the interests of the Group as a whole.

### (ii)  The Interests of the Group

Movants argue that the SPE or bankruptcy-remote structure of the project-level Debtors requires that each Debtor's financial distress be analyzed exclusively from its perspective, that the Court should consider only the financial circumstances of the individual Debtors, and that consideration of the financial problems of the Group in judging the good

faith of an individual filing would violate the purpose of the SPE structure.  There is no question that the SPE structure was intended to insulate the financial position of each of the Subject Debtors from the problems of its affiliates, and to make the prospect of a default less likely.  There is also no question that this structure was designed to make each Subject Debtor "bankruptcy remote."   Nevertheless, the record also establishes that the Movants each extended a loan to the respective Subject Debtor with a balloon payment that would require refinancing in a period of years and that would default if financing could not be obtained by the SPE or by the SPE's parent coming to its rescue.  Movants do not contend that they were unaware that they were extending credit to a company that was part of a much larger group, and that there were benefits as well as possible detriments from this structure. If the ability of the Group to obtain refinancing became impaired, the financial situation of the subsidiary would inevitably be impaired.

The few cases on point support the Debtors' position that the interests of the group can and should be considered.  In *Heisley v. U.I.P. Engineered Prods. Corp.* (*In re U.I.P. Engineered Prods. Corp.*), 831 F.2d 54 (4th Cir. 1987), the Court addressed the propriety of Chapter 11 filings by solvent subsidiaries of a parent corporation that had filed its own Chapter 11 case shortly before the subsidiaries filed.  Creditors sought to dismiss the subsidiaries' cases, arguing that the timing of the filings and the subsidiaries' admitted solvency evidenced an abuse of the bankruptcy process.  *See id.* at 56.  The Court found otherwise, stating that is was irrelevant whether the subsidiaries could independently demonstrate good faith for their filings.  Rather, the question was whether the wholly-owned subsidiaries "should have been included in their parent company's bankruptcy estate, when the parent company had filed in good faith for Chapter 11 reorganization."  *Id.*  The Court

28

found that it was "clearly sound business practice for [the parent] to seek Chapter 11

protection for its wholly-owned subsidiaries when those subsidiaries were crucial to its own

reorganization plan." *Id.* The Court explained that the nature of a corporate family created

an "'identity of interest' . . . that justifies the protection of the subsidiaries as well as the

parent corporation." *Id.*, citing *A.H. Robins v. Piccinin*, 788 F.2d 994 (4th Cir. 1986), *cert.*

*denied*, 479 U.S. 876 (1986). The Fourth Circuit also relied on the pre-Code case of *Duggan*

*v. Sansberry*, 327 U.S. 499 (1946), which stated that it was Congress' intent "ordinarily to

allow parent and subsidiary to be reorganized in a single proceeding, thereby effectuating its

general policy that the entire administration of an estate should be centralized in a single

reorganization court." *Id.* at 510-11.

The reasoning in *U.I.P. Engineered Prods.* was largely adopted in *In re Mirant Corp.,*

2005 WL 2148362 (Bankr. N.D. Tex. Jan. 26, 2005), where the Court addressed a motion to

dismiss the case of one of more than 80 related debtors. The Court held that the standard for

assessing the good-faith dismissal of a single stand-alone debtor is different from the

standard applied to "a key operating affiliate placed in chapter 11 in conjunction with

necessary filings by its family of affiliates." *Id.* at *5. The Court noted that if the subsidiary

had not been included in the bankruptcy filing, it would have likely faced repercussions from

the filings by its affiliates, and warned that "[a] failure to file for an entity that is a principal

member of the family could prove disastrous if relief in fact was necessary." *See id.* at *6.

Movants do not contend that the parent companies acted in bad faith in filing their

own Chapter 11 petitions. The parent companies depended on the cash flow from the

subsidiaries, but much of the project-level debt was in default: from January 1, 2009 through

the second week of April 2009, $1.1 billion of the GGP Group project-level debt had

29

matured, none of which the Company had been able to refinance.  As of the Petition Date,

billions of dollars of project-level debt had also reached hyper-amortization, with several

secured lenders having imposed cash traps.  In March 2009, Citibank, a lender on one of the

defaulted loans, had begun foreclosure proceedings against one property.  In addition to the

project-level debt, the Group had debt of more than $8.4 billion at the parent level.  Much of

this debt was in default and it, too, could not be refinanced.  Beyond the unsecured debt of

the parent companies were thousands of equityholders who depended, in large part, on the

net cash flow of and the equity in the project-level Debtors as a principal source of protection

for their investment.

