WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007
Marcia L. Goldstein
Gary T. Holtzer
Adam P. Strochak
Stephen A. Youngman (*admitted pro hac vice*)
Sylvia A. Mayer (*admitted pro hac vice*)

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*admitted pro hac vice*)

Attorneys for Debtors and
Debtors in Possession

Co-Attorneys for Certain Subsidiary
Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                         :
**In re**                     :       **Chapter 11 Case No.**
                         :
**GENERAL GROWTH**     :       **09-11977 (ALG)**
**PROPERTIES, INC.,** et al.,  :
                         :       **(Jointly Administered)**
           **Debtors.**       :
------------------------------------------------------------x

**NOTICE OF HEARING ON DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY**
**CODE (A) APPROVING BIDDING PROCEDURES, (B) AUTHORIZING**
**THE DEBTORS TO ENTER INTO CERTAIN AGREEMENTS, (C) APPROVING**
**THE ISSUANCE OF WARRANTS, AND (D) GRANTING RELATED RELIEF**

      **PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "**Motion**")

for entry of an order (A) approving bidding procedures substantially in the form attached to the

Motion as Exhibit A; (B) authorizing General Growth to enter into certain agreements with REP

Investments LLC ("**REP**"), an affiliate of Brookfield Asset Management Inc. ("**Brookfield**");

Fairholme Capital Management, LLC ("**Fairholme**"); and Pershing Square Capital Management,

L.P. ("**Pershing**"); (C) approving the issuance of warrants in connection therewith; and

(D) granting related relief, all as more fully described in the Motion, will be held before the

Honorable Allan L. Gropper, United States Bankruptcy Judge, at the United States Bankruptcy

Court for the Southern District of New York, One Bowling Green, Courtroom 617, New York, New York 10004 (the "**Bankruptcy Court**") on **April 29, 2010** at **11:00 a.m. (prevailing Eastern Time)**.

   **PLEASE TAKE FURTHER NOTICE** that the deadline to file any objections or responses to the Motion is **April 22, 2010** at **4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

   **PLEASE TAKE FURTHER NOTICE** that objections or responses, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to the chambers of the Honorable Allan L. Gropper), and shall be served upon: (i) the chambers of the Honorable Allan L. Gropper, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom 617, New York, New York 10004; (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10044, (Attn: Andrea B. Schwartz and Elisabetta G. Gasparini, Esqs.); (iii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York 10153, (Attn: Marcia L. Goldstein and Gary T. Holtzer, Esqs.) and Weil, Gotshal & Manges LLP, 700 Louisiana Street, Suite 1600, Houston, Texas 77002, (Attn: Sylvia A. Mayer, Esq.), attorneys for the Debtors; (iv) Kirkland & Ellis LLP, 300 North LaSalle,

Chicago, Illinois 60654, (Attn: Anup Sathy, P.C.) co-attorneys for certain subsidiary debtor entities; (v) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, (Attn: Michael S. Stamer, Esq.) and 1333 New Hampshire Avenue, N.W., Washington, D.C. 20036-1564, (Attn: James Savin, Esq.), attorneys for the official committee of unsecured creditors; (vi) Saul Ewing LLP, 500 E. Pratt St., Suite 800, Baltimore, MD 21202, (Attn: Joyce A. Kuhns, Esq.) and Saul Ewing LLP, 400 Madison Ave., Suite 12 B, New York, New York 10017, (Attn:  John J. Jerome, Esq.), attorneys for the official committee of equity security holders; (vii) Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166, (Attn: David M. Feldman, Esq.), attorneys for the debtor in possession lender; (viii) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York, 10019, (Attn: Marc Abrams and Paul Shalhoub, Esqs.), attorneys for Brookfield and REP; (ix) Sullivan & Cromwell LLP, 125 Broad Street, New York, New York, 10041 (Attn: Andrew G. Dietderich, Esq.), attorneys for Fairholme and Pershing; and (x) all parties who have requested notice in these chapter 11 cases, so as to be received no later than the Objection Deadline.

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is timely filed, objecting parties are required to attend a hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: New York, New York
March 31, 2010

 /s/ Marcia L. Goldstein 
Marcia L. Goldstein
Gary T. Holtzer
Adam P. Strochak
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

and

Stephen A. Youngman (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

and

Sylvia A. Mayer (*admitted pro hac vice*)
Melanie Gray, *(admitted pro hac vice)*
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

and

James H.M. Sprayregen, P.C
Anup Sathy, P.C. (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Co-Attorneys for Certain Subsidiary
Debtors and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein
Gary T. Holtzer
Adam P. Strochak
Stephen A. Youngman (*admitted pro hac vice*)
Melanie Gray (*admitted pro hac vice*)
Sylvia A. Mayer (*admitted pro hac vice*)

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 861-2000
Facsimile: (312) 861-2200
James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*admitted pro hac vice*)

Attorneys for Debtors and
Debtors in Possession

Co-Attorneys for Certain Subsidiary
Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
In re                                                       :    **Chapter 11 Case No.**
                                                            :
**GENERAL GROWTH**                                          :    **09-11977 (ALG)**
**PROPERTIES, INC., et al.,**                               :
                                                            :       **(Jointly Administered)**
               **Debtors.**                                 :
------------------------------------------------------------x

**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY**
**CODE (A) APPROVING BIDDING PROCEDURES, (B) AUTHORIZING**
**THE DEBTORS TO ENTER INTO CERTAIN AGREEMENTS, (C) APPROVING**
**THE ISSUANCE OF WARRANTS, AND (D) GRANTING RELATED RELIEF**

TO THE HONORABLE ALLAN L. GROPPER,
UNITED STATES BANKRUPTCY JUDGE:

       South Street Seaport Limited Partnership, its ultimate parent, General Growth

Properties, Inc. ("**GGP**"), and their debtor affiliates, as debtors and debtors in possession

(collectively, "**General Growth**" or the "**Debtors**"),[1] submit this motion (the "**Motion**") and in support thereof respectfully represent as follows:

# I.

## PRELIMINARY STATEMENT

1.      On March 31, 2010, General Growth executed agreements for more than $6.5 billion in equity capital commitments.  The cornerstone agreement is with REP Investments LLC ("**REP**"), an affiliate of Brookfield Asset Management Inc. ("**Brookfield**"), which will invest $2.625 billion in General Growth's standalone emergence plan (the "**REP Agreement**") in exchange for approximately 26% of reorganized General Growth.[2]  General Growth concurrently signed agreements with Fairholme Capital Management, LLC ("**Fairholme**") to invest $2.8 billion, and Pershing Square Capital Management, L.P. ("**Pershing**") to invest $1.1 billion (for a combined total of $3.925 billion) in reorganized General Growth (together, the "**Fairholme/Pershing Agreements**" and, collectively with the REP Agreement, the "**Investment Agreements**") in exchange for approximately 28% and 11% of reorganized General Growth, respectively.[3]

2.      These agreements permit General Growth to achieve key objectives: (i) obtain an emergence transaction with recovery levels that are not subject to risk due to potential changes in the marketplace and (ii) establish procedures to facilitate the most

---

[1]      A list of the Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, is filed with the Court at Docket No. 593 and is also available for free online at www.kccllc.net/GeneralGrowth.  Lists of the emerged Debtors are filed with the Court at Docket Nos. 4163, 4253, 4330, 4440, and 4627 and are also available online at www.kccllc.net/GeneralGrowth.

