# EXHIBIT A

## BIDDING PROCEDURES

The following procedures (the "**Bidding Procedures**") will govern the competitive process run by General Growth Properties, Inc. ("**GGP**"), and its debtor and non-debtor affiliates (collectively, "**General Growth**" or the "**Company**") to maximize the value of its estates by soliciting proposals for:

(i)     a purchase of all or substantially all of the Company (an "**M&A Transaction**");

(ii)    a purchase of a significant portion of the Company's assets (an "**Asset Purchase**"); or

(iii)   an investment of all or a portion of at least $1.5 billion of equity capital (a "**Plan Sponsor Investment**"); *provided*, *however*, that such bids are subject to a minimum investment of $100 million.

Following completion of the competitive processes, the Company will seek approval of its restructuring pursuant to a plan of reorganization (a "**Plan**").

### Preliminary Diligence

The Company may afford any prospective acquirers and/or investors the opportunity to conduct a reasonable due diligence review in the manner determined by General Growth, in its sole discretion.

General Growth has begun to provide certain parties who have either expressed an interest in making a proposal or who General Growth believes may have an interest in making a proposal (collectively, the "**Interested Parties**") with requests for such proposals ("**RFPs**") and confidential information memoranda ("**CIMs**"). In addition, General Growth has provided Interested Parties with access to certain information,[2] including these Bidding Procedures, through a virtual data room (the "**Data Room**") or otherwise. The Data Room has been operational as of March 3, 2010.

Parties submitting proposals may seek reimbursement of expenses incurred in connection with these Bidding Procedures up to $1 million per bidder by providing a written request for reimbursement with a summary and detailed backup for the expenses incurred. The Company will consider any such request and, in its sole discretion and subject to the exercise of its business judgment, determine whether to provide reimbursement; *provided*, *however*, that in no event will General Growth reimburse more than $10 million in the aggregate.

Each party submitting a Term Sheet (as defined below) shall be deemed to acknowledge and represent that it has had an opportunity to conduct due diligence on General Growth in connection with the first round prior to submitting its Term Sheet; and that it solely relied upon its own independent review, investigation and/or inspection of any documents and/or

---

[2]     Certain information may be restricted due to anti-trust or other concerns.

the assets in making its proposal; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding General Growth, or the completeness of any information provided in connection therewith; *provided*, that the foregoing shall not apply to REP, Fairholme, and/or Pershing, who have executed Investment Agreements (respectively, the "**REP Agreement**," the "**Fairholme Agreement**," and the "**Pershing Agreement**") and Warrant Agreements with General Growth, and the representations, warranties, and covenants set forth in such agreements.

## First Round Bidding Process

The Company will provide reasonable assistance to prospective acquirers and/or investors in conducting their due diligence.  Prospective acquirers and investors will be expected to submit a non-binding, detailed term sheet for a transaction ("**Term Sheets**") in writing on or before **April 19, 2010 at 3:00 p.m. (Eastern Time)** to the following "Bid Notification Parties":

| | |
|---|---|
| Ronen Bojmel | Jackson Hsieh |
| Managing Director | Vice Chairman |
| Miller Buckfire & Co., LLC | Global Head of Real Estate, Lodging and Leisure |
| 153 E. 53rd Street, 22nd Floor | UBS Securities, LLC |
| New York, New York  10022 | 299 Park Avenue |
| Tel:   (212) 895-1807 | New York, NY  10171 |
| Fax:  (212) 895-1850 | Tel:   (212) 821-4545 |
| ronen.bojmel@millerbuckfire.com | Fax:  (212) 821-2545 |
| | jackson.hsieh@ubs.com. |

Each Term Sheet must contain detailed descriptions of the M&A Transaction, Asset Purchase, Plan Sponsor Investment and Plan (collectively, as applicable, the "**Transaction**") that are the subject of such Term Sheet.  Subject to the applicable confidentiality agreements or provisions, the Company and its professionals will share the Term Sheets received during the first round with the advisors to the official committee of equity security holders and the official committee of unsecured creditors (collectively, the "**Committees**").

The Company will review those Term Sheets timely submitted and engage in negotiations with those prospective acquirer and/or investors that submitted Term Sheets complying with the preceding paragraph and as it deems appropriate in the exercise of its business judgment, subject to consultation with the Committees.  The Company will select, in its business judgment and after consultation with the Committees, those proposals qualifying for the second round on or before **April 28, 2010**.

**a.** *Proposal Assumptions*

Any proposal should make the following assumptions:

(i)    All unsecured debt is provided consideration in the form of cash, equity and/or debt (which may include reinstatement to the extent applicable) in an amount to satisfy their claims of principal and accrued interest (to the extent allowed by the Bankruptcy Court) in full;

(ii)   Pro forma for Plan distributions, the Company retains enough cash at emergence to ensure that it has a minimum of approximately $500 million in unrestricted and available liquidity;

(iii)  The Company's restructured property-level debt remains in place based on the restructured terms and maturities contemplated by the consummated plans of reorganization. Any property-level debtors that are pending restructuring are resolved based on terms that are substantially similar in all material respects to the treatment provided in the confirmed plans. All non-debtor property-level debt remains in place on its current terms; and

(iv)   Unless otherwise specified in your proposal, Plan Sponsor Investments that are less than $1.5 billion may be directed by the Company into consortia with other bidders, at the Company's option.

