WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein
Gary T. Holtzer
Adam P. Strochak
Stephen A. Youngman (*admitted pro hac vice*)
Sylvia A. Mayer (*admitted pro hac vice*)

Attorneys for Debtors and
Debtors in Possession

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*admitted pro hac vice*)

Co-Attorneys for Certain Subsidiary
Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                         :

**In re**                    :      **Chapter 11 Case No.**
                          :

**GENERAL GROWTH**    :      **09-11977 (ALG)**
**PROPERTIES, INC., et al.,** :
                          :      **(Jointly Administered)**
          **Debtors.**      :
------------------------------------------------------------x

## DEBTORS' MOTION FOR
## ENTRY OF AN ORDER PURSUANT TO SECTIONS 105(a)
## AND 363 OF THE BANKRUPTCY CODE (A) AUTHORIZING DEBTORS TO
## (1) EXERCISE CERTAIN CLAWBACK RIGHTS AND INCUR RELATED
## CLAWBACK FEES, (2) ENTER INTO COMMITMENT LETTER, SIDE LETTER AND
## FEE LETTER IN CONNECTION WITH POTENTIAL EXIT FINANCING FACILITY,
## AND (3) ENTER INTO THE EQUITY ROFO LETTER, PRE-EMERGENCE
## UNDERWRITING AGREEMENT, AND GUARANTEE, (B) APPROVING UBS AS
## UNDERWRITER AND LENDER COMMITMENT PARTY AND (C) AUTHORIZING
## <u>ENTRY INTO POTENTIAL ENGAGEMENT LETTER EXTENSIONS</u>

TO THE HONORABLE ALLAN L. GROPPER,
UNITED STATES BANKRUPTCY JUDGE:

      South Street Seaport Limited Partnership, its ultimate parent, General Growth

Properties, Inc. ("**GGP**"), and their debtor affiliates, as debtors and debtors in possession

(collectively, "**General Growth**" or the "**Debtors**"),[1] submit this motion (the "**Motion**") for an order (a) authorizing the Debtors to (1) if they so elect, to exercise certain clawback rights and incur related clawback fees, (2) enter into the Commitment Letter, the Fee Letter, and the Side Letter (each as defined below) in connection with a potential exit financing facility and (3) enter into the Equity ROFO Letter, the Pre-Emergence Underwriting Agreement and the Guarantee (each as defined below) (b) authorizing UBS[2] to act as one of the Underwriters (as defined below) and Lender Commitment Parties (as defined below) and finding that such engagement will not cause UBS to fail to be a disinterested person (as defined in section 101(14) of the Bankruptcy Code), and (c) authorizing the Debtors to enter into the Potential Engagement Letter Extensions (as defined below, and collectively, with the Equity ROFO Letter, the Pre-Emergence Underwriting Agreement, the Guarantee, Commitment Letter, the Fee Letter, and the Side Letter, the "**Agreements**"). In support thereof, General Growth respectfully represents as follows:

## I.

## PRELIMINARY STATEMENT[3]

1.       The Plan Debtors have scheduled a hearing on October 21, 2010 to consider confirmation (the "**Confirmation Hearing**") of their *Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, dated August 27, 2010 (the "**Plan**").

---

[1]       A list of the Debtors originally included in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, is filed with the Court at Docket No. 593 and is also available for free online at www.kccllc.net/GeneralGrowth. Certain of these Debtors have emerged from bankruptcy protection. Lists of these emerged Debtors are filed with the Court at Docket Nos. 4163, 4253, 4330, 4440, 4627, 4916, 5244, 5299, 5408, and 5605, and are also available for free online at www.kccllc.net/GeneralGrowth.

[2]       As used herein "UBS" means, as the context requires, UBS Securities LLC and UBS Loan Finance LLC and/or its affiliates.

[3]       Capitalized terms used, but not defined, in the Preliminary Statement have the meanings ascribed to them below unless otherwise noted.

In furtherance of its successful confirmation and emergence, in the Spring of 2010, the Debtors commenced a comprehensive process to select investment partners that would provide them not only with committed exit capital but also the desired flexibility to take advantage of market conditions and to source additional capital or replace existing capital. These efforts culminated in commitments from Brookfield, Pershing Square, Fairholme and Texas Teachers for the purchase of New GGP Common Stock and Spinco Common Stock (as defined in the Plan). The Investment Agreements provided the Debtors with the latitude to propose a Plan that allows the Debtors to source additional financing through debt commitments from those existing investors or third parties and to replace portions of certain of the equity commitments under the Investment Agreements. This may be accomplished through a pre-emergence public exchangeable notes offering, which would enable new investors to purchase notes mandatorily exchangeable into New GGP common stock (the "**Pre-Emergence Mandatorily Exchangeable Notes Offering**"), or through a post-emergence public stock offering (the "**New GGP Post-Emergence Public Equity Offering,**" and together with the Pre-Emergence Mandatorily Exchangeable Notes Offering, the "**Underwritten Offerings**").

2. General Growth expects to pursue the New GGP Post-Emergence Public Equity Offering. However, to maintain maximum flexibility, General Growth is seeking approval of certain actions that would be necessary to effectuate either Underwritten Offering. Regardless of which Underwritten Offering is consummated, General Growth expects to replace, in accordance with the clawback mechanism (the "**Clawback Election**") contained in the Investment Agreements, a substantial portion of the New GGP Common Stock that will be issued to the Investors pursuant to the Investment Agreements. As provided in the Investment Agreements, exercising the Clawback Election following the Effective Date requires General

Growth to pay a fee of $.25 per reserved share, or a total of $38.75 million (the "**Clawback Fee**") to Fairholme and Pershing Square on the effective date of the Plan (the "**Effective Date**"). General Growth believes that paying the Clawback Fee is integral to maintaining the flexibility to pursue the New GGP Post-Emergence Public Equity Offering and thereby preserving its ability to maximize value for shareholders.

3.      To facilitate its efforts to raise equity capital in the public markets, General Growth proposes to enter into an equity right of first offer letter with Goldman Sachs & Co., Deutsche Bank AG, Wells Fargo Securities, RBC Capital Markets, Barclays PLC, and UBS Securities LLC, as joint lead bookrunning managers, and Macquarie Bank Limited and TD Securities (USA) LLC, as co-managers (collectively, the "**Underwriters**"), which will provide that if New GGP (as defined below) proposes to issue equity securities in an underwritten public offering in connection with General Growth's exercise of the Clawback Election, New GGP shall offer the Underwriters the exclusive right to serve as the Underwriters for such offering in the roles set forth set forth above and with economic arrangements set forth in the Equity ROFO Letter.  The Underwriters will receive an aggregate underwriting fee only upon completion of such offering in the form of a discount to the purchase price of such common stock as set forth in the Equity ROFO Letter.

4.      In addition, in order to provide a post-emergence source of liquidity and to, among other things, ensure a source of funding in the event reinstatement of certain Rouse Notes is not permitted, General Growth also has pursued outside exit financing sources and has secured commitments from Deutsche Bank Securities Inc. ("**DBSI**"), Wells Fargo Securities, LLC ("**Wells Fargo Securities**") and RBC Capital Markets Corporation to act as joint lead arrangers (collectively, the "**Joint Lead Arrangers**") to structure and arrange an exit financing

facility in the form of (a) a senior secured revolving credit facility in an aggregate amount of $300,000,000 (the "**Standalone Revolving Facility**") or (b) a senior secured revolving credit facility in an aggregate amount of $300,000,000 and term facility in an aggregate amount of $1,500,000,000 (the "**Combined Facility**"), each as described in the Commitment Letter and in accordance with the terms of the Fee Letter and the Side Letter (each as defined below).

5.     Pursuant to the Commitment Letter, the Debtors may, but are not obligated to, borrow up to $1.8 billion to fulfill their exit financing needs – which needs depend, in part, on whether certain of the Rouse Notes (as defined in the Plan) are reinstated in accordance with the Plan, as proposed.

6.     With the commitments secured pursuant to the Commitment Letter, the Debtors are confident that they will have the funds necessary to address contingencies that may arise in connection with confirmation and to satisfy and pay necessary expenses and claims at emergence.  Pursuant to this Motion, the Debtors seek approval to execute the agreements necessary to execute their plan to access equity capital in the public market through Underwritten Offerings and to secure the commitments from the financial institutions discussed below.

7.     Finally, the Debtors seek approval to enter into the Potential Engagement Letter Extensions (defined below).  As is further described below, although the terms of the Potential Engagement Letter Extensions are still being negotiated, entry into the Potential Engagement Letter Extensions, if executed, would enable the Debtors to extend the deadline by which the Debtors must pay certain prepetition claims to the Engagement Letter Parties.  If the Debtors are able to reach agreement on the terms of the Potential Engagement Letter Extensions with the Engagement Letter Parties, they will file them with the Court no later than the date of

the hearing on this Motion.  Because of the sensitive nature of the Potential Engagement Letter Extensions, the Debtors have sought to file such agreements under seal.

## II.

## JURISDICTION

8.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.

## BACKGROUND[4]

### A.     General Background

9.     Commencing on April 16, 2009 (the "**Commencement Date**") and continuing thereafter, the Debtors each commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.     On April 24, 2009, as subsequently amended on January 15, 2010, February 2, 2010, February 18, 2010, April 5, 2010, April 27, 2010, May 27, 2010, July 15, 2010 and July 29, 2010, the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors'**

---

[4]     To the extent of any inconsistency between the summary of the Agreements contained in this Section and the Agreements, the Agreements shall control.

**Committee**").  On September 8, 2009, as subsequently amended on September 21, 2009 and

September 24, 2009, following the requests of certain equity holders, and pursuant to section

1102(a)(2) of the Bankruptcy Code, the U.S. Trustee appointed an official committee of equity

holders (the "**Equity Committee**").

        11.      Additional information regarding General Growth's business, capital

structure, and the circumstances leading to these chapter 11 cases is contained in the Declaration

of Adam S. Metz (Docket No. 12) and the Declaration of James A. Mesterharm Pursuant to

Local Bankruptcy Rule 1007-2 in Support of First Day Motions (Docket No. 13).

**B.**       **The Investment Agreements and the Clawback Election**

        12.      On March 31, 2010, the Debtors filed the *Debtors' Motion for Entry of an*

*Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code (A) Approving Bidding*

*Procedures, (B) Authorizing the Debtors to Enter into Certain Agreements, (C) Approving the*

*Issuance of Warrants, and (D) Granting Related Relief* [Docket No. 4874] (the "**Initial Plan**

**Sponsor Motion**").  The Court entered an order on May 7, 2010 [Docket No. 5145] (the "**Initial**

**Plan Sponsor Order**") approving the Initial Plan Sponsor Motion and authorizing General

Growth to enter into investment agreements (collectively, and as amended from time to time, the

"**Initial Plan Sponsor Agreements**") with each of REP Investments, LLC, an affiliate of

Brookfield Asset Management ("**Brookfield**"), Fairholme Capital Management, LLC

("**Fairholme**") and Pershing Square Capital Management L.P. ("**Pershing Square**" and together

with Brookfield and Fairholme, the "**Initial Plan Sponsors**") providing, *inter alia*, for the

purchase by the Initial Plan Sponsors of up to $6.3 billion of common stock of reorganized GGP

(the "**New GGP Common Stock**") at a price of $10.00 per share.

13.     On July 12, 2010, the Debtors filed the *Debtor's Motion Pursuant to Sections 105(a) and 363 of the Bankruptcy Code (A) Authorizing The Debtors to Enter into an Investment Agreement with The Teacher Retirement System of Texas, (B) Approving Related Breakup Fee and Expense Reimbursement, and (C) Granting Related Relief* [Docket No. 5448] (the "**Texas Teachers Motion**").  On August 5, 2010, the Court entered an order approving the Texas Teachers Motion and authorizing General Growth to enter into an investment agreement (the "**Texas Teachers Agreement**") with the Teacher Retirement System of Texas ("**Texas Teachers**" and, together with the Initial Plan Sponsors, the "**Investors**") for the sale of up to $500 million of New GGP Common Stock at a price of $10.25 per share (the "**Texas Teachers Order**") [Docket No. 5640].

14.     The Investment Agreements ensure that General Growth will have access to necessary emergence funds, while simultaneously enabling General Growth to take advantage of market conditions and to source replacement capital in a variety of ways, including, without limitation, the Underwritten Offerings, and entering into exit financing agreements for term and/or revolving credit facilities.

15.     Specifically, pursuant to the orders approving the Initial Plan Sponsor Agreements and the Texas Teachers Agreement (together, the "**Investment Agreements**"),[5] the Debtors have the right, subject to certain conditions as more particularly described in the Investment Agreements, to (A) reserve for repurchase from Fairholme and Pershing Square, upon notice given prior October 11, 2010 (the "**Clawback Election Notice**"), up to 155 million shares (the "**Reserved Shares**") of New GGP Common Stock pursuant to the Clawback Election

---

[5] Composite copies of the Initial Plan Sponsor Agreements are located at Docket No. 5172.  The Texas Teachers Agreement is located at Docket No. 5448.

and to repurchase from Fairholme and Pershing Square, within 45 days after the effective date of the Plan, on a pro rata basis, at a per share price of $10.00, a number of shares of New GGP Common Stock equal to the lesser of (i) the aggregate number of shares of New GGP Common Stock sold at a price of at least $10.50 (net of all underwriting and other discounts, fees and related consideration) per share in an Underwritten Offering on or prior to the 40th day after the Effective Date or (ii) 155 million shares and (B) reserve for repurchase from Texas Teachers upon at least 5 business days' notice prior to the Effective Date, up to 24,390,244 shares of New GGP Common Stock and to repurchase from Texas Teachers, within 45 days after the Effective Date, at a per share price of $10.25 per share, up to 24,390,244 shares of New GGP Common Stock, from the proceeds of the sale of shares at a price of at least $10.50 (net of all underwriting and other discounts, fees and related consideration) per share in an Underwritten Offering on or prior to the 45th day after the Effective Date. If GGP makes the Clawback Election, GGP will pay to Fairholme and Pershing Square pro rata an amount equal to $.25 per Reserved Share (the "**Clawback Fee**"). GGP is not required to pay any fee to Texas Teachers in connection with the Clawback Election. The table below depicts the number of shares subject to the Clawback Election.

| Investor | Current Commitment for New GGP Common Stock | Price Per Share of New Common Stock | Number of Shares of New Common Stock | Number of Shares of New Common Stock Subject to Clawback Election[6] | Amount Subject to Clawback Post Effective Date[6] |
|---|---|---|---|---|---|
| Fairholme | $2,714,285,710 | $10.00 | 271,428,571 | 135,714,285 | $1,357,142,850 |
| Pershing Square | $1,085,714,290 | $10.00 | 108,571,429 | 19,285,714 | $192,857,140 |

---

[6]       Amounts are approximate.

| Texas Teachers | $500,000,000 | $10.25 | 48,780,488 | 24,390,244 | $250,000,001 |
|---|---|---|---|---|---|
| **Total** | **$4,300,000,000** | **N/A** | **428,780,488** | **179,390,243** | **$1,800,000,000**[7] |

16.     In addition, if the Clawback Election is made, the Investment Agreements also provide that the Debtors may elect to have $350 million of Pershing Square's equity capital commitment delivered in cash at closing in exchange for bridge notes, in which case the Debtors will also have a put right whereby up to 35 million shares of New GGP Common Stock may be sold to Pershing Square 180 days after the Effective Date to fund repayment of the bridge notes (to the extent not already repaid), providing the Debtors with additional time to pursue the New GGP Post-Emergence Public Equity Offering.

**C       Equity Capital Raise**

17.     As noted previously, General Growth currently intends to pursue the New GGP Post-Emergence Public Equity Offering (and not the Pre-Emergence Mandatorily Exchangeable Notes Offering). However, it desires to maintain the flexibility to pursue an underwritten offering prior to emergence. In either case, General Growth expects to exercise the Clawback Election and pay the Clawback Fee.

18.     In order to facilitate either Underwritten Offering, General Growth proposes to enter into an Equity ROFO Letter (the "**Equity ROFO Letter**") to be filed under seal as **Exhibit A** with the Underwriters, which will provide that if New GGP proposes to issue equity securities in an underwritten public offering in connection with General Growth's exercise of the Clawback Election, New GGP shall offer the Underwriters the exclusive right to serve as the Underwriters for such offering in the roles set forth above and with economic arrangements

---

[7]     Total amount has been rounded.

set forth in the Equity ROFO Letter.  The Underwriters will receive an aggregate underwriting fee only upon completion of such offering in the form of a discount to the purchase price of such common stock as set forth in the Equity ROFO Letter.

19.　　To ensure a successful sale and marketing of equity capital, the Debtors desire to engage the Underwriters.  Subject to this Court's approval, the Debtors have requested that UBS serve as one of the Underwriters for either Underwritten Offering.  UBS, by virtue of its engagement pursuant to the *Debtors' Application Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rules 2014(a) and 2016 for Authorization to Employ and Retain UBS Securities LLC as Non-Exclusive Capital Markets and M&A Advisor for the Debtors* Nunc Pro Tunc *to December 10, 2009* [Docket No. 4268] (the "**UBS Advisor Motion**"), is intimately familiar with the Debtors, their business and finances, and these chapter 11 cases.[8] This continuing relationship is valuable to the Debtors' emergence prospects and will help to ensure a successful Underwritten Offering.

20.　　If General Growth changes its current financing intentions and pursues the Pre-Emergence Mandatorily Exchangeable Notes Offering, a new, wholly-owned subsidiary of GGP ("**New GGP**") (which will become the parent of reorganized GGP as a result of a corporate reorganization) would issue up to $2.25 billion (which amount may be increased at General Growth's discretion) of mandatorily exchangeable notes (the "**New GGP Notes**"), which will be guaranteed by GGP.  On the Effective Date, if New GGP elects, and subject to certain conditions, the New GGP Notes would be mandatorily exchanged into a fixed number of shares

---

[8] The court entered orders (the "**UBS Retention Orders**") approving the retention of UBS Securities LLC as Non-Exclusive Capital Markets and M&A Advisor on March 11, 2010 [Docket No. 4623] and April 2, 2010 [Docket No. 4878].  Pursuant to the terms of UBS's engagement, the Debtors anticipated requesting that UBS assist in a potential underwritten securities offering, and that any such underwritten offering would be subject to a separate engagement and/or agreement, including separate fees, expense reimbursement and other terms customary in such transactions.

of New GGP Common Stock based on an exchange ratio that will be determined during the marketing (or "book building") process with potential investors, subject to the limitations described above and the limitations in the Investment Agreements. The gross proceeds of the offering would be held in a segregated escrow and security account (the "**Escrow**") securing for the benefit of the holders of the New GGP Notes, New GGP's obligations under the New GGP Notes, pending consummation of the Plan. Significantly, in the event the exchange conditions are neither satisfied nor waived, the Escrow will be used to redeem the New GGP Notes at par plus accrued interest, and the Debtors would be relieved of any other material obligations under the Pre-Emergence Underwriting Agreement (as defined below) or pursuant to the New GGP Notes, other than interest related to the Escrow, underwriting expenses, and the indemnification obligations contained in the Pre-Emergence Underwriting Agreement.

21.     Because New GGP is a new entity initially formed, *inter alia,* for the purpose of issuing the New GGP Notes, GGP will fully and unconditionally guarantee, on a senior unsecured basis (the "**Guarantee**") the New GGP Notes. The Guarantee provides comfort that, beyond the Escrow, the New GGP Notes are backed by the support of an established company with a substantial balance sheet. The Guarantee also allows the inclusion in the registration statement of GGP's financials and other information, again signaling to potential investors that the Pre-Emergence Mandatorily Exchangeable Notes Offering benefits from the credit support of its parent. As a result of the Escrow, GGP's potential exposure under the Guarantee is highly unlikely, if not altogether eliminated.

22.     In the event that General Growth changes its current financing intentions and pursues the Pre-Emergence Mandatorily Exchangeable Notes Offering, New GGP would enter into an underwriting agreement (the "**Pre-Emergence Underwriting Agreement**"), which

GGP would also execute in its capacity as a "Guarantor," and which provides that New GGP will pay an underwriting fee in the form of a discount to the purchase price of the New GGP Notes (the "**Pre-Emergence Underwriting Fee**"), reimburse the Underwriters for certain reasonable and documented out-of-pocket expenses under certain circumstances and provide traditional and customary indemnities to the Underwriters and their affiliates. The Pre-Emergence Underwriting Fee will only be paid in the event that the Pre-Emergence Mandatorily Exchangeable Notes Offering is successful and the net proceeds of the Pre-Emergence Mandatorily Exchangeable Notes Offering are available to General Growth and the New GGP.

**D.      The Exit Financing**[9]

23.      In addition to taking steps to put itself in a position to execute the New GGP Post-Emergence Public Equity Offering, General Growth has actively negotiated the terms of the Standalone Revolving Facility or the Combined Facility (comprised of a revolver and term facility) with the Initial Lenders (defined below) to source up to $1.8 billion of revolving credit and term facilities. Pursuant to the terms of the agreement with the Initial Lenders, the Initial Lenders would commit to provide either the Standalone Revolving Facility or the Combined Facility, at General Growth's option, depending on the needs of General Growth. General Growth, however, would not be obligated to select either facility as its source of exit funds. In exchange for the Initial Lenders' commitments, General Growth has agreed to pay certain fees and provide certain indemnifications, all in accordance with the Commitment Letter, the Fee Letter, and the Side Letter (as each is defined and described below).

---

[9] The summaries and descriptions of the Agreements set forth herein are qualified in their entirety by the Agreements. In the event of any discrepancy between the summaries contained herein and the Agreements, the Agreements, as applicable, shall control.

### (i)     The Commitment Letter

24.     Pursuant to the commitment letter (the "**Commitment Letter**"), dated as of September 21, 2010, a copy of which is annexed hereto as **Exhibit B**, between and among the Joint Lead Arrangers, Barclays Capital, the investment banking division of Barclays Bank PLC ("**Barclays Capital**"), Goldman Sachs Lending Partners LLC ("**GS Lending Partners**"), Macquarie Capital (USA) Inc. ("**MCUSA**"), TD Securities (USA) LLC ("**TD Securities**"), and UBS (together with the Joint Lead Arrangers, Barclays Capital, GS Lending Partners, MCUSA and TD Securities, the "**Arrangers**" and the "**Bookrunners**"), Deutsche Bank Trust Company Americas ("**DBTCA**" and together with DBSI, "**DB**"), Wells Fargo Bank, N.A. ("**Wells Fargo Bank**" and together with Wells Fargo Securities, "**Wells Fargo**"), Royal Bank of Canada ("**Royal Bank of Canada**" and together with RBC Capital, "**RBC**"), Barclays Bank plc ("**Barclays Bank**" and together with Barclays Capital, "**Barclays**"), GS Lending Partners, MIHI LLC ("**MIHI**" and together with MCUSA, "**Macquarie**"), Toronto Dominion (New York) LLC ("**Toronto Dominion**," and together with TD Securities, "**TD**") and UBS Loan Finance LLC ("**UBS Loan Finance**") (DBTCA, Wells Fargo Bank, Royal Bank of Canada, Barclays Bank, GS Lending Partners, MIHI, Toronto Dominion, and UBS Loan Finance, the "**Initial Lenders**" and collectively, with the Arrangers and Bookrunners, the "**Lender Commitment Parties**") and GGP Limited Partnership, GGPLP L.L.C., and GGP (collectively, the "**GGP Commitment Parties**"), (a) each Initial Lender severally (but not jointly) has committed to provide, subject to the conditions precedent noted in the Commitment Letter, its share of the Standalone Revolving Facility or the Combined Facility (the facility ultimately selected by the GGP Commitment Parties, the "**Relevant Facility**") on the Closing Date (as defined in the Commitment Letter), the terms of which are described on Exhibit A to Attachments I and II, respectively, thereto and (b)

the Joint Lead Arrangers have agreed to act as joint lead bookrunners and joint lead arrangers for the Relevant Facility.

25.     The Joint Lead Arrangers intend to syndicate under the Commitment Letter, subject to certain qualifications more fully described in the Commitment Letter, the Relevant Facility to one or more financial institutions or other lenders reasonably acceptable to the GGP Commitment Parties.  As is typical in loan syndication arrangements, the GGP Commitment Parties would be obligated, from and after the date this Court enters an order authorizing General Growth's entry into the Commitment Letter through a date that is no later than 90 days after the Closing Date, to cooperate with and assist the Joint Lead Arrangers in their efforts to syndicate the Relevant Facility.  In connection therewith, other than the debt related to the Exchangeable Notes, the TRUP Junior Subordinated Notes, and the Reinstated Rouse Notes (if the Relevant Facility is the Standalone Revolving Facility) (each of the foregoing terms as defined in the Plan) and any other debt contemplated by the Plan and certain project-level debt, GGP is prohibited from syndicating or permitting its subsidiaries to syndicate debt for borrowed money without the written consent of the Joint Lead Arrangers.

26.     As described more fully in the Commitment Letter, the GGP Commitment Parties agree to indemnify and hold harmless the Lender Commitment Parties, the other lenders, and each of their respective affiliates, and all of their respective officers, directors, partners, trustees, employees, shareholders, agents, representatives, attorneys and controlling persons and each of their respective heirs, successors and assigns (each an, "**Indemnified Person**") from and against any and all losses, claims, damages and liabilities (including reasonable, documented out of pocket expenses related to the foregoing) to which any Indemnified Person may become subject arising out of or in connection with the Commitment Letter, the Relevant Facility, the use

of the proceeds therefrom, the transactions contemplated by the Commitment Letter and any other transaction related thereto or any action, claim litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto. However, as further provided in the Commitment Letter, no Indemnified Person will be entitled to indemnity to the extent that it is found by a final, non-appealable judgment of a court of competent jurisdiction for any loss, claim, damage, liability or expense that resulted from the gross negligence, bad faith, or willful misconduct of, or breach of the Commitment Letter by, such Indemnified Person.

        27.      The Commitment Letter terminates on the first to occur of (a) September 22, 2010 if the Commitment Letter and Fee Letter have not been filed with the Bankruptcy Court on or prior to such date; (b) October 12, 2010 (or if the Court delays the hearing on this Motion past October 8, 2010, the Business Day prior to the date the Bankruptcy Court hearing commences with respect to confirmation of the Plan or reinstatement of the Rouse Bonds (but in no event later than October 22, 2010)), unless on or prior to such date the GGP Commitment Parties have executed and delivered the Commitment Letter and the Fee Letter and (x) an order of the Bankruptcy Court has been entered in form and substance reasonably satisfactory to a majority of the Joint Lead Arrangers, authorizing and directing the GGP Commitment Parties to assume and perform the obligations set forth in the Commitment Letter and the Fee Letter, which order shall provide that (i) the payment obligations and all other obligations of the GGP Commitment Parties under the Commitment Letter and the Fee Letter are entitled to administrative priority under sections 503(b) and 507(a)(1) of the Bankruptcy Code and (ii) subject to the approval of the Court, an unredacted copy of the Fee Letter is filed under seal, and (y) as of such date, the order remains in full force and effect and has not been stayed, modified,

reversed or vacated without the consent of the Joint Lead Arrangers; (c) three (3) business days

after the date the Court enters the order described in clause (x) above, unless the Commitment

Fee has been paid to the Initial Lenders or their affiliates in accordance with the Fee Letter;

(d) December 31, 2010, or if the Closing Date has been extended in accordance with the

Commitment Letter, January 31, 2011 (unless prior to that date the conditions precedent have

been satisfied or unsatisfied conditions have been waived by the Lender Commitment Parties);

(e) the Effective Date without the use of the Relevant Facility (*provided* that clause (e) shall not

excuse any Lender Commitment Party for its breach of its obligation to provide funding pursuant

to the Relevant Facility on or after the Closing Date); or (f) the failure of any of the GGP

Commitment Parties to satisfy any material obligation under the Commitment Letter or the Fee

Letter; *provided,* that no right of termination will arise unless the GGP Commitment Parties have

failed to satisfy such obligation within thirty (30) days after receipt of notice thereof from the

Joint Lead Arrangers.

> **(ii)      The Fee Letter**

28.      In consideration for the commitments made by the Lender Commitment

Parties pursuant to the Commitment Letter, the GGP Commitment Parties have agreed to pay

certain fees and expenses to the Initial Lenders and the Joint Lead Arrangers in accordance with

the terms set forth in the letter dated as of September 21, 2010 by and between the Lender

Commitment Parties and the GGP Commitment Parties (the "**Fee Letter**").  General Growth has

filed a motion seeking to file the Fee Letter under seal as **<u>Exhibit C</u>**.  The Fee Letter provides for

the payment of commitment fees, ticking fees, funding fees and certain expenses, and contains a

market flex provision enabling the Joint Lead Arrangers to, under certain circumstances, make

certain changes to the Relevant Facility.  The Fee Letter also requires the GGP Commitment

Parties to pay the Initial Lenders funding fees provided in the Fee Letter (subject to certain conditions) if the GGP Commitment Parties do not close on the Relevant Facility and on or prior to the Effective Date, the GGP Commitment Parties complete another debt financing (including the backstop financing provided in the Investment Agreements).

### (iii) The Side Letter

29. Pursuant to an additional side letter between the GGP Commitment Parties and the Joint Lead Arrangers (the "**Side Letter**"), the GGP Commitment Parties have agreed not to list certain financial institutions on a list provided to the Joint Lead Arrangers that sets forth, among other things, institutions disqualified from participating as lenders under the Standalone Revolving Facility or Combined Facility (the "**Disqualified Institutions**") and have reserved their consent rights with respect to those financial institutions becoming lenders under the Relevant Facility. Also pursuant to the Side Letter, the GGP Commitment Parties and Joint Lead Arrangers have agreed to reasonably cooperate with each other regarding obtaining the appraisals and title insurance on, and minimizing the mortgage tax and title insurance costs with respect to, certain properties securing the Standalone Revolving Facility and Combined Facility.. Due to the confidential nature of the Side Letter, General Growth has filed a motion seeking to file the Side Letter under seal as **Exhibit D**.

### (iv) Fee Credit Provision Contained in Equity ROFO Letter

30. Pursuant to the Equity ROFO Letter, the Underwriters agree to credit a portion of the underwriting fees (the "**Term Loan Underwriting Fees**") earned on the term loan portion of the Combined Facility (the "**Term Loan**"), to the extent paid, against certain fees that become payable to the Underwriters in connection with an Underwritten Offering or, at each Underwriter's option, refund a portion of the Term Loan Underwriting Fees).

E.     **The Potential Engagement Letter Extensions**

31.     The Debtors also seek approval to enter into agreements (collectively, the "**Potential Engagement Letter Extensions**") with Goldman, Sachs & Co. and Deutsche Bank Securities, Inc. (collectively, the "**Engagement Letter Parties**") extending the date by which the Debtors would be required to make certain payments to such parties.  As noted above, the terms of the Potential Engagement Letter Extensions are still being negotiated.  If the Debtors reach agreement on the terms thereof with the Engagement Letter Parties, they will file the Potential Engagement Letter Extensions with this Court on or prior to the date of the hearing on this Motion.  Due to the confidential nature of the Potential Engagement Letter Extensions, the Debtors have sought to file the Potential Engagement Letter Extensions under seal as **Exhibits E** and **F**.

32.     Because the Fee Letter, the Side Letter, the Potential Engagement Letter Extensions, and the Equity ROFO Letter contain sensitive commercial information, General Growth filed a motion, pursuant to section 107 of the Bankruptcy Code, requesting authority to file the Fee Letter, the Side Letter, the Potential Engagement Letter Extensions and the Equity ROFO Letter under seal to protect the confidentiality of the information contained therein. Accordingly, other than as noted above, the specific terms of the Fee Letter (including the exact amount of fees to be paid by the GGP Commitment Parties pursuant thereto), the Side Letter, the Potential Engagement Letter Extensions, and the Equity ROFO Letter (including the fee credit provisions) are not contained herein.

# IV.

## RELIEF REQUESTED

33.     By this motion, General Growth seeks an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, an order (a) authorizing the Debtors to (1) exercise certain clawback rights and incur related clawback fees, (2) enter into the Commitment Letter, the Fee Letter, and the Side Letter in connection with a potential exit financing facility and (3) enter into the Equity ROFO Letter, the Pre-Emergence Underwriting Agreement and the Guarantee, (b) authorizing UBS to act as one of the Underwriters and Lender Commitment Parties and finding that such engagement will not cause UBS to fail to be a disinterested person (as defined in section 101(14) of the Bankruptcy Code), and (c) authorizing the Debtors to enter into the Potential Engagement Letter Extensions.  A proposed order is attached hereto as **Exhibit G**.  In support thereof, General Growth respectfully represents as follows.

