WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein
Gary T. Holtzer
Adam P. Strochak
Stephen A. Youngman (*admitted pro hac vice*)
Sylvia A. Mayer (*admitted pro hac vice*)

Attorneys for Reorganized Debtors

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200
James H.M. Sprayregen, P.C.
Anup Sathy, P.C.

Co-Attorneys for Certain Subsidiary
Reorganized Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                       :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **GENERAL GROWTH** | : | |
| **PROPERTIES, INC.,** *et al.*, | : | **Case No. 09-11977 (ALG)** |
| | : | |
| **Reorganized Debtors.** | : | **Jointly Administered** |
| | : | |

-------------------------------------------------------------x

**NOTICE OF HEARING ON OBJECTION TO REQUEST**
**OF WILMINGTON TRUST FSB FOR REIMBURSEMENT**
**OF CERTAIN PROFESSIONAL FEES AND EXPENSES**

       **PLEASE TAKE NOTICE THAT** a hearing to consider the Objection to the

Request of Wilmington Trust FSB for Reimbursement of Certain Professional Fees and

Expenses dated January 5, 2011 (the "**Objection**") filed by General Growth Properties, Inc., and

its reorganized debtor affiliates (collectively, "**General Growth**" or the "**Reorganized**

**Debtors**"),[1] shall be held before the Honorable Allan L. Gropper, United States Bankruptcy

---

[1]  A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, was originally filed with the Court at Docket No. 593 and is also available for free online at www.kccllc.net/GeneralGrowth.  The Debtors identified therein are now Reorganized Debtors.

Judge, in Room 617 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004 on **January 25, 2011 at 2:30 p.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Objection (a) must be in writing, (b) must conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, (c) must set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, (d) must be filed with the Court electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Court's case filing system, and by all other parties in interest, on a CD Rom, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format, and (e) must be served upon: (i) the chambers of the Honorable Allan L. Gropper, United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, Courtroom 617, New York, New York 10004; (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10044 (Attn: Andrea B. Schwartz and Elisabetta G. Gasparini, Esqs.); (iii) General Growth Properties, Inc., 110 North Wacker Drive, Chicago, Illinois 60606 (Attn: Ronald L. Gern, Esq.); (iv) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York 10153 (Attn: Gary T. Holtzer, Esq.), attorneys for the Reorganized Debtors; (v) Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654 (Attn: Anup Sathy, P.C.), co-attorneys for certain subsidiary Reorganized Debtors; (vi) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Michael S. Stamer, Esq.), attorneys for the Official Committee of Unsecured Creditors; (vii) Saul Ewing LLP, 500 E. Pratt Street, Suite 800, Baltimore, Maryland 21202 (Attn: Joyce A. Kuhns, Esq.), and Saul Ewing LLP, 400

Madison Ave., Suite 12 B, New York, New York 10017 (Attn: John J. Jerome, Esq.), attorneys

for the Equity Security Holders Committee; (viii) Brown Rudnick LLP, One Financial Center,

Boston, Massachusetts 02111 (Attn: Jeffrey L. Jonas, Esq.); (ix) Foley & Lardner LLP, 90 Park

Avenue, New York, New York 10016 (Attn: Douglas E. Spelfogel, Esq.), and Foley & Lardner

LLP, 321 North Clark Street, Suite 2800, Chicago, Illinois 60654 (Attn: Derek L. Wright, Esq.);

and (x) Latham & Watkins LLP, 885 Third Avenue, Suite 1000, New York, New York 10022

(Attn: Blair G. Connelly, Esq. and John D. Castiglione, Esq.), so as to be received no later than

**January 18, 2011.**

        **PLEASE TAKE FURTHER NOTICE** that if a response to the Objection is not

received by the objection deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

Dated: January 5, 2011
      New York, New York

                         /s/ Gary T. Holtzer

                         Marcia L. Goldstein
                         Gary T. Holtzer
                         Adam P. Strochak
                         WEIL, GOTSHAL & MANGES LLP
                         767 Fifth Avenue
                         New York, New York 10153
                         Telephone: (212) 310-8000
                         Facsimile: (212) 310-8007

                              and

                         Stephen A. Youngman *(admitted pro hac vice)*
                         WEIL, GOTSHAL & MANGES LLP
                         200 Crescent Court, Suite 300
                         Dallas, Texas 75201
                         Telephone: (214) 746-7700
                         Facsimile: (214) 746-7777
                              and

Sylvia A. Mayer *(admitted pro hac vice)*
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone:  (713) 546-5000
Facsimile:   (713) 224-9511

Attorneys for Reorganized Debtors

and

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

Co-Attorneys for Certain Subsidiary
Reorganized Debtors

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein
Gary T. Holtzer
Adam P. Strochak
Stephen A. Youngman (*admitted pro hac vice*)
Sylvia A. Mayer (*admitted pro hac vice*)

Attorneys for Reorganized Debtors

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
James H.M. Sprayregen, P.C.
Anup Sathy, P.C.

Co-Attorneys for Certain Subsidiary
Reorganized Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                             :

**In re**                             :          **Chapter 11**
                             :

**GENERAL GROWTH**          :
**PROPERTIES, INC.,** *et al.*,     :          **Case No. 09-11977 (ALG)**
                             :

            **Reorganized Debtors.**   :          **Jointly Administered**
                             :
------------------------------------------------------------x

## OBJECTION TO REQUEST OF WILMINGTON TRUST FSB FOR REIMBURSEMENT OF CERTAIN PROFESSIONAL FEES AND EXPENSES

TO THE HONORABLE ALLAN L. GROPPER,
UNITED STATES BANKRUPTCY JUDGE:

        South Street Seaport Limited Partnership, its parent, General Growth Properties,

Inc. ("**GGP**"), and their reorganized debtor affiliates (collectively, "**General Growth**" or the

"**Debtors**" or the "**Reorganized Debtors**"),[1] submit this objection (the "**Objection**") to the

---

[1]  A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, was originally filed with the Court at Docket No. 593 and is also available for free online at www.kccllc.net/GeneralGrowth.  The Debtors identified therein are now Reorganized Debtors.

request of Wilmington Trust FSB ("**Wilmington Trust**") for reimbursement of certain professional fees and expenses and respectfully represent as follows:[2]

# I.

## PRELIMINARY STATEMENT

1.      This dispute is about whether $12.3 million in fees charged by Brown Rudnick LLP ("**Brown Rudnick**") and Moelis & Company LLC ("**Moelis**") should be paid by General Growth or by the Exchangeable Notes holders who hired them and for whom the services were performed.  By characterizing the costs of these professionals as "indenture trustee expenses", Wilmington Trust is attempting to shift the expense of the "Consortium" (as defined below) of Exchangeable Notes holders to General Growth.  If permitted, this fee shifting scheme would unfairly charge General Growth for fees, or through assertion of a charging lien, other note holders who did not authorize reduction of their recoveries for these professionals' fees.

2.      Wilmington Trust fails the elements of the Exchangeable Notes Indenture's (as defined below) reimbursement provision for the Brown Rudnick and Moelis fees. First, Wilmington Trust cannot satisfy the reimbursement provision's requirement that Brown Rudnick and Moelis were "counsel" or "agent" to Wilmington Trust.  That failure ends the matter as far as General Growth's obligation to pay the fees.  However, if, and only if, this Court finds Brown Rudnick and Moelis were "counsel" or "agent" to Wilmington Trust, Wilmington Trust cannot, as further required by the indenture's reimbursement provision, justify as a "reasonable" charge the $12.3 million in fees.

3.      As detailed below, Brown Rudnick and Moelis were not counsel or agent to Wilmington Trust as a matter of fact or law.  Notwithstanding the boilerplate references to

---

[2] Terms not otherwise defined herein shall have the meaning ascribed to them in the TopCo Plan (as defined below).

