HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, NY 10016
Telephone: (212) 592-1400
Facsimile: (212) 592-1500
Andrew C. Gold

Attorneys for The Comptroller of the State of New York
as Trustee of the Common Retirement Fund

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                 :
In re:                                                           :   Chapter 11
                                                                 :
GENERAL GROWTH PROPERTIES, INC.,                                 :   Case No.:  09-11977 (ALG)
                                                                 :
                             Debtors.                            :
                                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**REPLY TO GGP'S RESPONSE TO OBJECTION OF THE COMPTROLLER OF
THE STATE OF NEW YORK AS TRUSTEE OF THE COMMON RETIREMENT
<u>FUND TO CURE AMOUNT IN CONNECTION WITH ITS CLAIM</u>**

The Comptroller of the State of New York as Trustee of the Common Retirement Fund, a fund established pursuant to NY Retirement and Social Security Law § 422 in the custody of the Comptroller of the State of New York ("CRF" or the "Common Retirement Fund"), by its counsel Herrick, Feinstein LLP, hereby files its reply (the "Reply") to the Debtors' response (the "Response") [Docket No. 6529] to CRF's objection (the "Objection")[1] [Docket No. 6121] to the cure amount in connection with CRF's claim against GGP LP.  In support of the Reply, CRF respectfully represents as follows:

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Objection.

1

**PRELIMINARY STATEMENT**

1. The Debtors, in this solvent chapter 11 case, have not provided any basis excusing them from their contractual obligation to pay default interest. Bankruptcy Code sections 1123(d) and 1124(e) and the post-1994 amendment case law make clear that the explicit and unambiguous terms of the contract and state law govern in determining the proper amount that must be paid to a secured creditor in order for a debtor to cure and reinstate the creditor's debt. The Debtors do not dispute that the Homart Note triggers the imposition of default interest upon the Debtors' bankruptcy filings, and that the default interest charged under the Homart Note is valid under state law. Accordingly, because CRF is legally entitled to default interest, the Debtors must pay CRF default interest in order to comply with the cure and reinstatement provisions of sections 1123 and 1124.

2. To the extent that the Debtors argue that CRF is not entitled to default interest where the default is based solely on the Debtors' bankruptcy filings, the statutes with respect to the unenforceability of *ipso facto* provisions also are unambiguous that they only apply to executory contracts and unexpired leases, neither of which are at issue here. The Debtors do not dispute that the Homart Note is a non-executory contract. Moreover, the leading Second Circuit decision acknowledging a secured lender's right to post-petition default interest was based, as here, on the imposition of default interest triggered solely by the debtor's bankruptcy filing. *See Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959). And, the recent decision by Judge Stong in the Eastern District of New York Bankruptcy Court case of *In re 20 Bayard Views, LLC* affirms that the presumption in favor of the contract default rate of interest applies where the default rate is triggered solely by the debtor's bankruptcy filing.

2

3. Notwithstanding the clear statutory and case law guidance on this issue, the Debtors urge the Court to ignore the provisions of the Bankruptcy Code, case law, and the terms of the underlying contract, because to allow CRF to collect default interest would be to grant CRF a windfall. The Debtors' windfall argument is a last desperate attempt to avoid the terms of a contract that so clearly provide for the payment of such default interest. CRF is not receiving any windfall; it is getting exactly what it is contractually entitled to receive. Indeed, the default interest provision in the note is important to *both* the Debtors and CRF because it allowed the Debtors to pay a lower non-default contract rate than it would have been able to obtain without the default interest provision. *See Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959). Furthermore, to deny default interest would benefit only the shareholders of the Debtors since they are solvent debtors. Under these circumstances, the contractual obligation should be enforced and default interest paid to CRF.

**REPLY**

**I.  The Debtors' Payment Of CRF's Interest At The Non-Default Rate Is Insufficient To Cure GGP LP's Defaults Pursuant To Section 1124**

4. The Debtors' Response does nothing to refute the plain language of the relevant statutes, as well as case law in the Southern District of New York. Each supports the payment of default interest as part of the Debtors' proposed cure and reinstatement of the Homart Note. In denying CRF's fundamental right to vote on the Plan, the Debtors proposed to deem CRF "unimpaired" under section 1124(d) of the Bankruptcy Code by curing and reinstating the Homart Note. To accomplish this, section 1124(d) requires the Debtors to leave unaltered CRF's legal, equitable and contractual rights. Section 1124(d) provides, in full, that:

