**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------x
In re:

GENERAL GROWTH PROPERTIES, INC., *et al.*,

                         Reorganized Debtors.

---------------------------------------------------------------------x

Chapter 11

Case No. 09-11977 (ALG)

(Jointly Administered)

## MEMORANDUM OF OPINION

A P P E A R A N C E S :

WEIL, GOTSHAL & MANGES LLP
*Attorneys for the Reorganized Debtors*
767 Fifth Avenue
New York, New York 10153
  By:  Marcia L. Goldstein
         Gary T. Holtzer
         Adam P. Strochak

200 Crescent Court, Suite 300
Dallas, Texas 75201
  By:  Stephen A. Youngman

700 Louisiana Street, Suite 1600
Houston, Texas 77002
  By:  Sylvia A. Mayer

KIRKLAND & ELLIS LLP
*Co-Counsel for the Reorganized Debtors*
300 North LaSalle Street
Chicago, Illinois 60654
  By:  James H.M. Sprayregen
         Anup Sathy

HERRICK, FEINSTEIN LLP
*Attorneys for the Comptroller of the State of New York,*
*as Trustee of the Common Retirement Fund*
2 Park Avenue
New York, NY 10016
  By:  Andrew C. Gold

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

The Comptroller of the State of New York, as trustee of the Common Retirement Fund ("CRF"), has objected to its treatment under the Reorganized Debtors' Third Amended Joint Plan of Reorganization (the "Plan") (Dkt. No. 6232).[1] Under the Plan, CRF's debt was reinstated. The sole issue is whether CRF is entitled to post-petition interest on its claim at the contract default rate of 8.95% for the period from the filing of the Chapter 11 petition of GGP Limited Partnership ("GGP") through November 9, 2010, the Effective Date. For the reasons set forth hereafter, in this involving a solvent debtor, CRF is entitled to such interest.

## BACKGROUND

The background facts set forth hereafter are largely taken from a stipulation of facts entered into between GGP and CRF (Dkt. No. 6728) and are not in dispute. On or about February 8, 2008, CRF and GGP entered into a promissory note (the "Homart Note") pursuant to which CRF extended a loan of $254 million to GGP in connection with GGP's purchase of a 50% interest in the "Homart II" joint venture, which is the indirect owner of twelve stand-alone shopping centers or malls. Pursuant to the Homart Note, GGP promised to pay CRF the outstanding principal amount upon maturity and to make quarterly interest payments. The Homart Note matures on February 28, 2013 and is secured by a pledge of GGP's shares in the Homart II joint venture.

The Homart Note provides that, among other things, the voluntary commencement of a bankruptcy case by GGP constitutes an event of default. *See* Art.

---

[1] The confirmation order (Dkt. No. 6240) was entered on October 21, 2010 and the Plan became effective on November 9, 2010 (the "Effective Date").

2

3(F), Homart Note. In contrast to other events of default in Article 3 of the Homart Note, subsection (F) provides that an event of default premised on the commencement of a voluntary bankruptcy case occurs automatically and without any requirement that CRF "call" the default by providing notice to any party. *See* Art. 3, Homart Note. Upon the occurrence of an event of default, the Homart Note provides that CRF is entitled to a 3% increase in the rate of interest owed on the balance of the unpaid principal for a total interest rate of 8.95% per annum (the "Default Rate"). *See* Art. 4, Homart Note. There is no dispute that the Default Rate, as a standalone figure, is not disproportionately higher than the non-default rate contained in the Homart Note. *See Stipulation of Facts* at ¶ 3.

