NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------x
In re:

GENERAL GROWTH PROPERTIES, INC., *et al.*,

                                 Reorganized Debtors.

Chapter 11

Case No. 09-11977 (ALG)

(Jointly Administered)

----------------------------------------------------------------------x

## MEMORANDUM OF OPINION

A P P E A R A N C E S:

WEIL, GOTSHAL & MANGES LLP
*Attorneys for the Reorganized Debtors*
767 Fifth Avenue
New York, New York 10153
  By:  Marcia L. Goldstein
       Gary T. Holtzer
       Adam P. Strochak

200 Crescent Court, Suite 300
Dallas, Texas 75201
  By:  Stephen A. Youngman

700 Louisiana Street, Suite 1600
Houston, Texas 77002
  By:  Sylvia A. Mayer

KIRKLAND & ELLIS LLP
*Co-Counsel for the Reorganized Debtors*
300 North LaSalle Street
Chicago, Illinois 60654
  By:  James H.M. Sprayregen
       Anup Sathy

MORRISON & FOERSTER LLP
*Attorneys for Eurohypo AG, New York Branch*
1290 Avenue of the Americas
New York, NY 10104
  By:  Brett H. Miller
       Mark S. Edelstein
       Stefan W. Engelhardt
       Todd M. Goren

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

Eurohypo AG, New York Branch, ("Eurohypo") as the administrative agent for and on behalf of the "2006 Lenders,"[1] has objected to its treatment under the Debtors' Third Amended Joint Plan of Reorganization (the "Plan") (Dkt. No. 6232).[2] The sole issue is whether the 2006 Lenders are entitled to interest on their claim for the post-petition period at the contractual default rate or the non-default rate. For the reasons set forth hereafter and in *In re General Growth Properties, Inc.*, Case No. 09-11977, 2011 WL 2441902 (Bankr. S.D.N.Y. June 16, 2011), which is a companion to the instant matter (the "Companion Case"), the 2006 Lenders are entitled to such interest.

## FACTS

The background facts set forth hereafter are largely taken from a stipulation of facts entered into between the Debtors and Eurohypo (Dkt. No. 6709) and are not in dispute. On February 24, 2006, the 2006 Lenders entered into the Credit Agreement with certain of the Debtors, pursuant to which they made a series of secured loans (the "2006 Loan").[3] Interest on the 2006 Loan was generally payable in arrears on the

---

[1] The "2006 Lenders" consist of the banks and other financial institutions or entities party to the Second Amended and Restated Credit Agreement (the "Credit Agreement"), dated February 24, 2006, between the 2006 Lenders and GGP Limited Partnership ("GGPLP"), General Growth Properties, Inc. ("GGP"), and GGPLP L.L.C. The Credit Agreement was guaranteed by GGP, GGPLP, Rouse LLC, GGP American Properties, Inc. and Caledonian Holding Company, Inc. The Credit Agreement is available as Exhibit A-1 to *GGP's Objection to Eurohypo's Request for Payment of Postpetition Interest at the Default Rate* (Dkt. No. 6530) ("GGP's Objection").

[2] As used herein, the term "Debtors" means those of the Debtors who were liable on the 2006 Loan. With respect to the Debtors, the confirmation order (Dkt. No. 6240) was entered on October 21, 2010 and the Plan became effective on November 9, 2010 (the "Effective Date"). In total, 126 debtors confirmed plans of reorganization on the Effective Date.

[3] The 2006 Loan is secured by properly perfected interests in equity pledges of certain of the Debtors. It is not disputed that the 2006 Lenders are oversecured creditors because the aggregate value of the equity pledges securing the Debtors' obligations under the 2006 Loan exceeds the amount of those

2

relevant Interest Payment Date.[4] On March 9, 17 and 23 and April 9, 2009, the Debtors failed to make certain interest payments required by terms of the 2006 Loan. These constituted potential events of default under the Credit Agreement but did not automatically accelerate the 2006 Loan without further action by Eurohypo. *See* § 8, Credit Agreement.[5] In response to the Debtors' failure to make timely interest payments, Eurohypo delivered interest rate modification notices to the Debtors on April 9, 15 and 21, 2009, which asserted that the operative interest rate under the Credit Agreement would increase from a LIBOR rate to a PRIME-based rate of 3.25% plus a 2% default rate (if applicable), for a total of 5.25%. Eurohypo did not, however, call an event of default or accelerate the 2006 Loan.