Faced with the unprecedented collapse of the real estate markets, and serious

uncertainty as to when or if they would be able to the refinance the project-level debt, the

Debtors' management had to reorganize the Group's capital structure.  Movants do not

explain how the billions of dollars of unsecured debt at the parent levels could be

restructured responsibly if the cash flow of the parent companies continued to be based on

the earnings of subsidiaries that had debt coming due in a period of years without any known

means of providing for repayment or refinance.  That is not to conclude, as Movants imply,

that the interests of the subsidiaries or their creditors should be sacrificed to the interests of

the parents and their creditors.  As further discussed below, there need be no sacrifice of

fundamental rights.  The point is that a judgment on an issue as sensitive and fact-specific as

whether to file a Chapter 11 petition can be based in good faith on consideration of the

interests of the group as well as the interests of the individual debtor.

Indeed, there is authority that under the circumstances at bar, the interests of the

parent companies *must* be taken into account.  The Operating Agreements of many of the

project-level Debtors contained provisions that required the appointment of two

"Independent Managers."[33]  The Operating Agreements do not enumerate the duties of the

Independent Managers except in the following instance, which is obviously highly relevant

to the instant Motions:  "To the extent permitted by law… the Independent Managers shall

consider only the interests of the Company, *including its respective creditors*, in acting or

otherwise voting on the matters referred to in Article XIII (p)."  (Joint Trial Ex. 34, 35.)

(emphasis added).  Article XIII (p) requires the "unanimous written consent of the Managers

of the Company, including both of the Independent Managers" before the SPE can take any

action to file or consent to the filing, as debtor, of any bankruptcy proceeding.  (Id.) The

Operating Agreements further provide that, "in exercising their rights and performing their

duties under this Agreement, any Independent Manager shall have a fiduciary duty of loyalty

and care similar to that of a director of a business corporation organized under the General

Corporation Law of the State of Delaware."  (Id.)

---

[33] Independent Manager is defined in the ING Clarion Debtors' documents as a:

> natural person who is not… (i) a stockholder, director, manager…, trustee, officer, employee, partner, member, attorney or counsel of the Company or any Affiliate of the Company; (ii) a creditor, customer, supplier or other Person who derives any of its purchases or revenues from its activities with the Company or any Affiliate of the Company; (iii) a Person controlling or under common control with any such stockholder, partner, member, creditor, customer, supplier or other Person; or (iv) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, creditor, customer, supplier or other Person.

(Joint Trial Ex. 34, 35).  The provision allows a "person who satisfies the foregoing definition other than subparagraph (ii)" to serve as Independent Manager if "such individual is an independent manager provided by a nationally-recognized company that provides professional independent directors, managers or trustees…or if such individual receives customary director, manager or trustee's fees for so serving…."  (Joint Trial Ex. 34, 35.)  Similarly, an individual who "otherwise satisfies the foregoing definition except for serving as an independent director, manager or trustee of one or more Affiliates of the Company that are 'Special Purpose Entities'" may serve as Independent Manager if such individual is "provided by a nationally recognized company that provides professional independent directors, managers and trustees…."  (Joint Trial Ex. 34, 35).  The Operating Agreements for the Helios Debtors define special purpose entity slightly differently, as "an entity whose organizational documents contain restrictions on its activities and impose requirements intended to preserve such entity's separateness in compliance with rating agency standards."  (Joint Trial Ex. 34, 35.)

The drafters of these documents may have attempted to create impediments to a

bankruptcy filing; in considering a filing, the Independent Managers are directed to consider

only the interests of the Company, including its "creditors" – meaning the lender as the only

substantial creditor of the entity.   However, it is also provided, appropriately, that the

Independent Managers can act only to the extent permitted by applicable law, which is

deemed to be the corporate law of Delaware.   Delaware law in turn provides that the

directors of a solvent corporation are authorized – indeed, required – to consider the interests

of the shareholders in exercising their fiduciary duties.   In *North American Catholic*

*Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007), the

Delaware Supreme Court held for the first time that the directors of an insolvent corporation

have duties to creditors that may be enforceable in a derivative action on behalf of the

corporation.   But it rejected the proposition of several earlier Chancery cases that directors of

a Delaware corporation have duties to creditors when operating in the "zone of insolvency,"

stating

> [w]hen a solvent corporation is navigating in the zone of
> insolvency, the focus for Delaware directors does not change:
> directors must continue to discharge their fiduciary duties to the
> corporation and its shareholders by exercising their business
> judgment *in the best interests of the corporation for the benefit of
> its shareholder owners*.