[2]      Excluding any shares that may be acquired through exercise of the Warrants (as defined below) and excluding ownership interest in GGO (as defined below).

[3]      Also excluding any shares that may be acquired through exercise of the Warrants and excluding ownership interest in GGO (as defined below).

competitive process to select the best value-maximizing transaction.  The requested relief will enable General Growth and its stakeholders to achieve these two objectives and emerge from chapter 11.

3. Under the REP Agreement, equity capital will be invested at $15 per share.  Creditors will be satisfied in full.  The REP Agreement provides General Growth with the option to use REP's equity capital to emerge without further equity investments or as a cornerstone investment in General Growth's ongoing public and private capital raise process. The Fairholme and Pershing investments are incremental to the REP investment and will further General Growth's ability to provide a full cash option for all creditors.  The standalone plan contemplated by the REP Agreement will allow existing shareholders to participate in the upside of reorganized General Growth or, if one becomes available, a change of control transaction.[4] As such, the Investment Agreements provide protections for minority shareholders.

4. In exchange for its commitment, REP will receive warrants exercisable into 60 million shares of current General Growth common stock at a strike price of $15 per share.  Similarly, in exchange for their commitments, Fairholme and Pershing collectively will receive warrants exercisable into 60 million shares of current General Growth common stock at a strike price of $15 per share, to be divided between them *pro rata* based on their commitment level.

5. General Growth is also proposing bidding procedures substantially in the form attached hereto as <u>Exhibit A</u> (the "**<u>Bidding Procedures</u>**") for interested parties to submit proposals to either acquire General Growth or to finance its standalone emergence.  The Bidding Procedures allow parties sufficient time to finalize diligence and submit fully-financed binding

---

[4]      The term sheet for the plan sponsored by the REP Agreement is annexed hereto as <u>Exhibit A</u> to <u>Exhibit B</u> to the Motion.

proposals by the conclusion of the bidding period. The Bidding Procedures also allow General Growth sufficient time to assess and develop such proposals and discuss them with the advisors to both the official committee of equity security holders (the "**Equity Committee**") and the official committee of unsecured creditors (the "**Creditors' Committee**") without being at risk to changes in the financial markets. Based upon its determination of the best time periods to achieve optimal results, General Growth has revised modestly the timeline outlined to this Court on March 3, 2010, and currently intends to select the transaction or transactions it intends to consummate and file a plan of reorganization (a "**Plan**") and disclosure statement (a "**Disclosure Statement**") to effectuate the terms of such transaction(s) on or around July 2, 2010.

6.        The issuance of warrants (the "**Warrants**") to REP, Fairholme, and Pershing (each a "**Commitment Party**" and together, the "**Commitment Parties**") is fair and reasonable in light of the extraordinary magnitude of these transactions, likely the largest long-term equity capital commitments ever made in a chapter 11 context, and represents General Growth's exercise of sound business judgment. The Warrants to be granted to REP are valued by General Growth as of the market close on March 30, 2010 (based on the assumptions described below), at approximately $260 million, and the Warrants to be granted to Fairholme and Pershing are valued at approximately $185 million and $74 million, respectively. The Warrants are a condition to the agreements, and the Commitment Parties are unwilling to provide their commitment without issuance of the Warrants.

7.        Although the Warrants represent significant consideration, they have no effect on cash available for creditors and are necessary to obtain the benchmark long-term financing offered by the Commitment Parties, which is the best financing proposed to General Growth to date. Moving forward without committed financing would unnecessarily risk General

Growth's ability to maximize value for all stakeholders through a competitive process. General

Growth's bidding process affords potential bidders the opportunity to submit higher and/or better

proposals both before and after the Warrants are issued. The certainty of the committed capital

provided by this benchmark proposal, including the Warrants, reduces recovery risk to creditors

while simultaneously allowing a process that will create the most value for all stakeholders.

8.     As demonstrated below, approval of the Bidding Procedures and

authorization to issue the Warrants is in the best interests of the estate and will foster a highly

competitive process available to secure the best emergence transaction for all stakeholders.

## II.

## GENERAL BACKGROUND

9.     Commencing on April 16, 2009 (the "**Commencement Date**") and

continuing thereafter, the Debtors commenced voluntary cases under chapter 11 of title 11 of the

United States Code (the "**Bankruptcy Code**"). The Debtors' chapter 11 cases have been

consolidated for procedural purposes only and are being jointly administered pursuant to Rule

1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). General

Growth is authorized to continue to operate its businesses and manage its properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.     On April 24, 2009, the Office of the United States Trustee for the

Southern District of New York (the "**U.S. Trustee**") appointed the Creditors' Committee. On

September 8, 2009, as subsequently amended on September 21, 2009 and September 24, 2009,

following the requests of certain equity holders, and pursuant to section 1102(a)(2) of the

Bankruptcy Code, the U.S. Trustee appointed the Equity Committee.

11.     To date, General Growth has successfully confirmed plans for 258 entities, restructuring approximately $14 billion of secured mortgage debt and the majority of General Growth's operating entities.

12.     On March 8, 2010, the Court entered its *Order Pursuant to Section 1121(d) of the Bankruptcy Code Approving a Second Extension of Exclusive Period for Filing a Chapter 11 Plan and Soliciting Acceptances Thereto* (the "**Second Exclusivity Order**"), extending General Growth's exclusive period for filing a chapter 11 plan to July 15, 2010.

## III.

## JURISDICTION

13.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. § § 1408 and 1409.

## IV.

## RELIEF REQUESTED

14.     By this motion, General Growth seeks an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code: (A) approving the Bidding Procedures; (B) authorizing General Growth to enter into the Investment Agreements and warrant agreements (collectively, the "**Warrant Agreements**") with REP, Fairholme, and Pershing substantially in the forms attached hereto as Exhibits B through E,[5] and approving Article IX of the REP Agreement; (C) approving the issuance of the Warrants pursuant to the terms of the Investment Agreements and the Warrant Agreements; and (D) granting related relief.  In addition, General

---

[5]     The agreements annexed hereto as Exhibits B through E do not include schedules.  The schedules will be made available to the Committee Advisors and to potential bidders pursuant to appropriate non-disclosure agreements.

Growth further requests that the Court waive the requirements of Bankruptcy Rule 6004(h) because the Investment Agreements require the issuance of the Warrants within one business day after the entry of an order approving this Motion, and General Growth desires to implement the requested relief as soon as possible.  A proposed order is attached hereto as Exhibit F.

V.

**THE BIDDING PROCESS**

15.     General Growth believes that the competitive capital raise and strategic sale process outlined below will maximize recoveries for all stakeholders and allow for the fair distribution of General Growth's enterprise value.  The competitive capital raise and strategic sale process currently underway is a two-round process, with the first round concluding just prior to the hearing on this Motion.