**b.** *Proposal Requirements*

Based on the form of transaction proposed, a Term Sheet should include the following:

| M&A TRANSACTION | PLAN SPONSOR INVESTMENT |
|---|---|
| (i) Total enterprise value ("**TEV**") and available equity value ("**EV**") for GGP and combined company implied by proposal and any assumptions or methodologies used in analyzing TEV and EV (including any adjustments or potential decreases in net proceeds to be received by shareholders); | (i) TEV and EV implied by the proposal and any assumptions or methodologies used in analyzing TEV and EV (including any adjustments or potential decreases in net proceeds to be received by shareholders); |
| (ii) Proposed treatment for each class of unsecured indebtedness outstanding; | (ii) Proposed treatment for each class of unsecured indebtedness outstanding; |
| (iii) Proposed purchase price per share of existing common stock; | (iii) Valuation per share of common stock implied by the proposal; |
| (iv) Transaction structure (stock deal, asset purchase, etc.); | (iv) Investment structure (e.g., PIPE, rights offering, other); |
| (v) Form of consideration (cash, stock, etc.), and methodology for determining any non-cash consideration; | (v) Whether the investment is contemplated to complement the REP Agreement, the Fairholme Agreement, and/or the Pershing Agreement or replace the REP Agreement and/or the Fairholme/Pershing Agreements; |
| (vi) If providing stock consideration, indicate the following:<br>• Value ascribed to synergies and related methodology, if applicable;<br>• Pro forma financials for combined company;<br>• Pro forma capital structure implied by proposal; | (vi) Key terms of newly issued securities, including but not limited to:<br>• Economic terms (ownership implied by investment; discount/fees related to investment);<br>• Governance;<br>• Registration rights; |
| (vii) Sources and certainty of capital, including equity or debt commitment letters; | (vii) Use of funds and pro forma capital structure (to the extent the proposal contemplates providing capital above the minimum amount requested); |
| (viii) Approvals required or anticipated, including regulatory approval(s); | (viii) Assumption regarding maximum debt capacity at the corporate level; |
| (ix) A listing of all regulatory authorities with whom contact has been made, and a summary of any approvals or objections obtained or raised; | (ix) Sources and certainty of capital, including equity or debt commitment letters; |
| (x) Shareholder or other required approvals; | (x) Approvals required or anticipated, including regulatory approval(s); |
| (xi) Transaction timing/process; | (xi) A listing of all regulatory authorities with whom contact has been made, and a summary of any approvals or objections obtained or raised; |
| (xii) Key contingencies and conditions precedent; and | (xii) Transaction timing and process; |
| (xiii) Detailed list of remaining due diligence requirements. | (xiii) Key contingencies and conditions precedent; and |
| | (xiv) Detailed list of remaining due diligence requirements. |

## Second Round Process

The Company will consider the first round bids and determine those bids that will advance to the second round process. In evaluating the Term Sheets, the Company will take into consideration, among other things, the TEV and EV implied by the proposed transaction, the form, value and certainty of recovery provided to prepetition creditors and shareholders, transaction structure and execution risk, including conditions to close, availability of financing, and approvals required. Upon completion of this review, the Company will select a limited number of parties to complete due diligence and provide the Company with final financing commitments in advance of filing a Plan.

The Company will (i) provide additional due diligence information to prospective acquirers and/or investors (including REP, Brookfield, Fairholme, and Pershing), to the extent that they have not previously received such information or new information becomes available, and (ii) negotiate documentation of proposals selected for the second round.

Prospective acquirers and/or investors will be expected to submit solid fully financed, binding offers with proposed final documentation ("**Final Proposals**") on or before **June 2, 2010 at 4:00 p.m. (Eastern Time)** to the Bid Notification Parties listed above. The Company and its professionals will share, subject to applicable confidentiality agreements or provisions, the Final Proposals received during the second round with the advisors to the Committees.

The Company will analyze the Final Proposals received during the second round, and will engage in discussion with prospective acquirers and/or investors regarding their respective Final Proposal. These discussions will provide prospective acquirers and/or investors, within a reasonable time before the Company makes a final determination, an opportunity to improve their proposals to exceed proposals the Company is considering accepting. On or before **July 2, 2010,** the Company intends to select, in its business judgment and after consultation with the Committees, the proposed transaction(s) it intends to consummate (the "**Successful Proposal**").

## Plan Process

After selecting the Successful Proposal, the Company, in consultation with the entity or entities which submitted the Successful Proposal, will prepare and file the Plan and the accompanying disclosure statement with of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). The Company currently anticipates filing the Plan on or around July 2, 2010. Based on this expected filing date, and subject to the Bankruptcy Court's schedule, the relevant timeline for the Plan would be:

- Hearing on the disclosure statement on or around **July 30, 2010**;

- Company to commence solicitation of the Plan on or around **August 6, 2010**;

- Deadline to vote and/or object to the Plan on or around **September 17, 2010**;

- Hearing to confirm the Plan on or around **September 30, 2010**.

## Reservation Of Rights

The Company reserves the right, in its sole discretion and subject to the exercise of its business judgment, to alter or terminate these capital raising processes or these Bidding Procedures, to alter the assumptions set forth herein, and/or to terminate discussions with any and all prospective acquirers and investors at any time and without specifying the reasons therefore.

Dated: April __, 2010