# V.

## BASIS FOR RELIEF REQUESTED

34.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In examining whether a debtor's proposed use, sale or lease of property of its estate comports with section 363(b), courts look to whether the debtor employed its "business judgment" in determining to take the action at issue. See In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under section 363(b), courts consider a variety of factors, which essentially represents the 'business judgment test'.") (quoting In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999));  see, e.g., In re Delphi Corp., 2009 WL 637315, at * 9 (Bankr. S.D.N.Y. Mar. 10, 2009) (applying the

business judgment rule). The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal citations and quotations omitted). Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence. Id. Further, parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity. Id. (quotation omitted). Finally, section 105 of the Bankruptcy Code provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

A. **Entry into the Agreements is in the Debtors' Business Judgment**

35. The business judgment standard is applicable to most business decisions by a debtor-in-possession. General Growth believes, in its business judgment, that there are substantial justifications for the exit-related transactions contemplated pursuant to this Motion. Obtaining requisite exit capital is key to any debtor's emergence from chapter 11 protection. Although General Growth has obtained commitments from the Investors for exit capital through, *inter alia,* the purchase by such Investors of New GGP Common Stock, General Growth believes that it may be desirable or necessary to obtain exit financing and to raise equity capital through the New GGP Post-Emergence Public Equity Offering (with the flexibility to pursue the Pre-Emergence Mandatorily Exchangeable Notes Offering) to replace and complement the Investors' commitments and to have the funds necessary to satisfy the certain of the Rouse Notes in the event such notes cannot be reinstated.

36.     The terms of the Agreements were negotiated at arm's length and in good faith, and the contemplated exit-related financing transactions will provide General Growth with, at a minimum, increased emergence flexibility and possibly funds that are integral to its emergence from chapter 11.  Absent General Growth's agreement to pay the fees required under the Agreements and to undertake the indemnification obligations likewise described therein, General Growth's chances of securing the referenced financing commitments or others similar to those commitments would significantly decrease.  Moreover, payment of the underwriting fees pursuant to the Equity ROFO Letter and the Pre-Emergence Underwriting Agreement is required only upon completion of a successful completion of the underwriting (and in the case of the Pre-Emergence Mandatorily Exchangeable Notes Offering, upon the exchange of the New  GGP Notes into New GGP Common Stock upon consummation of the Plan).

37.     Moreover, General Growth believes that the fees and other obligations contained in the these Agreements are on market terms.  Indeed, this and other courts have authorized debtors to pay fees and expenses and approved indemnification obligations in connection with the establishment of exit financing.  See, e.g., In re RCN Corp.,Case No. 04-13638 (RDD) [Docket No. 67] (Bankr. S.D.N.Y. June 22, 2004) (ratifying debtors' execution of, and authorizing debtors to perform obligations under, commitment letter and granting administrative priority status to related fees and expenses); In re Premier Int'l Holdings Inc., Case No. 09-12019 (CSS) (Bankr. D. Del. Dec. 18, 2009) [Docket No. 1235] (permitting the debtor to pay a 5% commitment fee and expense reimbursement on a $450 million rights offering proposed to fund the debtor's exit from bankruptcy) In re Spectrum Jungle Labs Corp., Case No. 09-50455 (RBK), [Docket No. 887] (Bankr. W.D. Tex. June 15, 2009) (authorizing debtor's decision to enter into commitment letter and fee letter and approving indemnification

provisions and payment of related fees and expenses associated therewith); In re USG Corp.,

Case No. 01-2094 (JKF) [Docket No. 11586] (Bankr. D. Del. June 7, 2006) (authorizing debtors

to incur and perform obligations under and accept terms of commitment letter).

**B.      Exercising the Clawback Election and Incurring
        the Related Clawback Fees is in the Debtors' Sound Business Judgment**

38.      General Growth's exercise of the Clawback Election and the payment of

related fees similarly is an exercise of the Debtors' sound business judgment. General Growth

believes that paying the Clawback Fee to maintain the flexibility to pursue either Underwritten

Offering and thereby preserving its ability to substitute better priced capital from public investors

for a substantial portion of the Investors' equity commitment will enhance General Growth's

ability to maximize value for its stakeholders.

**C.      UBS's Role as Financial Advisor Does Not Create a Conflict**

39.      As noted above, UBS currently serves as non-exclusive capital markets

and M&A advisor to the Debtors.  As disclosed in the UBS Advisor Motion, in addition to

advisory services, the UBS's engagement letter with the Debtors provides that the Debtors may

request UBS to assist in underwriting financings, and if so requested, such underwriting services

would be subject to a separate engagement and separate agreement regarding fees and other

customary matters.  As set forth above, by this Motion, the Debtors request that UBS serve as

one of several Underwriters for either Underwritten Offering.  UBS is also proposing to be one

of several Lender Commitment Parties.

40.      The Debtors believe that, given UBS's unique perspective and knowledge

of the Debtors, UBS's serving as one of several Underwriters and Lender Commitment Parties

will greatly assist the Debtors in their proposed capital raise.  Furthermore, these additional roles

will not affect or diminish UBS's existing engagement or ability to receive its existing

Completion Fee (as defined in the UBS Advisor Motion). Accordingly, the Debtors believe that it is in the best interests of their estates for UBS to expand its existing role in these cases as set forth herein. Because of UBS's existing role as non-exclusive capital markets and M&A advisor, the Debtors request an order that UBS's participation as an Underwriter, and Lender Commitment Party, with respect to the exit facility, is expressly approved and that the Court find that UBS's role as an Underwriter and Lender Commitment Party will not cause it to fail to be a disinterested person or to represent or hold an interest adverse to the interest of the Debtors' estates.

**D.     The Potential Engagement Letter Extensions**

41.     Entry into the Potential Engagement Letter Extensions is warranted and in the sound exercise of the Debtors' business judgment. The Potential Engagement Letter Extensions extend the deadline by which the Debtors would otherwise have to pay certain prepetition claims to the Engagement Letter Parties. As noted above, the Debtors have sought to file the Potential Engagement Letter Extensions under seal due to the commercially sensitive nature of these agreements.

42.     For the foregoing reasons, the Debtors submit that entry into the Agreements, exercise of the Clawback Election (along with the incurrence of related Clawback Fee) and authorization of UBS as one of the Underwriters and Lender Commitment Parties, are in the best interests of the Debtors and their estates.

**VI.**

**<u>Waiver of Bankruptcy Rule 6004(h)</u>**

43.     To successfully implement the foregoing, the Debtors seek a waiver of the ten-day stay pursuant to Bankruptcy Rule 6004(h). Significantly, if the order approving the

Motion is stayed, among other things, the Underwriters will not be able to commence the marketing process necessary for the Pre-Emergence Mandatorily Exchangeable Notes Offering, the Debtors will not be able to deliver the Clawback Election Notice in a timely manner, and the commitments set forth in the other Agreements may lapse.  Moreover, waiving Bankruptcy Rule 6004(h) will enable the Joint Lead Arrangers to begin marketing the prospective credit facilities to potential lenders so as to increase the likelihood that the anticipated loan syndication will be viable on the Effective Date

## VII.

## <u>NOTICE</u>

44.    No trustee or examiner has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion on: (i) the U.S. Trustee, Attention: Andrea B. Schwartz and Elisabetta G. Gasparini; (ii) counsel for the Creditors' Committee, Akin Gump Strauss Hauer & Feld LLP, Attention: Michael S. Stamer and James Savin; (iii) counsel for the Equity Committee, Saul Ewing LLP, Attn: John Jerome; (iv) counsel for the Underwriters, (v) counsel for the Joint Lead Arrangers, and (vi) parties entitled to receive notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  General Growth submits that no other or further notice need be provided.

WHEREFORE General Growth respectfully requests that the Court grant the

relief requested herein and such other and further relief as it deems just and proper.

Dated: September 22, 2010
      New York, New York

/s/ *Gary T. Holtzer*
Marcia L. Goldstein
Gary T. Holtzer
Adam P. Strochak
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

    and

Stephen A. Youngman (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas  75201
Telephone:  (214) 746-7700
Facsimile:  (214) 746-7777

    and

Sylvia A. Mayer (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

    and

James H.M. Sprayregen, P.C
Anup Sathy, P.C. (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Co-Attorneys for Certain Subsidiary
Debtors and Debtors in Possession

- 

# **Exhibit A**

**Equity ROFO Letter**

**(Filed Under Seal)**

- 

# Exhibit B

**Commitment Letter**

| DEUTSCHE BANK TRUST COMPANY AMERICAS | WELLS FARGO BANK, N.A. | ROYAL BANK OF CANADA | BARCLAYS BANK PLC |
|---|---|---|---|
| DEUTSCHE BANK SECURITIES INC. | WELLS FARGO SECURITIES, LLC | RBC CAPITAL MARKETS CORPORATION | |
| GOLDMAN SACHS LENDING PARTNERS LLC | MIHI LLC | TORONTO DOMINION (NEW YORK) LLC | UBS LOAN FINANCE LLC |
| | MACQUARIE CAPITAL (USA) INC. | | UBS SECURITIES LLC |
| | | TD SECURITIES (USA) LLC | |

September 21, 2010

<div align="center">

## COMMITMENT LETTER

</div>

PERSONAL AND CONFIDENTIAL

**GGP LIMITED PARTNERSHIP**
**GGPLP L.L.C.**
**GENERAL GROWTH PROPERTIES, INC.**
110 N. Wacker Drive
Chicago, Illinois 60606

Ladies and Gentlemen:

This commitment letter agreement (together with all exhibits and schedules hereto, the "***Commitment Letter***") will confirm the understanding and agreement among Deutsche Bank Securities Inc. ("***DBSI***"), Wells Fargo Securities, LLC ("***Wells Fargo Securities***") and RBC Capital Markets Corporation ("***RBC Capital***" and together with DBSI and Wells Fargo Securities, the "***Joint Lead Arrangers***"), Barclays Capital, the investment banking division of Barclays Bank plc ("***Barclays Capital***"), Goldman Sachs Lending Partners LLC ("***GS Lending Partners***"), Macquarie Capital (USA) Inc. ("***MCUSA***"), TD Securities (USA) LLC ("***TD Securities***") and UBS Securities LLC ("***UBSS***" and, together with the Joint Lead Arrangers, Barclays Capital, GS Lending Partners, MCUSA and TD Securities, the "***Arrangers***" and the "***Bookrunners***"), Deutsche Bank Trust Company Americas ("***DBTCA***" and together with DBSI, "***DB***"), Wells Fargo Bank, N.A. ("***Wells Fargo Bank***" and together with Wells Fargo Securities, "***Wells Fargo***"), Royal Bank of Canada ("***Royal Bank of Canada***" and together with RBC Capital, "***RBC***"), Barclays Bank plc ("***Barclays Bank***" and together with Barclays Capital, "***Barclays***"), GS Lending Partners, MIHI LLC ("***MIHI***" and together with MCUSA, "***Macquarie***"), Toronto Dominion (New York) LLC ("***Toronto Dominion***" and together with TD Securities, "***TD***") and UBS Loan Finance LLC ("***UBS Loan Finance***" and together with UBSS, "***UBS***") (DBTCA, Wells Fargo Bank, Royal Bank of Canada, Barclays Bank, GS Lending Partners, MIHI, Toronto Dominion and UBS Loan Finance, the "***Initial Lenders***", and together with the Arrangers and Bookrunners, the "***Lender Commitment Parties***", "***we***" or "***us***"), GGP Limited Partnership, a Delaware limited partnership (the "***Partnership***"), GGPLP L.L.C., a Delaware limited liability company (together with the Partnership, each, a "***Borrower***" and collectively, the "***Borrowers***") and General Growth Properties, Inc., a Delaware corporation ("***Existing GGPI***" and together with Borrowers, the "***GGP Commitment Parties***" and alternatively referred to, collectively, as "***you***" throughout this Commitment

Letter) in connection with the proposed financing of the consummation of the Plan described below and certain related transactions described in more detail in the Summary of Principal Terms and Conditions attached hereto as **Exhibit A to Attachment I** if the Relevant Facility (as defined below) is the Standalone Revolving Facility (as defined below) or **Exhibit A to Attachment II** if the Relevant Facility is the Combined Facility (as defined below) (such **Exhibit A to Attachment I** or **Exhibit A to Attachment II**, as the case may be, including the Annexes thereto, the "***Term Sheet***"). Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Term Sheet.

You have informed us that you have filed with the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") on August 27, 2010 a plan of reorganization (together with all exhibits, supplements, annexes, schedules and any other attachments filed as of the date of this Commitment Letter in conjunction with such plan, the "***Plan***") pursuant to which the Borrowers, Existing GGPI, and certain of their domestic subsidiaries (as reorganized pursuant to the Plan, together with the Borrowers and Existing GGPI, the "***Debtors***") that are currently debtors-in-possession in bankruptcy cases (the "***Bankruptcy Cases***") under Chapter 11 of Title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq (the "***Bankruptcy Code***"), expect to be reorganized and emerge from the Bankruptcy Cases. You have also advised us that in connection with the consummation of the Plan, New GGP, Inc., a Delaware corporation, will become the new public real estate investment trust indirect parent of the Borrowers and be renamed substantially concurrently with the Closing Date (as defined in the Term Sheet) General Growth Properties, Inc. ("***New Parent***"), GGP Real Estate Holding I, Inc. and GGP Real Estate Holding II, Inc., each a Delaware corporation, and GGP Limited Partnership II, a Delaware limited partnership, will each be newly formed in connection with the consummation of the Plan (such entities, together with New Parent and Existing GGPI, the "***Parent***").

In connection with the foregoing, and subject to the confirmation and effectiveness of the Plan, the GGP Commitment Parties are seeking to obtain exit financing (funding under which will be made available to the Borrowers upon the closing of the credit facilities in accordance with this Commitment Letter) comprised of one of the following:

•       A senior secured revolving credit facility in an aggregate principal amount of $300,000,000, as more particularly described on **Exhibit A to Attachment I** hereto (the "***Standalone Revolving Facility***"); or

•       A senior secured revolving credit facility in an aggregate principal amount of $300,000,000 and a senior secured term facility in an aggregate principal amount of $1,500,000,000, as more particularly described on **Exhibit A to Attachment II** attached hereto (the "***Combined Facility***").

As used herein the term "***Relevant Facility***" means (i) if the reinstatement of the Rouse Notes (as defined in the Term Sheet) is approved by the Bankruptcy Court, the Standalone Revolving Facility or (ii) if such reinstatement is not approved, the Combined Facility.

1.       The Commitments.

You have requested that each of the Initial Lenders severally commit, and each Initial Lender is pleased to confirm by this Commitment Letter its several, but not joint, commitment to you, to provide its share of the entire principal amount of the Relevant Facility, as listed in **Schedule 1** attached hereto (the "***Commitments***") in each case, upon the terms and subject solely to the conditions set forth in the Term Sheet for the Relevant Facility under the heading "Conditions to each Loan and Issuance of each Letter of Credit" and on **Exhibit B** to the Term Sheet for the Relevant Facility.

It is agreed that the Joint Lead Arrangers will act as joint lead bookrunners and joint lead arrangers for the Relevant Facility and the other Arrangers and Bookrunners will act as arrangers and bookrunners, respectively, for the Relevant Facility. You agree that DBSI shall have "left" placement, Wells Fargo Securities shall have second placement, RBC Capital will have third placement, and the other Arrangers and Bookrunners (or their affiliates, as applicable) will be listed in alphabetical order in any marketing material or other documentation used in connection with the Relevant Facility. Wells Fargo Securities and RBC Capital will act as co-syndication agents for the Relevant Facility. DBTCA, acting through one or more of its branches or affiliates, will act as the sole and exclusive Administrative Agent (acting in such role, the "***Administrative Agent***") for the Relevant Facility. Each of the Arrangers, the Administrative Agent, and the Initial Lenders will have the rights and authority customarily given to financial institutions in such roles, but will have no duties other than those expressly set forth herein. You agree that no other agents, co-agents, coordinators, arrangers or bookrunners will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by the Term Sheets or the Fee Letter referred to below) will be paid in connection with the Relevant Facility unless you and we so agree.

2.    <u>Syndication</u>.

(a)    The parties hereto agree that the Joint Lead Arrangers will have the right, subject to Section 10(b), to syndicate the Relevant Facility and the commitments hereunder to one or more financial institutions or other investors, identified by us after consultation with you and reasonably acceptable to you, other than Disqualified Institutions (collectively known as the "***Lenders***"). The Joint Lead Arrangers intend to commence syndication efforts promptly upon the execution of this Commitment Letter and will coordinate syndication among the Joint Lead Arrangers in a manner to be separately agreed among the Joint Lead Arrangers.

(b)    Subject to the consent rights of the GGP Commitment Parties under subsection (a) above, the Joint Lead Arrangers will have the right to manage all aspects of any such syndication, including decisions as to the selection of prospective Lenders and when they will be approached, the acceptance of commitments, the amounts offered, and the compensation provided to each prospective Lender from the amounts to be paid to the Lender Commitment Parties pursuant to the terms of this Commitment Letter and the Fee Letter. The Joint Lead Arrangers will determine the final commitment allocations in conjunction with such syndication and will notify the GGP Commitment Parties of such determinations. From and after the Authorization Date (as defined below) until the date that is ninety (90) days after the Closing Date, the GGP Commitment Parties shall use commercially reasonable efforts (taking into account that the GGP Commitment Parties and their representatives will concurrently be working on an equity placement) to assist the Joint Lead Arrangers in such syndication process, including, without limitation: (i) ensuring that the syndication efforts benefit from the existing lending relationships of the GGP Commitment Parties and their affiliates; (ii) arranging for direct contact between senior management and other representatives with appropriate seniority and expertise and advisors of the GGP Commitment Parties and their affiliates, and the proposed Lenders; (iii) assisting in the preparation of one or more information packages regarding the business, operations, financial projections and prospects of the GGP Commitment Parties and their affiliates as well as the current status of the Bankruptcy Cases (such information packages, collectively, the "***Confidential Information Memoranda***"), a presentation to potential lenders (the "***Lender Presentation***"), and other marketing materials to be used in connection with any syndication; and (iv) hosting, with the Joint Lead Arrangers, one or more meetings of prospective Lenders, and, in connection with any such Lender meeting, consulting with the Joint Lead Arrangers with respect to the presentations to be made at such meeting, and making available appropriate officers and representatives to rehearse such presentations prior to such meetings, as reasonably requested by the Joint Lead Arrangers. Notwithstanding anything to the contrary contained in this Commitment Letter or the Fee Letter, neither the commencement nor the completion of

the syndication of the Relevant Facility shall constitute a condition precedent to the availability and initial funding of the Relevant Facility on the Closing Date.

(c)    To ensure an orderly and effective syndication of the Relevant Facility and the commitments hereunder, you agree that if the Combined Facility is the Relevant Facility, from and after the Authorization Date until the earlier to occur of (i) ninety (90) days after the Closing Date or (ii) 30 days after a Successful Syndication (as defined in the Fee Letter) of the Relevant Facility, Parent will not, and will not permit any of its Subsidiaries to, syndicate or issue, attempt to syndicate or issue, announce or authorize the announcement of the syndication or issuance of, or engage in discussions concerning the syndication or issuance of, any debt for borrowed money facility or other debt for borrowed money, including any renewals or refinancings of any existing debt for borrowed money facilities or other debt for borrowed money (except as provided below), without the prior written consent of a majority of the Joint Lead Arrangers (which consent may not be unreasonably withheld or delayed); *provided*, *however*, that the foregoing shall not apply to the following: the Exchangeable Notes (as defined in the Term Sheet), the TRUP Notes (as defined in the Term Sheet), the Reinstated Rouse Notes (if the Relevant Facility is the Standalone Revolving Facility and as defined in **Exhibit A to Attachment I**), other indebtedness and other transactions specifically contemplated by the Plan as permitted pursuant to paragraph 4 of **Exhibit B** to the Term Sheet for the Relevant Facility, and Permitted Project Level Financing (including any renewals or refinancings of the foregoing)

3.    Conditions Precedent.  The commitments and agreements of each Lender Commitment Party described herein are subject to the satisfaction of each and every condition precedent as set forth in the Term Sheet for the Relevant Facility under the heading "Conditions to each Loan and Issuance of each Letter of Credit" and on **Exhibit B** to the Term Sheet for the Relevant Facility. In addition, if the Combined Facility is the Relevant Facility, the Closing Date shall not occur prior to (a) November 8, 2010, if the date the Confirmation Order is entered by the Bankruptcy Court (the "***Confirmation Date***") occurs on or prior to October 25, 2010, or (b) the date that is 21 days after the Confirmation Date if the Confirmation Date occurs on or after October 26, 2010.

4.    Fees and Expenses.  In consideration of the execution and delivery of this Commitment Letter by each Lender Commitment Party, you agree, jointly and severally, to pay or cause to be paid the fees and expenses set forth in the Term Sheet and in the Fee Letter dated the date hereof (the "***Fee Letter***") as and when payable in accordance with the terms thereof.

5.    Indemnification.

(a)    The GGP Commitment Parties hereby jointly and severally agree to indemnify and hold harmless each Lender Commitment Party, the other Lenders and each of their respective affiliates and all of their respective officers, directors, partners, trustees, employees, shareholders, advisors, agents, representatives, attorneys and controlling persons and each of their respective heirs, successors and assigns (each, an "***Indemnified Person***") from and against any and all losses, claims, damages and liabilities (including reasonable and documented out-of-pocket expenses related to any of the foregoing) to which any Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the Relevant Facility, the use of the proceeds therefrom, any of the other transactions contemplated by this Commitment Letter, any other transaction related thereto or any action, claim, litigation, investigation or proceeding relating to any of the foregoing (any of the foregoing, a "***Proceeding***"), regardless of whether any Indemnified Person is a party thereto, and to reimburse each Indemnified Person within thirty (30) days following a written demand (together with backup documentation supporting such reimbursement request) for all reasonable legal and other expenses paid or incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any Proceedings arising in any manner out

4

of or in connection with the transactions contemplated by this Commitment Letter (including, without limitation, in connection with the enforcement of the indemnification obligations set forth herein); *provided, however*, that (i) the Indemnified Persons shall use their reasonable efforts to use a single outside counsel for all such Indemnified Persons taken as a whole (and, if reasonably necessary, one local counsel in any relevant material jurisdiction) to represent them in connection with the foregoing, with exceptions in the case of conflicts of interest and in all cases the total legal fees for all counsel representing the Indemnified Persons must be reasonable taken as a whole, taking into account the nature of the Proceeding and, in the case of multiple counsel, the necessity of same, and (ii) no Indemnified Person will be entitled to indemnity hereunder in respect of (A) any loss, claim, damage, liability or expense to the extent that it is found by a final, non-appealable judgment of a court of competent jurisdiction that such loss, claim, damage, liability or expense resulted from the gross negligence, bad faith, willful misconduct or breach of this Commitment Letter of such Indemnified Person or (B) any Proceeding that is brought by an Indemnified Person against any other Indemnified Person that does not also include a claim against any GGP Commitment Party or their subsidiaries; *provided* that the Administrative Agent, in its capacity as such under the Relevant Facility, shall remain indemnified in respect of such disputes to the extent otherwise entitled to be so indemnified.

(b) In no event will any Indemnified Person, the GGP Commitment Parties or any other party hereto be liable on any theory of liability for indirect, special or consequential damages, lost profits or punitive damages in connection with this Commitment Letter, the Fee Letter or the Relevant Facility except, in the case of the GGP Commitment Parties, to the extent otherwise subject to indemnification pursuant to this Section 5. No Indemnified Person, GGP Commitment Party or any other party hereto will be liable for any damages arising from the use by unauthorized persons of information, projections or other materials sent through electronic, telecommunications or other information transmission systems that are intercepted by unauthorized persons except to the extent that it is found by a final judgment of a court of competent jurisdiction that such damages resulted from the gross negligence, bad faith, willful misconduct or breach of this Commitment Letter of such Indemnified Person, GGP Commitment Party or other party thereto.

(c) The GGP Commitment Parties further agree that, without the prior written consent of each Lender Commitment Party, none of them will enter into any settlement of any Proceeding arising out of this Commitment Letter or the transactions contemplated by this Commitment Letter to which any Lender Commitment Party is a party unless such settlement includes an explicit and unconditional release or, if such settlement contains a conditional release, such release shall be in form and substance reasonably satisfactory to such Lender Commitment Party, from the party bringing such lawsuit, claim or other proceeding of all Indemnified Persons. You shall not be liable for any settlement of a Proceeding or any loss, claim, damage, liability or expense where such settlement is effected without your consent, subject to the following: (i) you agree that you will not unreasonably withhold such consent with respect to any settlement that does not impair or prejudice any defense or claim of a GGP Commitment Party in the subject Proceeding or otherwise with respect to the subject matter of the settlement (a "***GGP-Impacted Settlement***"); (ii) you agree not to unreasonably delay responding to any written request for consent ("***Settlement Consent Request***"); (iii) in any case where a Settlement Consent Request has been delivered to the GGP Commitment Parties within a reasonable period prior to the applicable Indemnified Party entering into a settlement not consented to by a GGP Commitment Party, then the GGP Commitment Parties shall remain obligated to indemnify and hold harmless each such Indemnified Person from and against attorneys' fees and expenses incurred in connection with the underlying matter so settled to the extent otherwise provided in this Commitment Letter but shall not be liable for the costs of such settlement itself.

6. <u>Termination of Commitment</u>.

(a)     The commitments hereunder, and our agreements to perform the services described herein will terminate upon the first to occur of (i) September 22, 2010 if the Commitment Letter and the Fee Letter have not been filed with the Bankruptcy Court on or prior to such date; (ii) October 12, 2010 (or, if the Bankruptcy Court delays the hearing with respect to the Authorization Order (as defined below past October 8, 2010, the Business Day prior to the date the Bankruptcy Court hearing commences with respect to confirmation of the Plan or reinstatement of the Rouse Bonds (but in no event later than October 22, 2010), unless on or prior to such date, the GGP Commitment Parties shall have executed and delivered the Commitment Letter and the Fee Letter and (x) an order of the Bankruptcy Court (the "**Authorization Order**") has been entered (the date of such entry being referred to herein as the "***Authorization Date***"), in form and substance reasonably satisfactory to a majority of the Joint Lead Arrangers, authorizing and directing the GGP Commitment Parties to assume and perform the obligations set forth in this Commitment Letter and the Fee Letter, which order shall specifically provide that (A) the payment obligations and all other obligations of the GGP Commitment Parties hereunder and under the Fee Letter thereby assumed shall be entitled to priority as administrative claims against each of the GGP Commitment Parties and the other applicable Debtors on a joint and several basis under sections 503(b) and 507(a)(1) of the Bankruptcy Code, whether or not this Commitment Letter, the Fee Letter or the Loan Documents (as defined in the Term Sheet) are executed or delivered by any or all of the Debtors or any of the Loans are funded and (B) subject to the approval of the Bankruptcy Court, an unredacted copy of the Fee Letter shall be filed under seal, and (y) as of such date, such Authorization Order remains in full force and effect, and such Authorization Order has not been vacated, stayed, reversed or modified or amended in any respect (except to the extent the Joint Lead Arrangers shall have consented in writing thereto); (iii) three business days after the Authorization Date, unless the Commitment Fee has been paid to Initial Lenders or their affiliates in accordance with the Fee Letter; (iv) December 31, 2010, unless the Closing Date has been extended in accordance with the Term Sheet (in which case, January 31, 2011), unless prior to such date all conditions precedent set forth in this Commitment Letter have been fully satisfied (except to the extent the Lender Commitment Parties shall have consented in writing to an extension of the Closing Date or a waiver of any unsatisfied conditions) or (v) the effective date of the Plan without use of the Relevant Facility (provided that this clause (v) shall in no event excuse any Lender Commitment Party for its breach of its obligation to provide funding pursuant to the Relevant Facility on or after the Closing Date), or (v) the failure of any of the GGP Commitment Parties to satisfy any material obligation under this Commitment Letter or the Fee Letter; *provided* that no right of termination will arise unless the GGP Commitment Parties have failed to satisfy such obligation within thirty (30) days after receipt of written notice thereof from the Joint Lead Arrangers.  Upon closing of the Relevant Facility you agree to rely exclusively on your rights and the commitments set forth in the Loan Documents in respect of all loans and extensions of credit to be made after the Closing Date.

(b)     The provisions of this Commitment Letter relating to syndication (Section 2); the payment of fees and expenses (Section 4); indemnification and contribution (Section 5); confidentiality (Section 7); information (Section 8); governing law and jurisdiction (Section 9); the Lender Commitment Parties and their affiliates as full-service firms (Section 10(e)); and the absence of fiduciary or other relationship (Section 10(f)(collectively, the "***Surviving Provisions***")); will survive the expiration or termination of the commitments hereunder or this Commitment Letter, the execution and delivery of the Loan Documents, and the occurrence of an effective date of any plan of reorganization and any discharge of the Debtors; *provided* that (i) your obligations with respect to syndication shall survive until ninety (90) days following the Closing Date, (ii) on the Closing Date, your and our obligations with respect to the confidentiality provisions (other than with respect to the Fee Letter) and indemnification provisions set forth herein shall automatically be superseded by the Loan Documents and you and we shall automatically be released from all liability in connection therewith at such time and (iii) you may terminate this Commitment Letter (other than the Surviving Provisions) upon written notice to the Initial Lenders at any time and payment of any fees due and payable under the Fee Letter.

7. Confidentiality.

(a) This Commitment Letter and the terms and conditions contained herein and any written communications provided by, or oral discussions with, the Lender Commitment Parties in connection with this arrangement may not be disclosed by the GGP Commitment Parties to any person or entity other than (i) to your agents and advisors to the extent you notify such persons of their obligation to keep such information contained herein and therein confidential; (ii) to the parties to the Investment Agreements (as defined in the Plan) on the date of this Commitment Letter to the extent you notify such persons of their obligation to keep such information contained herein and therein confidential and such persons agree to hold the same in confidence; (iii) in motions to be filed with the Bankruptcy Court solely in connection with obtaining the entry of the Authorization Order or any other order of the Bankruptcy Court approving the GGP Commitment Parties' execution, delivery and performance of this Commitment Letter and the definitive Loan Documents; (iv) to the official creditor's committee, official equity committee and the U.S. Trustee in connection with the Bankruptcy Cases, in each case to the extent you notify such persons of their obligation to keep such information contained herein and therein confidential and such persons agree to hold the same in confidence; (v) to the extent required by applicable law, regulation or legal process or as requested by a governmental authority (in which case you agree to inform us promptly thereof to the extent allowed and practicable); (vi) in any action or proceeding to enforce the terms of this Commitment Letter, the Fee Letter or any related agreement; (vii) to any other party hereto; (viii) with the consent of the Lender Commitment Parties; (ix) to Moody's Investors Service, Inc. ("*Moody's*") and Standard & Poor's Ratings Group, a division of The McGraw Hill Corporation ("*S&P*"), solely with respect to the disclosure of the information contained in the Term Sheet; and (x) to the extent such information (x) is publicly available other than as a result of a breach of this paragraph or (y) becomes available to the GGP Commitment Parties or any of their respective affiliates on a nonconfidential basis from a source other than the Lender Commitment Parties not known by the GGP Commitment Parties to be bound by a confidentiality obligation after due inquiry.

(b) The GGP Commitment Parties further agree that without limitation of the other terms of this Section 7, without the prior written consent of the Joint Lead Arrangers, the Fee Letter and the terms and conditions contained therein may not be disclosed, and no disclosure regarding the amount of fees (either individually or in the aggregate) payable by the GGP Commitment Parties under this Commitment Letter or the Fee Letter shall be made to any person or entity, other than (i) to your agents and advisors to the extent you notify such persons of their obligation to keep such information contained herein and therein confidential; (ii) to the parties to the Investor Agreements (as defined in the Plan) on the date of this Commitment Letter to the extent you notify such persons of their obligation to keep such information contained herein and therein confidential and such persons agree to hold the same in confidence; (iii) to the official creditors' committee, official equity committee and the U.S. Trustee in connection with the Bankruptcy Cases, in each case to the extent you notify such persons of their obligation to keep such information contained herein and therein confidential and such persons agree to hold the same in confidence; (iv) as and to the extent required by applicable law, regulation or legal process or as requested by a governmental authority (in which case you agree to inform us promptly thereof to the extent allowed and practicable); (v) in any action or proceeding to enforce the terms of this Commitment Letter, the Fee Letter or any related agreement; (vi) to any other party hereto; (vii) with the consent of the Lender Commitment Parties; (viii) unredacted copies of the Fee Letter may be filed with the Bankruptcy Court so long as such filing is made under seal and if such filing is not permitted by the Bankruptcy Cout to be made under seal, redactions shall be made to the Fee Letter in a manner mutually satisfactory to the Joint Lead Arrangers and the GGP Commitment Parties to the extent permitted by the Bankruptcy Court; and (ix) to the extent such information (x) is publicly available other than as a result of a breach of this paragraph or (y) becomes available to the GGP Commitment Parties or any of their respective affiliates on a nonconfidential basis from a source other than the Lender Commitment Parties not known by the GGP Commitment Parties to be bound by a confidentiality obligation after due inquiry.

7

(c)     This Commitment Letter, the Fee Letter, the Term Sheet and the Information (as defined below) and any written communications provided by, or oral discussions with, the GGP Commitment Parties in connection with this arrangement may not be disclosed by the Lender Commitment Parties to any person or entity other than (i) to the Lender Commitment Parties' affiliates and their affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives, to the extent such persons are notified of their obligation to keep such information contained herein and therein confidential and such persons agree to hold the same in confidence; (ii) to the potential Lenders and participants to the extent such persons are notified of their obligation to keep such information contained herein and therein confidential and such persons agree to hold the same in confidence; (iii) as and to the extent required by applicable law, regulation or legal process or as requested by a governmental authority (including any self-regulatory authority) (in which case, the Lender Commitment Parties agree to inform the GGP Commitment parties promptly thereof to the extent allowed and practicable); (iv) in any action or proceeding to enforce the terms of this Commitment Letter, the Fee Letter or any related agreement; (v) to any other party hereto; (vi) with the consent of the GGP Commitment Parties; and (vii) to the extent such information (x) is publicly available other than as a result of a breach of this paragraph or (y) becomes available to the Lender Commitment Parties or any of their respective affiliates on a nonconfidential basis from a source other than the GGP Commitment Parties not known by the Lender Commitment Parties to be bound by a confidentiality obligation after due inquiry.