Brown Rudnick and Moelis's "retention" by Wilmington Trust, the substantive duties owed by and between Brown Rudnick and Moelis to Wilmington Trust are strictly limited and certain key obligations are relegated to the Consortium. Moreover, that Brown Rudnick and Moelis represented the Consortium (not Wilmington Trust) is substantiated by the time records maintained by Brown Rudnick, and by review of such time records as to Moelis's activities it also is clear Moelis's representation was on behalf of the Consortium. Further, as a matter of agency law, Moelis was not an "agent" of Wilmington under the Indenture so as to fall within the categories of professionals for the Indenture Trustee.

4. Even if Brown Rudnick and Moelis are considered counsel or agent of Wilmington Trust, which General Growth vehemently denies, the fees are disproportionately high in comparison to similarly situated professionals. No other indenture trustee retained an investment banker/advisor, much less one charging a $9 million transaction fee. In comparison, to the legal fees charged by counsel to the other indenture trustees in these chapter 11 cases, the fees of Brown Rudnick are nearly three and a half times the fees of Foley & Lardner LLP ("**Foley**") and Baker & Hostetler LLP ("**Baker**"),[3] more than four times the fees of Seward & Kissel LLP ("**Seward**"),[4] and more than thirty one times the fees of Morrison Cohen LLP ("**Morrison Cohen**").[5] By any measure, the fees and expenses of Moelis and Brown Rudnick are not a reasonable charge under the Exchangeable Notes Indenture and should not be awarded from General Growth or made chargeable to all of the holders of the Exchangeable Notes.

---

[3] Counsel and successor counsel to Wilmington Trust as indenture trustee for the Exchangeable Notes and the Rouse 6.75% Notes.

[4] Counsel for Bank of New York Mellon as indenture trustee for the Rouse 3.625% Notes, Rouse 5.375% Notes, Rouse 7.20% Notes, and Rouse 8.00% Notes.

[5] Counsel for HSBC Trust Company (Delaware) as indenture trustee for the TRUPS Junior Subordinated Notes.

5.     This is not a zero sum game for Brown Rudnick or Moelis.  Rather, it is about who should bear the fees of professionals for an ad hoc group of bondholders who made a strategic decision regarding an attempt to wedge their professional fee expenses into an indenture where the facts and the law do not support the payment of those fees under the indenture provisions.  The Court should deny this attempt to shift their fees in this manner.

6.     General Growth, Wilmington Trust and Brown Rudnick have agreed to request resolution of the fee disputes by this Court and have agreed on a briefing schedule and informal discovery process in connection therewith.[6]  The schedule is:

| | |
|---|---|
| Deadline to file objection | January 5, 2011 |
| Responses due | January 18, 2011 |
| Reply due | January 21, 2011 |
| Hearing | January 25, 2011 at 2:30 p.m. (prevailing Eastern Time) |

## II.

## JURISDICTION

7.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.

## GENERAL CASE BACKGROUND

8.     Commencing on April 16, 2009 and continuing thereafter, South Street Seaport Limited Partnership, its parent, General Growth Properties, Inc. ("**GGP**"), and their

---

[6] On December 6, 2010, Brown Rudnick sent a letter requesting that the Court expedite the hearing on Brown Rudnick's yet to be filed Motion Of Counsel For The Entry Of An Order To Compel Payment In Accordance With the Debtors' Plan (the "**Motion to Compel**").  Brown Rudnick indicated that although it had not yet filed the Motion to Compel, it was prepared to do so shortly.  General Growth responded in opposition to Brown Rudnick's letter on December 7, 2010 and the Court denied the request for expedited consideration of the Motion to Compel.  As of this date, Brown Rudnick has not filed the Motion to Compel.

reorganized debtor affiliates (collectively, the "**Debtors**" or the "**Reorganized Debtors**") each

commenced a voluntary case under chapter 11 of title 11 of the United States Code (the

"**Bankruptcy Code**").  The Debtors' chapter 11 cases are being jointly administered pursuant to

Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

9. On April 24, 2009, the United States Trustee for the Southern District of

New York (the "**U.S. Trustee**") appointed the official committee of unsecured creditors.  On

September 8, 2009, as subsequently amended on September 21, 2009 and September 24, 2009,

following the requests of certain equity holders, and pursuant to section 1102(a)(2) of the

Bankruptcy Code, the U.S. Trustee appointed the official committee of equity security holders

(the "**Equity Committee**").

10. On October 21, 2010, the Bankruptcy Court held a hearing to consider

confirmation of the *Plan Debtors' Third Amended Joint Plan of Reorganization Under Chapter*

*11 of the Bankruptcy Code, as Modified* [Docket No. 6232] (the "**TopCo Plan**," and together

with the Project Debtor Plan, the "**Plans**") and entered an order confirming the TopCo Plan with

respect to the Plan Debtors [Docket No. 6240] (the "**TopCo Confirmation Order**").  On

November 9, 2010, the TopCo Plan became effective under its terms.

## IV.

## FEE DISPUTE BACKGROUND

A.    **EXCHANGEABLE NOTES INDENTURE AND TOPCO PLAN PROVISIONS**

11. Wilmington Trust is the indenture trustee under the indenture, dated April

16, 2007, between GGP Limited Partnership as issuer and Wilmington Trust Company as

successor trustee for the Exchangeable Notes (the "**Exchangeable Notes Indenture**").  The

Exchangeable Notes Indenture is attached hereto as **Exhibit A**.  Wilmington Trust is also the

indenture trustee under the indenture, dated May 5, 2006 among The Rouse Company,  L.P., and

TRC Co-Issuer, Inc. as co-issuers and Wilmington Trust Company as successor trustee for the Rouse 6.75% Notes.

12.     Section 2.6 of the TopCo Plan sets forth the terms governing payment of Indenture Trustee Fee Claims.  Subject to certain conditions, General Growth will reimburse indenture trustees for *reasonable* accrued and unpaid fees and expenses, <u>provided</u>, <u>however</u>, that such fees and expenses must be *allowable under the applicable Indenture*.  TopCo Plan Sec. 2.6.

13.     The Exchangeable Notes Indenture echoes the reasonableness requirement set forth in the TopCo Plan and further limits reimbursement of professional fees to the indenture trustee's agent or counsel.  Specifically, Section 8.07 of the Exchangeable Note Indenture provides that "[t]he Issuer shall reimburse the Trustee upon request for all reasonable disbursements, expenses and advances incurred or made by it."  Exchangeable Notes Indenture Sec. 8.07.  Such expenses may include the reasonable compensation, disbursement and expenses of the "Trustee's agent and counsel."[7]  <u>Id</u>.

B.     <u>THE FEE REQUEST</u>

14.     Prior to the commencement of these chapter 11 cases, General Growth was negotiating with, among other parties, an ad hoc group of Exchangeable Notes holders.  In connection with the negotiations, General Growth paid approximately $304,000 to Brown Rudnick on account of attorneys fees and disbursements for that ad hoc group.

---

[7] Pursuant to Section 7.08 of the Exchangeable Notes Indenture, the indenture trustee may file proofs of claim in connection with claims for the "reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel."  <u>Id</u>. at Sec. 7.08.  Further, in the event that a receiver in a judicial proceeding is authorized by the indenture trustee to make payments directly to the holders of the Exchangeable Notes, such receiver shall pay the indenture trustee amounts owed for the "reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel."  <u>Id</u>

15. On April 23, 2009, Baker filed a Notice of Appearance and Request for Service of Papers [Docket No. 0115] in connection with its role as counsel to Wilmington Trust as indenture trustee for the Exchangeable Notes and the Rouse 6.75% Notes. A Notice of Change of Attorney [Docket No. 3339] was filed on October 29, 2009 substituting Foley for Baker as "attorneys of record" for Wilmington Trust in the Debtors' chapter 11 cases.