3

> Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan--
>
> (1)  leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or
>
> (2)  notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payments of such claim or interest after the occurrence of a default--
>
>> (A)  cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;
>>
>> (B)  reinstates the maturity of such claim or interest as such maturity existed before such default;
>>
>> (C)  compensates the holder of such claim or interest for damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;
>>
>> (D)  if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and
>>
>> (E)  **does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.**

11 U.S.C. § 1124(d) (emphasis added).

    5.    To add further clarity to the determination of the proper amount of a cure in any plan that proposed to cure and reinstate, the Bankruptcy Code was amended in 1994 to add section 1123(d), which provides as follows:

4

> Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default **the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law**.

11 U.S.C. § 1123(d) (emphasis added).

6. The 1994 amendment to section 1123 makes clear that the terms of the contract and state law govern the amount required to cure a default. *See, e.g., In re Moody Nat'l SHS Houston H, LLC*, 426 B.R. 667, 672 (Bankr. S.D. Tex. 2010) ("To the extent there was ambiguity as to how to cure a default when *Entz-White* was written, that ambiguity evaporated in 1994 when § 1123(d) was added."); *In re K&J Props., Inc.*, 338 B.R. 450, 461 (Bankr. D. Colo. 2005) ("The 1994 amendments to section 1123 appear specifically to address this matter [of whether cure and reinstatement can nullify default interest], requiring '… the amount necessary to cure the default, shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.' 11 U.S.C. § 1123(d). Section 1123(a)(5)(G) and section 1124(2) provide no basis to nullify the post-petition default interest claimed by PWP to the extent it is otherwise allowable under PWP's loan documents and applicable nonbankruptcy law.").

7. Section 1123(d) is unambiguous, so there is no need to look to its legislative history. It very plainly states that "the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d). However, even if the legislative history is consulted, it does not support the Debtors' position. The court in *Moody* analyzed the legislative history of section 1123(d) and concluded that "the legislative history *hurts* rather than helps the [debtor's] position." *In re*

5

*Moody Nat'l SHS Houston H, LLC*, 426 B.R. at 674. The *Moody* court recognized that the particular issue addressed by 1123(d) was to overrule the Supreme Court's holding in *Rake v. Wade*, 508 U.S. 464 (1993), that, where a chapter 13 debtor's plan cured a default, the creditor was entitled to interest on interest whether or not the agreement or state law provided for it. But, as the *Moody* court also correctly acknowledged, Congress did not amend section 1123 to just address *Rake* in a specific manner; instead, Congress invoked a broader remedy: look to the contract and state law in determining cure amounts. *Id.* And not just the cure amounts in a chapter 13 plan at issue in *Rake* (because Congress could have amended just section 1322), but cure amounts in connection with any plan that proposes to cure and reinstate should be determined by contract or state law. *Id.*

8. Thus, section 1123(d) requires a debtor to pay default interest in order to cure and reinstate if the underlying contract provides for default interest and state law allows it. No longer is it a viable argument that a debtor's cure and reinstatement of a claim nullifies the secured creditor's contractual right to default interest. All the New York and Second Circuit authority that the Debtors cite in their Response to support the proposition that default interest can be nullified by the Debtors' cure and reinstatement are <u>pre-1994 amendment cases</u>. The District Court for the Southern District of New York decision in *In re 139-141 Owners Corp.* remains the only post-1994 amendment case in this District that squarely addresses the present dispute, and that decision clearly holds that a debtor must pay default interest in order to cure and reinstate under section 1124(2):

> [Section 1124(2)] on its face is concerned only with a contract provision requiring 'accelerated payment' upon a default, and the statute permits the debtor to de-accelerate and reinstate the pre-default maturity of the loan only if the plan . . . 'does not otherwise alter' the secured creditor's contractual rights.' Because the denial

6

> of a mortgagee's contractual right to interest at a default rate does
> 'alter' the secured creditor's contractual rights within the meaning
> of subsection (D) of Section 1124(2), *Section 1124(2) does not
> provide a statutory basis for judicial nullification of a contract
> right to default interest rate.*

*In re 139-141 Owners Corp.*, 313 B.R. 364, 368 (S.D.N.Y. 2004) (internal quotations and citations omitted, emphasis added).