There is no dispute that prior to April 16, 2009 (the "Petition Date"), the Homart Note was not in default. Pursuant to Art. 3(F) of the Homart Note, GGP's filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code on April 16, 2009 constituted an automatic and immediate event of default. On November 5, 2009, CRF filed its secured proof of claim (the "CRF Claim") in the principal amount of $245,115,000 plus interest at the non-default rate of 5.95% through May 31, 2009 and thereafter at the default rate of 8.95%.[2] The CRF Claim

---

[2] In CRF's objection (the "Objection") to the Plan, dated October 7, 2010 (Dkt. No. 6121), CRF asserts that the CRF Claim is "a secured claim in the principal amount of $245,115,000, plus interest at the non-default rate of 5.95% through May 31, 2009 in the amount of $3,727,109.75 and interest at the default rate of 8.95% from June 1, 2009 through October 30, 2009 in the total amount of $9,262,653.50." *Objection* at ¶ 13. CRF also asserts that "Interest continues to accrue at the rate of $60,938.31 per diem." *Id.* at ¶ 14. In footnote 3 of GGP's Response (Dkt. No. 6529), filed on or about January 10, 2011, GGP suggested that the reference to October 30, 2009 is a "scrivener's error" and that CRF intended to refer to October 30, 2010. Rather than a scrivener's error, it appears that October 30, 2009 was chosen to allow calculation of the amount of default interest then owing prior to filing the CRF Claim. CRF alleges an entitlement to interest at the Default Rate thereafter through the Effective Date at a per diem of $60,938. *Id.* at ¶ 14, 31.

3

further asserts a claim for fees and expenses, including attorney's fees. Other than as discussed below, GGP has not objected to the CRF Claim.

Pursuant to § 4.13 of the Plan, which was filed on August 27, 2010, GGP proposed to cure the default on the Homart Note by reinstating the principal amount of the debt and paying any outstanding interest due to CRF at the non-default rate of 5.95%. In the Objection, CRF claimed that GGP "(i) incorrectly assumes that payment of CRF's claim at the non-default contract rate is sufficient . . . (ii) does not take into account the fees and expenses incurred by CRF, and (iii) in any event, does not fully pay CRF's claim because CRF is entitled to default interest." *Objection* at ¶ 1. GGP and CRF agreed to defer resolution of the Objection until after GGP's emergence from bankruptcy. On the Effective Date, consistent with § 4.13 of the Plan, GGP reinstated the Homart note and paid CRF $25,298,014.34 in cash to compensate CRF for accrued interest at the non-default rate from March 1, 2009 through the Effective Date and professional fees. Payment of this amount does not reflect payment of any interest at the Default Rate, and it reduced the sum in dispute to approximately $11.5 million.

There is also no dispute that GGP is and was, on the Effective Date, highly solvent. *See Stipulation of Facts* at ¶ 2. Indeed, because of the progress made during the course of the Chapter 11 cases of GGP and its affiliates, the Reorganized Debtors were able to relist their stock on the New York Stock Exchange even before their emergence from bankruptcy, apparently the first debtors to do so. *See* Debtor's Disclosure Statement at Art. III.B.7.[3] GGP and its affiliates emerged from bankruptcy

---

[3] The Disclosure Statement for Plan Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code was filed on August 27, 2010 (Dkt. No. 5865).

as the second largest mall owner in the United States, with 180 malls in 43 states. *Id.* at Art. I.A. They restructured more than $15 billion of secured debt, and more than $7 billion of unsecured creditor claims was paid in full with post-petition interest or reinstated. According to counsel for the Equity Committee, on the Effective Date, GGP and its affiliates distributed approximately $6 billion in value to its shareholders. *See* May 26, 2011, Trial Tr. (statement of John Jerome) (Dkt. No. 6939).

## DISCUSSION

Any consideration of a claim for post-petition interest should start with the statutory predicates. Section 502(b)(2) of the Bankruptcy Code ordinarily disallows post-petition interest, a principle that the Supreme Court has stated is "[t]he general rule in bankruptcy and in equity receivership" because the delay of the case is "a delay necessitated by law if the courts are properly to preserve the estate for the benefit of all interests involved." *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 163-64 (1946). Today this general rule is subject to two exceptions in Chapter 11 cases—one statutory and one court-created. *See* Carmen H. Lonstein and Steven A. Domanowski, *Payment of Post-Petition Interest to Unsecured Creditors: Federal Judgment Rate Versus Contract Rate*, 12 AM. BANKR. INST. L. REV. 421, 423 (Winter, 2004). The statutory exception is set forth in § 506(b) of the Bankruptcy Code, which provides:

> To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose.