The 2006 Lenders and the Debtors also entered into two forbearance and waiver agreements, pursuant to which Eurohypo agreed, subject to certain conditions, not to accelerate the 2006 Loan based upon the defaults specified therein for the duration of such agreement. The parties agree that the forbearance benefitted the Debtors; the Debtors further argue that the 2006 Lenders must have determined that it was in their economic best interest not to accelerate the 2006 Loan because acceleration could have started "the cascade of defaults and cross-defaults" that would have allowed other debt constituencies to take actions adverse to the interests of the 2006 Lenders. *See Debtor's Reply* at ¶ 6. In any event, as of March 15, 2009, all such forbearance and waiver agreements had expired by their own terms. On April

---

obligations, including, to the extent applicable, interest accruing at the default rate under the Credit Agreement.

[4] As such term is defined in the Credit Agreement.

[5] In addition to the failure to make certain interest payments on the 2006 Loan, prior to the Commencement Date the Debtors also defaulted on certain other loan agreements and bond obligations, triggering cross-default provisions in various credit facilities, including the 2006 Loan. These other defaults also did not trigger the automatic acceleration of the 2006 Loan.

3

14, 2009, counsel for Eurohypo sought comments from counsel for the Debtors on a draft letter which, if issued in final form, would have formally terminated Eurohypo's waiver and forbearance and accelerated the 2006 Loan (the "Draft Acceleration Letter"). It is undisputed that the Draft Acceleration Letter was never finalized, and approximately 36 hours later—on April 16, 2009 (the "Commencement Date")—the Debtors filed their Chapter 11 bankruptcy petitions. The terms of § 8(f) of the Credit Agreement provided that the Debtors' filing of voluntary petitions for relief under Chapter 11 of the Bankruptcy Code constituted an automatic and immediate event of default.

In their Plan of Reorganization, the Debtors satisfied the claims of all prepetition creditors in full, or as otherwise agreed to with an individual creditor. Pursuant to § 4.9 of the Plan and § 1124 of the Bankruptcy Code, the claims of the 2006 Lenders were deemed "unimpaired" under the Plan, and on the Effective Date, the Debtors paid the 2006 Lenders (i) all outstanding principal of approximately $2.58 billion; (ii) accrued prepetition and post-petition interest at the contractual *non-default* rate, including compound interest, of approximately $143.3 million; (iii) facility fees and agency fees of approximately $3.6 million; (iv) letter of credit fees of approximately $178,000; (v) cash collateralization of outstanding letters of credit of approximately $3.3 million; and (vi) reimbursement of the fees and expenses of counsel and financial advisors to the 2006 Lenders of approximately $7.49 million. Payment of these amounts did not reflect payment of any interest at the default rate,

but did reduce the sum in dispute to between $85.6 million and $87.4 million plus interest at the per diem rate of $12,573 after February 17, 2011.[6]

## DISCUSSION

In deciding a similar dispute in the Companion Case between the Comptroller of the State of New York, as trustee of the Common Retirement Fund ("CRF"), and GGPLP, this Court found that CRF was entitled to payment of interest at the default rate because (i) the *ipso facto* provision in the relevant note—Article 3(F)—was effective to trigger the Default Rate on the outstanding principal of the note upon the commencement of GGPLP's bankruptcy case without the need for affirmative action by CRF; (ii) 11 U.S.C. § 506(b) provides that an oversecured creditor is entitled to post-petition interest and the Debtors failed to rebut the presumption in favor of applying the contractual default interest rate; and (iii) the Second Circuit case of *Ruskin v. Griffith*, 269 F.2d 827 (2d. Cir 1959), *cert. denied*, 361 U.S. 947 (1960), and its progeny call for the payment of default interest by a solvent debtor, where factors that would make such payment inequitable are absent.