930 A.2d at 101 (emphasis supplied).[34]   This statement is a general formulation that leaves

open many issues for later determination – for example, when and how a corporation should

---

[34] The Court thus rejected certain of the holdings in *Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772 (Del. Ch. 2004) and footnote 55 in *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, 1991 Del. Ch. LEXIS 215 n. 55 (Del. Ch. 1991); *see also Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 195 (Del. Ch. 2006) ("If a plaintiff seeks to state a claim premised on the notion that a corporation was insolvent and that the directors of the corporation were therefore obligated to consider the corporation's creditors, as an object of their fiduciary beneficence, the plaintiff must plead facts supporting an inference that the corporation was in fact insolvent at the relevant time.").

be determined to be insolvent. But there is no contention in these cases that the Subject

Debtors were insolvent at any time – indeed, Movants' contention is that they were and are

solvent. Movants therefore get no assistance from Delaware law in the contention that the

Independent Managers should have considered only the interests of the secured creditor when

they made their decisions to file Chapter 11 petitions, or that there was a breach of fiduciary

duty on the part of any of the managers by voting to file based on the interests of the Group.

The record at bar does not explain exactly what the Independent Managers were

supposed to do. It appears that the Movants may have thought the Independent Managers

were obligated to protect only their interests. For example, an officer of ING Clarion

testified that "the real reason" he was disturbed by the Chapter 11 filings was the inability of

the Independent Managers to prevent one:

> Well, my understanding of the bankruptcy as it pertains to these
> borrowers is that there was an independent board member who was
> meant to, at least from the lender's point of view, meant to prevent
> a bankruptcy filing to make them a bankruptcy-remote, and that
> such filings were not anticipated to happen.

(Altman Dep. Tr. 159:7-13, June 5, 2009.) However, if Movants believed that an

"independent" manager can serve on a board solely for the purpose of voting "no" to

a bankruptcy filing because of the desires of a secured creditor, they were mistaken.

As the Delaware cases stress, directors and managers owe their duties to the

corporation and, ordinarily, to the shareholders. Seen from the perspective of the

Group, the filings were unquestionably not premature.

### B.  Inability to Confirm a Plan

In addition to prematurity, Metlife contends that objective futility has been

established and its cases should be dismissed because the Subject Debtors will never

be able to confirm a plan over its opposition.[35]  In making this argument, it is Metlife

that is acting prematurely.  There is no requirement in the Bankruptcy Code that a

debtor must prove that a plan is confirmable in order to file a petition.  *See In re*

*Century/ML Cable Venture*, 294 B.R. 9, 36 (Bankr. S.D.N.Y. 2003), citing *In re*

*Brown*, 951 F.2d 564, 572 (3d Cir. 1991); *In re Lizeric Realty Corp.*, 188 B.R. 499,

503-04 (Bankr. S.D.N.Y. 1995); *In re Toyota of Yonkers*, 135 B.R. 471, 476-77

(Bankr. S.D.N.Y. 1992).  Courts have consistently refused to dismiss on this ground

before a plan has been proposed.  *See In re RCM Global*, 200 B.R. 514, 524 (Bankr.

S.D.N.Y. 1996); *Faflich Assocs. v. Court Living Corp. (In re Court Living Corp.)*,

1996 U.S. Dist. Lexis 13588, at *13-*14 (S.D.N.Y. Sept. 1, 1996) (conversion); *In re*

*Lizeric Realty Corp.*, 188 B.R. 499, 503-04 (Bankr. S.D.N.Y. 1995) (rejecting

argument that plan could not be confirmed because creditor would not give approval);

*In re Hempstead Realty Associates*, 38 B.R. 287, 290 (Bankr. S.D.N.Y. 1984).  These

cases reflect the reality that parties often find it in their best interests to agree on the

terms of a plan, despite their litigating posture, as well as the fact that debt can always

be left unimpaired.

The cases relied upon by Metlife are not to the contrary. None dismissed a

Chapter 11 petition prior to the proposal of a plan.  *See In re 266 Washington Assocs.*,

141 B.R. 275 (Bankr. E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992) (debtor had

filed plan and parties had attempted settlement before court found reorganization

impossible); *In re 499 W. Warren Street Assocs. Ltd. P'ship*, 151 B.R. 307 (Bankr.