16.     On March 3, 2010, General Growth began working with strategic investors interested in pursuing an M&A transaction and financial investors that could sponsor a standalone emergence (collectively, the "**Interested Parties**") by providing them access to reasonable due diligence in connection with their potential submission of non-binding, detailed term sheets ("**Term Sheets**") on or before April 19, 2010 at 3:00 p.m. (Eastern Time) (the "**First Round Bid Deadline**").  General Growth will continue to provide Interested Parties with access to information contained in the Data Room or as otherwise requested.[6]  This exchange of information with Interested Parties is robust and ongoing.[7]  General Growth has also

---

[6]     Certain information may be restricted due to anti-trust or other concerns.

[7]     Based on the diligence made available by General Growth and the exchange of information referenced above, each party that submits a Term Sheet by the First Round Bid Deadline (the "**First Round Bidders**") is deemed to acknowledge and represent that it has had an opportunity to conduct due diligence on General Growth in connection with the first round prior to making its first round proposal; and that it solely relied upon its own independent review, investigation and/or inspection of any documents and/or the assets in making its proposal; and that it did not rely upon any written or oral

affirmatively contacted certain parties that have expressed an interest in making a proposal or whom General Growth believes may have an interest in making a proposal and will provide requests for proposals and confidential information memoranda to these parties shortly.

17. General Growth will share the Term Sheets submitted after the First Round Bid Deadline with the advisors to the Equity Committee and Creditors' Committee (collectively, the "**Committee Advisors**"), subject to applicable confidentiality agreements or provisions. Simultaneously, General Growth will review the Term Sheets and negotiate with the First Round Bidders as General Growth deems appropriate, based on the exercise of its business judgment and consultation with the Committee Advisors. On or before April 28, 2010, General Growth intends to select, in its business judgment and after consultation with the Committee Advisors, those proposals that qualify for participation in the second round bidding process.

18. Contemporaneously with the first round of bidding, General Growth continues to actively engage market participants in an effort to maximize value for its stakeholders by obtaining binding benchmark proposals that either enhance the REP Agreement on terms equivalent or superior to the Fairholme/Pershing Agreements or that replace the REP Agreement and/or the Fairholme/Pershing Agreements. Simply stated, General Growth will conduct the broadest competitive process to obtain investments from parties who can complete their due diligence quickly and submit binding benchmark proposals for the opportunity to co-

---

statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding General Growth, or the completeness of any information provided in connection therewith. As the Investment Agreements each contain bargained-for representations, warranties, and covenants, REP, Fairholme, and Pershing are excepted from this provision of the Bidding Procedures.

invest and/or provide capital on more competitive terms before other prospective acquirers and/or investors submit Term Sheets at the First Round Bidding Deadline.[8]

19.     General Growth currently intends to pursue the following timeline for the two-round competitive capital raise and strategic sale process, which it believes is fair for all bidders:

| APRIL 19 | • Deadline for submission of first round bids |
|---|---|
| APRIL 19 THROUGH APRIL 28 | • Analyze first round bids, including consultation with Equity Committee and Creditors' Committee<br>• Select qualifying bidders to proceed to second round |
| APRIL 29 | • Hearing on bid procedures motion |
| APRIL 30 THROUGH JUNE 2 | • Commence second round of process<br>• Form consortia of bidders, if applicable<br>• Provide additional due diligence information<br>• Negotiate documentation |
| JUNE 2 | • Deadline for submission of second round bids |
| JUNE 3 THROUGH JUNE 15 | • Analyze second round bids, including consultation with Equity Committee and Creditors' Committee |
| JUNE 16 THROUGH JULY 2 | • Select final bid(s)<br>• Negotiate documentation with final bidder(s), including Plan and Disclosure Statement<br>• Consult with Equity Committee and Creditors' Committee on final documentation<br>• File Plan and Disclosure Statement |
| JULY 30 | • Disclosure Statement hearing |
| AUGUST 6 | • Commence solicitation |

---

[8]     To the extent that prior to the hearing on this Motion, additional proposals, including change of control proposals, are submitted to General Growth that are superior to or enhance the proposals in hand, General Growth may seek approval of such proposal or proposals in place of or in addition to those currently described in the Motion, as General Growth may determine is appropriate in its business judgment.

| SEPTEMBER 17 | • Voting deadline<br>• Objection deadline |
|---|---|
| SEPTEMBER 30 | • Confirmation hearing |

20.     The second round of the bidding process will commence upon approval of the Bidding Procedures.[9]  The Bidding Procedures provide that prospective acquirers and/or investors whose proposals were selected for the second round (the "**Second Round Bidders**")[10] will receive additional due diligence information, to the extent that they have not previously received such information or new information becomes available, and General Growth will negotiate documentation with the Second Round Bidders.  The Second Round Bidders are expected to submit to the Bid Notification Parties (as defined in the Bidding Procedures) fully-financed binding offers without any contingencies or provisions relating to additional diligence, along with proposed final documentation ("**Final Proposals**"), on or before June 2, 2010 at 4:00 p.m. (Eastern Time).  General Growth will share the Final Proposals with the Committee Advisors, subject to applicable confidentiality agreements or provisions.  General Growth will analyze the Final Proposals received during the second round, and on or before July 2, 2010, it intends to select, in its business judgment and after consultation with the Committee Advisors, the transaction or transactions it intends to consummate in connection with its Plan (the "**Successful Proposal**").

21.     After selecting the Successful Proposal, General Growth, in consultation with the entity or entities which submitted the Successful Proposal, intends to file its Plan and

---

[9]     The description of the Bidding Procedures herein is for summary purposes only and in case of any conflict between the Bidding Procedures and this Motion, the Bidding Procedures attached hereto as Exhibit A will govern.

[10]    Notwithstanding anything to the contrary in the Bidding Procedures, REP, Fairholme, and Pershing are entitled to participate in the second round of bidding as "Second Round Bidders."

the accompanying Disclosure Statement with the Court.  General Growth currently anticipates filing the Plan on or around July 2, 2010.[11]  Based on this expected filing date, and subject to the Court's schedule, General Growth currently anticipates that a hearing to consider confirmation of the Plan would take place on or around September 30, 2010.

22.     Parties submitting proposals may seek reimbursement of expenses incurred in connection with these Bidding Procedures up to $1 million per bidder by providing a written request for reimbursement with a summary and detailed backup for the expenses incurred.  General Growth will consider any such request and, in its sole discretion and subject to the exercise of its business judgment, determine whether to provide reimbursement; *provided*, *however*, that in no event will General Growth reimburse more than $10 million in the aggregate.

## VI.

## THE INVESTMENT AGREEMENTS

23.      Pursuant to the REP Agreement, REP has committed $2.625 billion for nine months to sponsor a recapitalization of General Growth through a plan that is intended to maximize both current and long-term value for shareholders, satisfy unsecured claims in full, and enable General Growth to emerge from bankruptcy on a stand-alone basis with a diverse portfolio of high-quality income-producing assets, strong cash flow, and a solid balance sheet.