(d)     You acknowledge that each Lender Commitment Party and each of their respective affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise.  Each Lender Commitment Party will not use confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or their other relationships with you in connection with the performance by such Lender Commitment Party of services for other companies, and each Lender Commitment Party will not furnish any such information to other companies.  You also acknowledge that each Lender Commitment Party has no obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained from other companies.

8.     Information.

(a)     To assist the Joint Lead Arrangers in their syndication efforts, from the Authorization Date until the earlier of (i) the termination of the syndication of the Relevant Facility as reasonably determined by the Joint Lead Arrangers and (ii) ninety (90) days after the Closing Date (the "**Information Period**"), you agree promptly to prepare and provide to the Arrangers such information with respect to the GGP Commitment Parties, the Authorization Order and any other orders issued by the Bankruptcy Court with respect to the Relevant Facility and the other transactions contemplated hereby as either Joint Lead Arranger may reasonably request, including the Projections described in the Term Sheet, all in form reasonably satisfactory to the Joint Lead Arrangers.  You hereby represent and covenant that (A) the Confidential Information Memoranda, the Lender Presentation and all other written information other than the Projections, estimates and forward-looking statements and information of a general economic or industry-specific nature (the "**Information**") that has been or will be made available to the Arrangers by you or any of your representatives is or will be, when furnished and taken as a whole, complete and correct in all material respects and does not or will not, when furnished and taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (B) the Projections that have been or will be made available to the Arrangers by you or any of your representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at

the time made (it being recognized by the Lender Commitment Parties that such Projections are not to be viewed as facts and are subject to significant uncertainties and contingencies many of which are beyond your control, that no assurance can be given that any particular financial projections will be realized, and that actual results may differ and that such differences may be material). You understand that in arranging and syndicating the Relevant Facility and the commitments hereunder we may use and rely on the Information and Projections without independent verification thereof. You agree that if at any time prior to the end of the Information Period, any of the representations in the preceding sentence would be incorrect in any material respect as a result of a change in facts or circumstances if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement, or cause to be supplemented, the Information and Projections from time to time until the end of the Information Period so that such representations will be correct in all material respects under those circumstances (it being understood that any supplementation in such context shall cure any breach of such representation).

(b)     The GGP Commitment Parties acknowledge that certain of the Lenders may be "public side" Lenders (i.e. Lenders that do not wish to receive material non-public information with respect to the Debtors, their respective affiliates or any of their respective securities) (each, a "**_Public Lender_**"). At the request of any of the Joint Lead Arrangers, the GGP Commitment Parties agree to assist in the preparation of an additional version of the Confidential Information Memoranda to be used by Public Lenders that does not contain material non-public information concerning the Debtors, or their respective affiliates or securities. It is understood that in connection with your assistance described above, you will provide, and use commercially reasonable efforts to cause all other applicable persons to provide, authorization letters to the Joint Lead Arrangers in customary form authorizing the distribution of the Information to prospective Lenders, containing a representation to the Joint Lead Arrangers that the public-side version does not include material non public information about the Debtors or their respective affiliates or your or their respective securities. In addition, the GGP Commitment Parties will clearly designate as "PUBLIC" all Information provided to the Joint Lead Arrangers by or on behalf of the GGP Commitment Parties which is suitable to make available to Public Lenders and we shall treat any Information that is not specifically identified as "PUBLIC" as being suitable only for distribution to non-Public Lenders. The GGP Commitment Parties acknowledge and agree that the following documents may be distributed to Public Lenders (unless the GGP Commitment Parties promptly notifies the Joint Lead Arrangers in writing prior to such distribution that any such document contains material non-public information with respect to the GGP Commitment Parties, or their respective affiliates or securities and provided that the GGP Commitment Parties have been given a reasonable opportunity to review such documents and comply with the U.S. Securities and Exchange Commission disclosure requirements): (a) drafts and final versions of the Loan Documents; (b) administrative materials prepared by the Joint Lead Arrangers for prospective Lenders (such as a lender meeting invitation, allocations and funding and closing memoranda); and (c) term sheets and notification of changes in the terms of the Relevant Facility.

9.     Choice of Law; Jurisdiction; Waivers.

(a)     This Commitment Letter and the Fee Letter will be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws to the extent that the application of the laws of another jurisdiction will be required thereby. Each of the parties hereto for itself and its affiliates agrees that any suit or proceeding arising in respect to this Commitment Letter or the commitments or agreements of each of the Lender Commitment Parties hereunder or the Fee Letter will be tried in the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in the U.S. District Court for the Southern District of New York or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and each of the parties hereto irrevocably and unconditonaly agrees to submit to the exclusive jurisdiction of, and to venue in, such court and irrevocably agrees that all claims in respect of any such

suit, action or proceeding may be heard and determined in any such court. The parties hereto hereby waive any objection that they may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in any such court, and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. **The parties hereto hereby waive, to the fullest extent permitted by applicable law, any right to trial by jury with respect to any action or proceeding arising out of or relating to this Commitment Letter or the Fee Letter.**

(b)     Subject to the proviso in Section 10(b) below, no Lender Commitment Party or Lender will be liable in any respect for any of the obligations or liabilities of any other Lender Commitment Party or Lender under this Commitment Letter or arising from or relating to the transactions contemplated hereby.

10.     Miscellaneous.

(a)     This Commitment Letter may be executed in one or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic (in pdf or other similar format) transmission will be effective as delivery of a manually executed counterpart hereof. This Commitment Letter may not be amended or waived except by an instrument in writing signed by the Lender Commitment Parties and you.

(b)     The GGP Commitment Parties may not assign any of their rights, or be relieved of any of their obligations under the Commitment Letter, without the prior written consent of each of the Lender Commitment Parties (and any purported assignment without such consent will be null and void). In connection with any syndication of all or a portion of the commitments hereunder, the rights and obligations of each Initial Lender hereunder may be assigned, in whole or in part, to other Lenders, subject to the consultation and reasonable approval rights of the GGP Commitment Parties as set forth above; *provided* that (x) with respect to such assignments, no Initial Lender shall be relieved, released or novated from its obligations hereunder (including its obligation to fund the Relevant Facility on the Closing Date) in connection with any syndication, assignment or participation of the Relevant Facility, including its commitments in respect thereof, until after the Closing Date, (y) no assignment or novation shall become effective with respect to the portion of any Lender's Term Loan commitments in respect of the Relevant Facility so assigned until the initial funding of the Term Loan and (z) each Initial Lender shall retain exclusive control over all rights and obligations with respect to its commitments in respect of the Relevant Facility so assigned, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the Closing Date has occurred.

(c)     This Commitment Letter sets forth the entire understanding of the parties hereto as to the scope of the commitments hereunder and the obligations of the Lenders and the Lender Commitment Parties hereunder. This Commitment Letter (together with the Fee Letter) supersedes all prior understandings and proposals, whether written or oral, between any of the Lenders and you relating to any financing or the transactions contemplated hereby. This Commitment Letter is in addition to the agreements of the parties contained in the Fee Letter.

(d)     Each of the parties hereto agrees that this Commitment Letter is a binding and enforceable agreement with respect to the subject matter herein, notwithstanding that the availability and initial funding of the Relevant Facility on the Closing Date are subject to the limited conditions precedent as set forth herein.

(e)     This Commitment Letter has been and is made solely for the benefit of the parties signatory hereto and the Indemnified Persons, and, in each case, their respective heirs, successors and

assigns, and nothing in this Commitment Letter, expressed or implied, is intended to confer or does confer on any other person or entity any rights or remedies under or by reason of this Commitment Letter or the agreements of the parties contained herein.

(f)     The Arrangers and other Lender Commitment Parties (together with their respective affiliates) are full service financial services firms engaged, either directly or through affiliates, in various activities, including securities trading, investment banking and financial advisory, investment management, principal investment, hedging, financing and brokerage activities and financial planning and benefits counseling for both companies and individuals. In the ordinary course of these activities, such Persons may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and/or financial instruments (including bank loans) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and/or instruments. Such investment and other activities may involve securities and instruments of the GGP Commitment Parties and their affiliates as well as of other entities and persons and their affiliates which may (i) be involved in transactions arising from or relating to the engagement contemplated by this Commitment Letter, (ii) be customers or competitors of the GGP Commitment Parties or their affiliates, or (iii) have other relationships with the GGP Commitment Parties or their affiliates. In addition, the Arrangers and other Lender Commitment Parties may provide investment banking, underwriting and financial advisory services to such other entities and persons. The Arrangers and other Lender Commitment Parties may also co-invest with, make direct investments in, and invest or co-invest client monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of the GGP Commitment Parties, their affiliates, or such other entities. The transactions contemplated by this Commitment Letter may have a direct or indirect impact on the investments, securities or instruments referred to in this paragraph. Although the Arrangers and other Lender Commitment Parties in the course of such other activities and relationships may acquire information about the transaction contemplated by this Commitment Letter or other entities and persons which may be the subject of the transactions contemplated by this Commitment Letter, the Arrangers and other Lender Commitment Parties shall have no obligation to disclose such information, or the fact that they are in possession of such information, to the GGP Commitment Parties or to use such information on the GGP Commitment Parties's behalf. Consistent with the Lender Commitment Parties' policies to hold in confidence the affairs of its customers, the Lender Commitment Parties will not furnish confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter to any of their other customers. Furthermore, you acknowledge that none of the Lender Commitment Parties or any of their respective affiliates has an obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained or that may be obtained by them from any other person.

(g)     The Lender Commitment Parties may have economic interests that conflict with those of the GGP Commitment Parties and/or each of their respective equity holders and/or affiliates. You agree that the Lender Commitment Parties will act hereunder as an independent contractor and that nothing herein or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Lender Commitment Parties and the GGP Commitment Parties, each of their respective equity holders and/or affiliates. You acknowledge and agree that the transactions contemplated hereby (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lender Commitment Parties, on the one hand, and the GGP Commitment Parties, on the other, and in connection therewith and with the process leading thereto, (i) the Lender Commitment Parties have not assumed (A) an advisory responsibility in favor of the GGP Commitment Parties or any of their respective equity holders and/or affiliates with respect to the financing transactions contemplated hereby or (B) a fiduciary responsibility in favor of the GGP Commitment Parties or any of their respective equity holders and/or affiliates with

11

respect to the financing transactions contemplated hereby, or in each case, the exercise of rights or remedies with respect thereto or the process leading thereto (irrespective of whether the Lender Commitment Parties have advised, are currently advising or will advise the GGP Commitment or each of their respective equity holders and/or affiliates, on other matters) or any other obligation to the GGP Commitment Parties except the obligations expressly set forth in this Commitment Letter and the Fee Letter and (ii) each Lender Commitment Party is acting solely as a principal and not as the agent or fiduciary of the GGP Commitment Parties, its management, equity holders, affiliates, creditors or any other person. Each of the GGP Commitment Parties acknowledges and agrees that they have consulted its own legal and financial advisors to the extent deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each of the GGP Commitment Parties waives, to the fullest extent permitted by law, any claims they may have against the Lender Commitment Parties for breach of fiduciary duty or alleged breach of fiduciary duty and agree that the Lender Commitment Parties will have no liability (whether direct or indirect) to the GGP Commitment Parties in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of the GGP Commitment Parties or their affiliates, including a fiduciary duty claim made by any equity holders, employees or creditors of the GGP Commitment Parties or their affiliates. Each of the GGP Commitment Parties agrees that it will not claim that the Lender Commitment Parties have rendered advisory services of any nature or respect with respect to the financing transactions contemplated hereby, or owes a fiduciary or similar duty to the GGP Commitment Parties or their affiliates in connection with such transactions or the process leading thereto. In addition, the Lender Commitment Parties may employ the services of their affiliates in providing services and/or performing their obligations hereunder and may exchange with such affiliates information concerning the GGP Commitment Parties and other companies that may be the subject of this arrangement, and such affiliates will be entitled to the benefits afforded to the Lender Commitment Parties hereunder.

(h)     In addition, please note that the Lender Commitment Parties do not provide accounting, tax or legal advice. Notwithstanding anything herein to the contrary, the GGP Commitment Parties (and each employee, representative or other agent thereof) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Relevant Facility and all materials of any kind (including opinions or other tax analyses) that are provided to the GGP Commitment Parties relating to such tax treatment and tax structure. However, any information relating to the tax treatment or tax structure will remain subject to the confidentiality provisions hereof (and the foregoing sentence will not apply) to the extent reasonably necessary to enable the parties hereto, their respective affiliates, and their and their respective affiliates' directors and employees to comply with applicable securities laws. For this purpose, "tax treatment" means U.S. federal or state income tax treatment, and "tax structure" is limited to any facts relevant to the U.S. federal income tax treatment of the transactions contemplated by this Commitment Letter but does not include information relating to the identity of the parties hereto or any of their respective affiliates.

(i)     Each Lender Commitment Party hereby notifies the GGP Commitment Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "***Patriot Act***"), each Arranger and each Lender may be required to obtain, verify and record information that identifies the GGP Commitment Parties and each of the Guarantors (as defined in the Term Sheet), which information includes the name and address of, the GGP Commitment Parties and each of the Guarantors and other information that will allow each Arranger and each Lender to identify the GGP Commitment Parties and each of the Guarantors in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective for each Lender Commitment Party and each Lender.

LA\2136711.8

If you are in agreement with the foregoing, kindly sign and return to us the enclosed copy of this Commitment Letter.

Very truly yours,

**DEUTSCHE BANK SECURITIES INC.**

By: _____
     Name:   JAMES ROLISON
     Title:   MANAGING DIRECTOR

By: _____
     Name:   Robert D. Burns
     Title:   Managing Director

**DEUTSCHE BANK TRUST COMPANY AMERICAS**

By: _____
     Name:   JAMES ROLISON
     Title:   MANAGING DIRECTOR

By: _____
     Name:   Perry Forman
     Title:   Director

**WELLS FARGO SECURITIES, LLC**

By: _____
      Name: Stephen M. Neill
      Title: Managing Director

**WELLS FARGO BANK, N.A.**

By: _____
      Name:
      Title:

14

**WELLS FARGO SECURITIES, LLC**

By: _____
     Name:
     Title:


**WELLS FARGO BANK, N.A.**

By: _____
     Name:     SCOTT S. SOLIS
     Title:     SENIOR VICE PRESIDENT

14

**RBC CAPITAL MARKETS CORPORATION**

By: _____

    Name:    Dan LePage
    Title:     Authorized Signatory

**ROYAL BANK OF CANADA**

By: _____

    Name:    Dan LePage
    Title:     Authorized Signatory

**BARCLAYS BANK PLC**

By: _____

Name: Tim Hartzell

Title: Managing Director

**GOLDMAN SACHS LENDING PARTNERS LLC**

By: _____
       Authorized Signatory

**MACQUARIE CAPITAL (USA) INC.**

By: _____
Name: Robert Redmond
Title: Senior Managing Director

By: _____
Name: Kylie Rampa
Title: Senior Managing Director

**MIHI LLC**

By: _____
Name: Robert Redmond
Title: Attorney in Fact

By: _____
Name: Michael McLaughlin
Title: Attorney in Fact

**TD SECURITIES (USA) LLC**

By: _____
Name: William Balossino
Title: Director

**TORONTO DOMINION (NEW YORK) LLC**

By: _____
Name: Robyn Zeller
Title: Vice President

**UBS SECURITIES LLC**

By: _James Boland_
Name: James Boland
Title: Managing Director

By: _____
Name: Francisco Pinto-Leite
Title: Managing Director

**UBS LOAN FINANCE LLC**

By: _James Boland_
Name: James Boland
Title: Managing Director

By: _____
Name: Francisco Pinto-Leite
Title: Managing Director

Accepted and agreed to as
of the date first above written:

**GGP LIMITED PARTNERSHIP**


By: _____
      Name:
      Title:


**GGPLP L.L.C.**


By: _____
      Name:
      Title:


**GENERAL GROWTH PROPERTIES, INC.**


By: _____
      Name:
      Title:

LA\2136711.8

Schedule 1

Commitments

If the Relevant Facility is the Standalone Revolving Facility:

| Lender Commitment Party | Standalone Revolving Facility |
|---|---|
| Deutsche Bank Trust Company Americas | $37,500,000 |
| Wells Fargo Bank, N.A. | $37,500,000 |
| Royal Bank of Canada | $37,500,000 |
| Barclays Bank plc | $37,500,000 |
| Goldman Sachs Lending Partners LLC | $37,500,000 |
| MIHI LLC | $37,500,000 |
| Toronto Dominion (New York) LLC | $37,500,000 |
| UBS Loan Finance LLC | $37,500,000 |

If the Relevant Facility is the Combined Facility:

| Lender Commitment Party | Term Facility | Revolver |
|---|---|---|
| Deutsche Bank Trust Company Americas | $187,500,000 | $37,500,000 |
| Wells Fargo Bank, N.A. | $187,500,000 | $37,500,000 |
| Royal Bank of Canada | $187,500,000 | $37,500,000 |
| Barclays Bank plc | $187,500,000 | $37,500,000 |
| Goldman Sachs Lending Partners LLC | $187,500,000 | $37,500,000 |
| MIHI LLC | $187,500,000 | $37,500,000 |
| Toronto Dominion (New York) LLC | $187,500,000 | $37,500,000 |
| UBS Loan Finance LLC | $187,500,000 | $37,500,000 |

**<u>ATTACHMENT I</u>:**

**STANDALONE REVOLVING FACILITY**

See attached

## EXHIBIT A

### PROJECT GENEVA
### SENIOR SECURED REVOLVING FACILITY
### SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

Capitalized terms used but not defined in this <u>Exhibit A</u> shall have the meanings set forth in the letter to which this <u>Exhibit A</u> is attached (the "<u>Commitment Letter</u>") or in <u>Exhibit B</u> or <u>Exhibit C</u> thereto.

| | |
|---|---|
| **Borrowers:** | GGP Limited Partnership, a Delaware limited partnership (the "<u>Partnership</u>"), and GGPLP L.L.C., a Delaware limited liability company (collectively with the Partnership, the "<u>Borrowers</u>" and each, a "<u>Borrower</u>"). |
| **Administrative Agent and Collateral Agent:** | DBTCA (the "<u>Administrative Agent</u>"). |
| **Joint Lead Arrangers:** | DBSI, Wells Fargo Securities and RBC Capital (collectively, the "<u>Joint Lead Arrangers</u>"). |
| **Joint Bookrunners:** | DBSI, Wells Fargo Securities, RBC Capital, Barclays Capital, GS Lending Partners, MCUSA, TD Securities and UBSS. |
| **Syndication Agents:** | Wells Fargo Securities and RBC Capital. |
| **Documentation Agents:** | Barclays Capital, GS Lending Partners, MCUSA, TD Securities and UBSS. |
| **Commitment Parties:** | DB, Wells Fargo, RBC, Barclays, GS Lending Partners, Macquarie, TD and UBS (each, a "<u>Commitment Party</u>" and collectively, the "<u>Commitment Parties</u>"). |
| **Lenders:** | The Commitment Parties and a syndicate of financial institutions and other lenders arranged by the Joint Lead Arrangers in consultation with and reasonably acceptable to the Borrowers other than (a) competitors of the Borrowers and the affiliates of such competitors, in each case identified by the Borrowers prior to the date of the Commitment Letter, with respect to the initial syndicate and subsequent assignments and participations, and additional competitors and affiliates of such competitors identified by the Borrowers from time to time after the Closing Date with respect to subsequent assignments and participations (but no such identification shall apply retroactively to parties that already acquired an assignment or participation interest) and (b) other Persons (as defined on <u>Exhibit C</u> to the Commitment Letter) identified by the Borrowers prior to the date of the Commitment Letter (the Persons in clauses (a) and (b) collectively, the "<u>Disqualified Institutions</u>"). |
| **Facility:** | A senior secured revolving credit facility of $300,000,000 (the "<u>Revolver</u>" and the loans thereunder, the "<u>Loans</u>" and the commitments thereunder, the "<u>Commitments</u>"). |
| **Letters of Credit:** | A portion of the Revolver in an amount of up to $75,000,000 shall be available for the issuance of letters of credit (the "<u>Letters of Credit</u>") by the Administrative Agent and other Lenders under the Revolver that agree in writing with the Borrowers and the Administrative Agent to issue Letters of Credit (in such capacity, the |

"Issuing Lenders"). No Letter of Credit will have an expiration date after the earlier of (a) 1 year after the date of issuance and (b) 5 days prior to the Maturity Date (as defined below); provided that any Letter of Credit with a 1-year tenor may provide for the renewal thereof for additional 1-year periods (which shall in no event extend beyond the date referred to in clause (b) above unless the Borrowers shall have made arrangements reasonably satisfactory to the applicable Issuing Lender to cash collateralize or otherwise backstop such Letter of Credit). Any outstanding Letters of Credit will reduce availability under the Revolver on a dollar-for-dollar basis. Each Lender will be irrevocably and unconditionally required to purchase, under certain circumstances, a pro rata participation in each Letter of Credit on a pro rata basis.

| | |
|---|---|
| **Swingline Loans:** | A portion of the Revolver in an amount of up to $30,000,000 shall be available for swingline loans (the "Swingline Loans") from the Administrative Agent on same-day notice. Any Swingline Loans will reduce availability under the Revolver on a dollar-for-dollar basis. Each Lender will be irrevocably and unconditionally required to purchase, under certain circumstances, a pro rata participation in each Swingline Loan on a pro rata basis. |
| **Closing Date:** | On or prior to December 31, 2010; provided that the Borrowers may extend the Closing Date (and the commitments hereunder) (a) to a date on or before January 31, 2011, if the Confirmation Order (as defined on Exhibit B to the Commitment Letter) has been entered on or before December 15, 2010 or (b) to a date on or before January 31, 2011, if all conditions to the obligations of REP Investments LLC to consummate the Closing (as defined in the Cornerstone Agreement (as defined on Exhibit B to the Commitment Letter)) have been satisfied, other than those conditions that are to be satisfied (and are capable of being satisfied) by action taken at the Closing (as defined in the Cornerstone Agreement), but the investments contemplated thereunder have not been funded, so long as the Cornerstone Agreement has been similarly extended. |
| **Availability / Purpose:** | The Loans will be available on a revolving basis during the period commencing on the Closing Date and ending on the Maturity Date. |
| | The proceeds of the Loans, together with the proceeds of the contribution of new equity, will be used on the Closing Date to finance the Plan (as defined on Exhibit B to the Commitment Letter), including to refinance certain Indebtedness (as defined on Exhibit C of the Commitment Letter) of Existing GGPI (as defined below) and its Subsidiaries (as defined below), including, without limitation, the Matured Rouse Notes (as defined below), and to pay fees, commissions and expenses in connection therewith. The proceeds of the Loans may also be used on and after the Closing Date for general corporate purposes (including working capital). |
| | "Matured Rouse Notes" means the 3.625% Notes due 2009 of The Rouse Company LP and the 8.00% Notes due 2009 of The Rouse Company LP. |
| **Guarantors:** | (a) On the Closing Date, limited to (i) New GGP, Inc., a Delaware corporation which will become the new public REIT indirect parent of the Borrowers and be renamed General Growth Properties, Inc. |

(the "New Parent"), (ii) GGP Real Estate Holding I, Inc. and GGP Real Estate Holding II, Inc., each a Delaware corporation newly formed in connection with the consummation of the Plan (collectively, the "Holding Companies"), (iii) General Growth Properties, Inc., a Delaware corporation, to be renamed GGP, Inc. substantially concurrently with the Closing Date ("Existing GGPI"), (iv) GGP Limited Partnership II, a Delaware limited partnership newly formed in connection with the consummation of the Plan (together with Existing GGPI, the "Parent" and together with the New Parent and the Holding Companies, the "Parent Guarantors") and (v) those entities set forth on Annex II attached hereto and (b) after the Closing Date, any Subsidiary of the New Parent owning directly or indirectly assets required to be pledged to secure the Obligations (as defined below) as more particularly described under "Security" below, in any case, excluding The Rouse Company LP and its Subsidiaries (collectively, the "Guarantors", and together with the Borrowers, the "Loan Parties").

|                            |                                                                                                                             |
| :------------------------- | :-------------------------------------------------------------------------------------------------------------------------- |
| **Interest Rates and Fees:** | Interest rates, fees and payments in connection with the Revolver will be as specified on Annex I attached hereto.          |
| **Maturity and Amortization:** | The Revolver will mature on the third anniversary of the Closing Date (the "Maturity Date"). There is no amortization required on the Revolver. |

**Security:**

The Revolver, the guarantees of the Guarantors (the "Guarantees") and obligations in respect of any hedging agreements and cash management arrangements of the Loan Parties entered into with any Lender or any affiliate of a Lender (collectively, the "Obligations") will be secured by (a) a first priority perfected mortgage or deed of trust Lien (as defined on Exhibit C to the Commitment Letter), subject to clauses (ii), (iii) and (iv) of Permitted Liens (as defined below), on the properties set forth in Annex III attached hereto (the "Mortgaged Properties") and (b) a first priority perfected Lien, subject to Permitted Liens, on the Capital Stock (as defined on Exhibit C to the Commitment Letter) in certain Subsidiaries of the Borrowers set forth on Annex III attached hereto (the "Pledged Properties"; together with the Mortgaged Properties, the "Collateral"). In addition, if the New Parent or any newly formed Subsidiary of the New Parent acquires all or a portion of any real property with a purchase price in excess of $10,000,000 (calculated at the amount allocable to the Borrowers or their Wholly Owned Subsidiaries (as defined on Exhibit C to the Commitment Letter) on the date of such acquisition) the New Parent or such newly formed Subsidiary shall provide a first priority perfected Lien on such real property (or if a Lien on such real property cannot be provided, a first priority perfected Lien on the Capital Stock of such Subsidiary that owns a direct or indirect interest in such real property), in each case subject to Permitted Liens; provided, that neither the New Parent nor the Loan Parties shall be required to provide or cause to be provided such additional collateral (or Guarantees) if (i) at the time of acquisition of such property or Capital Stock, the ratio of (A) the aggregate Value (to be defined but in any event to include the concepts described below) of all remaining Collateral to (B) the sum of the aggregate amount of Commitments is at least 4.0 to 1.0 or (ii)

US_ACTIVE:\43436468\28\47658.0008

any existing contractual agreement or agreements assumed or entered into by the New Parent or any such Subsidiary to effectuate or reasonably facilitate the acquisition of such real property (including documents governing non-Wholly Owned Subsidiaries or joint ventures and Indebtedness permitted to be incurred pursuant to the Loan Documents (as defined below)) prohibits the granting of such Lien.

The Borrowers may, on or before the Closing Date, substitute other assets for the Collateral identified on <u>Annex III</u> so long as (i) the substituted Collateral has reasonably equivalent Value and (ii) Mortgaged Properties are substituted for other Mortgaged Properties unless otherwise agreed by a majority of the Joint Lead Arrangers.

**Facility Documentation:**     The definitive documentation for the Revolver (the "<u>Loan Documents</u>") shall contain the terms set forth in this Summary of Principal Terms and Conditions and such other terms as the Borrowers and the Joint Lead Arrangers shall agree and shall (a) give due regard to (i) the operational requirements of the New Parent and its Subsidiaries and joint ventures in light of their size, industry and practices, (ii) the projections dated as of September 9, 2010 (as updated from time to time and in the case of material adverse updates after the date of the Commitment Letter, in a manner reasonably acceptable to a majority of the Joint Lead Arrangers, the "<u>Projections</u>") and (iii) the REIT status of the New Parent and its REIT Subsidiaries and exceptions reasonably necessary to maintain the same and (b) in any event permit all transactions contemplated by the Plan (the terms in clauses (a) and (b) collectively, the "<u>Documentation Considerations</u>").

The representations and warranties, affirmative covenants, negative covenants, financial covenants and events of default contained in the Loan Documents shall be limited to the following, in each case applicable to the New Parent and its Subsidiaries and with scheduled exceptions and other exceptions for materiality or otherwise and "baskets" contemplated below and otherwise to be mutually agreed with due regard for the Documentation Considerations.

"<u>Subsidiary</u>" means, as to any Person, a corporation, partnership, limited liability company, trust, estate or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership, limited liability company or other entity are at the time owned, directly or indirectly through one or more intermediaries, or both, by such Person.

**Voluntary Prepayments:**     Voluntary prepayments of the Loans will be permitted at any time, in minimum principal amounts to be reasonably agreed upon, without premium or penalty, subject to reimbursement of the Lenders' customary costs in the case of a prepayment of LIBOR (as defined on <u>Annex I</u> attached hereto) advances, to the extent paid on any day other than the last day of the relevant interest period.

**Representations and**     (a)     corporate existence and good standing, with exceptions for, among others, permitted amalgamations, mergers,

**Warranties:**

consolidations, dissolutions or liquidations and permitted Dispositions (as defined below) of assets;

(b)   all requisite corporate and governmental authorizations, including the entry of the Confirmation Order by the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") as of the Closing Date;

(c)   no contravention of articles, by-laws, material agreements or applicable laws as a result of execution, delivery and performance of Loan Documents;

(d)   the execution, delivery and binding effect and enforceability of Loan Documents;

(e)   ownership of or valid leasehold interest with respect to material property, with exceptions for, among others, permitted Dispositions of assets;

(f)   no Default or Event of Default (each as defined below);

(g)   consolidated solvency of (i) the New Parent and its Subsidiaries, taken as a whole and (ii) the Borrowers and the other Loan Parties taken as a whole;

(h)   historical financial statements of Existing GGPI for the fiscal year ended December 31, 2009 and each fiscal quarter thereafter which has ended at least 60 days prior to the Closing Date, in each case prepared in accordance with generally accepted accounting principles as in effect on the date of preparation and that the Projections have been prepared in good faith based on reasonable assumptions at the time prepared (it being understood that material variations may have occurred);

(i)   no event or circumstance which has had or could reasonably be expected to have a material adverse effect on the business, operations or financial condition of the New Parent and its Subsidiaries, taken as a whole;

(j)   absence of material litigation;

(k)   compliance with applicable laws (including ERISA and environmental) and material agreements;

(l)   labor matters;

(m)   payment of taxes and all material obligations;

(n)   accuracy and completeness in all material respects of written information provided to the Lenders;

(o)   no Loan Party is required to register under the Investment Company Act and compliance with other similar regulations;

(p)   use of proceeds including no proceeds will be used to purchase or carry margin stock;

(q)   security documents and all filings and other actions necessary or advisable to perfect and protect the security interest in the Collateral and the creation and perfection of a

first priority Lien (subject to Permitted Liens) on the Collateral;

(r) existence and ownership by the New Parent of Subsidiaries and joint ventures, with exceptions for, among others, permitted amalgamations, mergers, consolidations, dissolutions or liquidations and permitted Dispositions of assets;

(s) ownership, use and non-infringement of material intellectual property;

(t) insurance;

(u) REIT status;

(v) PATRIOT Act (subject to the publicly traded stock exception), anti-money laundering statute and OFAC compliance; and

(w) no Default or Event of Default has occurred and is continuing under or with respect to any material contract that could reasonably be expected to have a material adverse effect on (i) the business, operations or financial condition of the New Parent and its Subsidiaries, taken as a whole, (ii) the material rights and remedies of the Administrative Agent and the Lenders, taken as a whole or (iii) the legality, validity or enforceability of the Loan Documents, taken as a whole (clauses (i), (ii) and (iii) together, a "Material Adverse Effect").

**Conditions to Closing:**    As set forth on Exhibit B to the Commitment Letter.

**Conditions to each Loan and Issuance of each Letter of Credit:**    On and after the Closing Date, the making of each Loan or the issuance of each Letter of Credit shall be conditioned upon the following:

(a) all representations and warranties shall be true and correct in all material respects as of the date of the making of any Loan or issuance of (or extension, amendment or renewal resulting in an increase in the face amount of) a Letter of Credit, before and after giving effect to such Loan or Letter of Credit, as the case may be, and to the application of proceeds therefrom, as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; and

(b) no Default or Event of Default shall have occurred and be continuing, or shall result from such Loan or issuance, extension, amendment or renewal of such Letter of Credit, as the case may be.