16. On or about April 23, 2009, a representative from Wilmington Trust executed an engagement letter with Brown Rudnick (the "**Brown Rudnick Engagement Letter**"). The Brown Rudnick Engagement Letter is attached hereto as **Exhibit B**. On May 6, 2009, Brown Rudnick filed a Notice of Appearance and Request for Documents [Docket No. 0383] in connection with its representations of (i) Wilmington Trust as indenture trustee under the Exchangeable Notes Indenture; (ii) an ad hoc consortium of Exchangeable Notes holders (the "**Consortium**"); and (iii) Capital Ventures International, also a holder of Exchangeable Notes.

17. On or about September 1, 2009, representatives from Wilmington Trust, Brown Rudnick, and the Consortium, among others, executed an engagement letter with Moelis (the "**Moelis Primary Engagement Letter**," and together with Annex A and Annex B to the Moelis Primary Engagement Letter, the "**Moelis Engagement Letter**," and together with the Brown Rudnick Engagement Letter, the "**Engagement Letters**"). The Moelis Engagement Letter is attached hereto as **Exhibit C**.

18. On or about October 22, 2010, Wilmington Trust submitted a *Notice and Request for Payment of Indenture Trustee's Claim pursuant to Section 2.6 of the Plan* (the "**Fee Request**") to General Growth requesting payment of the following fees and expenses:

| PROFESSIONAL | DESCRIPTION | FEES | COSTS | TOTAL |
|---|---|---|---|---|
| Wilmington Trust | Indenture trustee for the Exchangeable Notes and the Rouse 6.75% Notes | $519,061.75 | $12,000.00 | $531,061.75 |
| Foley | Counsel to Wilmington Trust as indenture trustee for the Exchangeable Notes and the Rouse 6.75% Notes | $799,048.50 | $11,703.02 | $810,751.52 |
| Brown Rudnick | Counsel to Wilmington Trust as indenture trustee for the Exchangeable Notes and the Rouse 6.75% Notes and the Consortium | $3,451,567.00 | $163,812.86 | $3,615,379.86 <br> Less $303,972.51 paid prepetition by General Growth:  $3,311,407.35 |
| Baker | Former Counsel to Wilmington Trust as indenture trustee for the Exchangeable Notes and the Rouse 6.75% Notes | $150,911.75 | $1,046.13 | $151,957.88 |
| Moelis | Investment banker/advisor to Wilmington Trust as indenture trustee for the Exchangeable Notes and the Rouse 6.75% Notes and the Consortium | $9,000,000.00[8] | $31,546.09 | $9,031,546.09[9] |
| **TOTAL** | | **$13,920,589.00** | **$220,108.10** | **$13,836,724.59** |

Wilmington Trust's Fee Request is attached hereto as **Exhibit D**.

---

[8] Pursuant to the Moelis Engagement Letter, Moelis' fee is earned and payable upon consummation of a Restructuring Transaction (as defined in the Moelis Engagement Letter).

[9] On November 17, 2010, Moelis commenced a state court action against Wilmington Trust seeking payment of its fees (the "**Adversary Proceeding**") and sought to enjoin Wilmington Trust from making any further distributions to holders of Exchangeable Note Claims pending resolution of its dispute with Wilmington Trust. The request was denied. On or about November 18, 2010, the Adversary Proceeding was removed to the United States District Court for the Southern District of New York and referred by the District Court to this Court. The Adversary Proceeding is currently pending before this Court as Adversary Case No. 10-02473-ALG.

19.     On or about October 28, 2010, General Growth responded to Wilmington Trust's Fee Request (the "**Fee Response**").  In its Fee Response, General Growth objected to the Fee Request in respect of the fees and expenses of Moelis and Brown Rudnick (which total $12,342,953.44, and are referred to collectively as the "**Disputed Fees**") because, among other things, such reimbursement is not required by the terms of the TopCo Plan and the Exchangeable Notes Indenture.  General Growth requested additional information with respect to certain redacted time entries for Foley and Baker and back-up documentation for the fees incurred directly by Wilmington Trust.  The Fee Response is attached hereto as **Exhibit E**.

20.     On or about November 4, 2010, Wilmington Trust replied to General Growth's Fee Response (the "**Second Fee Request**," and together with the Engagement Letters and the Fee Request, the "**Retention Documents**").  In its reply, Wilmington Trust disputed General Growth's position with respect to the Disputed Fees.  Wilmington Trust's Second Fee Request is attached hereto as **Exhibit F**.

21.     On or about November 4, 2010, Wilmington Trust provided General Growth notice that, to the extent General Growth maintained an objection with respect to any of its Indenture Trustee Fee Claims, Wilmington Trust intended to exercise a charging lien as against the "credit bid" that would be made by certain of the Investors with respect to their allowed Exchangeable Notes Claims.[10]  A copy of this notice is attached hereto as **Exhibit G**.

---

[10] The TopCo Plan and the Investment Agreements permitted the Investors to apply their Allowed Claims against the purchase price of New GGP Common Stock and Spinco Common Stock.  Fairholme and Pershing Square, which held Exchangeable Notes Claims, elected to apply the allowed amount of their Exchangeable Notes Claims against the purchase price.  Accordingly, on the Effective Date of the Plan, Fairholme and Pershing Square were allowed to offset their allowed Exchangeable Notes Claims against their purchase of New GGP Common Stock and Spinco Common Stock and did not receive a cash distribution on account of their Allowed Exchangeable Notes Claims.

To avoid interference with the "credit bid" process and, thus, the occurrence of the Effective Date, General Growth deposited the disputed amounts in escrow (the "**Disputed Amounts Escrow**") with Wilmington Trust as well as an additional reserve escrow of $2,315,250.00 (the "**Reserve Escrow**," and together with the Disputed Amounts Escrow, the "**Escrow**") for additional amounts that Wilmington Trust might claim under the Exchangeable Notes Indenture. In addition, on the Effective Date, General Growth delivered to Wilmington Trust all other outstanding, undisputed amounts asserted to be due and owing in connection with the Exchangeable Notes Indenture as well as approximately $746,886 for trustee and professional fees and expenses in connection with the Rouse 6.75% Notes.

22.     Following the Effective Date, on information and belief, Wilmington Trust made partial distributions to holders of Exchangeable Notes Claims on account of their claims, but reserved from distribution approximately $31,248,042.46, consisting of (i) an amount equal to the Disputed Fees (which totals $12,342,953.44); (ii) an amount equal to the Reserve Escrow (which totals $2,315,250.00); and (iii) an additional $16,589,839.02 (the "**Additional Reserve**").

23.     By letter dated December 22, 2010, Wilmington Trust submitted a *Supplemental Notice and Request for Payment of Indenture Trustee's Claim pursuant to Section 2.6 of the Plan* (the "**Supplemental Fee Request**") requesting payment of the following fees and expenses:

| PROFESSIONAL | DESCRIPTION | FEES | COSTS | TOTAL |
|---|---|---|---|---|
| Wilmington Trust | Indenture Trustee | $35,100.00 | N/A | $35,100.00 |
| Foley | Counsel | $151,258.50 | $6,416.74 | $157,675.24 |
| Brown Rudnick | Counsel | $62,862.50 | $1,214.04 | $64,076.54 |
| **TOTAL** | | **$249,221.00** | **$7,630.78** | **$256,851.78** |

General Growth is reviewing the Supplemental Fee Request to determine if the fees and expenses claimed relate to traditional post-closing indenture trustee work.

**V.**

**RELIEF REQUESTED**

24.     By this Objection, General Growth respectfully requests a determination by this Court that (i) the Disputed Fees are not payable by General Growth; (ii) the Disputed Fees are not chargeable against the charging lien in the Exchangeable Notes Indenture; (iii) General Growth should not be required to reimburse Wilmington Trust for any further fees and expenses incurred in connection with the Disputed Fees, including as requested in the Supplemental Fee Request to the extent that such request does not related to traditional post-closing matters; (iv) the Escrow funds held by Wilmington Trust should be returned to General Growth; and (v) the Additional Reserve should be distributed to the Exchangeable Notes holders in accordance with the TopCo Plan and the Exchangeable Notes Indenture.   A proposed order is attached hereto as **Exhibit H**.