9. In this case, the Homart Note expressly provides that default interest is to be paid upon the filing of the Debtors' bankruptcy cases with no further action required by CRF, and the Debtors do not dispute that the default rate is enforceable as a matter of state law. *See* Response ¶ 36 ("The Reorganized Debtors agree that, as a standalone figure, the percentage of the Default Rate is not disproportionately higher than the non-default rate contained in the Homart Note."). Accordingly, because CRF is entitled to be paid default interest under the terms of the Homart Note, the Debtors must pay the default interest in order to cure and reinstate the Homart Note and be able to deem CRF unimpaired and not entitled to vote under the Plan.

10. The Debtors' reliance on *In re Northwest Airlines Corp.*, 2007 WL 3376895 (Bankr. S.D.N.Y. Nov. 9, 2007), is misplaced. The debtor in that case objected to a secured lender's request for post-petition default interest on the entire principal balance of its loan rather than on defaulted installments, by invoking section 1124(d) and arguing that the cure and reinstatement of the creditor's debt limits the payment of interest to the past due installments and not the entire accelerated principal. 2007 WL 3376895 at *6. This Court in *Northwest* questioned the debtor's attempt to use section 1124 to avoid payment of default interest and reiterated the District Court's holding in *re 139-141 Owners Corp.* that only section 506 provided a statutory basis for denying a secured creditor's contractual right to default interest.

7

*Id.* This Court specifically did not apply section 1124(2), and instead denied the creditor's claim for default interest based on equitable considerations under section 506(b).

11. Even if the Court in this case were to apply equitable considerations under section 506, CRF clearly would be entitled to default interest. As CRF argued in its Objection, the law in the Second Circuit provides that, in solvent debtor cases, there is a presumption in favor of applying the default rate of interest set forth in the contract between the lender and the debtor, subject to certain equitable considerations. *See, e.g., Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959); *In re Urban Communicators PCS Ltd. P'ship*, 394 B.R. 325 (S.D.N.Y. 2008); *In re Adejobi*, 404 B.R. 78 (Bankr. E.D.N.Y. 2009); *In re 139-141 Owners Corp.*, 313 B.R. 364 (Bankr. S.D.N.Y. 2004); *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122 (Bankr. E.D.N.Y. 2002); *In re Vest Assocs.*, 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998); *In re 20 Bayard Views, LLC*; Case No. 09-50723 (Bankr. E.D.N.Y. Aug. 11, 2010). A "solvent Debtor's…filing of a bankruptcy petition to avoid a contractual default rate of interest" can not be allowed because "it would be inequitable and inappropriate to deny a creditor's right to interest at the default rate, particularly where the debtor was solvent and knowingly bargained for the terms of his contract." *In re 139-141 Owners Corp.*, 313 B.R. 364, 369 (Bankr. S.D.N.Y. 2004) (citing *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959)).

12. Bankruptcy courts have identified the following limited circumstances that would justify the rebuttal of the presumption in favor of a default rate interest: (i) misconduct by the creditor, (ii) harm to the unsecured creditors, (iii) the interest rate is a penalty, or (iv) preventing the debtor's fresh start. *See, e.g, In re P.G. Realty Co.*, 220 B.R. 773, 780 (Bankr. E.D.N.Y. 1998). None of those equitable considerations applies here. There has been

8

no misconduct, nor have the Debtors alleged any misconduct, by CRF. The Debtors concede that the Default Rate itself is not a penalty. The Debtors' ability to obtain a fresh start is not impaired, because the Debtors have already confirmed the Plan and have obtained their fresh start. Lastly, there is no harm to unsecured creditors because all general unsecured claims will have received a 100% distribution under the Plan, regardless of the outcome of this dispute.

**II.     The Default Rate Applies As Of The Petition Date**

13.    The plain language of section 365(e)(1) of the Bankruptcy Code prohibits the enforcement of *ipso facto* clauses, such as the one contained in the Homart Note, only in executory contracts and unexpired leases. U.S.C. § 365(e)(1). As Homart Note is neither an executory contract or an unexpired lease, the prohibition against *ipso facto* clauses does not apply to the Homart Note.

14.    The Debtors cite to a number of cases in support of their contention that the *ipso facto* provision in the Homart Note is unenforceable even though the Homart Note is not an executory contract. None of those cases (except *In re Bownetree*, an executory contract case, discussed *infra*) are from any courts in New York or the Second Circuit. Indeed, in the seminal Second Circuit decision regarding a secured lender's right to default interest, the Court of Appeals allowed a secured lender default interest that was triggered solely by the filing of the debtor's bankruptcy petition.