5

11 U.S.C. § 506(b). Although § 506(b) provides that an oversecured creditor is entitled to post-petition interest, it does not specify an interest rate. CRF and GGP agree that there is a rebuttable presumption in favor of granting an oversecured creditor interest at the rate specified in the contract, subject to equitable considerations. *See Key Bank Nat'l Ass'n v. Milham (In re Milham)*, 141 F.3d 420, 423 (2d Cir. 1998); *Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*, 160 F.3d 1054 (5th Cir. 1998); *Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325 (S.D.N.Y. 2008); *In re 139-141 Owners Corp.,* 313 B.R. 364 (S.D.N.Y. 2004); *In re Vest Assocs.*, 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998); *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122 (Bankr. E.D.N.Y. 2002); *In re Adejobi*, 404 B.R. 78 (Bankr. E.D.N.Y. 2009).

The court-created exception to the disallowance of post-petition interest is based on the principle that before there is a return to equity in a reorganization case, creditors should receive interest as compensation for the delay of the bankruptcy process. In *Ruskin v. Griffith*, 269 F.2d 827 (2d. Cir 1959), *cert. denied*, 361 U.S. 947 (1960), which remains binding authority even though it arose under the prior Bankruptcy Act,[4] the relevant agreement provided that upon the occurrence of an event of default, including the commencement of a bankruptcy case, noteholders could accelerate the entire unpaid amount of the notes upon notice to the debtor. Such notice was provided by the creditor in *Ruskin*, and the Court required the debtor to pay the default rate of interest, which was 6% rather than 4%, because the debtor was

---

[4] *See Citibank v. Nyland*, 878 F.2d 620, 625 (2d Cir. 1989) (finding that vitality of *Ruskin* remains unimpaired); *see also Urban Communicators PCS Ltd. P'ship*, 394 B.R. at 340 (collecting cases holding that *Ruskin* remains binding in the Second Circuit).

solvent and the Court found that the variable interest provision was not a penalty. The Court also stated that under the facts there, it would have been "the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act." *Id.* at 832.[5]

In the case at bar, CRF's right to receive default interest derives from the Debtors' reinstatement of the loan under § 1124 of the Bankruptcy Code. Section 1124 permits a debtor to reinstate debt in connection with confirmation of a Plan by curing any existing defaults and reinstating the maturity of the debt, without altering the legal, equitable or contractual rights of the debt holder.[6] GGP asserts that cure and reinstatement erases all effects of a default, and that since one effect of a default is the contractual right to interest at the Default Rate, reinstatement and cure wipes out this aspect of default as well. *See Response* at ¶ 20. In support of its proposition, GGP cites several older cases, including *Levy v. Forest Hills Assocs. (In re Forest Hills Assocs.)*, 40 B.R. 410 (Bankr. S.D.N.Y. 1984). *See Response* at ¶ 22; *see also Great Western Bank & Trust v. Entz-White Lumber and Supply, Inc. (Entz-White Lumber and Supply, Inc.)*, 850 F.2d 1338 (9th Cir. 1988). Other Courts in this district have rejected an expansive reading of § 1124(2). *See In re 139-141 Owners Corp.,* 313 B.R. at 368 ("Section 1124(2) does not provide a statutory basis for judicial

---

[5] The principle that creditors should be paid interest before any return is provided to equity is also reflected in 11 U.S.C. § 726(a)(5), which requires payment of interest to creditors at the legal rate before payment to equity in chapter 7 cases. Section 1129(a)(7), the "best interests test," provides that each creditor in a chapter 11 case must generally receive a distribution at least as large as it would receive in a chapter 7 liquidation, providing a further basis for the requirement that some post-petition interest be paid.