In the instant dispute, the 2006 Loan matured during the pendency of these cases, and the debt could not be reinstated. Thus, those portions of the Companion Case addressing whether a solvent debtor must pay default interest in order to reinstate a debt and effect a cure—and the effect of §§ 1124(2) and 1123(d) of the Bankruptcy Code—are not directly relevant here. However, the rest of the decision in the Companion Case is relevant to, and controls the resolution of, the instant dispute.

---

[6] In GGP's Objection, the Debtors assert that the amount of default interest in question is approximately $85.6 million. In Eurohypo's response, it contends that the 2006 Lenders are entitled to default interest in the amount of $87,409,857 plus interest at the per diem rate of $12,573 after February 17, 2011.

No extended discussion is required with respect to the applicability of the presumption in favor of enforcing the default interest rate agreed by the parties where the creditor is oversecured, the rate is both reasonable and not a penalty and, most importantly, the debtor is solvent. *See Ruskin v. Griffith*, 269 F.2d 827, which enforced a reasonable default rate against a solvent debtor.

The Debtors' primary argument is that the 2006 Lenders are not entitled to interest at the Default Rate because the 2006 Loan was never properly accelerated. *See, e.g., GGP's Objection* at ¶ 20. The Debtors recognize that § 8(f) of the Credit Agreement provided for the automatic acceleration of the loan and imposition of the Default Rate on the outstanding principal upon the commencement of a bankruptcy case without the need for any further action on the part of the 2006 Lenders. Like the promissory note at issue in the Companion Case, the Credit Agreement here contains a clause providing that, among other things, the voluntary commencement of a bankruptcy case by any of the Debtors constitutes an event of default. *See* § 8(f), Credit Agreement. In contrast to other events of default in § 8 of the Credit Agreement, subsection (f) provides that an event of default premised on the commencement of a voluntary bankruptcy case occurs automatically and without any requirement that Eurohypo "call" the default by providing notice to any party. *See id*. Upon the occurrence of an event of default, the Credit Agreement provides that the 2006 Lenders are entitled to a 2% increase in the rate of interest owed on the balance of the unpaid principal of each outstanding loan, for a total of 5.25% (the "Default Rate"). *See* § 2.15(d), Credit Agreement. There is no dispute that the Default Rate, as

6

a standalone figure, is not disproportionately higher than the non-default rate contained in the Credit Agreement. *See GGP's Objection* at ¶ 37.

However, as they argued in the Companion Case with respect to Article 3(F) of the note at issue there, the Debtors contend here that the 2006 Loan could not be accelerated without post-petition, affirmative action by Eurohypo, and that any such action was barred by the automatic stay. This Court found in the Companion Case that Congress did not expressly invalidate *ipso facto* clauses except in executory contracts and unexpired leases, and that the loan agreements at issue there could not be characterized as either. Further, this Court found that the reasons that many courts have found for invalidating default interest rates were not present—for example, payment of default interest would not impair the Debtors' fresh start nor would it deprive the Debtors of the benefits accruing from their Chapter 11 filings.

Notwithstanding the Debtors' argument that the 2006 Lenders should not receive default interest because they could have, but did not, accelerate the 2006 Loan prepetition, this case calls for the same result. This case is a good example of the reasons for enforcing reasonable contractual provisions in loan agreements that automatically impose a default interest rate upon a bankruptcy filing. Failure to enforce such clauses would deter lenders from withholding a notice of acceleration, where the notice would trigger cross-defaults and force the borrower into an unnecessary insolvency proceeding. Creditors such as the 2006 Lenders should not be encouraged to accelerate debt prepetition so as to be certain that the default interest rate would be applicable in the event of a bankruptcy filing.

In this case, the parties dispute certain of the implications relating to the forbearance and waiver agreements they entered into prior to the Commencement Date, and they dispute whether the Draft Acceleration Letter and the interest rate modification notices were sufficient to trigger imposition of the default interest rate under the Credit Agreement. However, there can be no dispute that efforts were made to avoid creditor action that might have forced the Debtors into an unnecessary, free-fall bankruptcy case, eliminating the possibility of an out-of-court workout.[7] The Debtors would penalize the 2006 Lenders for attempting to negotiate a consensual resolution, but neither the Credit Agreement nor the Bankruptcy Code provides such a penalty. For the reasons set forth in the Companion Case, we find that § 8(f) of the Credit Agreement was effective to accelerate the 2006 Loan without the need for any affirmative action by Eurohypo.[8]