N.D.N.Y. 1992) (plan had been filed and voted on by creditors); *In re Lumbar Exch.*

---

[35] Metlife's argument is that the Metlife Debtors have no other creditors, that it holds the only impaired claim and that the Debtors will never be able to satisfy the condition of § 1129(a)(10) of the Bankruptcy Code that the plan be accepted by one class of impaired creditors.

34

*Ltd. P'ship*, 125 B.R. 1000 (Bankr. D. Minn. 1991) (debtor had offered model plan

and subsequent official plan, and unsecured creditors' committee had submitted a

model plan). It is also consistent with § 1112(b)(4)(J) of the Bankruptcy Code,

defining cause for dismissal of a case as including failure to "file or confirm a plan,

within the time fixed by this title or by order of the court."

Metlife's argument that a plan cannot be confirmed over its objection reflects

its view of the leverage it has in the subject cases. Its invocation of its asserted

leverage is ironic, in view of the fact that Metlife also asserts that the Subject

Debtors' filings were taken in subjective bad faith. In any event, we turn to the

requirement that a Chapter 11 filing be made in subjective good faith.

### C. Subjective Faith

The second element in analyzing whether a Chapter 11 petition has been filed in good

faith is whether the debtor has exercised subjective good faith. The test in *C-TC 9th Ave.*

*P'ship* is a two-fold test, requiring proof of subjective bad faith as well as objective futility.

113 F.3d at 1309-10; *see also Carolin Corp. v. Miller*, 886 F.2d at 700-701 (discussing

reasons for requiring a "two-pronged inquiry.")

Movants do not contend that the Boards of the respective debtors did not act

deliberately, or that they did not have an intent to reorganize the companies. In addition to

their contentions relating to prematurity and lack of financial distress, they assert that the

Subject Debtors acted in subjective bad faith because (i) they failed to negotiate prior to

filing, and (ii) the initial "Independent Managers" of several of the SPE's were fired and

replaced shortly before the Petition Date.

35

### (i)  Failure to Negotiate

The Bankruptcy Code does not require that a borrower negotiate with its lender before filing a Chapter 11 petition.  BAPCPA contains a requirement that a consumer debtor obtain credit counseling before filing, 11 U.S.C. § 109(h), and an obscure provision of BAPCPA provides that an unsecured claim on a consumer debt can be reduced by up to 20% if the lender "unreasonably refused to negotiate a reasonable alternative repayment schedule," as defined.  11 U.S.C. § 502(k).  Neither of these provisions has any relevance here, except to demonstrate that Congress knows how to impose a filing requirement when it wants to do so.  There are often good reasons for a commercial borrower and its lender to talk before a bankruptcy case is filed.  But that does not mean that a Chapter 11 case should be deemed filed in bad faith if there is no prepetition negotiation.

On this record, there is no evidence that pre-filing talks would have been adequate to deal with the extent of the problem.  Indeed, there is no evidence Movants would have been willing to work with the Subject Debtors.  None of the Movants adduced testimony from witnesses with final decision-making authority who said that they would have been willing to refinance or modify the terms of the respective Subject Debtors' loans.  (See Hr'g Tr. 92:14-19 108:16-22, June 17, 2009; Hanson Dep., 61:9-16; Hr'g Tr. 129:2-9, 130-5-132:14, 165:6-9, 169:23-171:13, 173:4-9; 213:5-214:24, June 24, 2009.)  There is much evidence in the record that the Debtors could not even get the CMBS lenders to talk to them.  As discussed above, the CMBS structure gave the special servicers the right to negotiate an extension or refinancing of a loan.  The special servicers could only be appointed, however, if the loan was in default or nearing a default.  For example, Wachovia Securities, the

master servicer on several ING Clarion loans with the Subject Debtors, refused to negotiate and stated that the loans would have to default before they even could be transferred to the special servicer.[36]  Helios took the same position with respect to one of the Subject Debtors, contending that, "even after the commencement of a foreclosure action, SLG would still not have an immediate need to file for bankruptcy unless and until it was unable to achieve a resolution prior to the foreclosure sale of its property."  (Helios Reply, p. 8.)  The Subject Debtors did not act in bad faith when they failed to delay Chapter 11 petitions until the CMBS loans defaulted or were foreclosed.