24.     The REP Agreement offers a long-term equity capital commitment, as well as a commitment by REP's highly regarded and experienced affiliate, Brookfield, to provide strategic support for General Growth's restructuring efforts including, without limitation, access to capital markets, assistance in raising capital, and asset management.  Brookfield is a global

---

[11]     Although General Growth anticipates filing the Plan on or around July 2, 2010, the Second Exclusivity Order extended the period in which General Growth has the exclusive right to file a chapter 11 plan through and including July 15, 2010.

asset manager with over $100 billion of assets under management, including approximately $40 billion of real property assets. Brookfield's commitment to the bidding process is a strong indicator to other potentially interested parties, as well as shareholders, that General Growth's competitive process is robust. General Growth believes this will foster interest in the competitive bidding process, thereby creating even more value for all General Growth stakeholders.

25. Pursuant to the Fairholme/Pershing Agreements, Fairholme, General Growth's largest unsecured creditor, and Pershing, one of General Growth's largest equity holders and a significant unsecured creditor, have committed to invest a combined $3.925 billion of new equity capital for nine months to facilitate the recapitalization of General Growth contemplated under the REP Agreement.

26. The salient terms of the transactions contemplated by the Investment Agreements are as follows:[12]

| Investors | <ul><li>REP, a new company organized and owned by Brookfield and its institutional partners.</li><li>Fairholme.</li><li>Pershing.</li></ul> |
|---|---|
| Investment | GGP <ul><li>Total: $6.3 billion at $10 per share.<ul><li>REP: $2.5 billion.</li><li>Fairholme: $2.7 billion</li><li>Pershing: $1.1 billion.</li></ul></li></ul> GGO <ul><li>Total: $250 million at $5 per share.<ul><li>REP: $125 million.</li><li>Fairholme: $89.25 million</li><li>Pershing: $35.75 million.</li></ul></li></ul> |

---

[12] The description of the transaction contemplated by the Investment Agreements herein is for summary purposes only and in case of any conflict between the Investment Agreements themselves and this Motion, the Investment Agreements attached hereto as Exhibits B, C, and D will govern.

| | |
|---|---|
| **Term** | • REP has committed through December 31, 2010.<br>• Fairholme and Pershing have each committed through December 31, 2010, but can terminate after November 1, 2010, if General Growth pursues a Competing Transaction (as defined in the Investment Agreements). |
| **Corporate Debt** | • Investment contemplates that General Growth may have $1.5 billion of unsecured corporate debt upon emergence through reinstatement and/or new debt. |
| **Consideration to Unsecured Creditors** | • Satisfaction in full of par plus accrued interest. |
| **Consideration to Existing Stockholders** | • 34% of reorganized GGP (before any exercise of warrants).<br>• 86% of reorganized GGO (defined below) (before any exercise of warrants). |
| **Purchase Price per Share**[13] | • $10 per share of GGP and $5 per share of GGO. |
| **Partial Commitment Replacement** | • General Growth will have the option to reduce the Fairholme/Pershing commitment by up to $1.9 billion if equity capital becomes available on more advantageous terms pre-closing. |
| **Additional Capital** | • In addition to the capital committed by the Commitment Parties and any new debt, General Growth can secure an additional $500 million through the sale of shares to third parties and an additional $150 million (or more in certain circumstances) through sales of assets to third parties. |
| **GGO Distribution and Rights Offering** | • The transaction contemplated by the Investment Agreements provides for the creation of General Growth Opportunities ("**GGO**"), a new company to which GGP would transfer certain non-core assets that currently produce little or no current income but have the potential for significant long-term value.[14]<br>• The distribution of GGO shares to GGP shareholders is a condition to closing the transaction.<br>• In connection with the distribution, GGO will commence a $250 million equity rights offering.<br>    o The Commitment Parties will commit to purchase all unsubscribed shares in the equity rights offering, with REP providing $125 million, Fairholme providing $89.25 million, and Pershing providing $35.75 million.<br>    o Each of REP and Fairholme/Pershing will receive a |

---

[13]      Excluding value associated with the Warrants.

[14]      A listing of the assets that is contemplated to be transferred to GGO is annexed hereto as Exhibit E to Exhibit B to the Motion.

| | |
|---|---|
| | <ul><li>minimum allocation of \$50 million of GGO rights offering shares.<ul><li>Each of REP and Fairholme/Pershing will receive \$6.25 million in GGO shares as consideration for the backstop commitment.</li></ul></li><li>GGO will issue a note to GGP in an amount equal to debt in excess of the debt cap, claim in excess of the claims cap and any payments by GGP in settlement of the Hughes claims.</li></ul> |
| **<u>Warrants</u>** | <ul><li><u>Pre-emergence</u>: 60 million warrants to purchase GGP stock issued to each of REP and Fairholme/Pershing at an exercise price of \$15 per share.</li><li><u>Post-emergence</u>: Warrants will be exchanged for 60 million warrants for reorganized GGP common stock at an exercise price of \$10 per share and 40 million warrants for GGO common stock at an exercise price of \$5 per share to each of REP and Fairholme/Pershing.<ul><li>Post-emergence warrants will have seven-year maturity from closing.</li></ul></li><li>In the event of a change of control transaction after issuance of the warrants, the warrants will become redeemable for cash at the option of their holders (at their value calculated pursuant to the "Black Scholes" model assuming a fixed volatility), except to the extent shareholders receive listed public stock in connection with the change of control.</li><li>Warrants provide investors customary anti-dilution protection, including for cash dividends.</li></ul> |
| **Post-Emergence <u>Board of Directors</u>** | <ul><li>GGP: 9 directors on the GGP board at emergence.<ul><li>3 directors (including the initial chairperson upon closing) designated by REP and 1 designated by Pershing.</li><li>REP has post-emergence board designation rights that ratchet down if its percentage ownership decreases.</li><li>Fairholme and Pershing have no post-emergence board designation rights.</li></ul></li><li>GGO: 9 directors on the GGO board at emergence.<ul><li>2 directors designated by REP and 2 designated by Pershing.</li></ul></li><li>All board designation rights at GGP and GGO cease if the applicable investor's percentage ownership falls below 10%.</li></ul> |
| **Additional Investor <u>Rights</u>** | <ul><li>Participation rights in future public and private equity issuances by GGP and GGO, to allow investors to maintain percentage ownership on fully-diluted basis.</li><li>Registration rights.</li><li>Indemnification to REP in connection with assistance in arranging other financing.</li></ul> |

| | |
|---|---|
| **Conditions to Investors' <u>Obligation to Close</u>** | • Restructuring of General Growth holding company structure.<br>• Minimum liquidity floor of GGP of $500 million.<br>• Maximum debt cap.<br>• Maximum GGP share count.<br>• GGO distribution.<br>• Maximum GGO share count.<br>• Continued accuracy of General Growth representations and warranties, and performance by General Growth of its positive and negative covenants.<br>• Absence of any Material Adverse Effect on General Growth.<br>• No injunction or legal impediment.<br>• Receipt of regulatory approvals and third-party consents.<br>• Satisfaction of conditions in Bankruptcy Court Confirmed Plan, in form and substance satisfactory to the investors.<br>• Effectiveness of SEC registration statements.<br>• Listing:  NYSE for GGP; any U.S. stock exchange for GGO.<br>• REIT legal opinion.<br>• Non-Control Agreement.<br>• Completion of REP funding is a condition to the Fairholme/Pershing obligation to close. |
| **Post-Closing <u>Lock-Up</u>** | • REP: Lock-up expires at 18 month anniversary of closing.  Sale of an aggregate 16.5% of holding permitted between months 6 through 18 post-closing.<br>• Fairholme/Pershing: minimal restrictions: if GGP draws some but not all of the Fairholme/Pershing funding, lock-up for  up to 120 days after the closing. |