**Affirmative Covenants:**    (a) provision of annual audited consolidated financial statements of the New Parent within 105 days of its fiscal year end, which audited financial statements shall be unqualified as to going concern and scope of audit;

US_ACTIVE:\43436468\28\47658.0008

(b)     provision of quarterly unaudited consolidated financial statements of the New Parent for the first three fiscal quarters of each fiscal year within 60 days of its fiscal quarter end;

(c)     with the financial statements referred to in the immediately preceding clauses (a) and (b):  provision of quarterly and annual compliance certificates certificates as to financial statements and notices of any material damage, destruction or condemnation of any Collateral[1];

(d)     provision by the Partnership of an informational annual budget within 90 days after the beginning of each fiscal year;

(e)     promptly, provision by the Borrowers of notices of:

    (i)     Default or Event of Default;

    (ii)     any Material Adverse Effect;

    (iii)     any litigation that could reasonably be expected to have a Material Adverse Effect; and

    (iv)     any environmental event that could reasonably be expected to have a Material Adverse Effect;

(f)     general right of inspection (including of books and records and properties) by the Administrative Agent or any Lenders (when accompanying the Administrative Agent) on reasonable notice and subject to limitations on frequency and with expenses to be borne by the inspecting party (absent an Event of Default);

(g)     provision by the Borrowers of other information on reasonable request by the Administrative Agent or any Lender acting through the Administrative Agent;

(h)     punctual payment and performance of the Obligations;

(i)     maintenance of corporate existence, with exceptions for, among others, permitted amalgamations, mergers, consolidations, dissolutions or liquidations and permitted Dispositions of assets;

(j)     maintenance of proper books and records to enable the preparation of the financial statements in accordance with generally accepted accounting principles as in effect on the date of preparation;

(k)     maintenance and operation of properties, with exceptions for, among others, permitted amalgamations, mergers, consolidations, dissolutions or liquidations and permitted Dispositions of assets;

(l)     payment of all taxes and other material obligations;

(m)     compliance with all applicable laws and having and maintaining all required permits (including environmental

---

[1] The definitive list of requested deliverables is exhaustive of those to be included in the Loan Documents.

US_ACTIVE:\43436468\28\47658.0008

and ERISA);

(n)    use of proceeds of the Loans;

(o)    performance and compliance with all material agreements;

(p)    further assurances as to perfection and priority of Liens in the Collateral (including additional Collateral) and execution and delivery of additional guarantees;

(q)    maintenance of insurance; and

(r)    maintenance of REIT status.

The Loan Documents shall provide that information may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrowers post such documents, or provide a link thereto on the website of the Securities and Exchange Commission at http://www.sec.gov or on the website of the New Parent at www.ggp.com or (ii) on which such documents are posted on the Borrowers' behalf on IntraLinks/IntraAgency or another website to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that the Borrowers shall notify the Administrative Agent of the posting of any such documents (which notice may be by facsimile or electronic mail. The Borrowers shall identify all information as suitable for distribution to public or non-public Lenders, it being understood that unless identified as "public", all such information shall be deemed as suitable for distribution to only non-public Lenders.

**Negative Covenants:**

(a)    material changes in the nature of the business conducted, with exceptions for, among others, permitted amalgamations, mergers, consolidations, dissolutions or liquidations and permitted Dispositions of assets;

(b)    (x) amalgamation, merger, consolidation, dissolution or liquidation, and (y) the sale, lease (other than any lease, license, easement or other occupancy agreement entered into in the ordinary course of business or transactions solely in connection with the mortgage or other transfer of property for Permitted Project Level Financing (as defined below)) or other disposition of assets or, in the case of any Subsidiary of the Partnership, the issuance or sale of any shares of such Subsidiaries' Capital Stock or, in the case of any joint ventures, the sale of any Capital Stock owned by New Parent or any Subsidiary of New Parent (clause (y) collectively, a "Disposition") with exceptions for, among others:

(i)    Dispositions of the assets identified on Annex IV attached hereto (the "Special Consideration Properties") and properties or entities having an aggregate net equity value less than $200,000,000 (collectively with the Special Consideration Properties, the "Specified Properties");

(ii) Dispositions of assets for fair market value, as reasonably determined by the Person making such Disposition, so long as the Borrowers shall be in pro forma compliance with the Financial Covenants and if such Disposition is of any Collateral, the ratio of the Value of all remaining Collateral to the aggregate amount of the Commitments shall be at least 4.0 to 1.0;

(iii) amalgamations, mergers and consolidations among the New Parent and its Subsidiaries or with any Person the purpose of which is to effect an Investment otherwise permitted hereunder so long as (A) a Borrower is the survivor of any such transaction involving a Borrower, (B) a Loan Party is the survivor of any such transaction involving a Loan Party or the survivor shall expressly assume the obligations of the Loan Party under the Loan Documents in a manner reasonably acceptable to the Administrative Agent, (C) New Parent is the survivor of any such transaction involving the New Parent or, if the New Parent is not the survivor, (1) the survivor shall expressly assume the obligations of the New Parent under the Loan Documents in a manner reasonably acceptable to the Administrative Agent, (2) no Default or Event of Default shall occur after giving effect to such transaction and (3) the Loan Parties shall be in pro forma compliance after giving effect to such transaction with the financial covenants as of the end of the fiscal quarter most recently ended for which financial statements are available and shall provide a certificate to the Administrative Agent demonstrating the same, and (D) in the case of a transaction involving any non-Wholly Owned Subsidiary of the Borrowers, a Wholly Owned Subsidiary shall be the survivor of any such transaction or the transaction shall constitute a permitted Investment (as defined below);

US_ACTIVE:\43436468\28\47658.0008

(iv)    other customary exceptions to be agreed, but in any case including, among others: (A) Dispositions of obsolete or worn out personal property or fixtures; (B) Dispositions of inventory; (C) Dispositions (including Capital Stock) to any Loan Party or any Wholly Owned Subsidiary of the Borrowers or, in the case of any non-Wholly Owned Subsidiary of the New Parent, to the owners of such non-Wholly Owned Subsidiary on a pro rata basis; (D) the sale of the Capital Stock of, or issuance by any Person that is a REIT to individuals of preferred equity with a base liquidation preference not in excess of $180,000 in the aggregate per annum for any such REIT; (E) Dispositions of cash and cash equivalents; and (F) Dispositions as a result of the exercise of a buy/sell provision with respect to any non-Wholly Owned Subsidiary or joint venture;

(v)    Dispositions of real or personal property (including Capital Stock) in connection with permitted Investments;

(vi)    the spin-off of Spinco Inc. ("<u>Spinco</u>") as contemplated in the Plan;

(vii)    Dispositions of property as a result of (A) any condemnation proceeding (or credible threat thereof) or Disposition in lieu thereof or (B) a casualty;

(viii)    amalgamations, mergers and consolidations the purpose of which is to effect any Disposition otherwise permitted under the Loan Documents;

(c)    Liens on any property with exceptions for, among others (all such exceptions to be contained in the Loan Documents, collectively, "<u>Permitted Liens</u>"):

(i)    Liens securing Permitted Project Level Financings;

(ii)    capital leases on an unlimited basis;

(iii)    **[intentionally omitted]**; and

(iv)    other customary exceptions to be agreed, but in any case including, among others: (A) Liens for taxes, assessments, utilities or governmental charges not more than 30 days overdue, or if more than 30 days overdue, (1) being contested in good faith, (2) which consist of Liens on one or more Specified Properties or (3) which taxes, assessments, utilities or governmental charges do not exceed $50,000,000 in the aggregate; (B) statutory Liens of landlords, lessors, carriers, warehousemen, mechanics, materialmen and other similar Liens not more than 30 days overdue, or if more than 30 days overdue, (1) being contested in good faith, (2) which consist of Liens on one or more Specified Properties or (3)

which taxes, assessments, utilities or governmental charges do not exceed $50,000,000 in the aggregate; (C) pledges or deposits in connection with workers' compensation, unemployment insurance or other social legislation; (D) deposits to secure performance of bids, contracts, leases statutory obligations, surety, appeal and performance bonds and similar obligations; (E) easements, rights of way and similar real property encumbrances and including items shown on the title reports, UCC searches and surveys made available to the Commitment Parties or otherwise disclosed to the Commitment Parties prior to the date of the Commitment Letter; (F) Liens on Capital Stock of any non-Wholly Owned Subsidiary of the New Parent or joint venture securing obligations arising in favor of other holders of Capital Stock of such Person pursuant agreements governing such Person; and (G) a basket to be agreed;

(d)      Indebtedness with exceptions for, among others:

(i)      Indebtedness which, when aggregated with Indebtedness of the New Parent, the Borrowers and their Subsidiaries and joint ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary) would not cause the New Parent to fail to be in pro forma compliance with the Maximum Leverage Ratio covenant (as described below) in each case as determined in accordance with GAAP (as defined below), except as otherwise noted above with respect to non-Wholly Owned Subsidiary and joint venture allocations and that the amount of such Indebtedness shall be calculated as described in the Maximum Leverage Ratio covenant below; provided that the New Parent and its Subsidiaries and joint ventures shall not incur (A) unsecured Indebtedness (other than unsecured Indebtedness existing as of the Closing Date and refinancings thereof) in excess of $300,000,000 (the "Unsecured Indebtedness Sublimit") and (B) the aggregate outstanding amount of any Recourse Secured Mortgage Indebtedness (as defined on Exhibit C to the Commitment Letter) shall not exceed the amount of Recourse Secured Mortgage Indebtedness outstanding on the Closing Date plus $750,000,000; provided that such Recourse Secured Mortgage Indebtedness is (1) incurred to refinance, replace or extend Permitted Project Level Financing or (2) incurred to finance the construction,

development, redevelopment, repair or improvement of any GGP Property;

(ii)     intercompany Indebtedness among the New Parent and its Subsidiaries incurred (A) in the ordinary course of business (including transactions in the ordinary course of business in accordance with the consolidated cash management system of the New Parent and its Subsidiaries) or (B) outside the ordinary course of business in connection with tax, accounting, corporate structuring or reorganization or similar transactions; provided that intercompany Indebtedness pursuant to clause (B) shall be subordinated to the Obligations in a manner reasonably satisfactory to the Administrative Agent to the extent not otherwise restricted by any contractual obligation;

(iii)    ordinary course financing of insurance premiums;

(iv)     Indebtedness and other transactions specifically contemplated by the Plan (including the reinstatement of the Exchangeable Notes (as defined below), the reinstatement of the TRUP Notes (as defined below), the Reinstated Rouse Notes and the issuance of the Bridge Notes (as defined in the Plan)); and

(v)      permitted refinancings of the foregoing (including the Exchangeable Notes and the TRUP Notes);

(e)      investments, acquisitions, advances, loans, extensions of credit, capital contributions or purchases of any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting an ongoing business from, or make any other investment in or purchase any real or personal property from, any other Person (all of the foregoing, the "Investments") with exceptions for, among others:

(i)      transactions in the ordinary course of business in accordance with the consolidated cash management system of the New Parent and its Subsidiaries;

(ii)     Investments among the Loan Parties and the Wholly-Owned Subsidiaries of the Borrowers;

(iii)    Investments in existing non-Wholly Owned Subsidiaries of the Borrowers and joint ventures, without limitation provided, however, that no Investment will be made in such existing entities which are dormant nor immaterial entities with no assets (other than (A) holding companies whose only assets are Capital Stock of Subsidiaries or joint ventures that hold, directly or indirectly, GGP

Properties, (B) any entity that is party to an IDOT structure, (C) Investments in amounts required to cover costs and expenses of such entities and (D) Investments in such entities pursuant to <u>clause (iv)</u> below);

(iv)    Investments in any after-acquired real or personal property (including in any newly formed or after acquired non-Wholly Owned Subsidiary of the New Parent or joint venture owning such property or any existing dormant or shell entity); <u>provided</u> that (A) Investments in real estate upon which material improvements are not complete (as evidenced by being opened for business to the general public) shall not exceed 10% of Value (it being understood that no real estate that is at least 80% leased shall be subject to this <u>clause (A)</u> and that for the purposes of this provision any portion of such real estate that is under a binding contract of sale to an "anchor tenant" shall be deemed to be leased), (B) Investments in any single Person owning any GGP Property (as defined below) shall not exceed 25% of Value and (C) Investments in Limited Minority Holdings (as defined on <u>Exhibit C</u> to the Commitment Letter) shall not exceed 20% of Value after giving effect to such Investment;

(v)    Investments held as of the Closing Date;

(vi)    the spin-off of Spinco;

(vii)    Investments reasonably required in the minimum amount necessary for the New Parent or any of its Subsidiaries to maintain its qualification as a REIT, qualified REIT Subsidiary or taxable REIT Subsidiary;

(viii)    other customary exceptions to be agreed, but in any case including, among others: extensions of trade credit in the ordinary course of business; Investments received in connection with the bankruptcy or reorganization of suppliers and lessees and in the settlement of delinquent obligations and other disputes; deposits with financial institutions available for withdrawal on demand, prepaid expenses, accounts receivable and loans and advances to directors, officers and employees; guarantees of permitted Indebtedness and other obligations of the New Parent, its Subsidiaries and joint ventures; Investments of the New Parent and its Subsidiaries in any Subsidiary formed in connection with the issuance of trust preferred securities and by such entity in the New Parent and its Subsidiaries; Investments in cash and

US_ACTIVE:\43436468\28\47658.0008

cash equivalents; and Investments in the form of a permitted Disposition; and

(ix)     other Investments not in excess of $100,000,000 in the aggregate;

(f)     dividends or other distributions (whether payable in cash or other property) with respect to the Capital Stock of the Partnership or the Parent Guarantors unless payable solely in shares of Capital Stock of any such Person or any direct or indirect parent thereof, or in rights to subscribe for the purchase of such Capital Stock (all of the foregoing, the "Restricted Payments"), with exceptions for, among others:

(i)     dividends or distributions by the Partnership to the Parent (and by the Parent to any direct or indirect parent) in any period in an amount not in excess of the greater of (A) the amount required to be distributed during such period in order to maintain REIT status of the New Parent and its REIT Subsidiaries and avoid entity-level taxes and (B) 90% of the FFO (as defined on Exhibit C to the Commitment Letter) of the Parent Guarantors, the Borrowers and their Subsidiaries and joint ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary) for such period;

(ii)     transactions in the ordinary course of business in accordance with the consolidated cash management system of the New Parent and its Subsidiaries;

(iii)     dividends or distributions to the Parent to permit the Parent to (or to make dividends or distributions to any direct or indirect parent of the Parent to) (A) pay any tax liabilities, operating expenses and other corporate overhead in the ordinary course of business (including directors fees and expenses, indemnification and similar items, franchise and other similar taxes and fees and expenses of debt or equity offerings (whether successful or not)) and (B) purchase, redeem, retire or acquire Capital Stock (1) of the Parent Guarantors or the Partnership held as of the Closing Date by Persons other than Subsidiaries of the New Parent or issued to any such Person after the Closing Date pursuant to clause (b)(iv)(D), above and (2) of the New Parent (I) as contemplated by the Plan upon the New Parent's exercise of the New GGP Post-Emergence Public Offering Clawback Election and (II) held by any

US_ACTIVE:\43436468\28\47658.0008

present or former director, officer or employee of New Parent or any of its Subsidiaries or joint ventures (or the heirs, estate, family members, spouse or former spouse of any of the foregoing) in the case of this <u>clause (II)</u> in an amount not in excess of $25,000,000 per annum; and

(iv)    to the extent constituting a Restricted Payment, Investments not otherwise prohibited under the Loan Documents;

(g)    material adverse amendments, waivers or modifications to organizational documents or material agreements, with exceptions, among others, as required in connection with the Plan (including the spin-off of Spinco contemplated by the Plan);

(h)    hedging for speculative purposes;

(i)    no transactions with officers, directors, employees or affiliates with exceptions for, among others:

(i)    for fair market value and on arm's length terms;

(ii)    as in existence on the Closing Date;

(iii)    as contemplated by the Plan, including arrangements with Spinco and in connection with the spin-off thereof;

(iv)    customary directors fees and expenses, indemnification, incentive plans and similar items;

(v)    employment and other compensation arrangements (including base salary and incentives);

(vi)    transactions in the ordinary course of business in accordance with the consolidated cash management system of the New Parent and its Subsidiaries;

(vii)    ordinary course reimbursement of travel, moving and similar expenses;

(viii)    loans and advances to directors, officers and employees in the ordinary course of business;

(ix)    (A) guarantees of the Indebtedness of the New Parent and its Subsidiaries and joint ventures not otherwise prohibited under the Loan Documents and (B) other customary guarantees in the ordinary course of business; and

(x)    transactions among the New Parent and its Subsidiaries and joint ventures permitted under the Loan Documents;

(j)    voluntary prepayment, redemption or repurchase of material Indebtedness subordinated in right of payment to the Loans;

(k)    granting of negative pledges with exceptions for, among others, negative pledges granted in connection with

permitted debt;

(l)    changes in fiscal periods (without the consent of the Administrative Agent); and

(m)    limitation on restrictions on Subsidiary distributions with exceptions for, among others, restrictions granted in connection with certain permitted debt.

Notwithstanding anything to the contrary contained in this Commitment Letter, there shall not be any limitation on (i) capital expenditures so long as the New Parent is in pro forma compliance with the Financial Covenants or (ii) the purchase, redemption, retirement or acquisition of, Capital Stock of the Parent or its Subsidiaries.

"Exchangeable Notes" means, collectively, any of the 3.98% Exchangeable Senior Notes due 2027 of the Partnership.

"Permitted Project Level Financing" means any indebtedness secured by a mortgage on any real property (or, for convenience, to avoid expense or for other bona fide business expenses of the Borrowers, secured by rentals or cash flow of one or more real properties but not by a mortgage) or secured by a Lien on any Capital Stock of any entity whose primary asset is (a) the real property financed by such indebtedness or (b) the Capital Stock of an entity that directly or indirectly owns such real property other than, in each case, indebtedness secured by any asset that is a Mortgaged Property.

"Reinstated Rouse Notes" means, collectively, any of the 7.20% Notes due 2012 of The Rouse Company LP, any of the 5.375% Notes due 2013 of The Rouse Company LP, and any of the 6¾% Notes due 2013 of The Rouse Company LP, together with any refinancing or replacement thereof contemplated by the Plan.

"TRUP Notes" means, collectively, any of the TRUP Junior Subordinated Notes due 2036 of the Partnership.

**Financial Covenants:**    The following to be tested quarterly on the last day of each fiscal quarter, commencing with the first full fiscal quarter of the New Parent following the Closing Date and in each case excluding Special Consideration Properties (and any Person all or substantially all of whose assets comprise Special Consideration Properties):

(a)    Maximum Net Indebtedness to Value Ratio: maximum ratio of (i) the difference of (x) total Indebtedness (calculated at the outstanding principal amount based on the contract and not reflecting purchase accounting adjustments pursuant to GAAP) of the Parent Guarantors, the Borrowers and their Subsidiaries and joint ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary) minus (y) unrestricted cash and cash equivalents (and restricted cash and cash equivalents securing

Indebtedness and the application of which is to be made against the principal of such Indebtedness) of the Parent Guarantors, the Borrowers and their Subsidiaries and joint ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary), in each case as determined in accordance with GAAP, except as otherwise noted above with respect to the principal amount of Indebtedness and non-Wholly Owned Subsidiary and joint venture allocations, without duplication and collectively in an amount not to exceed $1,500,000,000 to (ii) Value (less the aggregate amount of unrestricted cash and cash equivalents subtracted from Indebtedness pursuant to the immediately preceding clause (y)).

(b)    <u>Maximum Leverage Ratio</u>: maximum ratio of (i) the difference of (x) total Indebtedness (calculated at the outstanding principal amount based on the contract and not reflecting purchase accounting adjustments pursuant to GAAP) of the Parent Guarantors, the Borrowers and their Subsidiaries and joint ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary), minus (y) unrestricted cash and cash equivalents (any restricted cash and cash equivalents securing Indebtedness and the application of which is to be made against the principal of such Indebtedness) of the Parent Guarantors, the Borrowers and their Subsidiaries and joint ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary), in each case as determined in accordance with GAAP, except as otherwise noted above with respect to the principal amount of Indebtedness and non-Wholly Owned Subsidiary and joint venture allocations, without duplication and collectively in an amount not to exceed $1,500,000,000 to (ii) Combined EBITDA (as described below) for the trailing four quarter period most recently ended.

(c)    <u>Minimum Net Cash Interest Coverage Ratio</u>: minimum ratio of trailing four quarter Combined EBITDA to net cash interest expense (to be defined, but in any event excluding one-time payments, original issue discount and fees and expenses in connection with the Revolver) of the Parent Guarantors, the Borrowers and their Subsidiaries and joint ventures (but, in the case of consolidated non-Wholly

Exhibit A
Page 17

Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary).

Financial covenant levels will be set forth on Annex V attached hereto; provided, that if the Applicable Margin (as determined as set forth in Annex I attached hereto) exceeds 5.50%, the financial covenant levels will be adjusted as agreed by the Borrowers and the majority of the Joint Lead Arrangers to maintain an appropriate cushion to the Projections. Financial covenants will be tested quarterly.

"Adjusted EBITDA": with respect to any GGP Property (as defined below) or the Parent Guarantors, the Borrowers or the Management Company (as defined on Exhibit C of the Commitment Letter), as the case may be, for any period, an amount equal to the net income (calculated on a GAAP basis and, for the avoidance of doubt, in the case of the Parent Guarantors, the Borrowers or the Management Company, taking into account such Person's corporate overhead) and to be adjusted in a manner to be agreed but to be adjusted in any event to account for the impacts associated with the following: (a) depreciation, (b) amortization, (c) interest expenses and interest income, (d) income taxes, (e) impairment expenses, (f) costs and expenses incurred in connection with any restructurings or reorganizations of such GGP Property or any entity owing a direct or indirect interest therein or the Parent Guarantors, the Borrowers or the Management Company, as the case may be (including in connection with the chapter 11 cases of Existing GGPI and its affiliates and in connection with the transactions contemplated by the Loan Documents, the Cornerstone Agreement and the Plan and hereinafter each a "Restructuring"), provided that cash restructuring charges not associated with the chapter 11 cases and the transactions contemplated by the Loan Documents, the Cornerstone Agreement and the Plan, shall be subject to a cumulative cap of $25,000,000 per annum and $100,000,000 during the term of the Revolver, (g) the costs and expenses of legal settlements, fines, judgments or orders to the extent reimbursed by insurance, (h) non-cash charges (including the effects of purchase accounting) and items related to FAS 141 adjustments, the straight lining of rents, the amortization of non-cash interest expense and the amortization of market rate adjustments on any Permitted Project Level Financing (but excluding non-cash charges that constitute an accrual of or reserve for future cash payments), (i) extraordinary, unusual or non-recurring gains and losses (which losses shall not be duplicative of expense items treated as an add-back above) including those related to (i) the sale of assets, (ii) foreign currency exchange rates, (iii) litigation, (iv) securities available-for-sale (but only where such security gain and loss is unrealized), (v) the early extinguishment or forgiveness of debt and (j) such other adjustments reflected in the Projections or as otherwise mutually agreed upon by the parties. Adjusted EBITDA shall be calculated on a pro forma basis for any GGP Property which has been open for business for less than four (4) calendar quarters.

US_ACTIVE:\43436468\28\47658.0008

"Combined EBITDA":  for any period, the sum of (a) 100% of the Adjusted EBITDA of any GGP Properties owned or leased by the Parent Guarantors, the Borrowers and the Wholly-Owned Subsidiaries of the Borrowers for such period; (b) the portion of the Adjusted EBITDA of the GGP Properties of any consolidated non-Wholly Owned Subsidiaries or joint ventures of the Borrowers or the Parent Guarantors for such period allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly-Owned Subsidiary; and (c) Adjusted EBITDA of the Parent Guarantors, the Borrowers and the Management Company; provided, that Combined EBITDA shall include Adjusted EBITDA allocable to the Management Company only to the extent that Adjusted EBITDA allocable to the Management Company does not exceed 4% of Combined EBITDA.

"Value" is to be defined but will include, without duplication, in addition to other concepts to be agreed, the following concepts, (a) Combined EBITDA of the Parent Guarantors, the Borrowers and any of their Subsidiaries (wholly-owned or otherwise) and joint ventures for the immediately preceding four (4) calendar quarters capped at 7.25% (excluding any GGP Property included on a cost basis pursuant to clause (c) below), (b) fair market value ("fair market value" to be defined but in any event if the New Parent obtains a third party appraisal by an appraiser reasonably acceptable to the Administrative Agent having an effective date no more than 180 days prior to the date of calculation, to be conclusively determined by such appraisal) of development and inactive assets including raw land, vacant outparcels, loans receivable, capital expenditures and the headquarters buildings in Illinois and Maryland and other underutilized assets with de minimis income (at the lesser of cost or fair market value, provided that the headquarters buildings shall be valued at their appraised values); (c) cost basis of new acquisitions of the New Parent, the Borrowers or any of their Subsidiaries (wholly-owned or otherwise) or joint ventures (calculated as (i) 100% for assets owned by the Parent Guarantors, the Borrowers or any Wholly Owned Subsidiary of the Borrowers and (ii) in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary; (d) unrestricted cash and cash equivalents of the Parent Guarantors, the Borrowers and their Subsidiaries and joint ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary), in each case as determined in accordance with GAAP, except as otherwise noted above with respect to non-Wholly Owned Subsidiary and joint venture allocations, without duplication; and (e) aggregate sums spent on the construction of improvements (including land acquisition costs) for any asset which is raw land, vacant out-parcels or is the subject of a material construction project but excluding such sums with respect to assets subject to material

US_ACTIVE:\43436468\28\47658.0008

construction projects, if the New Parent elects to include revenues in Adjusted EBITDA (provided that such costs can be included if the project is a renovation or expansion of an asset that is otherwise complete and operational, the construction will not impair ongoing business and operations and the inclusion of such revenues in Adjusted EBITDA and such aggregate sums in Value is not duplicative).

"GGP Properties" means any asset owned, leased or operated by the Parent Guarantors, the Borrowers or any Subsidiary of the Parent Guarantors or the Borrowers (wholly-owned or otherwise) or joint venture.

If any GGP Property shall be sold or otherwise transferred to a third party by the Parent Guarantors or any of their Subsidiaries or joint ventures prior to the date of calculation of the Maximum Net Indebtedness to Value Ratio and the Maximum Leverage Ratio, such Financial Covenants shall be calculated on a pro forma basis to exclude the effect of such GGP Property and any Indebtedness redeemed, retired, extinguished or repaid in connection therewith.

For purposes of determining compliance with the financial covenants, a cash equity contribution in the New Parent (in the form of a cash contribution or in exchange for Qualified Capital Stock (as defined in Exhibit C to the Commitment Letter)) after the commencement of the applicable fiscal quarter and on or prior to the day that is 10 days after the day on which financial statements are required to be delivered for such fiscal quarter will, at the request of the New Parent, which request will be made at the time of contribution, be included in the calculation of Combined EBITDA for the Maximum Leverage Ratio and Minimum Net Cash Interest Coverage Ratio and as cash and cash equivalents in the definition of Value for purposes of the Maximum Net Indebtedness to Value Ratio, in each case solely for purposes of determining compliance with such Financial Covenants at the end of such fiscal quarter and applicable subsequent periods that include such fiscal quarter (any such equity contribution so included in the calculation of Combined EBITDA or Value, as the case may be, a "Specified Equity Contribution"); provided that (a)(i) in each four fiscal quarter period, there shall be a period of two fiscal quarters in which no Specified Equity Contribution is made, and (ii) only three Specified Equity Contributions may be made during the term of the Revolver, (b) the amount of any Specified Equity Contribution shall be no greater than the amount required to cause the New Parent to be in compliance with such Financial Covenant(s) and (c) all Specified Equity Contributions will be disregarded for purposes of determining the availability of any baskets with respect to the covenants contained in Loan Documents.

**Events of Default:**

(a) default in payment of principal when due;

(b) other payment defaults, with 5-day cure period;

(c) failure to comply with any covenant or provision under the Loan Documents, subject, in the case of affirmative covenants (other than notice of Default or Event of Default or failure to maintain the corporate existence of any

Borrower), to a 30-day cure period after any responsible officer of the New Parent or any Borrower obtains knowledge thereof;

(d) representations and warranties under the Loan Documents being incorrect in any material respect when made;

(e) involuntary bankruptcy or other insolvency proceedings with respect to the New Parent, any Borrower or any material[2] Subsidiary of the New Parent (excluding any Subsidiary or Subsidiaries all or substantially all of whose assets comprise Specified Properties or equity of a person all or substantially all of whose assets comprise any Specified Property) which (i) result in an order for relief or any adjudication or appointment against or in respect of such person; or (ii) continue and have not been dismissed, discharged or stayed for a period of 30 days;

(f) appointment of a receiver or similar official with respect to the New Parent, any Borrower or any material Subsidiary of the New Parent (excluding any Subsidiary or Subsidiaries all or substantially all of whose assets comprise Specified Properties or equity of a person all or substantially all of whose assets comprise any Specified Property), if not removed within 90 days;

(g) voluntary bankruptcy or other insolvency proceedings with respect to the New Parent, the Borrowers or any material Subsidiary of the New Parent (excluding any Subsidiary or Subsidiaries all or substantially all of whose assets comprise Specified Properties or equity of a person all or substantially all of whose assets comprise any Specified Property);

(h) third-party security realization against property having an aggregate net equity value in an aggregate amount after the Closing Date in excess of $200,000,000, which realization shall continue and not be released, discharged or stayed within the lesser of 30 days and the period of time prescribed under applicable laws for completion of such realization (excluding any Specified Property or equity of a person all or substantially all of whose assets comprise any Specified Property);

(i) third-party seizure of property having an aggregate net equity value in an aggregate amount after the Closing Date in excess of $200,000,000, which seizure shall continue and not be released, discharged or stayed within the lesser of 30 days and the period of time prescribed under applicable laws for completion of the sale of or realization against the property subject to such seizure (excluding any Specified Property or equity of a person all or substantially all of whose assets comprise any Specified Property);

---

[2] For the purpose of all Events of Default, material Subsidiaries to be defined, but in any case, will exclude Subsidiaries having an aggregate net equity value after the Closing Date of $200,000,000 or less.

US_ACTIVE:\43436468\28\47658.0008

(j)     final judgments or orders, in an aggregate amount in excess of $50,000,000 in the case of judgments or orders not in respect of Non-Recourse Indebtedness (and in the case of judgments or orders in respect of Non-Recourse Indebtedness (as defined in <u>Exhibit C</u> to the Commitment Letter), with respect to any property having an aggregate net equity value in an amount after the Closing Date in excess of $200,000,000) in each case, excluding judgments solely relating to any Specified Property or any Subsidiary or Subsidiaries all or substantially all of whose assets comprise Special Consideration Properties or equity of a person all or substantially all of whose assets comprise any Specified Property, which have not been discharged, stayed or bonded pending appeal within 60 days;

(k)     payment cross-default: failure to pay Indebtedness when due (i) in the case of Recourse Indebtedness, in an aggregate amount in excess of $50,000,000 and (ii) in the case of Non-Recourse Indebtedness, involving properties of entities having an aggregate net equity value in an amount after the Closing Date in excess of $200,000,000 (in each case, excluding such defaults solely relating to any Specified Property or any Subsidiary or Subsidiaries all or substantially all of whose assets comprise Special Consideration Properties or equity of a person all or substantially all of whose assets comprise any Specified Property);

(l)     event cross-default: an event of default or equivalent condition under other Indebtedness (i) in the case of Recourse Indebtedness, where such Indebtedness is in an aggregate amount in excess of $50,000,000 and (ii) in the case of Non-Recourse Indebtedness, involving properties of entities having an aggregate net equity value in an amount after the Closing Date in excess of $200,000,000 (in each case, excluding such events of default or equivalent conditions solely relating to any Specified Property or any Subsidiary or Subsidiaries all or substantially all of whose assets comprise Special Consideration Properties or equity of a person all or substantially all of whose assets comprise any Specified Property);

(m)     Change of Control (as defined on <u>Exhibit C</u> to the Commitment Letter);

(n)     if Collateral having a net equity value in excess of $25,000,000 ceases to be subject to a valid first priority security interest in favor of the Administrative Agent on behalf of the Lenders (subject to Permitted Liens), except to the extent (x) any such loss of perfection or priority results from the act or omission of the Administrative Agent, (y) such loss is covered by a lender's title insurance policy as to which the insurer has been notified of such loss and does not deny coverage or (z) such loss of perfected security interest may be remedied by the filing of appropriate documentation without the loss of priority (other than non consensual

Permitted Liens);

(o) if any Loan Document ceases to be valid, without immediate replacement, or if any of the same shall be challenged or repudiated by any Loan Party or any Subsidiary thereof in writing; or

(p) an event occurs under applicable pension and ERISA laws, which could reasonably be expected to have a Material Adverse Effect.

The foregoing events are referred to as "Events of Default".

"Default" means any event which, with notice or lapse of time or both, shall be become an Event of Default.

**Voting:** Amendments and waivers of the Loan Documents will require the approval of Lenders holding more than 50% of the aggregate amount of the Commitments (the "Required Lenders"), except that (a) the consent of each Lender directly and adversely affected thereby (but not the Required Lenders in the case of clauses (i) and (iii) below) shall be required with respect to (i) reductions in the principal amount of any Loan or fee owed to such Lender, (ii) extensions of the final maturity of any Loan owed to such Lender, (iii) reductions in the rate of interest (other than a waiver of default interest) owed to such Lender and (iv) increases in the amount or extensions of the expiry date of such Lender's commitment (it being understood that a waiver of any condition precedent or the waiver of any default or mandatory prepayment shall not constitute an extension or increase of any commitment of any Lender) and (b) the consent of all Lenders directly and adversely affected shall be required with respect to (i) reductions of any of the voting percentages set forth in the definition of "Required Lenders" or any similar defined term, (ii) modifications to provisions requiring pro rata payments or sharing of payments (except with respect to the transactions described in the second following paragraph), (iii) releases of all or substantially all the Collateral, (iv) releases of all or substantially all of the value of the Guarantees and (v) assignment by any Borrower of its rights and obligations under the Loan Documents (other than, in the cases of clauses (iii), (iv) and (v), in accordance with the Loan Documents).