**VI.**

**ARGUMENT**

**A.     NEITHER MOELIS NOR BROWN RUDNICK IS AGENT OR COUNSEL TO WILMINGTON TRUST AS REQUIRED BY THE EXCHANGEABLE NOTES INDENTURE AND TOPCO PLAN**

**1.     Moelis and Brown Rudnick Were Retained by and Represent the Consortium and Not Wilmington Trust**

25.     Moelis and Brown Rudnick were retained by and represent the Consortium.  The suggestion set forth in the Retention Documents that Moelis and Brown Rudnick are properly agent and counsel, respectively, to Wilmington Trust is nothing more than a plan to transfer the cost of these professionals' fees from the Consortium to General Growth or

non-Consortium Exchangeable Notes holders.  The professional fees of an indenture trustee are traditionally paid by a debtor (with no court review) because such fees typically are traceable to the work performed under an indenture and are reasonable in amount relative to the chapter 11 case.  The Retention Documents contain numerous boilerplate references to Moelis's and Brown Rudnick's representation of Wilmington Trust.  However, the substantive duties owed by and between Moelis and Wilmington Trust and Brown Rudnick and Wilmington Trust are strictly limited, and the Consortium is responsible for certain key responsibilities.

### a.  <u>The Moelis Representation</u>

26.  For example, the publicity, indemnification, and expense reimbursement provisions of the Moelis Engagement Letter evidence that Moelis represents the Consortium and not Wilmington Trust.  To the extent that Moelis places an advertisement or announcement or otherwise publicizes its role in this transaction, it agreed to state that it "acted as exclusive financial advisor to [Brown Rudnick] and the Consortium…."  Moelis Engagement Letter at ¶ 7.  There is no reference made to Moelis's purported representation of Wilmington Trust.  Further, the members of the Consortium, in the first instance, are responsible for indemnifying Moelis and certain related parties for reasonable and customary legal and other expenses incurred in connection with or as a result of Moelis's engagement.  <u>Id.</u> at Annex A.   In addition, the members of the Consortium are obligated to reimburse Moelis (i) on a quarterly basis for all reasonable expenses incurred in entering into and performing the engagement, and (ii) for all reasonable fees, disbursements and other charges of legal counsel incurred by Moelis in connection with Moelis's obligation to diligently pursue payment of its fees from General Growth.  <u>Id.</u> at ¶¶ 4(b), 5.  In both cases, Wilmington Trust agreed to reimburse the members of the Consortium for such expenses from the distributions owed to all holders of the Exchangeable

Notes.  Id.  Finally, although the Moelis Engagement Letter is drafted such that Moelis is ostensibly engaged by Brown Rudnick and Wilmington Trust, it is also signed by individual members of the Consortium.

27.      Despite the numerous references in the Moelis Engagement Letter to Moelis's "representation" of Wilmington Trust, the letter severely limits when Moelis is appropriately considered an agent of Wilmington Trust.[11]  Specifically, the Moelis Engagement Letter states that Moelis is Wilmington Trust's agent solely for purposes securing payment of Moelis's fees and expenses:

> The Indenture Trustee agrees that it and Moelis intend for Moelis's status under Sections 7.08, 7.09, and 8.07 of the Indenture to be that *Moelis is acting hereunder as the Trustee's "agent," solely for purposes of payment of amounts owed to Moelis under this engagement letter and Annex A and for no other purpose.*  In any action, suit or proceeding in which Moelis claims a right to be reimbursed by the Company for any amounts hereunder, the *Indenture Trustee shall agree that Moelis is the Indenture trustee's "agent" for purposes of seeking payment from the Company of amounts owed hereunder pursuant to Sections 7.08, 7.09 and 8.07 of the Indenture and for no other purpose.*[12]

Moelis Engagement Ltr. ¶ 13 (emphasis added).  This language is an attempt to fit Moelis's fees and expenses within the confines of reimbursable expenses under the Exchangeable Notes Indenture without regard for the actual representation and scope of duties.

### b.  <u>The Brown Rudnick Representation</u>

28.      As is the case with Moelis, the Brown Rudnick Engagement Letter contains boilerplate references to Brown Rudnick's representation of Wilmington Trust, but then specifically states that Brown Rudnick is an agent of the Consortium and was retained by the

---

[11] As discussed below, General Growth disputes that an agency relationship was properly established between Moelis and Wilmington Trust.

[12] Virtually the same language is included in Annex A of the Moelis Engagement Letter, except that the phrase "and for no other purpose" was deleted from the last sentence of the quoted language.

members of the Consortium as well as the "DIP Group" (as defined in the Brown Rudnick Engagement Letter), a subset of the Consortium:

> The Trustee acknowledges and agrees that Brown Rudnick has been retained by (1) an informal consortium of certain Noteholders (the "Consortium") and will act as agent for the Consortium including, without limitation, for the purpose of giving direction(s) to the Trustee in connection with the Bankruptcy Case and (2) a subset of the Consortium consisting of the members (the "DIP Group") who may submit or pursue a counter proposal to the debtor-in-possession financing arrangement submitted for approval by the Debtors on April 16, 2009.

Brown Rudnick Engagement Ltr. p. 5. Although the Brown Rudnick Engagement Letter also states that Brown Rudnick represents Wilmington Trust, it makes clear that in the event of a conflict Brown Rudnick may withdraw as counsel to Wilmington Trust. The language in the Second Fee Request reinforces this point and notes that, in contrast to Brown Rudnick, Foley and Baker were retained to represent "Wilmington Trust with respect to its interests under the Exchangeable Notes Indenture and the Rouse 6.75% Indenture" and that "[n]either Baker nor Foley & Lardner have ever represented the holders." Second Fee Request p. 3.

      29.     That Brown Rudnick represented and represents the Consortium and not Wilmington Trust is substantiated by the time records maintained by Brown Rudnick. For example, on each of the invoices presented by Brown Rudnick for reimbursement of its fees and expenses, Brown Rudnick refers to its engagement by the matter name "AD HOC CONSORTIUM OF HOLDERS OF GGP LIMITED PARTNERSHIP 3.98% EXCHANGEABLE SENIOR NOTES DUE 2007." Indeed, the time records of the individual attorneys staffed on the matter show that the *actual* clients represented by Brown Rudnick were, in fact, the Consortium and not Wilmington Trust. Although just like Foley, Brown Rudnick dedicated a significant portion of its time to reviewing pleadings and the Plans, participating in

Creditors' Committee calls, corresponding with the Creditors' Committee, and researching issues such as the ability to receive "make whole" premiums, Brown Rudnick's time records are replete with attending to issues relating to the Consortium. Indeed, each month, Brown Rudnick spent a significant amount of time (reflected in hundreds of time entries) undertaking many of the following actions:

- Strategizing regarding Consortium meeting;
- Preparing memoranda to the Consortium or "ad hoc" committee;
- Corresponding with the Consortium;
- Addressing questions raised by individual holders on the Consortium;
- Preparing for and attending meetings with the Consortium;
- Discussing recent case developments with the Consortium;
- Attending to administrative matters relating to the Consortium;
- Participating in strategy calls with Moelis in connection with the Consortium
- Summarizing pleadings for the Consortium;
- Corresponding with "holders" concerning payment of the Consortium's fees and expenses;
- Conducting calls with the "ad hoc group" concerning the TopCo Plan process and the capital raise; and
- Discussing potential recoveries with individual Consortium members.

30. Brown Rudnick devoted a significant amount of time keeping the Consortium up to date on the chapter 11 cases' status. Noticeably absent from their time records, however, are similarly abundant references to conferences with Wilmington Trust or Patrick Healy (the representative of Wilmington Trust assigned to the matter). Indeed, although hundreds of entries reference the Consortium, less than a handful reference Patrick Healey, the person who would have been the point person at Wilmington Trust and whose name is listed as the addressee on Brown Rudnick's invoices.