15.    In *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959), the notes at issue contained an *ipso facto* clause that triggered default interest at 6% (rather than non-default interest of 4%) upon the occurrence of an event of default, including a bankruptcy filing. The debtor filed bankruptcy and the holder of the notes entered into a standstill agreement. The

9

noteholder, post-bankruptcy filing, declared the notes due and payable solely on the basis of the bankruptcy filing as an event of default and asserted default interest. In ruling for the noteholder, the Court of Appeals upheld a default interest provision on the grounds that such a default provision could benefit the debtor and that abrogating the contractually agreed to provision would be unfair to the creditor:

> A variable interest provision in event of a stated default such as we have here is not a penalty, nor should it be considered unconscionable. … <u>It can be beneficial to a debtor in that it may enable him to obtain money at a lower rate of interest than he could otherwise obtain it, for if a creditor had to anticipate a possible loss in the value of a loan due to his debtor's bankruptcy or reorganization, he would need to exact a higher uniform interest rate for the full life of the loan</u>. The debtor has the benefit of the lower rate until the crucial event occurs; he need not pay a higher rate throughout the life of the loan.
>
> Undoubtedly the debtor filed its petition under Chapter XI because it believed it beneficial to itself to do so, and in a case such as this, where there is no showing that the creditor entitled to the increased interest caused any unjust delay in the proceedings, it seems to us <u>the opposite of equity</u> to allow the debtor to escape the expressly-bargained-for result of its act.

269 F.2d at 832 (internal citations omitted, emphasis added).

16. *Ruskin* remains good law. "[T]he Second Circuit found that it would be inequitable and inappropriate to deny a creditor's right to interest at the default rate, particularly where the debtor was solvent [as in this case] and knowingly bargained for the terms of his contract. *Ruskin* remains the law of the Second Circuit and applies to this case." *In re 139-141 Owners Corp.*, 313 B.R. 364, 369 (Bankr. S.D.N.Y. 2004) (emphasis added).

17. More recent case law from bankruptcy courts in the Southern and Eastern Districts of New York support the enforceability of *ipso facto* clauses that trigger default interest. For example, in *In re Saint Vincent's Catholic Med. Ctrs. of N.Y.*, this Court held that *ipso facto*

10

clauses providing for penalties and default interest upon the filing of a bankruptcy case were enforceable. 440 B.R. 587, 601-02 (Bankr. S.D.N.Y. 2010). And as discussed in CRF's Objection, the Eastern District of New York Bankruptcy Court allowed a secured lender's claim for post-petition interest at the default rate based solely on the debtor's bankruptcy filing as the triggering event of default. *See In re 20 Bayard Views, LLC*; Case No. 09-50723 (Bankr. E.D.N.Y. Aug. 11, 2010). In granting the secured lender default interest at 24%, the court distinguished the case from the case of *In re Bownetree*, 2009 WL 22261-7 (Bankr. E.D.N.Y. 2009), in which the parties there agreed that the mortgage at issue was an executory contract. Accordingly, *In re Bownetree* is inapposite to the facts here.

18. The courts in *Ruskin*, *Saint Vincent's*, and *20 Bayard Views* did not find that the *ipso facto* clauses in those cases were unenforceable. If those courts had believed that *ipso facto* clauses are unenforceable as a general policy matter (as the Debtors suggest), then it would not have mattered if the agreements at issue in those cases were executory or not. But those courts *did* find it relevant, and correctly so, because to hold otherwise would lead to an irreconcilable reading of section 365(e)(1) of the Bankruptcy Code which unambiguously addresses *ipso facto* provisions only in *executory* contracts.

For all the foregoing reasons, CRF respectfully requests that this Court allow CRF's claim for, and compel the Debtors to pay CRF, default interest, fees, costs and expenses and grant CRF such other and further relief as the Court deems just and equitable.

Dated: New York, New York
February 22, 2011

HERRICK, FEINSTEIN LLP

Attorneys for The Comptroller of the State of New York as Trustee of the Common Retirement Fund

By:    /s/ Andrew C. Gold
    Andrew C. Gold
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
agold@herrick.com

HF 6311988v.3 #03138/0016