[6] In relevant part, § 1124(2) defines a class of claims as unimpaired under a plan provided that the plan, "notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—(A) cures any such default that occurred before or after the commencement of the case . . .;" (B) reinstates the pre-default maturity of such claim; "(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;" and "(E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest." Section 1124 contains several exceptions not relevant to the instant matter.

7

nullification of a contract right to default interest rate."). There is also conflicting authority whether the reasoning of cases such as *Entz-White* survived the 1994 amendment of the Bankruptcy Code, which added § 1123(d).[7] *Compare In re Moody Nat'l SHS Houston H, LLC*, 426 B.R. 667, 672 (Bankr. S.D. Tex. 2010) ("to the extent that there was ambiguity as to how to cure a default when *Entz-White* was written, that ambiguity evaporated in 1994 when § 1123(d) was added" to the Bankruptcy Code), *with In re Phoenix Bus. Park Ltd. P'Ship*, 257 B.R. 517, 522 (Bankr. D. Az. 2001) (construing the language of § 365(b)(2) of the Bankruptcy Code, which was adopted at the same time as § 1123(d), together with § 1124(2) and finding that "*Entz-White* remains good law in the Ninth Circuit" because "Congress did not legislatively overrule *Entz-White*" when it enacted § 1123(d)). We need not resolve this apparent conflict, however, because § 1123(d) certainly does not preclude the payment of default interest—under the facts of this case, § 1123(d) points to its payment "in accordance with the underlying agreement and applicable nonbankruptcy law." In any event, the instant matter falls squarely within the reasoning of *Ruskin v. Griffith* and its progeny. *Ruskin* calls for the payment of default interest by a solvent debtor to effect the cure and reinstatement of a debt, absent factors that would make such payment inequitable.

In the instant case, none of the factors typically justifying the nullification of a default rate interest provision are present. GGP has stipulated that, as a stand-alone

---

[7] 11 U.S.C. § 1123(d) provides that :

> Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

rate, the Default Rate is not a penalty. GGP has not alleged any misconduct by CRF. Finally, payment of default interest would neither inflict harm on other unsecured creditors nor impair GGP's fresh start because GGP was exceedingly solvent when it emerged from bankruptcy. As the Second Circuit said many years ago in *Ruskin v. Griffiths*, if creditors could not rely on the courts to enforce default interest rate clauses, creditors would have "to anticipate a possible loss in the value of the loan due to his debtor's bankruptcy or reorganization, [and a lender] would need to exact a higher uniform interest rate for the full life of the loan," unnecessarily increasing the cost of credit for all borrowers. *Ruskin,* 269 F.2d at 832.

GGP also argues that 1123(d) was enacted solely to overrule the Supreme Court's decision in *Rake v. Wade*, 508 U.S. 464 (1993), which construed § 1322 of the Bankruptcy Code and held that the statute requires that compound interest be paid by debtors defaulting on their mortgage, notwithstanding applicable state law. *See Supplemental Statement* at ¶ 3 (Dkt. No. 6715). GGP suggests that Congress' express purpose in enacting this section was to ensure that "a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never occurred." *Id.*, citing 140 Cong. Rec. H. 10, 770 (Oct 4, 1994); s*ee also, In re Schatz*, 426 B.R. 24 (Bankr. D.N.H. 2009), which disallowed post-petition default rate interest where the creditor was also recovering costs and attorneys' fees pursuant to section 506(b).[8] However, as CRF responds, § 1123(d) is a chapter 11 provision, and the plain terms of the 1994 amendments to the Bankruptcy Code are far broader than necessary if the

---

[8] It should also be noted that the Court in *In re Phoenix Bus. Park Ltd. P'Ship* determined that the default rate in that case of 24% was a "penalty rate" when compared to the contract rate of 10.75% and held that "if a default interest rate is a 'penalty rate,' then it does not need to be paid as part of a section 1124(2) cure." *In re Phoenix Bus. Park Ltd. P'Ship*, 257 B.R. at 521.