Having found that the 2006 Loan was accelerated, we now turn to the question of the appropriate interest rate. As discussed in the Companion Case, 11 U.S.C. § 506(b) requires payment of post-petition interest to an oversecured creditor such as

---

[7] Moreover, as the Second Circuit said in *Ruskin v. Griffiths*, 269 F.2d at 832, if creditors could not rely on timely enforcement of a default interest clause, they would have "to anticipate a possible loss in the value of the loan . . . [and] exact a higher uniform interest rate for the full life of the loan."

[8] Even if the *ipso facto* provision were not effective to accelerate the 2006 Loan without post-petition action by Eurohypo, the 2006 Loan matured by its terms on February 24, 2010, approximately 10 months after the Commencement Date, which triggered the imposition of a default interest rate from that date forward. *See, e.g.*, *In re Liberty Warehouse Assoc. Ltd.*, 220 B.R. 546, 550-52 (Bankr. S.D.N.Y. 1998); *In re Route One West Windsor Ltd.*, 225 B.R. 76, 85-91 (Bankr. D.N.J. 1998). The Debtors contend that, pursuant to 11 U.S.C. § 502(b), the 2006 Lenders' claim must be determined as of the Commencement Date, and they imply that the 2006 Loan was not in default even after its maturity date, but any such argument is without merit, as it would prohibit the payment of post-petition default interest under every circumstance.

Moreover, the Debtors wholly fail to account for 11 U.S.C. § 1124(1), which provides that a claim is impaired under a plan unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitled the holder of such claim or interest." Section 2.15(d) of the Credit Agreement provides that if any portion of the 2006 Loan is not "paid when due (whether at the stated maturity, by acceleration or otherwise)" default rate interest is due. The Plan treats the 2006 Lenders as unimpaired and under the terms of the Credit Agreement, the 2006 Lenders would not be so treated unless they received interest at the Default Rate subsequent to the maturity date of the Credit Agreement by its own terms.

8

Eurohypo and a rebuttable presumption exists favoring the payment of such interest at the contractual rate. Courts in this and other circuits have been reluctant to modify private contractual arrangements imposing default interest rates—particularly in cases involving a solvent debtor—except where: (i) there has been creditor misconduct; (ii) application of the contractual interest rate would cause harm to unsecured creditors; (iii) the contractual interest rate constitutes a penalty; or (iv) its application would impair the debtor's fresh start. *See In re P.G. Realty Co.*, 220 B.R. 773, 780 (Bankr. E.D.N.Y. 1998); *see also, In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006) (holding that "in solvent debtor cases, rather than considering equitable principles, courts have generally confined themselves to determining and enforcing whatever pre-petition rights a given creditor has against the debtor."); *Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*, 160 F.3d 1054, 1060 (5th Cir. 1998); *In re 139-141 Owners Corp.*, 313 B.R. 364, 368 (S.D.N.Y. 2004); *In re Payless Cashways, Inc.*, 287 B.R. 482, 489 (Bankr. W.D. Mo. 2002); *cf. Matter of Chicago, Milwaukee, St. Paul and Pacific R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986) (holding that "if the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights"). The instant case has none of the factors that have justified imposition of an interest rate lower than default rate. The Debtors have stipulated that, as a stand-alone rate, the Default Rate is not a penalty, and they have not alleged any misconduct by the 2006 Lenders. Finally, payment of default interest would neither inflict harm on other unsecured creditors nor impair the Debtors' fresh start because the Debtors were

exceedingly solvent when they emerged from bankruptcy. *See Ruskin v. Griffiths*, *supra*.

## **CONCLUSION**

For the reasons set forth above and in the Companion Case, the 2006 Lenders are entitled to post-petition interest at the contract default rate of 5.25%. Eurohypo should settle an order on five days' notice; if the parties cannot agree on the amount of interest due, detailed interest calculations should be submitted.

Dated: New York, New York
       July 20, 2011

                                            */s/ Allan L. Gropper*
                                            UNITED STATES BANKRUPTCY JUDGE