Metlife was not encumbered with the master servicer/special servicer structure, but there is no indication that it would have readily agreed to a refinancing of any of its loans.  Internal documents from Metlife's files show that its investment analysts had concluded that the loan-to-value ratios on several of its properties were too high and that millions of dollars of debt had to be repaid before refinancing would be considered.  (Hr'g Tr. 208:5-209:10, June 24, 2009; Debtors' Trial Ex. 60 at Met/GGP 1679; Hr'g Tr. 155:13-156:5, June 24, 2009.)   In December 2008, the head of real estate investments at Metlife identified its debt exposure to GGP (as a group) as a "lessons learned opportunity." (Debtors' Trial Ex. 71; Hr'g Tr. 174:16–20, 176:10–177:12, June 24, 2009.)  A director and member of the research group responded, "We wouldn't do a loan with GGP now, given their problems." (Hr'g Tr. 180:10–15, June 24, 2009; Debtors' Trial Ex. 71 at Met/GGP 02660.)  Metlife

---

[36] GGP contacted Wachovia Securities, a master servicer with respect to three loans.  Wachovia would not discuss appointing a special servicer and revising the terms on one loan until one month before maturity, and the other two loans matured and were in default before they were turned over to the special servicer.  (Nolan. Decl., June 16, 2009, ¶ 17.)

followed up in March 2009, by identifying GGP's "deteriorating financial capacity" as a reason to downgrade the Providence Place loan below investment grade, and it decided that Metlife should "take a pass" on the loan at maturity, rather than refinance or extend the loan. (Hr'g Tr. 140:1–14; 142:18–143:2, 144:24–145:24, 146:10–148:16, June 24, 2009; Debtors' Trial Ex. 70 at Met/GGP 00031, 00035; Debtors' Trial Ex. 72.) Obviously, none of this proves what Metlife would have done if the Debtors had opened negotiations before filing under Chapter 11, but it does support the conclusion that the Debtors' decision not to negotiate before filing was reasonable and made in good faith.[37]

### (ii) The Discharge of the Independent Managers

The second principal bad faith charge against the Debtors is that they engineered the discharge of the original Independent Managers of some of the Subject Debtors and replaced them with other Independent Managers. The basic facts are not in dispute. As discussed above, the Operating Agreements of some of the SPE's required that there be two independent managers or directors. The organizational documents permitted these independent managers to be supplied by a "nationally recognized company that provides professional independent directors, managers and trustees." In the cases at bar, Corporation Service Company ("CSC") supplied at least two "independent managers" who served on the Boards of over 150 project-level debtors. (Joint Trial Ex. 34, 35.)[38] It does not appear that these managers had any expertise in the real estate business and as mentioned above, some of

---

[37] On the subject of good faith, it is also suggestive that Metlife now states that it categorically refuses to agree to a plan that impairs its claim. (Metlife Reply, ¶ 22.) Such inflexibility and unwillingness to negotiate undermines Metlife's contention that it would have been willing to work with the Debtors prepetition to refinance its loans.

[38] Although the record is not altogether clear, it appears that CSC supplies these directors in the same fashion as it provides filing and other ministerial services for corporations. Nolan testified that "My understanding is that they serve on multiple boards. I do not know how they source their directors." (Hr'g Tr. 218: 12-17, June 17, 2009.)

the lenders thought the independent managers were obligated to protect their interests alone.
As articulated by Debtors' counsel, "the assumption by the lenders was that the independent
director was not really independent."   (Hr'g Tr. 62: 20-21, June 17, 2009.)

In any event, it is not disputed that the CSC-appointed independent managers were,
prior to the Petition Date, terminated from the Boards of those of the Subject Debtors that
maintained the independent-manager requirement.  (Hr'g Tr. 211-221, June 17, 2009.)  The
terminations "came as a surprise" to the independent managers because there was "no prior
indication such termination was being contemplated." (Manager Decl. at ¶5.)[39]  Moreover,
the managers did not learn of their termination until after the bankruptcy filings.[40]  It is also
undisputed that the Debtors selected two "seasoned individuals," Charles Cremens and John
Howard, to serve as successor independent managers or directors on the Boards.  Cremens
and Howard served on the Boards during the spring of 2009 when the Debtors reviewed their
restructuring prospects and ultimately voted to file under Chapter 11.  Nolan explained the
decision to replace the independent managers as follows:

> Given the significance, complexity, and time-consuming nature of
> assessing potential bankruptcy filings involving numerous entities,
> the project entities' stockholders and members desired independent
> managers with known experience in restructuring environments
> and complex business decisions, who understood the capital
> markets, who could commit significant time to learning about the
> projects, and who would bring critical, independent thinking to the
> restructuring challenges these project entities were facing.