| | |
|---|---|
| **Termination** | <ul><li>By the Commitment Parties if:<ul><li>Warrants not approved by Bankruptcy Court within 43 days, or issued within 1 business day of entry of an Order approving this Motion.</li><li>Closing does not occur on or before December 31, 2010 (subject to limited extension rights).</li><li>General Growth withdraws the Motion; Warrants are canceled or modified in a way adverse to the Commitment Parties; or GGP stock underlying the Warrants is not listed.</li><li>General Growth notifies that it intends to accept a Competing Transaction prior to approval of the Warrants by the Bankruptcy Court.</li><li>Closing conditions cannot be satisfied.</li><li>GGP issues shares below $10 minimum price per share.</li></ul></li><li>General Growth is generally able to terminate; however, the Commitment Parties may keep the Warrants once issued.<ul><li>The Warrants would be cancelled only if the Commitment Parties fail to fund when closing conditions are satisfied and the Warrants have been transferred following General Growth electing to support a Competing Transaction.</li></ul></li></ul> |
| **Remedies** | <ul><li>General Growth remedies against REP limited to specific performance prior to closing.<ul><li>REP will have an equity commitment letter from Brookfield and either escrowed funds or letters of credit from the other members of the Brookfield consortium (i.e., remedy would be to sue REP to cause its investors to honor the commitments; General Growth will not be a direct party to the commitments).</li><li>Remedies against Fairholme/Pershing would include ability to sue for direct damages.</li></ul></li></ul> |
| **Stockholder Protections** | <ul><li>Caps on economic ownership of common stock of GGP:<ul><li>REP capped at 45%.</li><li>Fairholme/Pershing capped at lower of (i) fixed percentage (Fairholme – 30%, Pershing – 25%), and (ii) Fairholme's or Pershing's respective ownership percentage at emergence plus 5%.</li><li>Exceptions to ownership caps for stock dividends and tender/exchange offers and mergers approved as provided in the non-control agreements.</li></ul></li><li>Voting restrictions:<ul><li>In connection with a proposed merger or similar transaction, if the General Growth board recommends a stockholder vote against such transaction: (i) REP can vote only 30% of its shares in favor, and shares in excess of 30% generally must be voted in</li></ul></li></ul> |

|  | proportion to the other stockholders, (ii) Fairholme can vote only 10% in favor and shares in excess of 10% will be voted in proportion to the other stockholders, and (iii) Pershing's voting is not limited. |
|  | o Affiliate transactions require approval of a majority of disinterested directors (i.e. directors not affiliated with participants in the transaction). |
|  | o In connection with a vote for the election of directors, (i) REP can vote for its designees and must otherwise vote in proportion to the other stockholders, and (ii) Fairholme and Pershing can each vote 10% as they wish, but must vote the rest of their shares in proportion to the other stockholders. |
|  | • Transfer restrictions: |
|  | o Unless approved by a majority of independent directors, REP and Fairholme/Pershing cannot transfer common stock if transferee would beneficially own more than 10% of GGP common stock. |
|  | o Exceptions to transfer restrictions for (i) transfers to affiliates or third-parties that agree to ownership and voting restrictions, (ii) registered offerings that are widely distributed, (iii) Rule 144 sales, (iv) mergers or other transaction approved by the General Growth board and (v) tender offers in which all other stockholders are allowed to sell on the same terms. |
|  | • Other provisions: |
|  | o General Growth board cannot be expanded without 75% of the vote of General Growth board. |
|  | o Provisions above generally apply to GGO. As regards REP, Fairholme, and Pershing will have smaller investments in GGO and will not sign non-control agreements. |

27.     The Investment Agreements collectively provide General Growth with more than $6.5 billion of committed equity capital for nine months,[15] making them one of the largest, if not the largest, equity capital commitments ever made in a chapter 11 context. These long-term commitments by the Commitment Parties enable General Growth to satisfy unsecured creditors in full and ensure substantial value for shareholders. Any additional cash needed to

---

[15]     REP, Fairholme, and Pershing have committed their capital through December 31, 2010. Under certain circumstances, Fairholme and Pershing may terminate their commitment on November 1, 2010.

satisfy unsecured creditors in full will come from cash on hand and the remaining capital raise process. Additionally, the unilateral nature of the Investment Agreements allows General Growth to secure these long-term capital commitments while simultaneously preserving the option to explore the possibility of even greater value being achieved from alternative sources of capital without risking the loss of the commitments provided by the Investment Agreements.

## VII.

## THE WARRANTS

28. The Warrants[16] are a right, on the part of the Commitment Parties, to participate in an increase in equity value by allowing the Commitment Parties to purchase stock at a predetermined strike price at any time prior to the maturity of the Warrants. As consideration for committing significant amounts of capital for an extended period of time, thereby creating a floor value for General Growth's equity and providing the momentum needed to drive a competitive capital raising process, General Growth has agreed to grant each of REP and Fairholme/Pershing warrants to purchase 60 million shares of existing GGP common stock at a strike price of $15 per share. Fairholme and Pershing would share their Warrants *pro rata* to their respective equity commitments under the Fairholme/Pershing Agreements.[17] The Warrants would have a maturity of seven years from the date of issuance.

29. GGP currently has over 320 million shares outstanding. The Warrants, if exercised, would raise the number of outstanding GGP shares to 440 million. As a result, the

---

[16] The description of the Warrants herein is for summary purposes only and in case of any conflict between the terms of the Investment Agreements and/or the Warrant Agreements and this Motion, the Investment Agreements attached hereto as Exhibits B, C, and D, and/or the Warrant Agreement attached hereto as Exhibit E will govern.

[17] Fairholme will commit approximately 71% and Pershing will commit approximately 29% of the capital committed pursuant to the Fairholme/Pershing Agreements.

Warrants would provide the Commitment Parties, collectively, with 25% of the total increase in equity value over $15 from the date the Warrants are issued through the effective date of the Plan. Following consummation of the restructuring contemplated under the Investment Agreements, the GGP Warrants and GGO Warrants will provide the Commitment Parties with approximately 10% of the total increase in equity value over $10. The Commitment Parties would effectively participate in the potential equity upside of any Plan, while the cost of the Warrants would be limited exclusively to existing shareholders who would also share in any potential equity upside. Importantly, the cost associated with the Warrants will not decrease the amount of cash available to satisfy holders of administrative expenses or unsecured claims against the General Growth's estates.