Modifications to provisions requiring pro rata payments, distributions or commitment reductions or sharing of payments in connection with "amend and extend" transactions or adding one or more tranches (which may, but are not required to be new money tranches) of debt and the like as permitted by the Loan Documents shall only require approval of the Required Lenders, provided, that all approving Lenders shall be treated on a pro rata basis and shall otherwise be on customary terms.

The Loan Documents shall contain provisions allowing the Borrowers to replace the commitment and/or Loans of a Lender at par (as the Borrowers shall elect) in connection with amendments and waivers requiring the consent of all Lenders or of all Lenders directly affected thereby (so long as the Required Lenders consent), increased costs, taxes, etc. and Defaulting Lenders (as defined below).

US_ACTIVE:\43436468\28\47658.0008

| | |
|---|---|
| **Assignments and Participations:** | The Lenders shall be permitted to assign all or a portion of their Loans and commitments to eligible assignees (other than to any Disqualified Institution) with the consent of (a) the Borrowers (not to be unreasonably withheld), unless a payment or bankruptcy (with respect to any Borrower) Event of Default has occurred and is continuing or such assignment is to a Lender or an affiliate of a Lender or an Approved Fund (as defined below), (b) the Administrative Agent, and (c) any Issuing Lender. Non-pro rata assignments shall be permitted. In the case of partial assignments (other than to another Lender, an affiliate of a Lender or an Approved Fund), the minimum assignment amount shall be $5,000,000 unless otherwise agreed by the Borrowers and the Administrative Agent. The assigning Lender shall pay the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) in connection with all assignments. The Lenders will have the right to participate their commitments and Loans to other Persons (other than any Disqualified Institutions) without the consent of the Borrowers, the Administrative Agent or the Issuing Lenders. Participants shall have the same benefits as the Lenders with respect to yield protection and increased cost provisions subject to customary limitations and restrictions. Voting rights of participants shall be limited to those matters set forth in clauses (a) and (b) under "Voting" with respect to which the affirmative vote of the Lender from which it purchased its participation would be required. Pledges of and repurchase agreements in respect of Loans in accordance with applicable law shall be permitted to Persons other than Disqualified Institutions without restriction. |
| | "Approved Fund" means, with respect to any Lender, any person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and is administered, advised or managed by (a) such Lender, (b) an affiliate of such Lender or (c) an entity or an affiliate of any entity that administers, advises or manages such Lender. |
| **Defaulting Lenders:** | The Loan Documents shall also contain customary limitations on Defaulting Lenders including non-payment/escrow of all amounts owed to the Defaulting Lender to be held as security and exclusion for purposes of Required Lender votes and the calculation of Required Lenders. |
| | "Defaulting Lender" means a Lender that has (a) failed to fund any portion of the Loans, or participations in Letter of Credit or Swingline Loan exposure required to be funded by it on the date required, (b) otherwise failed to pay the Administrative Agent or any other Lender any other amount required to be paid under the Loan Documents on the date when due unless the subject of a good faith dispute, (c) notified the Administrative Agent or the Borrowers that it does not intend to comply with any of its obligations under the Loan Documents, (d) failed, within three (3) business days after request by the Administrative Agent, to affirm its willingness to comply with its funding obligations under the Loan Documents or |

(e) become, or whose direct or indirect parent has become, insolvent or is the subject of a receivership, bankruptcy or other insolvency proceeding.

When any Lender is a Defaulting Lender, the Issuing Lenders shall have no obligation to issue a Letter of Credit and the Swingline Lender shall have no obligation to fund a Swingline Loan unless, after giving effect to the reallocation of the Letter of Credit or Swingline Loan exposure, as the case may be, to the other Lenders with Commitments, the Borrowers or such Defaulting Lender provides cash collateral or other security or support for such Defaulting Lender's pro rata share of the Issuing Lender's or Swingline Lender's, as the case may be, fronting risk.

**Agency:**

Usual and customary for facilities of this type; <u>provided</u>, that any substitution of the Administrative Agent shall require the consent of the Borrowers, not to be unreasonably withheld, unless a bankruptcy Event of Default then exists.

**Yield Protection; Taxes; Indemnification; Expenses:**

Usual and customary for facilities of this type giving effect to the Documentation Considerations.

**Governing Law and Jurisdiction:**

New York law will govern the Loan Documents, except with respect to certain security documents where applicable local law is necessary for enforceability or perfection. The Revolver will provide that the Loan Parties will submit to the exclusive jurisdiction and venue of the federal and state courts of the State of New York (except to the extent the Administrative Agent requires submission to any other jurisdiction in connection with the exercise of any rights under any security document or the enforcement of any judgment) and the parties will waive any right to trial by jury.

**Counsel:**

Latham & Watkins LLP

US_ACTIVE:\43436468\28\47658.0008

# ANNEX I

## INTEREST RATES AND FEES

**Applicable Margin:**

The Borrowers may elect that the Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR (as defined below) plus the Applicable Margin or (b) LIBOR (as defined below) plus the Applicable Margin; provided that all Swingline Loans shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

The Applicable Margin shall be 4.50%.

"LIBOR" means the rate reasonably determined by the Administrative Agent in the London interbank market for deposits in U.S. Dollars in the amount of, and for a maturity corresponding to, the amount of the applicable LIBOR advance, as adjusted for maximum statutory reserves.

"ABR" means the higher of (a) the rate of interest publicly announced by the Administrative Agent as its prime rate in effect at its principal office in New York City (the "Prime Rate") and (b) the federal funds effective rate from time to time plus 0.50% per annum.

The Borrowers may select interest periods of one, two, three, six or (if agreed to by all Lenders) nine months for LIBOR borrowings.

Interest on LIBOR-based Loans shall be calculated on the basis of the actual number of days elapsed over a year of 360 days and interest on ABR-based Loans shall be calculated on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable.

**Unused Commitments Fee:**

0.50% with a step-down to 0.375% if the aggregate outstanding usage under the Revolver (i.e. Loans, Letters of Credit and Swingline Loans) exceeds 50% of the Commitments.

**Default Rate:**

Upon and during the continuance of a payment event of default with respect to any principal or interest under the Revolver, such overdue amounts shall bear interest at the applicable interest rate plus 2.00% per annum or, in the event there is no applicable interest rate, the interest rate applicable to ABR advances plus 2.00% per annum.

## <u>ANNEX II</u>

## <u>GUARANTORS</u>

See attached

US_ACTIVE:\43436468\28\47658.0008

# Stand Alone Revolver Guarantor List[*]

| No. | Pledgors (noted in red on Organizational Chart) |
|---|---|
| 1. | GGPLPLLC 2010 Loan Pledgor Holding, LLC |
| 2. | GGPLP 2010 Loan Pledgor Holding, LLC |
| 3. | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC |
| | |
| | **Mortgagors (noted in orange on Organizational Chart)** |
| 1. | Bailey Hills Village Center, LLC |
| 2. | Benson Park Business Trust |
| 3. | 10 CCC Business Trust |
| 4. | 20 CCC Business Trust |
| 5. | 30 CCC Business Trust |
| 6. | Forty Columbia Corporate Center, LLC |
| 7. | Fifty Columbia Corporate Center, LLC |
| 8. | Sixty Columbia Corporate Center, LLC |
| 9. | Running Brook Business Trust |
| 10. | CCC Borrower, LLC |
| 11. | Fremont Plaza L.L.C. |
| 12. | BR STCR, LLC |
| 13. | The Rouse Company of Florida, LLC |
| 14. | GGP Savannah L.L.C. |
| 15. | Plaza 800 L.L.C. |
| 16. | Plaza 9400, LLC |
| 17. | Provo Development Land, LLC |
| 18. | Red Cliffs Plaza, LLC |
| 19. | Canyon Pointe Village Center, LLC |
| 20. | Yellowstone Square, LLC |

[*] Subject to revisions and modifications that are approved by a majority of the Joint Lead Arrangers

# <u>ANNEX III</u>

## <u>COLLATERAL</u>

See attached

US_ACTIVE:\43436468\28\47658.0008

| Property | City | State | Pledge Feasibility A=Pledgable B=Pledgable, provided Affiliate Pledgor has sufficient bulk C=Pledgable, Not Fully Foreclosable | Pledgor | % | Additional Pledgor | % |
|---|---|---|---|---|---|---|---|
| **Mortgage** | | | | | | | |
| Columbia Corporate Center Offices (Thirty Columbia Corporate Center) | Columbia | MD | | | | | |
| Columbia Corporate Center Offices (Forty Columbia Corporate Center) | Columbia | MD | | | | | |
| Columbia Corporate Center Offices (Fifty Columbia Corporate Center, including Columbia Bank Drive Thru) | Columbia | MD | | | | | |
| Columbia Corporate Center Offices (Sixty Columbia Corporate Center) | Columbia | MD | | | | | |
| Columbia Corporate Center Offices (Ten Columbia Corporate Center) | Columbia | MD | | | | | |
| Columbia Corporate Center Offices (Twenty Columbia Corporate Center) | Columbia | MD | | | | | |
| Canyon Point | Las Vegas | NV | | | | | |
| The Crossing Business Center (9901-9921 Covington Cross) | Las Vegas | NV | | | | | |
| PTC Motel Land | Provo | UT | | | | | |
| Bailey Hills Village | Eugene | OR | | | | | |
| Neighborhood Stores | Columbia | MD | | | | | |
| Benson Business Park (TGI Fridays) | Columbia | MD | | | | | |
| Oglethorpe Residential Properties, 42 Fairmont Avenue, 44 Fairmont Avenue, 48 Fairmont Avenue, 50 Fairmont Avenue, 52 Fairmont Avenue, 104 Fairmont Avenue, 106 Fairmont Avenue, 110 Fairmont Avenue, 112 Fairmont Avenue and 114 Fairmont Avenue | Savannah | GA | | | | | |
| Baskin Robbins | Idaho Falls | ID | | | | | |
| Mall of Louisiana Power Center | Baton Rouge | LA | | | | | |
| Plaza 9400 | Sandy | UT | | | | | |
| Yellowstone Square | Idaho Falls | ID | | | | | |
| Red Cliffs Plaza | St. George | UT | | | | | |
| Merrick Park Hotel & Thompson Parcels | Coral Gables | FL | | | | | |
| **Pledge** | | | | | | | |
| NewPark Mall | Newark | CA | A | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Ala Moana Center | Honolulu | HI | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Fashion Show Mall | Las Vegas | NV | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 0.0700% | GGPLP 2010 Loan Pledgor Holding, LLC | 99.9300% |
| The Grand Canal Shoppes at the Venetian | Las Vegas | NV | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Jordan Creek Town Center & Village at Jordan Creek | West Des Moines | IA | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Tysons Galleria | Mclean | VA | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Mall of Louisiana | Baton Rouge | LA | B | GGPLPLLC 2010 Pledgor Holding, LLC | 99.0025% | | |
| The Woodlands Mall | The Woodlands | TX | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Mayfair Mall | Wauwatosa | WI | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| The Mall in Columbia | Columbia | MD | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Providence Place | Providence | RI | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Fox River Mall | Appleton | WI | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| North Point Mall | Alpharetta | GA | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Saint Louis Galleria | St. Louis | MO | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Harborplace | Baltimore | MD | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Stonestown | San Francisco | CA | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |

| Property | City | State | Pledge Feasibility A=Pledgable B=Pledgable, provided Affiliate Pledgor has sufficient bulk C=Pledgable, Not Fully Foreclosable | Pledgor | % | Additional Pledgor | % |
|---|---|---|---|---|---|---|---|
| NorthTown Mall | Spokane | WA | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Columbiana Centre | Columbia | SC | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Pioneer Place | Portland | OR | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 0.000495% | GGPLP 2010 Loan Pledgor Holding, LLC | 99.999505% |
| Market Place | Champaign | IL | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| The Maine Mall | South Portland | ME | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Gateway Overlook (Leasehold) | Columbia | MD | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Owings Mills Mall | Owings Mills | MD | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Oakwood Mall | Eau Claire | WI | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Oglethorpe Mall | Savannah | GA | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| River Hills Mall | Mankato | MN | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Mondawmin Mall | Baltimore | MD | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Grand Teton Mall & Plaza | Idaho Falls | ID | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Sooner Fashion Mall | Norman | OK | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| The Mall at Sierra Vista | Sierra Vista | AZ | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Coronado Center | Albuquerque | NM | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Fallbrook Center | West Hills | CA | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Colony Square Mall | Zanesville | OH | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Southwest Plaza | Littleton | CO | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Peachtree Mall | Columbus | GA | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| White Mountain Mall | Rock Springs | WY | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Cache Valley Mall & Marketplace | Logan | UT | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Salem Center | Salem | OR | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Foothills Mall | Fort Collins | CO | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Mall of the Bluffs | Council Bluffs | IA | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Westwood Mall | Jackson | MI | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| North Plains Mall | Clovis | NM | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Birchwood Mall | Port Huron | MI | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Lakeside Mall | Sterling Heights | MI | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 93.1100% | GGPLP 2010 Loan Pledgor Holding, LLC | 6.8900% |
| Silver Lake Mall | Coeur D'Alene | ID | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Animas Valley Mall | Farmington | NM | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Pierre Bossier Mall | Bossier City | LA | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Spring Hill Mall | West Dundee | IL | B | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| The Shops at Fallen Timbers | Maumee | OH | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Mall St. Matthews | Louisville | KY | B (50% only) | GGPLP 2010 Loan Pledgor Holding, LLC | 50.0000% | | |
| Deerbrook Mall | Humble | TX | B, C | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| The Parks at Arlington | Arlington | TX | C | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Coastland Center | Naples | FL | C | GGPLPLLC 2010 Pledgor Holding, LLC | 100.0000% | | |
| Oak View Mall | Omaha | NE | C | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| White Marsh Mall | Baltimore | MD | C | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Four Seasons Town Centre | Greensboro | NC | C | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Brass Mill Center & Commons | Waterbury | CT | C | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |

* Subject to revisions and modifications that are approved by a majority of the Joint Lead Arrangers

<div align="center">

### <u>ANNEX IV</u>

### <u>SPECIAL CONSIDERATION PROPERTIES</u>

</div>

Piedmont
Bay City
Eagle Ridge
Lakeview Square
Montclair
Moreno Valley
Oviedo
Country Hills
Silver City
Chapel Hills
Chico
Mall St. Vincent
Northgate
Southland, MI
Grand Traverse
70 Columbia Corporate Center

## ANNEX V

## FINANCIAL COVENANTS

See attached

# EBITDA Covenant Analysis

| | | 2011 F | 2012 F | 2013 F | 2014 F | 2015 F |
|---|---|---|---|---|---|---|
| | **EBITDA COVENANT ANALYSIS** | | | | | |
| | **(Dollars in Millions)** | | | | | |
| ( A ) | **EBITDA** | $ 2,242 | $ 2,393 | $ 2,473 | $ 2,627 | $ 2,788 |
| ( A1 ) | **EBITDA adjusted to remove 2012 Asset Sales EBITDA** | $ 2,242 | $ 2,321 | $ 2,473 | $ 2,627 | 2,788 |
| ( B ) | **Value - (EBITDA / 7.25%)** | $ 30,921 | $ 32,010 | $ 34,108 | $ 36,238 | 38,452 |
| ( C ) | **Total Debt** | $ 19,762 | $ 18,600 | $ 17,907 | $ 17,456 | 17,011 |
| ( D ) | **Cash Interest** | $ 1,116 | $ 1,096 | $ 1,048 | $ 1,052 | 1,050 |
| ( E ) | **Ending Cash** | $ 512 | $ 903 | $ 798 | $ 1,154 | 1,600 |
| ( F ) | **Net Debt** | $ 19,249 | $ 17,698 | $ 17,110 | $ 16,303 | 15,411 |
| (F / B) | **NET INDEBTEDNESS TO VALUE RATIO** | 0.62 | 0.55 | 0.50 | 0.45 | 0.40 |
| | **Proposed Covenant** | 0.725 | 0.675 | 0.650 | 0.625 | 0.600 |
| | **Implied Cushion** | 16.5% | 22.1% | 29.6% | 38.9% | 49.7% |
| (F / A1) | **LEVERAGE RATIO** | 8.59 | 7.63 | 6.92 | 6.21 | 5.53 |
| | **Proposed Covenant** | 9.875 | 9.00 | 8.25 | 8.00 | 8.00 |
| | **Implied Cushion** | 15.0% | 18.0% | 19.2% | 28.9% | 44.7% |
| (A / D) | **NET CASH INTEREST COVERAGE RATIO** | 2.01 | 2.18 | 2.36 | 2.50 | 2.65 |
| | **Proposed Covenant** | 1.50 | 1.65 | 1.75 | 1.75 | 1.75 |
| | **Implied Cushion** | 25.3% | 24.4% | 25.8% | 29.9% | 34.1% |

**EXHIBIT B**

**CONDITIONS TO CLOSING**

1.	Each Loan Party shall have executed and delivered the Loan Documents and the Administrative Agent shall have received customary closing certificates and deliverables (including (a) to the extent requested, currently existing Phase I environmental reports in respect of all Mortgaged Properties, (b) existing surveys in respect of the Mortgaged Properties, (c) title reports with respect to the Mortgaged Properties, (d) organizational documents, resolutions, good standing certificates and incumbency certificates of each Loan Party, (e) a certificate of the chief financial officer of the New Parent as to the consolidated solvency of (i) the New Parent and its Subsidiaries, taken as a whole, and (ii) the Borrowers and the Loan Parties, taken as a whole, (f) customary insurance certificates naming the Administrative Agent as loss payee or additional insured (as the case may be) and (g) customary opinions of in-house and outside counsel).

2.	The Bankruptcy Court shall have entered an order (the "Confirmation Order") confirming the Plan in accordance with section 1129 of the Bankruptcy Code, which Plan shall not have been modified or amended in any manner materially adverse to the interests of the Administrative Agent and the Lenders, taken as a whole, from the plan of reorganization and any amendments, modifications or supplements thereto, in each case, filed with the Bankruptcy Court on the date of the Commitment Letter (collectively, the "Plan"), the Confirmation Order shall be in full force and effect (without waiver of the 14 day period set forth in Bankruptcy Rule 3020(e)) as of the Closing Date and shall not be subject to a stay of effectiveness.  The time to appeal, petition for certiorari or move for reargument or rehearing of the Confirmation Order shall have expired and no appeal, petition for certiorari or other proceedings for reargument or rehearing shall be pending.  If an appeal, writ of certiorari, reargument or rehearing of the Confirmation Order has been sought, the Confirmation Order shall have been affirmed by the highest court to which it has been appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification thereof materially adverse to the interest of the Administrative Agent and the Lenders, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.  The effective date of the Plan shall have occurred or shall occur substantially simultaneously with the Closing Date and substantial consummation of the Plan shall have occurred or shall be scheduled to occur but for the funding of the Loans and the use of proceeds thereof.  The Closing (as defined in that certain Amended and Restated Cornerstone Investment Agreement effective as of March 31, 2010, between Existing GGPI and REP Investments LLC (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Cornerstone Agreement")) shall occur concurrently with the initial funding of the Loans and no provision of the Cornerstone Agreement shall have been amended or waived in any respect materially adverse to the Lenders without the prior or concurrent written consent of the Joint Lead Arrangers, such consent not to be unreasonably withheld.

3.	The Administrative Agent shall have received unaudited consolidated balance sheets and related statements of income and cash flows of Existing GGPI for each fiscal quarter of 2010 ended more than 60 days prior to the Closing Date.

4.	To the extent any indebtedness remains outstanding (whether by reinstatement, amendment, consent or otherwise) pursuant to the Plan, no term (as reinstated, amended or otherwise existing) of any such indebtedness shall prohibit or otherwise restrict the Revolver, the transactions contemplated in connection therewith or the security interests granted thereunder.

US_ACTIVE:\43436468\28\47658.0008

5.     The Borrowers and each Guarantor shall have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; provided that such information shall have been requested at least ten (10) days prior to the Closing Date.

6.     The Lenders, the Administrative Agent and the Joint Lead Arrangers shall have received all fees due as of the Closing Date under the Loan Documents and the Fee Letter, and all expenses required to be paid under the Loan Documents and the Fee Letter for which invoices have been presented at least three (3) business days prior to the Closing Date.

7.     The Administrative Agent shall have received the results of a recent UCC Lien search in each relevant jurisdiction with respect to each of the Loan Parties, and such search results shall reveal no Liens on any of the assets of the Loan Parties, except for Liens permitted by the Plan, or the Loan Documents or Liens to be discharged on or prior to the Closing Date.

8.     All documents and instruments required to perfect the Administrative Agent's first priority security interests in the Collateral to the extent required by the Loan Documents shall have been executed by the applicable Loan Parties (if necessary) and delivered to the Administrative Agent.

9.     The Conditions set forth under "Conditions to each Loan and Issuance each Letter of Credit" herein shall be satisfied.

10.    No Material Adverse Effect (as defined in the Cornerstone Agreement) shall have occurred.

US_ACTIVE:\43436468\28\47658.0008

<u>**EXHIBIT C**</u>

<u>**CERTAIN DEFINITIONS**</u>

"<u>Capital Stock</u>" means any and all capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"<u>Capital Lease</u>" means any lease of any property (whether real, personal or mixed) by a Person as lessee which, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of that Person; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, in no event will any lease that would have been categorized as an operating lease in accordance with GAAP as of the Closing Date be considered to be a Capital Lease for any purpose under this Agreement.

"<u>Capital Lease Obligations</u>" means, with respect to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as Capital Leases on a balance sheet of such Person under GAAP; and, for the purposes of the Loan Documents, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"<u>Change of Control</u>" means the failure of the New Parent to be, or to have Control of, the general partner of the Partnership.

"<u>Contingent Obligations</u>" means, as to any Person, without duplication, (a) any contingent obligation of such Person required to be included in such Person's balance sheet in accordance with GAAP, and (b) any obligation required to be included in the disclosure contained in the footnotes to such Person's financial statements in accordance with GAAP, guaranteeing partially or in whole any Non-Recourse Indebtedness, lease, dividend or other obligation, exclusive of (i) contractual indemnities (including, without limitation, any indemnity or price-adjustment provision relating to the purchase or sale of securities or other assets) and (ii) guarantees of non-monetary obligations (other than guarantees of completion), in each case under clauses (i) and (ii) which have not yet been called on or quantified, of such Person or of any other Person. The amount of any Contingent Obligation described in clause (b) above in this definition shall be deemed to be (A) with respect to a guaranty of interest, interest and principal, or operating income, the sum of all payments required to be made thereunder (which in the case of an operating income guaranty shall be deemed to be equal to the debt service for the note secured thereby), calculated at the interest rate applicable to such Indebtedness, through (x) in the case of an interest or interest and principal guaranty, the stated date of maturity of the obligation (and commencing on the date interest could first be payable thereunder), or (y) in the case of an operating income guaranty, the date through which such guaranty will remain in effect, and (B) with respect to all guarantees not covered by the preceding clause (A) an amount equal to the stated or determinable amount of the primary obligation in respect of which such guaranty is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as recorded on the balance sheet and in the footnotes to the most recent financial statements required to be delivered pursuant to the affirmative covenant for delivery of annual or quarterly financial statements. Notwithstanding anything contained herein to the contrary, guarantees of completion or other performance shall not be deemed to be Contingent Obligations unless and until a claim for

Exhibit C
Page 1
US_ACTIVE:\43436468\28\47658.0008

payment has been made thereunder, at which time any such guaranty of completion or other performance shall be deemed to be a Contingent Obligation in an amount equal to any such claim.  Subject to the preceding sentence, (a) in the case of a joint and several guaranty given by such Person and another Person (but only to the extent such guaranty is Recourse Indebtedness, directly or indirectly to such Person or any of its Subsidiaries), the amount of the guaranty shall be deemed to be 100% thereof unless and only to the extent that (i) such other Person has delivered cash or cash equivalents to secure all or any part of such Person's obligations under such joint and several guaranty or (ii) such other Person holds an Investment Grade Credit Rating from any of Fitch, Moody's or S&P, or has creditworthiness otherwise reasonably acceptable to the Administrative Agent, and (b) in the case of a guaranty (whether or not joint and several) of an obligation otherwise constituting Indebtedness of such Person, the amount of such guaranty shall be deemed to be only that amount in excess of the amount of the obligation constituting Indebtedness of such Person.  Notwithstanding anything contained herein to the contrary, "Contingent Obligations" shall not be deemed to include guarantees of loan commitments or of construction loans to the extent the same have not been drawn.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person.

"Disqualified Capital Stock" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Capital Stock which is not Disqualified Capital Stock) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (in each case, other than solely as a result of a change of control or asset sale), in whole or in part, in each case prior to the date 91 days after the Maturity Date; provided, however, that if such Capital Stock is issued to any plan for the benefit of employees of the New Parent or its direct or indirect Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased in order to satisfy applicable statutory or regulatory obligations.

"Fitch" means Fitch, Inc.

"FFO" means net income, excluding gains (or losses) from debt restructuring and sales of property, plus depreciation and amortization, and after adjustments for unconsolidated partnerships and joint ventures (which will be calculated to reflect funds from operations on the same basis), as determined and adjusted in accordance with the standards established from time to time by the National Association of Real Estate Investment Trusts.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time.[8]

---

[8] The Loan Documents will provide that, in the event of any change to GAAP, and upon the election of the Borrowers or the Administrative Agent acting at the direction of the Required Lenders, the Loan Parties' compliance with the covenants set forth in the Loan Documents will be determined using GAAP as in effect immediately prior to such change.

Exhibit C
Page 2

US_ACTIVE:\43436468\28\47658.0008

"Governmental Authority" means any nation or government, any state or other political subdivision thereof and any entity of competent authority and jurisdiction exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government.

"Hedge Agreement" means all interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by the Borrowers or any of their Subsidiaries providing for protection against fluctuations in interest rates, currency exchange rates, commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies.

"Indebtedness" means, with respect to any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables and accrued expenses incurred in the ordinary course of such Person's business) and only to the extent such obligations constitute indebtedness for purposes of GAAP, (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities, (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Disqualified Capital Stock of such Person (other than (i) obligations existing on the Closing Date that any direct or indirect parent of such Person has the right to satisfy by delivery of its Capital Stock, (ii) obligations that any direct or indirect parent of such Person is given the right to satisfy by delivery of its Capital Stock and (iii) obligations to redeem trust preferred securities), (h) all Contingent Obligations of such Person in respect of the foregoing items (a) through (g), (i) all obligations of the kind referred to in clause (a) through (h) above secured by any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, (j) for the purposes of clause (k) and (l) of Events of Default only, the net obligations of such Person in respect of Hedge Agreements. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor. The amount of any Indebtedness under clause (i) above shall be limited to lesser of the amount of such Indebtedness or the fair market value of the assets securing such Indebtedness, as reasonably determined by the Borrowers.

"Investment Grade Credit Rating" means (i) with respect to Fitch, a credit rating of BBB- or higher, (ii) with respect to Moody's, a credit rating of Baa3 or higher and (iii) with respect to S&P, a credit rating of BBB- or higher.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement in respect of the property of a Person, in each case, in the nature of security (including, without limitation, any conditional sale or other title retention agreement and any Capital Lease having substantially the same economic effect as any of the foregoing).

Exhibit C
Page 3

US_ACTIVE:\43436468\28\47658.0008

"Limited Minority Holdings" means non-Wholly Owned Subsidiaries or joint ventures in which (i) the New Parent and its Wholly Owned Subsidiaries have a less than 50% ownership interest and (ii) the New Parent and its Wholly Owned Subsidiaries do not control the day-to-day management of such non-Wholly Owned Subsidiary or joint venture, whether as the general partner or managing member of such non-Wholly Owned Subsidiary or joint venture, or otherwise.  As used in this definition, Holdings and any Wholly Owned Subsidiaries shall be deemed to "control" the management of such non-Wholly Owned Subsidiary or joint venture if it has the authority to manage day-to-day operations of such Person.

"Management Company" means General Growth Management, Inc., a Delaware corporation, and its affiliates, and any of its successors and assigns that are affiliates of the New Parent.

"Moody's" means Moody's Investor Services, Inc.

"Non-Recourse Indebtedness" means Indebtedness which is not Recourse Indebtedness.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Qualified Capital Stock" means Capital Stock, which is not Disqualified Capital Stock.

"Recourse Indebtedness" means any Indebtedness, to the extent that recourse of the applicable lender for non-payment is not limited to such lender's Liens on a particular asset or group of assets.

"Recourse Secured Mortgage Indebtedness" means any Permitted Project Level Financing that is Recourse Indebtedness.

"S&P" means Standard & Poor's Ratings Services.

"Wholly Owned Subsidiary" means, as to any Person or Persons, any Subsidiary of any of such Person or Persons all of the Capital Stock of which (other than directors' qualifying shares and, in the case of any REIT Subsidiary, non-participating preferred equity with a base liquidation preference of no more than $180,000) is owned by such Person or Persons directly or indirectly.

Exhibit C
Page 4

US_ACTIVE:\43436468\28\47658.0008

**<u>ATTACHMENT II</u>:**

**COMBINED FACILITY**

See attached

<u>**EXHIBIT A**</u>

<u>PROJECT GENEVA</u>
<u>SENIOR SECURED FACILITIES</u>
<u>SUMMARY OF PRINCIPAL TERMS AND CONDITIONS</u>

Capitalized terms used but not defined in this <u>Exhibit A</u> shall have the meanings set forth in the letter to which this <u>Exhibit A</u> is attached (the "<u>Commitment Letter</u>") or in <u>Exhibit B</u> or <u>Exhibit C</u> thereto.

| | |
|---|---|
| **Borrowers:** | GGP Limited Partnership, a Delaware limited partnership (the "<u>Partnership</u>"), and GGPLP L.L.C., a Delaware limited liability company (collectively with the Partnership, the "<u>Borrowers</u>" and each, a "<u>Borrower</u>"). |
| **Administrative Agent and Collateral Agent:** | DBTCA (the "<u>Administrative Agent</u>"). |
| **Joint Lead Arrangers:** | DBSI, Wells Fargo Securities and RBC (collectively, the "<u>Joint Lead Arrangers</u>"). |
| **Joint Bookrunners:** | DBSI, Wells Fargo Securities, RBC Capital, Barclays Capital, GS Lending Partners, MCUSA, TD Securities and UBSS. |
| **Syndication Agents:** | Wells Fargo Securities and RBC Capital. |
| **Documentation Agents:** | Barclays Capital, GS Lending Partners, MCUSA, TD Securities and UBSS. |
| **Commitment Parties:** | DB, Wells Fargo, RBC, Barclays, GS Lending Partners, Macquarie, TD and UBS (each, a "<u>Commitment Party</u>" and collectively, the "<u>Commitment Parties</u>"). |
| **Lenders:** | The Commitment Parties and a syndicate of financial institutions and other lenders arranged by the Joint Lead Arrangers in consultation with and reasonably acceptable to the Borrowers other than (a) competitors of the Borrowers and the affiliates of such competitors, in each case identified by the Borrowers prior to the date of the Commitment Letter, with respect to the initial syndicate and subsequent assignments and participations, and additional competitors and affiliates of such competitors identified by the Borrowers from time to time after the Closing Date with respect to subsequent assignments and participations (but no such identification shall apply retroactively to parties that already acquired an assignment or participation interest) and (b) other Persons (as defined on <u>Exhibit C</u> to the Commitment Letter) identified by the Borrowers prior to the date of the Commitment Letter (the Persons in <u>clauses (a)</u> and <u>(b)</u> collectively, the "<u>Disqualified Institutions</u>"). |
| **Facilities:** | A senior secured revolving credit facility of $300,000,000 (the "<u>Revolver</u>" and the loans thereunder, the "<u>Revolving Loans</u>" and the |

commitments thereunder, the "<u>Revolving Commitments</u>").

A non-revolving senior secured term B facility in an aggregate principal amount of $1,500,000,000 (the "<u>Term B Facility</u>", and the loans thereunder, the "<u>Term Loans</u>" and together with the Revolving Loans, the "<u>Loans</u>").

**Letters of Credit:**

A portion of the Revolver in an amount of up to $75,000,000 shall be available for the issuance of letters of credit (the "<u>Letters of Credit</u>") by the Administrative Agent and other Lenders under the Revolver that agree in writing with the Borrowers and the Administrative Agent to issue Letters of Credit (in such capacity, the "<u>Issuing Lenders</u>"). No Letter of Credit will have an expiration date after the earlier of (a) 1 year after the date of issuance and (b) 5 days prior to the Revolver Maturity Date (as defined below); <u>provided</u> that any Letter of Credit with a 1-year tenor may provide for the renewal thereof for additional 1-year periods (which shall in no event extend beyond the date referred to in <u>clause (b)</u> above unless the Borrowers shall have made arrangements reasonably satisfactory to the applicable Issuing Lender to cash collateralize or otherwise backstop such Letter of Credit).  Any outstanding Letters of Credit will reduce availability under the Revolver on a dollar-for-dollar basis.  Each Lender under the Revolver will be irrevocably and unconditionally required to purchase, under certain circumstances, a <u>pro</u> <u>rata</u> participation in each Letter of Credit on a <u>pro</u> <u>rata</u> basis.