31. Instead, Brown Rudnick's time records contain references to phone calls and correspondence between Brown Rudnick and "Trustee's Counsel." See, e.g., Kresge, 7/2/09 ("Conference with Trustee's Counsel re: OCC Call"); Laudano, 7/20/09 ("Call with WTC Counsel"); Kresge, 9/10/09 ("Correspondence to Trustee's Counsel re: New Members"); Kresge,

9/30/09 ("Correspondence with Trustee's Counsel re: miscellaneous open items"); Kresge, 10/26/09 ("Conference with Trustee's Counsel re Professional Fees"); Kresge, 11/19/09 ("Draft Letter to Trustee re: Action Items and Related Discussions with Trustee's Counsel."); Pinarchik, 11/19/09 ("Review and revise letter to counsel for Wilmington Trust"); Kresge, 12/3/09 ("Review Trustee's counsel invoices and prepare correspondence to consortium re: same"); Kresge, 8/9/10 ("Telephone call to Trustee's counsel re: Trustee's obligations"); Kresge, 9/20/10 ("Correspondence with Trustee's counsel re: next steps").  To the extent Brown Rudnick believed that *it* was counsel to Wilmington Trust (*i.e.*, "trustee's counsel"), it is odd, to say the least, that it repeatedly would have characterized another law firm as "trustee's counsel." Attached as **Exhibit I** are the complete time records of Brown Rudnick from April 2009 through October 2010.  A stub period from March 2009 is included as well.

32.     In sum, Brown Rudnick's time records make clear that Brown Rudnick's client was the Consortium – not Wilmington Trust.  The fees and expenses of the Consortium are not reimbursable under the Exchangeable Notes Indenture.

### 2. Moelis and Wilmington Trust Do Not Meet the Requirements Necessary to Establish a Principal/Agent Relationship

33.     As discussed above, the Exchangeable Notes Indenture limits reimbursement of professional fees to the indenture trustee's agent or counsel.  Moelis is clearly not counsel to Wilmington Trust.  Determining whether Moelis is an agent of Wilmington Trust under the Exchangeable Notes Indenture necessitates a consideration of agency law and the requirements for a principal/agent relationship.  The Moelis Engagement Letter narrowly defines Moelis's role as an agent of Wilmington Trust.  Specifically, Moelis is an agent of Wilmington Trust only for the purpose of getting paid its fees and expenses.  Even if Moelis did in fact

represent Wilmington Trust, a point General Growth disputes, the structure of Moelis's retention is not sufficient to constitute an "agency relationship" with Wilmington Trust.

34. Under New York law, an agency relationship may be established by "the consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act." Art Fin. Partners, LLC v. Christie's Inc., 870 N.Y.S.2d 331, 333 (App. Div. 1st Dep't 2009); G.D. Searle & Co. v. Medicore Commc'n's, Inc., 843 F. Supp. 895, 907 (S.D.N.Y. 1994). Further, an agent "is a substitute, or deputy, appointed by his principal primarily to bring about business relations between the latter and third persons." Corcoran v. Scolardo, 46 N.Y.S.2d 278, 280 (Sup. Ct. 1943), rev'd on other grounds, 46 N.Y.S.2d 377 (App. Div. 2d Dep't 1944). As such, a "primary characteristic" of agency is that "the agent is placed in a position whereby he may affect or alter the legal relations between the principal and third persons; the agent may bind his principal to contractual liability." G.D. Searle & Co., 843 F. Supp. at 905; accord Tip Top Farms, Inc. v. Dairylea Co-op, Inc., 497 N.Y.S.2d 99, 105 (App. Div. 2d Dep't 1985). Moreover, "[w]hether a relationship is characterized as agency in an agreement between parties . . . is not controlling." Restatement (Third) of Agency § 1.02.

35. Courts have declined to find an agency relationship where the purported agent lacked the power to bind the purported principal in contractual relations with third parties. See, e.g., Northeast Gen. Corp. v. Wellington Adver., Inc., 624 N.E.2d 129, 132 (N.Y. 1993) (finding that a corporation's "non-exclusive independent investment banker and business consultant" was not an agent where it "had no explicit or implied power to bind" the corporation and "did not have the power to negotiate" transactions on behalf of the corporation); Sedig v. Okemo Mountain, 612 N.Y.S.2d 643 (App. Div. 2d Dep't 1994) (rejecting an argument that an

agency relationship existed between a ski shop and a ski resort where "there is no evidence that the shops have authority to contractually bind the defendant and thus serve as its agents."); <u>G.D. Searle & Co.</u>, 843 F Supp. 895 at 905 (finding an agency relationship where the controlling agreement expressly stated that one party "may contract with third parties on behalf of" the other).

36.     Here, Moelis is not an "agent" of Wilmington Trust but rather a consultant. There is no evidence that Wilmington Trust allowed Moelis to act on its behalf or that Moelis had authority to affect or alter the legal relations between Wilmington Trust and third parties. Indeed, the Moelis Engagement Letter expressly states that Moelis is not an agent of Wilmington Trust <u>unless it is necessary to be called one in order to get paid.</u> A significant component of the principal/agent relationship is the ability of the latter to bind the former, and Moelis lacked the power to bind Wilmington Trust. In addition, Wilmington Trust did not have the requisite "control" over Moelis. The only evidence of potential "control" appears in the Moelis Engagement Letter. Specifically, Moelis agreed to "diligently pursue" a substantial contribution claim against General Growth for payment of its fees and expenses if so directed by Wilmington Trust or Brown Rudnick. Moelis Engagement Ltr. ¶ 5. This language is too narrow to constitute "control" for the purpose of an agency relationship between Wilmington and Moelis with respect to representation in these chapter 11 cases. Further, to the extent that any such control exists it is not exclusive to Wilmington Trust as it is also vested in Brown Rudnick.

**B.     EVEN IF THE COURT FINDS THAT MOELIS AND BROWN RUDNICK ARE PROFESSIONALS FOR THE INDENTURE TRUSTEE, THE FEES AND EXPENSES ARE AN UNREASONABLE CHARGE UNDER THE TOPCO PLAN AND THE EXCHANGEABLE NOTES INDENTURE**

37.     Courts have held that for the fees of a party to be deemed "reasonable," the services associated with such fees must be necessary under the relevant contract. <u>U.S. v.</u>

<u>Bedford Assoc.</u>, 548 F. Supp. 748, 751 (S.D.N.Y. 1982).  For example, "[r]easonable attorneys'

fees are such as are necessary to accomplish the end sought considering the skill and experience

of counsel, the magnitude, complexity, and novelty of the litigation, the respective positions of

the parties in the litigation and the extent of responsibility legitimately undertaken by counsel."

<u>Id</u>.  In the context of a creditor representation in a bankruptcy case, "'[r]easonable' fees are those

*necessary* to the collection and protection of a creditor's claim."  <u>In re Huhn</u>, 145 B.R. 872, 876

(W.D. Mich. 1992) (emphasis added); <u>accord</u> <u>In re PCH Assocs.</u>, 122 B.R. 181, 202 (Bankr.

S.D.N.Y. 1990).

> **1.  The Fees and Expenses of Moelis Exceed the Fees
> Claimed by Other Similarly Situated Professionals
> in These Chapter 11 Cases and Are an Unreasonable
> <u>Charge Under the Exchangeable Notes Indenture</u>**

38.     Even if Moelis would be considered an agent of Wilmington Trust, the

fees of Moelis are unreasonable in comparison to the fees charged by other similarly situated

professionals in these chapter 11 cases, given the services provided, and considering the fact that

other holders of debt have not retained or sought reimbursement of financial advisor fees.