09-11977-alg    Doc 6947    Filed 06/16/11    Entered 06/16/11 16:05:32    Main Document
Pg 10 of 15

amendment's only purpose was to overturn *Rake*, a chapter 13 case. *See* Dean
Pawlowic, *Entitlement to Interest under the Bankruptcy Code*, 12 BANKR. DEV. J.
149, 179-82 (1995); *see, e.g., In re Moody Nat'l SHS Houston H, LLC*, 426 B.R. 667;
*see also Hepner v. PWP Golden Eagle Tree, LLC (In re K&J Props., Inc.)* 338 B.R.
450, 461 (Bankr. D. Colo. 2005); *see also* 140 Cong. Rec. H. 10, 770.

The payment of default interest in this matter is also consistent with the
increasing reluctance of courts in this and other circuits, in construing the requirement
of § 506(b) that an oversecured creditor receive "interest," to modify private
contractual arrangements imposing default interest rates except where: (i) there has
been creditor misconduct; (ii) application of the contractual interest rate would cause
harm to the unsecured creditors; (iii) the contractual interest rate constitutes a penalty;
or (iv) its application would impair the debtor's fresh start.[9] *See In re P.G. Realty Co.*,
220 B.R. at 780; *see also In re Vest Assocs.*, 217 B.R. at 702-03 ("The developing
consensus is a presumption in favor of the contract default rate subject to equitable
considerations."). This reluctance is particularly evident in cases where the debtor
proves to be solvent. *See In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006)
(holding that "in solvent debtor cases, rather than considering equitable principles,
courts have generally confined themselves to determining and enforcing whatever
pre-petition rights a given creditor has against the debtor."); *see also In re 139-141
Owners Corp.*, 313 B.R. at 368; *In re Southland Corp.*, 160 F.3d at 1060; *In re
Payless Cashways, Inc.*, 287 B.R. 482, 489 (Bankr. W.D. Mo. 2002); *cf. Matter of*

---

[9] The parties have not stipulated whether CRF is oversecured by virtue of its security interest in the
Homart II joint venture. However, during the course of the GGP Chapter 11 case, the parties only cited
one secured creditor as possibly undersecured, and the collateral there was a mall in Louisiana
adversely affected by Hurricane Katrina.

10

*Chicago, Milwaukee, St. Paul and Pacific R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986) (holding that "if the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights").

This Court's decision in *In re Northwest Airlines Corp.*, 2007 WL 3376895 (Bankr. S.D.N.Y. Nov. 9, 2007), cited by GGP, is not to the contrary. In that case, the Court canvassed some of the same authority cited herein relative to the reinstatement and cure of a default of a secured loan under § 1124 of the Bankruptcy Code. *See Id.* at *6. The equitable factors typically used in determining a rate for "interest" under § 506(b) were applied, and the § 506(b) claim for default interest was denied because the notice required to accelerate the debt had never been given, the debtor was insolvent, and payment of interest at the default rate would have come at the expense of the unsecured creditors. *Id.* The reasons supporting the denial of default interest in *Northwest* are not present in the case at bar.

Finally, GGP contends that the Default Rate should not be applied because it was never triggered and did not become applicable. *See Response* at ¶ 27. Although Article 3(F) of the Homart Note provides for the automatic imposition of the Default Rate on the outstanding principal upon the commencement of a bankruptcy case without the need for any further action, GGP asserts that Art. 3(F) is an invalid *ipso facto* clause that should not be given effect because it penalizes GGP for seeking chapter 11 relief. *See Response* at ¶ 1, citing 11 U.S.C. § 365(e)(1).

As a matter of statute, the question whether a bankruptcy default clause should be treated as an invalid *ipso facto* clause depends on whether the contract at

11

issue is an executory contract or unexpired lease. *See* 11 U.S.C. § 365(e)(1).[10] GGP

does not assert that the Homart Note is an executory contract, much less an unexpired

lease, accepting the obvious fact that the only obligation remaining to be performed

by GGP under the Homart Note is repayment and that loan agreements are generally

not considered to be executory contracts. *See NLRB v. Bildisco & Bildisco*, 465 U.S.