---

[39] To supplement the record, Helios offered into evidence declarations from the two independent
managers, together with exhibits thereto (Helios Trial Ex. 19, 20) (the "Manager Declarations").
While the affiants describe the circumstances of their termination, they do not offer any evidence as to
their expertise or why they were on the Boards.

[40] The Company sent notice of termination to CSC in a letter dated April 16, 2009.  The termination
letter cited March 4, 2009 as the effective date of the termination of the managers and included a
schedule showing that at least one CSC-supplied independent manager, director, or trustee had been
removed from the boards of 159 GGP project-level entities.  (Exhibit B to Manager Decl.).

(Nolan Decl., June 16, 2009, ¶26).  Nolan also asserted that the terminations were not

disclosed to CSC or to the original managers themselves until after the bankruptcy

filings due to concern that such information "could subject the company to publicity

about potential restructuring strategies…" and because the Debtors had no contractual

obligation to inform the managers.  (Hr'g Tr. 224: 24-25, 225: 1, 13-14, June 17,

2009.)

      On this record it cannot be said that the admittedly surreptitious firing of the

two "Independent Managers" constituted subjective bad faith on the part of the

Debtors sufficient to require dismissal of these cases.  The corporate documents did

not prohibit this action or purport to interfere with the rights of a shareholder to

appoint independent directors to the Board.[41]  The new Independent Managers

satisfied the requirements of that position.  As discussed above, the Independent

Managers did *not* have a duty to keep any of the Debtors from filing a bankruptcy

case.  As managers of solvent companies charged to act in the same fashion as

directors of a Delaware corporation, they had a *prima facie* fiduciary duty to act in the

interests of "the corporation and its shareholders."  *Gheewalla*, 930 A.2d at 101.  It

may be for that reason that the two CSC-nominated Independent Managers voted in

favor of the Chapter 11 filings of those debtors on whose boards they still served.

      In *In re Kingston Square Assoc.*, the Court declined to grant motions to

dismiss on bad faith grounds where the debtors' management, precluded from filing

---

[41] Both of the CSC-nominated independent managers acknowledged in declarations filed with the
Court that, upon examination of "further evidence from GGP to ensure that [each independent
manager] was properly removed and replaced as per Article XIII (o) of the Amended and Restated
Limited Liability Company Agreement," it was determined that each independent manager "was
properly removed and replaced in accordance with the terms outlined" in the organizational
documents.  (Manager Decl. ¶ 6, 7).

voluntary cases, colluded with creditors to engineer involuntary filings.  The Court

found that this far more egregious action was "suggestive of bad faith," but that the

cases should not be dismissed as the collusion was not rooted in a "fraudulent or

deceitful purpose" but designed "to preserve value for the Debtors' estates and

creditors."  214 B.R. at 734, 736.[42]

The Debtors here have established that the filings were designed "to preserve

value for the Debtors' estates and creditors," including the Movants.  Movants are

wrong in the implicit assumption of the Motions that their rights were materially

impaired by the Debtors' Chapter 11 filings.  Obviously, a principal purpose of

bankruptcy law is to *protect* creditors' rights.  *See Young v. Higbee Co.*, 324 U.S.

204, 210 (1945).  Secured creditors' access to their collateral may be delayed by a

filing, but secured creditors have a panoply of rights, including adequate protection

and the right to post-petition interest and fees if they are oversecured.  11 U.S.C. §§

361, 506(b).  Movants complain that as a consequence of the filings they are

receiving only interest on their loans and have been deprived of current amortization

payments, and Metlife complains that it is not even receiving interest on its

mezzanine loan, which is secured only by a stock interest in its borrower's subsidiary.

However, Movants have not sought additional adequate protection, and they have not

waived any of their rights to recover full principal and interest and post-petition

interest on confirmation of a plan.  Movants complain that Chapter 11 gives the

---

[42] Indeed, while the Movants, particularly Helios, devoted considerable attention to the independent
manager issues in their papers and at trial, the precise basis for challenging the replacement of the
independent managers remains unclear.  As noted, Movants have conceded that the Debtors did not
violate the corporate documents in firing the initial Independent Managers.  Furthermore, ING has
declined to ask the Court to find "that the way these entities landed into bankruptcy by replacing
independent directors" was "wrongful" or indicative of bad faith.  (Hr'g Tr. 19: 1-3, 13-16, June 17,
2009.)