30. The Commitment Parties will not receive under the Investment Agreements any expense reimbursement, underwriting fees, commitment fees, ticking fees, substantial contribution claims, breakup fees, or any other form of compensation other than the Warrants. Thus, the Commitment Parties will not receive any other consideration from General Growth for the value of their long-term commitments of more than $6.5 billion in capital pursuant to agreements that allow General Growth to continue exploring alternative sources of capital and possibly realize even greater value.[18]

31. The Warrants are an equity option and have a value that depends on the duration of the option, the value of the underlying security, the volatility of the underlying

---

[18] Although the Commitment Parties have not required any consideration under the Investment Agreements other than the issuance of the Warrants, because the Commitment Parties have allowed General Growth to shop their commitments under the Investment Agreements prior to the Court's consideration of this motion, the Commitment Parties expressly reserve their right to seek the allowance and payment of an administrative expense claim in these cases (under section 503(b)(1), (3) or otherwise) in the event that General Growth elects to proceed with a different proposal, as referenced in footnote 8 above.

security, cost of funds and other factors.  The Warrants provide that, upon a cash change of control transaction, whether <u>before or after emergence</u>, the holders of the Warrants have the right to redeem their Warrants for a cash amount equal to the fair market value of the Warrants as determined by the Company (calculated with the Black-Scholes model assuming 20% volatility). In a public stock-for-stock transaction resulting in a change of control, the acquirer has the option to cash out the Warrants at the Black-Scholes value (assuming 20% volatility) or roll the warrants into new warrants in the stock of the acquirer (which permits the Warrants to continue for their original term, preserving their option value).  The following table shows the potential effect of the Warrants on the price per share in the event that the Warrants are "cashed out" at their Black-Scholes value, assuming 6.5 years remaining in their term on a hypothetical transaction closing date:

| Implied Price per Share (w/o Warrants) ($) | Black-Scholes Value ($mm) | Implied Price per Share (w/ Warrants) ($) | Warrant Value per Share ($) |
|---|---|---|---|
| 10.00 | 137 | 9.58 | 0.42 |
| 11.00 | 183 | 10.44 | 0.56 |
| 12.00 | 235 | 11.28 | 0.72 |
| 13.00 | 292 | 12.11 | 0.89 |
| 14.00 | 353 | 12.92 | 1.08 |
| 15.00 | 418 | 13.72 | 1.28 |
| 16.00 | 485 | 14.51 | 1.49 |
| 17.00 | 555 | 15.30 | 1.70 |
| 18.00 | 628 | 16.08 | 1.92 |
| 19.00 | 702 | 16.85 | 2.15 |
| 20.00 | 779 | 17.61 | 2.39 |

For example, if General Growth received a cash offer that resulted in a merger closing with 6.5 years remaining on the term of the Warrants at a stock price of $18.00, the value of the Warrants would be $628 million or approximately $1.92 per share.

32.     Following consummation of any Plan, the Warrants would be exchanged by each of REP and Fairholme/Pershing for new warrants to purchase 60 million shares of reorganized GGP at a strike price of $10 per share (the "**GGP Warrants**") and new warrants to purchase 40 million shares of GGO at a strike price of $5 per share (the "**GGO Warrants**"). The new GGP Warrants and GGO Warrants would have a maturity of seven years from the date of emergence.  In the event of a cash transaction resulting in a change of control in General Growth <u>after emergence</u>, the Commitment Parties may elect to cash out the GGP Warrants at a Black-Scholes value assuming 20% volatility.  If a cash transaction results in a change of control in GGO <u>after emergence</u>, the Black-Scholes value of the GGO Warrants will be calculated assuming volatility that is the lesser of 30% and market.  Similarly, in a public stock-for-stock transaction resulting in a change of control after emergence, the acquirer has the option to cash out the GGP Warrants and GGO Warrants at their Black-Scholes value assuming 20% volatility for the GGP Warrants and the lesser of 30% and market for the GGO Warrants, or it may roll the warrants into new warrants in the acquirer.

33.     Prior to the Court's approval of the Warrants, Pershing has agreed to provide interim protection to Brookfield.  In the event that General Growth consummates a transaction with a party other than Brookfield at a "benchmark value per share", Pershing will be obligated to make a "contingent payment" to Brookfield.  The benchmark value per share is $12.75, with an additional approximately $.01 for each calendar day after April 7, 2010 until the Plan is consummated.  As an example, if consummation of a Plan occurs on June 30, 2010, the benchmark value per share would be roughly $13.57.  The contingent payment means a payment of approximately 25% of Pershing's profit above the benchmark value per share.  This obligation on the part of Pershing will terminate upon issuance of the Warrants to REP.  General Growth is

not required to reimburse Pershing for any amounts that may be paid as interim protection to Brookfield.

## VIII.

## BASIS FOR RELIEF REQUESTED

### A.  Sound Business Reasons Exist to Approve the Relief Requested

34.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the [Debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In addition, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

35.  Courts in the Second Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business upon a finding that such use is supported by sound business reasons.  See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him … a good business reason to grant such an application."); Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources), 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Enron Corp., 2003 WL 1562202, at *19 (Bankr. S.D.N.Y. Mar. 21, 2003). Accordingly, courts in the Second Circuit "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose."  In re Global Crossing, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citing Paramount Commc'n Inc. v. QVC Network Inc., 637 A.2d 34, 45 n.17 (Del. 1994)); accord In re

<u>Johns-Manville Corp.</u>, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

36. General Growth consulted with its advisors and carefully evaluated a number of qualitative and quantitative factors in designing a process that it believes will result in the successful restructuring of General Growth and the recognition of significant value for all stakeholders. This process includes, *inter alia*, a competitive capital raise and strategic sale process. General Growth submits that in its business judgment the Bidding Procedures, the Investment Agreements, and the Warrants are necessary to effectively manage the capital raising processes, maximize recoveries for stakeholders, and fairly distribute the enterprise value created during the first stage of these cases.

**B.** **Sound Business Reasons Exist to Approve the Bidding Procedures**

37. General Growth submits that there are sound business reasons justifying approval of the Bidding Procedures. The proposed form of Bidding Procedures will provide General Growth's stakeholders with the greatest benefit available from a competitive capital raise. Specifically, the Bidding Procedures are designed to attract the maximum number of bidders while providing General Growth with the flexibility to select the transaction or transactions that optimize value for its stakeholders. Further, the Bidding Procedures are fair and open, and do not unfairly favor REP, Fairholme, Pershing, or any other party interested in making a proposal. Finally, the Bidding Procedures establish a time frame that will allow potential purchasers sufficient time to conduct due diligence, arrange financing, and construct and submit informed competing bids, while still providing for the expeditious restructuring of General Growth. Based upon the foregoing, General Growth submits that the Bidding

Procedures will help ensure that General Growth receives proposals for transactions that optimize the value of its estates for the benefit of all stakeholders, and, accordingly, the Bidding Procedures should be approved by the Court.