**Swingline Loans:**

A portion of the Revolver in an amount of up to $30,000,000 shall be available for swingline loans (the "<u>Swingline Loans</u>") from the Administrative Agent on same-day notice. Any Swingline Loans will reduce availability under the Revolver on a dollar-for-dollar basis. Each Lender under the Revolver will be irrevocably and unconditionally required to purchase, under certain circumstances, a <u>pro</u> <u>rata</u> participation in each Swingline Loan on a <u>pro</u> <u>rata</u> basis.

**Closing Date:**

On or prior to December 31, 2010; <u>provided</u> that the Borrowers may extend the Closing Date (and the commitments hereunder) (a) to a date on or before January 31, 2011, if the Confirmation Order (as defined on <u>Exhibit B</u> to the Commitment Letter) has been entered on or before December 15, 2010 or (b) to a date on or before January 31, 2011, if all conditions to the obligations of REP Investments LLC to consummate the Closing (as defined in the Cornerstone Agreement (as defined on <u>Exhibit B</u> to the Commitment Letter)) have been satisfied, other than those conditions that are to be satisfied (and are capable of being satisfied) by action taken at the Closing (as defined in the Cornerstone Agreement), but the investments contemplated thereunder have not been funded, so long as the Cornerstone Agreement has been similarly extended.

**Availability / Purpose:**

The Term Loans shall be made in a single drawing on the Closing Date.  Repayments and prepayments of the Term Loans may not be

Exhibit A
Page 2

reborrowed.

The Revolving Loans will be available on a revolving basis during the period commencing on the Closing Date and ending on the Revolver Maturity Date.

The proceeds of the Loans, together with the proceeds of the contribution of new equity, will be used on the Closing Date to finance the Plan (as defined on Exhibit B to the Commitment Letter), including to refinance certain Indebtedness (as defined on Exhibit C of the Commitment Letter) of Existing GGPI (as defined below) and its Subsidiaries (as defined below), including, without limitation, the Rouse Notes (as defined below), and to pay fees, commissions and expenses in connection therewith. The proceeds of the Revolving Loans may also be used on and after the Closing Date for general corporate purposes (including working capital).

"Rouse Notes" means, collectively, any of the 7.20% Notes due 2012 of The Rouse Company LP, the 5.375% Notes due 2013 of The Rouse Company LP, or the 6¾% Notes due 2013 of The Rouse Company LP, the 3.625% Notes due 2009 of The Rouse Company LP and the 8.00% Notes due 2009 of The Rouse Company LP.

No Rouse Notes will remain outstanding following the Closing Date.

**Guarantors:** (a) On the Closing Date, limited to (i) New GGP, Inc., a Delaware corporation which will become the new public REIT indirect parent of the Borrowers and be renamed General Growth Properties, Inc. (the "New Parent"), (ii) GGP Real Estate Holding I, Inc. and GGP Real Estate Holding II, Inc., each a Delaware corporation newly formed in connection with the consummation of the Plan (collectively, the "Holding Companies"), (iii) General Growth Properties, Inc., a Delaware corporation, to be renamed GGP, Inc. substantially concurrently with the Closing Date ("Existing GGPI"), (iv) GGP Limited Partnership II, a Delaware limited partnership newly formed in connection with the consummation of the Plan (together with Existing GGPI, the "Parent" and together with the New Parent and the Holding Companies, the "Parent Guarantors") and (v) those entities set forth on Annex II attached hereto and (b) after the Closing Date, any Subsidiary of the New Parent owning directly or indirectly assets required to be pledged to secure the Obligations (as defined below) as more particularly described under "Security" below (collectively, the "Guarantors", and together with the Borrowers, the "Loan Parties").

**Interest Rates and Fees:** Interest rates, fees and payments in connection with the Facilities will be as specified on Annex I attached hereto.

**Maturity and Amortization:** The Revolver will mature on the third anniversary of the Closing Date (the "Revolver Maturity Date"). There is no amortization

US_ACTIVE:\43423994\49\47658.0008

required on the Revolver.

The Term Loans shall mature on the fifth anniversary of the Closing Date (the "Maturity Date").

Amortization of the Term B Facility shall be due and payable in equal quarterly installments, payable on the last day of each fiscal quarter following the Closing Date in an amount equal to 1.00% per annum of the original principal amount of the Term Loans, with the balance payable in full on the Maturity Date; provided that the obligation to make amortization payments shall be reduced on a dollar-for-dollar basis (without duplication) by amounts prepaid and applied to the principal of the Term Loans pursuant to "Voluntary Prepayments" and "Mandatory Prepayments".

**Security:**
The Facilities, the guarantees of the Guarantors (the "Guarantees") and obligations in respect of any hedging agreements and cash management arrangements of the Loan Parties entered into with any Lender or any affiliate of a Lender (collectively, the "Obligations") will be secured by (a) a first priority perfected mortgage or deed of trust Lien (as defined on Exhibit C to the Commitment Letter), subject to clauses (ii), (iii) and (iv) of Permitted Liens (as defined below), on the properties set forth in Annex III attached hereto (the "Mortgaged Properties") and (b) a first priority perfected Lien, subject to Permitted Liens, on the Capital Stock (as defined on Exhibit C to the Commitment Letter) in certain Subsidiaries of the Borrowers set forth on Annex III attached hereto (the "Pledged Properties"; together with the Mortgaged Properties, the "Collateral"). In addition, if the New Parent or any newly formed Subsidiary of the New Parent acquires all or a portion of any real property with a purchase price in excess of $10,000,000 (calculated at the amount allocable to the Borrowers or their Wholly Owned Subsidiaries (as defined on Exhibit C to the Commitment Letter) on the date of such acquisition) the New Parent or such newly formed Subsidiary shall provide a first priority perfected Lien on such real property (or if a Lien on such real property cannot be provided, a first priority perfected Lien on the Capital Stock of such Subsidiary that owns a direct or indirect interest in such real property), in each case subject to Permitted Liens; provided, that neither the New Parent nor the Loan Parties shall be required to provide or cause to be provided such additional collateral (or Guarantees) if (i) at the time of acquisition of such property or Capital Stock, the ratio of (A) the aggregate Value (to be defined but in any event to include the concepts described below) of Collateral securing the Obligations to (B) the sum of the principal balance of all outstanding Loans, the face amount of all outstanding Letters of Credit and the amount of all unused Revolving Commitments is at least 2.6 to 1:00 or (ii) any existing contractual agreement or agreements assumed or entered into by the New Parent or any such Subsidiary to effectuate or reasonably facilitate the acquisition of such real property (including documents governing non-Wholly Owned Subsidiaries or joint

ventures and Indebtedness permitted to be incurred pursuant to the Loan Documents (as defined below)) prohibits the granting of such Lien.

The Borrowers may, on or before the Closing Date, substitute other assets for the Collateral identified on <u>Annex III</u> so long as (i) the substituted Collateral has reasonably equivalent Value and (ii) Mortgaged Properties are substituted for other Mortgaged Properties unless otherwise agreed by a majority of the Joint Lead Arrangers.

**Facilities Documentation:** The definitive documentation for the Facilities (the "<u>Loan Documents</u>") shall contain the terms set forth in this Summary of Principal Terms and Conditions and such other terms as the Borrowers and the Joint Lead Arrangers shall agree and shall (a) give due regard to (i) the operational requirements of the New Parent and its Subsidiaries and joint ventures in light of their size, industry and practices, (ii) the projections dated as of September 9, 2010 (as updated from time to time and in the case of material adverse updates after the date of the Commitment Letter, in a manner reasonably acceptable to a majority of the Joint Lead Arrangers, the "<u>Projections</u>") and (iii) the REIT status of the New Parent and its REIT Subsidiaries and exceptions reasonably necessary to maintain the same and (b) in any event permit all transactions contemplated by the Plan (the terms in <u>clauses (a)</u> and <u>(b)</u> collectively, the "<u>Documentation Considerations</u>").

The mandatory prepayments, representations and warranties, affirmative covenants, negative covenants, financial covenants and events of default contained in the Loan Documents shall be limited to the following, in each case applicable to the New Parent and its Subsidiaries and with scheduled exceptions and other exceptions for materiality or otherwise and "baskets" contemplated below and otherwise to be mutually agreed with due regard for the Documentation Considerations.

"<u>Subsidiary</u>" means, as to any Person, a corporation, partnership, limited liability company, trust, estate or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership, limited liability company or other entity are at the time owned, directly or indirectly through one or more intermediaries, or both, by such Person.

**Mandatory Prepayments:** Subject to carveouts and exceptions consistent with the Documentation Considerations, the Term Loans shall be prepaid with:

(a)     100% of the net cash proceeds (to be defined, but in any event net of repayment of Indebtedness secured by a Lien on such asset and "mezzanine Indebtedness" with respect to such asset) of any non-ordinary course Dispositions (as defined below) of assets constituting Collateral pursuant to clauses (b)(i), (b)(ii), (b)(iv)(F)or (b)(vii) of "Negative Covenants" below (non-ordinary course to be defined; it being understood that any dedication, any Disposition resulting in net cash proceeds of less than $5,000,000 for any transaction or series of related transactions and $50,000,000 in the aggregate, any Disposition of an anchor parcel or outparcel to an end-user tenant and issuances of Capital Stock by private REITs not to exceed $180,000 per annum per private REIT shall be deemed to be an ordinary course Disposition) by any Loan Party (including as a result of casualty or condemnation), in each case, with exceptions to be agreed (which exceptions will include, without limitation, Permitted Reinvestments (as defined below)); provided that in the case of the first $300,000,000 net cash proceeds of Dispositions of Collateral, no such prepayment shall be required if and to the extent that the Consolidated Liquidity (as defined below) would, after giving effect to such prepayment, be less than $800,000,000 plus the Aggregate Refinancing Shortfall Amount (as defined below) (for purposes of this clause (a), the term "Collateral" shall include real property owned by an entity whose Capital Stock has been pledged to the Lenders and, in respect of Dispositions of Collateral by any non-Wholly Owned Subsidiary of the New Parent that is not a Loan Party, limited to the net cash proceeds distributed to any Loan Party in respect of their pro rata share thereof);

(b)     So long as the Consolidated Liquidity would, after giving effect to such prepayment, be at least $800,000,000 plus the Aggregate Refinancing Shortfall Amount, 100% of the net cash proceeds of any non-ordinary course Disposition of assets not constituting Collateral pursuant to clauses (b)(i), (b)(ii), (b)(iv)(F) or (b)(vii) of "Negative Covenants" below (non-ordinary course to be defined, it being understood that any dedication, any Disposition resulting in net cash proceeds of less than $10,000,000 in any transaction or series of related transactions and $100,000,000 in the aggregate, any Disposition of an anchor parcel or outparcel to an end-user tenant and issuances of Capital Stock by private REITs not to exceed $180,000 per annum per private REIT shall be deemed to be an ordinary course Disposition) by the New Parent or any of the New Parent's Subsidiaries (including as a result of casualty or condemnation and, in respect of Dispositions of assets by any non-Wholly Owned Subsidiary of the New Parent that is not a Loan Party, limited to the net cash proceeds distributed to a Loan Party

US_ACTIVE:\43423994\49\47658.0008

or any Wholly-Owned Subsidiary of a Loan Party in respect of their pro rata share thereof), with exceptions to be agreed (which exceptions will include, without limitation, Permitted Reinvestments);

(c)     100% of the net cash proceeds of issuances of Indebtedness of the New Parent and its Subsidiaries after the Closing Date (other than Indebtedness permitted to be incurred under the Loan Documents) and, in the case of any non-Wholly Owned Subsidiary of the New Parent that is not a Loan Party, limited to the net cash proceeds distributed to a Loan Party or any Wholly-Owned Subsidiary of a Loan Party in respect of their pro rata share thereof;

(d)     So long as the Consolidated Liquidity would, after giving effect to such prepayment, be at least $800,000,000 plus the Aggregate Refinancing Shortfall Amount, 50% of the net cash proceeds of issuances of equity of the Parent Guarantors or the Borrowers after the Closing Date (subject to exceptions to be agreed in respect of investments, restricted payments, Specified Equity Contributions (as defined below), issuances of Capital Stock in connection with any stock option or similar plan or contract with or for the benefit of any present or former director, officer or employee, issuances made in connection with the consummation of the Plan, the exercise of warrants outstanding on the effective date of the Plan, Capital Stock issued pursuant to the Investor Agreements (as defined in the Plan), issuances made in connection with the redemption, repayment or retirement of the Bridge Notes (as defined in the Plan) and issuance of Capital Stock by the private REITs not to exceed $180,000 per annum per private REIT and the redemption or repurchase of the reserve shares pursuant to the New Parent's exercise of the New GGP Post-Emergence Public Offering Clawback Election (as defined in the Plan)); and

(e)     So long as the Consolidated Liquidity would, after giving effect to such prepayment, be at least $800,000,000 plus the Aggregate Refinancing Shortfall Amount, 50% of the New Parent's annual excess cash flow (to be defined starting with net income from operations) in any event to include deductions for (without duplication): (i) dividends required for the maintenance of REIT status of the New Parent and its REIT Subsidiaries and the avoidance of entity-level taxes, (ii) other dividends to be agreed, (iii) proceeds of any Disposition applied in accordance herewith, (iv) scheduled amortization and (v) voluntary prepayments (other than in respect of the Loans)), and voluntary prepayments of the Term Loans and the Revolving Loans (to the extent accompanied by a permanent reduction of the Revolving

US_ACTIVE:\43423994\49\47658.0008

Commitment) made during the applicable period and prior to the excess cash flow payment date will reduce excess cash flow on a dollar for dollar basis.

Mandatory prepayments shall be applied to reduce, on a dollar-for-dollar basis (without duplication), scheduled amortization payments of the Term Loans in direct order of maturity.

"<u>Aggregate Refinancing Shortfall Amount</u>" means the sum of each Refinancing Shortfall Amount (as defined below) in respect of Permitted Project Level Financings (as defined below) without duplication, that have matured and have not yet been refinanced or will mature during the twelve months following the date of any prepayment for which Consolidated Liquidity is being determined.

"<u>Consolidated Liquidity</u>" means (a) the unused portion of the Revolving Commitments *plus* (b) unrestricted cash and cash equivalents of the New Parent, the Borrowers and their Wholly-Owned Subsidiaries determined in accordance with GAAP (as defined on <u>Exhibit C</u> to the Commitment Letter).

"<u>Permitted Reinvestment</u>" means the reinvestment of the net cash proceeds by the New Parent or its Subsidiaries or joint ventures in assets of a kind then used or usable in such Person's business (including the repair, refurbishment or redevelopment of existing assets); <u>provided</u> that (w) the Partnership shall provide notice that it intends to reinvest such net cash proceeds within 3 days of the receipt thereof and shall notify the Administrative Agent within 45 days of the date of receipt of such proceeds of the nature of the intended reinvestment, (x) such net cash proceeds shall be reinvested or committed to be reinvested within 6 months following the date of receipt of such proceeds, (y) such proceeds shall be actually reinvested within 18 months after the date of such commitment and (z) in the case of net cash proceeds from the Disposition of Collateral, such net cash proceeds shall be reinvested in property that is or will become Collateral.

"<u>Refinancing Shortfall Amount</u>" means, with respect to any property, other than a Special Consideration Property (defined below), subject to Permitted Project Level Financing, the positive difference, if any, between the amounts required to repay such Permitted Project Level Financing at maturity and the Borrowers' reasonable estimate of the net proceeds of a market execution of refinancing of such property.

In the event a property that was scheduled to experience a refinancing shortfall is refinanced and the actual net proceeds of such refinancing exceed the estimated refinancing proceeds, such excess shall be used to prepay the Term Loans subject to the terms, conditions and exclusions applicable to the original mandatory prepayment (but only to the extent for which the net cash proceeds

were reduced by such refinancing shortfall), but recalculating the Consolidated Liquidity and Aggregate Refinancing Shortfall as of such date.

**Voluntary Prepayments:**  Voluntary prepayments of the Loans will be permitted at any time, in minimum principal amounts to be reasonably agreed upon, without premium or penalty, subject to reimbursement of the Lenders' customary costs (as case of a prepayment of LIBOR (as defined on Annex I attached hereto) advances, to the extent paid on any day other than the last day of the relevant interest period. Voluntary prepayments of the Term Loans shall be applied to the installments of the Term Loans as directed by the Borrowers.

**Representations and Warranties:**

(a)   corporate existence and good standing, with exceptions for, among others, permitted amalgamations, mergers, consolidations, dissolutions or liquidations and permitted Dispositions of assets;

(b)   all requisite corporate and governmental authorizations, including the entry of the Confirmation Order by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") as of the Closing Date;

(c)   no contravention of articles, by-laws, material agreements or applicable laws as a result of execution, delivery and performance of Loan Documents;

(d)   the execution, delivery and binding effect and enforceability of Loan Documents;

(e)   ownership of or valid leasehold interest with respect to material property, with exceptions for, among others, permitted Dispositions of assets;

(f)   no Default or Event of Default (each as defined below);

(g)   consolidated solvency of (i) the New Parent and its Subsidiaries, taken as a whole and (ii) the Borrowers and the other Loan Parties taken as a whole;

(h)   historical financial statements of Existing GGPI for the fiscal year ended December 31, 2009 and each fiscal quarter thereafter which has ended at least 60 days prior to the Closing Date, in each case prepared in accordance with generally accepted accounting principles as in effect on the date of preparation and that the Projections have been prepared in good faith based on reasonable assumptions at the time prepared (it being understood that material variations may have occurred);

US_ACTIVE:\43423994\49\47658.0008

(i)     no event or circumstance which has had or could reasonably be expected to have a material adverse effect on the business, operations or financial condition of the New Parent and its Subsidiaries, taken as a whole;

(j)     absence of material litigation;

(k)     compliance with applicable laws (including ERISA and environmental) and material agreements;

(l)     labor matters;

(m)     payment of taxes and all material obligations;

(n)     accuracy and completeness in all material respects of written information provided to the Lenders;

(o)     no Loan Party is required to register under the Investment Company Act and compliance with other similar regulations;

(p)     use of proceeds including no proceeds will be used to purchase or carry margin stock;

(q)     security documents and all filings and other actions necessary or advisable to perfect and protect the security interest in the Collateral and the creation and perfection of a first priority Lien (subject to Permitted Liens) on the Collateral;

(r)     existence and ownership by the New Parent of Subsidiaries and joint ventures, with exceptions for, among others, permitted amalgamations, mergers, consolidations, dissolutions or liquidations and permitted Dispositions of assets;

(s)     ownership, use and non-infringement of material intellectual property;

(t)     insurance;

(u)     REIT status;

(v)     PATRIOT Act (subject to the publicly traded stock exception), anti-money laundering statute and OFAC compliance; and

(w)     no Default or Event of Default has occurred and is continuing under or with respect to any material contract that could reasonably be expected to have a material adverse effect on (i) the business, operations or financial condition of

Exhibit A
Page 10

|  | the New Parent and its Subsidiaries, taken as a whole, (ii) the material rights and remedies of the Administrative Agent and the Lenders, taken as a whole or (iii) the legality, validity or enforceability of the Loan Documents, taken as a whole (<u>clauses (i)</u>, <u>(ii)</u> and <u>(iii)</u> together, a "<u>Material Adverse Effect</u>"). |

**Conditions to Closing:** As set forth on <u>Exhibit B</u> to the Commitment Letter.

**Conditions to each Loan and Issuance of each Letter of Credit:** On and after the Closing Date, the making of each Loan or the issuance of each Letter of Credit shall be conditioned upon the following:

(a) all representations and warranties shall be true and correct in all material respects as of the date of the making of any Loan or issuance of (or extension, amendment or renewal resulting in an increase in the face amount of) a Letter of Credit, before and after giving effect to such Loan or Letter of Credit, as the case may be, and to the application of proceeds therefrom, as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; and

(b) no Default or Event of Default shall have occurred and be continuing, or shall result from such Loan or issuance, extension, amendment or renewal of such Letter of Credit, as the case may be.

**Affirmative Covenants:** (a) provision of annual audited consolidated financial statements of the New Parent within 105 days of its fiscal year end, which audited financial statements shall be unqualified as to going concern and scope of audit;

(b) provision of quarterly unaudited consolidated financial statements of the New Parent for the first three fiscal quarters of each fiscal year within 60 days of its fiscal quarter end;

(c) with the financial statements referred to in the immediately preceding <u>clauses (a)</u> and <u>(b)</u>: provision of quarterly and annual compliance certificates, including calculation of the Refinancing Shortfall Amount, certificates as to financial statements and notices of any material damage, destruction or condemnation of any Collateral[1];

---

[1] The definitive list of requested deliverables is exhaustive of those to be included in the Loan Documents.

US_ACTIVE:\43423994\49\47658.0008

(d)     provision by the Partnership of an informational annual budget within 90 days after the beginning of each fiscal year;

(e)     promptly, provision by the Borrowers of notices of:

    (i)     Default or Event of Default;

    (ii)    any Material Adverse Effect;

    (iii)   any litigation that could reasonably be expected to have a Material Adverse Effect; and

    (iv)   any environmental event that could reasonably be expected to have a Material Adverse Effect;

(f)     general right of inspection (including of books and records and properties) by the Administrative Agent or any Lenders (when accompanying the Administrative Agent) on reasonable notice and subject to limitations on frequency and with expenses to be borne by the inspecting party (absent an Event of Default);

(g)     provision by the Borrowers of other information on reasonable request by the Administrative Agent or any Lender acting through the Administrative Agent;

(h)     punctual payment and performance of the Obligations;

(i)     maintenance of corporate existence, with exceptions for, among others, permitted amalgamations, mergers, consolidations, dissolutions or liquidations and permitted Dispositions of assets;

(j)     maintenance of proper books and records to enable the preparation of the financial statements in accordance with generally accepted accounting principles as in effect on the date of preparation;

(k)     maintenance and operation of properties, with exceptions for, among others, permitted amalgamations, mergers, consolidations, dissolutions or liquidations and permitted Dispositions of assets;

(l)     payment of all taxes and other material obligations;

(m)    compliance with all applicable laws and having and maintaining all required permits (including environmental and ERISA);

US_ACTIVE:\43423994\49\47658.0008

(n)    use of proceeds of the Loans;

(o)    performance and compliance with all material agreements;

(p)    further assurances as to perfection and priority of Liens in the Collateral (including additional Collateral) and execution and delivery of additional guarantees;

(q)    maintenance of insurance;

(r)    maintenance of REIT status; and

(s)    commercially reasonable efforts to cause S&P (as defined in Exhibit C to the Commitment Letter) and Moody's (as defined in Exhibit C to the Commitment Letter) to continue to provide corporate family ratings for the Partnership (it being understood that no particular rating is required).

The Loan Documents shall provide that information may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrowers post such documents, or provide a link thereto on the website of the Securities and Exchange Commission at http://www.sec.gov or on the website of the New Parent at www.ggp.com or (ii) on which such documents are posted on the Borrowers' behalf on IntraLinks/IntraAgency or another website to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that the Borrowers shall notify the Administrative Agent of the posting of any such documents (which notice may be by facsimile or electronic mail).  The Borrowers shall identify all information as suitable for distribution to public or non-public Lenders, it being understood that unless identified as "public", all such information shall be deemed as suitable for distribution to only non-public Lenders.

**Negative Covenants:**

(a)    material changes in the nature of the business conducted, with exceptions for, among others, permitted amalgamations, mergers, consolidations, dissolutions or liquidations and permitted Dispositions of assets;

(b)    (x) amalgamation, merger, consolidation, dissolution or liquidation, and (y) the sale, lease (other than any lease, license, easement or other occupancy agreement entered into in the ordinary course of business or transactions solely in connection with the mortgage or other transfer of property for Permitted Project Level Financing) or other disposition of assets or, in the case of any Subsidiary of the Partnership, the issuance or sale of any shares of such Subsidiaries' Capital Stock or, in the case of any joint ventures, the sale of any Capital Stock owned by New Parent or any Subsidiary of New Parent (clause (y) collectively, a "Disposition") with

Exhibit A
Page 13

exceptions for, among others:

(i)    Dispositions of the assets identified on <u>Annex IV</u> attached hereto (the "<u>Special Consideration Properties</u>") and properties or entities having an aggregate net equity value less than $200,000,000 (collectively with the Special Consideration Properties, the "<u>Specified Properties</u>") so long as the net cash proceeds (if any) shall be applied, to the extent required, to prepay the Term Loans as set forth in "Mandatory Prepayments" above with exceptions to be agreed (which exceptions will include, without limitation, Permitted Reinvestments);

(ii)    Dispositions of assets for fair market value, as reasonably determined by the Person making such Disposition, so long as the Borrowers shall be in pro forma compliance with the Financial Covenants and the net cash proceeds shall be applied, to the extent required, to prepay the Term Loans as set forth in "Mandatory Prepayments" above, with exceptions to be agreed (which exceptions will include, without limitation, Permitted Reinvestments);

(iii)    amalgamations, mergers and consolidations among the New Parent and its Subsidiaries or with any Person the purpose of which is to effect an Investment otherwise permitted hereunder so long as (A) a Borrower is the survivor of any such transaction involving a Borrower, (B) a Loan Party is the survivor of any such transaction involving a Loan Party or the survivor shall expressly assume the obligations of the Loan Party under the Loan Documents in a manner reasonably acceptable to the Administrative Agent, (C) New Parent is the survivor of any such transaction involving the New Parent or, if the New Parent is not the survivor, (1) the survivor shall expressly assume the obligations of the New Parent under the Loan Documents in a manner reasonably acceptable to the Administrative Agent, (2) no Default or Event of Default shall occur after giving effect to such transaction and (3) the Loan Parties shall be in pro forma compliance after giving effect to such transaction with the financial covenants as of the end of fiscal quarter most recently ended for which financial statements are available and shall provide a certificate to the Administrative Agent demonstrating the same, and (D) in the case of a transaction involving any non-Wholly Owned Subsidiary of the Borrowers, a

US_ACTIVE:\43423994\49\47658.0008

Wholly Owned Subsidiary shall be the survivor of any such transaction or the transaction shall constitute a permitted Investment (as defined below);

(iv)     other customary exceptions to be agreed, but in any case including, among others:  (A) Dispositions of obsolete or worn out personal property or fixtures; (B) Dispositions of inventory; (C) Dispositions (including Capital Stock) to any Loan Party or any Wholly Owned Subsidiary of the Borrowers or, in the case of any non-Wholly Owned Subsidiary of the New Parent, to the owners of such non-Wholly Owned Subsidiary on a pro rata basis; (D) the sale of the Capital Stock of, or issuance by any Person that is a REIT to individuals of preferred equity with a base liquidation preference not in excess of $180,000 in the aggregate per annum for any such REIT; (E) Dispositions of cash and cash equivalents; and (F) Dispositions as a result of the exercise of a buy/sell provision with respect to any non-Wholly Owned Subsidiary or joint venture;

(v)      Dispositions of real or personal property (including Capital Stock) in connection with permitted Investments;

(vi)     the spin-off of Spinco Inc. ("Spinco") as contemplated in the Plan;

(vii)    Dispositions of property as a result of (A) any condemnation proceeding (or credible threat thereof) or Disposition in lieu thereof or (B) a casualty, in each case so long as the net cash proceeds (if any) shall be applied, to the extent required, to prepay the Term Loans as set forth in "Mandatory Prepayments" above with exceptions to be agreed (which exceptions will include, without limitation, Permitted Reinvestments); and

(viii)   amalgamations, mergers and consolidations the purpose of which is to effect any Disposition otherwise permitted under the Loan Documents;

(c)      Liens on any property with exceptions for, among others (all such exceptions to be contained in the Loan Documents, collectively, "Permitted Liens"):

(i)      Liens securing Permitted Project Level Financings;

(ii)    capital leases on an unlimited basis;

(iii)    pari passu Liens securing any Replacement Revolver (as defined below); and

(iv)    other customary exceptions to be agreed, but in any case including, among others:  (A) Liens for taxes, assessments, utilities or governmental charges not more than 30 days overdue, or if more than 30 days overdue, (1) being contested in good faith, (2) which consist of Liens on one or more Specified Properties or (3) which taxes, assessments, utilities or governmental charges do not exceed $50,000,000 in the aggregate; (B) statutory Liens of landlords, lessors, carriers, warehousemen, mechanics, materialmen and other similar Liens not more than 30 days overdue, or if more than 30 days overdue, (1) being contested in good faith, (2) which consist of Liens on one or more Specified Properties or (3) which taxes, assessments, utilities or governmental charges do not exceed $50,000,000 in the aggregate; (C) pledges or deposits in connection with workers' compensation, unemployment insurance or other social legislation; (D) deposits to secure performance of bids, contracts, leases statutory obligations, surety, appeal and performance bonds and similar obligations; (E) easements, rights of way and similar real property encumbrances and including items shown on the title reports, UCC searches and surveys made available to the Commitment Parties or otherwise disclosed to the Commitment Parties prior to the date of the Commitment Letter; (F) Liens on Capital Stock of any non-Wholly Owned Subsidiary of the New Parent or joint venture securing obligations arising in favor of other holders of Capital Stock of such Person pursuant agreements governing such Person; and (G) a basket to be agreed;

(d)    Indebtedness with exceptions for, among others:

(i)    Indebtedness which, when aggregated with Indebtedness of the New Parent, the Borrowers and their Subsidiaries and joint ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary) would not cause the New Parent to fail to be in pro forma compliance

US_ACTIVE:\43423994\49\47658.0008

with the Maximum Leverage Ratio covenant (as described below) in each case as determined in accordance with GAAP, except as otherwise noted above with respect to non-Wholly Owned Subsidiary and joint venture allocations and that the amount of such Indebtedness shall be calculated as described in the Maximum Leverage Ratio covenant below; provided that the New Parent and its Subsidiaries and joint ventures shall not incur (A) unsecured Indebtedness (other than unsecured Indebtedness existing as of the Closing Date and refinancings thereof) in excess of $300,000,000 (the "Unsecured Indebtedness Sublimit") and (B) the aggregate outstanding amount of any Recourse Secured Mortgage Indebtedness (as defined on Exhibit C to the Commitment Letter) shall not exceed the amount of Recourse Secured Mortgage Indebtedness outstanding on the Closing Date plus $750,000,000; provided that such Recourse Secured Mortgage Indebtedness is (1) incurred to refinance, replace or extend Permitted Project Level Financing or (2) incurred to finance the construction, development, redevelopment, repair or improvement of any GGP Property;

(ii)     intercompany Indebtedness among the New Parent and its Subsidiaries incurred (A) in the ordinary course of business (including transactions in the ordinary course of business in accordance with the consolidated cash management system of the New Parent and its Subsidiaries) or (B) outside the ordinary course of business in connection with tax, accounting, corporate structuring or reorganization or similar transactions; provided that intercompany Indebtedness pursuant to clause (B) shall be subordinated to the Obligations in a manner reasonably satisfactory to the Administrative Agent to the extent not otherwise restricted by any contractual obligation;

(iii)    ordinary course financing of insurance premiums;

(iv)    Indebtedness and other transactions specifically contemplated by the Plan (including the reinstatement of the Exchangeable Notes (as defined below), the reinstatement of the TRUP Notes (as defined below) and the issuance of the Bridge Notes);

(v)     permitted refinancings of the foregoing (including

US_ACTIVE:\43423994\49\47658.0008

the Exchangeable Notes and the TRUP Notes); and

(vi)    the Obligations and any refinancing, replacement or extension of the Revolver; <u>provided</u> that (a) the final maturity date of such refinancing, replacement or extension shall not be prior to the Revolver Maturity Date, (b) at the time of such refinancing, replacement or extension, no Event of Default shall have occurred and be continuing, (c) if the total commitment amount of such refinancing, replacement or extension revolver exceeds the amount of the Revolving Commitments, such excess shall be incurred in compliance with <u>clause (d)(i)</u> above and, any amount in excess of $450,000,000 in the aggregate shall be deemed a utilization of the Unsecured Indebtedness Sublimit dollar for dollar up to, but not to exceed, $150,000,000 in the aggregate, (d) to the extent such refinancing, replacement or extension revolver exceeds $300,000,000 the ratio of (1) the aggregate Value (to be defined but in any event to include the concepts described below) of Collateral securing the Term Loans and such new revolver to (2) the sum of the principal balance of all outstanding Term Loans and the aggregate amount of the commitments in respect of the new revolver is at least 2.6 to 1.00 (the "<u>Replacement Revolver</u>");

(e)    investments, acquisitions, advances, loans, extensions of credit, capital contributions or purchases of any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting an ongoing business from, or make any other investment in or purchase any real or personal property from, any other Person (all of the foregoing, the "<u>Investments</u>") with exceptions for, among others:

(i)    transactions in the ordinary course of business in accordance with the consolidated cash management system of the New Parent and its Subsidiaries;

(ii)    Investments among the Loan Parties and the Wholly-Owned Subsidiaries of the Borrowers;

(iii)    Investments in existing non-Wholly Owned Subsidiaries of the Borrowers and joint ventures, without limitation <u>provided</u>, however, that no Investment will be made in such existing entities which are dormant nor immaterial entities with no assets (other than (A) holding companies whose only assets are Capital Stock of Subsidiaries or joint ventures that hold, directly or indirectly, GGP

Properties, (B) any entity that is party to an IDOT structure, (C) Investments in amounts required to cover costs and expenses of such entities and (D) Investments in such entities pursuant to clause (iv) below);