39.     The chart below summarizes certain of the estimated investment banker

and financial advisor fees and expenses in these chapter 11 cases as of December 23, 2010:

| CONSTITUENCY/ DEBT SERIES | FINANCIAL ADVISOR/ INVESTMENT BANKER | AMOUNT OF DEBT HELD BY EACH CONSTITUENCY AS APPLICABLE | REQUESTED FEES | REQUESTED EXPENSES | TOTAL FEES AND EXPENSES[13] |
|---|---|---|---|---|---|
| Equity Committee | Cantor Fitzgerald & Co. ("**Cantor**") | N/A | $2,418,710.00 | $10,826.00 | $2,429,536.00 |
| 2006 Lenders[14] | Greenhill & Co. ("**Greenhill**") | $2,586,900,000.00 | $4,200,000.00 | $40,101.00 | $4,240,101.00 |
| Creditors' Committee | Houlihan Lokey Howard & Zukin Capital, Inc. ("**Houlihan**") | $4,091,200,000.00[15] | $15,897,957.00 | $182,537.00 | $16,080,494.00 |
| Rouse 3.625% Notes | N/A | $395,000,000.00 | N/A | N/A | N/A |
| Rouse 5.375% Notes | N/A | $450,000,000.00 | N/A | N/A | N/A |
| Rouse 6. 75% Notes | N/A | $800,000,000.00 | N/A | N/A | N/A |
| Rouse 7.20% Notes | N/A | $400,000,000.00 | N/A | N/A | N/A |
| Rouse 8.00% Notes | N/A | $200,000,000.00 | N/A | N/A | N/A |
| TRUPS Junior Subordinated Notes. | N/A | $206,200,000.00 | N/A | N/A | N/A |

---

[13] The Requested Fees and Requested Expenses are based on information submitted to General Growth as of December 21, 2011.

[14] The 2006 Lenders means the lenders under the 2006 Bank Loan Credit Agreement.

[15] This number is an estimate developed by General Growth in consultation with its advisors and is comprised of the estimated amount of (i) general unsecured claims asserted against General Growth (as anticipated by General Growth and its advisors) and (ii) debt held by holders of Rouse Notes, TRUPS Junior Subordinated Notes, and the holders of Exchangeable Notes (including the Consortium), all of which constituencies were represented by the Creditors' Committee. Administrative expense claims and priority tax claims are excluded from this calculation.

| Constituency/ Debt Series | Financial Advisor/ Investment Banker | Amount of Debt Held by Each Constituency as Applicable | Requested Fees | Requested Expenses | Total Fees and Expenses[13] |
|---|---|---|---|---|---|
| Consortium of holders of Exchangeable Notes | Moelis | $813,000,000.00[16] | $9,000,000.00 | $31,546.09 | $9,031,546.09 |

40.     First, of the seven series of notes governed by an indenture, only one – the Exchangeable Notes – has sought reimbursement of financial advisor fees.  Second, when comparing the fees of the other financial advisors in these chapter 11 cases against the amount of debt or value of the security held by the constituency, the fees sought by Moelis are disproportionately high in relationship to the aggregate principal amount of the Exchangeable Notes.

41.     In fact, even if compared strictly to the other fees claimed (without regard to the principal amount of the debt), the fees are likewise unreasonable as an expense under the Exchangeable Notes Indenture.  The fees and expenses claimed by Moelis total *more than four times* the fees and expenses claimed by Cantor, the financial advisor to the Equity Committee.  Similarly, Moelis's fees and expenses are more than twice those requested by Greenhill.  Greenhill has represented the 2006 Lenders – a creditor class whose financial advisor fees were payable under their credit agreement – throughout the course of these chapter 11 cases.  In an attempt to justify Moelis's fees and expenses, in its Second Fee Request, Wilmington Trust contends that, at the time Moelis was retained, there was "considerable doubt as to the extent of any payments on the Exchangeable Notes by the Debtors' estates."  Second Fee Request p. 2.  To

---

[16] Amount is as of May 6, 2009 as reflected in the 2019 Statement filed by Brown Rudnick with respect to Wilmington Trust, the Consortium of Exchangeable Notes holders, and an individual holder of Exchangeable Notes.  [Docket No. 368]

the extent that this statement is correct, the same issue would have applied to the 2006 Lenders and their retention of Greenhill.  The 2006 Lenders retained Greenhill on or about July 9, 2009, nearly three months *before* Moelis was retained.  Yet, Wilmington Trust has requested reimbursement of financial advisor fees and expenses that more than double the fees and expenses of Greenhill.

42.     Moelis's fees and expenses are nearly two-thirds those requested by Houlihan.  In contrast to Moelis which represented a subset of one group of claimants, the scope of Houlihan's engagement was significantly broader.  Houlihan represented the Creditors' Committee and the nearly 4,000 general unsecured creditors in these chapter 11 cases holding on the order of $90,000,000[17] of general unsecured debt as well as all of the debt series, including the holders of the Exchangeable Notes, aggregating approximately $4,001,200,000 in principal amount.  Finally, as noted above, no other indenture trustee in these chapter 11 cases retained or sought reimbursement from General Growth for the fees associated with a financial advisor or investment banker.

**2.    The Fees and Expenses of Brown Rudnick Exceed the
       Fees Claimed by Other Similarly Situated Professionals
       in These Chapter 11 Cases and Are an Unreasonable
       <u>Charge Under the Exchangeable Notes Indenture</u>**

43.     With respect to Brown Rudnick, the more than $3.3 million in fees and expenses claimed are far in excess of the fees and expenses of the indenture trustee counsel in these chapter 11 cases:

---

[17]  This number is an estimate developed by General Growth in consultation with its advisors and is comprised of the estimated amount of general unsecured claims asserted against General Growth (as anticipated by General Growth and its advisors).

| Constituency/ Debt Series | Indenture Trustee | Counsel | Approximate Amount of Debt Held by Each Constituency as Applicable | Requested Fees | Requested Expenses | Total Fees and Expenses[18] |
|---|---|---|---|---|---|---|
| Rouse 3.625% Notes, Rouse 5.375% Notes, Rouse 7.20% Notes, and Rouse 8.00% Notes | Bank of New York Mellon Trust Company, N.A. | Seward | $1,445,000,000.00 | $764,233.75 | $20,437.45 | $784,671.20 |
| TRUPS Junior Subordinated Notes. | HSBC Trust Company (Delaware), N.A. | Morrison Cohen | $206,200,000.00 | $100,197.63 | $5,000.00 | $105,197.63 |
| Rouse 6.75% Notes and Exchangeable Notes | Wilmington Trust | Foley and Baker[19] | $2,350,000,000.00 | $949,960.30 | $12,749.15 | $962,709.45 |
| **Consortium of holders of Exchangeable Notes** | **N/A** | **Brown Rudnick** | **$813,000,000.00[20]** | **$3,451,567.00** | **$163,812.86** | **$3,615,379.86 Less $303,972.51 paid prepetition by General Growth: $3,311,407.35[21]** |

---

[18] The Requested Fees and Requested Expenses are based on information submitted to General Growth as of December 21, 2011.

[19] General Growth considers the fees of Foley and Baker together given the change of attorney notice filed by Foley on October 29, 2009 [Docket No. 3339] substituting Foley for Baker as "attorneys of record" for Wilmington Trust in the Debtors' chapter 11 cases.

[20] General Growth obtained this figure from the *Verified Statement of Brown Rudnick LP Pursuant to Fed. R. Bankr. P. 2019(a)* filed on May 6, 2009 [Docket No. 368].

[21] Prior to the commencement of these chapter 11 cases, General Growth was negotiating with, among other parties, an ad hoc group of Exchangeable Notes holders. In connection with the negotiations, General Growth paid approximately $304,000 to Brown Rudnick on account of attorneys fees and disbursements for that ad hoc group.