513, 523 n.6 (1984) (executory contracts are those "on which performance remains

due to some extent on both sides."); *see In re Calpine,* Case No. 05-60200-BRL, 2008

WL 3154763 at *4 (Bankr. S.D.N.Y. Aug. 4, 2008); *In re Chateaugay Corp.*, 102

B.R. 335, 347 (Bankr. S.D.N.Y. 1989); H.R.Rep. No. 95–595, 95th Cong., 2d Sess.

347, reprinted in 1978 U.S. Code Cong. & Admin. News 6303–04 (a "note is not

usually an executory contract if the only performance that remains is repayment").[11]

GGP nonetheless contends that *ipso facto* clauses are generally disfavored and

should not be enforceable even when contained in a non-executory contract. *See*

*Response* at ¶ 15, citing *General Motors Acceptance Corp. v. Rose (In re Rose)*, 21

B.R. 272, 276 (Bankr. D. N.J. 1982).[12] In contrast, CRF has cited recent case law in

---

[10] In relevant part, 11 U.S.C. § 365(e)(1) of the Bankruptcy Code provides:

> an executory contract or unexpired lease of the debtor may not be
> terminated or modified, and any right or obligation under such
> contract or lease may not be terminated or modified, at any
> time after the commencement of the case solely because of a provision
> in such contract or lease that is conditioned on . . . (B) the
> commencement of a case under this title.

[11] The term "executory contract" is not defined in the Bankruptcy Code. However, Professor Countryman's definition of an executory contract as one "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other" has been widely accepted in this and other Circuits. Vernon Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 MINN. L. REV. 439, 460 (1973); *see also COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373 (2d Cir. 2008).

[12] *Rose* is neither binding precedent nor strong authority. It relied on the legislative history of § 365 to support its argument that *ipso facto* clauses should be invalid for all purposes, but failed to explain why legislative history explaining a prohibition on *ipso facto* clauses in executory contracts and unexpired leases should apply to other types of contracts. *See In re Rose*, 21 B.R. at 276. Furthermore, § 365 represented a departure from the treatment of *ipso facto* clauses under the prior Bankruptcy Act, but

12

this Circuit upholding a right to post-petition default interest triggered solely by a debtor's bankruptcy filing. *See In re 20 Bayard Views LLC*, Case No. 09-50723 (Bankr. E.D.N.Y. Aug. 11, 2010);[13] *accord, Katzenstein v. VIII SV5556 (In re Saint Vincent's Catholic Med. Ctrs. of N.Y.)*, 440 B.R. 587, 601-02 (Bankr. S.D.N.Y. 2010). Although *ipso facto* clauses are unenforceable under certain circumstances not applicable here, such clauses are not *per se* invalid in the Second Circuit except where contained in an executory contract or unexpired lease.

There are situations in which courts have declined to enforce a bankruptcy default clause, such as where the clause may impede a debtor's ability to enjoy a "fresh start." *See, e.g., Riggs Nat'l Bank v. Perry*, 729 F.2d 982, 984 (4th Cir. 1984); *see generally*, William J. Burnett, *Prepetition Waivers of the Automatic Stay: Automatic Enforcement Equals Automatic Trouble*, 5 J. BANKR. L. AND PRAC. 257, 283 (Mar./Apr. 1996).[14] However, there are no such concerns in this case. GGP and

_____

the Court failed to explain satisfactorily why Congress singled out only executory contracts and unexpired leases for special treatment under § 365(e)(1) when it could have spoken in broader terms. *See generally*, Richard H. Nowka, *Validating a Debtor's Retention of Collateral by Continuing Performance: Removing the Obstructions of 11 USC § 521(2)(A) and Ipso Facto Clauses*, 6 J. BANKR. L. AND PRAC. 145, 163-70 (Jan./Feb. 1997). *Rose* is also distinguishable on a factual basis from the case at bar because plaintiff's remedy in that case would have allowed the plaintiff to capture equity "over and above the remaining amount due" to plaintiff. *In re Rose*, 21 B.R. at 277. In the instant matter, CRF is not seeking the payment of any sums above and beyond those provided for in the Homart Note.