Debtors excessive leverage, but Metlife asserts it has all the leverage it needs to make sure that its rights will be respected.

It is clear, on this record, that Movants have been inconvenienced by the Chapter 11 filings.  For example, the cash flows of the Debtors have been partially interrupted and special servicers have had to be appointed for the CMBS obligations.  However, inconvenience to a secured creditor is not a reason to dismiss a Chapter 11 case.  The salient point for purposes of these Motions is that the fundamental protections that the Movants negotiated and that the SPE structure represents are still in place and will remain in place during the Chapter 11 cases.  This includes protection against the substantive consolidation of the project-level Debtors with any other entities.  There is no question that a principal goal of the SPE structure is to guard against substantive consolidation, but the question of substantive consolidation is entirely different from the issue whether the Board of a debtor that is part of a corporate group can consider the interests of the group along with the interests of the individual debtor when making a decision to file a bankruptcy case.  Nothing in this Opinion implies that the assets and liabilities of any of the Subject Debtors could properly be substantively consolidated with those of any other entity.

These Motions are a diversion from the parties' real task, which is to get each of the Subject Debtors out of bankruptcy as soon as feasible.  The Movants assert talks with them should have begun earlier.  It is time that negotiations commence in earnest.

## II. **Eligibility of the Lancaster Trust to File under Chapter 11**

ING Clarion also moves to dismiss the Chapter 11 case filed by Lancaster Trust, one of the Subject Debtors, on the ground it is an Illinois land trust and is ineligible to file. An Illinois land trust has been described as "a legal device whose primary function is to hold legal and equitable title to real estate," which "is not, and does not attempt to be, an active business or commercial entity." *In re North Shore Nat'l Bank of Chicago, Land Trust No. 362*, 17 B.R. 867, 869 (Bankr. N.D. Ill. 1982).

The facts are uncontested. Lancaster Trust was formed in 1979 and became a part of the GGP Group in June of 1998. It is the owner of the Park City Mall and the borrower under a loan serviced by ING Clarion, which is secured by the Park City Center. Lancaster Trust is described only as an "Illinois Trust" in its loan documentation, not as a "land trust." Nevertheless, ING Clarion contends that Lancaster Trust is ineligible to file for protection under the Bankruptcy Code because it does not maintain certain of the characteristics of a business entity, in that it lacks employees, independent managers, a governing board or officers, and the transferability of equity interests. The Debtors argue that the Lancaster Trust operates as a business trust because of its corporate attributes and because it transacts business for the benefit of investors, and thus that it is eligible to be a debtor under Chapter 11.

The Bankruptcy Code provides that a "person" may be a debtor under Chapter 11 and that the term "person" includes a "corporation." 11 U.S.C. §§ 109(d), 101(41). The term "corporation" in turn includes a "business trust." 11 U.S.C. § 101(9)(A)(v). However, neither the Bankruptcy Code nor its legislative history

defines the term "business trust."  *See Shawmut Bank Conn. v. First Fidelity Bank (In re Secured Equip. Trust of Eastern Air Lines)*, 38 F.3d 86, 89 (2d Cir. 1994).  The question is whether the Debtors have met their burden of proof of establishing that the Lancaster Trust was eligible to file because it operates as a business trust.[43]

In *Secured Equipment*, the Second Circuit addressed the question whether a "trust" should be considered a "business trust."  The Court stated that "a basic distinction between a business trust and other trusts is that business trusts are created for the purpose of carrying on some kind of business, whereas the purpose of a non-business trust is to protect and preserve the res."  *Id.* at 89 (internal citations omitted).  An important factor is whether the trust's purpose is to generate profit.  *Id.* at 91.  The Court concluded that each "inquiry must focus on the trust documents and the totality of the circumstances. . ." *Id.* at 90-91, citing *In re St. Augustine Trust,* 109 B.R. 494, 496 (Bankr. M.D.Fla.1990).[44]  Other courts have recognized that a trust that conducts business activities directed at generating a profit is a business trust eligible to file under the Bankruptcy Code.  *See Merrill v. Allen (In re Universal Clearing House Co.)*, 60 B.R. 985, 992 (D. Utah 1986) (court examined activity for which trust designed and authority granted to trustee); *Westchester County Civil Ser. E'ees Ass'n Benefit Fund v. Westchester County (In re Westchester County Civil Serv. E'ees Ass'n Benefit Fund),* 111 B.R. 451, 456 (Bankr. S.D.N.Y. 1990) ("If a trust conducts some

---

[43] The petitioner bears "the ultimate burden of establishing that the alleged debtor is an eligible debtor under the Bankruptcy Code . . . ."  *In re Secured Equip.*, 38 F.3d at 89, citing *In re Braten*, 99 B.R. 579, 583 (Bankr. S.D.N.Y. 1989).