**C.     Sound Business Reasons Exist to Authorize
General Growth to Enter into the Investment Agreements**

38.     General Growth further submits that there are sound business reasons justifying its decision to enter into the Investment Agreements.  General Growth expended considerable time and effort negotiating the terms of the Investment Agreements and ensuring that each of the Investment Agreements provides competitive and economically attractive long-term financing.  Considered together, the Investment Agreements provide General Growth with more than $6.5 billion of equity capital committed for nine months.  General Growth believes that this equity capital, along with cash on hand and additional capital that may be raised, will provide the cash required to meet General Growth's capital needs in connection with its emergence from bankruptcy.  Moreover, due to the length of the equity capital commitments and the flexibility to accept superior proposals without losing the value of that commitment, the Investment Agreements will facilitate a capital raise process in which General Growth will receive competitive proposals for alternate transactions, thereby optimizing the value of General Growth's estates for the benefit of all its stakeholders.

39.     Further, pursuant to the REP Agreement, General Growth will receive not just an equity capital commitment from a reputable and well-established sponsor, but will also receive additional support from Brookfield for General Growth's restructuring efforts through, among other things, Brookfield's widely respected asset management services and broad access to capital markets.  This will enable General Growth stakeholders to realize even greater value.

Based upon the foregoing, General Growth submits that sound business reasons exist to authorize General Growth to enter into each of the Investment Agreements.

### D. Sound Business Reasons Exist to Approve Issuance of the Warrants

40.　General Growth respectfully submits that sound business reasons justify approval of the Warrants.  The Warrants are the culmination of the parties' extensive negotiations over the consideration to be provided to the Commitment Parties for their commitments, and are necessary to secure the long-term equity capital commitments of REP, Fairholme, and Pershing, and thus, to realize the benefits provided by the Investment Agreements.   The Warrants, which represent the right to participate in the potential creation of value in General Growth, would be given to the Commitment Parties in consideration for (i) their collective unilateral contractual commitments to invest more than $6.5 billion of capital – commitments that set a floor value for equity and crystallize General Growth's total enterprise value, while still providing General Growth with the option to explore the possibility of even greater value from alternative sources of capital and (ii) the Commitment Parties' agreement to serve as a benchmark proposal for General Growth, thereby providing General Growth with the certainty of an attractive floor proposal and the momentum needed to spur a competitive capital raise process and encourage proposals from other parties.

41.　The Commitment Parties would receive the Warrants instead of any cash commitment fees, ticking fees, extension fees, break up fees, expense reimbursement, or other additional consideration for the significant value they have created and will create in General Growth.  Thus, in addition to serving as a proxy for the fees generally awarded to investors in chapter 11 cases, which typically constitute administrative expenses of the debtor's estate and are

paid in advance of the debtor's unsecured creditors,[19] the Warrants to be issued here would come at <u>no cost</u> to General Growth's unsecured creditors because the Warrants would not affect the amount or form of recovery available to unsecured creditors or holders of administrative expenses against General Growth's estates.

42.     General Growth believes that issuance of the Warrants is fair and reasonable in light of the extraordinary magnitude and duration of the commitments, the time already invested by the Commitment Parties in establishing the benchmark commitment, the significant flexibility afforded General Growth to pursue and select competing transactions without forfeiting these commitments, the complex nature of the transactions at issue, and the unique circumstances of these chapter 11 cases.  As of the date of this Motion, the REP Agreement and the Fairholme/Pershing Agreements, including the Warrants, are the best terms available to General Growth.

43.     General Growth achieved an incredible success in the first stage of its restructuring; the marketplace accordingly recognized that General Growth is not only solvent,

---

[19]     Approval of various fees to secure the commitment of investors in connection with restructuring transactions has become a recognized practice in chapter 11 cases.  <u>See, e.g.</u>, <u>In re Accuride Corp.</u>, Case No. 09-13449 (BLS) (Bankr. D. Del. Nov. 2, 2009) (Docket No. 167) (approving a commitment fee of 8% of common stock, plus expense reimbursement); <u>In re MagnaChip Semiconductor Fin. Co.</u>, Case No. 09-12008 (PJW) (Bankr. D. Del. Sept. 1, 2009) (Docket No. 250) (approving a commitment fee of 10% of new common stock, plus expense reimbursement ); <u>In re Global Power Equip. Group, Inc.</u>, Case No. 06-11045 (BLS) (Bankr. D. Del. Oct. 31, 2007) (Docket No. 1915) (approving a 5.5% commitment fee, with an increase up to 6.5% if the backstop deadline is extended, payable in warrants to purchase new common stock, plus expense reimbursement); <u>In re Owens Corning</u>, Case No. 00-03837 (JKF) (Bankr. D. Del. June 29, 2006) (Docket No. 18228) (approving a 4.5% commitment fee, with an increase up to 5.9% if the backstop deadline is extended, plus expense reimbursement); <u>In re Foamex International Inc.</u>, Case No. 05-12685 (KG) (Bankr. D. Del. Nov. 27, 2006) (Docket No. 2004) (approving 6.33% in commitment and termination fee, plus reimbursement of $125,000 per month).  In addition, payment of fees in the form of stock  or warrants to purchase stock has been approved previously.  <u>See, e.g.</u>, <u>In re Motor Coach Indus. Int'l, Inc.</u>, Case No. 08-12136 (BLS) (Bankr. D. Del. Oct. 29, 2008) (approving commitment and break-up fees paid in the form of stock); <u>In re Movie Gallery, Inc.</u>, 07-33849 (DOT) (Bankr. E.D. Va. Nov. 16, 2007) (Docket No. 935) (approving commitment fee paid in the form of new common stock); <u>In re Global Power Equip. Group, Inc.</u>, Case No. 06-11045 (BLS) (Bankr. D. Del. Oct. 31, 2007) (Docket No. 1915) (approving commitment fee paid in the form of warrants to purchase stock).

but it has a multi-billion dollar equity value and the potential to increase in value significantly. GGP's success in chapter 11 is confirmed by, among other things, the New York Stock Exchange's decision to re-list GGP's stock, even as it remains in chapter 11. As a result, interested investors have begun to view General Growth's remaining restructuring transactions less as a traditional restructuring and more as a market-driven merger and acquisition or equity investment opportunity. General Growth is successfully capitalizing on its atypical situation, and has expeditiously and aggressively worked to capture the maximum value for all constituents and fairly distribute its enterprise value, even if that requires, for example, non-traditional (in the bankruptcy sense) competitive capital raise and strategic sale processes. Consequently, traditional assumptions and metrics previously used by courts when examining the reasonableness of certain fees in the context of chapter 11 are not readily applicable to the Warrants. The Commitment Parties have agreed to fund more than $6.5 billion for nine months, without any corresponding commitment from General Growth that it will ever use their funds. In fact, the commitment of capital by the Commitment Parties has set a floor value on the equity of General Growth, thereby facilitating a bidding process that may result in General Growth obtaining other more attractive financing. Moreover, the Warrants, unlike consideration typically provided to parties committing capital in chapter 11 cases, will not decrease the amount of cash available to satisfy holders of administrative expenses or unsecured claims because any cost associated with the Warrants will be borne by existing shareholders.