(iv)    Investments in any after-acquired real or personal property (including in any newly formed or after acquired non-Wholly Owned Subsidiary of the New Parent or joint venture owning such property or any existing dormant or shell entity); provided that (A) Investments in real estate upon which material improvements are not complete (as evidenced by being opened for business to the general public) shall not exceed 10% of Value (it being understood that no real estate that is at least 80% leased shall be subject to this clause (A) and that for the purposes of this provision any portion of such real estate that is under a binding contract of sale to an "anchor tenant" shall be deemed to be leased), (B) Investments in any single Person owning any GGP Property (as defined below) shall not exceed 25% of Value and (C) Investments in Limited Minority Holdings (as defined on Exhibit C to the Commitment Letter) shall not exceed 20% of Value after giving effect to such Investment;

(v)    Investments held as of the Closing Date;

(vi)    the spin-off of Spinco;

(vii)    Investments reasonably required in the minimum amount necessary for the New Parent or any of its Subsidiaries to maintain its qualification as a REIT, qualified REIT Subsidiary or taxable REIT Subsidiary;

(viii)    other customary exceptions to be agreed, but in any case including, among others:  extensions of trade credit in the ordinary course of business; Investments received in connection with the bankruptcy or reorganization of suppliers and lessees and in the settlement of delinquent obligations and other disputes; deposits with financial institutions available for withdrawal on demand, prepaid expenses, accounts receivable and loans and advances to directors, officers and employees; guarantees of permitted Indebtedness and other obligations of the New Parent, its Subsidiaries and joint ventures; Investments of the New Parent and its Subsidiaries in any Subsidiary

Exhibit A
Page 19

formed in connection with the issuance of trust preferred securities and by such entity in the New Parent and its Subsidiaries; Investments in cash and cash equivalents; and Investments in the form of a permitted Disposition; and

(ix)    other Investments not in excess of $100,000,000 in the aggregate;

(f)    dividends or other distributions (whether payable in cash or other property) on or the purchase, redemption, retirement or acquisition of Capital Stock of the Partnership or the Parent Guarantors (in each case unless payable solely in shares of Capital Stock of any such Person or any direct or indirect parent thereof, or in rights to subscribe for the purchase of such Capital Stock) (all of the foregoing, the "Restricted Payments"), with exceptions for, among others:

(i)    dividends or distributions by the Partnership to the Parent (and by the Parent to any direct or indirect parent) in any period in an amount not in excess of the greater of (A) the amount required to be distributed during such period in order to maintain REIT status of the New Parent and its REIT Subsidiaries and avoid entity-level taxes and (B) 50% of the FFO (as defined on Exhibit C to the Commitment Letter) of the Parent Guarantors, the Borrowers and their Subsidiaries and joint ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary) for such period;

(ii)    transactions in the ordinary course of business in accordance with the consolidated cash management system of the New Parent and its Subsidiaries;

(iii)    dividends or distributions to the Parent to permit the Parent to pay (or to make dividends or distributions to any direct or indirect parent of the Parent to pay) any tax liabilities, operating expenses and other corporate overhead in the ordinary course of business (including directors fees and expenses, indemnification and similar items, franchise and other similar taxes and fees and expenses of debt or equity offerings (whether successful or not));

US_ACTIVE:\43423994\49\47658.0008

(iv)      the purchase, redemption, retirement or acquisition of Capital Stock of the Parent Guarantors or the Partnership (and Restricted Payments by the Borrower to the Parent and the Parent to any direct or indirect parent to enable any Parent Guarantor to make such purchase, redemption, retirement or acquisition) held as of the Closing Date by Persons other than Subsidiaries of the New Parent or issued to any such Person after the Closing Date pursuant to clause (b)(iv)(D), above;

(v)      the purchase, redemption, retirement or acquisition of Capital Stock (and Restricted Payments by the Borrower to the Parent and the Parent to any direct or indirect parent to enable any Parent Guarantor to make such purchase, redemption, retirement or acquisition) (A) not in excess of $50,000,000 in the aggregate during the term of the Facilities or (B) mandatorily required pursuant to any contractual obligations now or hereafter existing in an aggregate amount not to exceed $150,000,000, in each case, so long as such purchase, redemption, retirement or acquisition of Capital Stock could not reasonably be expected to result in a Material Adverse Effect and no Default or Event of Default shall have occurred and be continuing;

(vi)      dividends or distributions to the Parent to enable the Parent to effect (and by the Parent to any direct or indirect parent to enable such Person to effect) the purchase, redemption, retirement or acquisition of Capital Stock of the New Parent (including purchases, redemptions, retirements or acquisitions deemed to be made in connection with cashless exercises of stock options, warrants and similar items, the payment of taxes in respect of such options, warrants and similar items) (A) as contemplated by the Plan upon the New Parent's exercise of the New GGP Post-Emergence Public Offering Clawback Election or (B) held by any present or former director, officer or employee of New Parent or any of its Subsidiaries or joint ventures (or the heirs, estate, family members, spouse or former spouse of any of the foregoing) in the case of this clause (B) in an amount not in excess of $25,000,000 per annum; and

(vii)      to the extent constituting a Restricted Payment, Investments not otherwise prohibited under the Loan Documents;

US_ACTIVE:\43423994\49\47658.0008

(g)    material adverse amendments, waivers or modifications to organizational documents or material agreements, with exceptions, among others, as required in connection with the Plan (including the spin-off of Spinco contemplated by the Plan);

(h)    hedging for speculative purposes;

(i)    no transactions with officers, directors, employees or affiliates with exceptions for, among others:

    (i)    for fair market value and on arm's length terms;

    (ii)    as in existence on the Closing Date;

    (iii)    as contemplated by the Plan, including arrangements with Spinco and in connection with the spin-off thereof;

    (iv)    customary directors fees and expenses, indemnification, incentive plans and similar items;

    (v)    employment and other compensation arrangements (including base salary and incentives);

    (vi)    transactions in the ordinary course of business in accordance with the consolidated cash management system of the New Parent and its Subsidiaries;

    (vii)    ordinary course reimbursement of travel, moving and similar expenses;

    (viii)    loans and advances to directors, officers and employees in the ordinary course of business;

    (ix)    (A) guarantees of the Indebtedness of the New Parent and its Subsidiaries and joint ventures not otherwise prohibited under the Loan Documents and (B) other customary guarantees in the ordinary course of business; and

    (x)    transactions among the New Parent and its Subsidiaries and joint ventures permitted under the Loan Documents;

(j)    voluntary prepayment, redemption or repurchase of material Indebtedness subordinated in right of payment to the Loans;

(k)    granting of negative pledges with exceptions for, among others, negative pledges granted in connection with

Exhibit A
Page 22

permitted debt;

(l)    changes in fiscal periods (without the consent of the Administrative Agent); and

(m)    limitation on restrictions on Subsidiary distributions with exceptions for, among others, restrictions granted in connection with certain permitted debt.

Notwithstanding anything to the contrary contained in this Commitment Letter, there shall not be any limitation on capital expenditures so long as the New Parent is in pro forma compliance with the Financial Covenants.

"Exchangeable Notes" means, collectively, any of the 3.98% Exchangeable Senior Notes due 2027 of the Partnership.

"Permitted Project Level Financing" means any indebtedness secured by a mortgage on any real property (or, for convenience, to avoid expense or for other bona fide business expenses of the Borrowers, secured by rentals or cash flow of one or more real properties but not by a mortgage) or secured by a Lien on any Capital Stock of any entity whose primary asset is (a) the real property financed by such indebtedness or (b) the Capital Stock of an entity that directly or indirectly owns such real property other than, in each case, indebtedness secured by any asset that is a Mortgaged Property.

"TRUP Notes" means, collectively, any of the TRUP Junior Subordinated Notes due 2036 of the Partnership.

**Financial Covenants:**    The following to be tested quarterly on the last day of each fiscal quarter, commencing with the first full fiscal quarter of the New Parent following the Closing Date and in each case excluding Special Consideration Properties (and any Person all or substantially all of whose assets comprise Special Consideration Properties):

(a)    <u>Maximum Net Indebtedness to Value Ratio</u>: maximum ratio of (i) the difference of (x) total Indebtedness (calculated at the outstanding principal amount based on the contract and not reflecting purchase accounting adjustments pursuant to GAAP) of the Parent Guarantors, the Borrowers and their Subsidiaries and joint ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary) minus (y) unrestricted cash and cash equivalents (and restricted cash and cash equivalents securing Indebtedness and the application of which is to be made against the principal of such Indebtedness) of the Parent Guarantors, the Borrowers and their Subsidiaries and joint

ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary), in each case as determined in accordance with GAAP, except as otherwise noted above with respect to the principal amount of Indebtedness and non-Wholly Owned Subsidiary and joint venture allocations, without duplication and collectively in an amount not to exceed $1,500,000,000 to (ii) Value (less the aggregate amount of unrestricted cash and cash equivalents subtracted from Indebtedness pursuant to the immediately preceding clause (y)).

(b)  <u>Maximum Leverage Ratio</u>: maximum ratio of (i) the difference of (x) total Indebtedness (calculated at the outstanding principal amount based on the contract and not reflecting purchase accounting adjustments pursuant to GAAP) of the Parent Guarantors, the Borrowers and their Subsidiaries and joint ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary), minus (y) unrestricted cash and cash equivalents (any restricted cash and cash equivalents securing Indebtedness and the application of which is to be made against the principal of such Indebtedness) of the Parent Guarantors, the Borrowers and their Subsidiaries and joint ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary), in each case as determined in accordance with GAAP, except as otherwise noted above with respect to the principal amount of Indebtedness and non-Wholly Owned Subsidiary and joint venture allocations, without duplication and collectively in an amount not to exceed $1,500,000,000 to (ii) Combined EBITDA (as described below) for the trailing four quarter period most recently ended.

(c)  <u>Minimum Net Cash Interest Coverage Ratio</u>: minimum ratio of trailing four quarter Combined EBITDA to net cash interest expense (to be defined, but in any event excluding one-time payments, original issue discount and fees and expenses in connection with the Facilities) of the Parent Guarantors, the Borrowers and their Subsidiaries and joint

ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary).

Financial covenant levels will be as set forth on <u>Annex V</u> attached hereto; <u>provided</u>, that if the Applicable Margin (as determined as set forth in Annex I attached hereto) exceeds 5.50%, the financial covenant levels will be adjusted as agreed by the Borrowers and the majority of the Joint Lead Arrangers to maintain an appropriate cushion to the Projections. Financial covenants will be tested quarterly.

"<u>Adjusted EBITDA</u>": with respect to any GGP Property (as defined below) or the Parent Guarantors, the Borrowers or the Management Company (as defined on <u>Exhibit C</u> of the Commitment Letter), as the case may be, for any period, an amount equal to the net income (calculated on a GAAP basis and, for the avoidance of doubt, in the case of the Parent Guarantors, the Borrowers or the Management Company, taking into account such Person's corporate overhead) and to be adjusted in a manner to be agreed but to be adjusted in any event to account for the impacts associated with the following: (a) depreciation, (b) amortization, (c) interest expenses and interest income, (d) income taxes, (e) impairment expenses, (f) costs and expenses incurred in connection with any restructurings or reorganizations of such GGP Property or any entity owing a direct or indirect interest therein or the Parent Guarantors, the Borrowers or the Management Company, as the case may be (including in connection with the chapter 11 cases of Existing GGPI and its affiliates and in connection with the transactions contemplated by the Loan Documents, the Cornerstone Agreement and the Plan and hereinafter each a "<u>Restructuring</u>"), <u>provided</u> that cash restructuring charges not associated with the chapter 11 cases and the transactions contemplated by the Loan Documents, the Cornerstone Agreement and the Plan, shall be subject to a cumulative cap of $25,000,000 per annum and $100,000,000 during the term of the Facilities, (g) the costs and expenses of legal settlements, fines, judgments or orders to the extent reimbursed by insurance, (h) non-cash charges (including the effects of purchase accounting) and items related to FAS 141 adjustments, the straight lining of rents, the amortization of non-cash interest expense and the amortization of market rate adjustments on any Permitted Project Level Financing (but excluding non-cash charges that constitute an accrual of or reserve for future cash payments), (i) extraordinary, unusual or non-recurring gains and losses (which losses shall not be duplicative of expense items treated as an add-back above) including those related to (i) the sale of assets, (ii) foreign currency exchange rates, (iii) litigation, (iv) securities available-for-sale (but only where such security gain and loss is unrealized), (v) the early extinguishment or forgiveness of debt and

US_ACTIVE:\43423994\49\47658.0008

(j) such other adjustments reflected in the Projections or as otherwise mutually agreed upon by the parties. Adjusted EBITDA shall be calculated on a pro forma basis for any GGP Property which has been open for business for less than four (4) calendar quarters.

"Combined EBITDA": for any period, the sum of (a) 100% of the Adjusted EBITDA of any GGP Properties owned or leased by the Parent Guarantors, the Borrowers and the Wholly-Owned Subsidiaries of the Borrowers for such period; (b) the portion of the Adjusted EBITDA of the GGP Properties of any consolidated non-Wholly Owned Subsidiaries or joint ventures of the Borrowers or the Parent Guarantors for such period allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly-Owned Subsidiary; and (c) Adjusted EBITDA of the Parent Guarantors, the Borrowers and the Management Company; provided, that Combined EBITDA shall include Adjusted EBITDA allocable to the Management Company only to the extent that Adjusted EBITDA allocable to the Management Company does not exceed 4% of Combined EBITDA.

"Value" is to be defined but will include, without duplication, in addition to other concepts to be agreed, the following concepts, (a) Combined EBITDA of the Parent Guarantors, the Borrowers and any of their Subsidiaries (wholly-owned or otherwise) and joint ventures for the immediately preceding four (4) calendar quarters capped at 7.25% (excluding any GGP Property included on a cost basis pursuant to clause (c) below), (b) fair market value ("fair market value" to be defined but in any event if the New Parent obtains a third party appraisal by an appraiser reasonably acceptable to the Administrative Agent having an effective date no more than 180 days prior to the date of calculation, to be conclusively determined by such appraisal) of development and inactive assets including raw land, vacant outparcels, loans receivable, capital expenditures and the headquarters buildings in Illinois and Maryland and other underutilized assets with de minimis income (at the lesser of cost or fair market value, provided that the headquarters buildings shall be valued at their appraised values); (c) cost basis of new acquisitions of the New Parent, the Borrowers or any of their Subsidiaries (wholly-owned or otherwise) or joint ventures (calculated as (i) 100% for assets owned by the Parent Guarantors, the Borrowers or any Wholly Owned Subsidiary of the Borrowers and (ii) in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary; (d) unrestricted cash and cash equivalents of the Parent Guarantors, the Borrowers and their Subsidiaries and joint ventures (but, in the case of consolidated non-Wholly Owned Subsidiaries and joint ventures of the Parent Guarantors or the Borrowers, only to the extent allocable (based on economic share and not necessarily the percentage ownership) to the

US_ACTIVE:\43423994\49\47658.0008

Parent Guarantors, the Borrowers or their Wholly Owned Subsidiary), in each case as determined in accordance with GAAP, except as otherwise noted above with respect to non-Wholly Owned Subsidiary and joint venture allocations, without duplication; and (e) aggregate sums spent on the construction of improvements (including land acquisition costs) for any asset which is raw land, vacant out-parcels or is the subject of a material construction project but excluding such sums with respect to assets subject to material construction projects, if the New Parent elects to include revenues in Adjusted EBITDA (provided that such costs can be included if the project is a renovation or expansion of an asset that is otherwise complete and operational, the construction will not impair ongoing business and operations and the inclusion of such revenues in Adjusted EBITDA and such aggregate sums in Value is not duplicative).

"GGP Properties" means any asset owned, leased or operated by the Parent Guarantors, the Borrowers or any Subsidiary of the Parent Guarantors or the Borrowers (wholly-owned or otherwise) or joint venture.

If any GGP Property shall be sold or otherwise transferred to a third party by the Parent Guarantors or any of their Subsidiaries or joint ventures prior to the date of calculation of the Maximum Net Indebtedness to Value Ratio and the Maximum Leverage Ratio, such Financial Covenants shall be calculated on a pro forma basis to exclude the effect of such GGP Property and any Indebtedness redeemed, retired, extinguished or repaid in connection therewith.

For purposes of determining compliance with the financial covenants, a cash equity contribution in the New Parent (in the form of a cash contribution or in exchange for Qualified Capital Stock (as defined in Exhibit C to the Commitment Letter)) after the commencement of the applicable fiscal quarter and on or prior to the day that is 10 days after the day on which financial statements are required to be delivered for such fiscal quarter will, at the request of the New Parent, which request will be made at the time of contribution, be included in the calculation of Combined EBITDA for the Maximum Leverage Ratio and Minimum Net Cash Interest Coverage Ratio and as cash and cash equivalents in the definition of Value for purposes of the Maximum Net Indebtedness to Value Ratio, in each case solely for purposes of determining compliance with such Financial Covenants at the end of such fiscal quarter and applicable subsequent periods that include such fiscal quarter (any such equity contribution so included in the calculation of Combined EBITDA or Value, as the case may be, a "Specified Equity Contribution"); provided that (a)(i) in each four fiscal quarter period, there shall be a period of two fiscal quarters in which no Specified Equity Contribution is made, and (ii) only three Specified Equity Contributions may be made during the term of the Facilities, (b) the amount of any Specified Equity Contribution shall be no greater than

the amount required to cause the New Parent to be in compliance with such Financial Covenant(s) and (c) all Specified Equity Contributions will be disregarded for purposes of determining the availability of any baskets with respect to the covenants contained in Loan Documents.

**Events of Default:**

(a)    default in payment of principal when due;

(b)    other payment defaults, with 5-day cure period;

(c)    failure to comply with any covenant or provision under the Loan Documents, subject, in the case of affirmative covenants (other than notice of Default or Event of Default or failure to maintain the corporate existence of any Borrower), to a 30-day cure period after any responsible officer of the New Parent or any Borrower obtains knowledge thereof;

(d)    representations and warranties under the Loan Documents being incorrect in any material respect when made;

(e)    involuntary bankruptcy or other insolvency proceedings with respect to the New Parent, any Borrower or any material[2] Subsidiary of the New Parent (excluding any Subsidiary or Subsidiaries all or substantially all of whose assets comprise Specified Properties or equity of a person all or substantially all of whose assets comprise any Specified Property) which (i) result in an order for relief or any adjudication or appointment against or in respect of such person; or (ii) continue and have not been dismissed, discharged or stayed for a period of 30 days;

(f)    appointment of a receiver or similar official with respect to the New Parent, any Borrower or any material Subsidiary of the New Parent (excluding any Subsidiary or Subsidiaries all or substantially all of whose assets comprise Specified Properties or equity of a person all or substantially all of whose assets comprise any Specified Property), if not removed within 90 days;

(g)    voluntary bankruptcy or other insolvency proceedings with respect to the New Parent, the Borrowers or any material Subsidiary of the New Parent (excluding any Subsidiary or Subsidiaries all or substantially all of whose assets comprise Specified Properties or equity of a person all or substantially all of whose assets comprise any Specified Property);

---

[2] For the purpose of all Events of Default, material Subsidiaries to be defined, but in any case, will exclude Subsidiaries having an aggregate net equity value after the Closing Date of $200,000,000 or less.

US_ACTIVE:\43423994\49\47658.0008

(h)      third-party security realization against property having an aggregate net equity value in an aggregate amount after the Closing Date in excess of $200,000,000, which realization shall continue and not be released, discharged or stayed within the lesser of 30 days and the period of time prescribed under applicable laws for completion of such realization (excluding any Specified Property or equity of a person all or substantially all of whose assets comprise any Specified Property);

(i)      third-party seizure of property having an aggregate net equity value in an aggregate amount after the Closing Date in excess of $200,000,000, which seizure shall continue and not be released, discharged or stayed within the lesser of 30 days and the period of time prescribed under applicable laws for completion of the sale of or realization against the property subject to such seizure (excluding any Specified Property or equity of a person all or substantially all of whose assets comprise any Specified Property);

(j)      final judgments or orders, in an aggregate amount in excess of $50,000,000 in the case of judgments or orders not in respect of Non-Recourse Indebtedness (and in the case of judgments or orders in respect of Non-Recourse Indebtedness (as defined in <u>Exhibit C</u> to the Commitment Letter), with respect to any property having an aggregate net equity value in an amount after the Closing Date in excess of $200,000,000) in each case, excluding judgments solely relating to any Specified Property or any Subsidiary or Subsidiaries all or substantially all of whose assets comprise Special Consideration Properties or equity of a person all or substantially all of whose assets comprise any Specified Property, which have not been discharged, stayed or bonded pending appeal within 60 days;

(k)      payment cross-default: failure to pay Indebtedness when due (i) in the case of Recourse Indebtedness, in an aggregate amount in excess of $50,000,000 and (ii) in the case of Non-Recourse Indebtedness, involving properties of entities having an aggregate net equity value in an amount after the Closing Date in excess of $200,000,000 (in each case, excluding such defaults solely relating to any Specified Property or any Subsidiary or Subsidiaries all or substantially all of whose assets comprise Special Consideration Properties or equity of a person all or substantially all of whose assets comprise any Specified Property);

(l)      event cross-default: an event of default or equivalent condition under other Indebtedness (i) in the case of Recourse Indebtedness, where such Indebtedness is in an

US_ACTIVE:\43423994\49\47658.0008

aggregate amount in excess of $50,000,000 and (ii) in the case of Non-Recourse Indebtedness, involving properties of entities having an aggregate net equity value in an amount after the Closing Date in excess of $200,000,000 (in each case, excluding such events of default or equivalent conditions solely relating to any Specified Property or any Subsidiary or Subsidiaries all or substantially all of whose assets comprise Special Consideration Properties or equity of a person all or substantially all of whose assets comprise any Specified Property);

(m)     Change of Control (as defined on Exhibit C to the Commitment Letter;

(n)     if Collateral having a net equity value in excess of $25,000,000 ceases to be subject to a valid first priority security interest in favor of the Administrative Agent on behalf of the Lenders (subject to Permitted Liens), except to the extent (x) any such loss of perfection or priority results from the act or omission of the Administrative Agent, (y) such loss is covered by a lender's title insurance policy as to which the insurer has been notified of such loss and does not deny coverage or (z) such loss of perfected security interest may be remedied by the filing of appropriate documentation without the loss of priority (other than non consensual Permitted Liens);

(o)     if any Loan Document ceases to be valid, without immediate replacement, or if any of the same shall be challenged or repudiated by any Loan Party or any Subsidiary thereof in writing; or

(p)     an event occurs under applicable pension and ERISA laws, which could reasonably be expected to have a Material Adverse Effect.

The foregoing events are referred to as "Events of Default".

"Default" means any event which, with notice or lapse of time or both, shall be become an Event of Default.

**Voting:**     Amendments and waivers of the Loan Documents will require the approval of Lenders holding more than 50% of the aggregate amount of the Term Loans and Revolving Commitments (the "Required Lenders"), except that (a) the consent of each Lender directly and adversely affected thereby (but not the Required Lenders in the case of clauses (i) and (iii) below) shall be required with respect to (i) reductions in the principal amount of any Loan or fee, or extension of the scheduled date of any amortization payment owed to such Lender, (ii) extensions of the final maturity of any Loan owed to such Lender, (iii) reductions in the rate of interest (other

US_ACTIVE:\43423994\49\47658.0008

than a waiver of default interest) owed to such Lender and (iv) increases in the amount or extensions of the expiry date of such Lender's commitment (it being understood that a waiver of any condition precedent or the waiver of any default or mandatory prepayment shall not constitute an extension or increase of any commitment of any Lender) and (b) the consent of all Lenders directly and adversely affected shall be required with respect to (i) reductions of any of the voting percentages set forth in the definition of "Required Lenders" or any similar defined term, (ii) modifications to provisions requiring pro rata payments or sharing of payments (except with respect to the transactions described in the second following paragraph), (iii) releases of all or substantially all the Collateral, (iv) releases of all or substantially all of the value of the Guarantees and (v) assignment by any Borrower of its rights and obligations under the Loan Documents (other than, in the cases of clauses (iii), (iv) and (v), in accordance with the Loan Documents).

Notwithstanding the foregoing, the consent of the Lenders holding Term Loans shall not be required for the Replacement Revolver.

Modifications to provisions requiring pro rata payments, distributions or commitment reductions or sharing of payments in connection with (a) loan buy back or similar programs (b) "amend and extend" transactions or (c) adding one or more tranches (which may, but are not required to be new money tranches) of debt and the like as permitted by the Loan Documents shall only require approval of the Required Lenders, provided that all approving Lenders in respect of any Facility shall be treated on a pro rata basis with respect to such Facility; and shall otherwise be on customary terms.

The Loan Documents shall contain provisions allowing the Borrowers to replace the commitment and/or Loans of a Lender at par under the relevant Facilities (as the Borrowers shall elect) in connection with amendments and waivers requiring the consent of all Lenders or of all Lenders directly affected thereby (so long as the Required Lenders consent), increased costs, taxes, etc. and Defaulting Lenders (as defined below).

**Assignments and Participations:**

The Lenders shall be permitted to assign all or a portion of their Loans and commitments to eligible assignees (other than to any Disqualified Institution) with the consent of (a) the Borrowers (not to be unreasonably withheld), unless a payment or bankruptcy (with respect to any Borrower) Event of Default has occurred and is continuing or such assignment is to a Lender (if in respect of the Revolver, to another Lender under the Revolver) or an affiliate of a Lender or an Approved Fund (as defined below), (b) the Administrative Agent, and (c) any Issuing Lender unless in the case of this clause (c), a Term Loan is being assigned.  Non-pro rata assignments shall be permitted. In the case of partial assignments (other than to another Lender, an affiliate of a Lender or an

Exhibit A
Page 31

Approved Fund), the minimum assignment amount shall be $1,000,000 in the case of the Term Loans and $5,000,000 in the case of the Revolver, in each case unless otherwise agreed by the Borrowers and the Administrative Agent.  The assigning Lender shall pay the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) in connection with all assignments.  The Lenders will have the right to participate their commitments and Loans to other Persons (other than any Disqualified Institutions) without the consent of the Borrowers, the Administrative Agent or the Issuing Lenders.  Participants shall have the same benefits as the Lenders with respect to yield protection and increased cost provisions subject to customary limitations and restrictions.  Voting rights of participants shall be limited to those matters set forth in clauses (a) and (b) under "Voting" with respect to which the affirmative vote of the Lender from which it purchased its participation would be required.  Pledges of and repurchase agreements in respect of Loans in accordance with applicable law shall be permitted to Persons other than Disqualified Institutions without restriction.

"Approved Fund" means, with respect to any Lender, any person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and is administered, advised or managed by (a) such Lender, (b) an affiliate of such Lender or (c) an entity or an affiliate of any entity that administers, advises or manages such Lender.

**Defaulting Lenders:**    The Loan Documents shall also contain customary limitations on Defaulting Lenders including non-payment/escrow of all amounts owed to the Defaulting Lender to be held as security and exclusion for purposes of Required Lender votes and the calculation of Required Lenders.

"Defaulting Lender" means a Lender that has (a) failed to fund any portion of the Loans, or participations in Letter of Credit or Swingline Loan exposure required to be funded by it on the date required, (b) otherwise failed to pay the Administrative Agent or any other Lender any other amount required to be paid under the Loan Documents on the date when due unless the subject of a good faith dispute, (c) notified the Administrative Agent or the Borrowers that it does not intend to comply with any of its obligations under the Loan Documents, (d) failed, within three (3) business days after request by the Administrative Agent, to affirm its willingness to comply with its funding obligations under the Loan Documents or (e) become, or whose direct or indirect parent has become, insolvent or is the subject of a receivership, bankruptcy or other insolvency proceeding.

US_ACTIVE:\43423994\49\47658.0008

When any Lender is a Defaulting Lender, the Issuing Lenders shall have no obligation to issue a Letter of Credit and the Swingline Lender shall have no obligation to fund a Swingline Loan unless, after giving effect to the reallocation of the Letter of Credit or Swingline Loan exposure, as the case may be, to the other Lenders with Commitments, the Borrowers or such Defaulting Lender provides cash collateral or other security or support for such Defaulting Lender's pro rata share of the Issuing Lender's or Swingline Lender's, as the case may be, fronting risk.

**Agency:**

Usual and customary for facilities of this type; provided, that any substitution of the Administrative Agent shall require the consent of the Borrowers, not to be unreasonably withheld, unless a bankruptcy Event of Default then exists.

**Yield Protection; Taxes; Indemnification; Expenses:**

Usual and customary for facilities of this type giving effect to the Documentation Considerations.

**Governing Law and Jurisdiction:**

New York law will govern the Loan Documents, except with respect to certain security documents where applicable local law is necessary for enforceability or perfection. The Facilities will provide that the Loan Parties will submit to the exclusive jurisdiction and venue of the federal and state courts of the State of New York (except to the extent the Administrative Agent requires submission to any other jurisdiction in connection with the exercise of any rights under any security document or the enforcement of any judgment) and the parties will waive any right to trial by jury.

**Counsel:**

Latham & Watkins LLP

US_ACTIVE:\43423994\49\47658.0008

# ANNEX I

## INTEREST RATES AND FEES

**Applicable Margin:**

The Borrowers may elect that the Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR (as defined below) plus the Applicable Margin or (b) LIBOR (as defined below) plus the Applicable Margin; provided that all Swingline Loans shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

The Applicable Margin shall be determined by reference to the corporate family rating assigned to the Partnership by each of Moody's and S&P prior to the Closing Date as set forth on the following table (it being understood that in the event the corporate family ratings assigned by Moody's and S&P, respectively, correspond to different percentages on the following table, Applicable Margin shall be determined by reference to the lower of the two ratings):

| Corporate Family Rating | Applicable Margin |
|---|---|
| ≥ Ba3 / BB- | 4.50% |
| B1 / B+ | 5.00% |
| B2 / B | 5.50% |
| ≤ B3 / B- | 6.25% |

"LIBOR" means (a) in the case of the Revolver, the rate reasonably determined by the Administrative Agent in the London interbank market for deposits in U.S. Dollars in the amount of, and for a maturity corresponding to, the amount of the applicable LIBOR advance, as adjusted for maximum statutory reserves and (b) in the case of the Term Loans, the higher of (i) 1.75% per annum and (ii) the rate set forth in clause (a) above.

"ABR" means the highest of (a) the rate of interest publicly announced by the Administrative Agent as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (b) the federal funds effective rate from time to time plus 0.50% per annum and (c) in the case of the Term Loans, 2.75% per annum.

The Borrowers may select interest periods of one, two, three, six or (if agreed to by all Lenders) nine months for LIBOR borrowings.

Interest on LIBOR-based Loans shall be calculated on the basis of the actual number of days elapsed over a year of 360 days and interest on ABR-based Loans shall be calculated on the basis of the actual number of days elapsed over a year of 365 or 366 days, as

applicable.

**Revolver Unused Fee:** 0.50% with a step-down to 0.375% if the aggregate outstanding usage under the Revolver (i.e. Revolving Loans, Letters of Credit and Swingline Loans) exceeds 50% of the Revolving Commitments.

**Default Rate:** Upon and during the continuance of a payment event of default with respect to any principal or interest under the Facilities, such overdue amounts shall bear interest at the applicable interest rate plus 2.00% per annum or, in the event there is no applicable interest rate, the interest rate applicable to ABR advances plus 2.00% per annum.