Brown Rudnick's fees and expenses are more than four times the fees and expenses of Seward, nearly three and a half times the fees and expenses of Foley and Baker, and more than thirty-one times the fees and expenses of Morrison Cohen. Indeed, the fees and expenses for all counsel to all of the indenture trustees in these chapter 11 cases total $1,852,578.28. The fees and expenses claimed by Brown Rudnick alone are nearly twice this figure.

44. On February 24, 2010, General Growth announced in a press release that it would satisfy unsecured creditors in full and that shareholders would recover significant value. Moelis was retained on September 1, 2009. As such, Moelis's fees and expenses total more than $9 million in a case where payment in full was announced less than six months after Moelis was engaged. This amounts to over $1.5 million per month. No information was provided to General Growth as to what services, if any, were performed by Moelis over this period to earn these fees. Presumably, the expectation on the part of Wilmington Trust was that the mere presentation of a bill to General Growth was sufficient to ensure payment, regardless of the nature of the fees requested. Brown Rudnick was retained on April 23, 2009, 10 months before General Growth's announcement that all creditors would be paid in full. Approximately $900,000, more than one quarter of Brown Rudnick's fees and expenses were incurred *after* February 24, 2010.

**3. Wilmington Trust Was an Active Member of the Creditors' Committee since Its Formation and Its Interests Were Represented by Baker and Subsequently Foley**

45. Wilmington Trust has been an active member of the Creditors' Committee since its formation in April 2009. *Appointment of Committee of Unsecured Creditors* [Docket

No. 136].[22]  As an active member of the Creditors' Committee, Wilmington Trust participated in

frequent meetings with committee counsel and was privy to information and advice provided by

the Creditors' Committee's financial advisors to members of the Creditors' Committee.  As a

member of the Creditors' Committee, Wilmington Trust played a key role in making the

decisions affecting the unsecured creditors constituency and directing the actions of Creditors'

Committee counsel and financial advisor, Houlihan.  Wilmington Trust's membership on the

Creditors' Committee as well as its representation by Baker and subsequently Foley support the

argument that the fees and expenses of Moelis and Brown Rudnick are unreasonable charges

under the Exchangeable Notes Indenture, even if these professionals can properly be considered

agent and counsel, respectively, to Wilmington Trust.

46.     Courts have held that relevant considerations in analyzing the

reasonableness of fees include the potential duplication of efforts where multiple counsel are

involved as well as whether the official committee of unsecured creditors holds the same position

as, and can thus adequately represent, an indenture trustee's interests.  See In re Continental

Vending Mach. Corp., 543 F.2d 986, 994 (2d Cir. 1976) ("[W]here the interests of [a creditor]

and the trustee were parallel, the provision of duplicative services by the trustee may be taken

into account in appraising the extent and value of the services reasonably necessary to protect

[the creditor's] interests.").  Further, "judgment must be made in the awarding of fees as to

diminishing returns from such further efforts."  In re Nicfur-Cruz Realty Corp., 50 B.R. 162, 167

(Bankr. S.D.N.Y. 1985).  In addition, "[w]here an opposing party lodges a sufficiently specific

objection to an aspect of a fee award, the burden is on the party requesting the fees to justify the

---

[22] While the Creditors' Committee was reconstituted from time to time, Wilmington Trust remained a
member throughout.

size of its award.  <u>In re Worldwide Direct, Inc.</u>, 334 B.R. 112, 132 (Bankr. D. Del. 2005)

(quoting <u>Interfaith Comty. Org. v. Honeywell Int'l, Inc.</u>, 426 F.3d 694, 711 (3d Cir. 2005).

  47. In <u>In re W.T. Grant Co</u>, the District Court for the Southern District of New

York affirmed the bankruptcy court's decision to deny altogether the fees of multiple counsel to

bondholders.  119 B.R. 898 (S.D.N.Y. 1990), <u>aff'd</u>, 935 F.2d 1277 (2d Cir. 1991).  The indenture

trustee in <u>W.T. Grant</u> had already retained a law firm and the additional attorneys simply "failed

to present evidence that their services were non-duplicative or necessary to protect the interests"

of the bondholders.  <u>Id.</u> at 907.  The court also found "no evidence" that the bondholder who

retained the counsel "had been given any authority to retain counsel on behalf of anyone."  119

B.R. at 909.

  48. This is not the first time Wilmington Trust has had to account for its

failure to avoid duplicative professional fees.  One court significantly reduced the counsel fees

owed by the debtors to Wilmington Trust after finding that Wilmington Trust "did not exercise

the care required under the prudent person standard because it allowed duplication" of efforts

with counsel for the official unsecured creditors' committee.  <u>In re Worldwide Direct, Inc.</u>, 334

B.R. at 131.  The court held that "[w]hile it was prudent of [Wilmington Trust] to hire its own

attorneys, it had an obligation to assure that the firm did only what was necessary to protect the

Noteholders' interests."  <u>Id.</u> at 132.  The court was unconvinced by counsel's "self-serving"

affidavits that steps had been taken to avoid duplication:  "[M]any of the services rendered by

[Wilmington Trust's counsel] merely duplicated services performed by counsel for the

Committee.  It was unreasonable for [counsel] to perform them and [Wilmington Trust] cannot

be reimbursed for them."  <u>Id.</u> at 133.  The court also found it significant that Wilmington Trust

itself sat on the creditors' committee, stating that:

> [O]ur determination of what is necessary is tempered by the fact that a committee is authorized to retain counsel, accountants, financial advisors and other professionals to assist the committee in performing its duties. In large cases, committee advisors are typically retained and usually well-qualified to assist the committee in the performance of its duties. In such a case, it is difficult to justify allowing a committee member to hire its own legal counsel . . . to perform duties which are also performed by committee professionals. To allow such expenses would permit unnecessary duplication of effort.

Id. at 127 (citing a previous Worldwide Direct opinion, 259 B.R. 56, 61 (Bankr. D. Del. 2001).

49.    There is significant overlap between the roles of Houlihan and Moelis in these chapter 11 cases. For example, both Moelis and Houlihan agreed in their engagement letters respectively to review and analyze General Growth's business plans and financial projections or forecasts, assess General Growth's debt capacity, provide a valuation analysis, and advise on restructuring transactions. Similar issues arise in connection with Akin Gump Strauss Hauer & Feld LLP ("**Akin**"), counsel to the Creditors' Committee, and Brown Rudnick. Both Akin and Brown Rudnick spent significant amounts of time reviewing General Growth's background information, researching and addressing issues relating to bankruptcy remoteness; reviewing materials related to debtor in possession financing; reviewing tax issues and General Growth's REIT status; reviewing motions and other materials filed in these chapter 11 cases; developing strategies regarding these chapter 11 cases; attending hearings; reviewing issues regarding reinstatement, make-whole provisions, prepayment penalties and default interest; addressing issues related to exclusivity; reviewing materials related to bid procedures; and reviewing plans of reorganization. No evidence has been provided that illustrates any attempt to avoid the provision of duplicative services in light of Wilmington Trust's access to the professionals representing the Creditors' Committee.

50.     In addition, Wilmington Trust was represented by Baker and subsequently Foley.  In its Second Fee Request Wilmington Trust contends that "[i]t is entirely customary for an indenture trustee and consistent with Wilmington's prior practice and its obligations under the Exchangeables Indenture to employ two or more law firms to represent it with respect to different aspects of a case."  Second Fee Request p. 3.  However, no evidence has been provided which supports this contention.  Further, there is no reference in the Brown Rudnick Engagement Letter or indeed in any of the Retention Documents indicating a division of labor between Foley and Baker on the one hand and Brown Rudnick on the other, or setting forth a structure to avoid the provision of duplicative services by these professionals.  Indeed, a review of the time records presented by each of Foley and Brown Rudnick reveals that Brown Rudnick duplicated much of the same work that Foley performed (including participating in committee calls, reviewing pleadings, reviewing the plan and disclosure statement, and researching claims related issues), but also conducted additional work ostensibly on behalf of the Consortium that ranged from reviewing analyses prepared by Moelis, to reviewing news articles, to researching wiretapping statutes in a variety of states.  Given Wilmington Trust's active participation on the Creditors' Committee and its representation by Foley, it was not necessary for Wilmington Trust to retain a second law firm, Brown Rudnick, which indisputably had been representing and would continue to represent the Consortium.