[13] In its Response, GGP also cites *In re Bowntree, LLC*, 2009 WL 2226107 (Bankr. E.D.N.Y. July 24, 2009) in support of its position and suggests that the Bankruptcy Court in that case denied enforcement of an *ipso facto* clause even though the contract at issue was not an executory contract. *See Response* at ¶ 18. However, *Bowntree* has been distinguished by a subsequent decision in the same district by a different Bankruptcy judge, *see In re 20 Bayard Views LLC*, Case No. 09-50723 (Bankr. E.D.N.Y. Aug. 11, 2010), and, contrary to the Debtors' position, in *20 Bayard Views*, the Court held, in a ruling from the bench, that the "language in Bowntree suggest that there the Court viewed the contract as an executory contract." *See* August 11, 2010, Trial Tr. at 23-24 (Dkt. No. 142). On that basis, the Court held that the *Bowntree* case was distinguishable because the contract at issue in *20 Bayard Views* had not been shown to be an executory contract. Having determined that the contract at issue there was not an executory contract, the Court upheld the relevant *ipso facto* clause. *Id*. at 24.

[14] The author there contends that *ipso facto* clauses are disfavored because they are typically negotiated on behalf of shareholders who do not bear the negative consequences of such clauses post-petition. Rather, in the usual case where the debtor is insolvent, it is the unsecured creditors who bear the cost

13

its affiliated debtors are highly solvent, GGP has confirmed a Plan, and it emerged from bankruptcy months ago. GGP's ability to exercise its right to file for bankruptcy was not impaired, nor was its ability to enjoy a fresh start. *See Century Bank at Broadway v. Peacock (In re Peacock)*, 87 B.R. 657, 659 (Bankr. D. Colo. 1988); *see Taylor v. Albany Emps. Federal Credit Union (In re Taylor)*, 146 B.R. 41, 46–47 (M.D.Ga. 1992), *rev'd on other grounds,* 3 F.3d 1512 (11th Cir. 1993); *In re Saint Vincent's Catholic Med. Ctrs. of N.Y.*, 440 B.R. at 601-02 (enforcing an *ipso facto* clause that triggered the imposition of default interest).

Moreover, imposition of the Default Rate in this case is consistent with § 1123(d), even if not mandated by its terms.[15] *See* Grant T. Stein and Ralph S. Wheatly, *The Impact of Cure and Reinstatement on Default Interest,* 16 AM. BANKR. INST. J. 1, 33 (July/ Aug. 1997). If the interest rate here is determined strictly "in accordance with the underlying agreement and applicable nonbankruptcy law" as provided in § 1123(d), the Default Rate was triggered by GGP's Chapter 11 filing.

---

of a debtor's prior agreement to an *ipso facto* provision, and the debtor has "no particular incentive in negotiating loans to exclude such clauses, and other creditors may have no effective way of forcing the debtor to exclude them." *See*, Burnett, 5 J. BANKR. L. AND PRAC. at 283. Where, as here, the Debtor is solvent, it is the Debtor and equity who bear the burden of having agreed to the *ipso facto* provision in the first instance.

[15] The lead-in clause to § 1123(d) states that its application is "notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7) and 1129(b) of this title . . .." Section 365 is not referenced.

14

## <u>CONCLUSION</u>

For the reasons set forth above, CRF is entitled to post-petition interest on its claim at the contract default rate of 8.95% from the filing of GGP's bankruptcy petition through the Effective Date of the Plan. CRF should settle an order on 5 days' notice.

Dated: New York, New York
      June 16, 2011

                                       */s/ Allan L. Gropper*
                                       UNITED STATES BANKRUPTCY JUDGE