[44] Because the trust in *Secured Equipment* was not created to run a business or to generate a profit, but only to act as a vehicle to facilitate a secured financing, the Court found the entity was not a business trust.  *See id.* at 90.  "Rather, it was established merely to secure the repayment of the certificateholders' loans to Eastern. As such, its purpose was to preserve the interest that the certificateholders had already been guaranteed, not to generate it."  *Id.* at 90.

44

business or commercial activities for the benefit of the beneficiaries to the enterprise,
it may qualify as a 'business trust.'" ); *see also In re Cooper Properties Liquidating
Trust, Inc.,* 61 B.R. 531, 536 (Bankr.W.D.Tenn.1986) (trust created to wind up the
affairs of a predecessor corporation was a business trust).

There is ample evidence in the record that Lancaster Trust is a profit-making
enterprise and that its purpose goes beyond merely conserving a trust res or holding
title to land.  As the Park City Mall owner and operator, it is an active participant in
various business activities aimed at earning a profit.  It is the named lessor in leases
with its tenants, the borrower under a loan agreement, party to various service
contracts, and explicitly authorized to conduct business in Pennsylvania.  (*See* Nolan
Decl., June 16, 2009, ¶ 54; Debtors Trial Ex. 20.)  ING Clarion argues that Lancaster
Trust has no board, officers or stockholders, but these are characteristics of some
closely-held business entities.  ING argues that the Trust has an outside termination
date and that the interest of Lancaster Trust's sole beneficiary is "non-transferable,"
but "restrictions on the transfer of shares, particularly in the case of close
corporations, are also common."  *In re T.A.T. Property*, 2009 Bankr. Lexis 739, at *4
n.3 (Bankr. S.D.N.Y. February 20, 2009).[45]  ING states that Lancaster Trust has no
employees and is managed by a GGP Group entity, but this is also a characteristic
shared by many, if not all of the project-level Debtors.  Indeed, ING Clarion made no
effort to distinguish the Lancaster Trust from any of the other Movants or from any of
the other project-level Debtors in terms of its business characteristics, except that it
was formed as an Illinois trust.

---

[45] There is also evidence in the record that the ownership interest in the Lancaster Trust was transferred
at least once, when the GGP Group acquired it.

Cases that have found an Illinois land trust to be ineligible to be a debtor under the Bankruptcy Code have involved entities very different from the Lancaster Trust.  In *In re North Shore Nat. Bank of Chicago, Land Trust No. 362*, 17 B.R. at 869, the Court found an Illinois trust specifically identified as a land trust to be ineligible because it "is not . . . an active business or commercial entity. . . It is merely a legal device whose primary function is to hold legal and equitable title to real estate." *See also In re Dolton Lodge Trust No. 35188*, 22 B.R. 918 (Bankr. N.D. Ill. 1982).  Movants rely heavily on *In re Woodsville Realty Trust*, 120 B.R. 2  (Bankr. D. N.H. 1990), where the Court considered the non-transferability of interests as one of many factors relevant in determining whether the trust had the attributes of a corporation.  However, in *Woodsville*, the Court found that the debtor had failed to show *any* significant corporate attributes in the structure and operation of the trust. *Id.* at 5 (emphasis in original).  Similarly, in *In re Treasure Island Land Trust*, 2 B.R. 332 (Bankr. M.D. Fla. 1980), the Court held that a trust which was "unable to point to *any* business activity in which it was actively engaged" was not eligible to be a debtor under the Code on theory that it was a business trust. *Id.* at 335.

On the record as a whole, the Court finds that the Lancaster Trust is a business trust eligible to file under Chapter 11.

## <u>CONCLUSION</u>

For the reasons set forth above, the motions to dismiss are denied.  The Debtors are

directed to settle an order on five days' notice.


Dated: New York, New York
       August 11, 2009

                                        */s/ Allan L. Gropper*_____
                                        UNITED STATES BANKRUPTCY JUDGE