44. In sum, issuance of the Warrants constitutes an exercise of sound business judgment because the Warrants will (i) secure the long-term commitments of capital from the Commitment Parties, thereby providing the liquidity necessary to emerge from chapter 11 in a manner intended to permit satisfaction of all unsecured creditors in full and provide a substantial

recovery for shareholders; (ii) simultaneously provide the option of exploring even greater value from alternative sources of capital and pursuing such transactions for a period of time without risking the loss of the commitments; and (iii) establish a floor price for the equity value of General Growth for the benefit of all stakeholders and preserve their ability to capture the benefit of increased equity value in the future.  These benefits would be realized without constraining the amount of cash available to satisfy holders of administrative expenses or prepetition unsecured claims against the Debtors' estates.  The Warrants are a condition to and therefore necessary to obtain the benchmark financing offered by the Commitment Parties, which is the best financing proposed to General Growth to date.  And even though the Warrants will not prevent parties from making superior bids, General Growth's bidding process is such that potential bidders wishing to top the benchmark financing prior to approval of the Warrants may do so.  For the foregoing reasons, General Growth submits that issuance of the Warrants is justified and appropriate.

**F.    Amounts Payable under Article IX of the REP Agreement**
**Should Constitute Allowed Administrative Expenses**
**Pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code**

45.    Section 503(b)(1)(A) of the Bankruptcy Code provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including— (1)(A) the actual, necessary costs and expenses of preserving the estate …."  Further, section 507(a)(2) of the Bankruptcy Code provides that "administrative expenses allowed under section 503(b)" are entitled to priority.

46.    Article IX of the REP Agreement provides, in relevant part, that General Growth will:

> [I]ndemnify and hold harmless [REP], its members and partners and their respective [a]ffiliates, officers, directors, employees, agents, advisors and controlling persons (each an "Indemnified

Person"), from and against any and all losses, claims, damages, liabilities and reasonable expenses to which any such Indemnified Person may become subject, in each case, to the extent arising solely and directly out of any claim, challenge, litigation, investigation or proceeding initiated by a third party with respect to cooperation and assistance provided by [REP] to [General Growth] pursuant to Section 5.3(a) of this Agreement (but, for the avoidance of doubt, not other transactions relating to the Plan), and to reimburse such Indemnified Persons for any reasonable legal or other out-of-pocket expenses as they incur in connection with investigating, responding to or defending any of the foregoing. Notwithstanding the foregoing or anything to the contrary, [General Growth] will not be responsible to indemnify or reimburse any Indemnified Person for anything resulting from willful misconduct or gross negligence of any Indemnified Person.

Section 5.3(a) of the Brookfield Agreement articulates Brookfield role in assisting General Growth with other potential capital raising activities.

47. The indemnity provided in Article IX of the REP Agreement is customary and reasonable with respect to parties assisting in capital raising activities, as Brookfield has agreed to do. Further, the indemnity provided under Article IX of the REP Agreement is necessary in order to obtain Brookfield's assistance in additional capital raising activities that would provide a tangible benefit to General Growth's estates. Thus, in the event that any amounts become payable in connection with Article IX, such amounts should be an allowed administrative expense of General Growth's estates.

**E.     The Court Should Waive the Stay Period Required By Rule 6004(h) of the Federal Rules of Bankruptcy Procedure**

48. Pursuant to Rule 6004(h) of the Bankruptcy Rules, unless the court orders otherwise, all orders authorizing the use of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order. FED. R. BANKR. P. 6004(h). General Growth hereby requests a waiver of Rule 6004(h) for two primary reasons. First, the commitments under the Investment Agreements require that the Warrants be issued within one

business day after entry of an Order approving this Motion.  Second, General Growth believes

that it is imperative and in its best interest to avoid delay in the competitive capital raise and any

other parallel capital raising processes and therefore desires to conduct this process

expeditiously.  Specifically, General Growth respectfully requests that any order approving the

Motion should be effective immediately by providing that the 14-day stay under Bankruptcy

Rule 6004(h) is waived.

## IX.

## NOTICE

49.     No trustee or examiner has been appointed in these chapter 11 cases.

General Growth has served notice of this Motion on: (i) the U.S. Trustee; (ii) counsel to the

Equity Committee; (iii) counsel to the Committee; (iv) counsel to REP and Brookfield;

(v) counsel to Fairholme; (vi) counsel to Pershing; and (vii) parties entitled to receive notice in

these chapter 11 cases pursuant to Bankruptcy Rule 2002.  General Growth submits that no other

or further notice need be provided.

50.     No previous request for the relief sought herein has been made by General

Growth to this or any other court.

WHEREFORE General Growth respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated:  New York, New York
　　　　March 31, 2010

　　　　　　　　　　　　　　　　　_/s/ Marcia L. Goldstein_
　　　　　　　　　　　　　　　　　Marcia L. Goldstein
　　　　　　　　　　　　　　　　　Gary T. Holtzer
　　　　　　　　　　　　　　　　　Adam P. Strochak
　　　　　　　　　　　　　　　　　WEIL, GOTSHAL & MANGES LLP
　　　　　　　　　　　　　　　　　767 Fifth Avenue
　　　　　　　　　　　　　　　　　New York, New York 10153
　　　　　　　　　　　　　　　　　Telephone:  (212) 310-8000
　　　　　　　　　　　　　　　　　Facsimile:  (212) 310-8007

　　　　　　　　　　　　　　　　　　　and

　　　　　　　　　　　　　　　　　Stephen A. Youngman (*admitted pro hac vice*)
　　　　　　　　　　　　　　　　　WEIL, GOTSHAL & MANGES LLP
　　　　　　　　　　　　　　　　　200 Crescent Court, Suite 300
　　　　　　　　　　　　　　　　　Dallas, Texas  75201
　　　　　　　　　　　　　　　　　Telephone:  (214) 746-7700
　　　　　　　　　　　　　　　　　Facsimile:  (214) 746-7777

　　　　　　　　　　　　　　　　　　　and

　　　　　　　　　　　　　　　　　Sylvia A. Mayer (*admitted pro hac vice*)
　　　　　　　　　　　　　　　　　Melanie Gray, *(admitted pro hac vice)*
　　　　　　　　　　　　　　　　　WEIL, GOTSHAL & MANGES LLP
　　　　　　　　　　　　　　　　　700 Louisiana Street, Suite 1600
　　　　　　　　　　　　　　　　　Houston, Texas  77002
　　　　　　　　　　　　　　　　　Telephone:  (713) 546-5000
　　　　　　　　　　　　　　　　　Facsimile:  (713) 224-9511

　　　　　　　　　　　　　　　　　Attorneys for Debtors
　　　　　　　　　　　　　　　　　and Debtors in Possession

　　　　　　　　　　　　　　　　　　　and

　　　　　　　　　　　　　　　　　James H.M. Sprayregen, P.C
　　　　　　　　　　　　　　　　　Anup Sathy, P.C. (*admitted pro hac vice*)
　　　　　　　　　　　　　　　　　KIRKLAND & ELLIS LLP
　　　　　　　　　　　　　　　　　300 North LaSalle
　　　　　　　　　　　　　　　　　Chicago, Illinois 60654
　　　　　　　　　　　　　　　　　Telephone:  (312) 862-2000
　　　　　　　　　　　　　　　　　Facsimile:  (312) 862-2200

　　　　　　　　　　　　　　　　　Co-Attorneys for Certain Subsidiary
　　　　　　　　　　　　　　　　　Debtors and Debtors in Possession