## <u>ANNEX II</u>

## <u>GUARANTORS</u>

See attached

# Combined Facilities Guarantor List[*]

| No. | Pledgors (noted in red on Organizational Chart) |
|-----|--------------------------------------------------|
| 1.  | GGPLPLLC 2010 Loan Pledgor Holding, LLC |
| 2.  | GGPLP 2010 Loan Pledgor Holding, LLC |
| 3.  | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC |
|     |  |
|     | **Mortgagors (noted in orange on Organizational Chart)** |
| 1.  | Apache Mall, LLC |
| 2.  | Bailey Hills Village Center, LLC |
| 3.  | Chula Vista Center, LLC |
| 4.  | Benson Park Business Trust |
| 5.  | 10 CCC Business Trust |
| 6.  | 20 CCC Business Trust |
| 7.  | 30 CCC Business Trust |
| 8.  | Forty Columbia Corporate Center, LLC |
| 9.  | Fifty Columbia Corporate Center, LLC |
| 10. | Sixty Columbia Corporate Center, LLC |
| 11. | Running Brook Business Trust |
| 12. | CCC Borrower, LLC |
| 13. | St. Cloud Land L.L.C. |
| 14. | Fremont Plaza L.L.C. |
| 15. | BR STCR, LLC |
| 16. | Mall of Louisiana Land, LLC |
| 17. | The Rouse Company of Florida, LLC |
| 18. | GGP Savannah L.L.C. |
| 19. | Pines Mall, LLC |
| 20. | Plaza 800 L.L.C. |
| 21. | Plaza 9400, LLC |
| 22. | Provo Development Land, LLC |
| 23. | Red Cliffs Plaza, LLC |
| 24. | River Falls Mall, LLC |
| 25. | Riverlands Shopping Center, LLC |
| 26. | GGP-Grandville Land L.L.C. |
| 27. | South Shore Mall, LLC |
| 28. | 10000 Covington Cross, LLC |
| 29. | 10190 Covington Cross, LLC |
| 30. | 9901-9921 Covington Cross, LLC |
| 31. | 9950-9980 Covington Cross, LLC |
| 32. | 1201-1281 Town Center Drive, LLC |
| 33. | 1551 Hillshire Drive, LLC |
| 34. | 1635 Village Centre Circle, LLC |

[*] Subject to revisions and modifications that are approved by a majority of the Joint Lead Arrangers

| | |
|-----|------------------------------------|
| 35. | 1645 Village Center Circle, LLC    |
| 36. | 1450 Center Crossing Drive, LLC    |
| 37. | 1451 Center Crossing Drive, LLC    |
| 38. | Canyon Pointe Village Center, LLC  |
| 39. | GGP-Tucson Land L.L.C.             |
| 40. | Vista Commons, LLC                 |
| 41. | Yellowstone Square, LLC            |

# <u>ANNEX III</u>

# <u>COLLATERAL</u>

See attached

| Property | City | State | Pledge Feasibility A=Pledgable B=Pledgable, provided Affiliate Pledgor has sufficient bulk C=Pledgable, Not Fully Foreclosable | Pledgor | % | Additional Pledgor | % |
|---|---|---|---|---|---|---|---|
| **Mortgage** | | | | | | | |
| Apache Mall | Rochester | MN | | | | | |
| Chula Vista | Chula Vista | CA | | | | | |
| Mall of Louisiana Power Center | Baton Rouge | LA | | | | | |
| Columbia Corporate Center Offices (Thirty Columbia Corporate Center) | Columbia | MD | | | | | |
| Columbia Corporate Center Offices (Forty Columbia Corporate Center) | Columbia | MD | | | | | |
| Vista Commons | Las Vegas | NV | | | | | |
| Columbia Corporate Center Offices (Fifty Columbia Corporate Center, including Columbia Bank Drive Thru) | Columbia | MD | | | | | |
| Columbia Corporate Center Offices (Sixty Columbia Corporate Center) | Columbia | MD | | | | | |
| River Falls | Clarksville | IN | | | | | |
| Columbia Corporate Center Offices (Ten Columbia Corporate Center) | Columbia | MD | | | | | |
| Columbia Corporate Center Offices (Twenty Columbia Corporate Center) | Columbia | MD | | | | | |
| The Crossing Business Center (1201-1281 Town Center Drive) | Las Vegas | NV | | | | | |
| The Crossing Business Center (10190 Covington Cross) | Las Vegas | NV | | | | | |
| The Crossing Business Center #7, 1451 Center Crossing Drive | Las Vegas | NV | | | | | |
| The Crossing Business Center (10000 Covington Cross) | Las Vegas | NV | | | | | |
| Canyon Point | Las Vegas | NV | | | | | |
| Riverlands Shopping Center | Laplace | LA | | | | | |
| Hillshire Drive Property, 1551 Hillshire Drive (AKA HHP Government Services / DOE Building) | Las Vegas | NV | | | | | |
| The Crossing Business Center (1645 Village Center) | Las Vegas | NV | | | | | |
| The Crossing Business Center (9950-9980 Covington Cross) | Las Vegas | NV | | | | | |
| The Crossing Business Center (9901-9921 Covington Cross) | Las Vegas | NV | | | | | |
| Plaza 9400 | Sandy | UT | | | | | |
| The Crossing Business Center (1635 Village Center) | Las Vegas | NV | | | | | |
| The Pines Mall | Pine Bluff | AR | | | | | |
| The Crossing Business Center #6, 1450 Center Crossing Drive | Las Vegas | NV | | | | | |
| Tucson Entertainment Pavilion, 4646 N. Oracle Road, Tucson, AZ | Tucson | AZ | | | | | |
| 4848 Parcel, 4848 Oracle Road | Tucson | AZ | | | | | |
| Yellowstone Square | Idaho Falls | ID | | | | | |
| Red Cliffs Plaza | St. George | UT | | | | | |
| PTC Motel Land | Provo | UT | | | | | |
| South Shore Mall | Aberdeen | WA | | | | | |
| Bailey Hills Village | Eugene | OR | | | | | |
| Neighborhood Stores | Columbia | MD | | | | | |
| Fremont Plaza | Las Vegas | NV | | | | | |
| Benson Business Park (TGI Fridays) | Columbia | MD | | | | | |

| Property | City | State | Pledge Feasibility A=Pledgable B=Pledgable, provided Affiliate Pledgor has sufficient bulk C=Pledgable, Not Fully Foreclosable | Pledgor | % | Additional Pledgor | % |
|---|---|---|---|---|---|---|---|
| Oglethorpe Residential Properties, 42 Fairmont Avenue, 44 Fairmont Avenue, 48 Fairmont Avenue, 50 Fairmont Avenue, 52 Fairmont Avenue, 104 Fairmont Avenue, 106 Fairmont Avenue, 110 Fairmont Avenue, 112 Fairmont Avenue and 114 Fairmont Avenue | Savannah | GA | | | | | |
| Potomac Place (f/k/a Rivertown Crossings undeveloped land) | Grandville | MI | | | | | |
| Merrick Park Hotel & Thompson Parcels | Coral Gables | FL | | | | | |
| Crossroads Residential | St. Cloud | MN | | | | | |
| Baskin Robbins | Idaho Falls | ID | | | | | |
| Plaza 800 | Sparks | NV | | | | | |

| Pledge | | | | | | | |
|---|---|---|---|---|---|---|---|
| Ala Moana Center | Honolulu | HI | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Animas Valley Mall | Farmington | NM | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Baybrook Mall | Houston | TX | C | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Bayside Marketplace | Miami | FL | C | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Birchwood Mall | Port Hur | MI | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Boise Towne Square | Boise | ID | C | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Brass Mill Center & Commons | Waterbury | CT | C | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Cache Valley Mall & Marketplace | Logan | UT | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Coastland Center | Naples | FL | C | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Colony Square Mall | Zanesville | OH | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Columbiana Centre | Columbia | SC | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Coral Ridge Mall | Coralville | IA | C | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Coronado Center | Albuquerque | NM | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Deerbrook Mall | Humble | TX | B, C | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Eden Prairie Center | Eden Prairie | MN | B, C | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Fallbrook Center | West Hills | CA | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Faneuil Hall Marketplace | Boston | MA | C | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Fashion Place | Murray | UT | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Fashion Show Mall | Las Vegas | NV | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 0.0700% | GGPLP 2010 Loan Pledgor Holding, LLC | 99.9300% |
| Foothills Mall | Fort Collins | CO | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Four Seasons Town Centre | Greensboro | NC | C | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Fox River Mall | Appleton | WI | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Gateway Overlook (Leasehold) | Columbia | MD | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Governor's Square Mall | Tallahassee | FL | C | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Grand Teton Mall & Plaza | Idaho Falls | ID | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Greenwood Mall | Bowling Green | KY | C | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Harborplace | Baltimore | MD | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Hulen Mall | Ft. Worth | TX | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Jordan Creek Town Center & Village at Jordan Creek | West Des Moines | IA | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Lakeside Mall | Sterling Heights | MI | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 93.1100% | GGPLP 2010 Loan Pledgor Holding, LLC | 6.8900% |
| Mall of Louisiana | Baton Rouge | LA | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 99.0025% | | |
| Mall of the Bluffs | Council Bluffs | IA | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Mall St. Matthews | Louisville | KY | B | GGPLP 2010 Loan Pledgor Holding, LLC | 50.0000% | | |
| Market Place | Champaign | IL | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Mayfair Mall | Wauwatosa | WI | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Mondawmin Mall | Baltimore | MD | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| NewPark Mall | Newark | CA | A | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| North Plains Mall | Clovis | NM | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| North Point Mall | Alpharetta | GA | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| North Star Mall | San Antonio | TX | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 1.1200% | GGPLP 2010 Loan Pledgor Holding, LLC | 98.8800% |

| Property | City | State | Pledge Feasibility<br>A=Pledgable<br>B=Pledgable, provided Affiliate Pledgor has sufficient bulk<br>C=Pledgable, Not Fully Foreclosable | Pledgor | % | Additional Pledgor | % |
|---|---|---|---|---|---|---|---|
| NorthTown Mall | Spokane | WA | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Oak View Mall | Omaha | NE | C | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Oakwood Mall | Eau Claire | WI | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Oglethorpe Mall | Savannah | GA | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Owings Mills Mall | Owings Mills | MD | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Paramus Park | Paramus | NJ | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Peachtree Mall | Columbus | GA | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Pecanland Mall | Monroe | LA | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Pierre Bossier Mall | Bossier City | LA | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Pioneer Place | Portland | OR | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 0.000495% | GGPLP 2010 Loan Pledgor Holding, LLC | 99.999505% |
| Prince Kuhio Plaza | Hilo | HI | C | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 1.0000% | GGPLP 2010 Loan Pledgor Holding, LLC | 99.0000% |
| Providence Place | Providence | RI | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| River Hills Mall | Mankato | MN | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Rogue Valley Mall | Medford | OR | A | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Saint Louis Galleria | St. Louis | MO | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Salem Center | Salem | OR | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Silver Lake Mall | Coeur D'Alene | ID | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Sooner Fashion Mall | Norman | OK | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Southland Mall | Hayward | CA | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 0.5000% | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 99.5000% |
| Southwest Plaza | Littleton | CO | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Spring Hill Mall | West Dundee | IL | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Stonestown | San Francisco | CA | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| The Crossroads Mall | Portage | MI | A | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| The Grand Canal Shoppes at the Venetian | Las Vegas | NV | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| The Maine Mall | South Portland | ME | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| The Mall at Sierra Vista | Sierra Vista | AZ | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| The Mall in Columbia | Columbia | MD | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| The Parks at Arlington | Arlington | TX | C | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| The Shops at Fallen Timbers | Maumee | OH | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| The Woodlands Mall | The Woodlands | TX | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Tysons Galleria | Mclean | VA | B | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Westwood Mall | Jackson | MI | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| White Marsh Mall | Baltimore | MD | C | GGPLP Real Estate 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| White Mountain Mall | Rock Springs | WY | B | GGPLPLLC 2010 Loan Pledgor Holding, LLC | 100.0000% | | |
| Woodbridge Center | Woodbridge | NJ | B | GGPLP 2010 Loan Pledgor Holding, LLC | 100.0000% | | |

* Subject to revisions and modifications that are approved by a majority of the Joint Lead Arrangers

## <u>ANNEX IV</u>

## <u>SPECIAL CONSIDERATION PROPERTIES</u>

Piedmont
Bay City
Eagle Ridge
Lakeview Square
Montclair
Moreno Valley
Oviedo
Country Hills
Silver City
Chapel Hills
Chico
Mall St. Vincent
Northgate
Southland, MI
Grand Traverse
70 Columbia Corporate Center

## <u>ANNEX V</u>

## <u>FINANCIAL COVENANTS</u>

See attached

# EBITDA Covenant Analysis

| | EBITDA COVENANT ANALYSIS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | (Dollars in Millions) | | | | | | | | | |
| | | | 2011 F | | 2012 F | | 2013 F | | 2014 F | 2015 F |
| ( A ) | **EBITDA** | $ | **2,242** | $ | **2,393** | $ | **2,473** | $ | **2,627** | $ **2,788** |
| ( A1 ) | **EBITDA adjusted to remove 2012 Asset Sales EBITDA** | $ | **2,242** | $ | **2,321** | $ | **2,473** | $ | **2,627** | $ **2,788** |
| ( B ) | **Value - (EBITDA / 7.25%)** | $ | **30,921** | $ | **32,010** | $ | **34,108** | $ | **36,238** | $ **38,452** |
| ( C ) | **Total Debt** | $ | **19,762** | $ | **18,600** | $ | **17,907** | $ | **17,456** | $ **17,011** |
| ( D ) | **Cash Interest** | $ | **1,116** | $ | **1,096** | $ | **1,048** | $ | **1,052** | $ **1,050** |
| ( E ) | **Ending Cash** | $ | **512** | $ | **903** | $ | **798** | $ | **1,154** | $ **1,600** |
| ( F ) | **Net Debt** | $ | **19,249** | $ | **17,698** | $ | **17,110** | $ | **16,303** | $ **15,411** |
| (F / B) | **NET INDEBTEDNESS TO VALUE RATIO** | | **0.62** | | **0.55** | | **0.50** | | **0.45** | **0.40** |
| | **Proposed Covenant** | | **0.725** | | **0.675** | | **0.650** | | **0.625** | **0.600** |
| | **Implied Cushion** | | **16.5%** | | **22.1%** | | **29.6%** | | **38.9%** | **49.7%** |
| (F / A1) | **LEVERAGE RATIO** | | **8.59** | | **7.63** | | **6.92** | | **6.21** | **5.53** |
| | **Proposed Covenant** | | **9.875** | | **9.00** | | **8.25** | | **8.00** | **8.00** |
| | **Implied Cushion** | | **15.0%** | | **18.0%** | | **19.2%** | | **28.9%** | **44.7%** |
| (A / D) | **NET CASH INTEREST COVERAGE RATIO** | | **2.01** | | **2.18** | | **2.36** | | **2.50** | **2.65** |
| | **Proposed Covenant** | | **1.50** | | **1.65** | | **1.75** | | **1.75** | **1.75** |
| | **Implied Cushion** | | **25.3%** | | **24.4%** | | **25.8%** | | **29.9%** | **34.1%** |

## EXHIBIT B

## CONDITIONS TO CLOSING

1.      Each Loan Party shall have executed and delivered the Loan Documents and the Administrative Agent shall have received customary closing certificates and deliverables (including (a) to the extent requested, currently existing Phase I environmental reports in respect of all Mortgaged Properties, (b) existing surveys in respect of the Mortgaged Properties, (c) title reports with respect to the Mortgaged Properties, (d) organizational documents, resolutions, good standing certificates and incumbency certificates of each Loan Party, (e) a certificate of the chief financial officer of the New Parent as to the consolidated solvency of (i) the New Parent and its Subsidiaries, taken as a whole, and (ii) the Borrowers and the Loan Parties, taken as a whole, (f) customary insurance certificates naming the Administrative Agent as loss payee or additional insured (as the case may be) and (g) customary opinions of in-house and outside counsel).

2.      The Bankruptcy Court shall have entered an order (the "Confirmation Order") confirming the Plan in accordance with section 1129 of the Bankruptcy Code, which Plan shall not have been modified or amended in any manner materially adverse to the interests of the Administrative Agent and the Lenders, taken as a whole, from the plan of reorganization and any amendments, modifications or supplements thereto, in each case, filed with the Bankruptcy Court on the date of the Commitment Letter (collectively, the "Plan"), the Confirmation Order shall be in full force and effect (without waiver of the 14 day period set forth in Bankruptcy Rule 3020(e)) as of the Closing Date and shall not be subject to a stay of effectiveness. The time to appeal, petition for certiorari or move for reargument or rehearing of the Confirmation Order shall have expired and no appeal, petition for certiorari or other proceedings for reargument or rehearing shall be pending. If an appeal, writ of certiorari, reargument or rehearing of the Confirmation Order has been sought, the Confirmation Order shall have been affirmed by the highest court to which it has been appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification thereof materially adverse to the interest of the Administrative Agent and the Lenders, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired. The effective date of the Plan shall have occurred or shall occur substantially simultaneously with the Closing Date and substantial consummation of the Plan shall have occurred or shall be scheduled to occur but for the funding of the Loans and the use of proceeds thereof. The Closing (as defined in that certain Amended and Restated Cornerstone Investment Agreement effective as of March 31, 2010, between Existing GGPI and REP Investments LLC (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Cornerstone Agreement")) shall occur concurrently with the initial funding of the Loans and no provision of the Cornerstone Agreement shall have been amended or waived in any respect materially adverse to the Lenders without the prior or concurrent written consent of the Joint Lead Arrangers, such consent not to be unreasonably withheld.

3.      The Administrative Agent shall have received unaudited consolidated balance sheets and related statements of income and cash flows of Existing GGPI for each fiscal quarter of 2010 ended more than 60 days prior to the Closing Date.

US_ACTIVE:\43423994\49\47658.0008

4.      To the extent any indebtedness remains outstanding (whether by reinstatement, amendment, consent or otherwise) pursuant to the Plan, no term (as reinstated, amended or otherwise existing) of any such indebtedness shall prohibit or otherwise restrict the Facilities, the transactions contemplated in connection therewith or the security interests granted thereunder.

5.      The Borrowers and each Guarantor shall have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; provided that such information shall have been requested at least ten (10) days prior to the Closing Date.

6.      The Lenders, the Administrative Agent and the Joint Lead Arrangers shall have received all fees due as of the Closing Date under the Loan Documents and the Fee Letter, and all expenses required to be paid under the Loan Documents and the Fee Letter for which invoices have been presented at least three (3) business days prior to the Closing Date.

7.      The Administrative Agent shall have received the results of a recent UCC Lien search in each relevant jurisdiction with respect to each of the Loan Parties, and such search results shall reveal no Liens on any of the assets of the Loan Parties, except for Liens permitted by the Plan, or the Loan Documents or Liens to be discharged on or prior to the Closing Date.

8.      All documents and instruments required to perfect the Administrative Agent's first priority security interests in the Collateral to the extent required by the Loan Documents shall have been executed by the applicable Loan Parties (if necessary) and delivered to the Administrative Agent.

9.      The Partnership shall have received corporate family ratings from S&P and Moody's.

10.     The Conditions set forth under "Conditions to each Loan and Issuance each Letter of Credit" herein shall be satisfied.

11.     No Material Adverse Effect (as defined in the Cornerstone Agreement) shall have occurred.

US_ACTIVE:\43423994\49\47658.0008

<u>**EXHIBIT C**</u>

<u>**CERTAIN DEFINITIONS**</u>

"<u>Capital Stock</u>" means any and all capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"<u>Capital Lease</u>" means any lease of any property (whether real, personal or mixed) by a Person as lessee which, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of that Person; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, in no event will any lease that would have been categorized as an operating lease in accordance with GAAP as of the Closing Date be considered to be a Capital Lease for any purpose under this Agreement.

"<u>Capital Lease Obligations</u>" means, with respect to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as Capital Leases on a balance sheet of such Person under GAAP; and, for the purposes of the Loan Documents, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"<u>Change of Control</u>" means the failure of the New Parent to be, or to have Control of, the general partner of the Partnership.

"<u>Contingent Obligations</u>" means, as to any Person, without duplication, (a) any contingent obligation of such Person required to be included in such Person's balance sheet in accordance with GAAP, and (b) any obligation required to be included in the disclosure contained in the footnotes to such Person's financial statements in accordance with GAAP, guaranteeing partially or in whole any Non-Recourse Indebtedness, lease, dividend or other obligation, exclusive of (i) contractual indemnities (including, without limitation, any indemnity or price-adjustment provision relating to the purchase or sale of securities or other assets) and (ii) guarantees of non-monetary obligations (other than guarantees of completion), in each case under <u>clauses (i)</u> and <u>(ii)</u> which have not yet been called on or quantified, of such Person or of any other Person. The amount of any Contingent Obligation described in <u>clause (b)</u> above in this definition shall be deemed to be (A) with respect to a guaranty of interest, interest and principal, or operating income, the sum of all payments required to be made thereunder (which in the case of an operating income guaranty shall be deemed to be equal to the debt service for the note secured thereby), calculated at the interest rate applicable to such Indebtedness, through (x) in the case of an interest or interest and principal guaranty, the stated date of maturity of the obligation (and commencing on the date interest could first be payable thereunder), or (y) in the case of an operating income guaranty, the date through which such guaranty will remain in effect, and (B) with respect to all guarantees not covered by the preceding <u>clause (A)</u> an amount equal to the stated or determinable amount of the primary obligation in respect of which such guaranty is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as recorded on the balance sheet and in the footnotes to the most recent financial statements required to be delivered pursuant to the affirmative covenant for delivery of annual or quarterly financial statements. Notwithstanding anything contained herein to the contrary, guarantees of completion or other performance shall not be deemed to be Contingent Obligations unless and until a claim for

Exhibit C
Page 1

US_ACTIVE:\43423994\49\47658.0008

payment has been made thereunder, at which time any such guaranty of completion or other performance shall be deemed to be a Contingent Obligation in an amount equal to any such claim. Subject to the preceding sentence, (a) in the case of a joint and several guaranty given by such Person and another Person (but only to the extent such guaranty is Recourse Indebtedness, directly or indirectly to such Person or any of its Subsidiaries), the amount of the guaranty shall be deemed to be 100% thereof unless and only to the extent that (i) such other Person has delivered cash or cash equivalents to secure all or any part of such Person's obligations under such joint and several guaranty or (ii) such other Person holds an Investment Grade Credit Rating from any of Fitch, Moody's or S&P, or has creditworthiness otherwise reasonably acceptable to the Administrative Agent, and (b) in the case of a guaranty (whether or not joint and several) of an obligation otherwise constituting Indebtedness of such Person, the amount of such guaranty shall be deemed to be only that amount in excess of the amount of the obligation constituting Indebtedness of such Person. Notwithstanding anything contained herein to the contrary, "Contingent Obligations" shall not be deemed to include guarantees of loan commitments or of construction loans to the extent the same have not been drawn.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person.

"Disqualified Capital Stock" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Capital Stock which is not Disqualified Capital Stock) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (in each case, other than solely as a result of a change of control or asset sale), in whole or in part, in each case prior to the date 91 days after the Maturity Date; provided, however, that if such Capital Stock is issued to any plan for the benefit of employees of the New Parent or its direct or indirect Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased in order to satisfy applicable statutory or regulatory obligations.

"Fitch" means Fitch, Inc.

"FFO" means net income, excluding gains (or losses) from debt restructuring and sales of property, plus depreciation and amortization, and after adjustments for unconsolidated partnerships and joint ventures (which will be calculated to reflect funds from operations on the same basis), as determined and adjusted in accordance with the standards established from time to time by the National Association of Real Estate Investment Trusts.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time.[3]

---

[3] The Loan Documents will provide that, in the event of any change to GAAP, and upon the election of the Borrowers or the Administrative Agent acting at the direction of the Required Lenders, the Loan Parties' compliance with the covenants set forth in the Loan Documents will be determined using GAAP as in effect immediately prior to such change.

Exhibit C
Page 2

"Governmental Authority" means any nation or government, any state or other political subdivision thereof and any entity of competent authority and jurisdiction exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government.

"Hedge Agreement" means all interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by the Borrowers or any of their Subsidiaries providing for protection against fluctuations in interest rates, currency exchange rates, commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies.

"Indebtedness" means, with respect to any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables and accrued expenses incurred in the ordinary course of such Person's business) and only to the extent such obligations constitute indebtedness for purposes of GAAP, (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities, (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Disqualified Capital Stock of such Person (other than (i) obligations existing on the Closing Date that any direct or indirect parent of such Person has the right to satisfy by delivery of its Capital Stock, (ii) obligations that any direct or indirect parent of such Person is given the right to satisfy by delivery of its Capital Stock and (iii) obligations to redeem trust preferred securities), (h) all Contingent Obligations of such Person in respect of the foregoing items (a) through (g), (i) all obligations of the kind referred to in clause (a) through (h) above secured by any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, (j) for the purposes of clause (k) and (l) of Events of Default only, the net obligations of such Person in respect of Hedge Agreements. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor. The amount of any Indebtedness under clause (i) above shall be limited to lesser of the amount of such Indebtedness or the fair market value of the assets securing such Indebtedness, as reasonably determined by the Borrowers.

"Investment Grade Credit Rating" means (i) with respect to Fitch, a credit rating of BBB- or higher, (ii) with respect to Moody's, a credit rating of Baa3 or higher and (iii) with respect to S&P, a credit rating of BBB- or higher.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement in respect of the property of a Person, in each case, in the nature of security (including, without limitation, any conditional sale or other title retention agreement and any Capital Lease having substantially the same economic effect as any of the foregoing).

Exhibit C
Page 3

US_ACTIVE:\43423994\49\47658.0008

"Limited Minority Holdings" means non-Wholly Owned Subsidiaries or joint ventures in which (i) the New Parent and its Wholly Owned Subsidiaries have a less than 50% ownership interest and (ii) the New Parent and its Wholly Owned Subsidiaries do not control the day-to-day management of such non-Wholly Owned Subsidiary or joint venture, whether as the general partner or managing member of such non-Wholly Owned Subsidiary or joint venture, or otherwise. As used in this definition, Holdings and any Wholly Owned Subsidiaries shall be deemed to "control" the management of such non-Wholly Owned Subsidiary or joint venture if it has the authority to manage day-to-day operations of such Person.

"Management Company" means General Growth Management, Inc., a Delaware corporation, and its affiliates, and any of its successors and assigns that are affiliates of the New Parent.

"Moody's" means Moody's Investor Services, Inc.

"Non-Recourse Indebtedness" means Indebtedness which is not Recourse Indebtedness.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Qualified Capital Stock" means Capital Stock, which is not Disqualified Capital Stock.

"Recourse Indebtedness" means any Indebtedness, to the extent that recourse of the applicable lender for non-payment is not limited to such lender's Liens on a particular asset or group of assets.

"Recourse Secured Mortgage Indebtedness" means any Permitted Project Level Financing that is Recourse Indebtedness.

"S&P" means Standard & Poor's Ratings Services.

"Wholly Owned Subsidiary" means, as to any Person or Persons, any Subsidiary of any of such Person or Persons all of the Capital Stock of which (other than directors' qualifying shares and, in the case of any REIT Subsidiary, non-participating preferred equity with a base liquidation preference of no more than $180,000) is owned by such Person or Persons directly or indirectly.

Exhibit C
Page 4
US_ACTIVE:\43423994\49\47658.0008

- 

# <u>Exhibit C</u>

**Fee Letter**

**(Filed Under Seal)**

- 

# **Exhibit D**

**Side Letter**

**(Filed Under Seal)**

- 

# **Exhibit E**

**Potential Engagement Letter Extension (Goldman, Sachs & Co.)**


**(Filed Under Seal)**

- 

# **<u>Exhibit F</u>**

**Potential Engagement Letter Extension (Deutsche Bank Securities, Inc.)**

**(Filed Under Seal)**

- 

# <u>**Exhibit G**</u>

## **Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x
                                          :
In re                                     :          Chapter 11 Case No.
                                          :
**GENERAL GROWTH**                        :          09-11977 (ALG)
**PROPERTIES, INC., et al.,**             :
                                          :          **(Jointly Administered)**
            **Debtors.**                  :
--------------------------------------------------------------x


## ORDER PURSUANT TO SECTIONS 105(a)
## AND 363 OF THE BANKRUPTCY CODE (A) AUTHORIZING DEBTORS TO
## (1) EXERCISE CERTAIN CLAWBACK RIGHTS AND INCUR RELATED
## CLAWBACK FEES, (2) ENTER INTO COMMITMENT LETTER, SIDE LETTER AND
## FEE LETTER IN CONNECTION WITH POTENTIAL EXIT FINANCING FACILITY,
## AND (3) ENTER INTO THE EQUITY ROFO LETTER, PRE-EMERGENCE
## UNDERWRITING AGREEMENT, AND GUARANTEE,
## (B) APPROVING UBS AS UNDERWRITER AND LENDER COMMITMENT PARTY
## AND (C) AUTHORIZING ENTRY INTO POTENTIAL ENGAGEMENT LETTER
## EXTENSIONS

Upon the motion, dated September 22, 2010 (the "**Motion**")[1] of South Street

Seaport Limited Partnership, its ultimate parent, General Growth Properties, Inc. ("**GGP**"), and

their debtor affiliates, as debtors and debtors in possession (collectively, "**General Growth**" or

the "**Debtors**"), pursuant to sections 105 and 363 of title 11 of the United States Code (the

"**Bankruptcy Code**"), (A) authorizing General Growth to (i) enter into the Agreements, and to

undertake the obligations (including payment of fees and expenses and the incurrence of the

indemnification obligations) in connection therewith and (ii) exercise the Clawback Election and

pay the related Clawback Fee in accordance with the Investment Agreements and (B) authorizing

UBS to act as an Underwriter and Lender Commitment Party and finding that such engagement

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

will not cause it to fail to be a disinterested person (as defined in section 101(14) of the

Bankruptcy Code) or to represent or hold an interest adverse to the interest of the Debtors'

estates, all as more fully described in the Motion; and the Court having reviewed the Motion; and

the Court having jurisdiction to consider the Motion and grant the requested relief in accordance

with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges

for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10,

1984 (Ward, Acting C.J.); and consideration of the Motion being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and General Growth having provided notice of the Motion and Hearing (as defined below)

to (i) the Office of the United States Trustee for the Southern District of New York, (ii) counsel

for the Creditors' Committee, (iii) counsel for the Equity Committee, (iv) counsel to the

Underwriters, (v) counsel to the Joint Lead Arrangers, and (vi) parties entitled to receive notice

in these chapter 11 cases pursuant to Bankruptcy Rule 2002; and the Court having held a hearing

to consider the requested relief (the "**_Hearing_**"); and upon the record of the Hearing, and all of

the proceedings before the Court, the Court finds and determines that the requested relief is in

the best interests of the Debtors, their estates, creditors, and all parties in interest; that General

Growth has provided due and proper notice of the Motion and Hearing and no further notice is

necessary; and that upon all of the proceedings had before the Court and after due deliberation

and sufficient cause appearing therefor, it hereby

**FINDS, DETERMINES AND CONCLUDES THAT:**

        A.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157

and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District

of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.).

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      Good and sufficient notice of the relief sought in the Motion has been given, and no other or further notice is required.  A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested persons.

C.      The statutory predicates for the relief granted herein are sections 105(a) and 363(b) of the Bankruptcy Code.  In addition the relief granted herein is in accordance with Bankruptcy Rules 2002 and 6004 and rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of New York.

D.      General Growth has demonstrated sound business justifications for authorization to enter into the Agreements, to the extent provided in this Order, and to undertake the obligations contemplated therein.

E.      The participation of UBS as an Underwriter pursuant to the Pre-Emergence Underwriting Agreement and the Equity ROFO Letter and as a Lender Commitment Party is in the best interest of General Growth and its estates, and such participation will not cause UBS to fail to be a disinterested person or to represent or hold an interest adverse to the interest of General Growth's estates.

F.      Entry of this Order is in the best interests of General Growth and its estates, creditors, and interest holders and all other parties in interest herein.

G.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any finding of fact shall

later be determined to be a conclusion of law, it shall be so deemed and vice versa; and it is hereby

ORDERED that the Motion is GRANTED as provided herein; and it is further

ORDERED that the Debtors are authorized (but not directed), in their sole discretion and without further notice or order from this Court, to enter into the Agreements and to undertake the obligations set forth therein, including, but not limited to, paying any fees or expenses required under the Agreements; and it is further

ORDERED that if Debtors enter into the Pre-Emergence Underwriting Agreement and Guarantee, no relief from the automatic stay or the provisions of section 362 of the Bankruptcy Code shall be required for the Underwriters to take any action, or send any notice, with respect to the exercise of a termination right or to collect the Fee and Expenses under the terms of the Pre-Emergence Underwriting Agreement and Guaranty. No relief from the automatic stay or the provisions of section 362 of the Bankruptcy Code shall be required for New GGP to distribute the proceeds of the Escrow in accordance with its terms.

ORDERED that the Debtors are authorized, but not required, to accept the financing commitments upon terms substantially similar to the terms set forth in the Commitment Letter and Fee Letter and the term sheets attached thereto, and to perform the Debtors' obligations thereunder; and it is further

ORDERED that the Debtors are authorized, but not required, to execute the Side Letter and to perform the obligations thereunder; and it is further

ORDERED that the payment obligations of the Debtors under the Commitment Letter and the Fee Letter are entitled to and are hereby granted administrative priority under sections 503(b) and 507(a)(1) of the Bankruptcy Code; and it is further

ORDERED that the Debtors are authorized, but not directed, to exercise the Clawback Election and to incur any related Clawback Fee; and it is further

ORDERED that the Debtors are authorized, but not required, to provide any indemnification required pursuant to the Agreements, as and to the extent provided by the Agreements; and it is further

ORDERED that the Debtors are authorized to execute and deliver all instruments and documents and take any other actions as may be necessary or appropriate to implement and effectuate the transaction contemplated by this Order; and it is further

ORDERED that UBS is authorized to enter into the Equity ROFO Letter and the Pre-Emergence Underwriting Agreement and to serve as an Underwriter . UBS is authorized to enter into the Commitment Letter, Fee Letter, and Side Letter and serve a Lender Commitment Party. UBS's role as an Underwriter and Lender Commitment Party will not cause UBS to fail to be a disinterested person (as defined in Section 101(14) of the Bankruptcy Code) or to represent or hold an interest adverse to the interest of the General Growth's estates. UBS's engagement as an Underwriter or Lender Commitment Party will not limit or modify the terms of UBS's retention under the UBS Retention Orders or UBS's entitlement to compensation thereunder; and it is further

ORDERED that the Debtors are authorized to enter into the Potential Engagement Letter Extensions and to undertake any actions contemplated thereby; and it is further

ORDERED that notwithstanding Bankruptcy Rules 6004, 6006 or otherwise, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing; and it is further

ORDERED that all objections to the Motion or the relief requested therein that have not been withdrawn, waived, settled, or specifically addressed in this Order, and all reservations of rights included in such objections, are overruled in all respects on the merits.

ORDERED that this Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

Dated: _____, 2010
          New York, New York

_____
THE HONORABLE ALLAN L. GROPPER
UNITED STATES BANKRUPTCY JUDGE