51.     Although the chapter 11 cases of General Growth were unusual cases where this Court permitted the debtors to retain two law firms and two investment bankers, this should not have been taken to signify that an indenture trustee – particularly one that was a consistent member of the Creditors' Committee – had *carte blanche* to retain as many professionals as it desired at General Growth's expense.

28

**4. GENERAL GROWTH CANNOT DISCERN WHICH AMOUNTS WERE ATTRIBUTABLE TO WILMINGTON TRUST AND WHICH AMOUNTS WERE FOR SERVICES PERFORMED FOR THE CONSORTIUM**

52.     Even if Moelis and Brown Rudnick are agent and counsel, respectively, to Wilmington Trust, a point which General Growth disputes, it is clear from the Engagement Letters that these professionals were also simultaneously retained by the Consortium.  For example, the Brown Rudnick Engagement Letter states that in the event of a conflict of interest, "Brown Rudnick may withdraw as special counsel to the Indenture Trustee and *continue representation of the Consortium and/or the DIP Group*…."  Brown Rudnick Engagement Letter p. 5 (emphasis added).

53.     There is no provision in the TopCo Plan or the Exchangeable Notes Indenture that requires General Growth to pay professional fees incurred by individuals or ad hoc groups such as the Consortium.  In the present case, there is no way for General Growth to distinguish which portion of the $12,342,953.44 in fees and expenses claimed for Moelis and Brown Rudnick are attributable to the Consortium.  Indeed, no evidence or even guidance has been offered that identifies where one representation begins and the other ends.  Further, a substantial number of Brown Rudnick's time entries either reference services provided to the Consortium or offer no information at all as to which constituency was the appropriate recipient of Brown Rudnick's services.  With respect to Moelis, General Growth similarly has no information that enables it to allocate the claimed fee and expenses.

**C.     THE FEES AND EXPENSES FOR MOELIS AND BROWN RUDNICK ARE NOT APPROPRIATE UNDER THE EXCHANGEABLE NOTES INDENTURE**

54.     To the extent this Court determines that the Disputed Fees are not reasonable charges under the Exchangeable Notes Indenture, they may not be charged against *all* the holders of the Exchangeable Notes.  Specifically, section 7.08 of the Exchangeable Notes

Indenture provides that to the extent that the "*reasonable* compensation, expenses, disbursements and advances … shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other property which the Holders may be entitled to receive in such proceedings, whether in liquidation or under any plan of reorganization or arrangement or otherwise."  Exchangeable Notes Indenture ¶ 7.08 (emphasis added).

55.     Pursuant to Section 10.02 of the Exchangeable Notes Indenture, the written consent of each holder must be obtained to:

> (i) change the stated maturity of the principal of, or any installment of principal of, or interest on, the Securities; (ii) reduce the principal amount of, the rate of interest or the premium payable upon redemption of the Securities; (iii) reduce the amount of principal of the Securities payable upon acceleration of the maturity of the Securities.

Exchangeable Notes Indenture ¶ 10.02(a).

56.     The Engagement Letters for Moelis and Brown Rudnick provide that the fees and expenses of these professionals will be paid from recoveries to the Exchangeable Notes holders.  Specifically, the Moelis Engagement Letter states that "[t]he Indenture Trustee shall pay the Restructuring Fee solely from any and all consideration actually realized by the Indenture Trustee to which holders of the Notes are otherwise entitled to receive from the Company on account of the Notes pursuant to the Restructuring Transaction."  Moelis Engagement Letter ¶ 4.  Similarly, the Brown Rudnick Engagement Letter indicates that:

> "[i]t is expressly understood that the Trustee's liability for Brown Rudnick's fees and expenses will be limited to the amounts recovered by the Trustee, in its capacity as Indenture Trustee under the Indenture, from GGP, its property or its estate in bankruptcy; *from any recoveries on behalf of the holders of the Notes*…; from the Noteholders themselves; or from any other source of payment on account of Brown Rudnick's fees and expenses."

Brown Rudnick Engagement Letter p. 3.

57.     Wilmington Trust and the members of the Consortium had no right to burden all note holders with this obligation.  Upon information and belief, a substantial portion of the Exchangeable Notes holders did not provide the written consent required to have their recoveries reduced by the fees and expenses owed to Moelis and Brown Rudnick.  Not only was it unreasonable to attempt to shift the fees incurred onto unknowing note holders, but it also was a violation of Section 10.02(a) of the Exchangeable Notes Indenture.  Accordingly, to the extent that this Court determines the Disputed Fees are not reasonable charges under the Exchangeable Notes Indenture, it should simultaneously find that the Disputed Fees should not be paid from the distributions made to the holders through the charging lien provided for in the Exchangeable Notes Indenture or otherwise.

**D.     NEITHER GENERAL GROWTH NOR THE HOLDERS OF THE EXCHANGEABLE NOTES CLAIMS SHOULD BEAR THE COST OF THE PROFESSIONAL FEES AND EXPENSES FOR WILMINGTON TRUST, MOELIS, AND BROWN RUDNICK INCURRED IN CONNECTION WITH THIS DISPUTE OR THE ADVERSARY PROCEEDING**

58.     On information and belief, Wilmington Trust likely will seek reimbursement of the legal fees and other expenses incurred in connection with this fee dispute.  If it is not successful in obtaining payment of these fees and expenses from General Growth, it will likely try assess the fees and expenses against the distributions that would otherwise be payable to the holders of Exchangeable Note Claims.  As demonstrated above, the "retention" by Wilmington Trust of Moelis and Brown Rudnick was nothing more than a facade designed to "qualify" the Moelis and Brown Rudnick fees for reimbursement under the Exchangeable Notes Indenture.  The professionals at issue were, at bottom, retained by the Consortium.  Just as General Growth and the holders of Exchangeable Note Claims, *en masse*, should not be required

to reimburse these expenses and legal fees, so too should they not be required to reimburse Wilmington Trust's efforts to shift these costs to either General Growth or all the holders of the Exchangeable Notes.

## VII.

## NOTICE

59.     No trustee or examiner has been appointed in these chapter 11 cases.  The Debtors have served notice of this motion on:  (i) the office of the U.S. Trustee (Attn: Andrea B. Schwartz and Elisabetta G. Gasparini); (ii) Attorneys for the Creditors' Committee, Akin Gump Strauss Hauer & Feld LLP (Attn: Michael S. Stamer and James Savin); (iii) Attorneys for the Committee of Equity Security Holders, Saul Ewing LLP (Attn: J. Kuhns and J. Jerome); (iv) Brown Rudnick LLP (Attn:  Jeffrey L. Jonas); (v) Foley & Lardner LLP (Attn:  Douglas E. Spelfogel and Derek L. Wright); (vi) Latham & Watkins LLP (Attn:  Blair G. Connelly, Esq. and John D. Castiglione, Esq.); and (vii) parties entitled to receive notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Reorganized Debtors submit that no other or further notice need be provided.  No previous request for the relief sought herein has been made by the Reorganized Debtors to this or any other court.

WHEREFORE General Growth respectfully requests that the Court grant the

relief requested in this Objection and such other and further relief as it deems just and proper.

Dated: January 5, 2011
     New York, New York

                                   /s/ Gary T. Holtzer

Marcia L. Goldstein
Gary T. Holtzer
Adam P. Strochak
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

      and

Stephen A. Youngman *(admitted pro hac vice)*
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

      and

Sylvia A. Mayer *(admitted pro hac vice)*
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Reorganized Debtors

and

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Co-Attorneys for Certain Subsidiary
Reorganized Debtors